Brett D. Jaffe
bjaffe@cohengresser.com
Scott D. Thomson
sthomson@cohengresser.com
**COHEN & GRESSER LLP**
800 Third Avenue
New York, New York 10022
Telephone: (212) 957-7600
Facsimile: (212) 957-4514
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------X

ATLANTICA HOLDINGS, INC., BALTICA
INVESTMENT HOLDING, INC., BLU FUNDS,
INC., Allan KIBLISKY, Anthony KIBLISKY, and
Jacques GLIKSBERG,

                    *Plaintiffs*,

        – against –

BTA BANK JSC,

                *Defendant*.

: 13 CV 5790 (JMF),
: rel. 12 CV 8852 (JMF)
:
: **ECF CASE**
:
: **JURY TRIAL DEMANDED**
:
: **AMENDED COMPLAINT**

---------------------------------------------X

      Plaintiffs Atlantica Holdings, Inc., Baltica Investment Holding, Inc., Blu Funds Inc.,

Allan Kiblisky, Anthony Kiblisky, and Jacques Gliksberg (collectively, "Plaintiffs"), as and for

their Complaint against BTA Bank JSC ("Defendant" or "BTA Bank"), allege based on

knowledge as to their own individual conduct and information and belief as to the conduct of

others, as follows:

## INTRODUCTION

      1.    This action arises from a massive scheme orchestrated by BTA Bank and its

controlling shareholder, Sovereign Wealth Fund "Samruk-Kazyna" JSC, also known as

"National Welfare Fund 'Samruk-Kazyna'" ("S-K Fund"), to induce Plaintiffs and other creditors of BTA Bank to acquire subordinated debt securities as part of a corporate debt restructuring of BTA Bank that began in April 2009 and was finalized in approximately August 2010 (the "2010 Restructuring"), and thereafter to purchase tens of millions of dollars of additional subordinated debt securities issued by BTA Bank.

2.      The 2010 Restructuring was carried out pursuant to an information memorandum issued by BTA Bank and distributed to existing creditors of BTA Bank, as well as potential purchasers of BTA Bank securities to be issued as part of the 2010 Restructuring (the "Information Memorandum").  The Information Memorandum, which expressly incorporated a deed of undertaking executed by S-K Fund (the "Deed of Undertaking"), painted a misleadingly optimistic picture of BTA Bank's prospects following the 2010 Restructuring.  Among other things, the Information Memorandum lauded BTA Bank's ability to attract new capital from depositors, due to its purportedly improved financial position as a result of the 2010 Restructuring.

3.      Most critically, the Information Memorandum and Deed of Undertaking emphasized that S-K Fund – whose equity ownership of BTA Bank would increase from approximately 75% to approximately 81% as a result of the 2010 Restructuring – had agreed, with very limited exceptions, to accept no dividends or distributions from BTA bank.

4.      The Information Memorandum was false and misleading, and/or contained material omissions, because – unbeknownst to Plaintiffs and concealed in the Information Memorandum –BTA Bank and S-K Fund had devised a scheme to circumvent the express restriction on dividends to which S-K fund purportedly agreed.  The scheme had several parts. BTA Bank was directed to purchase S-K Fund bonds (the "S-K Bonds") that paid the bank an

effective interest rate of just 2%.  At the same time BTA Bank paid S-K Fund interest on its deposits at an exorbitant above-market rate of approximately 10% per annum.  At S-K Fund's direction, BTA Bank also entered into a repo arrangement with the National Bank of Kazakhstan ("NBK"), collateralized by the S-K Bonds, that required it to pay 7% interest.  The resulting annual "negative carry" of approximately $280 million (Kazakhstan tenge ("KZT") 42 billion) doomed any hope for a successful restructuring from the outset.

5.      This undisclosed scheme has resulted in net interest payments of more than KZT 45 billion ($300 million) since the 2010 Restructuring, yet in the Information Memorandum, BTA Bank falsely and misleadingly disclosed that for the most recent period for which results were available, it had *earned* approximately KZT 20 billion ($137 million) in interest on the S-K Bonds and paid approximately KZT 4 billion ($28 million) in interest to "shareholders" on their deposits.  These disclosures – all false and misleading when made – created the false impression that BTA Bank's relationship with S-K Fund was and would be profitable rather than a drain on BTA Bank's assets that would make failure of the 2010 Restructuring inevitable.

