UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ATLANTICA HOLDINGS, INC., BALTICA
INVESTMENT HOLDING, INC., BLU FUNDS, INC.,
Allan KIBLISKY, Anthony KIBLISKY, and Jacques
GLIKSBERG,

                             Plaintiffs,

              - against -

BTA BANK JSC,

                           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

13 CV 5790 (JMF)
[rel. No. 12 CV 8852 (JMF)]

**ECF CASE**

**DEFENDANT "BTA BANK" JSC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS OR STAY IN FAVOR OF ARBITRATION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ..........................................................................................3

    A.     THE 2010 RESTRUCTURING...........................................................3

    B.     THE NEW NOTES................................................................................4

    C.     PROCEDURAL BACKGROUND…………………………………….6

    D.     PLAINTIFFS' CLAIMS ......................................................................7

ARGUMENT ..............................................................................................................8

    I.     PLAINTIFFS LACK STANDING ......................................................8

    II.     PLAINTIFFS DO NOT PLEAD THE REQUIRED DOMESTIC CONTENT UNDER MORRISON .....................................................11

          A.     <u>Atlantica and Baltica's Initial Acquisitions Were Not Domestic Transactions</u> ...................................................................12

          B.     <u>Plaintiffs' Secondary Market Purchases Were Not Domestic Transactions</u> ...................................................................15

    III.     PLAINTIFFS' CLAIMS ARE SUBJECT TO ARBITRATION .........................17

          A.     <u>The Parties Agreed to Arbitrate Even Non-Contractual Claims</u>...............17

          B.     <u>The Claims in the Amended Complaint Are Subject to Arbitration Under the New York Convention and the Federal Arbitration Act</u> ..........18

          C.     <u>The Arbitrators Should Decide Any Questions of Arbitrability</u>...............21

          D.     <u>Plaintiffs' Claims Are Arbitrable</u>...........................................22

    IV.     THE COURT LACKS PERSONAL JURISDICTION OVER BTA ...................24

    V.     PLAINTIFFS FAIL TO STATE A SECTION 10(b) CLAIM ............................28

          A.     <u>Plaintiffs Have Not Adequately Alleged Reliance</u> .....................29

               1.     The Alleged Negative Carry Swap Was Disclosed .......................29

               2.     Other Alleged Misstatements Also Are Not Actionable...............32

               3.     Plaintiffs Cannot Claim Reliance on Alleged Misstatements Regarding the Recovery Units .......................................................33

          B.     <u>Plaintiffs Have Not Adequately Alleged Loss Causation</u>.........................35

          C.     <u>Plaintiffs Have Not Adequately Alleged Scienter</u> ....................36

               1.     Plaintiffs Fail to Allege Scienter with Respect to the Negative Carry Swap.................................................................................36

               2.     Plaintiffs Fail to Allege Scienter with Respect to the Other Alleged Misstatements.................................................................36

               3.     Plaintiffs Fail to Allege Scienter with Respect to the Recovery Units.................................................................................37

CONCLUSION..........................................................................................................................38

# TABLE OF AUTHORITIES

## CASES

Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60 (2d Cir. 2012) ...............11, 12, 15

Ameripay, LLC v. Ameripay Payroll, Ltd., 334 F. Supp. 2d 629 (D.N.J. 2004) ...........................25

Arco Capital Corp. Ltd. v. Deutsche Bank AG, 949 F. Supp. 2d 532 (S.D.N.Y. 2013) .................15

Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal., Solano Cnty., 480 U.S. 102 (1987) ...........26, 27

Ashcroft v. Iqbal, 556 U.S. 662 (2009)..................................................................................10, 28

Ashland Inc. v. Morgan Stanley & Co., Inc., 652 F.3d 333 (2d Cir. 2011).....................................31

ASTI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) ...................................32, 35

Backhaus v. Streamedia Commc'ns, Inc., No. 01 CIV.4889 (LMM/THK), 2002 WL 1870272
    (S.D.N.Y. Aug. 14, 2002) ..............................................................................................30

Bancol Y Cia. S. En C. v. Bancolombia S.A., 61 F. Supp. 2d 1 (S.D.N.Y. 1999).........................24

Barnum v. Millbrook Care Ltd. P'ship, 850 F. Supp. 1227 (S.D.N.Y. 1994) .................................14

Basic Inc. v. Levinson, 485 U.S. 224 (1988).................................................................................31

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ........................................................................28

Bell v. Cendant Corp., 293 F.3d 563 (2d Cir. 2002).....................................................................21

Best Van Lines, Inc. v. Walker, 490 F.3d 239 (2d Cir. 2007).......................................................25

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975).....................................................10

Boca Raton Firefighters & Police Pension Fund v. Bahash, No. 12-1776-cv, 2012 WL 6621391
    (2d Cir. Dec. 20, 2012) ..................................................................................................36

Cascade Fund, LLP v. Absolute Capital Mgmt. Holdings Ltd., No. 08-CV-01381-MSK-CBS,
    2011 WL 1211511 (D. Colo. Mar. 31, 2011) .....................................................................15

Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A., 957 F. Supp. 2d 316
    (S.D.N.Y. 2013).............................................................................................................20

Cicchetti v. Davis Selected Advisors, No. 02 Civ.10150 RMB, 2003 WL 22723015 (S.D.N.Y.
    Nov. 17, 2003) ...............................................................................................................19

City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, No. 12-4355-CV, --- F.3d ----, 2014 WL 1778041 (2d Cir. May 6, 2014) ........................................................................ passim

Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16 (2d Cir. 1995).................................23

Cornwell v. Credit Suisse Grp., 729 F. Supp. 2d 620 (S.D.N.Y. 2010) ...........................................17

Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42 (2d Cir. 1991).......................................4, 6, 16

Daimler AG v. Bauman, 134 S. Ct. 746 (2014).................................................................................24

Debora v. WPP Grp. PLC
     No. 91 CIV. 1775 (KTD), 1994 WL 177291 (S.D.N.Y. May 5, 1994)....................................35

Drexel Burnham Lambert Grp., Inc. v. Galadari, No. 84 CIV. 2602 (CBM), 1987 WL 6164
     (S.D.N.Y. Jan. 29, 1987)...........................................................................................................9

Dura Pharms., Inc. v. Broudo, 544 U.S. 336 (2005).........................................................................35

Elliot Assocs. v. Porsche Automobil Holdings, SE, 759 F. Supp. 2d 469 (S.D.N.Y. 2010)............16

Faulkner v. Verizon Commc'ns, Inc., 189 F. Supp. 2d 161 (S.D.N.Y. 2002).................................36

Gissin v. Endres,739, F. Supp. 2d 488 (S.D.N.Y. 2010) ..................................................................36

Halperin v. eBanker USA.com, Inc., 295 F.3d 352 (2d Cir. 2002) .................................................33

Hinerfeld v. United Auto Grp., No. 97 CIV. 3533 (RPP), 1998 WL 397852 (S.D.N.Y. July 15,
     1998) ........................................................................................................................................31

I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759 (2d Cir. 1991) ...........3

In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549 (S.D.N.Y. 2004)...............................32

In re DaimlerChrysler AG Sec. Litig., 247 F. Supp. 2d 579 (D. Del. 2003) ...................................25

In re Flag Telecom Holdings, Ltd. Sec. Litig., 618 F. Supp. 2d 311 (S.D.N.Y. 2009) ...................31

In re Keryx Biopharmaceuticals, Inc., Sec. Litig., No. 13 Civ. 755 (KBF), 2014 WL 585658
     (S.D.N.Y. Feb. 14, 2014)..........................................................................................................33

In re Merrill Lynch Auction Rate Sec. Litig.
     ("Merrill I"), 704 F. Supp. 2d 378 (S.D.N.Y. 2010)...............................................................34

In re Merrill Lynch Auction Rate Sec. Litig. ("Merrill II")
     765 F. Supp. 2d 375 (S.D.N.Y. 2011)............................................................................. passim

In re Merrill Lynch Auction Rate Secs. Litig. ("Merrill III"), 851 F. Supp. 2d 512 (S.D.N.Y.
     2012) ........................................................................................................................................36

In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig., 586 F. Supp. 2d 172 (S.D.N.Y. 2008) .................................................................................................................10

In re Royal Bank of Scot. Grp. PLC Sec. Litig., 765 F. Supp. 2d 327 (S.D.N.Y. 2011) ................17

In re Satyam Computer Servs. Ltd. Sec. Litig., 915 F. Supp. 2d 450 (S.D.N.Y. 2013) ..................15

In re Stillwater Capital Partners Inc. Litig., 858 F. Supp. 2d 277 (S.D.N.Y. 2012) ......................31

In re Terrorist Attacks on September 11, 2001, 538 F.3d 71 (2d Cir. 2008)..................................25

In re UBS AG Sec. Litig., No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) .......................................................................................................................36, 37

In re Vivendi Universal S.A. Sec. Litig., 765 F. Supp. 2d 512 (S.D.N.Y. 2011) ............................17

In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 431 (S.D.N.Y. 2003) .........................................9

In re WorldCom Sec. Litig., 496 F.3d 245 (2d Cir. 2007)..................................................................9

JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163 (2d Cir. 2004)....................................22, 23, 24

JSC Surgutneftegaz v. President & Fellows of Harvard Coll., No. 04 CIV. 6069 (RCC), 2005 WL 1863676 (S.D.N.Y. Aug. 3, 2005), aff'd, 167 F. App'x 266 (2d Cir. 2006) ...........20, 22, 23

Lasker v. New York State Electric & Gas Corp., 85 F.3d 55 (2d Cir. 1996) ..................................33

Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161 (2d Cir. 2005)..........................................28, 35

Liberty Media Corp. v. Vivendi Universal, S.A., 861 F. Supp. 2d 262 (S.D.N.Y. 2012) ...............15

Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC, No. 11 Civ. 398, 2012 WL 4616958 (S.D.N.Y. Sept. 28, 2012) ................................................................................................37

Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc. 252 F.3d 218 (2d Cir. 2001)...................................................................................19, 22

Madaus v. November Hill Farm, Inc., 630 F. Supp. 1246 (W.D. Va. 1986)...................................13

MBIA Ins. Corp. v. Spiegel Holdings, Inc., No. 03 CV 10097 (GEL), 2004 WL 1944452 (S.D.N.Y. Aug. 31, 2004) .................................................................................................10

Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560 (2d Cir. 1996)..................24, 26, 27, 28

MM Global Servs., Inc. v. Dow Chem. Co., 283 F. Supp. 2d 689 (D. Conn. 2003).......................13

Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010).......................................... passim

MVP Asset Mgmt. (USA) LLC v. Vestbirk, No. 2:10-cv-02483-GEB-CKD, 2013 WL 1726359
    (E.D. Cal. Mar. 22, 2013) .......................................................................................................13

Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc., 165 F. Supp. 2d 514 (S.D.N.Y.
    2001) .......................................................................................................................................24

New Avex, Inc. v. Socata Aircraft Inc., No. 02 CIV.6519 DLC, 2002 WL 1998193 (S.D.N.Y.
    Aug. 29, 2002) ........................................................................................................................21

Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameries, No. 03 Civ. 1681(LAP),
    2004 WL 2199547 (S.D.N.Y. Sept. 29, 2004)........................................................................27

NovelAire Techs., L.L.C. v. Munters AB, No. 13 CIV. 472 (CM), 2013 WL 6182938 (S.D.N.Y.
    Nov. 21, 2013) .........................................................................................................................27

O & G Carriers, Inc., v. Smith, 799 F. Supp. 1528 (S.D.N.Y. 1992) ...............................................33

Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2 (2d Cir. 1996) ...............................................30

Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645
    (2d Cir. 2004)....................................................................................................................19, 23

Phat Fashions, L.L.C. v. Phat Game Athletic Apparel, Inc., No. 00CIV0201 (JSM), 2001 WL
    1041990 (S.D.N.Y. Sept. 7, 2001).........................................................................................25

