UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ATLANTICA HOLDINGS, INC., BALTICA
INVESTMENT HOLDING, INC., BLU FUNDS, INC.,
Allan KIBLISKY, Anthony KIBLISKY, and Jacques
GLIKSBERG,

                                Plaintiffs,

          - against -

BTA BANK JSC,

                                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13 CV 5790 (JMF)
[rel. No. 12 CV 8852 (JMF)]

**ECF CASE**

## DECLARATION OF FRANCIS FITZHERBERT-BROCKHOLES

I, FRANCIS FITZHERBERT-BROCKHOLES, declare under penalty of perjury under the laws of the United States of America as follows:

1.    I am a member of White & Case LLP and have qualified both as an English barrister and as a member of the New York bar.  I, along with others at White & Case, represented "BTA Bank" JSC (the "Bank" or "BTA Bank") in connection with its restructuring proceedings which completed in 2010 (the "2010 Restructuring") and are described herein.  I am therefore familiar with the details of the 2010 Restructuring and the Information Memorandum that BTA Bank issued in connection with the 2010 Restructuring (the "Information Memorandum," attached as Exhibit 1).

2.    I am submitting this declaration in support of the Motion to Dismiss or Stay in Favor of Arbitration filed by BTA Bank.  I have reviewed the Amended Complaint filed in this action and am familiar with the allegations set forth therein, including the allegations that Plaintiffs "purchased subordinated debt of BTA Bank traceable to securities issued in connection

with the 2010 Restructuring." (Am. Compl. ¶¶ 8-13)  Although I am not sure what "traceable" means in this context, I believe Plaintiffs' reference to this subordinated debt refers to certain New Notes ("New Notes" as defined in the Information Memorandum) described below that were issued by BTA Bank in connection with the 2010 Restructuring.  I know of no other subordinated debt of BTA Bank issued in connection with the 2010 Restructuring.

3.      As more fully set forth below, both the issuance of the New Notes in connection with the 2010 Restructuring and any subsequent resale of the New Notes in the secondary market were structured to take place wholly outside of the United States.

**The 2010 Restructuring of BTA Bank**

4.      At the time of the 2010 Restructuring, BTA Bank was part of a leading banking network in the Commonwealth of Independent States.  BTA Bank's partner bank network extended to Russia, Ukraine, Belarus, Georgia, Armenia, Kyrgyzstan and Turkey.  BTA Bank also had representative offices in Russia, Ukraine, China and the United Arab Emirates. (BTA Bank Press Release dated April 19, 2010, attached as Exhibit 2)  To the best of my knowledge, BTA Bank does not and did not in 2010 have any offices in the United States.

5.      Between the period of April 2009 and April 2010, BTA Bank explored with certain creditors and, ultimately, a Steering Committee comprised of creditors selected from a broad range of creditor constituencies a number of alternatives for the financial restructuring of the Bank, which ultimately resulted in a detailed Term Sheet.  (Id.)

6.      By a press release dated May 3, 2010, BTA Bank announced a meeting of certain of its financial creditors to be held in Almaty, Kazakhstan on May 28, 2010 to approve the Bank's Restructuring Plan (as defined in the Information Memorandum).  Around this same time, the Bank published the Information Memorandum, which contained detailed information

about the Restructuring Plan as well as information as to the procedures for creditors to vote on the Restructuring Plan and to submit claims subject to it.  (BTA Bank Press Release dated May 3, 2010, attached as Exhibit 3)

      7.      Each of the above-referenced press releases included a legend stating "NOT FOR RELEASE, PUBLICATION OR DISTRIBUTION, DIRECTLY OR INDIRECTLY, IN OR INTO THE UNITED STATES OF AMERICA." The press releases were also available on the BTA Bank website, but only to individuals who certified that they were either (i) outside the U.S. and non-U.S. residents or (ii) within the United States and Accredited Investors as defined in Rule 501(a) of Regulation D under the Securities Act or Qualified Institutional Buyers ("QIBs") as defined in Rule 144A of the Securities Act.

**The Information Memorandum**

      8.      In May 2010, BTA Bank published the Information Memorandum to holders of existing indebtedness by making it available on the BTA Bank website.  The Information Memorandum was only available to individuals who certified on the website that they were either (i) outside the U.S. and non-U.S. residents or (ii) within the United States and Accredited Investors or QIBs.  In June 2010, BTA Bank published a revised and updated Information Memorandum on its website.  Access to that was similarly restricted.

      9.      The Information Memorandum provided in relevant part how the proposed Restructuring Plan would be effectuated through the issue of new consideration in exchange for the cancellation or restructuring of certain existing indebtedness of BTA Bank (the "Designated Financial Indebtedness").  (Ex. 1 at 7)  The proposed Restructuring Plan provided that holders of Designated Financial Indebtedness ("Claimants") would be issued one or more forms of

Entitlement, including but not limited to cash, New Notes, Shares or Global Depositary Receipts (all as defined in the Information Memorandum). (Id.)

