# EXHIBIT 1

**THIS INFORMATION MEMORANDUM IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION.** If you are in any doubt as to the action you should take, you are recommended to immediately seek advice from your own appropriately authorised independent financial adviser.

**INFORMATION MEMORANDUM AS AMENDED AND RESTATED TO REFLECT THE CHANGES SET OUT IN ANNEX 1 OF THE SUPPLEMENT DATED 19 MAY 2010 AND THE SUPPLEMENT DATED 27 MAY 2010**

*Prepared for the information of the holders of certain financial indebtedness of JSC BTA Bank and its subsidiaries in connection with the Restructuring Plan referred to herein.*



# JSC BTA BANK

*(a joint stock company incorporated in the Republic of Kazakhstan with registered number 39031900 AO)*

**An investment in the New Notes, Shares and GDRs involves a high degree of risk.  See "*Risk Factors*".**

A meeting of the Claimants to consider the Restructuring Plan will be held on 28 May 2010 at 10:00 a.m. (Almaty time) at The Dostyk Hotel, 36 Kurmangazy Street, Almaty 050021, Republic of Kazakhstan.  The Notice of the Claimants' Meeting is set out in Schedule 3 (*Notice of Claimants' Meeting*).  Whether or not relevant Claimants intend to attend the Claimants' Meeting they are requested to complete, execute and return the Claim Form and Form of Proxy included in this Information Memorandum in accordance with the instructions set out herein as soon as possible but, in any event, to be received no later than 5:00 p.m. (Almaty time) on 19 May 2010, except for trustees on behalf of Euronoteholders, BTA Finance Luxembourg and Claimants whose Claims remain in dispute (who have until 10:00 a.m. (Almaty time) on 26 May 2010), and as otherwise provided herein.  Claim Forms and Forms of Proxy are available on the Bank's website (www.bta.kz/en/investor).

Meetings of the holders of each series of Euronotes will be held on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW to consider and if thought fit to pass an Extraordinary Resolution approving, among other things, the Restructuring Plan and an instruction to the Trustee to vote the full principal amount of each Series at the Claimants' Meeting.  The Notices of the Euronoteholders' Meetings are set out in Schedule 5 (*Notices of Euronoteholders' Meetings*).  Euronoteholders are requested to submit Electronic Instruction Forms so that they are received no later than 10:00 a.m. (London time) on 5 May 2010.

A meeting of the shareholders of (including the holder of the Perpetual Securities issued by) BTA Finance Luxembourg was held on 22 April 2010 to consider and if thought fit to pass an extraordinary resolution, *inter alia*, to amend the articles of association of BTA Finance Luxembourg and to approve the Restructuring Plan.  A copy of each of the notice convening the meeting and the notice to beneficial owners of the Perpetual Securities is set out in Schedule 6 (*BTA Finance Luxembourg S.A. Notices*).  The meeting approved the Restructuring Plan but was otherwise inquorate in respect of part of the resolutions proposed, and was adjourned to 25 May 2010.

Beneficial owners of those CHF Notes which are held in Euroclear or Clearstream are required to submit electronic voting instructions appointing The Bank of New York Mellon to vote as proxy at the Claimants' Meeting and to submit a Claim Form on their behalf.  Holders of CHF Notes in individual certificated form must submit Claim Forms and Forms of Proxy directly to the Bank.

The Bank published a non-exhaustive Preliminary Debt List on 22 April 2010, an updated version of which is set out at Schedule 1 (*The Restructuring Plan*), Annex 1 (*Preliminary Debt List*), specifying the amount and classification applicable to certain Claims subject to the Restructuring Plan.  See Schedule 1 (*The Restructuring Plan*) — "*Verification of Quantum and Classification and Admission of Claims*" for further information.

If Claimants do not submit a Claim Form to the Bank on or prior to the Claims Submission Date, their Claims will be cancelled, but the Bank may, in its sole and absolute discretion, admit such Claims.  Euronoteholders are not required to submit a Claim Form in respect of their Euronotes.  The Trustee will instead submit on their behalf a Claim Form in respect of the outstanding Euronotes in accordance with the instructions of the relevant Euronoteholders.  Each lender under a syndicated or bilateral loan facility must submit its own Claim Form.

If Claimants approve the Restructuring Plan at the Claimants' Meeting, a hearing before the Court will be necessary in order to approve the Restructuring Plan.  All Claimants are entitled to attend the Court hearing in person or through counsel to support or oppose the Court approval of the Restructuring Plan.  The Bank will announce the date and location of such hearing on a Regulatory Information Service and the Bank's website (www.bta.kz/en/investor) at least 14 days in advance of such hearing.

The New Notes, Shares and GDRs have not been and will not be registered under the United States Securities Act of 1933, as amended (the "**Securities Act**").  As a result, Claimants who are in the United States or who are U.S. persons within the meaning of Regulation S of the Securities Act (each a "**U.S. Person**") will be eligible to participate in the Restructuring Plan only if they are either "qualified institutional buyers" ("**QIBs**") as defined in Rule 144A or "accredited investors" ("**Accredited Investors**") as defined in Rule 501(a) of Regulation D unless the Bank in any instance otherwise agrees.  Offers and issuances of New Notes, Shares and GDRs to persons outside the United States who are not U.S. Persons will be made in reliance on Regulation S subject to the conditions otherwise provided herein.

No person has been authorised by the Bank to give any information or make any representation other than those contained in this Information Memorandum and the accompanying documents and, if given or made, such information or representation must not be relied upon as having been so authorised.

This Information Memorandum is, subject to certain restrictions, available on the Bank's website (www.bta.kz/en/investor).

2 June 2010

**IMPORTANT NOTICE**

You must read the following before continuing.  The following applies to the Information Memorandum, and you are therefore advised to read this carefully before reading, accessing or making any other use of the Information Memorandum.  In accessing the Information Memorandum, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

THIS INFORMATION MEMORANDUM MAY NOT BE FORWARDED OR DISTRIBUTED OTHER THAN AS PROVIDED BELOW AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER.  ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORISED.  FAILURE TO COMPLY WITH THIS NOTICE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**THE NEW NOTES, SHARES AND GDRs ARE BEING OFFERED, AND WILL BE ISSUED ONLY TO, CLAIMANTS (I) OUTSIDE THE UNITED STATES THAT ARE NOT U.S. PERSONS OR (II) WITHIN THE UNITED STATES (IN PRIVATE TRANSACTIONS PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT) THAT ARE EITHER ACCREDITED INVESTORS OR QIBs (EACH AN "ELIGIBLE INVESTOR") UNLESS THE BANK IN ANY INSTANCE OTHERWISE AGREES.  ONLY ELIGIBLE INVESTORS AND CLAIMANTS WHO ARE OUTSIDE THE UNITED STATES, ARE NOT U.S. PERSONS AND ARE OTHERWISE ELIGIBLE, AS PROVIDED HEREIN, ARE AUTHORISED TO ACCESS OR RECEIVE THIS INFORMATION MEMORANDUM.**

**THIS INFORMATION MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITY.  NONE OF THE SECURITIES REFERRED TO IN THIS INFORMATION MEMORANDUM SHALL BE SOLD, ISSUED OR TRANSFERRED IN ANY JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW.**

**The New Notes, Shares and GDRs are subject to restrictions on transferability and resale and may not be transferred or resold except in accordance with the Securities Act and other applicable securities laws, pursuant to registration or an exemption therefrom.  See "*Issuance and Transfer Restrictions*".**

**CONFIRMATION OF YOUR REPRESENTATION:** By accessing this Information Memorandum you shall be deemed to represent that you are either (i) a person other than a U.S. Person and have received this Information Memorandum outside the United States or (ii) an Eligible Investor that is acquiring the New Notes, Shares or GDRs for its own account or the account of another person that is an Eligible Investor.

If you wish to participate in the Restructuring Plan and you are a Claimant who is a U.S. Person and is not an Eligible Investor, please contact the Bank by emailing zhaisanov@bta.kz or calling +7 727 3124671.

Lazard Frères and UBS Limited are acting as Financial Advisers to the Bank and to no one else in connection with the Restructuring and will not be responsible to anyone other than the Bank for providing the protections afforded to clients of Lazard Frères or UBS Limited nor for giving advice in relation to the Restructuring.

You should not construe the contents of this Information Memorandum as legal, tax or financial advice.  You are recommended to consult your own professional advisers as to legal, tax, financial or other matters relevant to the action you should take in connection with the Restructuring Plan.  This Information Memorandum has been prepared to assist Claimants and Euronoteholders to decide

whether and how to vote on the Restructuring Plan.  Pursuant to Clause 2.3 of the Restructuring Plan, various provisions of the Information Memorandum form an integral part of the Restructuring Plan.

The summary of the principal provisions of the Restructuring Plan contained in this Information Memorandum is qualified in its entirety by reference to the Restructuring Plan itself, the full text of which is set out in Schedule 1 (*The Restructuring Plan*).  Each Claimant and Euronoteholder is advised to read and consider carefully the full text of the Restructuring Plan.

The distribution of this Information Memorandum and the distribution of New Notes, Shares and GDRs may be restricted by law in certain jurisdictions.  The Bank makes no representation that this Information Memorandum or the New Notes, Shares or GDRs may be lawfully distributed in any jurisdiction or assumes any responsibility for facilitating any such distribution.  Accordingly, neither this Information Memorandum nor any other offering material may be distributed or published, and none of the New Notes, Shares or GDRs may be distributed, in any jurisdiction, except under circumstances that will result in compliance with all applicable laws and regulations.  Persons into whose possession this Information Memorandum may come must inform themselves about, and observe any such restrictions on the distribution of this Information Memorandum and the distribution of the New Notes, Shares and GDRs.

Claimants entitled to the distribution of New Notes, Shares or GDRs under the Restructuring Plan must comply with all laws and regulations applicable to them in force in any jurisdiction and must obtain any consent, approval or permission required to be obtained by them under the laws and regulations applicable to them in force in any jurisdiction to which they are subject and the Bank shall not have any responsibility therefor.

Nothing in this Information Memorandum or any other document issued with or appended to it should be relied on for any purpose other than to make a decision on the Restructuring Plan.  In particular and without limitation, nothing in this Information Memorandum or any other document issued with or appended to it should be relied on in connection with the purchase of any shares (other than under the Restructuring Plan), or assets of the Bank.  This Information Memorandum has been prepared in connection with the proposal in relation to the Restructuring Plan of the Bank under the Restructuring Law.

The information contained in this Information Memorandum has been prepared based upon information available to the Bank.  To the best of the Bank's knowledge, information and belief, the information contained in this Information Memorandum is in accordance with the facts and does not omit anything likely to affect the import of such information.  The Bank has taken all reasonable steps to ensure that this Information Memorandum contains the information reasonably necessary to enable Claimants and Euronoteholders to make an informed decision about the Restructuring Plan.  None of the Bank's legal, financial or tax advisers, the members of the Steering Committee, the Steering Committee's legal, financial, tax or other advisers, the Trustee or the Trustee's legal advisers have authorised the contents of this Information Memorandum or any part of it nor do they accept any responsibility for the accuracy, completeness or reasonableness of the statements contained within it.

None of the Bank's legal, financial, tax or other advisers, the members of the Steering Committee, the Steering Committee's legal, financial, tax or other advisers, the Trustee or the Trustee's legal advisers have verified that the information contained in this Information Memorandum is in accordance with the facts and does not omit anything likely to affect the import of such information and each of those persons expressly disclaims any responsibility for such information.

Nothing contained in this Information Memorandum shall be deemed to be a forecast, projection or estimate of the Bank's future financial performance except where otherwise specifically stated.  This Information Memorandum contains certain statements, statistics and projections that are, or may be, forward-looking.  See *"Forward-Looking Statements"*.  By their nature, forward-looking statements involve risk and uncertainty because they relate to events and depend on circumstances that will occur in the future.  Although the Bank believes that the expectations reflected in such statements are reasonable, no assurance can be given that such expectations will prove to be correct.

Claimants should inform themselves about and observe any legal requirements applicable in their own jurisdictions to the participation in the Restructuring Plan and the receipt of any New Notes, Shares or GDRs and should consult their professional advisers and satisfy themselves as to the full observance of the laws of the relevant jurisdiction in connection therewith, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in all applicable jurisdictions.  Any failure to comply with these restrictions may constitute a violation of the securities law of any such jurisdiction.

Claimants and Euronoteholders should consult their own financial, legal and tax advisers with respect to the financial, legal and tax consequences of the Restructuring Plan in light of their particular circumstances.  The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement). No member of the Steering Committee expresses any opinion as to the merits of the Restructuring Plan.  The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring.

The Bank has been required by the members of the Steering Committee to make public in this document all inside information, material non-public information or information that is price sensitive which has been supplied to the members of the Steering Committee by the Bank.  The Bank believes that it has performed this obligation and that, following the publication of this Information Memorandum, the members of the Steering Committee have no wider information, material, non-public information or information that is price sensitive which has been supplied to them by the Bank.  None of the members of the Steering Committee or the Steering Committee's legal, financial or tax advisers have verified such assertion and each of those persons expressly disclaims any responsibility for such assertion.

## NO ADMISSION OF LIABILITY OR WAIVER

All the statements in this Information Memorandum are made solely in connection with the Restructuring Plan.  Accordingly, they do not constitute, and should not be deemed to be, admissions of liability on the part of the Bank or any other party.  Nothing herein shall prejudice any right of the Bank in any pending or future legal or other proceedings to dispute the claim of any person in respect of or in connection with any indebtedness or the amounts of such indebtedness or to bring any claim or counterclaim against any Person and nothing herein shall imply that any person described herein as a Claimant or Euronoteholder or having the benefit of a claim has a valid claim against the Bank or any other party nor shall the payment of any Distributions constitute a waiver or relinquishment of any claim available to the Bank against any Person.

## NOTICE TO CLAIMANTS IN THE UNITED STATES

THE NEW NOTES, SHARES AND GDRS HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION IN THE UNITED STATES AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS.  NEITHER THE U.S. SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THE NEW NOTES, SHARES AND GDRS NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE NEW NOTES, SHARES, GLOBAL DEPOSITARY RECEIPTS OR THE ACCURACY OR ADEQUACY OF THIS INFORMATION MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENCE IN THE UNITED STATES.

**NOTICE TO CLAIMANTS IN THE EUROPEAN ECONOMIC AREA**

This Information Memorandum is only addressed to and directed at persons in member states of the European Economic Area (the "**EEA**") who are "Qualified Investors" within the meaning of Article 2(1)(e) of the Prospectus Directive.  The New Notes, Shares and GDRs are only available to Qualified Investors, unless in any instance the Bank otherwise agrees.  This Information Memorandum and its contents should not be acted upon or relied upon in any member state of the EEA by persons who are not Qualified Investors.  The expression "**Prospectus Directive**" means Directive 2003/71/EC and includes any relevant implementing measure in each relevant member state.

**NOTICE TO CLAIMANTS IN THE REPUBLIC OF KAZAKHSTAN**

The New Notes, Shares and GDRs may only be distributed in Kazakhstan to institutions or individuals in Kazakhstan, including banks, brokers, dealer participants, pension funds and collective investments institutions, as well as central government, large international and supranational organisations, other institutional investors and other parties, including treasury departments of commercial enterprises, which as an ancillary activity regularly invest in securities.

**TABLE OF CONTENTS**

**Page**

EXPECTED SEQUENCE OF PRINCIPAL EVENTS ........................................................................3
LETTER FROM THE CHAIRMAN OF THE MANAGEMENT BOARD OF THE BANK ...............5
KEY TERMS AND DEFINITIONS....................................................................................................13
TERMS OF THE RESTRUCTURING PACKAGES .........................................................................46
ALLOCATION MECHANISM ..........................................................................................................56
PART II – ALLOCATION OF AGREED OFFICIAL GOVERNMENT SECTOR DEBT
    BETWEEN SENIOR PACKAGES 1 AND 2 ..............................................................................58
PART III – EURONOTEHOLDERS ..................................................................................................60
BANK CREDITOR SPVS....................................................................................................................61
THE GDR PROGRAMME ..................................................................................................................64
UNDERTAKINGS BY THE BANK AND SAMRUK-KAZYNA .....................................................69
SHARE DISTRIBUTION AND RIGHTS OF MINORITY SHAREHOLDERS .............................75
INFORMATION FOR CLAIMANTS..................................................................................................86
PRESENTATION OF FINANCIAL AND OTHER INFORMATION ............................................111
FORWARD-LOOKING STATEMENTS ..........................................................................................114
EXCHANGE RATES AND EXCHANGE CONTROLS ...................................................................116
ENFORCEMENT OF FOREIGN JUDGMENTS AND ARBITRAL AWARDS .............................118
RISK FACTORS ................................................................................................................................119
PRO FORMA FINANCIAL INFORMATION .................................................................................145
THE BANK .........................................................................................................................................150
SELECTED CONDENSED CONSOLIDATED FINANCIAL DATA .............................................187
MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS
    AND FINANCIAL CONDITION ..............................................................................................191
SELECTED STATISTICAL AND OTHER INFORMATION .........................................................220
ASSET AND LIABILITY MANAGEMENT ....................................................................................240
MANAGEMENT AND CORPORATE GOVERNANCE .................................................................256
RELATED PARTY TRANSACTIONS..............................................................................................277
PRINCIPAL SHAREHOLDERS .......................................................................................................281
THE BANKING SECTOR IN KAZAKHSTAN................................................................................284
DESCRIPTION OF SHARE CAPITAL AND CERTAIN MATTERS OF KAZAKHSTAN
    LAW............................................................................................................................................295
TAXATION.........................................................................................................................................307
ISSUANCE AND TRANSFER RESTRICTIONS.............................................................................310
FORM OF THE NON-TENGE NEW NOTES AND PROVISIONS RELATING TO SUCH
    NOTES IN GLOBAL FORM.....................................................................................................314
ADDITIONAL INFORMATION .......................................................................................................321
SCHEDULE 1 — THE RESTRUCTURING PLAN..........................................................................322
    ANNEX 1 — PRELIMINARY DEBT LIST .............................................................................337
    ANNEX 2 — CALCULATION OF ENTITLEMENTS.............................................................349
    ANNEX 3 — FORM OF DEED OF RELEASE ........................................................................350
SCHEDULE 2 — CLAIM FORM......................................................................................................353
SCHEDULE 3 — NOTICE OF CLAIMANTS' MEETING .............................................................364
SCHEDULE 4 — FORM OF PROXY ...............................................................................................365
SCHEDULE 5 — NOTICES OF EURONOTEHOLDERS' MEETINGS ........................................369
SCHEDULE 6 — BTA FINANCE LUXEMBOURG S.A. NOTICES .............................................485
    ANNEX 1 — NOTICE OF SHAREHOLDERS' MEETING.....................................................486
    ANNEX 2 — NOTICE FROM REGISTERED HOLDER TO BENEFICIAL OWNERS OF
        PERPETUAL SECURITIES ..............................................................................................493
    ANNEX 3 — CORRECTION TO NOTICE OF SHAREHOLDERS' MEETING....................498
SCHEDULE 7 — TURANALEM FINANCE B.V. DRAFT PLAN OF COMPOSITION ...............499
SCHEDULE 8 — NOTICE TO BENEFICIAL OWNERS OF CHF NOTES ..................................502

SCHEDULE 9 — TERMS AND CONDITIONS OF THE NEW NOTES AND THE RCTFF ........510
    ANNEX 1 — TERMS AND CONDITIONS OF THE SENIOR DOLLAR NOTES .................510
    ANNEX 2 — TERMS AND CONDITIONS OF THE DOLLAR ORIGINAL ISSUE
        DISCOUNT NOTES ..........................................................................................528
    ANNEX 3 — TERMS AND CONDITIONS OF THE EURO ORIGINAL ISSUE
        DISCOUNT NOTES ..........................................................................................546
    ANNEX 4 — TERMS AND CONDITIONS OF THE RECOVERY UNITS............................564
    ANNEX 5 — TERMS AND CONDITIONS OF THE DOLLAR SUBORDINATED NOTES.588
    ANNEX 6 — TERMS AND CONDITIONS OF THE EURO SUBORDINATED NOTES ......602
    ANNEX 7 — SUMMARY OF TENGE NEW NOTES .......................................................616
    ANNEX 8 — TERMS AND CONDITIONS OF THE RCTFF............................................618
SCHEDULE 10 — REPRESENTATIONS AND WARRANTIES OF THE BANK....................632
SCHEDULE 11 — COVENANTS OF THE BANK ........................................................638
SCHEDULE 12 — CONDITIONS PRECEDENT TO THE RESTRUCTURING PLAN
    BECOMING EFFECTIVE.....................................................................................655
INDEX TO FINANCIAL STATEMENTS .....................................................................F1

## CATEGORIES OF CLAIMANTS

The Restructuring Plan will involve all Claimants in respect of any obligations of the Bank or its Finance Subsidiaries arising directly or indirectly in relation to Designated Financial Indebtedness. Designated Financial Indebtedness is defined under "*Key Terms and Definitions*" and consists broadly of all financial indebtedness of the Bank and its Subsidiaries and any guarantee or surety made or given by the Bank in relation to such financial indebtedness but does not include Excluded Debt.

The following persons are examples of categories of Claimants that must take action in respect of the Restructuring Plan:

- Trustees on behalf of the Euronoteholders;

- holders of notes denominated in Russian Roubles ("**Rouble Noteholders**") which have the benefit of a surety given by the Bank;

- holders of Tenge-denominated securities issued by the Bank (including Kazakhstan pension funds) ("**Domestic Noteholders**");

- counterparties in respect of derivatives contracts and with residual swap exposures;

- trade finance creditors (including Non-OGSC Eligible Trade Finance Creditors);

- Official Government Sector Creditors;

- financial creditors holding Perpetual Securities (and all related Claims under the Support Agreement);

- syndicated and bilateral lenders;

- counterparties under Shariah-compliant arrangements; and

- any other financial creditors who have Claims on the Bank.

The following persons are "**Excluded Creditors**":

(a)    ordinary trade creditors of the Bank (including providers of overnight funds on the money markets);

(b)    creditors with respect to Self-Liquidating Trade Finance Transactions;

(c)    Official Government Sector Creditors with contingent claims (or parts thereof) against the Bank that have not crystallised, matured or fallen due prior to 30 June 2010;

(d)    trade finance creditors which would be Non-OGSC Eligible Trade Finance Creditors but for the proviso in paragraph (iv) of the definition of Non-OGSC Eligible Trade Finance Debt;

(e)    all holders of current accounts, correspondent accounts and deposits with the Bank (including the BV Deposits);

(f)    the Government of Kazakhstan and any of its agencies (including the NBK and municipalities) in respect of Government Funding of up to KZT125 billion (plus accrued interest) for transactions entered into prior to 1 March 2010 and the Government of Kazakhstan and any of its agencies (including the NBK and municipalities) in respect of Government Funding for transactions entered into on and after 1 March 2010;

(g)    holders of Financial Indebtedness not exceeding U.S.$125 million incurred in relation to transactions entered into after 14 April 2009 or entered into before that date and not then funded or which are fully cash collateralised or including a U.S.$6.25 million standby letter of credit to be issued by the Bank and confirmed by Bank of New York Mellon in favour of

VISA International and any cash collateral securing the Bank's obligations in relation to that letter of credit;

(h)   employees of the Bank in respect of claims *qua* employee;

(i)   the Steering Committee, the advisers to the Steering Committee and the advisers to the Bank, but only to the extent such claims relate to outstanding fees, costs and expenses payable by the Bank under the relevant appointment or engagement letters;

(j)   the Supervisor, the Adjudicator, the Independent Auditor, the Recovery Assets Auditor and the Creditor Directors; and

(k)   the trustees for the Euronoteholders in respect of their indemnity rights against the Group.

**Any liability of the Bank to a Related Party (other than Excluded Debt) will be (unless otherwise specified in the Restructuring Plan) cancelled on the Restructuring Date. Related Parties are entitled to submit Claim Forms and to vote at the Claimants' Meeting but, other than as specifically provided in relation to the Finance Subsidiaries, are not eligible to receive Distributions.**

## EXPECTED SEQUENCE OF PRINCIPAL EVENTS

Claimants and Euronoteholders should observe the deadlines set by any institution or settlement system through which they hold any Designated Financial Indebtedness to ensure that their Electronic Instruction Form or Form of Proxy is delivered on time for the purposes of voting at the applicable Euronoteholders' Meeting or the Claimants' Meeting, as the case may be.

**Dates specified for particular events relating to the Restructuring in this Information Memorandum are indicative only and are subject to change.** The date of the final approval of the Restructuring Plan by the Court and of the Euronoteholders' and Claimants' meetings have not been finally settled, although they are expected to occur on or about the dates indicated. The Bank reserves the right to revise this timetable and will give appropriate notice thereof to Claimants.

Key dates relating to the process of adjudication of trade finance Indebtedness and Official Government Sector Debt) are set out at "*Information for Claimants — Trade Finance Creditors and Official Government Sector Creditors*". Other key dates are as follows:

| | |
|---|---|
| Preliminary Debt List published | 22 April 2010 |
| Meeting of Shareholders of BTA Finance Luxembourg | 12.00 noon (Central European time), 22 April 2010 |
| Adjudication Submission Expiry Date (last date for Claimants to notify the Bank of disagreement with classification or quantum of Claims in Preliminary Debt List) | 28 April 2010 |
| Voting Instructions Deadline for Euronotes | 10:00 a.m. (London time), 5 May 2010 |
| Scheduled Supervisor Determination Date (last date for Supervisor to make determinations in respect of Disputed Claims) | 6 May 2010 |
| Euronoteholders' Meetings | 7 May 2010, 21 clear days after notice to Euronoteholders |
| Claims Submission Date (deadline for submission of Claim Forms and Forms of Proxy) | 5:00 p.m. (Almaty time), 19 May 2010 |
| Voting Instructions Deadline for adjourned Euronoteholders' Meetings | 10:00 a.m. (London time), 21 May 2010 |
| Completion of good faith negotiations to agree final and binding amounts by reference to all non-Minor Quantum Discrepancies and disputes as to classification of Disputed Claims and satisfaction of pre-Euronoteholders' Meetings Conditions Precedent | 23 May 2010 |
| Adjourned Euronoteholders' Meetings (if necessary) | 24 May 2010 |
| Adjourned meeting of shareholders of BTA Finance Luxembourg | 25 May 2010 |

| | |
|---|---|
| Deadline to submit Claim Forms for trustees on behalf of Euronoteholders, BTA Finance Luxembourg and Claimants whose Claims remain in dispute on the Claims Submission Date | 10:00 a.m. (Almaty time), 26 May 2010 |
| Register of Agreed Claims established by the Bank and recalculation of coupons, discounts and coefficients of Restructuring Packages | 26 May 2010 |
| Registration for Claimants' Meeting | from 10:00 a.m. (Almaty time), 27 May 2010 until 10:00 a.m. (Almaty time), 28 May 2010 |
| Claimants' Meeting | 28 May 2010 |
| Minutes of the Claimants' Meeting published by the Bank | 31 May 2010 |
| Submission to the FMSA of the Restructuring Plan approved by the Claimants to ensure conformity with the Restructuring Plan originally submitted to the FMSA | 31 May 2010 |
| Submission of the Restructuring Plan and minutes of Claimants' Meeting to the Court for approval | 4 June 2010 |
| Notice of the Court's final hearing regarding the Restructuring Plan to Claimants | At least 14 days in advance of the final hearing |
| Settlement Instructions Deadline (for submission of all Settlement Instructions) | 25 June 2010 |
| Bank satisfies remaining Conditions Precedent | 30 June 2010 |
| Hearing of the Court to approve the Restructuring Plan and the approval of the Restructuring Plan by the Court | 2 July 2010 |
| The Bank publishes details of the Court's decision | 9 July 2010 |
| Restructuring Date (distribution of cash, New Notes, Shares and GDRs and Listing of the New Notes on an Approved Stock Exchange and the KASE as applicable) | 14 July 2010 |
| The Court's order confirming that the Restructuring Plan has been carried out and the Restructuring is complete | 23 July 2010 |
| Deadline for Listing the GDRs on an Approved Stock Exchange | 14 January 2011 |

If there are any changes to the above times and/or dates, the revised times and/or dates will be notified to Claimants in a Regulatory Information Service Announcement and will be published on the Bank's website (www.bta.kz/en/investor).

**LETTER FROM THE CHAIRMAN OF THE MANAGEMENT BOARD OF THE BANK**

1 May 2010

Dear Stakeholders,

**Introduction**

I am writing to give you notice of the meeting of the Claimants to be held on 28 May 2010 at The Dostyk Hotel, 36 Kurmangazy Street, Almaty 050021, Kazakhstan.

This letter and the recommendation from the Management Board is part of an Information Memorandum distributed to you for the reasons set out below and is qualified in its entirety by the more detailed information contained in the Information Memorandum.

The Bank and its advisers believe that a restructuring of the Bank's balance sheet is in the best interest of all of the Bank's creditors.  If a financial restructuring is not completed, the Bank is likely to enter into conservation and/or bankruptcy under Kazakhstan law.  If the Bank enters into conservation and/or bankruptcy, given its financial position and the fact that statutory claimants in Kazakhstan would have first claim on substantially all of the Bank's assets, the proceeds available to Claimants and Euronoteholders could be reduced to a level considerably below the value of the cash, New Notes, Shares and GDRs they would receive under the Restructuring Plan.

The terms of the Restructuring Plan are complex and I have summarised the key points in this letter.  I urge you, however, to read the entire Information Memorandum with care, since it contains a great deal of important information.  In particular, please see "*Risk Factors*" for a discussion of the risks associated with the Bank, the Restructuring and the New Notes, Shares and GDRs.

In this letter and in the Information Memorandum I use many defined terms, which have initial capital letters.  A list of these terms and their definitions can be found in "*Key Terms and Definitions*" in the Information Memorandum.

**Background to Restructuring and Significant Events**

Please see "*The Bank — Background to the Restructuring*" for information relating to the background to and reasons for the Restructuring.  Certain significant events relating to the Restructuring are set out below:

- On 2 February 2009, the Government, citing concerns over the state of the Kazakhstan economy and the Bank's ability to provision adequately for its debts, issued a directive requesting a mandatory increase of the Bank's share capital.

- On 3 February 2009, Samruk-Kazyna acquired 25,246,343 newly issued shares in the capital of the Bank for KZT 212 billion thereby obtaining a controlling stake of 75.1 per cent. in the Bank.

- At a meeting of the Board of Directors held on 3 February 2009, the Bank appointed a representative of Samruk-Kazyna to the Management Board.

- On 23 April 2009, the Bank stated that in order to treat all creditors equally, it had imposed a moratorium, ceasing to make all principal repayments (including scheduled maturities) and only servicing the interest repayments under its financial obligations.  This moratorium was stated to last indefinitely until the Bank had agreed and implemented with its creditors and investors a transparent and efficient programme for managing its current debt position.

- On 24 April 2009, the Bank announced that it had received notices up to 23 April 2009 from several creditors accelerating any debts owed to them by reason of default.

5

- On 3 July 2009, the Bank announced that in order to ensure the successful realisation of its restructuring programme it would not be distributing the net profit of the Bank for the fiscal year ending 31 December 2008 and would not be making any annual dividends.

- On 21 July 2009, the Bank retained the services of KPMG LLP London to conduct financial due diligence on the Bank primarily focusing on the Bank's loan portfolio and its other financial investments.

- On 21 July 2009, the Bank announced that a Steering Committee of its financial creditors was in the process of being established.

- On 22 July 2009, the Bank announced that the moratorium on its financial indebtedness was being extended to interest repayments as well.

- On 23 July 2009, the Bank made a presentation in London to certain creditors and investors (members of the proposed Steering Committee) concerning the Bank's financial position and future strategy.

- On 18 August 2009, the Bank made a presentation to its creditors and investors on its asset recovery strategy.

- On 27 August 2009, the Bank commenced legal proceedings against members of the former management of the Bank to recover assets it believes are owed to it. This was on the basis of evidence put to the court that some members of the former management have allegedly defrauded the Bank of approximately U.S.$300 million through a series of questionable agreements entered into previously in favour of off-shore companies in which these members of the former management are alleged to have held an interest.

- On 3 September 2009, the Bank formally appointed a Steering Committee of its financial creditors after agreeing on an Outline of Restructuring Principles with them. Currently, the Steering Committee comprises The Royal Bank of Scotland N.V. (formerly known as ABN AMRO Bank N.V.), Commerzbank Aktiengesellschaft, the D. E. Shaw Group, Euler Hermes Kreditversicherungs AG (acting for and on behalf of the Federal Republic of Germany), Fortis Investment Management UK Limited, Gramercy Advisors LLC, The Bank of Singapore Limited (formerly ING Asia Private Bank Limited), KfW (representing its affiliates DEG — Deutsche Investitions — und Entwicklungsgesellschaft mbH and KfW IPEX-Bank GmbH), Standard Chartered Bank, Export-Import Bank of the United States and Wells Fargo Bank N.A. (formerly known as Wachovia Bank N.A.).

- On 8 September 2009, following a recently completed internal review of its credit exposures coupled with KPMG's external review, the Bank announced an increase in its loan loss provisions to KZT 400 billion.

- Between 14 September and 17 September 2009, meetings took place in London between the Bank's advisers and the Steering Committee following which on 21 September 2009, the Bank signed a Memorandum of Understanding with the Steering Committee which outlined the general principles of the restructuring and two proposals for options to be offered to creditors.

- The Bank's application to the Court to initiate the restructuring was accepted by the Court on 16 October 2009, which resulted in an automatic stay of all relevant claims of the Bank's Creditors and protection of the Bank's property from execution and attachment until completion of the Restructuring.

- Following further discussions between the Steering Committee and the Bank, on 7 December 2009, the Bank and the Steering Committee signed a Principal Commercial Terms Sheet setting out the principal commercial terms of the Restructuring.

- On 17 March 2010 a Principal Commercial Terms Sheet Amendment Letter was signed between the Bank and the Steering Committee setting out amendments to the key commercial terms (as originally set out in the Principal Commercial Terms Sheet) of the Restructuring and the Bank published a news release relating to the commencement of adjudication of trade finance and Official Government Sector Creditor claims.

- On 18 April 2010 the Bank and the Steering Committee signed a Summary of Key Terms and Conditions of the Restructuring, setting out the detailed terms of the Restructuring (the "**Detailed Term Sheet**").  The offer made in this Information Memorandum does not vary in any material respect from the Term Sheet.

- On 22 April 2010 the Bank published the Preliminary Debt List, which is reproduced (as subsequently updated on 30 April 2010) at Schedule 1 *(The Restructuring Plan)*, Annex 1 *(Preliminary Debt List)*.

**Loan Loss Provisions**

Please refer to "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Factors Affecting the Bank's Results of Operations — Loan Loss Provisions*" for information regarding an increase in the Bank's loan loss provisions.

**Principal Elements of the Restructuring**

The Bank's proposed Restructuring Plan (set out in Schedule 1 (*The Restructuring Plan*)) will be effected through the allocation of new consideration in exchange for the cancellation or restructuring of the debts represented by the Designated Financial Indebtedness.

If the Restructuring Plan becomes effective Claimants will receive one or more of the following forms of Entitlement depending on which Restructuring Package or Packages their Claims are allocated to:

- Cash, Senior Notes, Subordinated Notes, Shares (or GDRs) and Recovery Units under Senior Package 1;

- OID Notes, Subordinated Notes, Shares (or GDRs) and Recovery Units pursuant to Senior Package 2;

- Participation in the RCTFF pursuant to Senior Package 3;

- Subordinated Notes pursuant to Junior Package 1; and

- Shares or GDRs pursuant to Junior Package 2.

The Restructuring Packages are described under "*Terms of the Restructuring Packages*".

Claimants may elect to receive their Non-Tenge New Notes (other than the Recovery Units) through a special purpose company which will hold such Non-Tenge New Notes (see "*Bank Creditor SPVs*").

Legal restrictions in certain jurisdictions may prevent distribution of the New Notes, Shares or GDRs. Claimants in those jurisdictions will receive the net proceeds of the sale of the New Notes, Shares or GDRs to which they would otherwise be entitled.  Further details are set out in "*Information for Claimants — Entitlement to and Distribution of Cash, New Notes and/or Shares and/or GDRs*".

**Shares and GDRs**

Upon completion of the Restructuring, the Shares of the Bank will be held as follows: approximately 81.5 per cent. less the Residual Minority Shareholder Percentage will be held by Samruk-Kazyna,14 per cent. will be held by Claimants restructured under Senior Packages 1 and 2 and 4.5 per cent. will be held by Claimants allocated to Junior Package 2. Shares allocated to Claimants may be delivered to such Claimants in the form of GDRs in respect of Claimants who are

non-Kazakh residents (unless the Claimant so elects in its Claim Form to receive Shares) and in respect of Kazakh residents, Shares.

The Bank will list the GDRs on an Approved Exchange no later than six months after the Restructuring Date.  See "*The GDR Programme*" for further information in relation to the rights of Restructuring Creditors receiving Shares or GDRs including minority protection rights.

***Drag-Along and Tag-Along Rights***

GDRs and Shares allocated to Restructuring Creditors under the Restructuring Plan will be subject to and benefit from minority protections including drag-along and tag-along rights.  See "*The GDR Programme*".

In addition, Creditor Shareholders will enjoy the benefit of various other minority protection rights which will be set out in undertakings by Samruk-Kazyna and BTA, in the Bank's Charter and the Deposit Agreement (see "*Undertakings by the Bank and Samruk-Kazyna – Share Distribution and Rights of Minority Shareholders*" and "*The GDR Programme*").

**Interest**

Interest accrued but unpaid to 30 June 2010 (calculated in accordance with "*Information for Claimants — Information for all Claimants*") will be included in the Restructuring for purposes of voting at the Claimants' Meeting and allocation of Entitlements.

**Samruk-Kazyna**

Samruk-Kazyna has a Claim against the Bank (which we refer to as the SK Claim) in the amount of KZT 671 billion (including accrued interest through 31 March 2010) in relation to the Bank Bonds.  Samruk-Kazyna will therefore vote at the Claimants' Meeting in respect of its Claim but will not be allocated into a Restructuring Package.  Instead, Samruk-Kazyna's Claim in relation to the Bank Bonds will be cancelled in consideration of the issuance to it of such number of Shares so that after the Restructuring its shareholding in the Bank will be 81.5 per cent. of the total issued Shares of the Bank.

In addition, Samruk-Kazyna shall issue a guarantee to the NBK for a duration of no less than ten years in respect of the obligations of the Bank to the NBK under any BTA/NBK Repo Transaction, in consideration of which the Bank will pay a guarantee fee semi-annually to Samruk-Kazyna equal to 50 per cent. of the interest paid from time to time by Samruk-Kazyna to the Bank on any outstanding Samruk-Kazyna Bonds (i) held by the Bank or (ii) which are the subject of a BTA/NBK Repo Transaction, if any, *provided that* this guarantee fee will not exceed KZT 6.45 billion in 2010 and thereafter KZT 12.9 billion annually, such fee to cease on the fourteenth anniversary of the date of the Restructuring Date.

**Related Party Debt**

On the Restructuring Date, Related Party Debt (other than Excluded Debt) shall be cancelled in full and no further payment on such Related Party Debt shall be made by the Bank and, save as set out in the Restructuring Plan, no Related Party shall be entitled to any Distribution in respect of such cancelled Related Party Debt.  The mechanisms for dealing with the Designated Financial Subsidiaries of Claimants which are Finance Subsidiaries is set out in "*Information for Claimants*".

**The Board of Directors**

Immediately after the Restructuring Date, the Board of Directors shall consist of nine directors comprising four Samruk-Kazyna Directors, two Creditor Directors and three Independent Directors. See "*Management and Corporate Governance*" for further information.

**The Restructuring Law and the Restructuring Plan**

The Restructuring Plan will be effected by the Bank under the Restructuring Law.  The Restructuring Plan is a formal process under which the Bank will be released from claims of certain creditors (i.e., holders of Designated Financial Indebtedness) in return for certain Claimants' entitlement to receive cash, New Notes, Shares or GDRs or a participation in the RCTFF under the Restructuring Plan.

If Claimants holding at least two-thirds by value of the Designated Financial Indebtedness vote in favour of the Restructuring Plan it will be binding on all Claimants and Related Parties.

A meeting of the Claimants to consider and, if thought fit, to approve the Restructuring Plan is scheduled to take place on 28 May 2010 in Almaty.  If the Restructuring Plan is approved at the Claimants' Meeting, the Restructuring Plan will take effect once it has received the final approval of the FMSA and the Court and provided certain conditions precedent set out in Schedule 12 (*Conditions Precedent to the Restructuring Plan Becoming Effective*) have been met or waived.

If the Bank determines that the Information Memorandum does not contain all material information reasonably necessary to enable all interested parties to make an informed decision about the Restructuring Plan or that any of the procedures comprised or terms relating to in the Restructuring Plan need to be amended in advance of the Approval Date in order more efficiently or effectively to complete the Restructuring, the Bank will publish a revised Information Memorandum or a supplement thereto.  In addition, the Bank reserves the right to change the date on which the Claimants' Meeting is held or on which other events are to occur so long as it provides adequate notice to Claimants via a Regulatory Information Service.

**Kazakhstan Taxation Considerations**

A number of Kazakhstan tax considerations for Claimants in relation to the Restructuring are set out in the Information Memorandum under "*Taxation*".  The comments are of a general, non-exhaustive nature, are included for information purposes only and are not intended to be legal or tax advice. Claimants should therefore consult their own advisers with respect to the possible tax consequences of receiving cash, New Notes and/or Shares or GDRs in the Restructuring.

**Action to be Taken by Claimants**

On 17 March 2010 the Bank issued a press release announcing a process for the adjudication of trade finance and Official Government Sector Creditor Claims, the purpose of which was to categorise the trade finance-related and Official Government Sector Creditor Claims and to adjudicate the principal amounts (but not interest) relating to those Claims in advance of the Claimants' Meeting.  See the full text of the press release at *"Information for Claimants — Information for Trade Finance Creditors and Official Government Sector Creditors"*.

On 22 April 2010 the Bank issued a press release relating to the verification of amounts of Claims and their classification and published the Preliminary Debt List based on its records, specifying in each case the total principal amount outstanding of each debt, as well as a calculation (or good faith estimate) of interest accrued to 30 June 2010.   See the full text of the press releases and the procedures and rules described in "*Information for Claimants — Information for all Claimants*" and in Schedule 1 (*The Restructuring Plan*) for information on what action must be taken by Claimants, including information relating to restrictions on set-offs by creditors.

In addition, all Claimants must complete and return a Claim Form and, if applicable, a Form of Proxy, contained at Schedule 2 (*Claim Form*) and Schedule 4 (*Form of Proxy*), respectively by electronic mail or facsimile in accordance with "*Information for Claimants – Information for all Claimants – Details for Return of Claim Forms*" **by 5:00 p.m. (Almaty time) 19 May 2010**.[1]  However, the

---

[1] Trustees on behalf of Euronoteholders, BTA Finance Luxembourg and Claimants whose Claims remain in dispute may submit Claim Forms until 10:00 a.m. (Almaty time) on 26 May 2010.

mechanisms for indirect participation in the Restructuring applicable to Euronoteholders, holders of CHF Notes and holders of Perpetual Securities are described in "*Information for Claimants*".

Claimants are entitled to attend and vote at the Claimants' Meeting, either in person or by proxy.

Claimants with questions relating to the quantum or classification of their Claim or the completion of Claim Forms should contact:

Mr. Asset Zhaisanov, Investor Relations Department
Tel: +7 727 3124671
E-mail: zhaisanov@bta.kz

Ms. Dinara Adil, Loan and Capital Markets Department
Tel: +7 727 266 26 07
E-mail: d_adil@bta.kz

The Bank may dispute the validity of a Claim at any time and may assert its rights in relation thereto notwithstanding completion of the Restructuring.

**Advantages of the Restructuring**

The Bank believes that the Restructuring will allow the Bank to continue as a going concern.  It is expected that:

● the Restructuring will provide the Bank's business with a new, sustainable capital structure;

● the Bank will be recapitalised by approximately U.S.$11.25 billion through (i) an injection of capital by way of the conversion of the debt owed to Samruk-Kazyna into Shares and (ii) the discharge and/or cancellation of Claims in exchange for new consideration;

● based on the Bank's pro-forma calculations, and its current estimate of the obligations to be cancelled pursuant to the Restructuring, the financial debt of the Bank will be reduced from approximately U.S.$11.39 billion as adjusted at 30 September 2009 to approximately U.S.$4.378 billion upon the restructuring becoming effective;

● Samruk-Kazyna will remain as the majority shareholder in the Bank, which the management of the Bank believes will restore confidence in its viability as a financial institution; and

● the strengthening of the Bank's financial position will also enable senior management to focus its efforts on further improving the operating performance of the Bank, and to provide additional stability to the Bank's customers, employees and other stakeholders.

**Disadvantages of the Restructuring**

As a result of the Restructuring, Claimants will generally have to accept significant discounts to the value of their existing Claims, which will be cancelled or restructured in exchange for the Entitlements deliverable under the Restructuring Plan.

**Consequences of the Restructuring Not Being Implemented**

The Restructuring is necessary to ensure the survival of the Bank.  If the Restructuring is not implemented, the ultimate return to creditors will be severely diminished as the Bank is expected to go into conservation or bankruptcy or may be subject to other procedures under applicable law.  See "*Risk Factors — Risks Relating to the Restructuring — If the Restructuring does not occur, the FMSA may institute proceedings for conservation or an insolvent liquidation of the Bank*".

The Bank understands that those financial institutions based in Kazakhstan that have been placed into conservation or bankruptcy in the past have made only limited repayments to creditors.  Under Kazakhstan law, certain creditors have priority of payment or repayment upon the bankruptcy of a bank.  These include, in order of priority, expenses related to the bankruptcy, payments for tort claims involving death or health, payments due to employees, payments to the KDIF and payments due to individual depositors.  Unsecured claims of creditors and subordinated claims are the last to be paid out on bankruptcy.  The Bank believes that no Kazakhstan bank placed into conservation or bankruptcy has had sufficient assets to make any payments to creditors ranking below the KDIF.

The Bank therefore believes that if the Bank is placed into conservation or bankruptcy creditors are likely to receive severely reduced returns on their Claims or no return at all.

**Other Relief Sought**

Recognition of the proceedings relating to the Restructuring was obtained:

- on 18 December 2009 in the United Kingdom as a foreign main proceeding in accordance with the Model Insolvency Law as set out in Schedule 1 to the Cross Border Insolvency Regulations 2006;

- on 2 March 2010 in the United States as a foreign main proceeding under Chapter 15 of the U.S. Bankruptcy Code; and

- on 17 February 2010 in the Ukraine by virtue of a decision of the Solomensky District Court of Kiev which came into force on 23 February 2010.

Recognition of the proceedings relating to the Restructuring is also being sought in Russia but a Russian court has declined to grant recognition prior to the final decision of the Court and there is no guarantee that, in any event, that ultimately such recognition will be obtained.

**Other Matters**

You are urged to read the Information Memorandum of which this letter forms a part as it contains detailed information on the Bank, the risks to be considered concerning the Bank's business and the Restructuring, financial information in relation to the Bank and details of the Restructuring Plan.  In particular, please see "*Risk Factors*" for a description of certain risks regarding the Bank and the Restructuring.

**Recommendations of the Bank's Management**

The terms of the Restructuring are complex and you are urged to read the Information Memorandum with care, since it contains a great deal of important information.  If you are in any doubt as to the action you should take, you are recommended immediately to seek advice from your independent adviser.

The Bank believes that the Restructuring is in the best interests of the Bank and its stakeholders taken as a whole and represents the best available compromise among all creditors, Samruk-Kazyna and the financial authorities in Kazakhstan and therefore urges Claimants to attend the Claimants' Meeting and, Euronoteholders to attend Euronoteholders' meetings, and in each case, to vote or instruct the Trustee to vote in favour of the Restructuring Plan.

The Bank may, without the consent of creditors or other interested parties, make a modification to the Restructuring Plan or any procedures to complete the Restructuring, in each case which are of a minor or technical nature or to correct a manifest error and/or to postpone particular events or deadlines by which particular aspects of the Restructuring need to be completed so long as the postponement is not materially prejudicial to interested parties and if it does do so will give appropriate notice.

Yours faithfully,


Anvar Saidenov

Chairman of the Management Board
JSC BTA Bank

## KEY TERMS AND DEFINITIONS

In this Information Memorandum:

"**Acceptable Bank**" means (a) a bank or financial institution which has a rating for its long term unsecured and non credit-enhanced debt obligations of BBB or higher by S&P or Fitch or B3 or higher by Moody's or a comparable rating from an internationally recognised credit rating agency or (b) any other bank or financial institution approved by the New Notes Trustee;

"**Account Designation**" means the designation as specified in the Settlement Instructions of an Existing Account, Designated Account or Local Account into which a Claimant with an Agreed Claim instructs deliveries under its Entitlement to be credited;

"**Accredited Investor**" means an accredited investor as defined in Rule 501(a) of Regulation D;

"**Accrued Interest**" means, in respect of Designated Financial Indebtedness, all accrued but unpaid interest or Late Payment Donations up to and including 30 June 2010 (in each case excluding all default interest or the default element of any Late Payment Donation) and calculated in accordance with "*Information for Claimants – Information for all Claimants*";

"**acting in concert**" means a group of persons who, pursuant to an agreement or understanding (whether formal or informal), actively co-operate, through the acquisition directly or indirectly of shares in the Bank or any of assets by any of them, either directly or indirectly, to obtain or consolidate control of the Bank;

"**ADB**" means Asian Development Bank;

"**Adjudicator**" means Watson, Farley & Williams LLP, appointed as adjudicator of trade finance related Claims;

"**Advisers**" means Lazard Frères, UBS Limited, Deloitte, White & Case LLP, White & Case Kazakhstan LLP, White & Case LLC, Baker & McKenzie LLP, Baker & McKenzie CIS Limited, Field Fisher Waterhouse LLP, Lovells, Allen & Overy LLP, NautaDutilh N.V., NautaDutilh Avocats Luxembourg and their respective Affiliates and Subsidiaries and any other adviser to the Bank, its Subsidiaries, the Government, the NBK, the FMSA, Samruk-Kazyna or the Steering Committee appointed in relation to the Restructuring

"**Affiliate**" of a person means a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, that person;

"**Agreed Claim**" means a Claim, the amount of which is liquidated in amount and has either been agreed to by the Bank or otherwise been determined by the Supervisor in accordance with the provisions of the Restructuring Plan;

"**Agreed Claimant**" means a Claimant (other than a Related Party) with an Agreed Claim. For the avoidance of doubt, if a Claimant has both an Agreed Claim and a Claim which has not yet been agreed, it shall be treated for the purposes of this Restructuring Plan as an Agreed Claimant only in respect of its Agreed Claim;

"**Agricultural State Finance Programme**" means the KZT 120,000 million programme adopted by the Government in July 2008 aimed at ensuring the stability and development of the agricultural sector of the Kazakhstan economy;

"**ALCO**" means the Bank's Asset and Liability Management Committee;

"**Allocation Mechanism**" has the meaning as set out in *"Allocation Mechanism"*;

"**Annual Financial Statements**" means the audited consolidated financial statements of the Bank as at and for the years ended 31 December 2007, 2008 and 2009 contained in this Information Memorandum;

"**Approval Date**" means the date of the Claimants' Meeting which approves the Restructuring Plan;

"**Approved Stock Exchange**" means a recognised stock exchange established in any member state of the European Economic Area;

"**Associate**" means an entity more than 20 per cent. and less than 50 per cent. of whose equity capital is owned by the Bank, directly or indirectly through one or more intermediaries;

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, permit, exemption, filing, notarisation or registration including the Bank's Banking Licence, required in connection with the business of the relevant person or in connection with the Restructuring, the Deeds of Covenant and/or Restructuring Documents;

"**Bank**" means JSC BTA Bank;

"**Bank Bonds**" means the 9 per cent. bonds issued by the Bank in an aggregate amount of KZT 645 billion in March 2009 to Samruk-Kazyna in exchange for all of the SK Bonds;

"**Bank Creditor Loan Agreement**" has the meaning as set out in "*Bank Creditor SPVs*";

"**Bank Creditor SPV**" means each special purpose company established for the benefit of the Restructuring Creditors who have elected to receive their allocation of applicable Non-Tenge New Notes under Senior Package 1 and/or Senior Package 2 indirectly;

"**Bank Group**" means the Bank and the Finance Subsidiaries;

"**Banking Law**" means the law of the Republic of Kazakhstan On Banks and Banking Activity in the Republic of Kazakhstan dated 31 August 1995, as amended;

"**Banking Licence**" means the licence and/or permits to carry out banking operations and other operations permitted by applicable legislation;

"**Base Case Model**" means the financial model titled "BTA Bank — BP — Revised PCTS@ 18 04 2010 — Sent Deloitte" sent to Deloitte at 8.00 p.m. on 18 April 2010;

"**Basel Accord**" means the 1988 Capital Accord adopted by the Basel Committee on Banking Supervision, then known as the Basel Committee on Banking Regulations and Supervisory Practices;

"**Basel II Report**" means the report titled "International Convergence of Capital Measurement and Capital Standards: A Revised Framework" of the Basel Committee on Banking Supervision;

"**Beneficial Owner**" has the meaning set out in "*Information for Claimants — Information for Euronoteholders*";

"**BIS**" means the Bank for International Settlements;

"**BIS Guidelines**" means the guidelines adopted by the Basel Committee on Banking Regulations and Supervisory Practices of the Bank for International Settlements;

"**Board of Directors**" or the "**Board**" means the board of directors of the Bank from time to time; "**Borrower**" means the Bank;

"**BTA Armenia**" means CJSC BTA Bank, a closed joint stock company incorporated under the laws of the Republic of Armenia on 1 June 1991;

"**BTA Belarus**" means JSC BTA (Belarus), a joint stock company formed under the laws of Belarus on 25 April 2002;

"**BTA DPR Finance Company**" means BTA DPR Finance Company, a public limited company formed under the laws of the Cayman Islands on 2 September 2007;

"**BTA Finance Luxembourg**" means BTA Finance Luxembourg S.A. affiliated company of JSC BTA Bank, a wholly owned subsidiary of the Bank incorporated in Luxembourg;

"**BTA Georgia**" means Joint Stock Company BTA Bank, a joint stock company incorporated under the laws of Georgia on 14 March 2000;

"**BTA Insurance**" means BTA Insurance JSC Subsidiary company of BTA Bank, a joint stock company formed under the laws of Kazakhstan on 8 September 1998;

"**BTA Ipoteka**" means JSC BTA Ipoteka Subsidiary Mortgage company of JSC BTA Bank, a joint stock company formed under the laws of Kazakhstan on 20 November 2000;

"**BTA Kazan**" means Joint Stock Commercial Bank BTA-Kazan (Tatarstan) (open joint stock company), a joint stock company incorporated under the laws of the Russian Federation on 3 October 1992;

"**BTA Kyrgyzstan**" means CJSC BTA Bank (Kyrgyzstan), a closed joint stock company formed under the laws of Kyrgyzstan on 2 December 1996;

"**BTA/NBK Repo Transaction**" means any securities repurchase or resale agreement, securities borrowing agreement (or other agreement between the Bank and the NBK which is similar in legal and commercial effect to any of the foregoing) pursuant to which liquidity is made available by the NBK to the Bank against the SK Bonds;

"**BTA Orix Leasing**" means JSC "BTA Orix Leasing", a joint stock company incorporated under the laws of Kazakhstan on 31 August 2000;

"**BTA Pension Fund**" means JSC Subsidiary of JSC BTA Bank Accumulative Pension Fund BTA Kazakhstan, previously known as JSC Pension Fund Kurmet Kazakhstan, a joint stock company formed under the laws of Kazakhstan and reregistered on 30 December 2005;

"**BTA Russia**" means AMT Bank limited liability company, formerly known as BTA Bank limited liability company (Russia), which was formerly known as Slavinvestbank, a limited liability company incorporated under the laws of the Russian Federation on 10 May 1994;

"**BTA Securities**" means BTA Securities JSC, a joint stock company formed under the laws of Kazakhstan on 17 October 1997;

"**BTA Ukraine**" means OJSC BTA Bank, (Ukraine), formerly known as Ukrainian Credit and Trade Bank, an open joint stock company created under the laws of Ukraine on 10 December 1992;

"**BTA Undertaking**" means the deed poll to be executed by the Bank prior to the Restructuring Date covering (without limitation) compliance with the New Charter;

"**BTA Zabota**" means JSC Subsidiary insurance company of BTA Bank BTA Zabota, a joint stock company formed under the laws of Kazakhstan on 10 September 1996;

"**BTA Zhizn**" means JSC Subsidiary Life Insurance company of BTA Bank BTA Zhizn, a joint stock company formed under the laws of Kazakhstan on 22 July 1999;

"**Business Plan**" means, at any time, the Bank's business plan then in effect duly approved by a Qualified Majority;

"**BV Deposit**" means any deposit held by the Bank for the account of TuranAlem Finance in relation to a series of Euronotes together with all accrued interest thereon (excluding the accrued but unpaid tax margin);

"**BV Scheme**" means the a plan of composition (*akkoord*) offered by TuranAlem Finance under the Dutch Bankruptcy Act (*Faillissementswet*);

"**BVI Proceedings**" means the legal proceedings initiated by the Bank as described in "*The Bank — Asset Recovery — BVI Proceedings*";

"**BYR**" means the Belarusian Ruble, the legal currency of Belarus;

"**Called Principal**" has the meaning set out in Condition 8(f) of Annex 1 (*Terms and Conditions of the Senior Dollar Notes*) or of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Capital**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Financial Covenants of the Bank*);

"**Cash Coefficient**" has the meaning set out in "*Terms of the Restructuring Packages — Senior Package 1*";

"**Cash Equivalent Investments**" means at any time:

(a) overnight bank deposits, time deposit accounts, certificates of deposit, banker's acceptances and money market deposits maturing within one year after the relevant date of calculation and issued by an Acceptable Bank or the NBK;

(b) any investment in marketable debt obligations issued or guaranteed by the government of the United States of America, the United Kingdom, Canada, Switzerland, any member state of the European Economic Area or any Participating Member State or by an instrumentality or agency of any of them having an equivalent credit rating, maturing within one year after the relevant date of calculation and not convertible or exchangeable to any other security;

(c) commercial paper not convertible or exchangeable to any other security:

(i) for which a recognised trading market exists;

(ii) issued by an issuer incorporated in the United States of America, the United Kingdom, Canada, Switzerland, any member state of the European Economic Area or any Participating Member State;

(iii) which matures within one year after the relevant date of calculation; and

(iv) which has a credit rating of either A-1 or higher by S&P or F1 or higher by Fitch or P-1 or higher by Moody's, or, if no rating is available in respect of the commercial paper, the issuer of which has, in respect of its long-term unsecured and non-credit enhanced debt obligations, an equivalent rating;

(d) Tenge bills of exchange eligible for rediscount at the NBK and accepted by an Acceptable Bank (or their dematerialised equivalent);

(e) any investment in money market funds which (i) have a credit rating of either A-1 or higher by S&P or F1 or higher by Fitch or P-1 or by Moody's Investor Services Limited, (ii) which invest substantially all their assets in securities of the types described in paragraphs (a) to (d) above and (iii) can be turned into cash on not more than 30 days' notice; or

(f) re-purchase obligations with a term of not more than seven days for underlying securities of the types described in paragraphs (a) to (d) above entered into with any financial institution meeting the qualifications specified in sub-paragraphs (c)(ii) and (iv) above;

(g)     money market funds at least 95 per cent. of the assets of which constitute Cash Equivalent Investments of the kinds described in paragraphs (a) through (f) of this definition;

(h)     any other debt security approved by an Extraordinary Resolution and to which any member of the Group is alone (or together with other members of the Group) beneficially entitled at that time and which is not issued or guaranteed by any member of the Group or subject to any Security;

"**Cash Management Agreement**"  has the meaning set out in Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 4 (*Terms and Conditions of the Recovery Units*) to this Information Memorandum;

"**Change of Control**" means:

(a)     Samruk-Kazyna ceases to control the Bank (other than where it ceases to control the Bank (a) by transfer of control to a Permitted Transferee or (b) in connection with a Secondary Public Offering), where "**control**" of the Bank means:

   (i)     the holding beneficially of more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital); or

   (ii)    the power (whether by ownership of shares, proxy, contract, agency or otherwise) to cast, or control the casting of, more than 50 per cent. of the maximum number of votes that might be cast at a general meeting of the Bank; or

(b)     Any person or group of persons acting in concert (other than where (a) such person or persons are Permitted Transferees or (b) in connection with a Secondary Public Offering) gains control of the Bank where "control" means the power (whether by ownership of shares, proxy, contract, agency or otherwise) to:

   (i)     appoint or remove all, or the majority, of the directors or other equivalent officers of the Bank; or

   (ii)    give directions with respect to the operating and/or financial policies of the Bank with which the directors or other equivalent officers of the Bank are obliged to comply;

   *provided that* any agreement whereby management of the Bank is transferred to a third party (the "**manager**") that does not, in conjunction with any acquisition of shares in the Bank by such manager or its Affiliates (whether or not occurring at the same time), cause the government of the Republic of Kazakhstan to cease to own more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), will not constitute a "**Change of Control**" if (a) the New Note Trustee and the Creditor Directors have been provided with an opinion in form and substance satisfactory to them of independent legal advisers of recognised standing to the effect that the management agreement, in conjunction with any acquisition of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), does not cause the government of the Republic of Kazakhstan (directly or indirectly) to cease to "control" the Bank or to have majority economic risk and/or benefit in the Bank and continues to allow the government of the Republic of Kazakhstan (directly or indirectly) to retain the sole right to exercise its rights as majority shareholders (including in relation to the appointment of directors), (b) the terms of the management agreement have been approved by a Qualified Majority and (c) the "**manager**" is a Permitted Transferee;

"**Charter**" means the current charter of the Bank;

"**CHF**" means the Swiss Franc, the legal currency of Switzerland;

"**CHF Notes**" means the CHF 200,000,000 Floating Rate Senior Notes due 2017 issued by the Bank on 7 August 2007;

"**Chrysopa**" means Chrysopa Holdings BV, a Dutch company;

"**Chrysopa Loan**" means the purported loan for U.S.$ 120 million from the Bank to Chrysopa on 1 August 2008 that is the subject of the Chrysopa Proceedings;

"**Chrysopa proceedings**" means the legal proceedings initiated by the Bank as described in "*The Bank — Asset Recovery — Chyrsopa Proceedings*";

"**Civil Code**" means the General Part of the Civil Code of the Republic of Kazakhstan dated 27 December 1994 (as amended) and/or the Special Part of the Civil Code of the Republic of Kazakhstan dated 1 July 1999 (as amended);

"**Claim**" means any amount which is claimed to be owed (actually or contingently) by a member of the Bank Group arising out of any Designated Financial Indebtedness;

"**Claim Form**" means the form set out in Schedule 2 (*Claim Form*) to this Information Memorandum;

"**Claimant**" means any person having a Claim including, but not limited to, Rouble Noteholders, Domestic Noteholders, Non-OGSC Eligible Trade Finance Creditors, Official Government Sector Creditors, Euronoteholders and/or the Trustee on their behalf, derivatives counterparties and syndicated and bilateral creditors of the Bank, but does not include Excluded Creditors or (except with respect to attending or voting at the Claimant's Meeting and the submission of any Form of Proxy and, in certain cases, Entitlements) Related Parties;

"**Claimants' Meeting**" means the meeting of Claimants (including the Trustee) convened in accordance with the Initial Order to consider and, if thought fit, approve the Restructuring Plan, including any adjournment thereof;

"**Claims Submission Date**" means 5:00 p.m. (Almaty time) on 19 May 2010[2] or such other date as shall be notified to Claimants by announcement on a Regulatory Information Service or on the Bank's website at www.bta.kz;

"**Clearing System**" means each or all of DTC, Euroclear or Clearstream, as appropriate and, in relation to the Tenge New Notes, KDC;

"**Clearstream**" means Clearstream Banking, société anonyme, Luxembourg;

"**Coefficients**" means each of the Cash Coefficient, the Senior Debt Coefficient, the SP1 Subordinated Debt Coefficient, the SP2 Subordinated Debt Coefficient and the OID Coefficient, as set out in "*Terms of the Restructuring Packages*";

"**Coercive Practice**" means impairing or harming or threatening to impair or harm, directly or indirectly, any party or its property or to influence improperly the actions of another party;

"**Collection Account**" has the meaning set out in Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 4 (*Terms and Conditions of the Recovery Units*) to this Information Memorandum;

"**Collusive Practice**" means an arrangement between two or more parties designed to achieve an improper purpose, including influencing improperly the actions of another party;

---

[2] Except for trustees on behalf of Euronoteholders, BTA Finance Luxembourg and Claimants whose Claims remain in dispute who may submit Claim Forms until 10:00 a m. (Almaty time) on 26 May 2010 and subject as provided in the Restructuring Plan.

"**Common Depositary**" means The Bank of New York Depository (Nominees) Limited in its capacity as book-entry depositary for the Euronotes and any successor thereto;

"**Competition Agency**" means the Agency of the Republic of Kazakhstan for the Protection of Competition;

"**Condition Precedent**" means a condition precedent to the Restructuring becoming effective as described in Schedule 12 (Conditions Precedent to the Restructuring Plan Becoming Effective);

"**Construction State Finance Programme**" means the KZT 240 billion programme adopted by the Government on 6 October 2007 aimed at providing financing for the completion of unfinished facilities and creation of favourable living conditions for the population of Kazakhstan;

"**Cooperation Agreement**" means the Agreement on Cooperation and Mutual Activity with respect to Questions of the Granting of Bank Loans by the National Bank No. 77NB dated as of 17 February 2009, as amended by an additional agreement No. 1/171 N.B dated 3 March 2010, by and among the Bank, the NBK and the FMSA;

"**Corporate Governance Code**" means the current corporate governance code of the Bank which shall be amended or replaced on or before the Restructuring Date by the New Corporate Governance Code;

"**Corrupt Practice**" means with respect to any person the offering, giving, receiving or soliciting, directly or indirectly, anything of value to influence improperly its actions or the actions of another party including any of its directors, managers or employees;

"**Court**" means the Specialised Financial Court in the City of Almaty;

"**Creditor Directors**" means the two directors nominated by the Steering Committee (one appointed on behalf of the holders of the Senior [Dollar][3] Notes and one appointed on behalf of the holders of the OID Notes) or any replacement Creditor Director appointed in accordance with "*Undertakings by the Bank and Samruk-Kazyna – The Samruk-Kazyna Undertaking – Board of Directors*");

"**Creditor Shareholders**" means Claimants who receive Shares or GDRs in the Bank through allocation to Senior Package 1, Senior Package 2 or Junior Package 2;

"**Custodian**" means the person appointed by the Depositary to act as custodian in respect of the Shares held through the GDR Programme;

"**Cut-off Date**" means 30 June 2010;

"**Damu Fund**" means JSC Fund for Development of Entrepreneurship Damu;

"**DBA**" has the meaning as set out in "*Information for Claimants — Information for Creditors of TuranAlem Finance — Scheme of Compositon under Dutch Law*".

"**DBK**" means the Development Bank of Kazakhstan;

"**Deed of Release**" means the deed to be entered into by the Bank following the Restructuring Date on behalf of Claimants and Related Parties pursuant to the Restructuring Plan, substantially in the form set out in Schedule 1 (*The Restructuring Plan*), Annex 3 (*Form of Deed of Release*) to this Information Memorandum;

"**Deeds of Covenant**" means the deeds of covenant to be provided by the Bank in respect of certain amounts payable by the Bank to the Bank Creditor SPVs and arising out of or in relation to the Bank Creditor Loan Agreements;

"**Deeds of Undertaking**" means the BTA Undertaking and the Samruk-Kazyna Undertaking;

---

[3] To be deleted if the governing law of the Tenge Notes is changed to English law.

"**Default**" means an Event of Default under any of the Restructuring Documents or any event or circumstance (as specified, in the case of each of the New Notes, in the relevant Annexes of Schedule 9 *(Terms and Conditions of the New Notes and RCTFF)* to the Information Memorandum which would (with the expiry of a grace period, the giving of notice, the making of any determination under the relevant Restructuring Documents or any combination of any of the foregoing) be an Event of Default;

"**Default Interest**" means the interest payable on overdue amounts under any financial obligation which accrues from the due date of the overdue amount up to the date of the actual payment;

"**Definitive Holder**" means the registered holder of a Euronote in definitive form;

"**Deposit Agreement**" means the deposit agreement to be entered into between the Bank and the Depositary in relation to the GDRs;

"**Depositary**" means a leading international provider of depositary services;

"**Deposited Shares**" shall have the meaning set out under "*The GDR Programme*";

"**Designated Account**" means the account specified by a Claimant in the Settlement Instructions into which deliveries under such Claimant's Entitlement shall be deposited;

"**Designated Financial Indebtedness**" means any Liability (whether incurred as principal or surety and whether present or future and whether actual or contingent) of the Bank and/or its Finance Subsidiaries in respect of:

(a)     moneys borrowed and debit balances at banks or other financial institutions (whether authorised or not and whether or not the debit balance arose by reason of unilateral action by the relevant institution);

(b)     any acceptance under any acceptance credit or bill discounting facility (or dematerialised equivalent) or other trade-related finance;

(c)     any note purchase facility, bonds, notes, debentures, perpetual securities, redeemable shares, loan stock or any similar instruments;

(d)     Finance Leases;

(e)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis and meet any requirement for de-recognition under FMSA Methodology);

(f)     any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution in respect of an underlying liability of an entity which is not a member of the Group which liability would fall within one of the other paragraphs of this definition;

(g)     an advance or deferred purchase agreement if (i) one of the primary reasons behind entering into the agreement is to raise finance or to finance the acquisition or construction of the asset or service in question or (ii) the agreement is in respect of the supply of assets or services and payment is due more than 90 days after the date of supply;

(h)     any amount raised under any other transaction (including any forward sale or purchase, sale and sale back or sale and leaseback agreement) having the commercial effect of a borrowing or otherwise classified as borrowings under FMSA Methodology;

(i)     Shariah-compliant instruments or arrangements;

(j)     swaps and other derivative instruments, transactions or arrangements;

(k)     any guarantee, surety, security, indemnity, support, responsibility or anything analogous thereto in respect of the obligations of any other person under arrangements listed in (a) to (j) above; and

(l)     the Subordinated Loan and any other amounts owing or payable by the Bank to the Finance Subsidiaries (excluding the BV Deposits),

including, without limitation, the obligations set out in Schedule 1 (*The Restructuring Plan*), Annex 1 (*Preliminary Debt List*) to this Information Memorandum) or as otherwise published on the Bank's website from time to time, but excluding Excluded Debt and *provided that*, for the avoidance of doubt, Designated Financial Indebtedness shall not include any obligation of the Bank under any BTA/NBK Repo Transaction;

"**Detailed Term Sheet**" means the termsheet signed by the Bank and the Steering Committee on 18 April 2010, outlining the terms of the Bank's proposed financial restructuring;

"**Development Organisation**" means any of Asian Development Bank, European Bank for Reconstruction and Development, International Bank for Reconstruction and Development, International Finance Corporation, Nederlandse Financierings Maatschappij voor Ontwikkelingslanden N.V. or Deutsche Investitions und Entwicklungsgesellschaft GmbH or any other development finance institution established or controlled by one or more states and any other person which is a, or is controlled by any, Kazakhstan governmental body acting on behalf of or funded in relation to the relevant Financial Indebtedness by one or more of the foregoing development finance institutions;

"**Direct Official Government Sector Debt**" means a direct loan to a member of the Group made by an Official Government Sector Creditor falling within paragraph (a) of the definition thereof;

"**Direct Participant**" means an accountholder in DTC, Euroclear or Clearstream;

"**Discounted Value**" has the meaning set out in Condition 8(f) of Annex 1 (*Terms and Conditions of the Senior Dollar Notes*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Discrepancy**" means a discrepancy between the Bank's and the Claimant's calculation as to the quantum or classification of a Disputed Claim which the Supervisor is unable to resolve by the Scheduled Supervisor Determination Date;

"**Disputed Claim**" means a Claim which has not been agreed by the Bank and the Claimant by 3 May 2010 and which is referred to the Supervisor for determination as to its amount or classification by the Scheduled Supervisor Determination Date;

"**Distressed Assets Fund**" means the Distressed Assets Fund established by the Government for the purpose of purchasing the doubtful assets of commercial banks;

"**Distribution**" means in the Restructuring Plan, the distribution of cash, New Notes, Shares and/or GDRs or other deliverables in accordance with any Entitlement or Net Proceeds of Sale in respect of Agreed Claims;

"**Distribution Agent**" means an agent to be appointed by the Bank as soon as practicable after the Approval Date to assist the Bank with the distribution of cash, New Notes, GDRs and/or Shares in accordance with the Restructuring Plan;

"**Distribution Agent Agreement**" means the agreement to be entered into between the Bank and the Distribution Agent pursuant to which the Distribution Agent will assist the Bank in the distribution of cash, New Notes, Shares and GDRs;

"**Dollar OID Notes**" means original issue discount notes issued by the Bank denominated in U.S. Dollars under Senior Package 2 as set out in "*Terms of the Restructuring Packages*";

21

"**Dollar Subordinated Notes**" means the subordinated notes issued by the Bank denominated in U.S. Dollars under Senior Package 1 and Senior Package 2 as set out in "*Terms of the Restructuring Packages*";

"**Domestic Noteholders**" means holders of Tenge denominated securities issued by the Bank;

"**Drag-Along Notice**" has the meaning set out in "*The GDR Programme*";

"**Drag-Along Price**" has the meaning set out in "*The GDR Programme*";

"**Drag-Along Purchaser**" has the meaning set out in "*The GDR Programme*";

"**Drey**" means Drey Associates Limited, a United Kingdom company;

"**Drey Proceedings**" means the legal proceedings initiated by the Bank as described in "*The Bank — Asset Recovery — Drey Proceedings*";

"**DTC**" means the Depository Trust Company of New York, a New York corporation;

"**EBRD**" means the European Bank for Reconstruction and Development;

"**ECA**" means Claimants that are export credit agencies or other government sector entities;

"**EEA**" means the European Economic Area;

"**Electronic Instruction Form**" refers to the means by which Direct Participants and Beneficial Owners inform the Registered Holder to complete and sign a Form of Proxy to be used at the relevant Euronoteholder Meeting;

"**Entitlement**" means the entitlement to cash, New Notes, participation in the RCTFF, GDRs and/or Shares (or in the case of a Claimant with a Relevant Contingent Claim making an election under Clause 4.3(b)(ii) of the Restructuring Plan either (a) the assignment of any relevant security rights or collateral which the obligor of the underlying debt conferred on or placed with the Bank in relation to the relevant debt or (b) the certification from the Bank that no Security rights or collateral exists) of each Claimant (other than as regards Samruk-Kazyna) with an Agreed Claim pursuant to the terms of the Restructuring Plan;

"**Escrow Account**" means an account into which Entitlements payable to certain Related Parties as specified in the Restructuring Plan may be placed;

"**Euro**" or "**€**" means the lawful currency of the Member States of the European Union that have adopted the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on the European Union and as further amended by the Treaty of Amsterdam;

"**Euronoteholder**" means a person with the ultimate economic interest in any of the Euronotes and holding such interest through one of the Clearing Systems from time to time, unless specifically stated otherwise;

"**Euroclear**" means Euroclear Bank SA/NV;

"**Euronotes**" means each of the notes issued by TuranAlem Finance pursuant to any of the Trust Deeds;

"**Euronoteholders' Meeting**" means a meeting of the Euronoteholders to consider and if thought fit, to approve the Extraordinary Resolution;

"**Euro OID Notes**" means original issue discount notes issued by the Bank denominated in Euro under Senior Package 2 as set out in "*Terms of the Restructuring Packages*";

"**Euro Subordinated Notes**" means the subordinated notes issued by the Bank denominated in Euro under Senior Package 2 as set out in "*Terms of the Restructuring Packages*";

"**Event of Default**" has the meaning set out in the relevant terms and conditions of the New Notes;

"**Excluded Creditors**" has the meaning set out in *"Categories of Claimants";*

"**Excluded Debt**" means any amount owed by any member of the Group to an Excluded Creditor;

"**Excluded Related Party**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Existing Account**" means the account in any of the Clearing Systems through which a Euronoteholder holds Euronotes;

"**Exposure**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Extraordinary Resolution**" means the extraordinary resolution to be proposed at the relevant Euronoteholders' Meeting to approve the Restructuring Plan, requiring a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, save where such term is used in Schedule 9 (*Terms and Conditions of New Notes and the RCTFF*), in which case "Extraordinary Resolution" shall have the meaning as set out in the relevant New Notes Trust Deed;

"**Finance Leases**" means any lease or hire purchase contracts which would, in accordance with FMSA Methodology, be treated as a finance or capital lease;

"**Finance Subsidiaries**" means BTA Finance Luxembourg, TuranAlem Finance and TuranAlem Finance (Russia);

"**Financial Advisers**" means Lazard Frères and UBS Limited, financial advisers to the Bank in connection with the Restructuring;

"**Financial Indebtedness**" means any obligation (whether incurred as principal or surety), whether present or future, actual or contingent, for or in respect of:

(a)     moneys borrowed and debit balances at banks or other financial institutions;

(b)     any acceptance under any acceptance credit or bill discounting facility (or dematerialised equivalent);

(c)     any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d)     the amount of any liability in respect of Finance Leases;

(e)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis and meet any requirement for de-recognition under FMSA Methodology);

(f)     any Treasury Transaction (and, when calculating the value of that Treasury Transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close-out of that Treasury Transaction, that amount) shall be taken into account);

(g)     any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution in respect of (i) an underlying liability of an entity which is not a member of the Group which liability would fall within one of the other paragraphs of this definition or (ii) any liabilities of any member of the Group relating to any post-retirement benefit scheme;

(h)     any amount raised by the issue of redeemable shares which are redeemable (other than at the option of the issuer) before the final redemption or repayment date under the relevant New Notes or Recovery Units or are otherwise classified as borrowings under the FMSA Methodology);

(i)     any amount of any liability under an advance or deferred purchase agreement if (i) one of the primary reasons behind entering into the agreement is to raise finance or to finance the acquisition or construction of the asset or service in question or (ii) the agreement is in respect of the supply of assets or services and payment is due more than 90 days after the date of supply;

(j)     any amount raised under any other transaction (including any forward sale or purchase, sale and sale back or sale and leaseback agreement) having the commercial effect of a borrowing or otherwise classified as borrowings under the FMSA Methodology; and

(k)     the amount of any liability in respect of any guarantee for any of the items referred to in paragraphs (a) to (j) above;

"**Financial Statements**" means the Annual Financial Statements and the Unaudited Interim Financial Statements;

"**Financial Year**" means the annual accounting period of the Group ending on or about 31 December in each year;

"**Financing of Terrorism**" means the act of providing or collecting funds with the intention that they be used, or in the knowledge that they are to be used, in order to carry out terrorist acts;

"**First Choice Election**" has the meaning set out in "*Allocation Mechanism*";

"**First Choice Claim Remainder Amount**" has the meaning set out in "*Allocation Mechanism*";

"**First Kazakh Securitisation Company**" means First Securitisation Company of Kazakhstan, a public limited company formed under the laws of The Netherlands on 8 December 2005;

"**Fitch**" means Fitch Ratings Ltd.;

"**FMSA**" means the Agency of the Republic of Kazakhstan on the Regulation and Supervision of the Financial Market and Financial Organisations;

"**FMSA Agreement**" means the agreement between the Bank and the FMSA dated as of 30 June 2009, as amended;

"**FMSA Asset Classification Rules**" means the rules of asset classification issued by FMSA, dated 25 December 2006;

"**FMSA Guidance**" means "Instruction about norm values and calculation methodology of prudential norms for second tier banks" approved by Resolution of the Board of the Agency of the Republic of Kazakhstan for Regulation and Supervision of Financial Market and Financial Organisations" dated 30 September 2005, #358, as amended, supplemented or updated from time to time;

"**FMSA Methodology**" means unaudited IFRS adjusted to reflect the FMSA's requirements for preparation of financial statements for regulatory purposes;

"**Foreign Currency**" means any currency other than Tenge;

"**Foreign Currency Assets**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Foreign Currency Liabilities**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Foreign Currency Open Position**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Form of Proxy**" means the Form of Proxy for Claimants accompanying this Information Memorandum for use at the Claimants' Meeting set out in Schedule 4 (*Form of Proxy*) to this Information Memorandum;

"**Fraudulent Practice**" means an act or omission, including a misrepresentation, that knowingly or recklessly misleads, or attempts to mislead, a party to obtain a financial or other benefit or to avoid an obligation;

"**Fully Accreted Principal Amount**" means the amount equal to the principal amount of Designated Financial Indebtedness in respect of which the OID Notes are allocated less the amount of any prepayments or repayments of principal made in relation to the OID Notes;

"**GDP**" means the gross domestic product of Kazakhstan;

"**GDR Holder**" means any person holding a GDR from time to time;

"**GDR Programme**" means the global depositary receipt programme to be established prior to the Restructuring Date in respect of the Shares of the Bank;

"**GDRs**" means global depositary receipts relating to Deposited Shares;

"**Global Note**" means either a Restricted Global Note or an Unrestricted Global Note;

"**Government**" means the government of the Republic of Kazakhstan;

"**Government Funding**" means (i) the Group's Indebtedness to the Government or any of its agencies (including the NBK and municipalities in Kazakhstan) to fund or support state-sponsored lending programmes plus (ii) any customer accounts of the Government or any of its agencies (including the NBK and such municipalities) placed with any member of the Group to fund or support state-sponsored lending programmes;

"**Group**" means the Bank and each of its Subsidiaries from time to time;

"**Guarantee**" means any guarantee or other financial support given by the Bank in favour of the Trustee in respect of a series of Euronotes;

"**Holding Company**" means, in relation to a company or corporation, any other company or corporation in respect of which it is a Subsidiary;

"**IFRS**" means International Financial Reporting Standards;

"**IMF**" means the International Monetary Fund;

"**IMF Charter**" means the charter of the International Monetary Fund;

"**Impaired Recovery Asset**" has the meaning set out in Schedule 9 *(Terms and Conditions of the New Notes and the RCTFF)*, Annex 4 (*Terms and Conditions of the Recovery Units*);

"**Indebtedness Guarantees**" means, in relation to any Financial Indebtedness of any Person, any obligation of another Person to pay such Financial Indebtedness, including (without limitation) (i) any obligation to purchase such Financial Indebtedness, (ii) any obligation to lend money, to purchase or subscribe to shares or other securities or to purchase assets or services in order to provide funds for the payment of such Financial Indebtedness, (iii) any indemnity against the consequences of a default in the payment of such Financial Indebtedness, (iv) any other agreement to be responsible for repayment of such Financial Indebtedness, including bonds, standby letters of credit or bank guarantees or other similar instruments issued in connection with the performance of contracts and (v) any Financial Indebtedness of another Person secured by a security interest over any of the

first-mentioned Person's assets, the amount of such Financial Indebtedness being the lesser of the value of such assets and the amount of Financial Indebtedness so secured;

"**Independent Auditor**" means any of Deloitte, PricewaterhouseCoopers, KPMG or Ernst & Young LLP appointed to carry out the annual corporate governance review of the Bank;

"**Independent Directors**" means the three independent directors nominated by the Corporate Management and Appointments Committee of the Bank;

"**Indirect Official Government Sector Debt**" means Official Government Sector Debt which is not Direct Official Government Sector Debt;

"**Industrial Innovation Programme**" means the programme of the Government proposed to be implemented over a five-year period beginning in 2010 aimed at developing new industries, industrial complexes and innovative products;

"**Initial Order**" means the order of the Court dated 16 October 2009 which initiated the Restructuring in accordance with the Restructuring Law;

"**Intermediary**" means any broker, dealer, bank, trust company or other nominee or custodian that holds Euronotes on behalf of Beneficial Owners;

"**Islamic Finance Claimant**" means a financial creditor of the Bank Group whose relationship with the Bank Group is governed by a Shariah-compliant debt instrument;

"**Joint Venture**" means any joint venture entity, whether a company, unincorporated firm, undertaking, association, joint venture or partnership or any other entity;

"**JPY**" means the Japanese Yen, the lawful currency of Japan;

"**JSC Law**" means the law of the Republic of Kazakhstan On Joint Stock Companies dated 13 May 2003, as amended;

"**Junior Package 1**" means the Restructuring Package outlined in "*Terms of the Restructuring Packages-Junior Package 1*";

"**Junior Package 2**" means the Restructuring Package outlined in "*Terms of the Restructuring Packages — Junior Package 2*";

"**KASE**" means the Kazakhstan Stock Exchange;

"**Kazakh Residents' Share Entitlement**" means those Shares required to be transferred on the Restructuring Date to Restructuring Creditors under Senior Packages 1 and 2 and Junior Package 2 who are resident in Kazakhstan, comprising part of the total Restructuring Creditors' Shares Entitlement;

"**Kazakhstan**" means the Republic of Kazakhstan;

"**KCD**" means Joint Stock Company Central Securities Depositary, a central depositary in Kazakhstan;

"**KDIF**" means Joint Stock Company Kazakhstan Deposit Insurance Fund;

"**KGS**" means the Kyrgyzstan Som, the legal currency of Kyrgyzstan;

"**KMC**" means JSC Kazakhstan Mortgage Company;

"**Late Payment Donation**" means any sum payable by the Bank upon the default of the Bank in its payment obligations to any Islamic Finance Claimant, the proceeds of which, other than those sums required to compensate the lenders for any actual loss suffered, are donated to charity;

"**LCIA**" means the London Court of International Arbitration;

"**Legal Reservations**" means:

(a)    the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors;

(b)    the time barring of claims under the Limitation Acts 1980 and the Foreign Limitation Periods Act 1984, the possibility that an undertaking to assume liability for or indemnify a person against non-payment of UK stamp duty may be void and defences of set-off or counterclaim;

(c)    similar principles, rights and defences under the laws of any Relevant Jurisdiction as those referred to in paragraphs (a) and (b) above (to the extent applicable in that Relevant Jurisdiction); and

(d)    any other matters which are set out as qualifications or reservations as to matters of law of general application in any of the legal opinions to be delivered pursuant to Schedule 12 *(Conditions Precedent to the Restructuring Plan Becoming Effective)* of this Information Memorandum;

"**Liability**" or "**Liabilities**" means any debt, liability or obligation whatsoever whether it is incurred as principal or surety or is present, future, prospective or contingent, whether or not its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation and whether it arises at common law, in equity or by statute, or in any other manner whatsoever, but excluding any liability which is barred by statute or is otherwise unenforceable or arises under a contract which is void or, being voidable, has been duly voided;

"**LIBOR**" means the London Inter-Bank Offered Rate as determined by the British Bankers' Association;

"**Litigation Recoveries**" has the meaning set out in Annex 4 (*Terms and Conditions of the Recovery Units*), Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Local Account**" means the account specified by a Claimant in the applicable Settlement Instructions into which such Claimant's Entitlement shall be deposited *provided that* such account is eligible to hold Tenge, Tenge New Notes and/or Shares;

"**Lux**" means Lux Investing Limited, a British Virgin Islands company;

"**Major Restructuring Documents**" means the Deeds of Undertaking, the Deposit Agreement and the Bank Creditor Loan Agreements;

"**Make Whole Amount**" has the meaning set out in Condition 8(f) of Annex I (*Terms and Conditions of the Senior Dollar Notes*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Management Board**" means the management board of the Bank from time to time;

"**Management Contract**" means a contract by which an independent third person agrees to manage any matters relating to the affairs of any member of the Group;

"**Material Adverse Effect**" means a material adverse effect on:

(a)    the business, operations, property, condition (financial or otherwise) or prospects of the Group taken as a whole; or

(b)    the ability of the Bank or the Group (taken as a whole) to perform its obligations under the relevant Restructuring Documents; or

(c)    the total equity or long-term debt of the Bank; or

(d)     the validity or enforceability of, or the effectiveness or ranking of any Security granted or purporting to be granted pursuant to, any of the Restructuring Documents or the rights or remedies of any holder or lender of or under any New Instruments or under any of the Restructuring Documents;

"**Material Jurisdiction**" means any jurisdiction in which the Bank has assets with a value in excess of U.S.$300 million;

"**Material Subsidiary**" means at any relevant time a Subsidiary of the Bank:

(a)     whose total assets, pre-tax profits or gross revenues (or, where the Subsidiary in question prepares consolidated accounts, whose total consolidated assets or gross consolidated revenues, as the case may be) attributable to the Bank represent not less than five per cent. of the total consolidated assets or pretax profits or the gross consolidated revenues of the Bank, all as calculated by reference to the then latest audited accounts (or, if none, its then most recent management accounts or consolidated accounts, as the case may be) of such Subsidiary and the then latest audited consolidated accounts of the Group; or

(b)     to which is transferred all or substantially all of the assets and undertaking of a Subsidiary which immediately prior to such transfer is a Material Subsidiary.

"**Memorandum of Understanding**" means the memorandum of understanding between the Bank and the Steering Committee dated 21 September 2009 with respect to the Restructuring;

"**Minimum Face Value**" has the meaning set out in "*Bank Creditor SPVs*";

"**Minor Quantum Discrepancy**" has the meaning set out in Clause 4.2(n) of Schedule 1 (*The Restructuring Plan*);

"**Minority Protection Expiry Date**" means the later of:

(a)     the date falling three years after the Restructuring Date; and

(b)     (if the GDRs are not so listed within six months of the Restructuring Date) the date on which the GDRs have been accepted for listing on an Approved Stock Exchange;

"**Model Insolvency Law**" means the 1997 UNCITRAL Model Law on Cross-Border Insolvency;

"**Money Laundering**" means:

(a)     the conversion or transfer of property, knowing it derived from a criminal offence, for the purpose of concealing or disguising its illegal origin or of assisting any person who is involved in the commission of the crime to evade the legal consequences of its actions which assistance has led or would be likely to, in the opinion of any New Notes Trustee, lead to a sanction, fine or reprimand from a competent authority or finding of guilt or liability by a competent court;

(b)     the concealment or disguise of the true nature, source, location, disposition, movement, rights with respect to, or ownership of, property knowing that it is derived from a criminal offence; or

(c)     the acquisition, possession or use of property knowing at the time of its receipt that it is derived from a criminal offence;

"**Moody's**" means Moody's Investors Service, Inc.;

"**Mortgage State Finance Programme**" means the KZT 120 billion programme adopted by the Government in February 2009 aimed at reducing the current interest rate on mortgage loans to between 9 and 11 per cent., converting foreign currency loans into Tenge and extending loan maturities up to 20 years;

"**NBK**" means the National Bank of Kazakhstan, the central bank of Kazakhstan;

"**NBK Agreement**" means the agreement between Samruk-Kazyna and the NBK in relation to the BTA/NBK Repo Transactions;

"**Net Assets**" means Total Assets less Total Liabilities;

"**Net Book Value**" means the outstanding amount of a loan minus the provisions relating thereto, each calculated in accordance with the FMSA Asset Classification Rules;

"**Net Loans**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Net Non-Performing Loans**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Net Proceeds of Sale**" means the proceeds of sale of the relevant New Notes and Shares net of all associated commissions, transfer taxes and other costs, including the expenses and compensation of the Distribution Agent or the Bank, as the case may be, in effecting such sale;

"**New Net Non-Performing Loans**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**New Charter**" means the Charter of the Bank as amended to reflect the principles set out in the Detailed Term Sheet;

"**New Corporate Governance Code**" means the new corporate governance code of the Bank to be adopted prior to the Restructuring Date reflecting the principles agreed to by the Bank and the Steering Committee in the Term Sheet;

"**New Instruments**" means the New Notes, GDRs, Shares and the RTCFF;

"**New Net Loans**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**New Notes**" means the Senior Notes, the OID Notes, the Subordinated Notes and the Recovery Units;

"**New Notes Trustee**" means the trustee appointed under the provisions of a trust deed in respect of Non-Tenge New Notes issued on the Restructuring Date;

"**New Notes Trust Deed**" means each of the trust deeds constituting the New Notes;

"**Nominated Recipient**" means the person specified as such in the Settlement Form;

"**non-Kazakhstan holders**" has the meaning as set out in "*Taxation*";

"**Non-Kazakh Residents Share Entitlement**" means those Shares required to be issued on the Restructuring Date to Restructuring Creditors under Senior Packages 1 and 2 and Junior Package 2 who are not resident in Kazakhstan or the Depositary on behalf of Restructuring Creditors under Senior Packages 1 and 2 and Junior Package 2 who are not resident in Kazakhstan, comprising part of the total Restructuring Creditors' Share Entitlement;

"**Non-OGSC Eligible Trade Creditor**" means a Claimant to whom non-OGSC Eligible Trade Finance Debt is owed;

"**Non-OGSC Eligible Trade Finance Debt**"[4] means any Financial Indebtedness of the Bank to a Restructuring Creditor incurred in respect of the sale and purchase of goods and/or services financed or supported by the Bank, including:

(a)     under any documentary letters of credit issued by the Bank;

(b)     by way of discounting of documentary letters of credit issued by the Bank and/or negotiable instruments issued in relation thereto;

(c)     under any standby letters of credit or guarantees issued by the Bank;

(d)     by way of any other provision of finance by the Bank; and

(e)     pursuant to the refinancing of any Financial Indebtedness as described in paragraphs (a) to (d) (inclusive) above,

but, excluding any such Financial Indebtedness of the Bank to a Restructuring Creditor:

(i)      that constitutes Official Government Sector Debt;

(ii)     incurred for general purposes, in particular on-lending to customers of the Bank where there was either no reference to a particular underlying trade transaction or where such customer as borrower was not identified in the relevant financing documentation;

(iii)    under any standby letter of credit or guarantee provided by the Bank in support of a payment obligation of any of its customers under a credit agreement with a financial institution; and

(iv)     under any contingent liability of the Bank that does not also constitute a guarantee falling within paragraph (iii) above, arising from any of the transactions described in paragraphs (a) to (e) (inclusive) above that has not crystallised, matured or fallen due prior to 30 June 2010.

"**Non-Tenge New Notes**" means the OID Notes, the Senior Dollar Notes, the Recovery Units, the Euro Subordinated Notes and the Dollar Subordinated Notes;

"**Note Certificates**" means Restricted Note Certificates and Unrestricted Global Note Certificates;

"**Noteholders**" means holders of some, or as the case may be, all of the New Notes;

"**NSA**" means the National Statistics Agency of Kazakhstan;

"**Obstructive Practice**" means:

(a)     deliberately destroying, falsifying, altering or concealing evidence material to an investigation, or making false statements to investigators, in order to materially impede an investigation by such investigators into allegations of a Coercive Practice, Collusive Practice, Corrupt Practice or Fraudulent Practice, and threatening, harassing or intimidating any party to prevent it from disclosing its knowledge of matters relevant to an investigation or from pursuing an investigation into such matters; or

(b)     acts intended to materially impede the exercise of any New Notes Trustee's contractual rights or access to information under the relevant Restructuring Documents;

"**OECD**" means the Organisation for Economic Co-operation and Development;

---

[4] Please note that this definition is unique to the Restructuring and is not intended by any Financial Creditor to define trade finance or any category of trade finance or what treatment it should be entitled to in any broader sense or for any wider purpose.

"**Official Government Sector Creditors**" means holders of Financial Indebtedness of the Bank Group:

(a)    which are:

        (i)    export credit agencies; or

        (ii)    multi-lateral or state-owned financial institutions specifically mandated to provide finance and promote investments in developing countries and emerging markets; or

        (iii)    direct or indirect wholly-owned Subsidiaries (not being commercial banks) of institutions not falling within paragraph (ii) above; or

        (iv)    other official government sector bodies; or

(b)    whose Claims are covered in whole or in part by an export credit agency or other official government sector body;

"**Official Government Sector Debt**" means Financial Indebtedness owed to or guaranteed or otherwise covered by Official Government Sector Creditors, with the whole amount of any Financial Indebtedness in respect of which such a guarantee or other cover has been provided constituting the Official Government Sector Debt, not merely the part (if only guaranteed or covered in part) to which such guarantee or cover relates;

"**OID Coefficient**" has the meaning set out in "*Terms of the Restructuring Packages — Senior Package 2*";

"**OID Noteholder**" means a holder of OID Notes;

"**OID Notes**" means the Dollar OID Notes and the Euro OID Notes;

"**Operating Expenses**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Operating Income**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank)*;

"**Ordinary Claim**" means a Claim which does not relate to Non-OGSC Eligible Trade Finance Debt, Official Government Sector Debt or Excluded Debt;

"**Ordinary Debt**" means Designated Financial Indebtedness other than Non-OGSC Eligible Trade Finance Debt, Official Government Sector Debt and Excluded Debt;

"**Original Business Plan**" means the original business plan prepared by the Bank dated 4 September 2009;

"**Overhead Ratio**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Participating Member State**" means any member state of the European Communities that adopts or has adopted the Euro as its lawful currency in accordance with legislation of the European Community relating to Economic and Monetary Union;

"**PCTS**" means the Principal Commercial Terms Sheet signed by the Bank and the Steering Committee on 7 December 2009 setting out the commercial terms of the Restructuring;

"**PCTS Amendment Letter**" means the Principal Commercial Terms Sheet Amendment Letter which was signed by the Bank and the Steering Committee on 17 March 2010 amending the PCTS;

"**Permitted Acquisition**" means:

(a)     an acquisition by a member of the Group of an asset sold, leased, transferred or otherwise disposed of by another member of the Group in circumstances permitted by paragraph (i) (*Disposals*) of Clause 3 (*Other Covenants*) of Schedule 11 (*Covenants of the Bank*);

(b)     the incorporation of a company with limited liability which on incorporation becomes a member of the Group, but only if that company is incorporated in the European Union, the United States of America or Kazakhstan and is engaged in a business substantially the same as that carried on by the Group with limited liability;

(c)     an acquisition for cash (including deferred cash) consideration, of (A) the issued share capital of a limited liability company or (B) (if the acquisition is made by a limited liability company whose sole purpose is to make the acquisition) a business or undertaking carried on as a going concern, but only if:

    (i)     no Default is continuing on the closing date for the acquisition or would occur as a result of the acquisition;

    (ii)    the acquired company, business or undertaking is engaged in a business substantially the same as that carried out by the Group;

(d)     any acquisition the aggregate consideration payable in respect of which (when aggregated with all other such acquisitions and Permitted Joint Ventures in the same Financial Year of the Bank) does not exceed 10 per cent. of the Net Assets of the Bank (by reference to, in the first Financial Year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent and, thereafter, its most recent audited annual financial statements delivered in accordance with paragraph (a) of Clause 1 (*Financial and Other Information Provisions*) of Schedule 11 (*Covenants of the Bank*);

(e)     any acquisition by any member of the Group of any asset(s) secured in its favour pursuant to any enforcement of, or foreclosure under, any security interest granted in its favour by or in relation to any of its customers or their Subsidiaries in connection with the acceleration of any Financial Indebtedness owing by any such customer to such member of the Group; or

(f)     any other acquisition to which the New Notes Trustee has given its prior written consent.

"**Permitted Dividend**" means a dividend or distribution by the Bank to its Shareholders:

(a)     at any time after the New Notes have been irrevocably repaid in full; or

(b)     at any time after the date falling four years after the Restructuring Date up to and including the date falling seven years after the Restructuring Date *provided that*:

    (i)     the Bank has positive operating cashflow post debt service for the year;

    (ii)    the Bank's tier 2 capital (as shown in its most recently delivered financial statements) is above 15 per cent.;

    (iii)   the aggregate distribution does not exceed 25 per cent. of cumulative net income or 25 per cent. of net operating cash flow after debt service;

    (iv)    at the same time as the Bank pays such distribution, it prepays the Senior Notes and the OID Notes in the same amount in aggregate as such distribution (such payment to be applied between the Senior Notes and the OID Notes *pro rata* to their face value on the Restructuring Date (and in the case of the Senior Notes to their applicable redemption price (being par plus the Make Whole Amount (if any) plus accrued (but unpaid) interest) and in the case of the OID Notes to their Fully Accreted Principal

Amount (plus accrued (but unpaid) interest) as at the date of its last repayment instalment); and

(v)     no Default has occurred and is continuing on both the date the dividend is declared and when it is paid; or

(c)     at any time after the date falling seven years after the Restructuring Date *provided that*:

(i)     the Bank has positive operating cashflow post debt service for the year;

(ii)     the Bank's tier 2 capital (as shown in its most recently delivered financial statements) is above 15 per cent.;

(iii)     the aggregate distribution does not exceed 50 per cent. of cumulative net income or 50 per cent. of net operating cash flow after debt service; and

(iv)     no Default has occurred and is continuing on both the date the dividend is declared and when it is paid;

"**Permitted Joint Venture**" means any investment in any Joint Venture where:

(a)     the Joint Venture is incorporated, or established, and carries on its principal business, in the European Union, the United States of America or Kazakhstan;

(b)     the Joint Venture is engaged in a business substantially the same as that carried on by the Group with limited liability; and

(c)     in any financial year of the Bank, the aggregate of: (i) all amounts subscribed for shares in, lent to, or invested in all such Joint Ventures by any member of the Group; (ii) the contingent liabilities of any member of the Group under any guarantee given in respect of the liabilities of any such Joint Venture; and (iii) the market value of any assets transferred by any member of the Group to any such Joint Venture, when aggregated with all other such acquisitions and Permitted Joint Ventures in the same financial year, does not exceed 10 per cent. of the Net Assets of the Bank (by reference to, in the first financial year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent and, thereafter, its most recent audited annual financial statements);

"**Permitted Security**" means:

(a)     any lien arising by operation of law and in the ordinary course of trading and not as a result of any default or omission by any member of the Group;

(b)     any netting or set-off arrangement entered into by any member of the Group in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances;

(c)     any Security arising under any retention of title, hire purchase or conditional sale arrangement or arrangements having similar effect in respect of goods supplied to a member of the Group in the ordinary course of trading and on the supplier's standard or usual terms and not arising as a result of any default or omission by any member of the Group;

(d)     any Security entered into pursuant to any Restructuring Documents (including any Security granted in respect of the Collection Account and the RCTFF Collection Account);

(e)     any Security arising pursuant to any agreement (or other applicable terms and conditions) which is standard or customary in the relevant market (and not for the purpose of raising credit or funds for the operation of any member of the Group other than on a short-term basis as part of its liquidity management activities), in connection with (i) contracts entered into simultaneously for sales and purchases at market prices of precious metals or securities, (ii) the establishment of margin deposits and similar securities in connection with interest rate

and foreign currency hedging operations and trading in securities or (iii) the foreign exchange dealings or other proprietary trading activities including, without limitation, Repos, of any member of the Group;

(f)     any Security *provided that* at the same time or prior to the creation of such Security, the Bank provides prior-ranking Security or the benefit of such other Security in favour of the holders of the Senior Notes and OID Notes, in each case in form and substance satisfactory to the New Notes Trustee (acting on the instructions of an extraordinary resolution of holders of the Senior Notes and OID Notes);

(g)     granted in favour of the Bank by any Material Subsidiary to secure Financial Indebtedness or other obligations owed by such Material Subsidiary to the Bank;

(h)     arising in the ordinary course of the Bank's or a Material Subsidiary's trading activities and which is necessary in order to enable the Bank or such Material Subsidiary to comply with any mandatory or customary requirement imposed on it by a banking or other regulatory authority in connection with the Bank's or such Material Subsidiary's business;

(i)     on property acquired (or deemed to be acquired) under a Finane Lease, or claims arising from the use or loss of or damage to such property, *provided that* any such encumbrance secures only rentals and other amounts payable under such lease;

(j)     granted by the Bank in favour of a Development Organisation to secure Financial Indebtedness owed by the Bank to such Development Organisation pursuant to any loan agreement or other credit facility entered into between the Bank and such Development Organisation, *provided that* the amount of Financial Indebtedness so secured pursuant to this paragraph (j) shall not exceed in aggregate an amount in any currency or currencies equivalent to six per cent. of the Bank's Net Assets calculated by reference to the most recent financial statements of the Bank prepared in accordance with FMSA Methodology;

(k)     arising out of the refinancing, extension, renewal or refunding of any Financial Indebtedness secured by Security permitted by any of the above exceptions, *provided that* the Financial Indebtedness thereafter secured by such Security does not exceed the amount of the original Financial Indebtedness and such Security is not extended to cover any property not previously subject to such Security;

(l)     not included in any of the above exceptions, in aggregate securing Financial Indebtedness with an aggregate principal amount at any time not exceeding U.S.$25 million (or its equivalent in other currencies) at that time; or

(m)     any other Security to which the New Notes Trustee has given its prior written consent;

"**Permitted Transaction**" means:

(a)     any Financial Indebtedness or Indebtedness Guarantee or Security incurred or given, or other transaction arising, under the Deeds of Covenant or the Restructuring Documents;

(b)     any transaction (other than (i) any acquisition, sale, lease, license, transfer or other disposal and (ii) the granting or creation of Security or the incurring or permitting to subsist of any Financial Indebtedness or Indebtedness Guarantee) conducted in the ordinary course of trading on arm's length terms and not in contravention of any of the provisions set out in Clause 3 (*Other Covenants*) of Schedule 11 (*Covenants of the Bank*); and

(c)     the solvent liquidation or reorganisation of a Subsidiary of the Bank so long as (i) any payments or assets distributed as a result of such liquidation or reorganisation are distributed (to the extent of that member of the Group's interest therein) to another member of the Group, (ii) the value or percentage of any minority interest in any member of the Group held by any person which is not a member of the Group is not increased and (iii) such liquidation or

reorganisation does not and could not reasonably be expected to have a Material Adverse Effect;

"**Permitted Transferee**" means a person which (a) is (i) a bank or other financial institution subject to financial regulation in Russia, China, Hong Kong, Singapore or an OECD country or (ii) a sovereign wealth fund from any such country or as may otherwise be approved by a Qualified Majority decision of the Board; (b) has (in the case of a bank or other financial institution) a minimum credit rating from S&P of at least BBB or equivalent from Moody's or Fitch; (c) has a minimum paid up share capital and reserves (in the case of a bank or other financial institution) or assets (in the case of a sovereign wealth fund) of at least U.S.$7 billion; and (d) is not affiliated with any of the present or former shareholders or managers of the Bank;

"**Perpetual Securities**" means the U.S.$400 million perpetual preferred securities issued by BTA Finance Luxembourg;

"**Plan Meeting**" has the meaning as set out in "*Information for Claimants — Information for Creditors of TuranAlem Finance — Scheme of Compositon under Dutch Law*";

"**Plan of Composition**" has the meaning as set out in "*Information for Claimants — Information for Creditors of TuranAlem Finance — Scheme of Compositon under Dutch Law*";

"**PLN**" means the Polish Zloty, the legal currency of Poland;

"**Preliminary Indebtedness List**" has the meaning as set out in "*Information for Claimants*";

"**Principal Paying Agent**" means The Bank of New York Mellon;

"**Pro Forma Financial Information**" means the unaudited *pro forma* financial information of the Bank as at 30 September 2009 as set out in "*Pro Forma Financial Information*" adjusted to reflect the Restructuring as described and subject to the assumptions and limitations set forth herein;

"**Pro-Rata Tag-Along Proportion**" has the meaning set out in "*The GDR Programme*";

"**Proceeding**" means any process, action, or other legal proceeding (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture, re-entry, lien, enforcement of judgment or enforcement of any security);

"**Prospectus Directive**" means Directive 2003/7I/EC of the European Parliament and of the Council on the prospectus to be published when securities are offered to the public or admitted to trading and amending Directive 2001/34/EC;

"**Qualified Majority**" means in relation to a decision of the Board, a majority of the Board including both of the Creditor Directors and at least one of the Independent Directors;

"**Qualified Majority Approval**" has the meaning given to it in "*Share Distribution and Rights of Minority Shareholders — Charter of the Bank*";

"**Qualified Majority Item**" shall have the meaning set out under "*Undertakings by the Bank and SamrukKazyna — the Samruk-Kazyna Undertaking*";

"**Quarterly Recovery Assets Management Report**" has the meaning given to it in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**QIBs**" means qualified institutional buyers, as defined in Rule 144A under the Securities Act;

"**RCTFF**" means the new U.S.$700 million revolving committed trade finance facility to be extended to the Bank by Claimants who are subject to participation in the RCTFF and to be used by the Bank for the funding of new trade finance transactions, the terms of which are set out in Annex 8 (*Terms

*and conditions of the RCTFF*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*) to this Information Memorandum;

"**RCTFF Agreement**" means the agreement setting out the terms of the RCTFF;

"**RCTFF Collection Account**" means the account held by the Borrower into which all amounts owing to it by each Eligible Customer or Approved Buyer (or its bank) with respect to any Eligible Trade Transaction are to be credited;

"**RCTFF Collection Account Pledge**" means a pledge agreement in respect of the RCTFF Collection Account in favour of the security trustee (on behalf of the RCTFF Lenders);

"**Recoveries**" has the meaning set out in "*Terms and Conditions of the Recovery Units*";

"**Recovery Assets**" has the meaning set out in "*Terms and Conditions of the Recovery Units*";

"**Recovery Assets Auditor**" has the meaning set out in "*Terms and Conditions of the Recovery Units*";

"**Recovery Assets Opening Report**" means an initial due diligence report on the Recoveries Assets carried out by the Recovery Assets Auditor covering and/or establishing methodologies for:

(a)     identification of Recoveries Assets based on agreed criteria (including a loan-by-loan analysis of each Impaired Recovery Asset as at 30 June 2009 and details of all loans written off as at or prior to 30 June 2009);

(b)     movement of Recoveries Assets to a separate system, module or tagging of Recoveries Assets within existing systems as Recoveries Assets;

(c)     quarterly reconciliation of Recoveries Assets as identified in the Quarterly Recovery Assets Management Report (defined below) to those identified in the Recoveries Assets Opening Report;

(d)     quarterly reconciliation of all accounting and cash Recoveries.

(e)     system access controls to prevent unauthorised journals or inappropriate changes or removals being made to Recoveries Assets;

(f)     daily bank reconciliations of Recovery Units Collection Account;

(g)     allocation of staff responsibilities as regards Recoveries Assets and non-Recoveries Assets, and Recoveries;

(h)     dual controls over payments (including input and/or verification controls on payment systems and dual signatories on cheques) with respect to Recoveries Assets; and

(i)     provision of training to staff in those newly adopted key processes;

"**Recovery Assets Replacement Loan**" has the meaning set out in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Recovery Sub-Committee**" means the sub-committee of the Management Board entitled the "Strategy Committee" on which shall sit a Creditor Director;

"**Recovery Unit Payment Date**" has the meaning set out in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Recovery Unitholder**" means the holder of a Recovery Unit from time to time;

"**Recovery Units**" means the recovery units deliverable under the Restructuring Plan, the terms and conditions of which shall be substantially in the form set out in Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Redemption Date**" means the date on which any New Note is redeemed, either in whole or in part;

"**Reference Amount**" has the meaning set out in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Reference Rate**" means, for the purposes of calculating the aggregate quantum of Agreed Claims in Tenge for the purposes of voting at the Claimants' Meeting and for Distribution of Entitlements, the average rate over the twenty-two trading days immediately preceding the Claimants' Meeting shown on the applicable Bloomberg pages for conversion of the relevant currency into Tenge;[5]

"**Registrar**" means registrar under the relevant Euronotes;

"**Regulation D**" means Regulation D under the Securities Act;

"**Regulation S**" means Regulation S under the Securities Act;

"**Regulatory Information Service**" means any of: Business Wire Regulatory Disclosure provided by Business Wire; FirstSight provided by Romeike; Announce provided by Hugin ASA; New Release Express provided by CCNMatthews UK Limited; PR Newswire Disclose provided by PRNewswire; Bloomberg News provided by Bloomberg LP or any other international newswire service used by the Bank from time to time and other media as set out in the documentation constituting the Rouble Notes and the Domestic Notes;

"**Reinvestment Yield**" has the meaning set out in Condition 8(f) of Annex 1 (*Terms and Conditions of the Senior Dollar Notes*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Related Party**" means any Affiliate of the Bank, any officer, director or manager of the Bank or its Affiliates, any member of the management board or supervisory board as at 31 December 2008 and the spouse, parents, siblings and children of any such person which is a natural person (and for these purposes SamrukKazyna and any entity owned by Samruk-Kazyna shall be treated as a Related Party) and any other person who is "connected" to any such person within the meaning of the Insolvency Act 1986;

"**Related Party Debt**" means all Financial Indebtedness owed by any member of the Bank Group to Related Parties (other than (i) to an Excluded Related Party; (ii) Financial Indebtedness owed by the Bank Group to members of the Group (excluding the Bank Group);(iii) Euronotes owned by any Related Party), whether or not such liability is off balance sheet and whether or not the liability is disclosed in the financial statements of the Bank; and (iv) the Subordinated Loan;

"**Related Party Exposure**" means the aggregate consolidated Exposure to all Related Parties (other than Excluded Related Parties);

"**Relevant Contingent Claim**" has the meaning set out in Clause 4.3(b) of the Restructuring Plan;

"**Relevant Creditor**" means the Restructuring Creditors, creditors in relation to Related Party Debt and Samruk-Kazyna;

"**Relevant Event**" means a Change of Control and/or any disposals (excluding ordinary course of trading) in any financial year of more than 6.5 per cent. of the Group's total gross assets (determined by reference to the Bank's most recent consolidated financial statements);

---

[5] With regard to the calculation of Entitlements, discussions continue with the Steering Committee as to whether claims are to be converted into Tenge or U.S. Dollars.

"**Relevant Excluded Debt**" means Financial Indebtedness which constitutes Excluded Debt owing to Excluded Creditors falling within paragraphs (b) to (d) (inclusive) of that definition;

"**Relevant Jurisdiction**" means, in relation to a member of the Group:

(a)      its jurisdiction of incorporation;

(b)      any jurisdiction where any asset subject to or intended to be subject to the transaction Security to be created by it is situated;

(c)      any jurisdiction where it conducts its business;

"**Remaining Average Life**" has the meaning set out in Condition 8(f) of Annex 1 (*Terms and Conditions of the Senior Notes*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Remaining Scheduled Payments**" has the meaning set out in Condition 8(f) of Annex 1 (*Terms and Conditions of the Senior Dollar Notes*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*) as applicable;

"**Repo**" means a securities repurchase or resale agreement or reverse repurchase and resale agreement, a securities borrowing agreement or any agreement relating to securities which is similar in effect to any of the foregoing and, for the purposes of this definition, "**securities**" means any capital stock, share, debenture or other debt or equity instrument, or other derivative, whether issued by any private or public company, any government or agency or instrumentality thereof or any supranational, international or multilateral organisation;

"**Residual Amount**" has the meaning set out in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Residual Minority Shareholder Percentage**" means the percentage of the Shares of the Bank collectively held by the pre-existing minority shareholders of the Bank immediately following the issue of Shares by the Bank prior to the Restructuring Date as described under "*The GDR Programme*";

"**Restricted Global Note**" means a permanent global note representing beneficial interest in Non-Tenge New Notes offered and issued to QIBs or Accredited Investors or subsequently sold in reliance on Rule 144A;

"**Restricted Note Certificate**" means a note certificate in definitive form which may be issued by DTC in exchange for a Restricted Global Note in accordance with the conditions of the relevant Non-Tenge New Notes;

"**Restructuring**" means the proposed overall restructuring and/or cancellation of certain of the debts and other financial obligations of the Bank pursuant to, *inter alia*, the Restructuring Plan;

"**Restructuring Creditors**" means those financial creditors whose debt is being restructured via the facilities provided for in: Senior Package 1, Senior Package 2, Senior Package 3, Junior Package 1, and Junior Package 2 (excluding Samruk-Kazyna and Related Parties);

"**Restructuring Creditors Share Entitlement**" means the Shares (corresponding to 18.5 per cent. of the total issued share capital of the Bank) required to be transferred or issued to Restructuring Creditors under Senior Packages 1 and 2 and Junior Package 2 or to the Depositary on behalf of Restructuring Creditors under Senior Packages 1 and 2 and Junior Package 2 who are not resident in Kazakhstan on the Restructuring Date;

"**Restructuring Date**" means a date which is not more than ten Business Days after the date on which the Steering Committee notifies to the Bank that the conditions precedent listed in Schedule 12 (*Conditions Precedent to the Restructuring Plan Becoming Effective*) to this Information

Memorandum are satisfied (for which purpose the Steering Committee shall be entitled to rely without further investigation on the officer's certificate and supporting evidence provided pursuant to paragraph (r) of Schedule 12 (*Conditions Precedent to the Restructuring Plan Becoming Effective*) to this Information Memorandum);

"**Restructuring Documents**" means:

(a)      The Restructuring Plan;

(b)      The Information Memorandum;

(c)      The Trust Deed and Paying Agency Agreement in relation to the Non-Tenge New Notes;

(d)      Cash Management Agreement;

(e)      RCTFF Agreement and the RCTFF Collection Account Pledge;

(f)      The Deposit Agreement in respect of the GDRs;

(g)      The SK Guarantee;

(h)      The Deeds of Undertaking;

(i)      The Deed of Release;

(j)      The Bank's New Charter;

(k)      The Bank's New Corporate Governance Code and;

(l)      Appointment letters and indemnities (from the Bank) for the Supervisor, the Adjudicator, the Independent Auditor, the Recovery Assets Auditor and the Creditor Directors.

"**Restructuring Law**" means the Law of the Republic of Kazakhstan dated 11 July 2009 On Amendments and Additions to Certain Legislative Acts of the Republic of Kazakhstan on Money Payments and Transfers, Accounting and Financial Reporting of Financial Organisations, Banking Activities, and activities of the National Bank of Kazakhstan;

"**Restructuring Packages**" means each of Senior Package 1, Senior Package 2, Senior Package 3, Junior Package 1 and Junior Package 2;

"**Restructuring Plan**" means the plan to restructure the Designated Financial Indebtedness between the Bank, the Claimants, the Euronoteholders and the Related Parties in the form set out at Schedule 1 (*The Restructuring Plan*) to this Information Memorandum or with any modification, addition or condition approved by the Claimants, the Euronoteholders and the Related Parties in accordance with clause 7.2 of the Restructuring Plan which the Court may think fit to approve or impose;

"**REUEL**" means REUEL Limited, a British Virgin Islands company;

"**RFCA**" means the Regional Financial Centre of Almaty;

"**RIROil**" means RIROil Sarl (now known as TANIL Sarl), a Swiss Company;

"**Rotterdam Court**" has the meaning as set out in "*Information for Claimants — Information for Creditors of TuranAlem Finance — Scheme of Compositon under Dutch Law*";

"**Rouble Noteholders**" has the meaning set out in "*Categories of Claimants*";

"**Rouble Notes**" means RUB 3 billion 7.8 per cent. notes due October 2009 issued by TuranAlem Finance (Russia) in October 2005 supported by a surety issued by the Bank;

"**RUB**" or "**Russian Roubles**" means the lawful currency of the Russian Federation;

"**Rule 144A**" means Rule 144A under the Securities Act;

"**S&P**" means Standard & Poor's Rating Services, a division of The McGraw Hill Companies;

"**Samruk-Kazyna**" means joint-stock company Sovereign Wealth Fund "Samruk-Kazyna";

"**Samruk-Kazyna Directors**" means the directors which Samruk-Kazyna appoints to the Board from time to time;

"**Samruk-Kazyna Undertaking**" means the deed poll to be executed by Samruk-Kazyna prior to the Restructuring Date;

"**Scheduled Supervisor Determination Date**" means 6 May 2010;

"**Second Choice Election**" has the meaning set out in "*Allocation Mechanism*";

"**Second Kazakh Securitisation Company**" means Second Securitisation Company of Kazakhstan, a public limited company formed under the laws of The Netherlands on 25 September 2007;

"**Secondary Public Offering**" means any sale or public offering of any equity security (including any preference share) in the Bank or receipts or similar securities representing such equity securities by way of flotation, public placing, listing or other public offering on any recognised international exchange;

"**Securities Act**" means the United States Securities Act of 1933, as amended;

"**Securities Entitlement**" means the entitlement to New Notes, Shares and GDRs of each Claimant with an Agreed Claim pursuant to the terms of the Restructuring Plan;

"**Securities Market Law**" means the law of the Republic of Kazakhstan On the Securities Market dated 2 July 2003, as amended;

"**Security**" means any mortgage, charge, pledge, lien, encumbrance or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect;

"**Senior Debt**" means the Senior Notes, OID Notes and the RCTFF;

"**Senior Debt Coefficient**" has the meaning set out in *"Terms of the Restructuring Packages — Senior Package 1"*;

"**Senior Dollar Notes**" means the notes denominated in U.S. Dollars issued by the Bank under Senior Package 1 as set out in "*Terms of the Restructing Packages*";

"**Senior Package 1**" means the Restructuring Package outlined in *"Terms of the Restructuring Packages — Senior Package 1"*;

"**Senior Package 1 Eligible Debt**" has the meaning set out in *"Terms of the Restructuring Packages — Senior Package 1"*;

"**Senior Package 2**" means the Restructuring Package outlined in *"Terms of the Restructuring Packages — Senior Package 2"*;

"**Senior Package 2 Eligible Debt**" has the meaning set out in *"Terms of the Restructuring Packages — Senior Package 2"*;

"**Senior Package 3**" means the Restructuring Package outlined in *"Terms of the Restructuring Packages — Senior Package 3"*;

"**Senior Tenge Notes**" means the notes denominated in Tenge issued by the Bank under Senior Package 1 as set out in "*Terms of the Restructuring Packages*";

"**Sekerbank**" means Sekerbank T.A.S., a bank incorporated under the laws of Turkey;

"**Self-Liquidating Trade Finance Transaction**" means a transaction which:

(a)       would constitute Non-OGSC Eligible Trade Finance Debt; or

(b)       would constitute Official Government Sector Debt,

in connection with which the exposure of the Restructuring Creditor has been reduced by reason of performance of the obligations of any other party to that transaction (including the Bank) with respect thereto, to the extent of such reduction.

"**Senior Dollar Noteholder**" means a holder of Senior Dollar Notes;

"**Senior Tenge Notes**" means the senior notes issued by the Bank denominated in Tenge under Senior Package 1;

"**Senior Note Restructuring Documents**" means each Restructuring Document issued or entered into in connection with the Senior Notes or the OID Notes;

"**Settlement Date**" has the meaning set out in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Senior Notes**" means the Senior Dollar Notes and the Senior Tenge Notes;

"**Settlement Instructions**" means the instructions to be given by all Claimants with Agreed Claims specifying such information as is necessary for the Distribution Agent or the Bank to distribute a Claimant's Entitlement, including Designated Account details, details of Nominated Recipient (if applicable), and whether the Claimant elects to receive GDRs (if applicable);

"**Settlement Instructions Deadline**" means such date as the Bank may in due course announce on a Regulatory Information Service as being the date by which all Claimants with Agreed Claims must have submitted their completed Settlement Instructions to the Distribution Agent;

"**Share Conversion Debt**" means the portion of Designated Financial Indebtedness in respect of which Shares or GDRs will be issued under the Restructuring (being that portion restructured under Senior Packages 1 and 2 and Junior Package 2 which will not be paid in cash or exchanged for New Notes);

"**Shareholder**" means a registered holder of Shares;

"**Shares**" means the common shares of the Bank;

"**Single Party**" means any counterparty and all Connected Parties of such counterparty (if any);

"**Single Party Exposure**" means the aggregate consolidated Exposure to any Single Party (including any interbank exposure);

"**SK Bonds**" means 4 per cent. bonds issued by Samruk-Kazyna in a total principal amount of KZT 645 billion, each with a denomination of KZT 1,000, and which Samruk-Kazyna issued in March 2009 and sold to the Bank in consideration for the issue by the Bank and sale to Samruk-Kazyna of the Bank Bonds with identification numbers KZP01Y06D392, KZP02Y07D398, KZP03Y08D394,    KZP04Y09D390,    KZP05Y10D395,    KZP06Y11D391,    KZP07Y12D397, KZP08Y13D393,    KZP09Y14D399,    KZP10Y15D394,    KZP11Y06D391,    KZP12Y07D397, KZP13Y08D393,    KZP14Y09D399,    KZP15Y10D394,    KZP16Y11D390,    KZP17Y12D396, KZP18Y13D392, KZP19Y14D398 and KZP20Y15D393;

"**SK Claim**" means the Claim that Samruk-Kazyna has against the Bank in the amount of KZT671 billion in relation to the Bank Bonds;

"**SK Guarantee**" means the guarantee which Samruk-Kazyna shall issue to the NBK for a duration of no less than ten years beginning from the first BTA/NBK Repo Transaction in respect of the obligations of the Bank to the NBK under any BTA/NBK Repo Transaction, in consideration of which the Bank will pay the SK Guarantee Fee when due;

"**SK Guarantee Fee**" means the semi-annual fee to be paid by the Bank to Samruk-Kazyna equal to fifty per cent. (50 per cent.) of the interest paid from time to time by Samruk-Kazyna to the Bank in relation to any outstanding SK Bonds (i) held by BTA or (ii) which are the subject of a BTA/NBK Repo Transaction, if any, *provided that* this guarantee fee, will not exceed KZT 6.45 billion in 2010 and thereafter KZT 12.9 billion annually, such fee to cease to become payable on the fourteenth anniversary of the date of the completion of the Restructuring;

"**SK/NBK Agreement**" means an undated agreement executed between Samruk-Kazyna and the NBK in respect, *inter alia*, of the guaranteeing of the Bank's obligations to the NBK under the BTA/NBK Repo Transactions;

"**SME**" means small and medium-sized enterprises with assets of no more than KZT 459 million, annual sales of no more than U.S.$25 million, no more than 250 employees and with a financing limit no higher than U.S.$10 million;

"**SME State Finance Programme**" means the KZT 305,200 million programme (disbursed in four tranches) adopted by the Government in 2007 aimed at providing financing to SMEs for the acquisition of new, and the modernisation of existing, material assets, the provision of working capital and the refinancing of existing loans made to SMEs by the Bank or other credit organisations;

"**SP Subordinated Notes**" means the Dollar Subordinated Notes, the Euro Subordinated Notes and the Subordinated Tenge A Notes;

"**SP1 Subordinated Debt Coefficient**" has the meaning set out in *"Terms of the Restructuring Packages — Senior Package 1"*;

"**SP2 Subordinated Debt Coefficient**" has the meaning set out in *"Terms of the Restructuring Packages — Senior Package 2"*;

"**State Finance Programmes**" means the SME State Finance Programme, the Mortgage State Finance Programme, the Construction State Finance Programme, the Agricultural State Finance Programme and other state finance programmes established by the Government;

"**Steering Committee**" means the steering committee from time to time of certain Claimants, as at the date hereof consisting of The Royal Bank of Scotland N.V. (formerly known as ABN AMRO Bank N.V.) (supported by members of The Royal Bank of Scotland plc's Global Restructuring Group), Commerzbank Aktiengesellschaft, the D. E. Shaw Oculus International, Inc., Euler Hermes Kreditversicherungs AG (acting for and on behalf of the Federal Republic of Germany), Fortis Investment Management UK Limited, Gramercy Advisors LLC, The Bank of Singapore Limited (formerly ING Asia Private Bank Limited), KfW (representing its affiliates DEG — Deutsche Investitions — und Entwicklungsgesellschaft mbH and KfW IPEX-Bank GmbH), Standard Chartered Bank, Export-Import Bank of the United States and Wells Fargo Bank N.A.;

"**Subordinated Loan**" means the U.S.$400 million subordinated loan made pursuant to a subordinated loan agreement dated 20 January 2006 between TuranAlem Finance and the Bank;

"**Subordinated Non-Tenge Notes**" means the Dollar Subordinated Notes and the Euro Subordinated Notes;

"**Subordinated Notes**" means Dollar Subordinated Notes, Euro Subordinated Notes, Subordinated Tenge A Notes and Subordinated Tenge B Notes;

"**Subordinated Tenge A Notes**" means the subordinated notes issued by the Bank denominated in Tenge under Senior Package 1 and Senior Package 2 as set out in "*Terms of the Restructuring Packages*";

"**Subordinated Tenge B Notes**" means the subordinated notes issued by the Bank denominated in Tenge under Junior Package 1 as set out in "*Terms of the Restructuring Packages*";

"**Subsidiary**":

(a)     an entity of which a person has direct or indirect control or owns directly or indirectly more than 50 per cent. of the voting capital or similar of ownership (and "control" for this purpose means the power to direct the management and policies of the entity whether through the ownership of voting capital, by contract or otherwise); or

(b)     an entity whose financial statements are, in accordance with applicable law and IFRS, consolidated with those of another person,

and for these purposes, when determining whether an entity is a "Subsidiary" of another, the registration of any shares in such "Subsidiary" in the name of any nominee or any other person holding security over such shares shall be ignored so that such entity is deemed to be the Subsidiary of the person who created that security or on whose behalf the nominee holds the relevant shares (as the case may be), and, in respect of the Bank, includes those entities listed in "*The Bank — Subsidiaries and Associates of the Bank — Subsidiaries*";

"**Subsidiary Subordinated Loan**" means the U.S.$400 million subordinated loan made pursuant to a loan agreement between TuranAlem Finance and BTA Finance Luxembourg dated 20 January 2006 using the net proceeds of the issue of the Perpetual Securities;

"**Supermajority**" means in respect of a relevant matter, that matter requires:

(a)     the approval of 75 per cent. or more of the total number of Shares; and

(b)     *provided that* the GDRs then in issue represent 5 per cent. or more of the total Shares of the Bank then in issue and provided the Depositary casts at least one vote on the relevant resolution, the approval of at least 2/3 of the votes cast by the Depositary on behalf of GDR Holders eligible to vote;

"**Supermajority Approval**" means that the relevant matter requires:

(a)     the approval of 75 per cent. or more of the total number of Shares; and

(b)     *provided that* the GDRs then in issue represent 5 per cent. or more of the total Shares of the Bank then in issue and provided the Depositary casts at least one vote on the relevant resolution, the approval of at least 2/3 of the votes cast by the Depositary on behalf of GDR Holders eligible to vote;

"**Supermajority Item**" means any matter listed as requiring a Supermajority Approval under "*Undertakings by the Bank and Samruk-Kazyna*";

"**Supervisor**" means the supervisor appointed by the Bank, which shall initially be Watson, Farley & Williams LLP, or otherwise an independent third party considered fit and proper by the Bank and the Steering Committee, or failing agreement, an individual nominated by the LCIA, for the purpose of adjudicating Disputed Claims;

"**Support Agreement**" means the support agreement in respect of the Perpetual Securities between BTA Finance Luxembourg and the Bank dated 25 January 2006;

"**Tabulation Agent**" means The Bank of New York Mellon;

"**Tag-Along Acceptance**" has the meaning set out in "*The GDR Programme*";

"**Tag-Along Offer**" has the meaning set out in "*The GDR Programme*";

"**Tag-Along Purchaser**" has the meaning set out in "*The GDR Programme*";

"**Tag Price**" has the meaning set out in "*The GDR Programme*";

"**Tagged Shareholder**" has the meaning set out in "*The GDR Programme*";

"**TARGET Day**" means day on which the Trans European Automated real-time Gross Settlement Express Transfer payment system which utilises a single shares platform (and which was launched on 19 November 2007) is open for the settlement of payments in Euro;

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same);

"**Tax Assets**" shall have the meaning given in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Tax Code**" means the code of the Republic of Kazakhstan On Taxes and Other Obligatory Payments to the Budget dated 10 December 2008, as amended;

"**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment under any of the New Notes;

"**Temir Capital B.V.**" means Temir Capital B.V., a limited liability company formed under the laws of The Netherlands on 29 May 2001;

"**Temirbank**" means JSC Temirbank, a joint stock company formed under the laws of Kazakhstan on 26 March 1992;

"**Temirleasing**" means JSC Temirleasing, a joint stock company incorporated under the laws of the Republic of Kazakhstan on 5 March 2001;

"**Tenge**" or "**KZT**" means the Kazakhstan Tenge, the lawful currency of Kazakhstan;

"**Tenge New Notes**" means the Senior Tenge Notes, the Subordinated Tenge A Notes and the Subordinated Tenge B Notes;

"**Term Sheet**" means the PCTS, as amended by the PCTS Amendment Letter as further amended by the Detailed Term Sheet signed by the Bank and the Steering Committee outlining the terms of the Bank's proposed financial restructuring;

"**Tier 1 Capital**" means the Bank's Tier 1 Capital as such term is defined in the FMSA Guidance, unless otherwise stated;

"**Tier 2 Capital**" means the Bank's Tier 2 Capital as such term is defined in the FMSA Guidance, unless otherwise stated;

"**Trade Finance Facilities**" has the meaning as set out in "*Selected Statistical Information*";

"**Treasury Transaction**" means any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price;

"**Trust Deeds**" means the list of trust deeds as specified in "*Information for Claimants — Information for Euronoteholders*";

"**Trustee**" means BNY Corporate Trustee Services Limited, or any successor trustee appointed in accordance with the provisions of the Trust Deeds;

"**TuranAlem Finance**" means TuranAlem Finance B.V., a wholly owned subsidiary of the Bank incorporated in the Netherlands;

"**TuranAlem Finance (Russia)**" means LLP TuranAlem Finance, a limited liability company formed under the laws of the Russian Federation on 22 June 2004;

"**UAH**" means the Ukranian Grivna, the legal currency of the Ukraine;

"**Unaudited Interim Financial Statements**" means the reviewed interim consolidated financial statements of the Bank for the nine-month period ended 30 September 2009 contained in this Information Memorandum;

"**United Kingdom**" means the United Kingdom of Great Britain and Northern Ireland;

"**United States**" or the "**U.S.**" means the United States of America, its territories and possessions, any State of the United States of America and the District of Columbia;

"**Unrestricted Global Note**" means a permanent global note representing beneficial interest in Non-Tenge New Notes offered and issued in reliance on Regulation S;

"**Unrestricted Note Certificate**" means a note certificate in definitive form which may be issued by DTC in exchange for an Unrestricted Global Note in accordance with the conditions of the relevant Non-Tenge New Notes;

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code;

"**U.S. Dollars**", "**Dollars**", "**$**" or "**U.S.$**" means United States Dollars, the lawful currency of the United States;

"**U.S. GAAP**" means accounting principles generally accepted in the United States;

"**U.S. Holder**" means a beneficial owner of the New Notes, Shares or GDRs that is (i) a U.S. citizen or resident, (ii) a corporation, partnership or other business entity organised under the laws of the United States, (iii) a trust subject to the control of a U.S. Person and the primary supervision of a U.S. court or (iv) an estate the income of which is subject to U.S. federal income tax regardless of its source;

"**U.S. Person**" means a U.S. person as defined in Regulation S;

"**Usarel**" means Usarel Investments Limited, a Cyprus company;

"**Valuation Date**" has the meaning set out in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Valuation Rejection Notice**" has the meaning set out in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Voting Instructions**" means the instructions given to a proxy in respect of a Euronoteholders' Meeting;

"**Voting Instructions Deadline**" shall be the dates specified in "*Expected Sequence of Principal Events*";

"**£**" means pounds sterling, the lawful currency of the United Kingdom.

## TERMS OF THE RESTRUCTURING PACKAGES

Depending on the nature of their Claim, Restructuring Creditors will be allocated to a Restructuring Package or given the right to elect which package they are allocated to in accordance with the procedures set out in "*Allocation Mechanism*".

**Claimants with Claims denominated in Tenge are only eligible to receive Entitlements denominated in Tenge, Recovery Units and Shares.  Non-Kazakh residents may elect to receive GDRs instead of Shares.  All other Claimants shall receive Entitlements denominated in U.S. Dollars (unless, in the case of Entitlements under Senior Package 1 and 2, they elect to receive Entitlements denominated in Tenge) other than those Claimants allocated into (or who elect to be allocated into) Senior Package 2, who may receive Entitlements in Euro.  Recovery Units shall be denominated in U.S. Dollars.  Senior Claims are, depending on their nature, eligible for Senior Packages 1, 2 or 3.  Subordinated Claims are, depending on their nature, eligible for Junior Packages 1 or 2.  Holders of BTA Finance Luxembourg's Perpetual Securities will automatically be allocated to Junior Package 2.**

### Restrictions on Resale of the New Notes, Shares and GDRs

The New Notes, Shares and GDRs that are being allocated are not and will not be registered under the Securities Act, and therefore, the New Notes, Shares and GDRs will be subject to restrictions on transfer.  Any transfer or resale of the New Notes, Shares and GDRs must comply with the restrictions contained under the heading "*Issuance and Transfer Restrictions*".

### Eligibility to Participate

By electing to participate, a Claimant will be required, unless in any instance the Bank agrees otherwise, to acknowledge and represent to the Bank, *inter alia*, that it is not, nor is it acting on behalf of, an Affiliate of the Bank or acting on the Bank's behalf and that either:

- it is an Accredited Investor and, if it is participating on behalf of one or more investor accounts, each of these investor accounts is an Accredited Investor, and it:

  - is acquiring the New Notes, Shares or GDRs for investment, in the normal course of its business, and not with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act;

  - invests in or purchases securities similar to the New Notes, Shares or GDRs and it has such knowledge and experience in financial and business matters that makes it capable of evaluating the merits and risks of acquiring the New Notes, Shares and GDRs; and

  - is aware that it (or any of these investor accounts) may be required to bear the economic risk of an investment in the New Notes, Shares or GDRs for an indefinite period of time and it (or that investor account) is able to bear this risk for an indefinite period;

or

- it is a QIB, and, if it is participating on behalf of one or more investor accounts, each of these investor accounts is a QIB;

or

- it is not a U.S. Person or participating for the account or benefit of a U.S. Person and it is located offshore in accordance with Regulation S.

See "*Issuance and Transfer Restrictions*".

The terms of the Restructuring Packages are set out below.  The Terms and Conditions of the New Notes and the RCTFF are set out in Schedule 9 (*Terms and Conditions of the New Notes and the*

*RCTFF*).  See "*Description of Share Capital and Certain Matters of Kazakhstan Law*" in this Information Memorandum for a description of the Shares.  See "*The GDR Programme*" for a description of the GDRs.

All figures (including principal and interest) and categorisations included in the following summaries relating to amounts of debt are estimates and are based on information supplied by the Bank and have not been capable of verification by the Steering Committee.

The final figures and categorisations will change once all Claims have been reconciled and as a result of the allocation of Non-OGSC Eligible Trade Finance Debt and Official Government Sector Debt between the Restructuring Packages in accordance with the Allocation Mechanism.   As this Information Memorandum was finalised before completion of the reconciliation and adjudication process and allocation of Agreed Claims to Restructuring Packages, adjustments will be made, once final numbers are known for each Restructuring Package, to the Coefficients, coupons, discount rates, etc. on the basis of the Base Case Model in consultation between the Steering Committee and the Bank prior to the Claimants' Meeting.

**<u>Senior Package 1</u>**

| | |
|---|---|
| Terms | Claims of Restructuring Creditors to be restructured in Senior Package 1 include U.S.$8.376 million of principal plus U.S.$628 million of interest as at 30 June 2010 and any Excess Non-OGSC Eligible Trade Finance allocated to Senior Package 1 less any Official Government Sector Debt allocated into Senior Package 2 in accordance with the Allocation Mechanism. |
| | Claimants shall have the option to have their entitlement to Senior Dollar Notes and Dollar Subordinated Notes under Senior Package 1 to be issued directly by the Bank to them directly or to a Bank Creditor SPV.  See "*Bank Creditor SPVs*" for further details of this option |
| | Where all or any part of a Restructuring Creditor's Agreed Claim is allocated to Senior Package 1 and its Claim is denominated in a currency other than Tenge, such Restructuring Creditor may elect in its Claim Form to receive Entitlements (other than Recovery Units) denominated in Tenge.  If such Restructuring Creditor fails to make an appropriate election in its Claim Form, it will receive Entitlements under Senior Package 1 denominated in U.S. Dollars.  Where all or any part of a Restructuring Creditor's Agreed Claim is allocated to Senior Package 1 and its Claim is denominated in Tenge, such Restructuring Creditor will receive Entitlements in Tenge (other than Recovery Units which will be denominated in U.S. Dollars). |

**Senior Package 1**

| | |
|---|---|
| Claims eligible for Senior Package 1 (the "**Senior Package 1 Eligible Debt**") | Senior financial creditors (including (i) most bonds, (ii) most bank loans, (iii) Claims falling within paragraphs (ii) and (iii) of the definition of Non-OGSC Eligible Trade Finance Debt, (iv) any Excess Non-OGSC Eligible Trade Finance Debt allocated to Senior Package 1 and (v) up to U.S.$750 million of Official Government Sector Debt allocated to Senior Package 1) other than: |

- Samruk-Kazyna;

- Excluded Creditors;

- Non-OGSC Eligible Trade Finance Creditors save to the extent set out in (iv) above; and

- Official Government Sector Debt save to the extent set out in (v) above.

| | |
|---|---|
| Write-off | 55.80 per cent. of the Designated Financial Indebtedness allocated to Senior Package 1 will be written-off. |

Restructuring Package Components:

| | |
|---|---|
| Cash | Agreed Claimants are to receive a *pro rata* share of cash equal to 11.07 per cent. (the "**Cash Coefficient**") of principal and interest restructured. |
| | U.S.$1 billion of cash is available for Claims allocated into Senior Package 1. |
| Senior Notes | Agreed Claimants are to receive a *pro rata* share of Senior Notes equal to 27.01 per cent. (the "**Senior Debt Coefficient**") of principal and interest restructured in the form of Senior Dollar Notes or Senior Tenge Notes. |
| | The Senior Notes have an eight-year tenor with a four-year grace period on amortisation of principal.  After the fourth year principal shall be amortised semi-annually in eight equal instalments. |
| | The Senior Notes are callable at any time (in whole only) at the option of the Bank on 30 days' notice at par plus accrued interest plus, if positive, the Make-Whole Amount, if any. |
| | The Senior Notes will include a put option at par (plus accrued interest) in the event of a Relevant Event. |
| | The Senior Dollar Notes will accrue interest from 1 July 2010 (regardless of the date of issue) payable in cash semi-annually at a rate of 10.75 per cent. per annum for the first five semi-annual payments, and 12.5 per cent. per annum thereafter. |

**Senior Package 1**

The Senior Tenge Notes will accrue interest from 1 July 2010 (regardless of the date of issue) payable in cash in semi annual instalments at a rate of 14.75 per cent. for the first five Semi annual payments and 16.5 per cent. per annum thereafter.

See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 1 (*Terms and Conditions of the Senior Notes*) and Annex 7 (*Summary of Tenge New Notes*) for further details of the Senior Notes.

Subordinated Notes

Agreed Claimants are to receive a *pro rata* share of SP

Subordinated Notes equal to 6.12 per cent. (the "**SP1 Subordinated Debt Coefficient**") of principal and interest restructured under Senior Package 1.

The SP Subordinated Notes have a 15-year tenor with a ten-year grace period on amortisation of principal. After the tenth year the principal shall be amortised semi-annually in ten equal instalments.

The Dollar Subordinated Notes will accrue interest payable in cash semi-annually at a rate of 7.2 per cent. per annum.

The Subordinated Tenge A Notes will accrue interest payable in cash semi-annually at a rate of 11.20 per cent. per annum.

See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 5 (*Terms and Conditions of the Dollar Subordinated Notes*) and Annex 7 (*Summary of Tenge New Notes*) to this Information Memorandum for further details of the Subordinated Notes.

Equity

Agreed Claimants to receive a *pro rata* share of 12.55 per cent. of the issued share capital of the Bank (as such coefficient may be increased to take into account additional equity allocated to Excess Non-OGSC Eligible Trade Finance and Official Government Sector Debt allocated to Senior Package 1).

Equity will be issued in the form of GDRs to Claimants who are non-Kazakh residents (unless they elect in the Claim Form to receive Shares) and in the form of Shares to Claimants who are Kazakh residents.

Recovery Units

Agreed Claimants to receive a *pro rata* share of 89.61 per cent. of the aggregate principal amount of the Recovery Units (as such coefficient may be increased to take into account additional Recovery Units allocated to Excess Non-OGSC Eligible Trade Finance and Official Government Sector Debt allocated to Senior Package 1).

**Senior Package 1**

Recovery Units shall have a ten-year (or if extended, 12-year) tenor and will be valued at maturity for the purposes of redemption.

Payments made under the Recovery Units will amount to 50 per cent. of all recoveries made.    The remaining 50 per cent. will go to the Bank.

Amounts payable under the Recovery Units will be calculated on:

- recoveries realised in 2009 (post 30 June 2009), 2010 and 2011 to the extent they exceed the projected recoveries in such years in the Base Case Model (being KZT 36 billion,  KZT 134 billion  and  KZT 103 billion, respectively); and

- all recoveries realised on or after 1 January 2012.

Any payment due to Recovery Note holders arising solely as a result of an accounting recovery will be deferred until the Bank receives the cash benefit thereof.

See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 4 (*Terms and Conditions of the Recovery Units*) for further details of the Recovery Units.

| | |
|---|---|
| Interest accrual date on new debt instruments (regardless of date of issue) | 1 July 2010 |

| | |
|---|---|
| Base Case Model | For the purposes of illustration only, the Base Case Model assumes an allocation of U.S.\$33 million of Excess Non-OGSC Eligible Trade Finance Debt to Senior Package 1 and U.S.\$288 million Senior Package 2 and the Coefficients mentioned below have been calculated on that basis.  This should not be taken as an indication that Excess Non-OGSC Eligible Trade Finance Debt will be allocated in this proportion to Senior Package 1 and Senior Package 2 which will depend on the outcome of the allocation process set out in "*Allocation Mechanism*".    Accordingly, the Cash Coefficient, the Senior Debt Coefficient and the SP1 Subordinated Debt Coefficient will be adjusted upon the result of the actual allocation. |

In case of a full allocation of the Excess Non-OGSC Eligible Trade Finance Debt into Senior Package 1, the Coefficients would be adjusted as follows:

Cash Coefficient: 10.72 per cent.
Debt Coefficient: 27.43 per cent.
SP1 Subordinated Debt Coefficient: 6.22 per cent.

**Senior Package 1**

In case of a full allocation of the Excess Non-OGSC Eligible Trade Finance Debt into Senior Package 2, the Coefficients would be adjusted as follows:

Cash Coefficient: 11.11 per cent.
Debt Coefficient: 26.96 per cent.
SP1 Subordinated Debt Coefficient: 6.11 per cent.

The Excess Non-OGSC Eligible Trade Finance Debt is in total entitled to an allocation of 0.48 per cent. of Shares and 3.43 per cent. of Recovery Units.

**Senior Package 2**

Terms

Claims to be restructured in Senior Package 2 are U.S.$650 million of principal plus U.S.$11 million of interest as at 30 June 2010 of Official Government Sector Debt and such amount of principal and interest of any Excess Non-OGSC Eligible Trade Finance Debt allocated to Senior Package 2 plus such amount of principal and interest of Official Government Sector Debt additionally allocated to Senior Package 2.

Claimants shall have the option to have their entitlement to OID Notes, Dollar Subordinated Notes and Euro Subordinated Notes under Senior Package 2 to be issued directly by the Bank to them or to a Bank Creditor SPV.  See "*Bank Creditor SPVs*" for further details of this option.

Where all or any part of a Restructuring Creditor's Agreed Claim is allocated to Senior Package 2 and its Claim is denominated in a currency other than Tenge, such Restructuring Creditor may elect in its Claim Form to receive Entitlements (other than Recovery Units and OID Notes) denominated in Tenge or, in the case of a Claim denominated in Euro, Euro.  If such Restructuring Creditor fails to make an appropriate election in its Claim Form, it will receive Entitlements under Senior Package 2 denominated in U.S. Dollars.  Where all or any part of a Restructuring Creditor's Agreed Claim is allocated to Senior Package 2 and its Claim is denominated in Tenge, such Restructuring Creditor will receive Entitlements in Tenge (other than Recovery Units and OID Notes which will be denominated in U.S. Dollars or Euros).

Claims eligible for Senior Package 2 (the "**Senior Package 2 Eligible Debt**").

(i)   Official Government Sector Creditors of up to U.S.$650 million;

(ii)   Non-OGSC Eligible Trade Finance Debt not allocated into Senior Package 3; and

**Senior Package 2**

|  |  |  |
|---|---|---|
| | (iii) | to the extent that less than U.S.$288 million of Non-OGSC Eligible Trade Finance Debt is allocated to Senior Package 2, an additional amount of Official Government Sector Creditors may be allocated into Senior Package 2. |

Restructuring package components

OID Notes

Agreed Claimants to receive a *pro rata* share of OID Notes issued with an original issue discount of 54.33 per cent. and a Day-1 value of 45.67 per cent. (the "**OID Coefficient**") of principal and interest restructured.

The OID Notes shall have an 11-year tenor with a seven-year grace period and straight line accretion over eleven years. After the seventh year, principal shall be repaid in eight semi-annual instalments, each of which shall be a fraction of the remaining accreted principal amount on the relevant date for which the numerator is one and the denominator is the number of instalments (including the one in question) remaining until (and including) the last instalment.

The OID Notes will include a put option at their then current accreted value (plus accrued interest) upon the occurrence of a Relevant Event.

The OID Notes will include a call option at their Fully Accreted Principal Amount plus accrued interest in the event of a change in or in the application of tax laws or treatment but are otherwise non-callable.

In respect of the Dollar OID Notes, interest shall be paid in cash semi-annually at 3.70 per cent. per annum during the seven-year grace period and 3.30 per cent. per annum thereafter.

In respect of the Euro OID Notes, interest shall be paid in cash semi-annually at 3.14 per cent. per annum during the seven-year grace period and 2.74 per cent.[6] per annum thereafter.

See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 2 (*Terms and Conditions of the Dollar Original Issue Discount Notes*) and Annex 3 (*Terms and Conditions of the Euro Original Issue Discount Notes)* to this Information Memorandum for further details of the OID Notes.

Subordinated Notes

Agreed Claimants to receive a *pro rata* share of SP Subordinated Notes equal to 6.46 per cent. (the "**SP2 Subordinated Debt Coefficient**") of principal and interest restructured under Senior Package 2.

---

[6] Euro OID Notes coupon will be updated to reflect prevailing market rates.

**Senior Package 2**

|  |  |
|---|---|
|  | SP Subordinated Notes shall have the same terms and conditions as set out under Senior Package 1 — "*Subordinated Notes*". |
|  | The Euro Subordinated Notes will accrue interest payable in cash semi-annually at a rate of 6.75 per cent. per annum. |
|  | See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 5 (*Terms and Conditions of the Subordinated Notes*), Annex 6 (*Terms and Conditions of the Euro Subordinated Notes*) and Annex 7 (*Summary of Tenge New Notes*) for further details of the Subordinated Notes. |
| Equity | Claimants to receive a *pro rata* share of 0.97 per cent. of the issued share capital of the Bank (as it may be increased to take into account additional equity allocated to Excess Non-OGSC Eligible Trade Finance and Official Government Sector Debt allocated to Senior Package 2). |
|  | Equity will be issued in the form of GDRs to Claimants who are non-Kazakh residents (unless they elect in their Claim Form to receive Shares) and Shares to Kazakh residents. |
| Recovery Units | Claimants to receive a *pro rata* share of 6.96 per cent. of the aggregate principal amount of the Recovery Units (as it may be increased to take into account additional Recovery Units allocated to Excess Non-OGSC Eligible Trade Finance and Official Government Sector Debt allocated to Senior Package 2). |
|  | Recovery Units shall have the same terms as set out under Senior Package 1 *"Recovery Units"*. |
|  | See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 4 (*Terms and Conditions of the Recovery Units*) for further details of the Recovery Units. |
| Interest accrual date on new debt instruments (regardless of date of issue) | 1 July 2010 |
| Base Case Model | For purposes of illustration only, the Base Case Model assumes an allocation of U.S.$33 million of Excess Non-OGSC Eligible Trade Finance Debt to Senior Package 1 and U.S.$288 million Senior Package 2 and the Coefficients mentioned below have been calculated on that basis. This should not be taken as an indication that Excess Non-OGSC EligibleTrade Finance Debt will be allocated in this proportion to Senior Package 1 and Senior Package 2, which depends on the outcome of the allocation process set out in the Allocation Mechanism. |
|  | Accordingly, the OID Coefficient and the SP2 Subordinated Debt Coefficient will be adjusted upon the result of the actual allocation. |

**Senior Package 2**

In case of a full allocation of the Excess Non-OGSC Eligible Trade Finance Debt into Senior Package 2, the Coefficients would be adjusted as follows:

OID Coefficient: 45.68 per cent.
SP2 Subordinated Debt Coefficient: 6.45 per cent.

In case of a full allocation of the Excess Non-OGSC Eligible Trade Finance Debt into Senior Package 1, the Coefficients would be adjusted as follows:

OID Coefficient: 45.30 per cent.
SP2 Subordinated Debt Coefficient: 6.56 per cent.

The Excess Non-OGSC Eligible Trade Finance Debt is, in total, entitled to an allocation of 0.48 per cent. of Shares and 3.43 per cent. of Recovery Units.

**Senior Package 3**

Terms

Claims of Restructuring Creditors to be restructured in Senior Package 3 include U.S.$700 million of principal of Non-OGSC Eligible Trade Finance Debt.

Claims eligible for Senior Package 3

Non-OGSC Eligible Trade Finance Debt up to U.S.$700 million.

The balance of Non-OSGC Eligible Trade Finance shall be allocated to Senior Package 1 or Senior Package 2 as further described under "*Allocation Mechanism — Part 1*".

Restructuring package components

Revolving Committed Trade Finance Facility:

U.S.$700 million of principal of the Non-OGSC Eligible Trade Finance Debt to be settled by the RCTFF.

See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 8 (*Terms and Conditions of the RCTFF*) for the principal terms of the RCTFF.

**Junior Package 1**

Terms

Claims of Restructuring Creditors to be restructured in Junior Package 1 include KZT 28 billion or U.S.$186 million equivalent of principal and U.S.$16 million of interest restructured as of 30 June 2010 of Subordinated Claims.

Claims eligible for Junior Package 1

Subordinated Claims owed to Kazakhstani pension funds.

Restructuring package components

**Junior Package 1**

| | |
|---|---|
| Subordinated Tenge B Notes | Agreed Claimants will receive a *pro rata* share of Subordinated Tenge B Notes with a face value of KZT 28 billion or U.S.$186 million equivalent (denominated in Tenge). |
| | The Subordinated Tenge B Notes shall have a 20-year tenor with a 15-year grace period.  Following the grace period, principal shall be amortised semi-annually in ten equal instalments.  Interest will be payable in cash semi-annually at a rate of 8.0 per cent. per annum. |
| | The Subordinated Tenge B Notes will not include any call option or put option. |
| | See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 7 (*Summary of Tenge New Notes*) for the terms of the Subordinated Tenge Notes. |
| Interest accrual date on new debt instruments (regardless of date of issue) | 1 July 2010 |

**Junior Package 2**

| | |
|---|---|
| Terms | Claims of Restructuring Creditors to be restructured in Junior Package 2 include U.S.$1.156 billion of principal and U.S.$115 million of interest restructured as of 30 June 2010 of Subordinated Claims. |
| Claims eligible for Junior Package 1 | All Subordinated Claims and Perpetual Securities (other than Subordinated Claims owed to Kazakhstani pension funds). |
| Restructuring package components Equity | Agreed Claimants to receive a *pro rata* share of 4.50 per cent. of the issued share capital of the Bank in the form of GDRs to non-Kazakh residents (unless they elect in their Claim Form to receive Shares) and Shares to Kazakh residents. |

## ALLOCATION MECHANISM

### PART I – ALLOCATION OF AGREED NON-OGSC ELIGIBLE TRADE FINANCE DEBT BETWEEN SENIOR PACKAGES 1, 2 AND 3

(a)    Restructuring Creditors submitting Claim Forms in respect Non-OGSC Eligible Trade Finance Debt shall be invited in such Claim Forms:

    (i)    to indicate:

        (A)    to which of Senior Packages 1, 2 and/or 3 they would wish their Agreed Claims in respect of Non-OGSC Eligible Trade Finance Debt to be allocated; and

        (B)    if they elect for a combination of Senior Packages, the amount of their Agreed Claim they would want allocated to each Senior Package they elect for (*provided that* the aggregate amounts so elected must equal the total amount of their Agreed Claim),

        (each a "**First Choice Election**"); and

    (ii)    (should the aggregate amount of First Choice Elections for Senior Package 3 exceed U.S.$700 million) to which of Senior Packages 1 or 2 they would wish their Agreed Claims (to the extent not allocated to Senior Package 3) to be allocated (each a "**Second Choice Election**").

(b)    If the aggregate amount of First Choice Elections for Senior Package 3 equals or exceeds U.S.$700 million:

    (i)    first, Agreed Claims of Restructuring Creditors who made First Choice Elections for Senior Package 3 in the amount of U.S.$700 million in aggregate shall be allocated to Senior Package 3 on a *pro rata* basis such that a portion of each such Restructuring Creditor's Claims admitted as Non-OGSC Eligible Trade Finance Debt and so elected shall be allocated to Senior Package 3 in the proportion which U.S.$700 million bears to all such First Choice Elections (the balance of such Restructuring Creditor's Agreed Claim so elected which is not thereby allocated to Senior Package 3 is referred to as its "**First Choice Claim Remainder Amount**");

    (ii)    secondly,

        (A)    Agreed Claims of Restructuring Creditors who made First Choice Elections for Senior Packages 1 and/or 2 shall be allocated to those packages in accordance with those elections;

        (B)    the First Choice Claim Remainder Amounts shall be allocated to Senior Packages 1 or 2 in accordance with the Second Choice Elections of the relevant Restructuring Creditors; and

        (C)    Agreed Claims of Restructuring Creditors in respect on Non-OGSC Eligible Trade Finance Debt who failed to make a First Choice Election and/or a Second Choice Election shall be allocated to Senior Package 1

(c)    If the aggregate amount of First Choice Elections for Senior Package 3 is less than U.S.$700 million:

    (i)    first, Agreed Claims of Restructuring Creditors who made First Choice Elections for Senior Package 3 shall to the extent so elected be allocated to Senior Package 3;

(ii)      secondly, Agreed Claims of Restructuring Creditors in respect of Non-OGSC Eligible Trade Finance Debt who failed to make a First Choice Election and/or a Second Choice Election shall be allocated first to Senior Package 3 and, if the amount allocated to Senior Package 3 then reaches U.S.$700 million, the balance shall be allocated to Senior Package 1; and

(iii)      thirdly, if U.S.$700 million has not following the operation of paragraphs (i) and (ii) been allocated to Senior Package 3, Agreed Claims of Restructuring Creditors who made First Choice Elections for Senior Packages 1 and/or 2 shall (by reference to the amounts so elected for Senior Packages 1 and/or 2) be allocated to Senior Package 3 on a *pro rata* basis such that (as a result of the operation of paragraphs (i), (ii) and this paragraph (iii)) U.S.$700 million in aggregate is allocated to Senior Package 3, following which the remainder of their Agreed Claims shall be allocated to Senior Packages 1 and/or 2 in accordance with their First Choice Elections.

**PART II – ALLOCATION OF AGREED OFFICIAL GOVERNMENT SECTOR DEBT BETWEEN SENIOR PACKAGES 1 AND 2**

(a)     Restructuring Creditors submitting Claim Forms in respect of Official Government Sector Debt shall be invited in such Claim Forms to indicate to which of Senior Packages 1 and/or 2 they wish their Agreed Claims in respect of Official Government Sector Debt to be allocated, and where they indicate more than one Senior Package the amount of their Agreed Claim they wish to allocate to each Senior Package indicated (provided that the aggregate amount of a Creditor's election(s) in this regard must  equal the total amount of its Agreed Claim).

(b)     The Bank shall allocate Agreed Claims admitted as Official Government Sector Debt between Senior Package 1 and Senior Package 2 as elected by the relevant Restructuring Creditor in its Claim Form provided that:

(i)      subject to sub-paragraph (iii) below, if the aggregate Claims of Restructuring Creditors admitted as Official Government Sector Debt electing for Senior Package 2 exceeds U.S.$650 million, the Agreed Claims of such Restructuring Creditors (so electing) shall be allocated on a *pro rata* basis to Senior Package 2 in the proportion which U.S.$650 million bears to all such Agreed Claims, and the balance thereof shall be allocated to Senior Package 1;

(ii)     if the aggregate Agreed Claims of Restructuring Creditors admitted as Official Government Sector Debt electing or deemed to elect for Senior Package 2 is less than U.S.$650 million (the difference between the actual amount electing or deemed to elect for Senior Package 2 and U.S.$650 million being, the "**Shortfall**"), then:

(A)     first, Official Government Sector Debt which Restructuring Creditors elected, or have been deemed to elect for Senior Package 2 shall (to the extent of such elections) be allocated to Senior Package 2; and

(B)     secondly, the Restructuring Creditors' Agreed Claims in respect of Official Government Sector Debt electing for Senior Package 1 shall instead be allocated on a *pro rata* basis to Senior Package 2 in the proportion which the Shortfall bears to the total of all such Agreed Claims electing for Senior Package 1, and the balance thereof shall be allocated to Senior Package 1;

(iii)    if less than U.S.$288 million of Excess Non-OGSC Eligible Trade Finance Debt is allocated to Senior Package 2 in accordance with  Part I above, then the balance of U.S.$288 million less the Excess Non-OGSC Eligible Trade Finance Debt elected for Senior Package 2 shall be available for allocation to Official Government Sector Debt, such that there would be no mandatory re-allocation under sub-paragraph (i) above of Official Government Sector Debt to Senior Package 1 unless the aggregate amount of Official Government Sector Creditors electing for Senior Package 2 exceeded  U.S.$650 million plus the portion (the "Unutilised Portion") of U.S.$288 million Excess Non-OGSC Eligible Trade Finance Debt unutilised by Excess Non-OGSC Eligible Trade Finance Debt, in which case:

(A)     allocation to Senior Package 2 of Agreed Claims admitted as Official Government Sector Debt under sub-paragraph (i) shall be made on a *pro rata* basis in the proportion which (x) the aggregate of U.S.$650 million plus the Unutilised Portion bears to (y) the aggregate amount of Official Government Sector Creditors electing for Senior Package 2 and the Unutilised Portion; and

(B)      the Agreed Claims of such Official Government Sector Creditors not thereby allocated to Senior Package 2 shall be re-allocated on a *pro-rata* basis to Senior Package 1; and

(iv)      where no election is made in the Claim Form, such Restructuring Creditor's Claims admitted as Official Government Sector Debt shall:

(A)      where there is a Shortfall, be deemed allocated to Senior Package 2; and

(B)      otherwise, be deemed allocated to Senior Package 1.

(c)      All amounts of principal and interest set out in this Information Memorandum are estimates. The final numbers are subject to the results of the adjudication and admission of Claims processes described herein and the elections of certain Restructuring Creditors and this Allocation Mechanism. Following finalisation of the total Agreed Claims and their allocation between the Restructuring Packages, on the basis the Base Case Model, the Bank and the Steering Committee shall (prior to the Claimants' Meeting) consult with a view to amending the coupons, discount rates and percentages of Designated Financial Indebtedness allocated to various types of Entitlements within a Restructuring Package to take into account the final numbers.

## PART III – EURONOTEHOLDERS

The Trustee on behalf of Euronoteholders will, unless it receives other instructions from Euronoteholders by 26 May 2010, make the following elections when submitting Claim Forms:

(a)     Entitlements to be received in U.S. Dollars;

(b)     Senior Dollar Notes and Dollar Subordinated Notes to be received directly from the Bank (as opposed to through a Bank Creditor SPV); and

(c)     GDRs to be received (as opposed to Shares).

**BANK CREDITOR SPVS**

Pursuant to the Restructuring Plan, each Restructuring Creditor which is allocated to either Senior Package 1 or Senior Package 2 (other than a Restructuring Creditor holding Tenge-denominated debt instruments) may elect that, instead of receiving the applicable Non-Tenge New Notes under such Senior Package itself, the relevant amount of Non-Tenge New Notes shall be issued to a Bank Creditor SPV who will hold such Non-Tenge New Notes on their behalf.  Restructuring Creditors who elect to have their allocation of relevant Non-Tenge New Notes issued to a Bank Creditor SPV will instead receive an equivalent participation in nominal/principal amount in a syndicated loan agreement with equivalent economic terms between the relevant Bank Creditor SPV and the relevant Restructuring Creditors making such elections (see "*Bank Creditor Loan Agreements*" below).

It is proposed that three Bank Creditor SPVs be established to hold the following classes of New Notes on behalf of relevant creditors:

(i)    Senior Dollar Notes issued to Restructuring Creditor under Senior Package 1;

(ii)   OID Notes issued to Restructuring Creditors under Senior Package 2; and

(iii)  Dollar Subordinated Notes and Euro Subordinated Notes issued to Restructuring Creditors under Senior Packages 1 and 2.

**Minimum Face Value**

A Bank Creditor SPV will only be established if Restructuring Creditors entitled to receive the relevant NonTenge New Notes with an aggregate principal amount of U.S.$50 million or higher (the "**Minimum Face Value**") elect for their relevant Non-Tenge New Notes to be issued to that Bank Creditor SPV.  Where applicable, the Bank Creditor SPVs will be incorporated, prior to the Restructuring Date, in a jurisdiction which is acceptable to the Steering Committee.  Each Bank Creditor SPV shall be established as an orphan company and will be managed for the benefit of the Restructuring Creditors who have opted to receive the relevant Non-Tenge New Notes indirectly as part of their Entitlement.

**Bank Creditor Loan Agreements**

Each Bank Creditor SPV shall enter into a syndicated loan agreement with the relevant Restructuring Creditors (each such loan agreement, a "**Bank Creditor Loan Agreement**").  The Bank Creditor Loan Agreements shall be on the same terms as the relevant Non-Tenge New Notes (save for such administrative and technical changes as are necessary to recognise the differing type of debt instrument).  Each relevant Restructuring Creditor shall participate under such Bank Creditor Loan Agreements in principal amounts equal to their entitlement to the relevant Non-Tenge New Notes under the Restructuring Plan.

Each Bank Creditor SPV shall hold any and all rights (including, without limitation, voting rights) attaching to the relevant Non-Tenge New Notes on behalf of the Restructuring Creditors from time to time under the relevant Bank Creditor Loan Agreement.  The Bank Creditor Loan Agreement will require the Bank Creditor SPV to cast a split vote in any meeting of holders of the relevant Non-Tenge New Notes based on the instructions of each Restructuring Creditor under such Bank Creditor Loan Agreement.

**Fees and Expenses in relation to Bank Creditor SPVs**

The Bank will be responsible for (and will covenant in the New Notes Trust Deed to pay) payment of the following fees and expenses relating to the Bank Creditor SPVs:

(i)    all properly documented fees, costs and expenses in relation to the establishment of any Bank Creditor SPV up to, in aggregate, EUR75,000 (plus VAT and disbursements);

(ii)     (for so long as any relevant Non-Tenge New Notes are held by any Bank Creditor SPV), the Bank will pay all properly documented fees, costs and expenses in relation to the maintenance and running costs of any Bank Creditor SPV up to, in aggregate, EUR100,000 (plus VAT and disbursements) per annum; and

(iii)     properly documented legal, agent, security agent or trustee fees, costs and expenses incurred in relation to the loans entered into, and security granted by, any Bank Creditor SPV to the relevant Restructuring Creditors.

Where a Bank Creditor SPV has been required, pursuant to the terms of a Bank Creditor Loan Agreement, to increase any amount payable by it as a result of deduction or withholding for or on account of tax from a payment under such Bank Creditor Loan Agreement, the Bank will indemnify the Bank Creditor SPV for any amount actually paid by it *provided that* the relevant Restructuring Creditor has not failed to take such steps as would avoid the need to make and/or reduce the amount of such tax deduction or withholding in accordance with mitigation obligations contemplated by Loan Market Association ("**LMA**") standard documentation. The relevant terms of the Bank Creditor Loan Agreement will be based on LMA standard documentation and in form and substance satisfactory to the Bank, acting reasonably.

Where a tax deduction or withholding has been made by a Bank Creditor SPV, the Bank may in its sole discretion elect to redeem such relevant principal amount of relevant Non-Tenge New Notes held by the Bank Creditor SPV at, in the case of the Senior Notes, their principal amount outstanding plus accrued interest as well as, if positive a Make Whole Amount or, in the case of the OID Notes, at their Fully Accreted Principal Amount plus accrued interest. Upon any such redemption taking place, the Bank Creditor SPV will prepay the relevant portion of the Bank Creditor Loan Agreement made by the relevant Restructuring Creditor.

**Limited Recourse**

The recourse of the Restructuring Creditors under a Bank Creditor Loan Agreement against any Bank Creditor SPV shall be limited to net recoveries under the applicable Non-Tenge New Notes issued to such Bank Creditor SPV and each Bank Creditor SPV will grant security over the relevant Non-Tenge New Notes held by it, any accounts held by it and, to the extent possible, any of its other assets in favour of a security trustee on behalf of the relevant lenders under the Bank Creditor Loan Agreement from time to time.

**Issue of New Notes on Restructuring Date**

*Minimum Face Value obtained*

On the Restructuring Date the applicable number and amount of Non-Tenge New Notes will be issued directly to Restructuring Creditors who, pursuant to the terms of the relevant Restructuring Packages, have opted to receive relevant Non-Tenge New Notes directly from the Bank. Where applicable, and provided the Minimum Face Value of the relevant class of Non-Tenge New Notes has been reached, such Non-Tenge New Notes will be issued to the relevant Bank Creditor SPVs, respectively, in the number and amount corresponding to the elections of the Restructuring Creditors under such Restructuring Packages. Each Bank Creditor Loan Agreement (and related security documents) shall be entered into between the relevant Restructuring Creditors and the relevant Bank Creditor SPV prior to the issue of the Non-Tenge New Notes. Pursuant to such Bank Creditor Loan Agreement the relevant Restructuring Creditors shall receive a participation under such Bank Creditor Loan Agreements in principal amount equivalent to their entitlement to Non-Tenge New Notes under the relevant Restructuring Package.

*Minimum Face Value not obtained*

In the event that eligible Restructuring Creditors electing that a Bank Creditor SPVs should receive their entitlement of relevant Non-Tenge New Notes would, in aggregate, receive relevant Non-Tenge New Notes with a face value of less than U.S.$50 million then, as described above, that Bank Creditor

SPVs shall not be established and the relevant Restructuring Creditors shall instead receive the relevant Non-Tenge New Notes directly from the Bank.  The Bank shall promptly notify the affected Restructuring Creditors (and in any event prior to the Claimants' Meeting) if this is the case.  For the avoidance of doubt, failure to reach the Minimum Face Value for one Bank Creditor SPV shall not preclude the establishment of the other Bank Creditor SPVs which meet the Minimum Face Value.

## THE GDR PROGRAMME

Prior to the Restructuring Date, the Bank shall establish the GDR Programme.  The GDRs shall be tradable in Euroclear, Clearstream and DTC from the Restructuring Date.  The Bank shall procure the listing of the GDRs on an Approved Stock Exchange within six months of the Restructuring Date.

On or immediately prior to the Restructuring Date, the Bank shall issue to Samruk-Kazyna a sufficient number of Shares to enable the Bank to comply with the requirements relating to the distribution of Shares and GDRs on the Restructuring Date as required under the Restructuring Packages.  The consideration payable in respect of the issue of such new Shares shall be paid by Samruk-Kazyna.

On or immediately prior to the Restructuring Date, following issue of the Shares, Samruk-Kazyna shall transfer such number of Shares to the Bank for transfer by the Bank, credited as fully paid, to (i) the Depositary under the GDR Programme representing the Non-Kazakh Residents Share Entitlement (less such number of Shares (being the "**Non-Resident Election Shares**") which non-Kazakh residents have elected in their Claim Forms to receive instead of GDRs) (the "**Deposited Shares**") and (ii) the Restructuring Creditors resident in Kazakhstan entitled to Shares under the Restructuring Packages representing the Kazakh Residents' Share Entitlement and (iii) the Restructuring Creditors not resident in Kazakhstan entitled to Shares/GDRs under the Restructuring Packages who have elected in their Claim Forms to receive Shares instead of GDRs, the Non-Resident Election Shares, such that the total amount of Shares of the Bank held by the Restructuring Creditors (or the Depositary (or Custodian)) amounts to 18.5 per cent. of the share capital of the Bank.

**Distribution of Shares and GDRs on the Restructuring Date**

Following the receipt of the Shares from the Bank, the Depositary shall issue, for no consideration, GDRs to the Restructuring Creditors who are non-Kazakh residents entitled to the corresponding Shares under Senior Packages 1 and 2 and Junior Package 2 (who have not elected in their Claim Forms to receive Shares instead of GDRs), such that each such non-Kazakh resident Restructuring Creditor shall receive a number of GDRs calculated *pro-rata* to the amount of Share Conversion Debt owed to that Restructuring Creditor.

On the Restructuring Date, the Bank shall transfer the Share Entitlements of Kazakh residents and non-Kazakh residents which have elected to receive Shares rather than GDRs to those Restructuring Creditors  such that each shall receive a number of Shares calculated pro-rata to the amount of Share Conversion Debt owed to that Restructuring Creditor.

The aggregate amount of Shares in respect of which GDRs will be issued to Restructuring Creditors is, at the date of this Supplemental Information Memorandum expected to be approximately 7,735,470,493 Shares corresponding to 14 per cent. of the share capital of the Bank under Senior Packages 1 and 2 and 2,486,401,230 Shares corresponding to 4.5 per cent. of the share capital of the Bank under Junior Package 2.  It is expected that each GDR will represent 500 Shares.  The foregoing numbers of Shares and GDRs expected to be issued to Restructuring Creditors are based on the assumptions that (i) all Restructuring Creditors allocated to Senior Packages 1 and 2 are non-Kazakh residents; (ii) all Restructuring Creditors allocated to Junior Package 2 are non-Kazakh residents; and (iii) all non-Kazakh residents choose GDRs, and are therefore subject to change.  Following the Restructuring the Residual Minority Shareholder Percentage is expected to be approximately 0.02 per cent.

**Rights of GDR Holders in respect of Deposited Shares**

The following is a summary of the rights of GDR Holders pursuant to the GDR Programme.  The Deposit Agreement and the terms and conditions of the GDRs shall be described in a supplement to this Information Memorandum and the following summary is subject in all respects to, and shall be superseded by, the terms of the Deposit Agreement.

*Right to receive Shares*

Any GDR Holder may request the withdrawal of, and the Depositary shall relinquish, the Deposited Shares attributable to the GDRs held by that GDR Holder.  Such GDR Holder will be required to produce evidence of entitlement to the relevant GDRs and a certificate in the required form certifying that the person to whom the deposited Shares are to be delivered is not prohibited from holding Shares in the Bank pursuant to Article 17.5 of the Kazakhstan Laws on Banks and Banking Activity.  See "*Description of Share Capital of the Bank and Certain Matters of Kazakhstan Law – Disclosure of Beneficial Ownership*".  In addition payment of taxes and reasonable fees may be required as applicable.

*Dividends*

GDR Holders will be entitled to receive an amount equivalent to any dividends or other proceeds payable on, or with respect to, the deposited Shares corresponding to its GDRs (less any withholding or other tax or duty incurred or payable in connection therewith) as soon as practicable after the dividends are paid.  The Bank and Samruk-Kazyna will each undertake, in the BTA Undertaking and the Samruk-Kazyna Undertaking respectively, that no dividend other than a Permitted Dividend shall be payable on the Shares.  See "*Undertakings by the Bank and Samruk-Kazyna*".

*Bonus issues of Shares*

Upon any free or bonus issues of Shares, the Depositary shall issue additional GDRs to the then existing GDR Holders in proportion to the number of deposited Shares corresponding to the GDRs held by each GDR Holder, or if the Depositary determines that such distribution is not practical or lawful, the Depositary shall sell the additional Shares and distribute the proceeds to the GDR Holders.

*Further deposits of Shares*

Other than the Shares which Samruk-Kazyna is required to transfer to the Bank for deposit in respect of the GDR Programme, neither Samruk-Kazyna nor any direct or indirect transferee of any Share held by SamrukKazyna shall be permitted to deposit any Share held by it from time to time with the Depositary to be included in the GDR Programme established by the Bank.

*Rights attaching to Shares*

If any rights (including but not limited to options to acquire further Shares) attaching to the Deposited Shares become exercisable, the Depositary shall send a notice to each GDR Holder's address, informing the GDR Holder of such rights.  The GDR Holder may request the Depositary to exercise such rights which the Depositary must then exercise *provided that* it considers, in its reasonable opinion, that it is lawful and reasonably practicable to exercise such rights and, where applicable, the relevant GDR Holder has put the Depositary in funds to pay the relevant subscription price together with any applicable fees and taxes.

Any issue of further Shares or other derivative assets following the exercise of such rights shall be held by the Depositary on the same terms as the existing Deposited Shares and the Depositary shall issue additional GDRs to the relevant GDR Holders in respect of such further deposited Shares or derivative assets.

If the Depositary considers in its reasonable opinion that it is not lawful or not reasonably practicable to exercise such rights or to distribute the Shares or other securities, the Depositary shall either sell such rights or exercise such rights and then sell the additional Shares or other securities and distribute the proceeds to the GDR Holders.

*Consolidation or restructuring of Shares*

Upon any consolidation or restructuring of Shares, the Depositary may issue additional GDRs to reflect the change in the share capital in the Bank held by the Depositary or require the exchange of

the existing GDRs for new GDRs which reflect the new number of Shares corresponding to each GDR, in each case as the Depositary shall determine appropriate.

### *Voting Rights*

GDR Holders will have voting rights with respect to the corresponding Deposited Shares of the Bank. However, such voting rights shall be subject to Article 17.5 of the Kazakhstan Law on Banks and Banking Activity.  See "*Description of the Share Capital and Certain Matters of Kazakhstan Law – Disclosure of Beneficial Owners*".

### *Shareholder Meetings*

The Bank shall promptly provide the Depositary with all notices of meetings of shareholders of the Bank and provide the Depositary with an agenda for such meeting including details of any resolution proposed to be put to a general meeting of the Bank.  The Depositary shall send all such notices and agenda to each GDR Holder together with a request for each GDR Holder who is eligible to vote to provide instructions to the Depositary as to whether such GDR Holder wishes to vote in favour of, against or abstain in respect of the relevant resolution.  To be eligible to provide voting instructions, each GDR Holder must certify that it is not prohibited from voting pursuant to Article 17.5 of the Kazakhstan Law on Banks and Banking Activity.

Each GDR Holder that is eligible to vote is entitled, in respect of each GDR that it holds, to one vote for each Deposited Share represented by such GDR and shall be entitled to provide instructions to the Depositary as to how the Depositary is to exercise such vote on a particular resolution of a general meeting of the Bank.

In respect of any resolution put to the Bank's shareholders, the Depositary aggregates all votes for and against such resolution received from GDR Holders eligible to vote and all abstentions of GDR Holders.  The Depositary shall then vote the corresponding number of Share for or against the resolution accordingly and abstain in respect of the remainder.

The Depositary shall have the right and obligation to requisition an extraordinary general meeting of the Bank upon receiving instructions from GDR Holders holding GDRs corresponding to Deposited Shares which in aggregate amount to 5 per cent. or more of the outstanding Shares of the Bank.

To the extent permitted by applicable law, each GDR Holder shall have the right to attend and speak at any general meeting of shareholders of the Bank.

### *Tag-Along Rights*

Each GDR Holder (each a "**Tagged Shareholder**") shall have the following tag-along rights up to and including the Minority Protection Expiry Date in respect of the Shares corresponding to their GDRs:

(a)     where Samruk-Kazyna (whether acting alone or in concert) is disposing of less than 30 per cent. of the Shares, each Tagged Shareholder shall be entitled to a *pro-rata* tag-along in respect of all or part (at its discretion) of the Shares corresponding to the GDRs held by it. The percentage of Shares (corresponding to a Tagged Shareholder's GDRs) up to which such Tagged Shareholder may elect to tag-along shall be equal to the percentage of Shares held by Samruk-Kazyna on the date of sale being sold by SamrukKazyna (and any persons with whom it is acting in concert) ("**Pro-rata Tag-Along Proportion**")); and

(b)     where Samruk-Kazyna (and any persons with whom it is acting in concert) is disposing of 30 per cent. or more of the Shares (either in one or more transactions and for which purpose all sales made by Samruk-Kazyna on or following the Restructuring Date shall be aggregated), each Tagged Shareholder shall be entitled to tag-along in respect of all or part (at its discretion) of the Shares corresponding to the GDRs held by it.

The tag-along sale price per Share (the "**Tag Price**") payable to the Tagged Shareholders shall be the average price per Share as paid to Samruk-Kazyna and any persons with whom it is acting in concert in connection with the relevant sale transaction.

Where Samruk-Kazyna wishes to dispose of any of its Shares to one or more persons (each a "**Tag-Along Purchaser**") then Samruk-Kazyna shall serve a notice (a "**Tag-Along Offer**") on each Tagged Shareholder specifying the total number of Shares being sold, the Tag Price and any other material terms of the proposed Share disposal no less than 21 days prior to the completion of such disposal (in the event of a private sale) and no less than two business days prior to completion of such disposal (in the event of a disposal by way of public offering, provided no less than 21 days prior notice of an intended public offering has been given).

Within 21 days of service of the Tag-Along Offer (and subject to completion of the disposal of Shares by Samruk-Kazyna), any Tagged Shareholder may serve a notice ("**Tag-Along Acceptance**") on Samruk-Kazyna and the Bank specifying that it wishes to exercise its tag-along right.

If any GDR Holder (i) in the case of a disposal other than by way of public offering has given a Tag-Along Acceptance, Samruk-Kazyna shall not dispose of any Shares to a Tag-Along Purchaser unless either the Tag-Along Purchaser or Samruk-Kazyna, as the case may be, makes an offer, that is capable of acceptance, to acquire, and acquires, all or the Pro-rata Tag-Along Proportion (as applicable) of the Shares corresponding to each such Tagged Shareholder's GDRs at the same time; or (ii) in the case of a disposal by way of public offering, SamrukKazyna makes an offer, that is capable of acceptance, to acquire and acquires, all or the Pro-rata Tag-Along Proportion (as applicable) of the Shares corresponding to each such Tagged Shareholder's GDRs, at the Tag Price within 21 days of the date of the public offer.

Where a GDR Holder withdraws its deposited Shares, any holder (and any subsequent transferee) of such Shares shall be entitled to tag-along rights equivalent to those enjoyed by the GDR Holders at the Tag Price.

Where tag-along rights described above become exercisable by the GDR Holders, the Bank shall notify the Depositary and provide details including the proposed Tag Price and whether the tag-along rights are exercisable in respect of all of the Shares or only a proportion of the Shares.   The Depositary shall then provide such information to each GDR Holder.

The GDR Holders may elect to either exercise the tag-along right or not exercise the tag-along right. If a GDR Holder elects to exercise their tag-along right, this will result in the sale of all or a proportion of the Shares corresponding to that GDR Holder's GDRs, depending on the percentage of Shares which Samruk-Kazyna is disposing.  The Depositary shall cancel the GDRs corresponding to Shares sold pursuant to the tag-along and shall distribute the proceeds from such sale to the relevant GDR Holders.

### *Drag-Along Rights*

If Samruk-Kazyna (whether acting alone or in concert) wishes to transfer a majority of the Shares in the Bank under a *bona fide* arm's length offer to one or more persons ("**Drag-Along Purchaser**"), then Samruk-Kazyna shall have the option (subject to certain conditions) to require GDR Holders to transfer all of the Shares corresponding to their GDRs to the Drag-Along Purchaser. Samruk-Kazyna's drag-along rights may be enforced against any GDR Holder.

Where the consideration for the sale of such shares is in a form other than cash, Samruk-Kazyna must procure that an amount in cash equivalent to the value determined by an independent expert is undertaken (by a party with a credit rating of BBB- or better from Standard & Poor's) to be paid to Restructuring Creditors holding GDRs issued pursuant to the Restructuring on completion of such sale or transfer (such undertaking to be in a form satisfactory to the Depositary and to be provided as a condition precedent to the effectiveness of such transfer).

The exercise of the drag-along right shall be subject to:

(a)    the condition that the Drag-Along Price is equal to or better than the fair market arms-length value as determined by an independent expert (being one of Deloitte, PricewaterhouseCoopers, KPMG or Ernst & Young or an international investment bank) appointed by Samruk-Kazyna and whose costs and expenses shall be borne by the Bank;

(b)    the condition that the each relevant GDR Holder receives no less than the price per Share received by Samruk-Kazyna; and

(c)    the sale price per Share is payable exclusively in cash or in a form immediately convertible into cash which the independent expert confirms is of at least equal value to the consideration provided to Samruk-Kazyna per Share and such consideration is paid or delivered at completion of such transfer.

Samruk-Kazyna may exercise the drag-along right by giving a written notice (a "**Drag-Along Notice**") to the Depositary specifying the proposed drag-along sale price per Share the ("**Drag-Along Price**") at least 45 days prior to completion of such transfer.  The Depositary shall then provide such information to the GDR Holders.

Upon exercise of the drag-along rights and transfer of the relevant Shares to the Drag-Along Purchaser, the Depositary shall cancel the GDRs corresponding to such Shares and shall distribute the proceeds from such sale to the relevant GDR Holders.  The Drag-Along Rights described above will also apply to Shares allocated to the Restructuring Creditors under the Restructuring Plan.

### Deposit Agreement

The Deposit Agreement between the Bank and the Depositary shall be on terms as described above and otherwise include such terms as are ordinarily included in deposit agreements in respect of similar GDR Programmes.

Each GDR holder shall have the right by virtue of a deed poll to enforce the relevant provisions of the Deposit Agreement as if it was a party to the Deposit Agreement.

In order to become a GDR Holder, Restructuring Creditors will need to certify that they are not related to former management of the Bank.  GDR Holders who are related to the former management of the Bank will not be entitled to vote their GDRs and will have their GDRs cancelled.

### The BTA Undertaking and the Samruk-Kazyna Undertaking

The Bank and Samruk-Kazyna will execute the BTA Undertaking and the Samruk-Kazyna Undertaking, for the benefit of the GDR Holders.  Such undertakings shall be effective as of the Restructuring Date.

## UNDERTAKINGS BY THE BANK AND SAMRUK-KAZYNA

Prior to the Restructuring Date the Bank and Samruk-Kazyna will each execute undertakings in favour of the Restructuring Creditors (and, for the avoidance of doubt, their direct or indirect transferees) and the New Notes Trustees.  The Undertakings shall be governed by the laws of England and Wales and will become effective on the Restructuring Date and shall cease to be of effect, save with respect to rights accrued as at such date, on the Minority Protection Expiry Date.  The key terms of each of the BTA Undertaking and the Samruk-Kazyna Undertaking are set out below.

**The BTA Undertaking**

***General Covenants***

The Bank shall undertake to:

(a)     carry on its business in an effective and businesslike manner;

(b)     only enter into service or management contracts or other arrangements (including any arrangements in respect of remuneration) with any of the members of the Board or the Bank's Chairman, Chief Executive Officer or Chief Financial Officer, with the prior approval of a Qualified Majority of the Board;

(c)     promptly deliver to the Depositary the information required under Section 1 of Schedule 11 (*Covenants of the Bank*) to be provided to the Depositary in English or accompanied by a certified translation into English, on the dates referred to therein;

(d)     prepare a draft Business Plan and budget for the Bank and the Group in respect of each Financial Year;

(e)     keep proper and up-to-date accounting and financial records in relation to its business;

(f)     comply, and procure that each member of the Group complies, with its constitutional documents (including the New Charter); and

(g)     procure annual independent reviews by an Independent Auditor in respect of:

(i)     compliance with the New Corporate Governance Code and internal procedures and controls; and

(ii)     the implementation of the Business Plan,

and the scope of each such review shall be approved by the Board.  The first such review shall be conducted on or about the date falling six months after the Restructuring Date, following it the Independent Auditor shall promptly report to the audit committee on the matters referred to above.  Any non-compliance identified in a review shall be remedied by the Bank within six months of the relevant review and shall be noted in the Bank's annual financial statements.  The Bank shall pay the costs and expenses of any Independent Auditor.

***Bank Covenants in favour of GDR Holders***

The Bank shall undertake:

(a)     to procure that all government or administrative authorisations, approvals, consents, permits or registrations are obtained or made which are required under any applicable Kazakhstan law or regulation in order for the Depositary to receive, hold and transfer the Shares and for the Restructuring Creditors to receive, hold and transfer the GDRs;

(b)     to pay all stamp duties and other taxes payable in Kazakhstan, Belgium, Luxembourg, Germany, the United Kingdom or the United States in connection with the issue and

69

distribution of the Shares or GDRs and the subsequent transfer of the Shares or GDRs from the Bank to the relevant Restructuring Creditors;

(c) to comply with its obligations under the Deposit Agreement in connection with providing information in respect of any drag-along or tag-along notice and to facilitate the exercise of any drag-along and tagalong rights;

(d) to comply with all its other obligations and undertakings under the Deposit Agreement;

(e) to the extent that any matter arises which is a Supermajority Item, procure that the a general meeting of shareholders of the Bank be requisitioned and that approval of such Supermajority Item be proposed as a resolution to be voted on at the general meeting of shareholders;

(f) not to agree to or allow any amendment to the Deposit Agreement which adversely affects the present or future interest or position of the GDR Holders to be made without the prior consent of at least two-thirds of the GDR Holders; and

(g) to indemnify the GDR Holders in respect of any loss, liability, damage, expense or cost (including reasonably incurred and properly documented legal costs) arising or in connection with enforcement by the GDR Holders of its undertakings under the BTA Undertaking.

### *Creditor Directors' Costs and Indemnity*

The Bank shall undertake:

(a) to pay the remuneration and expenses (including the cost of flights and reasonable accommodation costs) of the Creditor Directors;

(b) to provide to each of the Creditor Directors appropriate directors' and officers' liability insurance; and

(c) to the maximum extent permitted by law, to indemnify the Creditor Directors against all costs and expenses reasonably incurred or paid in relation to any claim or dispute or other proceedings which they may become involved in their capacity as a director.

### *Management Board*

The Bank shall undertake that the Management Board of the Bank shall consist of the Bank's Chairman and the persons fulfilling the roles of Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Chief Compliance Officer, the Chief Risk Officer and such other officers as the Board of Directors shall determine appropriate.

### *Dividends*

The Bank will undertake that no dividend other than a Permitted Dividend shall be paid on the Shares.

**The Samruk-Kazyna Undertaking**

**Board of Directors**[7]

*Composition*

(a)  Immediately after the Restructuring Date, the Board of the Bank shall consist of nine directors comprising four Samruk-Kazyna Directors and, if then appointed, two Creditor Directors and three independent Directors.  A director is "independent" only if (unless, in the case of the initial Independent Directors, the Steering Committee otherwise agrees) he:

  (i)  has not been a director or an employee of the Bank or Samruk-Kazyna (or any Affiliate of either) within the five years prior to 6 March 2009;

  (ii)  has not had, within the last three years, a material business relationship with the Bank or Samruk-Kazyna (or any Affiliate of either);

  (iii)  has no close family ties with any of the (current or former) advisers, directors or senior employees of the Bank;

  (iv)  holds no cross-directorships or significant links with other directors through involvement in other companies or bodies.

Notwithstanding the restrictions listed above, Yurki Talvite and Konstantine Korishchenko will be deemed to be "independent".

(b)  Where the current Creditor Director appointed by holders of the Senior Dollar Notes has resigned or has been removed:

  (i)  the Bank shall give notice of such event to the relevant New Notes Trustee;

  (ii)  promptly thereafter, a meeting of the Senior Dollar Noteholders shall be called and the quorum for such meeting shall be Senior Dollar Noteholders holding in aggregate not less than 5 per cent. of the total Senior Dollar Notes then outstanding;

  (iii)  at such meeting any candidate nominated by any Senior Dollar Noteholder shall be nominated to be the replacement Creditor Director and, in addition, the Bank shall nominate a candidate to be the replacement Creditor Director;

  (iv)  provided the meeting of Senior Dollar Noteholders is quorate:

    (A)  if the candidate nominated by any Senior Dollar Noteholder is approved by Senior Dollar Noteholders present in person or by proxy holding 25 per cent. of the total number of Senior Dollar Notes held by all Senior Dollar Noteholders present in person or by proxy at the meeting (or if greater than 50 per cent. present are voting on such resolution a simple majority of those voting) then the relevant New Notes Trustee shall instruct the Bank and SamrukKazyna to elect such person to the Board of Directors; or

    (B)  if such number of Senior Dollar Noteholders do not approve the candidate nominated by the Noteholders (if any) then, unless Senior Dollar Noteholders holding 25 per cent. or more of the Senior Dollar Notes reject the candidate nominated by the Bank, then the relevant New Notes Trustee shall instruct the Bank and Samruk-Kazyna to elect the Bank's nomination to the Board of Directors.

---

[7] If the governing law of the Tenge Notes is changed to English law, references to "Senior Dollar Notes" and "Senior Dollar Noteholders" shall be changed to "Senior Notes" and "Senior Noteholders" respectively.

(c)    Where the current Creditor Director appointed on behalf of holders of the OID Notes has resigned or has been removed:

    (i)    the Bank shall give notice of such event to the relevant New Notes Trustee;

    (ii)    promptly thereafter, a meeting of the OID Noteholders shall be called and the quorum for such meeting shall be OID Noteholders holding in aggregate not less than 5 per cent. of the total OID Notes then outstanding;

    (iii)    at such meeting any candidate nominated by any OID Noteholder shall be nominated to be the replacement Creditor Director and, in addition, the Bank shall nominate a candidate to be the replacement Creditor Director;

    (iv)    provided the meeting of OID Noteholders is quorate:

        (A)    if any candidate nominated by any OID Noteholder is approved by OID Noteholders present in person or by proxy holding 25 per cent. of the total number of OID Notes held by all OID Noteholders present in person or by proxy at the meeting (or if greater than 50 per cent. present are voting on such resolution a simple majority of those voting) then the relevant New Notes Trustee shall instruct the Bank and Samruk-Kazyna to elect such person to the Board of Directors; or

        (B)    if such number of OID Noteholders do not approve the candidate nominated by the OID Noteholders (if any) then, unless OID Noteholders holding 25 per cent. or more of the OID Notes reject the candidate nominated by the Bank, then the relevant New Notes Trustee shall instruct the Bank and Samruk-Kazyna to elect the Bank's nomination to the Board of Directors.

(d)    In the event any OID Noteholder or Senior Noteholder meeting described in paragraphs (b) or (c) above does not produce a candidate to be elected as the replacement Creditor Director, a further meeting(s) shall be called and held on the same basis.

*Removal*

(a)    The New Notes Trustee on the instructions of the holders of the Senior Dollar Notes and OID Notes and Samruk-Kazyna, respectively, shall have the right to remove and replace any respectively nominated directors.

(b)    In the case of the Creditor Director appointed on behalf of the holders of the Senior Dollar Notes, such holders holding in aggregate more than 25 per cent. of the outstanding Senior Dollar Notes may by notice to the Notes Trustee require the resignation of that Creditor Director.

(c)    In the case of the Creditor Director appointed on behalf of the holders of the OID Notes, such holders holding in aggregate more than 25 per cent. of the outstanding OID Notes may by notice to the New Notes Trustee require the resignation of that Creditor Director.

*Term*

(a)    Each Creditor Director shall be appointed for a term lasting up to the Minority Protection Expiry Date unless that person resigns or is removed in accordance with the above paragraph "*Removal*".

(b)    Following the Minority Protection Expiry Date, a Creditor Director may be removed from the board without the consent of the New Notes Trustee and no replacement Creditor Director will be appointed.

*Conflicts of Interest*

A Director may not vote on or be counted in the quorum in relation to a resolution of the Board, or of any committee of the Board, concerning any contract, arrangement, transaction or proposal with the Bank or in which the Bank is otherwise interested and in which he, the Shareholder who appointed him or any Affiliate has an interest which may reasonably be regarded as likely to give rise to a material conflict of interest.  For the avoidance of doubt the Creditor Directors shall not be prevented from being counted in the quorum of any board meetings or committee meetings and shall not be excluded from voting at such meetings on matters relating to recoveries (whether such recoveries shall be paid out under the Recovery Units or otherwise) owing only to the interest of the Restructuring Creditors who appointed them in the recoveries.

**Samruk-Kazyna Undertakings**

Samruk-Kazyna shall undertake to the GDR Holders, the Restructuring Creditors (and, for the avoidance of doubt, their direct and indirect transferees) and the New Notes Trustees that it shall:

(a)     exercise its voting rights in relation to the Shares held by it in order to procure that the Creditor Directors as nominated by the Steering Committee or in relation to any replacement Creditor Director subsequently nominated by the New Notes Trustee are appointed to the Board;

(b)     not exercise its voting rights in relation to the Shares held by it in order to remove either Creditor Director other than for incapacity or gross misconduct, in which event Samruk-Kazyna shall use its reasonable endeavours to secure the prompt appointment of a replacement, nominated by the New Notes Trustee and no Qualified Majority decisions can be taken unless at least one Creditor Director is still a member of the Board; and

(c)     procure that no Samruk-Kazyna votes in respect of any item listed as requiring a Qualified Majority under "*Share Distribution and Rights of Minority Shareholders — Shareholder and Board Approvals*" (a "**Qualified Majority Item**") unless both Creditor Directors and at least one Independent Director have voted to approve the Qualified Majority Item, in which case the Samruk-Kazyna Directors may vote in favour of or against approving the Qualified Majority Item at their discretion.

**Voting at Shareholder Meetings**

Samruk-Kazyna shall undertake to the GDR Holders, Restructuring Creditors (and, for the avoidance of doubt, their direct and indirect transferees) and the New Notes Trustees that it shall:

(a)     to the extent that any matter arises which listed as requiring a super-majority under "*Share Distribution and Rights of Minority Shareholders*" (a "**Supermajority Item**"), procure that the Samruk-Kazyna Directors propose that a general meeting of shareholders of the Bank be requisitioned and that approval of such matter be proposed as a resolution to be voted on at the general meeting of shareholders;

(b)     provided the total number of GDRs then in issue represents 5 per cent. or more of the total Shares of the Bank then in issue, in respect of any Supermajority Item, Samruk-Kazyna shall not exercise its voting rights in respect of such Supermajority Item unless more than two-thirds of the votes cast by or on behalf of the Depositary approve the Supermajority Item, in which case Samruk-Kazyna shall vote to approve or reject such Supermajority Item at its discretion; and

(c)     not deposit any Shares with the Depositary or purchase or hold (directly or indirectly) corresponding to any Shares deposited with the Depositary.

***Dividends***

Samruk-Kazyna will undertake that no dividend other than a Permitted Dividend shall be paid on the Shares.

*Tag-Along Rights*

The Samruk-Kazyna Undertaking will contain an undertaking with respect to the tag-along rights of GDR Holders as set out above under "*GDR Programme — Rights of GDR Holders in respect of Deposited Shares — Tag-Along Rights*".

*Drag-Along Rights*

The Samruk-Kazyna Undertaking will contain an undertaking with respect to the tag-along rights of GDR Holders as set out above under "*GDR Programme — Rights of GDR Holders in respect of Deposited Shares — Drag-Along Rights*".

***Accession***

Pursuant to the Samruk-Kazyna Undertaking, *provided that* the GDRs represent 5 per cent. or more of the Shares then in issue, if prior to the Minority Protection Expiry Date Samruk-Kazyna sells or transfers to any person or persons acting in concert (in any one or a series of transactions) where the result of such transfer would be that Samruk-Kazyna's holding of Shares would be less than 47.5 per cent. plus one Share, it shall be a condition precedent to such sale or transfer that the acquirer or acquirers accede to the Samruk-Kazyna Undertaking and become bound by the obligations of Samruk-Kazyna under it until the Minority Protection Expiry Date.

### SHARE DISTRIBUTION AND RIGHTS OF MINORITY SHAREHOLDERS

**Share Capital of the Bank as of the Restructuring Date**

On the Restructuring Date, the aggregate share capital of the Bank shall be held as follows:

*Shares held by the Restructuring Creditors* – The Restructuring Creditors (and the Depositary (or Custodian) on behalf of some Restructuring Creditors) shall hold such number of Shares, so that together the Restructuring Creditors (and the Depositary (or Custodian) on behalf of Restructuring Creditors) have an aggregate shareholding representing 18.5 per cent. of the total Shares in issue.

*Shares held by Samruk-Kazyna* — Samruk-Kazyna shall hold such number of Shares, so that its total shareholding in the Bank represents 81.5 per cent. (less the Residual Minority Shareholder Percentage) of the Shares in issue.

**Charter of the Bank**

The Bank will amend the Charter to reflect, among other things, changes to the composition of the Board of Directors, approval matters and required majorities.  Certain of the proposed amendments to the Charter are set out below.  Although the Bank has discussed the New Charter with the FMSA and has received in principle approval of certain provisions of the New Charter, the New Charter remains subject to official approval of the FMSA and of other relevant governmental bodies and therefore the types of approval matters and the other provisions as currently proposed by the New Charter may change.  Some of the provisions expected to be incorporated into the New Charter have never been tested under Kazakhstan law and the Bank gives no assurance that the applicable governmental and regulatory authorities will hold such provisions to be in compliance with Kazakhstan law.  If such provisions are not found to be in compliance with Kazakhstan law by the applicable governmental and regulatory bodies they may refuse to register the New Charter and the Bank may have to prepare a further revised Charter.  Therefore, certain protections which the Bank is seeking for its shareholders may not be available under the New Charter and there is the risk that the New Charter will not contain certain of the proposed amendments as described herein.  See "*Risk Factors — Risks Relating to the Restructuring — Certain provisions of the proposed New Charter may not comply with the requirements of Kazakhstan law and shareholders of the post-restructured Bank may therefore not receive the protections afforded by the proposed New Charter described in this Information Memorandum*".

**Shareholder Rights and Approvals**

The New Charter proposes that any Shareholder or Shareholders holding in excess of 5 per cent. of the total number of issued and outstanding Shares shall be entitled to require the calling of an extraordinary general meeting of the Bank and propose resolutions to be put to the vote at general meeting.  The quorum for a general meeting of the Bank shall be one or more Shareholders together holding more than 50 per cent. of the voting rights at the time any business is transacted.  Should any general meeting of the Bank be adjourned due to lack of quorum, the quorum at the subsequent adjourned general meeting of the Bank shall be one or more Shareholders holding 40 per cent. or more of the voting rights at the time any business is transacted.

Subject to the provisions relating to items requiring Supermajority Approval as set out below under "*Shareholder/Board Approvals*", decisions at general meetings shall be determined by a simple majority of votes cast on a poll.  Each Shareholder shall have one vote in respect of each Share held by the Shareholder, and the chairman shall not have any additional voting power (including any casting vote) by virtue of his position.  Each GDR Holder shall be entitled to attend and speak at any Shareholders' meeting.  The Depositary shall exercise its voting rights with respect to all valid voting instructions it receives from GDR Holders eligible to vote.

Matters which constitute Supermajority Items shall not have any effect unless and until such matters have been approved by a resolution passed at a duly convened Shareholders' meeting, at which a quorum is present, by the affirmative votes of:

(i)     Shareholders holding not less than 75 per cent. of the total Shares; and

(ii)    *provided that* the GDRs then in issue represent 5 per cent. or more of the total Shares of the Bank then in issue and *provided that* the Depositary casts at least one vote on the relevant resolution, the approval of at least two-thirds of the votes cast by the Depositary on behalf of GDR Holders eligible to vote.

**Board of Directors**

Immediately after the Restructuring Date, the Board of the Bank shall consist of nine directors comprising four Samruk-Kazyna Directors and, if then appointed, two Creditor Directors and three Independent Directors.

For ordinary meetings of the Board of Directors, the quorum for a Board meeting shall be at least half of the total number of directors, including a Samruk-Kazyna Director, and a Creditor Director.  For any meeting which is to consider a matter specified as requiring Qualified Majority Approval, as set out below under "*Shareholder/Board Approvals*" the quorum for such Board meeting shall be at least half of the total number of directors, including a Samruk-Kazyna Director and both Creditor Directors.  Should any meeting of the Board be adjourned due to lack of quorum, the quorum at the subsequent adjourned Board meeting shall be at least half the total number of directors provided all meeting notice requirements have been properly complied with by the Bank.

Each director shall have one vote, and the chairman shall not have any additional voting power (including any casting vote) by virtue of his position.

Resolutions listed as requiring Qualified Majority Approval, as set below, shall only be passed at a quorate Board meeting by a Qualified Majority.

**Board and Committee Meetings**

Board meetings will be held at least ten times per year until the second anniversary of the Restructuring Date and thereafter four times per year.  Board meetings shall be convened by the chairman of the Board upon the request of any director, the Bank's internal auditor, the Independent Auditor or any major shareholder who shall set forth in reasonable detail the reason for such request.

**Management Board**

The Management Board or any committee shall not have authority to consider and decide on any matters which are reserved for the Shareholders or the Board, either pursuant to the New Charter or the matters reserved for the Board under applicable laws.

**Shareholder/Board Approvals**

The table below sets out the matters which will be reserved for either Shareholder or Board Approval. Any matter listed in the "Approval Matter" column is reserved for the approval level specified in the "Reserved For" column and must be passed by the majority noted in the "Reserved For" column in order to become effective or be within a group of related or a basket of transactions approved by such majority.

In this table:

"**Qualified**" means that the relevant matter requires the approval of a majority of the Board including, subject as set out under "*Undertakings by the Bank and Samruk-Kazyna*", both of the Creditor Directors and at least one Independent Director;

"**Supermajority**" means that the relevant matter requires:

(a)    the approval of 75 per cent. or more of the total number of Shares; and

(b)    *provided that* the GDRs then in issue represent 5 per cent. or more of the total Shares of the Bank then in issue and provided the Depositary casts at least one vote on the relevant resolution, the approval of at least 2/3 of the votes cast by the Depositary on behalf of GDR Holders eligible to vote;

"**Variable 1**" means:

(a)    for transactions, liabilities (individual or in aggregate), security interests or other changes to the Bank's business which have a value of or amount to 10 per cent. or less of the Bank's charter capital, a decision of the management board;

(b)    for transactions, liabilities (individual or in aggregate), security interests or other changes to the Bank's business which have a value of or amount to more than 10 but less than 25 per cent. of the Bank's charter capital, a Qualified decision of the Board of Directors; and

(c)    for transactions, liabilities (individual or in aggregate), security interests or other changes to the Bank's business which have a value of or amount to more than 25 per cent. or more of the charter capital of the Bank, a Supermajority decision of the Bank's Shareholders;

"**Variable 2**" means:

(a)    for transactions, liabilities (individual or in aggregate), security interests or other changes to the Bank's business which have a value of or amount to 10 per cent. or less of the Bank's charter capital (or where specified, Net Assets), a decision of a simple majority of the Board of Directors;

(b)    for transactions liabilities (individual or in aggregate), security interests or other changes to the Bank's business which have a value of or amount to more than 10 but less than 25 per cent. of the Bank's charter capital (or where specified, Net Assets), a Qualified decision of the Board of Directors; and

(c)    for transactions, liabilities (individual or in aggregate), security interests or other changes to the Bank's business which have a value of or amount to 25 per cent. or more of the Bank's charter capital (or where specified, Net Assets), a Supermajority decision of the Bank's Shareholders;

"**Variable 3**" means:

(a)    for transactions, liabilities (individual or in aggregate), security interests or other changes to the Group's business which have a value of or amount to 10 per cent. or less of the Bank's charter capital, a decision of a simply majority of the management board of the Bank; and

(b)    for transactions, liabilities (individual or in aggregate), security interests or other changes to the Group's business which have a value of or amount to more than 10 of the Bank's charter capital, a Qualified decision of the Board of Directors; and

"**Variable 4**" means:

(a)    for transactions, liabilities (individual or in aggregate), security interests or other changes to the Group's business which have a value of or amount to 10 per cent. or less of the Bank's charter capital (or where specified, Net Assets), a decision of a simple majority of the Board of Directors; and

(b)     for transactions liabilities (individual or in aggregate), security interests or other changes to the Group's business which have a value of or amount to more than 10 of the Bank's charter capital (or where specified, Net Assets), a Qualified decision of the Board of Directors.

The list of the matters and/or voting requirements is in addition to, and not to replace, the statutory list of matters and/or voting requirements set out by applicable law.

Any matters included in the table which are supplemental to existing Kazakhstan law will be set out in an undertaking from Samruk-Kazyna by way of deed poll for the benefit of the Restructuring Creditors, GDR Holders and the New Notes Trustee and in the Bank's New Charter.  In any event, the full list of matters provided below will be set out in the Samruk-Kazyna Undertaking.

| APPROVAL MATTER | RESERVED FOR: | |
| --- | --- | --- |
| | SHAREHOLDERS | BOARD OF DIRECTORS |
| **CONSTITUTIONAL DOCUMENTS** | | |
| 1   Alteration of the Bank's Charter. | Supermajority | |
| 2   Any change to the Bank's Corporate Governance Code or, after its adoption, the New Corporate Governance Code. | Supermajority | |
| **AUDITORS, ADVISERS AND PROCEDURES** | | |
| 3   Any change of the Bank's Auditors or the Auditors' terms of reference. | Supermajority | |
| 4   Any change of the special auditor (whose functions are to audit compliance of the Bank with the Bank's Corporate Governance Code and internal procedures and controls and implementation of the Bank's business plan, or any change to his terms of reporting and responsibilities. | | Qualified |
| 5   Any change to the Bank's credit approval and decision-making procedures or lending policies or procedures. | | Qualified |
| 6   Approval of any of the Bank's internal audit, risk management or compliance policies or procedures and amendments thereto. | | Qualified |
| **SECURITIES ISSUANCE OR AMENDMENTS** | | |
| 7   Voluntary de-listing of the Shares of the Bank or any member of the Group from the list of any stock exchange or adoption of decision to list the Shares. | Supermajority | |
| 8   Issue of any ordinary or preference shares or securities or grant of any option to subscribe for shares or equity-linked securities or issue of convertible securities or entry into any agreement for the same. | | Qualified |
| 8A  Any increase in the Bank's authorised share capital. | Supermajority | |
| 9   Purchase of its share capital or other securities or conversion of any of its shares or other securities other than as permitted under the terms of the New Instruments. | Supermajority | |
| 10  Approval of any prospectus or any amendments to the prospectus for the issue of any ordinary or preference shares of the Bank. | | Qualified |
| **ADDITIONAL DEBT** | | |
| 11  Borrowing other than in the ordinary course of business and borrowing at rates above market rates. | | Qualified |

| **APPROVAL MATTER** | **RESERVED FOR:** | |
| --- | --- | --- |
| | **SHAREHOLDERS** | **BOARD OF DIRECTORS** |
| 12  Increasing the Bank's liabilities by an aggregate amount in any 12-month period (by reference to, in the first Financial Year following the Restructuring Date, the aggregate liabilities described in the opening balance sheet delivered as a Condition Precedent and, thereafter, the Bank's more recent audited annual financial statements. | Variable 1 | Variable 1 |
| 13  To the extent not covered by item 12, increasing any of the Group's liabilities by an aggregate amount in any 12-month period (by reference to, in the first Financial Year following the Restructuring Date, the aggregate liabilities described in the opening balance sheet delivered as a Condition Precedent and, thereafter, the Bank Consolidated Group's most recent audited annual financial statements. | | Variable 3 |
| 14  Creating or causing to be created any Security upon the whole or any part of the Bank's present or future undertaking, assets or revenues (including uncalled capital) to secure any Financial Indebtedness or guarantee of Financial Indebtedness other than Permitted Security (excluding under (j) of that definition). | Variable 1 | Variable 1 |
| 15  To the extent not covered by item 14, creating or causing to be created any Security upon the whole or any part of the Group's present or future undertaking, assets or revenues (including uncalled capital) to secure any Financial Indebtedness or guarantee of Financial Indebtedness other than a Permitted Security (excluding under (j) of that definition). | | Variable 3 |
| 16  The Bank providing any form of financial support (including but not limited to the grant of any loan, guarantee, indemnity or Security) in connection with any Bank Subsidiary entering into a transaction described in items 13 or 22. | Variable 1 | Variable 1 |
| **BOARD/MANAGEMENT BOARD/EXECUTIVES** | | |
| 17  Changes to the absolute number of directors on the Board of the Bank. | Supermajority | |
| 18  Appointing or removing the Bank's Chairman, or any member of the Bank's Management Board including the Chief Executive Officer, Chief Operating Officer, Chief Compliance Officer, Chief Risk Officer and/or Chief Financial Officer. | | Qualified |
| 19  Entering into and/or amending any contract of employment or appointment with the Bank's Chairman or approving or allowing the entry into and/or amendment of any contract of employment or appointment with any member of the Bank's Management Board including the Chief Executive Officer, Chief Operating Officer, Chief Compliance Officer, Chief Risk Officer and/or Chief Financial Officer and the setting of salaries, terms of work, bonuses, incentives commissions and other emoluments of such persons. | | Qualified |

| **APPROVAL MATTER** | | RESERVED FOR: | |
| --- | --- | --- | --- |
| | | **SHAREHOLDERS** | **BOARD OF DIRECTORS** |
| 20 | Terminating the employment of the Bank's Chairman or approving or allowing the termination of employment of any member of the Bank's Management Board including the Chief Executive Officer, Chief Operating Officer, Chief Compliance Officer, Chief Risk Officer and/or Chief Financial Officer. | | Qualified |
| 21 | Acquisition by the Bank of any assets or property or shares/participatory interests in the charter capital of other entities or persons.  In determining which approval level is required, the total value (per transaction or when aggregated with all other such acquisitions in the same Financial Year of the Bank) as a percentage of Net Assets of the Bank shall be determinative. | Variable 2 | Variable 2 |
| | The value of Net Assets shall be determined by reference to, in the first Financial Year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent to the Restructuring and, thereafter, its most recent audited annual financial statements. | | |
| 22 | Acquisition by any member of the Group other than the Bank itself of any assets or property or shares/ participatory interests in the charter capital of other entities or persons. In determining which approval level is required, the total value (per transaction or when aggregated with all other such acquisitions in the same Financial Year of the Bank) as a percentage of Net Assets of the Bank shall be determinative. | | Variable 4 |
| | The value of Net Assets shall be determined by reference to, in the first Financial Year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent and, thereafter, its most recent audited annual financial statements. | | |
| 23 | The Bank participating in entering into, amending or varying any partnership, joint venture or profit/revenue sharing arrangement or agreement or any management contract. | Variable 2 | Variable 2 |
| 24 | Any member of the Group other than the Bank participating in, entering into, amending or varying any partnership, joint venture or profit/revenue sharing arrangement or agreement or any management contract. | | Variable 4 |
| 25 | The Bank entering into any merger. | Variable 2 | Variable 2 |
| 26 | Any member of the Group other than the Bank entering into any merger. | | Variable 4 |
| 27 | Disposal by the Bank of any (i) assets, (ii) property, (iii) undertaking, (iv) business or (v) shares/participatory interests in the charter capital of any legal entity, (excluding disposals made in the ordinary course of trading of the Bank) in any Financial Year (whether by one or more transactions) of more than 6.5 per cent. of the Bank's total consolidated gross assets. | Supermajority | |

| **APPROVAL MATTER** | | **RESERVED FOR:** | |
| --- | --- | --- | --- |
| | | **SHAREHOLDERS** | **BOARD OF DIRECTORS** |
| | The value of gross assets shall be determined by reference to, in the first Financial Year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent and, thereafter, its most recent audited annual financial statements. | | |
| 28 | Disposal by any member of the Group other than the Bank itself of any (i) assets, (ii) property, (iii) undertaking, (iv) business or (v) shares/participatory interests in the charter capital of any legal entity, (excluding disposals made in the ordinary course of trading) in any Financial Year (whether by one or more transactions) of more than 6.5 per cent. of the Group's total consolidated gross assets. | | Qualified |
| | The value of gross assets shall be determined by reference to, in the first Financial Year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent and, thereafter, its most recent audited annual financial statements delivered. | | |
| | **BUSINESS PLAN AND ACCOUNTS** | | |
| 29 | Making any material change to the nature or scope of the Group's business. | Supermajority | |
| 30 | The Bank adopting any new business plan or budget or making any material change to the bank's existing business plan or budget. | | Qualified |
| 31 | Otherwise than as required by law, materially amending its accounting or financial policies or reporting practices including but not limited to the provisioning, write-off policies and write-back practices. | | Qualified |
| | **CONTRACTS** | | |
| 32 | Entry into or completion of any interested-party transaction, that is a transaction with an "Affiliate" of the Bank as that term is defined under Article 64 of the Kazakh Joint Stock Company Law. | | Qualified (comprised of disinterested directors with respect to the relevant Related Party Transaction) |
| 33 | To the extent not covered by item 32 above, entry into or completion of: | | Qualified |
| | (a) any Significant Transaction with: | | |
| | (i) an Affiliate of the Bank as that term is defined under Article 64 of the Kazakh Joint Stock Company Law; | | |
| | (ii) any shadow director or person exerting substantial influence over the Bank ("**Shadow Affiliate**"); | | |

| **APPROVAL MATTER** | **RESERVED FOR:** | |
| --- | --- | --- |
| | **SHAREHOLDERS** | **BOARD OF DIRECTORS** |

(iii) any person who is related by blood, marriage, or adoption to an Affiliate or Shadow Affiliate including such person's spouse, civil partner, child, step-child or parent (each a "**Close Relative**") or any spouse, former spouse, civil partner, child, step-child, parent, niece, nephew, uncle, aunt, lineal descendent or lineal ancestor, of any the Affiliate or Shadow Affiliate or of the Affiliate's or Shadow Affiliate's Close Relatives (together the "**Relatives**"); or

(iv) the trustees (acting as such) of any trust of which any Affiliate, Shadow Affiliate or any of the Affiliate's or Shadow Affiliate's Relatives is a beneficiary or discretionary object;

(v) any body corporate which any Affiliate, Shadow Affiliate or any Relative of the Affiliate or Shadow Affiliate is a director or together with any of the other aforesaid persons controls or directly or indirectly holds more than 10 per cent. of the shares in such body corporate, or any body corporate in the same group as that body corporate;

(vi) any partnership which any Affiliate, Shadow Affiliate or any Relative of the Affiliate or Shadow Affiliate is a partner,

(other than a transaction involving SK or any of its Subsidiaries) which involves aggregate payments or value of U.S.$5 million or more; or

(b) any Significant Transaction involving SK or any of its Subsidiaries which involves aggregate payments or value of U.S.$75 million or more.

For these purposes, "**Significant Transaction**" means:

(i) any intra-group borrowing or lending or guarantees, purchase, sale, transfer, assignment, lease, conveyance or exchange of any property or the rendering of any service or any similar transaction;

(ii) any agreement not on bona fide arms' length terms;

(iii) entry into any agreement (apart from an employment contract).

| | | **SHAREHOLDERS** | **BOARD OF DIRECTORS** |
| --- | --- | --- | --- |
| 34 | Any sale of the whole or any part of the Bank's loan book (not constituting a Recovery Asset) at a discount. | Variable 1 | Variable 1 |
| 35 | To the extent not covered by item 34, any sale of the whole or any part of any of the Bank's Subsidiaries' loan books (not constituting a Recovery Asset) at a discount. | | Variable 3 |

| APPROVAL MATTER | RESERVED FOR: | |
| --- | --- | --- |
| | SHAREHOLDERS | BOARD OF DIRECTORS |
| **LENDING PRACTICES** | | |
| 36  Entry into any lending arrangement on terms other than terms which achieve a proper commercial return to the Group when compared against terms offered in the market by corporations similar to the Bank engaged in similar types of business. | | Qualified |
| **CAPITAL EXPENDITURE** | | |
| 37  Incurring or entering into any commitment to incur any capital expenditure if the estimated amount or aggregate value of capital commitments already incurred or contracted for by the Group when considered on a whole in that Financial Year exceeds the budgeted annual amount for that year by more than 5 per cent. | | Qualified |
| **DIVIDENDS** | | |
| 38  Any Board decision to put a resolution before a general meeting of the Bank to approve the payment, making or declaring of any dividend in cash or in specie out of its profits, assets or reserves. | | Qualified |
| **REORGANISATIONS AND WINDING-UP** | | |
| 39  The Bank entering into any scheme of arrangement, reorganisation, reconstruction or compromise or other arrangement with creditors. | Supermajority | |
| 40  Taking any step to dissolve or wind-up the Bank or Material Subsidiary or to commence any other procedure an effect of which would be to create a general moratorium with respect to proceedings by its creditors. | Supermajority | |
| **LITIGATION** | | |
| 41  Commence or discontinue the prosecution or defence of, or settle any litigation or arbitration proceedings or claim, in each case where the amount claimed exceeds U.S.$30 million (except in respect of debt collection in the ordinary course of business or applying for or defending an interim injunction where it is not practicable to obtain consent). | | Qualified |

## Corporate Governance Code

Prior to the Restructuring Date, the Bank shall adopt the New Corporate Governance Code.  The Bank and the Shareholders shall procure that the Independent Auditor investigates and promptly reports on the Bank's compliance with the New Corporate Governance Code and internal procedures and controls to the Audit Committee) annually at the Bank's cost.  Any non-compliance identified in the Independent Auditor's report shall be remedied by the Bank within six months of the date of the report.  The New Corporate Governance Code shall include (without limitation) the matters set out in Section 3 of Schedule 11 (*Covenants of the Bank*), details, practices and procedures in relation to the issues set out below.

### *Directors' Roles and Responsibilities*

(a)  Independence of Directors — no one person, entity or group should be in a position to dictate or control the Board's decisions.

(b)  Disclosure of interests and avoidance of conflicts of interest.

(c)     Distinction of the roles and responsibilities of the Board of Directors from the roles and responsibilities of the Management Board and definition of the roles and responsibilities of the Chairman, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Chief Compliance Officer, the Chief Risk Officer and the Independent Directors.

(d)     Independence of the Audit Committee.

(e)     Board responsibility for risks and controls, including scrutinising performance of management and board directors satisfying themselves as to the integrity of the Bank's financial information.

(f)     Provision of information to the Board, including all information required for the Board to carry out its duties and to supervise the management of the Bank should be provided in a succinct and timely manner, and access to independent advice to the Board necessary to discharge its responsibilities, the costs and expenses thereof to be for the account of the Bank.

(g)     Collective responsibility for results.

(h)     Clear policies for methodology of strategy formulation, controls relating incurrence of risk, and approval (including credit approval) mechanisms.

(i)     Robust terms of reference for key committees, key control functions (including risk management, legal and regulatory compliance and internal audit).

(j)     Succession planning.

### Competence and Remuneration Of Directors

(a)     Selection and election of directors.

(b)     Training (induction and ongoing).

(c)     Evaluation of performance (individual and collective).

(d)     Rotation and re-appointment (subject to FMSA approval).

(e)     Remuneration of Directors — formal and transparent policies on determining remuneration of directors.

(f)     Independent remuneration committee.

### Internal Controls and Risk Management

(a)     Sound system of internal controls and financial reporting.

(b)     Embedding of internal controls.

(c)     Risk-based management approach, including identification, measurement and control of risks and risk-based capital management, all as approved by the Chief Compliance Officer.

(d)     Quality of management information.

(e)     Restrictions on Related Party transactions.

(f)     Setting of approval and authorisation structures and limitations.

(g)     Audit and Risk Committees membership, role and responsibilities.

(h)     Relationship with Auditors.

(i)     Review of effectiveness of system of controls.

The New Corporate Governance Code shall provide that risk management controls will include principles on the Four Eyes Principle, Record Keeping, Know Your Customer and Anti-Money Laundering principles. The Bank shall ensure that sufficient personnel with segregated responsibilities are retained to oversee and manage the above.

### Disclosure and Reporting

(a)     Subject to all applicable laws and regulations, the Bank shall communicate with its shareholders and external stakeholders and provide general disclosure as to business, including a fair, balanced and understandable assessment of the Bank's position and prospects, and avoiding selective disclosure of information to certain shareholders only or third parties save as otherwise permitted in favour of Samruk-Kazyna and/or the Depositary on behalf of the GDR Holders.

(b)     Board's activities and responsibilities.

(c)     Financial reporting.

(d)     Risk management and compliance reporting.

(e)     Reporting to regulators.

(f)     Evidence of embedded principles, standards and processes.

(g)     Director remuneration.

(h)     Annual General Meetings.

### Relationship with Major Shareholders

(a)     Dialogue with major shareholders.

(b)     Related Party transactions.

(c)     Independence from major shareholders.

## INFORMATION FOR CLAIMANTS

**If Claimants have any questions relating to this Information Memorandum or the completion of the Form of Proxy or the Claim Form they should contact Mr. Asset Zhaisanov or Ms. Dinara Adil at the Bank by emailing zhaisanov@bta.kz or d_adil@bta.kz by calling +7 727 3124671 or +7 727 266 2607.  Information regarding these forms is also available on the Bank's website at http://www.bta.kz/en/investor/**

**Overview**

- Section 1 contains information for Euronoteholders regarding how votes may be cast at the Euronoteholders' Meetings and the necessary approvals required to pass the Extraordinary Resolutions.

- Section 2 contains information for creditors of TuranAlem Finance.

- Section 3 contains information for holders of Perpetual Securities.

- Section 4 contains information relating to Non-OGSC Eligible Trade Finance Debt and Official Government Sector Debt.

- Section 5 contains information applicable to Rouble Noteholders.

- Section 6 contains information applicable to holders of CHF Notes.

- Section 7 contains information for Claimants with Relevant Contingent Claims.

- Section 8 contains information for all Claimants regarding the submission of Claim Forms, Forms of Proxy and voting at the Claimants' Meeting.

- Section 9 contains information regarding the distribution of Entitlements.

- Sections 10 and 11 discuss the Court approval and the Deed of Release to be signed on behalf of Claimants, respectively.

Details of the terms applicable to the Bank Creditor Loan Agreement(s) will be provided by way of a supplemental information memorandum.

## 1.    INFORMATION FOR EURONOTEHOLDERS

Euronoteholders will vote at the applicable Euronoteholders' Meeting on an Extraordinary Resolution approving, among other things, the Restructuring Plan and an instruction to the Trustee (i) upon the request of the Bank, to accelerate the Euronotes and demand payment under the relevant Guarantee and (ii) to vote at the Claimants' Meeting as described below, in accordance with the notices to Euronoteholders in Schedule 5 (*Notices of Euronoteholders' Meetings*) to this Information Memorandum.  The Extraordinary Resolution provides that the Bank can request acceleration of the Euronotes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.  The Trustee shall not be obliged to take any of the steps to accelerate the Euronotes or make a demand under the Guarantees until it has been indemnified or provided with security or pre-funded to its satisfaction.  The Trustee will submit a Claim Form in respect of the full outstanding principal amount plus Accrued Interest of each series of Euronotes.  The relevant Forms of Proxy will instruct the Chairman of the Claims' Meeting to vote in favour of or against the Restructuring Plan, as described below.

At the Claimants' Meeting, if the relevant Extraordinary Resolution is passed, the Trustee representing that class of Euronotes will be entitled to vote the full principal amount plus Accrued Interest of Euronotes outstanding in favour of or against the Restructuring Plan in the same proportions as the relevant Euronoteholders vote for or against the Restructuring

Plan at the relevant Euronoteholders' Meeting.  Euronoteholders will therefore not be permitted to vote at the Claimants' Meeting since their votes for or against the Restructuring Plan will be submitted at the Claimants' Meeting by the Trustee on their behalf.  In the event the relevant Extraordinary Resolution is not passed at a Euronoteholders' Meeting in respect of a series of Euronotes, the Bank will deem those votes cast in favour of or against the Extraordinary Resolution to have been cast in favour of or against the Restructuring Plan at the Claimants' Meeting and will deem the relevant Euronoteholders to have submitted a

Claim Form in respect of the relevant principal amount of Euronotes outstanding plus Accrued Interest specifying that it is submitted in respect of "notes issued by the Bank" designating the Distribution Agent as its contact.

If the Restructuring Plan becomes effective, under Kazakhstan law the Bank's obligation to repay the relevant BV Deposit of TuranAlem Finance will be set off in its entirety against TuranAlem Finance's obligation to reimburse the Bank for payments by the Bank under the relevant Guarantee.  The Finance Subsidiaries will not submit Claims in respect of their deposits with the Bank.

### *The Euronoteholders' Meetings*

Various Conditions Precedent which must be satisfied prior to the Euronoteholders meetings are set out in Part I of Schedule 12 (*Conditions Precedent to the Restructuring Plan becoming effective*).  The Euronoteholders' Meetings will be held in accordance with the provisions of the relevant Trust Deeds with respect to each series of Euronotes.  A copy of the Trust Deeds (certain relevant provisions of which are summarised below) and other relevant documents listed below are available for inspection by the relevant Euronoteholders during normal business hours at the office of the Trustee and the Principal Paying Agent.  In the case of any difference or inconsistency between these summaries and the provisions of the relevant Trust Deeds, the provisions of the Trust Deeds shall prevail.

The following documents are available for inspection at any time during normal business hours on any weekdays (Saturdays, Sundays and bank and other public holidays excepted) at the office of the Trustee and the Principal Paying Agent in advance of the Euronoteholders' Meetings:

(a)     Trust Deeds:

(i)     Trust Deed dated 2 June 2003 constituting the Issuer's U.S.$225,000,000 7.875 per cent.  Notes due 2010 between TuranAlem Finance B.V. as Issuer, OJSC Bank TuranAlem as Guarantor and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) as Trustee;

(ii)    the Supplemental Trust Deed dated 30 November 2004 constituting U.S.$375,000.000 7.875 per cent.  Notes due 2010 (supplementing the Trust Deed dated 2 June 2003) between TuranAlem Finance B.V. as Issuer and JSC Bank TuranAlem as Guarantor and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) as Trustee;

(iii)   the Trust Deed dated 24 March 2004 constituting the Issuer's U.S.$300,000,000 8 per cent.  Notes due 2014 between TuranAlem Finance B.V. as Issuer and JSC Bank TuranAlem as Guarantor and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) as Trustee;

(iv)    the Supplemental Trust Deed dated 6 April 2004 constituting U.S.$100,000.000 8 per cent.  Notes due 2014 (supplementing the Trust Deed

dated 24 March 2004 constituting the Issuer's U.S.$300,000,000 8 per cent. Notes due 2014) between TuranAlem Finance B.V. as Issuer and JSC Bank TuranAlem as Guarantor and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) as Trustee;

(v)     the Trust Deed dated 10 February 2005 constituting U.S.$350,000,000 8.5 per cent. Notes due 2015 between TuranAlem Finance B.V. as Issuer and JSC Bank TuranAlem as Guarantor and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) as Trustee;

(vi)    the Trust Deed dated 4 November 2005 between TuranAlem Finance B.V. as Issuer and JSC Bank TuranAlem as Guarantor and BNY Corporate Trustee Services Limited as Trustee in respect of the U.S.$3,000,000,000 Global Medium Term Note Programme; and

(vii)   the Amended and Restated Trust Deed dated 2 May 2007 (amending and restating the Trust Deed dated 4 November 2005) between TuranAlem Finance B.V. and JSC Bank TuranAlem and BNY Corporate Trustee Services Limited as Trustee in respect of the increase of the programme limit to U.S.$8,000,000,000.

(b)     Offering Circulars, Base Prospectuses and supplements dated:

(i)     Offering Circular dated 30 May 2003 with respect to TuranAlem Finance B.V.'s issue of U.S.$225,000,000 7.875 per cent. Notes due 2010 guaranteed by the Bank;

(ii)    Offering Circular dated 29 November 2004 with respect to TuranAlem Finance B.V.'s issue of U.S.$375,000,000 7.875 per cent. Notes due 2010 guaranteed by the Bank;

(iii)   Offering Circular dated 19 March 2004 with respect to TuranAlem Finance B.V.'s issue of U.S.$300,000,000 8 per cent. Notes due 2014 guaranteed by the Bank;

(iv)    Offering Circular dated 2 April 2004 with respect to TuranAlem Finance B.V.'s issue of U.S.$100,000,000 8 per cent. Notes due 2014 guaranteed by the Bank;

(v)     Offering Circular dated 9 February 2005 with respect to TuranAlem Finance B.V.'s issue of U.S.$350,000,000 8.5 per cent. Notes due 2015 guaranteed by the Bank;

(vi)    Base Prospectus dated 7 April 2006 with respect to JSC Bank TuranAlem and TuranAlem Finance B.V. U.S.$3,000,000,000 Global Medium Term Note Programme;

(vii)   Base Prospectus dated 18 September 2006 with respect to JSC Bank TuranAlem and TuranAlem Finance B.V. U.S.$3,000,000,000 Global Medium Term Note Programme;

(viii)  Supplement to the Base Prospectus dated 18 September 2006 with respect to JSC Bank TuranAlem and TuranAlem Finance B.V. U.S.$3,000,000,000 Global Medium Term Note Programme dated 8 December 2006;

(ix)  Supplement to the Base Prospectus dated 18 September 2006 with respect to JSC Bank TuranAlem and TuranAlem Finance B.V. U.S.$3,000,000,000 Global Medium Term Note Programme dated 9 January 2007;

(x)  Base Prospectus dated 2 May 2007 with respect to JSC Bank TuranAlem and TuranAlem Finance B.V. U.S.$8,000,000,000 Global Medium Term Note Programme;

(xi)  Supplement to the Base Prospectus dated 2 May 2007 with respect to JSC Bank TuranAlem and TuranAlem Finance B.V. U.S.$8,000,000,000 Global Medium Term Note Programme dated 22 May 2007;

(xii)  Base Prospectus dated 25 June 2007 with respect to JSC Bank TuranAlem and TuranAlem Finance B.V. U.S.$8,000,000,000 Global Medium Term Note Programme; and

(xiii)  Supplement to the Base Prospectus dated 25 June 2007 with respect to JSC Bank TuranAlem and TuranAlem Finance B.V. U.S.$8,000,000,000 Global Medium Term Note Programme dated 8 October 2007.

(c)  Each Paying Agency Agreement relating to each series of Euronotes and the Global Medium Term Note Programme.

(d)  This Information Memorandum.

The Euronoteholders' Meetings will be convened to consider the Extraordinary Resolutions. The Extraordinary Resolutions may only be considered at the relevant Euronoteholders' Meeting if such Euronoteholders' Meeting is quorate. The quorum and voting requirements are set out in the Euronoteholders' Meeting provisions, and are summarised under "*Voting and Quorum*" below. The Bank has been advised that the Trustee is able to file a valid Claim at the Claimant's Meeting in respect of the Guarantee for each series of Euronotes notwithstanding the fact that no demand has been made by the Trustee under such Guarantee. However, no assurance can be given that such Claim will satisfy the requirements of the FMSA and the Court.

### *Timing for Voting Instructions*

No Voting Instructions will be accepted after the Voting Instructions Deadline except in relation to an adjourned meeting.

### *No Brokerage Fees*

Euronoteholders and Direct Participants will not be obliged to pay brokerage fees or commissions to the Financial Advisers, the Bank or TuranAlem Finance in connection with giving Voting Instructions or casting votes at the Euronoteholders' Meetings.

### *Procedures at the Euronoteholders' Meetings*

Euronoteholders should note the quorum requirements for each Euronoteholders' Meeting set out below. Euronoteholders should be aware that if Euronoteholders present or represented at a Euronoteholders' Meeting are insufficient to meet these quorum requirements then the Extraordinary Resolutions to be considered at such Euronoteholders' Meeting cannot be considered at such Euronoteholders' Meeting but will be considered at the relevant adjourned meeting, which will have lower quorum requirements; see "*Voting and Quorum*" below.

*Notices*

The Notices of Euronoteholders' Meetings are set out in Schedule 5 (*Notices of Euronoteholders' Meetings*) to this Information Memorandum.  The Notices of Euronoteholders' Meetings were issued on 15 April 2010.

*Chairman*

The chairman of each Euronoteholders' Meeting in respect of the relevant Euronotes (who may, but need not, be a Euronoteholder) will be nominated in writing by the Trustee.  If no such nomination is made or if the nominated chairman is not present at a Euronoteholders' Meeting in respect of the relevant Euronotes within 15 minutes of the time fixed for such Euronoteholders' Meeting, then the Euronoteholders or their proxies who are present at such Euronoteholders' Meeting shall choose a chairman from the Euronoteholders or proxies present at such meeting.  The chairman of an adjourned meeting does not have to be a Euronoteholder or an agent of a Euronoteholder or the same person as the chairman of the original meeting that was adjourned.

*Voting and Quorum*

The provisions governing the convening and holding of the Euronoteholders' Meetings are set out in Schedule 3 (*Provisions for Meetings of Noteholders*) or Schedule J (*Provisions for Meetings of Noteholders*), as the case may be, to the relevant Trust Deed, copies of which are available for inspection as described above.  The Euronotes are currently represented by global notes (the "**Global Notes**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, and Cede & Co. as common depository for DTC (together with Euroclear and Clearstream, the "**Clearing Systems**", and each a "**Clearing System**").  Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Euronotes, as shown in the records of DTC, Euroclear or Clearstream, or its accountholders ("**Direct Participants**"), should note that such person will not be a Euronoteholder for the purposes of the relevant Notice of Euronoteholders' Meeting and will only be entitled to attend and vote at the relevant Euronoteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below.  On this basis, the only Euronoteholder for the purposes of the relevant Notice of Euronoteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted Electronic Instruction Forms to the Clearing Systems in accordance with the procedures set out in this Information Memorandum need take no further action in relation to voting at the relevant Euronoteholders' Meeting in respect of the Extraordinary Resolutions.  By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the relevant Euronoteholder instructs the Registered Holder of such Euronotes to complete and sign a Form of Proxy (as defined below) in accordance with the relevant Trust Deed and in such Form of Proxy to authorise and instruct the Tabulation Agent to act as proxy and to vote in favour (or against, as the case may be) of the Extraordinary Resolutions and to instruct the Trustee to submit the Claim Form.

A Euronoteholder, Direct Participant or Beneficial Owner wishing to participate in the Restructuring must submit, or arrange to have submitted on its behalf, at or before the Voting Instructions Deadline and before the deadlines set by each Clearing System (unless the Restructuring is terminated earlier), a duly completed Electronic Instruction Form to the relevant Clearing System in accordance with the requirements of the relevant Clearing System and in the manner specified herein.  Euronoteholders and Beneficial Owners should check with their bank, securities broker or any other intermediary through which they hold their Euronotes whether such bank, securities broker or other intermediary will apply earlier

deadlines for submission to those set out in this Information Memorandum and, if so, should follow those deadlines.

The submission to Euroclear or Clearstream, by a Euronoteholder or a Direct Participant of a duly completed Electronic Instruction Form with respect to Euronotes prior to the applicable Voting Instructions Deadline will be deemed to constitute delivery of a vote with respect to such Euronotes by such Euronoteholder. Each Euronoteholder or a Direct Participant agrees that an Electronic Instruction Form constitutes instruction to the Euronoteholder of record to complete and sign a Form of Proxy or Block Voting Instruction in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) or Schedule J (*Provisions for Meetings of Holders*), as the case may be, to the relevant Trust Deed with respect to the Euronotes and in such Block Voting Instruction or Form of Proxy to authorise and instruct the applicable proxies to attend, and to cast the votes corresponding to such Euronotes in favour of or against the Extraordinary Resolutions. It is intended that the Tabulation Agent (or an officer thereof) will act as proxy at the Euronoteholders' Meetings.

The instruction to the Euronoteholder of record holding Euronotes in Euroclear or Clearstream, to authorise the applicable Tabulation Agent to issue and complete a Block Voting Instruction in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) or Schedule J (*Provisions for Meetings of Noteholders*), as the case may be, to the relevant Trust Deed with respect to the Euronotes and to instruct the applicable proxies to attend, and to cast the votes corresponding to such Euronotes in favour of or against the Extraordinary Resolutions by a Euronoteholder or a Direct Participant will be deemed to have occurred upon receipt by the Euronoteholder of record as nominee for Euroclear and Clearstream, of a valid Electronic Instruction Form in accordance with the requirements of such Clearing System. The receipt of such Electronic Instruction Form by the Euronoteholder of record as nominee for Euroclear and Clearstream, will be acknowledged in accordance with the standard practices of such Clearing System and will result in the blocking of Euronotes in the relevant Clearing System so that no transfers may be effected in relation to such Euronotes.

Euronoteholders and Direct Participants must take the appropriate steps through the relevant Clearing System to ensure that no transfers may be effected in relation to such blocked Euronotes until the conclusion of the Euronoteholders' Meeting, in accordance with the requirements of the relevant Clearing System and the deadlines required by such Clearing System. By blocking its Euronotes in the relevant Clearing System, each Euronoteholder and Direct Participant will be deemed to consent to the relevant Clearing System providing details concerning such Euronoteholder's and/or Direct Participant's identity to the Tabulation Agent.

Only Direct Participants may submit Electronic Instruction Forms. If a Euronoteholder or Beneficial Owner is not a Direct Participant, it must arrange for the Direct Participant through which it holds Euronotes to submit an Electronic Instruction Form on its behalf to the relevant Clearing System prior to the deadline specified by the relevant Clearing System and the Voting Instructions Deadline.

**EURONOTEHOLDERS WHOSE EURONOTES ARE HELD IN DTC SHOULD CONTACT THE TABULATION AGENT FOR THE RELEVANT PROCEDURES AND CONSULT THE APPLICABLE NOTICE.**

### *Revocation of Electronic Instruction Forms*

Electronic Instruction Forms from Beneficial Owners or Direct Participants (as defined below) shall be irrevocable *provided*, *however*, *that* in the event that the Bank, in its sole discretion, amends, terminates or withdraws the Restructuring Plan, at any time up to and including the applicable date on which the approval of the Restructuring Plan is announced, in a manner that is materially adverse to affected Euronoteholders in the opinion of the Trustee, Euronoteholders shall be permitted, subject to the conditions set out herein, to revoke any

Electronic Instruction Forms delivered in relation thereto for a period of two business days (as defined in the relevant Trust Deed) from the date of notification of any materially adverse amendments to the terms and conditions of the Restructuring Plan.

With respect to the limited situations when an Electronic Instruction Form may be revoked as set out above, to be effective, any notice of revocation must indicate the relevant voting instructions to be revoked and must be received prior to the applicable Voting Instruction Deadline in the same manner as the original Electronic Instruction Forms.  With respect to Electronic Instruction Forms given in respect of Euronotes held in Euroclear or Clearstream, Beneficial Owners who are not Direct Participants must arrange either directly or through their Intermediary (as defined below) to contact the Direct Participant through which they hold the Euronotes to deliver notice of such revocation to the relevant Clearing System prior to the applicable Voting Instructions Deadline.

Such Beneficial Owners should give such directions to their Intermediary sufficiently in advance to ensure receipt by the Euroclear or Clearstream of any such notice of revocation prior to the Voting Instruction Deadline and within the time limit specified by such Clearing System.

Euronoteholders and Beneficial Owners of Euronotes that are held in the name of a broker, dealer, bank, trust company or other nominee or custodian (collectively, an "**Intermediary**") should contact such entity sufficiently in advance of the applicable Voting Instructions Deadline if they wish to vote for or against the Restructuring and procure that the Euronotes are blocked in accordance with the normal procedures of the relevant Clearing System and the deadlines imposed by such Clearing System.

The Registered Holder may by instrument in writing in the English language in the form available from the office of the relevant Registrar signed by the Registered Holder or, in the case of a corporation, executed under its seal or signed on its behalf by its duly appointed attorney or a duly authorised office of the corporation and delivered to the specified office of the relevant Registrar not less than 48 hours before the time fixed for the relevant Euronoteholders' Meeting with respect to the Euronotes, appoint any person (a "**Proxy**") to act on his or its behalf in connection with the relevant Euronoteholders' Meeting in relation to the Euronotes (or any adjourned such meeting).

A Proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the relevant Euronoteholders' Meeting in respect of the relevant Euronotes to be the holder of the Euronotes to which such appointment relates and the Registered Holder of the Euronotes shall be deemed for such purposes not to be the holder.

The Beneficial Owner can request through his Direct Participant to appoint the Tabulation Agent as Proxy to cast the votes relating to the Euronotes in which he has an interest at the relevant Euronoteholders' Meeting in respect of the Euronotes (or any adjourned such meeting).

Alternatively, Beneficial Owners and Direct Participants who wish a different person to be appointed as their Proxy to attend and vote at the relevant Euronoteholders' Meeting in respect of the Euronotes (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a Proxy in respect of the Euronotes in which they have an interest for the purposes of attending and voting at the relevant Euronoteholders' Meeting in respect of the Euronotes (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the relevant Euronoteholders' Meeting in relation to the Euronotes and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing

System to block the Euronotes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Tabulation Agent.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Euronoteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

Any Euronote(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the relevant Euronoteholders' Meeting (or, if later, the adjourned Euronoteholders' Meeting) and (ii) upon such Euronote(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Tabulation Agent to be held to its order or under its control.

### *Irregularities*

All questions as to the validity, form and eligibility (including the time of receipt) of any Electronic Instruction Form or such other document, with respect to Euronotes held in DTC, required by the Tabulation Agent, will be determined by the Bank in its sole discretion, which determination will be final and binding.  The Bank reserves the absolute right to reject any and all Electronic Instruction Forms or such other document, with respect to Euronotes held in DTC, required by the Tabulation Agent not in proper form or for which any corresponding agreement by the Bank (on behalf of TuranAlem Finance and the Bank) to exchange would, in the opinion of the Bank, be unlawful.  The Bank also reserves the absolute right to waive any of the conditions of the Restructuring or defects in Electronic Instruction Forms or such other document, with respect to Euronotes held in DTC, required by the Tabulation Agent with regard to any Euronotes.  None of TuranAlem Finance, the Bank, the Trustee or the Tabulation Agent shall be under any duty to give notice to Euronoteholders, Direct Participants or Beneficial Owners of any irregularities in Electronic Instruction Forms or such other document, with respect to Euronotes held in DTC, required by the Tabulation Agent, as applicable; nor shall any of them incur any liability for failure to give notification of any material amendments to the terms and conditions of the Restructuring.

The Extraordinary Resolutions may only be considered at the relevant Euronoteholders' Meeting if the relevant Euronoteholders' Meeting is quorate.  A Euronoteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Euronoteholder or as proxy) are present at the relevant Euronoteholders' Meeting who together hold or represent the requisite principal amount of outstanding Euronotes satisfying the quorum requirement as set out below.

Votes in favour of the Extraordinary Resolutions must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolutions to be duly passed.

If, within fifteen minutes after the time appointed for the relevant Euronoteholders' Meeting, a quorum is not present, such Euronoteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days as determined by the chairman of such Euronoteholders' Meeting and approved by the Trustee prior to the adjournment of such Euronoteholders' Meeting.  An adjourned Euronoteholders' Meeting will be subject to lower quorum requirements as set out below.

The quorum requirement for each Euronoteholders' Meeting is as follows:

| Euronoteholders' Meeting | Quorum Requirement |
| --- | --- |
| Original Euronoteholders' Meeting | One or more persons present in person holding Euronotes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Euronotes for the time being outstanding. |
| Adjourned Euronoteholders' Meeting | One or more persons present in person holding Euronotes or being proxies or representatives holding or representing in the aggregate not less than 25 per cent. in principal amount of the Euronotes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, TuranAlem Finance, the Bank, the Trustee or one or more persons representing 2 per cent. or more of the relevant Euronotes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.   The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

On a show of hands every person who is present in person and who produces a certificate of which he is the registered holder or is a Proxy or representative has one vote.  On a poll every such person has one vote in respect of each U.S.$1,000, EUR 1,000, £1,000, PLZ50,000 or JPY1,000,000 principal amount, as the case may be, of Euronotes so produced or for which he is a Proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If an Extraordinary Resolution is not passed at a Euronoteholders' Meeting, but the Restructuring Plan is approved at the Claimants' Meeting, the relevant Euronoteholders will retain their claim against TuranAlem Finance but as part of the Restructuring Plan the relevant Guarantee will be deemed paid and satisfied and the Bank's obligation to repay the relevant BV Deposit will be set off in its entirety against TuranAlem Finance's obligation to reimburse the Bank for its deemed payment under the relevant Guarantee.  As a result, or as otherwise may be permitted by law, the relevant BV Deposit will be extinguished. TuranAlem Finance will, in such case, be unable to repay the relevant Euronoteholders and its other creditors, if any, and its assets will be liquidated for the benefit of its creditors (including the relevant Euronoteholders) in a Dutch bankruptcy procedure, unless the BV Scheme is offered and approved as discussed below.

TuranAlem Finance is entitled to submit a Claim Form and Form of Proxy in relation to the Subordinated Loan provided it does not transfer the Subordinated Loan to BTA Finance Luxembourg.

2.     **INFORMATION FOR CREDITORS OF TURANALEM FINANCE — SCHEME OF COMPOSITION UNDER DUTCH LAW**

If any circumstances occur which, in the view of the managing board of TuranAlem Finance make it necessary or advisable to declare TuranAlem Finance bankrupt (*in staat van faillissement te verklaren*), TuranAlem Finance will file a request with the court at Rotterdam, the Netherlands (the "**Rotterdam Court**"), to so declare TuranAlem Finance bankrupt pursuant to Article 1 of the Dutch Bankruptcy Act (*Faillissementswet*) ("**DBA**").

By way of example and without limitation, such circumstances could in particular arise if:

- one or more of the Extraordinary Resolutions is not passed; or

- one or more of TuranAlem Finance's lenders (the "**Lenders**") under any of the facility agreements entered into by TuranAlem Finance do not voluntarily release TuranAlem Finance of its obligations thereunder subject only to the Restructuring Plan being approved at the Claimants' Meeting and approval of the Restructuring Plan by the competent Kazakh court.

Together with the request, TuranAlem Finance may file a draft plan of composition (*ontwerp van akkoord*) with the Rotterdam Court.  A copy of the draft plan of composition (the "**Plan of Composition**") is attached to this Information Memorandum at Schedule 7 (*TuranAlem Finance B.V. Plan of Composition*).

If accepted and sanctioned by the Rotterdam Court, the Plan of Composition will release TuranAlem Finance from all its debts towards its creditors, including all Euronoteholders.

It is expected that the Rotterdam Court will declare TuranAlem Finance bankrupt as requested and appoint a liquidator in bankruptcy (*curator*) to conduct the administration of TuranAlem Finance during the bankruptcy, and a supervisory judge (*rechter-commissaris*) to supervise the administration of TuranAlem Finance during the bankruptcy.  It is also expected that the Rotterdam Court will set a date for a meeting of the creditors of TuranAlem Finance (*verificatievergadering*) to establish the claims filed and to consider and, if thought fit, approve the Plan of Composition ("**Plan Meeting**").  TuranAlem Finance will inform its creditors of the court judgement and the exact date and location of the Plan Meeting via a Regulatory Information Service and the Bank will also publish this on its website at www.bta.kz.

### *The Plan of Composition*

The Plan of Composition provides, subject to the Restructuring Plan being approved at the Claimants' Meeting and approval of the Restructuring Plan by the competent Kazakh court, that the claims of all of TuranAlem Finance's financial creditors (other than BTA Finance Luxembourg) be cancelled in exchange for the transfer to those creditors of Entitlements as provided by the Restructuring Plan by reference to the type of debt subject to the Plan of Composition, and that TuranAlem Finance's creditors other than its financial creditors, whose claims in aggregate are expected to amount to less than U.S.\$ 200,000, be paid in full.  If the Plan of Composition becomes effective, TuranAlem Finance will emerge from the bankruptcy without any indebtedness and equity which is expected to be approximately U.S.\$ 7.5 million. If BTA Finance Luxembourg remains a creditor of TuranAlem Finance under the Subsidiary Subordinated Loan on the date at which TuranAlem Finance is declared bankrupt, the Plan of Composition will provide that its claim be cancelled in exchange for the transfer to it of any Entitlement, which TuranAlem Finance may receive under the Restructuring Plan in respect of the Subordinated Loan (except for any part of such Restructuring Consideration which relates to accrued interest under the Subordinated Loan in excess of accrued interest under the Subsidiary Subordinated Loan).   Please see the following section of this Information Memorandum (*Information for holders of Perpetual Securities*) for further information on the

contemplated transfer of the Subordinated Loan by TuranAlem Finance to BTA Finance Luxembourg, including information on certain consequences if such transfer does not take place.

***Procedural aspects***

Pursuant to article 145 DBA, the Plan of Composition will be approved if more than 50 per cent. of the recognised and admitted creditors present or represented at the Plan Meeting, together representing more than 50 per cent. of the recognised and admitted debt of TuranAlem Finance, vote in favour of the Plan of Composition.

TuranAlem Finance will publish the result of the Plan Meeting via a Regulatory Information Service and the Bank will do so on its website at www.bta.kz.

If the Plan of Composition is rejected at the Plan Meeting, the supervisory judge may – at the request of TuranAlem Finance or the liquidator in bankruptcy and by reasoned order – adopt the Plan of Composition as if it were approved, if:

- three-fourths of the recognised and admitted creditors who were present or represented at the Plan Meeting voted in favour of the Plan of Composition; and

- the rejection of the Plan of Composition resulted from one or more creditors having voted against it who, taking into account all circumstances and, in particular, the percentage which those creditors may be expected to receive in payment of their claim if the estate would be liquidated, could not have arrived at such voting conduct in all reason (Article 146 DBA).

If instructed pursuant to the relevant Extraordinary Resolution to do so, the Trustee is expected to file a claim with TuranAlem Finance's liquidator in bankruptcy for the benefit of the Euronoteholders in an amount equal to the amount outstanding under each series of Euronotes as per the date at which TuranAlem Finance is declared bankrupt.  Euronoteholders will in such case not be permitted to file a claim with the liquidator in bankruptcy.  It is expected that the claims filed by the Trustee will be recognised by the liquidator in bankruptcy in their full amount.   If instructed pursuant to the relevant Extraordinary Resolution to do so, the Trustee is expected to release TuranAlem Finance from its obligations under the relevant trust deed, *provided that* the Trustee will only so release TuranAlem Finance upon written instruction of TuranAlem Finance where TuranAlem Finance proposes a Plan of Composition that does not become binding, in which case the Trustee should not release TuranAlem Finance.

At the Plan Meeting, provided the Extraordinary Resolution is adopted at the relevant Euronoteholders' meeting, the Trustee is expected to vote the claim filed by it in respect of the relevant series of Euronotes as instructed pursuant to the Extraordinary Resolution, i.e. in favour of or against the Plan of Composition in the same proportions as the relevant Euronoteholders vote in favour of or against the Extraordinary Resolution at the relevant Euronoteholders' Meeting.  If in such case the competent court or the supervisory judge will not allow the Trustee to cast a split vote, the Trustee will vote the claim filed by it in respect of the relevant series of Euronotes in favour of the Plan of Composition.  If the Extraordinary Resolution is adopted at a Euronoteholders' meeting, the relevant Euronoteholders will not be permitted to vote at the Plan Meeting in respect of their Euronotes.

If the Extraordinary Resolution is not adopted at a certain Euronoteholders' meeting, the Trustee is expected to neither file a claim with TuranAlem Finance's liquidator in bankruptcy in respect of the relevant series of Euronotes nor vote at the Plan Meeting for the benefit of the relevant Euronoteholders.  In such case, there can be no certainty that the relevant Euronoteholders will be permitted to file a claim with the liquidator in bankruptcy or will be permitted to vote at the Plan Meeting.

The Plan of Composition, if approved at the Plan Meeting or adopted by the supervisory judge, is subject to sanctioning by the Rotterdam Court.  It is expected that the sanction hearing will not be held until the competent Kazakh court has approved the Restructuring Plan.  The liquidator in bankruptcy will notify the date of the sanction hearing to the creditors of TuranAlem Finance who have filed their claim, and the Issuer will publish the date of the sanction hearing via a Regulatory Information Service and the Bank will do so on it's website at www.bta.kz.

Pursuant to Article 153 DBA the competent court shall refuse sanction of a plan of composition:

- if the assets of the estate substantially exceed the amount offered in the plan of composition; and/or

- if performance of the plan of composition is insufficiently secured; and/or

- if the plan of composition was realised by fraudulent acts or undue preference of one or more creditors or other unfair means, regardless of whether the debtor or any other party co-operated therein; and/or

- if the liquidator in main insolvency proceedings under Article 3(1) of Council Regulation 1346/2000 withheld his consent to the plan of composition, unless the court is of the opinion that the plan of composition does not adversely affect the financial interests of the creditors in those main proceedings.

The competent court may also refuse sanction on other grounds and at its own initiative.

If the Rotterdam Court finds there are no grounds to refuse sanction, it will sanction the Plan of Composition.  The Issuer will publish the court order sanctioning the Plan of Composition or refusing to sanction the Plan of Composition via a Regulatory Information Service and on the Bank's website at www.bta.kz.

If the Rotterdam Court sanctions the Plan of Composition and no appeal is lodged against the relevant court order within eight days, or, after appeal, no appeal in cassation is lodged within eight days, the Plan of Composition will become effective and binding on all relevant creditors of TuranAlem Finance and the bankruptcy of TuranAlem Finance will end.  The liquidator in bankruptcy will publish the termination of the bankruptcy in the Official Gazette (Staatscourant) and TuranAlem Finance will publish the termination of the bankruptcy via a Regulatory Information Service and on the Bank's website at www.bta.kz.

If the Plan of Composition becomes effective, TuranAlem Finance will emerge from the bankruptcy without any indebtedness, and with equity which is expected to be approximately U.S.\$ 7.5 million.  In such case, TuranAlem Finance may resume to do business unless the Bank decides to dissolve and liquidate TuranAlem Finance.

There are many legal uncertainties surrounding the Plan of Composition and the Plan Meeting, most of which relate to the fact that the concept of a trust as construed under English law does not exist under Netherlands' law.  These uncertainties include, without limitation, uncertainty about:

- how the Trustee will be treated for the purpose of calculating the number of creditors present or represented at the Plan Meeting;

- whether it is permitted under Netherlands' law to cast a split vote in the manner contemplated by the Extraordinary Resolutions and, if that is permitted, how such vote will be treated for the purpose of calculating the number of creditors who voted in favour of or against the Plan of Composition;

- whether Euronoteholders will be permitted to file a claim with the liquidator in bankruptcy or will be permitted to vote at the Plan Meeting if the Extraordinary Resolution is not adopted at a Euronoteholders' Meeting; and

- how the amount offered under the Plan of Composition and the value of the assets of TuranAlem Finance must be calculated and whether the assets of the estate substantially exceed the amount offered in the plan of composition, each for the purpose of Article 153 DBA.

Due to these legal uncertainties, it is possible that the Trustee will have to seek new instructions in respect of the Plan Meeting from Euronoteholders or that Euronoteholders will eventually be requested to file and vote their claims in respect of the Euronotes themselves. In addition, it is possible that the Plan of Composition may have to be changed, or that the Plan of Composition, if adopted at the Plan Meeting, will not be sanctioned by the Rotterdam Court.

If the Plan of Composition does not become effective, TuranAlem Finance's assets will be liquidated by the liquidator in bankruptcy for the benefit of its creditors.

TuranAlem Finance's major assets are its claims on the Bank under, *inter alia*, the BV Deposits.  If the Restructuring Plan becomes effective, under Kazakhstan law the Bank's obligation to pay under each BV Deposit will be set off in its entirety (except for the accrued but unpaid tax margin) against TuranAlem Finance's obligation to reimburse the Bank for payment under the relevant Guarantee.  Consequently, the BV Deposits will be extinguished if the Restructuring Plan becomes effective.  TuranAlem Finance's remaining assets in such case are unlikely to represent significant value and will comprise cash at bank as well as certain claims on BTA which will constitute Designated Financial Indebtedness and will be cancelled in the Restructuring without receiving any Entitlement.  TuranAlem Finance will be entitled to submit a Claim Form and a Form of Proxy in order to vote in respect of any Designated Financial Indebtedness held by it.  Accordingly, if TuranAlem Finance is liquidated,  the liquidation proceeds are unlikely to enable the bankruptcy trustee to make significant liquidation payments to TuranAlem Finance's creditors.

If neither the Plan of Composition nor the Restructuring Plan becomes effective, the Bank is expected to go into conservation or insolvent liquidation (see "*Risk Factors — Risks Relating to the Restructuring — If the Restructuring does not occur, the FMSA may institute proceedings for conservation or an insolvent liquidation of the Bank*") and TuranAlem Finance's assets will be liquidated.  In insolvency procedures, the Bank's assets would be sold.  Due to the fact that proceeds from such sale would be unlikely to be sufficient to repay the outstanding indebtedness and other creditors of the Bank, TuranAlem Finance would likely receive insufficient compensation to repay its creditors or no compensation at all and, as a result, TuranAlem Finance's creditors would likely receive severely reduced returns on their claims or no return at all.

3.    **INFORMATION FOR HOLDERS OF PERPETUAL SECURITIES**

The Perpetual Securities issued by BTA Finance Luxembourg are governed by the articles of association of BTA Finance Luxembourg.  The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") is the registered holder of Perpetual Securities as nominee for the Clearing Systems.  Interests in the Perpetual Securities are directly or indirectly held by certain beneficial owners of the Perpetual Securities (the "**Beneficial Holders**").

BTA Finance Luxembourg initially advanced the proceeds of the issuance of the Perpetual Securities to TuranAlem Finance under a Subsidiary Subordinated Loan, and TuranAlem Finance in turn advanced the proceeds to the Bank under the Subordinated Loan.  In addition, the Bank and BTA Finance Luxembourg entered into a Support Agreement under which the Bank agreed to procure that BTA Finance Luxembourg fulfills its obligations to the

Registered Holder.  The Registered Holder is in certain circumstances entitled to require BTA Finance Luxembourg to enforce its rights under the Support Agreement but the Registered Holder does not have a direct claim against the Bank under the Support Agreement.

In order to simplify the restructuring and allow BTA Finance Luxembourg to make a claim in respect of the Subordinated Loan, it is proposed that TuranAlem Finance transfers to BTA Finance Luxembourg its rights and obligations under the Subordinated Loan, and BTA Finance Luxembourg releases TuranAlem Finance of its obligations under the Subsidiary Subordinated Loan.   Following the transfer of the rights and obligations under the Subordinated Loan, BTA Finance Luxembourg will be entitled to submit a claim a Claim Form in respect of the Subordinated Loan.  That claim will fall to be restructured under Junior Package 2 and the corresponding Entitlements will be delivered to the Registered Holder through BTA Finance Luxembourg for onward transfer to the Beneficial Holders.

Conversely, if TuranAlem Finance cannot proceed to this transfer of its rights and obligations under the Subordinated Loan, TuranAlem Finance may need to transfer to BTA Finance Luxembourg any Entitlements which it may receive from the Bank in respect of the Subordinated Loan (except for any part of such Entitlements which correspond to accrued interest under the Subordinated Loan which is in excess of accrued interest under the Subsidiary Subordinated Loan).  This would be the case where a BV Scheme is offered to, and adopted and ratified by, the creditors of TuranAlem Finance (see "*Scheme of composition under Dutch law*" above).  Such a scheme will be necessary if, at the time that the transfer should take place, there is no reasonable expectation that TuranAlem Finance will otherwise be released by its financial creditors following the restructuring.

BTA Finance Luxembourg would be prevented, on the basis of its current articles of association, from making any distributions under the Perpetual Securities and the Entitlements so paid may not be distributed to Beneficial Holders.  Accordingly, certain amendments to the articles of association of BTA Finance Luxembourg are required so that it may pay on to the Registered Holder the Entitlements it receives under the Restructuring Plan (if approved) and in turn cancel all payment obligations under the terms of the Perpetual Securities.

For these purposes, BTA Finance Luxembourg, pursuant to a notice dated 12 April 2010, convened, on 22 April 2010 an extraordinary general meeting of its shareholders (the "**EGM**"), being the Registered Holder and the Bank (the "**Convening Notice**"), to (i) *inter alia*, approve the Restructuring Plan, document their support of the board of directors and authorise the board of directors to approve the above proposed transfers and to vote at the Claimants' Meeting (the "**First Resolutions**") and (ii) make the amendments to its articles of association required in order to implement the Restructuring Plan (the "**Second Resolutions**").  In turn, the Registered Holder sent a notice through the Clearing Systems seeking instructions from Beneficial Holders as to how to vote in respect of (i) and (ii) at the EGM (see Schedule 6, Annex 2 (*Notice from Registered Holder to Beneficial Holders of Perpetual Securities*) and received instructions from 23.10 per cent. of the Beneficial Holders.

At the EGM, the First Resolutions were adopted by simple majority at 98.9 per cent. of the votes cast, without the presence or representation of the Bank, while the meeting with respect to the Second Resolutions was adjourned to 25 May 2010 due to the EGM being inquorate with respect to the Second Resolutions.  At the adjourned EGM, the First Resolutions may be passed by simple majority, and the Second Resolutions may be passed with a two-thirds majority without a quorum requirement.  The First Resolutions will be put to vote again because of, *inter alia*, the low percentage of instructions received by the Registered Holder for the EGM.  The terms of the First Resolutions and Second Resolutions remain as set out in the Convening Notice.

A notice of the outcome of the first EGM and of the re-proposal of the First Resolutions has been given to the Registered Holder and to the Bank on Friday 23 April 2010.   The Registered Holder on 27 April 2010 sent a notice through the Clearing Systems seeking instructions from Beneficial Holders as to how to vote in the adjourned EGM.   Unless revoked, the Registered Holder will deem instructions that were received by it for the EGM to apply to the adjourned EGM.   The adjourned EGM will be held at 12:00 noon (Central European Time) on 25 May 2010 at the offices of BTA Finance Luxembourg at 46A, avenue John F. Kennedy, L-1855 Luxembourg, Grand Duchy of Luxembourg.   The date for the adjourned EGM was formerly set for 24 May 2010, but has been postponed to 25 May 2010 because 24 May 2010 is a public holiday in Luxembourg.

If the above proposed transfers will not take effect and no BV Scheme will be adopted and ratified while TuranAlem Finance is declared bankrupt and liquidated, TuranAlem Finance's assets (including the Subordinated Loan or the Entitlements) will be distributed by a liquidator and it is unlikely that in such case BTA Finance Luxembourg will receive any distribution from TuranAlem Finance or the Bank.

4.   **TRADE FINANCE CREDITORS AND OFFICIAL GOVERNMENT SECTOR CREDITORS**

On 17 March 2010, the Bank issued the following press release in relation to Trade Finance Claims:

"JSC BTA Bank (the "**Bank**") is commencing an adjudication process for trade finance claims (including those owed to or guaranteed or otherwise covered by export credit agencies ("**ECAs**")) in connection with the restructuring of the financial indebtedness of the Bank (the "**Restructuring**").   The adjudication process will be conducted by Watson, Farley & Williams LLP (the "**Adjudicator**").   The purpose of this adjudication is the categorisation of the claims of trade finance creditors of the Bank and the amounts of principal related thereto; it being understood that the Adjudicator will not make any determination, adjudication or assessment as to the validity of a creditor's claim.   Interest and other sums that may be due and payable to creditors in relation to their claims will be assessed at a later date under a procedure to be agreed between the Bank and its creditors' steering committee (the "**Steering Committee**").

On 17 March 2010, the Bank signed a revised principal commercial terms sheet (the "**PCTS**") with the Steering Committee setting out the revised principal commercial terms of the Restructuring.   Under the PCTS, certain trade finance claims will be eligible to be restructured by means of a Revolving Committed Trade Finance Facility (the "**RCTFF**").   Other trade finance claims which are not eligible for the RCTFF will be restructured separately.   ECA and trade-related government sector creditor claims will be reviewed by the Adjudicator to confirm that these claims have been correctly classified as ECA or trade-related government sector creditors.   The Bank's ECA creditors, trade-related government sector creditors and trade finance creditors who wish to submit their claims (the "**Claims**") to the Adjudicator should follow the steps set out in this notice and submit to the Adjudicator the documentation related to the submission of Claims specified on the Bank's website at http://www.bta.kz/en/investor.   The Adjudicator will then review the documentation supplied to it by both creditors and the Bank.   In the meantime, the Bank will promptly, and in any case not later than 19 March 2010, publish on its website a complete list of claims that its trade finance department has booked and that the Bank believes are owed to its creditors.

IN ORDER TO ENSURE THAT THE ADJUDICATION PROCESS IS CONDUCTED IN A TIMELY AND SUCCESSFUL MANNER, YOU ARE ENCOURAGED TO SUBMIT TO THE ADJUDICATOR AS SOON AS POSSIBLE A SEPARATE CLAIMS NOTICE (THE FORM OF WHICH IS SET OUT ON THE BANK'S WEBSITE) IN RELATION TO EACH

CLAIM   THAT   YOU   HAVE   TOGETHER   WITH   THE   SUPPORTING DOCUMENTATION.

If you believe that you are a trade finance creditor, ECA creditor or trade-related government sector creditor of the Bank and wish to have your Claim considered by the Adjudicator, you must:

- by no later than 3:00 p.m. London time on 30 March 2010, submit a separate completed and signed Claims Notice for each Claim to the Adjudicator (via email: btaadjudication@wfw.com) together with the supporting documentation to be reviewed by the Adjudicator with a copy to the Bank (via email: tfadjudication@bta.kz). It will greatly facilitate the adjudication process if you submit with your Claims Notice a brief summary of the structure of the transaction underlying your Claim and an English translation of any document that is only available in a language other than English. Failure to do so may delay adjudication of your Claim.

After receipt of your Claims Notice, the Adjudicator will then send you a letter containing a Waiver & Release (the form of which, containing key definitions to be used in the adjudication process, is posted on the Bank's website and has been approved by the Steering Committee).   For a Claim to be adjudicated, you must return the countersigned letter containing the Waiver & Release to the Adjudicator by no later than 11:00 a.m. London time on 7 April 2010.

Furthermore, if you are not an ECA or government sector creditor, as a condition to the Adjudicator's determination being released to you and for RCTFF eligibility, you must also have signed and returned to the Bank (via email: tfadjudication@bta.kz) a Co-operation Undertaking Letter (the form of which is posted on the Bank's website and has been approved by the Steering Committee) by no later than 7 April 2010.   If you are not an ECA or government sector creditor and you do not provide the Bank with a signed Co-operation Undertaking Letter, to the extent you hold senior debt of the Bank, your Claim will be allocated into the Senior Package 1, which is the restructuring package for senior unsecured debt as set out in the PCTS, rather than the RCTFF.   In the case of ECA creditors and trade-related government sector creditors, we would request that you also provide a Co-operation Undertaking Letter to the Bank no later than 7 April 2010.

The process thereafter is as follows:

- The Adjudicator will deliver its determination with respect to the categorisation of your Claim, on the basis set out in the above-mentioned Waiver & Release, by 14 April 2010. The determination of the Adjudicator in relation to a Claim will not include reasons. Furthermore, the Adjudicator will include the amount of principal of your Claim as submitted by you in the aggregate amount of the category in which your Claim will have been allocated in such determination.   In parallel, where there is a discrepancy between your and the Bank's calculation of the principal amount owing to you, the Adjudicator will also indicate the amount of principal owing to you according to the Bank's records.

- If you or the Bank disagrees with the determination of the Adjudicator, you and the Bank will have the opportunity, by 12:00 noon London time on 23 April 2010, to supply further documentation and request the Adjudicator to review such determination.

- If the Adjudicator identifies a discrepancy between your and the Bank's calculation of the principal amount owing to you under a Claim, the Adjudicator will notify both you and the Bank and you may both supply further documentation in support of your calculations, you may both be requested to answer questions in clarification, explanation or corroboration of evidence submitted by you in respect of that Claim and you may both be requested to contact each other in an attempt to find a resolution to such discrepancy by 12:00 noon London time on 23 April 2010 (the "**Cut-Off Time**").

- To the extent that such discrepancy with respect to any particular Claim amounts to a difference between the amounts of principal submitted by you and the Bank that is equivalent to less than the lower of 5 per cent. of the principal amount submitted by the Bank and U.S. $100,000 (a "**Minor Discrepancy**"), then if no agreement is reached by you and the Bank by the Cut-Off Time, the Adjudicator will use the average of the discrepant figures provided to the Adjudicator by you and the Bank in such circumstances for its final determination.

- To the extent there are discrepancies which are not Minor Discrepancies and no agreement has been reached by you and the Bank in relation to such discrepancies by the Cut-Off Time, and:

    (a)    if the discrepancies in respect of which the Adjudicator cannot make a final determination are considered by the Steering Committee to be material, then such discrepancies will be settled by expert determination in accordance with a procedure the structure and terms of which will be settled by 6 May 2010; or

    (b)    if such discrepancies are not considered by the Steering Committee to be material, then you will both be requested to contact each other in an attempt to find a resolution to the discrepancy relating to your Claimed Amount by 12:00 noon London time on 23 May 2010.

- The Adjudicator will deliver its final determination on categorisation and, to the extent an adjudication can be made, on the principal amount of each Claim by 6.00 p.m. London time on 6 May 2010, such determination being final and binding.

If any of our trade finance creditors, ECA creditors or trade-related government sector creditors has any question relating to any of the documents required for the submission of a Claim to the Adjudicator or the adjudication process, it should contact Ms. Dinara Ibrayeva at the Bank (via email: DIbrayeva@bta.kz)."

Claims purporting to be Non-OGSC Eligible Trade Finance Debt or Official Government Sector Debt not notified to the Adjudicator in accordance with the above press release will, provided they are not claims in respect of Excluded Debt or Related Party Debt, be dealt with in the same manner as Ordinary Claims for adjudication and distribution of Entitlements.

Following completion of the adjudication process:

(a)    Claims confirmed by the Adjudicator as Non-OGSC Eligible Trade Finance Debt will be eligible to be restructured by means of the RCTFF as described under "*Terms of the Restructuring Packages*";

(b)    Claims confirmed by the Adjudicator as Official Government Sector Debt will be eligible to be restructured by means of Senior Package 2 as described under "Terms of the Restructuring Packages"; and

(c)    Claims confirmed as neither Non-OGSC Eligible Trade Finance Debt nor Official Government Sector Debt will (unless they are Excluded Debt or Related Party Debt) be eligible to be treated as Ordinary Claims.

Eligibility for allocation to the RCTFF and Senior Package 2 should be read in conjunction with the provisions of the Allocation Mechanism (which additionally permit Non-OGSC Eligible Trade Finance Creditors to elect to be allocated into Senior Package 1 or 2 and Official Government Sector Creditors to elect to be allocated into Senior Package 1, subject always to the conditions set out in the Allocation Mechanism).

5.     **ROUBLE NOTEHOLDERS**

Holders of Rouble Notes will have a Claim on the Bank under the surety issued by the Bank in respect of the Rouble Notes.  Rouble Noteholders must submit Forms of Proxy and Claim Forms in respect of their Claims under the Rouble Notes directly to the Bank.  If the Restructuring Plan is approved at the Claimants' Meeting all claims of Rouble Noteholders in respect of the Rouble Notes (whether against TuranAlem Finance (Russia), the Bank or any other Subsidiary of the Bank shall be cancelled.

6.     **INFORMATION FOR HOLDERS OF CHF NOTES**

A notice to beneficial owners of the CHF Notes was sent through the Clearing Systems (see Schedule 8 (*Notice to beneficial owners of CHF Notes*)).  Beneficial owners of CHF Notes held through the Clearing systems should make arrangements for the registered holder of the CHF Notes to submit a Claim Form and Form of Proxy in relation to Claims relating to the CHF Notes in accordance with the above notice.  Holders of CHF Notes in individual certificated form should submit Claim Forms directly to the Bank.

7.     **INFORMATION FOR CLAIMANTS WITH RELEVANT CONTINGENT CLAIMS**

Claimants with Relevant Contingent Claims may make certain elections as to how they intend to participate in the Restructuring with respect to their contingent claims against the Bank, as provided in paragraph 4.3(b) of Schedule 1 (*The Restructuring Plan*).

8.     **INFORMATION FOR ALL CLAIMANTS**

*Verification of amounts of Claims and classification*

On 22 April 2010, the Bank issued the following press release in relation to the Preliminary Debt List which was also published on that date:

"JSC BTA Bank (the "**Bank**") has published on its website (http://www.bta.kz/en/investor) a preliminary list of its outstanding financial indebtedness to be restructured under its restructuring plan (the "**Preliminary Indebtedness List**").  The Preliminary Indebtedness List states principal and notional accrued interest due as at 30 June 2010.  The Preliminary Indebtedness List was prepared by the Bank following extensive consultation with the relevant creditors and, as a result, the Bank hopes that the amounts set out therein are all agreed.

The publication of this Preliminary Indebtedness List is in accordance with the detailed term sheet between the Bank and the Steering Committee (on behalf of the Bank's creditors) signed on 18 April 2010 (the "**Detailed Term Sheet**").

Please note that the Preliminary Indebtedness List DOES NOT currently include the notional accrued interest due as at 30 June 2010 relating to trade finance claims.  The Preliminary Indebtedness List will be updated to include these amounts as soon as they are available.  Once available, creditors will be notified that the Preliminary Indebtedness List has been updated.

In addition, the classification of claims contained in the Preliminary Indebtedness List is indicative only.  The final classification of claims shall be determined by the adjudicator as described in our press release dated 17 March 2010.

The Preliminary Indebtedness List includes the following:

(i)     all financial indebtedness (including contingent indebtedness) which the Bank believes to be subject to the restructuring, specifying in each case the total principal amount outstanding of each debt, as well as a calculation of interest accrued to 30 June 2010 on the basis agreed with the Steering Committee;

(ii)     all financial indebtedness which constitutes Direct Official Government Sector Debt (as defined in the Detailed Term Sheet); and

(iii)    all financial indebtedness excluded from the restructuring in accordance with the Detailed Term Sheet

but currently EXCLUDES the notional accrued interest due as at 30 June 2010 relating to trade finance indebtedness subject to the restructuring.

***Procedure to be followed in relation to any Disputed Amounts***

If a creditor wishes to dispute the amount applicable to its claim stated in the Preliminary Indebtedness List or the classification of such claim, it must notify the Bank and provide its own calculations by 28 April 2010 (the "**Adjudication Submission Expiry Date**").  If a creditor fails to so notify the Bank by this date that it disputes the amount of the claim or the category of debt into which it is classified as stated on the Preliminary Indebtedness

List, the amount or classification so stated in the Preliminary Indebtedness List will (except in the case of a manifest error) be deemed to be the amount admitted in relation to the claim or the correct classification as its claim, regardless of anything stated on any subsequent claim form delivered to the Bank.

If a purported creditor does not notify the Bank that its claim does not appear on the Preliminary Indebtedness List by 28 April 2010, any such creditor may nevertheless submit a claim form in respect of its claim but if the Bank disputes such claim and the dispute is not resolved between the Bank and the creditor by 6 May 2010 then that creditor shall not receive any consideration until such time as the dispute is resolved in its favour by Watson, Farley & Williams LLP (the "**Supervisor**") or, if the Supervisor is unable to resolve the dispute, an arbitrator nominated by the London Court of International Arbitration.

Any such disputed amounts or classification, if not resolved between the Bank and the creditor within three business days (each a "**Disputed Claim**") shall be referred to the Supervisor for the purpose of adjudicating the dispute as to quantum or classification by 6 May 2010 (the "**Scheduled Supervisor Determination Date**").

**IN ORDER TO ENSURE THAT THE ADJUDICATION PROCESS IS CONDUCTED IN A TIMELY AND SUCCESSFUL MANNER, IN THE EVENT THAT YOU DISAGREE WITH THE AMOUNT APPLICABLE TO YOUR CLAIM STATED IN THE PRELIMINARY INDEBTEDNESS LIST OR THE CLASSIFICATION OF SUCH CLAIM, YOU ARE ENCOURAGED TO NOTIFY THE BANK AND PROVIDE YOUR OWN CALCULATIONS AS SOON AS POSSIBLE AND IN ANY CASE BEFORE 28 APRIL 2010 IN RELATION TO EACH DISPUTED CLAIM THAT YOU HAVE TOGETHER WITH SUPPORTING DOCUMENTATION.**

Once any Disputed Claim is referred to the Supervisor, it shall follow the process set out in the Term Sheet.

The Preliminary Indebtedness List and the Detailed Term Sheet are available on the Bank's website at http://www.bta.kz/en/investor."

Accrued Interest will be included in each Agreed Claim and is calculated as follows:

● *Fixed Rate*

Where a Claim accrues interest on a fixed rate basis and whether or not the current interest period ends before, on or after the Cut-off Date, interest shall be calculated on the principal amount of the Claim using the fixed rate currently applicable (calculated in

accordance with the relevant contract) from the last interest payment date through to and including the Cut-off Date.

- *Floating Rate*

  Where a Claim accrues interest on a floating rate basis and the current interest period ends before the Cutoff Date, it will be necessary to calculate the amount of interest for the period from the end of that interest period up to and including 30 June 2010 using a reference rate for the purposes of agreeing the total outstanding amount for purposes of voting at the Claimants' Meeting and for the distribution of Entitlements.

  Where the current interest period ends after the Cut-off Date, interest should be calculated on the principal amount using the currently applicable interest rate (calculated in accordance with the relevant contract) for the period up to and including the Cut-off Date.

Where the current interest period ends on or before the Cut-off Date, interest should be calculated on the principal amount using the currently applicable interest rate (calculated in accordance with the relevant contract) for the period up to and including the last day of the current interest period and thereafter the interest rate for the period up to and including 30 June 2010 shall be calculated on the assumption that such period is a new interest period starting on the last day of the current interest period and ending on and including the Cut-off Date and that the rate of interest that will apply to such period is calculated in accordance with the relevant contract as if 12 April 2010 was the day for determining/fixing the new interest rate (using the most closely comparable generally available screen-based floating rate for the relevant period).

The Restructuring Plan does not contemplate payment of any breakage costs incurred in relation to the shortening of any interest period.

Claimants should also read the section entitled *"Verification of Quantum and Classification and Admission of Claims"* in Clause 4 of Schedule 1 *(The Restructuring Plan)* relating to the verification of the amount of their Claim and their classification.

### *Submission of Claim Forms*

Subject as provided above in relation to certain categories of Claimants, all Claimants (whether their Claim is actual or contingent) must complete and submit to the Bank a Claim Form by the Claims Submission Date.  The Claim Form is contained at Schedule 2 (*Claim Form*) including notes on completing the Claim Form.[8]

### *Details for Return of Claim Forms*

The address, fax number and e-mail addresses of the Bank for the return of Claim Forms are specified on the Claim Form.

Claim Forms may be sent by electronic mail or fax to the Bank by the Claims Submission Date provided the original of such forms are mailed to and received by the Bank by 26 May 2010.  Service shall be effective upon receipt by the Bank (whether by fax, phone, email or post) on a Business Day in Almaty; *provided*, *however*, *that* (i) any such communication which would otherwise take effect before 6:00 p.m. on any particular day shall not take effect until 10:00 a.m. on the immediately succeeding business day in Almaty. Claimants (other than Excluded Creditors) are accordingly urged to contact the Bank by emailing zhaisanov@bta.kz or d_adil@bta.kz or by phone on +7 727 3124671 or +7 727 266 2607 in order to obtain confirmation from the Bank that their Claim Form has been received.

---

[8] BTA Finance Luxembourg, Trustees on behalf of Euronoteholders and Claimants whose Claims remain in dispute may submit Claim Forms until 10:00 am (Almaty time) on 26 May 2010.

### Consequences of failing to notify the Bank of Claims before the Claims Submission Date

Claimants who have not notified the Bank of their Claims (and which are not Excluded Debt) on or prior to the Claims Submission Date will have their Claims cancelled and will receive no Entitlements, but the Bank may, in its sole and absolute discretion, admit such Claims.

### The Claimants' Meeting

The Restructuring Plan is contained at Schedule 1 (*The Restructuring Plan*) and contains important information relating to all claims.  Claimants should read the Restructuring Plan carefully.  Before the Restructuring Plan can become effective and binding on the Bank and the Claimants and Euronoteholders, a resolution to approve the Restructuring Plan must be passed by Claimants holding at least two-thirds by value of the Designated Financial Indebtedness at the Claimants' Meeting convened by the order of the Court.

The notice convening the Claimants' Meeting is set forth in Schedule 3 *(Notice of Claimants' Meeting)*.  Each Claimant or its proxy will be required to register its attendance at the Claimants' Meeting prior to its commencement.  Registration will commence at 10:00 a.m. (Almaty time) on the day before the Claimants' Meeting.  Claimants or their proxies must be duly authorised to vote at the Claimants' Meeting.

The Claimants' Meeting will be chaired by Mr. Anvar Saidenov.

### Voting by Claimants

All Claimants who wish to vote by proxy at the Claimants' Meeting will need to complete a Claim Form in respect of each Claim (*provided that* when a Claimant has more than one Claim of the same type these may be included in a single Claim Form) and a Form of Proxy even if they have previously notified the Bank of their Claims.

In order to expedite the procedure for voting at the Claimants' Meeting, please return any Claim Forms and Forms of Proxy to the address shown on those forms as soon as possible and in any event by no later than 5:00 p.m. (Almaty time) on 19 May 2010.  However, after this time, Forms of Proxy may be presented to the registration desk at the Claimants' Meeting or lodged with the Chairman, to be accepted at his sole discretion at any time prior to the Claimants' Meeting, provided they have been properly completed and signed.

If a Claimant wishes to appoint the Chairman to be its proxy, it must specifically direct the Chairman to vote either for, or against, the Restructuring Plan in the Form of Proxy.  If the Chairman is appointed as Proxy but is not given specific directions on how to vote, the amount of the Claim will be counted as an abstention.

If a Claimant wishes an authorised person to attend the Claimants' Meeting and vote on its behalf, that person must produce at the Claimants' Meeting a copy of the resolution or other appropriate documentation authorising him to do so.  The copy should be sealed by the authorised body or certified as a true copy by a director or by the company secretary or an authorised signatory.

### Form of Proxy

Enclosed with this Information Memorandum at Schedule 4 (*Form of Proxy*) is the Form of Proxy.  Each Claimant (or its duly authorised agent) should ensure that the original Form of Proxy is completed and submitted in accordance with the notes printed on the Form of Proxy, regardless of whether such Claimant intends to be present at the Claimants' Meeting, in order to direct how votes attributable to its Claims should be exercised.

A Form of Proxy should be completed and submitted in respect of each Claim Form that is completed and submitted.

*Deadlines for Return of Forms of Proxy*

Claimants should ensure that the Bank receives their Form of Proxy by no later than the Claims Submission Date.  If not returned by this time, duly completed Forms of Proxy will only be accepted at the absolute discretion of the Chairman of the Claimants' Meeting at any time prior to the Claimants' Meeting and only upon production of appropriate, verifiable evidence that the person that completed that Form of Proxy is a Claimant and has the right to vote in respect of its Claim.

Once a Form of Proxy is submitted, it may only be withdrawn by application to the Bank.

If any changes are made to the Restructuring Plan as set out in this Information Memorandum which are materially adverse to Claimants, the Bank shall, in a supplement to this Information Memorandum in which such changes are published, inform Claimants that they are entitled to revoke their Forms of Proxy and the supplement will contain information relating to the deadline for the submission of new Forms of Proxy applicable to Claimants that have so revoked their Forms of Proxy.  Any notice of revocation must indicate the relevant Forms of Proxy to be revoked and must be received by the Bank in the same manner as the Forms of Proxy were required to be delivered originally.

The address, fax number and e-mail addresses of the Bank for the return of Forms of Proxy are specified on the Form of Proxy.

### Attendance at the Claimants' Meeting; Verification of Identity

Claimants wishing to attend and vote in person at the Claimants' Meeting should ensure that they indicate that this is their intention in the relevant part of the Form of Proxy.  Admittance to the Claimants' Meeting will only be permitted to the person named in the Form of Proxy on the production of proof of personal identity, and, in the case of a corporation, the Form of Proxy has been executed under its seal or signed on its behalf by its duly appointed attorney or a duly authorised officer or authorised signatory of the corporation.  If the person so named cannot produce an appropriate proof of personal identity (for example, a passport), he will not be permitted to attend and vote at the Claimants' Meeting.

The Bank has the right to request additional documentation to confirm that a person who has completed a Form of Proxy is a Claimant.  In the event that such additional documentation is not provided, or is insufficient, the Chairman may at his absolute discretion, for voting purposes only, reject a claim.

### Value of a Claimant's Claim for Voting Purposes

In no circumstances shall a Claim be admitted for voting purposes by the Bank or the Chairman for a value greater than the Agreed Claim amount as determined pursuant to Schedule 1 (*The Restructuring Plan*).

The quantum of a Claim for voting purposes shall be the Agreed Claim amount.  For voting purposes Claims denominated in currencies other than Tenge will be converted into Tenge at the Reference Rate.

### Questions

An opportunity will be given at the Claimants' Meeting for Claimants to raise any questions and to voice any objections they may have in relation to the Restructuring Plan.

### Final Hearing

All Claimants and Euronoteholders are entitled to appear at the hearing of the application to the Court to approve the Restructuring Plan.  The time and date of the hearing will be notified

to Claimants by an announcement on a Regulatory Information Service and on the Bank's websites at www.btainvestorrelations.com and www.bta.kz.

**9.      ENTITLEMENT TO AND DISTRIBUTION OF CASH, NEW NOTES AND/OR SHARES OR GDRS**

### Distribution Agent

Before the Restructuring Date, the Bank will enter into the Distribution Agent Agreement appointing the Distribution Agent.

The Restructuring Plan provides that the Distribution Agent will be responsible for assisting with the distribution process on behalf of the Bank.  The Distribution Agent may also be responsible for holding cash, New Notes and/or Shares/GDRs on behalf of certain Claimants pending distribution under the terms of the Restructuring Plan.

### Distribution Agent Agreement

On execution of the Distribution Agent Agreement, the Bank will, conditional on the Restructuring Plan becoming effective, deliver cash and New Notes and Shares or GDRs to the Distribution Agent to be held on behalf of certain Claimants in accordance with the terms of the Distribution Agent Agreement.

### Satisfaction of Entitlements

Entitlements will be satisfied by the distribution to Claimants (other than Samruk-Kazyna and as regards claims to be allocated to the RCTFF) of the appropriate number of New Notes and Shares or GDRs and/or amount of cash, as the case may be.  Claimants with Non-OGSC Eligible Trade Finance Debt allocated to Senior Package 3 will participate as lenders in the RCTFF which will become effective on the Restructuring Date.

### Foreign Jurisdictions

Cash, New Notes and/or Shares/GDRs will not be distributed pursuant to the Restructuring Plan where such distributions would be prohibited.  Claimants in certain jurisdictions should refer to the discussion in "*Issuance and Transfer Restrictions*" and "*Risk Factors – Restrictions apply to a holder of GDRs or Shares if it is incorporated or has affiliates in a Prohibited Jurisdiction*" to determine whether this may affect them.

### Procedure for the Admission and Rejection of Claimants' Claims

Please see the clause entitled *"Verification of Quantum and Classification and Admission of Claims"* as included at Clause 4 of Schedule 1 *(The Restructuring Plan)* for a description of the procedure applicable to the verification, adjudication and admission of Claims.

### Calculation of Entitlements

Details of the calculation of Entitlements are provided in Schedule 1 (*The Restructuring Plan*), Annex 2 (*Calculation of Entitlements*) to this Information Memorandum.

### Distribution of cash, New Notes and/or Shares or GDRs to Claimants

*Distribution of New Notes and Shares or GDRs*

For all Agreed Claims, the Distribution Agent or the Bank, as the case may be, will transfer (or permit to be transferred) such number of New Notes and Shares/GDRs to either an Existing Account, a Designated Account or a Local Account specified in the Settlement Instructions.  In due course the Bank will make available Settlement Instructions for Claimants.  Each Settlement Instruction must contain such information as is required by the

Distribution Agent or the Bank, as the case may be, to transfer the appropriate cash, New Notes and/or Shares or GDRs to the relevant Claimant (or its Nominated Recipient).

*Direction to Sell New Notes, Shares or GDRs*

If, for any reason, a Claimant does not wish to, or is unable to, hold the New Notes and (i) Shares/GDRs to which it is entitled, it may direct the Distribution Agent or the Bank, as the case may be, to sell its Securities Entitlement and account to it for the Net Proceeds of Sale or (ii) to transfer the same to a third party who is not so affected.  The price, terms, timing and manner of such sale will be on the best terms reasonably available at the time using a transparent open market process and shall be for cash and shall take place as soon as reasonably practicable after the Restructuring Date, and neither the Bank, the Steering Committee nor any of their respective advisers, or any person acting on behalf of all or any of them, will have any Liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for such New Notes and Shares/GDRs (or any of them)).

*Transfers of New Notes, Shares or GDRs to Claimants may be restricted in Certain Jurisdictions*

The New Notes and Shares or GDRs will not be distributed to Claimants in jurisdictions where such distributions would be prohibited.  Instead, such persons will be entitled to receive the Net Proceeds of Sale of the New Notes and Shares or GDRs to which they would otherwise be entitled.  Payments to such persons shall be made in U.S. Dollars.

If in the reasonable opinion of the Bank (having taken appropriate legal advice), the transfer of New Notes and Shares/GDRs pursuant to the Restructuring Plan a Claimant, or a Claimant's Nominated Recipient, may be prohibited by any relevant law then the Distribution Agent shall, if so directed by the Bank, or the Bank shall, sell, or procure the sale of, the same and pay the Net Proceeds of Sale from the sale of such New Notes and Shares/GDRs to that Claimant, or that Claimant's Nominated Recipient, as the case may be, on the best terms reasonably available at the time using a transparent open market process and shall be for cash and shall take place as soon as reasonably practicable after the Restructuring Date, in full satisfaction of that Claimant's rights under the Restructuring Plan.

*Distribution of Cash*

Cash payments made under Senior Package 1 will be made by wire transfer to the Claimant in accordance with the account details as set out in their completed Settlement Instructions.

*Escrow Account*

In accordance with the Restructuring Plan the Bank is entitled to place Entitlements of certain Related Parties in the Escrow Account pending resolution of the Bank's enquiries.

## 10.  APPROVAL BY THE FMSA AND THE COURT

If the Restructuring Plan is approved at the Claimants' Meeting, the Bank must submit the approved plan to the FMSA in order to establish its conformity with the indicative restructuring and recapitalisation plan initially approved by the FMSA on 26 September 2009.

The Court must approve the Restructuring Plan before it can become effective and binding on all relevant parties.  Approval takes place at the Court hearing after the requisite majority of Claimants has approved the Restructuring Plan at the Claimants' Meeting.  The date of the Court hearing for approval of the Restructuring Plan will be announced on a Regulatory Information Service and on the Bank's websites at www.bta.kz at least 14 days in advance of such hearings.  Claimants, Euronoteholders and Related Parties are entitled to attend and make representations at the Court hearing.

Further conditions precedent to the Restructuring Plan becoming effective are set forth in Schedule 12 (*Conditions Precedent to the Restructuring Plan Becoming Effective*) to this Information Memorandum.

**11.     DEED OF RELEASE**

The terms of the Restructuring Plan provide for the Bank to be given the authority to enter into the Deed of Release on behalf of all Claimants and Related Parties releasing the Bank and other persons named therein from all Liabilities to Claimants and Euronoteholders as more fully set out in Schedule 1 *(The Restructuring Plan),* Annex 3 (*Form of Deed of Release*).

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

**Historical Financial and Other Information**

The Bank is required to maintain its books of account in Tenge in accordance with IFRS and with the relevant laws and regulations in Kazakhstan.  The Bank is also required to submit certain compliance reports prepared in accordance with the regulations of the FMSA.

The historical financial information of the Bank set forth herein has, unless otherwise indicated, been extracted without material adjustment from the Annual Financial Statements and the Unaudited Interim Financial Statements, prepared in accordance with IFRS. Ernst & Young LLP, independent auditors (acting as an auditor under licence No. 0000003, Type MFU-2, dated 15 July 2005 issued by the Ministry of Finance of Kazakhstan), 77/7, Al-Farabi Avenue, Esentai Tower, Almaty, 050060, Republic of Kazakhstan, have audited the Bank's Annual Financial Statements and their audit report is included in this Information Memorandum.  Ernst & Young LLP have also reviewed the Bank's Unaudited Interim Financial Statements for the nine months ended 30 September 2009 and their review report is included in this Information Memorandum.

The audit report issued by Ernst & Young LLP in respect of the Annual Financial Statements for the year ended 31 December 2008 and the review report issued by Ernst & Young LLP in respect of the Unaudited Interim Financial Statements for the nine months ended 30 September 2009 each expressed an unqualified opinion, but the audit report and review report did include emphasis of matter paragraphs in respect of the material uncertainty which exists in respect of the Bank continuing as a going concern.

**Investors should be aware that the Bank has not published any financial statements with respect to any period after 30 September 2009.  The effect of local and global market conditions on the Bank and the Bank's customers and counterparties, as well as the effect of the other events both within and outside the Bank as described in detail in this Information Memorandum, may cause actual results of operations and financial condition of the Bank as at and for the financial year ended 31 December 2009 or for any period thereafter to be materially and adversely different from the results presented as at and for the nine months ended 30 September 2009.  Accordingly, investors should not assume that the results presented as at and for the nine months ended 30 September 2009 are an accurate indication of the actual results as at and for the financial year ended 31 December 2009 or as at any date or for any period thereafter.**

**The Bank is in the process of finalising its financial statements as at and for the year ended 31 December 2009 and if they are published prior to the Claimants' Meeting, the Bank will publish, if practicable, a supplement to this Information Memorandum.  However, there is no guarantee that the Bank will publish those financial statements prior to the Restructuring.  If no such supplement is published, Claimants should understand that they are participating in the Restructuring on the basis of the information then available and that they are aware of the consequences thereof.  See *"Risk Factors — Risks Relating to the Bank — The Bank's results as at and for the year ended 31 December 2009 may have a material and adverse impact on the market price of the New Notes and GDRs".***

Due to internal control weaknesses experienced by the Bank in the past, Claimants are advised to assess financial information presented in this Information Memorandum with caution.  See "*Risk Factors — Risks Relating to the Bank — Internal control weaknesses have been evidenced by several transactions in the past and other unusual transactions may be uncovered in the future*".

Certain information presented in this Information Memorandum is prepared on the basis of FMSA Methodology.  Such information is not audited and is not directly comparable with the information presented in accordance with IFRS.  See "*Pro Forma Financial Information*" and "*Asset and Liability Management — Provisioning Policy*".

In making an investment decision, Claimants must rely upon their own examination of the Bank, the terms of the Restructuring and the financial information included in this Information Memorandum, and should consult their own professional advisers for an understanding of the differences between IFRS, FMSA Methodology and U.S. GAAP and how these differences might affect the financial information in this Information Memorandum.

**Pro Forma Financial Information**

The financial information set forth herein also includes the Pro Forma Financial Information. The Pro Forma Financial Information was prepared by the Bank on the basis of FMSA Methodology and IFRS, as indicated, to illustrate the effect of the Restructuring as if the Restructuring had been completed as at 30 September 2009 and is based on data derived from the Unaudited Interim Financial Statements and management accounts prepared on the basis of FMSA Methodology. The Pro Forma Financial Information is unaudited and presented on an unconsolidated basis, and it is presented for illustrative purposes only.

The Bank's management believes that the Pro Forma Financial Information may be useful in enabling Claimants to assess and understand the Restructuring and to select Restructuring Packages. The Pro Forma Financial Information is based upon certain assumptions and adjustments which the Bank's management believes are reasonable and necessary for a fair presentation of such information.

While the Bank has used all reasonable efforts to ensure that the Pro Forma Financial Information is correct, accurate and complete as at the date of this Information Memorandum, no representation or warranty (express or implied) is made as to the reliability, accuracy or completeness of the Pro Forma Financial Information. The assumptions and adjustments are based upon the Bank's preliminary analysis and based upon currently available information. The Pro Forma Financial Information does not take into account the potential adverse impact of certain negative developments since 30 September 2009, such as additional loan loss provisions and further operational losses resulting from the deteriorating financial condition of the Bank and instability aggravated by the ongoing restructuring process.

Claimants are cautioned that *pro forma* financial information is inherently unreliable and that the Pro Forma Financial Information is not necessarily indicative of how the Bank's consolidated capitalisation, balance sheet or capital adequacy information as at 30 September 2009 would have been presented had the Restructuring actually been completed at that date, nor is it necessarily indicative of the Bank's consolidated capitalisation, balance sheet or capital adequacy as at any future date. The unaudited Pro Forma Financial Information should be read in conjunction with the Financial Statements included elsewhere in this Information Memorandum. See "*Risk Factors — Risks Relating to the Restructuring — The Pro Forma Financial Information would likely differ materially if it were based on consolidated financial statements prepared in accordance with IFRS*".

**Currency Translations**

Solely for the convenience of the reader, this Information Memorandum presents unaudited translations of certain Tenge amounts into U.S. Dollars at specified rates. Unless otherwise stated, any balance sheet data in U.S. Dollars is translated from Tenge at the applicable exchange rate on the date of such balance sheet (or, if no such rate was quoted on such date, the immediately preceding date) and any income statement data in U.S. Dollars is translated from Tenge into U.S. Dollars at the daily average exchange rate applicable to the period to which such income statement data relate, in each case calculated in accordance with the official exchange rates for U.S. Dollars on the KASE as reported by the NBK. Further details can be found in the section headed "*Exchange Rates and Exchange Controls*".

The Bank has translated the summary income statement and balance sheet information for the nine-month period ended 30 September 2009 and the year ended 31 December 2008 into U.S. Dollars at the rate of U.S.$1.00 = KZT 150.95 and U.S.$1.00 = KZT 120.79, respectively. See "*Exchange Rates and Exchange Controls*". As at 30 April 2010 (the latest practicable date prior to the date of

this Information Memorandum), the official KZT/U.S.$ rate of exchange reported by the NBK was KZT 146.43 = U.S.$1.00.

No representation is made that the Tenge or U.S. Dollar amounts in this Information Memorandum could have been converted into U.S. Dollars or Tenge, as the case may be, at any particular rate or at all.

Certain figures which appear in this Information Memorandum have been subject to rounding adjustments; accordingly, figures shown as totals in certain tables may not be the sum of the figures which precede them.

**Statistical and Market Information**

Certain statistical and market information presented in this Information Memorandum in the sections headed "*Risk Factors*", "*The Bank*", "*Management's Discussion and Analysis of Results of Operations and Financial Condition*", "*Selected Statistical and Other Information*" and "*The Banking Sector in Kazakhstan*" on such topics

as the Bank's competitors, the Kazakhstan banking sector, the Kazakhstan economy in general and other related subjects represents the Bank's calculations based on information and official data of the FMSA, the NBK, the NSA and other third party sources. Specifically, information related to the Bank's industry ranking and market share is derived from figures published by the FMSA. The Bank has accurately reproduced such information and, so far as the Bank is aware and is able to ascertain from information published by such third parties, no facts have been omitted that would render the reproduced information inaccurate or misleading. The Bank has relied on the accuracy of this information without independent verification. Claimants should note that some of the Bank's estimates are based on such third party information. Claimants are advised to consider this data with caution. Official data published by Kazakhstan governmental or regional agencies is substantially less complete and less thoroughly researched than that of more developed countries. Further, official statistics, including those produced by the FMSA, the NBK and the NSA, may be produced on different bases than those used in more developed countries. Any discussion of matters relating to Kazakhstan itself in this Information Memorandum is, therefore, subject to uncertainty due to concerns about the completeness or reliability of available official and public information.

## FORWARD-LOOKING STATEMENTS

Certain statements included herein may constitute forward-looking statements that involve a number of risks and uncertainties.  Such forward-looking statements can be identified by the use of forward-looking terminology such as "believes", "expects", "may", "are expected to", "intends", "will", "will continue", "should", "would be", "seeks", "approximately" or "anticipates" or similar expressions or the negative thereof or other variations thereof or comparable terminology.  These forward-looking statements include all matters that are not historical facts.  They appear in a number of places throughout this Information Memorandum and include statements regarding the Bank's intentions, beliefs or current expectations concerning, amongst other things, the Bank's results of operations, financial condition, liquidity, prospects, growth, strategies and the industry in which it operates.  By their nature, forward-looking statements involve risks and uncertainties because they relate to events and depend on circumstances that may or may not occur in the future.

Claimants and Euronoteholders should be aware that forward-looking statements are not guarantees of future performance and that the Bank's actual results of operations, financial condition and liquidity, and the development of the industry in which it operates may differ materially from those statements made in or suggested by the forward-looking statements contained in this Information Memorandum.  In addition, even if the Bank's results of operations, financial condition and liquidity and the development of the industry in which it operates are consistent with the forward-looking statements contained in this Information Memorandum, those results or developments may not be indicative of results or developments in subsequent periods.  Important factors that could cause those differences include, but are not limited to:

- the Bank's ability to successfully restructure its indebtedness;

- the stability of the banking sector in Kazakhstan;

- the state of the Bank's retail, corporate and SME businesses;

- the quality and stability of its deposit base;

- future credit losses that the Bank may incur;

- expectations as to the impact of projects undertaken to improve cost efficiencies and enhance liquidity and revenues; and

- estimates and financial targets for increasing and diversifying the composition, as well as the quality, of the Bank's loan portfolio.

Factors that could cause actual results to differ materially from the Bank's expectations are contained in cautionary statements in this Information Memorandum and include, among other things, the following:

- overall economic and business conditions;

- effects of the global financial crisis and international economic conditions;

- the level of demand for the Bank's services;

- deposit outflows;

- competitive factors in the industries in which the Bank and its customers operate;

- changes in Government regulations and in the Government's or Samruk-Kazyna's policies regarding support for the banking sector in Kazakhstan;

- the timing, impact and other uncertainties of unrecognised guarantees and pledges, if any;

- the timing, impact and other uncertainties of unidentified related party transactions, if any;

- changes in tax requirements, including tax rate changes, new tax laws and revised tax law interpretations;

- results of litigation or arbitration;

- interest rate fluctuations and other changing conditions in the capital markets;

- exchange rate fluctuations;

- economic and political changes in international markets, including governmental changes;

- hostilities and restrictions on the ability to transfer capital across borders; and

- the impact of valuation of derivatives and property and equipment.

The sections of this Information Memorandum entitled "*Risk Factors*", "*Management's Discussion and Analysis of Results of Operations and Financial Condition*", and "*The Bank*" and "*Selected Statistical and Other Information*" contain a more complete discussion of the factors that could affect the Bank's future performance and the industry in which it operates.   In light of these risks, uncertainties and assumptions, the forward-looking statements described in this Information Memorandum may not occur.

The Bank is not obliged to, and does not undertake any obligation to, update or revise any forward-looking statement, whether as a result of new information, future events or otherwise.   All subsequent written and oral forward-looking statements attributable to the Bank or to persons acting on its behalf are expressly qualified in their entirety by the cautionary statements referred to above and contained elsewhere in this Information Memorandum.

## EXCHANGE RATES AND EXCHANGE CONTROLS

**Exchange Rates**

The currency of Kazakhstan is the Tenge, which was introduced in November 1993. Prior to 5 April 1999, the NBK maintained a managed floating exchange rate system with the rate being determined on the basis of market developments and the NBK's role in setting the exchange rate was limited to interventions in the domestic currency market in order to prevent exchange rate volatility caused by short-term changes in supply and demand. In April 1999, the NBK and the Government publicly announced that the NBK would cease to establish fixed exchange rates for the Tenge and permit the exchange rate to float freely, and that the NBK would continue to intervene in the foreign exchange market only where necessary to support the Tenge. This decision was supported by international financial organisations such as the IMF. As a result, the Tenge depreciated from a pre-announcement rate of KZT 88.00 per U.S. Dollar to a rate of approximately KZT 130.00 per U.S. Dollar by May 1999. For the next three years the Tenge generally continued to depreciate in nominal terms against the U.S. Dollar, although from 2002 to 2008 it strengthened overall against the U.S. Dollar as a result of export proceeds from oil, agricultural products and other commodities. On 4 February 2009, the NBK reduced its level of support for the Tenge/U.S. Dollar exchange rate from KZT 117 – KZT 123 to 1 U.S. Dollar to KZT 150 to 1 U.S. Dollar (+/- 3 per cent.). This devaluation was due in part to recent pressure on the balance of payments of Kazakhstan as a result of a decline in commodity prices (in particular oil and gas) in the international markets and to prevent a significant decrease of Kazakhstan's gold and currency reserves. It was also intended to enhance export competitiveness. From 5 February 2010 a new exchange rate corridor began to operate. In light of the state of world trade and currency markets, and in order to make the setting of exchange rates more flexible, the NBK has indicated that it will widen the KZT corridor until 20 March 2011 to allow fluctuations from a base rate of KZT 150 to 1 U.S. Dollar of + 10 per cent. (i.e. up to KZT 165 to 1 U.S. Dollar) and – 15 per cent. (i.e. down to KZT 127.5 to 1 U.S. Dollar).

The following table sets out year-end, high, average and low Tenge/U.S. Dollar official exchange rates for each year from 2002 through 2009 and period-end, high, average and low Tenge/U.S. Dollar official exchange rates for the first nine months of 2009 and first one month, two months and three months of 2010, in each case as reported by the NBK:

| Period ended | Period end | High | Average[1] | Low |
|---|---|---|---|---|
| 31 December 2002 .................................................. | 155.60 | 155.60 | 153.28 | 150.60 |
| 31 December 2003 .................................................. | 144.22 | 155.89 | 149.52 | 143.66 |
| 31 December 2004 .................................................. | 130.00 | 143.33 | 136.05 | 130.00 |
| 31 December 2005 .................................................. | 133.77 | 136.12 | 132.86 | 129.83 |
| 31 December 2006 .................................................. | 127.00 | 133.85 | 126.10 | 117.25 |
| 31 December 2007 .................................................. | 120.30 | 127.00 | 122.56 | 118.79 |
| 31 December 2008 .................................................. | 120.79 | 120.87 | 120.29 | 119.48 |
| 30 September 2009 ................................................. | 150.95 | 151.40 | 146.88 | 120.79 |
| 31 December 2009 .................................................. | 148.46 | 151.40 | 147.59 | 120.79 |
| 31 January 2010 .................................................... | 148.21 | 148.46 | 148.13 | 147.88 |
| 28 February 2010 ................................................... | 147.32 | 148.46 | 147.96 | 147.32 |
| 31 March 2010 ...................................................... | 146.98 | 148.46 | 147.67 | 146.89 |

_____
Note:
(1)   The weighted average rate reported by the NBK for each month, as applicable, during the relevant period.

On 30 April 2010 (the latest practicable date prior to the date of this Information Memorandum), the official KZT/U.S.$ rate of exchange as reported by the NBK was KZT 146.43 per U.S.$1.00.

The above rates may differ from the actual rates used in the preparation of the Financial Statements and other financial information appearing in this Information Memorandum. The inclusion of these exchange rates is not intended to suggest that the Tenge amounts actually represent such U.S. Dollar amounts or that such amounts could have been converted into U.S. Dollars at any particular rate, or at all.

**Exchange Controls**

Kazakhstan has accepted the conditions of paragraphs 2, 3 and 4 of Article VIII of the IMF Charter and, as a result, has agreed not to introduce or increase any exchange rate restrictions, introduce or modify any practice of multiple exchange rates, enter into any bilateral agreements violating Article VIII or impose any import restrictions.  In accordance with Article VIII, a new law on currency regulation was adopted in 1996.  According to this law, all current account operations, including transfers of dividends, interest and other investment income, may be made without restriction.  Only certain outflowing and inflowing capital account operations need to be licensed by, or registered with, the NBK.  Capital inflows are registered and monitored for statistical purposes only, but are not restricted.

Following the influx of U.S. Dollars into Kazakhstan due to, among other things, rising oil prices, a number of steps aimed at liberalising the currency control regime were undertaken in Kazakhstan from 2002 to 2004.  The Law on Currency Regulation and Currency Control and supporting regulations came into effect at the end of 2005, representing a significant milestone towards achieving the liberalisation of currency operations, extension of export of capital and elimination of double control in Kazakhstan.  Among other things, the new currency control rules substantially expanded the classes of Kazakhstan investors that can invest abroad and eased the requirements for international financing in Kazakhstan.

Since 1 January 2007, when certain provisions of the Law on Currency Regulation and Currency Control came into effect, it has become unnecessary to obtain an NBK licence for any foreign currency transactions, including the opening by Kazakhstan residents of accounts with foreign banks. Further, since 1 January 2007, most foreign currency transactions only require notification to the NBK, or are not subject to currency control at all.  Only financial loans (with a non-bank local counterparty), direct investments and certain other capital account operations require registration with the NBK.  With respect to most of their offshore operations, Kazakhstan banks are only obliged to notify the NBK as to the existence of such operations.

### ENFORCEMENT OF FOREIGN JUDGMENTS AND ARBITRAL AWARDS

The Bank is a joint stock company organised under the laws of Kazakhstan and substantially all of its operations are located in the Kazakhstan.  Most of its directors and executive officers reside in Kazakhstan and substantially all of the Bank's assets and the assets of such persons are located outside the United States.  As a result, it may not be possible for Claimants and Euronoteholders to effect service of process within the United States upon the Bank or such persons or to enforce against any of them judgements of U.S. federal or state courts, including judgements predicated upon civil liabilities under the securities laws of the United States or any state or territory within the United States.

The Non-Tenge New Notes and the New Notes Trust Deed will be governed by English law and will provide that any claims, disputes or differences regarding their existence, termination or validity or any non contractual obligations arising out of or in connection with such documents shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration.  The trustee will have an option to elect that such disputes shall be heard instead by the courts of England.

Kazakhstan is a signatory to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards 1958 and, to the extent that a foreign arbitral award is obtained, such award should generally be enforced by Kazakhstan courts (subject to conditions and qualifications provided in the Convention) upon compliance with civil procedures established by Kazakhstani laws on international commercial arbitration for the enforcement of foreign arbitration decisions.

Kazakhstan courts will not enforce any judgement obtained in a court established in a country other than Kazakhstan, unless there is in effect a treaty between such country and Kazakhstan providing for reciprocal enforcement of judgments and then only in accordance with the terms of such treaty.  There is no such treaty in effect between Kazakhstan and the United Kingdom or between Kazakhstan and the United States.

**RISK FACTORS**

*In addition to other information in this Information Memorandum, Claimants should carefully consider the following risk factors when considering the Restructuring Plan.  The risks and uncertainties described below are the principal risks relating to the Bank, the Restructuring, the Kazakhstan banking sector and other relevant matters, however, they are not the only ones the Bank faces.  Additional risks and uncertainties that the Bank is not aware of or that the Bank currently believes are immaterial may also adversely affect the Bank's business, financial condition or results of operations.  If any of the risks or uncertainties described below come to fruition, the Bank's business, financial condition or results of operations, among other things, could be materially and adversely affected.*

*The order in which these risk factors are presented does not necessarily reflect the likelihood of their occurrence or the magnitude of their potential impact on the Bank's business, financial condition, cash flows or results of operations.*

**Risks Relating to the Bank**

***The Bank's results as at and for the year ended 31 December 2009 may have a material and adverse impact on the market price of the New Notes and GDRs.***

Investors should be aware that the Bank has not published any financial statements with respect to any period after 30 September 2009.  The effect of local and global market conditions on the Bank and the Bank's customers and counterparties, as well as the effect of the other events both within and outside the Bank, may cause actual results of operations and financial condition of the Bank as at and for the financial year ended 31 December 2009 or in this Information Memorandum for any period thereafter to be materially and adversely different from the results presented as at and for the nine months ended 30 September 2009.  Accordingly, investors should not assume that the results presented as at and for the nine months ended 30 September 2009 are an accurate indication of the actual results as at and for the financial year ended 31 December 2009 or as at any date or for any period thereafter.

**The Bank is in the process of finalising its financial statements as at and for the year ended 31 December 2009 and if they are published prior to the Claimants' Meeting, the Bank, will publish, if practicable, a supplement to this Information Memorandum.  However, there is no guarantee that the Bank will publish those financial statements prior to the Restructuring.  If no such supplement is published, Claimants should understand that they are participating in the Restructuring on the basis of the information then available and that they are aware of the consequences thereof.  See *"Risk Factors — Risks Relating to the Bank — The Bank's results as at and for the year ended 31 December 2009 may have a material and adverse impact on the market price of the New Notes and GDRs".***

***Any failure to reach and maintain the minimum capital adequacy ratios following the Restructuring could lead to conservation or liquidation of the Bank.***

The Bank is currently in breach of the minimum capital adequacy ratios established by the FMSA.  If the Restructuring is completed as planned, the Bank estimates that its Tier I and total capital adequacy ratios calculated in accordance with FMSA regulations will be 5.3 per cent. and 11.2 per cent., respectively, as at 31 December 2010, compared to the minimum levels of 5.0 per cent. and 10.0 per cent. for Tier I and total capital, respectively, required under the FMSA regulations.  The Tier 1 capital adequacy ratio will further increase to 7.0 per cent. from 1 July 2012 and 8.0 per cent. from 1 July 2013.  Any further deterioration in the quality of the Bank's loan portfolio after the Restructuring and the consequent need to make impairment provisions may cause the Bank's capital adequacy ratios to fall below the minimum levels.

In the event that Samruk-Kazyna ceases to be at least a 10.0 per cent. shareholder in the Bank, the Bank may be subject to increased minimum Tier I and total capital adequacy ratios calculated in accordance with FMSA regulations of 6.0 per cent. (increasing to 8.0 per cent. from 1 July 2012 and

to 9.0 per cent. from 1 July 2013) and 12.0 per cent., respectively. These minimum levels would further increase to 7.0 per cent. and 14.0 per cent. respectively, if the Bank does not have amongst its shareholders a physical person holding at least 10.0 per cent. of the Bank's shares. See "*The Banking Sector in Kazakhstan – Banking Supervision – Capital Adequacy*" for a discussion of the factors that may lead to increased minimum capital adequacy requirements.

Any failure to comply with the minimum capital adequacy ratios, whether because of the deterioration in the quality of the Bank's loan portfolio or an increase in minimum capital adequacy requirements, could lead to sanctions and other measures being applied by the FMSA, including forcing the Bank into conservation or mandatory liquidation.

***The Bank entered into an agreement with the FMSA which may restrict its ability to operate and conduct its business as a financial institution.***

In June 2009, the Bank announced it had recorded negative capital and consequently the Bank and the FMSA entered into the FMSA Agreement pursuant to which the Bank was obliged, among other things, to provide the FMSA with a restructuring plan and to enter into a Term Sheet with the Steering Committee and the FMSA undertook not to apply sanctions and enforcement measures against the Bank, including commencement of liquidation or conservation procedures against the Bank or withdrawal of the Bank's license. Pursuant to the FMSA Agreement, the Bank is restricted from undertaking any mass marketing campaigns. The deadline under the FMSA Agreement for delivery of the restructuring plan was subsequently extended to 18 September 2009 pursuant to Addendum No. 1 to the FMSA Agreement and the deadline for delivery of the Term Sheet was extended to 7 December 2009 under Addendum No. 2 to the FMSA Agreement. See "*The Bank — Background to the Restructuring*".

On 19 April 2010, the Bank and the FMSA entered into a further addendum to the FMSA Agreement whereby the FMSA agreed, among other things, (i) to require the implementation of the measures envisaged by the Restructuring Plan (including the conversion of securities into shares of the Bank) by 1 September 2010 and (ii) to extend until 1 September 2010 its agreement not to apply sanctions and enforcement measures against the Bank under the provisions of Articles 46 and 47 of the Banking Law. For a discussion of the measures that the FMSA may apply to banks under Articles 46 and 47 of the Banking Law, see "*The Banking Sector in Kazakhstan — The FMSA's Compulsory Measures under the Banking Law*".

In the event that the Bank does not comply with its obligations under the FMSA Agreement, the FMSA may apply sanctions and other measures to the Bank, including forcing the Bank into conservation or mandatory liquidation.

***The Bank will be controlled by Samruk-Kazyna, Kazakhstan's sovereign wealth fund, whose interests may differ from the interests of the Bank or the Claimants.***

As the Bank's majority shareholder with 81.5 per cent. (less the Residual Minority Shareholder Percentage) of the Bank's share capital following the Restructuring, Samruk-Kazyna, Kazakhstan's sovereign wealth fund, will be able to control or affect the composition of the Board of Directors, the outcome of any corporate transaction or other matter submitted to the Bank's shareholders for approval, including acquisitions, divestitures, financings or other transactions of the Bank, and could also prevent or cause a change in control. As the Government's sovereign wealth fund, with the goal of supporting and diversifying Kazakhstan's economy, the interests of Samruk-Kazyna may conflict with the interests of the Bank's other shareholders or the Claimants and there can be no assurance that Samruk-Kazyna will exercise influence over the Bank in a manner that is in the best interests of the Bank, the Bank's other shareholders or the Claimants. Although, as part of the Restructuring, a New Charter is to be introduced, the aim of which is to provide Restructuring Creditors who become Shareholders of the Bank with increased protection, some of the provisions expected to be incorporated in the New Charter have never been tested under Kazakhstan law and the Bank gives no assurances that the applicable governmental and regulatory authorities will hold such provisions to be in compliance with Kazakhstani law. See "*Certain provisions of the New Charter may not comply*

*with the requirements of Kazakhstan law and shareholders of the post-restructured Bank may therefore not receive the protections afforded by the New Charter described in this Information Memorandum.*"   In addition, being controlled by the Government may slow the Bank's decision-making process and may subject the Bank to the risk of bureaucracy, corruption and inefficiencies commonly attributed to state-controlled companies.   Furthermore, because Samruk-Kazyna is controlled by the Government, there is a risk that any change of administration in Kazakhstan may result in Samruk-Kazyna's policies changing as well, and such new policies may conflict with the interests of the Bank, its shareholders and the Claimants.  For a description of the ownership of the Bank, see "*Principal Shareholders*".

***The NBK provides funding support to the Bank but may withdraw its support and accelerate repayment of its loans if certain requirements are not met.***

On 17 February 2009, the Bank, the NBK and the FMSA entered into the Cooperation Agreement. Under the Cooperation Agreement, the Bank may apply to the NBK for two types of loans-special purpose loans and refinancing loans secured by the SK Bonds.  As at 30 September 2009, the Bank had borrowed KZT 404,938 million excluding interest as refinancing loans by way of entering into BTA/NBK Repo Transactions with the NBK (and no amounts as special purpose loans) under the Cooperation Agreement.  See "*The Bank — NBK Support*".

Pursuant to the Cooperation Agreement, the Bank is required by the NBK to:

- maintain daily balances of all claims it has against (including loans issued to) non-residents of Kazakhstan in Tenge and Tenge equivalent of foreign currency not higher than KZT 1,046 million (being the actual value of such assets as at 1 November 2007);

- reduce its claims against non-residents of Kazakhstan in respect of issued loans by at least 5 per cent. each quarter;

- not create or increase its share (in absolute values) in any subsidiary and dependent companies located outside Kazakhstan;

- maintain daily balances of its liabilities to non-residents of Kazakhstan in respect of (i) loans granted to it, (ii) deposits of special purpose organisations and (iii) bonds, in Tenge and Tenge equivalent of foreign currency not higher than KZT 1,554 million (being the actual value of such liabilities as at 1 November 2007);

- make efforts to increase the Bank's shareholders' equity; and

- adhere to a conservative credit policy and a moderate deposit policy.

In the event that the Bank breaches these requirements, the NBK may reduce the refinancing limit in relation to the refinancing loans or demand prepayment of the special purpose loans.

***Samruk-Kazyna may demand early repayment of funds allocated to the Bank through the State Finance Programmes if the Bank breaches conditions for the utilisation of the funds.***

The Group has been allocated significant funds by Samruk-Kazyna under the State Finance Programmes.  The Group has received KZT 126,453 million of Government Funding under the State Finance Programmes and, as at 30 September 2009, the Group had utilised KZT 114,097 million, returned to the Government the unutilised amount of KZT 11,771 million and retained for future lending KZT 584 million pursuant to the State Finance Programmes.  See "*The Bank — State Finance Programmes*".  Under the State Finance Programmes, SamrukKazyna has the right to demand early repayment of funds allocated to the Bank if: (i) the Bank does not make timely repayments of debt or interest; (ii) the Bank does not use the proceeds in compliance with their stated purpose; (iii) the Bank's credit rating is downgraded by Fitch, S&P or Moody's by two or more notches; (iv) the Bank infringes the FMSA's prudential requirements at least once in each of two consecutive months or its licence is suspended; (v) more than 10 per cent. of the shares in the Bank are sold or transferred and

such transfer has a negative impact on the Bank's financial condition; or (vi) the Bank reports negative financial results for two consecutive quarters.

If early repayment is demanded as a result of a breach of the requirements of the Bank under any of the above State Finance Programmes, this could have a material adverse effect on the Restructuring and the Bank's business, financial condition, results of operations and prospects generally.

***Internal control weaknesses have been evidenced by several transactions in the past and other unusual transactions may be uncovered in the future.***

In early 2009, the newly appointed management of the Bank conducted a due diligence review of the Bank's loan portfolio, which uncovered numerous suspicious transactions between the Group and entities believed to be affiliated with former management of the Bank.  The Bank has uncovered a significant number of loans that at present appear to have been provided on preferred terms to companies connected with former management and for which the security provided was inadequate or non-existent.  In addition, the Bank has uncovered numerous examples of purported loans being granted that do not appear to have gone through the proper approval process within the Bank.  Furthermore, certain loan documentation, including collateral and associated agreements, primarily relating to financing of projects outside Kazakhstan, is no longer available and many loans were unlawfully transferred to new borrowers often offshore and no collateral was provided by the new borrowers, so the loans are unsecured.

Under the previous management, the Bank had two regional credit committees, which were separate from the Bank's main credit committee but nevertheless approved loans that were to be granted by the Bank.  The Bank believes that many loans that were purportedly approved by these credit committees were granted applying practices which were wholly inadequate and which differed significantly from the practices typically used by the Bank's main credit committee.

A number of significant borrowers, primarily registered outside of Kazakhstan, stopped making payments in 2009 and the Bank has been unable to monitor the collateral (if any) or their financial performance.  Many of these borrowers have also ceased to communicate with the Bank and some have unlawfully transferred the collateral secured by the loans.

The Bank had also entered into derivatives contracts with certain offshore companies, which exposed the Bank to excessive credit risk and have become uncollectible.  The offshore counterparties have ceased to respond to the Bank's inquiries.  The current management suspects that these contracts were entered into on behalf of the Bank through actions of the former management in contravention of then existing internal controls and in order to circumvent such controls.  The current management has decided to fully provision against receivables on these derivative contracts as at 31 December 2008 for KZT 16,298 million.  For a complete discussion of internal control weaknesses, see "*The Bank — Background to the Restructuring — Factors Affecting Deterioration of Bank's Loan Portfolio — Internal Factors*".

Although the Bank has improved its systems to address the deficiencies in the internal control systems, there can be no assurance that such new systems will be effective and that the Bank will not suffer losses from the failure of these controls to detect or contain operational risk in the future.  Similar to other Kazakhstan banks, the Bank is susceptible to, among other things, fraud by employees or outsiders, unauthorised transactions by employees and operational errors, including clerical or record keeping errors and errors resulting from faulty computer or telecommunications systems.  Given the Bank's high volume of transactions, errors may be repeated or compounded before they are discovered and rectified.  In addition, the Bank's IT systems do not fully support its operations and a number of transactions are not fully automated, which may further increase the risk that human error or employee tampering or manipulation will result in losses that may be difficult to detect.  Consequently, the inadequacy of the Bank's internal processes or systems may result in unauthorised transactions and errors not being detected.  Further, the Bank's insurance may not cover the Bank's losses from such transactions or errors, which may have a material adverse effect on the Bank's financial condition or results of operations.

*Transactions with unidentified Related Parties may cause future losses.*

Certain customers and counterparties of the Bank may not have been properly identified as related parties. The Bank was unable to obtain appropriate evidence as to whether certain entities are related parties as at 30 September 2009 and 31 December 2008 and cannot therefore be sure that all customers and counterparties that are related parties have been disclosed. Given the internal control weaknesses in the Bank, related party transactions with unusual terms not known as at the date of this Information Memorandum may be uncovered in the future and may have further adverse effects on the Bank's financial condition and recovery prospects.

*Declines in customer deposits, which are an important source of funding for the Group, have negatively affected and may continue to negatively affect the Group's funding base.*

The Group has experienced significant outflows of customer deposits since January 2009. The Group's retail deposits decreased by 40.3 per cent. from KZT 307,345 million as at 31 December 2008 to KZT 183,552 million as at 30 September 2009. The Group has also experienced a significant outflow of private corporate and SME deposits (i.e., deposits from entities other than Samruk-Kazyna and its subsidiaries) during the same period. Such deposits decreased by 64.9 per cent. from KZT 364,482 million as at 31 December 2008 to KZT 128,093 million as at 30 September 2009. Due to deposits totalling KZT 150,329 million which were placed in February 2009 and March 2009 by Samruk-Kazyna and throughout the period by subsidiaries of Samruk-Kazyna, the deposits by Samruk-Kazyna and its subsidiaries (which includes amounts deposited pursuant to the State Finance Programmes) increased by 73.5 per cent. from KZT 214,225 million as at 31 December 2008 to KZT 371,636 million as at 30 September 2009 and the Group's total deposits decreased by only 22.9 per cent. from KZT 886,052 million as at 31 December 2008 to KZT 683,281 million as at 30 September 2009.

If decreases in retail and corporate deposits continue after the Restructuring and/or if Samruk-Kazyna withdraws some or all of the deposits made by it with the Bank, the Group will face significant difficulties and may be unable to carry on its business as other sources of funding, both domestically and in the international markets, may not be readily available.

*Lower expected growth of Kazakhstan's GDP in 2010 could put increasing pressure on the ability of the Bank's existing borrowers to repay their loans.*

The Government expects the growth of Kazakhstan's GDP to remain slow throughout 2010 as a result of the slow economic recovery, unpredictable commodity prices, volatility in the real estate market, reduced access to credit for both corporates and households and the general weakening of business and consumer confidence in Kazakhstan. The Bank expects that lower GDP growth will put increasing pressure on the ability of its current borrowers to repay their existing loans and could therefore increase the Bank's losses from non-performing loans, which could adversely affect the Bank's business, financial condition, results of operations and prospects.

*Concentration of the Bank's loan portfolio subjects it to risks from exposure to particular sectors of the Kazakhstan economy.*

As at 30 September 2009 and 31 December 2008, the Group's ten largest borrowers accounted for 15.2 per cent. and 14.0 per cent., respectively, of gross loans and advances compared to 11.0 per cent. as at 31 December 2007. Although the Group's level of concentration in its lending base is relatively low when compared with its competitors, the Bank will need to monitor the concentration of its loan portfolio and if it does not do this effectively, its credit exposure could increase, which would have a material adverse effect on the Bank's business, results of operations and financial condition.

*Volatility in the real estate market in Kazakhstan has had and may continue to have an adverse effect on the Bank's asset quality and collateral value.*

Real estate prices in Kazakhstan and Russia, which increased rapidly from 2002 to 2007, have dropped sharply since June 2007 in Kazakhstan and 2008 in Russia. Such volatility in the real estate

market has had and may continue to have an adverse effect on the Bank's business, financial condition, results of operations and prospects.

Of the loans to the Group's ten largest borrowers, 37.0 per cent. were made to borrowers in the real estate sector (civil construction and real estate operations) as at 30 September 2009.  In addition, a substantial number of the Bank's loans to customers are secured by real estate.  As at 30 September 2009, 24.9 per cent. of net loans to customers of the Bank on an unconsolidated basis were collateralised by real estate.  The recent declines in the price of real estate in Kazakhstan have increased the price volatility and consequently have made it difficult to value certain collateral held by the Bank.  The collateral value ultimately realised by the Bank in the event of foreclosure of these customer loans will depend on the fair value as determined at that time and may be materially different from the current or estimated fair value.  Also, the real estate market in Kazakhstan suffers from low liquidity and the Bank may be unable to liquidate its real estate collateral in a reasonably short time frame.  As a result, in the event that a portion of the Bank's loans to customers secured by real estate go into default, the Bank may not be able to recoup the full value of the loan by taking ownership and disposing of the underlying real estate, which may result in a material adverse impact on the Bank's results of operations and financial condition.

***The continuing decline in value of the Group's loan portfolio will likely lead to a gradual seasoning of the Group's loan portfolio which may increase the proportion of loan defaults.***

Because corporate banking relationships are relatively mature in Kazakhstan, the value of the Group's net loan portfolio decreased by 31.5 per cent. to KZT 1,107,241 million as at 30 September 2009 from KZT 1,617,063 million as at 31 December 2008, which in turn represented a decrease of 32.1 per cent. from KZT 2,379,810 million as at 31 December 2007.  As the Group's loan portfolio is expected to continue to decline in value, it is likely to lead to a gradual seasoning of the Group's loan portfolio,  with the concentration of older loans in the portfolio becoming more significant.  There is some evidence that the likelihood of borrower default increases with the age of a loan.  Therefore, as a result of the expected gradual seasoning of its loan portfolio, the Group could experience a further increase in the percentage of its loans which are non-performing after the Restructuring which could adversely affect the Bank's business, financial condition, results of operations and prospects.

***The Bank faces significant competition, which may increase in the future.***

The Bank is subject to significant competition from both domestic and foreign banks.  As at 1 March 2010, there were 37 commercial banks in Kazakhstan (excluding Zhilstroysberbank), of which 19 were banks with foreign shareholders, including the subsidiaries of foreign banks.  In addition, regulatory changes may make it easier for foreign banks to increase their market presence in Kazakhstan.  As at 1 March 2010, the Bank's net assets constituted 17.0 per cent. of the total assets of the banking system in Kazakhstan.

There are relatively few large corporate customers that do not have established banking relationships, which means that competition is intense in the corporate sector.

In the past, the Bank has faced competition primarily from banks which focus on the corporate banking market, including Kazkommertsbank and ATF Bank.  According to the FMSA, as at 1 March 2010, the Bank is currently the largest bank in Kazakhstan, as measured by the aggregate gross value of loans issued.  As a result of the ongoing financial crisis, the Bank faces greater competition from other banks as larger banks in more stable financial positions will aim to increase their market shares in all sectors of the market.  In particular, the Bank faces competition attracting and retaining individual depositors.

***Any failure of, interruption in, or breach of, the Bank's information systems, or any failure to properly implement or update such systems, may have a material adverse effect on the Bank's business, results of operations and financial condition.***

The Bank's information technology strategy focuses on the integration of its business needs and information technology capabilities, while maintaining cost effective and safe systems. In recent years, the Bank has built a highly productive and reliable technology environment, located in two data centres in Almaty. The Bank has also developed and implemented disaster recovery and backup strategy. The Bank is certified under ISO 27001, an international quality standard.

The Bank relies heavily on information systems to conduct its business. However, it has currently suspended implementation of non-critical information technology projects and implemented a moratorium on the purchase of property and equipment. There can be no assurance that the Bank will resume implementation of these projects, that implementation of improved information technology systems, if resumed, will be developed according to schedule, that the new systems will address any shortcomings of the current systems or that they will be sufficient to meet the needs of the Bank's rapidly growing and changing business.

Due to the Bank's financial condition, the Bank has stopped work on the implementation of the new core banking system. Despite the fact that the existing systems can handle the current volume of operations and have substantial reserves for processing as reflected in the Bank's business plan for the period until 2014, there is a risk that competitors may develop their information technologies faster and more successfully than the Bank.

Due to the degree of penetration of information technologies in the business processes of the Bank, any failure of, interruption in, or breach in security of, the Bank's systems could result in failures or interruptions in the Bank's risk management, deposit servicing and/or loan origination systems or errors in its accounting books and records. The occurrence of any failures or interruptions or the failure to properly implement or upgrade any of the Bank's information technology systems could have a material adverse effect on the Bank's business, results of operations or financial condition. Furthermore, the location of both of the Bank's data centres in Almaty subjects the Bank to risk of loss due to destruction from earthquakes.

***The Bank's risk management strategies and techniques expose the Bank to a number of unidentified or unanticipated risks.***

Although the Bank expects to invest substantial time and effort in improving and monitoring its risk management strategies and techniques, it may nevertheless fail to adequately manage risks under certain circumstances, particularly when it is confronted with risks that it has not identified or anticipated. If circumstances arise that the Bank has not identified or anticipated in developing its statistical models, its losses could be greater than expected. If its measures to assess and mitigate risk prove insufficient, or if its models yield inaccurate results or incorrect valuations, the Bank may experience material unexpected losses. For example, assets that are not traded on public trading markets, such as derivative contracts between banks, may be assigned values using mathematical models which may be inadequate or imperfect and the values they generate may be incorrect. The deterioration in value of assets like these could lead to losses that the Bank has not anticipated.

***The Bank is exposed to interest rate and foreign currency exchange risk and has significant exposure to foreign currency exchange rate fluctuations following the early termination of its swap transactions.***

The Bank, like other commercial banks in Kazakhstan, is exposed to risks resulting from mismatches between interest rates on its interest bearing liabilities and interest earning assets as well as risks resulting from fluctuations in the prevailing foreign currency exchange rates.

Between 2005 and 2008, the Group hedged its foreign currency and interest rate risks using cross-currency swaps and interest rate swaps. As at 31 December 2008, the Group had cross-currency

swap transactions concluded with foreign banks with a total notional amount of KZT 136,115 million and interest rate swap transactions with foreign banks for a total notional amount of KZT 462,318 million.

In the first half of 2009, nearly all of the Group's cross-currency swap counterparties exercised their right to terminate the swaps early, as a result of which the Group incurred a total loss of KZT 2,210 million. The Group's foreign currency exchange exposure increased immediately after the early termination of the cross-currency swaps. Currently the Bank has significant exposure to foreign currency exchange rate fluctuations because it has not entered into new hedges. The Bank anticipates that following the completion of the Restructuring it will enter into transactions to hedge against foreign currency exchange risk in order to comply with the NBK's and the FMSA's requirements related to the open foreign currency position of the Bank as required by the terms and conditions of the New Notes.

The notional amount of the Bank's interest rate swaps also decreased during the same period, by 48.3 per cent. from KZT 462,318 million as at 31 December 2008 to KZT 238,800 million as at 30 September 2009.

***The Bank's credit dossiers have serious gaps and many documents are missing.***

Regulations of the FMSA and the Bank's internal regulations set out certain requirements when creating credit dossiers in respect of borrowers of a bank. See "*Asset and Liability Management — Lending Policies and Procedures — Credit Dossiers*". In the course of its due diligence, the Bank's management has uncovered a significant number of purported loans that at present appear to have been provided on preferred terms to companies connected with former management and for which the security provided was inadequate or nonexistent. In the Financial Statements for the year ended 31 December 2008 and the FMSA report provided in January 2009, the Bank and the FMSA, respectively, each noted that certain loan documentation, including collateral and associated agreements, primarily relating to financing of projects outside Kazakhstan, was no longer available. The Bank attributes many of these gaps and missing documents to fraud and to the fact that, prior to February 2009, the credit dossiers for transactions involving purported projects outside Kazakhstan had been compiled on behalf of the Bank by associate banks such as BTA Russia and BTA Ukraine. The Bank believes that there is a significant risk that, as these associate banks were and still are under the effective control of the previous management of the Bank, a number of documents may not become available to the Bank and that the veracity of documents which are or become available may be questionable. Furthermore, deficiencies exist in the credit dossiers compiled by the Bank itself. See "*The Bank — Background to the Restructuring — Factors Affecting Deterioration of Bank's Loan Portfolio — Internal Factors*". These gaps in credit dossiers seriously impede the Bank's ability to investigate and, if necessary, to issue claims relating to these purported loans.

***The Bank's success is dependent on the continued service of its key personnel and it may not be able to retain such personnel.***

The Bank appointed new senior management in 2009 to oversee implementation of its strategy and its day-to-day operations. The banking industry is relatively new in Kazakhstan and there are a limited number of experienced banking managers in the country. There is also a high level of competition for the services of these individuals. While the Bank believes it has been successful in attracting skilled and motivated employees and officers, it may be at risk of losing qualified personnel in this increasingly competitive environment. The loss of the Bank's senior management for any reason could have a material adverse effect on the Bank's business, results of operations and financial condition.

**Risks Relating to Operating within the Kazakhstan Banking Sector**

***It is not possible to predict the full impact on the Bank of the financial stability laws in Kazakhstan, which are currently in the early stages of implementation.***

On 23 October 2008, the Kazakhstan Parliament adopted the law "Introduction of Amendments and Addendums into certain Legislative Acts of the Republic of Kazakhstan Governing the Stability of the Financial System."  The law introduced numerous amendments to the Banking Law, the JSC Law and the Securities Market Law.

The main objectives of this new law are to improve mechanisms for the early detection of risks in the financial system, to provide powers to the Government to acquire shares in commercial banks that face financial problems and to generally improve the condition of financial institutions in Kazakhstan. The law also consolidates authority to oversee large second-tier Kazakhstan banks and provides additional mechanisms for supervising commitments made by banks and other financial institutions.

Under the new law, in the event of (i) a breach by a bank of capital adequacy or liquidity ratios or (ii) two or more breaches by a bank in any 12-month period of any other prudential or other mandatory requirements, the Government may, with the agreement of the FMSA, acquire, either directly or through the national management holding company (currently, Samruk-Kazyna), the authorised shares of such bank to the extent necessary (but not less than 10 per cent. of the total amount of issued and outstanding shares of such bank, including those to be acquired by the Government or the national management holding company) to improve such bank's financial condition and ensure compliance with prudential or other mandatory requirements.  The new law provides that capital increases required in order to accomplish such an acquisition do not require approval of the shareholders or the management and the existing shareholders of an affected bank do not have pre-emptive rights in relation to the newly issued shares.  Following such an acquisition, the state body authorised to manage state property, or the national management holding company, is authorised to appoint no more than 30 per cent. of the members of the board of directors and the management board of the affected bank.

Should the financial status of the affected bank improve resulting in compliance with prudential norms, the Government may take measures to sell the acquired shares by way of a direct addressed sale or auction at the stock exchange.  The financial system stability law is currently in the early stages of its implementation and it is not possible to predict its full impact on the Bank.

***Changes in the liquidity support for the Kazakhstan banking sector may have an adverse impact on the Bank.***

The NBK and the Government have taken steps, including the provision of short term liquidity support, to protect the Kazakhstan banking sector from the recent turmoil in the financial markets. Starting in the second half of 2008, the NBK adopted a number of measures aimed at providing additional liquidity to the banks.  In particular, with effect from 3 March 2009, the minimum level at which second tier banks must maintain reserves has been decreased from 2.0 per cent. to 1.5 per cent. with respect to domestic liabilities and from 3.0 per cent. to 2.5 per cent. with respect to other liabilities.  On 30 November 2009, the NBK Management Board reduced the obligatory reserve ratio requirement applicable to the Bank to zero per cent. for both internal and external liabilities.  The reduced ratio will remain in effect until the Restructuring process is finalised.

Additional measures taken include the deposit into local commercial banks, of temporary excess cash of national companies, enterprises and joint stock companies which are wholly or partially owned by the State or controlled by the NBK and the establishment by the Government of a Distressed Assets Fund to buy doubtful assets of commercial banks.

If the NBK and the Government were to withdraw their liquidity support it would lead to decreased overall liquidity in the Kazakhstan banking sector.  This decreased liquidity would likely result in an

increase in the Bank's funding costs which would adversely affect the Bank's business, financial condition, results of business and prospects.

***Risks resulting from failures in Kazakhstan's banking industry could adversely affect the Bank.***

Since the peak of the banking crisis at the beginning of 2009, Alliance Bank, Temirbank and the Bank, which jointly owned 35.6 per cent. of the total assets of the banking system in Kazakhstan as at 1 January 2009, have defaulted on their contractual payments and breached certain regulatory requirements of the FMSA.  Astana Finance, which is a non-bank financial holding company that owns companies that provide lease financing and commercial and residential mortgages and is more than 26 per cent. owned by the state, announced a moratorium on the repayment of its debt in May 2009.

In April 2010, the Court issued an order confirming the completion of Alliance Bank's restructuring, making Alliance Bank the first bank in Kazakhstan to complete its restructuring.  Temirbank has announced that its restructuring plan was approved on 31 March 2010 by the requisite majority of its creditors.  The Kazakhstan banking system remains under stress with banks seeking to deleverage through partial repayments and debt restructurings.  Further defaults and debt restructuring cannot be ruled out.  This could in turn have an adverse effect on the Restructuring and the Bank's ability to receive support from Samruk-Kazyna, as the Government's resources may become strained and the Government may be required to allocate support and funds selectively.

***The ongoing crisis in the global financial markets and deterioration of general economic conditions have adversely affected the Bank's results of operations and financial condition and could continue to cause them to decline.***

The global economy and the global financial system have experienced a period of significant turbulence and uncertainty in recent years, particularly the severe disruption of the financial markets around the world that began in August 2007 and that has substantially worsened since September 2008 with adverse consequences for many large global commercial and investment banks, insurance companies and other financial institutions.  This disruption has severely impacted general levels of liquidity and the availability of credit together with the terms on which credit is available.  Governments around the world, including that of Kazakhstan, have sought to inject liquidity into banking systems and to recapitalise their banking sectors to reduce the risk of systemic failure and increase confidence in the financial markets.

This market disruption has also been accompanied by a slowdown in many economies including that of Kazakhstan.  These developments have already adversely affected the Bank's earnings and profits.  Continued general deterioration in the world economy, including plummeting production and services, business and consumer confidence, plunging pace of growth of household income, unemployment trends, the state of the housing market, the commercial real estate sector, equity markets, bond markets, foreign exchange markets, counterparty risk, inflation, the availability and cost of credit, lower transaction volumes in key markets, the liquidity of the global financial markets and market interest rates, would further reduce the level of demand for, and supply of, the Bank's products and services, would lead to lower realisations as well as writedowns and impairments of investments and negative fair value adjustments of assets, and could materially and adversely impact the Bank's operating results, financial condition and prospects.

The Kazakhstan banking sector has been particularly affected by the lack of availability of international wholesale debt financing and the volatility of deposits.  Kazakhstan banks have previously heavily relied on such financing and deposits as a source of funding.  The high dependence on capital market funding poses a significant refinancing risk for both individual banks and the banking system as a whole.  Wholesale debt financing has now become significantly more expensive.  If the availability of international wholesale debt financing continues to be limited or available at significantly higher costs or if the Bank suffers from increased volatility of its deposit base, this could adversely affect the Bank's business, financial condition, results of operations and prospects.  The

effect of any of these conditions may be exacerbated by the deterioration of the financial condition of other banks in Kazakhstan.

The full range and consequences of the risks faced by the Bank are difficult to predict and guard against in view of the fact that many of those risks are either partially or entirely outside the control of the Bank and may be exacerbated by the severity of the financial crisis.

***The Bank faces increased risks related to the devaluation of the Tenge.***

A large proportion of the Bank's funding base is made up of borrowings in currencies other than Tenge whereas the vast majority of its income is in Tenge. While the proportion of the Bank's funding base denominated in currencies other than Tenge will decrease after the Restructuring, it will remain significant.

On 4 February 2009, the NBK reduced its level of support for the Tenge/U.S. Dollar exchange rate from KZT 117 — KZT 123 to 1 U.S. Dollar to KZT 150 to 1 U.S. Dollar (+/- 3 per cent.). This devaluation was due in part to recent pressure on the balance of payments of Kazakhstan as a result of a decline in commodity prices (in particular oil and gas) in the international markets. The devaluation of the Tenge was also intended to enhance the competitiveness of Kazakhstan goods in the export market. From 5 February 2010 a new exchange rate corridor began to operate. In light of the state of world trade and currency markets, and in order to make the setting of exchange rates more flexible, the NBK has indicated that it will widen the KZT corridor until 20 March 2011 to allow fluctuations from a base rate of KZT 150 to 1 U.S. Dollar of + 10 per cent. (i.e. up to KZT 165 to 1 U.S. Dollar) and -15 per cent. (i.e. down to KZT 127.5 to 1 U.S. Dollar). This policy decision makes the Tenge/U.S. Dollar exchange rate more difficult to predict in the immediate future and could lead to a further devaluation of the Tenge.

This devaluation increased the cost of foreign borrowings for the Bank. Further, the devaluation of the Tenge will likely affect the Bank's costs as the majority of the Bank's funding base is denominated in U.S. Dollars, whereas income from its loan portfolio is typically denominated in Tenge. A further devaluation or depreciation of the Tenge against the U.S. Dollar or other foreign currencies could negatively affect the Bank in a number of ways, including, among other things, by causing a further outflow of Tenge deposits, by increasing the actual cost to the Bank of financing its U.S. Dollar denominated liabilities and by making it more difficult for Kazakhstan borrowers to service their U.S. Dollar loans. Any of these developments may have a material adverse effect on the Bank's business, financial condition and results of operations.

***The lack of accurate statistical, corporate and financial information in Kazakhstan may limit the ability of the Bank to assess its credit risks accurately.***

Kazakhstan's system for gathering and publishing statistical information relating to the Kazakhstan economy generally, or specific economic sectors within it, or corporate or financial information relating to companies or other economic enterprises, is not as comprehensive as those of many countries with established market economies. Moreover, the Bank's customers, particularly in the SME sector, may not have detailed financial information regarding their creditworthiness. Under-reporting of income in Kazakhstan, which is common, also makes it more difficult for the Bank to make accurate credit assessments. Thus, the statistical, corporate and financial information, including annual financial statements and recognised debt rating reports, available to the Bank as well as other Kazakhstan banks relating to prospective and existing corporate borrowers or other clients makes the assessment of credit risk, including the valuation of collateral, more difficult. Although the Bank ordinarily estimates the net realisable value of collateral in determining any collateralisation requirements, the difficulties associated with accurately assessing the post-enforcement value of collateral may result in the Bank extending loans without the necessary collateral to support them.

The First Credit Bureau is a private company that was created on 29 July 2004 by the Bank, Kazkommertsbank, Bank CenterCredit, Halyk Bank, Tsesna Bank, ATF Bank, Alliance Bank, Astana Finance and the Association of Financiers of Kazakhstan pursuant to the "Law on Credit Bureaus and

Credit History" of Kazakhstan dated 6 July 2004. The First Credit Bureau manages a database containing the credit histories of individuals and legal entities in Kazakhstan. The FMSA requires all credit institutions to provide information about their borrowers to the First Credit Bureau. Commercial banks can then purchase information about potential or existing borrowers from the First Credit Bureau. The First Credit Bureau charges a case-by-case fee on each request made by a bank for information depending on the amount of detail requested by the bank with respect to the individual borrower. Although the FMSA's requirement to provide information to the First Credit Bureau should ensure that the Bureau's records are comprehensive and up to date, there can be no assurance that all banks do indeed comply with this requirement or that the information is ultimately accurate and reliable.

***Banking regulations in Kazakhstan are not as developed as in many Western countries and any further changes thereto might adversely affect the Bank's business.***

The Bank operates in a highly regulated environment. However, like most of Kazakhstan's legislation regarding business activities, Kazakhstan's laws regarding banks and banking activities have been adopted only relatively recently and are subject to change, which could be rapid and unexpected. It is difficult to forecast how changes in banking and financial regulation may affect the Kazakhstan banking system, and no assurance can be given that the regulatory system will not change in a way that will impair the Bank's ability to provide a full range of banking and financial services, thus materially and adversely affecting the Bank's financial condition or results of operations.

In addition, Claimants should understand that regulatory standards applicable to banks in Kazakhstan and the oversight and enforcement thereof by the relevant regulators may differ from those applicable to banking operations in countries with more developed regulatory regimes. As a result, Claimants may not have the benefit of all of the protections available in such other countries.

In February 2007, to reduce the risks associated with rapid growth in the external debt of Kazakhstan banks, the FMSA introduced certain amendments to Kazakhstan's capital adequacy regulations. These regulations limit the total amount of foreign borrowings which a bank may incur to a multiple of such bank's regulatory capital. Although the Bank fully complies with those particular regulations as of the date hereof, this limitation on the Bank's ability to access foreign lenders and the international capital markets may adversely affect the Bank's ability to secure adequate financing in the future. See "*The Banking Sector in Kazakhstan*".

The future implementation by the FMSA of the recommendations of the Basel II Report may impose constraints on the Bank's business which may materially and adversely affect the Bank's business and financial condition or results of operations. See "*The Banking Sector in Kazakhstan — Banking Supervision*".

**Risks Relating to Kazakhstan**

***Kazakhstan is subject to the risks associated with emerging markets generally.***

Emerging markets such as Kazakhstan are subject to greater risk than more developed markets, including in some cases significant legal, economic and political risks. Claimants should also note that emerging economies such as that of Kazakhstan are subject to rapid change and that the information contained in this Information Memorandum may become outdated relatively quickly. Accordingly, Claimants should exercise particular care in evaluating the risks involved and must decide for themselves whether, in light of those risks, their decision is appropriate. Claimants are urged to consult with their own legal and financial advisers before making any decision with respect to the Restructuring.

In addition, the availability of credit to entities operating within the emerging markets is significantly influenced by the level of investor confidence in such markets as a whole and as such any factors that affect investor confidence (for example, a decrease in credit ratings or state or central bank

intervention in one market) could affect the price or availability of funding for entities within any of these markets.

***The Kazakhstan corporate governance and disclosure laws which apply to the Bank are different from those generally applicable to corporations organised in the United States, the United Kingdom and other jurisdictions.***

The Bank's governance is regulated by the laws governing companies incorporated in Kazakhstan and by the Bank's Charter and Corporate Governance Code. The Bank's corporate governance policies were not particularly sophisticated in the past, which contributed to deficiencies in the Bank's internal control and credit system. See "*Risks Relating to the Bank — Internal control weaknesses have been evidenced by several transactions in the past and other unusual transactions may be uncovered in the future*". The corporate governance regime in Kazakhstan is less developed than that in the United States and the United Kingdom and the rights of shareholders and the responsibilities of members of the board of directors and the management board under Kazakhstan law are different from those generally applicable to corporations organised in the United States, the United Kingdom and other jurisdictions.

A principal objective of the securities laws of the United States, the United Kingdom and certain other countries is to promote the full and fair disclosure of all material corporate information to the public. Although the Bank is subject to certain disclosure requirements under Kazakhstan law, these requirements are less stringent than the comparable requirements in the United States, the United Kingdom and certain other jurisdictions and, therefore, there is less information publicly available about the Bank than would be required if the Bank were organised in the United States, the United Kingdom or certain other jurisdictions.

The Government has stated that it intends to continue to reform the corporate governance regulations with a view towards increasing disclosure and transparency in the corporate sector in order to promote growth and stability. However, the Government may not continue to pursue such a policy in the future or such policy, if continued, may not ultimately prove to be successful. It is not possible to predict the effect of future legislative developments on the Bank.

The Bank is in the process of improving its corporate governance and will adopt a New Corporate Governance Code on or before the Restructuring Date. The New Corporate Governance Code will include provisions on the role and responsibilities of the members of the Board of Directors, their selection procedures and the monitoring of their performance, the Bank's internal controls and risk management and the Bank's disclosure and reporting obligations to its shareholders following the Restructuring. Following the Restructuring, the Bank will also arrange for an annual audit of the Bank's corporate affairs and governance policies by an Independent Auditor and remedy any identified non-compliance within six months of the date of such audit report.

While the planned improvements should bring the Bank's corporate governance standards closer to those in the United States and the United Kingdom, there can be no assurance that such amended governance standards will prove to be effective or that they will be implemented in a proper manner.

***The Bank may be subject to money laundering risks.***

The existence of "black" and "grey" market economies in Kazakhstan (typical in developing countries), inconsistent legislation and the lack of administrative guidance on its interpretation increase the risk of Kazakhstan's financial institutions being used as vehicles for money laundering.

The Parliament of Kazakhstan has recently adopted the Law of the Republic of Kazakhstan On the Prevention of Legalisation (Laundering) of Illegal Income and Terrorism Financing No. 191-IV dated 28 August 2009. This law became effective on 8 March 2010.

The new law identifies various types of transactions that will be subject to financial monitoring and establishes thresholds for each of them, such as (i) exchanges of cash equalling or exceeding the equivalent of KZT 7 million, (ii) withdrawing funds from, or crediting funds to, bank accounts

equalling or exceeding the equivalent of KZT 7 million, (iii) insurance payments equalling or exceeding the equivalent of KZT 7 million, (iv) transactions in securities or immovable property equalling or exceeding the equivalent of KZT 45 million and (v) receiving funds, including in electronic form, through the proceeds of betting, gambling in a gaming establishment or lottery equal to or more than the equivalent of KZT 1 million.  Banks, pension funds, insurance and reinsurance companies and certain other financial institutions and individuals are obliged to monitor any such transactions entered into by their clients by conducting due diligence as outlined in the law with respect both to the clients and the transaction.  If it is not possible to conduct such due diligence, the financial institution must prevent their clients from entering into such a transaction.  The law requires any suspicious transaction to be reported to an authorised state body within 24 hours.

The Bank has implemented measures aimed at preventing it from being used as a vehicle for money laundering, including "know your client" policies and the adoption of anti-money laundering and compliance procedures in all its branches.  In particular, the Bank has created an office for the introduction of a financial monitoring and internal control system whose task is to develop an appropriate program to verify clients and other persons participating in bank operations, and a procedure for working with foreign public officials, to identify suspicious operations and operations requiring financial monitoring, and to provide training to employees of the Bank on anti-money laundering and financial terrorism issues.  The Bank is currently not establishing business relationships with non-resident banks that do not have constantly active management bodies in the countries in which they are registered, is not opening accounts for potential clients who do not submit the necessary identification documents, and is closely monitoring relationships with residents of countries that have not fulfilled the Financial Action Task Force recommendations in full.

However, there can be no assurance that attempts to launder money through the Bank will not be made or that anti-money-laundering measures implemented by the Bank will be effective.  If the Bank were associated with money laundering, albeit only through the failure of its anti-money laundering measures, or if it were unable to comply with all of the relevant laws and internal policies regarding financial assistance or money laundering, it could be subject to significant fines as well as harm to its reputation, and its business, financial condition and results of operations may be materially and adversely affected.

***Most of the Bank's operations are conducted, and most of its assets are located, in Kazakhstan. Accordingly, the Bank's financial position and its results of operations are substantially dependent on the legal, economic and political conditions prevailing in Kazakhstan.***

Kazakhstan became an independent sovereign state in 1991 as a result of the dissolution of the former Soviet Union.  Since then, Kazakhstan has undergone significant change as it has emerged from a single party political system and a centrally controlled command economy to a market oriented, democratic model.  The transition was initially marked by political uncertainty and tension, a recessionary economy marked by high inflation, instability of the local currency and rapid, but incomplete, changes in the legal environment.

Since 1992, Kazakhstan has actively pursued a programme of economic reform designed to establish a free market economy through privatisation of state enterprises.  However, as with any transition economy, there can be no assurance that such reforms and other reforms described elsewhere in this Information Memorandum will continue or that such reforms will achieve all or any of their intended aims.  Kazakhstan depends on neighbouring countries to access world markets for a number of its major exports, including oil, gas, steel, copper, ferro alloys, iron ore, aluminium, coal, lead, zinc and wheat.  Kazakhstan is thus dependent upon good relations with its neighbours to ensure its ability to export and has taken various steps to promote regional economic integration among neighbouring countries.  In September 2003, Kazakhstan signed an agreement with Ukraine, Russia and Belarus for the creation of a single economic zone, which was expected to result in common economic policies, harmonisation of legislation implementing such policies and the creation of a single commission on trade and tariffs.  However, in practice this agreement has proved difficult to implement, particularly since the first half of 2008, when Ukraine's joining of the World Trade Organisation effectively

precluded it from joining this single economic zone.  Negotiations nevertheless continued on integrating the policies and legislation of the CIS countries and in 2009, Kazakhstan, Russia and Belarus created a customs union.  The aim of this customs union is to create a free customs area within which member countries would enjoy free movement of goods, services, capital and labour.  The member countries also intend to harmonise their fiscal, credit and currency policies to support further economic integration with the CIS countries and to assure continued access to export routes.  However, should access to export routes be materially impaired, this could adversely affect the economy of Kazakhstan.  Moreover, adverse economic factors in the markets of such member countries may adversely affect Kazakhstan's economy.

Although Kazakhstan has in the recent past enjoyed relative political stability, it could be adversely affected by political unrest in the Central Asian region.  Additionally, in common with other countries in Central Asia, Kazakhstan could be adversely affected by terrorism or by military or other action taken against sponsors of terrorism in the region.

According to figures compiled by the NSA, GDP grew in real terms following the adoption of a floating exchange rate policy in April 1999, increasing by 13.5 per cent. in 2001, 9.8 per cent. in 2002, 9.3 per cent. in 2003, 9.6 per cent. in 2004, 9.7 per cent. in 2005, 10.7 per cent. in 2006 and 8.9 per cent. in 2007. In 2008, GDP increased by only 3.3 per cent.  According to preliminary NSA data, GDP increased by 1.2 per cent. in 2009.

The beginning of 2010 saw certain positive economic signs: for instance, the rate of GDP growth for the first two months of 2010 according to preliminary data of the NSA was 6.4 per cent. higher than for the equivalent period of 2009.  However, the Kazakhstan economy remains heavily dependent upon the prices of commodities on world markets, which are currently volatile.

According to estimates of the NBK and the Government, a further reduction in inflation pressures is not expected for the remainder of 2010.  A planned rise in wages, social benefits and pensions may raise consumer demand.  In addition, it is conceivable that certain types of imported products could become more expensive because of a rise in customs duties on imports introduced as a result of the creation of the customs union between Kazakhstan, Russia and Belarus.  Although the condition of the financial market in Kazakhstan is expected to gradually improve throughout 2010, there is unlikely, given the lingering economic and financial risks, to be a sharp increase in the credit activity of banks or a material improvement in the quality of their credit portfolio, and the further development of the economy of Kazakhstan will depend on a variety of factors.  Were the economic situation to deteriorate further, consequences would include higher unemployment, reduced corporate profitability, increased corporate insolvency rates, increased personal insolvency rates and increased interest rates.  This in turn may reduce borrowers' ability to repay loans, cause prices of residential or commercial real estate or other asset prices to fall further, thereby reducing the value of the collateral securing many of the Bank's loans and increasing writedowns, and negatively affect the ability and willingness of companies and individuals to place deposits with domestic banks, including the Bank.

***The Kazakhstan economy is highly dependent on oil exports and, as a result, is affected by oil price volatility.***

Countries in the Central Asian region, including Kazakhstan, whose economies and state budgets rely in part on the export of oil, oil products and other commodities as well as the import of capital equipment and significant foreign investments in infrastructure projects, could be adversely affected by volatility in oil and other commodity prices and by any sustained fall in them or by the frustration or delay of any infrastructure projects caused by political or economic instability.  In addition, any fluctuations in the value of the U.S. Dollar relative to other currencies may cause volatility in earnings from U.S. Dollar denominated oil exports.  An oversupply of oil or other commodities in world markets or a general downturn in the economies of any significant markets for oil or other commodities or weakening of the U.S. Dollar relative to other currencies would have a material adverse effect on the Kazakhstan economy, which would, in turn, have an adverse effect on the business, financial condition and results of operations of the Bank.

The sharp drop in world prices for oil and other commodities since mid-2008 has had a negative impact on the growth prospects of the Kazakhstan economy.

The national budget for 2009–2011 initially projected revenues on the basis of world oil prices of U.S.\$60 per barrel.  These projections have been subsequently revised to U.S.\$40 per barrel in light of the continuing decline in world oil prices.  Although oil prices have recovered for the time being, there can be no assurance that further revisions of the national budget will not be required in light of continuing oil price volatility.

***The Kazakhstan regulatory and tax regime, as well as the judicial system, are not fully developed and therefore are unpredictable.***

Although a large volume of legislation has come into force since early 1995 (including a new tax codes in January 2002 and 2009 and laws relating to foreign arbitration in 2004, additional regulation of the banking sector and other legislation covering such matters as securities exchanges, economic partnerships and companies, state enterprise reform and privatisation), the legal framework in Kazakhstan is still in a relatively early stage of development compared to countries with established market economies.  The judicial system, judicial officials and other government officials in Kazakhstan may not be fully independent of external social, economic and political forces.  There have been instances of improper payments being made to public officials, administrative decisions have been inconsistent, and court decisions have been difficult to predict.

Further, due to numerous ambiguities in Kazakhstan's commercial legislation, in particular in its newly adopted tax legislation, the tax authorities may make arbitrary assessments of tax liabilities and challenge previous tax assessments, thereby rendering it difficult for companies to ascertain whether they are liable for additional taxes, penalties and interest.  As a result of these ambiguities, as well as the lack of any established system of precedent or consistency in legal interpretation, the tax risks involved in doing business in Kazakhstan are substantially more pronounced than in jurisdictions with a more developed tax system.

Although the Bank will obtain a letter from the Kazakhstani tax authorities with respect to the tax treatment of certain aspects of the Restructuring, such tax rulings are non-binding on the Kazakhstani tax authorities and, therefore, there can be no assurance that such authorities will not change the tax treatment of the restructuring and the structure of the New Instruments in a way that might adversely affect the interests of the Bank and of its creditors.

The Government may increase corporate tax rates in the future in order to address its budget deficit and, if it does so, such measures may result in significant additional taxes becoming payable.  Additional tax exposure could have a material adverse effect on the Bank's business and financial condition and on the results of operations of companies operating in Kazakhstan.  The new Tax Code, which entered into force on 1 January 2009, introduced numerous changes to the existing tax regime and it is not clear how this new legislation will be interpreted and applied.

***There are risks associated with the underdevelopment of Kazakhstan's securities markets.***

Kazakhstan has a less developed securities market than the United States, the United Kingdom and the rest of Western Europe, which may hinder the development of the Kazakhstan economy.  An organised securities market was established in Kazakhstan only in the mid to late 1990s and the procedures for settlement, clearance and registration of securities transactions may therefore be subject to legal uncertainties, technical difficulties and delays.  Although significant developments have occurred in recent years, the sophisticated legal and regulatory frameworks necessary for the efficient functioning of modern capital markets have yet to be fully developed in Kazakhstan.  In particular, legal protections against market manipulation and insider trading are not as well developed in Kazakhstan, or as strictly enforced, compared to the United States, the United Kingdom and the other Western European countries, and existing laws and regulations may be applied inconsistently.

134

*Kazakhstan's president, Nursultan Nazarbaev, has been in office since 1991 and, if he were to step down, Kazakhstan could become unstable.*

Kazakhstan's president, Nursultan Nazarbaev, has been in office since Kazakhstan became an independent sovereign state in 1991.  Under President Nazarbaev's leadership, the foundations of a market economy have taken hold, including the privatisation of state assets, liberalisation of capital controls, tax reforms and pension system development.  President Nazarbaev was re-elected for his most recent term of office in December 2005.  In May 2007, Kazakhstan's Parliament voted to amend Kazakhstan's constitution to allow President Nazarbaev to run in an unlimited number of elections.  While this amendment will allow President Nazarbaev to seek re-election at the end of his current term, there is no guarantee that he will remain in office.  Should he not complete his current term of office or should a new president be elected at the next election, Kazakhstan's political situation and economy could become unstable and the investment climate in Kazakhstan could deteriorate, which would have a material adverse effect on the Bank's business, results of operations and financial condition.  Conversely, although President Nazarbaev's remaining in office may contribute to stability in Kazakhstan, the constitutional amendment in May 2007 has raised some concerns regarding the democratic nature of reforms.  A lack of confidence in Kazakhstan's government could threaten the country's economic stability, which could have a material adverse effect on the Bank's business, results of operations and financial condition.

**Risks Relating to the Restructuring**

*The Restructuring Law has not been substantially tested in practice and there can be no assurance that any restructuring effected under such legislation, including the Restructuring, will be recognised internationally.*

Prior to July 2009, there was no law in Kazakhstan allowing for creditors' claims on Kazakhstan finance institutions to be restructured without the consent of all affected creditors.  The restructuring process set out in the Restructuring Law is designed to be fair to the affected creditors.  However, as at the date of this Information Memorandum, it has only been fully tested once before with the completion of the restructuring of Alliance Bank in April 2010.  The restructuring of Temirbank is currently underway.

The central proposition of the Restructuring Law is that creditors holding at least two-thirds of a bank's obligations by value subject to the restructuring may, through a fair and transparent process, approve a restructuring plan and that this approval will ultimately bind dissenting minority creditors.  In the meantime a compulsory restructuring arrangement will not bind foreign creditors in respect of assets held outside of Kazakhstan unless the local Kazakhstan restructuring is recognised in the countries where such creditors or assets are located.  Thus foreign creditors not wishing to participate in a restructuring may set off their claims against the Bank's assets or bring litigation in any jurisdiction where any of those assets are located.

The Restructuring Law was designed to be capable of international recognition in countries which have adopted legislation based on the Model Insolvency Law.  The High Court of Justice of England and Wales on 18 December 2009 and the United States Bankruptcy Court for the Southern District of New York on 9 April 2010 each issued an order recognising the Bank's restructuring proceedings in the Court as the main foreign proceeding in respect of the Bank's assets located in Great Britain and the United States, respectively, pursuant to the Model Insolvency Law.  Furthermore, the Solomensky District Court of Kiev on 17 February 2010 issued a decision which came into force on 23 February 2010 recognising the restructuring proceedings in the Court pursuant to the Convention of Legal Aid and Legal Relations on Civil, Family and Criminal Matters signed on 7 October, 2002 in Kishinev City, Republic of Moldova by ten CIS member states, including the Ukraine and Kazakhstan.  The Bank also filed an application with the Moscow Court of Arbitration to obtain recognition in the Russian Federation of the ruling of the Court dated 16 October 2009 concerning the Restructuring.  However, there can be no assurance that the Restructuring, if approved, will be recognised by other courts abroad.  If the Restructuring is not capable of international recognition, the Bank's assets

outside Kazakhstan may be frozen by dissenting foreign creditors. As a result, the Bank's business will be significantly affected and the Bank may be limited to entering into transactions only within Kazakhstan.

***Certain aspects of the Restructuring require the FMSA to take steps over which the Bank has no control and which could delay or frustrate the restructuring process.***

Under the Restructuring Law, if a restructuring plan has been approved by the requisite majority of the creditors, the FMSA reviews the plan to determine its conformity with the plan originally submitted for the FMSA's consideration. Despite the FMSA's cooperation with the restructuring process to date, there can be no assurance that the FMSA will agree with a bank's restructuring plan in the form in which it is approved by the creditors. Given that the Restructuring Law is in the early stages of implementation and there has only been one successful bank restructuring in Kazakhstan, that of Alliance Bank in April 2010, it is possible that the FMSA may take a substantial amount of time to familiarise itself with the Restructuring Plan or may have substantive comments to the Restructuring Plan, which would delay the restructuring process and could have a negative effect on the Bank's financial condition and the interests of the Claimants.

***Any indebtedness of the Bank cancelled as a result of the Restructuring may be subject to taxation in Kazakhstan if the Restructuring is not finalised by 1 January 2011.***

Under the current tax law of Kazakhstan, corporate income tax will not be assessed on the debt of a bank cancelled pursuant to the Restructuring during 2010.

Recent amendments to Kazakhstan tax legislation provide that for the purposes of calculation of taxable annual income during 2010, the Bank may exclude income from debt that is written off by its creditors *provided that* such debt is included in the list of restructured liabilities contained in the Restructuring Plan approved by the Court. Starting from 1 January 2011, the Bank may be required to record amounts for written off debt which is treated as a profit and may have to pay corporate income tax in respect of such amount. Under the Tax Code, the applicable corporate income tax rate is 20 per cent. (this rate will be reduced to 17.5 per cent. from 1 January 2013 and 15 per cent. from 1 January 2014 onwards).

If the amount of the cancelled debt were to become subject to taxation, the Bank's capital following the Restructuring would likely be insufficient to meet the applicable capital adequacy requirements of the FMSA and the purposes of the Restructuring might not be achieved.

***The Base Case Model should not be relied upon as a forecast.***

The Base Case Model is a tool used by the Bank for illustrative modelling purposes, and no amounts included in it or derived from it should be construed as a forecast by the Bank or any other person of any results of the Bank. The Bank accepts no responsibility for the Base Case Model or the Original Business Plan, and Claimants or investors should not form any decisions based upon either of these documents.

***The Bank has historically been unable to fund its operations and the Bank's substantial level of indebtedness after the Restructuring will significantly reduce available cash, impact its ability to obtain additional financing and limit its flexibility.***

The Bank historically has not been able to fund its operations and debt payment obligations and has therefore incurred substantial indebtedness. After the Restructuring, on a *pro forma* consolidated basis, the Bank and its subsidiaries will have approximately KZT 717,704 million (or approximately U.S.$4,755 million) of indebtedness outstanding as at 30 September 2009. See "*Pro Forma Financial Information*". The Bank's substantial consolidated level of indebtedness, and associated interest payment obligations, will:

- limit its cash flow available for general corporate purposes, including any acquisitions;

- limit its ability to obtain necessary financing for working capital, capital expenditure or business opportunities and to implement its business strategies;

- limit its flexibility in reacting to competitive and other changes;

- expose it to the risk that a decrease in net cash flows due to economic developments or adverse developments in its business could make it difficult or impossible to meet senior debt payment obligations; and

- expose it to risks inherent in interest rate fluctuations.

Although interest payments will be significantly reduced after partial cancellation of the existing financial indebtedness of the Bank as a result of the Restructuring, it is possible that the Bank may continue to incur losses and may not achieve or sustain sufficient cash flow in the future for the payment of interest, principal and the meeting of expenditure needs or other purposes.  If the Bank's cash flow is not sufficient to meet its expenses, debt payment obligations and other requirements, the Bank may be forced to raise cash or reduce expenses by doing one or more of the following:

- restructuring or refinancing its indebtedness prior to original maturity;

- delaying or reducing expenditures necessary to maintain its business and meet increased competition;

- disposing of some of its assets, possibly on unfavourable terms;

- revising or delaying the implementation of its strategic plans; or

- forgoing business opportunities.

The Bank could also be forced to seek additional equity capital, which could dilute the interests of the holders of its common shares.  The Bank cannot be sure that any of the above actions would be sufficient to fund its operations in the future.

***The Bank's operations and financing activities will be restricted by covenants and undertakings in the Restructuring Documentation.***

The Restructuring Documentation to be entered into by the Bank will contain a number of significant restrictions and covenants that limit the Bank's and its subsidiaries' ability to:

- dispose of businesses or assets;

- enter into joint ventures, acquisitions, mergers and to incorporate subsidiaries;

- engage in intra-group lending or guarantees and related party lending or similar transactions;

- obtain new borrowings;

- pay dividends on common shares unless agreed conditions are satisfied; and

- enter into major transactions unless concluded at fair value and subject to certain conditions.

The Bank will be required to comply with specified financial ratios and performance covenants contained in the Restructuring Documentation.  There will also be significant restrictions on the Bank's activities which could affect the Bank's ability to operate its business and may limit its ability to take advantage of potential business opportunities as they arise.

The Bank's ability to comply with the covenants and undertakings in the Deeds of Covenants and the Restructuring Documents will depend on a number of factors, including its operating performance and the level of interest rates, as well as other factors that it may have failed to anticipate or that are beyond its control.

If the Bank is unable to comply with the covenants and undertakings in the Deeds of Covenants or the Restructuring Documents, the Claimants could impose additional restrictions on the Bank or accelerate repayment of all amounts due under the New Notes.  If its indebtedness is accelerated, the Bank may not be able to repay its debt or borrow sufficient funds to refinance that debt.  In addition, any default under its New Notes, or agreements governing its other existing or future indebtedness, is likely to lead to an acceleration of indebtedness under any other debt instruments or loans that contain cross-acceleration or cross-default provisions.   If the indebtedness under the New Notes is accelerated, the Bank is unlikely to have sufficient assets to repay amounts due, or any other indebtedness then outstanding.

***Some provisions of the Restructuring Documents may discourage or prevent a takeover of the Bank, even if a takeover would be beneficial to its shareholders.***

The Restructuring Documents will include a number of provisions protecting the Bank's shareholders and creditors after the Restructuring if changes are made to the Bank's shareholding structure after the Restructuring.  Such provisions include granting a put option to holders of the Senior Notes and OID Notes if a Relevant Event occurs, granting tag-along rights to the Restructuring Creditors holding the Bank's equity after the Restructuring and granting drag-along rights to Samruk-Kazyna.   Such protections may have the effect of preventing an acquisition or merger in which the Bank is acquired and may discourage potential equity investors from investing in the Bank's shares.

***Adverse publicity relating to the Restructuring and the financial condition of the Bank may adversely affect the Bank's customer relationships and the market perception of its business.***

Adverse publicity relating to the Restructuring and the financial condition of the Bank may make it difficult to convince customers to maintain relationships with the Bank and to attract new customers, which could materially adversely affect the Bank's business.  Ongoing negative publicity may also have a long-term negative effect on the Bank's brand name, which could make it more difficult for the Bank to market its products and services in the future.

***Following the Restructuring, a significant percentage of the Bank's outstanding common shares may be held by a small number of shareholders who may have conflicts of interest.***

Following the Restructuring, it is anticipated that some of the Claimants will become significant shareholders of the Bank.  As a result of these relationships, if conflicts arise between the interests of these significant shareholders and the interests of the Bank's other shareholders, directors nominated by the affected significant shareholders may not be disinterested.  These shareholders may also from time to time make significant investments in other banks operating in Kazakhstan.  This may result in conflicts of interest.  Actions these shareholders take relating to those investments may conflict with the interests of the Bank and the Bank's other shareholders.

***Approval of the Restructuring is not assured and, even if Claimants approve the Restructuring Plan, there is a risk that the Restructuring may not be completed.***

The Restructuring is subject to a number of conditions and uncertainties, in addition to the approval of the Restructuring Plan by the Claimants, over which the Bank has limited control.  If any one of the conditions is not met, the Restructuring may not be completed, in which case the Claimants of the Bank may accelerate outstanding indebtedness, initiate bankruptcy proceedings and exercise other remedies.  Under these circumstances, the Bank may be forced into conservation or bankruptcy.

For additional information on the conditions to the completion of the Restructuring see Schedule 1 (*The Restructuring Plan*) to this Information Memorandum.

***If the Restructuring does not occur, the FMSA may institute proceedings for conservation or an insolvent liquidation of the Bank.***

The current management has been able to permit the Bank to continue to do business in large measure as a direct result of the continued support of the Bank's creditors (broadly, by not calling defaults or

accelerating their claims) and of the current management's belief that the Restructuring is likely to be implemented.  However, the current management is not certain that the creditors will continue to refrain from declaring defaults if the Restructuring is not implemented or if it is not implemented in a timely manner.  If the Bank loses the support of its creditors, the FMSA may be empowered to take certain actions in order to protect the Bank's assets for the benefit of the Bank's creditors pursuant to relevant legislation, including either conservation or insolvent liquidation.

Insolvency procedures would result in a sale of the Bank's assets.  Proceeds from that sale would likely be insufficient to repay outstanding indebtedness to all classes of the Bank's creditors.  Historically, institutional creditors and shareholders of banks that were liquidated through insolvency procedures in the Kazakhstan banking system have received no compensation as a result of such liquidation.

***The Bank has incurred, and will continue to incur, significant costs in connection with the Restructuring, substantially all of which must be paid regardless of whether the Restructuring occurs.***

The Bank has incurred significant costs in connection with the Restructuring and will continue to do so until the Restructuring is completed.  These costs principally relate to fees payable to the Bank's financial, legal and accounting advisers as well as the advisers to significant stakeholders that have been affected by the Bank's need to restructure.  Pursuant to the terms of engagement with these advisers, substantially all of these costs will be paid regardless of whether the Restructuring occurs.  As at 30 September 2009, costs related to hiring external advisers and consultants in connection with the Restructuring were approximately U.S.$11.5 million.  The Bank currently expects that, by the end of 2010, such costs in total will amount to approximately U.S.$90.60 million.

In the event that the Restructuring is not completed on the terms disclosed in this Information Memorandum, substantial additional costs may be incurred as a result of the likely need to petition for an insolvency procedure.

***The Pro Forma Financial Information would likely differ materially if it were based on financial statements prepared in accordance with IFRS.***

The Pro Forma Financial Information has been prepared based on the Bank's historical unconsolidated management accounts, adjusted for selected IFRS accounting policies, and based on certain assumptions to reflect the effect of the Restructuring as if it had taken place on 30 September 2009.

Management may not have identified all adjustments to the management accounts used in the preparation of the Pro Forma Financial Information necessary to address differences in the Bank's accounting policies and rules applied in the preparation of such management accounts from IFRS accounting policies and principles.  In addition, not all of the assumptions made in order to prepare the Pro Forma Financial Information may prove to be correct.  Although the current management believes that the Pro Forma Financial Information may be useful in enabling Claimants to assess and understand the Restructuring, Claimants should read such information with due regard to the limitations inherent in its preparation and analysis of financial information prepared on a non-IFRS basis should only be used as a complement to, and in conjunction with, the financial information presented in accordance with IFRS.  See "*Presentation of Financial and Other Information*".

***Certain provisions of the New Charter may not comply with the requirements of Kazakhstan law and shareholders of the post-restructured Bank may therefore not receive the protections afforded by the New Charter described in this Information Memorandum.***

As part of the proposed restructuring process, a New Charter is to be introduced, the aim of which is to provide Claimants who become shareholders of the post-restructured Bank with increased protection.  Although the Bank has received, in principle, approval from the FMSA in respect of the draft form of the New Charter.  Some of the provisions expected to be incorporated into the New

Charter have never been tested under Kazakhstan law and the Bank gives no assurances that the applicable governmental and regulatory authorities will hold such provisions to be in compliance with Kazakhstan law.  If such provisions are not found to be in compliance with Kazakhstan law by the applicable governmental and regulatory bodies they may refuse to register the New Charter. Therefore, certain protections which the Bank is seeking for its shareholders may not be available under the New Charter and there is the risk that the New Charter will not contain certain of the proposed amendments as described herein.   See "*Management and Corporate Governance — Management and Corporate Governance Following the Restructuring — New Charter*" and "*Description of Share Capital and Certain Matters of Kazakhstan Law — New Charter*".

***Devaluation of the Tenge may render the Restructuring ineffective.***

In accordance with the terms of the Restructuring Packages, U.S.$1 billion of cash is available for Claims allocated into Senior Package 1.  This amount is funded in Tenge with cash transferred to the Bank by the NBK under BTA/NBK Repo Transactions (consisting of refinancing loans under the Cooperation Agreement) against delivery of the SK Bonds.  The cash under Senior Package 1 is payable in U.S. Dollars or Tenge at the option of Claimants.  It is likely that the majority of the Claimants will choose U.S. Dollars and the Bank may therefore need to purchase up to U.S.$1 billion with an amount in Tenge at the prevailing exchange rate prior to the Restructuring Date.  If the Tenge depreciates against the U.S. Dollar prior to the Restructuring Date,  it would become more expensive for the Bank to satisfy such obligations and the Restructuring may not be able to occur without the Bank providing the full amount in Dollars required under Senior Package 1.

***The Bank is reliant on the NBK's support of the Restructuring and may be unable to complete the Restructuring if the NBK's position changes.***

The Bank holds the SK Bonds and uses them as collateral for BTA/NBK Repo Transactions with the NBK.  As at 30 September 2009, the Bank has received KZT 404,938 million from the NBK (based on internal management reports of the Bank) by way of refinancing loans under the Cooperation Agreement in the form of BTA/NBK Repo Transactions.  To ensure that U.S.$1 billion is available for Claims allocated into Senior Package 1, the Bank will have to have obtained funding from the NBK under BTA/NBK Repo Transactions in exchange for all of the SK Bonds.  If the NBK is unable to provide such funding to the Bank, the Bank will not have sufficient funds for Senior Package 1 and the Restructuring could not occur.

***The completion of the Restructuring is conditional upon the Bank successfully carrying out its proposed plan to release the required level of provisions.***

The completion of the Restructuring is conditional upon the FMSA being satisfied that the Bank will be in compliance with the regulatory capital requirements applicable to the Bank following the Restructuring Date.  As described in "*Management's Discussion and Analysis of Results of Operations and Financial Condition – Recent Developments*", the Bank is currently not in compliance with such requirements and has set out a number of steps it intends to take to release the provisions necessary to become compliant once again by early September 2010.  However, if the Bank is unable to successfully carry out those steps to the extent required and within the timeframe specified, such failure may have an adverse impact on the ability of the Bank to meet regulatory capital requirements and accordingly may result in the Restructuring failing to complete as anticipated or at all.

**Risks relating to the New Notes, Shares and GDRs**

***The market value of the New Notes, Shares and GDRs that the Claimants will receive in connection with the Restructuring may be less than the current value of the Claimants' Claims.***

The value of the New Notes, Shares and GDRs will depend on the public trading price of the New Notes, Shares and GDRs after the Restructuring.  The New Notes, Shares and GDRs will not trade publicly until the Restructuring is completed.  As a result, Restructuring Creditors will not know the market value of any New Notes, Shares and GDRs that they may receive in the Restructuring until the

Restructuring is completed.  There can be no assurance that the trading price of the New Notes, Shares and GDRs received by any Restructuring Creditor will be related to the value of its Claims.

***The large number of Shares eligible for public sale after the Restructuring could cause the market price of the Shares to decline and make it difficult for the Bank to issue equity securities in the future.***

When the Restructuring is complete, the Restructuring Creditors will own 18.5 per cent. of the Shares (in the form of Shares or GDRs).  Most of these Restructuring Creditors are not in the business of holding equity on a long-term basis.  Sales by these shareholders of a substantial number of Shares after the Restructuring may significantly reduce the market price of the Shares.  Moreover, the perception that these shareholders might sell significant amounts of Shares could depress the trading price of the Shares for a considerable period of time after the Restructuring.  Sales of these Shares, and the possibility of such sales, could make it more difficult for the Bank to sell equity or equity-related securities in the future at a time and price that the Bank considers appropriate.

***Due to the Bank's financial condition and the historical volatility in the price of shares in Kazakhstan banks, the market price of the New Notes and Shares is likely to be volatile.***

As a result of a number of factors, including the Bank's recent financial condition and its participation in markets that have experienced historical price volatility, the market price for the Bank's shares has historically been volatile and the market price for the New Notes, Shares and GDRs is also likely to be volatile, perhaps even more so than the stock market in general or the market for shares of other Kazakhstan banks.  Investors may not be able to sell their New Notes and Shares at the desired terms or at attractive prices as a result of such volatility.  Factors that could cause volatility in the market price for the New Notes, Shares and GDRs in the future may include, among other things:

- actual or anticipated variations in the Bank's operating results;

- new products or services, whether the Bank's or those of its competitors;

- changes in financial estimates by analysts covering the Bank;

- changes in the market valuations of other Kazakhstan banks;

- large increases or decreases in capital commitments;

- additions to, or departures of, its key personnel; and

- issues of Shares by the Bank.

Due to the Bank's troubled financial history and its participation in historically volatile markets, these factors may negatively affect the market price for the New Notes, Shares and GDRs to a greater extent than they would securities of other companies, in some cases regardless of the Bank's actual operating performance.

***Restrictions apply to a holder of GDRs or Shares if it is incorporated or has affiliates in a Prohibited Jurisdiction.***

Ownership of Shares is subject to certain legislative restrictions under Kazakhstan law.  Specifically (i) legal entities registered in any of the jurisdictions listed in "Disclosure of Beneficial Ownership" or which have affiliates registered in such jurisdictions or (ii) natural persons who are participants or shareholders in such legal entities, may not directly or indirectly own voting shares in the capital of a Kazakhstan bank.  Accordingly Claimants falling under (i) or (ii) may not be able to own, hold or dispose of the Shares.

Although the Bank has been advised that such restrictions would not prevent a holder of GDRs registered in any such jurisdiction (or which has an affiliate registered in such jurisdiction) from holding GDRs and exercising or benefiting from other rights (including the right to receive dividends

and pre-emptive rights in respect of the GDRs), the Shares corresponding to the GDRs held by persons registered in any such jurisdiction (or which has an affiliate registered in any such jurisdiction) may not be voted at any general meeting of the Bank.  There is also no guarantee that the FMSA or any other relevant authority such as a Kazakhstan court will not take a view that persons registered in any such jurisdiction (or which has an affiliate registered in any such jurisdiction) should be prohibited from holding GDRs or that such holders should be restricted from exercising or benefiting from other shareholder rights.

***A person acquiring more than 10.0 per cent. of the voting Shares or equivalent requires prior FMSA approval.***

Any natural person or legal entity becoming a "major shareholder" or, for legal entities, a "bank holding" company in relation to the Bank must obtain prior written permission from the FMSA.  A major shareholder or bank holding company means a person directly or indirectly owning or holding 10.0 per cent. or 25.0 per cent., respectively, of the voting shares of a bank or who can otherwise influence the decisions of such bank on the basis of an agreement or otherwise as set out in the FMSA regulations.

Any person acquiring 10.0 per cent. or more of the voting shares of a bank is considered an affiliate of such bank and must disclose its identity to such bank.  Information about the identity of an affiliate is publicly available information.

A major shareholder of a bank also assumes certain obligations including (i) an obligation to support the bank in remedying any financial problems the bank may incur, (ii) an obligation to obtain a credit rating and (ii) ongoing reporting obligations.

***Subordinated Notes may not rank junior to Senior Notes and that Subordinated Debt will not qualify as Tier II Capital.***

Kazakhstan legislation neither expressly permits nor prohibits different classes of unsecured creditors or contractual subordination in bankruptcy proceedings.  While it is the Bank's intention that the proceeds of issuance of the Dollar Subordinated Notes and the Euro Subordinated Notes will be included in its Tier II capital in accordance with the FMSA Guidance, there is no assurance that they will qualify as such.  Under the FMSA Guidelines, debt securities of a bank may be included into Tier II capital only after the FMSA approves a report on the result of their placement in accordance with the precedure set out by Kazakhstani legislation.  Currently, there is no such procedure for notes which are governed by laws other than the laws of Kazakhstan, such as the Dollar and Euro Subordinated Notes.  Accordingly, there is no assurance that the report on the results of the placement of the Dollar and Euro Subordinated Notes will be approved by the FMSA and whether such Notes will qualify as Tier II capital of the Bank.

Kazakhstan legislation neither expressly permits nor prohibits contractual subordination of general unsecured creditors in bankruptcy.  In practice, it is not uncommon for commercial banks to issue subordinated instruments, which are treated as Tier I or Tier II instruments for capital adequacy purposes in accordance with the FMSA Guidance.  Although, to the Bank's knowledge, the FMSA has not in the past sought to challenge such treatment, the ranking of such subordined debt has not been tested in bankruptcy proceedings or by the courts in the Republic of Kazakhstan.  Therefore, it is unclear as to how the Subordinated Notes would be treated in bankruptcy proceedings by a liquidator and/or Kazakhstan court.  If they are treated equally with other unsecured debt, including Senior Debt, this could materially adversely affect the interests of senior unsecured creditors under the Senior Notes.

Furthermore, the cash under Senior Package 1 is payable in Tenge or U.S. Dollars at the option of Claimants.  It is likely that the majority of the Claimants will choose U.S. Dollars and the Bank may therefore need to purchase up to U.S.$1 billion with Tenge prior to the Restructuring Date.

The Bank may be unable to purchase U.S.$1 billion on the foreign currency market in Kazakhstan and may need to resort to the NBK to buy a sufficient amount of U.S. Dollars.  See Schedule 1 (*The Restructuring Plan*), Annex 2 (*Calculation of Entitlements*) to this Information Memorandum.

If the NBK were to withdraw support from the Bank, the Bank may not have sufficient cash in Tenge or may not be able to convert the requisite amount of Tenge into U.S. Dollars, and the Restructuring may not be completed.

In addition, if the Restructuring is successful, the Bank's debt following the Restructuring will be denominated primarily in U.S. Dollars.  The Bank's assets are primarily in Tenge.  Due to the limited access to hedging instruments in the market in Kazakhstan, the Bank may need the NBK's help in hedging.  See "*Risk Factors — Risks Relating to the Bank — The Bank is exposed to foreign currency exchange risk and significant exposure to foreign currency exchange rate fluctuations following the early termination of its swap transactions*".  As a condition precedent to the Restructuring, the NBK must deliver a confirmation that it will treat the Bank no less favourably than other second-tier banks in Kazakhstan.   See Schedule 12 (*Conditions Precedent to the Restructuring Plan Becoming Effective*).  Despite this confirmation, any change in the NBK's policy or support may lead to an increase in the Bank's funding costs or to the Bank being unable to comply with its regulatory requirements or currency positions and obligations under the New Notes, which would adversely affect the Bank's business, financial condition, results of business and prospects.

***In certain circumstances, the Trustee is entitled to be indemnified, secured or pre-funded and failure to do this may prejudice implementation of the Restructuring.***

If the Bank requests the Trustee to accelerate any series of Euronotes, as it will be authorised to do by the relevant Extraordinary Resolution, if passed, the Trustee retains the right to be indemnified, secured or pre-funded to its satisfaction.  The purpose of this is to permit Euronotes to be accelerated should the Bank determine that it is necessary to facilitate the implementation of the Restructuring Plan.  As at the date of this Information Memorandum, the Bank has not determined whether or not to request acceleration of any Euronotes and accordingly, no such indemnity, security or pre-funding has been provided to the Trustee.  Should the Bank determine to accelerate any series of Euronotes and the Trustee is not satisfactorily indemnified, secured or pre-funded, it may not be possible to implement the Restructuring Plan.

***The Bank may face litigation if the FMSA applies any of its compulsory restrictive measures to the Bank.***

The FMSA may apply a number of compulsory restrictive measures to second tier banks (commercial banks) in financial distress or in breach of prudential or other mandatory regulations.   See "*The Banking Sector in Kazakhstan — Financial Stability and Restructuring Reforms*" and "*The Banking Sector in Kazakhstan — The FMSA's Compulsory Measures under the Banking Law*" for a detailed description of such measures.

Were the FMSA to apply any such measures the Bank's shareholders, including investors holding the Shares in the form of GDRs and Claimants receiving the Shares in the Restructuring, could bring claims against the Bank and seek redress against the FMSA's actions.  Irrespective of the merit of such claims, if such shareholders' claims are successful, the Bank's financial position and the interests of the Claimants may be negatively affected.

***The Bank will be subject to various restrictions relating to Money Laundering, Corrupt Practices, Fraudulent Practices, Collusive Practices, Coercive Practices, Obstructive Practices and Financing of Terrorism that may be less onerous than restrictions in financings involving multilateral development banks.***

The Bank will be subject, in the New Notes Trust Deed, to various restrictions relating to Money Laundering, Corrupt Practices, Fraudulent Practices, Collusive Practices, Coercive Practices, Obstructive Practices and Financing of Terrorism (each as defined in Schedule 11 (*Covenants of the*

*Bank*) to this Information Memorandum).  Claimants should note that these restrictions are based upon, although not identical to and in certain respects less onerous than, restrictions commonly imposed on borrowers in financings involving multilateral development banks.  See Schedule 11 (*Covenants of the Bank*), Clause 3(b) (*Compliance with laws and other regulatory requirements*) to this Information Memorandum.

## PRO FORMA FINANCIAL INFORMATION

*The following information should be read in conjunction with "Presentation of Financial and Other Information — Pro Forma Financial Information", "Risk Factors — Risks Relating to the Restructuring — The Pro Forma Financial Information would likely differ materially if it were based on financial statements prepared in accordance with IFRS" and the Financial Statements included elsewhere in this Information Memorandum and the notes thereto.*

The Pro Forma Financial Information was prepared by the Bank on the basis of FMSA Methodology and IFRS to illustrate the effect of the Restructuring as if the Restructuring had been completed as at 30 September 2009 and is based on data derived from the Unaudited Interim Financial Statements and management accounts prepared on the basis of FMSA Methodology.  The Pro Forma Financial Information is unaudited and is presented for illustrative purposes only.  The Bank's management believes that the Pro Forma Financial Information may be useful in enabling Claimants to assess and understand the Restructuring and to select Restructuring Packages.

The key purpose of the Restructuring is to achieve compliance with the FMSA's regulatory capital adequacy requirements applicable to the Bank.  Therefore the Pro Forma Financial Information based on FMSA Methodology is more indicative of whether the purpose of the Restructuring is likely to be achieved.

The Pro Forma Financial Information is based upon certain assumptions and adjustments which the Bank's management believes are reasonable and necessary for a fair presentation of such information.  The assumptions and adjustments are based upon the Bank's preliminary analysis and based upon currently available information.  While the Bank has used all reasonable efforts to ensure that the Pro Forma Financial Information is correct, accurate and complete as at the date of this Information Memorandum, no representation or warranty is made (express or implied) as to the reliability, accuracy or completeness of the Pro Forma Financial Information.

The Pro Forma Financial Information does not take into account the potential adverse impact of certain negative developments since 30 September 2009, such as additional loan loss provisions and further operational losses resulting from the deteriorating financial condition of the Bank and instability aggravated by the ongoing restructuring process.

Claimants are cautioned that pro forma financial information is inherently unreliable and that the Pro Forma Financial Information is not necessarily indicative of how the Bank's consolidated capitalisation, statement of financial position or capital adequacy as at 30 September 2009 would have been presented had the Restructuring actually been completed at that the date, nor is it necessarily indicative of the Bank's consolidated capitalisation, statement of financial position or capital adequacy as at any future date.  The unaudited Pro Forma unconsolidated Financial Information should be read in conjunction with the Financial Statements included elsewhere in this Information Memorandum.

See "*Risk Factors — Risks Relating to the Restructuring — The Pro Forma Financial Information would likely differ materially if it were based on financial statements prepared in accordance with IFRS*".

### Assumptions

The Pro Forma unconsolidated Financial Information is based on the following assumptions:

- the Restructuring had been completed as at 30 September 2009;

- there have been no material transactions concerning the Bank, other than the transactions discussed herein;

- External debt will be restructured through three senior packages and two junior packages;

- The first package (Senior Package 1) include approximately U.S.$8,376 billion of principal plus related interest plus such amount of principal and interest of Excess Non-OGSC Eligible Trade Finance Debt plus such amount of principal and interest of Official Government Sector Debt allocated into Senior Package 1. Debt of Senior Package 1 will be restructured as new debt instruments in the amount of U.S.$2,944 billion (U.S.$2,441 billion of senior debt securities and U.S.$553 million of subordinated instruments) and cash will be paid in the amount of U.S.$1 billion;

- The second package (Senior Package 2) includes approximately U.S.$650 million of principal plus related interest plus such amount of principal and interest of any Excess Non-OGSC Eligible Trade Finance Debt plus related interest plus such amount of principal and interest of Official Government Sector Debt additionally allocated to Senior Package 2. This package includes the issuance of special debt instrument, OID Notes. Besides OID Notes, creditors of Senior Package 2 will receive about U.S.$62 million of 15-year subordinated instruments on the same conditions as in the first package;

- The third package (Senior Package 3) includes approximately U.S.$700 million of liabilities of trade finance (excluding those that were covered by export credit agencies, which will be restructured in accordance with second package) Third package, per se, includes refinancing of liabilities through a new 3-year renewable credit line (RCTFF);

- Two additional packages are for Kazakhstani pension funds and holders of Subordinated Notes and Perpetual Securities. Debt of first package (Junior Package 1) is approximately KZT 28 billion or U.S.$186 million of principal plus related interest that will be prolonged for 20 years. Holders of Subordinated Notes and Perpetual Securities (Junior Package 2) in a total amount of U.S.$1,156 billion of principal will receive about 4.5 per cent. of Shares of Bank;

- Bank Bonds bought by Samruk-Kazyna in amount KZT 645 billion (U.S.$4,273 million) of nominal value plus accrued interest (KZT 10 billion or U.S.$68.5 million), charged until 30 September 2009, will be converted at a nominal value into Shares of the Bank; and

- All amounts in U.S. Dollars are translated at the Tenge/U.S. Dollar exchange rate as at 30 September 2009, as reported by the NBK, of KZT 150.95 = U.S.$1.00.

**Pro Forma Unconsolidated Financial Information based on FMSA Methodology**

*Statement of Financial Position*

The following table sets out the Bank's unaudited unconsolidated historical and pro forma unconsolidated statement of financial position prepared based on FMSA Methodology as at 30 September 2009:

| | Historical As at 30 September 2009 | | As Adjusted to Reflect the Restructuring As at 30 September 2009 | |
|---|---|---|---|---|
| | *(KZT millions)* | *(U.S.$ millions)* | *(KZT millions)* | *(U.S.$ millions)* |
| Cash and cash equivalents | 96,508 | 639 | 96,508 | 639 |
| Obligatory reserves | 3,959 | 26 | 3,959 | 26 |
| Financial assets at fair value through profit or loss | 712,392 | 4,719 | 712,392 | 4,719 |
| Investment securities | 44,540 | 295 | 44,540 | 295 |
| Amounts due from credit institutions | 53,998 | 358 | 53,998 | 358 |
| Loans to customers | 863,959 | 5,723 | 863,959 | 5,723 |
| Property and equipment | 9,308 | 62 | 9,308 | 62 |
| Investments in associates | 71,551 | 474 | 71,551 | 474 |
| Derivative financial assets | 45,427 | 301 | 45,427 | 301 |
| Other assets | 232,876 | 1,543 | 232,876 | 1,543 |
| **Total assets** | **2,134,516** | **14,141** | **2,134,516** | **14,141** |
| Amounts due to the NBK and the Government | 1,258 | 8 | 1,258 | 8 |
| Amounts due to clients | 610,042 | 4,041 | 610,042 | 4,041 |
| Total financial debt[(4)] | 2,057,392 | 13,630 | 1,104,183 | 7,315 |
| Bonds bought by Samruk-Kazyna[(5)] | 645,000 | 4,273 | — | — |
| Derivative financial liabilities | 36,234 | 240 | 36,234 | 240 |
| Reserves | 119,688 | 793 | 103,674 | 687 |
| Other liabilities | 51,948 | 344 | 51,948 | 344 |
| **(Accumulated deficit) Total shareholders' equity** | **(1,387,046)** | **(9,189)** | **227,178** | **1,505** |
| **Total liabilities and shareholders' equity** | **2,134,516** | **14,141** | **2,134,516** | **14,141** |

Notes:
(1)  Financial liabilities after restructuring will be U.S.$2,877 billion of new senior debt, U.S.$800 million of new subordinated debt and U.S.$700 million of RCTFF.
(2)  Bank Bonds bought by Samruk-Kazyna will be converted into Shares of the Bank.
(3)  Increase of capital will be done through income from debt discount and shares conversion.
(4)  Includes only nominal amount of due to TuranAlem Finance B.V. Discount & Premium is included within "Amounts due to clients".
(5)  Nominal amount of bonds bought by Samruk-Kazyna, net of accrued interest.

## Capital Adequacy

The following table gives information regarding the Bank's unconsolidated total, Tier I and Tier II capital and its capital adequacy ratios calculated based on FMSA Methodology:

| | Historical unconsolidated As at 30 September 2009 | As Adjusted to Reflect the Restructuring As at 30 September 2009 |
|---|---|---|
| | *(KZT millions, except percentages)* | *(KZT millions, except percentages)* |
| Total capital | (1,662,263) | 200,353 |
| Tier I capital | (1,428,481) | 185,742 |
| Tier II capital | — | 122,469 |
| K1 (Tier I capital to total assets) | (87.50)% | 5.84% |
| Total risk weighted assets | 2,569,604 | 1,918,153 |
| K2 (own capital to total assets weighted for risk) | (65.70)% | 10.45% |

**Pro Forma Financial Information based on Unaudited IFRS**

*Capitalisation*

The following table sets out the Group's unaudited historical and pro forma consolidated capitalisation in accordance with IFRS as at 30 September 2009:

| | Unaudited historical As at 30 September 2009 | | As Adjusted to Reflect the Restructuring As at 30 September 2009 | |
|---|---|---|---|---|
| | *(KZT millions)* | *(U.S. (KZT $millions)[1]* | *(KZT millions)* | *(U.S.$ millions)* |
| Senior short- and long-term liabilities.................................... | 1,667,293 | 11,046 | 573,162 | 3,797 |
| Subordinated short- and long-term liabilities........................ | 110,831 | 734 | 144,542 | 958 |
| **Total short- and long-term liabilities**................................. | **1,778,224** | **11,780** | **717,704** | **4,755** |
| Share capital[2] ......................................................................... | 509,076 | 3,372 | 1,239,435 | 8,211 |
| Additional paid-in capital ....................................................... | (38,798) | (257) | (38,798) | (257) |
| Retained earnings and revaluation reserves[3] ........................ | (2,083,759) | (13,804) | (1,094,965) | (7,254) |
| Minority interests.................................................................... | (10,538) | (70) | (10,538) | (70) |
| **Total equity** ........................................................................... | **(1,624,019)** | **(10,759)** | **95,134** | **630** |
| **Total equity and short- and long-term liabilities**............... | **154,204** | **1,022** | **812,837** | **5,385** |

Notes:
(1)    See "*Presentation of Financial and Other Information*" for the method of calculation and presentation of U.S. Dollar amounts.
(2)    Share capital less shares held in treasury.
(3)    Includes available for-sale-investment securities revaluation reserve of KZT (2,868.1) million and foreign currency revaluation reserve of KZT (260) million.

### Statement of Financial Position

The following table sets out the Group's unaudited historical statements of financial position based on IFRS as at 30 September 2009:

| | Unaudited historical As at 30 September 2009 | | As Adjusted to Reflect the Restructuring As at 30 September 2009[2] | |
|---|---|---|---|---|
| | *(KZT millions)* | *(U.S.$ millions)* | *(KZT millions)* | *(U.S.$ millions)* |
| Cash and cash equivalents | 30,153 | 200 | 30,153 | 200 |
| Obligatory reserves | 43,003 | 285 | 43,003 | 285 |
| Financial assets at fair value through profit or loss | 120,648 | 799 | 120,648 | 799 |
| Investment securities | 22,244 | 147 | 22,244 | 147 |
| Amounts due from credit institutions | 31,439 | 208 | 31,439 | 208 |
| Shareholder's bonds | 511,097 | 3,386 | 511,097 | 3,386 |
| Loans to customers | 1,107,241 | 7,335 | 1,107,241 | 7,335 |
| Property and equipment | 12,252 | 81 | 12,252 | 81 |
| Investments in associates | 80,372 | 532 | 80,372 | 532 |
| Goodwill | 4,556 | 30 | 4,556 | 30 |
| Derivative financial assets | 31,346 | 208 | 31,346 | 208 |
| Deferred tax assets | 2,030 | 14 | 2,030 | 14 |
| Current income tax assets | 5,590 | 37 | 5,590 | 37 |
| Other Assets | 46,156 | 306 | 46,156 | 306 |
| **Total Assets** | **2,048,127** | **13,568** | **2,048,127** | **13,568** |
| Amounts due to the NBK and the Government | 407,911 | 2,702 | 407,911 | 2,702 |
| Amounts due to customers | 683,281 | 4,527 | 683,281 | 4,527 |
| Amounts due to credit institutions | 752,636 | 4,986 | 217,369 | 1,440 |
| Debt securities issued | 1,670,588 | 11,067 | 500,335 | 3,315 |
| Derivative financial liabilities | 2,308 | 15 | 2,308 | 15 |
| Reserves | 120,600 | 799 | 106,968 | 709 |
| Other liabilities | 34,822 | 231 | 34,822 | 231 |
| **Total Liabilities** | **3,672,146** | **24,327** | **1,952,993** | **12,938** |
| Common shares | 515,551 | 3,416 | 1,245,910 | 8,254 |
| Treasury shares | (6,475) | (43) | (6,475) | (43) |
| Additional paid-in-capital | (38,798) | (257) | (38,798) | (257) |
| Securities revaluation reserve | (2,868) | (19) | (2,868) | (19) |
| Other revaluation reserves | (260) | (2) | (260) | (2) |
| (Accumulated deficit)/related earning | (2,080,631) | (13,784) | (1,091,836) | (7,234) |
| **Total shareholders' equity before minority interest** | **(1,613,481)** | **(10,689)** | **105,672** | **700,045** |
| Minority interest | (10,538) | (70) | (10,538) | (70) |
| **Total shareholders' equity** | **(1,624,019)** | **(10,759)** | **95,134** | **630** |
| **Total Liabilities and Equity** | **2,048,127** | **13,568** | **2,048,127** | **13,568** |

Notes:
(1)   See "*Presentation of Financial and Other Information*" for the method of calculation and presentation of U.S. Dollar amounts.
(2)   Consolidated statement of financial position of Group as at 30 September 2009 taking into account of Bank and Temirbank restructuring.

**THE BANK**

**Overview**

The Bank is a commercial bank operating in Kazakhstan, offering a full range of traditional corporate and retail banking products and services including deposit taking, lending, issuing of letters of credit, funds transfers, custodial services, issuing of payment cards and related services, foreign currency exchange, issuing of guarantees, cash operations, trust operations, collection operations, transactions with precious metals, leasing, broker dealer transactions, clearing operations and safe keeping operations. The Bank also provides pension fund services and is engaged in certain insurance activities.

The Group is one of the leading banking groups in the CIS and has bank-partners in Russia, Ukraine, Belarus, Georgia, Armenia, Kyrgyzstan and Turkey. In addition, the Bank maintains representative offices in Russia, Ukraine, China and the United Arab Emirates. The Bank has one of the most advanced branch-office networks in the Republic of Kazakhstan and, as of 30 September 2009, operates 22 branches and 237 cash offices, 916 automated teller machines and 160 self-service terminals. As at 30 September 2009, the Bank services 1,220,981 retail customers and 139,704 corporate customers.

The Bank has four principal business segments:

- Corporate Business (consisting of the Department of Analysis and Corporate Business Development, the Department of Credit Analysis of Corporate Business No. 1, the Department of Credit Analysis of Corporate Business No. 2, the Department of Credit Analysis of Corporate Business No. 3, the Department of Client Relations of Corporate Business No. 1, the Department of Client Relations of Corporate Business No. 2, Regional Directorate for Agriculture Business and the Department of CIS Countries Financing);

- SME Business (consisting of the Department of Small and Medium Business);

- Retail Business (consisting of the Department of Channel Sales (the department responsible for all retail sales) and Bank Cards Development, the Retail Marketing Department, the Retail Sales Department and the Project Office of Kastle ULS Implementation (a special office devoted to implementation of accounting software); and

- Investment Activities (consisting of the Treasury, the Section of Monitoring and Treasury Operations, the Division of Operations with Capital and Custody Services, the Representative Office in Shanghai (China), the Representative Office in Moscow (Russia), the Representative Office in Kiev (Ukraine), the Islamic Banking and Representative Office in Dubai (UAE), the Division of International Business Analysis, the Division of External Borrowing, the Division of International Activities Monitoring, the Department for Working with Investors and the Financial Institutions, Division of Structured and Trade Financing, Directorate of Global Treasury).

The Bank also has various departments providing global support services including accounting, monitoring and control, asset restructuring, problem loans, and credit and operational risk and collateral monitoring, among others.

**History**

The Bank was incorporated on 15 January 1997 as a closed joint stock company as part of the restructuring and merger between two state-owned banks, Alem Bank and Turan Bank, pursuant to the decision of the Government and the NBK. On 30 December 2003, the NBK issued the Bank its current banking licence (No. N242). The registered office and the head office of the Bank are located at 97 Zholdasbekov Street, "Samal 2" Microdistrict, Almaty 050051, Kazakhstan.

On 24 January 2008 Bank TuranAlem JSC changed its name to BTA Bank JSC. The Bank was issued certificate No. 3903-1900-JSC from the Registration Committee of the Ministry of Justice of Kazakhstan.

**Background to the Restructuring**

***Sequence of Significant Events before Samruk-Kazyna's Acquisition***

From 20 May 2005 to 2 February 2009, Mukhtar Ablyazov was the Chairman of the Board of Directors of the Bank. He replaced in this role Mr. Yerzhan Tatishev, who had been Chairman of the Board of Directors from 1997 until 19 December 2004, when he was killed in a hunting accident.

Mr. Ablyazov had been Minister for Energy, Industry and Trade in the Government from 1998 until he was imprisoned in May 2002. He was pardoned by President Nazarbayev in May 2003 after serving ten months of his sentence. Following his pardon, he moved to Moscow where he founded and became chairman of the Eurasia Industrial and Investment Group of companies, which appears at that time to have included Eurasia Real Estate, Eurasia Logistics (a logistics warehouse complex developer in Russia, Kazakhstan and Ukraine), Eurasia Capital (a fund management firm) and others. In May 2005, Mr. Ablyazov returned to Kazakhstan.

As Chairman of the Board of Directors, Mr. Ablyazov exercised management control over the Bank and was responsible for establishing and overseeing procedures within the Bank to avoid any conflicts of interest arising between shareholders, the Board of Directors and employees of the Bank and for settling any conflicts of interest on issues which other bodies within the Bank were unable to handle.

The Bank understands that, during the period that he was the Chairman of the Board of Directors, Mr. Ablyazov beneficially owned a significant portion of the shares of the Bank through intermediary companies, including Drey Associates Limited, Strident Energy Limited and InvestCapital Company LLC. See "*Principal Shareholders — The Bank's Shareholders Prior to the Restructuring*". There is no legal evidence of Mr. Ablyazov's ownership directly or indirectly in the Bank. Therefore, Mr. Ablyazov's beneficial interest in the Bank was not disclosed by Mr. Ablyazov or the Bank in the Bank's consolidated financial statements for the years 2006, 2007 or 2008 or nine months ended 30 September 2009.

In August 2008, the Government approached four banks — the Bank, Halyk Bank, Kazkommertsbank and Alliance Bank — which the Government viewed as "systemic" in the Kazakhstan financial system, to understand and address the financial difficulties facing these banks in light of the global financial crisis. In the autumn of 2008, Samruk-Kazyna, Kazakhstan's sovereign wealth fund, commenced negotiations with the Bank regarding the terms of a possible capital injection by Samruk-Kazyna into the Bank to support its liquidity following reports that the Bank was unable to meet withdrawal requests of customers and that the Bank failed to participate in rights offerings of two of its important subsidiaries, BTA Russia and BTA Ukraine. In October 2008, the Government and the FMSA announced a proposal to recapitalise the Bank as part of a broader plan to stabilise the financial system of Kazakhstan.

On 9 November 2008 the Bank, the NBK, the FMSA, Samruk-Kazyna and the Government (represented by the Ministry of Finance) entered into a memorandum of understanding pursuant to which the parties declared their intention to coordinate their efforts to stabilise the economy of Kazakhstan, use all reasonable endeavours to provide additional financial resources to the Kazakhstan economy and assist in the stabilisation of the financial system, including the maintenance by the Bank of an adequate level of liquidity and quality of the credit portfolio. At this time, Samruk-Kazyna was considering injecting approximately KZT 212,000 million into the Bank in exchange for 25 per cent. of the Bank's share capital.

At the same time that Samruk-Kazyna was negotiating the memorandum of understanding with the Bank, the FMSA was conducting an independent due diligence review of the Bank's business and operations. The FMSA issued a report dated 22 January 2009, which indicated that the Bank had

violated applicable banking legislation and incurred substantial risks through the actions of the Management Board and Board of Directors.  The FMSA report specifically identified deficiencies in the credit dossiers prepared by the Bank, breaches of capital adequacy requirements and risky lending practices, particularly in respect of loans to persons resident outside of Kazakhstan.  The report suggested downgrading KZT 294,803 million of loans classified as "prime loans" to certain categories of "problem loans" and KZT 189,441 million of "category 1 problem loans" to more impaired categories of problem loans.  In addition, the FMSA sent a letter to the Bank dated 27 February 2009 in which it identified certain key issues relating to the Bank that it recommended be addressed, including (i) checking legal compliance issues and security taken, and assessing non-recovery risk, in relation to credits granted to non-residents of Kazakhstan, (ii) taking steps to save originals of security documentation kept at the Bank's premises and to compile an inventory of all property of the Bank and (iii) examining the Bank's stamps and headed paper and authorizing key personnel as the only officers of the Bank authorised to use them.

During late 2008 and early 2009, Samruk-Kazyna conducted its own independent analysis of the financial condition of the Bank in order to assess the value of the Bank's shares.  In connection with this review, and following the release of the January 2009 FMSA report, Samruk-Kazyna re-evaluated the potential net losses of the Bank and determined that it was necessary to acquire a supermajority interest in the Bank in return for the approximately KZT 212,000 million that it was prepared to inject into the capital of the Bank.

In light of the increasing deterioration in the Bank's financial position, the FMSA instructed the Bank to increase its loan loss provisions to 24.9 per cent. by 1 February 2009.  This increase would have caused the Bank to breach its capital adequacy requirements and so, on 2 February 2009, the Government accepted the recommendation of the FMSA to recapitalise the Bank pursuant to Articles 17 and 17-2 of the Banking Law through Samruk-Kazyna.  On 2 February 2009, Samruk-Kazyna acquired a controlling shareholding in the Bank through the Bank's issuance of 25,246,343 new common shares constituting 75.1 per cent. of the Bank's total share capital for cash consideration of KZT 212,095 million.

The Group incurred a net loss amounting to KZT 1,188,050 million (approximately U.S.$9.8 billion) during the year ended 31 December 2008.

### Factors Affecting Deterioration of the Bank's Loan Portfolio

The investigation of the FMSA and Samruk-Kazyna prior to Samruk-Kazyna's investment into the Bank, and the Bank's internal due diligence conducted following the acquisition and the appointment of the new management team, have revealed a number of internal and external factors that the Bank believes led to the deterioration of the Bank's loan portfolio.

*Internal Factors*

The Bank has uncovered a significant number of purported loans that at present appear to have been provided on preferred terms to companies connected with former management and for which the security provided was inadequate or non-existent.  In addition, the Bank has uncovered numerous examples of purported loans being granted that do not appear to have gone through the proper approval process within the Bank.  Credit committee decisions, as well as related documentation, reflecting the actual terms of the purported loans were often (but not always) marked "FOR SAFE DEPOSIT", which meant that they remained outside the proper filing system and were not provided to the auditors in the usual way.  In some instances, a different version of each such decision, which, for example, might wrongly suggest that security had been taken before drawdown of a loan, was then put on file.

The Bank indicated in the Financial Statements for the year ended 31 December 2008 that the quality of the loan portfolio had significantly deteriorated as a result of circumstances and actions taken before the current management of the Bank were appointed by Samruk-Kazyna.  The Bank indicated that certain loan documentation, including collateral and associated agreements, primarily relating to

152

financing of projects outside Kazakhstan, was no longer available.  In addition, the Bank noted, many loans were transferred to new borrowers often offshore and no collateral was provided by the new borrowers, so the loans were unsecured.   The Bank attributes many of these gaps and missing documents to fraud and to the fact that, prior to February 2009, the credit dossiers for transactions outside Kazakhstan had been compiled on behalf of the Bank (to the extent that they were compiled) by associate banks such as BTA Russia and BTA Ukraine.  The Bank believes that there is a significant risk that, as these associate banks were and still are under the effective control of the previous management of the Bank, a number of documents may not become available to the Bank, and that the veracity of documents which are or become available may be questionable.

The January 2009 FMSA report criticised the Bank's previous management for lending to borrowers in offshore jurisdictions without identifying the ultimate beneficiaries and for granting working capital loans including those for non-residents of Kazakhstan, despite the absence of current assets, business plans, the Bank's preliminary decisions to substantiate profitability and legitimacy of granting working capital loans, or any documents to confirm the intended use of the borrowed funds. The Bank believes that, in respect of some of these borrowers, former management used multi-layered credit schemes under which one company (usually offshore) would act as the borrower, then forward the loaned funds to a project manager (often a resident of Russia, Ukraine or another country), and a third person would provide security.  Such schemes have made it more difficult for the Bank to file legal proceedings and have necessitated engaging law enforcement bodies in various countries to assist in returning the funds.  See "*Asset Recovery*".

Furthermore, the Bank has noted that the Bank had two regional credit committees, which were separate from the Bank's main credit committee but nevertheless approved loans that were to be granted by the Bank.   The Regional Credit Committee for Russia was set up in March 2006, purportedly to consider and approve financing for projects falling within the geographical boundaries of Russia.  A separate Regional Credit Committee for non-Russian (non-Kazakh) CIS projects was set up two years later.   Mr. Ablyazov was the Chairman of both regional committees.   While the appointments to these committees required the approval of the Bank's Management Board and Board of Directors, decisions of the Russian Regional Credit Committee did not require further approval from either.  In its January 2009 report, the FMSA criticised the procedures followed by the regional committees, indicating that the Bank's compliance reports indicated that it was impossible to establish whether or not there were insider relations between the borrower and the Bank, which prevented the Bank from confirming that such loans complied with the requirements of Kazakhstan law.   The January 2009 FMSA report specifically indicated that Mr. Ablyazov's role on the Russian Regional Credit Committee and Board of Directors was bound to involve a conflict of interest and contradicted corporate management principles.   The Bank believes that the loans purportedly approved by the Russian Regional Credit Committee were granted based on practices which were wholly inadequate and which differed significantly from the practices typically used by the Bank's main credit committee.

A number of significant borrowers, primarily registered outside of Kazakhstan, stopped making payments in 2009 and the Bank has been unable to monitor the collateral or their financial performance.  Many of these borrowers have also ceased to communicate with the Bank and some have unlawfully transferred the collateral secured by the loans.

During 2008, the Bank placed certain available-for-sale securities with a carrying amount of KZT 35,402 million with a custodian in an offshore jurisdiction.   The securities consisted of AAA-rated bonds.   In May 2008, at the direction of the former management of the Bank, the securities were transferred from the account of the existing custodian to a custodian account held by a different custodian.   Subsequent to 31 December 2008, the Bank received a statement from the custodian, indicating that these securities had been disposed of at the direction of the former management of the Bank by January 2009.  No consideration was received by the Bank from this disposal.   The Bank initiated an internal investigation with respect to the disposal and passed the information to the Procuracy of the Republic of Kazakhstan and the FMSA.  Management of the Bank believes that the circumstances above indicate that these securities were not recoverable as at

31 December 2008.  Therefore, these securities have been fully written off as at 31 December 2008.  The Bank is actively investigating the circumstances surrounding the transfer of these securities to third parties and is currently considering its options.

The Bank also was party to derivatives contracts with certain offshore companies, which exposed the Bank to excessive credit risk and have become uncollectible.  The offshore counterparties have ceased to respond to the Bank's inquiries.  The current management suspects that these contracts were entered into on behalf of the Bank through actions of the former management in contravention of then existing internal controls and in order to circumvent such controls.  The current management has decided to fully provision against receivables on these derivative contracts as at 31 December 2008 for KZT 16,298 million.

*External Factors*

The Bank, like many other banks around the world, suffered from the global financial crisis beginning in August 2007.  During the period from 2004 to 2007, the Bank's total assets increased more than four-fold, its loan portfolio increased about five-fold and its deposits increased more than two-fold.  For the year ended 31 December 2007, the Bank's net profit equalled KZT 48,683 million.  The Bank also expanded its branch network from 22 branches and 189 cash offices as at 31 December 2004 to 22 branches and 289 cash offices as at 31 December 2007.

The Bank's growth from 2004 to 2007 was primarily funded by short term bank borrowings and debt securities issues in the international capital markets and was aided by the ready availability of credit.  The proportion of funding through customer deposits remained relatively low.

Following Kazakhstan's credit rating downgrade in October 2007 by S&P from BBB to BBB- and the general deterioration in the financial markets since August 2007, the Bank became unable to refinance its international debt, which in turn adversely affected its ability to make loans.  In light of the global economic crisis, international lenders reduced their exposure to developing countries, including the Kazakhstan banking sector, which led to increased costs of funds.  In connection with this, Kazakhstan banks, including the Bank, decreased lending activities to preserve liquidity in order to service their international debt.

At the beginning of the financial crisis in August 2007, the Bank was rated BB by S&P, BB+ by Fitch and Ba1 by Moody's.  Since then, as a result of the Bank's rapidly deteriorating financial condition, suspension of repayments and its initiation of negotiations with the creditors concerning the Restructuring, the Bank's credit ratings have been downgraded a number of times.  Between March and April 2009 the ratings agencies downgraded the Bank's short and long-term counterparty credit ratings in stages as follows: S&P's from BB to D; Fitch from BB to RD and Moody's from Ba1 to Caa3.  As at the date of this Information Memorandum, the

Bank has been assigned an RD long-term issuer default rating by Fitch, a D long-term credit rating by S&P and Caa3 long-term deposit obligation rating by Moody's.

**Sequence of Significant Events Following Samruk-Kazyna's Acquisition**

As part of the efforts to restore the stability of the Bank, Samruk-Kazyna appointed Mr. Dunayev and Mr. Saidenov on 2 February 2009 to the Board of Directors.  On 6 March 2009, the shareholders of the Bank replaced the remaining members of the Board of Directors, except Mr. Talvite.  See "*Management and Corporate Governance — Current Management and Corporate Governance — Board of Directors*".  All of the members of the Management Board were replaced between March 2009 and March 2010, except Mr. Zhumakhmetov, and most of the members of the Bank's management team were replaced in 2009 as well.  See "*Management and Corporate Governance — Current Management and Corporate Governance — Management Board*" and "*Management and Corporate Governance — Management Team*".

In order to provide additional liquidity to the Bank, Samruk-Kazyna agreed to issue the SK Bonds and sell them to the Bank in exchange for the Bank Bonds.  On 17 February 2009 the Bank, the NBK and

the FMSA entered into the Cooperation Agreement pursuant to which the Bank is entitled to obtain from the NBK refinancing loans and special purpose loans. In March 2009, the Bank issued the Bank Bonds within the first and second obligation programs in the amounts of KZT 300,000 million and KZT 345,000 million, respectively. See "*Selected Statistical and Other Information — Debt Securities*". On 13 March 2009 two agreements were entered into by Samruk-Kazyna and the Bank, one for the sale by Samruk-Kazyna to the Bank of 300 million SK Bonds for consideration of KZT 300 billion, the other for the sale by the Bank to Samruk-Kazyna of 300 million Bank Bonds for consideration of KZT 300 billion. On 18 March 2009, two further agreements were entered into one for the sale of 345 million SK Bonds for consideration of KZT 345 billion, the other for the sale by the Bank to Samruk-Kazyna of 345 million Bank Bonds for KZT 345 billion.

As of the date of this Information Memorandum, the Group has received liquidity support in the amounts of KZT 404,938 million from the NBK under seven BTA/NBK Repo Transactions (constituting refinancing loans under the Cooperation Agreement) against delivery of the SK Bonds.

In addition to the KZT 212,095 million capital injection mentioned above, the Government has provided additional liquidity support in the form of deposits and pursuant to loans under the State Finance Programmes. As at the date of this Information Memorandum, the Group has received liquidity support in the amounts of KZT 404,938 million from the NBK under seven BTA/NBK Repo Transactions (constituting refinancing loans under the Cooperation Agreement) against delivery of the SK Bonds, KZT 310,495 million in deposits of SamrukKazyna and KZT 126,453 million under the State Finance Programmes. See "*The Role of Samruk-Kazyna and the NBK — Liquidity Support*".

As at 1 January 2009, the Bank in its unaudited unconsolidated statement of financial position reported provisions on its loan portfolio of KZT 214,777 million (based on FMSA Methodology), representing 9.2 per cent. of its total loan portfolio including loans to credit institutions and reverse repurchase agreements as of such date. Following its due diligence inspection of the Bank, the FMSA instructed the Bank to increase provisions on its loan portfolio to 24.9 per cent. of its loan portfolio by 1 February 2009. The Bank partially responded to this request and increased its provisions on loans to KZT 518,272 million (based on FMSA Methodology) as at 1 March 2009, representing 19.9 per cent. of the total loan portfolio as at such date.

Based on the further due diligence conducted by the Bank and in light of its deteriorating loan portfolio, the Bank increased provisions to KZT 1,522,139 million in its unaudited unconsolidated statement of financial position as at 1 June 2009 (based on FMSA Methodology), representing 57.6 per cent. of its total loan portfolio as at such date. This increase of provisions caused the Bank to breach its capital adequacy ratios on 1 June 2009. As at 1 October 2009, the Bank had created KZT 1,958,899 million in its unaudited unconsolidated statement of financial position (based on FMSA Methodology) in provisions, representing 75.5 per cent. of its total loan portfolio. Additional provisions required to be reported to the FMSA were recognised in the Bank's consolidated financial statements as at 31 December 2008 based on IFRS. The Group recognised loan loss provisions in its audited consolidated financial statements equal to KZT 1,217,278 million as at 31 December 2008 (based on IFRS) and its unaudited consolidated financial statements equal to KZT 2,068,923 million as at 30 September 2009 (based on IFRS). For a discussion of the differences between the determinations of loan loss provisions under FMSA Methodology and IFRS, see "*Asset and Liability Management — Provisioning Policy*".

During the nine months of 2009, the Kazakhstan banking system experienced a massive outflow of deposits and a so-called "run to quality". The Group's deposits decreased from KZT 886,052 million as at 31 December 2008 to KZT 683,281 million as at 30 September 2009. The Bank's market share of total deposits decreased from 17.6 per cent. as at 31 December 2008 to 10.6 per cent. as at 30 September 2009. In light of the results of the Bank's internal due diligence and in response to the deteriorating market and the Bank's financial condition, the Bank continued downsizing its operating activities. The Bank's branch network was reduced from 279 cash offices as at 31 December 2008 to 237 cash offices as at 30 September 2009, representing a 15.1 per cent. decrease. As at 30 September 2009, the Bank further reduced its staff by 23.0 per cent. to 5,085 employees from 6,608 employees as

at 31 December 2008.  The Bank also reduced limits for representative costs, travel expenses and mobile phones, reduced social benefits for Bank employees except with respect to health insurance costs and instituted a hiring freeze and a moratorium on raising wages.  The Bank has also reduced costs on advertising, training and compensation for staff transfers to other localities.  The Bank suspended implementation of noncritical information technology projects and implemented a moratorium on the purchase of property and equipment and opening new offices.  The Bank terminated its plans to open offices in Japan and South Korea and decided to close its representative office in London.

Between February and April 2009, the Bank maintained a consistent position that it would continue to make scheduled payments on its indebtedness as long as creditors did not accelerate their debt, which would effectively cause all debt to be *pari passu*.  In keeping with this position, upon acceleration by certain lenders of the Bank of U.S.$500 million on 22 April 2009, the Bank declared a moratorium on all principal payments.  The Bank continued paying interest until 24 July 2009, when repayment of interest was suspended as well.

On 1 April 2009, the Bank breached the FMSA requirement that the Bank maintain an exposure of less than 10 per cent. of its equity capital with respect to any single borrower.  This was because its loans to Temirbank exceeded the 10 per cent. threshold due to the growth of funds appropriated for Temirbank.  The FMSA issued a letter to the Bank on 3 April 2009 notifying the Bank that it had identified a number of factors negatively impacting the financial position of the Bank and requiring the Bank to provide the FMSA with a plan for early reaction measures and further development forecasts.  Due to the Bank's failure to repay certain of its liabilities, the Bank also breached liquidity requirements of the FMSA in May 2009.  Following the Bank's breach of these regulatory requirements, the Bank entered into an agreement with the FMSA on 22 May 2009 which imposed certain restrictions on the Bank and required the Bank to develop and present to the FMSA a restructuring and recapitalisation plan by 10 June 2009.  The Bank submitted a preliminary plan of restructuring to the FMSA on 10 June 2009.

In June 2009 the Bank announced it had recorded negative capital and consequently the Bank and the FMSA entered into the FMSA Agreement on 30 June 2009 pursuant to which the Bank was obliged, among other things, to provide the FMSA with a restructuring plan not later than 3 August 2009 and the FMSA undertook not to apply sanctions and enforcement measures against the Bank, including commencement of liquidation or conservation procedures against the Bank or withdrawal of the Bank's license.  The deadline under the FMSA Agreement was subsequently extended to 18 September 2009 pursuant Addendum No. 1 to the FMSA Agreement dated as of 11 September 2009.

Since 1 July 2009, the Bank has failed to comply with the minimum reserve requirements of the NBK, which provide that second tier banks must maintain reserves equal to 1.5 per cent. of internal liabilities and 2.5 per cent. of other liabilities.  On 30 November 2009, the NBK Management Board reduced the obligatory reserve ratio requirement applicable to the Bank to zero per cent. for both internal and external liabilities.  The reduced ratio will remain in effect until the Restructuring process is finalised.

On 18 September 2009, the Bank submitted an indicative restructuring and recapitalisation plan to the FMSA in accordance with the FMSA Agreement.  Following negotiations with the creditors during September 2009, the Bank and the Steering Committee of the creditors signed the Memorandum of Understanding on 21 September 2009.  The FMSA approved this plan on 26 September 2009.  On 5 October 2009, the Bank and the FMSA executed Addendum No. 2 to the FMSA Agreement which extended to 7 December 2009 the deadline for the Bank to enter into the Term Sheet with the Steering Committee.

Following the adoption of the Restructuring Law in Kazakhstan, which came into effect in August 2009, the Bank submitted an application to the Court on 7 October 2009 to formally initiate the restructuring process under the Restructuring Law.  The Bank's application was approved by the

Court on 16 October 2009, which resulted in an automatic stay of all relevant claims of the Bank's creditors and protection of the Bank's property from execution and attachment until completion of the Restructuring.   Pursuant to the terms of the decision of the Court, the Restructuring must be completed by 5 September 2010.  The High Court of Justice of England and Wales on 18 December 2009 and the United States Bankruptcy Court for the Southern District of New York on 9 March 2010 each issued an order recognising the restructuring proceedings in the Court as the main foreign proceeding in respect of the Bank's assets located in Great Britain and the United States, respectively, pursuant to the Model Insolvency Law.

The Solomensky District Court of Kiev on 17 February 2010 issued a decision which came into force on 23 February 2010 recognising the restructuring proceedings in the Court pursuant to the Convention of Legal Aid and Legal Relations on Civil, Family and Criminal Matters signed on 7 October 2002 in Kishinev City, Republic of Moldova by ten CIS member states, including the Ukraine and Kazakhstan.

On 7 December 2009, the Bank and the Steering Committee signed the PCTS setting out key commercial terms of the Restructuring, certain restructuring options and certain other arrangements, principally relating to the Bank's corporate governance and other aspects of its operations and business following completion of the Restructuring.  On 17 March 2010, the Bank and the Steering Committee entered into the PCTS Amendment Letter, relating to the restructuring options and the conditions of the Restructuring process.  On 29 March 2010, the Bank and the FMSA entered into a further addendum to the FMSA Agreement whereby the FMSA agreed, among other things, (i) to require the implementation of the measures envisaged by the Restructuring Plan (including the conversion of securities into shares of the Bank) by 1 September 2010 and (ii) to extend until 1 September 2010 its agreement not to apply sanctions and enforcement measures against the Bank. On 18 April 2010, the Bank and the Steering Committee entered into the Detailed Term Sheet.

As at 30 September 2009, based on data published by the FMSA, the Bank was the second largest bank in Kazakhstan by total assets with a market share of 17.7 per cent.  This compares with a market share of 24.5 per cent. as at 31 December 2008 (when it was the largest bank in Kazakhstan by total assets) and 22.7 per cent. as at 31 December 2007 (when it was the second largest bank in Kazakhstan by total assets).

### *Recovery Efforts*

The Bank has assembled a team to investigate the circumstances behind the Bank's current financial position and the extent to which it is a result of what are believed to be fraudulent transactions entered into by, or on the instructions of, the former management, in particular, Mr. Ablyazov.  That team is made up of a combination of certain members of the Bank's new management and staff, as well as lawyers and accountants with international firms.  As part of the work of the Bank's asset recovery team, various legal proceedings have been commenced which are summarised below.  See "*Asset Recovery*".

### Strengths

A successful restructuring would provide the Bank with an advantage over other Kazakhstan banks. The Bank would be perceived as one of the first Kazakhstan financial institutions to have overcome the financial crisis as opposed to other banks operating in a generally distressed banking sector with limited funding sources.  The Bank believes that a successful restructuring would also boost client confidence, which would give the Bank an opportunity both to increase collections on existing assets and to attract new clients, including depositors.  After restructuring, the Bank intends to continue to capitalise on its historical strengths.

The Bank believes its historical strengths are:

- extensive network;

- highly skilled management and staff;

- "one-stop-shop" approach for clients;

- salary card programmes;

- advanced direct distribution channels infrastructure; and

- partnerships with money transfer businesses.

### Extensive network

The Bank enjoys one of the most extensive geographical branch networks among the banks in Kazakhstan with its 22 branches and 230 cash offices in 66 cities across the country as at 31 March 2010, representing the second most extensive network of cash offices and third most extensive network of branches in Kazakhstan.  The Bank ranks third in the country as at 31 March 2010 with 924 automated teller machines and 160 cash and pay self-service terminals as at 31 March 2010.  The Bank also provides 11 currency exchange terminals and 2,056 point of service units as at the date of this Information Memorandum.

### Highly skilled management and staff

In early 2009, the top management of the Bank was replaced with new highly skilled managers appointed to implement the new corporate strategy.  In particular, the Bank's new management has significant experience in the financial sector, in various local and foreign banks, accounting firms and governmental agencies.  See "*Management and Corporate Governance — Current Management and Corporate Governance — Management Team*".  Despite the changes in the Bank's top management in early 2009, the Bank retained its highly skilled and experienced staff.

### "One-stop-shop" approach for clients

The Bank provides a full range of products that makes the Bank a "one-stop-shop" for its retail, corporate and SME clients, including a combination of lending services with current account, payment processing and deposit services.  The Bank's highly competitive pricing and efficiency of processing payments of clients (e.g., the Bank processes on average 35,000 payments per day) also serves to strengthen the Bank's strong reputation and customer loyalty among retail, corporate and SME clients.  The staff has developed a loyal customer base among clients with a corporate and SME client base of over 28,000 and retail client base of over 650,000 as at 30 September 2009.

### Salary card programmes

The Bank launched its salary card programmes in the mid-1990s pursuant to which the Bank issues Visa and Mastercard cards to the staff of participating companies who, in return for signing a salary deposit agreement with the Bank, receive benefits (such as pre-approved credit lines) and reduced commissions on card payments.  As at 30 September 2009, the Bank operated salary card programmes with over 6,100 companies under which the Bank provided services to employees through over 680,000 issued and activated cards.  The salary card programmes encourage customer loyalty towards the Bank and provide cross-selling opportunities for the Bank's payment cards services and internet banking.  The Bank seeks to attract new customers and new deposits through the salary card programmes and is targeting an increase in the number of salary cards to 720,000 by the end of 2010.

### Advanced direct distribution channels infrastructure

The Bank has developed alternative distribution technologies, including through internet banking, SMS banking and telebanking.  The Bank provides a variety of over 50 services to more than 45,000 users and adds over 1,000 new user accounts each month to its internet banking platform.  During the first nine months of 2009, the Bank processed KZT 4.7 billion worth of transactions.  The Bank provides SMS banking services to over 46,000 users, including over 3,000 new user accounts each month.  The Bank furthermore seeks to improve payment channel availability and the range of services offered in order to increase market share in this segment (from 8 per cent. currently to

15 per cent. by the beginning of 2014). The Bank plans to focus on "non-credit" products to support all of its retail business infrastructure and to leverage the cross-selling potential of its vast existing client base. The Bank seeks to increase its market share of exchange transactions from 12 per cent. to 20 per cent. by the beginning of 2014.

### Partnerships with money transfer businesses

The Bank seeks to provide its clients with prompt and reliable service. Clients can send or receive a money transfer in all cash settlement offices of the Bank. The Bank provides money transfers inside Kazakhstan and the CIS, international money transfers (SWIFT and Western Union) and interbank money transfers inside Kazakhstan. Since the beginning of 2009 and until 30 September 2009, the volume of transfers amounted to over KZT 162 billion. The Bank was the first among Kazakhstan banks to launch its own system of express money transfer without the need to open a bank account. In 2008, express transfers were available in all 279 cash offices of the Bank (as well 147 of the Bank's subsidiary, Temirbank's, cash offices) located in 14 regions of Kazakhstan. There are 250 outlets to service customers within the Faster system in nine CIS countries, Great Britain and the Czech Republic. The express transfers are designed to be effected in less than a minute and money can be transferred in KZT, Dollars, Russian Roubles and Euro.

### Strategy

The Bank's principal strategies may be divided into general strategies of the Bank and specific strategies with respect to restructuring and recovery of troubled assets and future development of each of its corporate, SME and retail portfolios.

### General Strategies of the Bank

The Bank's general strategies are as follows:

#### Focus on Increasing Liquidity

As of the date of this Information Memorandum, the Bank relies heavily on the liquidity support provided by Samruk-Kazyna. See "*The Role of Samruk-Kazyna and the NBK*". The Bank expects to increase its current liquidity by expanding its role in Government programmes, restructuring its portfolio, refinancing existing obligations, increasing cross-selling and attracting new clients. The Group has already utilised KZT 114,097 million and retained for future lending KZT 584 million as an agent under the existing State Finance Programmes. See "*State Finance Programmes*". The Bank will seek to expand its role under such programmes and become an agent under new programmes proposed by the Government.

The Bank and DBK have started discussion about developing a scheme to refinance the obligations of the Bank's borrowers. See "— *Other Potential Government Support*". The Bank plans to participate in these programmes if they are ultimately developed.

A successful debt restructuring would provide the Bank with an advantage over other Kazakhstan banks as the Bank would be perceived as one of the first Kazakhstan financial institutions to have overcome the financial crisis. The Bank believes that a successful restructuring would also boost client confidence, which would give the Bank an opportunity both to increase collections on existing assets, as well as to attract new clients, including depositors. After the Restructuring, the Bank will seek to capitalise on its historical strengths, including its network, customer base and experience in servicing state-sponsored programmes.

#### Focus on Core Businesses and Client Segments

The Bank's new management conducted an analysis of the Bank's subsidiaries and has decided to refocus the Bank's operations on the domestic market. In addition, the Bank has divided its subsidiaries into "core" (i.e., subsidiaries that the Bank intends to retain going forward) and "non-core" (i.e., subsidiaries and associates that the Bank intends to dispose of) based on the results of

this analysis.  The Bank deemed a subsidiary or associate core if such entity was of strategic importance to servicing the Bank's key client segments and provided high growth and profitability potential where such subsidiary operates.  All subsidiaries were determined to be "core" except BTA Georgia, BTA Armenia, Temirbank and BTA Ipoteka.

*Strengthen Corporate Structure and Governance*

Following Samruk-Kazyna's investment in the Bank in early 2009, Mr. Arman Dunayev was appointed Chairman of the Board of Directors.  On 6 March 2009, Mr. Iskandirov, Mr. Aitekenov and Mr. Karibzhanov were further appointed to the Board of Directors by Samruk-Kazyna.  On the same date, Mr. Wokurka, Dr. Korishchenko and Mr. Talvite were appointed as independent directors on the Board of Directors.  Following these appointments, the Bank commenced a company-wide review and reform of its corporate governance policies and procedures.  As a part of these reforms, the Board of Directors now meets three times per month and has increased its interaction with the Bank's management.  Furthermore, new members were appointed to each of the remuneration committee and management board.  The Bank is required to implement a corporate governance framework consistent with best international practices as part of the Restructuring.

*Improve Risk Management*

In order to improve its risk management, the Bank has created a new credit policy that describes key sectors on which the Bank is planning to focus, as well as requirements for client selection.  The new credit policy gives priority to the SME loan business and key agricultural and industrial companies with a focus on vertically integrated businesses.  The Bank will also focus on financing state-owned companies, export and highly efficient production industries, including through participation in state programmes that provide business support.  As a part of its policy, the Bank will not offer loans to new real estate projects, start-up investment projects or non-residents (including off-shore companies).  The Bank will also develop and introduce a maximum allowable concentration for its portfolio risks and implement a new borrower risk assessment system after the Restructuring.

On the retail side, the Bank's new policy will decrease the lending limits established for each loan product, require income confirmation of its retail borrowers and focus on lending to employees of corporate clients with deposits already held by the Bank through its salary card programmes.  The Bank will also discontinue a number of its more risky retail lending programmes, including lending to the secondary auto market.  Finally the new policy will require examination of clients' credit history through the credit history bureau, the First Credit Bureau.

The new credit policy will require that liquid collateral, including deposits, real estate, insured cars and equipment, comprise at least 70 per cent. of the overall collateral structure.  The Bank will institute a limit of 30 per cent. on the proportion of collateral that may be comprised of land lots and subsurface use rights.  Under the policy, the Bank will no longer accept as collateral immovable property under construction which is less than 80 per cent. completed, except with respect to "investment loans" (which under FMSA rules of classification must include the following terms: (i) a maturity of five or more years; (ii) restriction on prepayment in full; and (iii) a business plan that contemplates the creation, expansion and modernisation of material production, manufacturing or transport infrastructure.  Further, any collateral proposed for loans in excess of U.S.$3 million must be reviewed by the Bank's Division of Expertise and Monitoring of Collateral.

Finally, the Board of Directors must approve (in some cases with a Qualified Majority) any loan involving (i) a borrower that has any type of special relationship with the Bank or is affiliated with the Bank, (ii) an exception from the Bank's credit policy or (iii) any type of Government interest.

*Build on Existing Banking Franchise*

Historically, the Bank has had a strong corporate banking franchise and that has only recently been negatively affected by the lending practices of former management.  The Bank's new management expects to rectify the lending practices to build on the Bank's strong franchise following

Restructuring.  Further, the Bank's close relationship and support from the Government allows the Bank to participate in the State Finance Programmes and provides the Bank access to major domestic corporate clients.  The Bank's new strategy refocuses the Bank's business strategy on Kazakhstan customers and the retail and SME businesses.  The Bank believes its banking franchise is fundamentally a healthy business that should perform efficiently following the change in management and key shareholders of the Bank and abandonment of the deficient legacy lending practices.  The retail and SME business divisions have retained their core infrastructure and personnel despite the recent financial turmoil.  The SME and retail businesses will be further developed to enhance cross-selling opportunities.

*Strengthen Treasury Operations*

The Bank intends to strengthen its treasury operations to ensure that the Bank maintains current liquidity.  The Treasury department regulates the Bank's external cash flows to meet the Bank's client demands, as well as internal and regulatory liquidity standards.  Further, the Treasury department hedges the Bank's currency risks and engages in securities and derivatives trading.  The Bank intends to strengthen the Treasury department by adopting automated systems that will incorporate real time risk management for a wide range of the Treasury department's operations while enhancing further liquidity management.

*Improve Human Resources and Information Technology*

In order to reduce its costs, the Bank has decreased its headcount (on an unconsolidated basis) from 7,185 employees as at 31 December 2007 to 6,608 employees as at 31 December 2008 to 5,085 as at 30 September 2009.  Going forward, the Bank plans to increase the proportion of employees deployed in client-facing roles by improving efficiency in its back-office operations.  With respect to operations, the Bank plans to improve its customer service to differentiate itself from its competitors.

The Bank currently has one of the most modern and reliable information technology systems in the Kazakhstan banking sector.  The Bank intends to build on its infrastructure by increasing the quality of the data produced, providing consistent classification and resolving data-reconciliation issues.

*Optimise Branch Network*

The Bank's new management commenced a review and optimisation of the Bank's domestic branch network beginning in the fourth quarter of 2008.  As a part of the optimisation, the Bank has reduced its branch network to 22 branches and 230 cash offices in 66 cities across the country as at the date of 31 March 2010 from 22 branches and 279 cash offices as at 31 December 2008.  The Bank's branch network as at 30 September 2009 included 142 full service outlets offering a full range of products to corporate and retail clients, 37 specialised retail units servicing all types of retail clients and 58 cash offices providing payment services to retail clients.  The Bank believes that the optimisation is complete as of the date of this Information Memorandum and the Bank expects to increase its branch network going forward.

**Corporate Business Strategy**

*Restructuring and Recovery of Troubled Assets*

The Bank has analysed each of the loans in its corporate portfolio and, based on certain economic and legal factors, created a notional division to identify its troubled assets portfolio.  The economic factors that the Bank considered when deciding whether to identify a particular corporate loan asset as troubled included: (i) inability of the borrower to service the debt in accordance with the terms of the loan; (ii) delinquency of over 60 days; (iii) a change in provisions of between 50 per cent. and 100 per cent.; (iv) two or more loan extensions; (v) debt discharge at the end of the term; (vi) need for further investments to complete projects with no interim cash flows; and (vii) borrowers in certain "problem" sectors including construction and development (civil and industrial), property speculation, building materials production or trading and mining start-ups.  The legal factors that the Bank considered include: (a) suspected related party transactions; (b) no connection between the purpose of

the loan and the business of the borrower; (c) unresolved legal issues in respect of credit transactions; and (d) absence or discharge of a pledge.

As of 30 September 2009, the value of the Group's total corporate loans portfolio was KZT 2,443,296 million, of which KZT 1,838,280 million were loans segregated into the troubled assets portfolio.

After a loan is segregated into the troubled asset portfolio, the Bank pursues one of three strategies — recovery, write-off or restructuring and transfer to the performing loans portfolio. See "*Asset and Liability Management — Non-Performing Loans*" and "*Asset and Liability Management — Write-off Policy*".

*Development Strategy*

The Bank's development strategy with respect to its corporate portfolio will focus on corporate clients in Kazakhstan and on lending to corporates under the State Finance Programmes and the Industrial Innovation Programme. The Bank also seeks to improve its corporate lending procedures.

As an initial matter, the Bank plans to focus on corporate borrowers in Kazakhstan. The Bank plans to restore its reputation and thereby resume its relationships with former domestic corporate clients with the aim of replacing the corporate deposits lost since 2008. The Bank plans to provide loans to Kazakhstan-based companies through the State Finance Programmes and companies in key industries (including oil and gas, minerals, metallurgy, transport, communication and agriculture) and to provide guarantees to contractors and suppliers of SamrukKazyna's group companies.

As at 30 September 2009, the Group has utilised KZT 25,197 million pursuant to the Construction State Finance Programme and utilised KZT 8,160 million pursuant to the Agricultural State Finance Programme. See "*State Finance Programmes*". The Bank intends to continue its participation under these and similar programmes funded by the Government and other multilateral organisations and will covenant in the Trust Deed to use its reasonable efforts to remain eligible for participation in programmes sponsored by the Government or its agencies for funding the commercial banking sector and to participate in such programmes to the extent that such funding is available on reasonable commercial terms.

As a state-owned bank following the Restructuring, the Bank will play a crucial role in the national industrialisation programme, pursuant to which the Government has publicly stated that it plans to invest KZT 9.5 trillion into 368 projects over the next five years. The Bank believes that its involvement in this programme will improve the diversification of its corporate loan portfolio due to the programme's strict eligibility requirements.

With respect to its lending procedures, the Bank plans to establish more conservative risk limits for specific industries and to monitor more closely its credit risk compliance. The Bank will seek to ensure adequate diversification of the corporate loan portfolio, provide credit risk monitoring, including the calculation of capital level of an individual borrower, economic sector, country and product, more closely monitor risk concentration in the corporate portfolio by economic sectors and ensure monitoring of lending procedures in accordance with agreed bank rules and regulations.

### SME Business Strategy

*Restructuring and Recovery of Troubled Assets*

The Bank relies on certain economic factors to identify loans that should be included in its SME troubled assets portfolio, including: (i) payment delinquency; (ii) financial performance of the borrower (if the borrower's financial condition is assessed as unsatisfactory or critical due to the borrower's inability to meet its obligations); (iii) collateral quality and (iv) other parameters, including misuse of previously loaned amounts, previous extensions of the maturity of the loans, presence of other outstanding obligations and the availability of a credit rating for the borrower. The

Bank does not evaluate any legal factors when determining whether a loan will be included in the SME troubled assets portfolio.

As at 30 September 2009, the value of the Group's total SME loans portfolio was KZT 235,512 million, of which KZT 58,003 million were loans segregated into the SME troubled assets portfolio.

The Bank reviews the troubled loans in the SME portfolio on a monthly basis to monitor the borrower's standing and conducts financial due diligence on each SME borrower twice per year. The Bank also undertakes a valuation of the collateral on an annual basis. Both the financial due diligence and collateral valuation must be approved by the Credit Committee of the Bank.

After a troubled SME loan becomes delinquent, the Bank's Department of Small and Medium Business pursues one of several strategies depending on the particular borrowing, including refinancing, requiring full or partial prepayment, obtaining additional collateral or collateral sale. Once a troubled loan becomes overdue by more than 60 days, the loan is handled by a dedicated department for further work on loan repayment with a focus on full recovery through enforcement and sale of security.

*Development Strategy*

As a part of its development strategy, the Bank seeks to regain market share in the SME sector and increase the proportion of its overall loan portfolio represented by SME loans to 30 per cent. As at 30 September 2009, the Bank's SME market share was 13.4 per cent. and SME loans comprised 7.4 per cent. of its total loan portfolio. As at 1 March 2009, the Bank's SME market share had decreased to 11.6 per cent. The Bank also seeks to increase its efficiency in the SME business in part by reducing the application processing time for an SME loan from 32 days to 16 days.

The Bank also seeks to expand its role in the SME State Finance Programmes. As at 30 September 2009, the Group had received KZT 39,800 million from the Government pursuant to the SME State Finance Programmes, of which it had utilised KZT 37,566 million. See "*State Finance Programmes*".

**Retail Business Strategy**

*Restructuring and Recovery of Troubled Assets*

The Bank uses the same analysis to identify the troubled assets in its retail portfolio that it uses for its SME portfolio.

As at 30 September 2009, the value of the Group's total retail loans portfolio was KZT 497,356 million, of which KZT 106,223 million were loans segregated into the retail troubled assets portfolio.

Once a retail loan is deemed to be a troubled asset (which occurs once payment is overdue for 31 days), the Department of Problem Loans of the Bank implements a three-tiered strategy for recovery. First, the Bank will attempt to prevent delays in repayment by making warning calls to borrowers of loans that are overdue, but not yet classified as non-performing. If the loan becomes non-performing, meaning overdue for 90 days, the Bank will attempt to restructure the loan by altering the repayment schedule, prolonging the maturity date and, for loans that qualify, provide refinancing through the Mortgage State Finance Programme. Finally, if these measures do not succeed, the Bank may exercise its rights over collateral, including conducting a collateral sale. If a particular company decides to terminate its salary card programme in which that company pays all employee salaries through the Bank by way of the issuance by the Bank to that company's employees of salary cards, then the Bank will classify any loans granted to employees of such company (which will no longer be secured by the salary cards and by the ability of the Bank to directly debit such cards) as "potential" troubled assets which are closely monitored.

*Development Strategy*

The Bank's goal with respect to its retail deposits is to attain a ranking within the top three of Kazakhstan banks by 2014, with market share of at least 15 per cent.  In order to achieve this goal, the Bank will focus on middle and mass segments of the population (as opposed to high-end customers) and improve customer relations through loyalty programmes with existing customers.  The Bank also intends to expand its credit card business and attract new corporate clients to salary card programmes. Furthermore, the Bank will focus on non-credit products as a source of support for all retail business, including exchange transactions, payment transactions and transfers.  The Bank will expand its payment channel availability to facilitate this goal.

The Bank will seek to expand its role as an agent bank for the State Finance Programmes.  The Bank will also focus on lending to employees already participating in its salary card programmes and seek to increase the customers in its salary card programmes from approximately 640,000 to 720,000.  The Bank will further target borrowers that are employees of financially stable companies.  Finally, the Bank will seek to reduce the level of provisions to less than 11.5 per cent. of the overall retail loan portfolio by 2014.

**Business of the Bank**

The Bank is a leading commercial bank in Kazakhstan.  Under the terms of the Bank's licence, the Bank is authorised to offer a full range of traditional corporate and retail banking products and services.  See "*Overview*".

The Bank services private commercial enterprises, state-owned enterprises and individual customers. As at 30 September 2009, the Bank had 22 regional branches and 237 cash offices throughout Kazakhstan.  In addition, the Bank maintains representative offices outside Kazakhstan in Moscow, Russia; Kiev, Ukraine; Shanghai, China and Dubai, United Arab Emirates.

The Bank has four principal business activities, divided into various departments: corporate, SME, retail and investment activities.  See "*Principal Business Activities*".  The Bank has various ancillary departments that provide support services.

The following table presents a breakdown of the Group's net loan portfolio as at 30 September 2009 and as at 31 December 2008 and 2007:

| | As at 30 September | | As at 31 December | | | |
| | 2009 | | 2008 | | 2007 | |
| | *(KZT millions)* | *(per cent.)* | *(KZT millions)* | *(per cent.)* | *(KZT millions)* | *(per cent.)* |
|---|---|---|---|---|---|---|
| Corporate loans | 507,339 | 45.8% | 897,681 | 55.5% | 1,558,146 | 65.5% |
| SME loans | 180,375 | 16.3% | 235,671 | 14.6% | 277,094 | 11.6% |
| Retail loans | 419,527 | 37.9% | 483,711 | 29.9% | 544,570 | 22.9% |
| **Total** | **1,107,241** | **100.0%** | **1,617,063** | **100.0%** | **2,379,810** | **100.0%** |

The Bank offers its products and services through its own branch network as well as through alternative distribution channels.

**Principal Business Activities *Corporate Business***

As at 1 March 2010, the Bank serviced 598 corporate clients.  In order to provide high-quality client service, the Bank developed a dedicated team of personal managers with a high level of responsibility and professional skills.

The Bank's corporate business is comprised of two divisions responsible for long-term client relationships based on the location of the corporate customer (Department of Client Relations of Corporate Business No. 1, Department of Client Relations of Corporate Business No. 2), three divisions responsible for the quality of the corporate portfolio based on the economic sector of the corporate client (Department of Credit Analysis of Corporate Business No. 1, Department of Credit Analysis of Corporate Business No. 2, Department of Credit Analysis of Corporate Business No. 3),

one division responsible for credit analysis and recovery of existing loans made to businesses in CIS countries (Department of CIS Countries Financing), one division responsible for business development (Department of Analysis and Corporate Business Development) and a regional directorate for agricultural business.

A significant part of the corporate loan portfolio comprises trade financing, mostly in Tenge and in U.S. Dollars, including letters of credit, guarantees and working capital financing.  The corporate departments of the Bank provide a range of services that includes cash management control and online banking.  The Bank cross-sells a number of products and services to corporate clients, including payroll management services and corporate card services.  According to the FMSA, as of 1 March 2010, the Bank held a 29.2 per cent. share of the corporate lending market in Kazakhstan.

In July 2009, the Bank engaged an independent auditor to review the credit files of a portion of the borrowers in the Bank's corporate loan portfolio to assess, in conjunction with independent auditors engaged by the Steering Committee, the appropriate level of loan loss provisions as at 30 June 2009 based on FMSA Methodology.  This review resulted in a report dated 3 September 2009.  On 23 September 2009, the Bank and the Steering Committee again engaged their independent auditors to supplement and expand on their previous review of the corporate loan portfolio by reviewing the credit files of all of the borrowers in the Bank's corporate loan portfolio.  Pursuant to its report issued on 12 November 2009, the Bank's independent auditors in conjunction with the Steering Committee's independent auditors advised that the appropriate level of loan loss provisions on the corporate loan portfolio of the Bank was KZT 1,965 billion (based on FMSA Methodology) as at 30 June 2009.  For a discussion of the differences between FMSA Methodology and IFRS, see "*Pro Forma Financial Information*" and "*Asset and Liability Management — Provisioning Policy*".

As at 30 September 2009, the Group's corporate loan portfolio included KZT 2,443,296 million in loans to corporate customers (not including SME customers), representing 76.9 per cent. of its gross loan portfolio.  As at 30 September 2009, the Group posted KZT 1,935,957 million of provisions in respect of corporate loans (excluding SME loans).  Of the gross corporate loan portfolio, loans totalling KZT 1,838,280 million have been deemed troubled loans as at 30 September 2009.  See "*Strategy — Corporate Business Strategy — Restructuring and Recovery of Troubled Assets*".

The Bank's deposits of corporate clients (on an unconsolidated basis) decreased by 21.2 per cent. to KZT 330,095 million as at 30 September 2009 from KZT 418,823 million as at 31 December 2008, primarily as a part of the overall significant deposit outflow in the Kazakhstan banking sector during that time.

The Bank also provides certain insurance services to its corporate clients, including borrowers' property insurance through its insurance subsidiary companies.  See "*Other Activities of the Bank — Insurance Services*".

### SME Business

The Department of Small and Medium Business provides banking services to SMEs, which are defined as legal entities with assets of no more than KZT 459 million, annual sales of no more than U.S.$25 million and no more than 250 employees.  The Bank sets a financing limit equal to no more than U.S.$10 million for SMEs.  The Department of Small and Medium Business consists of three divisions: Division of Loan Business, Division of Non-Loan Business and Division of SME Support.

The Bank offers cooperation to enterprises of all sectors of the economy and offers loans for various purposes, including:

- replenishment of working capital;

- purchase of raw materials;

- trade operations;

- purchase of equipment, real estate purchase and equity investments; and

- "investment loans," (which under FMSA guidelines means loans which include the following terms:

(i) a maturity of five or more years; (ii) restriction on prepayment in full; and (iii) a business plan that contemplates the creation, expansion and modernisation of material production, manufacturing or transport infrastructure).

The Bank offers different types of products to its SME clients: loans and credit lines, overdrafts, letters of credit, guarantees, promissory notes, bonds and factoring. The Bank also lends funds to SMEs through the SME State Finance Programme and Agricultural State Finance Programme, as well as through other Samruk-Kazyna stabilisation programmes. See "*State Finance Programmes*".

As at the date of this Information Memorandum, the Bank services approximately 52,039 SME clients in its 22 branches, including approximately 9,862 SME borrowers. The Bank evaluates the particular circumstances of each SME client and uses a tailored approach in servicing their loans supported by a full range of banking services. The Bank will provide certain discounts on certain products to customers who have been loyal to the Bank for many years or provide high turnover.

As at 30 September 2009, the Group's SME loan portfolio included KZT 235,512 million in loans to SME customers, which represents 7.4 per cent. of its gross loan portfolio. As at 30 September 2009, the Group posted KZT 55,137 million of provisions in respect of SME loans. Of the gross corporate loan portfolio, loans totalling KZT 58,003 million have been deemed troubled loans as at 30 September 2009. See "*Strategy — SME Business Strategy — Restructuring and Recovery of Troubled Assets*".

The Bank's deposits of SME clients (on an unconsolidated basis) decreased by 44.6 per cent. to KZT 69,438 million as at 30 September 2009 from KZT 125,374 million as at 31 December 2008, primarily as a part of the overall significant deposit outflow in the Kazakhstan banking sector during that time.

As of 1 March 2010, the Bank's share (on an unconsolidated basis) of the SME market was 11.6 per cent. based on data of the NBK.

### Retail Business

The retail banking market is an important source of business for the Bank, and the current management believes the Bank is well placed to take advantage of its individual customer and depositor base. The Bank has benefited from its corporate banking relationships by extending retail banking services to the management and employees of its major corporate customers. As of 1 March 2010, the Bank (not including its subsidiaries) had over 1 million retail customer accounts, which includes term deposits, demand deposits and current accounts, aggregating KZT 162,946 million and over 1.1 million cards in circulation including both debit and credit cards.

Following the Bank's breach of capital adequacy requirements in June 2009, the FMSA has temporarily prohibited the Bank from conducting mass television or radio marketing campaigns to attract retail deposits.

The Bank offers a wide range of retail banking products and services, including current accounts, term deposits, credit and debit cards, money transfer services within Kazakhstan as well as to and from foreign countries, currency exchange services and automated teller machine services. The Bank has maintained its position as the second largest bank in Kazakhstan in terms of the number of retail customers (after Halyk Bank, which historically has led the retail banking market as Kazakhstan's former state-owned "savings" bank) principally because it has a large number of clients who still use salary cards issued by the Bank. The monetary value of retail deposits held with the Bank was the second largest in Kazakhstan at the beginning of 2009 with 19 per cent. of market share, but as of March 2010, the Bank's market share has fallen to 8 per cent., which places it fifth in Kazakhstan.

Since 1999, the Bank has continued to increase its penetration into the retail banking market and to expand its branch network in regions with a high potential for retail banking business, particularly eastern Kazakhstan and the Caspian Sea regions in the western part of the country. Since 2007, the Bank has invested heavily in automated teller machines and terminals throughout Kazakhstan, and now has the third most automated teller machines among banks in Kazakhstan after Halyk Bank and Alliance Bank.

The Bank offers a wide range of consumer lending products, including: mortgage loans (including through BTA Ipoteka), loans for purchasing automobiles and consumer goods, loans to employees of large corporate customers and loans to the Bank's personnel. As at 1 March 2010, total consumer loans were KZT 200,879 million. The Bank's policy is to focus on lending to retail customers through the salary card programme and to increase the retail client base through the issue of salary and other cards.

For the purpose of further developing mortgage lending, the Kazakhstan Mortgage Loan Guarantee Fund was established and the Bank joined this scheme in 2004. Participation in the Mortgage Loan Guarantee Fund entitles banks and mortgage companies to be protected from losses resulting from borrowers' defaults under mortgage loans. As of 1 March 2010, the Bank on an unconsolidated basis had received guarantees of the Fund on mortgage loans in the amount of KZT 2,423 million.

The Bank offers a wide range of card products to retail customers. As at the date of this Information Memorandum, the Bank has a leading market position in card products, with a 16.1 per cent. share of the market for active cards. The Bank offers different types of cards to its customers, including: Visa Electron, Visa Classic, Visa Gold, Visa Platinum, Visa Business, Visa Business Electron, Visa Virtuon, MasterCard Standard, MasterCard Gold, MasterCard Platinum, MasterCard Business and Maestro. As of 1 March 2010, the Bank has issued over 1,119,369 cards that are in circulation, 23,806 of which are credit cards; 440 corporate debit cards; 1,022,340 personal debit cards (including 87,618 individual debit cards, 713,359 salary debit cards, 221,363 other debit cards (which include, among others, debit cards given to individuals for receiving pension payments, debit cards for individuals making internet payments, debit cards for the payment of customs duties and debit cards for high-end clients)); and 72,783 domestic debit cards (i.e., Smart Alem cards). As of 1 March 2010, the Bank has issued 706,139 Visa cards, 340,447 Master Cards and 72,783 domestic Smart Alem cards. The Bank is a principal member of both Visa International and Master International payment systems. The Bank's card processing activities have been outsourced by the Bank to Alem Card Ltd., which acts as a processing centre.

As at 30 September 2009, the Group's consolidated retail loan portfolio included KZT 497,356 million in loans to retail customers, which represents 15.7 per cent. of its gross loan portfolio. As at 30 September 2009, the Group posted KZT 77,829 million of provisions in respect of retail loans. Of the gross corporate loan portfolio, loans totalling KZT 106,223 million have been deemed troubled loans as at 30 September 2009. See "*Strategy — Retail Business Strategy — Restructuring and Recovery of Troubled Assets*". Based on information provided by the NBK, as at 1 March 2010, the Bank had a 13.7 per cent. market share of retail loans compared to 13.9 per cent. as at 31 December 2008 and 9.6 per cent. as at 31 December 2007.

The deposits of retail clients of the Bank (on an unconsolidated basis) decreased by 44.6 per cent. to KZT 151,413 million as at 30 September 2009 from KZT 273,275 million as at 31 December 2008, primarily as a part of the overall significant deposit outflow in the Kazakhstan banking sector during that time. Based on information provided by the NBK, as at 1 March 2010, the Bank had a 8.4 per cent. market share of retail deposits compared to 19.4 per cent. as at 31 December 2008 and 18.5 per cent., as at 31 December 2007 respectively. The Bank had 1,234,313 retail deposit accounts as at 30 September 2009, compared to 1,206,917 as at 31 December 2008 and 1,014,679 as at 31 December 2007.

As at 1 March 2010, deposits of less than U.S.$10,000 accounted for 42.8 per cent. of the Bank's total deposits, deposits of an amount between U.S.$10,000 and U.S.$100,000 accounted for 39.7 per cent. and deposits in excess of U.S.$100,000 accounted for 17.5 per cent. of the Bank's total deposits.

The Bank provides additional services to its clients who use its card services, such as SMS banking, internet banking, utility bills payments through automated teller machines, transfers between cards, loan repayments and fund transfers to saving accounts.

The Bank also provides certain pension services through its subsidiary, BTA Pension Fund, and insurance services through its subsidiaries, Insurance Company London Almaty, BTA Zhizn, BTA Zabota and BTA Insurance.  See "*Other Activities of the Bank — Pension Fund Services*" and "*Other Activities of the Bank — Insurance Services*".

*Investment Activities*

The Bank's investment activities include trading or investing financial assets and liabilities, financing and merger and acquisitions transaction support.  The Bank operates in local and foreign market operations through BTA Securities, its Treasury department and international operations support departments.

The Bank's Treasury department provides open-market operations in order to ensure the efficient management of the Bank's funds (for the Bank as a whole).  The Treasury department achieves this purpose using foreign exchange (FOREX) and money market operations, and operations with securities, taking into consideration the policy of efficient internal and external risk management.  In addition, the Bank is one of the leading traders of Government debt securities and one of the leading participants on the interbank money market.  See "*Asset and Liability Management — Treasury Operations*".

In 1997 the Bank created BTA Securities, a wholly owned subsidiary of the Bank.  BTA Securities offers its clients a wide range of services: broker services, individual trust management services, mutual fund services, issuance and placement of securities of its clients.  The Bank also renders services related to the organisation of mergers and take-overs.

BTA Securities also has a trading division that carries out brokerage operations, as well as trading operations for its own portfolio.  BTA Securities provides its clients with access to Kazakhstan and international securities markets.

The principal activities of BTA Securities include individual trust management, which is focused on institutional investors and their individual investment preferences and purposes, and mutual funds focused on preserving and increasing the capital of individuals and SMEs.  BTA Securities' clients include insurance companies, mutual funds of various types, real estate funds and other legal persons who are interested in the effective implementation of their investment aims by means of the financial market.  The cumulative investment portfolios of BTA Securities' clients consist of various financial instruments, such as equity and debt securities of Kazakhstan and international issuers and derivative financial instruments.

As a financial adviser and underwriter, BTA Securities offers its clients services related to the state registration of securities issuances, inclusion of securities on the KASE and placement of securities with investors.  BTA Securities also provides consulting services to assist issuers to obtain ratings by international rating agencies.

BTA Securities provides a range of investment banking products and services, including mergers and acquisitions, structured solutions and derivatives, for clients of all sizes and across all industries.  BTA Securities' investment banking clients include local and foreign acquirers and target companies.  Traditionally, BTA Securities' primary client was the Bank itself when acquiring businesses in Kazakhstan, Russia, Turkey, Ukraine, Georgia and Armenia.  Target company clients have generally not been related to the Bank.  The investor base for target company clients includes large foreign investment banks, their clients and local and foreign private equity funds.

The Bank has been historically active on the international markets and has regularly entered into various trade finance interbank facilities with foreign banks and Kazakhstan subsidiaries of foreign banks, pursuant to each of which the Bank is permitted to draw various amounts for on-lending funds for export-import operations of its clients in Kazakhstan and abroad.  Such facilities are drawn for the purposes of providing short term financing for export-import contracts for an average of two years and for providing medium and long term loans under guarantees of export-import banks and export credit agencies that usually cover imports of goods and services for a period of up to 12 years.

As at the date of this Information Memorandum, the Bank maintains Trade Finance Facilities with ABN AMRO Bank N.V., HSBC Bank, Bank Austria Creditanstalt AG (Austria), Bayerische Hypo-Und Vereinsbank Aktiengesellschaft (Germany), Exim India (India), JBIC (Japan), Exim China (Taiwan), Exim Korea (Korea), Credit Suisse (Switzerland), Wachovia Bank (United States of America), Mediobanca (Italy), Calyon (France), UBS (Switzerland), Deutsche Bank AG (Germany), Deere Credit Inc. (Switzerland) and BNP Paribas (France) and others.

The Bank has expanded its regional presence through the establishment of a network of representative offices.  As at 30 September 2009, the Bank maintained representative offices beyond Kazakhstan in Moscow, Russia; Kiev, Ukraine; China and Dubai, United Arab Emirates through which it intends to diversify its client base and the range of banking products in the areas of lending and international trade finance.

As of 30 September 2009, the Bank has 17 subsidiaries (entities in which it owns 50 per cent. or more of the equity interest) and eight associates (entities in which it owns more than 20 per cent. and less than 50 per cent. of the equity interest).  See "*Subsidiaries and Associates of the Bank*".  The Bank has significant shareholdings in a number of local commercial banks that it believes have the potential, in particular, of developing the Bank's trade finance business.  The Bank works with these banks to develop and coordinate loan policies, and implement risk management and operational systems.

The Bank is currently considering increasing its interest in BTA Georgia in order to ensure that the Bank does not lose its controlling interest in BTA Georgia, to preserve the Group's business in Georgia and to preserve and increase the attractiveness of the Bank for potential investors post-Restructuring.  As at the date of this Information Memorandum, the Bank has no immediate plans for increasing any particular investments in any other banks.

**Other Activities of the Bank**

The Bank also provides pension fund services and insurance services to support its corporate, SME and retail business segments.

*Pension Fund Services*

The provision of pension fund services is a growing business in Kazakhstan as a result of government reform in this area in 1998.  There are currently ten asset management companies, 13 private pension funds and one state run pension fund in Kazakhstan.  The Group is committed to becoming a leading provider of pension fund services and, as of 30 September 2009, owned 86.05 per cent. of the share capital of BTA Pension Fund.

As at 30 September 2009, BTA Pension Fund had KZT 212,800 billion in assets, representing a 12.1 per cent. share of the total pension assets in the overall Kazakhstan pension market.  BTA Pension Fund has a regional network and operates through 22 representative offices and 146 agency centres.  Its principal activities include collection of obligatory and voluntary pension fees, payments of pensions to clients and investments of pension assets within the framework provided under Kazakhstan law.  The Government caps the commission interest of accumulative pension funds to 15 per cent. of investment income and 0.05 per cent. of pension assets.

*Insurance Services*

The insurance market is developing rapidly in Kazakhstan due to changes in legislation, increased regulatory supervision and the general economic development in Kazakhstan over the past few years. As at the date of this Information Memorandum, there are 43 insurance companies operating in Kazakhstan.   As of 30 September 2009, these insurance companies had total capital of KZT 182.3 billion and total assets of KZT 307.2 billion.  The Bank has a controlling interest in each of Insurance Company London Almaty (99.54 per cent.), BTA Zhizn (100 per cent.), BTA Zabota (98.17 per cent.) and BTA Insurance (100 per cent.) through which it offers a broad range of insurance products.  The Bank is focused on furthering its penetration of the insurance market over the next few years.  Management believes the Bank is well positioned to capitalise on the expected growth in this sector during the next five years.

Insurance Company London Almaty focuses on services related to property and responsibility insurance, particularly to legal entities.  BTA Zhizn provides life insurance and annuities, primarily to individuals.  BTA Zabota specialises in medical insurance, primarily to legal entities, including social benefits to the employees of its corporate clients.  BTA Insurance provides voluntary property insurance and obligatory auto insurance.

**Subsidiaries and Associates of the Bank**

*Subsidiaries*

The Bank had 17 subsidiaries as at 30 September, 2009.  The financial results of these subsidiaries are consolidated with those of the Bank in the financial statements contained herein.  The following table sets out certain information relating to the Bank's subsidiaries as at 30 September 2009:

| Subsidiary | Per cent. owned | Country of incorporation | Date of incorporation | Industry | Date of acquisition |
|---|---|---|---|---|---|
| BTA Pension Fund | 86.05 | Kazakhstan | 11 December 1997 | Pension fund | 16 September 1998 |
| BTA Insurance | 100.00 | Kazakhstan | 8 September 1998 | Property and responsibility insurance | 21 December 2006 |
| BTA Ipoteka | 100.00 | Kazakhstan | 20 November 2000 | Consumer mortgage lending | 20 November 2000 |
| BTA Zhizn | 100.00 | Kazakhstan | 22 July 1999 | Life Insurance and annuity | 30 March 2001 |
| BTA Zabota | 98.17 | Kazakhstan | 10 September 1996 | Medical insurance | 4 April 2001 |
| Insurance Company London Almaty | 99.54 | Kazakhstan | 20 November 1997 | Property and responsibility insurance | 5 August 2004 |
| BTA Securities | 100.00 | Kazakhstan | 17 October 1997 | Securities trading and asset management | 13 December 1997 |
| TuranAlem Finance | 100.00 | Netherlands | 22 May 2001 | Capital markets | 22 May 2001 |
| TuranAlem Finance (Russia) | 100.00 | Russia | 22 June 2004 | Capital markets | 28 September 2004 |
| BTA Finance Luxemburg | 86.11 | Luxembourg | 5 January 2006 | Capital markets | 6 March 2006 |
| Temirbank[1] | 70.51 | Kazakhstan | 26 March 1992 | Banking | 29 December 2006 |
| TemirCapital B.V. | 100.00 | The Netherlands | 29 May 2001 | Operations on capital markets | 29 December 2006 |
| BTA Kyrgyzstan | 71.00 | Kyrgyzstan | 2 December 1996 | Banking | 19 November 2007 |
| BTA Belarus | 99.29 | Belarus | 25 April 2002 | Banking | 30 October 2008 |
| First Kazakhstan Securitisation Company | — | The Netherlands | 8 December 2005 | Securitisation of financial assets | — |
| Second Kazakhstan Securitisation Company | — | The Netherlands | 25 September 2007 | Securitisation of financial assets | — |
| BTA DPR Finance Company | — | Cayman Islands | 2 September 2007 | Financial services | 2 September 2007 |

Note:
(1)   The Bank and Samruk-Kazyna signed an agreement on 14 October 2009 on the transfer of 100 per cent. of the Bank's shares in Temirbank to Samruk-Kazyna under a trust management agreement.  See "*Management's Discussion and Analysis of Results of Operations and Financial Conditions — Recent Developments*".

Following are brief summaries relating to the status and operations of the Bank's subsidiaries. Financial information for each entity has been extracted from the Bank's Unaudited Interim Financial Statements as at 30 September 2009.

*BTA Pension Fund*

BTA Pension Fund, previously known as JSC Pension Fund Kurmet Kazakhstan, was registered on 30 December 2005.  BTA Pension Fund, located in Almaty, was established on 16 September 1998 as a result of the merger of two pension funds, JSC Pension Fund Kurmet and JSC Pension Fund Kazakhstan, each of which was established in 1998 as a closed joint stock company.  As of 30 September 2009, the Bank owned 86.05 per cent. of BTA Pension Fund's equity capital.  BTA Pension Fund is a non-state pension fund.  See "*The Bank — Other Activities of the Bank — Pension Fund Services*".  According to information provided by the FMSA as at 30 September 2009, BTA Pension Fund had a 12.1 per cent. share of the pension market in Kazakhstan.  As of 30 September 2009, BTA Pension Fund had share capital of KZT 12,984 million and assets of KZT 13,051 million.

*BTA Insurance*

BTA Insurance was established on 8 September 1998 as an open joint stock company.  BTA Insurance is a wholly owned subsidiary of the Bank.  It provides a full range of insurance services. As of 30 September 2009, BTA Insurance had a 1.68 per cent. share of the overall insurance market in Kazakhstan, assets of KZT 22,824 million and equity capital of KZT 19,373 million.

*BTA Ipoteka*

BTA Ipoteka was established in November 2000 as an open joint stock company and is based in Almaty.  The Bank holds 100 per cent. of BTA Ipoteka's share capital.  BTA Ipoteka provides a wide range of services, including financing for the purchase, maintenance and construction of real estate. According to information provided by the FMSA, as of 30 September 2009, it had a 6.9 per cent. share of the mortgage market in Kazakhstan.  As of 30 September 2009, BTA Ipoteka had equity capital of KZT 7,265 million and assets of KZT 62,239 million.  The Bank considers BTA Ipoteka a "non-core" subsidiary.  See "*— Strategy — General Strategies of the Bank — Focus on Core Businesses and Client Segments*".

*BTA Zhizn*

BTA Zhizn was established in July 1999 as a closed joint stock company and is based in Almaty.  As of 30 September 2009, the Bank held 100 per cent. of the share capital of BTA Zhizn.  BTA Zhizn provides life insurance services and was one of the first insurance companies in Kazakhstan to be licensed by the FMSA to provide such services.  As of 30 September 2009, BTA Zhizn had an 11.1 per cent. share of the voluntary individual insurance market in Kazakhstan.  As of 30 September 2009, BTA Zhizn had assets of KZT 8,320 million and its equity capital was KZT 3,371 million.

*BTA Zabota*

BTA Zabota was established in September 1996 as an open joint stock company.  As of 30 September 2009, the Bank held 98.17 per cent. of BTA Zabota's equity capital.  BTA Zabota provides a full range of insurance services and, at the date of this Information Memorandum, had a 4.1 per cent. share of the voluntary individual insurance market.  As of 30 September 2009, BTA Zabota had a 0.7 per cent. share of the overall insurance market in Kazakhstan, its total assets were KZT 1,753 million and its equity capital was KZT 1,157 million.

*Insurance Company London Almaty*

Insurance Company London Almaty was established in November 1997 as a closed joint stock company.  As of 30 September 2009, the Bank held 99.54 per cent. of its share capital.  Insurance Company London Almaty is located in Almaty and provides a wide range of services such as individual insurance and property insurance.  As at 30 September 2009, it had a 2.2 per cent. share of the insurance market in Kazakhstan, total assets of KZT 10,845 million and equity capital of KZT 5,880 million.

*BTA Securities*

BTA Securities was established on 17 October 1997 and it is a wholly owned subsidiary of the Bank. Its principal business areas include sales, investment banking, trading and underwriting of government, municipal and corporate securities in Kazakhstan.  According to a new method of ranking of activity of operators in the stock exchange, bonds and repurchase transactions, during the first nine months of 2009, BTA Securities was first place on the stock market activity index, second place on the bond market activity index and eighth place on the repurchase transactions market activity index.  As of 30 September 2009, BTA Securities' equity capital was KZT 54,902 million and it had assets of KZT 59,318 million.

*TuranAlem Finance*

TuranAlem Finance was established on 22 May 2001 in The Netherlands as a limited liability company.  TuranAlem Finance may act as an issuer of notes under the Bank's notes programme.

*TuranAlem Finance (Russia)*

TuranAlem Finance was established on 22 June 2004 in Moscow, Russia as a limited liability company and is a wholly owned subsidiary of the Bank.  It was created principally for the purpose of raising funds for the Bank through the issuance of Russian Rouble denominated bonds and promissory notes.  As of 30 September 2009, TuranAlem Finance (Russia)'s assets of the company were KZT 15,941 million and its equity capital was KZT 187.7 million.

*BTA Finance Luxembourg*

BTA Finance Luxembourg was established in Luxembourg on 5 January 2006 as a public limited liability company (*société anonyme*).  It is a special purpose vehicle established for the purpose of the Perpetual Securities.  As of 30 September 2009, BTA Finance Luxembourg had assets of KZT 63,771 million and negative equity capital of KZT 62.2 million.

*Temirbank*

Temirbank was established on 26 March 1992.  The head office of Temirbank is located in Almaty. As of 30 September 2009, Temirbank had total assets of KZT 240.5 billion and negative equity capital of KZT 40.8 billion.  Temirbank is currently in the process of restructuring its financial indebtedness. The Bank and Samruk-Kazyna signed an agreement on 14 October 2009 on the transfer of 100 per cent. of the Bank's shares in Temirbank to Samruk-Kazyna under a trust management agreement.  See "*Management's Discussion and Analysis of Results of Operations and Financial Conditions — Recent Developments*".

*Temir Capital B. V.*

Temir Capital B.V. was incorporated on 29 May 2001 under the laws of The Netherlands and is a wholly owned subsidiary of the Bank.  Its primary business consists of raising funds on the international capital markets and lending such funds to Temirbank.  As of 30 September 2009, Temir Capital B.V. had assets of KZT 119,655 million and equity capital of KZT 639 million.

*BTA Kyrgyzstan*

BTA Kyrgyzstan was established on 2 December 1996.  As of 30 September 2009, the Bank held 71 per cent. of the equity of BTA Kyrgyzstan.  BTA Kyrgyzstan provides a wide range of services to its corporate and individual customers.  As of 30 September 2009, BTA Kyrgyzstan has assets of KZT 15,416 million and equity capital KZT 4,907 million.  Currently the Bank is involved in legal proceedings with respect to what it believes was an unlawful foreclosure against its Shares in BTA Kyrgyzstan. See "*Legal Proceedings — Litigation in respect of BTA Kyrgyzstan*".

*BTA Belarus*

BTA Belarus was established on 25 April 2002 and the Bank acquired its interest in BTA Belarus on 30 October 2008.  As of 30 September 2009, the Bank's share in the equity capital of BTA Belarus was 99.29 per cent.  BTA Belarus provides a wide range of services to its corporate and individual customers.  As of 30 September 2009, the assets of BTA Belarus were KZT 12,131 million and equity capital was KZT 1,727 million.  The Bank is currently seeking to invalidate three sale and purchase agreements entered into on 12 and 19 August 2008 for the acquisition by it of a 51.06 per cent. stake in BTA Belarus.  This forms part of the additional U.S.$ 106 million claim which has been brought in the Drey Proceedings by way of the Bank's proposed amendments to its particulars of claim.  See "*Asset Recovery – Drey Proceedings*".

*First Kazakh Securitisation Company*

The First Kazakh Securitisation Company was founded in The Netherlands on 8 December 2005 as a public limited company for the special purpose of pursuing securitisations of financial assets of the Group.  As of 30 September 2009 the assets of First Kazakh Securitisation Company were KZT 7,659 million and its equity capital was KZT 3.5 million.

*Second Kazakh Securitisation Company*

The Second Kazakh Securitisation Company was founded in The Netherlands on 25 September 2007 as a public limited company for the special purpose of pursuing securitisations of financial assets of the Group.  As of 30 September 2009, the assets of Second Kazakh Securitisation Company were KZT 14,190 million and its equity capital was KZT 3.8 million.

*BTA DPR Finance Company*

BTA DPR Finance Company was formed under the laws of the Cayman Islands on 2 September 2007 for the sole purpose of the Bank's DPR securitisation programme.  As of 30 September 2009, BTA DPR Finance Company held assets of KZT 75,000 and its equity capital was KZT 75,000.

***Associates***

The Bank has eight associates, which are entities in which the Bank owns more than 20 per cent. and less than 50 per cent. of such entity's share capital.  The Bank considers BTA Armenia and BTA Georgia "non-core" associates of the Bank.  See "*Strategy — General Strategies of the Bank — Focus on Core Businesses and Client Segments*".  The following sets out information relating to the Bank's associates as at 30 September 2009.

*BTA Armenia*

BTA Armenia is a bank located in Yerevan, Armenia.  BTA Armenia's principal activity is banking activities in Armenia.  The Bank holds a 48.93 per cent. interest in BTA Armenia.

*BTA Georgia*

BTA Georgia is a small bank located in Tbilisi, Georgia.  BTA Georgia's principal activity is banking activities in Georgia.  The Bank acquired a 49.00 per cent. equity interest in BTA Georgia in June 2005.  The Bank is currently considering increasing its interest in BTA Georgia in order to ensure that the Bank does not lose its controlling interest in BTA Georgia, to preserve the Group's business in Georgia and to preserve and increase the attractiveness of the Bank for potential investors post-Restructuring.

*BTA Kazan*

BTA Kazan is a small bank based in Tatarstan, Russia.  BTA Kazan's principal activity is banking activities in the Russian Federation.  The Bank acquired a 47.32 per cent. equity interest in BTA Kazan in October 2006.  It has been reported in the press that Rikas-Finance LLC, AMK-INVEST

Design-Construction Company LLC, DeltaTorg LLC and TuranAlem Capital, who own the remaining 52.68 per cent. stake in BTA

Kazan (who, the Bank believes, hold that stake on Mr. Ablyazov's behalf), have recently sold their stakes in BTA Kazan to Rusneftekhim, Bashpromreserve LLC and Nayada Development LLC.

*BTA Russia*

BTA Russia is a bank located in Moscow. BTA Russia's principal activity is banking activities in the Russian Federation. In July 2008, the Bank's equity interest in BTA Russia was increased to 52.84 per cent. from 14.2 per cent. In November 2008, the Bank's equity interest was decreased to 22.6 per cent. As of 30 September 2009, the Bank held a 22.26 per cent. equity interest in BTA Russia. The Bank is currently seeking to invalidate six sale and purchase agreements (all dated 6 June 2008) for the acquisition by it of an additional 38.63 per cent. shareholding in BTA Russia. This forms part of the additional U.S.$ 106 million claim which has been brought in the Drey Proceedings by way of the Bank's proposed amendments to its particulars of claim. See "*Asset Recovery – Drey Proceedings*".

*BTA Ukraine*

BTA Ukraine is a bank located in Kiev, Ukraine. BTA Ukraine's principal activity is banking activities in the Ukraine. The Bank acquired a 40.038 per cent. equity interest in BTA Ukraine in December 2008. BTA Ukraine has claimed that authorised persons of the Bank entered into an agreement dissolving the Bank's share purchase agreement for the acquisition of its 49.99 per cent. interest. As a result of this alleged agreement, the ownership of the Bank in BTA Ukraine was reduced in the register of BTA Ukraine down to 9.9 per cent. On 28 May 2009, Samruk-Kazyna and the public prosecutor on behalf of the Bank submitted a petition to the Court asking that the alleged agreement dissolving the share purchase agreements be recognised as invalid, and that the issuing of a power of attorney in respect of debiting the Bank's shares in BTA Ukraine be recognised as invalid. The Court satisfied Samruk-Kazyna's claims by absentee decision which entered into force on 3 December 2009. The decision recognised the transactions as invalid and obligated the defendants to return the shares to the Bank and to make the corresponding entry in the register of BTA Ukraine. On 18 January 2010 the Bank submitted to the Shevchenko district court of Kiev a request to have the decision of the court recognised in accordance with laws of Ukraine. The application was accepted on 26 February 2010 and a hearing is scheduled at the Kiev court for 28 April 2010.

*Temirleasing*

Temirleasing is located in Almaty, Kazakhstan. Temirleasing's principal activity is leasing. The Bank directly holds a 26.75 per cent. equity interest in Temirleasing, Temirbank holds a 18.88 per cent. equity interest in Temirleasing and BTA Securities holds a 0.17 per cent. equity interest in Temirleasing.

*BTA Orix Leasing*

BTA Orix Leasing is located in Almaty, Kazakhstan. BTA Orix Leasing's principal activity is leasing. The Bank directly holds a 45.00 per cent. equity interest in BTA Orix Leasing.

*Sekerbank*

Sekerbank is a bank located in Istanbul, Turkey. Sekerbank's principal activities are providing a range of individual and corporate banking services. The Bank holds a 33.98 per cent. indirect equity interest in Sekerbank through BTA Securities.

**The Role of Samruk-Kazyna and the NBK**

Samruk-Kazyna, Kazakhstan's sovereign wealth fund, is wholly owned by the Government and serves as the holding company for substantially all state enterprises. Samruk-Kazyna's primary

objective is to improve the competitiveness and stability of the Kazakhstan economy and alleviate the possible effects of changes in world markets on economic growth in Kazakhstan.

### Liquidity Support

Since January 2009, Samruk-Kazyna and the NBK have been providing liquidity support to the Group by way of the following:

- exchanging the Bank Bonds with SK Bonds for a total nominal value of KZT 645,000 million and allowing the Bank to use the SK Bonds as collateral under BTA/NBK Repo Transactions with the NBK totalling KZT 404,938 million excluding interest accrued as at 30 September 2009.  See also "*NBK Support*";

- depositing KZT 113,348 million in deposit accounts (both current and term) within the Group, such that deposits of Samruk-Kazyna and its subsidiaries equalled KZT 310,495 million as of 30 September 2009;

- providing funding to the Group pursuant to the State Finance Programmes under which the Group has received KZT 75,215 million since 31 December 2008, of which the Group has utilised KZT 72,215 million (and already repaid KZT 1,120 million thereof), and returned to the Government an unutilised amount of KZT 3,000 million.  Over all periods, the Group has received KZT 126,453 million under the State Finance Programmes and, as at 30 September 2009, the Group has utilised a total amount of KZT 114,097 million under the State Finance Programmes, returned to the Government the unutilised amount of KZT 11,771 million, retained KZT 584 million for future lending under the programme and repaid to the Government KZT 1,120 million.  See also "*State Finance Programmes*"; and

- acquiring the 25,246,343 new common shares of the Bank constituting 75.1 per cent. of the Bank's total share capital for cash consideration of KZT 212,095 million.

As at the date of this Information Memorandum, the total support provided by Samruk-Kazyna and the NBK to the Group since January 2009 amounts to KZT 805,596 million.  The Group's obligations under the deposit agreements governing the demand deposits and term deposits with Samruk-Kazyna and other state-owned entities are on the same terms as the Bank's typical deposit agreements and do not require any additional security.

### Legal Framework

In October 2008, the Government and the FMSA announced a proposal to strengthen the capital of the Bank as part of a broader plan to stabilise the financial system of the Republic of Kazakhstan.  The plan was announced in a public statement entitled "On Further Measures to Stabilise the Banking Sector" dated 28 October 2008.

On 9 November 2008 the Bank, the NBK, FMSA, Samruk-Kazyna and the Ministry of Finance entered into a memorandum of understanding pursuant to which the parties declared their intention to coordinate their efforts to stabilise the economy of the Republic of Kazakhstan, use all reasonable endeavours to provide additional financial resources to the real sector of the economy and assist in the stabilisation of the financial system, including the maintenance of an adequate level of liquidity and quality of the credit portfolio.

Since 31 December 2008, Samruk-Kazyna and its subsidiaries have further deposited KZT 113,348 million in deposit accounts (both current and term) within the Group, such that deposits of Samruk-Kazyna and its subsidiaries equalled KZT 310,495 million as of 30 September 2009.  The deposits are pursuant to standard deposit agreements used generally for the depositors of the Bank.

In February 2009, Samruk-Kazyna acquired 25,246,343 newly issued shares in the Bank for KZT 212,095 million and obtained a controlling stake of 75.1 per cent. of the Bank's issued share capital.

In order to provide additional liquidity to the Bank, Samruk-Kazyna agreed to issue the SK Bonds and sell them to the Bank in exchange for the Bank Bonds. On 17 February 2009 the Bank, the NBK and the FMSA entered into the Cooperation Agreement pursuant to which the Bank is entitled to obtain from the NBK refinancing loans and special purpose loans. In March 2009, the Bank issued the Bank Bonds within the first and second obligation programs in the amounts of KZT 300,000 million and KZT 345,000 million, respectively. See "*Selected Statistical and Other Information — Debt Securities*". On 13 March 2009 two agreements were entered into by Samruk-Kazyna and the Bank, one for the sale by Samruk-Kazyna to the Bank of SK Bonds for consideration of KZT 300 billion, the other for the sale by the Bank to Samruk-Kazyna of Bank Bonds for consideration of KZT 300 billion. On 18 March 2009, two further agreements were entered into one for the sale of SK Bonds for consideration of KZT 345 billion, the other for the sale by the Bank to Samruk-Kazyna of Bank Bonds for KZT 345 billion.

As of the date of this Information Memorandum, the Group has received liquidity support in the amounts of KZT 404,938 million from the NBK under seven BTA/NBK Repo Transactions (constituting refinancing loans under the Cooperation Agreement) against delivery of the SK Bonds.

The Cooperation Agreement is effective until the termination of the Restructuring.

**State Finance Programmes**

As of the date of this Information Memorandum, the Bank participates in four State Finance Programmes with Samruk-Kazyna and its subsidiaries. See the table of all amounts funded by the Government for the stabilisation of the Kazakhstan economy in "*The Banking Sector in Kazakhstan — Introduction*".

The Group has received KZT 39,800 million in aggregate in three tranches under the SME State Finance Programme, KZT 46,175 million under the Mortgage State Finance Programme, KZT 32,318 million under the Construction State Finance Programme, KZT 8,160 million under the Agricultural State Finance Programme. As at 30 September 2009, the Group has utilised KZT 114,097 million under the State Finance Programmes from Samruk-Kazyna or its wholly owned subsidiaries, returned to the Government the unutilised amount of KZT 11,771 million, retained KZT 584 million for future lending under the Construction State Finance Programme and repaid to the Government KZT 1,120 million under the Agricultural State Finance Programme. The Government provided an additional KZT 8,000 million to the Bank under a fourth tranche to the SME State Finance Programme in 2010.

*SME State Finance Programme*

The Bank and Temirbank are two of 12 agents under the SME State Finance Programme adopted by the Government in 2007. The SME State Finance Programme aims to provide financing to SMEs for the acquisition of new, and the modernisation of existing, material assets and the provision of working capital. The SME State Finance Programme funding can also be used to refinance existing loans previously made to SMEs by the Bank or Temirbank or other credit organisations provided the purpose of any loan being refinanced complies with the requirements of the programme.

Samruk-Kazyna and its subsidiary Damu Fund have provided to the Bank, for the purposes of financing and refinancing of small and medium size entities under the SME State Finance Programme, a total of KZT 39,200 million in three tranches: KZT 12,200 million on 14 December 2007, KZT 5,000 million on 13 August 2008 and KZT 22,000 million on 14 February 2009. Furthermore Damu Fund provided to Temirbank KZT 600 million under the SME State Finance Programme on 19 November 2008. As of 30 September 2009, the Group had utilised KZT 37,567 million of this amount and returned KZT 2,234 million to the Government.

As at 30 September 2009, the Government had allocated KZT 127,000 million under the third tranche of the SME State Finance Programme since 1 January 2009, and the following banks utilised the most support under the programme: ATF Bank (KZT 20,000 million), Alliance Bank

(KZT 18,000 million), Kazkommertsbank (KZT 16,000 million) and Halyk Bank (KZT 11,700 million). As at the date of this Information Memorandum, the Bank has no information about any further allocations in the future.

The interest rate on the Government funds advanced under the SME State Finance Programme is 8.0 per cent. per year. Damu Fund has the right to demand early repayment if (i) the Bank does not make timely repayments of debt or interest, (ii) the Bank does not use the proceeds in compliance with their stated purpose, (iii) the Bank's credit rating is downgraded by Fitch, S&P or Moody's by two or more notches, (iv) the Bank infringes the FMSA's prudential requirements at least once in each of two consecutive months or its licence is suspended, (v) more than 10.0 per cent. of the Shares in the Bank are sold or transferred and such transfer has a negative impact on the Bank's financial condition; or (vi) the Bank reports negative financial results for two consecutive quarters. Despite the Bank's infringement of the FMSA's prudential requirements in 1 April 2009 and the credit rating downgrade, Damu Fund has not demanded repayment under the SME State Finance Programme. See "*Risk Factors — Samruk-Kazyna may demand early repayment of funds allocated to the Bank for the State Finance Programmes if the Bank breaches conditions for the utilisation of the funds.*".

In addition to its right to demand early repayment of the funds, Damu Fund is also entitled to demand from the Bank a penalty of 15.0 per cent. on the amount of any funds used for purposes other than those permitted by the agreement under which the Bank obtained financing under the SME State Finance Programme.

### Mortgage State Finance Programme

The Bank is one of 11 agents under the Mortgage State Finance Programme adopted by the Government in February 2009. The Mortgage State Finance Programme aims at reducing the current interest rate on mortgage loans to between 9.0 and 11.0 per cent., converting foreign currency loans into Tenge and extending loan maturities up to 20 years. The total amount of investments to be made under the programme is KZT 120,000 million.

Under the Mortgage State Finance Programme, Samruk-Kazyna deposited KZT 40,000 million during 2009 with the Bank for the period of 20 years. As at 30 September 2009 the Bank had utilised KZT 37,000 million from the total amount of placed funds and returned the unutilised KZT 3,000 million to the Government. The Bank is permitted to provide mortgages under the Mortgage State Finance Programme to the extent it receives repayment proceeds of the previously made Mortgage State Finance Programme loans for a period of 36 months from the date it received the funds under the programme, after which time it will need to use the repayment proceeds to repay Samruk-Kazyna. The Bank pays interest to Samruk-Kazyna on the amounts provided under the Mortgage State Finance Programme of 5.7 per cent. on amounts lent by the Bank to certain vulnerable borrowers and 7.7 per cent. on the amounts lent to the remaining borrowers.

Of the 11 agents selected for the Mortgage State Finance Programme, the following banks utilised the most support under the programme: the Bank (KZT 37,000 million), Kazkommertsbank (KZT 24,000 million), Halyk Bank (KZT 20,500 million), Alliance Bank (KZT 10,900 million) and Bank CenterCredit (KZT 4,300 million).

### Construction State Finance Programme

The Bank is one of seven agents under the Construction State Finance Programme adopted by the Government on 6 October 2007. The Construction State Finance Programme aims at finishing incomplete constructions. The total amount of investments to be made under the programme is KZT 240 billion.

Under the Construction State Finance Programme, Samruk-Kazyna deposited KZT 23,640 million with the Bank during 2007 and 2008 for a period of three and a half years. As at 30 September 2009, the Bank had utilised approximately KZT 19,788 million from the total amount of placed funds, returned to the Government the unutilised amount of KZT 3,268 million and retained the unutilised

amount of KZT 584 million for future lending under the programme.  The Bank pays interest to Samruk-Kazyna on the amounts provided under the Construction State Finance Programme of 10.6 per cent. and 11.1 per cent.

Of the seven agents selected for the Construction State Finance Programme, the Government plans to provide the following amounts to the following banks under the programme: Kazkommertsbank (KZT 49,320 million), the Bank (KZT 26,695 million), Temirbank (KZT 5,431 million) and Kaspi Bank (KZT 4,258 million).

***Agricultural State Finance Programme***

The Bank is one of four agents under the Agricultural State Finance Programme adopted by the Government on 6 October 2007.  The Agricultural State Finance Programme aims at stabilising the agricultural sector of Kazakhstan.  The total amount of investments to be made under the programme is KZT 120,000 million.

Under the Agricultural State Finance Programme, Samruk-Kazyna deposited KZT 8,160 million with the Bank for the period from 28 April 2009 until 28 June 2010.  As at 30 September 2009, the Bank had utilised all of the placed funds and repaid the Government KZT 1,120 million of such placed funds.  The Bank pays interest to Samruk-Kazyna on the amounts provided under the Agricultural State Finance Programme of 9.05 per cent.

The four agents selected for the Agricultural State Finance Programme received the following amounts under the programme: the Bank (KZT 8,160 million), Bank CenterCredit (KZT 5,550 million), Nurbank (KZT 4,100 million) and Eurasian Bank (KZT 2,590 million).

**NBK Support**

On 17 February 2009 the Bank, the NBK and the FMSA entered into the Cooperation Agreement.  Under this agreement, the Bank may apply to the NBK for two types of loans.

The Bank may apply for refinancing loans (including secured short-term loans (not more than one month) and loans to banks and organisations carrying out banking activities (such as small credit houses), the interest rate of which equals the official refinance rate).  Every week, the NBK establishes refinancing limits in relation to refinancing loans which cannot be higher than 50 per cent. of the Bank's equity capital (the beginning of the current month and informs the Bank on the working day after it establishes such limit.  The refinancing limit includes total indebtedness of the Bank to the NBK under reverse repo transactions, swap transactions, deposits placed by the NBK with the Bank, and guarantees granted by the NBK to the Bank.  The BTA/NBK Repo Transactions form part of this refinancing limit.  The Bank can receive a further refinancing loan even if it has not repaid the earlier one, *provided that* it has provided security to the NBK for the further loan (or has sufficient funds in accounts with the NBK to secure the further loan).  As of the date of this Information Memorandum, the Bank has not provided special purpose loans pursuant to this agreement.

The Bank may also apply for special purpose loans (including secured and unsecured loans to banks and other legal entities having bank accounts opened with the NBK for a period not exceeding one year, the interest rate of which is established by the NBK Board).  The Bank can request a special purpose loan only once any existing special purpose loan has been repaid).

In March 2009, the Bank issued the Bank Bonds within the first and second obligation programs in the amounts of  KZT 300,000 million  and  KZT 345,000 million, respectively.    See  "*Selected Statistical and Other Information — Debt Securities*".   On 13 March 2009 two agreements were entered into by Samruk-Kazyna and the Bank, one for the sale by Samruk-Kazyna to the Bank of 300 million SK Bonds for consideration of KZT 300 billion, the other for the sale by the Bank to Samruk-Kazyna of 300 million Bank Bonds for consideration of KZT 300 billion.  On 18 March 2009, two further agreements were entered into one for the sale of 345 million SK Bonds for consideration of KZT 345 billion, the other for the sale by the Bank to Samruk-Kazyna of 345 million

Bank Bonds for KZT 345 billion.  See "*NBK Support*" for a further description of the Cooperation Agreement and the BTA/NBK Repo Transactions.

The Bank has been in breach of certain requirements under the Cooperation Agreement since the date it was executed, however, the NBK has not taken any actions in respect of such breach and has not indicated any intention to do so.  See "*Risk Factors — Risks Relating to the Bank — The NBK provides funding support to the Bank but may withdraw its support and accelerate repayment of its loans if certain requirements are not met.*".

**Other Potential Government Support**

According to the Government decree of Kazakhstan No. 1553 dated 9 October 2009, the Government's Distressed Assets Fund will start negotiations with second-tier banks, which includes the Bank, with a view to the possible repurchase of troubled assets of such banks.  The Bank plans to participate in this Government programme once rules and procedures are developed and subject to the obligations of the Bank under the Recovery Units.

In addition, the Bank and the DBK have started discussions about developing a scheme of refinancing of the obligations of the Bank's borrowers.  The Bank has identified those of its borrowers that it believes should receive refinancing loans under the scheme and reported to the DBK a list of proposed borrowers.  For some borrowers that have received a positive response from the DBK, the Bank and the DBK have started to negotiate the possible refinancing schemes and the Bank has been providing the necessary information to the DBK for making the examination.  As of the date of this Information Memorandum, the DBK has not provided any refinancing loans.

**Distribution Channels**

*Branch Network*

As at 30 September 2009, the Bank had 22 branches and 237 cash offices located throughout Kazakhstan, a decrease from 22 branches and 279 cash offices as at 31 December 2008.  The operations of each branch and cash office are subject to internal regulation and to oversight by the head office.  Certain types of activities, including control functions such as underwriting and credit administration are conducted by the Bank's head office only.  The branches have the authority to undertake all client functions and each branch has an authorised body capable of making certain credit decisions.

In comparison to branches, cash offices offer limited services appropriate to the geographical area in which they are located.  Each branch has different types of cash offices, including: centres of banking services (which provide consultations and cash settlement services for individuals and legal entities and deposit taking and lending to individuals and legal entities), centres of retail business (which provide consultations and cash settlement services for individuals and deposit taking and lending to individuals), universal offices (which have more limited lending authority to individuals and legal entities) and retail offices (which provide have more limited lending authority to individuals).

*ATM Network*

The Bank started establishing an automated teller machine network in 1994.  As at 30 September 2009, the Bank had 916 automated teller machines compared to 787 automated teller machines as at 31 December 2008, an increase of 16.4 per cent.  The Bank does not currently plan to increase its automated teller machines network globally, except in isolated instances in which there is an increase in card activity in a certain area.

**Competition**

As of 30 September 2009, there were 37 banks operating in Kazakhstan.  Commercial banks in Kazakhstan may be divided into three groups: major local banks with large total assets and a focus on the corporate market, such as the Bank and its principal competitor, Kazkommertsbank; banks under

foreign ownership, such as Sberbank, HSBC Bank Kazakhstan and Citibank Kazakhstan; and other local banks, including Halyk Bank, ATF Bank, Alliance Bank, Kaspi Bank and Bank CenterCredit, which are also among the Bank's competitors in Kazakhstan.  Although the Bank believes that it is well-positioned to compete in the nation's banking sector, it faces competition from a number of existing and prospective players and has suffered losses of customers and deposits as described in this Information Memorandum.  See "*Risk Factors — Risk Related to the Bank — The Bank faces significant competition, which may increase in the future.*"

Kazkommertsbank was established in July 1990.  As of 1 October 2009, Kazkommertsbank was the market leader in terms of total assets and the Bank's principal competitor in corporate and retail banking services.  As of 1 October 2009, Halyk Bank was the largest bank in Kazakhstan in terms of total deposits.

The following table sets out certain financial information relating to the Bank and the largest local and foreign banks which the Bank considers to be its major competitors in the Kazakhstan banking sector as of 30 September 2009 (information is unconsolidated and derived from financial statements prepared in accordance with FMSA Methodology):

| | As of 30 September 2009 | | | |
| --- | --- | --- | --- | --- |
| | Total Assets | Total Gross | Customer Loans[1] Deposits[2] | Shareholders' Equity |
| | | | *(million KZT)* | |
| The Bank ................................................................. | 2,134,516 | 2,593,728 | 630,288 | 516,598 |
| Kazkommertsbank ..................................................... | 2,538,298 | 2,541,628 | 1,129,418 | 204,062 |
| Halyk Bank .............................................................. | 2,027,988 | 1,238,711 | 1,313,828 | 140,527 |
| Alliance Bank .......................................................... | 497,896 | 661,629 | 185,169 | 101,238 |
| ATF Bank ................................................................. | 1,210,585 | 877,678 | 502,718 | 106,879 |
| Bank CenterCredit .................................................... | 1,101,671 | 669,344 | 605,579 | 52,584 |
| Kaspi Bank .............................................................. | 322,820 | 246,030 | 191,567 | 16,892 |

_____
Source: Based on figures published by the KASE, the FMSA and company websites.
Notes:
(1)    Net, without reverse repurchase agreements.
(2)    Not including TuranAlem Finance or Kazkommertz International B.V. (a subsidiary of Kazkommertsbank).

## Property

The Group mainly leases its office space with certain exceptions.  The Bank owns nine buildings, and the land on which eight of the buildings stand, which it uses as cash offices.  Temirbank owns five buildings which it uses for its operations and a part of the building where its head office is situated. Additionally, BTA Belarus owns the building in which its head office is situated in Minsk.

## Asset Recovery

As part of the work of the Bank's asset recovery team, various legal proceedings have been commenced in England and the British Virgin Islands which are summarised below.  In relation to the Drey, Chrysopa, Tekhinvest and BVI Proceedings, the English and BVI Courts have imposed various restrictions on the publication and dissemination of information concerning the litigation.  The summaries below have been prepared having regard to those restrictions.

The Bank expects to issue further claims in jurisdictions such as England against former management of the Bank, and individuals and entities connected with them.

### *Drey Proceedings*

In August 2009, the Bank commenced proceedings in the Commercial Court (Claim No 2009 Folio 1099) against Mr. Ablyazov, Roman Solodchenko, Zhaksylyk Zharimbetov, Drey Associates Limited, Anthony Stroud, John Wilson and Sarah Wilson (the "**Drey Proceedings**").

In summary, the claim relates to the alleged misappropriation of funds belonging to the Bank totalling approximately U.S.$295 million pursuant to various "Compensation Agreements" entered into with

Drey Associates Limited ("**Drey**"), a UK company, between May and October 2008. Drey is also a shareholder of the Bank. See *"Principal Shareholders — The Bank's Shareholders Prior to the Restructuring"* and *"Principal Shareholders — The Bank's Shareholders Following the Restructuring".*

Under the Compensation Agreements, the Bank paid Drey approximately U.S.$ 295 million. This money was purportedly paid in consideration for Drey procuring that certain existing shareholders of BTA Ukraine, BTA Belarus and BTA Russia would not exercise supposed pre-emption rights to block the proposed purchase by the Bank of shares in these three banks. The Bank contends that there was no legitimate commercial justification for the payments made under the Compensation Agreements and that they were simply a device used by the first three defendants, as officers of the Bank, for misappropriating funds from the Bank. The Bank also alleges that the fourth to seventh defendants (all incorporated or resident in England) facilitated or were used to facilitate the misappropriation.

The Bank is seeking to amend its claim in the Drey Proceedings to recover a further U.S.$ 106 million transferred by the Bank under purported share purchase agreements ("**SPAs**") relating to the acquisition of shares in BTA Russia and BTA Belarus that were connected to the Compensation Agreements. Under its amended claim, the Bank is seeking the return of the monies paid under both the Compensation Agreements and the SPAs plus profits and interest and/or delivery of the assets to which the monies were applied.

The Commercial Court has granted various asset freezing and disclosure orders against the defendants (including Mr. Ablyazov) in the Drey Proceedings up to a value of £175 million in respect of the defendants other than Mr. Ablyazov. This is the equivalent of the U.S. $295 million that was paid under the Compensation Agreements. In relation to Mr. Ablyazov, however, the injunction is in the amount of £252 million. This reflects not only the amount of the claim in respect of the Compensation Agreements, but also the separate claim against him in the Chrysopa Proceedings discussed below. The effect of the asset freezing order is that if the total value of the defendants' assets in England and Wales do not exceed £175 million, (or £252 million in the case of Mr. Ablyazov) the defendants (including Mr. Ablyazov) are prohibited from disposing or dealing with any of their assets outside England and Wales.

The Bank has applied for an increase in the freezing order in the Drey Proceedings by a further £68 million (in respect of Messrs Ablyazov, Solodchenko and Zharimbetov only) to reflect the additional claims that are being brought in relation to the SPAs. This application is due to be considered by the Court shortly.

The Bank has obtained various orders against the Defendants requiring the provision of information concerning their assets and other matters. The disclosures provided by the Defendants are subject to various confidentiality obligations imposed by the Court, including limitations on sharing of certain disclosures with the Bank itself.

In connection with the asset freezing orders, the Bank has provided corresponding cross-undertakings in damages as and when required. Under these cross undertakings in damages, the Bank is liable to compensate the defendants if the Court later finds that the asset freezing orders should not have been granted, have caused them loss and the Court concludes that the defendants should be compensated for that loss. The undertakings are unlimited in amount and are standard provisions in any English asset freezing orders.

Mr. Ablyazov has issued a defence in the Drey Proceedings contending *inter alia* that (i) there is no rule of law in Kazakhstan, (ii) Mr. Ablyazov held a majority stake in the Bank, and was the ultimate beneficial owner of all the selling and non-selling shareholders under the Compensation Agreements (through a series of nominee arrangements), (iii) given the alleged risk of assets being confiscated or extorted in Kazakhstan the use of such nominee holding arrangements is extensive, (iv) the Board of Directors knew of Mr. Ablyazov's interests in the Bank and the selling and non-selling shareholders,

and (v) the global consideration paid by the Bank under the Compensation Agreements and SPAs was reasonable.

The Bank is subject to a counterclaim in this matter from Mr. Zharimbetov. Mr. Zharimbetov's counterclaim is for KZT 108,378,000 (or £441,154). It is alleged to be monies due for the notice period for which he says he was entitled under his contract of employment (which he was not paid as he was summarily dismissed). The Bank is confident that its termination of Mr. Zharimbetov's contract was justified.

Mr. Ablyazov has recently applied to strike out the Drey Proceedings on the basis that, *inter alia*, they were brought in breach of international law, and that they constitute an abuse of process and an abuse of Mr. Ablyazov's human rights. They assert this partly on the basis that Mr. Ablyazov's majority shareholding in the Bank was allegedly misappropriated from him by Samruk-Kazyna in February 2009. It is understood that similar applications will be made in respect of the Chrysopa Proceedings and the Teckhinvest Proceedings.

### Chrysopa Proceedings

The Bank commenced further proceedings in the Commercial Court (Claim No 2010 Folio 93) in January 2010 against Mr. Ablyazov, Ildar Khazhaev, Anton Rybalkin, Chrysopa Holdings BV (a Dutch company ("**Chrysopa**")), Usarel Investments Limited (a Cyprus company ("**Usarel**")) and Lux Investing Limited (a British Virgin Islands company ("**Lux**")) (the "**Chrysopa Proceedings**").

In summary, the claim relates to a purported loan of U.S.$ 120 million by the Bank to Chrysopa (the "**Chrysopa Loan**") on terms highly unfavourable to the Bank (including the absence of any security). The Bank contends that the loan was a sham intended to conceal the theft of $120 million for the benefit of Mr. Ablyazov.

In summary, the background to the Chrysopa Loan is that on or around 1 August 2008, the Bank purportedly agreed to lend U.S.$ 120 million to Chrysopa for onward transmission to Usarel which appears to have been used by Usarel to acquire various companies who owned and/or operated the Vitino port facility on the White Sea in Russia.

Although the loan agreement provided for security such as a pledge over Usarel's shares and over the assets that Usarel was to acquire, this security was never granted. No interest has been paid on the purported loan.

In the Chrysopa Proceedings, the Bank contends that the purported loan was a sham to disguise the fact that the Defendants were engaged in misappropriating funds from the Bank for the benefit of Usarel and Lux which, together with Chrysopa, are alleged by the Bank to be controlled by Mr. Ablyazov. The Bank seeks, amongst other things, a declaration invalidating the Chrysopa Loan, repayment of the money transferred under the loan agreement and delivery up of all assets to which any of the funds were applied.

On 27 January and 30 March 2010, the Commercial Court granted freezing orders (and associated disclosure orders containing confidentiality obligations imposed by the Court similar in nature to those in the Drey Proceedings) against Messrs Ablyazov, Khazhaev, Rybalkin and Usarel and Lux in connection with this claim up to the value of U.S.$ 120 million. As noted above, the injunction against Mr. Ablyazov in the Drey Proceedings has been increased to reflect the claim against him in the Chrysopa Proceedings.

The Bank, as claimant, has given cross-undertakings in damages in respect of these freezing orders similar in nature to the undertakings in the Drey Proceedings. Defences have not yet been served.

*Tekhinvest Proceedings*

The Bank has recently issued proceedings in the Commercial Court (Claim No 2010 Folio 362) against Mr. Ablyazov, Ildar Khazhaev, Tekhinvest CJSC, Konvis LLC, PaladioExport LLC, Konvis LLC and Colligate Investments Limited.

In summary, the claim relates to a series of purported loan facilities amounting to over U.S.$ 300 million that were granted to Tekhinvest, Konvis, PaladioExoprt, and Konvis between 2004 and 2008 on terms that were highly unfavourable to the Bank. These funds were purportedly to be used in connection with the construction by Tekhinvest of the Eurasia Tower building in the Moscow City development in Russia.

The Bank contends that these were related-party transactions to affiliates of Mr. Ablyazov and that he failed to disclose (adequately or at all) his interests in those companies to the Bank. The Bank also contends that no adequate security was ever put in place and that Mr. Ablyazov, with the assistance of Mr. Khazhaev and Colligate Investments Limited, subsequently engineered the release of such security as had been obtained through an undated pledge release document in the full knowledge that to do so was contrary to the Bank's interests.

The Bank seeks, *inter alia*, a declaration invalidating the loans, repayment of the money transferred under the loan agreements and delivery up of all assets to which any of the funds were applied. In the alternative, the Bank seeks repayment of the amounts outstanding under the loans as at the date of the claim (plus interest).

The Bank has applied for permission to serve the claim out of the jurisdiction on the Second to Sixth Defendants because they are domiciled in Russia. The Court granted permission on 22 March 2010 and service of the proceedings pursuant to the Hague Convention is currently being effected on the Russian domiciled defendants. Mr. Ablyazov and Colligate Investments Limited have been served with the claim. No defences have yet been served and the Court has recently granted Mr. Ablyazov an extension of time for service of his defence to 11 June 2010.

*BVI Proceedings*

On 16 November 2009, the Bank brought a claim in the Commercial Division of the High Court of the British Virgin Islands against four defendants: REUEL Limited ("**REUEL**"), RIROil sarl (now known as TANIL sarl) ("**RIROil**"), Mr. Ablyazov and Mr. Khazhaev.

The background to the claim is as follows. On 6 August 2008, the Bank made a loan of U.S.$ 57.5 million to RIROil, a Swiss company and an existing customer of the Bank, which was secured, repayable on 5 August 2013, with interest at 18 per cent. per annum.

On 14 January 2009, the Bank purportedly assigned its rights under the loan to REUEL, a recently established BVI company, for consideration of U.S.$ 57.5 million plus U.S.$ 229,944.05 (apparently in respect of interest accrued on the loan as at the date of the purported assignment).

Under the terms of the purported assignment agreement, REUEL was not obliged to pay the consideration amount of U.S.$ 57,729,944.05 until 31 December 2015 (28 months later than the Bank would have been paid by RIROil under the terms of the loan agreement). REUEL had no obligation to pay interest on this amount, and no security was provided.

The Bank believes that the purported assignment to REUEL on such unfavourable terms was a fraud against the Bank for the benefit, *inter alia*, of the owners of REUEL.

On 18 November 2009, the Bank was granted *ex parte* freezing injunctions and ancillary disclosure orders against REUEL and Mr. Ablyazov, and disclosure orders against RIROil and REUEL's registered agent in the BVI. On the same date, the BVI court granted the Bank permission to serve the proceedings on RIROil, Mr. Ablyazov and Mr. Khazhaev out of the jurisdiction.

On 15 January 2010, Mr. Ablyazov applied for an order setting aside the court's permission to serve the proceedings on him out of the jurisdiction. The application was heard on 22 and 23 March. In a judgment handed down on 24 March 2010, The Honourable Justice Bannister granted the order applied for by Mr. Ablyazov and released the freezing injunction against him. That judgment, including the reasons for the judge's decision, is confidential.

### Stepanov Litigation

The Bank also obtained judgment in England on 14 October 2009 against Alexander Stepanov, the former General Director and major shareholder of Energomash (UK) Limited, in the amount of U.S.$ 468 million in an action commenced in May 2009. The judgment was granted in connection with a guarantee given by Mr. Stepanov for a loan by the Bank to Rolls Finance Limited, an English company.

Mr. Stepanov resides in Russia and the English Court took jurisdiction over him based on an English jurisdiction clause in a charge he had granted to the Bank. As part of the process of enforcing the judgment against Mr. Stepanov, Alan Bloom and Liz Bingham of Ernst & Young were appointed liquidators of Energomash (UK) Limited (which is an English company) by a Secretary of State appointment made on 29 October 2009. Some of the shares of Energomash belonging to Mr. Stepanov had been pledged to the Bank as security for the loan to Rolls Finance Limited. The Bank had to provide undertakings when obtaining the injunction orders following judgment against Mr. Stepanov to meet any losses that he might suffer if it proves that those injunctions were wrongfully granted.

On 31 March 2010, the High Court in England sentenced Mr. Stepanov (*in absentia*) to two years imprisonment for breaching various orders made by the Court in the proceedings initiated against him by the Bank, including a failure to disclose information on his assets.

The Bank has also obtained judgment in Russia in November 2009 against Mr. Stepanov in the amount of U.S.$ 411 million in relation to this matter. That judgment is under appeal.

### Legal Proceedings

Except as described in this Information Memorandum, the Group is not and has not been involved in any governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which either of TuranAlem Finance or the Bank is aware) during the last twelve months which may have, or have had in the recent past, significant effects on the Group's financial position or profitability.

### Litigation in respect of BTA Kyrgyzstan

The Bank is involved in a legal dispute with CJSC Investment Holding Company, a Kyrgyzstan registered entity. The total amount of this dispute is £30,418,144. In June 2009, Central Asia Investment Company, a Kyrgyzstan registered entity and a 100 per cent. subsidiary of CJSC Investment Holding Company, obtained a loan from its parent of £8,670,000 to purchase Kyrgyzstan state securities. Central Asia Investment Company, in violation of the intended purpose of the loan from its parent, used these funds to purchase bonds of TuranAlem Finance at a significant discount on the market. The nominal value of the purchased bonds was £28,395,000 and accrued interest was £2,023,144. Central Asia Investment Company defaulted on its loan payable to CJSC Investment Holding Company. As a result, CJSC Investment Holding Company filed a lawsuit against the Bank, BTA Kyrgyzstan and TuranAlem Finance claiming repayment of the full nominal value and interest accrued on bonds of TuranAlem Finance. In accordance with the decision of Bishkek's district court, Bishkek's municipal court of appeals and the Supreme Court of Kyrgyzstan dated 11 September 2009 the Bank is obliged to pay the full amount and CJSC Investment Holding Company commenced enforcement of the decision against the Bank, which has guaranteed the obligations under bonds issued by TuranAlem Finance, including seeking the Bank's shares in BTA Kyrgyzstan and amounts due to the Bank by BTA Kyrgyzstan. In December 2009, an officer of the court foreclosed on shares

held by the Bank in BTA Kyrgyzstan.  The current management of the Bank believes that the decision of the Kyrgyzstan courts was not in compliance with international laws and legislation between the Republic of Kazakhstan and Kyrgyzstan and was executed in violation of Kyrgyzstan law.  On 5 November 2009, the Bank filed a claim with the Kyrgyzstan government for compensation of £30,418,143 and an additional U.S.$38,891,000 representing damages incurred as a result of illegal acts of Kyrgyz legal and government entities.

### Litigation in respect of BTA Russia

The Bank holds 22.2589 per cent. of the participatory share in the charter capital of BTA Russia. Three petitions have been lodged during 2009 with the Moscow Arbitration Court disputing the results of general participants' meetings of BTA Russia held on 13 April 2009, 29 April 2009 and 11 August 2009.  The petitions in respect of the meetings held on 13 April 2009 and 29 April 2009 have been rejected by the court.  The court has accepted the petition in respect of the meeting held on 11 August 2009 and the hearing is to be held on 20 May 2010.

### Other Proceedings

The Bank has been notified of several separate arbitration proceedings (only one of which is active) commenced under various international treaties against, *inter alia*, the Government of Kazakhstan in connection with the actions taken in relation to the Bank in 2008 and early 2009, namely the various capital injections made into the Bank and described in "– *Background to the Restructuring*".  These proceedings do not name the Bank as a respondent and, indeed it is not possible to bring a claim against anyone other than a state under the relevant treaty.  In addition, certain creditors of the Bank have commenced proceedings against it and have sought to attach certain assets of the Bank including correspondent accounts in Switzerland and the shares of certain of the Finance Subsidiaries.  The Bank believes that these creditors will participate in the Restructuring and file Claim Forms. Accordingly, pursuant to the terms of the Restructuring Plan the relevant creditors will be obliged to terminate the proceedings they have commenced.

### Criminal Proceedings Against Former Management

Based on news reports, the Bank is aware of criminal investigations commenced against Mr. Ablyazov and other former management as well as entities connected to them in each of Kazakhstan, the Russian Federation and

Kyrgyzstan in respect of actions taken by these individuals and entities during the period in which Mr. Ablyazov was the Chairman of the Board of Directors of the Bank.

### Technology

The Bank's information technology strategy focuses on the integration of its business needs and information technology capabilities, while maintaining cost effective and safe systems.  In recent years, the Bank has built a highly productive and reliable technology environment, located in two data centers located in Almaty.  The Bank has also developed and implemented disaster recovery and backup strategy.  The Bank is certified under ISO 27001, an international quality certification.

The Bank now has a modern, reliable, secure, flexible and scalable information technology system that can support the business operations of the Bank, as well as provide business opportunities for income generation.  Information technology systems of the Bank are in a state of continuous improvement and change.  The Bank intends to continue to take advantage of modern technologies, which allow it to reduce capital and operating costs.  Due to the Bank's financial condition, the Bank stopped the work on the implementation of the new core banking system; however, the existing systems are expected to be able to handle the current volume of operations and have substantial reserves for processing.

As a part of its strategy going forward, the Bank plans to strengthen its Treasury department by automating its processes to provide real time risk management for a wide range of operations.  See

"— *Strategy — General Strategy of the Bank — Strengthen Treasury Operations*".  Furthermore, the Bank plans to build on its already strong information technology infrastructure to increase the quality of data produced, provide consistent classification and resolve data-reconciliation issues.  See "*— Strategy — General Strategy of the Bank — Improve Human Resources and Information Technology*".

**Employees and Training**

As at 30 September 2009, the Bank employed 5,085 full time employees, of whom 3,411 were employed at the Bank's branches outside Almaty, 525 were employed at the Almaty branch and the remainder were employed by the Head Office and by the Bank's subsidiaries.  As of 31 December 2008 and 2007, the Bank employed 6,608 and 7,185 full time employees, respectively.  The decrease in headcount is part of the Bank's optimisation strategy under the Restructuring.  See "*Strategy — General Strategies of the Bank — Improve Human Resources and Information Technology*".

Currently, there are no labour unions representing any employees of the Bank or its subsidiaries.  The Group has never experienced any industrial action or other work stoppages resulting from labour disputes.  The average age of the Group's employees as of 30 September 2009 was 33.4 years and 4,729 of the employees in professional positions hold university degrees.

In order to improve professional qualifications and efficiency of employees the Bank conducts staff training as part of its business plan.  During the nine months ending 30 September 2009, 726 employees participated in the Bank's training programme.

Until 6 May 2009, the Bank operated a training centre which included financial training and professional skills development programmes.  This programme was closed because of the Bank's financial condition.  The Bank currently conducts internal trainings for its employees in respect of different aspects of the business of the Bank including financial analysis and working with clients.  In addition, the Bank also engages external providers of training programmes including BACEE, RFCA Academy, ABS Training Centre, Deloitte, Network Academy Lanit-Kazakhstan, LLP E'LTC, Alliance Factors Kazakhstan, Specialised Training Centre of Association of Security Organisations of Kazakhstan, and the Institute of Professional Appraisers of Kazakhstan.  During the nine months ended 30 September 2009, 21 employees were trained by external providers.

**SELECTED CONDENSED CONSOLIDATED FINANCIAL DATA**

The summary information set out below has been extracted from, should be read in conjunction with, and is qualified in its entirety by, the Group's financial statements, including the notes thereto, contained elsewhere in this Information Memorandum.  See "*Index to Financial Statements*" and "*Management's Discussion and Analysis of Results of Operations and Financial Condition*".

The Group's audited consolidated financial statements contained in this Information Memorandum including the notes thereto, as at and for the years ended 31 December 2008 and 2007 were prepared in accordance with the IFRS.  The Group's audited consolidated financial statements contained in this Information Memorandum, including the notes thereto, as at and for the years ended 31 December 2008 and 2007 were audited by Ernst & Young, whose audit reports are included elsewhere in this Information Memorandum.

The Group's unaudited interim condensed consolidated financial statements contained in this Information Memorandum including notes thereto, as at and for the nine months ended 30 September 2009 were prepared in accordance with International Financial Reporting Standard IAS 34, Interim Financial Reporting.  The Group's unaudited interim condensed consolidated financial including notes thereto, as at and for the nine months ended 30 September 2009 were reviewed by Ernst & Young, whose review report thereon is included on page F-3 of this Information Memorandum.

Prospective investors should read this selected consolidated financial information in conjunction with information contained in "*Risk Factors*", Schedule 1 (The Restructuring Plan), "*Capitalisation*", "*Management's Discussion and Analysis of Results of Operations and Financial Conditions*", "*Selected Statistical and Other Information*", "*The Bank*" and the Bank's audited consolidated financial statements including the notes thereto, as well as the other financial data appearing elsewhere in this Information Memorandum.