6.      As a result of these false and misleading statements and material omissions, set forth in detail below, BTA Bank has violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

7.      This action is related to a case previously commenced in this Court on December 5, 2012 against S-K Fund, BTA Bank's dominant shareholder, arising out of many of the same misstatements and omissions described in this Complaint.  *See Atlantica Holdings Inc. v. Sovereign Wealthy Fund "Samruk-Kazyna" JSC*, No. 12 CV 8852 (JMF) (S.D.N.Y.) (the "S-K Fund Litigation").  BTA Bank was not named as a defendant in the S-K Fund Litigation because, at the time the S-K Fund Litigation was commenced, BTA Bank was the debtor in a Chapter 15

bankruptcy case pending in the United States Bankruptcy Court for the Southern District of New York.  *See In re "BTA Bank" JSC,* Case No. 12-13081 (JMP) (Bankr. S.D.N.Y. terminated July 17, 2013).  BTA Bank's bankruptcy was discharged on July 17, 2013, permitting Plaintiff to bring the instant Complaint against BTA Bank.

PARTIES AND RELEVANT NON-PARTIES

8.      Plaintiff Atlantica Holdings, Inc. ("Atlantica") is a corporation formed under the laws of the Republic of Panama.  Atlantica acquired its initial investment in BTA Bank subordinated debt in connection with the 2010 Restructuring and in reliance on the Information Memorandum.  Atlantica unconditionally communicated its commitment to participate in the 2010 Restructuring by sending its completed "Electronic Instruction Form" to its broker in the Miami, Florida, office of UBS Financial Services, and thereby incurred irrevocable liability to accept the subordinated debt in the 2010 Restructuring in the United States.  Thereafter, Atlantica purchased additional subordinated debt of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in reliance on the Information Memorandum and certain other false and misleading statements described herein.  These purchases were made through off-exchange transfers of beneficial interest on the books of UBS, which was a "Direct Participant" in the 2010 Restructuring.  It made each of these purchases by placing orders with its broker in the Miami, Florida, office of UBS Financial Services.  UBS Financial Services then transmitted the order to its U.S. broker-dealer, where funds from a bank account Atlantica maintained at the UBS Miami office were transferred to UBS's back office in Stamford, Connecticut, where the order was filled and the transaction was completed.  Therefore, Atlantica incurred irrevocable liability to pay for the securities at issue in the United States.

9.      Plaintiff Baltica Investment Holding, Inc. ("Baltica") is a corporation formed under the laws of the Republic of Panama.  Baltica acquired its initial investment in BTA Bank

subordinated debt in connection with the 2010 Restructuring and in reliance on the Information Memorandum.  Baltica unconditionally communicated its commitment to participate in the 2010 Restructuring by sending its completed Electronic Instruction Form to its broker in the Miami, Florida, office of UBS Financial Services, and thereby incurred irrevocable liability to accept the subordinated debt in the 2010 Restructuring in the United States.  Thereafter, Baltica purchased additional subordinated debt of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in reliance on the Information Memorandum and certain other false and misleading statements described herein.  These purchases were made through off-exchange transfers of beneficial interest on the books of UBS, which was a "Direct Participant" in the 2010 Restructuring.  It made each of these purchases by placing an order with its broker in the Miami, Florida, office of UBS Financial Services.  UBS Financial Services then transmitted the order to its U.S. broker-dealer, where funds from a bank account Baltica maintained at the UBS Miami office bank were transferred to UBS's back office in Stamford, Connecticut, where the order was filled and the transaction was completed.  Therefore, Baltica incurred irrevocable liability to pay for the securities at issue in the United States.

10.     Plaintiff Blu Funds, Inc. ("Blu Funds") is a corporation formed under the laws of the Republic of Panama.  After the 2010 Restructuring, Blu Funds purchased subordinated debt of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in reliance on the Information Memorandum.  These purchases were made through off-exchange transfers of beneficial interest on the books of UBS, which was a "Direct Participant" in the 2010 Restructuring.  It made each purchase by placing an order with its broker in the Miami, Florida, office of UBS Financial Services.  UBS Financial Services then transmitted the order to its U.S. broker-dealer, where funds from a bank account Blu Funds maintained at the UBS Miami office

were transferred to UBS's back office in Stamford, Connecticut, where the order was filled and the transaction was completed.  Therefore, Blu Funds incurred irrevocable liability to pay for the securities at issue in the United States.

11. Plaintiff Allan Kiblisky resides in Miami, Florida.  After the 2010 Restructuring, Allan Kiblisky purchased subordinated debt of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in reliance on the Information Memorandum and certain other false and misleading statements described herein.  His purchases were made through off-exchange transfers of beneficial interest on the books of UBS, which was a "Direct Participant" in the 2010 Restructuring.  He made each purchase by placing an order with his broker in the Miami, Florida, office of UBS Financial Services.  UBS Financial Services then transmitted the order to its U.S. broker-dealer, where funds from a bank account Allan Kiblisky maintained at the UBS Miami office were transferred to UBS's back office in Stamford, Connecticut, where the order was filled and the transaction was completed.  Therefore, Allan Kiblisky incurred irrevocable liability to pay for the securities at issue in the United States.