Pivot Point Capital Master LP v. Deutsche Bank AG, No. 08 CIV. 2788 (AKH), 2010 WL
    9452230 (S.D.N.Y. Dec. 9, 2010)..........................................................................................32

Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.,
    886 F. Supp. 2d 328 (S.D.N.Y. 2012)....................................................................................35

Porina v. Marward Shipping Co., Ltd., No. 05 Civ. 5621(RPP), 2006 WL 2465819 (S.D.N.Y.
    Aug. 24, 2006) ........................................................................................................................27

Press v. Quick & Reilly
    No. 96 CIV 4278 (RPP), 1997 WL 458666 (S.D.N.Y. Aug. 11, 1997) ...................................36

Rimac Internacional Cia de Seguros y Reaseguros, S.A. v. Exel Global Logistics, Inc., 2009 WL
    1868580 (S.D.N.Y. June 24, 2009).........................................................................................20

RJ Capital, S.A. v. Lexington Capital Funding III, Ltd., No. 10 CIV. 25 (PGG), 2011 WL
    3251554 (S.D.N.Y. July 28, 2011) .........................................................................................20

Roby v. Corp. of Lloyd's, 996 F.2d 1353 (2d Cir. 1993) ................................................................23

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004)..........................................................................33

S.E.C. v. Alexander
    No. 00 Civ. 7290 LTS HBP, 2003 WL 21196852 (S.D.N.Y. May 20, 2013)...........................27

S.E.C. v. Benger, No. 09 C 676, 2013 WL 593952 (N.D. Ill. Feb. 15, 2013) ............................13, 15

Sable v. Southmark/Envicon Capital Corp., 819 F. Supp. 324 (S.D.N.Y. 1993) ................29, 30, 34

Scottevest, Inc. v. AyeGear Glasgow Ltd., No. 12 Civ. 851 (PKC), 2012 WL 1372166 (S.D.N.Y. Apr. 17, 2012) ....................................................................................................................................25

Shaw Grp. Inc. v. Triplefine Int'l Corp., 322 F.3d 115 (2d Cir. 2003) ......................................21, 22

Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220 (1987).....................................................23

Shields v. CityTrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994)....................................................37

Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88 (2d Cir. 1999) .............................................................................................................................................20

Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26 (2d Cir. 2001)............................19

Starshinova v. Batratchenko, 931 F. Supp. 2d 478 (S.D.N.Y. 2013)  ...........................................13

Tellabs, Inc. v. Makor Issue & Rights, Ltd., 551 U.S. 308 (2007).................................................36

Thomas v. Ashcroft, 470 F.3d 491 (2d Cir. 2006).........................................................................24

United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190 (2d Cir. 1993) ......................31

Walden v. Fiore, 134 S. Ct. 1115 (2014).................................................................................17, 26

Wilder v. News Corp., No. 11 Civ. 4947 (PGG), 2014 WL 1315960 (S.D.N.Y. Mar. 31, 2014)....26

## STATUTES AND RULES

17 C.F.R. § 230.144A ..............................................................................................................4, 10

17 C.F.R. § 230.501(a)....................................................................................................................4

17 C.F.R. §§ 230.901-230.905.........................................................................................2, 4, 25, 30

11 U.S.C. § 1510...........................................................................................................................24

15 U.S.C. § 78u–4(b) ....................................................................................................................28

9 U.S.C. § 4 ..................................................................................................................................19

9 U.S.C. § 201 ..............................................................................................................................19

9 U.S.C. § 206 ..............................................................................................................................19

9 U.S.C. § 208 ..............................................................................................................................19

**MISCELLANEOUS**

LCIA Arbitration Rules (effective Jan. 1, 1998), *available at*
http://www.lcia.org/Dispute_Resolution_Services/LCIA_Arbitration_Rules.aspx ...................22

List of Contracting States to the Convention on the Recognition and Enforcement of Foreign
Arbitral Awards, *available at*
http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/NYConvention_status.html.......21

Defendant "BTA Bank" JSC ("BTA") submits this memorandum of law in support of its motion to dismiss the Amended Complaint filed by Plaintiffs Atlantica Holdings, Inc. ("Atlantica"), Baltica Investment Holding, Inc. ("Baltica"), Blu Funds Inc. ("Blu Funds"), Allan Kiblisky, Anthony Kiblisky, and Jacques Gliksberg (collectively, "Plaintiffs") or to stay this action in favor of arbitration.

## PRELIMINARY STATEMENT

This case involves three Panamanian companies (the "Panamanian Plaintiffs") and three U.S. residents (the "Individual Plaintiffs") who allegedly acquired interests in foreign debt securities (the "Subordinated Notes") issued by BTA, a Kazakhstan bank, in connection with a restructuring transaction that was designed to take place, and did take place, wholly outside the United States.   Plaintiffs nevertheless allege BTA violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder based on alleged misstatements and omissions in an information memorandum (the "Information Memorandum") issued by BTA in connection with the restructuring.

After BTA moved to dismiss the original Complaint, this Court provided Plaintiffs with an opportunity to file an amended complaint to address the deficiencies identified by BTA. Plaintiffs filed the Amended Complaint that included only a few new allegations and otherwise failed to remedy those pleading defects.   Plaintiffs added no new allegations addressing BTA's arguments that (1) Plaintiffs lack standing to pursue their claims; (2) the Court lacks personal jurisdiction over BTA; or (3) Plaintiffs failed to state a claim for securities fraud under the Exchange Act.   Moreover, Plaintiffs' single substantive attempt to address their failure to plead a domestic transaction does not meet the pleading requirements recently articulated by the Second Circuit.

As a threshold matter, Plaintiffs do not adequately allege they have standing to assert any claims against BTA premised on their purported interest in the Subordinated Notes.  Interests in the Subordinated Notes are subject to "Transfer Restrictions" which limited the initial issuance to (i) a non-U.S. Person (as defined in Regulation S) or (ii) either (1) an Accredited Investor (as defined in under SEC Regulation D) or (2) a Qualified Institutional Buyer ("QIB") (as defined in SEC Rule 144A).  Any subsequent transfers were limited to non-U.S. Persons or QIBs.  Any purported acquisition or transfer not in compliance with these restrictions is void *ab initio*.  Plaintiffs do not allege they were qualified investors or that they complied with the Transfer Restrictions.  Accordingly, they have no standing to assert any claims against BTA.  (See infra 8-10)

The claims also fall outside the scope of Section 10(b) under Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010).  The Subordinated Notes are foreign securities not listed on a U.S. exchange and the relevant transactions were designed to and did in fact take place outside the United States.  As recent Second Circuit precedent makes clear, the Exchange Act does not apply to a foreign transaction simply because an investor elects to place a "buy order" with a U.S. broker to purchase a foreign security.  Thus, Plaintiffs' attempt now to recast their placement of a "buy order" with a U.S. broker as a "private, off-exchange transaction" whereby the "beneficial interest" in the Subordinated Notes was allegedly transferred in the United States fails to state a claim.  Furthermore, the Amended Complaint still does not allege that the Panamanian Plaintiffs were anywhere other than Panama when they made their orders such that any purported liability they incurred was never in the United States.  (See infra 11-17)

Plaintiffs' claims should also be dismissed because they are subject to arbitration.  The Subordinated Notes are subject to a broad arbitration agreement and the Information

Memorandum (upon which Plaintiffs rely) made clear that any claims or disputes related to the Notes would be subject to binding arbitration in London.  (See infra 17-24)

The lack of connection to this forum is further demonstrated by this Court's lack of personal jurisdiction over BTA.  Plaintiffs have not adequately alleged a basis to hale BTA, a Kazakh bank, into New York federal court where no alleged acts or omissions occurred here, nor does any Plaintiff claim to have relied on any U.S. act by BTA.  (See infra 24-28)

Finally, the Section 10(b) claims suffer from other fatal deficiencies.  Plaintiffs do not and cannot sufficiently allege that they reasonably relied on the allegedly false and misleading statements.   A number of Plaintiffs' purported purchases occurred before the alleged misstatements were made and in any event, the allegedly concealed facts were expressly disclosed.  Other alleged misstatements were only expressions of corporate optimism which are not actionable.  Plaintiffs also cannot allege loss causation to the extent they concede that most of their purchases occurred after the "true facts" were disclosed to the market or fail to allege a disclosure that resulted in an injury.  (See infra 28-37)

## STATEMENT OF FACTS

### A.  THE 2010 RESTRUCTURING

BTA is a bank organized under the laws of the Republic of Kazakhstan.  (Am. Compl. ¶ 15)  A Kazakhstan government sovereign wealth fund, "Samruk-Kazyna" JSC ("S-K Fund"), is BTA's controlling shareholder.  (Id. ¶ 1)  In 2010, BTA and its creditors agreed on the terms of a proposed restructuring (the "2010 Restructuring"), the terms of which were set forth in an Information Memorandum published in May 2010.[1]  The restructuring was designed to comply

---

[1] The Information Memorandum is attached as Exhibit 1 to the Declaration of Francis Fitzherbert-Brockholes dated June 10, 2014 (hereinafter the "FFB Decl.").  The Information Memorandum is referenced and relied upon throughout the Amended Complaint and is therefore properly considered by the Court on a motion to dismiss.  See, e.g., I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 762 (2d Cir. 1991).  Indeed, the

with Regulation S and Rule 144A, which provide that offers and sales of securities made outside the United States in "offshore" transactions are not subject to the registration requirements of the Securities Act so long as they are subject to Transfer Restrictions.[2]  Accordingly, consistent with this design, the Information Memorandum related to the restructuring was made available on BTA's website, but only to individuals who certified either that they (i) were outside the U.S. and non-U.S. Persons (as defined in Regulation S); or (ii) were either "Accredited Investors" as defined in the Regulation D or "Qualified Institutional Buyers" ("QIBs") as defined in Rule 144A.[3]  (FFB Decl. ¶ 8)  The 2010 Restructuring reduced BTA's debt by converting existing debt securities ("Euronotes") into equity and issuing new debt securities.  (FFB Decl., Ex. 1 at 7)

### B.  THE NEW NOTES

The 2010 Restructuring required holders of Euronotes and all other BTA creditors to approve the Restructuring Plan, and then the restructuring needed to be approved by a Kazakh court.  (FFB Decl., Ex. 1 at 9, 109-10)  Ultimately, the Restructuring Plan was approved at meetings of Euronoteholders in London and of other creditors in Almaty, Kazakhstan. (FFB Decl. ¶¶ 18-19)  The Plan was then approved by the Kazakh court, after which the existing Euronotes were cancelled and their holders received "New Notes" (as defined in the Information

---

documents attached to the FFB Decl. are "documents plaintiffs had either in its possession or had knowledge of and upon which they relied in bringing suit."  As such, they can be considered on a "motion to dismiss because there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim."  Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991).

[2] 17 C.F.R. §§ 230.901-230.905 ("Regulation S"); 17 C.F.R. § 230.144A ("Rule 144A").

[3] Regulation D of the Securities Act defines an "Accredited Investor" to include, among other things, "natural persons whose net worth, or joint net worth with that person's spouse . . . exceeds $1,000,000."  17 C.F.R. § 230.501(a).  Rule 144A defines a "QIB" as an entity that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the entity.  17 C.F.R. § 230.144A.