10.     At the time of the 2010 Restructuring, the only outstanding debt securities of BTA Bank and its subsidiaries whose holders were entitled to receive New Notes as part of the 2010 Restructuring were certain Series of senior Notes issued by the Bank's subsidiary TuranAlem Finance BV, guaranteed by the Bank, and payable in various currencies with varying interest rates and maturities (collectively, "Euronotes").

11.     At the time immediately prior to the 2010 Restructuring, the Euronotes were represented by global notes held by The Bank of New York Depository (Nominees) Limited, through its offices in London, as common depositary for Euroclear Bank SA/NV ("Euroclear Bank"), and Clearstream Banking SA ("Clearstream Banking"), and registered in the name of The Bank of New York Depository (Nominees) Limited, as nominee for Euroclear Bank and Clearstream Banking, and Cede & Co. as nominee for the Depository Trust Company ("DTC"), a clearing system located in New York, New York. (Id. at 90)

12.     Thus, any interest in the Euronotes could only be held through accounts maintained in these clearing systems.  Generally only large financial institutions had such accounts.  These financial institutions were referred to as "Direct Participants." The Direct Participants held particular principal amounts of the Euronotes for their own accounts or for the benefit of their customers.  An example of a Direct Participant would be a bank like UBS.

13.     So far as I am aware, neither the Euronotes nor any other security of BTA Bank were ever listed on any U.S. exchange.

**Conditions Required for Effectuation of the Restructuring Plan**

14.    The Information Memorandum detailed the conditions that would have to be met to effectuate the Restructuring Plan. As set forth in the Information Memorandum, holders of each Series of Euronotes were required to meet and instruct the Trustees for that Series how to vote on the Plan. (Id. at 370) Specifically, the purpose of each of the meetings was to consider and vote upon a resolution, which provided for, among other things, the approval of the Restructuring Plan and instruction of the Trustee on how to vote at the subsequent meeting of all Claimants (a group which included the Euronoteholders as well as other creditors) to be held to approve or reject the proposed Restructuring Plan. (Id. at 370-371)

15.    Euronoteholders were to submit "Electronic Information Forms" ("EIFs") to register their votes for the Euronoteholders' Meetings. (Id. at 22, 86) Specifically, these EIFs were to be submitted by Direct Participants[1] to the relevant clearing systems to instruct the Registered Holder of the global Note representing the relevant Euronotes to vote for or against the resolution to approve or reject the proposed Restructuring Plan. (Id. at 22, 86-92).

16.    If the Restructuring Plan was approved the Claimants' Meeting (which in effect required approval by a substantial portion of the Euronotes), it would then be submitted to the specialized financial court in Almaty, Kazakhstan (the "Almaty Court") for final approval. (Id. at 9, 109-10) By its terms, the Restructuring Plan would not become effective, and the exchange of prior interests for new Entitlements could not occur, unless and until it was approved by the Almaty Court. (Id. at 322) Each condition for effectuation of the Restructuring Plan was required to be met before holders of Designated Financial Indebtedness, including holders of Euronotes, could exchange their prior interests for new Entitlements. (Id. at 110) The

---

[1] If a Euronoteholder was not itself a Direct Participant, it was required to arrange for the Direct Participant through which it held its Euronotes to submit an EIF on its behalf to the relevant clearing system. (Id. at 91)

Restructuring Plan explicitly provided that "[t]his Restructuring Plan will come into effect on the date on which it is approved by the [Almaty] Court" and that "[o]nce the [Almaty] Court approves this Restructuring Plan Claimants, Related Parties and Shareholders of the Bank and their respective affiliates will be bound by its terms and conditions." (Id. at 322) (Restructuring Plan §§ 2.1; 2.4)

17.   In connection with the 2010 Restructuring, representatives from BTA Bank and investment bankers from UBS and Lazard Freres, who served as financial advisors to BTA on the 2010 Restructuring, travelled to Hong Kong, Singapore, Zurich, Geneva and London to meet with creditors and to discuss the proposed Restructuring Plan.  To my knowledge, no one from BTA Bank travelled to the United States to meet with creditors in connection with the 2010 Restructuring.

18.   The meetings of holders of the various Series of Euronotes were ultimately held on May 24, 2010 at the White & Case offices in London. (Id. at 370) The persons voting on each Series of Euronotes voted almost unanimously in favor of the resolution proposed and thus it was duly passed.  (BTA Bank Press Release dated May 26, 2010, attached as Exhibit 4)

19.   The Claimants' Meeting occurred on May 28, 2010 in Almaty, Kazakhstan, where the Claimants overwhelmingly approved the Restructuring Plan.