12. Plaintiff Anthony Kiblisky resides in Miami, Florida.  After the 2010 Restructuring, Anthony Kiblisky purchased subordinated debt of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in reliance on the Information Memorandum and certain other false and misleading statements described herein.  His purchases were made through off-exchange transfers of beneficial interest on the books of UBS, which was a "Direct Participant" in the 2010 Restructuring.  He made each purchase by placing an order with his broker in the Miami, Florida, office of UBS Financial Services.  UBS Financial Services then transmitted the order to its U.S. broker-dealer, where funds from a bank account Anthony Kiblisky maintained at the UBS Miami office were transferred to UBS's back office in Stamford,

Connecticut, where the order was filled and the transaction was completed.  Therefore, Anthony Kiblisky incurred irrevocable liability to pay for the securities at issue in the United States.

13.     Plaintiff Jacques Gliksberg ("Gliksberg") resides in Highland Park, Illinois.  After the 2010 Restructuring, Gliksberg purchased subordinated debt of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in reliance on the Information Memorandum and certain other false and misleading statements described herein.  His purchases were made through off-exchange transfers of beneficial interest on the books of UBS, which was a "Direct Participant" in the 2010 Restructuring.  He made each purchase by placing orders with his broker in the Miami, Florida, office of UBS Financial Services.  UBS Financial Services then transmitted the order to its U.S. broker-dealer, where funds from a bank account Gliksberg maintained at the UBS Miami office were transferred to UBS's back office in Stamford, Connecticut, where the order was filled and the transaction was completed.  Therefore, Gliksberg incurred irrevocable liability to pay for the securities at issue in the United States.

14.     Annexed hereto as Exhibit A is a chart showing the date and amount of each Plaintiff's investment in the subordinated debt of BTA Bank.

15.     Defendant BTA Bank is a joint-stock company organized under the laws of the Republic of Kazakhstan.  It was formed in 1997 by decree of the Republic of Kazakhstan as a combination of two predecessor institutions, Turanbank Joint-Stock Bank and Alem Bank Kazakhstan.  As a result of the scheme described in this Complaint, BTA Bank was forced to undergo a second restructuring (the "2012 Restructuring").

16.     In connection with the 2012 Restructuring, on July 16, 2012, BTA Bank filed a petition under Chapter 15 of the Bankruptcy Code in the United States Bankruptcy Court of the Southern District of New York to protect itself from creditors in the United States, including

holders of BTA Bank's debt securities.  On July 17, 2013, the Court entered an order of relief

closing BTA Bank's bankruptcy case, allowing creditors in the United States, including holders

of BTA Bank's debt securities, to bring legal action against BTA Bank in the United States for

all claims that had not expired as of July 16, 2012 (the date BTA Bank filed the bankruptcy

petition).  The Court's order incorporated the terms of the "Termination Order" entered by the

Kazakh court, which closed BTA Bank's parallel bankruptcy proceedings in Kazakhstan.  While

releasing BTA Bank from certain claims arising out of pre-bankruptcy conduct, the "Termination

Order" expressly excludes a release of any fraud-related claims against BTA Bank.

17.     S-K Fund is a sovereign wealth fund formed under the laws of the Republic of

Kazakhstan and owned entirely by the Republic of Kazakhstan.  It was founded in 2008

following a merger of two predecessor funds, Kazakhstan Holding for the Management of State

Assets "Samruk" and "Kazyna" Sustainable Development Fund.  According to a press release

issued by the Fund, it controls more than 500 companies "in the key areas of the national

economy," including oil and gas, mining, chemicals, transport and communication, electricity,

and banking.  S-K Fund describes itself as an "active business model" that "thinks about the

competitiveness of companies in…market principles."

### JURISDICTION AND VENUE

18.     The Court has jurisdiction over the Plaintiffs' claims arising under the Exchange

Act pursuant to 28 U.S.C. § 1331, as well as Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     The statute of limitations for the claims asserted herein were tolled pursuant to the

provisions of 11 U.S.C. § 108, and Plaintiffs have commenced this action within 30 days of the

discharge of BTA Bank's bankruptcy case and the termination of the automatic stay.

20.     To the extent BTA Bank is the instrumentality of a foreign sovereign entity as defined in 28 U.S.C. § 1605, BTA Bank expressly waived sovereign immunity in connection with the 2010 Restructuring:

> To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, ***the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity*** to the full extent permitted by the laws of such jurisdiction.

Information Memorandum at 601(emphasis added).  In addition to this express waiver, BTA Banks's conduct as alleged in this Complaint constitutes commercial activity for which BTA Bank is not immune pursuant to 28 U.S.C. §1605(a).