Memorandum).  (Id. ¶¶ 20-21)  The definition of New Notes includes the Subordinated Notes allegedly held by Plaintiffs.[4]

The New Notes at all times only represented interests in global note certificates held in London by a nominee for the "Designated Clearing Systems."  (FFB Decl. ¶¶ 21-22)[5]  Pursuant to the Settlement Instructions, referenced in the Information Memorandum,[6] only accountholders in these Designated Clearing Systems, referred to as "Direct Participants," could acquire interests in New Notes.  (Id. ¶ 21; Ex. 7)  Direct Participants were generally large financial institutions, like UBS here, which held interests in the New Notes for their own accounts or for the accounts of eligible investors.  (Id. ¶ 21)  Any beneficial interest in the New Notes could only be transferred through accounts held by Direct Participants at the Designated Clearing Systems in a transaction that complied with the Transfer Restrictions.  (FFB Decl. ¶¶ 26-28, Ex. 1 at 311)  The Designated Clearing Systems were Euroclear Bank SA/NV ("Euroclear") and Clearstream Banking société anonyme, Luxembourg ("Clearstream"), both of which were located outside the U.S.  (FFB Decl. ¶ 21)[7] After issuance, the New Notes were listed on the Kazakhstan Stock Exchange and the Luxembourg Stock Exchange.  (Id. ¶ 24; Ex. 1 at 4, 14; Ex. 8)  The New Notes were never listed on any U.S. exchange.  (Id. ¶ 24)

---

[4] In the Amended Complaint, Plaintiffs refer to "dollar–denominated Subordinated Notes" (Am. Compl. ¶ 35) as well as "Subordinated Notes" (e.g., id. ¶¶ 36-39, 52, 56, 65) and "subordinated debt" (id. ¶¶ 8-14).  Accordingly, it appears that Plaintiffs allege to have acquired interests in Subordinated Notes (as defined in the Information Memorandum) and such notes will be referred to as "Subordinated Notes" herein.

[5] See also FFB Decl., Ex. 1 at 316 (summarizing the arrangement with the clearing systems for the issuance and subsequent transfer of interests in the relevant notes, which included the Subordinated Notes at issue here); id. at 314 (noting that "Non-Tenge New Notes" (which include the Subordinated Notes at issue here) allocated to eligible investors would be represented by interests in a "Restricted Global Note.")

[6] FFB Decl. Ex. 1 at 108 (providing that the New Notes would be distributed in accordance with the Settlement Instructions); see also id. at 4 (noting key dates in the 2010 Restructuring, including the "Settlement Instruction Deadline (for submission of all Settlement Instructions)").

[7] Clearstream and Euroclear are located in Luxembourg and Brussels respectively.  See, https://www.clearstream.com/ci/dispatch/en/kir/ci_nav/6_customers/020_contact/010_by_location/50_luxembourg?displayText=footerIMP  (last visited June 10, 2014) (reflecting Clearstream is located in Luxembourg); https://www.euroclear.com/en/about/our-structure/Corporate-details.html (last visited June 10, 2014) (reflecting that Euroclear is located in Brussels).

Because the New Notes were not listed on a U.S. exchange and would not be registered under the Securities Act or with any U.S. regulatory authority, they were subject to Transfer Restrictions.  The initial issuance of New Notes was limited to (i) non-U.S. Persons or (ii) either Accredited Investors or QIBs.  (Id. Ex. 1 at 310-13)  Any subsequent transfers were limited to non-U.S. Persons or QIBs.  (Id. at 311-12)  Each purchaser or transferee was deemed to have represented that it was a qualified investor.  (Id.)  Any purported transfer in violation of the transfer restrictions would be void *ab initio* and of no force or effect.  (Id. at 311)  Qualified investors acquiring New Notes also agreed to be subject to the Trust Deed.[8]  (Id. at 588) (the "Terms and Conditions" for the New Notes stated that "[t]he Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed….")[9]

In 2012, BTA defaulted on its debts and began proceedings for a second restructuring (the "2012 Restructuring").  Under the terms of the 2012 Restructuring, the holders of New Notes exchanged their notes for new debt securities issued by BTA.  (Am. Compl. ¶¶ 56, 57)

## C.  PROCEDURAL BACKGROUND

The original Complaint was served on March 11, 2014.  BTA moved to dismiss on April 22.  [Dkt. No. 27]  On April 28, the Court ordered Plaintiffs to file any amended complaint by May 13.  [Dkt. No. 31]  Plaintiffs' Amended Complaint made only limited changes to the original Complaint.[10]  [Dkt. No. 32]

---

[8] The Court may properly consider the contents of the Trust Deed, as the Subordinated Notes were expressly subject to its terms.  See Cortec Indus., 949 F.2d at 48 (in securities fraud action court could consider purchase agreement, offering memorandum and warrant as plaintiff "did not lack notice of those documents; these papers were integral to complaint" even if not expressly incorporated by reference in the complaint).

[9] "Noteholders" is defined by the Information Memorandum as the holders of New Notes.

[10] A redline comparing the original Complaint and Amended Complaint is attached to the Declaration of Gergory M. Startner dated June 10, 2014 ("Starner Decl.") as Exhibit B.

Plaintiffs previously sued Sovereign Wealth Fund Samruk-Kazyna JSC ("S-K Fund") on substantially similar grounds.   See Atlantica Holdings Inc. et al. v. Sovereign Wealth Fund Samruk-Kazyna JSC, No. 12 CV 8852 (S.D.N.Y.) (the "S-K Action").   On March 10, 2014, the Court issued an opinion and order denying in part and granting in part S-K Fund's motion to dismiss (the "S-K Decision").   S-K Fund has appealed the S-K Decision.   See Atlantica Holdings Inc. et al. v. Sovereign Wealth Fund Samruk-Kazyna JSC, Nos. 14-917, 14-1608 (2d Cir.).[11]

### D.  PLAINTIFFS' CLAIMS

In the Amended Complaint Plaintiffs allege certain misstatements and omissions by BTA in connection with the sale of the New Notes.   The Plaintiffs are three Panamanian companies (Atlantica, Baltica and Blu Funds) and three U.S. residents (Messrs. Kiblisky, Kiblisky and Gliksberg).   Plaintiffs do not allege they purchased interests in any securities directly from BTA. Rather, Atlantica and Baltica allege that they acquired their initial interests in the Subordinated Notes by "sending [their respective] completed 'Electronic Instruction Form[s]' to [their] broker in the Miami, Florida, office of UBS Financial Services."   (Am. Compl. ¶¶ 8, 9)   All Plaintiffs also allege that they purchased interests in the Subordinated Notes on the secondary market through what Plaintiffs now describe as "off-exchange transfers of beneficial interests on the books of UBS, which was a 'Direct Participant' in the 2010 Restructuring" and that these purchases were made by "placing orders with [their] brokers in the Miami, Florida office of UBS Financial Services."   (Id. ¶¶ 8-13)   Thereafter, orders were allegedly "transmitted" to UBS's "U.S. broker-dealer, where funds from a bank account [each Plaintiff] maintained at the UBS Miami office were transferred to UBS's back office in Stamford, Connecticut, where the order was filled and the transaction completed."   (Id.)

---

[11] S-K Fund appealed the S-K Decision with respect to S-K Fund's argument that it is immune from suit under the Foreign Sovereign Immunities Act.  This Court also certified those portions of the S-K Decision concerning S-K Fund's argument that plaintiffs failed to adequately plead the existence of a "domestic transaction" under Morrison.

Plaintiffs allege three categories of false and misleading statements.  First, they allege that the Information Memorandum failed to disclose information about a so-called "Negative Carry Swap."  (Id. ¶ 43)  Specifically, Plaintiffs allege that BTA failed to disclose that it purchased $4.3 billion in S-K Bonds that paid an effective interest rate of 2%, while at the same time S-K Fund received interest as high as 10.9% on deposits held at BTA and BTA paid 7% interest with respect to a repo arrangement with the National Bank of Kazakhstan.  (Id.)  Second, that BTA made false and misleading statements in the Information Memorandum about its "future viability."  (Id. at ¶ 54)  Third, that BTA made certain misstatements and omissions regarding its liability for "Recovery Units" issued in connection with the 2010 Restructuring. (Id. ¶ 59)

## ARGUMENT

## I.     PLAINTIFFS LACK STANDING

The Subordinated Notes were subject to "Transfer Restrictions" which were set forth in the Information Memorandum (and in the terms and conditions of the Notes themselves).  To obtain an interest in a Subordinated Note in the initial exchange, an investor had to be (i) a non-U.S. Person or (ii) either (1) an Accredited Investor or (2) a QIB.  (FFB Decl., Ex. 1 at 310-311) Any subsequent transfers of that interest on the secondary market were limited to non-U.S. persons or QIBs.  (Id. at 312)  A purported acquisition or transfer not in compliance with these restrictions would be void *ab initio* and of no force or effect.  (Id.)

The Subordinated Notes were required to bear a legend reflecting the Transfer Restrictions, which provided in relevant part:

> **EACH BENEFICIAL OWNER HEREOF REPRESENTS THAT (A) IT IS EITHER (I) NOT A U.S. PERSON AND IS LOCATED OUTSIDE THE UNITED STATES AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT; OR (II) AN ACCREDITED INVESTOR AS DEFINED**

**IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT ("AN ACCREDITED INVESTOR") OR (III) A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("QIB")** AND (B) THE SECURITY MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (I) OUTSIDE THE UNITED STATES TO PERSONS THAT ARE NOT U.S. PERSONS AS DEFINED IN, AND IN ACCORDANCE WITH, REGULATION S AND (II) WITHIN THE UNITED STATES IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QIB THAT IS PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER QIB; AND IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES. **TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE OR EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE**.

(Id. at 311) (emphasis added)

The transfer restrictions are enforceable.  See, e.g., In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 431, 454 (S.D.N.Y. 2003) (recognizing the validity of transfer restrictions which limited transfer of notes to QIBs or non-U.S. Persons), vacated and remanded on other grounds In re WorldCom Sec. Litig., 496 F.3d 245 (2d Cir. 2007); Drexel Burnham Lambert Grp., Inc. v. Galadari, No. 84 CIV. 2602 (CBM), 1987 WL 6164 (S.D.N.Y. Jan. 29, 1987) (recognizing that a transfer restriction on a share certificate is effective against all persons).

Plaintiffs nowhere allege facts showing that they were qualified investors nor that they acquired interests in the Subordinated Notes in compliance with the Transfer Restrictions. Specifically, Plaintiffs Atlantica and Baltica allege that they acquired interests in some Subordinated Notes in the initial exchange of existing BTA debt securities (Am. Compl. ¶¶ 8, 9), but they do not allege they were Accredited Investors or QIBs.  As to the remaining purchases of interests in the Subordinated Notes on the secondary market, none of the Plaintiffs allege that

they were QIBs.[12]   Indeed, the Individual Plaintiffs by definition cannot be QIBs as individuals cannot be "Qualified *Institutional* Buyers."   17 C.F.R. § 230.144A(a)(1) (emphasis added).   Thus, as recognized in the S-K Decision, "Plaintiffs acquired the Notes even though they were either not qualified buyers or were United States persons—that is, even though they were not within the universe of investors eligible to buy the Notes pursuant to the terms of the Information Memorandum."   (S-K Decision at 6)   Thus, any purported interest that Plaintiffs allegedly acquired in the Subordinated Notes would be void *ab initio*.   Significantly, BTA raised this issue in its original motion to dismiss but Plaintiffs did not make any attempt to, and presumably cannot, allege the requisite standing to bring their claims.

Failing to plead facts showing that they are qualified investors leaves Plaintiffs without standing.   It is well established that only qualified purchasers and sellers have standing to bring claims under section 10(b) and Rule 10b-5.   Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975); see also MBIA Ins. Corp. v. Spiegel Holdings, Inc., No. 03 CV 10097 (GEL), 2004 WL 1944452, at *2 (S.D.N.Y. Aug. 31, 2004) (recognizing "'actual purchaser or seller' standing limitation [for] claims brought under section 10(b) and Rule 10b–5"); In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig., 586 F. Supp. 2d 172, 180 (S.D.N.Y. 2008) ("[I]n the absence of any allegation that plaintiffs themselves were 'actual purchasers [or] sellers of securities', plaintiffs lack standing to seek a private remedy [for securities fraud].").   Having failed to plead facts showing that they were eligible investors in the first place, Plaintiffs' purported acquisition of Subordinated Notes was void *ab initio*, and they lack standing to assert any claims against BTA as to the Notes.   See, e.g., MBIA Ins. Corp., 2004 WL 1944452, at *2.