20.   The Restructuring Plan was approved by the Almaty Court on July 1, 2010 and, on August 31, 2010, the Almaty Court ordered the termination of the 2010 Restructuring.  (BTA Bank Press Release dated July 2, 2010, attached as Exhibit 5, and BTA Bank Press Release dated September 1, 2010, attached as Exhibit 6)

**Issuance of New Notes in Exchange for Cancellation of Euronotes**

21.    Following the effectuation of the Restructuring Plan, the Euronotes were cancelled and New Notes were issued to Direct Participants through the clearing systems in Europe.   The New Notes were the only form of debt Entitlements provided to holders of Euronotes, i.e., Direct Participants.   Due to DTC's inability to handle payments in currencies other than U.S. dollars, BTA Bank designated Euroclear Bank and Clearstream Banking as "Designated Clearing Systems." Only Direct Participants in the Designated Clearing Systems could receive New Notes in the 2010 Restructuring.   ("Notice of Settlement Instructions" dated July 27, 2010, attached as Exhibit 7)   As had been the case with respect to the Euronotes, the Direct Participants held interests in the New Notes either for their own accounts or for the benefit of their customers.   Accordingly, beneficial interests in the New Notes could only be held through the Designated Clearing Systems in Europe.

22.    The New Notes were at all times represented by global note certificates (the "Global Notes") held by The Bank of New York Mellon, acting through its offices in London, as common depositary (the "Common Depositary") for Euroclear Bank and Clearstream Banking, and registered in the name of The Bank of New York Depository (Nominees) Limited, as nominee for the Common Depositary.   (Listing Prospectus for the New Notes at cover page, attached as Exhibit 8)

23.    As provided by the Information Memorandum, the New Notes were constituted by a Trust Deed (attached as Exhibit 9), and Noteholders were bound by the terms of the Trust Deed.   (Ex. 1 at 588) ("The Noteholders are bound by, and are deemed to have notice of, all provisions of the Trust Deed…"29); (see also Ex. 9 at 26, § 2.6) ("The Notes are subject to the

provisions contained in this Trust Deed, all of which shall be binding on the Bank and the Noteholders.")

**Secondary Market for New Notes**

24.     Pursuant to a covenant contained in the Trust Deed, at all relevant times, the New Notes were listed on the Kazakhstan Stock Exchange and, from February 22, 2011, on the official list of the Luxembourg Stock Exchange.  (Ex. 8 at cover page)  However, the New Notes were not listed on any U.S. exchange.

25.     Because the New Notes were not listed on a U.S. exchange and would not be registered under the Securities Act or with any securities regulatory authority in the United States, the New Notes were subject to certain transfer restrictions.

26.     As set forth in the Information Memorandum, the New Notes were transferable only to QIBs under the requirements of Rule 144A or to non-U.S. Persons in a transaction that met the requirements of Regulation S.  (Ex. 1 at 311)  Each subsequent purchaser or transferee would be deemed to have represented that it was either a QIB or a non- U.S. Person.  A U.S. Person who was not a QIB was prohibited from purchasing the New Notes in the secondary market and the Information Memorandum provided that any "transfer in violation of the foregoing [transfer restrictions] will be of no force and effect, will be void ab initio, and will not operate to transfer any rights to the transferee."  (Id.)

27.     Any transfer of interests in the New Notes could only occur through or in accounts held with Euroclear Bank or Clearstream Banking.  Thus, a Direct Participant in one of these clearing systems could transfer interests in the New Notes to another Direct Participant in that clearing system.  Euroclear Bank and Clearstream Banking also maintained an electronic "bridge" between them that allowed for transfer of interests in New Notes between participants

in the two clearing systems.  Thus, while an individual might have been able to place an order for New Notes with its own intermediary or broker in the United States, the order must have been executed, cleared and settled in or through clearing systems located in Europe.  Of course, an interest in the New Notes could also be transferred on the books of a Direct Participant or on the books of a third party holding a beneficial interest in New Notes through a Direct Participant.

28.     However, any transfer of an interest in the New Notes either within a clearing system or between the clearing systems or on the books of a Direct Participant or such third party had to comply with the transfer restrictions described above.

**Payment of Principal and Interest on the New Notes**

29.     Payment of principal, interest and other amounts due on the New Notes was to be made to the person shown as holder in the Register, namely The Bank of New York Depository (Nominees) Limited, an English company.  (Id. at 314)  The terms of the relevant Global Note provided: "Payments of principal and interest in respect of Notes . . . shall be made against presentation for endorsement and if no further payment falls to be made in respect of the Notes, surrender of the Restricted Global Note to or to the order of The Bank of New York Mellon, London Branch."  (Form of Restricted Global Note at ¶ 12, attached as Exhibit 10).  The Unrestricted Global Note representing New Notes provided similarly.

30.     BTA Bank's obligation to pay any sum due in respect to the New Notes was satisfied upon payment to the Principal Paying and Transfer Agent, the Bank of New York Mellon, acting through its offices in London ("Principal Paying and Transfer Agent"), except to the extent that there was a failure in its subsequent payment to the relevant Noteholders.  The Principal Paying and Transfer Agent was responsible for processing payment of all sums due on the New Notes.

31.     The Trust Deed granted to the Trustee the right "to institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes."

32.     Furthermore, the Trust Deed provided that any dispute, including a dispute regarding a failure to pay, shall be referred to and finally settled in arbitration in accordance with the rules of the London Court of International Arbitration, with the seat of arbitration being London, England.  (Ex. 9 at 75)  The Trustee, however, had the right, at its sole option, to elect that such disputes should instead be heard by the courts of England.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated: June 10, 2014

_____

Francis Fitzherbert-Brockholes