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Defendant directed misstatements and omissions – and knowingly assisted and participated in BTA Bank's omissions and transmissions of misstatements – towards Plaintiffs and their agents in this District.  Defendant knew that its public representations in the Information Memorandum regarding its financial condition would be disseminated throughout the United States, and especially in this District, which is widely recognized as a hub of the global financial markets.

22.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because substantial acts in furtherance of the alleged fraud and of its effects have occurred within this District.  Specifically, Defendant offered securities for sale in this District, and payments on those securities were made and were to be made in this District.  Defendant also directed misstatements and omissions towards purchasers of its securities within this District.

23.     In the alternative, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3), because Defendant is subject to this Court's personal jurisdiction.

24.      In connection with the acts alleged herein, Defendant used the means and instrumentalities of interstate commerce, including but not limited to the United States mails and interstate and international telecommunications networks.

## FACTUAL ALLEGATIONS

### Background to the 2010 Restructuring

25.      Defendant BTA Bank is one of Kazakhstan's largest banking institutions.  BTA Bank has an international presence, with offices in the Russian Federation, United Arab Emirates, Great Britain and China.  BTA Bank offers a range of traditional corporate and retail banking products and services to its customers.

26.      Prior to the 2010 Restructuring, several Plaintiffs purchased debt securities issued by BTA Bank.

27.      On February 3, 2009, S-K Fund invested KZT 212 billion (approximately $1.5 billion) in BTA Bank, receiving a 75.1% stake in the common stock of BTA Bank in exchange. That same day, an S-K Fund representative was appointed to BTA Bank's Management Board.

28.      In April 2009, BTA Bank announced that it had ceased payment of principal on all outstanding BTA Bank financial obligations.

29.      Thereafter, BTA Bank, at the direction of its controlling shareholder, S-K Fund, undertook to restructure BTA Bank's debt and overall capital structure.  The product of that effort was the 2010 Restructuring.

30.      In support of the 2010 Restructuring, BTA Bank distributed the Information Memorandum to BTA Bank's existing creditors, including Plaintiffs Atlantica and Baltica, as well as to potential investors.  The Information Memorandum was mailed directly to Plaintiffs' brokers at the UBS Miami Office.  At all relevant times, BTA Bank also made the Information Memorandum available to creditors and potential investors on its website.

31.     BTA Bank represented that the Information Memorandum comprehensively detailed the terms of the 2010 Restructuring, and the intended effect of the 2010 Restructuring on BTA Bank's future operations.

32.     On May 28, 2010, in reliance upon the Information Memorandum, BTA Bank's creditors, including Plaintiffs Atlantica and Baltica, approved the terms of the 2010 Restructuring as presented by BTA Bank.

33.     Under the terms of the 2010 Restructuring, S-K Fund received additional equity in BTA Bank; following completion of the 2010 Restructuring S-K Fund owned more than 80% of the common stock of BTA Bank.

34.     In accordance with the terms of the 2010 Restructuring, BTA Bank issued equity and debt securities to pre-restructuring holders of its debt.  In the United States, BTA Bank issued, *inter alia*, the Subordinated Notes in an exempt offering.

35.     Eighty per cent of the securities issued in connection with the 2010 Restructuring were denominated in U.S. dollars.  According to a presentation prepared by BTA Bank for foreign investors, at least 17% of the dollar-denominated Subordinated Notes issued in the 2010 Restructuring were purchased by investors in the United States.

36.     In reliance on the Information Memorandum, Atlantica and Baltica accepted Subordinated Notes in exchange for their prior interest as creditors of BTA Bank.  Atlantica and Baltica communicated their commitment to participate in the 2010 Restructuring by sending their completed "Electronic Instruction Forms" to their broker in the UBS Miami Office.  The Electronic Instruction Form provided in part:

> **Electronic Instruction Form from Beneficial Owners . . . shall be irrevocable** *provided, however, that* in the event that the Bank, in its sole discretion, amends, terminates or with draws the Restructuring Plan . . . in a manner that is materially adverse to affected Euronoteholders in the opinion of the Trustee,

> Euronoteholders shall be permitted, subject to the conditions set out herein, to revoke any *Electronic Instruction Forms* delivered in relation thereto for a period of **two days**.

(italics in original, bold added).

37.     Resale of the Subordinated Notes to certain qualified purchasers in the United States, including Plaintiffs, was permitted pursuant to United States Securities and Exchange Commission Rule 144A (the "Rule 144A Offering").

38.     To facilitate such transfers of the Subordinated Notes in the secondary market in the United States, the 2010 Restructuring provided that the Subordinated Notes could be transferred in private, off-exchange transactions.  BTA Bank has admitted that the Subordinated Notes could be bought and sold in private transactions not conducted on any foreign securities exchange:

> Of course, an interest in the New Notes could also be transferred on the books of a Direct Participant or on the books of a third party holding a beneficial interest in the New Notes through a Direct Participant.