---

[12] While there is a passing reference to the resale of New Notes to "certain qualified purchasers in the United States, including Plaintiffs" being permitted under Rule 144A (Am. Compl. ¶ 37), this is not sufficient.   Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (pleadings offering only "labels and conclusions" or "mere conclusory statements" "do not suffice").   The Amended Complaint fails to specifically allege that each Plaintiff was eligible to acquire any interest in the New Notes.

## II.     PLAINTIFFS DO NOT PLEAD THE REQUIRED DOMESTIC CONTENT UNDER <u>MORRISON</u>

In <u>Morrison</u> v. <u>National Australia Bank Ltd.</u>, 130 S. Ct. 2869 (2010), the Supreme Court concluded that there is a presumption against the extraterritorial application of the Exchange Act and adopted a "transactional test" to limit the reach of Section 10(b) to only (i) the purchase or sale of a security listed on an American stock exchange, and (ii) the purchase or sale of any other security in the United States.  <u>Id.</u> at 2888.

Plaintiffs Atlantica and Baltica allege that they acquired a small amount of Subordinated Notes in the initial exchange of existing BTA debt securities, (Am. Compl. ¶¶ 8, 9), while their remaining purchases and those of all other Plaintiffs were in the secondary market.  (<u>Id.</u> at ¶¶ 8-13)  Plaintiffs do not, and cannot, allege that any of these purchases occurred on a U.S. exchange: the Subordinated Notes were only listed on exchanges in Kazakhstan and Luxembourg.  (FFB Decl. ¶ 24; Ex. 1 at 4, 14; Ex. 8; <u>see also</u> S-K Decision at 4)  Accordingly, under <u>Morrison</u>, "the exclusive focus" is on whether there is a "domestic transaction."  130 S. Ct. at 2885.   While <u>Morrison</u> did not define a "domestic transaction," the Second Circuit has interpreted <u>Morrison</u> to require a showing that "irrevocable liability was incurred or that title was transferred within the United States."  <u>Absolute Activist Value Master Fund Ltd.</u> v. <u>Ficeto</u>, 677 F.3d 60, 62 (2d Cir. 2012).  Plaintiffs concede that no title was ever transferred here, and rely solely on the theory that they somehow became irrevocably liable in the U.S. by routing their orders through a U.S. broker.  (Am. Compl. ¶¶ 8-13)

Importantly, the Second Circuit recently clarified that simply placing an order with a broker in the U.S. to purchase a foreign security is not sufficient to domesticate a foreign transaction for purposes of a Section 10(b) claim.  <u>City of Pontiac Policemen's & Firemen's Ret. Sys.</u> v. <u>UBS AG</u>, No. 12-4355-CV, --- F.3d ----, 2014 WL 1778041, at *4 (2d Cir. May 6, 2014).

11

In City of Pontiac, plaintiffs were both foreign and domestic investors who purchased UBS shares that were listed on foreign exchanges and cross-listed on the New York Stock Exchange. In affirming dismissal as to all plaintiffs who purchased the UBS shares on the foreign exchanges, the Second Circuit concluded that the "mere placement of a buy order in the United States for the purchase of foreign securities on a foreign exchange" cannot establish that a purchaser incurred irrevocable liability in the United States sufficient to support a claim under Section 10(b) of the Securities Act. Id. at *4. The court also clarified its prior rulings and noted it had never held that the placement of a purchase order, without more, is sufficient to incur irrevocable liability. Id. at *4 n. 33.

Here, Plaintiffs fail to plead facts sufficient to show that the relevant transactions occurred here, and Plaintiffs cannot rely on conclusory allegations of a "domestic" transaction to state a claim. Absolute Activist, 677 F.3d at 62; City of Pontiac, 2014 WL 1778041, at *4.

A.    **Atlantica and Baltica's Initial Acquisitions Were Not Domestic Transactions**

Atlantica and Baltica's initial acquisitions of Subordinated Notes are exactly the type of "foreign-cubed" transaction that Morrison places outside the ambit of Section 10(b). Atlantica and Baltica are foreign plaintiffs, who purchased foreign securities that were listed on foreign exchanges. There is a presumption against the application of the Exchange Act to this kind of transaction, even where there may be some U.S. connection. See, e.g., Morrison, 130 S. Ct. at 2884-86 (noting that virtually any transaction can have U.S. connections).

First, in attempting to avoid Morrison, Plaintiffs parrot the "irrevocable liability" language in Absolute Activist. Atlantica and Baltica allege they "unconditionally communicated [their] commitment" to participate in the 2010 Restructuring by "sending [their] completed 'Electronic Instruction Form' [("EIF")] to a UBS broker in Florida, and "thereby incurred irrevocable liability" in the United States to accept the New Notes. (Am. Compl. ¶¶ 8-9)

However, under City of Pontiac, Atlantica and Baltica simply choosing to route their EIFs through a U.S. broker does not domesticate what were otherwise foreign securities issued and listed abroad.  City of Pontiac, 2014 WL 1778041, at *4.  Atlantica and Baltica plead no other domestic connection as to these transactions and as such they have failed to meet the pleading standards under Morrison and City of Pontiac.

Second, to the extent the EIFs created any binding agreement, that agreement would have occurred (and any attendant liability would have been incurred) at the time and place Atlantica and Baltica completed and transmitted the EIFs to their broker.  Thus, the relevant inquiry is where Atlantica and Baltica were located when they made their decision, completed their EIFs and sent them to their broker.  See S.E.C. v. Benger, No. 09 C 676, 2013 WL 593952, at *10 (N.D. Ill. Feb. 15, 2013) (irrevocable liability occurred either where seller accepted the offer or where investor put its acceptance in the mail).[13]  There are no allegations in the Amended Complaint that Atlantica and Baltica were located anywhere other than Panama when they transmitted the EIFs, and accordingly the allegations do not plead irrevocable liability incurred in the U.S.  See Starshinova v. Batratchenko, 931 F. Supp. 2d 478, 484 (S.D.N.Y. 2013) (allegations insufficient to support a plausible inference that plaintiffs incurred irrevocable U.S. liability where complaint did not specify where purported agreements were entered into); MVP Asset Mgmt. (USA) LLC v. Vestbirk, No. 2:10-cv-02483-GEB-CKD, 2013 WL 1726359, at *7 (E.D. Cal. Mar. 22, 2013) (dismissing claims where plaintiff failed to allege where defendants were

---

[13] Under Plaintiffs' construct, the EIFs represented Atlantica and Baltica's acceptance of an offer to exchange their old debt securities for interests in Subordinated Notes.  Here, the "seller" was located abroad.  As for the "purchaser," under the "mailbox rule," a contract becomes binding at the time and place of acceptance.  See Restatement (Second) of Contracts § 64 (1981) (contract becomes binding at time and place where acceptor speaks or manifests consent); MM Global Servs., Inc. v. Dow Chem. Co., 283 F. Supp. 2d 689, 699 (D. Conn. 2003) (contract became binding in Singapore where accepting party send letters confirming acceptance from Singapore); Madaus v. November Hill Farm, Inc., 630 F. Supp. 1246, 1249 (W.D. Va. 1986) (place of contracting was West Germany where acceptance was sent from West Germany to Virginia).

located when they accepted the agreement that set forth "the point at which (and where) [the parties] would have made a 'valid, binding and enforceable agreement'").

Finally, the EIF by itself could not create "irrevocable liability" because it could not, and did not, create any binding agreement to issue Subordinated Notes to Atlantica and Baltica.  To the contrary, the EIFs were only a way for Euronoteholders like Atlantica and Baltica to register their votes for the Euronoteholders' Meeting in London with respect to the proposed 2010 Restructuring.  (FFB Decl. ¶ 15; Ex. 1 at 22, 86)  EIFs were used by Direct Participants to instruct the Registered Holder of the Euronotes at the Euronoteholders' Meetings and, in turn, appoint a trustee to vote during a subsequent creditor meeting in Kazakhstan.  (FFB Decl., Ex. 1 at 22, 86-92)  Thus, when the EIFs were submitted, the 2010 Restructuring had yet to be approved and there was no binding agreement or transaction for the issuance of any Subordinated Notes.[14]  See Barnum v. Millbrook Care Ltd. P'ship, 850 F. Supp. 1227, 1232-33 (S.D.N.Y. 1994) ("[I]f the allegations of a complaint are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the complaint.").

Accordingly, when Atlantica and Baltica submitted their EIFs, any agreement for the issuance of Subordinated Notes was far from certain, and the parties were not bound to effectuate any transaction.  Rather, there were real conditions (all occurring outside the United States) that had to be met before the Direct Participants could exchange Atlantica and Baltica's interests in the prior debt for an interest in Subordinated Notes through the Designated Clearing Systems located in Europe.  (FFB Decl. ¶ 16; Ex. 1 at 9, 109-10)  Where, as here, non-U.S. actions are conditions precedent to consummating the transaction at issue, there cannot be a domestic

---

[14] The designated process for submitting EIFs and their role in the 2010 Restructuring is detailed in the Information Memorandum.  See, e.g., FFB Decl., Ex. 1 at 90-93, 373-375.

transaction.  See, e.g., Cascade Fund, LLP v. Absolute Capital Mgmt. Holdings Ltd., No. 08-CV-01381-MSK-CBS, 2011 WL 1211511, at *7 (D. Colo. Mar. 31, 2011) (transaction did not occur here where it "was not completed until [defendant] finally accepted an application—presumably in its Cayman Islands offices.").[15]

### B.      Plaintiffs' Secondary Market Purchases Were Not Domestic Transactions

Plaintiffs allege that they "plac[ed] orders with [their] broker in Miami, Florida", which in turn transmitted the orders to its U.S. broker-dealer to be "filled and the transaction completed" at UBS's back office in Stamford, Connecticut.  (Am. Compl. ¶¶ 8-13)  The Plaintiffs characterize this as an "off-exchange transfer[] of beneficial interest on the books of UBS."  Id.  This amended characterization does not plead a domestic transaction.

First, Plaintiff's allegations that they placed buy orders with their U.S. brokers to purchase beneficial interests in foreign securities fail to satisfy City of Pontiac.  That Plaintiffs' allege they acquired interests in the Subordinated Notes in an "off-exchange" transaction (via a transaction with a third-party "Direct Participant," not the issuer BTA), as opposed to on a foreign exchange directly, makes no difference.  Direct Participants like UBS only held interests in the Subordinated Notes through accounts with the Designated Clearing Systems.  (FFB Decl.

---

[15] The Court previously considered this argument in the S-K Action and concluded that (i) conditions precedent do not render a transaction non-domestic and (ii) for all practical purposes Atlantica and Baltica were committed to the transaction when they submitted the EIF.  (S-K Decision at 17-18)  However, the S-K Decision did not consider the question of where acceptance occurred, nor had the Second Circuit issued its decision in City of Pontiac.  Read in conjunction with City of Pontiac, Morrison requires more than a plaintiff's unilateral commitment to acquire a foreign security from a foreign defendant.  Absolute Activist, 677 F.3d at 67 (noting that any "purchase" or "sale" only takes place when both parties become bound to effectuate the transaction); Benger, 2013 WL 593952, at *9-10 (no irrevocable liability when intervening events must occur before a party is irrevocably bound).  Indeed, the importance of foreign conditions precedent takes on added significance after City of Pontiac's clarification of Absolute Activist.  City of Pontiac, 2014 WL 1778041, at *4.  Nor, in any event, are the cases following Absolute Activist and cited by the Court to the contrary, as those cases indicate that plaintiffs must allege a contract binding on all the parties that was consummated in the U.S.  See, e.g., Arco Capital Corp. Ltd. v. Deutsche Bank AG, 949 F. Supp. 2d 532, 543 (S.D.N.Y. 2013) (receipt of funds in U.S. consummated the transaction in the U.S. by making the contract irrevocably binding on all the parties); Liberty Media Corp. v. Vivendi Universal, S.A., 861 F. Supp. 2d 262, 269 (S.D.N.Y. 2012) (relying on the fact that the operative agreement which bound both parties to "irrevocable liability" was executed in the U.S.); see also Satyam, 915 F. Supp. 2d at 475 (allegedly committing to buy orders in the U.S. is not sufficient under Morrison).