Declaration of Francis Fitzherbert-Brockholes in Support of the Motion to Dismiss or Stay in Favor of Arbitration dated April 22, 2014 at ¶ 27.

39.     In reliance on the misrepresentations contained in the Information Memorandum, each of the Plaintiffs purchased Subordinated Notes (i) as part of the Restructuring, in exchange for their previous interest as creditors of BTA Bank and/or (ii) in private, off-exchange transactions in the United States whereby interests in the Subordinated Notes were exchanged on the books of a Direct Participant or a third party holding a beneficial interest in the Subordinated Notes through a Direct Participant.  Each Plaintiff's respective purchases are further explained in paragraphs 8-14, *supra*.

BTA Bank and S-K Fund Devise the Negative Carry Swap to
Funnel Cash to S-K Fund

40.      The Information Memorandum incorporated by reference a Deed of Undertaking

executed by S-K Fund in favor of all creditors participating in the 2010 Restructuring.  This

Deed of Undertaking contained a number of materially false and misleading misstatements.

Most significantly, the Information Memorandum stated that "[n]o dividend other than a

Permitted Dividend shall be paid on the Shares," in BTA Bank held by S-K Fund.

41.      The term "Permitted Dividend" was defined in the Information Memorandum to

include only "a dividend or distribution by the Bank to its Shareholders:  (a) at any time after the

New Notes [a collective term for all the securities issued pursuant to the 2010 Restructuring,

including the Subordinated Notes] have been irrevocably repaid in full; (b) at any time after the

New Notes have been irrevocably repaid in full *provided that* [certain conditions would have

been met], or (c) at any time after the date falling seven years after the Restructuring date

*provided that* [certain other conditions would have been met]."  None of these restrictions were

satisfied at any point after the 2010 Restructuring, yet during the 2010 Restructuring, S-K Fund

used its position as the controlling shareholder to extract the equivalent of an impermissible

dividend from BTA Bank.

42.      The Deed of Undertaking was executed "in favour of the Restructuring Creditors

(and, for the avoidance of doubt, their direct or indirect transferees) and the New Notes

Trustees."  Therefore, Defendant and S-K Fund were aware of and intended that their

undertakings and representations would be relied upon by potential purchasers of the securities

issued in connection with the 2010 Restructuring.

43.      But wholly undisclosed in the Information Memorandum was that the real

purpose of the 2010 Restructuring was to enable S-K Fund to siphon hundreds of millions of

dollars from BTA Bank at the expense of BTA Bank's other creditors including those, like several of the plaintiffs, who already saw their debt position significantly reduced in connection with the 2010 Restructuring.  Specifically, under the terms of the 2010 Restructuring, BTA Bank was directed to purchase KZT 645 billion ($4.3 billion) of S-K Bonds paying a nominal return of 4% per year to BTA Bank.  BTA Bank also was required to pay 2% on this sum in exchange for a guarantee from the S-K Fund (the S-K Guarantee"), so that the effective interest rate on the S-K Bonds was only 2%.  This minimal return was more than offset by two extremely unfavorable related transactions.  Shortly before the 2010 Restructuring, S-K Fund deposited KZT 245 billion ($1.6 billion) with BTA Bank (the "S-K Deposit").  The S-K Deposit earned variable but extremely high rates of interest, reaching 10.9%.  In addition, BTA Bank entered into a repo transaction with NBK on approximately KZT 400 billion ($2.7 billion) that required it to pay 7% interest to the national bank.  The net result of this arrangement (the "Negative Carry Swap") was that S-K Fund received interest from BTA Bank on its deposits far above market rates in the period following the 2010 Restructuring, while BTA Bank received minimal interest payments from S-K Fund.  This Negative Carry Swap resulted in material declines in BTA Bank's cash flow.

44.     During and after the 2010 Restructuring, BTA Bank knew of the Negative Carry Swap, and was specifically aware of the strongly negative impact that this arrangement had on its cash flow after the 2010 Restructuring.

45.     Additional disclosures in the Information Memorandum were false and misleading in that they further obscured the Negative Carry Swap and the deleterious effect of that transaction on BTA Bank's cash flow and prospects.  The Information Memorandum stated that as of September 30, 2009, BTA Bank's interest income on the S-K Bonds for the nine

months' prior was KZT 20,502,000,000 ($137 million), and that its interest expense on amounts

due to customers (principally S-K Fund) for the nine months' prior was KZT 4,214,000,000 ($28

million).  This misstatement was misleading because, as discussed above with respect to the

Negative Carry Swap, at the time that the 2010 Restructuring was approved, interest expenses

due to S-K Fund far exceeded interest income received from S-K Fund.