¶¶ 21-22, Exs. 7-8)  Plaintiffs fail to even acknowledge the role of the clearing systems, much less allege where or how UBS acquired the interests in the Subordinated Notes to fill Plaintiffs' orders.  Plaintiffs have failed in two attempts to plead facts to domesticate the acquisition of interests in securities issued abroad and listed only on foreign exchanges, and have ignored the Information Memorandum which makes clear where and how their broker obtained interests in the Subordinated Notes on their behalf.  See, e.g., Elliot Assocs. v. Porsche Automobil Holdings, SE, 759 F. Supp. 2d 469, 476 (S.D.N.Y. 2010) (purchaser located in the U.S. failed to allege a domestic transaction where the counterparty to the transaction was not identified).  That UBS may have chosen to record book orders concerning interests in the Subordinated Notes in its records somewhere else does not create a domestic transaction, particularly where the Subordinated Notes at issue were issued, located and held abroad.  (FFB Decl. ¶¶ 21-22, Exs. 7-8)[16]

Second, the Second Circuit's recent decision in City of Pontiac must be read in the context of Morrison's clear intention to limit the extraterritorial reach of § 10(b), and neither Morrison nor City of Pontiac can be read to allow a simple book entry transfer by a third party bank (that is not the issuer) of an interest in a foreign security to create a basis for a Section 10(b) claim.  Indeed, to hold that a Section 10(b) suit could be brought by any plaintiff anywhere who acquired an interest in a foreign security in an "off-exchange transaction" would effectively open

---

[16] The Court concluded that it could not consider a similar argument raised by S-K because it was premised on facts not found in the Complaint or the Information Memorandum.  (S-K Decision at 16, n. 6)  Respectfully, the Second Circuit has made clear that the Court may properly consider documents that are integral to Plaintiffs' claims and as to which Plaintiffs had notice or knowledge.  Cortec Indus., Inc., 949 F.2d at 48.  Here, Plaintiffs rely upon UBS' role as a Direct Participant in processing their orders to allege they incurred irrevocable liability in the U.S.  (Am. Compl. at ¶¶ 8-13)  Having done so, they cannot ignore that as a Direct Participant UBS could only obtain interests in the Subordinated Notes through the Designated Clearing Systems.  The Information Memorandum specifically references the "Notice of Settlement Instructions" (FFB Decl., Ex. 7) which make clear that Euroclear and Clearstream were the "Designated Clearing Systems" for the Subordinated Notes.  (FFB Decl., Ex. 1 at 108) (discussing deadline for distribution of New Notes as provided for in the Settlement Instructions); (id. at 4) (referring to the deadline for submission of Settlement Instructions).  At a minimum, Plaintiffs' failure to allege how their broker UBS acquired interest in the Subordinated Notes leaves their claims deficient.

the door to claims related to the purchase of an interest in any security listed on any foreign exchange against *any* issuer, so long as the plaintiff routed the purchase through a U.S. broker. Such a result would effectively turn the reasoning of Morrison and City of Pontiac on its head by extending Section 10(b)'s extraterritorial coverage to all foreign securities and foreign exchanges.[17]  If anything, City of Pontiac puts a finer point on those post-Morrison cases that did not bring foreign securities transactions, like those here, within the ambit of Section 10(b).  See, e.g., In re Vivendi Universal S.A. Sec. Litig., 765 F. Supp. 2d 512, 532-33 (S.D.N.Y. 2011) (recognizing that the purpose of Morrison cannot be accomplished if every foreign security listed on a foreign exchange were subject to Section 10(b) whenever an investor places a U.S. buy order); In re Royal Bank of Scot. Grp. PLC Sec. Litig., 765 F. Supp. 2d 327, 337 (S.D.N.Y. 2011) (concluding that it is not enough for plaintiffs to merely allege they are U.S. residents who were here when they decided to purchase foreign securities listed on foreign exchanges); Cornwell v. Credit Suisse Grp., 729 F. Supp. 2d 620, 625-26 (S.D.N.Y. 2010) (concluding that Morrison indicates that Section 10(b) does not extend to foreign securities trades of foreign securities traded on foreign exchanges even if purchased by American investors and even if some aspects of the transaction occurred in the U.S.).

## III.   PLAINTIFFS' CLAIMS ARE SUBJECT TO ARBITRATION

### A.   The Parties Agreed to Arbitrate Even Non-Contractual Claims

Any claims Plaintiffs may have against BTA are subject to arbitration.  Investors acquiring the Subordinated Notes agreed to be bound by all the provisions of the Trust Deed. (See, FFB Decl., Ex. 1 at 510 ("The Noteholders are bound by, and are deemed to have notice of,

---

[17] The Supreme Court also recently reiterated that a plaintiff's unilateral actions cannot be the basis for establishing personal jurisdiction, further confirming that Morrison should not be read to allow plaintiffs to create jurisdiction by simply routing through a U.S. broker an order to purchase foreign securities that are listed on a foreign exchange. See Walden v. Fiore, 134 S. Ct. 1115, 1122 (2014) (holding that to establish specific jurisdiction "the relationship must arise out of contacts that the 'defendant himself' creates with the forum State" and not those of plaintiff).

all the provisions of the Trust Deed…."); <u>see also</u> FFB Decl., Ex. 9 at 26 ("The Notes are subject

to the provisions contained in this Trust Deed, all of which shall be binding on the Bank and the

Noteholders."))  The Trust Deed includes a broad arbitration clause:

> Any claim, dispute or difference <u>of whatever nature</u> arising under, out of or in
> connection with the Notes or the Trust Deed (including a claim, dispute or
> difference regarding its existence, termination or validity <u>or any non contractual</u>
> <u>obligations</u> arising out of or in connection with this Trust Deed) (a "Dispute"),
> shall be referred to and finally settled by arbitration in accordance with the rules
> of the London Court of International Arbitration ("LCIA") (the "Rules") as at
> present in force and as modified by this Clause, which Rules shall be deemed
> incorporated into this Clause.[18]

(FFB Decl., Ex. 9 at 75) (the "Arbitration Clause") (emphasis added).

The Information Memorandum upon which Plaintiffs claim to have relied echoes this

broad agreement to arbitrate <u>any</u> (even "non contractual") dispute:

> The Non-Tenge New Notes and the New Notes Trust Deed will be governed by
> English law and will provide that any claims, disputes or differences regarding
> their existence, termination or validity or any non contractual obligations arising
> out of or in connection with such documents shall be referred to and finally settled
> by arbitration in accordance with the rules of the London Court of International
> Arbitration.[19]

(FFB Decl., Ex. 1 at 118)[20]

### B.   The Claims in the Amended Complaint Are Subject to Arbitration Under the New York Convention and the Federal Arbitration Act

Under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards,

dated June 10, 1958, 330 U.N.T.S. 38; 21 U.S.T. 2517; 7 I.L.M. 1046 (1968) ("New York

---

[18] The Trust Deed defines "Notes" to include the Subordinated Notes at issue here.  FFB Decl., Ex. 9 at 1 (defining "Notes" to include "Subordinated Notes").

[19] The Information Memorandum similarly defines "Non-Tenge New Notes" to include the Subordinated Notes here.  (FFB Decl., Ex. 1 at 22, 23, 30 (defining "Non-Tenge New Notes" to include "Dollar Subordinated Notes" and "Euro Subordinated Notes"))

[20] The "Terms and Conditions" of the Subordinated Notes likewise states that "any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non-contractual obligations arising out of or in connection with the Trust Deed)" be referred to arbitration.  (FFB Decl., Ex. 1 at 600)  The Terms and Conditions are summaries of the Trust Deed and subject to the Trust Deed's terms.  (FFB Decl., Ex. 1 at 588)

Convention"), as enforced by Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 *et seq.*, parties to an international arbitration agreement must abide by those agreements. Section 206 of the FAA provides that "[a] court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States."  9 U.S.C. § 206.[21]

Similarly, Section 4 of the FAA (applicable to international arbitration under 9 U.S.C. § 208) provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court.... [U]pon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

9 U.S.C. § 4; see also Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26, 29 (2d Cir. 2001) ("As is evident from both 9 U.S.C. §§ 4 and 206, a strong presumption of arbitrability is established by the FAA."); Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 653 (2d Cir. 2004) (affirming an order to compel arbitration where the arbitration clause was broad and covered the asserted dispute).

The FAA expresses "a liberal federal policy favoring arbitration agreements" and that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 223 (2d Cir. 2001); Cicchetti v. Davis Selected Advisors, No. 02 Civ. 10150 RMB, 2003 WL 22723015, at *1 (S.D.N.Y. Nov. 17, 2003).  Arbitration is especially favored in resolving disputes involving international commerce, as is the case here.  See Paramedics, 369 F.3d at 654 ("[t]he federal

---

[21] See New York Convention art II.3 ("The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.").

policy favoring the liberal enforcement of arbitration clauses … applies with particular force in international disputes"); see also Rimac Internacional Cia de Seguros y Reaseguros, S.A. v. Exel Global Logistics, Inc., 2009 WL 1868580, at *2 (S.D.N.Y. June 24, 2009) ("In the case of international transactions, the 'bias in favor of arbitration . . . is even stronger.'").

The New York Convention and implementing provisions of the FAA set forth four requirements for enforcing arbitration agreements:  (1) there must be a written agreement; (2) it must provide for arbitration in the territory of a signatory of the Convention; (3) the subject matter must be commercial; and (4) it cannot be entirely domestic in scope.  Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 92 (2d Cir. 1999).

Here, all the requirements are readily satisfied.  First, the Trust Deed is a written agreement, binding BTA and Plaintiffs.  In allegedly acquiring the Subordinated Notes, Plaintiffs agreed to be bound by the Trust Deed.  (See FFB Decl., Ex. 1 at 588 ("The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed…."); see also FFB Decl., Ex. 9 at 26  ("The Notes are subject to the provisions contained in this Trust Deed, all of which shall be binding on the Bank and the Noteholders."))  Courts regularly recognize that investors like Plaintiffs acquire securities subject to the terms of the operative agreements.  See, e.g., Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A., 957 F. Supp. 2d 316, 330 (S.D.N.Y. 2013) (acknowledging that indenture agreement was enforceable with respect to the debt securities); RJ Capital, S.A. v. Lexington Capital Funding III, Ltd., No. 10 CIV. 25 (PGG), 2011 WL 3251554, at *5-7 (S.D.N.Y. July 28, 2011) (concluding that noteholders were bound by provisions of indenture agreement setting forth prerequisites to bring suit and dismissing claims against issuer); JSC Surgutneftegaz v. President & Fellows of Harvard Coll., No. 04 CIV. 6069 (RCC), 2005 WL 1863676, at *1 (S.D.N.Y. Aug. 3, 2005) (recognizing

that holders of securities were subject to terms of deposit agreement), aff'd, 167 F. App'x 266 (2d Cir. 2006).