46.     In addition, the Information Memorandum falsely and misleadingly disclosed that

"current accounts generally bear no interest," when in fact S-K Fund had current account

deposits in excess of KZT 245 billion with BTA Bank, and was receiving interest payments as

high as 10.9%.  On an annual basis, Defendant paid approximately KZT 68 billion ($453

million) in interest on S-K deposits, the S-K Guarantee, and the NBK repo transaction, while

receiving only KZT 26 billion ($173 million) in bond interest payments from S-K Fund,

resulting in an annual negative carry of KZT 42 billion ($280 million).

47.     The misstatements contained in the Information Memorandum described above

were false and misleading because they were intended to create and did create the false

impression that the 2010 Restructuring would preserve BTA Bank's status as a going concern

and its ability to make future payments on its debt obligations.  BTA Bank knew that the 2010

Restructuring was only a temporary fix and that under any realistic projection of its future cash

flows, an additional restructuring would be necessary, BTA Bank intentionally concealed these

facts during the 2010 Restructuring to enable S-K Fund to obtain hundreds of millions of dollars

from the Negative Carry Swap at the expense of its creditors, including Plaintiffs.

48.     Defendant was motivated to negotiate terms favorable to S-K Fund in the 2010

Restructuring that appeared fair to its creditors and potential investors, but in fact concealed that

it would pay extraordinary interest payments after the 2010 Restructuring, particularly from the

Negative Carry Swap.  Omitting information about the Negative Carry Swap from the Information Memorandum, and misrepresenting its relationship with S-K Fund as one intended to "maximiz[e] long term value and increas[e] [BTA Bank's] competitiveness . . . in world markets," improved the appearance of BTA Bank as a going concern, thereby increasing the likelihood that creditors would approve the 2010 Restructuring and that potential investors, including Plaintiffs, would purchase Subordinated Notes.  This allowed Defendant to continue to provide S-K Fund with a steady flow of funds.

49.     Prior to acquiring or purchasing the Subordinated Notes, Plaintiffs (or the agents of the Plaintiffs) read and relied on the Information Memorandum and the S-K Undertaking.

50.     Information about the Negative Carry Swap began to be leaked to the marketplace in or about May 2011.  Defendant issued a set of PowerPoint slides entitled the "Investor Call Presentation" on May 17, 2011, in which it disclosed on page 24 of a 24-page presentation that one of the outstanding issues that needed to be addressed was "negative carry."  Even then, however, BTA Bank disclosed in writing only that its yield on all assets averaged 5.5% while its average cost for all liabilities was 8.6% – but it did not disclose that the driving force behind its overall negative carry was the Negative Carry Swap.

51.     The following day, May 18, 2011, J.P. Morgan published a research report providing limited additional details concerning the Negative Carry Swap.  Specifically, J.P. Morgan reported that on a conference call with investors on May 17, 2011, BTA Bank disclosed that the average interest rate on deposits held by the S-K Fund was 9.8%, which was significantly higher than the interest rate BTA Bank earned on its assets.

52.     In response to these disclosures, the price of BTA Bank debt, including the Subordinated Notes, dropped significantly.  The Subordinated Notes, which had been trading for

approximately 70% of face value prior to the May 17 and 18 disclosures, immediately fell to less than 60% of face value and continued their downward slide to approximately 40% of face value by the end of June 2011 and to less than 10% of face value by January 2012.

The Information Memorandum Contains Additional Material
Misstatements and Omissions

53.     While Plaintiffs relied on the Information Memorandum in connection with their acquisition of the Subordinated Notes as part in the course of the 2010 Restructuring and in post-restructuring secondary market purchases, they did so without knowledge of a number of material misstatements and omissions in the Information Memorandum.

54.     The Information Memorandum contained a number of material misstatements concerning Defendant's post-restructuring prospects, and the role that S-K Fund would play in ensuring BTA Bank's future viability that went far beyond misrepresentations and omissions about the Negative Carry Swap.  Among other things, the Information Memorandum expressly represented that:

a.     "The Bank believes that the Restructuring will allow the Bank to continue as a going concern."

b.     "The Bank expects that the necessary levels of capital ratios will be achieved following the successful completion of the Restructuring by virtue of the economic gain it will achieve from the reduction of the principal amount of the Bank's indebtedness, conversion of certain debt into Shares and *liquidity support to be provided by [S-K Fund]*." (emphasis added).

c.      "[S-K Fund's] primary objective is to manage [BTA Bank] with *a goal of*

*maximizing long term value* and increasing competitiveness of such legal

entities in world markets."  (emphasis added).