Second, the Trust Deed provides for arbitration in London, and the United Kingdom is a signatory to the New York Convention.[22]   Third, the subject matter of the Trust Deed is commercial as it involves the issuance of subordinated debt securities.  Fourth, the Trust Deed involves foreign parties (BTA is a Kazakh bank) and international transactions and thus is not entirely domestic in scope.

**C.     The Arbitrators Should Decide Any Questions of Arbitrability**

Any questions of arbitrability are properly addressed in the arbitration.  Courts should defer any questions regarding arbitrability to the arbitrators.  Shaw Grp. Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 120-21 (2d Cir. 2003).  Here, the arbitration clause in the Trust Deed is broad in scope, providing that "[a]ny claim, dispute or difference *of whatever nature* arising under, out of or in connection with the Notes or the Trust Deed … *shall be referred to and finally settled by arbitration*…."  FFB Decl., Ex. 9 at 75 (emphasis added).  Courts regularly interpret this broad language to include an agreement to submit questions of arbitrability to the arbitrators. See, e.g., New Avex, Inc. v. Socata Aircraft Inc., No. 02 CIV.6519 DLC, 2002 WL 1998193, at *5 (S.D.N.Y. Aug. 29, 2002) ("The broadly worded, inclusive terms of the arbitration provision of the Agreement constitute unambiguous evidence that the parties clearly and unmistakably intended to arbitrate questions of arbitrability."); Bell v. Cendant Corp., 293 F.3d 563, 569 (2d Cir. 2002) ("broad language in an arbitration clause … can be sufficient to send the issue of arbitrability to the arbitrator.").

---

[22] See List of Contracting States to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *available at* http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/NYConvention_status.html.

The parties' intent to arbitrate any questions of arbitrability also is reflected in the incorporation of the rules of the LCIA in the Arbitration Clause.  See FFB Decl., Ex. 9 at 75. The rules of the LCIA provide in relevant part that "[t]he Arbitral Tribunal shall have the power to rule on its own jurisdiction, including any objection to the initial or continuing existence, validity or effectiveness of the Arbitration Agreement."  See LCIA Rules, Article 23.1;[23] Shaw Grp. Inc., 322 F.3d at 124-25 ("In sum, because the parties' arbitration agreement is broadly worded to require the submission of "all disputes" concerning the Representation Agreement to arbitration, and because it provides for arbitration to be conducted under the rules of the ICC, which assign the arbitrator initial responsibility to determine issues of arbitrability, we conclude that the agreement clearly and unmistakably evidences the parties' intent to arbitrate questions of arbitrability."); JSC Surgutneftegaz, 2005 WL 1863676, at *1 (enforcing broad arbitration clause in securities deposit agreement providing that "[a]ny controversy, claim or cause of action . . . arising out of or relating to" to securities at issue "shall be finally settled by arbitration").

### D.    Plaintiffs' Claims Are Arbitrable

Although this Court need not reach the issue, where, as here, the parties agreed to a broad arbitration clause, there is a presumption that the claims are arbitratable.  JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 172 (2d Cir. 2004); Louis Dreyfus Negoce S.A., 252 F.3d at 224.

Here, the Arbitration Clause is a broad arbitration provision specifically referring to non-contractual claims.  The clause provides that "[a]ny claim, dispute or difference *of whatever nature arising under, out of or in connection with the Notes or the Trust Deed* (including a claim, dispute or difference regarding its existence, termination or validity *or any non contractual*

---

[23] LCIA Arbitration Rules (effective Jan. 1, 1998), *available at* http://www.lcia.org/Dispute_Resolution_Services/LCIA_Arbitration_Rules.aspx

*obligations arising out of or in connection with this Trust Deed*) . . . shall be referred to and finally settled by arbitration. . . ."  (FFB Decl., Ex. 9 at 75 (emphasis added))  Courts have broadly interpreted similarly expansive language.   See, e.g., Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 20 (2d Cir. 1995) (interpreting a similar arbitration clause providing that "[a]ny claim or controversy arising out of or relating to the agreement" were subject to arbitration); JLM Indus., 387 F.3d at 172 ( "[a]ny and all differences and disputes of whatsoever nature arising out of this Charter"); Paramedics, 369 F.3d at 649 ( "any controversy, claim or dispute between the Parties arising out of or relating in any way to this Agreement").

Plaintiffs allege that they acquired the Subordinated Notes in reliance on alleged misrepresentations and omissions in the Information Memorandum issued in connection with the Subordinated Notes.  As such, these claims by necessity "arise under, out of or in connection with the Notes…" and are therefore subject to arbitration.  See, e.g., JSC Surgutneftegaz, 2005 WL 1863676, at *1.  Furthermore, the Information Memorandum upon which Plaintiffs claim to have relied expressly put them on notice that any claims or disputes concerning the Notes would be subject to arbitration.  See FFB Decl., Ex. 1 at 118.  Plaintiffs cannot rely on the Information Memorandum for some purposes and not others.

Finally, it is well-established that securities fraud claims are arbitrable.  See, e.g., Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 238 (1987) (agreements to arbitrate Exchange Act claims are enforceable).  For example, in Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1361 (2d Cir. 1993), the Second Circuit rejected arguments that U.S. securities laws were beyond the scope of arbitration, where the arbitration clause dictated London arbitration under English law.  Id. at 1360 ("It defies reason to suggest that a plaintiff may circumvent forum selection and arbitration clauses merely by stating claims under laws not recognized by the

forum selected in the agreement."); see Bancol Y Cia. S. En C. v. Bancolombia S.A., 61 F. Supp. 2d 1, 3 (S.D.N.Y. 1999) (requiring plaintiffs to submit their securities claims to arbitration in Colombia under Colombian law).  Similarly, fraudulent inducement or concealment claims are also arbitrable.  Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc., 165 F. Supp. 2d 514, 533-34 (S.D.N.Y. 2001) (collecting cases where arbitration clauses where found to encompasses various fraud based claims); JLM Indus., Inc., 387 F.3d at 170 (collecting cases and holding that claims of fraudulent inducement and unconscionability are all subject to arbitration).

## IV.   THE COURT LACKS PERSONAL JURISDICTION OVER BTA

Plaintiffs also have failed to plead personal jurisdiction over BTA.  Plaintiffs are required to plead sufficient facts to establish jurisdiction, and they bear the burden of making a prima facie showing of jurisdiction over BTA.  Thomas v. Ashcroft, 470 F.3d 491, 495 (2d Cir. 2006); Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996).  Here, Plaintiffs' conclusory allegations do not establish a prima facie basis for specific jurisdiction over BTA.[24] Plaintiffs had the opportunity to address these deficiencies in the Amended Complaint but did not.

Plaintiffs allege that BTA made public statements directed at Plaintiffs and unnamed agents in New York and "directed misstatements and omissions" towards U.S. investors.  (Am. Compl. ¶ 22)  Significantly, there are no particularized allegations as to how BTA directed any

---

[24] Because BTA is a Kazakh bank headquartered in Kazakhstan, there is no basis for general jurisdiction.  Daimler AG v. Bauman, 134 S. Ct. 746, 754 (2014).  Plaintiffs also have acknowledged that BTA has no U.S. office or agent for service of process.  See Plaintiffs Memo in Support of Motion for Alternative Service at 2 [Dkt. No. 9]; see also FFB Decl. ¶ 4.  While Plaintiffs note that BTA filed a petition under Chapter 15 of the U.S. Bankruptcy Code (Am. Compl. ¶ 16), a Chapter 15 proceeding does not subject a foreign defendant to personal jurisdiction in any subsequent litigation.  See 11 U.S.C. § 1510 (("The sole fact that a foreign representative files a petition under section 1515 does not subject the foreign representative to the jurisdiction of any court in the United States for any other purpose.").

statements at investors here.  Plaintiffs' conclusory allegations do not meet their burden and this Court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  In re Terrorist Attacks on September 11, 2001, 538 F.3d 71, 93 (2d Cir. 2008).

Plaintiffs' allegations regarding the alleged U.S. dissemination of the Information Memorandum are likewise insufficient.  Plaintiffs allege that BTA "knew that its public representations in the Information Memorandum would be disseminated throughout the United States" (Am. Compl. ¶ 21), but the only specific allegation is that BTA made the Information Memorandum available on a website.  (Id. at ¶ 30)[25]  In this Circuit, "the mere existence of a website that is visible in a forum and that gives information about a company and its products is not enough, by itself, to subject a defendant to personal jurisdiction in that forum."  Scottevest, Inc. v. AyeGear Glasgow Ltd., No. 12 Civ. 851 (PKC), 2012 WL 1372166, at *3 (S.D.N.Y. Apr. 17, 2012) (quoting Best Van Lines, Inc. v. Walker, 490 F.3d 239, 253 (2d Cir. 2007)).  Specifically, there is no nexus between BTA's website and Plaintiffs' claims, because access to the website was expressly limited to certain eligible investors, a group that does not include any of the Plaintiffs.[26]  See, e.g., In re DaimlerChrysler AG Sec. Litig., 247 F. Supp. 2d 579, 584 (D. Del. 2003) (plaintiffs failed to show requisite nexus between their claims and defendant's alleged conduct within forum); Ameripay, LLC v. Ameripay Payroll, Ltd., 334 F. Supp. 2d 629, 635 (D.N.J. 2004) (defendant's website did not warrant exercise of specific jurisdiction where website functions required software "key" that defendant distributed only to certain clients and

---

[25] Plaintiffs also allege that the Information Memorandum "was mailed directly to Plaintiffs' brokers at the UBS Miami Office."  (Am. Compl. ¶ 30)  However, Plaintiffs do not allege that BTA mailed it or caused it to be mailed. In any event, "[m]ere telephone, mail, or email contacts will normally not suffice to support [specific] jurisdiction." Phat Fashions, L.L.C. v. Phat Game Athletic Apparel, Inc., No. 00CIV0201 (JSM), 2001 WL 1041990, at *4 (S.D.N.Y. Sept. 7, 2001).  This is particularly the case here, where there is no allegation that BTA contacted these Plaintiffs who were not even eligible investors.

[26] Pursuant to Regulation S and Rule 144A, the Information Memorandum was only available to individuals who certified that they were either (i) non-U.S. residents or (ii) Accredited Investors or QIBs.  (FFB Decl. ¶ 8)  As discussed supra at 8-10, there are no allegations that Plaintiffs met these conditions.

not plaintiff).   Plaintiffs also do not allege they ever accessed BTA's website to obtain the Information Memorandum, much less that they accessed the website from within the U.S.

Plaintiffs' allegations that BTA made certain misrepresentations in presentations (Am. Compl. ¶¶ 50, 63, 64) and on a conference call with investors (id. ¶ 51) are equally deficient, because Plaintiffs do not allege those acts happened here (or were directed at U.S. investors that included Plaintiffs).   Non-U.S. acts only constitute "minimum contacts" "(1) if those acts caused effects in the United States (2) that were the direct and foreseeable result of the actions abroad and (3) if the defendant knew or had good reason to know that the actions would have effects in the United States."   Wilder v. News Corp., No. 11 Civ. 4947 (PGG), 2014 WL 1315960, at *3 (S.D.N.Y. Mar. 31, 2014).   Here, the 2010 Restructuring was structured to take place abroad. Even if Plaintiffs' choice to use a U.S. broker could constitute a U.S. effect, which it cannot,[27] that choice was not a direct and foreseeable result of BTA's actions.   Rather, the Panamanian Plaintiffs' claims relate to alleged effects in Panama, not here.   Similarly, because the Individual Plaintiffs were not eligible investors, their claims cannot directly and foreseeably arise from BTA's actions, nor did BTA have reason to believe its actions would affect ineligible investors.