55.      Each of these statements was false and, at the time they were made, BTA Bank

knew they were false.  Contrary to the representations made in the Information Memorandum,

BTA Bank knew that the 2010 Restructuring would doom BTA Bank to failure, enriching S-K

Fund – BTA Bank's dominant shareholder – at the expense of Plaintiffs and other BTA Bank

creditors.

56.      Plaintiffs relied on these false and misleading statements contained in the

Information Memorandum in connection with their decision to purchase the Subordinated Notes.

<u>BTA Bank Fails to Disclose Material Information and Makes</u>
<u>Additional False and Misleading Statements in 2012</u>

57.      BTA Bank defaulted on its debt obligations in January 2012 (less than 18 months

after the 2010 Restructuring was finalized), for the first time signaling that it might be unable to

continue as a going concern and that it would not be able to satisfy its debt obligations.  BTA

Bank underwent another restructuring in 2012 (the "2012 Restructuring").  As a result of the

2012 Restructuring, S-K Fund became the 97 percent owner of BTA Bank.

58.      Following BTA Bank's default on its debt obligations, certain of the Plaintiffs

purchased additional Subordinated Notes in the first quarter of 2012.  Those purchases were

made based upon an examination of BTA Bank's reported balance sheet and other financial

information, and an analysis of the value of the Subordinated Notes in the event of a second

restructuring or a liquidation.

59.      Throughout this time period, however, Defendant misrepresented critical financial

information to Plaintiffs and other investors and potential investors.  Most significantly, BTA

Bank misrepresented the impact "Recovery Units" issued in connection with the 2010
Restructuring could have on its total liquidation.

60.     The purpose of the Recovery Units, issued to various creditors in connection with
the 2010 Restructuring, was to provide those creditors an interest in BTA Bank's efforts to
recover approximately $10 billion in BTA Bank assets unlawfully diverted from BTA Bank by
BTA Bank's former management prior to the 2010 Restructuring.  Under the terms of the
Recovery Units, holders of the Recovery Units and BTA Bank would each be entitled to 50% of
all funds recovered (net of expenses) from BTA Bank's previous management.

61.     Additionally, the Recovery Units provided that in the event of BTA Bank's
default on its Senior Debt issued in the 2010 Restructuring, the Recovery Units (which bore a
notional $5 billion reference amount, representing approximately 50% of the assets sought to be
recovered from BTA Bank's prior management) could be accelerated by holders of the Recovery
Units and become an unconditional $5 billion obligation of BTA Bank *pari passu* to BTA
Bank's Senior Debt.

62.     Yet in 2012, even though the Recovery Units issued in the 2010 Restructuring
could be accelerated upon a default by BTA Bank on its senior debt, and the full approximately
$5 billion reference amount of the Recovery Units could then become an unconditional
obligation of BTA Bank with the same level of priority as the Senior Debt, BTA Bank
intentionally failed to disclose its liability for the Recovery Units.

63.     BTA Bank's omissions and misrepresentations concerning the Recovery Units are
highlighted by its public statements in 2012.  In a January 2012 PowerPoint presentation made in
connection with the 2012 Restructuring, BTA Bank identified its *total* external liabilities – which
included the approximately $2 billion in senior debt and $850 million in Subordinated Notes – as

approximately $4.8 billion.  Thus, despite knowing that the full approximately $5 billion

reference amount of the Recovery Units would be accelerated and due and owing upon its

default on its senior debt, BTA Bank intentionally concealed its liability for the Recovery Units

in its January 2012 presentations made in connection with the 2012 Restructuring.

      64.     Indeed, as late as March 19, 2012, BTA Bank represented in a PowerPoint

presentation to the Steering Committee for the 2012 Restructuring that its total liability for debt

securities issued –included the senior debt and Subordinated Notes, as well as the Recovery

Units – declined by 6.5% in its preliminary audited financial statements from previously issued

estimates, from KZT 702 billion ($4.68 billion) to KZT 656 billion ($4.37 billion).  BTA Bank

further misrepresented that this purported decrease in its liabilities was the result of a KZT 46

billion ($310 million) decrease in its liability on the Recovery Units.  In fact, BTA Bank knew at

the time it issued the PowerPoint presentation that it was liable for the full $5 billion reference

amount of the Recovery Units because it had defaulted on its senior debt and Subordinated

Notes.

      65.     Once the true facts concerning BTA Bank's liability for the Recovery Units was

disclosed, the price of the Subordinated Notes declined even further, to less than 10% of face

value.

<u>**CLAIM FOR RELIEF**</u>

**Defendant's Violations of Section 10(b) of the Exchange Act
and Rule 10b-5**

      66.     Plaintiffs repeat and reallege each and every allegation contained above as if set

forth fully herein.