Finally, the exercise of jurisdiction would not be reasonable.   See Metro. Life Ins. Co., 84 F.3d at 568; see also Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal., Solano Cnty., 480 U.S. 102, 115 (1987) ("Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.")   The Court must consider several factors in assessing whether the exercise of personal jurisdiction is reasonable: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in

---

[27] The Supreme Court has made clear that Plaintiffs' (and their agents') contacts with the forum do not create specific jurisdiction over a defendant.   Walden, 134 S. Ct. at 1122 ("[H]owever significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated' [through the exercise of personal jurisdiction].").   Thus, allegations that Plaintiffs and their brokers may have acted here are not enough to establish jurisdiction over BTA.

adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." Metro. Life Ins. Co., 84 F.3d at 568 (citing Asahi Metal Indus. Co., 480 U.S. at 113-116); see also S.E.C. v. Alexander, No. 00 Civ. 7290 LTS HBP, 2003 WL 21196852, at *3 (S.D.N.Y. May 20, 2013).  Here, all of the factors militate against the exercise of jurisdiction.

Based on the Amended Complaint and the Information Memorandum that Plaintiffs rely upon and have incorporated into their pleading, it is clear that BTA is a Kazakh bank with no U.S. offices or business operations.  It would also impose a substantial burden on BTA, a Kazakh bank, to litigate this dispute in this Court.  See Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameries, No. 03 Civ. 1681(LAP), 2004 WL 2199547, at *16 (S.D.N.Y. Sept. 29, 2004) ("There can be little doubt that BWS, a Peruvian bank, would bear a heavy burden if it were required to defend this action in New York"); Porina v. Marward Shipping Co., Ltd., No. 05 Civ. 5621(RPP), 2006 WL 2465819, at *8 (S.D.N.Y. Aug. 24, 2006) (requiring defendant Cypriot corporation to defend suit in New York would impose a "substantial" burden on defendant, where defendant's business was in Cyprus and the relevant evidence was located abroad).

In addition, there is not a strong U.S. interest in adjudicating claims related to a transaction involving foreign securities issued by a foreign bank and not listed on any U.S. exchange.  See, e.g., NovelAire Techs., L.L.C. v. Munters AB, No. 13 CIV. 472 (CM), 2013 WL 6182938, at *12 (S.D.N.Y. Nov. 21, 2013) (dismissing for lack of personal jurisdiction where forum had little interest in adjudicating suit because neither party was resident of forum and events at issue did not take place in forum).  Even if there were a U.S. interest, the Amended

Complaint's few conclusory statements regarding BTA's U.S. connections would not make the exercise of jurisdiction reasonable, as the a restructuring took place abroad.  <u>Metro. Life Ins.</u>, 84 F.3d at 574.

## V.      PLAINTIFFS FAIL TO STATE A SECTION 10(b) CLAIM

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Bell Atl. Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 570 (2007)).  Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible."  <u>Twombly</u>, 550 U.S. at 570; <u>Iqbal</u>, 556 U.S. at 678.  Furthermore, though the court must accept factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation."  <u>Iqbal</u>, 556 U.S. at 678.

To state a claim under Section 10(b), a plaintiff must plead that defendants (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance proximately caused their injury.  <u>See</u>, <u>e.g.</u>, <u>Lentell</u> v. <u>Merrill Lynch & Co., Inc.</u>, 396 F.3d 161, 172 (2d Cir. 2005).  Plaintiffs' claims are subject to the heightened pleading requirements of Federal Rule 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(b).

Here, Plaintiffs allege three categories of false and misleading statements.  First, Plaintiffs allege that the Information Memorandum did not disclose information concerning the so-called "Negative Carry Swap."  (Am. Compl. ¶¶ 43-46)  Second, Plaintiffs allege that the Information Memorandum contained material misstatements concerning BTA's post-Restructuring prospects.  (<u>Id.</u> ¶ 54)  Third, Plaintiffs allege that BTA failed to disclose its liability for the so-called Recovery Units.  (<u>Id.</u> ¶¶ 59-64)  Again, despite the opportunity to

address the arguments made in BTA's initial motion to dismiss, Plaintiffs left their allegations

unchanged in the Amended Complaint.

### A.   <u>Plaintiffs Have Not Adequately Alleged Reliance</u>

#### 1.   **The Alleged Negative Carry Swap Was Disclosed.**

A plaintiff cannot allege reliance where the allegedly concealed facts were disclosed.

<u>Sable</u> v. <u>Southmark/Envicon Capital Corp.</u>, 819 F. Supp. 324, 333 (S.D.N.Y. 1993) ("The naked

assertion of concealment of material facts which is contradicted by published documents which

expressly set forth the very facts allegedly concealed is insufficient to constitute actionable

fraud.")  Here, the Information Memorandum disclosed the relevant facts relating to the so-called

Negative Carry Swap.

Plaintiffs allege that, in connection with the 2010 Restructuring the Information

Memorandum did not disclose, (i) BTA was directed to purchase $4.3 billion of S-K Bonds

paying interest of 4% per year; (ii) but that BTA paid S-K Fund a 2% fee in exchange for a

guarantee on this sum from S-K Fund so that the effective interest rate on the S-K Bonds was

only 2%; (iii) at the same time, S-K Fund received interest rates as high as 10.9% on "current

account" S-K Fund deposits with BTA; and, (iv) in addition, BTA entered into a "repo

transaction" on $2.7 billion requiring BTA to pay 7% interest to the National Bank of

Kazakhstan ("NBK"), resulting in a "Negative Carry Swap" which "siphon[ed] hundreds of

millions of dollars from BTA Bank at the expense" of other BTA creditors.  (Am. Compl. ¶ 43)

However, each of the relevant details of the alleged "Negative Carry Swap" were in fact

expressly disclosed in the Information Memorandum, which detailed:

- S-K Fund's agreement to accept $4.3 billion of BTA Bonds in exchange for an equal face amount of S-K Bonds (FFB Decl., Ex. 1 at 175-76, 178);

- BTA's use of the S-K Bonds as collateral to obtain additional financing from NBK and S-K Fund's guarantee of BTA's obligations under that loan for a fee of up to 2% of the face value of the S-K Bonds (id. at 8);

- S-K Fund's payment to BTA of 4% on the S-K Bonds, and a list of the interest S-K Fund paid to BTA on these bonds (id. at 41, 189);

- S-K Fund's sizeable deposits with BTA that consisted of both current and term accounts, which were on the same terms as the accounts of BTA's other depositors, and that term accounts paid interest rates ranging from 4% to 10.6%, 11.1% and 12.5% (id. at 175-78, 233);[28] and

- BTA's receiving refinancing loans from NBK through repo transactions  (id. at 8, 15, 42, 121, 155, 178)[29]

Thus, it was fully disclosed that BTA had purchased $4.3 billion in S-K Bonds at the interest rates noted in the Amended Complaint.  It also was disclosed that S-K Fund had very large deposits at BTA and that those deposits carried an interest rate well above what BTA was receiving on its S-K Bonds (and, indeed, the Information Memorandum revealed higher interest rates than cited in the Amended Complaint).  Thus, the information allegedly missing about the so-called "Negative Carry" was disclosed in multiple places.  In re Merrill Lynch Auction Rate Sec. Litig. ("Merrill II"), 765 F. Supp. 2d 375, 384 (S.D.N.Y. 2011); Sable, 819 F. Supp. at 339.[30]

---

[28] Nor must the Court accept that these were "exorbitant above-market rate[s]."  (Am. Compl. ¶ 4).  To the contrary, the rates were comparable to the interest rate of the New Notes issued in the 2010 Restructuring.  (FFB Decl., Ex. 1 at 512 ("The Notes shall bear interest on their outstanding principal amount from 1 July 2010 to 1 January 2013 at the rate of 10.75 per cent. per annum, and 12.5 per cent per annum thereafter[.]"); 616 ("The terms and conditions of the Subordinated Tenge A Notes . . . will bear interest at the rate of 11.20 per cent. per annum. . . . The terms and conditions of the Senior Tenge Notes . . . will bear interest at the rate of 14.75 per cent. per annum till 1 January 2012 and 16.50 per cent thereafter.")

[29] Significantly, Plaintiffs allege that interest payments on the repo transaction was paid to NBK and not S-K Fund. (Am. Compl. ¶¶ 4, 43)

[30] That the relevant disclosures were included in a lengthy information memorandum does not render those disclosures ineffective.  See Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996) ("It is undisputed that the prospectuses must be read 'as a whole.'"); see also Backhaus v. Streamedia Commc'ns, Inc., No. 01 CIV.4889 (LMM/THK), 2002 WL 1870272, at *5 (S.D.N.Y. Aug. 14, 2002) ("Examining the entire Prospectus in context, the Court finds that plaintiffs have failed to establish a prima facie case because the alleged misstatements are forward-looking and investment risks are disclosed in the Prospectus.").  That is especially true where, as here, the disclosures were not intended to meet the more rigorous standards of the Securities Act of 1933, and instead were aimed at sophisticated investors under Regulation S and Rule 144A.

More importantly, Plaintiffs hold themselves out as sophisticated investors (which they must be to be eligible investors) and so cannot plead reliance where their claims of misstatements or omissions are contradicted by explicit disclosures.  Ashland Inc. v. Morgan Stanley & Co., Inc., 652 F.3d 333, 338 (2d Cir. 2011) (affirming dismissal of Section 10(b) claims where plaintiffs, as sophisticated investors, were not justified in relying on alleged misrepresentations regarding liquidity risks where defendant explicitly disclosed those risks); Hinerfeld v. United Auto Grp., No. 97 CIV. 3533 (RPP), 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) (dismissing plaintiffs' claims where alleged omissions were contradicted by disclosures made on the face of the prospectus).   The express disclosures here are also distinguishable from those cases where the disclosures were not readily available to investors.[31]

Plaintiffs also cannot adequately allege reliance after information regarding the Negative Carry Swap became public.  Plaintiffs acknowledge that in May 2011, "information about the Negative Carry Swap began to be leaked to the marketplace" and allege that this information affected the price of the Notes.  (Am. Compl. ¶¶ 50-52)  Accordingly, Plaintiffs could not have reasonably relied on any alleged misstatement or omission regarding the Negative Carry Swap in any  transaction after these disclosures.  See Basic Inc. v. Levinson, 485 U.S. 224, 249 (1988) ("[T]hose who traded [defendant's] shares after the corrective statements would have no direct or indirect connection with the fraud."); see also Merrill II, 765 F. Supp. 2d at 384 n.9 ("[I]f

---

[31] Cf. In re Flag Telecom Holdings, Ltd. Sec. Litig., 618 F. Supp. 2d 311, 325 (S.D.N.Y. 2009) (defendants cannot rely *on scattered disclosures in various amendments, annexes and exhibits* to the prospectus and registration statement) (emphasis added); United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1199-200 (2d Cir. 1993) (concluding that regulatory filings that *have not been distributed to shareholders* should rarely be considered part of the total mix of information reasonably available) (emphasis added); In re Stillwater Capital Partners Inc. Litig., 858 F. Supp. 2d 277, 287 (S.D.N.Y. 2012) (holding that defendants' contention that "*some* of the complained of omissions had already been disclosed in [defendant's] *various* public disclosures" would not defeat claims) (emphasis added).

[plaintiff] allegedly relied on earlier misstatements or omissions when making later purchases, its claims were 'negated' once it receive the PPM.").[32]

### 2.     Other Alleged Misstatements Also Are Not Actionable.

"It is well settled that a complaint alleging violations of the securities laws may not rely upon statements that are true, or constitute puffery or ordinary expressions of corporate optimism."  In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004). Here, Plaintiffs claim to have relied on the following portions of the Information Memorandum:

- "The Bank believes that the Restructuring will allow the Bank to continue as a going concern;"

- "The Bank expects that the necessary levels of capital ratios will be achieved following the successful completion of the Restructuring by virtue of the economic gain it will achieve from the reduction of the principal amount of the Bank's indebtedness, conversion of certain debt into Shares and liquidity support to be provided by [S-K Fund]"

- "[S-K Fund's] primary objective is to manage [BTA Bank] with a goal of maximizing long term value and increasing competitiveness of such legal entities in world markets."