      67.     As set forth above, Defendant made a number of material misstatements and

omissions of material fact in the Information Memorandum, which was disseminated to

purchasers of through the Rule 144A Offering and in presentations made to its creditors after the offering and in connection with the 2012 Restructuring.

68.      These statements are not subject to the Safe-Harbor for Forward Looking Statements provisions of the Exchange Act, 15 U.S.C. § 78u-5(c), because the misstatements were material, were unaccompanied by meaningful cautionary language, and made with actual knowledge that the statement was false or misleading.

69.      These misrepresentations were made in connection with the Rule 144A Offering.

70.      Defendant made these misrepresentations with scienter.  Specifically, BTA Bank (i) made the misrepresentations with the intent to defraud Plaintiffs or did so recklessly; and (ii) had motive and opportunity to engage in the wrongful conduct, as set forth in Paragraphs 46 through 47, *supra*.

71.      These misrepresentations were made by means of the mails and interstate and international telecommunications networks.

72.      In acquiring the Subordinated Notes, Plaintiffs reasonably relied on the statements in the Information Memorandum and in Defendants' subsequent public statements to its creditors.  Plaintiffs' reliance was reasonable because BTA Bank's misstatements and omissions concerned information that would tend to influence a reasonable investor.  Specifically, a reasonable investor in debt securities would consider whether the issuer would continue as a going concern and whether it would have sufficient cash flow to satisfy its debt obligations, as well as the value of the Subordinated Notes in the context of BTA Bank's capital structure.

73.      Subsequent to Plaintiffs' purchases, the Subordinated Notes lost substantially all of their value.

<u>**RELIEF REQUESTED**</u>

In consideration of the forgoing, Plaintiffs pray for relief and judgment:

    a.     awarding all damages and other remedies set forth in the Exchange Act in favor of Plaintiffs against Defendant in an amount to be proven at trial, including interest thereon; and

    b.     such other and further relief as the Court may deem just and proper.

Dated:  May 13, 2014                Respectfully submitted,


                                        _____/s/_____

                                        Brett D. Jaffe
                                        bjaffe@cohengresser.com
                                        Scott D. Thomson
                                        sthomson@cohengresser.com
                                        COHEN & GRESSER LLP
                                        800 Third Avenue, 21st Floor
                                        New York, NY  10022
                                        Telephone:  (212) 957-7600
                                        Facsimile:   (212) 957-4514

                                        *Attorneys for Plaintiffs Atlantica Holdings, Inc.,*
                                        *Baltica Investment Holding, Inc., Blu Funds, Inc.,*
                                        *Allan Kiblisky, Anthony Kiblisky, and Jacques*
                                        *Gliksberg*

# Exhibit A

**EXHIBIT A**
**Plaintiffs' Purchases of BTA Bank Subordinated Debt Securities**

| Client | Purchase Date | Quantity |
|---|---|---|
| Atlantica Holdings, Inc. | 2010 Restructuring | $603,816 |
| | 9/8/2010 | $5,808,722 |
| | 9/9/2010 | $3,191,278 |
| | 9/21/2010 | $96,184 |
| | 2/3/2012 | $4,000,000 |
| | 2/7/2012 | $6,000,000 |
| | 2/13/2012 | $3,500,000 |
| | 2/16/2012 | $750,000 |
| | 2/27/2012 | $9,208,000 |
| | 3/7/2012 | $13,000,000 |
| | 3/23/2012 | $11,000,000 |
| | 3/26/2012 | $5,000,000 |
| | 3/30/2012 | $5,000,000 |
| | 10/16/2012 | $2,000,000 |
| | **TOTAL** | **$69,158,000** |
| | | |
| Baltica Investment Holding, Inc. | 2010 Restructuring | $342,325 |
| | 9/9/2010 | $2,800,000 |
| | 9/21/2010 | $7,675 |
| | **TOTAL** | **$3,150,000** |
| | | |
| Blu Funds, Inc. | 4/4/2012 | $1,000,000 |
| | 4/10/2012 | $500,000 |
| | 4/13/2012 | $1,500,000 |
| | **TOTAL** | **$3,000,000** |
| | | |
| Gliksberg, Jacques | 9/9/2010 | $6,847 |
| | 9/9/2010 | $50,000 |
| | 9/28/2010 | $3,153 |
| | 1/7/2011 | $200,000 |
| | 5/24/2011 | $100,000 |
| | 5/25/2011 | $100,000 |
| | **TOTAL** | **$460,000** |
| | | |
| Kiblisky, Anthony | 1/7/2011 | $200,000 |
| | **TOTAL** | **$200,000** |
| | | |
| Kiblisky, Allan | 1/7/2011 | $100,000 |
| | **TOTAL** | **$100,000** |
| | | |
| | **Total Purchases** | **$76,068,000** |