(Am. Compl. ¶ 54).

As the Second Circuit recently reaffirmed in City of Pontiac, these types of general statements of corporate optimism are not actionable.  See, e.g., 2014 WL 1778041, at *6-7 (concluding that the alleged misrepresentations were too open-ended and subjective to constitute

---

[32] In the S-K Decision, the Court suggested that the publication of the J.P. Morgan report would only be relevant if Plaintiffs' failure to act on such disclosure was "reckless."  (S-K Decision at 19)  Respectfully, BTA submits that Plaintiffs' allegations here fall short of the required diligence and any purported reliance after the disclosures would have been reckless.  Plaintiffs cannot plead reasonable reliance if, "through minimal diligence, [they] should have discovered the truth."  Pivot Point Capital Master LP v. Deutsche Bank AG, No. 08 CIV. 2788 (AKH), 2010 WL 9452230, at *5 (S.D.N.Y. Dec. 9, 2010) (dismissing complaint for failure to sufficiently plead reasonable reliance where plaintiff would have understood risks of transaction through minimal diligence of reviewing defendants' disclosures).  Here, Plaintiffs allege that disclosures by BTA and J.P. Morgan related to the so-called Negative Carry Swap resulted in a significant drop in the price of the Subordinated Notes.  (Am. Compl. ¶¶ 50-52)  As sophisticated investors, Plaintiffs cannot simply ignore this supposedly watershed event.  Absent well-pled facts showing that they could not have discovered the truth through minimal diligence, Plaintiffs cannot meet their burden to plead reliance. ASTI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 106 (2d Cir. 2007).

a guarantee of some concrete fact of outcome, and accordingly the statements were not materially misleading); Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) ("expressions of puffery and corporate optimism" are not actionable); In re Keryx Biopharmaceuticals, Inc., Sec. Litig., No. 13 Civ. 755 (KBF), 2014 WL 585658, at *7 (S.D.N.Y. Feb. 14, 2014) ("rosy predictions," or statements that are loosely optimistic regarding a company's well-being have been found to be too vague and general to be actionable).   In an analogous case, the Second Circuit held similar statements by a defendant that it (1) would not "compromise its financial integrity;" (2) had a "commitment to create earnings opportunities;" or (3) that "business strategies [would] lead to continued prosperity" were not actionable.  Lasker v. New York State Electric & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996).  Moreover, the Information Memorandum explicitly cautioned that these general statements necessarily involved uncertainty and that "no assurance can be given that such expectations will prove to be correct." (FFB Decl. Ex. 1 at ii; 114 ("Forward-Looking Statements")); see also Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002) ("[A]lleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.").

> ### 3.   Plaintiffs Cannot Claim Reliance on Alleged Misstatements Regarding the Recovery Units.

Plaintiffs allege that BTA failed to disclose the bank's potential liability for Recovery Units in investor presentations BTA made in early 2012.  (Am. Compl. ¶¶ 57-65)  However, only Atlantica and Blu Funds allegedly bought Subordinated Notes after the dates of these presentations, and thus all other Plaintiffs could not have relied on the presentations.  See, e.g., Merrill II, 765 F. Supp. 2d at 384 n.9; O & G Carriers, Inc., v. Smith, 799 F. Supp. 1528, 1539 (S.D.N.Y. 1992) ("[s]ince the alleged fraud [ ] took place after [plaintiffs] had invested, the

alleged fraud was not 'in connection with' the purchase or sale of a security").  Indeed, this Court already concluded in the S-K Action that to the extent any claim is premised on purchases of Subordinated Notes that occurred before an alleged misstatement was made, those claims cannot be premised on such misstatements.  <u>See</u> S-K Decision at 20.  The conclusion should apply equally here.

As for Atlantica and Blu Funds, neither of them (nor any Plaintiff) allege that it reviewed any presentations in connection with any purchases.  They only allege that the presentations were "made in connection with the 2012 Restructuring" and that BTA made certain representations "in a PowerPoint presentation to the Steering Committee for the 2012 Restructuring."  (Am. Compl. ¶¶ 63, 64)  These allegations cannot suffice.  <u>In re Merrill Lynch Auction Rate Sec. Litig.</u> ("<u>Merrill I</u>"), 704 F. Supp. 2d 378, 399 (S.D.N.Y. 2010) ("The Plaintiffs do not allege that they read the research reports cited in the Complaint and therefore cannot use the reports to establish direct reliance.").  Where, as here, a plaintiff cannot plead that they were aware of, much less relied on, an alleged misstatement, there can be no reliance.  <u>Merrill I</u>, 704 F. Supp. 2d at 399.

Moreover, once again, the terms of the Recovery Units were in fact set forth in the Information Memorandum (FFB Decl., Ex. 1 at 564-87), and plaintiff cannot allege reliance where the allegedly concealed facts were actually disclosed.  <u>Sable</u>, 819 F. Supp. at 333; <u>see also</u> <u>Merrill I</u>, 704 F. Supp. 2d at 400.  Plaintiffs were also aware that BTA defaulted on its debt obligations in January 2012, and any prudent sophisticated investor exercising minimal diligence would have been on notice of the terms of the Recovery Units set forth in the Trust Deed governing the Subordinated Notes.  (FFB Decl., Ex. 9 at 251-74)

### B.      Plaintiffs Have Not Adequately Alleged Loss Causation

Plaintiffs have failed to allege a "causal connection between the material misrepresentation and the [plaintiff's] loss," otherwise known as "loss causation." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005); see also ASTI Commc'ns, Inc., 493 F.3d at 106. Plaintiffs have not pled facts to support an inference that their losses were caused by BTA's alleged non-disclosures and not other factors including BTA's default in January 2012 (Am Compl. ¶ 57), the announcement of a second restructuring (id.), or the various negative factors affecting BTA listed in the Information Memorandum (FFB Decl., Ex. 1 at 119-44 ("Risk Factors")). See Lentell, 396 F.3d at 173-74 (requiring a plaintiff to allege facts sufficient to support an inference that it was the defendant's alleged fraud and not other market factors that caused the plaintiff's loss to avoid dismissal). As to those purchases by Atlantica and Blu Funds after the alleged "disclosures" referred to in the Amended Complaint (Am. Compl. ¶¶ 50, 51) and after the drop in the price of BTA's debt (id. at ¶ 52), no loss causation has been or could be alleged. See Debora v. WPP Grp. PLC, 91 CIV. 1775 (KTD), 1994 WL 177291 (S.D.N.Y. May 5, 1994) (plaintiff failed to allege causation where purchases made after disclosures).[33] Nor have Plaintiffs alleged any "particular disclosure" as to the Recovery Units that resulted in any injury or loss. See Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd., 886 F. Supp. 2d 328, 338 (S.D.N.Y. 2012) ("[A] particular disclosure constitutes a sufficient foundation for loss causation allegations only if it possesses a sufficient nexus to a prior misstatement such that it reveals at least part of the falsity of that misstatement.").[34]

---

[33] Significantly, Blu Funds allegedly acquired all of its Subordinated Notes, and Atlantica 86% of its Subordinated Notes, after the relevant disclosures and alleged precipitous drop in trading price. (Am. Compl. Ex. A)

[34] As the Court noted in the S-K Decision, Plaintiffs are required to allege a disclosure of the purportedly false or misleading statement followed by a decrease in the price of the Notes. (S-K Decision at 20) Here, Plaintiffs do not allege any particularized disclosure regarding the allegedly misleading statements regarding the Recovery Units nor any resulting decrease in the price of the Subordinated Noted.

C.   **Plaintiffs Have Not Adequately Alleged Scienter**

Plaintiffs must plead with particularity facts giving rise to a strong inference of fraudulent intent or "scienter."  Tellabs, Inc. v. Makor Issue & Rights, Ltd., 551 U.S. 308, 314 (2007).

1.   **Plaintiffs Fail to Allege Scienter with Respect to the Negative Carry Swap.**

Where, as here, defendants have disclosed the very information that plaintiffs claim was omitted, plaintiffs cannot establish a strong inference of scienter.  See Merrill II, 765 F. Supp. 2d at 387; In re Merrill Lynch Auction Rate Secs. Litig. ("Merrill III"), 851 F. Supp. 2d 512, 529 (S.D.N.Y. 2012) ("When adequate disclosures are made, it cannot be said that a defendant's conduct is highly unreasonable and represents an extreme departure from the standards of ordinary care.")

As discussed above, the Information Memorandum disclosed the components of the Negative Carry Swap that Plaintiffs allege were concealed, making it impossible for Plaintiffs to plead a strong inference of scienter.  See Press v. Quick & Reilly, No. 96 CIV 4278 (RPP), 1997 WL 458666, at *5 (S.D.N.Y. Aug. 11, 1997); see also In re UBS AG Sec. Litig., No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *15 (S.D.N.Y. Sept. 28, 2012).

2.   **Plaintiffs Fail to Allege Scienter with Respect to the Other Alleged Misstatements.**

Statements of corporate optimism and predictions of future performance do not support a strong inference of scienter.  See Boca Raton Firefighters & Police Pension Fund v. Bahash, No. 12-1776-cv, 2012 WL 6621391, at *3-4 (2d Cir. Dec. 20, 2012); Gissin v. Endres, 739 F. Supp. 2d 488, 511 (S.D.N.Y. 2010); Faulkner v. Verizon Commc'ns, Inc., 189 F. Supp. 2d 161, 172 (S.D.N.Y. 2002).  As discussed above, statements that (i) "the Bank believes the Restructuring will allow the Bank to continue as a going concern", (ii) "the Bank expects that the necessary levels of capital ratios will be achieved following the successful completion of the

Restructuring" or (iii) S-K Fund's "primary objective is to manage [BTA] with a goal of maximizing long term value" (Am. Compl. at ¶ 54) are nothing more than expressions of corporate optimism and predictions of future performance that do not support any inference of fraudulent intent.  In re UBS AG Sec. Litig., 2012 WL 4471265, at *36 ("simple economic projections and expressions of optimism are [mere puffery]"); see also Shields v. CityTrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) ("misguided optimism is not a cause of action, and does not support an inference of fraud"); Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC, No. 11 Civ. 398, 2012 WL 4616958, at *8 (S.D.N.Y. Sept. 28, 2012) (optimistic statements were insufficient to raise a strong inference of scienter).

### 3.   Plaintiffs Fail to Allege Scienter with Respect to the Recovery Units.

Finally, Plaintiffs have not pled facts showing that BTA acted with fraudulent intent with respect to the Recovery Units.   Again, as shown above, that BTA may have made two presentations to unidentified investors (not Plaintiffs) in connection with the 2012 Restructuring that allegedly failed to disclose information on the Recovery Units does not help Plaintiffs. Moreover, as shown above, BTA's potential liability on the Recovery Units was in fact specifically disclosed in the Information Memorandum.  (FFB Decl., Ex. 1 at 564-88)  Indeed, the alleged presentation expressly cautioned that BTA could potentially become liable for the full reference amount of the Recovery Units of $5.2 billion.  (Starner Decl., Ex. A at 42, 45) Under these circumstances, Plaintiffs cannot plead a strong inference of scienter.  See Merrill II, 765 F. Supp. 2d at 387; In re UBS AG Secs. Litig., 2012 WL 4471265, at *15.

## CONCLUSION

For the foregoing reasons, BTA respectfully requests that an order be made dismissing the Amended Complaint in its entirety or staying this action and compelling Plaintiffs to arbitrate their claims.

Dated: New York, New York
June 10, 2014

WHITE & CASE LLP

By:  /s/ Gregory M. Starner
Gregory M. Starner (GS1719)
Owen C. Pell (OP0118)

1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200

Attorneys for Defendant
"BTA Bank" JSC