**Consolidated Balance Sheet Data**

| | As at 30 September | | As at 31 December | |
|---|---|---|---|---|
| | 2009 | | 2008 | 2007 |
| | *(U.S. millions)[1]* | *(unaudited) (KZT millions)* | *(KZT millions)* | |
| **Assets** | | | | |
| Cash and cash equivalents | 200 | 30,153 | 87,893 | 99,723 |
| Obligatory reserves | 285 | 43,003 | 64,054 | 168,242 |
| Financial assets at fair value through profit or loss | 799 | 120,648 | 128,150 | 112,175 |
| Amounts due from credit institutions | 208 | 31,439 | 85,174 | 107,589 |
| Derivative financial assets | 208 | 31,346 | 21,650 | 31,397 |
| Available-for-sale investment securities | 147 | 22,244 | 20,482 | 26,422 |
| Loans to customers | 7,335 | 1,107,241 | 1,617,063 | 2,379,810 |
| SK Bonds | 3,386 | 511,097 | — | — |
| Investments in associates | 532 | 80,372 | 72,371 | 67,767 |
| Property and equipment | 81 | 12,252 | 13,704 | 13,433 |
| Goodwill | 30 | 4,556 | 37,421 | 37,557 |
| Current income tax assets | 37 | 5,590 | 5,505 | 110 |
| Deferred tax assets | 14 | 2,030 | 5,046 | 683 |
| Other assets | 306 | 46,156 | 35,688 | 19,709 |
| **Total assets** | **13,568** | **2,048,127** | **2,194,201** | **3,064,617** |
| **Liabilities** | | | | |
| Amounts due to the NBK and the Government | 2,702 | 407,911 | 1,718 | 913 |
| Amounts due to credit institutions | 4,986 | 752,636 | 803,366 | 835,304 |
| Derivative financial liabilities | 15 | 2,308 | 18,789 | 652,508 |
| Amounts due to customers | 4,527 | 683,281 | 886,052 | 5,528 |
| Debt securities issued | 11,067 | 1,670,588 | 1,087,726 | 1,084,445 |
| Provisions | 799 | 120,600 | 104,893 | 10,577 |
| Other liabilities | 231 | 34,822 | 34,436 | 23,311 |
| **Total liabilities** | **24,327** | **3,672,146** | **2,936,980** | **2,612,586** |
| **Equity** | | | | |
| Issued capital: common shares | 3,416 | 515,551 | 303,456 | 303,427 |
| Additional paid-in capital | (43) | (257) | (38,798) | — |
| Treasury shares | (43) | (6,475) | (1,568) | (555) |
| Available-for-sale investment securities revaluation reserve | (19) | (2,868) | (1,112) | (195) |
| Foreign currency translation reserve | (2) | (260) | (948) | 104 |
| (Accumulated deficit)/retained earnings | (13,784) | (2,080,631) | (1,057,646) | (129,938) |
| **Equity attributable to shareholders of the parent** | **(10,689)** | **(1,613,481)** | **(757,818)** | **432,719** |
| Non-controlling interest | (70) | (10,538) | 15,039 | 19,312 |
| **Total equity** | **(10,759)** | **(1,624,019)** | **(742,779)** | **452,031** |
| **Total liabilities and equity** | **13,568** | **2,048,127** | **2,194,201** | **3,064,617** |

Notes:

(1)  See "*Presentation of Financial and other Information*" for information as to the U.S. Dollar/Tenge exchange rate used to calculate U.S. Dollar amounts.

**Consolidated Income Statement Data**

| | For the 9 months ended 30 September 2009 | | For the year ended 31 December | |
| --- | --- | --- | --- | --- |
| | | | **2008** | **2007** |
| | *(unaudited)* | | | |
| | *(U.S. millions)[1]* | | *(KZT minions)* | |
| Loans | 1,062 | 155,971 | 366,037 | 291,724 |
| SKBonds | 140 | 20,502 | — | — |
| Securities | 79 | 11,609 | 12,597 | 14,587 |
| Deposits with other banks | 40 | 5,852 | 17,833 | 17,137 |
| **Total interest income** | **1,321** | **193,934** | **396,467** | **323,448** |
| Debt securities issued | (755) | (110,878) | (95,888) | (85,683) |
| Deposits from customers | (252) | (36,949) | (55,748) | (39,935) |
| Deposits and loans from credit institutions | (328) | (48,128) | (56,745) | (53,661) |
| **Interest expense** | **(1,335)** | **(195,954)** | **(208,381)** | **(179,279)** |
| **Net interest (expense)/income before impairment charge** | **(14)** | **(2,021)** | **188,086** | **144,169** |
| Impairment charge | (4,368) | (641,604) | (1,094,300) | (67,810) |
| **Net interest (expense)/income** | **(4,382)** | **(643,625)** | **(906,214)** | **76,359** |
| Fees and commission income | 104 | 15,310 | 30,334 | 28,489 |
| Fee and commission expense | (8) | (1,114) | (1,179) | (1,057) |
| **Fees and commissions** | **96** | **14,196** | **29,155** | **27,432** |
| Net trading loss | (136) | (20,020) | (29,769) | 2,503 |
| Gains less losses from foreign currencies | | | | |
| — dealing | (65) | (9,513) | 1,665 | 2,512 |
| — translation differences | (2,406) | (353,377) | (10,870) | 19,884 |
| Fair value change of options | 135 | 19,837 | — | — |
| Income from insurance operations | 56 | 8,248 | 13,585 | 12,539 |
| Expenses from insurance operations | (42) | (6,202) | (11,485) | (9,222) |
| Share of income of associates | 28 | 4,169 | (15,448) | 4,234 |
| Loss on disposal of subsidiaries | — | — | (11,252) | (249) |
| Impairment charge for available-for-sale investment securities | (8) | (1,243) | (42,610) | — |
| Impairment charge for goodwill | (224) | (32,885) | (8,107) | — |
| Impairment charge for investments in associates | — | — | (19,138) | |
| Gain from purchase of own securities | 66 | 9,708 | — | — |
| Excess of acquirer's interest in the net fair value of acquiree's identifiable assets, liabilities and contingent liabilities over cost | 16 | 2,294 | 212 | — |
| Other income/(loss) | 16 | 2,294 | 212 | (62) |
| **Non-interest income** | **(2,580)** | **(378,984)** | **(133,217)** | **32,139** |
| Salaries and other employee benefits | (116) | (17,000) | (26,597) | (25,744) |
| Administrative and other operating expenses | (113) | (16,565) | (27,414) | (23,400) |
| Depreciation and amortisation | (25) | (3,704) | (4,435) | (2,314) |
| Taxes other than income tax | (20) | (2,932) | (4,163) | (3,469) |
| Obligatory insurance of individuals' deposits | (9) | (1,353) | (2,102) | (1,761) |
| Other provisions | 44 | 6,415 | (113,130) | (4,705) |
| Other expense | (16) | (2,358) | — | — |
| **Non-interest expense** | **(255)** | **(37,497)** | **(177,841)** | **(61,393)** |
| **(Loss)/Income before income tax expense** | **(7,121)** | **(1,045,910)** | **(1,188,117)** | **74,537** |
| Income tax expense | (25) | (3,628) | 67 | (9,832) |
| **Net (loss)/income after income tax expenses** | **(7,146)** | **(1,049,538)** | **(1,188,050)** | **64,705** |
| **Attributable to:** | | | | |
| Equity holders of the parent | (6,965) | (1,022,985) | (1,187,584) | 61,354 |
| Non-controlling interest in net income | (181) | (26,553) | (466) | 3,351 |
| **Net (loss)/income** | **(7,146)** | **(1,049,538)** | **(1,188,050)** | **64,705** |
| **Basic and diluted (loss)/earnings per share (in KZT)** | **(211)** | **(31,039)** | **(141,878)** | **8,143** |

Notes:

(1) See "*Presentation of Financial and other Information*" for information as to the U.S. Dollar/Tenge exchange rate used to calculate U.S. Dollar amounts.

**Selected Financial Ratios and Economic Data**

| | As at and for the nine-month period ended 30 September 2009 | As at and for the year ended 31 December | |
| --- | --- | --- | --- |
| | | **2008** | **2007** |
| **Profitability Ratios[1]** | | | |
| Return on average equity[9] ...................................................... | N/A[11] | N/A[11] | 22.4% |
| Return on average total equity ................................................. | N/A[11] | N/A[11] | 22.4% |
| Return on average assets[2] ...................................................... | N/A[11] | N/A[11] | 2.4% |
| Net interest margin[3] .............................................................. | (0.1)%[10] | 6.3% | 6.0% |
| Net interest spread[4] .............................................................. | 5.4%[10] | 5.4% | 5.2% |
| Non-interest expense/net interest income before impairment charge plus non-interest ................................................................... | N/A[11] | 208.7% | 30.0% |
| Non-interest expense as a percentage of net interest income before impairment ............................................................................. | N/A[11] | 94.6% | 42.6% |
| Non-interest expense as a percentage of average total assets............ | 1.8% | 5.5% | 2.3% |
| **Loan Portfolio Quality[5]** | | | |
| Non-performing loans/gross loans[6] ........................................ | 63.0% | 34.3% | 0.8% |
| Allowance for impairment/gross loans ...................................... | 65.1% | 42.9% | 5.4% |
| Allowance for impairment/non-performing loans[6]..................... | 103.3% | 125.0% | 691.1% |
| **Balance Sheet Ratios and Capital Adequacy** | | | |
| Customer deposits as a percentage of total assets ......................... | 33.4% | 40.4% | 21.3% |
| Loans from other banks and financial institutions as a percentage of total assets..................................................................................... | 36.7% | 36.6% | 27.3% |
| Debt securities issued as a percentage of total assets..................... | 81.6% | 49.6% | 35.4% |
| Net loans as a percentage of total assets .................................... | 54.1% | 73.7% | 77.7% |
| Total equity as a percentage of total assets ................................. | N/A[11] | N/A[11] | 14.7% |
| Liquid assets as a percentage of total assets[7] ............................ | 12.1% | 17.6% | 16.8% |
| Risk weighted total capital adequacy ratio[8] ............................. | (128.9)% | (44.8)% | 17.6% |
| Risk weighted Tier I capital adequacy ratio[8] ............................ | (122.9)% | (41.0)% | 16.9% |
| **Operating Data** | | | |
| Number of full time employees ................................................ | 10,495 | 12,965 | 13,194 |
| Number of regional branches .................................................... | 22 | 22 | 22 |
| Number of retail units ............................................................. | 237 | 279 | 289 |
| **Economic Data** | | | |
| Period-end exchange rate (KZT/U.S.$) ..................................... | 150.95 | 120.79 | 120.30 |
| Average exchange rate for period (KZT/U.S.$)............................ | 146.88 | 120.29 | 122.56 |
| Inflation rate (CPI)................................................................. | 4.7% | 9.5% | 18.8% |
| GDP growth (real) ................................................................. | (1.5)% | 3.3% | 8.9% |

Notes:

(1)   Average balance in 2007 and 2008 and nine months ended 30 September 2009 of assets and liabilities were calculated based on monthly average. Average equity and total equity were calculated using monthly averages for all years presented in the table.

(2)   Return on average assets comprises net income less dividends on non-redeemable convertible preference shares divided by average period assets. Average period assets in 2007 and 2008 are calculated on a monthly basis.

(3)   Net interest margin comprises net interest income before impairment charge as a percentage of average earning assets.

(4)   Net interest spread comprises the difference between the average interest rate on interest earning assets and the average interest rate on interest bearing liabilities.

(5)   Calculate using gross loan balances, including accrued interest.

(6)   Non-performing loans comprise loans where past due payments exceed 90 days.

(7)   Liquid assets comprise securities plus cash and cash equivalents, obligatory reserves and due from other banks.

(8)   Calculated in accordance with BIS standards.

(9)   Total equity, excluding preferred shares.

(10)  Calculated using net total assets.

(11)  The ratio is not economically useful due to the Bank having negative equity in 2009.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION

*The following discussion should be read in conjunction with the Financial Statements and the notes thereto, prepared in accordance with IFRS and included elsewhere in this Information Memorandum. See "Presentation of Financial and Other Information". The forward-looking statements contained in this discussion and analysis are subject to a variety of factors that could cause actual results to differ materially from those contemplated by such forward-looking statements. Factors that may cause such a difference include, but are not limited to, those discussed in "Forward-Looking Statements" and "Risk Factors". Operating results for the nine-month period ended 30 September 2009 are not necessarily indicative of the results for the year ending 31 December 2009.*

### Introduction

**Investors should be aware that the Bank has not completed any financial statements with respect to any period, after 30 September 2009. The effect of local and global market conditions on the Bank and the Bank's customers and counterparties, as well as the effect of the other events both within and outside the Bank, may cause actual results of operations and financial condition of the Bank as at and for the financial year ended 31 December 2009 or in this Information Memorandum for any period thereafter to be materially and adversely different from the results presented as at and for the nine months ended 30 September 2009. Accordingly, investors should not assume that the results presented as at and for the nine months ended 30 September 2009 are an accurate indication of the actual results as at and for the financial year ended 31 December 2009 or as at any date or for any period thereafter.**

**The Bank is in the process of finalising its financial statements as at and for the year ended 31 December 2009 and if they are published prior to the Claimants' Meeting, the Bank, will publish, if practicable, a supplement to this Information Memorandum. However, there is no guarantee that the Bank will publish those financial statements prior to the Restructuring. If no such supplement is published, Claimants should understand that they are participating in the Restructuring on the basis of the information then available and that they are aware of the consequences thereof. See *"Risk Factors — Risks Relating to the Bank — The Bank's results as at and for the year ended 31 December 2009 may have a material and adverse impact on the market price of the New Notes and GDRs".***

### Overview

After following an aggressive growth strategy from 2004 to 2007 primarily funded by short term bank borrowings and debt securities issues in the international capital markets, the Bank's financial condition and liquidity position had severely deteriorated by February 2009. The Bank reported increasing levels of loan loss provisions on its loan portfolio throughout the first five months of 2009, beginning with provisions on its unconsolidated unaudited loan portfolio of KZT 214,777 million (based on FMSA Methodology), representing 9.2 per cent. of its total unconsolidated unaudited loan portfolio as at 1 January 2009, KZT 518,272 million (based on FMSA Methodology), representing 19.9 per cent. of the total unconsolidated unaudited loan portfolio as at 1 March 2009, and finally KZT 1,522,139 million (based on FMSA Methodology), representing 57.6 per cent. of its total unconsolidated unaudited loan portfolio as at 1 June 2009. This increase in provisions caused the Bank to breach its required capital adequacy ratios during 2009. As at 1 October 2009, the Bank had created KZT 1,958,899 million (based on FMSA Methodology) in provisions, representing 75.5 per cent. of its total unconsolidated unaudited loan portfolio.

Additional provisions were recognised in the Bank's consolidated financial statements as at 31 December 2008 in accordance with IFRS. The balance of loan loss provisions in its audited consolidated financial statements amounted to KZT 1,217,278 million as at 31 December 2008 (based on IFRS) and its unaudited consolidated financial statements amounted to KZT 2,068,923 million as at 30 September 2009 (based on IFRS). For a discussion of the differences between the determination

of loan loss provisions under FMSA Methodology and IFRS, see "*Asset and Liability Management – Provisioning Policy*".

On 2 February 2009, the Government accepted the recommendation by the FMSA to recapitalise the Bank, following which Samruk-Kazyna acquired a controlling shareholding of the Bank's total share capital for cash consideration of KZT 212,095 million.  As at 30 September 2009, Samruk-Kazyna held 75.1 per cent. of the issued share capital of the Bank.  Furthermore, the Government has provided additional liquidity support in the form of deposits and pursuant to loans under the State Finance Programmes.  As at the date of this Information

Memorandum, the Group has received liquidity support in the amount of KZT 805,596 million from SamrukKazyna and other state-owned entities to support the Group's financial stability and capitalisation.  See "*The Bank — The Role of Samruk-Kazyna and the NBK — Liquidity Support*".

As at 30 September 2009, the Bank was the second largest bank in Kazakhstan by total assets with a market share of 17.7 per cent., compared to 24.5 per cent. as at 31 December 2008 and 24.7 per cent. as at 30 September 2008.

As at 30 September 2009, the Group's total assets were KZT 2,048,127 million compared to KZT 2,194,201 million as at 31 December 2008 and KZT 3,064,617 million as at 31 December 2007, representing a decrease of 6.7 per cent. and 28.4 per cent., respectively.  The Group's total equity was KZT (1,624,019) million as at 30 September 2009 as a result of the provisions against the Group's loan portfolio, compared to total equity of KZT (742,779) million as at 31 December 2008 and total equity of KZT 452,031 million as at 31 December 2007.

**Recent Developments**

On 14 October 2009, the Bank and Samruk-Kazyna signed an agreement on the transfer of 13,318,319 ordinary shares of Temirbank owned by the Bank, representing 100 per cent. of the Bank's interest in Temirbank, under a trust management agreement.  The purpose of the trust management agreement was to permit SamrukKazyna to exercise control over Temirbank for the purpose of Temirbank's financial restructuring.

Following the adoption of the Restructuring Law, which came into effect in August 2009, the Bank submitted an application on 7 October 2009 to the Court to formally initiate the restructuring process under the Restructuring Law.  The Bank's application was approved by the Court on 16 October 2009, which resulted in an automatic stay of all relevant claims of the Bank's creditors and protection of the Bank's property from execution and attachment until completion of the Restructuring.  Pursuant to the terms of the decision of the Court, the Restructuring is to be completed by 5 September 2010. The High Court of Justice of England and Wales on 18 December 2009 and the United States Bankruptcy Court for the Southern District of New York on 9 March 2010 each issued orders recognising the restructuring proceedings in the Court as the main foreign proceeding for purposes of the Bank's assets located in Great Britain and the United States, respectively, pursuant to the Model Insolvency Law.  The Bank filed an Application to Moscow Court of Arbitration to obtain recognition in the Russian Federation of the ruling of the Court dated 16 October 2009 concerning the restructuring of the Bank.  The Solomensky District Court of Kiev on 17 February 2010 issued a decision which came into force on 23 February 2010 recognising the restructuring proceedings in the Court pursuant to the Convention of Legal Aid and Legal Relations on Civil, Family and Criminal Matters signed on 7 October, 2002 in Kishinev City, Republic of Moldova by ten CIS member states, including the Ukraine and Kazakhstan.

On 17 April 2009, the shareholders of Oranta NJSIC OJSC voted to issue new equity in the company. At that time, the Bank held 14.01 per cent. and BTA Securities (as a nominal holder on behalf of its clients) held 21.16 per cent. of Oranta NJSIC OJSC, respectively.   In order to avoid having its ownership interest diluted, in December 2009, the Bank purchased an additional 16.37 per cent. share in Oranta NJSIC OJSC for KZT 2,516 million.  As a result the Group's equity interest in Oranta NJSIC OJSC as of the date of this Information Memorandum is 30.39 per cent.

On 7 December 2009, the Bank and the Steering Committee signed the PCTS setting out key commercial terms of the Restructuring, the Restructuring Package and certain other arrangements, principally relating to the Bank's corporate governance and other aspects of its operations and business following completion of the Restructuring.  On 17 March 2010, the Bank and the Steering Committee entered into the PCTS Amendment Letter related to the Restructuring Packages and the conditions of the Restructuring process.

On 17 December 2009, Goldman Sachs LLC filed a suit in the Moscow Court of Arbitration against TuranAlemFinance (Russia) and the Bank seeking payment of principal and interest on bonds issued by TuranAlem Finance (Russia), which were guaranteed by the Bank, in the amount of RUB 3,178 million or approximately KZT 16 billion.

In January 2010 the Bank obtained a 74.99 per cent. share in Accumulated Pension Fund Ular-Umit JSC and 74.99 per cent. share in Zhetysu Pension Asset Management Company JSC in exchange for the discharge of the liabilities owed to the Bank by LLP Astana Stroiservice, LLP Kazakhstan Standart Invest and LLP Logistic

Technopark CM.  As of the date of this Information Memorandum, these entities are not considered subsidiaries of the Bank.

### Going Concern

During the fourth quarter of 2008 there was a significant deterioration in the consolidated financial position of the Group principally resulting from loss events related to the loan portfolio, which ultimately led to a breach by the Group of certain prudential requirements including those related to capital adequacy set by the FMSA.  See "*The Bank — Background to the Restructuring*".  In addition, in February 2009, the Tenge devalued against US Dollar, which negatively affected the Group and its customers, resulting in further deterioration of the Group's assets.  See "*The Bank — Background to the Restructuring*".  As a result of these loss events the Group's total liabilities as at 30 September 2009 exceeded its total assets by KZT 1,624,019 million and the Group has reported a net loss amounting to KZT 1,049,538 million for the nine-month period then ended.  This led to the Bank's noncompliance with certain regulatory ratios, including the capital adequacy ratio as calculated in accordance with the Basel Accord.

As at 30 September 2009, the amount drawn by the Group under bond programs and loan facilities amounted to KZT 2,423,224 million.  In accordance with the contractual terms of certain bond programs and loan facilities, the Bank is required to maintain certain financial ratios, particularly with regard to its liquidity, capital adequacy and lending exposures.  Furthermore, the Bank is required to maintain a certain level of credit rating from major international rating agencies.

The Bank was in breach of these capital adequacy and lending covenants on syndicated loans, bonds and certain other facilities as at 30 September 2009 and 31 December 2008.  In addition, in April 2009, the credit rating of the Bank from major international rating agencies decreased to default levels.  Accordingly, certain credit facilities are in default and have become callable by the lenders.  The Bank's default under these covenants resulted in accelerations and cross-defaults under the terms of the respective agreements.

In April 2009, the Bank suspended its payments on principal and in July 2009 on interest payments.  The Group, with the support of Samruk-Kazyna, is in the process of completing the Restructuring.

In light of the negative events described above, the Annual Financial Statements included a note indicating there was a material uncertainty which may cast significant doubt about the Bank's ability to continue as a going concern.

The Annual Financial Statements and Unaudited Interim Financial Statements do not include any adjustments relating to the recoverability and classification of recorded assets and classification of liabilities that might be necessary if the Restructuring is unsuccessful and adequate additional resources are not available and the Bank is unable to continue as a going concern.

**Factors Affecting the Bank's Results of Operations** *Kazakhstan's Economy*

The unprecedented recent market and economic conditions have resulted in tighter credit conditions and slower growth. Continued concerns about the health of the financial sector in many countries, possible inflation, energy costs, geopolitical issues and the availability and cost of credit have contributed to increased market volatility and diminished expectations for various economies.

The economy in Kazakhstan was particularly affected by the collapse of oil and gas prices beginning in the second half of 2008. In addition, real estate prices in Kazakhstan have dropped sharply since June 2007. See "*Risk Factors — Volatility in the real estate market in Kazakhstan has had and may continue to have an adverse effect on the Bank's asset quality and collateral value*". Such volatility in the commodity prices and the real estate market has had an adverse effect on the country's economy. These adverse economic conditions led to a decrease in GDP growth of 3.3 per cent. in 2008 compared to 8.9 per cent. GDP growth in 2007. According to preliminary NSA data, GDP increased by 1.2 per cent. in 2009.

Further, on 4 February 2009, the NBK reduced its level of support for the exchange rate from KZT 117 – KZT 123 to 1 U.S. Dollar to KZT 150 to 1 U.S. Dollar (+/- 3 per cent.) This devaluation was due in part to declines in Kazakhstan's balance of payments and foreign exchange reserves as a result of falls in commodity prices, in particular oil and gas, in the international markets. From 5 February 2010 a new exchange rate corridor began to operate. In light of the state of world trade and currency markets, and in order to make the setting of exchange rates more flexible, the NBK has indicated that it will widen the KZT corridor until 20 March 2011 to allow fluctuations from a base rate of KZT 150 to 1 U.S. Dollar of + 10 per cent. (i.e. up to KZT 165 to 1 U.S. Dollar) and - 15 per cent. (i.e. down to KZT 127.5 to 1 U.S. Dollar).

In addition, concern about the stability of the banking sector in Kazakhstan led to a material reduction in liquidity as wholesale funding has become more expensive and less available. Funding from retail depositors also fell as a result of a public loss of confidence in the Kazakhstan banking sector. To prevent deposit outflow and due to the deterioration in asset quality in 2009, Samruk-Kazyna has provided financial support to the banking sector totalling KZT 1,082.1 billion as at 18 February 2010, according to official data. This support took a number of forms, including a direct equity investment as well as placing deposits with the banks, and in the case of the Bank the exchanging of Bank Bonds for SK Bonds. Moreover, the Government has provided KZT 120 billion pursuant to each of the Mortgage State Finance Programme and SME State Finance Programme. For more detailed information, see "*The Banking Sector in Kazakhstan — Introduction*".

***Loan Loss Provisions***

Before 1 May 2007, the FMSA provisioning policy in respect of SME borrowers and corporate borrowers was based on an analysis of eight criteria of asset quality and six criteria of contingent liability quality. Each criterion was assessed a score and the class of an asset or contingent liability of a borrower was calculated by adding up the scores of each criterion of quality.

Effective 1 May 2007, the Bank changed its provisioning policies in order to comply with amended FMSA regulations on provisioning. Under these new policies, loans are separated into two groups: loans for which provisions accrue on a case by case basis and homogeneous loans. The Bank determines provisions for the former group, which includes corporate, SME loans and retail loans in excess of 0.02 per cent. of the Bank's equity, based on its analysis of historical losses and the supervision of its loan portfolio. For loans assessed on an individual basis, the FMSA reduced the number of asset quality criteria from eight to five and the number of contingent liabilities quality criteria from six to three. For the retail loans that are classified as homogeneous loans, the Bank decides on the level of provisions in respect of the entire group of homogeneous retail loans rather than overdue loans only. According to this policy, the Bank reviews historical data on a monthly basis and, if necessary, revises its provisioning rate to reflect changes in its losses and other relevant factors.

In July 2009, the Bank engaged an independent auditor to review the credit files of a portion of the borrowers in the Bank's corporate loan portfolio to assess the appropriate level of loan loss provisions as at 30 June 2009 based on FMSA Methodology. This review resulted in a report dated 3 September 2009. On 23 September 2009, the Bank and Steering Committee again engaged their independent auditors to supplement and expand on their previous review of the corporate loan portfolio by reviewing the credit files of all of the borrowers in the Bank's corporate loan portfolio. Pursuant to its report issued on 12 November 2009, the Bank's independent auditors advised that the appropriate level of loan loss provisions on the corporate loan portfolio of the Bank was KZT 1,965 billion (based on FMSA Methodology) as at 30 June 2009. For a discussion of the difference between FMSA Methodology and IFRS, see "*Pro Forma Financial Information*" and "*Asset and Liability Management — Provisioning Policy*".

Provisions as a percentage of gross loans based on IFRS increased to 65.1 per cent. as at 30 September 2009 compared to 42.9 per cent. as at 31 December 2008 and 5.4 per cent. as at 31 December 2007. For a discussion on recognition of provisions see "*Asset and Liability Management — Loan Supervision and Monitoring*". Provisions as a percentage of gross loans increased in the first nine months of 2009 as a result of a multitude of internal and external (both foreign and domestic) factors that materially influenced the worsening of the quality of the corporate loan portfolio.

The investigation of the FMSA and Samruk-Kazyna prior to Samruk-Kazyna's investment into the Bank in February 2009, and the Bank's internal due diligence conducted following the acquisition and the appointment of the new management team, have revealed a number of factors that the Bank believes led to the deterioration of the Bank's loan portfolio and significant net losses. For a complete discussion of these factors, see "*The Bank — Background to the Restructuring — Factors Affecting Deterioration of Bank's Loan Portfolio*" and "*The Bank — Asset Recovery*".

In particular, a high number of purported loans granted to non-residents became problem loans. Such loans represented 49.5 per cent. of the gross portfolio of the Bank as at 30 September 2009. For the first nine months of 2009 provisions in respect of loans issued to non-resident borrowers rose 2.6 times as a result of the following factors:

- a number of such borrowers may have been connected with the former management of the Bank and potentially fraudulent schemes were used when issuing loans and transferring loaned funds outside Kazakhstan;

- former management used multi-layered credit schemes under which one company (usually offshore) would act as the borrower, then forward the loaned funds to a project manager (often a resident of Russia, Ukraine or another country), and a third person would provide security (if security was provided at all). Such schemes made it more difficult for the Bank to investigate and enforce its rights;

- many non-resident borrowers are not responding to the Bank's requests and communication with them has been lost, which leads to loss of control over the realisation of the project and ability to monitor the use of funds;

- the Bank has been unable to monitor the use of funds, security and results of financial activity of nonresident borrowers;

- the Bank has been unable to monitor and re-value pledged property; and

- certain security provided by certain borrowers has been inaccessible as a consequence of the borrowers having purportedly cancelled the pledge over the property in question and subsequently sold such property to third persons.

For the first nine months of 2009 provisions in respect of loans issued to resident borrowers rose 3.4 per cent.

The Bank has faced internal challenges identifying, analysing and dealing with problem loans since the Bank's management changed in early 2009 see "*Risk Factors — Risks Related to the Bank — Internal control weaknesses have been evidenced by several transactions in the past and other unusual transactions may be uncovered in the furture*". The Bank has taken the actions in order to deal with the large volume of problem loans. See "*Asset and Liability Management — Non-Performing Loans*".

In respect of external factors, the world financial crisis in 2008 and 2009 was accompanied by a fall in world prices for oil and gas, metals, raw materials and real estate. In the domestic economy, there was a reduction in business activity, a fall in the volume of sales, a reduction of consumer demand in the population and a crisis in the construction sector, among other things. The economic crisis led to a sharp loss of turnover for businesses (a liquidity crisis) which led to payment defaults.

As the financial condition of the Bank's borrowers worsened, this contributed to a reduction in the creditworthiness of clients and to an increase in defaults on their obligations to the Bank. Late payment of indebtedness by corporate business borrowers rose 62 per cent. in the first nine months of 2009. The number of loans for which the maturity date was extended rose by 20 per cent.

A reduction in real estate prices also contributed to a reduction in the value of pledged property and increased the risk of non-return of money under problem loans when enforcing against pledged property. As at 30 September 2009, 31 December 2008 and 31 December 2007, the Group held retail mortgages totalling KZT 240,625 million, KZT 234,130 million and KZT 254,417 million, respectively, which represented 7.6 per cent., 8.3 per cent. and 10.1 per cent., respectively, of its total gross loan portfolio.

Provisions on corporate loans as a percentage of gross corporate loans increased to 79.2 per cent. as at 30 September 2009 compared to 56.7 per cent. as at 31 December 2008 and 6.7 per cent. as at 31 December 2007. On an unconsolidated basis, provisions on CIS loans of the Bank increased to 96.7 per cent. of CIS loans as at 30 September 2009 compared to 10.1 per cent. as at 31 December 2008 and provisions on investment loans increased to 82.7 per cent. of the investment loan portfolio as at 30 September 2009 from 4.5 per cent. as at 31 December 2008.

Provisions on SME loans as a percentage of gross SME loans increased to 23.4 per cent. as at 30 September 2009 compared to 8.2 per cent. as at 31 December 2008 and 7.7 per cent. as at 31 December 2007.

Provisions on retail loans as a percentage of gross retail loans increased to 15.6 per cent. as at 30 September 2009 compared to 4.3 per cent. as at 31 December 2008 and 0.4 per cent. as at 31 December 2007.

*Interest Rates*

As a significant portion of the Bank's assets and liabilities are interest-bearing, changes in prevailing interest rates, both in Kazakhstan and internationally, can materially affect its results. As a general matter, because the Bank has both interest-earning assets and interest-bearing liabilities, rising interest rates can lead to higher or lower interest margins, depending on whether the Bank's interest-earning assets reprice at a faster rate than its interest-bearing liabilities.

From 2003 to early 2009, the NBK steadily raised refinancing interest rates, from 7 per cent. as at 7 July 2003 to 10 per cent. as at 1 January 2009. As of 4 September 2009, the NBK has decreased the refinancing interest rate to 7 per cent. Although the official refinancing rate of the NBK has, under normal conditions, a minimal effect on the cost of funding of Kazakhstan banks, its influence grows sharply during periods of constrained liquidity on the internal banking market, when most banks are forced to turn to the NBK for liquidity.

In addition, the Bank's securities portfolio, which consists of both Tenge and U.S. Dollar denominated assets, is affected by changes in interest rates. Rising interest rates would, over time,

increase the Bank's income from its securities portfolio but may at the same time reduce the market value of its pre-existing fixed income investment portfolio.

### *Mix of Funding Base*

Historically international sources of funding were less expensive than domestic sources of funding. Before 2008, the Bank relied heavily on raising funds through the international debt capital markets and through term facilities with international lenders.  As at 31 December 2007, 41.5 per cent. of the Group's funding base (i.e., the Group's total liabilities) consisted of debt securities issued and 32.0 per cent. was due to credit institutions, both of which derived primarily from international markets.  As at 31 December 2007, the remaining portion of the funding base was made up primarily of customer accounts (25.0 per cent.) and other liabilities (1.5 per cent.).

As a result of the global financial crisis, the Bank no longer had access to new international sources of funding.  Of international funding reflected on the Group's balance sheet as at 31 December 2008, 84.5 per cent. was obtained prior to 31 December 2007 and represented primarily debt securities issued and due to banks.  As at 30 September 2009, 45.5 per cent. of the Group's funding base consisted of debt securities issued and 20.5 per cent. was due to credit institutions, compared to 37.0 per cent. and 27.4 per cent. as at 31 December 2008, respectively.  If the Restructuring is successful the proportion of international funding reflected on the Group's balance sheet will significantly decrease.

The management of the Bank does not believe that new international funding will become available in the short term, so the Bank will increasingly rely on domestic funding sources, which historically has been more expensive than international funding.  Furthermore, the current management expects that the competition for domestic funding will increase among other banks in Kazakhstan, which will further increase the cost of such funding.

### *Samruk-Kazyna's Support*

The Group has experienced significant outflows of customer deposits since January 2009.  The Group's retail deposits decreased by 40.3 per cent. from KZT 307,345 million as at 31 December 2008 to KZT 183,552 million as at 30 September 2009.  The Group has also experienced a significant outflow of private corporate and SME deposits (i.e., deposits from entities other than Samruk-Kazyna and its subsidiaries) during the same period.  Such deposits decreased by 64.9 per cent. from KZT 364,482 million as at 31 December 2008 to KZT 128,093 million as at 30 September 2009.  Due to deposits totalling KZT 157,411 million which were placed in February 2009 and March 2009 by Samruk-Kazyna and throughout the period by subsidiaries of Samruk-Kazyna, the deposits by Samruk-Kazyna and its subsidiaries (which includes amounts deposited pursuant to the State Finance Programmes) increased by 73.5 per cent. from KZT 214,225 million as at 31 December 2008 to KZT 371,636 million as at 30 September 2009 and the Group's total deposits decreased by only 22.9 per cent. from KZT 886,052 million as at 31 December 2008 to KZT 683,281 million as at 30 September 2009.  See also "*The Banking Sector in Kazakhstan — Introduction*".

### Critical Accounting Policies and Estimates

The Group's accounting policies are integral to an understanding of the results of operations and financial condition presented in the consolidated financial statements and notes thereto.  The Group's significant accounting policies are described in Note 4 to the Annual Financial Statements appearing elsewhere in this Information Memorandum.  The preparation of these financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the reported amounts of revenues and expenses during the relevant period.  On an on-going basis, management evaluates its estimates and judgments, including those related to impairment charges, reserves for insurance claims, the carrying values of property and investments, income taxes and deferred taxes, financing operations and contingencies, litigation and arbitration. Management bases its estimates and judgments on historical experience and on various other factors that are considered to be reasonable under the circumstances.  Actual results may differ from

estimates under different assumptions or conditions.  Please refer to "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Factors Affecting the Bank's Results of Operations — Loan Loss Provisions*" for information regarding an increase in the Bank's loan loss provisions.

**Significant Accounting Judgements and Estimates**

In the process of applying the Group's accounting policies, management has made certain judgements and estimates set out in Note 5 to the Annual Financial Statements, appearing elsewhere in this Information Memorandum.

**Changes in accounting policies**

The accounting policies adopted in the preparation of the Unaudited Interim Financial Statements are consistent with those followed in the preparation of the Group's Annual Financial Statements for the year ended 31 December 2008, except for the adoption of new standards and interpretations, noted in Note 3 to the Unaudited Financial Statements:

**Principles of Consolidation**

The consolidated financial statements of the Group include the Bank and the companies that it controls (subsidiaries).  This control is normally evidenced when the Group owns, either directly or indirectly, more than 50 per cent. of the voting rights of a company's share capital and is able to govern the financial and operating policies of an enterprise so as to benefit from its activities.  All intragroup transactions, balances and unrealised gains on transactions between Group companies are eliminated in full.  Unrealised losses are also eliminated unless the transaction provides evidence of an impairment of the asset transferred.  Where necessary, accounting policies for subsidiaries have been changed to ensure consistency with the policies adopted by the Group.  Consolidated financial statements are prepared using uniform accounting policies for like transactions and other events in similar circumstances.  The equity and net income attributable to minority shareholders' interests are shown separately in the balance sheets and statements of income, respectively.

Subsidiaries are consolidated from the date on which effective control is transferred to the Group and are no longer consolidated from the date control ceases.

*Acquisition of Subsidiaries – 2008*

The purchase method of accounting is used to account for the acquisition of subsidiaries by the Group.  Identifiable assets acquired and liabilities and contingent liabilities assumed in a business combination are measured initially at their fair values at the acquisition date, irrespective of the extent of any minority interest.

The excess of purchase consideration over the Group's share in the net fair value of the identifiable assets, liabilities and contingent liabilities is recorded as goodwill.  If the cost of the acquisition is less than the Group's share in the net fair value of the identifiable assets, liabilities and contingent liabilities of the subsidiary acquired the difference is recognised directly in the consolidated statement of income.

Minority interest is the interest in subsidiaries not held by the Group.  Minority interest at the reporting date represents the minority shareholders' share in the net fair value of the identifiable assets, liabilities and contingent liabilities of the subsidiary at the acquisition date and the minorities' share in movements in equity since the acquisition date.  Minority interest is presented within equity.

Losses allocated to minority interest do not exceed the minority interest in the equity of the subsidiary unless there is a binding obligation of the minority to fund the losses.  All such losses are allocated to the Group.

The differences between the carrying values of net assets attributable to interests in subsidiaries acquired and the consideration given for such increases are charged or credited to goodwill.

*Acquisition of Subsidiaries – 2009*

Early adoption of amendments to IFRS "Business combinations" and amendment to IAS 27 "Consolidated and Separate Financial Statements".  The revised standards were issued in January 2008 and have become effective for financial years beginning on or after 1 July 2009.  Revised IFRS 3 introduces a number of changes in the accounting for business combinations that will impact the number of goodwill recognised, the reported results in the period that an acquisition occurs, and future reported results.  Revised IAS 27 requires that a change in the ownership interest of a subsidiary is accounted for as an equity transaction.  Therefore, such a change will have no impact on goodwill, nor will it give rise to a gain or loss.  Furthermore, the revised standard changes the accounting for losses incurred by the subsidiary as well as the loss of control of a subsidiary.  The changes introduced by the revised Standards must be applied prospectively and will affect only future acquisitions and transactions with non-controlling interests.

The Group has elected to early adopt these amendments starting from 1 January 2009.  In accordance with these amendments total comprehensive loss is attributed to the owners of the parent and to the non-controlling interests even if this results in the non-controlling interests having a deficit balance.  As a result, total comprehensive loss of the Group's subsidiaries in the amount KZT 26,425 million were attributed to non-controlling interests.

*Investments in Associates*

Associates are entities in which the Group generally has between 20 per cent. and 50 per cent. of the voting rights, or is otherwise able to exercise significant influence, but which it does not control or jointly control.  Investments in associates are accounted for under the equity method and are initially recognised at cost, including goodwill.  Subsequent changes in the carrying value reflect the post-acquisition changes in the Group's share of net assets of the associate.  The Group's share of its associates' profits or losses is recognised in consolidated statement of income, and its share of movements in reserves is recognised in other comprehensive income.  However, when the Group's share of losses in an associate equals or exceeds its interest in the associate, the Group does not recognise further losses, unless the Group is obliged to make further payments to, or on behalf of, the associate.

Unrealised gains on transactions between the Group and its associates are eliminated to the extent of the Group's interest in the associates; unrealised losses are also eliminated unless the transaction provides evidence of an impairment of the asset transferred.

**Results of Operations for the Nine-Month Periods ended 30 September 2009 and 2008**

***Summary***

For the nine months ended 30 September 2009, the Group reported net loss of KZT 1,049,538 million or KZT 31,039 per diluted share, compared to net income of KZT 35,212 million or KZT 4,015 per diluted share for the nine months of 2008.  The significant decrease in income in the nine months of 2009 compared to the nine months of 2008 was due primarily to the increase in impairment of assets and losses from foreign currency operations.  See "*Financial Condition as at 30 September 2009 and as at 31 December 2008 and 2007 — Total Assets*" below.  The impairment recognised on the Group's loans to customers and amounts due from credit institutions was KZT 641,604 million for the nine months of 2009 as compared to KZT 80,019 million for the nine months of 2008, which represents an increase of 701.8 per cent.  The Group recognised losses from foreign currency operations of KZT 362,890 million for the period ended 30 September 2009 compared to gains of KZT 3,101 million for the period ended 30 September 2008.

*Interest Income, Interest Expense, Net Interest Income and Provision for Losses*

The following table sets out the principal components of the Group's net interest income for the periods indicated:

| | Nine-month period ended 30 September | |
|---|---|---|
| | **2009** | **2008** |
| | *(KZT millions, unaudited)* | |
| Loans to customers | 155,971 | 274,806 |
| SKBonds | 20,502 | — |
| Securities | | |
| — Financial assets at fair value through profit or loss | 9,677 | 7,216 |
| — Available-for-sale investment securities | 1,932 | 2,201 |
| Deposits with other banks | 5,852 | 13,931 |
| **Total interest income** | **193,934** | **298,154** |
| **Interest expense** | **(195,955)** | **(160,422)** |
| Net interest (expense)/income before impairment | (2,021) | 137,732 |
| Impairment charge | (641,604) | (80,019 |
| **Net interest (expense)/income** | **(643,625)** | **57,713** |

*Total Interest Income*

Total interest income decreased by 35.0 per cent. to KZT 193,934 million for the nine months ended 30 September 2009 from KZT 298,154 million for the nine months ended 30 September 2008, largely as a result of a 43.2 per cent. period-to-period decrease in interest on loans to customers to KZT 155,971 million as at 30 September 2009 from KZT 274,806 million as at 30 September 2008 due to the decrease in the average amounts of loans provided to customers by 47.7 per cent. The decrease in total interest income was partially offset by interest on the SK Bonds in the amount of KZT 20,502 million earned over the nine-month period ended 30 September 2009. See "*The Bank — NBK Support*".

For the nine months ended 30 September 2009 the average yield on total interest earning assets was 14.0 per cent. compared to 14.4 per cent. for the same period in 2008.

Interest income on the Group's securities portfolio increased over the relevant period. During the nine months ended 30 September 2009, interest earned on securities increased by 23.3 per cent. to KZT 11,609 million from KZT 9,417 million for the same period in 2008.

For the nine months ended 30 September 2009, the monthly average balance of the Group's securities portfolio was KZT 156,480 million, compared to KZT 190,299 million for the nine months ended 30 September 2008, reflecting a decrease of 17.8 per cent. The profitability of the securities portfolio increased to 9.9 per cent. as of 30 September 2009 from 6.6 per cent. as of 30 September 2008.

Interest earned on bank deposits decreased by 58.0 per cent. to KZT 5,852 million for the first nine months of 2009 from KZT 13,931 million for the first nine months of 2008. The decrease in interest earned on bank deposits for the first nine months of 2009 compared to the first nine months of 2008 was primarily attributable to the decrease in the average amounts of deposits with other banks by 51.5 per cent. The average interest rates on balances in other banks decreased to 7.4 per cent. over the first nine months of 2009 from 8.5 per cent. over the same period in 2008.

Tenge-denominated average deposits represented 27.1 per cent. of total average deposits for the first nine months of 2009, compared to 32.8 per cent. for the first nine months of 2008.

As at 30 September 2009, large deposits (i.e., in excess of U.S.$10,000), as a percentage of total deposits, also decreased compared to 30 September 2008 to 85.9 per cent. from 86.9 per cent. Deposits of an amount between U.S.$10,000 – U.S.$100,000 accounted for 13.8 per cent. of total deposits and deposits in excess of U.S.$100,000 accounted for 72.1 per cent. of total deposits as at 30 September 2009, compared to 14.5 per cent. and 72.4 per cent. of total deposits, respectively, as at 30 September 2008.

*Interest Expense*

The following table sets out certain information relating to the Group's interest expense for the periods indicated:

| | Nine-month period ended 30 September | |
|---|---|---|
| | **2009** | **2008** |
| | *(unaudited)* | |
| | *(KZT millions)* | |
| Debt securities issued | (110,878) | (72,867) |
| Deposits from customers | (36,949) | (39,687) |
| Deposits and loans from credit institutions | (48,128) | (47,868 |
| **Total** | **(195,955)** | **(160,422)** |

For the nine months ended 30 September 2009 interest expense increased by 22.1 per cent. to KZT 195,955 million from KZT 160,422 million for the nine months ended 30 September 2008.  The increase in interest expense over the period was largely due to the issuances of debt securities in 2009, partially offset by reductions in average amounts of client deposits.

Average balances of the Group's interest-bearing customer deposits, including both corporate and retail deposits (calculated, in each case, by reference to the unaudited accounting records of the Bank as at the relevant year end based on the balances for the end of each month in the relevant year) were KZT 546,487 million for the nine months ended 30 September 2009, compared to KZT 609,591 million for the nine months ended 30 September 2008, reflecting a decrease of 10.4 per cent.

The lower balances for the period were largely attributable to the generally worsened economic conditions in Kazakhstan and the related deterioration in the level of customer confidence in Kazakhstan banks.

Average interest rates paid on interest-bearing customer deposits for the nine months ended 30 September 2009 and 2008 were 9.0 per cent. and 8.7 per cent., respectively.

For the nine months ended 30 September 2009, interest expense on issued debt securities increased by 52.2 per cent. to KZT 110,878 million from KZT 72,867 million for the nine months ended 30 September 2008.  The primary reason for the increase was the higher average balances of debt securities outstanding by 34.3 per cent. and the increase of the effective rates from 8.8 per cent. over the nine months ended 30 September 2008 to 9.9 per cent. over the same period ended 30 September 2009.  See "*Selected Statistical and other Information — Funding Sources — Debt Securities*".

*Net Interest (Expense)/Income before Impairment*

The Group had a net interest expense before impairment charge of KZT 2,021 million for the nine months ended 30 September 2009 compared to a net interest income before impairment charge of KZT 137,732 million for the nine months ended 30 September 2008, reflecting a decrease of 101.5 per cent.

The Group's net interest margin, defined as net interest income before impairment charge as a percentage of average interest-earning assets, was (0.1) per cent., for the nine months ended 30 September 2009 compared to 6.6 per cent. for the nine months ended 30 September 2008.  This decrease was due to an increase in the average rate on attracted liabilities and a decrease in the earning assets rate under client loans.  This tendency was observed in second tier banks in 2008 and the first half of 2009.  The decrease was also due to a change in the structure of the Bank's financing sources for large international borrowers and issuances of debt securities.  The Bank constantly monitors its interest rate margins and spreads.

*Impairment Charge*

The Group's impairment charge for the nine months ended 30 September 2009 increased by 701.8 per cent. to KZT 641,604 million from KZT 80,019 million for the nine months ended 30 September 2008. This increase was primarily due to the deterioration of the loan portfolio.

Allowance for loan impairment increased more than nine-fold to KZT 2,068,923 million as at 30 September 2009 from KZT 204,774 million as at 30 September 2008.

As a result, the allowance for loan impairment as a percentage of gross loans increased to 65.1 per cent. as at 30 September 2009 compared to 6.8 per cent. as at 30 September 2008. See "*Asset and Liability Management — Provisioning Policy*".

**Non-Interest Income**

The following table sets out certain information on the Group's non-interest income for the periods indicated:

| | Nine-month period ended 30 September | |
| --- | --- | --- |
| | 2009 | 2008 |
| | *(unaudited)* | |
| | *(KZT millions)* | |
| Net trading loss | (20,020) | (4,676) |
| Gains less losses from foreign currencies: | | |
| — dealing | (9,513) | 884 |
| — translation differences | (353,377) | 2,217 |
| Fair value change of options | 19,837 | — |
| Income from insurance operations | 8,248 | 11,030 |
| Expenses from insurance operations | (6,202) | (9,384) |
| Share of income of associates | 4,169 | 4,193 |
| Impairment charge for available-for-sale investment securities | (1,243) | — |
| Impairment charge for goodwill | (32,885) | — |
| Gain from purchase of own debt securities | 9,708 | — |
| Other income | 2,294 | 5,033 |
| **Total** | **(3,78,984)** | **9,297** |

*Net trading loss*

Net trading loss for the nine months of 2009 increased by 328.1 per cent. to KZT 20,020 million from KZT 4,676 million for the nine months of 2008. This increase in net trading loss was due to losses from buying and selling, and changes in the fair value of financial assets at fair value through profit or loss and the effect of buying and selling of available-for-sale investment securities as well as changes in fair value of forward transactions with securities.

*Gains less Losses from Foreign Currencies*

Gains less losses arising from the translation of foreign currency-denominated assets and liabilities and from dealing, which are reported in the income statement as gains less losses from foreign currencies, comprised a loss of KZT 362,890 million for the nine months of 2009, compared to a gain of KZT 3,101 million for the nine months of 2008, reflecting a decrease due in large part to gains from a revaluation of foreign currency. Losses from foreign currency revaluation are due to the U.S. Dollar exchange rate increase to KZT 150.95 per U.S.$1.00 as at 30 September 2009 from KZT 119.84 per U.S.$1.00 as at 30 September 2008.

*Fair Value Change of Options*

With respect to certain loans linked to foreign currencies, the Bank has the option to demand higher payments if the foreign currency specified in the contract appreciates above a certain floor (typically the level of spot rates prevailing on the loan issuance date). The Bank believes this feature creates an embedded foreign currency option that should be recognised separately from the underlying loan.

The Group recognised income in respect of fair value change of options of KZT 19,837 million for the nine months ended 30 September 2009 compared to nil over the same period 2008.

*Income and Expenses from Insurance Operations*

Income from insurance operations decreased by 25.2 per cent. to KZT 8,248 million for the nine months ended 30 September 2009 from KZT 11,030 million for the nine months ended 30 September 2008, while expenses from insurance operations decreased as well by 33.9 per cent. to KZT 6,202 million from KZT 9,384 million.  Decreases in income were due to decreases in the amount of insurance premiums received, while the decreases in expenses were due to the proportional decrease of commissions paid and insurance payments, as well as optimisation of administrative expenses of insurance companies.

*Impairment Charge for Available-for-Sale Investment Securities*

The Group recognised an impairment charge for available-for-sale investment securities of KZT 1,243 million for the nine months ended 30 September 2009 compared to nil over the same period in 2008, which was due primarily to the increase in provision expenses on bonds of Astana-Finance and Alliance Bank held by the Bank.

*Impairment Charge for Goodwill*

An impairment charge for goodwill for the nine months ended 30 September 2009 was KZT 32,885 million compared to nil over the same period in 2008, as a result of the impairment test conducted with respect to Temirbank based on a comparison of the book value of the Bank's investment in Temirbank against the recoverable value of Temirbank.  Recoverable value was determined based on the discounted future cash flows of Temirbank.

*Gain from Purchase of Own Debt Securities*

The Group recognised a gain from purchase of own debt securities of KZT 9,708 million over the nine months ended 30 September 2009 compared to nil over the same period in 2008, due to the purchase by the Group of its own subordinated bonds with a carrying value of KZT 44,150 million for KZT 34,442 million.

*Other Income*

Other income decreased by 54.4 per cent. to KZT 2,294 million for the nine months ended 30 September 2009 compared to KZT 5,033 million for the nine months ended 30 September 2008, largely due to a decrease in operations of subsidiaries and affiliated companies.

**Non-Interest Expense**

The following table shows the composition of the Group's non-interest expense for the periods indicated:

|  | Nine-month period ended 30 September | |
|---|---|---|
|  | **2009** | **2008** |
|  | *(unaudited)* | |
|  | *(KZT millions)* | |
| Salaries and other employee benefits | (17,000) | (20,029) |
| Administrative and other operating expenses | (16,565) | (19,551) |
| Depreciation and amortization | (3,704) | (3,282) |
| Taxes other than income tax | (2,932) | (2,737) |
| Obligatory reserves of individuals' deposits | (1,353) | (1,725) |
| Other provisions | 6,415 | (476) |
| Other expenses | (2,358) | (1,886) |
| **Total** | **(37,497)** | **(49,686)** |

Non-interest expense for the nine months of 2009 decreased by 24.5 per cent. to KZT 37,497 million from KZT 49,686 million for the nine months of 2008.  The decrease in non-interest expense was mainly due to recoveries in other provisions, as well as decreases in amounts paid to salaries and benefits and administrative and operating expenses.

*Salaries and Benefits*

Salaries and benefits for the nine months of 2009 decreased by 15.1 per cent. to KZT 17,000 million from KZT 20,029 million for the nine months of 2008.  This decrease was primarily attributable to the decrease in staff levels and closure of cash offices.  The number of employees in the Group decreased by 28.2 per cent. to 10,495 employees as at 30 September 2009 compared to 14,608 employees as at 30 September 2008.

*Administrative and Other Operating Expenses*

The following table shows the composition of the Group's other administrative and operating expenses for the periods indicated:

|  | Nine-month period ended 30 September | |
| --- | --- | --- |
|  | **2009** | **2008** |
|  | *(unaudited)* | |
|  | *(KZT millions)* | |
| Occupancy and rent | (4,349) | (5,338) |
| Legal services and consultancy | (3,317) | (1,076) |
| Repair and maintenance of property and equipment | (1,253) | (1,608) |
| Security | (1,047) | (1,166) |
| Communications | (1,019) | (1,230) |
| Plastic cards | (821) | (571) |
| Marketing and advertising | (759) | (2,483) |
| Encashment | (716) | (689) |
| Transportation expenses | (609) | (1,573) |
| Agency services | (426) | (366) |
| Penalties | (415) | (130) |
| Data processing | (331) | (250) |
| Business travel and related expenses | (318) | (801) |
| Office supplies | (193) | (339) |
| Mail and express services | (124) | (122) |
| State duty | (84) | (177) |
| Representation expenses | (31) | (82) |
| Insurance expense | (23) | (20) |
| Training | (13) | (73) |
| Loss on disposals of property and equipment | (12) | (11) |
| Participation in forums, seminars and conferences | (10) | (122) |
| Other | (695) | (1,324) |
| **Administrative and other operating expenses** | **(16,565)** | **(19,551)** |

Total administrative and other operating expenses for the nine months of 2009 decreased by 15.3 per cent. to KZT 16,565 million from KZT 19,551 million in the nine months of 2008.  Marketing and advertising, occupancy and rent and transportation expenses represented the largest contributing factors to the decrease, while expenses for legal services and consultancy significantly increased.

Marketing and advertising expenses decreased by 69.4 per cent. to KZT 759 million for the nine months of 2009, compared to KZT 2,483 million for the same period in 2008.  This decrease was mainly attributable to the decreased level of advertising conducted by the Group in line with the restructuring of its business.

Occupancy and rent decreased by 18.5 per cent. to KZT 4,349 million for the nine months ended 30 September 2009, compared to KZT 5,338 million for the nine months ended 30 September 2008. This decrease primarily resulted from the closure of 42 cash offices in the nine months of 2009.  See "*The Bank — Strategy — General Strategies of the Bank — Optimise Branch Network*".

Transportation expenses decreased to KZT 609 million for the nine months ended 30 September 2009, compared to KZT 1,573 million for the same period in 2008, reflecting a decrease of 61.3 per cent.

Business travel and related expenses decreased by 60.3 per cent. from KZT 801 million for the nine months ended 30 September 2008 to KZT 318 million for the same period as at 30 September 2009.

Repair and maintenance expenses of property and equipment decreased by 22.1 per cent. to KZT 1,253 million as at 30 September 2009 from KZT 1,608 million as at 30 September 2008 due to the cash office closures in 2009.  See "*The Bank — Strategy — General Strategy of the Bank — Optimise Branch Network and Subsidiaries*".

Communication fees were KZT 1,019 million for the nine months ended 30 September 2009, compared to KZT 1,230 million for the same period in 2008, reflecting a decrease of 17.2 per cent. This decrease of communication fees for the nine months ended 2009 was mainly due to optimisation of the Bank's expenses, in particular the reduction in the total number of employees and number of employees that were allowed to use long distance telephone services.

Office supplies expenses decreased by 43.1 per cent. to KZT 193 million for the nine months ended 30 September 2009, compared to KZT 339 million for the same period in 2008.

Legal and consultancy fees increased by 208.3 per cent. to KZT 3,317 million for the nine months ended 30 September 2009, compared to KZT 1,076 million for the nine months ended 30 September 2008.  Higher legal and consultancy fees for the nine months ended 30 September 2009 were mainly due to the Bank's restructuring efforts.

Penalties increased by 219.2 per cent. to KZT 415 million for the nine months ended 30 September 2009 from KZT 130 million for the nine months ended 30 September 2008 reflecting penalties paid by the Group for taxes payable in the years of 2004 to 2006 as a result of due diligence undertaken by the Tax Committee of the Ministry of Finance and in respect of an adjustment in the benefits to the Bank of certain mortgage loans issued from 2005 to 2007.

*Depreciation and Amortisation*

Depreciation and amortisation expenses for the nine months of 2009 increased by 12.9 per cent. to KZT 3,704 million from KZT 3,282 million for the nine months of 2008.  This increase was mainly due to purchases in the second half of 2008 of calculation equipment, servers and certain other equipment for the call centres.

*Taxes other than Income Tax*

Taxes other than income tax were KZT 2,932 million for the nine months ended 30 September 2009, compared to KZT 2,737 million for the same period in 2008, reflecting an increase of 7.1 per cent. Despite a decrease in VAT from 13 per cent. to 12 per cent. during the period, the taxes other than income tax increased as result of increases in the tax base of the Group, including with respect to services provided to non-residents, additional land plots taken on to the Group's balance sheet over the period and an increase in the national monthly index used to calculate pension payments.

*Obligatory Insurance of Individuals' Deposits*

Certain members of the Group have a regulatory obligation to pay premiums for the insurance of individuals' deposits.  The Bank has an obligation to pay premiums to the KDIF in respect of its insured customer deposits.  Obligatory expenses for insurance of individuals' deposits for the nine months ended 30 September 2009 were KZT 1,353 million as compared to the same expenses for the nine months ended 30 September 2008 of KZT 1,725 million, a decrease of 21.6 per cent.

*Other Provisions*

The Group had a recovery of other provisions of KZT 6,415 million for the nine months ended 30 September 2009, compared to a charge for other provisions of KZT 476 million over the nine

months ended 30 September 2008, an increase in the recovery of other provisions of 1,447.7 per cent. Other provisions consist of recoveries or charges under guarantees and letters of credit and other assets. The Group had a recovery of other provisions of KZT 10,597 million for guarantees and letters of credit over the nine months ended 30 September 2009, compared to charges of other provisions of KZT 149 million over the nine months ended 30 September 2008, an increase in the recovery of other provisions of 7,212.1 per cent. This increase in recoveries of other provisions in respect of guarantees and letters of credit was due to recoveries of provisions due to the Bank satisfying the underlying obligations under the guarantees and letters of credit. The Group had charges of other provisions of KZT 4,182 million for other assets over the nine months ended 30 September 2009, compared to charges of other provisions of KZT 327 million over the nine months ended 30 September 2008, an increase in the charges of other provisions of 1,178.9 per cent. This increase in the charges of other provisions in respect of other assets is due to provisions on commissions of guarantees and letters of credit.

*Other Non-Interest Expenses*

Other non-interest expenses increased by 25.0 per cent. to KZT 2,358 million for the nine months ended 30 September 2009 from KZT 1,886 million for the nine months ended 30 September 2008 due the Bank's purchase of 553,185 common shares of BTA Pension Fund in February and March 2009.

*Income Tax*

The statutory corporate income tax rate in Kazakhstan for the year 2008 was 30.0 per cent. In November 2008, the Tax Code was enacted to reduce the corporate income tax from 30.0 per cent. to 20.0 per cent. effective from 1 January 2009, to 17.5 per cent. effective from 1 January 2013 and to 15.0 per cent. effective from 1 January 2014.

Due to the Bank's negative financial results for the nine months ended 30 September 2009, the Bank did not pay corporate income tax during this period. The Bank's effective tax rate was 16.3 per cent. for the nine months ended 30 September 2008 due to a decrease in the deferred tax assets of the Group during that period. Starting from 31 December 2008, deferred taxes are measured at the rates expected to apply to the period in which the asset is realised or the liability is settled.

**Results of Operations for the Years ended 31 December 2008 and 2007**

***Summary***

The Group reported net loss of KZT 1,188,050 million, equal to a loss per diluted share of KZT 141,878, for 2008, compared to net income of KZT 64,705 million, or income per diluted share of KZT 8,143, for 2007. The decrease in net income for 2008 compared to 2007 primarily reflected the increase of impairment charge of the Group's assets. Average balances of assets and liabilities for 2008 are calculated by adding closing monthly balances and dividing by twelve.

The return on average common shareholders' equity was negative 259.7 per cent. for year ended 31 December 2008, compared to 22.4 per cent. for 2007. The return on average common shareholders' equity in 2008 and 2007 is calculated based on monthly average balances of shareholders' equity.

*Interest Income, Interest Expense, Net Interest Income and Provision for Losses*

The following table sets out the principal components of the Group's net interest income for the periods indicated:

| | 31 December | |
|---|---|---|
| | 2008 | 2007 |
| | *(KZT millions)* | |
| Loans to customers | 366,037 | 291,724 |
| Securities | 12,597 | 14,587 |
| Deposits with other banks | 17,833 | 17,137 |
| **Total interest income** | **396,467** | **323,448** |
| **Interest expense** | **(208,381)** | **(179,279)** |
| Net interest income before impairment | 188,086 | 144,169 |
| Impairment charge | (1,094,300) | (67,810) |
| **Net interest (expense)/income** | **(906,214)** | **76,359** |

*Total Interest Income*

Total interest income increased by 22.6 per cent. to KZT 396,467 million for 2008 from KZT 323,448 million for 2007. The increase in interest income in 2008 as compared to 2007 was due to the growth in interest-earning assets by 23.6 per cent. from KZT 2,412,615 million in 2007 to KZT 2,982,189 million in 2008.

The monthly average yield on total interest-earning assets decreased to 13.3 per cent., for the year ended 31 December 2008, compared to 13.4 per cent. for the year ended 31 December 2007, as calculated by the Bank according to the unaudited accounting records of the Group as at 31 December 2008 and 2007.

Interest income on loans to customers increased by 25.5 per cent. to KZT 366,037 million for the year ended 31 December 2008, compared to KZT 291,724 million for the year ended 31 December 2007, as the average balance of outstanding loans in the Group's loan portfolio rose by 29.9 per cent. to KZT 2,579,135 million for the year ended 31 December 2008 from KZT 1,985,158 million for the year ended 31 December 2007, as calculated by the Bank according to the unaudited accounting records of the Bank for the year ended 31 December 2008 and 2007, respectively.

As at 31 December 2008, interest rates charged to borrowers ranged from 12 per cent. to 20 per cent. on Tenge-denominated loans, with the average interest rate on Tenge-denominated loans being 17.8 per cent., while interest rates charged on foreign currency denominated loans ranged from 10 per cent. to 20 per cent. with the effective interest rate on foreign currency denominated loans being 12.1 per cent. The overall average yield earned on loans for the year ended 31 December 2008 decreased to 14.2 per cent. compared to 14.7 per cent. for the year ended 31 December 2007, as calculated by the Bank according to the unaudited accounting records of the Bank for the years ended 31 December 2008 and 2007, respectively. These decreases largely reflected write offs, the balance of accrued interest of loans that were written off the balance.

For the year ended 31 December 2008, interest income earned on the Group's securities portfolio decreased by 13.6 per cent. to KZT 12,597 million from KZT 14,587 million for 2007 largely as a result of the decrease of the average balance of the Group's securities portfolio.

For the year ended 31 December 2008, the average balance of the Group's securities portfolio, including financial assets at fair value through profit or loss, available-for-sale and held-to-maturity securities, was KZT 190,908 million, compared to KZT 242,516 million for 2007, reflecting a decrease of 21.3 per cent., as calculated by the Bank according to the unaudited accounting records of the Bank as at 31 December 2008 and 2007. Average interest rates earned on the securities portfolio were 6.6 per cent. and 6.0 per cent. for 2008 and 2007, respectively, as calculated by the Bank according to the unaudited accounting records of the Bank as at 31 December 2008 and 2007, respectively.

Interest earned on bank deposits increased by 4.1 per cent. to KZT 17,833 million for the year ended 31 December 2008 from KZT 17,137 million for the same period in 2007, primarily as a result of the higher average balance of bank deposits maintained by the Group in 2008, which increased to KZT 212,146 million from KZT 184,941million in 2007, as calculated by the Bank according to the unaudited accounting records of the Bank for the years ended 31 December 2008 and 2007, respectively.

As at 31 December 2008 the average balance of Tenge-denominated deposits represented 31.2 per cent. of total deposits, compared to 32.5 per cent. as at 31 December 2007.

As at 31 December 2008 large deposits (i.e., in excess of U.S.$10,000), as a percentage of total deposits, also increased compared to 31 December 2007 to 88.0 per cent. from 85.0 per cent.   In particular, deposits of an amount between U.S.$10,000 – U.S.$100,000 accounted for 13.5 per cent. of total deposits and deposits in excess of U.S.$100,000 accounted for 74.5 per cent. of total deposits as at 31 December 2008, compared to 17.5 per cent. and 67.5 per cent. of total deposits, respectively, as at 31 December 2007.

*Interest Expense*

The following table sets out certain information relating to the Group's interest expense for the periods indicated:

|  | Year ended 31 December | |
|  | 2008 | 2007 |
| --- | --- | --- |
|  | *(KZT millions)* | |
| Debt securities issued | (95,888) | (85,683) |
| Customer accounts | (55,748) | (39,935) |
| Loans and advances from other credit institutions | (56,745) | (53,661) |
| **Total** | **(208,381)** | **(179,279)** |

For the year ended 31 December 2008, interest expense increased by 16.2 per cent. to KZT 208,381 million from KZT 179,279 million for the year ended 31 December 2007.  The increase in interest expense over the period was largely due to the growth in the Group's deposit base, increased bank borrowings and issuances of debt securities in 2008 and 2007, partially offset by reductions in average rates paid on bank borrowings and debt securities.

Average balances of the Group's interest-bearing customer deposits, including both corporate and retail deposits (calculated, in each case, by reference to the unaudited accounting records of the Bank as at the relevant year end based on the balances for the end of each month in the relevant year) were KZT 639,666 million in 2008, compared to KZT 520,269 million in 2007, reflecting an increase of 22.9 per cent., as calculated by the Bank according to the unaudited accounting records of the Bank for the years ended 31 December 2008 and 2007.

Average interest rates paid on interest-bearing customer deposits as at 31 December 2008 and 2007 were 8.7 per cent. and 7.7 per cent., respectively, as calculated by the Bank according to the unaudited accounting records of the Bank for the years ended 31 December 2008 and 2007.  The increase in the average interest rates paid during the year ended 31 December 2008, compared to those during the year ended 31 December 2007, primarily reflected the growth in the volume of customer deposits having a term of more than a year from 39.5 per cent. to 29.5 per cent. of the total amount of deposits, as well as the increase in such deposits.

For the year ended 31 December 2008, interest expense on issued debt securities increased by 11.9 per cent. to KZT 95,888 million from KZT 85,683 million for the year ended 31 December 2007.  The primary reason for the increase was the higher average balances of debt securities outstanding. See "*Selected Statistical and other Information — Funding Sources — Debt Securities*".

*Net Interest Income before Impairment Charge*

Net interest income before impairment charge increased by 30.5 per cent. to KZT 188,086 million for the year ended 31 December 2008 from KZT 144,169 million for the year ended 31 December 2007.

The Group's net interest margin was 6.3 per cent. for the year ended 31 December 2008, compared to 6.0 per cent. for 2007.  The lower margin was attributable to decreases in cost of funding, since the rate of interest-bearing liabilities decreased to 7.9 per cent. in 2008 from 8.2 per cent. in 2007.

*Impairment Charge*

Impairment charges (including in respect of amounts due from credit institutions) taken by the Group for the year ended 31 December 2008 increased by 1,513.8 per cent. to KZT 1,094,300 million, compared to KZT 67,810 million in 2007.  During 2008, the quality of the Group's loan portfolio significantly deteriorated as a result of circumstances and actions taken before the current management of the Bank were appointed by the controlling shareholder.  Certain loan documentation, including collateral and associated additional agreements, primarily relating to financing of projects outside Kazakhstan, was no longer available.  In addition, many loans were transferred to new borrowers that do not have adequate sources of repayment.  Moreover, no collateral was provided by these new borrowers.  Consequently all transferred loans were unsecured.  A number of significant borrowers, primarily registered outside Kazakhstan, have ceased servicing their loans, have not allowed the Bank to monitor collateral or failed to provide information about their financial performance.  While the Bank continues its efforts related to the recovery of the above loans, the Bank's management considers that loans where a borrower fails to service debt, monitoring of the borrowers has not been possible and there is neither properly registered collateral nor other necessary legal documentation, to be fully impaired and has created an allowance for the full carrying amount of such loans.  In addition, the ongoing financial crisis has affected borrowers' ability to service their obligations and the value of collateral in 2008.  As a result of the above the Group recorded an impairment charge for losses on loans to customers of KZT 1,090,127 million and an impairment charge on loans to credit institutions of KZT 4,173 million for 31 December 2008, compared to KZT 67,414 million and KZT 396 million respectively as at 31 December 2007.  The Group's total allowance for loan impairment as at 31 December 2008 increased by 788.2 per cent.   to KZT 1,217,278 million from KZT 137,043 million as at 31 December 2007.

During 2008 loan provisions as a part of total loan portfolio increased to 42.9 per cent. as at 31 December 2008 compared to 5.4 per cent. as at 31 December 2007.

**Non-Interest Income**

The following table sets out certain information on the Group's non-interest income for the periods indicated:

| | Year ended 31 December | |
|---|---|---|
| | **2008** | **2007** |
| | *(KZT millions)* | |
| Fees and commissions, net | 29,155 | 27,432 |
| Foreign exchange gains, net | (9,205) | 22,396 |
| Net trading loss/income | (29,769) | 2,503 |
| Loss/gain from insurance operations | 2,100 | 3,317 |
| Loss/income of associates | (15,448) | 4,234 |
| Loss on disposal of subsidiaries | (11,252) | (249) |
| Impairment charge for available-for-sale investment securities | (42,610) | — |
| Impairment charge for goodwill | (8,107) | — |
| Impairment charge for investments in associates | (19,138) | |
| Other income | 212 | (62) |
| **Total** | **(104,062)** | **59,571** |

*Fees and Commissions*

Fee and commission income increased by 6.5 per cent. for the year ended 31 December 2008 to KZT 30,334 million compared to KZT 28,489 million for 2007.  This increase was attributable to the increases in fees and commissions related to letters of credit and guarantees issued, asset management fees and transfer operations.

Fee and commission expense increased to KZT 1,179 million for the year ended 31 December 2008 compared to KZT 1,057 million, for the year ended 31 December 2007, representing the increases of 11.5 per cent.

Reflecting the foregoing, net fees and commissions increased by 6.3 per cent. for the year ended 31 December 2008 to KZT 29,155 million, compared to KZT 27,432 million for 2007.  The increases were primarily due to increases in the volume of transactions.

*Gains and Losses from Foreign Currencies*

Gains and losses arising from the translation of and dealing with foreign currency-denominated assets and liabilities, which are reported in the income statement as gains less losses from foreign currencies, comprised a loss, of KZT 9,205 million for the year ended 31 December 2008, compared to a gain of KZT 22,396 million for the year ended 31 December 2007 reflecting a decrease by 141.1 per cent., due to losses from currency revaluations in JPY (exchange rate increased from KZT 1,071 per JPY 1 to KZT 1,340 per JPY 1) since the Group had a large short position in this currency in amount of KZT 201 billion as at 31 December 2008.

*Insurance Income (Loss)*

The Group reported net insurance gains of KZT 2,100 million for the year ended 31 December 2008, compared to a net gain of KZT 3,317 million in 2007.  This decrease primarily reflected the increase in expenses of agent services and insurance.

*Loss/Income of Associates*

The Group reported a net loss in its share of income from associates of KZT 15,448 million for the year ended 31 December 2008, compared with a net gain of KZT 4,234 million as at 31 December 2007, reflecting a decrease of 464.9 per cent.  This resulted from changes in the Bank's equity share in BTA Russia.

*Loss on Disposal of Subsidiaries*

The Group reported a net loss on disposal of subsidiaries of KZT 11,252 million for the year ended 31 December 2008, compared with a net loss of KZT 249 million as at 31 December 2007 due to deemed disposal in equity share in BTA Russia.

*Impairment Charge for Available-for-sale Securities*

As at 31 December 2008, the Group reported an impairment charge on available-for-sale investment securities in the amount of KZT 42,610 million.   During 2008, the Bank placed certain available-for-sale securities with a carrying amount of KZT 35,402 million with a custodian in an offshore jurisdiction.   Subsequent to 31 December 2008, the Bank received a statement from its custodian, which indicated that these securities were disposed of in January 2009.  No consideration was received by the Bank from this disposal.  The Bank initiated an internal investigation with respect to the disposal and passed the information to the Procuracy of the Republic of Kazakhstan and FMSA.  Management of the Bank believes that the circumstances above indicate that these securities were not recoverable as at 31 December 2008.  Therefore, these securities have been fully written-off as at 31 December 2008.  Also included in this figure is an impairment loss on equity securities in the amount of KZT 7,208 million which the Group recognised during 2008.

*Impairment Charge for Goodwill*

The Group recorded an impairment charge of KZT 8,107 million in respect of goodwill as at 31 December 2008, whereas no impairment charge was recorded as at 31 December 2007. The impairment is largely the result of uncertainties in the Kazakhstan economy, especially in the retail and mortgage sectors. Another key factor in the evaluation of goodwill is the discount rate used to determine the present value of projected cash flows.

*Impairment Charge for Investment in Associates*

As at 31 December 2008, the Group reported an impairment charge for investment in associates in the amount of KZT 19,138 million as a result of impairment of investments in BTA Ukraine.

*Other Income*

Other income increased by 441.9 per cent. to KZT 212 million for the year ended 31 December 2008, compared to KZT loss of 62 million for the year ended 31 December 2007, largely due to adjustments of difference between audited and unaudited reporting of subsidiaries.

**Non-Interest Expense**

The following table shows the composition of the Group's non-interest expense for the periods indicated:

| | Year ended 31 December | |
| --- | --- | --- |
| | **2008** | **2007** |
| | *(KZT millions)* | |
| Salaries and other employee benefits | (26,597) | (25,744) |
| Administrative and other operating expenses | (27,414) | (23,400) |
| Depreciation and amortization | (4,435) | (2,314) |
| Taxes other than income tax | (4,163) | (3,469) |
| Other provisions | (113,130) | (4,705) |
| Obligatory reserves of individuals' deposits | (2,102) | (1,761) |
| **Total** | **(177,841)** | **(61,393)** |

Non-interest expense increased by 189.7 per cent. to KZT 177,841 million for the year ended 31 December 2008, compared to KZT 61,393 million for 2007. This increase was due to the adjustment of provisions on contingent liabilities for 2008.

*Salaries and Benefits*

Salaries and benefits remained stable, increasing by only 3.3 per cent. to KZT 26,597 million for the year ended 31 December 2008, compared to KZT 25,744 million in 2007.

*Administrative and Other Operating Expenses*

The following table shows the composition of the Group's other administrative and operating expenses for the periods indicated:

| | Year ended 31 December | |
|---|---|---|
| | 2008 | 2007 |
| | *(unaudited)* | |
| | *(KZT millions)* | |
| Occupancy and rent | (7,056) | (4,797) |
| Marketing and advertising | (3,984) | (3,193) |
| Repair and maintenance of property and equipment | (2,548) | (1,750) |
| Transportation expenses | (2,077) | (1,411) |
| Communications | (1,639) | (1,522) |
| Security | (1,572) | (1,117) |
| Legal services and consultancy | (1,499) | (1,307) |
| Agency services | (1,047) | (1,035) |
| Business travel and related expenses | (1,041) | (1,033) |
| Encashment | (909) | (752) |
| Plastic cards | (767) | (786) |
| Office supplies | (445) | (358) |
| Penalties | (427) | (59) |
| Data processing | (346) | (298) |
| State duties and customs | (294) | (75) |
| Postal charges | (191) | (161) |
| Trainings | (100) | (117) |
| Representation | (99) | (80) |
| Insurance | (59) | (2,891) |
| Participation in forums, seminars and conferences | (43) | (54) |
| Loss on disposals of property and equipment | (12) | — |
| Other | (1,259) | (604) |
| **Administrative and other operating expenses** | **(27,414)** | **(23,400)** |

Total administrative and other operating expenses increased by 17.2 per cent. to KZT 27,414 million for the year ended 31 December 2008, compared to KZT 23,400 million for 2007. Occupancy and rent expenses, marketing and advertising costs and repair and maintenance of property and equipment represented the largest factors contributing to this increase.

Occupancy and rent increased by 47.1 per cent. to KZT 7,056 million for the year ended 31 December 2008, compared to KZT 4,797 million for the year ended 31 December 2007. This increase primarily resulted from increase of leased area due to business growth and the increase of rent tariffs on leased buildings.

Marketing and advertising expenses increased by 24.8 per cent. to KZT 3,984 million for the year ended 31 December 2008, compared to marketing and advertising expenses of KZT 3,193 million for 2007. This yearon-year increase was mainly attributable to the higher level of advertising conducted by the Group and to the rebranding campaign.

Business travel and related expenses increased to KZT 1,041 million for 2008, compared to KZT 1,033 million for 2007, reflecting an increase of 0.8 per cent.

Communication fees increased by 7.7 per cent. to KZT 1,639 million from KZT 1,522 million for the year ended 31 December 2008 compared to 2007. Increase of communication fees in 2008 was mainly due to business development and the spectrum of available services (services through internet) and accordingly network service (new cash settlement centres, offices and the Bank's expansion of staff).

Security charges increased by 40.7 per cent. to KZT 1,572 million for the year ended 31 December 2008, compared to KZT 1,117 million for the year ended 31 December 2007. The increase of security charges occurred partly due to an increase in post-hours (the number of hours worked by security personnel) and to a minor increase in hourly wages of security personnel. The costs increased in 2008 also due to the new requirements of the NBK regarding organisational safety and on arrangements of

accommodations of second-tier banks.  The buildings of branches were equipped with additional equipment, for which maintenance costs have increased correspondingly.

Legal and consultancy fees increased by 14.7 per cent. to KZT 1,499 million for the year ended 31 December 2008, compared to KZT 1,307 million for 2007.  The increase in 2008 compared to 2007 was mainly due to new borrowings and new developments in the Group's activities, including the costs to implement the IBS system, operational risk management system, and the business continuity management function.

In 2008 other expenses increased by 108.4 per cent. to KZT 1,259 million compared to KZT 604 million in 2007, primarily due to the increase of expenses related to deposit insurance.

*Depreciation and Amortisation*

Depreciation and amortisation expenses for the year ended 31 December 2008 increased by 91.7 per cent. to KZT 4,435 million for the year ended 31 December 2008 from KZT 2,314 million for 2007.  In the second half 2007 automated teller machines and computer and server equipments were transferred on the balance sheet of the Bank from "Alem Card" (processing centre) and "Force Technology".  This fact, in addition to further purchases by the Bank during 2008, were the primary factors underlying the increase.

*Taxes other than Income Tax*

Taxes (other than income taxes) increased to KZT 4,163 million for the year ended 31 December of 2008, compared to KZT 3,469 million for the year ended 31 December 2007, reflecting an increase of 20.0 per cent.  This increase in tax expenses was mainly attributable to higher value-added taxes, land taxes and other taxes, duties and mandatory payments required to be made under the national budget.

*Other Provisions*

Other provisions increased to KZT 113,130 million from KZT 4,705 million for 2007 largely due to the significant adjustment of provisions on contingent liabilities.  See "*Factors Affecting the Bank's Results of Operations — Loan Loss Provisions*".

*Obligatory insurance of individuals' deposits*

Expenses for deposit insurance increased by 19.4 per cent. to KZT 2,102 million for the year ended 31 December 2008 from KZT 1,761 million for the year ended 31 December 2007, due to the increase in the volume of the Bank's deposits that were required to be insured.

*Taxation*

Kazakhstan tax regulations do not provide for the filing of consolidated income tax returns.  Accordingly, the Bank and its subsidiaries file individual tax returns.  In 2008, the Group reported income tax benefit of KZT 67 million.

**Financial Condition as at 30 September 2009 and as at 31 December 2008 and 2007**

*Total Assets*

As at 30 September 2009 the Group's total assets were KZT 2,048,127 million, reflecting a decrease of 6.7 per cent. compared to KZT 2,194,201 million as at 31 December 2008.

As at 31 December 2008, the Group's total assets were KZT 2,194,201 million compared to KZT 3,064,617 million as at 31 December 2007, reflecting a decrease of 28.4 per cent.

The following table sets out a breakdown of the Group's total assets, excluding goodwill and property and equipment, by currency as at the dates indicated:

| | As at 30 September 2009 | | | As at 31 December | | | | | |
| | | | | 2008 | | | 2007 | | |
| | KZT | Foreign Currency | Total | KZT | Foreign Currency | Total | KZT | Foreign Currency | Total |
|---|---|---|---|---|---|---|---|---|---|
| | *(unaudited)* *(KZT millions)* | | | *(KZT millions)* | | | | | |
| Cash and cash equivalents ....................... | 10,912 | 19,241 | 30,153 | 25,011 | 62,882 | 87,893 | 46,050 | 53,673 | 99,723 |
| Obligatory reserves ................................... | 29,929 | 13,074 | 43,003 | 40,329 | 23,725 | 64,054 | 43,983 | 124,259 | 168,242 |
| Financial assets at fair value through profit or loss............................................ | 54,323 | 66,325 | 120,648 | 95,738 | 32,412 | 128,150 | 55,937 | 56,238 | 112,175 |
| Amounts due from credit institutions........ | 8,394 | 23,045 | 31,439 | 22,271 | 62,903 | 85,174 | 44,849 | 62,740 | 107,589 |
| Derivative financial assets ........................ | 30,145 | 1,201 | 31,346 | 701 | 20,949 | 21,650 | 12,287 | 19,110 | 31,397 |
| Available-for-sale securities. .................... | 16,829 | 5,415 | 22,244 | 16,350 | 4,132 | 20,482 | 15,705 | 10,717 | 26,422 |
| Loans to customers .................................... | 556,245 | 550,996 | 1,107,241 | 392,170 | 1,224,893 | 1,617,063 | 950,000 | 1,429,810 | 2,379,810 |
| SK Bonds ................................................... | 511,097 | - | 511,097 | - | - | - | - | - | - |
| Investments in associates .......................... | 52,446 | 27,926 | 80,372 | 48,152 | 24,219 | 72,371 | 48,585 | 19,182 | 67,767 |
| Current income tax assets ......................... | 5,553 | 37 | 5,590 | 5,487 | 18 | 5,505 | 110 | — | 110 |
| Deferred income tax assets ....................... | 2,005 | 25 | 2,030 | 5,040 | 6 | 5,046 | 683 | — | 683 |
| Other assets ............................................... | 28,970 | 17,186 | 46,156 | 26,839 | 8,849 | 35,688 | 14,539 | 5,170 | 19,709 |
| **Total** .......................................................... | **1306,848** | **724,471** | **2,031,319** | **678,088** | **1,464,988** | **2,143,076** | **1,232,728** | **1,780,899** | **3,013,627** |

214

Total assets decreased 6.7 per cent. as at 30 September 2009 compared to 31 December 2008 and 28.4 per cent. as at 31 December 2008 compared to 31 December 2007, due to significant decreases in loans to customers, cash and cash equivalents, amounts due from credit institutions, obligatory reserves, available-for-sale securities and financial assets at fair value through profit or loss.   The decreases were partially offset by increases in the Group's assets due to the SK Bonds, investments in associates and other assets.

The primary cause of the decrease in total assets was the decrease in loans to customers by 31.5 per cent. to KZT 1,107,241 million as at 30 September 2009 from KZT 1,617,063 million as at 31 December 2008 and by 32.1 per cent. as at 31 December 2008 from KZT 2,379,810 million as at 31 December 2007, due primarily to a deterioration of the loan portfolio quality and increases in loan loss provisions.  See "– *Factors Affecting the Bank's Results of Operations – Loan Loss Provisions*".

As at 30 September 2009, obligatory reserves decreased by 32.9 per cent. to KZT 43,003 million compared to obligatory reserves of KZT 64,054 million as at 31 December 2008 and by 61.9 per cent. as at 31 December 2008 from KZT 168,242 million as at 31 December 2007, due to a decrease in the obligatory reserve requirements of the NBK from 6.0 per cent. to 1.5 per cent. of internal liabilities and 8.0 per cent. to 2.5 per cent. of other liabilities since 31 December 2007.

Cash and cash equivalents also decreased by 65.7 per cent. to KZT 30,153 million as at 30 September 2009 from KZT 87,893 million as at 31 December 2008 and by 11.9 per cent. as at 31 December 2008 from KZT 99,723 million as at 31 December 2007, due primarily to the decreases in cash held by the Group, current accounts with other financial organisations and reverse repurchase agreements.

Amounts due from credit institutions was KZT 31,439 million as at 30 September 2009 compared to KZT 85,174 million as at 31 December 2008, a decrease of 63.1 per cent., attributable primarily to an increase in the allowance for impairment due to the deterioration of the quality of the loan portfolio to financial organisations, in particular with respect to organisations focused in mortgages and leasing. Amounts due from credit institutions decreased  20.8 per cent.  to  KZT 85,174 million  as  at 31 December 2008 compared to KZT 107,589 million as at 31 December 2007.

SK Bonds represent an asset of KZT 511,097 million as at 30 September 2009 compared to no corresponding asset as at 31 December 2008 and 31 December 2007.  See "*The Bank — The Role of Samruk-Kazyna and the NBK*".

Investments in associates increased by 11.1 per cent. to KZT 80,372 million as at 30 September 2009 from KZT 72,371 million as at 31 December 2008 and by 6.8 per cent. as at 31 December 2008 from KZT 67,767 million as at 31 December 2007, primarily as a result of the investment of KZT 27,301 million into BTA Ukraine (representing 40.038 per cent. of the share capital of BTA Ukraine) in December 2008, as well as additional investments into Temirleasing.

Other assets increased to KZT 46,156 million as at 30 September 2009 from KZT 35,688 million as at 31 December 2008 and KZT 19,709 million as at 31 December 2007, due to the increase in the amount of collateral obtained by the Bank as a result of enforcement against the collateral of borrowers of non-performing loans.

***Total liabilities***

As at 30 September 2009, the Group's total liabilities were KZT 3,672,146 million, an increase of 25.0 per cent. from KZT 2,936,980 million as at 31 December 2008.  The increase was primarily attributable to the increase in debt securities issued by the Group and the increase in amounts due to the Government and NBK held by the Group.

The Group's total liabilities increased by 12.4 per cent. to KZT 2,936,980 million as at 31 December 2008 from KZT 2,612,586 million as at 31 December 2007, due to the increase in debt securities issued by the Group by KZT 3,281 million and the increase in deposits held by the Group by KZT 233,544 million, and also to the increase in provisions on contingent liabilities in 2008.

Debt securities issued increased to KZT 1,670,588 million as at 30 September 2009 from KZT 1,087,726 million as at 31 December 2008, representing an increase of 53.6 per cent., due primarily to the issuance in March 2009 of the Bank Bonds with a nominal value of KZT 645,000 million.  Furthermore, amounts due to the Government and the central banks increased substantially to KZT 407,911 million from KZT 1,718 million, due to the BTA/NBK Repo Transactions.  See "*The Bank — NBK Support*".

The increases described above were partially offset by decreases in amounts due to customers to KZT 683,281 million as at 30 September 2009 from KZT 886,052 million as at 31 December 2008, representing a 22.9 per cent. decrease, and in amounts due to credit institutions to KZT 752,636 million as at 30 September 2009 from KZT 803,366 million as at 31 December 2008, a 6.3 per cent. decrease.  Amounts to customers decreased as a result of the decrease in term deposits of businesses and individuals in connection with the overall deterioration of the economic conditions in Kazakhstan.  Amounts due to credit institutions decreased due to a decrease in loans of institutions of OECD countries and from Kazakhstan banks and financial institutions.

| | As at 30 September 2009 | | | As at 31 December | | | | | |
| | | | | 2008 | | | 2007 | | |
| | KZT | Foreign Currency | Total | KZT | Foreign Currency | Total | KZT | Foreign Currency | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | *(unaudited)* | | | | *(KZT millions)* | | | |
| **Liabilities**: | | | | | | | | | |
| Amounts due to the Government and the central banks........................................ | 407,477 | 434 | 407,911 | 1,320 | 398 | 1,718 | 398 | 515 | 913 |
| Amounts due to credit institutions ........... | 70,265 | 682,371 | 752,636 | 161,294 | 642,072 | 803,366 | 112,871 | 722,433 | 835,304 |
| Amount due to customers ........................ | 381,587 | 301,694 | 683,281 | 461,912 | 424,140 | 886,052 | 396,012 | 256,496 | 652,508 |
| Derivative financial liabilities................. | 2,269 | 39 | 2,308 | 1,246 | 17,543 | 18,789 | 5,467 | 61 | 5,528 |
| Debt securities issued.............................. | 714,475 | 956,113 | 1,670,588 | 211,531 | 876,195 | 1,087,726 | 179,224 | 905,221 | 1,084,445 |
| Provisions .............................................. | 1,149 | 119,451 | 120,600 | 306 | 104,587 | 104,893 | 10,436 | 141 | 10,577 |
| Other liabilities ...................................... | 21,444 | 13,378 | 34,822 | 21,748 | 12,688 | 34,436 | 19,101 | 4,210 | 23,311 |
| **Total liabilities**........................................ | **1,598,666** | **2,073,480** | **3,672,146** | **859,357** | **2,077,623** | **2,936,980** | **723,509** | **1,889,077** | **2,612,586** |

217

Other liabilities increased by 1.1 per cent. to KZT 34,822 million as at 30 September 2009 from KZT 34,436 million as at 31 December 2008 and by 47.7 per cent. to KZT 34,436 million as at 31 December 2008 from KZT 23,311 million as at 31 December 2007.   The increase in other liabilities in 2008 compared to 2007 primarily reflected higher balances due to creditors for banking.

*Off-Balance Sheet Arrangements*

The Group enters into certain financial instruments with off-balance sheet risk in the normal course of business in order to meet the needs of its customers.   These instruments, which include guarantees, letters of credit, forward contracts and option contracts, involve varying degrees of credit risk and are not reflected in the Group's balance sheet.

The Group enters into swaps to hedge movements in interest and foreign currency rates.   The notional amount of interest rate swaps and currency swaps of the Group as at 30 September 2009 was KZT 238,800 million    and    KZT 1,122 million    compared    to    KZT 462,318 million    and KZT 136,115 million, respectively, as at 31 December 2008 representing decreases of 48.3 per cent. and 99.2 per cent.   These decreases were attributable to the Group closing out most of its interest rate and cross currency swap transactions.

Forwards and futures contracts are contractual agreements to buy or sell a specified financial instrument at a specific price and date in the future.   The Group entered into a notional amount of KZT 956 million in forwards and futures contracts as at 30 September 2009 compared to KZT 27,799 million as at 31 December 2008, a decrease of 96.6 per cent., due to the Group closing out most of its forwards and futures contracts.

As at 31 December 2008, the aggregate notional amount outstanding under forward and futures contracts was KZT 27,799 million, in comparison with KZT 204,128 million as at 31 December 2007. The Group had currency and interest rate swap contracts for a total amount of KZT 598,433 million as at 31 December 2008, compared to KZT 751,519 million as at 31 December 2007.

At 30 September 2009, the Group had certain loans that are foreign currency linked debt instruments with a floor feature, i.e., where interest and principal payments are linked to foreign currencies, in such a way that the Group has an option to demand higher payments if the foreign currency specified in the contract appreciates above a certain floor (which is generally set at the level of spot rates prevailing on the loan issue date).   At the same time, if foreign currency rates fall below the floor, interest and principal rates will remain at the original level.   The Group recorded this feature as a foreign currency option as at 30 September 2009 equal to KZT 175,196 million and did not record any amount for 31 December 2008.

As at 30 September 2009, the Group had issued letters of credit totalling KZT 57,402 million, guarantees in the amount of KZT 169,954 million and undrawn loan commitments in the amount of KZT 434,848 million.   As at 31 December 2008, the Group had issued letters of credit totalling KZT 139,524 million, guarantees in the amount of KZT 175,196 million and undrawn loan commitments in the amount of KZT 363,490 million.   The Group's maximum exposure to credit losses for guarantees and letters of credit is represented by the contractual amount of these transactions.   Since many of the commitments are expected to expire without being drawn upon, the total amount does not necessarily represent future cash requirements.

As at 31 December 2008, the Group had undrawn loan commitments totalling KZT 363,490 million, issued letters of credit totalling KZT 139,524 million and guarantees totalling KZT 175,196 million. As at 31 December 2007, the Group had undrawn loan commitments totalling KZT 334,171 million, issued letters of credit totalling KZT 150,644 million and guarantees totalling KZT 141,931 million. The Group's maximum exposure to credit losses for guarantees, loan commitments and letters of credit is represented by the contractual amount of these transactions.   Since many of the commitments are expected to expire without being drawn upon, the total amount does not necessarily represent future cash requirements.

The Group did not have any significant commitment as at 30 September 2009 other than as discussed above.

The Group applies the same credit control and management policies to its off-balance sheet commitments as it does to its on-balance sheet operations.

### *Capital Adequacy*

The Bank is currently in breach of the minimum capital adequacy ratios established by the FMSA. See "*Risk Factors — Risks Relating to the Bank — Any failure to reach and maintain the minimum capital adequacy ratios following the Restructuring could lead to conservation or liquidation of the Bank*."

Due to the shareholding of Samruk-Kazyna, the Bank is subject to minimum level requirements of 5.0 per cent. for K1-1 (Tier 1 capital to total assets) and K1-2 (Tier 1 capital to total assets weighted for risk) ratios and 10.0 per cent. for K2 (own capital to total assets weighted for risk ratio). Depending on the composition of the Bank's shareholders following the Restructuring, it will become subject to the general minimum level requirements of 6.0 per cent. for K1-1 (Tier 1 capital to total assets) and K1-2 (Tier 1 capital to total assets weighted for risk) ratios and 12.0 per cent. for K2 (own capital to total assets weighted for risk) ratio or to the increased requirements of 7.0 per cent. for the K1-1 (Tier 1 capital to total assets) and K1-2 (Tier 1 capital to total assets weighted for risk) ratios and 14.0 per cent. for the K2 (own capital to total assets weighted for risk) ratio.  See "*Risk Factors — Risks Relating to the Bank — Any failure to reach and maintain the minimum capital adequacy ratios following the Restructuring could lead to conservation or liquidation of the Bank*".

As at 30 September 2009, the Group's total equity deficit was KZT 1,624,019 million, as a result of the factors discussed above.  This negative result was primarily due to the decrease in the asset quality and increase in loan loss provisions.  The Group was in breach with BIS capital adequacy ratios as at 30 September 2009 due to negative capital.

The Bank expects that the necessary levels of capital ratios will be achieved following the successful completion of the Restructuring by virtue of the economic gain it will achieve from the reduction of the principal amount of the Bank's indebtedness, conversion of certain debt into Shares and liquidity support to be provided by Samruk-Kazyna.  The following table gives certain information regarding the Group's Tier I and Tier II capital and risk weighted capital adequacy ratio calculated in accordance with the Basel Accord as at the dates indicated based on the Group's unaudited consolidated financial statements as at 30 September 2009, 31 December 2008 and 2007:

| | Nine month period ended 30 September 2009 | Year ended 31 December | |
| --- | --- | --- | --- |
| | | 2008 | 2007 |
| | *(unaudited)* | | |
| | *(KZT millions)* | *(KZT millions)* | |
| Tier I capital | (1,625,448) | (778,140) | 462,320 |
| Tier II capital | 0 | — | 85,168 |
| Gross available capital | (1,625,448) | (778,140) | 547,488 |
| Less investments | (80,372) | (72,371) | (67,767) |
| **Tier I + Tier II capital** | **(1,705,820)** | **(850,511)** | **479,721** |
| Risk weighted assets | 1,323,049 | 1,900,154 | 2,730,706 |
| **BIS Tier I capital adequacy ratio**[1] | **(122.86)%** | **(40.95)%** | **16.93%** |
| **BIS Tier I + Tier II capital adequacy ratio**[2] | **(128.93)%** | **(44.76)%** | **17.57%** |

Notes:

(1)   Comprising Tier I capital divided by total risk weighted assets calculated in accordance with the Basel Accord.
(2)   Comprising Tier I + Tier II capital divided by total risk weighted assets calculated in accordance with the Basel Accord.

## SELECTED STATISTICAL AND OTHER INFORMATION

### Average Balances

The following table sets out certain information as to average balances of the Group's assets and liabilities for the periods indicated based upon the monthly average balances of such periods, respectively:

| | For the nine months ended 30 September | For the years ended 31 December | |
|---|---|---|---|
| | 2009 | 2008[1] | 2007[1] |
| | | (KZT millions) | |
| **Average Assets:** | | | |
| Cash and cash equivalents | 72,814 | 133,444 | 125,895 |
| Obligatory reserves | 60,222 | 152,103 | 148,987 |
| Gross amounts due from credit institutions | 82,148 | 104,215 | 95,535 |
| Financial assets at fair value through profit of loss | 139,129 | 146,496 | 198,505 |
| Available-for-sale securities | 21,551 | 48,702 | 35,830 |
| Held-to-maturity securities | — | — | 11,247 |
| Gross loans to customers | 3,148,682 | 2,744,813 | 2,060,086 |
| Allowance for impairment of gross loans to customers and gross amounts due from credit institutions | (1,660,149) | (259,030) | (90,782) |
| SK Bonds | 358,258 | — | — |
| Property and equipment | 13,524 | 14,214 | 9,799 |
| Investments in affiliates | 76,964 | 63,340 | 40,245 |
| Goodwill | 34,002 | 42,715 | 28,198 |
| Asset as a current tax asset | 6,034 | 948 | 68 |
| Deferred tax income | 4,807 | 1,968 | 53 |
| Derivatives | 27,040 | 42,690 | 6,243 |
| Other assets | 45,610 | 37,254 | 34,739 |
| **Total average assets** | **2,430,636** | **3,273,872** | **2,704,648** |
| **Average liabilities and equity:** | | | |
| Amounts due to the Government and the NBK | 249,757 | 2,212 | 1,068 |
| Amounts due to credit institutions | 755,245 | 892,417 | 747,250 |
| Amounts due to customers | 781,114 | 815,328 | 659,520 |
| Debt securities issued | 1,523,886 | 1,124,936 | 934,996 |
| Corporate income tax payable | — | 699 | 1,477 |
| Deferred income tax | — | 571 | 529 |
| Derivatives | 25,949 | 9,161 | 1,106 |
| Reserves (provisions) against loss from notional liabilities | 136,249 | 8,069 | — |
| Other liabilities | 40,356 | 36,496 | 30,128 |
| **Total average liabilities** | **3,512,556** | **2,889,889** | **2,376,074** |
| Minority interest | 8,026 | 28,542 | 15,991 |
| Average equity | (1,089,946) | 355,441 | 312,583 |
| **Average liabilities and equity** | **2,430,636** | **3,273,872** | **2,704,648** |

———————
Notes:

(1)   Calculated based on the monthly averages.

The table below sets out the Group's consolidated average balances and interest rates for the periods indicated, as calculated by the Group according to the unaudited consolidated accounting records of the Group for the years ended 31 December 2008 and 2007, respectively and the unaudited consolidated accounting records of the Group for the nine months ended 30 September 2009.

| | For the nine months ended 30 September 2009[1] | | | For the years ended 31 December | | | | | |
| | | | | 2008[1] | | | 2007[1] | | |
| | Average Balance | Interest | Yield/ Rate | Average Balance | Interest | Yield/ Rate | Average Balance | Interest | Yield/ Rate |
| | | | | *(KZT millions)* | | | | | |
| **Assets** | | | | | | | | | |
| *Interest-earning deposits* | **105,743** | **5,852** | **7.4%** | **212,146** | **17,833** | **8.4%** | **184,941** | **17,137** | **9.3%** |
| KZT | 28,705 | 2,780 | 12.9% | 66,805 | 6,452 | 9.7% | 60,078 | 4,565 | 7.6% |
| Foreign currency | 77,038 | 3,072 | 5.3% | 145,341 | 11,381 | 7.8% | 124,863 | 12,572 | 10.1% |
| *Securities* | **156,480** | **11,609** | **9.9%** | **190,908** | **12,597** | **6.6%** | **242,516** | **14,587** | **6.0%** |
| KZT | 101,773 | 8,789 | 11.5% | 100,061 | 8,602 | 8.6% | 135,059 | 9,402 | 7.0% |
| Foreign currency | 54,707 | 2,820 | 6.9% | 90,847 | 3,995 | 4.4% | 107,457 | 5,185 | 4.8% |
| *Loans* | **1,232,936** | **155,971** | **16.9%** | **2,579,135** | **366,037** | **14.2%** | **1,985,158** | **291,724** | **14.7%** |
| KZT | 506,697 | 62,700 | 16.5% | 946,918 | 168,539 | 17.8% | 710,216 | 126,163 | 17.8% |
| Foreign currency | 726,239 | 93,271 | 17.1% | 1,632,217 | 197,498 | 12.1% | 1,274,942 | 165,561 | 13.0% |
| *SK Bonds* | **353,625** | **20,502** | **7.7%** | | | | | | |
| KZT | 353,625 | 20,502 | 7.7% | | | | | | |
| **Total interest-earning assets** | **1,848,784** | **193,934** | **14.0%** | **2,982,189** | **396,467** | **13.3%** | **2,412,615** | **323,448** | **13.4%** |
| Cash and non-interest deposits | 192,491 | | | 280,933 | | | 251,673 | | |
| Accrued interest | 291,891 | | | 172,706 | | | 80,206 | | |
| Allowance | — | | | (259,030) | | | (90,782) | | |
| Fixed assets | 13,524 | | | 14,214 | | | 9,799 | | |
| Other assets | 83,946 | | | 82,860 | | | 41,137 | | |
| **Total average assets** | **2,430,636** | **—** | **—** | **3,273,872** | **—** | **—** | **2,704,648** | **—** | **—** |
| **Liabilities and equity** | | | | | | | | | |
| *Due to the NBK and the Government* | **249,197** | **15,704** | **8.4%** | **2,191** | **82** | **3.7%** | **1,059** | **57** | **5.4%** |
| KZT | 248,756 | 15,686 | 8.4% | 978 | 40 | 4.1% | 759 | 44 | 5.8% |
| Foreign currency | 441 | 18 | 5.4% | 1,213 | 42 | 3.5% | 300 | 13 | 4.3% |
| *Due to other banks* | **747,997** | **32,424** | **5.8%** | **881,358** | **56,663** | **6.4%** | **738,061** | **53,604** | **7.3%** |
| KZT | 102,018 | 6,888 | 9.0% | 140,351 | 11,044 | 7.9% | 103,353 | 8,690 | 8.4% |
| Foreign currency | 645,979 | 25,536 | 5.3% | 741,007 | 45,619 | 6.2% | 634,708 | 44,914 | 7.1% |
| *Due to customers* | **546,487** | **36,949** | **9.0%** | **639,666** | **55,748** | **8.7%** | **520,269** | **39,935** | **7.7%** |
| KZT | 322,585 | 20,770 | 8.6% | 318,829 | 32,066 | 10.1% | 291,161 | 25,481 | 8.8% |
| Foreign currency | 223,902 | 16,179 | 9.6% | 320,837 | 23,682 | 7.4% | 229,108 | 14,454 | 6.3% |
| *Debt securities issued* | **1,488,867** | **110,78** | **9.9%** | **1,104303** | **95,888** | **8.7%** | **917,672** | **85,683** | **9.3%** |
| KZT | 572,801 | 53,282 | 12.4% | 205,618 | 23,941 | 11.6% | 174,305 | 17,003 | 9.8% |
| Foreign currency | 916,066 | 57,596 | 8.4% | 898,685 | 71,947 | 8.0% | 743,367 | 68,680 | 9.2% |
| **Total interest-bearing liabilities** | **2,830,548** | **195,955** | **8.6%** | **2,627,518** | **208,381** | **7.9%** | **2,177,061** | **179,279** | **8.2%** |
| Non interest bearing customer accounts | 227,643 | | | 167,542 | | | 133,001 | | |
| Accrued interest | 49,810 | | | 39,831 | | | 32,836 | | |
| Other liabilities | 202,555 | | | 54,998 | | | 33,255 | | |
| *Minority interest* | 8,026 | | | 28,542 | | | 15,991 | | |

| | For the nine months ended 30 September 2009[1] | | For the years ended 31 December | | | | |
| | | | 2008[1] | | | 2007[1] | |
|---|---|---|---|---|---|---|---|
| *Equity* | (1,089,946) | | 355,441 | | | 312,504 | |
| **Total average liabilities and equity** | **2,430,636** | | **3,273,872** | | | **2,704,648** | |
| Net interest spread | | 5.4% | | 5.4% | | | 5.2% |
| Net interest income | (2,021) | | 188,086 | | | 144,169 | |
| Net interest margin | | (0.1)% | | 6.3% | | | 6.0% |

Notes:

(1)     Calculated based on the monthly averages.

**Analysis of Changes in Net Interest Income**

The following table provides a comparative analysis of changes in net interest income and expense by reference to changes in average volumes and rates for the periods indicated.  Changes in net interest income are attributed to either changes in average balances (volume change) or changes in average rates (rate change) for earning assets and sources of funds on which interest is received or paid. Volume change is calculated as change in volume multiplied by the previous rate, while rate change is change in rate multiplied by the current volume.  The rate/volume change (change in rate multiplied by change in volume) is allocated between volume change and rate change at the ratio each component bears to the absolute value of their total.

| | For the nine months ended 30 September 2009/2008 | | | For the years ended 31 December 2008/2007 | | |
| | Increase/(decrease) due to changes in | | | Increase/(decrease) due to changes in | | |
| | Volume | Rate | Net Change | Volume | Rate | Net Change |
|---|---|---|---|---|---|---|
| | | | *(KZT millions)* | | | |
| **Interest Income** | | | | | | |
| Interest earning deposits: | | | | | | |
| KZT ...................................... | (3,245) | 606 | (2,639) | 511 | 1,376 | 1,887 |
| Foreign currency.................. | (4,036) | (1,404) | (5,440) | 2,062 | (3,253) | (1,191) |
| Securities: | | | | | | |
| KZT ...................................... | 259 | 2,296 | 2,555 | (2,436) | 1,636 | (800) |
| Foreign currency.................. | (1,302) | 939 | (363) | (801) | (389) | (1,190) |
| Loans: | | | | | | |
| KZT ...................................... | (47,862) | (3,335) | (51,197) | 42,048 | 328 | 42,376 |
| Foreign currency.................. | (82,155) | 14,517 | (67,638) | 46,395 | (14,458) | 31,937 |
| SK Bonds: | | | | | | |
| KZT ...................................... | 20,502 | — | 20,502 | — | — | — |
| Foreign currency.................. | — | — | — | — | — | — |
| **Total interest income** ............ | **(117,839)** | **13,619** | **(104,220)** | **87,779** | **(14,760)** | **73,019** |
| **Interest Expense** | | | | | | |
| Due to the Government and the NBK: | | | | | | |
| KZT ...................................... | 7,887 | 7,772 | 15,659 | 13 | (17) | (4) |
| Foreign currency.................. | (16) | 4 | (12) | 40 | (11) | 29 |
| Due to other banks: | | | | | | |
| KZT ...................................... | (1,892) | 1,260 | (632) | 3,111 | (757) | 2,354 |
| Foreign currency.................. | (5,171) | (9,584) | (14,755) | 7,522 | (6,817) | 705 |
| Due to customers: | | | | | | |
| KZT ...................................... | 434 | (2,766) | (2,332) | 2,421 | 4,164 | 6,585 |
| Foreign currency.................. | (3,909) | 3,503 | (406) | 5,787 | 3,441 | 9,228 |
| Debt securities: | | | | | | |
| KZT ...................................... | 35,328 | (1,058) | 34,270 | 3,054 | 3,884 | 6,938 |
| Foreign currency.................. | 449 | 3,292 | 3,741 | 14,350 | (11,083) | 3,267 |
| **Total interest expense** ........ | **33,110** | **2,423** | **35,533** | **36,298** | **(7,196)** | **29,102** |
| **Net change in net interest income**.............................. | **(150,949)** | **11,196** | **(139,753)** | **51,481** | **(7,564)** | **43,917** |

**The Group's Loan Portfolio**

Loans to customers represent the largest part of the Bank's business.  The Group's gross loan portfolio (including accrued interest) was KZT 2,516,853 million as at 31 December 2007, KZT 2,834,341 million as at 31 December 2008 and KZT 3,176,164 million as at 30 September 2009. See "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Total Assets*".  The average balance of the Group's gross loan portfolio (net of accrued interest) was KZT 1,985,158 million for 2007, KZT 2,579,135 million for 2008 and KZT 2,543,751 million for the nine months ended 30 September 2009.  Lending to corporate clients represented 76.9 per cent. of the Group's gross loan portfolio for the nine months ended 30 September 2009, compared to 73.1 per cent. as at 31 December 2008 and 66.3 per cent. as at 31 December 2007.  The Group's customer base includes many of Kazakhstan's leading industrial companies and trading corporations, as well as medium and small size enterprises.  Amounts due from credit institutions have also represented a small percentage of the Group's Gross Loan Portfolio including gross amounts due from

credit institutions (0.7 per cent. as at 30 September 2009, 2.8 per cent. as at 31 December 2008 and 4.1 per cent. as at 31 December 2007).

The following table sets out certain information relating to the amounts and composition of the Group's loan portfolio, its contingent liability exposure and loss allowances, respectively, as calculated by the Bank according to the unaudited accounting records of the Bank as at 30 September 2009, 31 December 2008 and 2007, respectively:

| | As at 30 September 2009 | As at 31 December | |
| --- | --- | --- | --- |
| | | 2008 | 2007 |
| | | (KZT millions) | |
| Loans ............................................................. | 2,898,123 | 2,622,783 | 2,400,649 |
| including: | | | |
| Non performing loans(1) ................................. | 2,002,505 | 973,551 | 19,829 |
| Accrued interest receivable............................. | 278,041 | 211,558 | 116,204 |
| **Total gross loans** ......................................... | **3,176,164** | **2,834,341** | **2,516,853** |
| Commercial letters of credit............................ | 57,402 | 139,524 | 150,644 |
| Financial guarantees(2)................................... | 169,954 | 175,196 | 141,931 |
| Undrawn loan commitments ............................ | 434,848 | 363,490 | 334,171 |
| **Total contingent liabilities** ......................... | **662,204** | **678,210** | **626,746** |
| Allowance for impairment of loans .................. | 2,068,923 | 1,217,278 | 137,043 |
| Provision for off balance sheet items .............. | 120,600 | 104,893 | 10,577 |
| Allowance for impairment on amounts due from credit institutions . | 47,463 | 4,439 | 123 |
| Other ............................................................. | 4,572 | 1,387 | 360 |
| **Total** ........................................................... | **2,241,558** | **1,327,997** | **147,993** |
| Equity............................................................. | (1,624,019) | (742,779) | 452,031 |
| Non performing loans/gross loans ................... | 63.0% | 34.3% | 0.8% |
| Allowance for impairment of loans/non performing loans .............. | 103.3% | 125% | 691.1% |
| Allowance for impairment of loans/gross loans............................. | 65.1% | 42.9% | 5.4% |

Notes:

(1)   Non-performing loans comprise loans where past due payments exceed 90 days or are 100 per cent. provisioned.
(2)   Financial guarantees do not include the guarantees given by the Bank in favour of TuranAlem Finance in respect of its Euronotes issued from 2001 through 2006.

### Loans by Type

The Group provides financing for various purposes, although the majority of loans are for working capital purposes with a maturity of twelve months or less, for fixed asset purchases and for trade finance.

The following table sets out certain information relating to the Group's loan portfolio (including advances and accrued interest), by reference to the type of loan, as calculated by the Bank according to the unaudited accounting records of the Bank as at the dates indicated in the table:

| | As at 30 September 2009 | | As at 31 December | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | 2008 | | 2007 | |
| | (KZT millions) | (%) | (KZT millions) | (%) | (KZT millions) | (%) |
| Working capital finance ..................... | 1,516,326 | 47.7% | 1,297,743 | 45.8% | 1,305,560 | 51.9% |
| Construction and repair........................ | 557,549 | 17.6% | 463,706 | 16.4% | 309,926 | 12.3% |
| Fixed asset purchase (excluding real estate) ..................... | 486,517 | 15.3% | 484,741 | 17.1% | 278,673 | 11.1% |
| Consumer loans .......... | 256,731 | 8.1% | 271,387 | 9.6% | 292,463 | 11.6% |
| Real estate purchase.... | 61,010 | 1.9% | 60,405 | 2.1% | 69,912 | 2.8% |
| Other .......................... | 298,031 | 9.4% | 256,359 | 9.0% | 260,319 | 10.3% |
| **Total (including accrued interest) ....** | **3,176,164** | **100.0%** | **2,834,341** | **100.0%** | **2,516,853** | **100.0%** |

***Loans by Type of Borrower***

The following table sets out certain information relating to the Group's commercial loan portfolio (including advances and accrued interest), by reference to the type of borrower, as at the dates indicated in the table:

| | As at 30 September 2009 | | As at 31 December | | | |
| | | | 2008 | | 2007 | |
| | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* |
|---|---|---|---|---|---|---|
| Private companies....... | 2,670,926 | 84.1% | 2,321,272 | 81.9% | 1,963,281 | 78.0% |
| Individuals ................. | 497,356 | 15.7% | 505,517 | 17.8% | 546,880 | 21.7% |
| State companies .......... | 7,674 | 0.2% | 7,353 | 0.3% | 6,609 | 0.3% |
| Others ........................ | 208 | 0.0% | 199 | 0.0% | 83 | 0.0% |
| **Loans to customers, gross** ...................... | **3,176,164** | **100.0%** | **2,834,341** | **100.0%** | **2,516,853** | **100.0%** |

The Bank inherited a large corporate customer base from its predecessors, Alem Bank and Turan Bank, including many of the country's leading industrial companies engaged in a broad range of industries. Historically, a significant percentage of the Bank's predecessors' loans were extended to state-owned companies, but since the Bank's establishment in January 1997, this focus has been significantly reduced. Loans to private companies and individuals increased from 99.1 per cent. of total loans as at the time of the Bank's establishment to 99.8 per cent. of total loans as at 30 September 2009. The increase in loans to private companies and individuals reflects the overall growth of the economy and the resulting improvement in the general welfare of a large number of individuals across Kazakhstan, the privatisation of a number of State-owned enterprises by the Government in recent years as well as the policy of the Bank.

The Bank has identified certain sectors, including oil and gas, energy, trading and metals & metallurgy and construction, as key target areas in which it intends to expand its lending business. As at 30 September 2009, the Group's loan portfolio including accrued interest comprised KZT 3,168,282 million to private companies and individuals (99.8 per cent.) and KZT 7,674 million to state-owned companies (0.2 per cent.). As at 31 December 2008, the Group's loan portfolio including accrued interest comprised KZT 2,826,789 million to private companies and individuals (99.7 per cent.) and KZT 7,353 million to state-owned companies (0.3 per cent.). As at 31 December 2007, the Group's loan portfolio including accrued interest comprised KZT 2,510,161 million to private companies and individuals (99.7 per cent.) and KZT 6,609 million to state controlled companies (0.3 per cent.).

As at 30 September 2009, the Group's ten largest borrowers accounted for 15.2 per cent. of the total gross loan portfolio then outstanding (as compared to 14.0 per cent. as at 31 December 2008), although no single borrower accounted for more than 2 per cent. of the total loan portfolio.

*Loans by Sector*

The following table sets out the composition of the Group's loan portfolio (including advances and accrued interest), by reference to the economic sector of the borrower, as at the dates indicated in the table:

| | As at 30 September 2009 | | As at 31 December | | | |
| | | | 2008 | | 2007 | |
| | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* |
|---|---|---|---|---|---|---|
| Real estate investments | 530,050 | 16.7% | 435,188 | 15.4% | 365,741 | 14.5% |
| Individuals ................. | 497,356 | 15.7% | 505,517 | 17.8% | 546,880 | 21.7% |
| — including consumer loans ...................... | 256,731 | 8.1% | 271,387 | 9.6% | 292,463 | 11.6% |
| — including mortgage loans ...................... | 240,625 | 7.6% | 234,130 | 8.3% | 254,418 | 10.1% |
| Housing construction .. | 477,792 | 15.0% | 415,536 | 14.7% | 316,222 | 12.6% |
| Oil & gas.................... | 383,517 | 12.1% | 314,970 | 11.1% | 173,948 | 6.9% |
| Wholesale trade ......... | 324,833 | 10.2% | 298,573 | 10.5% | 415,817 | 16.5% |
| Construction of roads and industrial buildings ................. | 275,543 | 8.7% | 206,066 | 7.3% | 154,495 | 6.1% |
| Agriculture................. | 154,722 | 4.9% | 142,819 | 5.0% | 139,615 | 5.5% |
| Energy...................... | 72,016 | 2.3% | 84,266 | 3.0% | 7,971 | 0.3% |
| Chemical industry ....... | 69,970 | 2.2% | 62,783 | 2.2% | 47,869 | 1.9% |
| Retail trade................ | 58,050 | 1.8% | 62,116 | 2.2% | 71,836 | 2.9% |
| Transport................... | 44,637 | 1.4% | 51,087 | 1.8% | 50,650 | 2.0% |
| Food industry.............. | 40,941 | 1.3% | 40,152 | 1.4% | 48,401 | 1.9% |
| Mining ...................... | 36,803 | 1.2% | 35,580 | 1.3% | 30,325 | 1.2% |
| Telecommunication .... | 33,235 | 1.0% | 25,244 | 0.9% | 24,233 | 1.0% |
| Metallurgical industry. | 30,795 | 1.0% | 25,374 | 0.9% | 11,174 | 0.5% |
| Hospitality ................. | 17,200 | 0.5% | 13,903 | 0.5% | 10,689 | 0.4% |
| Financial services....... | 14,008 | 0.4% | 12,968 | 0.5% | 8,024 | 0.3% |
| Textile and leather ...... | 13,802 | 0.4% | 11,241 | 0.4% | 4,134 | 0.2% |
| Production of machinery and equipment ............... | 9,686 | 0.3% | 12,259 | 0.4% | 16,664 | 0.7% |
| Publishing ................. | 845 | 0.0% | 1,059 | 0.0% | 3,072 | 0.1% |
| Production of rubber and plastic articles ... | 756 | 0.0% | 894 | 0.0% | 731 | 0.0% |
| Research and development ............ | 590 | 0.0% | 818 | 0.0% | 724 | 0.0% |
| Other.......................... | 89,017 | 2.9% | 75,928 | 2.7% | 67,638 | 2.7% |
| **Total** .......................... | **3,176,164** | **100.0%** | **2,834,341** | **100.0%** | **2,516,853** | **100.0%** |

*Loans by Maturity*

The Group predominantly lends to SMEs for terms ranging from one to three years and to large corporations for longer terms.  The Bank expects that demand for longer-term financing from existing customers and other high quality corporate credits will continue to increase and that the maturity profile of the Group's loan portfolio will, in turn, be lengthened.  The policy of the Bank in respect of the maturity profile of its loans depends on the Bank's strategic goals and the sources of funding available to the Bank, as well as on the current state of the Kazakhstan economy, overall market conditions and the financial standing of the borrower.

The following table sets out certain information relating to the maturity profile of the Group's loan portfolio (including advances and accrued interest) based on the accounting records of the Bank as at the dates indicated in the table:

| | As at 30 September 2009 | | As at 31 December | | | |
| | | | 2008 | | 2007 | |
| | (KZT millions) | (%) | (KZT millions) | (%) | (KZT millions) | (%) |
|---|---|---|---|---|---|---|
| Less than 1 year ........... | 246,015 | 7.8% | 509,045 | 18.0% | 392,622 | 15.6% |
| From 1 to 3 years ......... | 633,175 | 19.9% | 707,869 | 25.0% | 697,990 | 27.7% |
| Over 3 years................ | 1,833,937 | 57.7% | 1,556,024 | 54.9% | 1,408,617 | 56.0% |
| Past Due..................... | 463,037 | 14.6% | 61,404 | 2.1% | 17,624 | 0.7% |
| **Total**........................ | **3,176,164** | **100.0%** | **2,834,341** | **100.0%** | **2,516,853** | **100.0%** |

### Loans by Geographic Location

The following table sets out certain information relating to the Group's loan portfolio (including advances and accrued interest) by reference to the geographic location of the Borrower, based on the unaudited accounting records of the Bank as at the dates indicated in the table:

| | As at 30 September 2009 | | As at 31 December | | | |
| | | | 2008 | | 2007 | |
| | (KZT millions) | (%) | (KZT millions) | (%) | (KZT millions) | (%) |
|---|---|---|---|---|---|---|
| **Kazakhstan** | | | | | | |
| Almaty ...................... | 882,998 | 27.8% | 857,785 | 30.3% | 664,054 | 26.4% |
| Astana ....................... | 163,712 | 5.2% | 151,054 | 5.3% | 173,139 | 6.9% |
| West region................ | 166,431 | 5.2% | 189,366 | 6.7% | 243,283 | 9.7% |
| East region................. | 99,731 | 3.2% | 107,689 | 3.8% | 139,356 | 5.5% |
| North region............... | 98,381 | 3.1% | 104,405 | 3.7% | 131,596 | 5.2% |
| Central region............. | 69,875 | 2.2% | 88,687 | 3.1% | 84,687 | 3.4% |
| South region............... | 121,697 | 3.8% | 128,888 | 4.5% | 142,160 | 5.6% |
| **CIS and other** | | | | | | |
| **countries** ................ | 1,573,339 | 49.5% | 1,206,467 | 42.6% | 938,578 | 37.3% |
| **Total**........................... | **3,176,164** | **100.0%** | **2,834,341** | **100.0%** | **2,516,853** | **100.0%** |

Notes:

(1)   Excluding Astana.
(2)   Excluding Almaty.

### Collateralisation of Loan Portfolio

The Bank estimates that it holds collateral with a value in excess of the principal amount of its loan portfolio as a part of principal debt.  While Kazakhstan has passed a law on the foreclosure of assets such as property of a pledgee, historically the Bank has generally not been able to realise the full value of the collateral on its loans.  The following table sets out certain information relating to the collateralisation of the Group's loan portfolio, based on the unaudited accounting records of the Bank as at the dates indicated in the table.  For a description of the Bank's collateralisation policy, see "*Asset and Liability Management — Lending Policies and Procedures*".

| | As at 30 September 2009 | | As at 31 December | | | |
| | | | 2008 | | 2007 | |
| | (KZT millions) | (%) | (KZT millions) | (%) | (KZT millions) | (%) |
|---|---|---|---|---|---|---|
| Collateralised.............. | 2,582,239 | 81.3% | 2,459,283 | 86.8% | 2,307,954 | 91.7% |
| Uncollateralised .......... | 593,925 | 18.7% | 375,058 | 13.2% | 208,899 | 8.3% |
| **Total loans** ................ | **3,176,164** | **100.0%** | **2,834,341** | **100.0%** | **2,516,853** | **100.0%** |

### Credit Exposure other than Loans

As at 30 September 2009, the Group had exposure to other credit risks consisting of financial instruments with off-balance sheet risk in the aggregate amount of KZT 662,204 million, including

commitments to extend credit of KZT 434,848 million, financial guarantees and promissory notes of KZT 169,954 million and commercial letters of credit of KZT 57,402 million.   As at 30 September 2009, the Bank held open forward contracts for KZT 103,030 million.

As at 30 September 2008, the Group was exposed to other credit risks consisting of financial instruments with off-balance sheet risk in the aggregate amount of KZT 829,223 million, including commitments to extend credit of KZT 460,848 million, financial guarantees and promissory notes of KZT 209,305 million and commercial letters of credit of KZT 159,070 million.   As at 30 September 2008, the Bank held open forward contracts for KZT 176,342 million.

As at 30 September 2009, 31 December 2008 and 2007, the Group had established provisions for losses with respect to off-balance sheet risks of KZT 120,600 million, KZT 104,893 million and KZT 10,577 million, respectively.   See also "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Financial Condition for the Nine-Months ended 30 September 2009 and 2008 — Off-Balance Sheet Arrangements*" and "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Financial Condition for the Years ended 31 December 2008 and 2007 — Off-Balance Sheet Arrangements*".

**Investments**

***Financial Assets at Fair Value through Profit or Loss***

Securities purchased with the intention of recognising short-term profits, which consist primarily of debt securities, but also include some equity securities, are classified as financial assets at fair value through profit or loss.   After initial recognition, securities which are classified as held for trading are measured at estimated fair value.   Changes in the estimated fair value are included in the accompanying consolidated statements of income within gains less losses from securities.   In determining estimated fair value, financial assets at fair value through profit or loss are valued at the last trade price, if quoted on an exchange, or the last bid price, if traded over-the-counter.

The following table sets out certain information relating to the Group's portfolio of financial assets at fair value through profit or loss as at the dates indicated:

| | As at 30 September | | | As at 31 December | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2009 | | | 2008 | | | 2007 | | |
| | KZT (millions) | % | Repayment term | KZT (millions) | % | Repayment term | KZT (millions) | % | Repayment term |
| Debt securities: | | | | | | | | | |
| Corporate bonds | 50,358 | 7.0%-12.0% | 2009-2018 | 59,979 | 7.0%-12.0% | 2009-2018 | 46,241 | 7.0%-8.9% | 2009-2015 |
| Treasury bills of Ministry of Finance of Kazakhstan | 21,218 | 3.5%-8.8% | 2009-2016 | 25,019 | 3.5%-18.7% | 2009-2015 | 19,156 | 5.5%-6.4% | 2008-2010 |
| Notes of NBK | — | | | 9,918 | 6.6%-8.0% | 2009 | 3,707 | 7.3% | 2008 |
| Bonds of Kazakhstan non-financial institutions | 4,795 | 8.0% | 2013 | 4,841 | 8.0% | 2013 | — | | |
| Sovereign bonds of OECD countries | 9,139 | 4.0% | 2037 | 3,793 | 4.0% | 2037 | 6,694 | 4.0% | 2037 |
| Bonds of Kazakhstan non-financial institutions | 4,984 | 6.0%-7.4% | 2013-2026 | 2,887 | 6.0% | 2026 | 6,881 | 6%-12.2% | 2013-2026 |
| Bonds of international financial organizations | 100 | 4.4%-5.5% | 2012-2013 | 80 | 4.4%-5.5% | 2012-2013 | 76 | 4.4%-5.5% | 2012-2013 |
| Treasury bills of Ministry of Finance of Russian Federation | 3 | 7.5% | 2030 | 2 | 7.5% | 2030 | 3 | 7.5% | 2030 |
| Municipal bonds | — | | | — | | | 264 | 8.5% | 2008 |
| **Total** | **90,597** | | | **106,519** | | | **83,022** | | |
| Equity securities | 30,051 | | | 21,631 | | | 29,100 | | |
| Shares of mutual funds | — | | | — | | | 53 | | |
| **Financial assets at fair value through profit or loss** | **120,648** | | | **128,150** | | | **112,175** | | |
| Subject to repurchase agreements | — | | | 65,472 | | | 60,129 | | |

*Available-for-Sale Investment Securities*

The Bank classifies investment securities based on the intention of management at the time of the purchase.

Shares of affiliates and subsidiaries held by the Bank for the purpose of future disposal are classified as available-for-sale.  Available-for-sale securities are measured at fair value, which is equal to the market value at the relevant balance sheet date.  When debt securities with fixed maturities are non-marketable or there is no available public information for similar instruments, fair value is estimated as discounted future cash flows using current interest rates.

As at 30 September 2009, the Group did not have any held-to-maturity securities in its portfolio of investment securities as all such securities were reclassified to available-for-sale securities due to "tainting rule" as at 31 December 2007 in line with IAS39.

The following table sets outs certain information in respect of the Group's securities classified as available-for-sale as at the dates indicated in the table.

| | As at 30 September | | | As at 31 December | | | | | |
| | 2009 | | | 2008 | | | 2007 | | |
| | Amount (KZT millions) | % | Repayment term | Amount (KZT millions) | % | Repayment term | Amount (KZT millions) | % | Repayment term |
|---|---|---|---|---|---|---|---|---|---|
| Bonds of international financial organizations................................ | — | | | 35,402 | 2.6%-5.5% | 2011-2014 | — | | |
| Corporate bonds........................................ | 13,230 | 8.1%-15.0% | 2009-2011 | 15,142 | 8.1%-20.7% | 2009-2014 | 14,179 | 8.5%-16.0% | 2008-2015 |
| Treasury bills of the Ministry of Finance of the Republic of Kazakhstan.............. | 4,655 | 3.5%-6.0% | 2009-2017 | 2,129 | 5.5%-8.8% | 2009-2014 | — | | |
| Treasury bills of the Ministry of Finance of the Republic of Belorussia................ | 288 | 8.95%-9.1% | 2009 | 912 | 9.2%-10.3% | 2009 | — | | |
| Treasury bills of the Ministry of Finance of Kyrgyztan........................................ | 481 | 3.0%-19.5% | 2009-2010 | 409 | 8.6%-25.0% | 2009-2010 | 410 | 5.7%-14.6% | 2008-2009 |
| Bonds of Kazakhstan financial institutions | 916 | 6.5%-7.4% | 2013-2020 | 312 | 7.4% | 2013 | 24 | 12.2% | 2014 |
| Nots of the NBK ...................................... | 868 | 5.49% | 2009-2012 | 218 | 6.7% | 2009 | 1,165 | 7.3% | 2008 |
| Notes of National Bank of Kyrgyztan....... | — | | | — | | | 1,390 | 8.2%-9.2% | 2008 |
| Bonds of OECD Countries ........................ | — | | | — | | | 3,697 | 5.3%-6.0% | 2008-2009 |
| Equity securities | 1,806 | | | 8,536 | | | 5,557 | | |
| Mutual fund shares | — | | | 32 | | | | | |
| **Securities available for sale** | **22,244** | | | **63,092** | | | **26,422** | | |
| Write-off | — | | | (42,610) | | | — | | |
| | **22,244** | | | **20,482** | | | **26,422** | | |

Bonds of international financial organisations are represented as securities of EBRD, CEDB, EuroFIMA, EIB (European Investment Bank) and IFC (International Finance Corporation).  Pursuant to the adjustments made to IAS 39 and IFRS 7, "Reclassification of financial assets", the Bank reclassified a number of financial assets purchased in order to control current liquidity from the category designed for trade which it did not intend to sell in the near future.  Reclassification was made as at 1 July 2008 at the fair value for this date.  The table below reflects this reclassification:

| | Trade financial assets were reclassified into financial assets, available for sale |
|---|---|
| | *(KZT millions)* |
| Fair value as at the date of reclassification .................................................................... | 35,420 |
| Balance cost of assets reclassification as at 31 December 2008 ...................................... | 35,402 |
| Write-off of reclassified assets......................................................................................... | (35,402) |
| Fair value of reclassified assets as at 31 December 2008 ................................................ | — |
| Losses from change in a fair value of reclassified assets recognised prior to reclassification ended on 31 December 2008.................................................................................................. | (546) |
| Interest income recognised after reclassification in income and loss report per year ended on 31 December 2008.................................................................................................................. | 728 |
| Effective interest rate as at the date of reclassification................................................... | 4.06% |
| Cash flow to be reimbursed by the date of reclassification.............................................. | 41,376 |

**Funding Sources**

The Group's principal sources of funding include domestic customer deposits, amounts due from other banks and financial institutions and debt securities issued.

The following table sets out certain information relating to the Group's sources of funding as at the dates indicated in the table:

| | As at 30 September | | As at 31 December | | | |
|---|---|---|---|---|---|---|
| | 2009 | | 2008 | | 2007 | |
| | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* |
| Customer deposits....... | 683,281 | 18.6% | 886,052 | 30.2% | 652,508 | 25.0% |
| Time deposits.............. | 270,318 | 7.3% | 684,330 | 23.3% | 463,450 | 17.7% |
| Current accounts ......... | 399,171 | 10.9% | 179,658 | 6.1% | 165,685 | 6.3% |
| Guarantee and other deposits.................... | 13,792 | 0.4% | 22,064 | 0.8% | 23,373 | 1.0% |
| Amounts due to credit institutions .............. | 752,636 | 20.5% | 803,366 | 27.4% | 835,304 | 32.0% |
| Debt securities issued.. | 1,670,588 | 45.5% | 1,087,726 | 37.0% | 1,084,445 | 41.5% |
| Amounts due to the Government and the NBK ........................ | 407,911 | 11.1% | 1,718 | 0.0% | 913 | 0.0% |
| Deferred tax liability ... | — | — | — | — | — | — |
| Derivative financial liability .................... | 2,308 | 0.1% | 18,789 | 0.6% | 5,528 | 0.2% |
| Reserves...................... | 120,600 | 3.3% | 104,893 | 3.6% | 10,577 | 0.4% |
| Other liabilities ........... | 34,822 | 0.9% | 34,436 | 1.2% | 23,311 | 0.9% |
| **Total**............................ | **3,672,146** | **100%** | **2,936,980** | **100%** | **2,612,586** | **100%** |

***Funding from Samruk-Kazyna and the NBK***

As at 30 September 2009, the Group received liquidity support in the amounts of KZT 404,938 million through refinancing loans from the NBK under BTA/NBK Repo Transactions, against delivery of the SK Bonds, KZT 310,495 million in deposits of Samruk-Kazyna, KZT 113,562 million under the State Finance Programmes and KZT 212,095 million through a capital injection in consideration for 75.1 per cent. of the shares of the Bank.  See "*The Bank — The Role of Samruk-Kazyna and the NBK — Liquidity Support*"

232

*Customer Deposits*

The Bank believes customer deposits are relatively insensitive to short term fluctuations in interest rates and more dependent on the Bank's ability to provide a good level of customer service and on the range of banking products and services according to information provided by the FMSA.  As at 30 September 2009, the Group had total customer deposits of KZT 683,281 million, representing 11.4 per cent. of the total deposits in the banking system.  As at 30 September 2009, 73.1 per cent. of deposits were made by corporate and governmental entities (including 54.4 per cent. by Samruk-Kazyna and its affiliates) and 26.9 per cent. of deposits were made by individuals.

As at 30 September 2009, the ten largest customers of the Group accounted for 57.3 per cent. of total customer deposits compared to 27.1 per cent. as at 30 September 2008.

The Group's deposits consist of customer current accounts and time deposits.  Customer current accounts generally bear no interest and can be withdrawn upon demand.  For time deposits, different interest rates are paid on the various types of accounts offered by the Group.  For the nine months ended 30 September 2009 rates on Tenge based time deposits offered by the Group ranged between 4.0 per cent. and 12.5 per cent., while interest rates paid on U.S. Dollar and Euro deposits ranged from 6.0 per cent. to 12.0 per cent.  For the year ended 31 December 2008, rates on Tenge based time deposits offered by the Group ranged between 2.0 per cent. and 12.9 per cent., while interest rates paid on U.S Dollar and Euro deposits ranged from 4.5 per cent. to 14.4 per cent.

*Deposits by Currency*

As at 30 September 2009, foreign currency deposits accounted for 44.2 per cent. of total customer deposits compared to 47.9 per cent. and 39.3 per cent. as at 31 December 2008 and 2007, respectively.  Customer deposits in foreign currencies are substantially denominated in U.S. Dollars.

The following table sets out certain information relating to customer deposits in Tenge and foreign currency, by amount and as a percentage of the total amount owed to customers, as at the dates indicated in the table:

| | As at 30 September 2009 | | As at 31 December 2008 | | 2007 | |
|---|---|---|---|---|---|---|
| | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* |
| Foreign currency | 301,694 | 44.2% | 424,140 | 47.9% | 256,496 | 39.3% |
| Tenge accounts | 381,587 | 55.8% | 461,912 | 52.1% | 396,012 | 60.7% |
| **Total** | **683,281** | **100.0%** | **886,052** | **100.0%** | **652,508** | **100.0%** |

*Deposits by Maturity*

The following table sets out certain information relating to the structure of the Group's deposits, based on the unaudited accounting records of the Bank, as at the dates indicated in the table:

| | As at 30 September 2009 | | As at 31 December 2008 | | 2007 | |
|---|---|---|---|---|---|---|
| | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* |
| On demand | 405,810 | 59.4% | 67,194 | 7.6% | 165,211 | 25.3% |
| Savings: | | | | | | |
| Less than 1 month | 31,194 | 4.6% | 141,530 | 16.0% | 77,852 | 11.9% |
| Between 1 and 3 months | 13,796 | 2.0% | 90,188 | 10.1% | 110,360 | 16.9% |
| Between 3 months and 1 year | 46,374 | 6.8% | 237,390 | 26.8% | 106,380 | 16.3% |
| Between 1 and 3 years | 126,052 | 18.4% | 252,233 | 28.5% | 136,031 | 20.9% |
| Over 3 years | 60,055 | 8.8% | 97,517 | 11.0% | 56,674 | 8.7% |
| **Total savings** | **277,471** | **40.6%** | **818,858** | **92.4%** | **487,297** | **74.7%** |
| **Total (On demand + savings)** | **683,281** | **100.0%** | **886,052** | **100.0%** | **652,508** | **100.0%** |

233

*Deposits by Type of Accounts*

The following table sets out the balances of the Group's customer deposits, by type, as at the dates indicated in the table:

| | As at 30 September 2009 | As at 31 December 2008 | As at 31 December 2007 |
|---|---|---|---|
| | | *(KZT millions)* | |
| Corporate deposits ................................................ | 120,787 | 339,664 | 268,179 |
| Individual deposits (retail) .................................... | 183,552 | 307,345 | 280,425 |
| State and budgetary deposits................................... | 378,942 | 239,043 | 103,904 |
| **Total**.................................................................... | **683,281** | **886,052** | **652,508** |

*Deposits by Sector*

The following table sets out the composition of the Group's customer deposits by reference to the economic sector of the deposit as at the dates indicated in the table:

| | As at 30 September 2009 | | As at 31 December 2008 | | 2007 | |
|---|---|---|---|---|---|---|
| | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* |
| Individuals ................................. | 183,552 | 26.9% | 307,345 | 34.7% | 280,425 | 43.0% |
| Oil and gas................................. | 195,311 | 28.6% | 233,290 | 26.3% | 86,213 | 13.2% |
| State agencies ............................ | 174,287 | 25.5% | 28,501 | 3.2% | 11,071 | 1.7% |
| Construction............................... | 29,800 | 4.4% | 49,060 | 5.5% | 33,623 | 5.2% |
| Wholesale trade ......................... | 22,614 | 3.3% | 81,303 | 9.2% | 52,003 | 8.0% |
| Non-credit financial organisations............................ | 17,229 | 2.5% | 19,226 | 2.2% | 38,578 | 5.9% |
| Transportation............................ | 8,966 | 1.3% | 33,113 | 3.7% | 41,388 | 6.3% |
| Research and development ........ | 4,122 | 0.6% | 11,594 | 1.3% | 6,622 | 1.0% |
| Education................................... | 3,879 | 0.6% | 7,014 | 0.8% | 5,938 | 0.9% |
| Retail trade................................ | 3,371 | 0.5% | 4,265 | 0.5% | 8,691 | 1.3% |
| Mining....................................... | 3,063 | 0.5% | 1,912 | 0.2% | 3,688 | 0.6% |
| Agriculture................................. | 2,030 | 0.3% | 3,887 | 0.4% | 6,596 | 1.0% |
| Textile and leather industry ....... | 1,968 | 0.3% | 1,607 | 0.2% | 1,235 | 0.2% |
| Chemical processing.................. | 1,680 | 0.2% | 1,480 | 0.2% | 5,720 | 0.9% |
| Machinery and equipment production............................... | 1,650 | 0.2% | 5,873 | 0.7% | 6,652 | 1.0% |
| Food industry............................ | 1,525 | 0.2% | 1,091 | 0.1% | 3,620 | 0.6% |
| Energy industry......................... | 1,358 | 0.2% | 30,788 | 3.5% | 3,978 | 0.6% |
| Metallurgy................................. | 799 | 0.1% | 11,475 | 1.3% | 12,024 | 1.8% |
| Entertainment............................ | 796 | 0.1% | 1,241 | 0.1% | 1,207 | 0.2% |
| Communication ......................... | 412 | 0.1% | 5,425 | 0.6% | 2,429 | 0.4% |
| Hotel and hospitality.................. | 233 | 0.0% | 353 | 0.0% | 454 | 0.1% |
| Other.......................................... | 24,636 | 3.6% | 46,209 | 5.3% | 40,353 | 6.1% |
| **Total**........................................ | **683,281** | **100.0%** | **886,052** | **100.0%** | **652,508** | **100.0%** |

234

***Bank Loans and Similar Financings***

The following table sets out certain information relating to balances due to other banks and financial institutions based on the unaudited accounting records of the Group, as at the dates indicated in the table:

| | As at 30 September 2009 | As at 31 December | |
| --- | --- | --- | --- |
| | | 2008 | 2007 |
| | | *(KZT minions)* | |
| Loans from OECD based banks and financial institutions | 446,095 | 451,737 | 455,384 |
| Syndicated bank loans | 167,236 | 156,617 | 241,157 |
| Loans from Kazakh banks and financial institutions | 96,413 | 126,434 | 51,329 |
| Loans from other banks and financial institutions | 25,657 | 24,201 | 26,609 |
| Pass through loans | 16,033 | 17,278 | 9,482 |
| Interest bearing placements from Kazakh banks | 44 | 21,112 | 46,021 |
| Interest bearing placements from non OECD banks | 749 | 3,484 | 4,034 |
| Loro accounts | 409 | 2,503 | 1,288 |
| **Total** | **752,636** | **803,366** | **835,304** |
| **Subject to repurchase agreements** | 7,142 | 65,472 | 60,129 |

The Group has historically entered into various trade finance interbank facilities with foreign banks and Kazakhstan subsidiaries of foreign banks.  If the Restructuring is successful, the Bank's principal method of trade finance will be utilisation of the RCTFF.

As at 30 September 2009, the aggregate outstanding principal balance including overdue indebtedness under the Trade Finance Facilities was approximately U.S.$1,794 million; such facilities have maturities ranging between one and seven years, while off balance Trade Finance liabilities including overdue indebtedness as at 30 September 2009 were approximately U.S.$1,565 million.  The Bank intends to continue rending services to its customers and finance their trade activities following successful completion of the Restructuring.

In accordance with the contractual terms of loan facilities from foreign banks and with the terms of the debt securities issued, the Bank is required to maintain certain financial ratios, particularly with regard to its liquidity, capital adequacy and lending exposures.  Furthermore, the Bank is required to maintain a certain level of credit rating from major international rating agencies.  As at 30 September 2009 and 31 December 2008 the Bank was in breach of capital adequacy, lending exposure and cross default covenants on these loan facilities.

### Debt Securities

*Eurobonds*

As of 30 September 2009, the Group had the following outstanding note issuances:

| Issuer | Name | Currency | Nominal Value | Interest rate (%) | Due |
|---|---|---|---|---|---|
| TuranAlem Finance............ | 3rd tranche of eurobonds | U.S..$ | 176,236,052 | 7.88 | 6/2/2010 |
| TuranAlem Finance............ | 3rd tranche of eurobonds (additional issue) | U.S. $ | 378,457,444 | 7.88 | 6/2/2010 |
| TuranAlem Finance............ | 4th tranche of eurobonds | U.S. $ | 380,507,224 | 8 | 24/03/2014 |
| TuranAlem Finance............ | 5th tranche of eurobonds | U.S. $ | 309,543,635 | 8.50 | 09/2/2015 |
| TuranAlem Finance............ | Program of Global Medium Term Notes, 2nd issue | PLZ | 199,786,055 | 6.25 | 30/03/2011 |
| TuranAlem Finance............ | Program of Global Medium Term Notes, 3rd issue | U.S. $ | 190,411,252 | 7.75 | 25/04/2013 |
| TuranAlem Finance............ | Program of Global Medium Term Notes, 5th issue | EUR | 499,326,288 | 6.3 | 27/09/2011 |
| TuranAlem Finance............ | Program of Global Medium Term Notes, 6th issue | £ | 199,983,744 | 7.1 | 20/12/2009 |
| TuranAlem Finance............ | Program of Global Medium Term Notes, 7th issue | JPY | 19,861,331,204 | 4.3 | 28/12/2016 |
| TuranAlem Finance............ | Program of Global Medium Term Notes, 8th issue | U.S. $ | 977,344,215 | 8.25 | 22/01/2037 |
| TuranAlem Finance............ | Program of Global Medium Term Notes, 10th issue | JPY | 28,719,121,341 | 3M LIBOR + margin of 2.85% annually | 31/05/2017 |
| TuranAlem Finance............ | Program of Global Medium Term Notes, 11th issue | JPY | 14,288,384,128 | 3M LIBOR + margin of 5,4% annually | 11/10/2017 |
| TuranAlem Finance............ | Program of Global Medium Term Notes, 12th issue | U.S. $ | 200,000,000 | 3M LIBOR + 9,5% or 11.50% | 10/4/2013 |
| TuranAlem Finance............ | Program of Global Medium Term Notes, 13th issue | U.S. $ | 100,000,000 | 3M LIBOR + 9,5% or 11.25% | 27/05/2014 |
| Bank.................................... | eurobonds in CHF | CHF | 200,000,000 | 3m CHF Libor+3,35% | 7/8/2017 |
| BTA Finance Luxembourg | Perpetual Bond | U.S. $ | 399,993,998 | 8.3 | 1/25/2016 |
| TurranAlem Finance (Russia)................................ | 1 issue of documentary bonds | RUB | 3,000,000,000 | 7.8 | 10/5/2009 |
| Temir Capital B.V.[1].......... | 1st series of eurobonds | U.S. $ | 0 | 9.25 | 3/23/2009 |
| Temir Capital B.V.[1].......... | 2nd series of eurobonds | U.S. $ | 275,182,471 | 9 | 11/24/2011 |
| Temir Capital B.V.[1].......... | 3rd series of eurobonds | U.S. $ | 487,271,699 | 9.50 | 5/15/2014 |

Note:

_____

(1)  The Bank and Samruk-Kazyna signed an agreement on 14 October 2009 on the transfer of 100 per cent. of the Bank's shares in Temirbank to Samruk-Kazyna under a trust management agreement. See "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Recent Developments*". The notes issued by Temir Capital B.V. are not subject to the Restructuring and will instead be restructured, if at all, under Temirbank's restructuring.

*Subordinated Bonds*

As of 30 September 2009, the Group had the following outstanding subordinated bond issuances:

| Issuer | Name | Currency | Nominal Value | Interest rate (%) | Due |
|---|---|---|---|---|---|
| Bank.............................. | Subordinated coupon bonds, 2nd issue with indexing (tenge) | KZT | 3,698,787,500 | 9.0 | 29/04/2010 |
| Bank.............................. | Subordinated coupon bonds, 3rd issue with indexing (tenge) | KZT | 7,500,000,000 | inflation rate+2% | 6/11/2013 |
| Bank.............................. | Subordinated coupon bonds, 4th issue with indexing (tenge) | KZT | 14,000,000,000 | inflation rate+2% | 10/6/2014 |
| Bank.............................. | Subordinated coupon bonds, 5th issue with indexing (tenge) | KZT | 15,685,950,000 | 7.0 | 30/12/2015 |
| Bank.............................. | Subordinated coupon bonds, 7th issue with indexing (tenge) | KZT | 96,414,540,000 | 7.0 | 29/06/2036 |
| Bank.............................. | Subordinated coupon bonds, 9th issue with indexing (tenge) | KZT | 51,412,043,000 | 11.0 | 16/06/2018 |
| BTA Ipoteka................ | Subordinated bonds (3rd bond program), 2nd issue | KZT | 4,120,000 | 7.0 | 8/4/2016 |
| BTA Ipoteka................ | Subordinated bonds (3rd bond program), 3rd issue | KZT | 10,000,000 | 7.0 | 12/28/2016 |
| Temirbank[1] ................ | Subordinated bonds (2nd bond program), 3rd issue | KZT | 928,000,000 | 9.5 | 4/14/2016 |
| Temirbank[1] ................ | Subordinated bonds (2nd bond program), 4th issue | KZT | 867,528,736 | 9.5 | 4/14/2016 |
| Temirbank[1] ................ | Preferred shares | KZT | 4,457,487,000 | 10 | |
| BTA Kyrgyzstan .......... | Subordinated Loan | KZT | 210,000 | 1.5 | 7/1/2015 |

Note:

(1)   The Bank and Samruk-Kazyna signed an agreement on 14 October 2009 on the transfer of 100 per cent. of the Bank's shares in Temirbank to Samruk-Kazyna under a trust management agreement. See "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Recent Developments*". The subordinated bonds issued by Temirbank are therefore not subject to the Restructuring and will be restructured, if at all, pursuant to Temirbank's restructuring.

*Senior Bonds*

As of 30 September 2009, the Group had the following outstanding senior bond issuances:

| Issuer | Name | Currency | Nominal Value | Interest rate (%) | Due |
|--------|------|----------|--------------|-------------------|-----|
| Bank............................. | Bonds (1st bond program), 1st — 10th issue | KZT | 300,000,000,000 | 9.0 | Each 3 March from 2015 until 2024 |
| Bank............................. | Bonds (2nd bond program), 1st — 10th issue | KZT | 345,000,000,000 | 9.0 | Each 19 March from 2015 until 2024 |
| Temirbank[(1)] ................ | Bonds (1st bond program), 1st issue | KZT | 602,600,000 | upon decision of Management Board depending on market situation, but not less than 5% | 7/6/2015 |
| Temirbank[(1)] ................ | Bonds (1st bond program), 3rd issue | KZT | 3,989,070,000 | inflation rate+1% | 12/30/2012 |
| Temirbank[(1)] ................ | Bonds (1st bond program), 4th issue | KZT | 2,992,000,000 | upon decision of Management Board depending on market situation, but not less than 5% | 6/1/2015 |
| Temirbank[(1)] ................ | Bonds (1st bond program), 5th issue | KZT | 3,492,000,000 | 8.50 | 6/1/2012 |
| Temirbank[(1)] ................ | Bonds (1st bond program), 7th issue | KZT | 2,478,283,000 | 9.00 | 11/29/2016 |
| Temirbank[(1)] ................ | Bonds (1st bond program), 8th issue | KZT | 3,962,620,000 | 9.00 | 11/29/2021 |
| Temirbank[(1)] ................ | Bonds (2nd bond program), 1st issue | KZT | 2,500,000,000 | 9.00 | 4/14/2010 |
| Temirbank[(1)] ................ | Bonds (2nd bond program), 2nd issue | KZT | 448,636,289 | 9.00 | 4/14/2012 |
| Temirbank[(1)] ................ | Bonds (2nd bond program), 5th issue | KZT | 448,636,289 | 8.50 | 4/14/2012 |
| Temirbank[(1)] ................ | Bonds (2nd bond program), 2nd issue | KZT | 7,423,108,773 | 8.50 | 4/14/2017 |
| Temirbank[(1)] ................ | Bonds (2nd bond program), 6th issue | KZT | 1,500,000,000 | upon decision of Management Board depending on market situation, but not less than 5% | 4/14/2017 |
| Temirbank[(1)] ................ | Bonds, 3rd issue | KZT | 2,200,000,000 | Company has right to change interest rate once a year. Average rate for circulation period must not be less than 5% | 10/20/2012 |
| BTA Ipoteka................ | Mortgage bonds, 1st issue | KZT | 500,000,000 | inflation rate + 1.3% | 2/26/2010 |
| BTA Ipoteka................ | Mortgage bonds, 2nd issue | KZT | 1,500,000,000 | inflation rate + 1.0% | 10/21/2014 |
| BTA Ipoteka................ | Mortgage bonds (1st bond program), 1st issue | KZT | 2,000,000,000 | inflation rate + 2% | 12/15/2011 |
| BTA Ipoteka................ | Mortgage bonds (1st bond program), 2nd issue | KZT | 2,000,000,000 | inflation rate + 1.0% | 5/11/2010 |
| BTA Ipoteka................ | Mortgage bonds (1st bond program), 3rd issue | KZT | 4,000,000,000 | inflation rate + 2% | 5/11/2015 |
| BTA Ipoteka................ | Mortgage bonds (1st bond program), 4th issue | KZT | 2,000,000,000 | inflation rate + 1.0% | 6/17/2010 |
| BTA Ipoteka................ | Mortgage bonds (2nd bond program), 1st issue | KZT | 1,417,000,000 | | 7/13/2012 |
| BTA Ipoteka................ | Mortgage bonds (2nd bond program), 2nd issue | KZT | 7,000,000,000 | inflation rate + 0.5% | 8/22/2013 |
| BTA Ipoteka................ | Mortgage bonds (2nd bond program), 3rd issue | KZT | 4,000,000,000 | inflation rate + 0.1% | 2/21/2016 |
| BTA Ipoteka................ | Mortgage bonds (3rd bond program), 1st issue | KZT | 1,004,120,000 | 15% inflation rate | 8/4/2016 |
| BTA Ipoteka................ | Mortgage bonds (3rd bond program), 5th issue | KZT | 3,895,540,000 | inflation rate + 0.1% | 4/3/2014 |
| BTA Ipoteka................ | Mortgage bonds (3rd bond program), 7th issue | KZT | 17,180,000 | inflation rate + 1.5% | 4/1/2018 |
| BTA Belarus................ | Bonds without collateral | U.S.$ | 732,428 | 12.00 | 8/27/2010 |
| BTA Belarus................ | Bonds without collateral | U.S.$ | 613,408 | 12.00 | 8/27/2010 |
| | | U.S.$ | 41,165,990 | 1M LIBOR + 1.25% | 3/29/2029 |

| Issuer | Name | Currency | Nominal Value | Interest rate (%) | Due |
|---|---|---|---|---|---|
| | Notes of Kazakh Mortgage | U.S.$ | 0 | 1M LIBOR + 2.00% | 3/29/2029 |
| | Backed Securities 2007 1 B.V. | U.S.$ | 0 | 1M LIBOR + 3.75% | 3/29/2029 |

_____

Note:

(1)    The Bank and Samruk-Kazyna signed an agreement on 14 October 2009 on the transfer of 100 per cent. of the Bank's shares in Temirbank to Samruk-Kazyna under a trust management agreement. See "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Recent Developments*". The senior bonds issued by Temirbank are therefore not subject to the Restructuring and will be restructured, if at all, pursuant to Temirbank's restructuring.

*Certificates of Deposit*

As of 30 September 2009, the Group had the following outstanding certificates of deposit:

| Issuer | Name | Currency | Nominal Value | Interest rate (%) | Due |
|---|---|---|---|---|---|
| BTA Belarus.................. | Certificate of Deposit | BYR | 200,000,000 | 22.50 | 3/26/2010 |
| BTA Belarus.................. | Certificate of Deposit | BYR | 14,000,000 | 18.50 | 10/26/2009 |
| BTA Belarus.................. | Certificate of Deposit | BYR | 60,000,000 | 20.50 | 10/26/2009 |

ASSET AND LIABILITY MANAGEMENT

**Introduction**

The Bank monitors its interest rate and exchange rate exposure and the maturities of its financial instruments in order to minimise the effect of market changes on the Bank's profitability and liquidity.  The Bank has a relatively liquid asset base, including substantial Tenge and U.S. Dollar demand deposits, comprised, as at 30 September 2009, of 95.0 per cent. of corporate deposits and 5.0 per cent. of retail deposits.  The volume of clients' assets, as at the same date, comprised 37.3 per cent. of term deposits and 62.7 per cent. of deposits on demand.  In addition, as at 30 September 2009, the Bank's loan portfolio comprised 91.4 per cent. of corporate loans and 8.6 per cent. of retail loans.  Accordingly, the Bank's interest rate risk is relatively low and, despite the size of the portfolio, adjusting the profile of the portfolio is relatively straightforward for the Bank.

**Asset and Liability Management Committee**

The overall asset and liability position of the Bank is monitored by the Bank's Asset and Liability Management Committee ("**ALCO**"), which reports directly to the Management Board with respect to issues relating to the day-to-day operations of the Bank or, in the case of matters relating to the Bank's strategy, directly to the Board of Directors.  ALCO is chaired by the Chairman of Management Board or Deputy Chairman of Management Board or any person specifically appointed by Management Board.  The Committee consists of representatives of Department of Credit and Operational Risk, one of the corporate business departments, one of the SME business departments, one of the retail business departments, the international operations departments of the investment activities business, Treasury Department and Financial Controlling Department of the Bank.  ALCO meets on a weekly basis to review the Group's asset and liability position by reference to the following criteria, based on information provided by the Financial Controlling Department:

● size and maturity of assets and liabilities;

● the Bank's foreign currency position;

● operational ratios in terms of the regulations established by the FMSA; and

● exchange rates and other economic data.

Based on its review of this information, ALCO determines short-term policies for the forthcoming week with the aim of increasing interest and non-interest income for the Group while maintaining adequate liquidity, complying with prudential standards and regulations and minimising the impact of financial market risks so as to maintain the Group's attractiveness to depositors.  Policies proposed by ALCO are reviewed and approved by the Bank's senior management, which has overall responsibility for ensuring that the asset and liability maturity profiles are prudent considering prevailing market conditions, consistent with the Bank's strategy and in compliance with all of the FMSA's requirements and limitations.

**Liquidity Risk and Management of Funding Sources**

The liquidity risk is the risk that the Group may not be able to meet its obligations when they fall due.  Managing the liquidity risk is one of the key components of the Group's risk management process.  This risk is managed by:

1.      compliance with the regulators' liquidity ratios; and

2.      managing liquidity by gap analysis and forecasting cash flows.

According to FMSA requirements, the Bank must meet certain liquidity ratios over each reporting period, including the K4, K4-1, K4-2, K4-3, K4-4, K4-5 and K4-6 ratios.  The K4 ratio is calculated as the ratio of average monthly highly liquid bank assets to the average size of on demand deposits,

taking into account accrued interest.  The K4-2 ratio is calculated as the average size of liquid assets with a remaining maturity up to one month inclusive, including highly liquid assets, to the average size of fixed-term obligations with remaining maturity up to one month inclusive.  The K4-3 ratio is calculated as the average size of liquid assets with a remaining maturity up to three months inclusive, including highly liquid assets, to the average size of fixed-term obligations with remaining maturity up to three months inclusive.  The K4-4 ratio is calculated as the average size of highly liquid assets in foreign currency to the average size of fixed-term obligations in the same foreign currency with remaining maturity of up to seven days inclusive.  The K4-5 ratio is calculated as the average size of liquid assets in foreign currency with a remaining maturity up to one month inclusive, including highly liquid assets, to the average size of fixed-term obligations in the same foreign currency with remaining maturity up to one month inclusive.  The K4-6 ratio is calculated as the average size of liquid assets in foreign currency with remaining maturity up to three months inclusive, including highly liquid assets, to the average size of fixed-term obligations in the same foreign currency with remaining maturity up to three months inclusive.  The minimum ratio values established by the FMSA are as follows: K4 (0.3), K4-1 (1.0), K4-2 (0.9), K4-3 (0.8), K4-4 (1.0), K4-5 (0.9) and K4-6 (0.8).

The gap analysis consists of comparing the maturity profiles of the Group's assets and liabilities to evaluate the absolute and relative gap between the flow of assets and liabilities at each of various intervals.  The Bank then attempts to adjust the maturities of its assets and liabilities to reduce significant gaps in any given maturity interval.

In forecasting future cashflows, the Bank analyses the risk of changes in the urgency of the requirements and obligations of the Bank and unexpected withdrawals of deposits.  The Bank undertakes this analysis on both a short-term and long-term basis to detect potential risks to such changes.

ALCO meets weekly to analyse operational data and make liquidity management decisions.  If the situation warrants it, additional ALCO meetings are scheduled.  ALCO reviews asset-liability gaps by maturity and currency, asset and liability durations and projected future cash flows.  All business subdivisions, together with Risk Management, participate in the process of managing the liquidity of the Group so as to provide informational support.

The management regularly monitors highly liquid assets that can be sold at any time.  The Group maintains a portfolio of highly liquid assets consisting mostly of debt instruments issued by governments with high credit ratings.  On 30 November 2009, the NBK Management Board amended the obligatory reserve ratio requirement for the Bank to zero per cent. for both internal and external liabilities.  The reduced ratio will remain in effect until Restructuring process is finalised.

As at 30 September 2009, the balance of funds borrowed by the Group via various bond issues, bilateral, syndicated-loan and other agreements totalled KZT 2,423,224 million.  Under the terms of part of these bonds and loan agreements, the Bank has undertaken to maintain certain financial ratios, including, with respect to its liquidity, capital adequacy and credit exposure.  In addition, the Bank is obliged to maintain a certain credit rating from leading rating agencies.

As at 30 September 2009 and since approximately 1 January 2009, the Bank was not in compliance with some of these requirements.  Following the acquisition of shares in the Bank by Samruk-Kazyna, certain creditors accelerated their loans to the Bank in a total of U.S.$550 million or KZT 83 billion.  In addition, in April 2009, the Bank had its credit ratings lowered to "default", which constituted yet another credit event under other credit agreements to which the Bank is a party.

Supported by the Government, the Group formally announced in April 2009 its intention to undergo a restructuring of its financial indebtedness.  The Group is currently in the process of this restructuring.

*Analysis of Financial Liabilities by Reference to Maturity*

The table below summarises the Group's financial obligations as at 30 September 2009, with a breakdown by the time remaining until maturity on the basis of contractual undiscounted repayment obligation.

| | Maturity | | |
| | As at 30 September 2009 | | |
| | 1 year or less | More than 1 year | Total |
|---|---|---|---|
| Amounts due to the Government and National Bank | 407,271 | 1,677 | 408,948 |
| Amounts due to credit institutions | 592,694 | 186,825 | 779,519 |
| Derivative financial instruments | 1,475 | 833 | 2,308 |
| Amounts due to customers | 523,487 | 301,942 | 825,429 |
| Debt securities outstanding | 1,018,988 | 1,749,423 | 2,768,411 |
| Other liabilities | 43,028 | 326 | 43,354 |
| **Total undiscounted financial obligations** | **2,586,943** | **2,241,026** | **4,827,969** |

The table below summarises the Group's financial obligations as at 31 December 2008, with a breakdown by time remaining until maturity on the basis of contractual undiscounted repayment obligations.

| | Maturity | | |
| | As at 31 December 2008 | | |
| | 1 year or less | More than 1 year | Total |
|---|---|---|---|
| Amounts due to the Government and National Bank | 217 | 1,902 | 2,119 |
| Amounts due to credit institutions | 698,139 | 127,258 | 825,397 |
| Derivative financial instruments | 16,689 | 2,100 | 18,789 |
| Amounts due to customers | 680,055 | 300,393 | 980,448 |
| Debt securities outstanding | 769,514 | 637,713 | 1,407,227 |
| Other liabilities | 34,957 | 1,306 | 36,263 |
| **Total undiscounted financial obligations** | **2,199,571** | **1,070,672** | **3,270,243** |

The table below summarises the Group's financial obligations as at 31 December 2007, with breakdown by time remaining until maturity on the basis of contractual undiscounted repayment obligations.

| | Maturity | | |
| | As at 31 December 2007 | | |
| | 1 year or less | More than 1 year | Total |
|---|---|---|---|
| Amounts due to the Government and National Bank | 130 | 884 | 1,014 |
| Amounts due to credit institutions | 384,784 | 559,105 | 943,889 |
| Derivative financial instruments | 3,130 | 2,398 | 5,528 |
| Amounts due to customers | 489,668 | 225,075 | 714,743 |
| Debt securities outstanding | 164,010 | 1,473,570 | 1,637,580 |
| Other liabilities | 32,999 | 5,398 | 38,397 |
| **Total undiscounted financial obligations** | **1,074,721** | **2,266,430** | **3,341,151** |

The Group's financial condition deteriorated drastically in 2008, mainly due to losses from its loan portfolio, financial derivatives and securities uncovered by the Bank's new management in 2009. This effectively put both the Bank and the Group in breach of certain prudential ratios, including the FMSA's capital adequacy ratio.  As a result of these losses, the Group's total liabilities, exceeded its total assets by KZT 742,779 million as at 31 December 2008, and the Group reported a net loss of KZT 1,049,538 million as at 30 September 2009 and of KZT 1,188,050 million for the year ended 31 December 2008.

The table below summarises the contractual maturities of the Group's financial and contingent liabilities.

| | On demand | 1 month or less | From 1 to 3 months | From 3 to 12 months | From 1 year to 3 years | More than 3 years | Total |
|---|---|---|---|---|---|---|---|
| Nine months to | | | | | | | |
| 30 September 2009 .................. | 23,434 | 8,297 | 81,441 | 116,030 | 210,212 | 222,790 | 662,204 |
| 2008 ............................................. | 14,694 | 21,095 | 39,854 | 192,546 | 249,788 | 160,233 | 678,210 |
| 2007 ............................................. | 17,775 | 16,478 | 28,756 | 146,621 | 250,623 | 166,493 | 626,746 |

As mentioned above, as at 30 September 2009, the Bank was not in compliance with certain financial covenants undertaken pursuant to certain of its debt securities issues, a fact that led to a number of cross-defaults being triggered as well.  As a result, a total of KZT 1,097,023 million in amounts payable to lending institutions and outstanding debt securities have become and are currently due and payable.

The table below breaks down financial assets and liabilities by reference to their expected maturities:

| | Nine months to 30 September 2009 | | |
|---|---|---|---|
| | 1 year or less | More than 1 year | Total |
| | *(KZT millions)* | | |
| **Assets:** | | | |
| Cash and cash equivalents.......................................................... | 30,153 | — | 30,153 |
| Obligatory reserves ..................................................................... | 17,695 | 25,308 | 43,003 |
| Financial assets at fair value through profit or loss ............... | 120,648 | — | 120,648 |
| Amounts due from credit institutions ........................................ | 22,120 | 9,319 | 31,439 |
| Derivative financial assets .......................................................... | 12,043 | 19,303 | 31,346 |
| Available-for-sale investment securities.................................... | 5,971 | 16,273 | 22,244 |
| Loans to customers ...................................................................... | 263,409 | 843,832 | 1,107,241 |
| SK Bonds....................................................................................... | — | 511,097 | 511,097 |
| Other assets................................................................................... | 28,376 | 2,921 | 31,297 |
| | 500,415 | 1,428,053 | 1,928,468 |
| **Liabilities:** | | | |
| Amounts due to the Government and NBK.................................. | 406,430 | 1,481 | 407,911 |
| Amounts due to credit institutions ............................................. | 453,892 | 298,744 | 752,636 |
| Derivative financial liabilities................................................... | 1,475 | 833 | 2,308 |
| Amounts due to customers........................................................... | 485,540 | 197,741 | 683,281 |
| Debt securities issued.................................................................. | 733,866 | 936,722 | 1,670,588 |
| Provisions..................................................................................... | 45,356 | 75,244 | 120,600 |
| Other liabilities............................................................................ | 32,370 | 2,452 | 34,822 |
| | 2,158,929 | 1,513,217 | 3,672,146 |
| **Net position** ............................................................................. | (1,658,514) | (85,164) | (1,743,678) |
| **Accumulated gap** ..................................................................... | (1,658,514) | (1,743,678) | |

|  | 2008 | | |
| --- | --- | --- | --- |
|  | 1 year or less | More than 1 year | Total |
|  | *(KZT millions)* | | |
| **Assets:** | | | |
| Cash and cash equivalents | 87,893 | — | 87,893 |
| Obligatory reserves | 24,173 | 39,881 | 64,054 |
| Financial assets at fair value through profit or loss | 128,150 | — | 128,150 |
| Amounts due from credit institutions | 71,925 | 13,249 | 85,174 |
| Derivative financial assets | 655 | 20,995 | 21,650 |
| Available-for-sale investment securities | 3,810 | 16,672 | 20,482 |
| Loans to customers | 851,289 | 765,774 | 1,617,063 |
| Other assets | 15,994 | 7,006 | 23,000 |
|  | 1,183,889 | 863,577 | 2,047,466 |
| **Liabilities:** | | | |
| Due to government and central banks | 125 | 1,593 | 1,718 |
| Amounts due from credit institutions | 708,182 | 95,184 | 803,366 |
| Derivative financial liabilities | 16,689 | 2,100 | 18,789 |
| Amounts due to customers | 536,302 | 349,750 | 886,052 |
| Debt securities issued | 722,510 | 365,216 | 1,087,726 |
| Provisions | 54,294 | 50,599 | 104,893 |
| Other liabilities | 33,930 | 506 | 34,436 |
|  | 2,072,032 | 864,948 | 2,936,980 |
| **Net position** | (888,143) | (1,371) | (889,514) |
| **Accumulated gap** | (888,143) | (889,514) | |

|  | 2007 | | |
| --- | --- | --- | --- |
|  | 1 year or less | More than 1 year | Total |
|  | *(KZT minions)* | | |
| **Assets:** | | | |
| Cash and cash equivalents | 99,723 | — | 99,723 |
| Obligatory reserves | 52,266 | 115,976 | 168,242 |
| Financial assets at fair value through profit or loss | 112,175 | — | 112,175 |
| Amounts due from credit institutions | 59,091 | 48,498 | 107,589 |
| Derivative financial assets | 375 | 31,022 | 31,397 |
| Available-for-sale investment securities | 8,211 | 18,211 | 26,422 |
| Loans to customers | 558,562 | 1,821,248 | 2,379,810 |
| Other assets | 16,299 | 2,555 | 18,854 |
|  | 906,702 | 2,037,510 | 2,944,212 |
| **Liabilities:** | | | |
| Due to government and central banks | 95 | 818 | 913 |
| Amounts due from credit institutions | 255,600 | 579,704 | 835,304 |
| Derivative financial liabilities | 1,908 | 3,620 | 5,528 |
| Amounts due to customers | 459,803 | 192,705 | 652,508 |
| Debt securities issued | 66,912 | 1,017,533 | 1,084,445 |
| Provisions | 5,276 | 5,301 | 10,577 |
| Other liabilities | 22,016 | 1,295 | 23,311 |
|  | 811,610 | 1,800,976 | 2,612,586 |
| **Net position** | 95,092 | 236,534 | 331,626 |
| **Accumulated gap** | 95,092 | 331,626 | |

## Treasury Operations

The Bank's Treasury department provides open-market operations in order to ensure the efficient management of the Bank's funds (for the Bank as a whole).  The Treasury department achieves this purpose using foreign exchange (FOREX) and money market operations, and operations with securities, taking into consideration the policy of efficient internal and external risk management.

The Bank is one of the leading traders of Government debt securities and one of the leading participants on the interbank money market.  Other operations performed by the Treasury department include currency trade operations, swap operations, the execution of repurchase agreements, reverse repurchase agreements and forward, futures and options contracts.

The Bank's Treasury department also provides brokerage services on the local securities market to its clients.

**Foreign Currency Management**

Currency risk is the risk that the value of a financial instrument will fluctuate due to changes in exchange rates.  The Risk Committee's limits on foreign exchange positions are based on those of the FMSA.  The positions are monitored daily.

The following table sets out the KZT equivalent amount of the Group's financial assets and liabilities denominated in KZT and foreign currencies as at the dates indicated:

| | As at 30 September | | | As at 31 December | | | | | |
| | **2009** | | | **2008** | | | **2007** | | |
| | KZT | Other foreign currency | Total | KZT | Other foreign currency | Total | KZT | Other foreign currency | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | *(KZT millions)* | | | | |
| **Assets:** | | | | | | | | | |
| Cash and cash equivalents . | 10,912 | 19,241 | 30,153 | 25,011 | 62,882 | 87,893 | 46,050 | 53,673 | 99,723 |
| Obligatory reserves............ | 29,929 | 13,074 | 43,003 | 40,329 | 23,725 | 64,054 | 43,983 | 124,259 | 168,242 |
| Financial assets at fair value through profit or loss ...... | 54,323 | 66,325 | 120,648 | 95,738 | 32,412 | 128,150 | 55,937 | 56,238 | 112,175 |
| Amounts due from credit institutions ..................... | 8,394 | 23,045 | 31,439 | 22,271 | 62,903 | 85,174 | 44,849 | 62,740 | 107,589 |
| Available for sale securities | 16,829 | 5,415 | 22,244 | 16,350 | 4,132 | 20,482 | 15,705 | 10,717 | 26,422 |
| Loans to customers ............ | 556,245 | 550,996 | 1,107,241 | 392,170 | 1,224,893 | 1,617,063 | 950,000 | 1,429,810 | 2,379,810 |
| SK Bonds ......................... | 511,097 | – | 511,097 | – | – | – | – | – | – |
| Derivative financial assets . | 30,145 | 1,201 | 31,346 | 701 | 20,949 | 21,650 | 12,287 | 19,110 | 31,397 |
| Other assets ...................... | 14,148 | 17,149 | 31,297 | 14,188 | 8,812 | 23,000 | 13,706 | 5,148 | 18,854 |
| **Total assets** ..................... | **1,232,022** | **696,446** | **1,928,468** | **606,758** | **1,440,708** | **2,047,466** | **1,182,517** | **1,761,695** | **2,944,212** |
| **Liabilities:** | | | | | | | | | |
| Amounts due to the Government and the NBK ... | 407,477 | 434 | 407,911 | 1,320 | 398 | 1,718 | 398 | 515 | 913 |
| Amounts due to credit institutions ..................... | 70,265 | 682,371 | 752,636 | 161,294 | 642,072 | 803,366 | 112,871 | 722,433 | 835,304 |
| Amounts due to customers......... | 381,587 | 301,694 | 683,281 | 461,912 | 424,140 | 886,052 | 396,012 | 256,496 | 652,508 |
| Debt securities issued......... | 714,475 | 956,113 | 1,670,588 | 211,531 | 876,195 | 1,087,726 | 179,224 | 905,221 | 1,084,445 |
| Derivative financial obligations ..................... | 2,269 | 39 | 2,308 | 1,246 | 17,543 | 18,789 | 5,467 | 61 | 5,528 |
| Provisions ........................ | 1,149 | 119,451 | 120,600 | 306 | 104,587 | 104,893 | 10,436 | 141 | 10,577 |
| Other liabilities ................ | 21,444 | 13,378 | 34,822 | 21,748 | 12,688 | 34,436 | 19,101 | 4,210 | 23,311 |
| **Total liabilities**................ | **1,598,666** | **2,073,480** | **3,672,146** | **859,357** | **2,077,623** | **2,936,980** | **723,509** | **1,889,077** | **2,612,586** |
| **Net balance sheet position** | **(366,644)** | **(1,377,034)** | **(1,743,678)** | **(252,99)** | **(636,15)** | **(889,514)** | **459,008** | **(127,382)** | **331,626** |

The following table shows currencies, for which the Group had principal positions as at 30 September 2009 by cash assets and liabilities, and also by assumed cash flow.  The analysis calculates the effect of a reasonably possible movement of the currency rate against the Tenge, with all other variables held constant on the income statement.  Negative amounts reflect a potential net decrease in income and positive amounts reflect a potential net increase.

| Currency | Bank's forecast as at 30 September 2009 of the likely change in FX rate against KZT in % in 2010 | Effect on pre-tax income in as at 30 September 2009 | Bank's forecast as at 31 December 2008 of the likely change in FX rate against KZT in % in 2009 | Effect on pre-tax income as at 31 December 2008 forecast | Bank's forecast as at 31 December 2007 of the likely change in FX rate against KZT in % in 2008 | Effect on pre-tax income as at 31 December 2007 forecast |
|---|---|---|---|---|---|---|
| | | *(KZT millions)* | | *(KZT millions)* | | *(KZT millions)* |
| U.S.$ | +19.1 | (131,627) | +15.4 | (61,315) | -4 | (5,591) |
| Euro | +24.3 | (65,995) | +15.2 | (22,811) | -7 | 1,044 |
| RUB | +25.4 | (9,174) | +8.3 | (1,043) | -5 | (1,681) |
| CHF | +24.7 | (6,961) | +16.4 | (3,624) | -8 | 1,609 |
| JPY | +25.3 | (60,235) | +22.4 | (47,122) | -9 | 831 |
| KGS | — | | +15 | 517 | — | — |
| FTO | +30.3 | (3,211) | — | — | -10 | 792 |
| £ | +26.7 | (13,608) | +23.2 | (10,892) | -8 | 3,476 |
| UAH | +37.1 | 8 | — | — | — | — |

Regulation and monitoring of the net foreign currency positions of banks in Kazakhstan are carried out by the FMSA.  The FMSA defines the net open foreign currency position as the difference between the Tenge equivalent of all foreign currency assets and all foreign currency liabilities.  Foreign currency assets include all foreign currency claim accounts and the total value of its forward currency purchases.  Foreign currency liabilities include all foreign currency liability accounts and the total value of its forward foreign currency sales.  The Bank provides a report on the Bank's net currency positions to the FMSA on a weekly basis.

Since its establishment, the Bank's management has attempted to maintain a currency position within current standards.  At its weekly meetings, ALCO monitors the open foreign currency position in accordance with the prevailing market conditions and outlook, advises of the Bank's position and implements the Bank's strategy accordingly.  The Bank is permitted to maintain open positions in currencies of countries with sovereign ratings of "A" or better at a level not exceeding 12.5 per cent. of equity capital, with an overall limit on all currencies not exceeding 25 per cent. of equity capital.

The following table shows the net foreign currency positions of the Bank on an unconsolidated basis as at the dates indicated in the table:

| | As at 30 September 2009 | As at 31 December | |
| --- | --- | --- | --- |
| | | 2008 | 2007 |
| Net long/(short) position (U.S.$ millions) | (5,900) | 298 | 286 |
| Net position as a percentage of risk weighted capital | 60.5% | 6.6% | 7.4% |
| Net position as a percentage of foreign currency liabilities | (47.9)% | 2.0% | 2.1% |

The Bank is a party to a number of forward contracts for the purchase or sale of certain amounts of foreign currency (typically U.S. Dollars) or precious metals at an agreed upon price in Tenge with delivery and settlement at a specified future date, which are used for hedging purposes in managing currency risks.

**Interest Rate Risk**

Risk resulting from changes in interest rates is caused by the fact that changes in interest rates will affect future cash flows or fair value of financial instruments.  The following table demonstrates the sensitivity of the income statement of the Group on changes in interest rates.  Other parameters are in constants.

By sensitivity of the income statement is meant the impact of forecasted changes in interest rates on net interest income for one year, calculated based on financial assets and liabilities with a floating interest rate for the nine months ended 30 September 2009.  The sensitivity of equity is calculated by revaluing available-for-sale financial assets with a fixed rate for the nine months ended 30 September 2009, taking into account forecasted changes in interest rates based on the assumption (for each of the following tables) that yield curve is parallel.

| Currency | (Decrease)/increase in basis points 30 September 2009 | Sensitivity of net interest income 30 September 2009 | Sensitivity of equity 30 September 2009 |
| --- | --- | --- | --- |
| | (basis points) | (unaudited) (KZT millions) | |
| LIBOR: | | | |
| U.S.$ | -20/+20 | 407/(407) | 10/(10) |
| KZT | -20/+20 | (322)/322 | 63/(63) |
| Euro | -20/+20 | 153/(153) | — |
| CHF | -20/+20 | 57/(57) | — |
| JPY | -20/+20 | 349/(349) | — |

| Currency | (Decrease)/increase in basis points 31 December 2008 | Sensitivity of net interest income 31 December 2008 | Sensitivity of equity 31 December 2008 |
|---|---|---|---|
| | *(basis points)* | *(KZT millions)* | |
| **LIBOR:** | | | |
| U.S.$ .................................................. | -59/+59 | 2,372/(2,372) | 711/(711) |
| KZT .................................................. | -59/+59 | 1,699/(1,699) | 217/(217) |
| Euro .................................................. | -59/+59 | 1,080/(1,080) | — |
| CHF .................................................. | -59/+59 | 177/(177) | |
| JPY .................................................. | -59/+59 | 804/(804) | — |

| Currency | (Decrease)/increase in basis points 31 December 2007 | Sensitivity of net interest income 31 December 2007 | Sensitivity of equity 31 December 2007 |
|---|---|---|---|
| | *(basis points)* | *(KZT millions)* | |
| **LIBOR:** | | | |
| U.S.$ .................................................. | -46/+46 | 1,570/(1,570) | 1/(1) |
| KZT .................................................. | -46/+46 | 719/(719) | 168/(168) |
| Euro .................................................. | -46/+46 | 427/(427) | — |
| CHF .................................................. | -46/+46 | 90/(90) | |
| JPY .................................................. | -46/+46 | 806/(806) | — |

The following table sets out the effective average interest rates by currencies for interest earning financial instruments as at the dates indicated:

| | As at 30 September 2009 | | As at 31 December 2008 | | As at 31 December 2007 | |
|---|---|---|---|---|---|---|
| | KZT % | Foreign Currency | KZT | Foreign Currency | KZT | Foreign Currency |
| Financial assets at fair value through profit or loss ................. | 11.1 | 6.7 | 8.1 | 5.1 | 6.6 | 5.9 |
| Amounts due from other credit institutions ................................. | 12.9 | 5.3 | 9.7 | 7.8 | 7.6 | 10.1 |
| Available for sale investment securities ..................................... | 13.8 | 8.7 | 11.1 | 3.1 | 11.2 | 3.7 |
| Loans to customers ....................... | 16.5 | 17.1 | 17.8 | 12.1 | 17.8 | 13.0 |
| SK Bonds ..................................... | 7.7 | — | — | — | — | — |
| Amounts due to the NBK and the Government ................................. | 8.4 | 5.4 | 4.1 | 3.5 | 5.8 | 4.3 |
| Amounts due to credit institutions . | 9.0 | 5.3 | 7.9 | 6.2 | 8.4 | 7.1 |
| Amounts due to customers ............ | 8.6 | 9.6 | 10.1 | 7.4 | 8.8 | 6.3 |
| Debt securities issued ................... | 12.4 | 8.4 | — | 8.0 | 9.8 | 9.2 |

The Bank believes that its dependency on interest rates has increased as compared to that in 2008 and 2007, as interest rates across the world have become more volatile.

A number of external debts of the Group held during 2005-2008 had swap contracts focused on hedging against FX and interest rate risks.  During April and May 2009, LIBOR significantly dropped and since the Group pays variable interest rates linked to LIBOR on external debts, the Group assumes that the risk associated with interest rates on external debts will be immaterial in the near future.

Risk related to share price changes is the risk that the fair value of a share will decrease due to changes in the level of share price.  Risk related to share price changes pertains to investment and trade portfolios.

The risk of the Group relating to share instruments is measured using the capital asset pricing model which examines the profitability of shares depending on the behaviour of the market (or of the index influencing the share) as a whole.

The tables below demonstrate the effect on income and equity (due to changes in the fair value of equity instruments accounted by fair value through income and loss and available-for-sale) as a result of potential changes in share prices, with the usage of the capital assets determination model; other parameters are taken as constant. In the first table the model assesses the effects of positive movements in the relevant indices. In the second table the model assess the effects of negative movements in the relevant indices.

| Market index | As at 30 September 2009 | | |
|---|---|---|---|
| | Increase in indices | Effect on profit before tax and equity | Effect on profit before tax and equity |
| | *%* | *(unaudited), (KZT millions)* | *%* |
| KASE............................................ | 72.48 | 1,278 | 4.186 |
| MSCI World Index............................ | 16.58 | 3,526 | 11.550 |
| FTSE............................................ | 10.22 | 416 | 1.363 |
| MICEX.......................................... | 85.44 | 50 | 0.165 |
| NYSE........................................... | 13.70 | 44 | 0.143 |
| **Total of weighted average changes of all indices influencing the portfolio**............... | **30.15** | **5,314** | **17.41** |

| Market index | As at 30 September 2009 | | |
|---|---|---|---|
| | Decrease in indices, | Effect on profit before tax and equity | Effect on profit before tax and equity |
| | *(unaudited), %* | *(KZT millions)* | *(unaudited), %* |
| KASE............................................ | -72.48 | (898) | -2.940 |
| MSCI World Index............................ | -16.58 | (2,574) | -8.431 |
| FTSE............................................ | -10.22 | (488) | -1.599 |
| MICEX.......................................... | -85.44 | (50) | -0.165 |
| NYSE........................................... | -13.70 | (41) | -0.135 |
| **Total of weighted average changes of all indices influencing the portfolio**............... | **-29.03** | **(4,051)** | **-13.27** |

## Operational Risk

Operational risk includes risks related to a system failure, errors of personnel, fraud or external causes. When control systems cease to function, operational risk can damage reputation and may lead to legal proceedings and/or financial losses. The Group cannot eliminate operational risks, but it manages it by means of a control and track system. This control system involves implementing effective allocation of responsibilities, rights of access, authorisation and verification procedures, personnel training and evaluation procedures, including internal audits.

The Bank introduced new operational risk management software in 2009 in order to build an effective risk management system in line with international standards. The Bank further introduced new risk management tools, such as risk maps, a database for damages in order to measure operational losses, improved risk self-assessment in its various departments and detailed reports in respect of operational risks. The new database allows the Bank to track in a timely manner the potential damages due to operational risks in order to prevent or mitigate such risks and to assess whether compensation is due for such risks from individuals or insurance companies. The database also allows the Bank to track operational risks and analyse the possibility of future risks. The Bank also hired outside consultants to develop and implement a business continuity management system, which was approved by the Board of Directors along with a crises management plan for the Bank, emergency situation action plan and activities recovery plans of each of the Bank's key departments.

## Lending Policies and Procedures

### General

The Bank's credit approval process is based on applicable NBK and the FMSA regulations, as well as internal procedures established by the Management Board as approved by the Board of Directors. The FMSA regulations limit the exposure to any single borrower or group of borrowers to 10 per cent. of a bank's equity for related parties and to 25 per cent. of a bank's equity for non-related parties. The Bank will agree additional restrictions on single party and related party exposures under the New Notes.

All applications for credit by corporate and retail customers must be submitted to the Bank on its standard forms. Depending on the type of borrower and industry sector, the application is reviewed at brand level if the borrower is an SME or an individual and by the Bank's credit analysis and corporate business departments, if the borrower is a large corporation.

After an application is received by the credit analysis and corporate business departments or the relevant branch (as the case may be) an expert opinion is prepared, which contains both a feasibility evaluation of the project to be financed and information on the financial standing, reputation and experience of the potential borrower. Simultaneously, the credit analysis and corporate business departments or the relevant branch make requests to the following departments for separate research:

- the Bank's Economic Security Department is asked to obtain references from other banks and information from criminal records of the Interior Ministry;

- an outside firm is asked to make an independent assessment of the collateral being offered; and

- the Legal Department is asked to examine the potential borrower's documents for compliance with current legislation.

On the basis of the expert opinion and other reports the relevant credit analysis and corporate business departments conduct an independent risk assessment.

All corporate customers of the Bank are assigned an internal credit rating by the Bank's credit analysis and corporate business departments.

Depending on the amount sought in the credit application, a credit application is examined by the appropriate credit decision-making body of the Bank for a final decision on the approval of the application as follows:

- the Credit Committee of each branch is authorised to take decisions within lending limits established for each branch by the Credit Committee of the Head Office; this authority varies depending on the size of the branch, quality of the loan portfolio and needs of the branch's business;

- the Retail Loans Credit Committee is responsible for improving the Bank's retail loan portfolio structure and is authorised to take decisions on retail loans applications for short and long term financings up to U.S.$1,000,000 (or the equivalent);

- the Branch Network Credit Committee is authorised to take decisions on financings of up to U.S.$5,000,000 (or the equivalent) for investments and up to U.S.$10,000,000 (or the equivalent) for the replenishment of working capital; and

- the Head Office Credit Committee is authorised to take decisions on large credit contracts in excess of U.S.$5,000,000 (or the equivalent) for investments and up to U.S.$10,000,000 (or the equivalent) for the replenishment of working capital.

***Credit Dossiers***

Under normal circumstances, the Bank creates a dossier of information for each loan that it provides, including original loan agreements, security and title documents as well as up to date financial statements supplied by borrowers, opinions prepared by internal Bank departments (*e.g.*, Risk Management Department, Department of Economic Security, Legal Department and Division of Collateral Expertise), and on-going confirmations that the loans are used for the purposes provided under the original loan agreements.

In the course of the management's review of the Group's loan portfolio in early 2009, it was discovered that several deficiencies existed in the existing credit dossiers. See "*Risk Factors — Risks Relating to the Bank — The Bank's credit dossiers have serious gaps and many documents are*

*missing"*.  In particular, the credit dossiers of loans provided to borrowers in the CIS businesses that were held by BTA Russia and BTA Ukraine have not been recovered or have exhibited deficiencies.

The Bank currently is developing an electronic dossiers system, which will allow it to minimise some of the operational risks associated with credit dossiers.  In addition, the Bank plans to store all original documents at a special storehouse with the Economic Security Department, and employees will work only with electronic dossiers to minimise risks of loss or substitution of client documents.  The transition to a system of electronic dossiers is planned to be implemented during 2010–2011.

**Loan Supervision and Monitoring**

The Bank's Department of Credit and Operational Risk, operates independently from the loan approval process and is responsible for monitoring the Group's loan portfolio and determining allowances and provisions.  In order to determine adequate allowances and provisions, loans are classified by their perceived risk in accordance with criteria set out in the Bank's policies and with the requirements of the FMSA and of IFRS.  The Department of Credit and Operational Risk also conducts evaluations of other assets and off balance sheet contingent liabilities.

In 2006, the Department of Credit and Operational Risk changed its methodology for the assessment of the quality of the Group's credit portfolio in line with FMSA requirements, reclassifying all loans in accordance with IAS 39 as at 31 December 2006.  The assessment procedure was divided into individual assessment of the loans and collective assessment of the "pool" of loans.  According to IAS 39, the losses relating to amortised financial assets are measured on the basis of the "incurred loss model" as opposed to the "expected loss model".  This means that the loss is recognised only if there is objective evidence of an event of loss.

For the purposes of individual loan assessment, objective evidence of the impairment resulting from the event of loss is required.  Thereafter, potential default risk is assessed and the amount due for repayment is calculated.

For the purposes of the collective assessment, loans having similar credit risk characteristics are pooled together by sector, type of product, region, or otherwise.  Reserves required to be made in respect of such pools of loans are estimated on the basis of the historic losses for the loans within the relevant pool over a specified period (the Bank currently uses the period from 2004 to 2008 as its base period).  "Historic losses" are defined by reference to the amounts of loans outstanding and written off during the base period.

The following table sets out certain information relating to the Group's loan portfolio, by classification as at 30 September 2009 in accordance with IAS 39 standards:

|  | As at 30 September 2009 | | | |
|  | Indebtedness | % of total loans | Provisions | Provisions/ Indebtedness |
| --- | --- | --- | --- | --- |
|  | *(KZT millions)* | | | |
| Individual loans | 2,389,390 | 75 2% | 2,022,616 | 84.6% |
| Pooled loans | 786,774 | 24.8% | 46,307 | 5.9% |
| **Total loan portfolio** | **3,176,164** | **100.0%** | **2,068,923** | **65.1%** |

In classifying the Group's loan exposure, the Department of Credit and Operational Risk performs detailed credit reviews and assesses the borrower's financial condition and operating results to determine if these have deteriorated since the origination of the loan, the current performance of the borrower with regards to the timely repayment of principal and interest and whether any extensions of interest or principal payments have been granted or other modifications have been made to the original loan agreement, the quality and quantity of any collateral provided, the purpose of the loan and whether there has been any unauthorised use of the loan proceeds.  In addition to these assessments, the Department of Credit and Operational Risk performs other analytical procedures and takes into consideration any macro and microeconomic factors specifically relating to the Kazakhstan economy and the relevant industry sector.

The Department of Credit and Operational Risk controls the execution of loan policy and establishes risk limits by products, counteragents, transactions, branches and persons authorised to make lending decisions. The Department of Credit and Operational Risk provides weekly and monthly reports to the Bank's management detailing all aspects of the Bank's credit activity. Immediate action is taken by the departments having responsibility for supervising and monitoring loan repayments if any issue arises with respect to repayment of principal or accrued interest. The Bank's determination of whether a repayment issue has arisen is based on a number of objective and subjective criteria, including changes to the borrower's turnover in accounts held by the Group, changes to the borrower's economic and financial activity giving rise to the suspicion that a loan is not being used for its intended purpose, applications to change credit terms, failure of the borrower to fulfil the terms and conditions of its loan agreement and refusal of a borrower to cooperate in providing updated information.

The Bank's Department of Credit and Operational Risk is also involved in overseeing the risk management activities of the target banks in which the Group holds an interest, including BTA Belarus, BTA Kazan, BTA Georgia and BTA Armenia. While these local banks maintain their own risk management division, their policies have been streamlined with those of the Bank and only the Bank has approval authority with respect to any loan in excess of defined limits.

The Bank adopted detailed anti-money laundering policies, including extensive "know-your-client" regulations, in 1995. On 28 August 2009, the Government passed the law "On counter measures to legalisation of income received in illegal ways (money laundering) and to financing of terrorism", which came into force from 9 March 2010. The Bank is currently reviewing its existing "know your client" and anti-money laundering, antiterrorism financing policies to ensure that its activities comply with the new law.

Any overall deterioration in the quality of the Group's loan portfolio or increased exposure relating to off-balance sheet contingent liabilities is brought to the attention of the Bank's Management Board.

**Non-Performing Loans**

Non-performing loans are loans where the payment of principal is past due and interest is past due for more than 90 days. The percentage of non-performing loans to gross loans was 63.0 per cent. as at 30 September 2009 and 2.1 per cent. as at 30 September 2008.

As at 30 September 2009, the Group's gross loans increased by 5.2 per cent. to KZT 3,176,164 million from KZT 3,018,937 million as at 30 September 2008. The provisions on loans increased more than six-fold to KZT 600,354 million as at 30 September 2009 from KZT 79,466 million as at 30 September 2008. This increase principally reflected the increase in the volume of problem and overdue loans, and also due to the practical assessment of risks by the Bank and adequate reserves for coverage of potential losses.

The Bank undertakes the following actions with regards to non performing loans: (i) devises an action plan for collection of such loans; (ii) conducts an analysis of the relevant company's financial results and activities; (iii) approves a debt repayment schedule considered to be realistic by both the Bank and the borrower; (iv) continuously monitors cash flows of the relevant company; and (v) requires additional collateral to secure such loans. As at 30 September 2009, the ratio of the Group's provisions to gross loans was 65.1 per cent. compared to 6.8 per cent. as at 30 September 2008.

The action plans may consist of any one or more of the following actions by the Bank: (i) negotiation with the borrower to restructure the underlying debt obligation; (ii) pursuit of out-of-court enforcement against the collateral; (iii) out-of-court enforcement against the collateral with simultaneous judicial enforcement; (iv) enforcement against debtors of the borrower for amounts owed to the borrower; (v) initiation of bankruptcy proceedings against the borrower; and (vi) pursuit of remedies through other legal bodies. Ultimately, the Department of Problem Loans will decide on the appropriate action plan. The Recovery Units contain certain covenants relating to Recoveries in

respect of non-performing Loans. (See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 4 (*Terms and Conditions of the Recovery Units*)).

In the event that the Bank pursues debt restructuring with the borrower, the Bank may take one or more of several actions in respect of the underlying loan agreement, including modifying or extending the repayment schedule, changing the interest rate on the loan, cancelling or suspending penalties and fines, providing a repayment grace period or exchanging the debt for an equity interest in the borrower. The Bank may also pursue business restructuring, which may include negotiating with the borrower's debtors to encourage repayment, transferring its claims to third parties and assisting the borrower to find new participants in its business. Finally, the Bank may assist the borrower with organisational restructuring, including transferring the borrower's fixed assets to leases to third parties or affiliates of the Bank and providing guidance on asset management.

In the course of the management's review of the Group's internal control processes in early 2009, it was discovered that deficiencies existed that may have contributed to increased levels of non-performing loans. See "*Risk Factors — Risks Relating to the Bank — Internal Control Weaknesses have been evidenced by several transactions in the past and other unusual transactions may be uncovered in the future*". Failure by the Bank to adhere to their current internal control processes could lead to similar issues in the future.

**Provisioning Policy**

The provisions calculated for regulatory purposes for unconsolidated Bank's compliance information forms are based on FMSA Methodology and differ from provisions calculated based on IFRS presented in the Group's consolidated Financial Statements. In determining provisions, the main difference between FMSA Methodology and IFRS is the treatment of collateral. According to the FMSA methodology, provisions are created against amounts of principal of outstanding loans without taking into account accrued interest and without taking into account the value of collateral in the case of collateralised loans. With respect to the uncollateralised loans, banks must provide provisions equal to 5.0 per cent. of the loan amount in respect of each new loan. With respect to collateralised loans, the provisioning rate is zero per cent. for loans classified as "standard", 5.0 per cent. for loans classified as "doubtful 1st category", 10.0 per cent. for loans classified as "doubtful 2nd category", 20.0 per cent. for loans classified as "doubtful 3rd category", 25.0 per cent. for loans classified as "doubtful 4th category", 50.0 per cent. for loans classified as "doubtful 5th category", and 100.0 per cent. for loans classified as "loss". In addition, according to the FMSA methodology, banks are not required to create provisions against accrued interest. Under the IFRS methodology applied by the Bank, provisions are created against amounts of loans including accrued interest but less the discounted value of collateral in the case of collateralised loans. For IFRS, provisioning rates are determined based on the type of loan (retail or corporate) and the size of the loan. For retail loans and corporate loans not exceeding KZT 5,000 million, the Bank determines provisions based on the "roll rate" approach applied to homogenous pools of retail and SME loans, which takes into account the historical performance of each pool and does not take into account collateral value, as under the FMSA approach. See "*Loan Supervision and Monitoring*". For corporate loans exceeding KZT 5,000 million, the Bank conducts an individual analysis of each borrower's cash flow and the market value of collateral in order to determine provisions. For insignificant loans (i.e., loans of less than KZT 5,000 million) as at 30 September 2009, the Bank assessed the level of impairment of such loans on an individual basis for calculation of fair market value.

**Write-off Policy**

The Bank writes-off loans that are past due by 360 days or more or at such earlier time as it is evident that a loss has been sustained and no amounts will be collected, in accordance with the conclusions of the Security Department and the Legal Department. Once a loan has been written-off or fully provisioned, the Security Department, the Problem Loans Department and Management for the Expert Assessment and Monitoring of Security for Credits will commence monitoring the loan and its collateral for a five year period.

The following table sets out an analysis of the Group's allowance for loan impairments, including allowance in respect of amounts due from credit institutions, for the periods indicated:

| | For the nine months ended 30 September 2009 | For the year ended 31 December 2008 | For the year ended 31 December 2007 |
|---|---|---|---|
| | | *(KZT millions)* | |
| Beginning allowance balance | 1,221,717 | 137,166 | 70,270 |
| Impairment charge for losses | 641,604 | 1,094,300 | 67,810 |
| Write-offs | (37,826) | (10,529) | (6,891) |
| Recoveries | 1,730 | 4,712 | 5,723 |
| Foreign currency revaluation | 289,161 | (1,320) | 2 |
| Amounts arising on business combination | — | (2,612) | 252 |
| **Ending allowance balance** | **2,116,386** | **1,221,717** | **137,166** |
| Write-offs | (37,826) | (10,529) | (6,891) |
| Recoveries | 1,730 | 4,712 | 5,723 |
| **Net write-offs** | **(36,096)** | **(5,817)** | **(1,168)** |

Net write offs for the nine months ended 30 September 2009 increased by 130.1 per cent. to KZT 36,096 million, compared to net write offs of KZT 15,689 million as at 30 September 2008. The following table sets forth certain ratios of the Group's write-offs with respect to loans to customers for periods indicated:

| | For the nine months ended 30 September 2009 | For the year ended 31 December 2008 | For the year ended 31 December 2007 |
|---|---|---|---|
| | | *(%)* | |
| Percentage of net write-offs to gross loans (excluding accrued interest) | 1 25% | 0.23% | 0.03% |
| Percentage of net write-offs to the opening reserve balance | 3.0% | 4.5% | 1.2% |
| Percentage of recoveries to write-offs | 4.6% | 41.8% | 87.6% |

Net write-offs as a percentage of gross loans increased from 0.03 per cent. for the year ended 31 December 2007 to 0.23 per cent. for the year ended 31 December 2008 and to 1.25 per cent. for the nine months ended 30 September 2009, reflecting the continuing deterioration in the Group's overall asset quality over the period.

The ratio of recoveries to write-offs fluctuated throughout each of the years ended 31 December 2008 and 2007 and during the nine months ended 30 September 2009. It is difficult to assess the reasons for this fluctuation due to the timing of a write-off and the date when a recovery is made. The discounting of bad loans is not permitted in Kazakhstan and accordingly the Bank must pursue other methods of recovery. There is no industry concentration in the Group's bad loans. The Bank continues to focus on improving its bad debt recovery ratio, although no assurance can be made that any significant improvement will be achieved in the future.

## MANAGEMENT AND CORPORATE GOVERNANCE

The General Meeting of Shareholders is the highest corporate governing body of the Bank.  The Charter provides that the Bank shall have a Board of Directors and a Management Board.  The JSC Law vests in the board of directors the final approval of the majority of corporate decisions, although the final approval of certain major corporate decisions is vested in the General Meeting of Shareholders.  In accordance with Kazakhstan legislation, members of the Board of Directors are elected and their powers may be terminated early at any time by the General Meeting of Shareholders.  The Chairman of the Board of Directors and Members of the Management Board are elected and their term of office may be terminated early by the Board of Directors.  The appointment of the Chairman, members of the Board of Directors and members of the Management Board is subject to the consent of the FMSA.

**Management and Corporate Governance Following the Restructuring**

The Bank intends to implement a number of changes to the Bank's management and corporate governance after the Restructuring Plan is approved.  The structure of the Bank's management bodies will remain unchanged and will consist of the General Meeting of Shareholders, the Board of Directors and the Management Board.  However, approval matters, composition of certain management bodies and financial and information reporting will be amended to improve the Bank's corporate governance.

***Board of Directors***[9]

The Bank expects that a new Board of Directors will be appointed following the Restructuring, consisting of nine members, including four directors nominated by Samruk-Kazyna, two Creditor Directors nominated by the Steering Committee (one appointed on behalf of the holders of the Senior Dollar Notes and one appointed on behalf of the holders of the OID Notes) and three Independent Directors nominated by the Corporate Management and Appointments Committee.

A director is considered "independent" only if he (unless, in the case of the initial Independent Directors, the Steering Committee otherwise agrees): (i) has not been a director or an employee of the Bank or Samruk Kazyna (or any Affiliate of either) within the five years prior to 6 March 2009; (ii) has not had, within the last three years, a material business relationship with the Bank or Samruk-Kazyna (or any Affiliate of either); (iii) has no close family ties with any of the (current or former) advisers, directors or senior employees of the Bank and; (iv) holds no cross-directorships or significant links with other directors through involvement in other companies or bodies.  Notwithstanding this definition, Yurki Talvite and Konstantin Korishenko will be deemed to be "independent".

Where the current Creditor Director appointed by Senior Dollar Noteholders has resigned or has been removed:

(i)      the Bank shall give notice of such event to the relevant New Notes Trustee;

(ii)     promptly thereafter, a meeting of the Senior Dollar Noteholders shall be called and the quorum at such meeting shall be Senior Dollar Noteholders holding in aggregate not less than 5 per cent. of the total Senior Dollar Notes then outstanding;

(iii)    at such meeting any candidate nominated by any holder of Senior Dollar Notes shall be nominated to be the replacement Creditor Director and, in addition, the Bank shall nominate a candidate to be the replacement Creditor Director;

---

[9] If the Senior Tenge Notes are governed by English law then all references herein to "Senior Dollar Notes" and "Senior Dollar Noteholders" should be read as "Senior Notes" and "Senior Noteholders".

(iv)     provided the meeting of the Senior Dollar Noteholders is quorate:

    (A)     if the candidate nominated by any Senior Dollar Noteholders is approved by holders of Senior Notes present in person or by proxy holding 25 per cent. of the total number of Senior Notes held by all Senior Dollar Noteholders present in person or by proxy (or if greater, a simple majority of those voting) at the meeting then the New Notes Trustee shall instruct the Bank and Samruk Kazyna to elect such person to the Board of Directors; or

    (B)     if such number of Senior Dollar Noteholders do not approve the candidate nominated by the Senior Dollar Noteholders (if any) then, unless by Senior Dollar Noteholders holding 25 per cent. or more of the Senior Notes reject the candidate nominated by the Bank, then the New Notes Trustee shall instruct the Bank and Samruk Kazyna to elect the Bank's nomination to the Board of Directors.

Where the current Creditor Director appointed on behalf of holders of the OID Notes has resigned or has been removed:

(i)     the Bank shall give notice of such event to the New Notes Trustee;

(ii)     promptly thereafter, a meeting of the holders of the OID Notes shall be called and the quorum at such meeting shall be OID Noteholders holding in aggregate not less than 5 per cent. of the total Discounts Notes then outstanding;

(iii)     at such meeting any candidate nominated any holder of OID Notes shall be nominated to be the replacement Creditor Director and, in addition, the Bank shall nominate a candidate to be the replacement Creditor Director;

(iv)     provided the meeting of the holders of OID Notes is quorate:

    (A)     if the candidate nominated by any holder of OID Notes is approved by holders of OID Notes present in person or by proxy holding 25 per cent. of the total number of OID Notes held by all holders of OID Notes present in person or by proxy (or if greater, a simple majority of those voting) at the meeting then the New Notes Trustee shall instruct the Bank and Samruk Kazyna to elect such person to the Board of Directors; or

    (B)     if such number of holders of OID Notes do not approve the candidate nominated by the holders of OID Notes (if any) then, unless by holders of OID Notes holding 25 per cent. or more of the OID Notes reject the candidate nominated by the Bank, then the New Notes Trustee shall instruct the Bank and Samruk Kazyna to elect the Bank's nomination to the Board of Directors.

In the event any meeting of the holders of the Senior Dollar Notes or OID Notes described above does not produce a candidate to be elected as the replacement Creditor Director, a further meeting(s) shall be called and held on the same basis.

The Trustee and Samruk-Kazyna, respectively, will have the right to remove and replace any respectively nominated directors.  In the case of the Creditor Director appointed by Senior Dollar Noteholders, such holders holding in aggregate more than 25 per cent. or more of the outstanding Senior Dollar Notes may by notice to the New Notes Trustee require the resignation of that Creditor Director.  In the case of the Creditor Director appointed on behalf of the holders of the OID Notes, such holders holding in aggregate more than 25 per cent. or more of the outstanding may by notice to the New Notes Trustee require the resignation of that Creditor Director.

Unless a Creditor Director resigns or is removed as described above, each will be appointed for a term lasting up to the later of Minority Protection Expiry Date.  Following such date, the Creditor Director

may be removed from the Board of Directors without the consent of the Trustee and no replacement Creditor Director will be appointed.

### Committees of the Board of Directors

If the Restructuring Plan is approved and the new composition of the Board of Directors becomes effective, the Bank expects that the Audit Committee and the Risk Committee will be reconstituted so that at least one Creditor Director (if then appointed to the Board) shall on each.

### New Corporate Governance Code

The Bank will implement a New Corporate Governance Code following the Restructuring. The Bank expects that the New Corporate Governance Code will cover the following areas:

(i) the Board of Directors' role and responsibilities, including independence of directors, and the audit committee establishment of a remuneration committee, clear policies for risks and controls and clear terms of reference for key Board committees;

(ii) competence of Board members, including their selection and election criteria, training, individual and collective evaluation of performance, rotation and reappointment (subject to FMSA approval) and effective supervision;

(iii) internal controls and risk management, including a sound system of internal controls and financial reporting, risk-based management approach and risk-based capital management, identification and control of risks, quality of management information, restrictions on related party transactions and approval structures and limitations;

(iv) disclosure and reporting, including director remuneration, Board activities, financial reporting, communication with shareholders and external stakeholders, and evidence of embedded principles, standards and processes; and

(v) relationship with and independence from major shareholders.

### Independent Compliance Audit

Following the Restructuring, the Bank will arrange for an annual audit of the Bank's Corporate Governance Code and (or New Corporate Governance Code as relevant) internal procedures and controls to be conducted by an independent "big four" accounting firm and will endeavour to remedy any identified non-compliance within six months of the date of such audit report.

### New Charter

The Bank is in the process of preparing a New Charter that will reflect changes to the approval matters and required majorities. As currently proposed, the New Charter will indicate those matters that require the approval of: (a) a Supermajority of Shareholders (requiring (i) the approval of 75 per cent. or more of the total number of Shares and (ii) *provided that* the GDRs then in issue represent 5 per cent. or more of the total Shares then in issue and provided the Depositary casts at least one vote on the relevant resolution, the approval of at least 2/3 of the votes cast by the Depositary on behalf of GDR Holders eligible to vote); (b) a majority of the Board including both of the Creditor Directors and at least one Independent Director; or (c) a simple majority of the Management Board of the Bank. See "*Description of Share Capital and Certain Matters of Kazakhstan Law — New Charter*". The draft New Charter, however, remains subject to further review of the Bank and the approval of the relevant governmental bodies and therefore the types of approval matters and the required majorities for approval of such matters may change after the New Charter is finalised and registered. Although the Bank has discussed the New Charter with the FMSA and has received its in principle approval of certain provisions thereof, some of the provisions expected to be incorporated into the New Charter have never been tested under Kazakhstan law and the Bank gives no assurances that the applicable governmental and regulatory authorities will hold

such provisions to be in compliance with Kazakhstan law.  If such provisions are not found to be in compliance with Kazakhstan law by the applicable governmental and regulatory bodies they may refuse to register the New Charter.  Therefore, certain protections which the Bank is seeking for its shareholders may not be available and there is the risk that the New Charter will not contain certain of the proposed amendments as described herein.  See "*Risk Factors — Risks Relating to the Restructuring — Certain provisions of the New Charter may not comply with the requirements of Kazakhstan law and shareholders of the post-restructured Bank may therefore not receive the protections afforded by the New Charter described in this Information Memorandum*".

**Current Management and Corporate Governance**

***Board of Directors***

The Board of Directors is a permanently functioning body involved in the general management of the Bank's activities during the period between General Meetings of Shareholders except for the matters specifically reserved by the legislation of the Republic of Kazakhstan and the Bank's Charter as being within the exclusive authority of the General Meeting of Shareholders.  The powers of the Board of Directors (subject to the overview of the General Meeting of Shareholders) include deciding on the strategy of the Bank, defining the investment, credit and other policies of the Bank, nominating the Chairman and members of the Management Board, approving material contracts, calling General Meeting of Shareholders approving the Bank's budget, establishing and closing branches and representative offices, adopting decisions of the Bank on the acquisition of 10 per cent. or more of the shares in another legal entity and increases in the Bank's liabilities in excess of 10 per cent. of its equity capital.  In addition, the JSC Law requires that at least one third of the members of a company's Board of Directors must be independent directors.  All members of the Board of Directors are elected for an indefinite term.

As at 1 February 2009, immediately prior to the acquisition by Samruk-Kazyna of control of the Bank, the Bank's Board of Directors consisted of Mukhtar Ablyazov, Yerlan Tatishev, Talgat Akhsambiyev, Yurki Talvitie (Independent Director), Akmaral Ablyazova, Roman Solodchenko, Yerkin Tatishev and Tatiana Paramonova (Independent Director).

As at the same date, the Management Board of the Bank consisted of Roman Solodchenko, Dmitriy Gladkov, Timur Sabyrbayev, Raimkhan Uzbekgaliyev, Kunsulu Kapbasova, Indira Izteleuova, Khalil Kamalov, Botagoz Jardemalie, Murat Yuldashev, Karlygash Yezhenova, Genrikh Kholodzinskiy, Bakhyt Otar bekov and Zhaksylyk Zharimbetov.

Certain members of the Board of Directors and the Bank's former management have fled Kazakhstan and the Bank has commenced legal proceedings in the High Court of Justice of England and Wales in London against Mukhtar Ablyazov, the former Chairman of its Board of Directors, Roman Solodchenko, the former Chairman of its Management Board and Zhaksylyk Zharimbetov, the former First Deputy Chairman of its Management Board.  See "*Risk Factors — Risks Relating to the Bank — Internal control weaknesses have been evidenced by several transactions in the past and other unusual transactions may be uncovered in the future*".  In February and March 2009, eight of the nine members of the Board of Directors were replaced.

The Board of Directors consists of nine members.  The following persons are the members of the Board of Directors as at the date of this Information Memorandum:

| Name | Position | Director Since |
| --- | --- | --- |
| Arman Dunayev........................................ | Chairman | 2 February 2009 |
| Anvar Saidenov...................................... | Member | 2 February 2009 |
| Abay Iskandirov..................................... | Member | 6 March 2009 |
| Kairat Aitekenov.................................... | Member | 6 March 2009 |
| Aidan Karibzhanov ................................. | Member | 6 March 2009 |
| Ulf Wokurka ........................................... | Member, Independent Director | 6 March 2009 |
| Konstantine Korishchenko...................... | Member, Independent Director | 6 March 2009 |
| Yerlan Tatishev....................................... | Member | 6 March 2009 |
| Yurki Talvite........................................... | Member, Independent Director | 7 September 2006 |

The business address of all members of the Board of Directors is 97 Zholdasbekov Street, "Samal 2" Microdistrict, Almaty 050051, Republic of Kazakhstan.

*Arman Dunayev — Chairman, Board of Directors*.  Mr. Dunayev graduated from Kazakh State University named after Kirov in 1988, majoring in Political Economy, and received a Candidate of Economic Science degree at Moscow State University named after M. Lomonosov in 1991.  During the period from 1992 to 1993 Mr. Dunayev worked within local state executive bodies in management positions.  For the next seven years, he worked in the head offices of holdings and a commercial bank in positions of increasing responsibility.  Mr. Dunayev returned to state service in 2000.  He was appointed Director of the Department of State Borrowing, Finance Ministry of the Republic of Kazakhstan from 2000 until May 2001.  From May 2001 until September 2002, Mr. Dunayev held the post of Vice-Minister of Finance of Kazakhstan.  On 4 September 2002, Mr. Dunayev was appointed Vice-Minister of Economics and Budget Planning.  In June 2003 he was appointed Chairman of the "**National Innovation Fund**" CSC and First Vice-Minister of Finance from March to April 2004.  From January 2006 to January 2008, Mr. Dunayev was the Chairman of the FMSA.  From January until October 2008, Mr. Dunayev was Chairman of JSC "Sustainable Development Fund Kazyna" and from October 2008 until February 2009, Vice-Chairman of Samruk-Kazyna.  On 3 February 2009 Mr. Dunayev was appointed Chairman of the Board of Directors by the decision of the Board of Directors.

*Anvar Saidenov — Member of the Board of Directors*.  Mr. Saidenov graduated magna cum laude from the Economic Faculty of Moscow State University named after M. V. Lomonosov and received a qualification of Economist and Lecturer of Political Economy.  Mr. Saidenov further received a Master of Science degree in Financial Economics from London University in 1994 and a degree of Candidate of Economic Science degree from Moscow University.  Mr. Saidenov's started his professional career as a Lecturer and Head of Sector at the Social and Economic Disciplines at Dzhambul Irrigation and Construction Institute.  In 1994, Mr. Saidenov joined EBRD as a consultant and banker in London.  In 1996, he was appointed Deputy Governor of the NBK and in 1998 was appointed Executive Director of the State Investment Committee.  During the period from January to August 1999, Mr. Saidenov held the post of Chairman at the Investment Agency of the Republic of Kazakhstan that was followed by his appointment as Vice-Minister of Finance of Kazakhstan until August 2000 when he was appointed Chairman of the Executive Board at "National Savings Bank" JSC.  In June 2002 Mr. Saidenov joined the NBK first as Deputy Governor and then as of January 2004 as Governor.  On 2 February 2009 Mr. Saidenov was appointed Member of the Board of Directors.  On 16 February 2009 he was appointed acting Chairman of the Management Board of the Bank by a decision of the Board of Directors.  On 21 February 2009, he became Chairman of the Management Board.

*Abai Iskandirov — Member of the Board of Directors.*  Mr. Iskandirov received a law degree from the Kazakh State Law University in 2003, an LLM degree from Oxford Brookes University in 2004 and MSc IM from Oxford Brookes University in 2005.  Mr. Iskandirov's professional experience started in 2005 at the Ministry of Economics and Budget Planning where he held positions of increasing

responsibility, from Specialist to Deputy Director.  In October 2006 Mr. Iskandirov joined Fund for Sustainable Development "Kazyna" JSC as Director Systems Project, and then Director of Corporate Development, Director of Investment and Managing Director effective September 2007.  In 2008, Mr. Iskandirov was appointed Deputy Leader at the Centre of Strategic Development and Analysis at the President's Office.  In October 2008, he was appointed Managing Director of Samruk-Kazyna. On 6 March 2009, he was appointed Member of the Board of Directors.

*Kairat Aitekenov — Member of the Board of Directors.*  Mr. Aitekenov graduated from Almaty Institute of National Economy and qualified as an Economist in 1985.  In 1997, Mr. Aitekenov graduated from the National Higher School of State Management under the auspices of the President's Office from the faculty of "Public Administration".  Mr. Aitekenov's professional experience includes positions at Kostanay Oblast Committee on Price and Antimonopoly Policy, Agency of Strategic Planning of the Republic of Kazakhstan and Ministry of Natural Resources and Environment Protection of the Republic of Kazakhstan.  During the period from August 2003 to February 2006, Mr. Aitekenov held the post of Vice-Minister of Economics and Budget Planning of the Republic of Kazakhstan and Vice-Minister of Tourism and Sports from August 2006 to August 2007.  In September 2007, Mr. Aitekenov was appointed Deputy Chairman on Government Affairs and Operations of Samruk-Kazyna.  On 6 March 2009, he was appointed Member of the Board of Directors.

*Aidan Karibzhanov — Member of the Board of Directors.*  Mr. Karibzhanov graduated from Moscow State Institute of International Relations under the auspices of the Ministry of Foreign Affairs of the Russian Federation from the faculty of "International Economic Relations".  Mr. Karibzhanov has professional experience as a consultant and top manager with the State Privatization Committee of the Russian Federation, Representative Office of Credit Commercial De France in Kazakhstan, as 1st Vice-Chairman at Investment Bank Global Kazkommerts CSC, as Director at Kazkommerts Securities and as Managing Director of Kazmunaygaz CJSC.  During the period from August 2005 to February 2007, Mr. Karibzhanov was President at "VISOR Investment Solutions" JSC.  In December 2008, Mr. Karibzhanov was appointed Managing Director at Samruk-Kazyna.  On 6 March 2009, he was appointed Member of the Board of Directors.

*Ulf Wokurka — Independent Member of the Board of Directors.*  Mr. Wokurka graduated from the University named after Martin Luther in Germany and from Moscow State Institute of International Relations under the auspices of the Ministry of Foreign Affairs of the Russian Federation from the faculty of International Relations.  Mr. Wokurka's professional experience started in 1990 at Deutsche Bank AG.  From 1993 until 1994 he headed the Representative Offices of Deutsche Bank AG and Morgan Grenfell & Co.  Limited in Kazakhstan.  In 1996 Mr. Wokurka worked in Deutsche Bank's Primary Commodities Group.  From 2006 until 2008 he held a post of Vice-Chairman and Member of the Executive Board at State Assets Management Holding Company "Samruk".  Mr. Wokurka has been a member of the International Council of the Regional Financial Centre Almaty since February 2007, Independent Director of the Board of Directors at Kazakhstan Development Bank since April 2007 and Independent Director of the Board of Directors of Kazyna Capital Management JSC since September 2007.  On 6 March 2009 Mr. Wokurka was appointed Independent Director of the Board of Directors.

*Konstantine Korishchenko — Independent Member of the Board of Directors.*  Dr. Korishchenko graduated from Moscow State University named after M. V. Lomonosov from the faculty of "Applied Mathematics".  Dr. Korishchenko holds a Ph.D. in Economics.  During the period from 1984 until 1988, Dr. Korishchenko worked at the Scientific Research Institute "Scientific Centre" as an engineer, then joined the All State Scientific Research Institute for polygraphic industry.  From 1992 to 1995, Dr. Korishchenko worked in the Securities Department of the Central Bank of the Russian Federation as Secondary Market Department Manager and as Deputy Head of the Exchange Department.  Over the next five years, Dr. Korishchenko served as the Deputy Director and the Director of Open Market Operations at the Securities Department of the Central Bank.  From 2000 to 2001, Dr. Korishchenko was the President at the Non-profit Partnership "RTS Exchange".  From 2001 to 2002 he held the post of Managing Director at "Investment Company Troika Dialog" CJSC.  From July 2002 until

September 2008 Dr. Korishchenko, was Vice-Chairman and Member of the Board of Directors of the Central Bank of the Russian Federation.  Since September 2008 Dr. Korishchenko has served as President of the Russian Exchange "Moscow Interbank Currency Exchange — Information Technologies".  On 6 March 2009, Dr. Korishchenko was appointed Independent Director of the Board of Directors.

*Yerlan Tatishev — Member of the Board of Directors*.  Mr. Tatishev graduated from Almaty Institute of National Economy in 1991, majoring in "Planning of National Economy" and received his qualification as an "economist".  In 1993-1994, he worked as Vice-Chairman of the Executive Board of JSC "Astana Holding".  From 1994 to 2000, he started work at Kazkommertsbank initially as the Saving Department Head and thereafter holding management positions, including as Director of Branches Management and Development Department and Director Strategic Development.  From 2000 to 2005 he was the Vice-Chairman of the Executive Board of Temirbank.  From 2005 he began working at JSC Bank TuranAlem as an Adviser to the Chairman.  Since June 2005, he has been a Member of the Board of Directors of JSC Bank TuranAlem.  On 6 March 2009, Mr. Tatishev was appointed as a Member of the Board of Directors.

*Yurki Talvite — Independent Member of the Board of Directors*.  In 1991 Mr. Talvite received a degree in International Finance and a Masters degree in Juridical Science from the University of Helsinki and an Executive MBA from the London Business School in 2002.  From 1990 to 1992, he worked as Manager in SCORP field in Helsinki.  From 1992 to 1993, he served as Vice-President of Union Bank of Finland, Helsinki.  From 1993 to 1995 he headed the Representative Office in Moscow and was Vice-President of Scandinavian Bank Partners (Merita Bank, Den Norske Bank, Skandinaviska Enskilda Banken, Unibank).  From 1995 to 1997, he was the Head of the Representative Office in Moscow and the Vice-President of New-York Bank.  From 1997 to 2000 he was Vice-President in charge of the Department of Eastern Europe of New-York Bank, in London, and simultaneously a member of the Executive Board of Registrar Company, Moscow.  From 2000 to 2003, he was Vice-President and Manager of New-York Group Bank, London.  In 2003 he was appointed Senior Vice-President of BNP Paribas Securities Services, Paris.  From 2003 to 2005 he served as the Head of International Trade and General Manager of Financial Corporation URALSIB, Moscow.  Since 2005, he has been Head of the Representative Office of East Capital, Moscow.  In 2006, he became a member of Board of Directors.

### Committees of the Board of Directors

The following is a description of the committees of the Board of Directors.  Currently, as the Bank pursues the Restructuring, the Bank expects that membership of the committees as reflected below may be subject to change until the completion of the Restructuring.

*Internal Audit Service*

The Internal Audit Service exercises control over the Bank's financial and economic activities.  Under the Charter, the Internal Audit Service monitors the following aspects of the Bank: (i) the Bank's internal control system; (ii) the completeness and effectiveness of the Bank's risk assessment methodology and the Bank's risk management procedures; (iii) the effective operation of information systems, including the integrity of databases and their protection from unauthorised access, as well as the availability of emergency plans (including a plan of business recovery, a plan for continuity of business and a plan of crisis management); (iv) the accuracy, completeness, objectivity and timing of accounting and reporting; (v) the accuracy, completeness, objectivity and timing of all filings under Kazakhstan law; (vi) the economic viability and effectiveness of the Bank's operations; (vii) the compliance of the Bank's internal documents with Kazakhstan laws; and (viii) the Bank's human resources department.

The Internal Audit Service has the following structure:

1.      Internal Audit Division:

- Head Office Audit Section;

- Branch Network Audit Section; and

- Subsidiary Companies and Banks Audit Section.

2.      Information Systems Audit Division, which includes the Information Security Audit Section.

The Internal Audit Service is appointed by and is directly accountable to the board of directors and is supervised by the Internal Audit Committee.

Pursuant to the Charter, the office of any member of the Internal Audit Service may be terminated at any time by a resolution of the Board of Directors.

*Internal Audit Committee*

The Internal Audit Committee: (a) discusses the Bank's financial statements with the Management Board and external auditor; (b) analyses the functioning and assessment of internal control system efficiency; (c) sets aggregate limits on transactions with financial instruments as well as limits accepted in the international practice; (d) performs occasional checks of the Bank's strategy; (e) issues recommendations to the Board of Directors on identifying, appointing and re-appointing the external auditor; (f) coordinates the work of external auditors; (g) considers audit results; (h) approves audit terms and remuneration for services; (i) assesses the external auditor's qualification, competence and independence; (i) assesses the efficiency of the audit processes; (j) monitors the activities of the Internal Audit Service; (k) assesses the efficiency of internal audit functions and observation of laws by the Bank; and (l) approves the register of persons affiliated to the Bank.

The Internal Audit Committee is comprised of at least three members, each with a term of office of three years.  The committee is headed by the Chairman and each member of the committee must be a member of the Board of Directors, an officer of the Bank or a person nominated by the Board of Directors.  At least one member of the Internal Audit Committee must be independent.  The Internal Audit Committee meets as necessary, but no less than once every three months.

As at the date of this Information Memorandum, the Internal Audit Committee consists of the following five members, as approved by a resolution of the Board of Directors dated 13 March 2009:

| Name | Position |
| --- | --- |
| Ulf Wokurka ............................. | Chairman, Member of Board of Directors (Independent Director) |
| Yerlan Tatishev ........................... | Member, Member of Board of Directors |
| Kairat Aitekenov ......................... | Member, Member of Board of Directors |
| Yurki Talvite.............................. | Member, Member of Board of Directors (Independent Director) |

For the biographies of Mr. Wokurka, Mr. Tatishev and Mr. Talvite, see "*Board of Directors*".

*Risk Committee*

The Risk Committee is an advisory and consultative body under the Board of Directors, engaged in analysis, assessment and control and risk minimisation in order to strengthen the Bank's financial stability.  The aim of the committee is to provide recommendations to the Board of Directors in relation to the creation and functioning of the Bank's risk management system.

The Risk Committee provides the Board of Directors with: (a) recommendations on improving the methodology for management, measurement, assessment and monitoring of risks; (b) approval of risk evaluation card, risk profile and risk reporting forms for further approval of the Board of Directors; (c) approval of internal normative documents related to the Bank's risk management;

(d) recommendations for the allocation of maximum acceptable equity losses under risk transactions and risk minimisation; and (e) approval of action plans to implement risk management principles under Basel II in the Bank.  The committee is entitled to request any information related to risk management in the Bank.

The Chairman of the Risk Committee is a member of the Board of Directors who is approved by the Board of Directors.  The committee consists of a minimum of two members of the Board of Directors and the Deputy Chairman of the Management Board supervising risk management issues in the Bank.  The committee may also be composed of the Bank's department directors responsible for risks as well as other persons nominated by the Chairman of the Risk Committee.

The Risk Committee meets monthly.  As at the date of this Information Memorandum, the members of the Risk Committee are:

| Name | Position |
| --- | --- |
| Yerlan Tatishev | Chairman, Member of Board of Directors |
| Ulf Wokurka | Member, Member of Board of Directors (Independent Director) |
| Yurki Talvite | Member, Member of Board of Directors (Independent Director) |
| Anvar Saidenov | Member, Member of Board of Directors |
| Abay Iskandirov | Member, Member of Board of Directors |

For the biographies of Risk Committee members, see "*Board of Directors*".

*Corporate Management and Appointments Committee*

The Corporate Management and Appointments Committee advises and consults with the Board of Directors in order to improve the Bank's management by developing guidelines as to the human resources policy and motivation policy.

The committee: (a) recommends qualification requirements to the Board of Directors in respect of the Bank's executives, managing directors and corporate secretary; (b) considers applicants for positions to be approved by the Board of Directors; (c) provides recommendations on early termination, remuneration and bonuses to persons to be approved by the Board of Directors; (d) provides recommendations in respect of the labour contract for the Chairman of the Management Board; (e) performs comparative analyses of the pay level and policy of chairman of members of the Management Board, Internal Audit Service employees, corporate secretary, and managing directors; (f) provides recommendations to the Board of Directors in relation to nominations to the boards of directors of subsidiaries and associates and their qualification requirements.

The Corporate Management and Appointments Committee is composed of at least three members of the Board of Directors, including at least two independent directors.  The committee holds meetings as scheduled by the chairman of the committee.  Extraordinary meetings are held pursuant to a decision of the chairman of the committee, at the request of a committee member, or at the request of the Board of Directors.

As at the date of this Information Memorandum, the members of the Corporate Management and Appointments Committee are:

| Name | Position |
| --- | --- |
| Dunayev Arman | Chairman, Chairman of Board of Directors |
| Ulf Wokurka | Member, Member of Board of Directors (Independent Director) |
| Anvar Saidenov | Member, Member of Board of Directors |
| Konstantine Korishchenko | Member, Member of Board of Directors (Independent Director) |

For the biographies of members of the Corporate Management and Appointments Committee, see "*Board of Directors*".

*Management Board*

The Management Board is responsible for the day-to-day management and administration of the Bank's activities.  The Management Board possesses all executive powers.  The Management Board's responsibilities include making executive business decisions, implementing the Bank's business strategy, appointing senior management and branch representatives of the Bank and dealing with all other matters not reserved to the Board of Directors or the General Meeting of Shareholders.

The internal by-laws of the Management Board are fixed by the Board of Directors, which also appoints the members of the Management Board.  The Management Board has a duty to fulfil decisions approved by the General Meeting of Shareholders and the Board of Directors.  Shareholders and employees (whether or not shareholders) are eligible to become members of the Management Board.  Members of the Management Board are permitted to act in other capacities for other entities only with the prior consent of the Board of Directors.

As at the date of this Information Memorandum, the members of the Management Board are:

| Name | Position |
| --- | --- |
| Anvar Saidenov | Chairman of the Management Board |
| Nikolay Varenko | The First Deputy Chairman of the Management Board |
| Berik Otemurat | Deputy Chairman of the Management Board |
| Sergey Yeltsov | Deputy Chairman of the Management Board |
| Abilakim Zhumakhmetov | Deputy Chairman of the Management Board, Director of Astana Branch |
| Natalya Loginova | Managing Director, Member of the Management Board |
| Kunsulu Kapbasova | Managing Director, Member of the Management Board |
| Saida Abuova | Managing Director, Member of the Management Board |

For a biography of Mr. Saidenov, see "*Board of Directors*".

*Nikolay Varenko — First Deputy Chairman of the Management Board.*  In 1994, Mr. Varenko graduated from Moscow State Institute of International Relations and qualified as Economist.  In 1995, he received a Banking and Finance degree from the London School of Economics and received an MBA from St. Anna College at Oxford University.  Mr. Varenko's professional experience started in 1994 first at the State Property Committee of the Russian Federation, then at the Russian Privatization Centre as well as at the Representative Office of Deloitte & Touche in Moscow.  During the period from 1997 until 2001, Mr. Varenko held the post of Director of Corporate Finance at "Kazkommerts Securities" JSC.  From 2003 to 2004, Mr. Varenko was a member of the board of directors of "Himpharm" JSC, chairman of the board of directors at "Central Asia Cement" JSC, and chairman and board member of "Compass" Investment Management Company.  Mr. Varenko has been the President of "Venture Fund Advant" SC since 2005 and chairman of the board of directors at "Visor Investment Solutions" JSC since 2001.  On February 9, 2009, Mr. Varenko was appointed Vice-Chairman of the Bank.  In August 2009, Mr. Varenko was appointed the First Deputy Chairman of the Management Board of the Bank.

*Berik Otemurat — Deputy Chairman of the Management Board.*  Mr. Otemurat graduated with honors from Zhambyl Kazakh-Turkish Accounting and Economics College in 1999 with a specialty in banking.  In 2003, he graduated from Kazakh Institute of Management, Economics and Strategic Research (KIMEP) with Bachelors of Science in Business Administration and Accounting with a specialisation in Finance.  He began his career in 2003 as an audit expert at Ernst & Young.  From 2005 to 2007, Mr. Otemurat worked as the CFO at Paragon Development.  From 2007 to 2008 he worked at "Sustainable Development Fund "Kazyna" JSC as a senior manager of Corporate Financing Department.  From 2008 to 2009, he served as Director of Corporate Financing Department in "National Welfare Fund "Kazyna" JSC and from October 2009 as Director of Corporate Finance Department at Samruk-Kazyna.  From June 2009 to March 2010, Mr. Otemurat was a Managing Director and member of the Management Board of the DBK.  On March 18, 2010, he was appointed Deputy Chairman of the Management Board of the Bank.

*Abilakim Zhumakhmetov — Deputy-Chairman of the Management Board.* In 1981, Mr. Zhumakhmetov graduated from Karaganda Co-operative Institute, majoring in Accounting. In 1984, he graduated from Moscow Cooperative Institute, specialising in Accounting and received a qualification as a teacher of cooperative technical school. During the period of 1984-1989, he worked as an assistant, then as a Professor of Karaganda Cooperative Institute. In 1993, he received a PhD in Economic Science. In 1994, he worked as a specialist in the Branch Offices Management Department at Kazkommertsbank. From 1995 until 1998, he served as the Director of the Kzylorda Branch office of Kazkommertsbank. Since 1998, he has worked at the Bank, beginning in the position of Director of Kzylorda branch office. Since August 2000, he has been Deputy-Chairman of the Management Board of the Bank.

*Sergey Yeltsov — Deputy Chairman of the Management Board.* In 1997, Mr. Yeltsov graduated from the Kazakh Institute of Law and International Relations with an International Law specialty and qualification as a lawyer (international lawyer). In 2005, he graduated from the Almaty Academy on Economics and Statistics, with a Finance and Credit specialty and qualification as an economist. Mr. Yeltsov started his career in 1995 at the Ministry of Industry and Trade of the Republic of Kazakhstan. From 1998 to 1999, he was a Senior Specialist at the non-commercial Legislation Section of the Financial Authorities Activity Maintenance Division, Legal Service Department and the Deputy Head of Claim Arrangement Division of the Finance Legal Service Department at the Ministry of Finance of Kazakhstan. From 1999 to 2000, he worked at OJSC "Kazakhtelecom" and in CJSC "National Law Service" in the Ministry of Justice of the Republic of Kazakhstan. From 2000 through 2007, he worked as a lawyer and as a Head of Legal Department in "Kazphosphate" LTD. At the same time from 2002 to 2004 he held the position of the Chairman of the Board of Directors of OJSC "Vasilkovskiy GOK". From 2007 through 2008 he was a Head of Legal Department, Managing Director-Head of the Unit under the President of OJSC "Vasilkovskiy GOK". Since 2007, he has been an out-of-the-staff Advisor to the Chairman of the Management Board of JSC "IC"Kazkommerce-Polis". From 2008 until 2009, Mr. Yeltsov served as the Legal Department Head and Chairman of the Management Board of JSC "Investment Fund of Kazakhstan". In December 2003 he passed an examination for the position of Judge in the Qualification College of Justice of the Republic of Kazakhstan and was accepted to the reserve Judges of the Republic of Kazakhstan. Since 2001 he has been a judge of the International Court of Arbitration. On August 24, 2009, Mr. Yeltsov was appointed a Deputy Chairman of the Management Board of the Bank. On October 7, 2009, by the decision of the Board of Directors, Mr. Yeltsov was appointed to the position of the Bank's Compliance-Controller.

*Natalya Loginova — Managing Director, Member of the Management Board.* In 1986, Ms. Loginova graduated from the Kazakh Polytechnic Institute with a specialty in Automated Management Systems. In 1997 she graduated from Almaty Banking School with a speciality in Banking. She started her career in 1991 as an engineer-programmer in the Computer Center of Kazakh Republican Bank of USSR State Bank. In the period from 1994 to 1997 she worked at the NBK, beginning as an Economist of the Improvement of Accounting and Reporting Group and ending as a Chief Economist. In 1997, she started working for the Bank. From 1997 to 2009 she worked as a Chief of the Budget Planning Division, then Director of the Financial Controlling Department. In December 2009, she was appointed as a Managing Director of the Bank and in January 2010 Ms. Loginova was appointed a member of the Management Board of the Bank.

*Kunsulu Kapbasova — Managing Director, Member of the Management Board.* In 1996, Ms. Kapbasova graduated from Kazakh State Economic University with a specialty in Finance and Credit. In the period from 1995 to 1998, she worked as an expert at different levels at the Economic Analysis Department in Kazkommertsbank, Almaty. In 1998, she headed the Financial Analysis Department of Kazkommertsbank. In 1998, she received a diploma with honours from the Maastricht School of Management at the direction of Financial Management (Netherlands). In 2000-2002, she served as deputy director of the Marketing Department of Kazkommertsbank. In 2002, she headed the Marketing Department of Kazkommertsbank. In 2005, she became Director of the former Retail Products Department of the Bank. In July 2009, she was appointed a Managing Director of the Bank.

*Saida Abuova — Managing Director, Member of the Management Board.*  In 1994, Ms. Abuova graduated from Kazakh State Academy of Management with a degree in Finance and Credit.  In 2000, she graduated from the Kazakh Institute of Management, Economics and Strategic Research, receiving an MBA degree.  Since 2000, she has worked in various leadership positions, including as Managing Director at JSC Kazinvestbank, Chairman of the Board of Directors of JSC "ATF Polis", Vice Chairman of the Management Board of JSC "Demir Bank Kazakhstan".  In October 2009, she was appointed a Managing Director of the Bank.

### Committees of the Management Board

*Asset and Liability Management Committee*

ALCO is responsible for the execution of policy with respect to the asset and liabilities management of the Bank and for setting rates for banking products.  See "*Asset and Liability Management — Asset and Liability Management Committee*".  The committee meets weekly.  The members of ALCO are:

| Name | Position |
| --- | --- |
| Tsurkan Oleg | Chairman, Managing Director |
| Kunsulu Kapbasova | Member, Managing Director, Member of the Management Board |
| Natalya Loginova | Member, Managing Director, Member of the Management Board |
| Baglana Toyganbaeva | Member, Director of Department of Asset Restructuring |
| Nurlan Mukhametzhanov | Member, Treasurer |
| Timur Sabyrbaev | Member, Managing Director |
| Gulnara Tleukulova | Member, Managing Director |
| Marina Tormasheva | Member, Managing Director |

*Product Committee*

The Product Committee is responsible for making decisions on issues related to the development, modification and implementation of new and modified competitive banking products in the market to ensure performance of sales plans, achievement of the given market positions and overall financial performance of the Bank.  The committee meets weekly.  The members of the Product Committee are:

| Name | Position |
| --- | --- |
| *Section for working with products for legal entities* | |
| Sergey Yeltsov | Chairman, Deputy Chairman of the Management Board |
| Ekaterina Prikhodko | Member, Deputy Director of the Department of Analysis and Corporate Business Development |
| Marlen Zhakezhanov | Member, Managing Director |
| Erik Iklasov | Member, Deputy Director of Department of Small and Medium Business |
| Luiza Satvoldinova | Member, Deputy Chief of Legal Corporate Business Support Division, Legal Department |
| Marina An | Member, Deputy Chief of Division of Small and Medium Business Credit Risks, an internal division of the Department of Credit and Operational Risks |
| Adilzhan Nugmanov | Member, Chief of Operational Risk Division, an internal division of the Department of Credit and Operational Risks |
| Akbota Temirbekova | Member, Chief of the Section of Development and Implantation of New Technologies of Corporate Business, internal division of Business Technologies Department |
| Natalya Loginova | Member, Managing Director, Member of the Management Board |
| Saule Yusupova | Member, Director of Main Operational Department |

| Name | Position |
| --- | --- |
| *Section for working with products for individuals* | |
| Ramazan Basibekov.................... | Member, Chief of Branch Network of Economic Security Division, an internal division of the Economic Security Department |
| Kunsulu Kapbasova .................... | Member, Managing Director, Member of the Management Board |
| Tatiana Fedorova ........................ | Member, Director of Retail Marketing Department |
| Bekbolat Isabaev......................... | Member, Deputy Chief of Division of Retail Business Risks and Underwriting, an internal division of the Department of Credit and Operational Risks |
| Adilzhan Nugmanov ................... | Member, Chief of Operational Risk Division, an internal division of the Department of Credit and Operational Risks |
| Evgeniya Lopatina ..................... | Member, acting Chief of the Division of Product Technologies, internal division of Business Technologies Department |
| Natalya Loginova........................ | Member, Managing Director, Member of the Management Board |
| Saule Yusupova ......................... | Member, Director of Main Operational Department |
| Rinat Shaibakov .......................... | Member, Chief of Information and Analytical Division, an internal division of Economic Security Department |
| Serik Kuzhamkulov .................... | Member, Deputy Chief of Division of SME Branch Network and Retail Business Legal Support, an internal division of the Legal Department |

*Credit Committee of Head Office*

The Credit Committee of the Head Office is responsible for the organisation, execution and control over the lending procedures of the Bank.  The committee makes decisions regarding issuing any types of financing, setting limits for financing for the other credit committees and contractor banks.  The committee meets twice per week.  The members of the Credit Committee of the Head Office are:

| Name | Position |
| --- | --- |
| Nikolay Varenko.......................... | Chairman, First Deputy Chairman of the Management Board |
| Zhanat Asylbek .......................... | Member, Managing Director |
| Marina Tormasheva .................... | Member, Managing Director |
| Galym Omarov............................. | Member, Director of Department of Credit and Operational Risks |
| Irina Telegina.............................. | Member, Deputy Director of Legal Department |
| Tuleu Ashlyaev ........................... | Member, Director of Economic Security Department |
| Zhamilya Maxatbek ................... | Member, Managing Director |

*Regional Credit Committee of Head Office*

The Regional Credit Committee of Head Office is responsible for executing and controlling the lending procedures of the Bank within the Russian Federation.  The committee meets weekly.

The members of the Regional Credit Committee of Head Office are:

| Name | Position |
| --- | --- |
| Nikolay Varenko.......................... | Chairperson, First Deputy Chairman of the Management Board |
| Zhamilya Maxatbek .................... | Member, Managing Director |
| Gulnara Tleukulova .................... | Member, Managing Director |
| Tuleu Ashlyaev ........................... | Member, Director of Economic Security Department |
| Zaure Kuatbekova....................... | Member, Chief of Legal Corporate Business Support Division, Legal Department |
| Baglana Toyganbaeva................. | Member, Director of Department of Asset Restructuring |

*Major Credit Committee for HO Retail Business*

The Major Credit Committee for HO Retail Business is responsible for ensuring compliance of retail financing with the credit policy of the Bank and making decisions on non-standard extra-limit retail loans as well as loan applications in amounts exceeding the limit of Minor Committee for HO Retail Business.   The committee also considers disputes related to the Bank's credit procedure.   The committee does not meet on a regular basis, but instead only when necessary.

The members of the Major Credit Committee for HO Retail Business are:

| Name | Position |
| --- | --- |
| Nikolay Varenko | Chairperson, First Deputy Chairman of the Management Board |
| Kunsulu Kapbasova | Member, Managing Director, Member of the Management Board |
| Bekbolat Isabaev | Member, Deputy Chief of Division of Retail Business Risks and Underwriting, an internal division of the Department of Credit and Operational Risks |

*Minor HO Retail Business Credit Committee*

The Minor HO Retail Business Credit Committee is responsible for ensuring compliance of retail financing with the credit policy of the Bank within the limits set by the Credit Committee of Head Office.   The committee considers issues on improving credit procedures within the Bank, improving financial analysis of borrowers, structuring of transactions, cooperation of departments during application consideration and further monitoring.   The Minor HO Retail Business Credit Committee also considers and makes decisions on non-standard extra-retail loans as well as loan applications in amounts exceeding the limit of the Credit Committee of Branch Network.   Furthermore, the committee establishes the authority of persons and the limits of powers in the Bank's branches and approves the methodologies and instruments to assess the solvency of Borrowers.   The Minor HO Retail Business Credit Committee meets daily.

The members of the Minor HO Retail Business Credit Committee responsible for loan applications are:

| Name | Position |
| --- | --- |
| Kunsulu Kapbasova | Chairperson, Managing Director |
| Dosym Enkebaev | Member, Chief of Loan Division, an internal division of the Retail Sales Department |
| Serik Meirzhanov | Member, Head of the Division of Credit Applications Analysis of Retail Business Risk Department, an internal division of the Department of Credit and Operational Risks |

The members of the Minor HO Retail Business Credit Committee responsible for product applications are:

| Name | Position |
| --- | --- |
| Kunsulu Kapbasova | Chairperson, Managing Director |
| Dosym Enkebaev | Member, Chief of Loan Department, an internal division of the Retail Department |
| Bekbolat Isabaev | Member, Deputy Chief of Division of Retail Business Risks and Underwriting, an internal division of the Department of Credit and Operational Risks |
| Madina Utegulova | Member, Head of Retail Products Development Section of Retail Products Development Division, an internal division of the Retail Marketing Department |

*Customer Committee of Corporate Business*

The Customer Committee of Corporate Business is responsible for monitoring the Bank's policies in respect of servicing corporate customers, corporate banking products and diversification of the corporate business customer base.  The committee meets weekly.

The members of the Customer Committee of Corporate Business are:

| Name | Position |
| --- | --- |
| Marina Tormasheva ................... | Chairperson, Managing Director |
| Zhanat Asylbek .......................... | Deputy Chairman, Managing Director |
| Darkhan Kaliev ........................... | Member, Director of Department of Credit Analysis of Corporate Business No. 2 |
| Kunsulu Kapbasova ................... | Member, Managing Director |
| Oleg Tsurkan............................... | Member, Managing Director |
| Dina Palymbetova....................... | Member, Director of Department of Analysis and Corporate Business Development |
| Timur Sabyrbaev......................... | Member, Managing Director |
| Tuleu Ashlyaev ........................... | Member, Director of Economic Security Department |

*Customer Committee of SME Business*

The main objective of the Customer Committee of SME Business is to maximise profitability from customer service, achieve sales growth of the Bank's products and increase the customer base of SMEs.  The Customer Committee of SME Business meets once per week.

The members of the Customer Committee of SME Business are:

| Name | Position |
| --- | --- |
| Marlen Zhakezhanov .................. | Chairman, Managing Director |
| Aigul Turebaeva.......................... | Member, Head of Analytics and Marketing Section of Support Division of Small and Medium Business, an internal division of Department of Small and Medium Business |
| Lasker Murzabekov .................... | Deputy Director of Department of Small and Medium Business |
| Meruert Zhunusova..................... | Member, Head of the Monitoring and Control Section, SME Division of the Department of Small and Medium Business |
| Madiyar Kasenov ........................ | Member, Head of Micro and Small Business Expertise Section of Credit Business Division, an internal division of the Department of Small and Medium Business |
| Asyl Dautbaev............................. | Member, Chief of Client Operations Division, an internal division of the Treasury |
| Andrey Tskhay............................ | Member, Chief of Support Division for Small and Medium Business, an internal division of Department of Small and Medium Business |
| Shuhrat Tairov ............................ | Member, Chief of Non credit Business Section, an internal division of Department of Small and Medium Business |

*HO NPL Committee*

The HO NPL Committee is responsible for monitoring the Bank's loan portfolio to determine payment delays and makes decisions in order to minimise potential non-payment risks and increase non-performing loan recovery.  The committee meets weekly.

The members of the HO NPL Committee are:

| Name | Position |
| --- | --- |
| Sergey Yeltsov | Chairman, Deputy Chairman of Management Board |
| Nikolay Varenko | Deputy Chairman of Committee, First Deputy Chairman of the Management Board |
| Timur Suleymanov | Member, Director of the Department for Working with Problem Loans |
| Sholpan Basambaeva | Member, Director of Legal Department |
| Marina Tormasheva | Member, Managing Director |
| Galym Omarov | Member, Director of the Department of Credit and Operational Risks |
| Ulukbek Maxatbekuulu | Member, Managing Director |
| Tuleu Ashlyaev | Member, Director of Economic Security Department |
| Svetlana Vitkovskaya | Member, Chief of Division of Expertise and Monitoring of Collateral |

*Retail Business NPL Committee*

The Retail Business NPL Committee monitors the Bank's retail loan portfolio to determine payment delays and makes decisions in order to minimise potential non-payment risks and increase retail non-performing loan recovery.  The committee meets weekly.

The members of the Retail Business NPL Committee are:

| Name | Position |
| --- | --- |
| Timur Suleymanov | Member, Director of the Department for Working with Problem Loans |
| Syrim Adambaev | Member, Chief of Retail Business Problem Loans Division, an internal division of the Department of Problem Loans |
| Svetlana Kislashko | Member, Deputy Chief of Retail Business of the Department of Problem Loans |
| Adilzhan Nugmanov | Member, Chief of Operational Risk Division, an internal division of Department of Credit and Operational Risk |
| Dosym Enkebaev | Member, Chief of Loan Division, an internal division of the Retail Sales Department |
| Vyacheslav Zevenkov | Member, Head of Monitoring Section of Division of Risk of Retail Business and Underwriting, an internal division of the Department of Credit and Operational Risks |
| Aizhan Ershina | Member, Deputy Chief Accountant of Accounting and Reporting Department |
| Ermek Tulepov | Member, Chief of the Claim Work Division, an internal division of the Legal Department |
| Alpamys Kurmambaev | Member, Deputy Director of Economic Security Department |
| Gulzada Abdullina | Member, Head of Problem Loans Section an internal section of Division of Expertise and Monitoring of Collateral |

*Credit Committee of Branch Network*

The Credit Committee of Branch Network makes decisions regarding the financing of small and medium business of the Bank's branches.  The committee meets twice weekly.

The members of the Credit Committee of Branch Network are:

| Name | Position |
| --- | --- |
| Marlen Zhakezhanov | Chairman, Managing Director |
| Ernar Tashenov | Deputy Chairman, Director of Department of Small and Medium Business |
| Aset Amirbekov | Member, Chief of the Working with Collateral Sector of the Division of Expertise and Monitoring of Collateral |
| Erzhan Akzhanov | Member, Chief of Division of Credit Risks of Small and Medium Business, an internal division of the Department of Credit and Operational Risks |
| Igor Morozov | Member, Chief of the Division of Legal Support of SME of Branch Network and Retail Business of Legal Department |
| Ramazan Basibekov | Member, Chief of Branch Network of Economic Security Division, an internal division of the Economic Security Department |

*Ethics Committee*

The Ethics Committee is responsible for determining the Bank's corporate ethics standards in internal banking in respect of the relationships between the Bank and its affiliates and associates, customers and contractors of the Bank, authorised bodies and other third parties. The Ethics Committee meets as necessary.

The members of the Ethics Committee are:

| Name | Position |
| --- | --- |
| Anvar Saidenov | Chairman, Chairman of the Management Board |
| Abilakim Zhumakhmetov | Member, Deputy Chairman of Management Board, Director of Astana branch |
| Sergey Yeltsov | Member, Deputy Chairman of Management Board |
| Aidar Alibaev | Member, Director of Internal Audit Service |
| Elvira Ankapova | Member, Chief of HR Division |
| Dana Zakirova | Member, Chief of Compliance Control Division |

*Information Committee*

The main purpose of Information Committee is to coordinate and control processes associated with the automation of the Bank, as well as the implementation of control and supervisory authority in the implementation of new technologies in the information structure of the Bank. The Committee meets not less than once every two weeks.

The members of the Information Committee are:

| Name | Position |
| --- | --- |
| Sergey Yeltsov | Chairman, Deputy Chairman of Management Board |
| Sultan Doskhojayev | Member, Director of the Department of Technological Solutions |
| Ainura Kunkhozhayeva | Member, Director of the Department of sales channels' and bank cards' development |
| Yekaterina Prikhodko | Member, Deputy Director of the Department of analysis and corporate business development |
| Yliya Kim | Member, Director of the Business Technologies Department |
| Lasker Murzabekov | Deputy Director of Department of Small and Medium Business |
| Adilzhan Nugmanov | Member, Chief of Operational Risk Division, an internal division of Department of Credit and Operational Risk |
| Sergey Nasyrov | Member, Deputy Chief of the Division of Information and Technical Security, Security Department |

*Management Team*

The Management Team comprises the individuals responsible for the day-to-day management of their respective departments or divisions and who report regularly to the Management Board in relation to the status of their respective departments.  Any member of the Management Team can be called to sit at a meeting of the Board of Directors as appropriate.

As of the date of this Information Memorandum, the Management Team consists of nine members, including the following persons:

| Name | Position |
| --- | --- |
| Tsurkan Oleg................................ | Managing Director |
| Timur Sabyrbaev.......................... | Managing Director |
| Marlen Zhakezhanov ................. | Managing Director |
| Erken Shardarbekov.................... | Managing Director |
| Zhanat Asylbek ........................... | Managing Director |
| Zhamilya Maxatbek .................... | Managing Director |
| Ulukbek Maxatbekuulu............... | Managing Director |
| Gulnara Tleukulova .................... | Managing Director |
| Marina Tormasheva .................... | Managing Director |

The business address for all members of the Bank's Management Board and management team is 97 Zholdasbekov Street, "Samal 2" Microdistrict, Almaty 050051, Republic of Kazakhstan.

The name and certain other information about each of the current members of the management team are set out below:

*Oleg Tsurkan — Managing Director.*  In 1991, Mr. Tsurkan graduated from Kazakh State University named after S.M. Kirov with a specialty in Biology.  In 1994, he graduated from Kazakh Institute of Management, Economics and Strategic Research, Almaty, with an MBA.  From 1991 to 1992, he worked as an expert in the firm of "Eicos".  In 1994, he accepted the post of specialist at ABN AMRO Bank Kazakhstan.  He started as a senior dealer, treasurer to the Deputy Chairman of the Board of ABN AMRO Bank Kazakhstan.  From 2003 to 2004, Mr. Tsurkan acted as Managing Director, Deputy Chairman of the Board of JSC "Nauryz Bank Kazakhstan".  From 2004 to 2005, he worked as an adviser to the Chairman of the Board of the Bank.  Concurrently, in 2005, he served as Chairman of the Board of JSCB Transbank.  From 2006 to 2007, he served as Acting Chairman of the Board, Chairman of the Board of JSC Ukrainian Credit Commercial Bank.  Since 2007 he has been Managing Director of the Bank.

*Timur Sabyrbaev — Managing Director.*  In 2000, Mr. Sabyrbaev graduated from the University of Turan, Faculty of Business and Management.  In May 2004, he took a course to improve his skills of strategic management at the EBRD, Vienna, Austria.  He started his career in 2000 as a specialist in the operating department of ABN AMRO Bank Kazakhstan.  In the period from December 2000 to the present, he held various positions at the Bank in the Trade Finance Office of the International Relations Department and the Global Trade Finance and Financial Institutions Department, eventually serving as the Head of Global Trade Finance and Financial Institutions Department.  In May of 2008, he was appointed Managing Director of the Bank.  In December 2008, he was elected to the Management Board.  In March 2009, he resigned as a member of the Management Board.

*Marlen Zhakezhanov — Managing Director*.  In 1992, Mr. Zhakezhanov graduated from Army General Khrulev A.V. Yaroslavl Higher Military Financial Order of the Red Star College with a specialty in monetary-cash and credit-cash support of troops, and qualified as an economist.  In 2004, he graduated from the University of International Business and received a Masters in Business Administration.  In 2006, he graduated from the Satpaev K.I. Kazakh National Technical University with a specialty in the Development of Oil and Gas Fields and a qualification as an engineer.  He began his career in 1992, as a senior cashier of the field office of the State Bank.  In 1994, he worked as an accountant in the company "BIAL".  From 1994 to 2000, he worked at the NBK, in the

273

positions of Chief Economist, Head of the Balance Sheet and Financial Statements Division, Deputy Chief of Banking Supervision Division and the Deputy Director of Banking Supervision Department. From 2000 to 2006, he worked at the Halyk Bank, as Chief of Internal Audit Service, Chief of Internal Audit Division, Director of Internal Audit Department, Acting Director of the Akmolinsk regional branch and acting Director of the Taldycorgan regional branch.  From September 2006 to September 2008 worked as a Head of the Internal Audit Service of "National Company" Kazakhstan Temir Zholy" JSC.  From September 2008 to November 2008 has worked by the Head of the Internal Audit Service of "Sustainable Development Fund "Kazyna" JSC and from November to December 2008 as the Head of the Internal Audit Service of "National Welfare Fund "Kazyna" JSC.  From February 2009 to January 2010, Mr. Zhakezhanov was a Member of the Management Board and Deputy Chairman of the Management Board of Temirbank.  On 1 February 2010, Mr. Zhakezhanov was appointed Managing Director of the Bank.

*Erken Shardarbekov — Managing Director.*  In 1993, Mr. Shardarbekov graduated from V.I. Lenin Kazakh Polytechnic Institute with a specialty in conveying machinery and equipment.  In 1998, he earned a scientific degree of Candidate of Economic Sciences, St. Petersburg State University of Economics and Finance.  He has worked in various management positions at JSC "SWF Kazyna" as Director of the Department, Samruk-Kazyna and JSC "BDF "Damu" in the post of Deputy Chairman of the Management Board.  He was appointed a Managing Director of the Bank in July 2009.

*Zhanat Asylbek — Managing Director.*  In 1996, Mr. Asylbek graduated from Kazakh State Academy of Management with a degree in Finance and Credit, and a qualification as an economist.  From 1997 to 1998, he worked at Kazkommertsbank.  In 1998, he worked at JSC "Industrial Bank".  From 1998 to 1999, he worked at JSC "Businessbank".  Since 2000, he has worked at the Bank having risen from the Chief Specialist of the bill operations division to the Regional Director.  In 2007, he served as Chairman of the Management Board of "Gold Investment Group".  In June 2009 he was appointed Managing Director of the Bank.

*Zhamilya Maxatbek — Managing Director.*  In 1991, Ms. Maxatbek graduated from the Almaty Institute of National Economy with a degree in Labour Economics and a qualification as an economist.  She began her career in 1991 in the Almaty branch of the national office of the Pension Fund.  In the period from 1993 to 1994, she worked in JSB "Montazhbank".  From 1994 to 1997, she worked in Alem Bank Kazakhstan.  From 1997 to 2000, she worked at the Bank in the Documentary Account Division of Operational Department.  From 1997 to 2000, she worked in the Almaty Trade Finance Bank.  Since 2000, she worked at the Bank in various positions, including Head of Representative Office in Moscow, Managing Director, Executive Director, Advisor to the Chairman of the Board.  In May 2009, she was appointed Managing Director of the Bank.

*Ulukbek Maxatbekuulu — Managing Director.*  In 2001, Mr. Maxatbekuulu graduated from the Moscow State Institute of International Relations with a specialty in jurisprudence.  In 2006, he graduated from the Kazakh Humanitarian Law University, with a master's degree in jurisprudence.  In 2006, he earned a scientific degree of candidate of economic sciences of Russian State Agrarian University — Timiryazev K.A. Moscow Agricultural Academy.  From 2001 to 2003, he worked at the post of General Director Deputy of LLP Vimpeks.  From 2003 to 2005, he was the Assistant Chairman of the Board of Directors, Chief of Legal Department of LLC "Postnoff", Moscow.  From 2007 to 2008, he worked as the general partner of LLC "Forsyth".  In August 2009, he was appointed to the position of Managing Director of the Bank.

*Gulnara Tleukulova — Managing Director.*  In 1983, Ms. Tleukulova graduated from Lenin V.I. Kazakh Polytechnic Institute with a degree in Economics and Organization of the metallurgical industry.  In 1992, she earned a PhD in Economics from the Ordzhonikidze State Academy of Management.  She began her career in 1983 at the Kazakh Institute for Chemical Technology.  In 1992, she worked in the Staff of Heads of regional administration.  In 1993, she worked in Trade industrial firm "Shart".  From 1995 to 1998, she worked in the Kazakh holding company "Astana Holding".  Since 1998, she has been working at the Bank starting as the Chief of the Investment

Planning Division of Investment and International Programs Department and ultimately rising to the Managing Director, overseeing the Department of Credit and Operational Risks of the Bank.

*Marina Tormasheva — Managing Director*.  In 1986, Ms. Tormasheva graduated from the Jambyl Technological Institute of Light and Food Industry with a specialty in Accounting.  From 1987 to 1993, she worked in Almaty Polytechnic School.  In 1993, Ms. Tormasheva worked at the production and commercial firm "RION".  From 1993 to 2001, she worked in Kazkommertsbank.  From 2001 to 2004, she worked at Temirbank in different positions, including Director of Operational Department, Acting Director of a branch office and Director of a branch office in Almaty.  In 2004, she was appointed as a Managing Director in "Texakabank" JSC.  From 2004 to 2007, she worked as Deputy Chairman of the Management Board of "Eximbank Kazakhstan" JSC.  From July 2007 to September 2009, Ms. Tormasheva worked as an Advisor to the Chairman of the Management Board and First Deputy Chairman of the Management Board of "Eximbank Kazakhstan" JSC.  In December 2009, she was appointed to the position of Managing Director of the Bank.

### Corporate Governance

Corporate governance best practice in Kazakhstan is set out in the Kazakhstan Corporate Governance Code, which is based on existing international best practice in the area of corporate governance and sets out recommendations for the application of the principles of corporate governance by Kazakhstan joint stock companies.  The Code was developed in 2005 by the Association of Financiers of Kazakhstan and approved by the FMSA.  The Bank's current Corporate Governance Code was adopted by the shareholders of the Bank on 14 October 2005.  The Code incorporates provisions of the Kazakhstan Corporate Governance Code and otherwise complies with the JSC Law in all material respects.  During the due diligence process conducted by the Bank's new management team beginning in February 2009, certain irregular transactions were uncovered that indicated that the existing corporate governance procedures were ineffective.  See "*Risk Factors — Risks Relating to the Bank — Internal control weaknesses have been evidenced by several transactions in the past and other unusual transactions may be uncovered in the future*".  To remedy this situation, the Bank and the Steering Committee agreed to implement a number of changes to the Bank's corporate governance, including, amongst others, the adoption of a New Corporate Governance Code and changes to the configuration of the Bank's managing bodies.  See "*Management and Corporate Governance — Management and Corporate Governance Following the Restructuring*".

### Management Remuneration

In accordance with the Bank's Charter, the remuneration and compensation of all managing directors of the Bank are determined by the Management Board of the Bank.  The Bank paid KZT 303 million for the year ended 31 December 2009 and KZT 383 million in aggregate during the year ended 31 December 2008 to members of the Management Board (which figures include the payments made to Mr. Zharimbetov referred to in the paragraph below).  The Bank paid KZT 222 million for the year ended 31 December 2009 and KZT 263 million for the year ended 31 December 2008 to its managing directors other than members of the Management Board.  The Bank also made payments to members of the former management team upon termination of their employment contracts in an aggregate amount of KZT 45 million for the year ended 31 December 2009 and KZT 44 million for the year ended 31 December 2008  (which figures include the payments made to Mr. Zharimbetov referred to in the paragraph below).  The Bank has further committed to pay in aggregate KZT 54 million upon the termination of the employment contracts of the Bank's current management.  The Bank paid KZT 56 million in aggregate during the year ended 31 December 2009 compared to zero during the year ended 31 December 2008 to the independent directors on its Board of Directors.  The Bank paid KZT 117 million in aggregate during the year ended 31 December 2009 and KZT 240 million in aggregate during the year ended 31 December 2008 to the non-independent directors on its Board of Directors (which figures include the payments made to Messrs Ablyazov and Solodchenko referred to in the paragraph below).

During the year ended 31 December 2008 and the year ended 31 December 2009, the Bank paid in aggregate KZT 158 million and KZT 21 million to Mr. Ablyazov, Mr. Solodchenko and Mr. Zharimbetov.

### Conflicts of Interest

There are no potential conflicts of interest between duties owed to the Bank by any of the members of the current management team and their private interests and/or other duties.

A director may not vote on or be counted in the quorum in relation to a resolution of the Board, or of any committee of the Board, concerning any contract, arrangement, transaction or proposal with the Bank or in which the Bank is otherwise interested and in which he, the Shareholders who appointed him, or any Affiliate, has an interest which may reasonably be regarded as likely to give rise to a material conflict of interest. For the avoidance of doubt, if the relevant provisions are incorporated in the Bank's Charter, the Creditor Directors shall not be prevented from being counted in the quorum of any Board meetings or committee meetings, and shall not be excluded from voting at such meetings on matters relating to recoveries (whether such recoveries shall be paid out under the Recovery Units or otherwise), owing only to the interest of the Restructuring Creditors who appointed them in such recoveries.

### Litigation Statement

As at the date of this Information Memorandum, for at least the last five years, none of the current directors or members of the Management Board:

(i)      has had any convictions in relation to fraudulent offences;

(ii)     has held an executive function in the form of a senior executive officer or a member of the administrative, management or supervisory bodies, of any company at the time of or preceding any bankruptcy, receivership or liquidation; nor

(iii)    has been subject to any official public incrimination and/or sanction by any statutory or regulatory authority (including any designated professional body) or has ever been disqualified by a court from acting as a member of the administrative, management or supervisory bodies of a company or from acting in the management or conduct of the affairs of any company.

## RELATED PARTY TRANSACTIONS

The Bank has uncovered a significant number of loans that at present appear to have been provided on preferred terms to companies which may be connected with the former management, and for which the security provided was inadequate or non-existent.  The current management suspects that these contracts were entered into on behalf of the Bank through actions of (and for the benefit of) the former management and their associates and in breach of legal duties and of the Bank's existing internal controls.  See "*The Bank — Background to the Restructuring — Factors Affecting Deterioration of Bank's Loan Portfolio — Internal Factors*".  In March 2010, news sources reported that the Investigating Committee at the Russian Ministry of Internal Affairs is conducting a preliminary investigation of a criminal case against Mr. Ablyazov and certain individuals and companies connected with him for allegations generally related to fraud during the period in which Mr. Ablyazov was Chairman of the Board of Directors of the Bank.  See "*The Bank — Criminal Proceedings against Former Management*".

The Bank's management continues to review the loan portfolio to determine if additional transactions were concluded with suspected related parties outside Kazakhstan.  The Bank has established substantial provisions relating to some of these transactions, primarily including purported loans concerning projects in CIS countries.  The Bank expects that following the Restructuring, the internal procedures relating to the approval of related party transactions will be improved by taking a number of measures, including adopting the New Corporate Governance Code and introducing periodic audits of the Bank's compliance with its governance policies.

For a description of the definition of related parties under IAS 24 "Related Party Disclosure" and quantitative disclosure on transactions with related parties, see Note 27 to the Unaudited Interim Financial Statements and Note 31 to the 2008 Annual Financial Statements included elsewhere in this Information Memorandum.

As at 30 September 2009 and 31 December 2008, the Group had the following transactions with related parties. (including affiliates and Samruk-Kazyna):

| | 30 September 2009 | 31 December 2008 |
|---|---|---|
| | *(unaudited)* | |
| | *KZT (millions)* | |
| **Loans outstanding, net** | 5,053 | 1,302 |
| — Companies under common control | 4,470 | — |
| — Key management personnel | 580 | 1,295 |
| — Other related parties | 3 | 7 |
| **Amounts due from credit institutions (deposits)** | 2,898 | 6,359 |
| — Associates | 2,898 | 6,359 |
| **Amounts due from credit institutions (loans)** | 2,728 | 3,646 |
| — Associates | 2,728 | 3,646 |
| **Amounts due to credit institutions** | 46,915 | 6,883 |
| — Companies under common control | 43,343 | — |
| — Associates | 3,572 | 6,883 |
| **Financial assets at fair value through profit or loss** | 74,087 | — |
| — Companies under common control | 74,087 | — |
| **Cash and cash equivalents** | 579 | 667 |
| — Associates | 579 | 667 |
| **SK Bonds** | 511,907 | — |
| — Shareholders | 511,907 | — |
| **Amounts due to customers** | 161,624 | 998 |
| — Shareholders | 161,593 | 6 |
| — Key management personnel | 27 | 705 |
| — Other related parties | 4 | 287 |
| **Commitments and guarantees issued** | 189,501 | 3,105 |
| — Associates | 189,501 | 3,105 |

### Loans Outstanding

As at 30 September 2009, the Group had net loans outstanding of KZT 4,470 million made to companies under common control, KZT 580 million to key management personnel and KZT 3 million to other related parties compared at 31 December 2009 to no net loans outstanding to companies

under common control, KZT 1,295 million to key management personnel and KZT 7 million to other related parties.  The sharp increase in net outstanding loans to companies under common control reflect loans from the Bank to subsidiaries, associates and companies under the control of Samruk-Kazyna, which are required to be recognised due to the fact that the Bank became a subsidiary of Samruk-Kazyna for purposes of IFRS.  The decrease in loans to key management personnel was primarily because of the change of management personnel in February 2009.

The sharp increase in net outstanding loans to companies under common control was due to the fact that from February 2009 the Bank became a subsidiary of Samruk-Kazyna, and in accordance with IFRS 24 "Disclosure of related parties" operations with all subsidiary, associate and jointly managed companies are included in report as operations with companies under common control.  The decrease in loans to key management personnel was primarily because of the fact that key management personnel changed in February 2009 and the amount of loans given to new management is significantly less.

**Amounts Due from Credit Institutions**

The amounts due from credit institutions as deposits decreased by 54.4 per cent. to KZT 2,898 million as at 30 September 2009 compared to KZT 6,359 million as at 31 December 2008, as a result of decreased deposits with the Group by due to the maturity of term deposits.  The amounts due from credit institutions as loans decreased by 25.2 per cent. to KZT 2,728 million as at 30 September 2009 from KZT 3,646 million as at 31 December 2008, due to translation differences in foreign currencies against the Tenge.

**Amounts Due to Credit Institutions**

The Group recognised KZT 43,343 million as at 30 September 2009 for amounts due to credit institutions in respect of companies under common control of the Group representing loans made by Samruk-Kazyna and its subsidiaries to the Group.  The amounts due to credit institutions in respect of associates decreased by 48.1 per cent. to KZT 3,572 million as at 30 September 2009 from KZT 6,883 million as at 31 December 2008, due to the maturity of term deposits of associates of the Bank.

**Financial Assets at Fair Value through Profit or Loss**

The Group recognised KZT 74,087 million as at 30 September 2009 for financial assets at fair value through profit or loss in respect of companies under common control of the Group in respect of securities that the Group holds in companies affiliated with Samruk-Kazyna, including Kazmunaigas, DKB and Kazkommertsbank.

**SK Bonds**

As at 30 September 2009, the Group recognised KZT 511,907 million in respect of the SK Bonds acquired by the Bank in March 2009.  See "*The Bank — The Role of Samruk-Kazyna and the NBK*".

**Amounts Due to Customers**

As at 30 September 2009, the Group had KZT 161,593 million in amounts due to its shareholder customers compared as at 31 December 2008 to KZT 6 million.  This sharp increase was due largely to deposits of Samruk-Kazyna pursuant to the State Finance Programmes.  See "*The Bank — The Role of Samruk-Kazyna and the NBK — State Finance Programmes*".

**Commitments and Guarantees Issued**

The commitments and guarantees issued as at 30 September 2009 totalled KZT 189,501 million compared as at 31 December 2008 to KZT 3,105 million, a six-fold increase, due in large part to guarantees provided in favour of BTA Belarus by Sekerbank.

The following table describes the income and expenses of the Group identified in respect of related party transactions as at 30 September 2009 and 2008:

| | Nine-month period ended | |
| --- | --- | --- |
| | 30 September 2009 | 30 September 2008 |
| | (unaudited) | |
| | KZT (millions) | |
| **Interest income on deposits up to 90 days** | 193 | 64 |
| — Companies under common control | 2 | — |
| — Associates | 191 | 55 |
| — Other related parties | — | 9 |
| **Interest income on loans** | 808 | 536 |
| — Companies under common control | 773 | — |
| — Key management personnel | 35 | 534 |
| — Other related parties | — | 2 |
| **Interest income on SK Bonds** | 20,502 | — |
| — Shareholders | 20,502 | — |
| **Interest income on due from credit institutions** | 961 | 2,851 |
| — Associates | 961 | 1,130 |
| — Other related parties | — | 1,721 |
| **Interest expense on due to credit institutions** | (2,714) | (155) |
| — Companies under common control | (2,503) | — |
| — Associates | (211) | (138) |
| — Other related parties | — | (17) |
| **Interest expense on due to customers** | (4,214) | (117) |
| — Shareholders | (4,208) | — |
| — Key management personnel | (1) | (93) |
| — Other related parties | (5) | (24) |
| **Interest income on financial assets** | 1,541 | 110 |
| — Companies under common control | 1,541 | — |
| — Associates | — | 110 |
| **Fee and commission income** | 86 | 237 |
| — Associates | 86 | 169 |
| — Other related parties | — | 68 |
| **Other income** | — | 59 |
| — Associates | — | 58 |
| — Key management personnel | — | 1 |
| **Other expenses** | (38) | (38) |
| — Associates | (38) | (38) |

## Interest Income

The Group's interest income on deposits up to 90 days increased by 201.6 per cent. to KZT 193 million over the nine month period ended 30 September 2009 compared to KZT 64 million over the nine month period ended 30 September 2008. This increase was primarily due to a 247.3 per cent. increase in interest income on deposits from associates to KZT 191 million for the nine months ended 30 September 2009 from KZT 55 million for the nine months ended 30 September 2008, due primarily to increases in such deposits of BTA Georgia.

The Group's interest income on loans increased by 50.7 per cent. to KZT 808 million for the period ended 30 September 2009 from KZT 536 million for the period ended 30 September 2008. This increase was largely attributable to the Group's recognition of KZT 773 million in respect of companies under common control, which was a result of recognition of Samruk-Kazyna's subsidiaries, associates and entities under its control. This amount was offset by the decrease to KZT 35 million over the nine months ended 30 September 2009 from KZT 534 million over the nine months ended 30 September 2008 for in respect of key management personnel as a result of the change in key management personnel in February 2009.

Interest income on amounts due from credit institutions decreased by 66.3 per cent. to KZT 961 million for the period ended 30 September 2009 from KZT 2,851 million over the period ended 30 September 2008, largely due to decreases in amounts due to associates and other related parties as a result of de-consolidation of BTA Russia.

Interest income on financial assets increased thirteen-fold to KZT 1,541 million from KZT 110 million over the nine months ended 30 September 2009 compared to the nine months ended

30 September 2008.  The increase was due to interest income earned on financial assets of companies under common control of Samruk-Kazyna, including Kazmunaigas, the DBK and Kazkommertsbank.

**Interest Expense**

Interest expense on amounts due to credit institutions increased sixteen-fold over the nine months ended 30 September 2009 compared to 30 September 2008, to KZT 2,714 million from KZT 155 million.  The large increase was due to loans provided to the Group by Samruk-Kazyna and its subsidiaries.

Interest expense on amounts due to customers increased sharply to KZT 4,214 million from KZT 117 million for the nine months ended 30 September 2009 and 30 September 2008, respectively. The increase was primarily in respect of companies under common control, as a result of deposits by Samruk-Kazyna pursuant to the State Finance Programmes.

**Fee and Commission Income**

The Group had fees and commissions income of KZT 86 million for the nine months ended 30 September 2009 compared to KZT 237 million for the nine months ended 30 September 2008, a decrease of 63.7 per cent.  This decrease was attributable to de-consolidation of BTA Russia.

## PRINCIPAL SHAREHOLDERS

**The Bank's Shareholders Prior to the Restructuring**

After having been recapitalised by the Government, the Bank was fully privatised by way of a competitive auction in March 1998 and on 17 December 1998 was reorganised from a closed joint stock company to an open joint stock company.  The consortium of investors that took control of the Bank at this time consisted of the following entities:

| Name | Percentage of Shares |
| --- | --- |
| YassiOJSC | 20.00 |
| SMKKOJSC | 20.00 |
| Maktaaral OJSC | 15.00 |
| Melkombinat LLC | 14.74 |
| Araltuz LLC | 10.00 |
| Kustanayasbest LLC | 10.00 |
| Shymkentskaya Makaronnaya Fabrika LLC | 10.00 |
| Bank CenterCredit OJSC | 0.13 |
| Temirbank OJSC | 0.13 |
| **Total** | **100.00** |

During the financial year ended 31 December 2006, the Bank issued 260,042 non-redeemable convertible preferred shares to seven entities—SMKK LLC (100,000), Makta Aral Company LLC (100,000), InvestCapital Company LLC (51,362), Orken Invest LLC (4,200), Agroinvest LLC (2,060), JSC Turanalem Securities (1,630) and Yassi Invest LLC (790)— which were subsequently converted into 1,134,432 common shares of the Bank.  During the period from 2006 to 2008, the shareholders of the Bank approved further issuances of the Bank's common shares.  As at 31 December 2008, the principal shareholders of the Bank were:

| Name | Percentage of Shares |
| --- | --- |
| KT Asia Investment Group B.V | 9.66 |
| Drey Associates Limited | 9.65 |
| Strident Energy Limited | 9.56 |
| Invest Capital Company LLC | 8.14 |
| SMKK LLC | 7.77 |
| Yassi Invest LLC | 7.19 |
| Agroinvest LLC | 7.15 |
| CP-CreditPrive SA | 6.74 |
| Makta Aral Company LLC | 6.67 |
| Others less than 5 per cent. | 27.47 |
| **Total** | **100.00** |

None of the Principal Shareholders were registered as a "major shareholder" under law.  The Bank is unable to verify whether any of these principal shareholders were affiliated with former management of the Bank as at 31 December 2008, however, based on statements made by Mr. Ablyazov, the Bank believes that, during the period that he was the Chairman of the Board of Directors, Mr. Ablyazov beneficially owned a significant portion of the shares of the Bank through intermediary companies, including Drey Associates Limited, Strident Energy Limited and InvestCapital Company LLC.  The Bank does not have evidence to support Mr. Ablyazov's statements.   Therefore, Mr. Ablyazov's beneficial interest in the Bank was not disclosed by Mr. Ablyazov or the Bank in the Bank's consolidated financial statements for the years 2006, 2007, 2008 and nine months ended 30 September 2009.

On 2 February 2009, Samruk-Kazyna acquired a controlling shareholding in the Bank through the Bank's issuance of 25,246,343 new common shares constituting 75.1 per cent. of the Bank's total share capital for cash consideration of KZT 212,095 million.

**The Bank's Shareholders Following the Restructuring**

Assuming satisfaction of relevant conditions precedent, the Shares will be held as follows after the completion of the Restructuring:

| Name | Percentage of Shares |
|---|---|
| Samruk-Kazyna (including any Residual Minority Shareholders)............................................................... | 81.5 |
| Claimants allocated into Senior Packages 1 and 2........................................................................................ | 14.0 |
| Claimants allocated into Junior Package 2.................................................................................................... | 4.5 |
| **Total** ............................................................................................................................................................ | **100.0** |

*Samruk-Kazyna*

Samruk-Kazyna is wholly owned by the Government and is the national managing holding company for substantially all state enterprises. Samruk-Kazyna was created in 2008 pursuant to the Presidential Edict No. 669, dated 13 October 2008, and the Resolution of the Government No. 962, dated 17 October 2008, by way of the merger of JSC "Kazakhstan Holding for Management of State Assets", "Samruk" and JSC "Sustainable Development Fund" "Kazyna". Samruk-Kazyna is a joint stock company whose shares are held by the Ministry of Finance's Committee of State Property and Privatisation On behalf of Kazakhstan.

Samruk-Kazyna's primary objective is to manage shares (participatory interests) of legal entities it owns with a goal of maximising long term value and increasing competitiveness of such legal entities in world markets.

The governance of Samruk-Kazyna's activities is subject to general corporate governance applicable to all joint stock companies in Kazakhstan. Accordingly, the corporate governance structure of Samruk-Kazyna is as follows: the Government, as the sole shareholder constitutes the supreme governing body, the Board of Directors constitutes the managing body, and the management board constitutes the executive body.

Members of Samruk-Kazyna's Board of Directors are appointed by the Government, and its members are, among others, the Minister of Economy and Budget Planning, the Minister of Finance, the Minister of Energy and Mineral Resources, the Minister of Industry and Trade, independent directors and the Chairman of the management board of Samruk-Kazyna. The Board of Directors is chaired by the Prime Minister of Kazakhstan.

On 2 February 2009, taking into account the growing deterioration of the Bank's financial condition, the Government approved the FMSA's plan for Samruk-Kazyna to acquire a controlling stake in the Bank. On the same day, the Bank issued and Samruk-Kazyna purchased 25,246,343 Shares of the Bank at a price of 8,401 Tenge per share. As a result the Bank received additional capital of KZT 212,095 million and Samruk-Kazyna obtained 75.1 per cent. of the Bank's authorised capital.

*Samruk-Kazyna Undertaking*

As a condition precedent to the Restructuring, Samruk-Kazyna will execute the Samruk-Kazyna Undertaking. The Samruk-Kazyna Undertaking will be in the form of a Deed Poll executed in favour of the GDR Holders, the Restructuring Creditors (and, for the avoidance of doubt, their transferees) and the New Notes Trustees, setting out the post-restructuring obligations of Samruk-Kazyna, which shall become effective on the Restructuring Date, and which will survive the Minority Protection Expiry Date in relation to the operation and management of the Bank and its relationship and obligations to the GDR Holders and other Restructuring Creditors. Pursuant to the Samruk-Kazyna Undertaking, Samruk-Kazyna undertakes to the GDR Holders, the Restructuring Creditors (and, for the avoidance of doubt, their direct and indirect transferees) and the New Notes Trustees that it will (*inter alia*):

(a)       exercise its voting rights in relation to the Shares held by it in order to procure that the Creditor Directors as nominated by the Steering Committee or in relation to any replacement

Creditor Director subsequently nominated by the New Notes Trustee are appointed to the Board;

(b)     not exercise its voting rights in relation to the Shares of the Bank held by it in order to remove either Creditor Director other than for incapacity or gross misconduct, in which event Samruk-Kazyna will use its reasonable endeavours to secure the prompt appointment of a replacement, nominated by the New Notes Trustee and no Qualified Majority decisions can be taken unless at least one Creditor Director is still a member of the Board; and

(c)     procure that no Samruk-Kazyna Director votes in respect of any item listed as requiring a Qualified Majority under "*Restructuring Creditors as Shareholders of the Bank — Shareholder/Board Approval Matters*" unless both Creditor Directors and at least one Independent Director have voted to approve the Qualified Majority Item, in which case the Samruk-Kazyna Directors may vote in favour of or against approving the Qualified Majority Item at their discretion.

For a further description of the Samruk-Kazyna Undertaking see "Undertakings by the Bank and Samruk Kazyna – The Samruk-Kazyna Undertaking".

## THE BANKING SECTOR IN KAZAKHSTAN

**Introduction**

Since mid-1994, the Government has adhered to a strict macroeconomic stabilisation programme, combining tight budgetary discipline, stringent monetary policy and structural economic reforms, which have sharply reduced inflation and lowered interest rates.

Kazakhstan has a two-tier banking system with the central bank of Kazakhstan, the NBK, comprising the first tier and all other commercial banks comprising the second tier (with the exception of the DBK, which has a special status and belongs to neither tier). Generally, all credit institutions in Kazakhstan are required to be licensed and regulated by the FMSA (prior to 2004 this licensing role was carried out by the NBK).

The Government, the NBK and the FMSA have undertaken significant structural reforms in the banking sector, aimed at promoting consolidation in the banking sector and improving the overall stability of the system.

Global financial instability and market dislocation have adversely affected the Kazakhstan banking sector, resulting in asset quality deterioration and reduced funding sources for Kazakhstan banks. Statistics published by the FMSA show the considerable asset quality deterioration in 2009, with non-performing loans in the banking sector increasing to 36.5 per cent. as at 1 January 2010 from 8.1 per cent. as at 1 January 2009. In 2009, the banking sector overall showed a net loss of KZT 2,834 billion (by way of comparison, the aggregate financial result for the banking sector as at the end of 2008 was a profit of KZT 10.7 billion) and assets of the banking sector also declined in that period. As of 1 March 2010 the share of bad loans in the Kazakhstan banking sector was 36.3 per cent., and the aggregate financial result for the banking sector for the first two months of 2010 was a loss of KZT 66.2 billion.

The Government has taken a number of steps to support the Kazakhstan banking sector including significant capital injections. The Government's capital injections into the Kazakhstan banking sector are estimated at 1.9 per cent. of Kazakhstan's GDP in 2008 (although, assuming the completion of the restructurings of Alliance Bank and of the Bank, this figure could, as a result of the conversion of bonds into shares, reach 6.7 per cent.), compared, for example, to the United Kingdom and the United States where, according to the IMF, capital injections represented 3.9 per cent. and 2.2 per cent., respectively. The total amount of capital injected into the Kazakhstan banking sector was U.S.$2,054 million as at 18 February 2010 (although, assuming the completion of the restructurings of Alliance Bank and of the Bank, this figure could, as a result of the conversion of bonds into shares, reach U.S. $7,214 million with a U.S.$/KZT exchange rate of 1:150). The Bank has been the principal beneficiary of this capital injection, with funds injected to acquire equity amounting to approximately U.S.$1.4 billion (approximately KZT 212,000 million) and further liquidity support to be converted into equity following the Restructuring amounting to approximately U.S.$4.3 billion (approximately KZT 645,000 million).

The table below shows the amount of funds of the National Fund of the Republic of Kazakhstan allocated to putting into effect the Plan of Joint Actions of the Government of Kazakhstan, the NBK and the FMSA for the Stabilisation of the Economy and the Financial System for 2009-2010, as of 18 March 2010:

| No. | Destination of state support | Allocated | Appropriated[*] | % appropriated |
|-----|------------------------------|-----------|-----------------|----------------|
| | | | (KZT billions) | |
| 1 | Capitalisation of banks ................................ | 332.1 | 308.1 | 92.8% |
| 2 | Resolving problems on the real estate market, incl.: ... | 360.0 | 190.3 | 52.9% |
| | Mortgage State Finance Programme ........................... | 120.0 | 120.0 | 100.0% |
| | Construction State Finance Programme ......................... | 240.0 | 70.3 | 29.3% |
| 3 | SME State Finance Programme, including:................. | 120.0 | 120.0 | 100.0% |
| | through second-tier banks........................................... | 117.0 | 117.0 | 100.0% |
| | through the Damu Fund............................................... | 3.0 | 3.0 | 100.0% |
| 4 | Crediting of projects in the real sector of the economy | 144.0 | 144.0 | 100.0% |
| 5 | Industrial Innovation Programme................................ | 120.0 | 4.2 | 3.5% |
| 6 | Agricultural State Finance Programme........................ | 120.0 | 120.0 | 100.0% |
| 7 | **Total funds of the National Fund of the Republic of Kazakhstan allocated to putting into effect the Plan of Joint Actions of the Government of Kazakhstan, the National Bank of Kazakhstan and the FMSA for the Stabilisation of the Economy and the Financial System for 2009-2010 (1+2+3+4+5+6):** | **1,196.1** | **886.6** | **74.1%** |
| 8 | Financial support (exchange of bonds between Samruk-Kazyna and banks to be restructured) from Samruk-Kazyna which upon completion of the restructurings will be converted into the shares of the Bank and of Alliance Bank, incl.: ............................ | 750.0 | 0.0 | 0.0% |
| | The Bank................................................................ | 645.0 | 0.0 | 0.0% |
| | Alliance Bank........................................................ | 105.0 | 0.0 | 0.0% |
| | **Total state support (7+8), incl.:** ............................ | **1,946.1** | **886.6** | **45.6%** |
| | financial sector (1+8)........................................... | 1,082.1 | 308.1 | 28.5% |
| | **Total state support as % of GDP for 2008, incl.:** .... | **12.1%** | **5.5%** | |
| | financial sector ....................................................... | 6.7% | 1.9% | |

Note:

[*] In the event of financial support from Samruk-Kazyna which upon completion of the restructurings will be converted into the shares of the Bank and of Alliance Bank, the amount is treated as appropriated after conversion.

*Sources  FMSA, data of banks.*

For a discussion of various risks associated with the banking sector and banking regulation in Kazakhstan, see "*Risk Factors — Risks Relating to Operating within the Kazakhstan Banking Sector*".

**The NBK and the FMSA**

The NBK is the central bank of Kazakhstan and although it is an independent institution, it is subordinate to the President of Kazakhstan.  The President has the power, among other things, to appoint (with the approval of the Senate (i.e., the higher chamber of the Parliament)) and remove the NBK's Chairman, to appoint and remove the NBK's Deputy Chairmen upon the proposal of the Chairman, to approve the annual report of the NBK, to approve the concept and design of the national currency, and to request information from the NBK.  Mr. Grigoriy Marchenko was appointed as Chairman of the NBK in January 2009.  The principal governing bodies of the NBK are the Executive Board and the Board of Directors.  The Executive Board, the highest governing body of the NBK, consists of nine members, including the Chairman, four other representatives of the NBK, a representative of the President, two representatives of the Government and the chairperson of the FMSA.

Currently, the principal task of the NBK is to ensure price stability in Kazakhstan.  The NBK is also empowered to develop and conduct monetary policy, organise banking settlement systems, conduct currency regulation and control, assist in ensuring stability of the financial system and protect the

interests of depositors with commercial banks. Following legislative changes in July 2003, the FMSA was formed and, on 1 January 2004, took over responsibility for most of the supervisory and regulatory functions in the financial sector, which were previously performed by the NBK.

The FMSA is an independent institution reporting directly to the President. The principal task of the FMSA is to regulate and supervise Kazakhstan's financial markets and financial institutions, including banks, insurance companies, pension funds and pension asset management companies, as well as professional participants in the securities market. The FMSA is empowered, among other things, to license financial institutions, to approve prudential standards for them, to approve, jointly with the NBK, the scope of financial reporting for financial institutions and to monitor the activities of, to apply sanctions to (where necessary) and to participate in the liquidation of, financial institutions.

The administration of anti-monopoly legislation in Kazakhstan with respect to the banking sector was transferred from the FMSA to the Competition Agency. However, certain issues of anti-monopoly regulation are under the jurisdiction of both the Competition Agency and the FMSA. For example, certain transactions with a value exceeding certain thresholds require the prior consent of the Competition Agency. Such thresholds for the purposes of regulated financial organisations are established jointly by the Competition Agency and the FMSA.

**Banking Supervision**

*Capital Adequacy*

The FMSA refined its capital adequacy and credit exposure standards in September 2005, when it set limits and rules for calculating capital adequacy, single party exposure, liquidity ratios and open currency positions. In November 2005, the regulations regarding regulatory capital and risk management came into effect in Kazakhstan. These regulations represented a substantial step towards the implementation of the Basel Accord. In particular, these regulations introduced the concepts of hybrid capital eligible to be included in Tier I and Tier II capital, Tier III capital (qualified subordinated debt) and operational and market risks and included rules for calculating risk with respect to derivatives.

As at 1 July 2009, the FMSA required banks to maintain a K1-1 (Tier 1 capital to total assets) and K1-2 (Tier 1 capital to total assets weighted for risk) capital adequacy ratio of 6.0 per cent. (with the K1-1 ratio increasing to 8.0 per cent. from 1 July 2012 and to 9.0 per cent. from 1 July 2013 and K1-2 ratio increasing to 9.0 per cent. from 1 July 2011), compared with the BIS Guidelines' recommendation of 4.0 per cent. The FMSA's K2 (own capital to total assets weighted for risk) capital adequacy ratio requirement is 12.0 per cent. compared with the BIS Guidelines' recommendation of 8.0 per cent. For banks with a bank holding company among their shareholders, a bank parent company of which has a rating set forth by the FMSA, state-controlled banks and banks in which the Government or a national management holding company has acquired at least a 10.0 per cent. stake as the result of a breach of prudential or regulatory requirements by such bank, the FMSA's K1-1 (Tier 1 capital to total assets) and K1-2 (Tier 1 capital to total assets weighted for risk) capital adequacy ratio requirement is reduced to 5.0 per cent. of total assets (with the K1-1 (Tier 1 capital to total assets) ratio increasing to 7.0 per cent. from 1 July 2012 and to 8.0 per cent. from 1 July 2013 and K1-2 (Tier 1 capital to total assets weighted for risk) ratio increasing to 8.0 per cent. from 1 July 2011) while the K2 (own capital to total assets weighted for risk ratio) is reduced to 10.0 per cent. of risk weighted assets.

Furthermore, FMSA regulations require a bank which does not have amongst its shareholders a physical person holding at least 10.0 per cent. of such bank's shares to comply with higher capital adequacy ratios. Such ratios are 7.0 per cent. for the K1 1 (Tier 1 capital to total assets) and K1 2 (Tier 1 capital to total assets weighted for risk) ratios (with K1-1 ratio increasing to 9.0 per cent. staring from 1 July 2012 and to 10.0 per cent. starting from 1 July 2013 and with K1-2 ratio increasing to 10 per cent. starting from 1 July 2011) and 14.0 per cent. for the K2 (own capital to total assets weighted for risk) ratio.

In February 2007, to reduce the risks associated with rapid growth in the external debt of Kazakhstan banks, the FMSA introduced amendments to the capital adequacy regulations which imposed limits on foreign borrowings or "external liabilities" which a bank can incur to a multiple of such bank's "own capital" as calculated both including and excluding debt securities issued.

These amendments mean that banks are not permitted to increase borrowings from non-domestic holders (subject to certain exceptions) to a level in excess of certain multiples of regulatory capital. If banks exceed the prescribed ratios they would have to either repay foreign sourced debt or increase their regulatory capital. The ratios that apply to the Bank currently are (i) two times own capital for external liabilities excluding debt securities issued by special purpose subsidiaries of the Bank guaranteed by the Bank (K8 ratio) and (ii) three times own capital for external liabilities including such debt securities issued (K9 ratio).

The FMSA monitors compliance with capital adequacy standards (in accordance with international standards set by the Basel Committee), current liquidity ratios, maximum credit exposures to single borrowers and related parties, maximum investments in fixed and other non-financial assets and limits on contingent obligations and foreign exchange positions. Additionally, the FMSA regulates problem asset classification and contingent obligations (similar to the World Bank's Guidelines for Asset Classifications) and loan loss reserves.

### Reserve Requirements

Starting in the second half of 2008, the NBK adopted a number of measures aimed at providing additional liquidity to banks. With effect from 3 March 2009, the minimum level at which second tier banks must maintain reserves has been decreased from 2.0 per cent. to 1.5 per cent. with respect to domestic liabilities and from 3.0 per cent. to 2.5 per cent. with respect to other liabilities. On 30 November 2009, the NBK Management Board reduced the obligatory reserve ratio requirement for the Bank to zero per cent. for both internal and external liabilities. The reduced ratio will remain in effect until the Restructuring process is finalised.

### Deposit Insurance

In December 1999, a self-funded domestic deposit insurance scheme, the KDIF, was established and as at 1 March 2010, 37 commercial banks, including subsidiaries of foreign banks and the Bank, were covered by the scheme. The insurance coverage is presently limited to personal deposits in any currency up to a maximum amount per customer of KZT 5 million at any given bank. Starting from 1 January 2012, the maximum guaranteed amount is scheduled to be reduced from KZT 5 million to KZT 1 million. Only banks participating in the deposit insurance scheme are authorised to open accounts and take deposits from private individuals. It is anticipated that participant banks will be called upon to make further contributions to the scheme as a result of payments made by the scheme to depositors of JSC Valut-Transit Bank as described below in "*The Banking Sector in Kazakhstan – Banking Supervision — Commercial Banks*".

### Acquisition of Interests in Kazakhstan Banks

Current legislation requires FMSA approval of any acquisition of a shareholding of 10.0 per cent. or more (whether held independently or jointly with another affiliated legal entity) in a Kazakhstan bank. Furthermore, a foreign entity must obtain a credit rating from one of the rating agencies which are recognised by the FMSA in order to hold 10.0 per cent. or more of a Kazakhstan bank. The rating of such an entity must be long term and not be less than (i) Kazakhstan's sovereign rating (or equivalent); or (ii) if the entity is a financial institution, "BB-" (by S&P) or the equivalent, *provided that* the country in which the entity is domiciled has a rating of not less than "BB-" (by S&P) or the equivalent and the regulator of that country has an agreement on information exchange with the FMSA.

*Other Regulations*

In addition, in June 2006 the FMSA implemented measures to restrict Kazakhstan banks from having outstanding external short-term financings which exceed a bank's regulatory capital.  These measures may limit a bank's ability to extend the maturity of certain short-term facilities causing it to look to longer term financings or customer deposits to replace such short-term facilities.  A failure to replace these facilities could lead to an increase in a bank's funding costs, an increase in its liquidity and interest rate risk or both.  See *"Management's Discussion and Analysis of Results of Operations and Financial Condition — Financial Condition as at 30 September 2009 and as at 31 December 2008 and 2007 — Capital Adequacy"*.

To address concern about currency mismatches and more precisely, to manage banks' liquidity, the FMSA has also tightened requirements regarding open/net currency positions and introduced various limits on currency liquidity.

In December 2006, and with effect from 1 April 2007, the FMSA approved new rules on classification of assets and provisioning.  While the principles of classification and provisioning remain largely unchanged, these rules, among others, introduced more stringent requirements regarding monitoring of credit files, developed a definition of financial soundness with respect to borrowers, provided for a more differentiated approach to various types of borrowers, loans and security and stipulated the right of the FMSA to demand that a bank increases its provisioning ratios.

*Commercial Banks*

In November 2001, the Government divested its remaining 33.3 per cent. stake in JSC Halyk Bank (formerly known as OJSC Halyk Bank) by means of privatisation through a public auction.  In February 2004, the entire share capital of EximBank Kazakhstan, formerly a state-owned bank, was sold by tender to a consortium of 11 members for KZT 2,100 million.  In June 2005, the banking licence granted to JSC Nauryz Bank was terminated by the FMSA and this bank has been in the process of liquidation since November 2005.  On 24 December 2005, the FMSA adopted a resolution to suspend the banking licence granted to JSC Industrial Bank of Kazakhstan for six months due to violations of prudential standards.  In December 2006, the FMSA revoked the banking licence of JSC Valut-Transit Bank due to the violation of Kazakhstan law, improper performance of contractual obligations and breach of prudential standards.  A decision on the mandatory liquidation of JSC Valut-Transit Bank was adopted by the special inter-district economic court of Karaganda on 13 February 2007 and came into effect on 1 March 2007.  As at 1 December 2009, the KDIF reported total payments of KZT 15,000 million to the depositors of JSC Valut-Transit Bank and JSC Nauryz Bank and money was returned to more than 67,000 depositors of those banks.  As of 7 December 2009 the liquidation commission of JSC Valut-Transit Bank had satisfied claims of the KDIF (a creditor of the third priority) representing 23.6 per cent. of the total amount of indebtedness of the bank in respect of the third group of priority.  As of 28 October 2009 the liquidation commission of JSC Nauryz Bank had satisfied claims of the KDIF (a creditor of the third priority) representing 88 per cent. of the total amount of indebtedness of the bank in respect of the third group of priority.

As at 1 March 2010, 24 of the 37 second-tier banks (excluding Zhilstroysberbank) had capital of over KZT 5,000 million and seven banks had a capital of KZT 2,000 million to KZT 5,000 million.  Since 1 October 2009, any bank whose own capital (i.e. shareholders' equity) falls below KZT 5,000 million (or KZT 2,000 million for banks registered outside of Astana and Almaty) is required to apply to the FMSA for voluntary reorganisation into an organisation performing only limited banking operations.  Starting from 1 July 2011 the minimum requirements for size of own capital are established at KZT 10 billion for banks, including newly-created banks, KZT 5 billion for residential construction savings banks and KZT 4 billion for banks registered and carrying out a significant part of their operations outside Astana and Almaty.

In 2001, the Government established the DBK to provide medium and long term financing for, and otherwise facilitate, industrial projects in Kazakhstan.  The DBK was established with a charter capital of KZT 30,000 million.  The DBK has its own legal status which does not fall within either tier

of the Kazakhstan banking system.  The DBK does not currently accept commercial or retail deposits or provide corporate settlement services.  However, the Bank expects that the DBK may become an important competitor in the corporate lending sector.  The DBK is not treated as a commercial bank for the purposes of market share data and ranking in this Information Memorandum.

The liberalisation of the economy in Kazakhstan in recent years has resulted in a number of foreign companies, including banks, establishing operations in Kazakhstan through direct investment and otherwise participating in the banking and financial services sector.  A foreign bank may not open a branch in Kazakhstan.  Accordingly, foreign banks must establish a Kazakhstan subsidiary or joint venture in order to operate as a bank in Kazakhstan.

While foreign-owned banks do not currently provide significant domestic competition and are not active in the retail banking sector, the Bank believes that in the long term such banks, some of which may have significantly greater resources and a cheaper funding base than the Bank, will, together with the larger local banks, become the Bank's primary competitors in the corporate banking sector. Foreign banks also bring international experience in servicing customers and target the most attractive corporate customers of Kazakhstan's domestic banks as well as foreign companies operating in Kazakhstan.

As at 1 March 2010, there were 19 banks with foreign participation operating in Kazakhstan, including RBS Kazakhstan, Citibank Kazakhstan and HSBC Bank Kazakhstan.  Under relevant Kazakhstan legislation, a bank with foreign participation is defined as a bank with more than one-third direct or indirect foreign ownership.  Banks with less than one-third direct or indirect foreign ownership are considered domestic banks.  A number of foreign banks have opened representative offices in Kazakhstan, including JPMorgan Chase Bank N.A., Deutsche Bank AG, Commerzbank AG, ING Bank N.V., Landesbank Berlin AG and Société Générale.

The total capital of commercial banks decreased to negative capital KZT 1,016 billion as at 1 March 2010 compared to negative capital of KZT 978 billion as at 1 January 2010 and KZT 1,453 billion as at 1 January 2009.  During such period, the total assets of such banks increased to KZT 11,745 billion as at 1 March 2010 from KZT 11,557 billion as at 1 January 2010 (compared to approximately KZT 11,890 billion as at 1 January 2009).  The aggregate liabilities increased to approximately KZT 12,761 billion as at 1 March 2010 from KZT 12,536 billion as at 1 January 2010 and KZT 10,437 billion as at 1 January 2009.  The aggregate net loss amounted to KZT 66,188 million for the first two months of 2010 compared to KZT 265,428 million for the same two months in 2009.

**Financial Stability and Restructuring Reforms**

*Financial Stability Laws*

On 23 October 2008, new legislation relating to the stability of the Kazakhstan financial system was adopted.

Under the new law, in the event of (i) a breach by a bank of capital adequacy or liquidity ratios; or (ii) two or more breaches by a bank in any twelve-month period of any other prudential or other mandatory requirements, the Government may, with the agreement of the FMSA, acquire, either directly or through a national management holding company (which is currently Samruk-Kazyna), the authorised shares of any bank in Kazakhstan to the extent necessary (but not less than 10.0 per cent. of the total amount of issued and outstanding shares of such bank, including those to be acquired by the Government or the national management holding company) to improve such bank's financial condition and ensure compliance with prudential or other mandatory requirements.  The new law provides that the management and shareholders of an affected bank do not have the right to approve any such acquisition, and any shares issued as part of any such acquisition may be issued without granting pre-emptive rights to existing shareholders.  Following such an acquisition, the state body authorised to manage state property or the national management holding company is authorised to appoint no more than 30.0 per cent. of the members of the board of directors and the management board of the affected bank.

The main objectives of the new financial system stability law are to improve early detection mechanisms for risks in the financial system, to provide powers to the Government to acquire shares in commercial banks that face financial problems and to improve the overall condition of financial institutions in Kazakhstan.  The law also consolidates authority to oversee large and second-tier Kazakhstan banks and provides additional mechanisms for supervising commitments made by banks and other financial institutions.

The Government or the national management holding company must sell the acquired shares within one year of their acquisition to a third party investor or investors by way of direct sale or through the stock exchange.  However, this term may be extended if the financial condition of the bank shows no sign of improvement.

On 2 February 2009, the FMSA agreed with the Government on the acquisition of approximately 75.1 per cent. of the Bank's Shares, which were subsequently acquired by Samruk-Kazyna within the new financial stability measures.  Also on 2 February 2009, Alliance Bank announced that its major shareholder had decided to sell 76.0 per cent. of the common shares of Alliance Bank to Samruk-Kazyna, and on the same date Samruk-Kazyna announced that it was considering such purchase.  Separately from the acquisition of the common shares of Alliance Bank, Samruk-Kazyna and Alliance Bank signed a deposit agreement for the deposit of KZT 24,000 million with Alliance Bank to support its financial stabilisation and further capitalisation.

The NBK decreased its refinancing rate from 10.5 per cent. to 10.0 per cent. effective from 1 January 2009, and the current refinancing rate is 7.0 per cent.  The stated reason for the rate cut was the shortage of liquidity in the market.

These measures proved to be insufficient and both the Bank and Alliance Bank defaulted on their debt in April 2009.  JSC Astana Finance, a diversified financial services company, defaulted and announced a moratorium on the repayment of its debt in May 2009, and other banks face increasing pressure due to the growing number of non-performing loans.  In response to the pressure faced by major banks in Kazakhstan in 2008-2009, Kazakhstan's parliament adopted the Restructuring Law with the twin aims of enabling consensual financial restructurings approved by a majority of creditors and of revising the existing framework for good bank/bad bank reorganisations.  See *"The Restructuring Law in Kazakhstan"*.  As at the date of this Information Memorandum, the Kazakhstan banking system remains under stress with banks starting to de-leverage through partial repayments and debt restructurings.

### The Restructuring Law in Kazakhstan

Prior to July 2009 when the Restructuring Law was adopted, there was no law in Kazakhstan which would allow for creditor claims to be restructured on a basis involving less than 100 per cent. consent of the affected creditors.  Creditors not wishing to participate in a restructuring had the ability to set off their claims against a bank's assets or bring litigation in any jurisdiction where any of these assets are located.

#### Financial Restructurings

The Restructuring Law introduced a procedure for restructuring the financial indebtedness of a bank in the following general format.  The bank decides to restructure its debt and enters into an agreement with the FMSA with respect to such restructuring.  The bank submits a restructuring plan to the FMSA for its consideration.  The restructuring plan should describe the process for and period of the restructuring, list the bank's assets and liabilities to be restructured, contain a *pro forma* balance sheet showing the bank's financial condition following the restructuring, and describe the bank's future activities and any limitations on them.  The bank applies to the Court to initiate the process described in the restructuring plan.  If the Court approves the restructuring process then, with immediate effect, all relevant claims of the bank's creditors are stayed, the bank's property is protected from execution and attachment, and the bank's obligations under agreements for the sale of assets and any financial

commitments as either a lender (if the commitment carries any credit risk) or as a borrower, including contingent obligations such as guarantees, may be suspended in whole or in part.

The bank convenes a meeting of its relevant creditors to approve the restructuring plan. If creditors holding at least two-thirds in value of the bank's obligations subject to restructuring vote in favour of the restructuring plan, the restructuring plan is approved. The bank then submits the approved restructuring plan to the FMSA to establish its conformity with the restructuring plan originally submitted to the FMSA. The restructuring plan is then submitted to the Court for final approval. If the restructuring plan is approved by the Court, it becomes binding on all creditors with claims subject to the restructuring.

Completion of the bank's restructuring will be achieved when the restructuring plan has been carried out to the satisfaction of the Court and the FMSA. Upon completion of the restructuring, the relevant liabilities of the bank are cancelled and any claims in relation to them are discharged and replaced by appropriate restructured claims. Completion of the restructuring is confirmed by a decision of the Court upon the FMSA's application.

The restructuring process set out in the Restructuring Law is designed to be fair to the affected creditors and should ensure that a restructuring effected under it will be capable of international recognition in countries (such as the United Kingdom and the United States) which have adopted legislation based on the Model Insolvency Law. However, as at the date of this Information Memorandum, the application of the Restructuring Law has been tested in practice just once, in the case of the restructuring of Alliance Bank. See "*Risk Factors — Risks Relating to the Restructuring — The Restructuring Law has not been substantially tested in practice and there can be no assurance that any restructuring effected under such legislation, including the Restructuring, will be recognised internationally*".

*Good Bank/Bad Bank Reorganisations*

The second principal feature of the Restructuring Law is the amendment of the existing legislative framework allowing the segregation of the "good" assets and liabilities of a distressed bank and the transfer of them to another bank (or several banks) or to a specialised stabilisation bank. The good bank/bad bank structure could be used in a number of different circumstances. For example:

(i)     the process could be initiated by a bank itself if other efforts to restructure itself have failed or if it does not wish or cannot, for whatever reason, achieve a financial restructuring following the process described above;

(ii)    if a bank has already been placed in conservation, the reorganisation may be initiated by a temporary manager appointed by the FMSA; or

(iii)   if a bank's licence has been revoked, the reorganisation may be initiated by a temporary manager appointed by the FMSA to manage the bank's assets pending the court-ordered compulsory liquidation taking effect.

Any reorganisation under these new procedures requires the FMSA's consent and the consent of depositors and creditors. Depositors and creditors are notified of the proposed reorganisation by an announcement published in Kazakhstan's mass media and any depositor or creditor may object to it by timely filing of a written objection.

*Stabilisation Banks*

The Restructuring Law also makes provision for the establishment of stabilisation banks. These could be used as the "good" bank in the reorganisation into a good bank and bad bank of a bank which is in conservation. A stabilisation bank would be a special purpose company established by the FMSA on an *ad hoc* basis and would have a special status under the Banking Law and a limited scope of business compared to ordinary commercial banks. Due to its special status and purpose, a stabilisation bank would not be subject to normal capital adequacy and other prudential requirements.

Its main role would be to hold "good" assets while the segregation of the "good" and "bad" assets of the distressed bank was in progress.  Upon completion of the segregation process, the stabilisation bank would transfer the "good" assets to another bank designated by the FMSA, subject to the consent of the depositors and other creditors of the stabilisation bank.  The procedures for obtaining this consent would be similar to the procedures for obtaining the depositors' and creditors' consent to the initial transfer of "good" assets from the distressed bank.

The Restructuring Law provides that once the stabilisation bank passes on the assets to an acquiring bank, it may either be liquidated or be sold to an investor, provided the investor can procure a recapitalisation of the stabilisation bank and bring it into compliance with the requirements applicable to ordinary commercial banks because following a sale, the stabilisation bank would lose its special status and become subject to the general banking legislation applicable to an ordinary bank.

As at the date of this Information Memorandum, it is unclear whether one stabilisation bank can be used as a holding vehicle for "good" assets of several distressed banks.

**The FMSA's Compulsory Measures under the Banking Law**

Under the Banking Law, the FMSA may apply a number of compulsory restrictive measures to banks in financial distress or in breach of prudential or other mandatory regulations.  Articles 45, 46, 47 and 47-1 of the Banking Law allow the FMSA to apply, *inter alia*, the following compulsory measures to second tier banks (commercial banks) in Kazakhstan and their shareholders which are major participants or bank holding companies:

(i)    issuing a warning and mandatory written instructions to a bank;

(ii)   entering into an agreement with a bank setting out measures to be taken by the bank to remedy any identified breaches, including but not limited to breaches of prudential requirements;

(iii)  instituting the FMSA special regime in a bank and requiring the bank to develop an action plan to restore such bank's financial condition;

(iv)   suspending or revoking a bank's licence for all or certain banking operations;

(v)    mandatory purchase of a bank's shares;

(vi)   removing the management of a bank;

(vii)  forcing a bank to reorganise into a credit partnership;

(viii) forcing a bank into conservation;

(ix)   forcing a bank into mandatory liquidation; and

(x)    forcing a bank into segregating such bank's "good" assets and liabilities and to mandatorily transfer such assets and liabilities to another bank or a specialised stabilisation bank, following the revocation of the bank's licence or the bank being put into conservation, pursuant to the Restructuring Law.

Where a bank's shareholders include a major participant or a bank holding company, the FMSA may require such shareholders to decrease their direct or indirect ownership of the relevant bank to less than 10.0 per cent. of the bank's voting shares in the case of a major participant and less than 25.0 per cent. of the bank's voting shares in the case of a bank holding company shareholder.  Such measures can be applied to a bank's shareholder when, for example, a bank is in breach of the FMSA's prudential requirements or the bank's shareholders which are major participants or bank holding companies are in an unstable financial condition which may negatively affect the bank concerned.  See "*Risk Factors — Risks Relating to the Restructuring — The Bank may face litigation if the FMSA applies any of its compulsory restrictive measures to the Bank*".

### The FMSA Special Regime

Article 45.2 of the Banking Law provides for "measures of early response" which the FMSA may apply to a bank under certain circumstances.  These are discretionary measures that the FMSA may take with respect to a bank that is in financial distress.  For example, if a bank's liquidity ratio is lower than usual, the FMSA may require such bank to develop and deliver to the FMSA for approval a plan of action which the bank must undertake to improve its financial stability.  If the FMSA does not approve the plan, it may apply certain early response measures including replacing the bank's management and restructuring the bank's assets.

### Reorganisation into a Credit Partnership

Under Article 47 of the Banking Law, the FMSA may require a bank to reorganise into a credit partnership if the bank's capital adequacy ratios fall to a level below 50.0 per cent. of the minimum requirements.  Shareholders of a bank being reorganised receive participation interests in a credit partnership in proportion to their shares in the reorganised bank.  A credit partnership is not allowed to carry out normal banking activities and is allowed to carry out only certain limited banking operations and services for its participants.

### Mandatory Purchase of Shares

The Banking Law provides that the FMSA may, with the Government's consent, effect a mandatory purchase of all of a bank's shares (including shares underlying any global depositary receipts) from such bank's shareholders at a price determined by the FMSA in the event the bank's own capital (i.e. shareholders' equity) is negative.  According to the Banking Law, after such purchase the FMSA must transfer the shares to a new investor which can procure an increase of the bank's regulatory capital and restore the bank's normal operations.

### Conservation

Conservation is a compulsory measure which may be applied by the FMSA to a Kazakhstan second tier bank (i.e., not upon such bank's discretion) when, among other things, such bank is in breach of prudential norms.  When a bank is put into conservation, the authority to manage the bank is transferred to a temporary manager appointed by the FMSA.  The bank put into conservation may carry out its operations in its regular manner, but specific restrictions may be imposed by the FMSA (for example suspending contingent liabilities of the bank).  Under conservation the bank is granted statutory immunity from the decisions of the Kazakhstan courts and international arbitration awards.  This immunity covers decisions and arbitral awards issued prior to the bank entering into conservation as well as those issued after the establishment of the conservation.  Enforcement of court orders or arbitral awards against the bank in respect of its indebtedness (whether domestic or international) is not permitted.  Accordingly, conservation protects the bank from the enforcement of any domestic or foreign court decisions as well as any arbitral awards in respect of its indebtedness that arose prior to or during the conservation period.  There have not been many examples of banks being put into conservation in the Kazakhstan banking sector.  Financial institutions that have gone through conservation include Nauryz Bank in 2004 (the successor to Kazagroprombank, which itself went through conservation in 2001) and JSC NP Valut Transit Fund.  Both these institutions were unable to improve their financial condition during the conservation period.  At present, these institutions are in the process of liquidation.

### Bankruptcy Regime

Any creditor has the right to initiate insolvency proceedings against a Kazakhstani entity (including a bank) if the entity has failed to pay its debt within three months after the debt became due and payable, *provided that* the amount owed by the debtor is more than 150 times the monthly calculation index (approximately U.S. Dollars 1,273).  The court will declare the entity bankrupt if the entity fails to prove its solvency.

However, in respect of banks, it is not the court but the FMSA which will determine whether the bank is insolvent. Thus, under the Banking Law, a court cannot declare a bank insolvent unless the FMSA consents. The FMSA will determine whether the bank is solvent on the basis of its own calculations, taking into account the applicable capital requirements and other factors.

If the FMSA advised that the bank was not insolvent, then the bankruptcy proceedings would be effectively terminated and the bank could be put into conservation. If the FMSA decided that the bank was indeed insolvent and this decision was confirmed by the court, then the court would have a liquidator appointed by the FMSA and there would be a liquidation of the bank's assets in accordance with the order of priority set out under the Banking Law which is as follows:

(i)      administrative and legal expenses of bankruptcy;

(ii)     payments for tort claims involving harm to life or health;

(iii)    payments due to employees as a result of their employment and related social security and mandatory pension payments;

(iv)    KDIF's claims related to insured deposits;

(v)     claims of individual depositors relating to deposits and transfers, deposits made from pension fund assets and deposits of life insurance companies;

(vi)    claims of non-profit organisations;

(vii)   claims of legal entities secured by pledges of the bank's property;

(viii)  tax liability settlements and repayment of borrowings from the state; and

(ix)    unsecured claims of creditors.

## DESCRIPTION OF SHARE CAPITAL AND CERTAIN MATTERS OF KAZAKHSTAN LAW

**Share Capital**

The Bank's authorised share capital consists of 38,286,050 Shares and 100,000 preference shares. As at the date of this Information Memorandum, the Bank had 33,616,968 Shares issued and outstanding and zero preference shares issued and outstanding, all of which were all fully paid.

The holders of the Bank's Shares and preference shares can decide at a general meeting to convert the preference shares into Shares.

All Shares are in registered form in the share register of the Bank, maintained by an independent third party registrar. The registrar is Centre "DAR" JSC and its address is 565/8, Seifullina Avenue, 050012, Almaty. Ownership of the Shares is evidenced by an extract from the share register of the Bank.

**Summary of the Charter**

The Charter provides that the Bank's principal objective is to facilitate formation and further development of a market economy in the Republic of Kazakhstan, to conduct financial activities with the purpose of developing various sectors of economy, to earn profit and use the profits in the interests of shareholders and to conduct and expand the scope of banking services in accordance with international standards and legislation of the Republic of Kazakhstan. The Bank's objects are set out in full in Article 4 of the Charter.

Subject to the provisions of the JSC Law and the Charter and without prejudice to any rights attached to any existing Shares or class of Shares, the Bank may issue Shares, preference shares and other securities convertible into Shares.

The General Meeting of Shareholders of the Bank has authority to determine the total number of authorised shares of the Bank, while the Board of Directors has the authority to decide to place (sell) such shares, to determine the selling price and other placement terms.

**New Charter**

The Bank is in the process of preparing a New Charter that will reflect changes to the composition of the Board of Directors, approval matters and required voting majorities. Although the Bank has discussed the New Charter with the FMSA and has received its in principle approval of certain provisions thereof, the New Charter remains subject to official approval of the FMSA and other relevant governmental bodies. Therefore, the types of approval matters and the required voting majorities for the approval of such matters as well as other provisions of the New Charter may not fully represent those set out in "*Share Distribution and Rights of Minority Shareholders — Shareholder/Board Approvals*". Some of the provisions expected to be incorporated into the New Charter have never been tested under Kazakhstan law and the Bank gives no assurances that the applicable governmental and regulatory authorities will hold such provisions to be in compliance with Kazakhstan law. If such provisions are not found to be in compliance with Kazakhstan law by the applicable governmental and regulatory bodies they may refuse to register the New Charter. Therefore, certain protections which the Bank is seeking for its shareholders may not be available under the New Charter and there is the risk that the New Charter will not contain certain of the proposed amendments as described herein. See "*Risk Factors — Risks Relating to the Restructuring — Certain provisions of the New Charter may not comply with the requirements of Kazakhstan law and shareholders of the post-restructured Bank may therefore not receive the protections afforded by the New Charter described in this Information Memorandum*".

***Composition of the Board of Directors***

Under the proposed terms of the New Charter, the Board of Directors will be comprised of nine directors.  In accordance with the Term Sheet, the Board of Directors will be comprised of three Independent Directors, two Creditor Directors and four Samruk-Kazyna Directors.  For a description of the approval and replacement procedures for the directors, see "*Management and Corporate Governance — Management and Corporate Governance Following the Restructuring — Board of Directors*".

***Voting***

As currently proposed, the New Charter will amend the existing Charter to provide that, *inter alia*, the following matters shall not have any effect unless and until such matters have been approved by the affirmative votes of:

(i)     Shareholders holding not less than 75 per cent. of the total number of Shares; and

(ii)    *provided that* the GDRs then in issue represent five per cent. or more of the total number of Shares then in issue and *provided that* the Depositary casts at least one vote on the relevant resolution, the approval of at least two-thirds of the votes cast by the Depositary on behalf of GDR Holders eligible to vote:

      (a)     alteration of the New Charter;

      (b)     any change to the New Corporate Governance Code;

      (c)     any change of the Bank's auditors or the auditors' terms of reference;

      (d)     adoption of a decision on the voluntary de-listing of the Shares from the list of any stock exchange or adoption of a decision to list the Shares;

      (e)     any increase in the Bank's authorised share capital;

      (f)     adoption of a decision to purchase of its share capital or other securities or conversion of any of its Shares or other securities other than as permitted under the terms of the New Instruments;

      (g)     adoption of a decision to change the absolute number of directors on the Board of Directors;

      (h)     approval of disposal by the Bank of any (i) assets, (ii) property, (iii) undertaking, (iv) business or (v) shares/participatory interests in the charter capital of any legal entity (excluding disposals made in the ordinary course of trading of the Bank) in any financial year (whether by one or more transactions) of more than 6.5 per cent. of the Bank's total consolidated gross assets;

      (i)     making any material change to the nature or scope of the Bank's or any Subsidiary's business;

      (j)     approval of entering into any scheme of arrangement, reorganisation, reconstruction or compromise or other arrangement with creditors; and

      (k)     approval of taking any step to dissolve or wind-up the Bank or any Material Subsidiary or to commence any other procedure an effect of which would be to create a general moratorium with respect to proceedings by its creditors.

In addition, as currently proposed, the New Charter will provide that, *inter alia*, the following matters will require the approval of a majority of the Board of Directors including both of the Creditor Directors and at least one Independent Director:

(i)     any change of the special auditor (whose functions are to audit compliance of the Bank with the New Corporate Governance Code and internal procedures and controls and implementation of the Bank's business plan) or any change to his terms of reporting and responsibilities;

(ii)    any change to the Bank's credit approval and decision-making procedures or lending policies or procedures;

(iii)   approval of any of the Bank's internal audit, risk management or compliance policies or procedures and amendments thereto;

(iv)    adoption of decision to issue any Shares or preference shares or securities or to grant any option to subscribe for Shares or equity-linked securities or to issue convertible securities or to enter into any agreement for the same;

(v)     approval of any prospectus or any amendments to the prospectus for the issue of any Shares or preference shares of the Bank;

(vi)    approval of borrowing other than in the ordinary course of business and borrowing at rates above market rates;

(vii)   appointing or removing the chairman of the Management Board, or any member of the Management Board, including the chief executive officer, chief operating officer, chief compliance officer, chief risk officer and/or chief financial officer;

(viii)  approval of entering into and/or amending any contract of employment or appointment with the chairman of the Management Board, any member of the Management Board, including the chief executive officer, chief operating officer, chief compliance officer, chief risk officer and/or chief financial officer and the setting of salaries, terms of work, bonuses, incentives, commissions and other emoluments of such persons;

(ix)    taking a decision on terminating the employment of the chairman of the Management Board or approving or allowing the termination of employment of any member of the Management Board, including the chief executive officer, chief operating officer, chief compliance officer, chief risk officer and/or chief financial officer;

(x)     approval of the Bank adopting any new business plan or budget or making any material change to the Bank's existing business plan or budget;

(xi)    otherwise than as required by law, materially amending its accounting or financial policies or reporting practices including but not limited to the provisioning, write-off policies and write-back practices;

(xii)   approval of entry into any lending arrangement on terms other than market terms;

(xiii)  approval of incurring or entering into any commitment to incur any capital expenditure if the estimated amount or aggregate value of capital commitments already incurred or contracted for by the Bank and all its Subsidiaries when considered as a whole in that financial year exceeds the budgeted annual amount for that year by more than five per cent.;

(xiv)   decision to commence or discontinue the prosecution or defence of, or settle any litigation or arbitration proceedings or claim, in each case where the amount claimed exceeds U.S. $30,000,000 (except in respect of debt collection in the ordinary course of business or applying for or defending an interim injunction where it is not practicable to obtain consent);

(xv)     adoption of a decision on disposal by any member of the Group in any financial year of more than 6.5 per cent. of the Bank's total consolidated gross assets;

(xvi)    approval of entry into or completion of any interested-party transaction, that is a transaction with an "Affiliate" of the Bank as that term is defined under Article 64 of the Kazakh Joint Stock Company Law;

(xvii)   approval of entry any Transaction involving Samruk-Kazyna or any of its Subsidiaries which involves aggregate payments or value of U.S.$75,000,000 or more; and

(xviii)  any Board decision to put a resolution before a general meeting of the Bank to approve the payment, making or declaring of any dividend in cash or in specie out of its profits, assets or reserves.

In addition, under the New Charter as currently proposed, *inter alia*, the following matters will require approval by either:

(i)      the Management Board, or

(ii)     a simple majority of the Board of Directors, or

(iii)    the majority of the Board of Directors including both of the Creditor Directors and at least one Independent Director, or

(iv)     Shareholders holding not less than 75 per cent. of the total number of Shares and, *provided that* the GDRs then in issue represent five per cent. or more of the total number of Shares then in issue and *provided that* the Depositary casts at least one vote on the relevant resolution, the approval of at least two thirds of the votes cast by the Depositary on behalf of GDR Holders eligible to vote,

depending on the value of the transaction, liabilities (individual or in aggregate), security interests or other changes to the Bank's or to the Bank's and each Subsidiary's business in comparison with the Bank's charter capital or net assets:

(a)      acquisition by the Bank of any assets or property or shares/participatory interests in the charter capital of other entities or persons;

(b)      increasing the Bank's liabilities;

(c)      creating or causing to be created any security upon the whole or any part of its present or future undertaking, assets or revenues (including uncalled capital) to secure any financial indebtedness or guarantee of Financial Indebtedness other than a Permitted Security (excluding under paragraph (j) of the definition of permitted security);

(d)      the Bank providing any form of financial support in connection with any Subsidiary increasing its liabilities or making an acquisition;

(e)      the Bank or any subsidiary of the Bank participating in, entering into, amending or varying any partnership, joint venture or profit/revenue sharing arrangement or agreement or any management contract;

(f)      the Bank or any Subsidiary entering into any merger; and

(g)      any sale of the whole or any part of the Bank's loan book at a discount.

### *Quorum for Shareholders and Board Meetings*

The current Charter of the Bank provides that the quorum for the General Meeting of Shareholders shall be one or more Shareholders together holding more than 50 per cent. of the voting rights at the

time any business is transacted.  Should any General Meeting of Shareholders be adjourned due to lack of quorum, the quorum at the subsequent adjourned General Meeting of Shareholders shall be one or more Shareholders holding 40 per cent. or more of the voting rights at the time any business is transacted.  The New Charter will set the same quorum requirements for the General Meetings of Shareholders.

The quorum for an ordinary meeting of the Board of Directors shall be at least half of the total number of directors including a director nominated by Samruk-Kazyna and a Creditor Director and for a meeting which is to consider a matter that requires the approval of a Qualified Majority of the Board of Directors the quorum shall be at least half of the total number of directors including a director nominated by Samruk-Kazyna and both Creditor Directors.  Should any meeting of the Board of Directors be adjourned due to lack of quorum, the quorum at the subsequent adjourned Board of Directors meeting shall be at least half the total number of directors provided all meeting notice requirements have been properly complied with by the Bank.

***Other Provisions***

Board of Directors meetings will be held at least ten times per year until the second anniversary of the Restructuring Date and thereafter four times per year.  Board of Directors meetings shall be convened by the chairman of the Board of Directors upon the request of any director, the Bank's internal auditor, the Bank's external auditor or any major shareholder.

As currently proposed, the New Charter will provide that at least one Creditor Director shall be appointed to sit on each committee of the Board of Directors (including, the Remuneration and Appointments Committee, the Recovery Sub-Committee, the Audit Committee and the Risk Management Committee).

***Voting Rights***

Subject to any rights or restrictions attached to any class of Shares by or in accordance with the Charter every holder of Shares present in person or by proxy shall have one vote for each fully paid Share of which he is the holder.  No holder of preference shares shall be entitled to vote except in limited circumstances.

Supermajority matters as described in "*Description of Share Capital and Certain Matters of Kazakhstan Law New Charter — Voting*" shall not have any effect unless and until such matter has been approved by a resolution passed at a duly convened Shareholders' meeting at which a quorum is present, by the affirmative votes of:

(i)      Shareholders holding not less than 75 per cent. of the total Shares; and

(ii)     *provided that* the GDRs then in issue represent 5 per cent. or more of the total Shares of the Bank then in issue and *provided that* the Depositary casts at least one vote on the relevant resolution, the approval of at least 2/3 of the votes cast by the Depositary on behalf of GDR Holders eligible to vote.

No resolution of shareholders in writing shall be effective without a quorum being present (which is persons holding 50 per cent. or more of the voting share capital of the Bank) or, for an adjourned meeting called in absence of the 50 per cent. quorum, persons holding 40 per cent. or more of the voting share capital of the Bank.

**Dividends and Other Distributions**

The JSC Law sets out the procedure for determining dividends that may be distributed by the Bank to its shareholders.  Subject to the provisions of the JSC Law, the General Meeting of Shareholders may declare dividends to be paid to holders of the Shares by simple majority vote.  Under the JSC Law and the Charter, the Bank may distribute dividends to the holders of its Shares annually or based on its

quarterly or semi-annual results (subject to all JSC Law requirements therefor) only on the basis of a decision of the General Meeting of Shareholders.

The JSC Law prohibits the accrual of dividends if a company's "own capital" is negative or would become negative as a result of such an accrual or if the Bank is insolvent under Kazakhstan bankruptcy legislation or would become so as a result of such an accrual.

Except as provided by the rights and restrictions attached to any class of shares, the holders of the Shares will, under the JSC Law, be entitled to participate in any surplus assets on a winding-up in proportion to their shareholdings.

The Bank and Samruk-Kazyna will, pursuant to the the Samruk-Kazyna Undertaking and the BTA Undertaking, agree that no dividends shall be paid other than Permitted Dividends.

**Variation of Rights**

Under the JSC Law, the rights of holders of common and preference shares may be extended by a company's charter (although the Charter does not extend such rights), but these rights cannot be restricted.

**Transfer of Shares**

To transfer a Share on the over-the-counter market, the holder (or its representative) must sign a written order and submit it to the registrar or its nominee for execution, or give suitable electronic instructions as permitted by Kazakhstan law.  The other party to the transaction or its nominee will execute a buy order by pairing it with a sell order.  Transfer of Shares on the organised securities market must be done in accordance with the rules of such market.

All dealings in the Shares must be registered by way of making entries in the personal accounts in the registry system or the nominee's books and also reflected in the "unified system of registers" maintained by KCD. Legal title to a Share vests from the moment when the transaction is so registered (unless each party to the transaction has a different nominee, in which case legal title transfers at the moment when the transaction is registered in the personal accounts of each nominee in the KCD).

An extract from the personal account of a shareholder in the registry system or a nominee's books is evidence of that holder's legal right to a Share.

A registrar or its nominee can refuse to register a transfer of Shares if the documents submitted do not conform to legal requirements and its internal requirements.

In addition, the FMSA has the right (by notifying the relevant issuer, the registrar and the KCD) to suspend trading in securities listed on the KASE by blocking all or certain personal accounts in the registry or nominee systems if legal requirements establishing (i) the rights and interests of investors when acquiring securities or (ii) the terms and procedures for trading securities have been violated.

A fee will ordinarily be payable to the registrar or nominee for registering the transfer, under contractual terms.

**Authority to Allot Shares**

Under the JSC Law, the Board of Directors may issue and place Shares by a resolution of the Board of Directors.  Any decision must state the number and the price of the Shares, the manner of subscription and qualification requirements to investors.  The New Charter of the Bank proposes that any placement (sale) of Shares shall require approval of a Qualified Majority of the Board.

**Alteration of Share Capital**

The Bank may from time to time by a Supermajority vote of holders of the voting share capital of the Bank at a General Meeting of Shareholders (but by no other method) increase its authorised share capital.

**Unpaid and Bought-Back Shares**

The JSC Law states that, until a Share is paid in full, the Bank must not instruct the registrar to credit the Share to the personal account of the would-be acquirer.  Instead, the Share will be credited to the account of the Bank itself with the registrar.  Therefore, a Share cannot be placed unless it is fully paid up.

Shares which have been bought back by the Bank are credited to another special account of the Bank with the registrar.

No dividends accrue or are payable on issued Shares that have not yet been placed or Shares bought back by the Bank.  Such Shares are not counted for the purposes of determining a quorum and do not carry the right to vote.

**Purchase of Own Shares**

Subject to the JSC Law and without prejudice to any relevant special rights attached to any class of shares, the Bank may purchase any of its own shares of any class in any way and at any price (whether at par or above or below par) using a valuation methodology which has been approved in advance by a General Meeting of Shareholders.  Any such purchase must be effected with the consent of the relevant Shareholder.  Shares purchased by the Bank will be credited to the Bank's account with the registrar.

The Bank cannot purchase any of its Shares which are being placed in a primary offering, and cannot purchase its own Shares before confirmation by the FMSA of the results of the placement of Shares.

In certain limited circumstances provided by the JSC Law, a Shareholder may request the Bank to buy back Shares belonging to the Shareholder, which the Bank must do within 30 days of receipt of a duly formalised request from the Shareholder.

In addition, the Bank will agree as a term of the New Notes that it will not buy back any of its Shares in circumstances which would result in any reduction of its share capital within the first 3 years following the Restructuring Date and, thereafter, by more than one per cent. in aggregate in any year.

Shares being bought back by the Bank cannot exceed 25 per cent. of the total number of issued Shares of the Bank, and the purchase price cannot exceed 10 per cent. of the size of the Bank's own capital.

**Pre-emption Rights**

Under the JSC Law, a Shareholder of the Bank has a pre-emptive right to acquire any newly placed Shares of the Bank (including newly issued Shares or Shares previously bought back).  Accordingly, holders of Shares have pre-emptive rights on newly issued Shares.  However, according to the Banking Law upon conversion of securities into the shares of a bank within the framework of its restructuring, the pre-emptive rights are not available to shareholders of a bank upon placement of its shares through conversion of securities and/or monetary obligations of a bank into its shares.

Subject to the above paragraph, within 10 days from the date upon which the Bank takes a decision to issue new Shares, it must make an offer to each existing shareholder (either by written notification or by way of publication in the mass media) to acquire the new Shares *pro rata* to its shareholding at the placement price established by the Bank in the decision.  Each shareholder then has 30 days from the date of such notification or publication to submit an application to acquire such Shares (i.e., to exercise its pre-emptive right).  Upon the expiry of such period, the right to submit such an application will lapse.

The FMSA has in the past taken the position that persons not holding Shares and therefore not disclosed in the register of the KCD, such as the holders of GDRs, are not entitled to the pre-emptive rights attaching to the underlying Shares.  Although the FMSA currently takes the position that holders of GDRs are entitled to such rights (and although there is nothing under current Kazakhstan law that would prevent GDR holders from exercising the pre-emptive rights that are attached to the underlying Shares), there is no guarantee that the FMSA will not reverse this position in the future.

**General Meeting of Shareholders**

The Board of Directors must convene and the Bank must hold extraordinary General Meetings of Shareholders and annual General Meetings of Shareholders in accordance with the requirements of the JSC Law.  The Board of Directors may call extraordinary General Meeting of Shareholders at such times as it determines.  In addition, an extraordinary General Meeting of Shareholders should be convened by the Board of Directors on the written request of any holder of Shares representing not less than 10 per cent. of the issued Shares.  According to the proposed amendments to the Charter any Shareholder or Shareholders holding in excess of 5 per cent. of the total number of issued and outstanding Shares shall be entitled to require the calling of an extraordinary General Meeting of Shareholders and propose resolutions to be put to the vote at the meeting.

Shareholders are entitled to receive not less than 30 (45 in the event of a meeting in absence pursuant to the absentee voting procedure) days' notice of any general meeting.

Under the JSC Law, the General Meeting of Shareholders has exclusive competence to determine certain matters, including, but not limited to, the following:

(a)     the introduction of amendments and supplements to, or the approval of new versions of, the Charter;

(b)     the voluntary reorganisation or winding up of the Bank, including any change in the Bank's status as a Kazakhstan joint stock company;

(c)     any increase in the amount of authorised Shares of the Bank or any change in the class of any authorised Shares of the Bank which have not been issued or placed;

(d)     the determination of the scope and the expiry dates of the powers of the Board of Directors, the selection of members of the Board of Directors and early termination of their powers, as well as determination of the amount and payment terms of remuneration to members of the Board of Directors;

(e)     the appointment of an auditor of the Bank;

(f)     approval of annual financial statements and the amount of the annual dividend paid on Shares, if any;

(g)     determination of conditions and procedures for converting the Bank's securities or amending the rights attached to such securities; and

(h)     if such decision may not be taken by the Board of Directors, decisions on behalf of the Bank to conclude any transaction by the Bank with any affiliate of the Bank.

The JSC law also requires that matters referred to in paragraphs (a) to (c) above shall require the approval by a Qualified Majority of shareholders.

The General Meeting of Shareholders has the right to cancel any decision made by any other management body of the Bank on issues related to the internal organisation of the Bank.

The proposed New Charter provides that matters (a), (b), (c), (e) and a number of other matters described in "*Description of Share Capital and Certain Matters of Kazakhstan Law — New Charter — Voting*" also require Supermajority Approval of Shareholders.

**Directors**

The Board of Directors must comprise no fewer than three persons, of which no fewer than one third must be independent directors.  Members of the Board of Directors are appointed by Shareholders by way of cumulative voting (whereby each Shareholder has a right to give the votes owned by such Shareholder completely to one candidate or to be distributed among several candidates to the Board of Directors).  Candidates receiving a majority of votes are appointed to the Board of Directors.  If two or more candidates gain an equal number of votes then an additional election is carried out with regard to such candidates.

The quorum required for a duly convened meeting of the Board of Directors shall be not less than half of the members of the Board of Directors.  The New Charter provides that the quorum required for a duly convened meeting of the Board of Directors shall be not less than half of the members of the Board of Directors including a Samruk-Kazyna Director, and a Creditor Director.  For any meeting which is to consider a matter specified as a "Qualified Majority" matter as described in "*New Charter — Voting*", the quorum for such Board meeting shall be at least half of the total number of directors including a Samruk-Kazyna Director and both Creditor Directors.  Should any meeting of the Board be adjourned due to lack of quorum, the quorum at the subsequent adjourned Board meeting shall be at least half the total number of directors provided all meeting notice requirements have been properly complied with by the Bank.  Each member of the Board of Directors has one vote.  Decisions of the Board of Directors are made by a simple majority of votes of the members present at the meeting except in relation to matters requiring Qualified Majority approval which require the consent of both Creditor Directors and at least one Independent Director.

A General Meeting of Shareholders has the right to terminate at any time the powers of all or any members of the Board of Directors and to remove any member of the Board of Directors from office except for decision in relation to Qualified Majority matters which require the consent of both Creditor Directors and at least one Independent Director.

The current Charter provides that the Board of Directors has exclusive competence to determine certain matters including the following:

(i)      the placement of Shares, including the price, number and the manner of subscription of the Shares to be placed and qualification requirements for investors;

(ii)     the powers of the Management Board, the selection of the chairman of the Management Board and members of the Management Board, and early termination of their powers;

(iii)    the remuneration and bonuses to be paid to the members of the Management Board;

(iv)     any agreements concerning major transactions of the Bank (being a transaction or combination of interrelated transactions which result or may result in the purchase or disposal by the Bank of assets representing 25 per cent. of the total value of the Bank's assets), transactions resulting in an increase of the Bank's liabilities by an amount equal to or exceeding 10 per cent. of the Bank's related party transactions and acquisitions of 10 per cent. or more of the voting shares of other legal entities;

(v)      the establishment of the general terms and conditions of the Bank's operations and approval of certain internal regulations; and

(vi)     the establishment of the Bank's strategic plan, annual operation plan, annual budget, business plan and investment plan.

The New Charter proposes that the Board of Directors have the competence to determine certain matters relating to major transactions in a number of ways depending on the size of the transaction.  In particular, the Board of Directors shall have the power to approve any agreements concerning major transactions of the Bank (being a transaction or combination of interrelated transactions which result or may result in the purchase or disposal by the Bank of assets representing between 10 per cent. and

25 per cent. of the total value of the Bank's Net Assets) or transactions resulting in an increase of the Bank's liabilities by an amount equal to or exceeding 10 per cent. but less than 25 per cent. of the Bank's charter capital. Some related party transactions may also require Board Approval. For transactions below 10 per cent. of the total value of the Bank's Net Assets the decision is within the powers of the management board of the Bank, and for transactions for those above 25 per cent., the decisions must receive shareholder approval. For more information in relation to the competence of the Board of Directors as such is proposed under the New Charter, please refer to the "*Share Distribution and Rights of Minority Shareholders — Shareholder/Board Approvals*".

### Remuneration of Directors

The remuneration of the members of the Board of Directors shall be determined by the General Meeting of Shareholders. The chairman of the Board of Directors should inform Shareholders of the amount and composition of the remuneration of directors and the members of the Management Board of the Bank.

### Conflicts of Interest of Directors

A member of the Board of Directors cannot participate in discussions or vote on any transaction between the Bank and:

- himself or any related persons;

- any legal entity in which she/he or any related persons has a material interest in, or is otherwise affiliated with; or

- any legal entity in which she/he or any related persons is a director or manager.

### Disclosure of Beneficial Ownership

A list of Shareholders that have the right to participate in a General Meeting of Shareholders and vote at the meeting will be prepared by the Bank's registrar on the basis of information recorded in the register of shareholders of the Bank. However, any Shareholder holding Shares through a nominee and whose identity is not disclosed to the KCD shall not be entitled to vote at a General Meeting of Shareholders. Holders of GDRs will be able to exercise their voting rights as described in "*The GDR Programme — Rights of GDR Holders in respect of Deposited Shares*". These GDR holders will also be able to exchange GDRs for Shares.

Ownership of the Shares is also subject to certain restrictions under Kazakhstan law. Specifically, (a) legal entities registered in any of the offshore jurisdictions specified below or which have affiliates registered in such jurisdictions or (b) individuals who are participants or shareholders in such legal entities may not directly or indirectly own voting shares in the capital of the Bank unless the Bank is a subsidiary bank of a foreign bank having a credit rating of "A" or above from certain rating agencies. Accordingly, holders of GDRs falling under (a) or (b) above will not be entitled to vote through the Depositary at General Meetings of Shareholders, cannot exchange GDRs into Shares and cannot own, hold or dispose of the Shares.

The offshore jurisdictions referred to above are Andorra, Antigua and Barbuda, the Bahamas, Barbados, Belize, Brunei, China (Hong Kong and Macau Special Administrative Regions only), Comoros, Costa Rica, Cyprus, Djibouti, Dominican Republic, Grenada, Guatemala, Indonesia, Liberia, Liechtenstein, Malaysia (Labuan Enclave only), the Marshall Islands, Maldives, Malta, Mauritius, Monaco, Myanmar, Nauru, the Netherlands (Aruba and the Netherlands Antilles only), New Zealand (Cook Islands and Niue only), Nigeria, Palau, Panama, Portugal (Madeira only), Samoa, Saint Vincent and the Grenadines, Saint Kitts and Nevis, Saint Lucia, Spain (Canary Islands only), Seychelles, United Kingdom of Great Britain and Northern Ireland (Anguilla, Bermuda, British Virgin Islands, the Cayman Islands, the Channel Islands (Guernsey, Jersey, Sark and Alderney), the Isle of Man, Gibraltar, Montserrat and the Turks and Caicos Islands only), the United States of

Case 1:13-cv-05790-JMF   Document 44-2   Filed 06/10/14   Page 118 of 195

America (the U.S. Virgin Islands, Guam and Puerto Rico only), the Philippines, Sri Lanka, Tonga and Vanuatu.

A holder of Shares that intends to participate in a General Meeting of Shareholders of the Bank should certify in writing that its is not and it does not have any affiliates registered in any of the offshore jurisdictions referred to above if the Bank does not have such information on file already.  A holder of Shares that does not provide such evidence will not be allowed to participate in a General Meeting of Shareholders of the Bank.

If such is determined to be untrue or if an individual participant in a holder of Shares is registered in any of the offshore jurisdictions referred to, the following consequences will ensue:

(i)     if a resolution of the meeting was passed by a majority of voting Shares (excluding the Shares in question) the resolution will be regarded as passed only if it would have been passed disregarding the votes of the Shares in question; and

(ii)    if disregarding the votes of the Shares in question means that the resolution would not have been passed, the resolution may be declared invalid by claim of the FMSA or other interested parties.

Although the Bank has been advised that such restrictions should not prevent a holder of GDRs registered in any such jurisdiction (or which has an affiliate registered in such jurisdiction) from exercising or benefiting from other rights (including the right to receive dividends and pre-emptive rights in respect of the non-voting Shares) there is no guarantee that the FMSA or any other relevant authority such as a Kazakhstan court will not take a different view thereby restricting all such holders of Shares from exercising or benefiting from such shareholder rights.  Moreover, there can be no assurance that the FMSA or any other relevant authority would not interpret the foregoing legislation as restricting such entities or persons from owning the GDRs. In addition, any natural person or legal entity becoming a "major shareholder" or, for legal entities, a "bank holding" company in relation to the Bank should obtain prior written permission of the FMSA.  A major shareholder or bank holding company means a person directly or indirectly owning or holding 10 per cent. or 25 per cent. respectively, of the voting Shares or who can otherwise influence the decisions of the Bank on the basis of an agreement or otherwise as set out by the FMSA regulations.

In addition, any person acquiring 10 per cent. or more of the voting shares of the Bank is considered an affiliate of the Bank and must disclose its identity to the Bank.  Information about the identity of an affiliate is public information.

**Mandatory Offers**

Under the JSC Law a person either alone or jointly with its affiliated persons who acquired 30 per cent. or more of the voting Shares is required to make an offer to the remaining shareholders to buy out their Shares at no less than the market price.  Any failure by the acquirer to make such an offer would result in the acquirer being obligated to reduce its shareholding to not more than 29 per cent.

**Related Party Transactions**

Interested party transactions as described under Article 73 of the JSC law should be approved by a majority of non-interested members of the Board of Directors or, if all directors are interested, by the decision of a General Meeting of Shareholders made by a majority of non-interested Shareholders or by a simple majority vote if all Shareholders are interested.

The New Charter proposes that other related party transactions which fall outside the JSC Law definition of Interested Party transaction and which have a value of over $5 million or, in the case of transactions involving Samruk-Kazyna or any of its affiliates, or its subsidiaries, which involves aggregate payments or value of U.S.$75 million or more, shall also require the approval of a Qualified

Majority of the Board.   See "*Distribution of Shares and Rights of Minority Shareholders —
Shareholder/Board Approvals*"

## TAXATION

*The following summary covers only certain taxation matters in Kazakhstan and does not cover taxation matters in any other jurisdiction.*

*The following summary of certain Kazakhstan taxation matters is based on the laws and practice in force as at the date of this Information Memorandum and is subject to any changes in the law and the interpretation and application thereof, which changes could be made with retroactive effect. The following summary does not purport to be a comprehensive description of all the tax considerations that may be relevant to a decision to acquire, hold or dispose of New Notes and Shares, and does not purport to deal with the tax consequences applicable to all categories of Claimants, some of which may be subject to special rules. Save as otherwise indicated, this summary addresses only the position of Claimants who do not have any connection with Kazakhstan other than a holding of New Notes or Shares.*

*Each Claimant is urged to consult its own tax adviser as to the particular tax consequences to such Claimant relating to the Restructuring Plan, including the applicability and effect of tax laws or tax treaties in any relevant jurisdiction, and of pending or proposed changes in applicable tax laws as at the date of this Information Memorandum, and of any actual changes in applicable tax laws after such date, and to seek specialist Kazakhstan tax advice as necessary.*

This summary discusses the Kazakhstan tax consequences of the acquisition, ownership and disposal of New Notes and Shares. In general, Kazakhstan tax legislation with respect to the taxation of securities and financial instruments is not well developed, and in many cases the exact scope of Kazakhstan tax, compliance rules and enforcement mechanisms is unclear or open to different interpretations.

The only tax that may under certain circumstances apply in Kazakhstan to the above transactions is income tax. No other taxes or duties should be levied in Kazakhstan with respect to the above transactions. For all relevant purposes of this summary, except as noted below (*e.g.*, in relation to treaty relief in respect of dividends), legal entities and individuals are subject to similar income tax treatment.

**Shares**

*Tax Residence*

Non-resident persons will not become resident in Kazakhstan for Kazakhstan tax purposes by reason only of the acquisition, ownership or disposal of the Shares. Therefore, under Kazakhstan tax law, holders of the Shares should be taxed only on their income earned from sources in Kazakhstan, rather than their worldwide income.

References to holders of the Shares in this summary mean legal owners of such Shares. This summary assumes that no holders of the Shares are resident in Kazakhstan for tax purposes.

*Disposals of Shares*

The new Tax Code came into effect in Kazakhstan on 1 January 2009. Under the new Tax Code, generally all disposals and acquisitions of the Shares are exempt from any tax payment, reporting or compliance requirements in Kazakhstan. There is a risk that tax authorities in Kazakhstan may interpret applicable provisions of the Tax Code in a way to apply withholding tax to disposals to a Kazakhstan resident (or a non-resident with a permanent establishment in Kazakhstan) by a transferor registered in a country with a favourable tax regime (e.g., Cyprus, Liechtenstein, Luxembourg, Nigeria, Malta, Aruba, etc.). In this case, the applicable withholding tax rate will be in amount of 20 per cent. In addition, any income derived from the sale of the Shares through open trade on a Kazakhstan stock exchange or foreign stock exchange is tax exempt, *provided that* such Shares are admitted to the official lists of such stock exchanges at the time of sale.

*Taxable Disposals of Shares*

Non-resident buyers and their successors (including recipients of gifts or inheritances) of the Shares are not subject to Kazakhstan income tax upon acquisition of the Shares.  It is unclear from currently applicable tax regulations in Kazakhstan whether capital gains from the disposal of GDRs will be subject to taxation in Kazakhstan.  Therefore, independent tax advice should be sought in relation to each disposal of GDRs.

Holders of Shares who are resident in countries with which Kazakhstan has bilateral taxation treaties may be exempt from Kazakhstan withholding tax applicable to capital gains on the disposal of Shares.

*Taxation of Dividends*

Under the Tax Code, dividends paid on the Shares are exempt from any tax payment, reporting or compliance requirements in Kazakhstan if the Shares are admitted to the official list of a Kazakhstan stock exchange on the date of the accrual of such dividends.  In addition, if a holder of the Shares has been holding such Shares for longer than three years, dividends payable on the Shares become exempt from any withholding tax in Kazakhstan starting from the fourth year of holding such shares.

There is a risk that tax authorities in Kazakhstan may interpret applicable provisions of the Tax Code to apply withholding tax to dividends paid on GDRs which are not listed on a stock exchange operating in Kazakhstan at the date of accrual of such dividends.

If dividends paid on the Shares are not exempt, such dividends are subject to withholding tax at the rate of 15 per cent. or 20 per cent. if the recipient is registered in a country with a favourable tax regime.  The withholding tax is applied to the gross amount of dividends without allowance for any deductions and satisfies all Kazakhstan income tax obligations with respect to dividends.  Holders of Shares should not be subject to any other tax reporting, payment, registration or compliance requirements with respect to dividends paid on the Shares.

Holders of Shares who are resident in countries with which Kazakhstan has bilateral taxation treaties may be entitled to a reduced rate of withholding tax.  Depending on the country of residence and satisfaction of certain other conditions, the dividend withholding tax rates under Kazakhstan's bilateral tax treaties in effect as at the date of this Information Memorandum may be between 5 per cent. and 15 per cent.  Under bilateral tax treaties effective on the date of this Information Memorandum, reductions below 10 per cent. may be available only to beneficial owners that are legal entities.

In order to avail themselves of this relief, eligible holders must provide the Bank with a document (legalised or apostilled) issued by the tax authority of their country of residence confirming their tax residence in a treaty jurisdiction.

If the above document is not made available to the Bank prior to the date of payment of the dividends, then the Bank should apply withholding tax at a standard 15 per cent. rate and account for the withheld amounts to the relevant authority.  Holders who are eligible for a lower withholding tax rate should later be able to claim a refund of overpaid tax from the Government.  In doing so, they should provide the respective tax authority with a tax residence confirmation.

**New Notes**

Under Kazakhstan law as presently in effect, payments of interest on the New Notes to an individual who is a non-resident of Kazakhstan for tax purposes or to a legal entity that (i) is not established in accordance with the legislation of Kazakhstan, (ii) does not have its actual governing body (place of actual management) in Kazakhstan, (iii) does not maintain a permanent establishment in Kazakhstan and (iv) otherwise has no taxable presence in Kazakhstan (together, "**non-Kazakhstan holders**") will be subject to withholding tax at a rate of 15 per cent. the withholding tax on interest payable to any recipient, including but not limited to those, who are described above in this paragraph, will not apply where withholding tax on interest would not apply.  Payments of interest on the New Notes to

non-Kazakhstan holders registered in specified countries with a favourable tax regime (such as Cyprus, Liechtenstein, Luxembourg, Nigeria, Malta, Aruba and others) will be subject to the Kazakhstan withholding tax at a rate of 20 per cent. unless the New Notes are listed, as at the date of accrual of interest, on the official list of a stock exchange operating in the territory of Kazakhstan.

Non-Kazakhstan holders who are resident in countries with which Kazakhstan has bilateral taxation treaties may be entitled to a reduced rate of withholding tax.

In order to avail themselves of this relief, eligible holders must provide the Bank with a document (legalised or apostilled) issued by the tax authority of their country of residence confirming their tax residence in a treaty jurisdiction.

Gains realised by non-Kazakhstan holders derived from the disposal, sale, exchange or transfer of the New Notes will be subject to withholding tax at a rate of 15 per cent. unless such New Notes are listed as at the date of sale on the official list of a stock exchange operating in the territory of Kazakhstan or foreign stock exchange and sold through an open auction on such stock exchange.  If the disposal of the New Notes is made to a Kazakhstan resident (or a non-resident with a permanent establishment in Kazakhstan) and the transferor is registered in a country with a favourable tax regime, the net gain realised from such a disposal is subject to withholding tax in Kazakhstan at the rate of 20 per cent..  Any capital gains of non-Kazakhstan residents in relation to the New Notes which are listed as of the date of sale on the official list of a stock exchange operating in the territory of Kazakhstan or a foreign stock exchange and sold through open trades on such stock exchanges are exempt from the withholding tax.

**Debt Cancellation**

Partial cancellation of indebtedness, including as a result of an exchange of the existing debt instruments into new instruments, would generally be a taxable event for the Bank.  The Bank would be liable to pay tax at the rate of 20.0 per cent. (17.5 per cent. from 1 January 2013 and 15 per cent. from 1 January 2014 onwards) on the amount of the cancelled indebtedness.  However, the recent amendments to the Tax legislation provide that for the purposes of calculation of the taxable annual income; during 2010 the Bank can exclude the income from writing-off of the debt to creditors *provided that* such debt is included into the list of restructured liabilities contained in the Restructuring Plan approved by the court.  Starting from 1 January 2011, the Bank may be required to record amounts for cancelled debt recognised as a profit and may have to pay corporate income tax over such amount.

Under Kazakhstan law, an exchange of the existing debt instruments into new instruments of the Bank would not have any tax consequences for the Claimants.

## ISSUANCE AND TRANSFER RESTRICTIONS

**United States**

The New Notes, Shares and GDRs have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state of the United States or other jurisdiction and may not be offered, sold, pledged or otherwise transferred except (i) to a person who is located outside the United States and is not a U.S. Person, in an offshore transaction in accordance with Rule 903 or Rule 904 of Regulation S under the Securities Act or (ii) in a transaction exempt from, or not subject to, the registration requirements of the Securities Act, in each case in accordance with any applicable securities laws of any state of the United States.  Any future sale, offer, pledge or transfer of the New Notes, Shares and GDRs will also be subject to (i) and (ii) above.

Therefore, by electing to receive New Notes, Shares or GDRs, a Claimant will be required, unless in any instance the Bank otherwise agrees, to represent, acknowledge and agree that:

(1)     the New Notes, Shares and GDRs have not been and will not be registered under the Securities Act or any other securities laws and are being offered in transactions not involving any public offering in the United States;

(2)     unless so registered, the New Notes, Shares and GDRs may not be offered, sold or otherwise transferred except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act or any other applicable securities laws;

(3)     it is not, nor is it acting on behalf of, an Affiliate of the Bank or acting on the Bank's behalf and that it is either:

    (i)     not a U.S. Person or acting for the account or benefit of a U.S. Person, it is located outside the United States and it acknowledges that until the expiration of the period which expires on and includes the 40th day after the later of the commencement of the offering of the New Notes, Shares and GDRs and the Closing Date (the "**distribution compliance period**"), any offer or sale of these New Notes, Shares or GDRs shall not be made by it except (a) to a person whom it reasonably believes is a QIB, in a transaction meeting the requirements of Rule 144A or (b) to a person that is not a U.S. Person or acting for the account or benefit of a U.S. Person in an offshore transaction in accordance with Rule 903 or 904 of Regulation S; and, in each case, accordance with any applicable securities laws of any state of the United States or any other jurisdiction; or

    (ii)     an Accredited Investor and, if it is participating on behalf of one or more investor accounts, each of these investor accounts is an Accredited Investor, and it:

        (a)     is acquiring the New Notes, Shares and GDRs for investment, in the normal course of its business, and not with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act;

        (b)     invests in or purchase securities similar to the New Notes, Shares and GDRs and it has such knowledge and experience in financial and business matters that makes it capable of evaluating the merits and risks of acquiring the New Notes, Shares and GDRs; and

        (c)     is aware that it (or any of these investor accounts) may be required to bear the economic risk of an investment in the New Notes, Shares and GDRs for an indefinite period of time and it (or that investor account) is able to bear this risk for an indefinite period; or

    (iii)     it is a QIB, and, if it is participating on behalf of one or more investor accounts, each of these investor accounts is a QIB;

(4)    it understands that the New Notes will bear a legend to the following effect:

THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**") OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES.  BY ACCEPTANCE OF THE SECURITY REPRESENTED HEREBY,

EACH BENEFICIAL OWNER HEREOF REPRESENTS THAT (A) IT IS EITHER (I) NOT A U.S. PERSON AND IS LOCATED OUTSIDE THE UNITED STATES AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT; OR (II) AN ACCREDITED INVESTOR AS DEFINED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT ("**AN ACCREDITED INVESTOR**") OR (III) A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("**QIB**") AND (B) THE SECURITY MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (I) OUTSIDE THE UNITED STATES TO PERSONS THAT ARE NOT U.S. PERSONS AS DEFINED IN, AND IN ACCORDANCE WITH, REGULATION S AND (II) WITHIN THE UNITED STATES IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QIB THAT IS PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER QIB; AND IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES.  TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE OR EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE.  NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION UNDER THE SECURITIES ACT FOR RESALES OF THIS SECURITY.

THIS SECURITY AND ALL RELATED DOCUMENTATION MAY BE AMENDED OR SUPPLEMENTED FROM TIME TO TIME TO MODIFY THE RESTRICTIONS ON AND PROCEDURES FOR RESALES AND OTHER TRANSFERS OF THIS SECURITY TO REFLECT ANY CHANGE IN APPLICABLE LAW OR REGULATION (OR THE INTERPRETATION THEREOF) OR IN PRACTICES RELATING TO THE RESALE OR TRANSFERS OF RESTRICTED SECURITIES GENERALLY.  BY THE ACCEPTANCE OF THIS SECURITY.  THE HOLDER HEREOF SHALL BE DEEMED TO HAVE AGREED TO ANY SUCH AMENDMENT OR SUPPLEMENT.

(5)    if it is a QIB or an Accredited Investor, it understands that the New Notes offered pursuant to an exemption from the Securities Act other than Regulation S will be represented by a Restricted Global Note.  Before any interest in any Restricted Global Note may be offered, sold, pledged or otherwise transferred to a person who takes delivery in the form of an interest in an Unrestricted Global Note, it will be required to provide the Registrar with a written certification (in the form provided in the Agency Agreement) as to compliance with applicable securities laws;

(6)    if it has elected to participate in compliance with Regulation S, it understands that the New Notes will be represented by an Unrestricted Global Note.  Prior to the expiration of the distribution compliance period, before any interest in any Unrestricted Global Note may be offered, sold, pledged or otherwise transferred to a person who takes delivery in the form of an interest in a Restricted Global Note, it will be required to provide the Registrar with a written certification (in the form provided in the Agency Agreement) as to compliance with applicable securities laws; and

(7)    the Bank, the Registrar, the Trustee and the Principal Paying and Transfer Agent and their affiliates and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements.

*Transfer Restrictions*

The New Notes, Shares and GDRs issued to persons in the United States are transferable in the United States only to QIBs in a transaction meeting the requirements of Rule 144A or outside the United States under Regulation S.  Because of the following restrictions, such persons are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of such New Notes, Shares and GDRs.

Each subsequent purchaser or transferee of New Notes, Shares and GDRs in the United States or that is a U.S. Person will be deemed to have represented, agreed and acknowledged as follows:

(i)  the purchaser (a) is a QIB, (b) is acquiring the New Notes, Shares and GDRs for its own account or for the account of such a QIB and (c) such person is aware that the sale of the New Notes, Shares and GDRs to it is being made in reliance on Rule 144A;

(ii)  the New Notes, Shares and GDRs have not been and will not be registered under the Securities Act or any other securities laws and are being offered in transactions not involving any public offering in the United States;

(iii)  unless so registered, the New Notes, Shares and GDRs may not be reoffered, resold or otherwise transferred except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act or any other applicable securities laws, except in accordance with the restrictions set forth above;

(iv)  it understands that the New Notes offered pursuant to an exemption from the Securities Act will be represented by a Restricted Global Note.  Before any interest in any Restricted Global Note may be offered, sold, pledged or otherwise transferred to a person who takes delivery in the form of an interest in an Unrestricted Global Note, it will be required to provide the Registrar with a written certification (in the form provided in the Agency Agreement) as to compliance with applicable securities laws;

(v)  each Restricted Global Note and any Restricted Note Certificates issued in exchange for an interest in a Restricted Global Note will bear the same legend as set forth in above, unless the Bank determines otherwise in accordance with applicable law; and

(vi)  the Bank, the Registrar, the New Notes Trustee and the principal paying and transfer agent and their affiliates and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements.

Each subsequent purchaser or transferee of the New Notes or Shares in re-sales during the distribution compliance period will be deemed to have represented, agreed and acknowledged as follows:

(i)  it is, or at the time the New Notes, Shares and GDRs are purchased will be, the beneficial owner of such New Notes, Shares and GDRs and it is not a U.S. Person and it is located outside the United States (within the meaning of Regulation S);

(ii)  it understands that such New Notes, Shares and GDRs have not been and will not be registered under the Securities Act and that, prior to the expiration of the distribution compliance period, it will not offer, sell pledge or otherwise transfer such New Notes or Shares, except (a) to a person whom it reasonably believes is a QIB, in a transaction meeting the requirements of Rule 144A or (b) to a person that is not a U.S. Person or acting for the account of benefit of a U.S. Person in an offshore transaction in accordance with Rule 903 or 904 of Regulation S; and, in accordance with any applicable securities laws of any state of the United States or any other jurisdiction;

(iii)  it understands that the New Notes will be represented by an Unrestricted Global Note.  Prior to the expiration of the distribution compliance period, before any interest in any Unrestricted Global Note may be offered, sold, pledged or otherwise transferred to a person who takes

delivery in the form of an interest in a Restricted Global Note, it will be required to provide the Registrar with a written certification (in the form provided in the Agency Agreement) as to compliance with applicable securities laws; and

(iv)      the Bank, the Registrar, the New Notes Trustee and the principal paying and transfer agent and their affiliates and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements.

If you wish to participate in the Restructuring Plan, and you are a Claimant who is a U.S. Person and are not an Eligible Investor, please contact the Bank on zhaisanov@bta.kz or +7 727 3124671.

This Information Memorandum is only addressed to and directed at persons in member states of the European Economic Area (the "**EEA**") who are "Qualified Investors" within the meaning of Article 2(1)(e) of the Prospectus Directive.  The New Notes, Shares and GDRs are only available to Qualified Investors, unless in any instance the Bank otherwise agrees.   This Information Memorandum and its contents should not be acted upon or relied upon in any member state of the EEA by persons who are not Qualified Investors.   The expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each relevant member state.

**FORM OF THE NON-TENGE NEW NOTES AND PROVISIONS RELATING TO SUCH NOTES IN GLOBAL FORM**

*The following information relates to the form of the Non-Tenge New Notes and to such Non-Tenge New Notes when in global form.  Appropriate information relating to Tenge New Notes will be set forth in a supplement to this Information Memorandum containing the Terms and Conditions of the Tenge New Notes.*

1.      **Form of the Non-Tenge New Notes**

All Non-Tenge New Notes will be in registered form, without interest coupons attached. Non-Tenge New Notes offered and sold outside the United States in reliance on Regulation S to persons who are not U.S. Persons will be represented by interests in an Unrestricted Global Note, in definitive fully registered form, without interest coupons attached, which will be deposited on or about the Closing Date with the Common Depositary, acting through its London branch, as common depositary for Euroclear and Clearstream, and registered in the name of its nominee, as nominee for such common depositary in respect of interests held through Euroclear and Clearstream.

Non-Tenge New Notes allocated to Eligible Investors will be represented by interests in a Restricted Global Note, in fully registered form, without interest coupons attached, which will be registered in the name of Cede & Co., as nominee for, and which will be deposited on or about the Closing Date with a custodian for DTC.  Each Restricted Global Note (and any Note Certificates issued in exchange therefor) will be subject to certain restrictions on transfer contained in a legend appearing on the face of such Note as set forth under paragraph (4) in the section entitled "*Issuance and Transfer Restrictions*".

*Each Unrestricted Global Note will have an ISIN number and a Common Code and each Restricted Global Note will have a separate CUSIP number.*

For the purposes of the Restricted Global Notes and the Unrestricted Global Notes, any reference in the Conditions to "Note Certificate" or "Note Certificates" shall, except where the context otherwise requires, be construed so as to include the Restricted Global Notes or, as the case may be, the Unrestricted Global Notes and interests therein.

2.      **Notices**

So long as any Non-Tenge New Note is represented by a Global Note and such Global Note is held on behalf of a clearing system, notices to the holder of such Non-Tenge New Note may be given by delivery of the relevant notice to that clearing system for communication by it to entitled account holders except that so long as the NonTenge New Notes are listed on an approved Stock Exchange or the KASE and the rules of such Exchange so require, notices shall also be published in a leading newspaper having general circulation in Luxembourg or Kazakhstan.

3.      **Payments**

Each payment in respect of a Global Note will be made to the person shown as the holder in the Register at the close of business (in the place of the relevant clearing system) on the business day before the due date for such payment.

4.      **Transfers between Global Notes**

On or prior to the 40th day after the Closing Date, a beneficial interest in any Unrestricted Global Note may be transferred to a person who wishes to take delivery of such beneficial interest through the Restricted Global Note only upon receipt by the Registrar of a written certification from the transferor (in the form provided in the Agency Agreement) to the effect that such transfer is being made to a person whom the transferor reasonably believes is a QIB,

in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction. After such 40th day, such certification requirements will no longer apply to such transfers, but such transfers will continue to be subject to the transfer restrictions contained in the legend appearing on the face of such Note, as set out in "*Issuance and Transfer Restrictions*".

A beneficial interest in a Restricted Global Note may also be transferred to a person who wishes to take delivery of such beneficial interest through the corresponding Unrestricted Global Note only upon receipt by the Registrar of a written certification from the transferor (in the form provided in the Agency Agreement) to the effect that such transfer is being made in accordance with Regulation S or Rule 144A (if available) under the Securities Act.

Any beneficial interest in either a Restricted Global Note or any Unrestricted Global Note that is transferred to a person who takes delivery in the form of a beneficial interest in the other Global Note will, upon transfer, cease to be a beneficial interest in such Global Note and become a beneficial interest in the other Global Note and, accordingly, will thereafter be subject to the transfer restrictions set out in the section entitled "*Issuance and Transfer Restrictions*" and other procedures applicable to a beneficial interest in such other Global Note for so long as such person retains such an interest.

5.   **Exchange of Interests in Global Notes for Note Certificates**

A Restricted Global Note will become exchangeable, free of charge to the holder, in whole but not in part, for Restricted Note Certificates if DTC (i) notifies the Bank that it is no longer willing or able to discharge properly its responsibilities as depositary with respect to a Restricted Global Note or ceases to be a "clearing agency" registered under the Exchange Act, or is at any time no longer eligible to act as such, and the Bank is unable to locate a qualified successor within 90 days of receiving notice of such ineligibility on the part of DTC or (ii) an Event of Default (as defined and set out in Condition 11 (*Events of Default*) of the relevant Non-Tenge New Notes) occurs. In such circumstances, such Restricted Note Certificates shall be registered in such names as DTC shall direct in writing, and the Bank will procure that the Registrar notify the holders as soon as practicable after the occurrence of the events specified in (i) and (ii).

An Unrestricted Global Note will become exchangeable, free of charge to the holder, in whole but not in part, for Unrestricted Note Certificates if (i) Euroclear or Clearstream is closed for business for a continuous period of 14 days (other than by reason of legal holidays) or announces an intention permanently to cease business or does in fact do so or (ii) an Event of Default occurs. In such circumstances, such Unrestricted Note Certificates will be registered in such names as Euroclear and Clearstream shall direct in writing, and the Bank will procure that the Registrar notify the holders as soon as practicable after the occurrence of the events specified in (i) and (ii).

In the event that a Restricted Global Note is to be exchanged for Restricted Note Certificates or an Unrestricted Global Note is to be exchanged for Unrestricted Note Certificates, the relevant Global Note shall be exchanged in full for the relevant Note Certificates, and the Bank will, without charge to the holder or holders thereof, but against such indemnity as the Registrar may require in respect of any tax or other duty of whatever nature that may be levied or imposed in connection with such exchange, cause sufficient Note Certificates to be executed and delivered to the Registrar for completion, authentication and dispatch to the relevant Noteholders.

On exchange, a person having an interest in a Global Note must provide the Registrar with (i) a written order containing instructions and such other information as the Bank and the Registrar may require to complete, execute and deliver such Note Certificates and (ii) in the case of a Restricted Global Note only, a fully completed, signed certification substantially to the effect that the exchanging holder is not transferring its interest at the time of such

exchange or, in the case of simultaneous sale pursuant to Rule 144A, a certification that the transfer is being made in compliance with the provisions of Rule 144A.  Note Certificates issued in exchange for a beneficial interest in the Restricted Global Note shall bear the legends applicable to transfers pursuant to Rule 144A, as set out in "*Issuance and Transfer Restrictions*".   Restricted Note Certificates issued as described above will not be exchangeable for beneficial interests in an Unrestricted Global Note, and Unrestricted Note Certificates issued as described above will not be exchangeable for beneficial interests in a Restricted Global Note.

In addition to the requirements described under "*Form of the Non-Tenge New Notes and Provisions Relating to Notes in Global Form – Transfer between the Global Notes*" above, the holder of a Note may transfer such Note only in accordance with the provisions of Conditions of the Non-Tenge New Notes.

Upon the transfer, exchange or replacement of a Restricted Note Certificate bearing the legend referred to in "*Issuance and Transfer Restrictions*", or upon specific request for removal of the legend on a Restricted Note Certificate, the Bank will deliver only Restricted Note Certificates that bear such legend, or will refuse to remove such legend, as the case may be, unless there is delivered to the Bank and the Registrar such satisfactory evidence, which may include an opinion of counsel, as may reasonably be required by the Bank that neither the legend nor the restrictions on transfer set forth therein are required to ensure compliance with the provisions of the Securities Act.

The Registrar will not register the transfer of any Non-Tenge New Notes or exchange of interests in a Global Note for Note Certificates for a period of 15 days ending on the due date of any payment of principal or interest in respect of such New Notes.

6.     **Euroclear, Clearstream and DTC Arrangements**

Custodial and depositary links have been established between Euroclear, Clearstream and DTC to facilitate the initial issue of the Non-Tenge New Notes and cross-market transfers of the New Notes associated with secondary market trading.

### *Euroclear and Clearstream*

Euroclear and Clearstream each hold securities for participating organisations and facilitate the clearance and settlement of securities transactions between their respective participants through electronic book-entry changes in accounts of such participants.   Euroclear and Clearstream provide to their respective participants, among other things, services for safekeeping, administration, clearance and settlement of internationally-traded securities and securities lending and borrowing.   Euroclear and Clearstream participants are financial institutions throughout the world, including underwriters, securities brokers and dealers, banks, trust companies, clearing corporations and certain other organisations.   Euroclear and Clearstream have established an electronic bridge between their two systems across which their respective customers may settle trades with each other.   Indirect access to Euroclear or Clearstream is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Euroclear or Clearstream participant, either directly or indirectly.

Payments with respect to book-entry interests in the Non-Tenge New Notes held through Euroclear or Clearstream will be credited, to the extent received by the Principal Paying and Transfer Agent, to the cash accounts of Euroclear or Clearstream participants in accordance with the relevant system's rules and procedures.

### *DTC*

DTC has advised the Bank as follows: DTC is a limited purpose trust company organised under the laws of the State of New York, a "banking organisation" within the meaning of the

New York Banking Law, a member of the United States Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC holds securities for DTC participants (including Euroclear and Clearstream) and facilitates the clearance and settlement of securities transactions between DTC participants through electronic computerised book-entry changes in DTC participants' accounts.  DTC participants include securities brokers and dealers, banks, trust companies, clearing corporations and certain other organisations.  Indirect access to the DTC system is also available to others, such as securities brokers and dealers, banks and trust companies that clear through or maintain a custodial relationship with a DTC participant, either directly or indirectly.

Holders of book-entry interests in the New Notes holding through DTC will receive, to the extent received by the Principal Paying Agent, all payments with respect to book-entry interests in the Non-Tenge New Notes from the Principal Paying Agent through DTC and DTC participants.  Distributions in the United States may be subject to relevant U.S. tax laws and regulations. ***Each Claimant and Euornoteholder is urged to consult its own tax adviser as to the particular tax consequences to such Claimant/Euronoteholder relating to the Restructuring Plan, including the applicability and effect of tax laws or tax treaties in any relevant jurisdiction.***

As DTC can act on behalf of DTC direct participants only, who in turn act on behalf of DTC indirect participants, the ability of beneficial owners who are indirect participants to pledge book-entry interests in the Non-Tenge New Notes to persons or entities that do not participate in DTC, or otherwise take actions with respect to book-entry interests in the New Notes, may be limited.

### General

So long as DTC or its nominee or Euroclear, Clearstream or the nominee of their common depositary is the registered holder of a Global Note, DTC, Euroclear, Clearstream or such nominee, as the case may be, will be considered the sole owner or holder of the Non-Tenge New Notes represented by such Global Note for all purposes under the paying agency agreement, the New Notes Trust Deed and the Non-Tenge New Notes.  Payments of principal, interest and additional amounts, if any, in respect of Global Notes will be made to DTC, Euroclear, Clearstream or such nominee, as the case may be, as the registered holder thereof.  None of the Bank, the Trustee, the paying and transfer agent or any agent or any affiliate of any of the above or any person by whom any of the above is controlled for the purposes of the Securities Act will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in the Global Notes or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

Distributions of principal and interest with respect to book-entry interests in the Non-Tenge New Notes held through Euroclear or Clearstream will be credited, to the extent received by Euroclear or Clearstream from the principal paying and transfer agent, to the cash accounts of Euroclear or Clearstream customers in accordance with the relevant system's rules and procedures.

The laws of some states of the United States require that certain persons take physical delivery of securities in definitive form.  Consequently, the ability to transfer interests in a Global Note to such persons will be limited.  Because DTC, Euroclear and Clearstream can only act on behalf of participants, who in turn act on behalf of indirect participants, the ability of a person having an interest in a Global Note to pledge such interest to persons or entities that do not participate in the relevant clearing system, or otherwise take actions in respect of such interest, may be affected by the lack of a physical certificate in respect of such interest.

The holdings of book-entry interests in the Non-Tenge New Notes in Euroclear, Clearstream and DTC will be reflected in the book-entry accounts of each such institution. As necessary, the Registrar will adjust the amounts of Non-Tenge New Notes on the Register for the accounts of the nominee of the Common Depositary to reflect the amounts of Non-Tenge New Notes held through Euroclear and Clearstream on the one hand and DTC, on the other. Beneficial ownership in Non-Tenge New Notes will be held through financial institutions as direct and indirect participants in Euroclear, Clearstream and DTC.

Interests in any Unrestricted Global Note and any Restricted Global Note will be in uncertificated book-entry form.

### Trading between Euroclear and/or Clearstream Account Holders

Secondary market sales of book-entry interests in the Non-Tenge New Notes held through Euroclear or Clearstream to purchasers of book-entry interests in the Non-Tenge New Notes through Euroclear or Clearstream will be conducted in accordance with the normal rules and operating procedures of Euroclear and Clearstream and will be settled using the procedures applicable to conventional eurobonds.

### Trading between DTC Participants

Secondary market sales of book-entry interests in the Non-Tenge New Notes between DTC participants will occur in the ordinary way in accordance with DTC rules and will be settled using the procedures applicable to United States corporate debt obligations in DTC's Same Day Funds Settlement System.

### Trading between DTC Seller and Euroclear/Clearstream Purchaser

When book-entry interests in Non-Tenge New Notes are to be transferred from the account of a DTC participant holding a beneficial interest in a Restricted Global Note to the account of a Euroclear or Clearstream accountholder wishing to purchase a beneficial interest in an Unrestricted Global Note (subject to such certification procedures as are provided in the Agency Agreement), the DTC participant will deliver instructions for delivery to the relevant Euroclear or Clearstream accountholder to DTC by 12 noon, New York time, on the settlement date. Separate payment arrangements are required to be made between the DTC participant and the relevant Euroclear or Clearstream accountholder. On the settlement date, the Custodian will instruct the Registrar to decrease the amount of Non-Tenge New Notes registered in the name of Cede & Co. and evidenced by a Restricted Global Note and increase the amount of Non-Tenge New Notes registered in the name of the nominee of the Common Depositary for Euroclear and Clearstream and evidenced by an Unrestricted Global Note. Book-entry interests will be delivered free of payment to Euroclear or Clearstream, as the case may be, for credit to the relevant accountholder on the first business day following the settlement date.

### Trading between Euroclear/Clearstream Seller and DTC Purchaser

When book-entry interests in the Non-Tenge New Notes are to be transferred from the account of a Euroclear or Clearstream accountholder to the account of a DTC participant wishing to purchase a beneficial interest in the Restricted Global Note (subject to such certification procedures as are provided in the principal paying agency agreement), the Euroclear or Clearstream participant must send to Euroclear or Clearstream delivery free of payment instructions by 5.00 p.m. Brussels or Luxembourg time, one business day prior to the settlement date. Euroclear or Clearstream, as the case may be, will in turn transmit appropriate instructions to the common depositary for Euroclear and Clearstream, and the Registrar to arrange delivery to the DTC participant on the settlement date. Separate payment arrangements are required to be made between the DTC participant and the relevant Euroclear or Clearstream, account holder, as the case may be. On the settlement date, the common

depositary for Euroclear and Clearstream will transmit appropriate instructions to the Custodian who will in turn deliver such book-entry interest in the Non-Tenge New Notes free of payment to the relevant account of the DTC participant and instruct the Registrar to decrease the amount of Non-Tenge New Notes registered in the name of the nominee of the common depositary for Euroclear and Clearstream and evidenced by an Unrestricted Global Note and increase the amount of Non-Tenge New Notes registered in the name of Cede & Co. and evidenced by a Restricted Global Note.

Although the foregoing sets out the procedures of Euroclear, Clearstream and DTC in order to facilitate the transfers of interests in the Non-Tenge New Notes among participants of DTC, Clearstream, and Euroclear, none of Euroclear, Clearstream or DTC is under any obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time.

None of the Bank, the Trustee, the Principal Paying and Transfer Agent or any of the Agents or any affiliate of any of the above, or any person by whom any of the above is controlled for the purposes of the Securities Act, will have any responsibility for the performance by DTC, Euroclear and Clearstream or their respective direct or indirect participants or accountholders of their respective obligations under the rules and procedures governing their operations or for the sufficiency for any purpose of the arrangements described above.

7.     **Central Securities Depositary, Tenge New Notes and Shares**

Central Securities Depository is a not-for-profit organisation established and registered in 1997 as the sole organisation in Kazakhstan that conducts depository activities.  Its shares are held by professional securities market participants, trade organisations and international financial organisations.  Central Securities Depositary conducts activities on the securities market, opens and maintains bank accounts for legal entities in Tenge and foreign currency, processes money transfer instructions and performs activities related to the use of encrypted means of information protection.

The Central Securities Depositary's main functions include providing nominee shareholder services for its participants, settling trades of financial instruments conducted on organised securities markets and over-the-counter transactions involving its participants, depository servicing of state issued securities in accordance with the Kazakhstan law and its code of conduct, providing consultancy, information and other services that do not contradict Kazakhstan law, clearing trades of financial instruments both in exchange for financial instruments and money, providing settlement between brokers and dealers, providing paying agent functions for income payment and redemptions of financial instruments, designating money transfers for trades with securities and other financial instruments and receipt of income payments and redemptions.

According to Kazakhstan law, the clients of Central Securities Depositary may be broker-dealers, custodian banks licensed by the authorised body dealing with the state regulation of securities market and foreign depositories and custodians.

Records of financial instruments held by Central Securities Depositary are maintained on personal accounts of depositors.  In order to separate the financial instruments of the depositor and its clients, each depositor has sub-accounts in which the financial instruments of its clients are held.

Central Securities Depositary issues extracts in electronic or documentary form of the personal account of a depositor as proof of such depositor's ownership and nominal holding of its securities in accordance with the Code of Practice of Central Securities Depositary.

Central Securities Depositary also serves as a paying agent for short-term notes of the NBK by effecting payment on the primary market, as well as provides money transfers upon

repayment of such short-term notes.  It also acts as paying agent in respect of government bonds issued by the Ministry of Finance of Kazakhstan, as well as provides money transfers upon repayment of state treasury bills.

Central Securities Depositary also transfers money to the holders of securities upon interest payment and settlement of securities issued in accordance with the laws of other states.

The Bank will publish details regarding clearing and settlement of Tenge New Notes.

See "*Description of Share Capital and Certain Matters of Kazakhstan Law – Transfer of Shares*" for information regarding Clearing and Settlement of Shares.

**8.      Prescription**

Claims against the Bank in respect of principal and interest on a Non-Tenge New Note while such NonTenge New Note is represented by a Global Note will become void unless it is presented for payment within a period of ten years (in the case of principal) and five years (in the case of interest) from the appropriate Relevant Date (as defined in the relevant Non-Tenge New Notes).

**9.      Meetings**

The holder of a Global Note will be treated as being two persons for the purposes of any quorum requirements of, or the right to demand a poll at, a meeting of holders of Non-Tenge New Notes and, at any such meeting, as having one vote in respect of a principal amount to be determined in respect of Non-Tenge New Notes for which the Global Note may be exchanged.

**10.      Purchase and Cancellation; Prepayments**

Cancellation of any Note required by the Conditions to be cancelled following its purchase and any prepayment will be effected by a reduction in the principal amount of the relevant Global Note as provided in the New Notes Trust Deed.

**11.      Trustee's Powers**

In considering the interests of holders of Non-Tenge New Notes while a Global Note is held on behalf of a clearing system, the New Notes Trustee may have regard to any information provided to it by such clearing system or its operator as to the identity (either individually or by category) of its account holders with entitlements to such Global Note and may consider such interests as if such account holders were the holder of the relevant Global Note.

**12.      Put Option**

The put option in the Conditions of the Non-Tenge New Notes (other than Recovery Units) may be exercised by the holder of the relevant Global Note giving notice to the principal paying and transfer agent of the principal amount of such Non-Tenge New Notes in respect of which the option is exercised and presenting the Global Note for endorsement of exercise within the time limits specified in such Condition and as otherwise provided in the principal paying agency agreement for the Non-Tenge New Notes.

## ADDITIONAL INFORMATION

**Significant Change**

Except as described under "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Recent Developments*", there has been no significant change in the financial or trading position of the Bank since 31 December 2008.

**Costs of the Restructuring**

As at the date of this Information Memorandum, the Bank had incurred costs in relation to the Restructuring of approximately U.S.$33.53 million.

Assuming that the Restructuring Plan is implemented on the timetable contemplated in this Information Memorandum, the Bank estimates that the total costs and expenses payable by the Bank in relation to the Restructuring (including amounts payable to its advisers, advisers to the Steering Committee and to members of the Steering Commitee) in 2009 and in 2010 to the Restructuring Date, will be approximately U.S.$90.60 million.

As is customary in a financial restructuring of the nature proposed by the Bank, in addition to the costs and expenses of its own advisers, the Bank has agreed to pay the expenses of the Steering Committee and BNY Corporate Trustee Services Limited as Trustee and the professional fees and expenses of certain advisers, including those of the Steering Committee and BNY Corporate Trustee Services Limited.

**Governing Law and Jurisdiction**

The Restructuring Plan shall be governed by, and construed in accordance with, the laws of the Republic of Kazakhstan.  The Court shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute which may arise out of this Information Memorandum or any provisions of the Restructuring Plan or out of any action taken or omitted to be taken under the Restructuring Plan or in connection with the administration of the Restructuring Plan.

**Documents Available for Inspection**

Copies of certain documents are available for inspection during normal business hours on any weekday (Saturdays, Sundays and public holidays excepted) from the date of this Information Memorandum until the Restructuring Date at the registered office of the Bank and on the Bank's website at www.bta.kz.  These documents include:

- the New Charter;

- the New Corporate Governance Code;

- the Financial Statements;

- the Bank Creditor Loan Agreement;[10]

- this Information Memorandum and any supplement thereto; and

- drafts of the Deeds of Covenant and the Restructuring Documents,

in each case as and when they become available.

---

[10] Subject to the proviso that the Bank is provided with a copy of this document by the SPV and is authorised by the SPV to make it available to the public.

## SCHEDULE 1 — THE RESTRUCTURING PLAN

1.     **INTERPRETATION**

In this Restructuring Plan, unless the context otherwise requires or otherwise expressly provides for:

(a)     terms not otherwise defined herein shall have the meanings ascribed to them in the information memorandum (the "**Information Memorandum**") of the Bank dated 1 May 2010 (and as supplemented from time to time) under "*Key Terms and Definitions*";

(b)     references to Clauses, Annexes and Recitals are references to the Clauses, Annexes and Recitals respectively of this Restructuring Plan;

(c)     references to a "person" include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(d)     references to a statute or a statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

(e)     the singular includes the plural and *vice versa* and words importing one gender shall include all genders; and

(f)     headings are for ease of reference only and shall not affect the interpretation of this Restructuring Plan.

2.     **RESTRUCTURING DATE AND IMPACT OF RESTRUCTURING**

2.1     This Restructuring Plan will come into effect on the date on which it is approved by the Court.

2.2     The process of the Restructuring is described below in Clauses 3 and 4.  Notional currency conversion shall be made in accordance with Annex 2.

2.3     The procedures as to voting, deemed voting and submission of Claims or otherwise the terms of the Restructuring Packages, details of the GDR Programme and the Deeds of Undertaking and the rights of minority shareholders of the Bank, each as described in the Information Memorandum form an integral part of the Restructuring and of this Restructuring Plan.  Each Claimant who receives GDRs as part of the Restructuring or Shares in submitting a Claim Form is deemed to agree to be bound by the drag-along provisions as set out in "*The GDR Programme – Drag-Along Rights*" (subject always to the conditions of exercise of the Drag-Along Rights as described in "*The GDR Programme – Drag-Along Rights*") and hereby irrevocably appoints the Bank as its true and lawful attorney with full power and authority in its name or otherwise and on its behalf to consider, settle, approve, execute, sign and deliver all agreements, documents, certificates and instruments (whether as a deed or not) which the Bank (acting reasonably) considers necessary or desirable in connection with the transfer of its Shares pursuant to the exercise of the Drag-Along Rights by Samruk-Kazyna.  In addition each Claimant in submitting a Claim Form is deemed to agree to execute and deliver any additional documents and instruments and perform any additional acts that may be reasonably necessary or appropriate to effectuate and perform its obligations in relation to the Drag-Along Rights and the transactions contemplated thereby.  For the avoidance of doubt, the Claimant will not be required to give any warranties (other than as to title, Shares being frees of encumbrances, authority and enforceability) or give any indemnity to any purchaser in respect of a transfer of its Shares.

2.4     Once the Court approves this Restructuring Plan Claimants, Related Parties and Shareholders of the Bank and their respective affiliates will be bound by its terms and conditions.

2.5     The expected financial consequences of the Restructuring are set out in the Information Memorandum.

2.6     The "**Restructuring Date**" shall have the meaning set out in the Information Memorandum and shall be notified by the Bank to the Claimants on its website as soon as possible after such date is notified by the Steering Committee to the Bank.

2.7     The "**Release Date**" shall be the later of (a) the Restructuring Date and (b) the date on which the Distribution Agent has confirmed in writing to the Bank and the Steering Committee that all cash, New Notes, Shares, GDRs and other deliverables in respect of Agreed Claims have been paid or distributed in accordance with all Settlement Instructions delivered to the Bank or the Distribution Agent and for such purpose defective, unlawful or incomplete Settlement Instructions shall be disregarded.

2.8     If the Restructuring Date does not occur on or before 5 September 2010, the Restructuring Plan will lapse and cease to have effect.

**3.      THE RESTRUCTURING PLAN**

3.1     **Release and acceleration of Claims**

(a)     In relation to any contingent Claim, demand for the outstanding amount payable thereunder shall be deemed to have been made immediately prior to the Restructuring Date and in relation to any Designated Financial Indebtedness constituted by an ISDA Master Agreement in respect of which an early termination date has not been designated or otherwise occurred, the agreements constituting the relevant Designated Financial Indebtedness shall be deemed terminated as at the Restructuring Date and the Restructuring Date shall be deemed to be the early termination date for purposes of those agreements and the applicable early termination amount shall be payable by or to the Bank and if payable by the Bank shall constitute an Agreed Claim.

(b)     Pursuant to this Restructuring Plan, on the Restructuring Date all Related Party Debt shall be cancelled and on the Release Date all Designated Financial Indebtedness (including but not limited to the financial indebtedness included in the Preliminary Debt List at Annex 1) shall be discharged and/or cancelled or restructured as set out herein and all Claims, actual and contingent, shall be cancelled and/or discharged fully and absolutely and treated as satisfied, released and paid in full, in each case so as to bind the Claimants, the Related Parties and any person who at any time acquires any interest in or arising out of a Claim.  For the avoidance of doubt, the discharge, release or restructuring of any Claims of Claimants against the Bank Group pursuant to the Restructuring will not in any way affect the obligations of a third party not a member of the Group (including without limitation any guarantor or co-obligor) under any guarantee or other credit support given in relation to such Claim.

(c)     In consideration of the discharge and/or cancellation referred to in Clause 3.1(b), each Agreed Claimant shall have transferred to it or to its Nominated Recipient cash, New Notes, Shares and/or GDRs in accordance with the relevant Entitlements and the procedures set out in this Restructuring Plan.  For the avoidance of doubt, where the Bank is ready, willing and able to distribute cash, New Notes, Shares and/or GDRs in accordance with the relevant Entitlements to a Claimant but is unable to make delivery due to a failure of that Claimant to supply (or supply correct) Settlement Instructions, that will not prevent the discharge and/or cancellation of all Designated Financial Indebtedness on the Release Date.

(d)     The Entitlement (or part thereof) of any Agreed Claimant and Samruk Kazyna referred to in Clause 3.1(c) shall be satisfied in accordance with the provisions of Clause 4.

(e)     Any Claim which has not been included in a Claim Form submitted to the Bank (other than Excluded Debt) shall be cancelled and/or discharged on the Restructuring Date and the relevant Claimant shall not be entitled to receive any Entitlements in respect of such Claim *provided that* the Bank may, in its role and absolute discretion, admit such Claims.

(f)     On the Restructuring Date, all Related Party Debt will be cancelled and/or discharged and the relevant Related Party shall have its Claim treated in accordance with Clause 3.2(c) below.

(g)     On the Release Date, Excluded Debt shall remain in full force and effect and shall not be cancelled and/or discharged.

(h)     On the Release Date, the SK Claims will be cancelled and/or discharged.

3.2     **Entitlements**

(a)     On the Restructuring Date (or as soon as practicably thereafter) the Bank shall procure the distribution of cash, New Notes Shares, GDRs and other deliverables in accordance with the Entitlements allocated to Agreed Claimants in accordance with the "*Terms of the Restructuring Packages*" in the Information Memorandum, which shall be paid or delivered to their Existing Accounts, Designated Accounts or Local Accounts.  For the avoidance of doubt, where a Claimant has not supplied any or correct details of its Existing Accounts, Designated Account or Local Account, it shall only receive its distribution of Entitlements after it has done so.

(b)     Samruk-Kazyna shall receive on the Restructuring Date such number of Shares so that its total shareholding in the Bank represents 81.5 per cent. (less the Residual Minority Shareholder Percentage).   In addition, on the Restructuring Date, in consideration of the guarantee issued by Samruk-Kazyna to the NBK, Samruk-Kazyna shall as from the Restructuring Date receive a guarantee fee from the Bank, payable semi-annually, equal to fifty per cent. of the interest paid from time to time by Samruk-Kazyna to the Bank in relation to any outstanding SK Bonds (i) held by the Bank or (ii) which are the subject of a BTA/NBK Repo Transaction, if any, *provided that* this guarantee fee will not exceed KZT 6.45 billion in 2010 and thereafter KZT 12.9 billion annually, such fee to cease to become payable on the fourteenth anniversary of the date of completion of the Restructuring.   For the avoidance of doubt, Samruk-Kazyna will not be entitled to any other Distribution or Entitlement.

(c)     On the Restructuring Date, Related Party Debt (and to the extent not Related Party Debt, any Designated Financial Indebtedness owed to a Related Party other than the Subordinated Loan) shall be cancelled in full and no further payment on such Related Party Debt shall be made by the Bank Group, *provided that* in respect of domestic bonds owned by any person who was a member of the Bank's supervisory board or management board as at 31 December 2008 (and whether or not such domestic bonds are held in his own name or through any nominee, broker, proxy, trustee or agent, held solely or jointly with any other person, are owned legally, beneficially or otherwise, and including any bond over which he has the power directly or indirectly to dispose of or deal with as if it were his own and he shall be regarded as having that power if a third party holds or controls the bonds in accordance with his direct or indirect instructions), the Bank shall at its discretion (acting reasonably and in good faith) have the right to issue Entitlements to such person on the Restructuring Date or withhold such Entitlements and instead place such Entitlements in the Escrow Account pending resolution by the Bank of investigations into the validity of such person's Claim and/or whether any member of the Bank Group has any claim against such person (which shall be concluded within a reasonable time after the

Restructuring Date).  Following such time, the Entitlements shall (as applicable) either be returned to the Bank and cancelled or released to the relevant Related Party.

3.3    **Interest on Claims**

(a)    Accrued Interest calculated as provided in the Information Memorandum shall be included in the relevant Claim.

(b)    Default interest, penalties, breakage costs and the default element of Late Payment Donations under any Shariah-compliant instrument or arrangement may not be admitted as part of any Claim and shall be deemed to be cancelled and/or discharged on the Release Date.

3.4    **Release**[11]

(a)    Each Claimant and Related Party authorises the Bank from the Restructuring Date to enter into, execute and deliver the Deed of Release on behalf of each Claimant, Related Party and any person to whom a Claimant or Related Party has transferred any Claim, in substantially the form attached hereto as Annex 3.

(b)    On the Restructuring Date the Bank shall enter into and deliver the Deed of Release as principal and on behalf of all Claimants and Related Parties pursuant to the authority conferred by Clause 3.4(a).

3.5    **Finance Subsidiaries and TuranAlem Finance (Russia)**

Certain procedures applicable to indebtedness owed to or by the Finance Subsidiaries are described in "*Information for Claimants*" of the Information Memorandum and shall form part of this Restructuring Plan.  If the Restructuring Plan is approved at the Claimants' Meeting all claims of Rouble Noteholders in respect of the Rouble Notes (whether against TuranAlem Finance (Russia), the Bank or any other Subsidiary of the Bank shall be cancelled.

3.6    **No Proceedings**

Claimants and Euronoteholders understand and irrevocably agree that, without prejudice to their right to receive Entitlements, as of the Restructuring Date no Proceeding or other judicial or quasi-judicial, administrative or regulatory process whatsoever against the Bank or its property shall be commenced or continued in any jurisdiction whatsoever to recover any Claim or to establish the amount or existence of any Claim and any Claimant or Euronoteholder which has commenced any such Proceeding shall forthwith cease such Proceeding.[12]

**4.    VERIFICATION OF QUANTUM AND CLASSIFICATION AND ADMISSION OF CLAIMS**

4.1    **Overview**

The provisions of this section shall apply for the purposes of determining whether a Claim should become an Agreed Claim for the purposes of voting at the Claimant's Meeting and distribution of Entitlements.

---

[11] The form of the deed of release (including its scope) remains subject to discussion with the Steering Committee.

[12] This item is being discussed by BTA and the Steering Committee.

4.2     **Quantum and Classification of Claims**

(a)     On 17 March 2010, the Bank issued a press release which is set out at "*Information for Claimants — Information for Trade Finance Creditors and Official Government Sector Creditors*" of the Information Memorandum announcing a process for the adjudication of trade finance Claims and published a list of all indebtedness which it believes constitutes the principal amount of trade finance indebtedness of the Bank Group, the purpose of which was to establish a process:

   (i)    to determine which Claims against the Bank should be categorised as Non-OGSC Eligible Trade Finance Debt;

   (ii)   in the case of Claims against the Bank which it determined should not be categorised as NonOGSC Eligible Trade Finance Debt to determine which of the exclusions in the definition of NonOGSC Eligible Trade Finance Debt is applicable; and

   (iii)  to make determinations in respect of the principal amount of a disputed trade finance Claim, in advance of the Claimants' Meeting.

(b)     On 22 April 2010 the Bank issued a further press release and published the Preliminary Debt List, which is reproduced (as subsequently updated on 30 April 2010) at Annex 1 *(Preliminary Debt List)* which included all Designated Financial Indebtedness (including contingent Designated Financial Indebtedness) which it then believed to be subject to the Restructuring, specifying in each case the total principal amount outstanding of each debt, as well as a calculation (or good faith estimate) of interest accrued or which will accrue to the Cut-off Date on the basis set out in "*Information for Claimants – Information for all Claimants – Interest*" of the Information Memorandum and Relevant Excluded Debt.

(c)     The amounts published on the Preliminary Debt List were determined as at the Cut-off Date and by reference to the terms of agreements and/or arrangements between the member of the Bank Group and the relevant Claimant (or in the case of a contingent Claim, between the Claimant and the obligor of the underlying debt) in existence as at the Cut-off Date and include the principal amount plus Accrued Interest in each case as at the Cut-Off Date.  No interest or late payment owing is included other than Accrued Interest.

(d)     If a Claimant has previously submitted documentation to the Adjudicator as part of the trade finance adjudication process referred to in paragraph 4.1(a) above, the principal component of its Agreed Claims will be the amount agreed or adjudicated by means of that process and it will not, subject to paragraph 4.4(a), otherwise be reviewed, rejected or disputed by the Bank pursuant to this paragraph 4.2.

(e)     As explained in the press release of 22 April 2010, if any Claimant wished to dispute the amount applicable to its Claim stated in the Preliminary Debt List (including where additional unpaid claims under indemnities, guarantees and in respect of premium were not included) or its classification or non-classification as Relevant Excluded Debt or Direct Official Government Sector Debt, it had to notify the Bank and provide its own calculations by 28 April 2010.  If a Claimant failed to so notify the Bank by this date that it disputed the amount of the Claim or the category of debt into which it was classified, the amount or classification so stated in the Bank's Preliminary Debt List would (except in the case of a manifest error) be deemed to be the amount admitted in relation to the Claim or the correct classification, regardless of anything stated on any subsequent Claim Form delivered to the Bank.

(f)  A purported Claimant or Excluded Creditor who did not notify the Bank by 28 April 2010 that its Claim did not appear on the Preliminary Debt List may nevertheless submit a Claim Form in respect of its Claim but if the Bank disputes such Claim and the dispute is not resolved between the Bank and the Claimant by the Scheduled Supervisor Determination Date then that Claimant shall not (unless it is an Excluded Creditor) receive any Entitlement until such time as the dispute is resolved in its favour by the Supervisor or, if the Supervisor is unable to resolve the dispute, an arbitrator nominated by the LCIA.

(g)  Any such disputed amounts or classification, if not resolved between the Bank and the Claimant within three London business days (each a "**Disputed Claim**") shall be referred to the Supervisor for the purpose of adjudicating the dispute as to quantum or classification by 6 May 2010 (the "**Scheduled Supervisor Determination Date**"), it being understood that the Supervisor shall not be required to make any determination as to the validity of Claims.

(h)  The Supervisor shall be provided with copies of any relevant documentation and shall be entitled to send a notice by electronic mail to the Bank or the Claimant concerned requesting further information, which the Bank or the Claimant, respectively, must provide within three London business days.

(i)  The Supervisor shall review all relevant documentation with regard thereto provided by the relevant Claimant and the Bank Group and shall determine on the basis of the documentation provided to it whether Claims:

   (i)   should be admitted, in which case they shall be to that extent "**Agreed Claims**";

   (ii)  constitute Direct Official Government Sector Debt by assessing whether each such Claim is: (A) owed to an Official Government Sector Creditor; and (B) is by way of direct loan;

   (iii) constitute Relevant Excluded Debt and, if so, into which category of Excluded Creditor the Claimant falls by reference to such Claim, and/or

   (iv)  whether they should be rejected.

(j)  The Supervisor may, based on the documentation provided to it, reject the whole or any part of a Claim and determine the classification of a Claim as Relevant Excluded Debt or Direct Official Government Sector Debt.  The Supervisor's determination shall be made in good faith.  The Supervisor shall, however, advise the relevant person of its decision by electronic mail.

(k)  If the Supervisor requires an extension of time in making his determination, he may, with the consent of the Bank (such consent not to be unreasonably withheld) extend the said period by such amount of time as he and the Bank shall agree.  In making his determination the Supervisor shall be entitled to consult with such advisers, including experts, as he may deem appropriate.

(l)  Where a Disputed Claim has been subject to adjudication by the Supervisor, the amount of the Claim which shall be admitted and its classification shall be the amount and classification determined by the Supervisor, regardless of any amount or classification included on any Claim Form.

(m)  The Supervisor's determination as to the quantum and classification of a Claim shall, to the extent permitted by law, be final and binding on the Bank and the Claimant concerned (but without prejudice to the Bank's right to dispute the validity of such Claim).

(n)     If by the Scheduled Supervisor Determination Date, the Supervisor is unable to resolve a particular Disputed Claim, to the extent that any discrepancy between a Claimant's and the Bank's calculations in relation to such Claim (a "**Discrepancy**") amounts to a difference that is equivalent to less than the lower of 5 per cent. of the amount submitted by the Bank and U.S.$100,000 (a "**Minor Quantum Discrepancy**"), then the Supervisor will use the average of the discrepant figures provided to the Supervisor by the relevant Claimant and the Bank in such circumstances for its final determination.

(o)     Where the Supervisor is unable to resolve all disputes as to quantum and classification by the Scheduled Supervisor Determination Date and:

(i)     the aggregate amount of all Discrepancies, all Disputed Claims as to classification and all discrepancies arising as part of the trade finance adjudication process is less than U.S.$75 million (calculated for disputes as to quantum on a net basis by setting off the aggregate of Discrepancies indicating that the Bank owes them less than the amount claimed against the aggregate of Discrepancies indicating that the Bank owes them more than the amount claimed); and

(ii)    there are fewer than 100 claims (when aggregated with any such claims arising as part of the trade finance adjudication process) in respect of which there are non-Minor Quantum Discrepancies or disputes as to classification,

then the Bank and the Steering Committee shall negotiate in good faith to agree final and binding amounts by reference to all non-Minor Quantum Discrepancies and disputes as to classification by 23 May 2010.

(p)     Where the Supervisor is unable to resolve all disputes as to quantum by the Scheduled Supervisor Determination Date and:

(i)     the aggregate amount of all Discrepancies, all Disputed Claims as classification and all discrepancies arising as part of the trade finance adjudication process is U.S.$75 million or more (calculated for disputes as to quantum on a net basis setting off the aggregate of Discrepancies indicating that the Bank owes less than the amount claimed against the aggregate of Discrepancies indicating that the Bank owes more than the amount claimed); or

(ii)    there are 100 or more claims (when aggregated with any such claims arising as part of the trade finance adjudication process) in respect of which there are non-Minor Quantum Discrepancies or disputes as to classification, then such Disputed Claims will be settled by expert determination in accordance with a procedure the structure and terms of which will be settled by 23 May 2010, and in which case the various Euronoteholders' meetings and the Claimants' Meeting to approve the Restructuring may (and shall at the request of the Bank and/or the Steering Committee) be rescheduled.

(q)     For the avoidance of doubt, to the extent permitted by law, there shall be no right of appeal from a decision of the Supervisor.

(r)     The Supervisor is not liable for anything done or omitted to be done in the discharge or purported discharge of his functions as the Supervisor and there shall be no right to make any claim against the Supervisor in respect thereof except in the case of fraud or bad faith of the Supervisor.  This applies to an employee or agent of the Supervisor as it applies to the Supervisor himself.

4.3     **Particulars of Claimant's Claim**

(a)     All Claimants must submit a Claim Form (whether the Claim is actual or contingent) by the Claims Submission Date.  The Trustees acting on behalf of the Euronoteholders and BTA Finance Luxembourg must submit Claim Forms no later than 10.00 a.m. (Almaty time) on 26 May 2010.  The Bank may, at its discretion, accept a Claim Form at any time prior to the Claimants' Meeting.

(b)     Claimants with contingent off-balance sheet Claims against the Bank (which are not Excluded Debt) relating to one or more underlying arrangements or transactions the purpose of which were to provide finance to a third party ("**Relevant Contingent Claims**") may participate in the Restructuring by either:

(i)     electing to participate in the Restructuring Packages in respect of the outstanding principal amount (plus interest accrued but unpaid up to 30 June 2010) of the underlying debt (or part thereof) (and if they do so, such Claimants must submit a Claim Form for that amount and by doing so they will be deemed to have accelerated and made their Claim (if applicable, in respect of part thereof) against the Bank (regardless of whether the underlying debt has fallen due or is in default) and will agree to irrevocably assign to the Bank all of their rights in respect of the underlying debt (or the relevant part thereof) on the Restructuring Date and to notify, as soon as reasonably practicable, the assignment to the obligor of the underlying debt (or the relevant part thereof)), or

(ii)    electing to participate in the Restructuring but not under the Restructuring Packages in respect of the outstanding principal amount (plus accrued interest) of the underlying debt (or part thereof) and if they do so, such Claimants should submit a Claim Form confirming that they are not participating in the Restructuring Packages and in doing so agree that their contingent Claim (or the relevant part thereof) will be deemed to have been accelerated and made against the Bank (regardless of whether the underlying debt has fallen due or is in default) and will be cancelled (without prejudice to their rights against the obligor of the underlying debt).  In this case, such Claimants will not receive any cash or New Instruments under the Restructuring Packages in respect of the claim (or the relevant part thereof) and will not be required to assign their rights in respect of the underlying debt (or the relevant part thereof) but the Bank will on the Restructuring Date or as soon as reasonably practicable (as that Claimant's Entitlement) either (to the extent it is not legally or contractually prevented from doing so having made all reasonable endeavours to overcome the same)[13] assign to such Claimants any security rights or collateral which the obligor of the underlying debt conferred on or placed with the Bank in relation to that debt (or in the case of a claim hereunder of part only of the claim, a corresponding proportion thereof) or certify to such Claimants that no such security rights or collateral exists and to that effect the Bank shall make available to Claimants of Relevant Contingent Claims information relating to such collateral or security interest.

If such Claimants with Relevant Contingent Claims do not submit a Claim Form in relation to their Claims by the Claims Submission Date, they will be deemed to have made an election pursuant to paragraph (ii) above and will be treated accordingly.

---

[13] The wording in parenthesis is not agreed with the Steering Committee.

(c)    Claim Forms and accompanying documentation must include the following information:

(i)    the Claimant's name and address, (if a company) its company registration number and contact details;

(ii)    the principal amount and the Accrued Interest amount of its Claim as at the Cut-off Date (which should correspond with the adjudicated amount in the case of a Disputed Claim which has been adjudicated by the Supervisor);

(iii)    to the extent indemnities, premia and fees have been agreed or adjudicated by the Supervisor as admissible, such amounts shall be included in the Claim Form[14];

(iv)    whether or not that amount includes outstanding uncapitalised interest or late payment amounts which it may only do to the extent they constitute Accrued Interest;

(v)    particulars of how and when the debt was incurred by the relevant member of the Group and, if relevant, purchased by the Claimant;

(vi)    particulars of any rights of set-off available to the Claimant and the value of such set-off rights;

(vii)    the name, address and authority of the person signing the Claim Form (if other than the Claimant himself);

(viii)    whether the Claimant is an Official Government Sector Creditor;

(ix)    whether the Claim relates to Ordinary Debt, Direct Official Government Sector Debt or Relevant Excluded Debt (and, if the latter, which category of Relevant Excluded Debt it falls within);

(x)    whether the Claim is a Relevant Contingent Claim (see paragraph (b) above);

(xi)    where an election with regard to Restructuring Packages is available to the Claimant, whether it wishes to make such election, in what way and with reference to what amount of its Claim;

(xii)    where an election with regard to currency of Entitlements is available to the Claimant, which currency it wishes to elect;

(xiii)    where an election with regard to receipt of New Notes by a Bank Creditor SPV is available, whether is wishes to make such election;

(xiv)    where an election with regard to receipt of Shares or GDRs is available, which of those it wishes to receive;

(xv)    details of any documents by reference to which the debt can be substantiated and, if available, a copy of such documents shall be attached to the proof or submitted with it; and

(xvi)    all other relevant documentary or other evidence as the Bank shall require in order to carry out its determination.

The Claimant must also give certain representations and warranties including, *inter alia*, in relation to their status and the purpose for which they are acquiring New Notes, GDRs and/or Shares in connection with selling restrictions under applicable

---

[14] This is subject to further discussion with the Steering Committee.

securities laws and confirm whether the Claims submitted by it constitute Related Party Debt.

(d)   Claimants who submitted claims notices in the adjudication process for trade finance claims referred to in Clause 4.2(a) above must submit a Claim Form but shall be deemed to have submitted sufficient information and documentation with respect to the principal amount of those Claims and, if applicable, their status as an Official Government Sector Creditor but may nevertheless submit additional supporting information.

(e)   The Bank may, if it thinks it necessary, require a Claim Form to be verified by means of an affidavit or statutory declaration (or by such other analogous method as they may consider appropriate).

4.4   **Admission and rejection of Claims for voting and distribution of Entitlement**

(a)   The Bank reserves the right to dispute the validity of Claims at all times, including, for the avoidance of doubt, any Claim agreed as to quantum or classification with a Claimant or adjudicated as to quantum or classification by the Supervisor.

(b)   All Claims, whether actual (non-contingent) Claims or contingent Claims, must be made by submitting a Claim Form to the Bank.   In certain circumstances, as described herein, Claim Forms will be deemed to have been submitted.

(c)   Claims submitted after the Claims Submission Date will be cancelled but the Bank may, in its sole and absolute discretion, admit such Claims.

(d)   Subject to Clause 3.2(c) and Clause 3.5 above, Claims in respect of Related Party Debt (other than Excluded Debt) shall be expunged and reduced to zero on the Restructuring Date.

4.5   **Debt payable at a future time**

(a)   Where a Claimant has proved for a Claim, the payment of which is not due at the Claims Submission Date, he is entitled to Entitlements equally alongside other Claimants, but subject to paragraph (b) below.

(b)   For the purpose of such distribution of Entitlements (and no other purpose) the amount of the Claimant's Agreed Claim (or, if the Entitlement has previously been distributed to him, the amount remaining outstanding in respect of his Agreed Claim) shall be reduced by applying such discount rates as the Bank and the Steering Committee agree are appropriate and *provided that* Claimants shall in any event, be deemed to have accelerated such Claims on or before the Claims Submission Date regardless of whether they have done so.

4.6   **Reductions/Increases of amounts of proof**

(a)   If, after a Claimant's Claim has been admitted, the Claim is withdrawn or expunged, or the amount of it is reduced (in each case other than pursuant to the implementation of the Restructuring), the Claimant is liable to repay or otherwise return to the Bank any Entitlement overpaid or over distributed.

(b)   Each Claimant understands and irrevocably agrees that no Claimant shall have any right after the Claims Submission Date to increase the amount of its Claim (irrespective of whether such increase is based on real damage, any loss, moral damage, lost opportunity or otherwise).

(c)    Any Agreed Claim which is withdrawn, expunged, or the amount of which is reduced shall be extinguished, released or barred to the extent so withdrawn, expunged or reduced.

4.7    **Set-off**[15]

(a)    No Claimant may set off a Claim acquired (other than where acquired as a result of a merger or similar with any other entity) on or after 20 April 2009 ("**Acquired Claims**") against a Claim (whether actual or contingent) that the Bank or any Subsidiary has against it.

(b)    Any liability of a Claimant set off against a Claim by the Bank (other than set-offs made before 18 April 2010 against Claims which are not Acquired Claims as a result of any Claimant's enforcement of (i) Security or other cash collateralisation arrangement, (ii) rights of the Claimant under the terms and conditions of business delivered to a member of the Group in connection with the opening or operation of any account, (iii) any judicial, statutory, regulatory or common law right of such Claimant or (iv) any contractual set-off as may be allowed due to a set-off provision of a loan facility or similar agreement) will be treated as an advance distribution of the Entitlements and the relevant Entitlements under the Restructuring Plan actually distributed to the Claimant will be reduced accordingly.

(c)    Where a guarantee or surety of the Bank or its Subsidiaries is treated as satisfied, released and paid in full, the Bank shall be entitled to set off against any person's obligation to reimburse the Bank or its Subsidiary for payments made under such guarantee or surety any obligation of the Bank or its Subsidiary to such person as if the guarantee or surety had actually been paid in full.

(d)    In relation to any Claim or Designated Financial Indebtedness referred to in Clause 3.1(a), if the net amount payable thereunder by the Bank to the Relevant Claimant or any affiliate thereof is positive, such amount shall be treated as an Agreed Claim subject to the Restructuring and if the net amount is negative (in other words, an amount is deemed payable to the Bank), the amount payable shall be treated as an advance distribution of the Claimant's Entitlement under the Restructuring Plan and the Entitlement actually distributed to the Claimant will be reduced accordingly.

4.8    **Realisations following Claims Submission Date**

(a)    Subject to paragraph (b) below, where any Claimant obtains any proceeds in respect of any Claim on or following the Claims Submission Date, it shall be treated as an advance distribution of Entitlements under the Restructuring Plan and the Entitlements actually distributed to the Claimant shall be reduced accordingly.

(b)    For the avoidance of doubt, where any member of the Group receives any amount by reference to a Non-OGSC Eligible Trade Finance Debt or Indirect Official Government Sector Debt which would, were that member of the Group to pay the proceeds thereof to a Claimant, render a transaction to become in whole or in part, a Self-Liquidating Trade Finance Transaction, that member of the Group shall forthwith pay such sums to such Claimant both before as well as after the Claims Submission Date.  Any amounts to be paid shall not be treated as an advanced distribution of Entitlements but shall reduce *pro tanto* the Claim of such Claimant to be restructured or cancelled.

---

[15] This is subject to further discussion with the Steering Committee.

4.9 **No double proof**

Proofs of Claim with respect to essentially the same underlying debt shall not, when aggregated, be admitted for an amount in aggregate in excess of 100 per cent. of the underlying debt to which they relate.

4.10 **Assignments and transfers**

The Bank is not obliged to recognise transfers of any Claim made by Claimants after the Claims Submission Date (but may in its absolute discretion do so).

4.11 **Assignment of right to Entitlements**

(a)     If a Claimant with an Agreed Claim gives notice to the Bank before the Claims Submission Date that he wishes any Entitlements to which he is entitled to be paid or distributed to another person, or that he has transferred or assigned his entitlement to another person, the Bank shall pay or distribute the Entitlements to that other accordingly.

(b)     A notice given under this paragraph must specify the name and address of the person to whom payment is to be made.

(c)     To the extent that any Claimant transfers or assigns all or part of its Claim after it has submitted a Claim Form, the transfer by or on behalf of the Bank to the Claimant or the Claimant's Nominated Recipient named in any Claim Form submitted by such Claimant, or any assignee or transferee recognised by the Bank in accordance with Clause 4.10, of Entitlements shall be effective to discharge and extinguish any Liabilities as at the Restructuring Date or thereafter of the Bank to any transferee or assignee of such Claim in relation to the relevant Claim.

4.12 **Costs of Supervisor**

The Bank shall pay all reasonable costs, charges and expenses incurred by the Supervisor in the course of exercising and performing his powers, duties and functions under the Restructuring Plan.

**5.     DISTRIBUTION**

5.1 **Entitlement**

Each Agreed Claimant (including Euronoteholders) will be entitled to receive Entitlements assigned to it in accordance with the terms of the Restructuring Packages.

In determining a Euronoteholder or Agreed Claimant's Entitlement, fractions of New Notes, Shares and GDRs shall be disregarded and not transferred to the relevant Euronoteholder or Agreed Claimant. Any fractions of New Notes, Shares and GDRs will instead be sold in accordance with Clauses 5.2.7 and 5.2.8 and the Bank shall account to the relevant Claimants who were entitled to such fractions for the Net Proceeds of Sale.

5.2 **Method of Distribution; Full and Final Settlement of Claims**

5.2.1     In order to make the Distribution, if any, to a Euronoteholder or Agreed Claimant, as the case may be, the Distribution Agent or the Bank, as the case may be, shall aggregate the total amount of cash, New Notes, Shares or GDRs attributable to each Euronoteholder or Agreed Claimant, as the case may be and shall transfer the same into the appropriate Existing Account, Designated Account or Local Account in accordance with the instructions set out in the Settlement Instructions and as determined by the terms of the Restructuring Packages or as otherwise set out in the Information Memorandum.

5.2.2    A Euronoteholder with an Agreed Claim will have its Entitlement and Distribution, if any, (or part thereof) credited to its Existing Account, Designated Account or Local Account or as otherwise set out in the Settlement Instructions.

5.2.3    A Claimant with an Agreed Claim who requires Distribution, if any, (or part thereof) to be transferred to a Nominated Recipient or credited to an Existing Account, Designated Account or Local Account shall make an Account Designation in its Settlement Instructions.

5.2.4    If a Claimant does not complete a Claim Form or does not complete it correctly, or if the Settlement Instructions do not include an Account Designation in respect of the relevant Entitlement, or if the operators of a Clearing System are unable or unwilling to provide clearing facilities in respect of the relevant New Notes, Shares and GDRs, or if for any other reason the Bank so wishes, the obligations of the Bank to transfer (or procure the transfer of) such Entitlement to a Claimant with an Agreed Claim shall be discharged by the Distribution to the relevant Claimant or its Nominated Recipient (as appropriate) by certified cheque or wire transfer, in the case of cash, or in certificated form, in the case of New Notes, Shares and GDRs.

5.2.5    If, for any reason, a Claimant with a Securities Entitlement does not wish to, or is unable to, hold the New Notes, Shares or GDRs to which it is entitled, it may direct the Distribution Agent or the Bank, as the case may be, to (i) sell its Securities Entitlement and account to such Claimant for the Net Proceeds of Sale thereof or (ii) transfer the same to a third party who is not so affected.  The price, terms, timing and manner of such sale, and any currency exchange effected by the Distribution Agent or the Bank, as the case may be, in connection with or related to such sale, or the Net Proceeds of Sale, shall be on the best terms reasonably available at the time using a transparent open market process for cash as soon as reasonably practicable after the Restructuring Date.

5.2.6    If in the opinion of the Bank (having taken appropriate legal advice), the allotment, issue or transfer of New Notes, Shares and GDRs pursuant to the Restructuring Plan to that Claimant or its Nominated Recipient may be prohibited by any relevant law, the Distribution Agent shall, if so directed by the Bank, or the Bank shall sell, or procure the sale of, the same and pay the Net Proceeds of Sale from such sale of them to that Claimant or its Nominated Recipient, as the case may be, in full satisfaction of that Claimant's rights under the Restructuring Plan.  Any such sale shall be deemed to have been undertaken at the request and authorisation of the relevant Claimant and the Distribution Agent and the Bank are irrevocably and unconditionally requested and authorised to (i) sell such New Notes, Shares and GDRs on behalf of such Claimant in the market on the best terms reasonably available at the time, using a transparent open market process for cash as soon as reasonably practicable after the Restructuring Date; (ii) transfer the document(s) of title in respect of such New Notes, Shares and GDRs; and (iii) remit the Net Proceeds of Sale as soon as reasonably practicable to the relevant Claimant or its Nominated Recipient, as the case may be.  The price, terms, timing and manner of the sale, and any currency exchange effected by the Bank or the Distribution Agent in connection with or related to the sale or the proceeds of the sale, shall be on the best terms reasonably available at the time using a transparent open market process for cash as soon as reasonably practicable after the Restructuring Date.

5.2.7    No Claimant shall have any entitlement to any distribution of Entitlement other than in accordance with this Clause 5.2 and Clause 4.3(b).

**6.**      **DISTRIBUTION AGENT ARRANGEMENTS**

6.1      **Consent to Distribution Agent Arrangements**

Each Claimant agrees to the New Notes, Shares and GDRs being delivered (to the extent necessary) to the Distribution Agent, and being held by the Distribution Agent such that on the Restructuring Date the Distribution Agent may distribute them to Agreed Claimants in accordance with the Distribution Agent Agreement and the Restructuring Plan.

6.2      **Distribution Agent Agreement**

Prior to the Restructuring Date, the Bank will enter into an agreement with the Distribution Agent setting out the terms on which the Distribution Agent will hold cash, participation in the RCTFF and New Notes, Shares and GDRs on behalf of eligible Claimants.

**7.**      **GENERAL PLAN PROVISIONS**

7.1      **Costs**

(a)      The Bank will pay in full all costs, charges, expenses and disbursements incurred by it in connection with the negotiation, preparation and implementation of the Restructuring Plan as and when they arise, including, but not limited to, the costs of holding the Euronoteholders' Meetings and the Claimants' Meeting, the costs of obtaining the approval of the Court and the costs of placing the notices required by the Restructuring Plan.  For the avoidance of doubt, the Bank will not be liable for any costs of any Claimant in relation to the Euronoteholders' Meetings and the Claimants' Meeting.

(b)      Notwithstanding any other provision in this Restructuring Plan, the Bank shall not be released or waived from any Liability to pay the fees and expenses of the Steering Committee and their advisers and will pay the same promptly (and in any event within three Business Days) following request by the Steering Committee.

7.2      **Modifications of the Restructuring Plan**

(a)      Following the Claims Submission Date, the Bank will, in consultation with its advisers, the Steering Committee and the advisers to the Steering Committee, tabulate the elections of all Claimants in the Claim Forms and revise the discount rates, coupons, coefficients, etc. as set out in "*Terms of Packages*" of the Information Memorandum.  Each Agreed Claimant in respect of Official Government Sector Debt or Non-OGSC Eligible Trade Finance Debt will be notified of its allocation into the relevant Restructuring Packages made in accordance with the Allocation Mechanism and all Claimants will be notified of the changes to the discount rates, coupons, coefficients, etc. arising from this process.

(b)      The Bank may without the consent of the Claimants, Euronoteholders and the Related Parties but following consultation with the Steering Committee, make a modification to the Restructuring Plan or any procedures to complete the Restructuring, in each case which are of a minor or technical nature or to correct a manifest error and/or to postpone particular events or deadlines by which particular aspects of the Restructuring need to be completed so long as the postponement is not materially prejudicial to the interests of the Claimants, Euronoteholders or Related Parties and if it does so will give appropriate notice to Claimants, Euronoteholders and Related Parties.

(c)      Save for amendments to the Restructuring Plan made in accordance with Clause 7.2(a) or (b), no other amendment to the Restructuring Plan will be effective

without the prior approval of two-thirds of Claimants and Related Parties (in aggregate) by value.

7.3   **Payments on Days other than a Business Day**

If any sum is due or obligation is to be performed under the terms of the Restructuring Plan on a date other than a business day in the relevant place, the relevant payment shall be made, or obligation performed, on the next such business day.

7.4   **Actions and measures taken in the course of the Restructuring**

A list of principal events, measures and activities which the Bank is subject to in the course of the Restructuring is set out in the Information Memorandum.

7.5   **Governing Law and Jurisdiction**

This Restructuring Plan shall be governed by, and construed in accordance with, the laws of the Republic of Kazakhstan and the Court shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute which may arise out of any provision of this Restructuring Plan, or out of any action taken or omitted to be taken in connection with the administration of this Restructuring Plan and, for such purposes, the Claimants and Euronoteholders irrevocably submit to the jurisdiction of the Court, *provided*, *however*, *that* nothing in this Clause 7.5 shall affect the validity of other provisions determining governing law and jurisdiction as between the Bank and any of its Claimants and Euronoteholders, whether contained in any contract or otherwise.

## ANNEX 1 – PRELIMINARY DEBT LIST

The Preliminary Debt List in this Annex 1 is for illustrative purposes only.  This Preliminary Debt List includes any Guarantee and any surety provided by the Bank in respect of the Rouble Notes whether or not demand has been made under the relevant Guarantee or surety.

BTA – Designated Financial Indebtedness



345

[1] Interest accrued through 30 June 2010 has been calculated in accordance with the methodology explained in the document entitled "Methodology for calculating interest to be included in the restructuring process" which can be found on the Bank's website at http://www.bba/planderenchment... in the Restructuring of Interest will be written off and is included in this table solely for the purpose of determining voting at the Claimants Meeting and for reallocations between Packages.

**ANNEX 2 — CALCULATION OF ENTITLEMENTS**

As Claims are denominated in different currencies, to calculate the sharing of Entitlements between Restructuring Creditors allocated to a Restructuring Package, all Claims which are not denominated in Tenge will be notionally converted into Tenge at the average rate for the twenty-two trading days immediately preceding the Claimants' Meeting shown on the applicable Bloomberg pages for conversion of the relevant currency into Tenge[16].

Each Restructuring Creditor under Senior Package 1 and Senior Package 2 will, in respect of each of its Agreed Claims, receive Entitlements in accordance with the relevant Coefficients (as adjusted if applicable in accordance with the provisions of the Restructuring Packages).

All Restructuring Creditors will receive Entitlements in the currencies properly elected in their Claim Forms.

---

[16]     To be determined whether Entitlements will be calculated in Tenge or U.S. Dollars.

### ANNEX 3 — FORM OF DEED OF RELEASE[17]

**THIS DEED** is made on _____ 2010

**BETWEEN**:

**(1)** JSC BTA BANK, a company incorporated in the Republic of Kazakhstan under registered number 39031900 AO whose registered office is at 97 Dzholdasbekov Street, Samal-2, Almaty 050051, Kazakhstan (the "**Bank**");

**(2)** **THE CLAIMANTS** acting by the Bank pursuant to the authority conferred upon the Bank by the Claimants pursuant to the Restructuring; and

**(3)** **THE RELATED PARTIES** acting by the Bank pursuant to the authority conferred upon the Bank by the Claimants pursuant to the Restructuring.

**WHEREAS:**

Pursuant to the Restructuring Plan, each Claimant and Related Party has authorised the Bank to enter into and execute and deliver this Deed on its behalf.

**NOW IT IS AGREED** as follows:

**1.     INTERPRETATION**

1.1     In this Deed, unless the context otherwise requires, the following words and expressions shall have the following meanings:

"**Directors and Officers**" means any person who is an officer or director of the Bank or any of its Subsidiaries as at the Restructuring Date or such reduced class of individuals as the Bank may subsequently determine;

"**Information Memorandum**" means the information memorandum of the Bank dated 1 May 2010 as amended or supplemented from time to time relating to the Restructuring.

1.2     In this Deed, unless the context otherwise requires or expressly provides:

(a)     capitalised terms used herein and not otherwise defined shall have the meanings ascribed to them in the Information Memorandum;

(b)     references to any clause, without further designation, shall be construed as a reference to the clause of this Deed so numbered;

(c)     section headings are for convenience only and shall not be taken into account in the interpretation of this Deed;

(d)     reference to any act, statute or statutory provision shall include a reference to that provision as amended, re-enacted or replaced from time to time whether before or after the date of this Deed and any former statutory provision replaced (with or without modification) by the provision referred to;

(e)     words importing the plural shall include the singular and *vice versa;* and

(f)     reference to a person includes a reference to any body corporate, unincorporated association or partnership and to that person's legal personal representatives or successors.

---

[17]     The form of the Deed of Release remains subject to further discussion with the Steering Committee.

**2.     WAIVER, RELEASE AND CONFIRMATION**

2.1     The Claimants and the Related Parties hereby irrevocably and unconditionally release and/or waive on their own behalf and on behalf of any person to whom they may have transferred any of their Claims, in each case to the extent permitted by law, each and every claim (actual or potential) which they have or may have against:

(a)     the Bank;

(b)     the Subsidiaries;

(c)     Samruk-Kazyna;

(d)     the government of Kazakhstan;

(e)     the NBK;

(f)     the FMSA;

(g)     the Directors and Officers;

(h)     the Steering Committee;

(i)     the Trustee;

(j)     the Trade Finance Adjudicator;

(k)     the Supervisor; and

(l)     the Advisers,

arising out of or in connection with the Designated Financial Indebtedness and/or the implementation of the Restructuring with effect from the Release Date (in the case of Claimants) and the Restructuring Date (in the case of Related Parties).  This Clause 2.1 shall not apply to any claim a Steering Committee member may have against its advisers by virtue of any advisory relationship.

2.2     The Claimants and the Related Parties hereby irrevocably and unconditionally release on their own behalf and on behalf of any person to whom they may have transferred any of their Claims, in each case to the extent permitted as a matter of law (and save in the case of any claim a Steering Committee member may have against its advisers by virtue of any advisory relationship), each and all of:

(a)     the Bank;

(b)     the Subsidiaries;

(c)     Samruk-Kazyna;

(d)     the government of Kazakhstan;

(e)     the NBK;

(f)     the FMSA;

(g)     the Directors and Officers;

(h)     the Steering Committee;

(i)     the Trustee;

(j)     the Trade Finance Adjudicator;

(k)      the Supervisor; and

(l)      the Advisers,

from each and every Liability (actual or potential) which they or any of them may have to a Claimant or a Related Party, or any person to whom they may have transferred any of their Claims in relation to or arising out of Designated Financial Indebtedness and/or the implementation of the Restructuring with effect from the Release Date (in the case of Claimants) and the Restructuring Date (in the case of Related Parties).  This Clause 2.2 shall not apply to any claim a Steering Committee member may have against its advisers by virtue of any advisory relationship.

2.3      The Claimants and the Related Parties hereby irrevocably and unconditionally agree and understand that none of the members of the Steering Committee or their Advisers have verified any assertion contained in the Information Memorandum and that such persons have expressly disclaimed any responsibility for such assertions and that the members of the Steering Committee have not acted as fiduciary or adviser to any person and give no covenants and have no duties or obligations to any person in connection with the Restructuring.

2.4      Notwithstanding any other provision of this Deed, no person shall be released or waived from any Liability arising from gross negligence, fraud or wilful misconduct on the part of such person.

2.5      The Claimants hereby acknowledge that their receipt of cash, New Notes, Shares, GDRs and other deliverables in accordance with their Entitlements pursuant to the Restructuring is accepted in full and final settlement of all Claims for which Claim Forms have been submitted relating thereto.

**3.      CONFLICT**

If at any time there shall be any conflict between the provisions of this Deed and the provisions of the Restructuring Plan, the provisions of the Restructuring Plan shall prevail.

**4.      THIRD PARTIES**

A person who is not a party to this Deed shall have no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any of its terms.

**5.      GOVERNING LAW**

This Deed and any non-contractual obligations arising out of or in connection with this Deed shall be governed by and construed in accordance with English law.]

# SCHEDULE 2 — CLAIM FORM[18]

## FOR THE RESTRUCTURING PLAN

in respect of

### JSC BTA BANK

**THIS CLAIM FORM IS TO BE COMPLETED BY ALL CLAIMANTS IN RESPECT OF THEIR CLAIMS FOR DESIGNATED FINANCIAL INDEBTEDNESS.**

**EURONOTEHOLDERS, HOLDERS OF PERPETUAL SECURITIES AND HOLDERS OF CHF NOTES HELD THROUGH THE CLEARING SYSTEMS DO NOT NEED TO COMPLETE A CLAIM FORM.**

**Claimants must submit separate Claim Forms in relation to each Claim of the same type prior to the Claims Submission Date. The provisional date of the Claims Submission Date is 19 May 2010. Any change to this date will be notified by announcement on a Regulatory Information Service and on the Bank's website at www.bta.kz**

**Claimants (other than Excluded Creditors (to which the next paragraph shall apply) should submit a Claim Form prior to the Claims Submission Date and will have their Claims cancelled if they do not, but the Bank may, in its sole and absolute discretion, admit such Claims.**

**Claimants with respect to: (i) Self-Liquidating Trade Finance Transactions, (ii) Official Government Sector Creditors with contingent claims (or parts thereof) against the Bank that have not crystallised, matured or fallen due prior to 30 June 2010 and (iii) trade finance creditors which would be Non-OGSC Eligible Trade Finance Creditors but have received a determination from the Adjudicator that they are not in that category because the claim has not crystallised, matured or fallen due prior to 30 June 2010 (each being holders of Relevant Excluded Debt) are also required to submit a Claim Form by the Claims Submission Date in order to ensure the correct categorisation of their debts.**

Before completing and executing this Claim Form, you should read the instructions below and the detailed notes set out at the end of this Claim Form. If the Claim Form is not completed in its entirety and executed in accordance with the detailed instructions, you may not be eligible to attend and vote at the Claimants' Meeting or receive your Entitlement under the Restructuring Plan.

If you have any questions relating to the completion of this Claim Form, please contact the Bank at the address and telephone number set out below. If you require further copies of this Claim Form, the Information Memorandum or Form of Proxy referred to below, please visit the Bank's website at http://www.bta.kz/en/investor/

This Claim Form is to be read in conjunction with the Information Memorandum dated 1 May 2010 and the Restructuring Plan contained therein that has been prepared in connection with the Restructuring. The definitions contained in the Information Memorandum apply to this Claim Form.

**Instructions for completion and return of this Claim Form:**

1. Detailed instructions regarding completion of this Claim Form are set out at the end of this form.

2. If a Claimant is unable to make all of the representations and undertakings set out in Box 4 of this Claim Form, their Claim Form will be rejected.

   Claim Forms should be submitted initially by email or fax by 19 May 2010, with the originals to be received by the Bank at the address specified below by 26 May 2010.

   Bank details for return of Claim Forms and queries:

   | | |
   |---|---|
   | Contact: | Mr. Asset Zhaisanov, Investor Relations Department |
   | Tel: | +7 727 3124671 |
   | Fax: | +7 727 250 0224 |
   | Email: | zhaisanov@bta.kz |

---

[18] Note: This is the updated version of the Claim Form, in the form previously agreed and made available on the Bank's website.

Contact:      Ms Dinara Adil, Loan and Capital Markets Department
Tel:          +7 727 266 2607
Fax:          +7 727 250 0224
Email:        d_adil@bta kz

Original Claim Forms should be sent to:

Mr. Asset Zhaisanov/Ms Dinara Adil,
117 Dostyk Avenue
6th floor
Almaty Business Centre "Khan-Tengri"
Republic of Kazakhstan, 050020.

THE CLAIMANT REPRESENTS THAT THE CLAIM TO WHICH THIS CLAIM FORM RELATES IS
TRUE AND ACCURATE TO THE BEST OF THE CLAIMANT'S INFORMATION AND BELIEF.

---

1. <u>FULL NAME AND CONTACT DETAILS OF CLAIMANT</u>                                   (BOX 1)

Claimant name (and, if applicable, company registration number):

_____

_____

Contact person with respect to this Claim Form:

_____

_____

Contact Telephone Number: _____

E-mail: _____

Full Address: _____

_____

   Kazakh Pension Fund: (*mark this box if you are a Kazakh Pension Fund*)

---

2. <u>CLAIM</u>                                                                      (BOX 2)

1) Claim Registration Number (*which may be found in the Preliminary Debt List published on the Bank's website and in the Information Memorandum*):

_____

2) Principal (*specify currency and amount*):_____

3) Accrued Interest (*specify currency and amount*) (*to be calculated in accordance with the provisions of the Information Memorandum under "Information for Claimants — Information for all Claimants"*):

_____

4) Premia, Fees, Indemnities (*specify currency and amount*):_____

_____

5) Total Claim (*specify currency and amount*) (*being the sum of 2), 3) and 4)*):

_____

6) Description of Claim:

_____

_____

7) Date incurred by the Bank Group or (if later) purchased by the Claimant:

_____

8) Details of set-offs effected against Claim (*specify dates and amounts*):

_____

_____

9) Details of underlying debt (*applicable to Relevant Contingent Claims only*) (*see paragraph 4.3(b) of the Restructuring Plan*)

_____

If you are an Official Government Sector Creditor who has previously submitted documentation to the Adjudicator, please confirm if you are attaching any additional documentation with this Claim Form:

   Yes

   No

| CATEGORY OF CLAIM | RELEVANT EXCLUDED DEBT |
|---|---|
| Please mark the appropriate boxes in respect of this Claim:<br><br>　Non-OGSC Eligible Trade Finance Debt<br>　Official Government Sector trade finance<br>　Senior bilateral Official Government Sector Debt<br>　Subordinated bilateral Official Government Sector Debt<br>　participation under a syndicated loan<br>　bilateral loan (non-Official Government Sector)<br>　derivative contract<br>　Senior foreign securities (e.g. euronotes)<br>　Perpetual Securities<br>　Subordinated Securities denominated in Tenge<br>　Shariah-compliant instrument/arrangement<br>　any other form of financial indebtedness (*specify type and also mark below if this is a Relevant Contingent Claim*)_____<br>　Relevant Contingent Claim (*see section 4.3(b) of the Restructuring Plan and 3.A below*) | If your Claim constitutes **Relevant Excluded Debt** (*see page 1*) as listed on the Designated Financial Indebtedness list published on the Bank's website, please tick this box. |
| | |

---

3. ELECTIONS                                                                                          (BOX 3)

A.  If your Claim is a Relevant Contingent Claim, please mark the appropriate box below (see Section 4.3(b) of the Restructuring Plan for further details):

　　I wish to participate in the Restructuring and receive Entitlements under the Restructuring Packages, and hereby irrevocably assign with effect on the Restructuring Date, all my rights to the underlying debt described in Box 2, and hereby undertake to notify the obligor of such assignment as soon as practicable

　　I wish to participate in the Restructuring and receive Entitlements outside the Restructuring Packages in accordance with Section 4.3(b)(ii) of the Restructuring Plan and understand that my Claim against the Bank will be cancelled on the Restructuring Date

B.  If your Claim is Non-OGSC Eligible Trade Finance Debt, please fill in the appropriate boxes below:

**First Choice Election**

Amount of Claim you wish to be allocated to Senior Package 1: _____

Amount of Claim you wish to be allocated to Senior Package 2: _____

Amount of Claim you wish to be allocated to Senior Package 3: _____

TOTAL (please ensure that the total of the amounts above equals the Total Claim specified in Box 2):_____

**Second Choice Election**

(Please indicate now by ticking the relevant box, your preference between Senior Package 1 or Senior Package 2, which will only be used in the event that First Choice Elections of Non-OGSC Eligible Trade Finance Creditors (in aggregate) electing Senior Package 3 exceed U.S. Dollars 700 million) Please note that you must tick only Senior Package 1 or Senior Package 2

　　Senior Package 1

　　Senior Package 2

and

　　My Claim is denominated in Euro and, if any part of my Claim is allocated to Senior Package 2, I wish my OID Notes to be denominated in [Euro/U.S. Dollars]* and, if any part of my Claim is

allocated to Senior Package 1, I wish my Senior Notes to be denominated in [U.S. Dollars/Tenge]* and Subordinated Notes to be denominated in [Euro/U.S. Dollars/Tenge]*; or

My Claim is denominated in a currency which is neither Tenge nor Euro and, if any part of my Claim is allocated to Senior Package 1, I wish my Senior Notes to be denominated in [U.S. Dollars/Tenge]* and I wish my Subordinated Notes to be denominated in [U.S. Dollars/Tenge]*;

or

My Claim is denominated in Tenge.

and

I wish to receive Entitlements that I may have to any of the following New Notes:

(i)   Senior Dollar Notes: [directly/Bank Creditor SPV]*

(ii)  Dollar OID Notes: [directly/Bank Creditor SPV]*

(iii) Euro OID Notes: [directly/Bank Creditor SPV]*

(iv) Subordinated Non-Tenge Notes: [directly/Bank Creditor SPV]*

C.   If your Claim is Senior Official Government Sector Debt, please mark the appropriate boxes below:

Amount of Claim you wish to be allocated to Senior Package 1: _____

Amount of Claim you wish to be allocated to Senior Package 2: _____

TOTAL (please ensure that the total of the amounts above equals the Total Claim specified in Box 2): _____

and

My Claim is denominated in Euro and, if any part of my Claim is allocated to Senior Package 2, I wish my OID Notes to be denominated in [Euro/U.S. Dollars]* and, if any part of my Claim is allocated to Senior Package 1, I wish my Senior Notes to be denominated in [U.S. Dollars/Tenge]* and Subordinated Notes to be denominated in [Euro/U.S. Dollars/Tenge]*; or

My Claim is denominated in neither Tenge nor Euro and, if any part of my Claim is allocated to Senior Package 1, I wish my Senior Notes to be denominated in [U.S. Dollars/Tenge]* and I wish my Subordinated Notes to be denominated in [U.S. Dollars/Tenge]*; or

My Claim is denominated in Tenge.

and

I wish to receive Entitlements that I may have to any of the following New Notes:

(i)   Senior Dollar Notes: [directly/Bank Creditor SPV]*

(ii)  Dollar OID Notes: [directly/Bank Creditor SPV]*

(iii) Euro OID Notes: [directly/Bank Creditor SPV]*

(iv) Subordinated Non-Tenge Notes: [directly/Bank Creditor SPV]*

D.   If you are a creditor with an <u>Ordinary Claim</u> (not falling with B. or C. above), please mark the appropriate boxes below:

My Claim is denominated in a currency other than Tenge and I wish to receive any Entitlements in [U.S. Dollars/Tenge]*; or

My Claim is denominated in Tenge

and

I wish to receive Entitlements that I may have to any of the following New Notes:

Senior Dollar Notes: [directly/Bank Creditor SPV]*

Dollar Subordinated Notes: [directly/Bank Creditor SPV]*

E.   <u>Shares/GDR Election</u>

Please mark the appropriate box below:

I am a creditor who is resident in Kazakhstan; or

I am a creditor who is not resident in Kazakhstan and wish to receive any Entitlement to Shares in the form of [GDRs/Shares]*

* *Delete as applicable*

| 4. REPRESENTATIONS AND UNDERTAKINGS | (BOX 4) |
|---|---|

The Claimant represents and undertakes as follows:

(1) The Claimant hereby authorises the Bank to execute and deliver on its behalf the Deed of Release substantially in the form contained in Schedule 1, Annex 3 (*Deed of Release*) of the Information Memorandum and agrees to be bound by the Restructuring Plan.

(2) If a body corporate, the Claimant is duly organised and validly existing under the laws of the jurisdiction of its organisation and has full power and authority to execute this Claim Form.

(3) The execution and delivery of this Claim Form in connection with the Restructuring Plan do not and will not violate any law or regulation applicable to the Claimant.

(4) This Claim Form has been duly completed by the Claimant and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms hereof, subject to the general principles of equity and any applicable bankruptcy, insolvency, reorganisation or similar law in any jurisdiction affecting creditors' rights generally.

(5) The Claimant is a creditor of the Bank Group and has not entered into any prior assignment, sale, grant, conveyance or other transfer of its rights in respect of the Claim to which this Claim Form relates and has good title to make the Claim to which this Claim Form relates (other than any assignment to an Official Government Sector Creditor by a policy holder making claims on their behalf).

(6) The Claimant has adequate information concerning its Claim and the business and financial condition of the Bank to make an informed decision regarding the Restructuring Plan and the Entitlement to be received under the Restructuring Plan in exchange for cancellation or restructuring of its Claim, and no reliance has been made on any document other than the Information Memorandum.

(7) The claimant understands that the New Notes, Shares and GDRs have not been and will not be registered under the Securities Act or any other securities laws and are being offered in transactions not involving any public offering in the United States and unless so registered, the New Notes, Shares and GDRs may not be offered, sold or otherwise transferred except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act or any other applicable securities laws, and in each case in compliance with the conditions for transfer set forth in the first paragraph under the heading "Issuance and Transfer Restrictions" in the Information Memorandum.

(8) It is not, nor is it acting on behalf of, an Affiliate of the Bank or acting on the Bank's behalf and it is either:

    (i) not a U.S. Person or acting for the account or benefit of a U.S. Person, it is located outside the United States and it acknowledges that until the expiration of the period which expires on and includes the 40th day after the later of the commencement of the offering of the New Notes, Shares and GDRs and the Closing Date (the "**distribution compliance period**"), any offer or sale of these New Notes, Shares or GDRs shall not be made by it except (a) to a person whom it reasonably believes is a QIB, in a transaction meeting the requirements of Rule 144A or (b) to a person that is not a U.S. Person or acting for the account or benefit of a U.S. Person in an offshore transaction in accordance with Rule 903 or 904 of Regulation S; and, in each case, accordance with any applicable securities laws of any state of the United States or any other jurisdiction; or

    (ii) an Accredited Investor and, if it is participating on behalf of one or more investor accounts, each of these investor accounts is an Accredited Investor, and it:

        (a) is acquiring the New Notes, Shares and GDRs for investment, in the normal course of its business, and not with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act;

        (b) invests in or purchase securities similar to the New Notes, Shares and GDRs and it has such knowledge and experience in financial and business matters that makes it capable of evaluating the merits and risks of acquiring the New Notes, Shares and GDRs; and

        (c) is aware that it (or any of these investor accounts) may be required to bear the economic risk of an investment in the New Notes, Shares and GDRs for an indefinite period of time and it (or that investor account) is able to bear this risk for an indefinite period; or

(iii)   it is a QIB, and, if it is participating on behalf of one or more investor accounts, each of these investor accounts is a QIB.

(9)   It understands that the New Notes will bear a legend to the following effect:

THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES. BY ACCEPTANCE OF THE SECURITY REPRESENTED HEREBY, EACH BENEFICIAL OWNER HEREOF REPRESENTS THAT (A) IT IS EITHER (I) NOT A U.S.

PERSON AND IS LOCATED OUTSIDE THE UNITED STATES AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT; OR (II) AN ACCREDITED INVESTOR AS DEFINED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT ("**AN ACCREDITED INVESTOR**") OR (III) A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("**QIB**") AND (B) THE SECURITY MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (I) OUTSIDE THE UNITED STATES TO PERSONS THAT ARE NOT U.S. PERSONS AS DEFINED IN, AND IN ACCORDANCE WITH, REGULATION S AND (II) WITHIN THE UNITED STATES IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QIB THAT IS PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER QIB; AND IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES. TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE OR EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION UNDER THE SECURITIES ACT FOR RESALES OF THIS SECURITY.

THIS SECURITY AND ALL RELATED DOCUMENTATION MAY BE AMENDED OR SUPPLEMENTED FROM TIME TO TIME TO MODIFY THE RESTRICTIONS ON AND PROCEDURES FOR RESALES AND OTHER TRANSFERS OF THIS SECURITY TO REFLECT ANY CHANGE IN APPLICABLE LAW OR REGULATION (OR THE INTERPRETATION THEREOF) OR IN PRACTICES RELATING TO THE RESALE OR TRANSFERS OF RESTRICTED SECURITIES GENERALLY. BY THE ACCEPTANCE OF THIS SECURITY. THE HOLDER HEREOF SHALL BE DEEMED TO HAVE AGREED TO ANY SUCH AMENDMENT OR SUPPLEMENT.

(10)   If it is a QIB or an Accredited Investor, it understands that the New Notes offered pursuant to an exemption from the Securities Act other than Regulation S will be represented by a Restricted Global Note. Before any interest in any Restricted Global Note may be offered, sold, pledged or otherwise transferred to a person who takes delivery in the form of an interest in an Unrestricted Global Note, it will be required to provide the Registrar with a written certification (in the form provided in the Agency Agreement) as to compliance with applicable securities laws.

(11)   If it has elected to participate in compliance with Regulation S, it understands that the New Notes will be represented by an Unrestricted Global Note. Prior to the expiration of the distribution compliance period, before any interest in any Unrestricted Global Note may be offered, sold, pledged or otherwise transferred to a person who takes delivery in the form of an interest in a Restricted Global Note, it will be required to provide the Registrar with a written certification (in the form provided in the Agency Agreement) as to compliance with applicable securities laws.

(12)   The Bank, the Registrar, the Trustee and the Principal Paying and Transfer Agent and their Affiliates and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements.

4. <u>EXECUTION</u>                                                                 (BOX 4)

**PLEASE SEE NOTES AT THE BACK OF THIS CLAIM FORM REGARDING EVIDENCE TO BE ATTACHED TO THE CLAIM FORM.**

**EXECUTE A OR B BELOW**

(A) <u>Execution by a company (or a partnership or other entity which has a separate legal personality from its partners or members)</u>

EITHER (i) IF THE CLAIMANT'S SEAL IS TO BE AFFIXED

This Claim Form has been executed on _____ (date)

Executed by the Claimant named below:

_____            *(Affix company seal)*
Name of Claimant

_____     _____     _____
Name in full *(please print)*     Director/Authorised signatory     Signature

_____     _____     _____
Name in full *(please print)*
*(if two signatories are required)*     Director/Authorised signatory     Signature
                                                                          *(if two signatories are required)*

OR (ii) IF THE CLAIMANT'S SEAL IS **NOT** TO BE AFFIXED

This Claim Form has been executed on _____

Executed by the Claimant named below:

Name of Claimant _____

Acting by the person (or persons) named below each of whom is duly authorised on behalf of the Claimant named above:

_____     _____     _____
Name in full *(please print)*     Director/Authorised signatory     Signature
                                  *(Delete as applicable)*

_____     _____     _____
Name in full *(please print)*     Director/Authorised signatory     Signature
*(if two signatures are required)*     *(Delete as applicable)*     *(if two signatures are required)*

(B) <u>Execution by individuals</u>

This Claim Form has been executed on _____ (date)

1. _____            _____

Name in full *(please print)*                         Signature

2. _____            _____

Name in full *(please print)*                         Signature
*(If two signatories are required)*                    *(If two signatories are required)*

**NOTES FOR COMPLETION OF THIS CLAIM FORM**

PLEASE FOLLOW THESE NOTES CAREFULLY WHEN COMPLETING THIS CLAIM FORM.
ALL BOXES MUST BE COMPLETED AS DESCRIBED IN THESE NOTES.

1 **FULL NAME AND CONTACT DETAILS OF CLAIMANT**                                    (Box 1)

This Box must be completed by the Claimant. Please provide all information requested.

2 **CLAIM**                                                                        (Box 2)

Full details of the Claim or Claims of the same type should be provided and a continuation sheet should be used, if necessary. If you are an Official Government Sector Creditor who has previously submitted documentation to the Adjudicator you need not submit such documentation with this Claim Form (but may do so) and may supply additional documents or information if you wish. Claimants should reference any specific agreement or document pursuant to which the Claim is being made. Claimants should also indicate the category of a Claim in the relevant box including, (where applicable, as determined by the Adjudicator or Supervisor).

The Claimant should set out the amount of the/each claim (being the principal amount of the Claim plus Accrued Interest plus any unpaid indemnities, premia and fees). If the amount of any Claim specified in a Claim Form has been reduced by reason of any set-off, the Claimant should provide the details of it and the date when such set-off was made.

Claimants should specify whether their claims are actual or contingent.

3 **ELECTIONS**                                                                    (Box 3)

Claimants should complete only the appropriate sections of Box 3.

4 **REPRESENTATIONS AND UNDERTAKINGS**                                             (Box 4)

Please read Box 4 carefully. If Box 4 is amended in any way, this Claim Form will be invalid. If the representations and undertakings cannot be made, please contact the Bank.

5 **EXECUTION**                                                                    (Box 5)

Box 5 must be signed by each person who is named as a Claimant as explained below.

Insert the date on which this Claim Form is executed. This date must be the date on which the person who signs the Claim Form actually does so. Where more than one person signs the Claim Form, the date inserted should be the date on which the last person to sign the Claim Form actually does so.

As described in the notes below, in most cases evidence of the authority of the signatory(ies) to execute this Claim Form needs to be submitted with the Claim Form.

***Companies (and partnerships or other entities which have a separate legal personality):***

Where a person signing and executing Box 4 is a company (or partnership or other entity which has a separate legal personality), then section (A) must be executed as follows. Either:

(1) that company's seal may be affixed in accordance with the company's articles of association. The person(s) witnessing the affixing of the seal must also complete and sign Box 4 where indicated; or

(2) authorised signatories of the company may sign Box 4 on behalf of that company.

In either case, the persons signing on behalf of the company must specify their position in that company and must submit the evidence of their authority to sign as described in the notes below.

***Individuals:***

Where a Claimant is an individual or individuals, that person or persons must sign and complete Box 4, section (B).

If the person signing in section (B) as an individual is a Claimant who is not holding a Claim solely for his own account (for example, if he holds that Claim as a trustee, executor or personal representative or a partner in a partnership), evidence of his authority to sign the Claim Form must be submitted as described in the notes below.

Even where an attorney has been appointed to sign the Claim Form in Box 4 on behalf of a Claimant, the Claimant must be named in Box 1.

In all cases, the attorney must submit evidence of his, her or its authority to sign as described in the notes below.

*Powers of attorney:*

This note applies if a person named as Claimant in Box 1 has appointed someone else to execute the Claim Form on his, her or its behalf under a power of attorney. If the attorney so appointed is an individual, he or she must (i) sign and complete section (B) as an individual, as described above under "Individuals", and (ii) when he or she prints his or her name in section (B), also write the words "as attorney for X", X being the name of the Claimant who has granted the power of attorney. If the attorney so appointed is a company or a partnership or other entity having its own legal personality, then (i) section (A) must be completed and signed in the manner described above, and (ii) when the name of the company (or other entity) is inserted in section (A), the words "as attorney for X" must be inserted, X being the name of the Claimant who has granted the power of attorney.

Even where an attorney has been appointed to sign the Claim Form in Box 4 on behalf of a Claimant, the Claimant must be named in Box 1.

In all cases, the attorney must submit evidence of his, her or its authority to sign as described in the notes below.

*Evidence to be submitted:*

In all cases other than where an individual who signs the Claim Form is claiming as a Claimant solely for his own account, evidence of the authority of the signatory(ies) to execute the Claim Form on behalf of the Claimant must be submitted with the Claim Form.

Where the Claimant (or the person signing the Claim Form on behalf of the Claimant) is a company, partnership or other entity, this evidence must consist of:

(i)  copies of, or extracts from, the company, partnership or entity's constitutional documents (such as articles of association or partnership agreement) indicating which officers or bodies of the company, partnership or entity are authorised to execute documents, or have the capacity to delegate authority to execute documents, on behalf of that company; or

(ii) (if applicable) copies of, or extracts from, minutes or resolutions of the appropriate officers or bodies of the company, partnership or entity, evidencing that such authority has been delegated to the person(s) completing and signing the Claim Form on behalf of that company, partnership or entity.

For other individuals (such as personal representatives or executors) this evidence should show that the relevant individual is authorised to sign the Claim Form.

The Bank reserves the right to request that evidence of a signatory(ies) authority to execute the Claim Form has been duly legalised and/or apostilled and is accompanied by a notarised translation into the Russian language but no such legalisation and/or apostille shall be required unless so requested by the Bank.

Where a Claimant has appointed an attorney, a copy of the power of attorney must be submitted with the Claim Form, together with any other evidence of authority required to be submitted as described in the notes above. The power of attorney must authorise the attorney to execute this Claim Form. If the power of attorney has been granted under English law, that power of attorney must be executed as a deed. If the power of attorney has been granted under Kazakhstan law, that power of attorney must be notarised when applicable, signed by the authorised officer of the Claimant and its chief financial officer and duly sealed and must contain the date of issuance and term of the power of attorney.

*Corrections and amendments:*

If, in completing this Claim Form, any corrections or amendments, however minor, are made, each person who signs in Box 5 must also sign his or her initials next to each correction or amendment. No amendment may be made to the wording in Box 4.

## SCHEDULE 3 — NOTICE OF CLAIMANTS' MEETING

## JSC BTA BANK

NOTICE IS HEREBY GIVEN that a meeting (the "**Claimants' Meeting**") be convened of the Claimants (as defined in the Information Memorandum referred to below (and, generally, being a person having a claim in respect of the financial indebtedness of JSC BTA Bank (the "**Bank**")) arising under or in connection with certain financial indebtedness of the Bank for the purpose of considering and, if thought fit, approving a restructuring plan proposed to be made between the Bank and the Claimants (the "**Restructuring Plan**").  The Claimants' Meeting will be held in Almaty on 28 May 2010 at or about 10:00 a.m. (Almaty time) at The Dostyk Hotel, 36, Kurmangazy Street, Almaty, Republic of Kazakhstan, 050021 (Tel: +7 727 2582270), at which place and time all the Claimants, save for Euronoteholders, are requested to attend either in person or by proxy.  Each Claimant or his proxy will be required to register his attendance at the Claimants' Meeting prior to its commencement.  Registration will commence at 10:00 a.m. (Almaty time) on 27 May 2010 and will close at 10:00 a.m. (Almaty time) on 28 May 2010.

The agenda of the Claimants' Meeting is the consideration and, if thought fit, approval of the Restructuring Plan.  The quorum for the purposes of the Claimants' Meeting is established at two-thirds of the Bank's obligations by value subject to the Restructuring.

Claimants may vote in person at the Claimants' Meeting or they may appoint another person, whether a Claimant or not, as their proxy to attend and vote in their place.  Claimants are requested to submit their Form of Proxy to an agent whose details are included in the Form of Proxy included with the Information Memorandum.  Claimants or their proxies must be duly authorised to vote.

The text of the Restructuring Plan and of the Information Memorandum are incorporated in the Information Memorandum of which this notice forms part.  Additional copies of such Information Memorandum are available at www.bta.kz.  A blank Form of Proxy is enclosed with the Information Memorandum and can be obtained from the Bank's websites at www.bta.kz

It is requested that Forms of Proxy be lodged with the Bank by no later than 5:00 p.m. (Almaty time) on 19 May 2010[19], but if forms of proxy are not so lodged they may be accepted at the discretion of the Chairman at any time prior to the Claimants' Meeting if properly completed and executed.

By an order of the Specialised Financial Court of the Regional Financial Centre of Almaty (the "**Court**") dated 16 October 2009, the Court has authorised Mr. Anvar Saidenov to act as Chairman of the Claimants' Meeting.

DATED 1 May 2010

---

[19]        Except for trustees on behalf of Euronoteholders and Claimants whose Claims remain in dispute who have until 10:00 a.m. (Almaty time) on 26 May 2010.

## SCHEDULE 4 – FORM OF PROXY

|  |  |  |
| --- | --- | --- |
|  | **FORM OF PROXY FOR CLAIMANTS OF JSC BTA BANK** | **Voting Deadline: 19 May 2010** |

**Instructions for completing and transmitting this Form of Proxy:**

1.  This form should only be completed by all Claimants.

2.  **Box 1** is to be completed for each Claim held.  Complete part (i) and part (ii).

**PLEASE NOTE THAT A SEPARATE FORM OF PROXY MUST BE COMPLETED IN RESPECT OF EACH CLAIM.**

3.  **Box 2** is the certification box.  Complete all the details and sign in the appropriate place.

4.  **Box 3** is your voting instruction.

  (i)  Detail at part (a) whether you would like to appoint the Chairman of the Meeting or yourself or another person as your proxy.

  (ii)  If you would like to appoint the Chairman as your proxy, please indicate at (c) whether you would like the Chairman to vote for or against the Restructuring Plan.  The Chairman can only vote as directed and cannot be directed to vote at his discretion.  There is no need to complete (b) if you appoint the Chairman of the Claimants' Meeting as your proxy.

  (iii) If you do not wish to appoint the Chairman of the Claimants' Meeting as your proxy, please complete your own details (if you wish to attend) or the details of your chosen proxy at (a)(ii). You can detail at (b) either whether you wish your proxy to vote at his own discretion or to vote in accordance with your instructions for or against the Restructuring Plan.  If you do not want your proxy to vote at his own discretion, please also complete (c).

  (iv) The proxy must produce an appropriate proof of personal identity (for example, his or her passport or driving licence with photo-card) at the Claimants' Meeting in order to verify their identity and gain admission to the Claimants' Meeting.

5.  THE DEADLINE FOR SUBMISSION OF PROXIES IS 5:00 P.M. (ALMATY TIME) ON 19 MAY 2010.[20]  PLEASE MAKE SURE YOU RETURN THIS FORM TO THE BANK IN SUFFICIENT TIME FOR YOUR VOTE TO BE CAST.

**General Instructions**

1.  Forms of Proxy may be returned to the Bank by post, fax or electronic mail as set out below:

> Contact:      Mr. Asset Zhaisanov, Investor Relations Department
> Tel:      +7 727 3124671
> Fax:      +7 727 250 0224
> Email:      zhaisanov@bta.kz
>
> Contact:      Ms. Dinara Adil, Loan and Capital Markets Department
> Tel:      +7 727 266 2607
> Fax:      +7 727 250 0224
> Email:      d_adil@bta.kz

2.  The person appointed under this Form of Proxy must attend the Claimants' Meeting in person to represent you.

---

[20]      Except for trustees on behalf of Euronoteholders and Claimants whose Claims remain in dispute until 10:00 am (Almaty time) on 26 May 2010.

3.  All references to defined terms in this Form of Proxy are to be given the same meaning as in the Information Memorandum and the Restructuring Plan.

1  <u>CLAIM</u>                                                                                                    (BOX 1)

The Claimant, identified in Box 2, certifies that the undersigned holds a Claim arising out of an interest identified at (i) below in the amount set out in (ii) below:

**(i)  PLEASE PROVIDE DETAILS (including a reference to any agreement or document relating to the Claim):**

Please use a continuation sheet if necessary

(ii)  Claim amount (stating currency) (being the principal amount of the Claim plus Accrued Interest):

---

2  <u>CERTIFICATION</u>                                                                              (BOX 2)

**TO BE COMPLETED BY ALL CLAIMANTS**

By returning this Form of Proxy, the Claimant certifies that it:

(a)  is a Claimant;

(b)  has full power and authority to vote at the Claimants' Meeting with respect to the Claim listed in Box 1;

(c)  has received a copy of the Information Memorandum; and

(d)  has adequate information to make an informed decision regarding the Restructuring Plan.

Claimant: _____

Signature: _____

Name and title of signatory: _____


Address:

Tel.  No:

Email:

Fax No:

Date:

---

| 3 | FORM OF PROXY AND VOTE | | (BOX 3) |
|---|---|---|---|

**TO BE COMPLETED BY ALL CLAIMANTS**

The Claimant identified in Box 2 hereby:

(a)  appoints the following person as its proxy

| | (i)   **THE CHAIRMAN** | OR | (ii)   **OTHER PROXY** |
|---|---|---|---|
| | instructed paragraph | | |
| **The** | | | the person whose details are given immediately below: |
| | **Chairman**, who is hereby to vote as marked in (c) below | | Name: |
| | | | _____ |
| | | | Address: |
| | | | _____ |
| | | | _____ |
| | | | _____ |
| | | | Tel. no.: |
| | | | _____ |
| | | | Passport no.: |
| | | | _____ |
| | | | and instructs its proxy to vote: |
| | | | using his own discretion (if you check this box do not complete (c))  OR  in accordance with the instructions given in paragraph (c) below. |

| (c) | **(please check one box only):** | |
|---|---|---|
| | **FOR** the Restructuring Plan | **AGAINST** the Restructuring Plan |

| (d) | is not appointing a proxy and will attend in person |
|---|---|

**NB.**  Complete this section if you have appointed the Chairman of the meeting as your proxy or if you have chosen to give specific instructions to your proxy in section (b) above.

If you are a lender with a Claim against TuranAlem Finance, by signing this Form of Proxy you hereby authorise each attorney (**advocaat**) of NautaDutilh N.V. to:

(1)    in the event that TuranAlem Finance offers the BV Scheme to its creditors, file your claim and vote the full amount of your claim in favour and/or against the BV Scheme at TuranAlem Finance's creditors meeting in accordance with your vote for or against the Restructuring Plan, as indicated in Section 3;

(2)    If you have voted in favour of the Restructuring Plan, release TuranAlem Finance from its obligations towards you upon written instruction of TuranAlem Finance unless TuranAlem Finance proposes a BV Scheme that does not become binding, in which case TuranAlem Finance shall not be so released.

**IF YOU HAVE ANY QUESTIONS**

If you have any questions regarding this Form of Proxy or the voting procedures or if you need a Form of Proxy or additional copies of the Information Memorandum or other enclosed materials, please contact the Bank as follows:

Contact:     Mr. Asset Zhaisanov, Investor Relations Department
Tel:     +7 727 3124671
Fax:     +7 727 250 0224
Email:     zhaisanov@bta.kz

Contact:     Ms. Dinara Adil, Loan and Capital Markets Department
Tel:     +7 727 266 2607
Fax:     +7 727 250 0224
Email:     d_adil@bta.kz

## SCHEDULE 5 — NOTICES OF EURONOTEHOLDERS' MEETINGS

[TEXT TO BE INSERTED]

**ANNEX 1 — NOTICE OF MEETING**

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

**TURANALEM FINANCE B.V.**
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "Issuer")*

**NOTICE OF MEETING**
**of the holders of the**
**U.S.$600,000,000 7.875% Notes due 2010 of the Issuer presently outstanding (the "Notes")**

and listed on the Luxembourg Stock Exchange
Common Code: 016884880 ISIN:  XS0168848801 U.S. ISIN:  US89989EAC12 CUSIP: 89989EAC1

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule 3 (*Provisions for Meetings of Noteholders*) to the trust deed dated 2 June 2003 (the "**Original Trust Deed**") as supplemented by a supplemental trust deed dated 30 November 2004 (the "**Supplemental Trust Deed**" and together with the Original Trust Deed, the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly J.P.  Morgan Corporate Trustee Services Limited) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 9:00 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the U.S.$600,000,000 7.875% Notes due 2010 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 2 June 2003 as supplemented pursuant to a supplemental trust deed dated 30 November 2004 (together, the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as

votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)     instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)     instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)     in the event the Restructuring Plan is approved at the Claimants' Meeting:

    (i)     assents to the termination of the Guarantee; and

    (ii)    instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)     authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)     discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)     authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee.  The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.  Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.  The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will,

subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum). If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum). Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*). This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan. Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors. In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding. This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)     the Trust Deed;

(b)     the Paying Agency Agreement;

(c)     the Prospectuses dated 30 May 2003 and 29 November 2004 relating to the Notes;

(d)     the PCTS; and

(e)     following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

### General

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

### Voting Arrangements and Quorum

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule 3 (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below. On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution. By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and

in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
| --- | --- |
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes. Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it. If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs. The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken. A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded. A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote. On a poll every such person has one vote in respect of each U.S.$1,000 principal amount of Notes so produced or for which he is a proxy or representative. Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way. In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar. Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form. Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**DTC Voting Procedures**

Record Date: 15 April 2010

Expiration Date: 5:00 p.m. (New York time) 4 May 2010

Notes represented by a Rule 144A Global Note are held by a custodian for The Depository Trust Company ("**DTC**").  Any Noteholder who, as at the Record Date holds Notes through DTC who wishes to attend and vote at the Noteholders' Meeting or appoint a Proxy to attend and vote at the Noteholders' Meeting on their behalf will be required to complete a form of sub-proxy (as set out in the Annex) and send it to the Principal Paying Agent so that it is received no later than the Expiration Date.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**ANNEX**

**Form of Sub-proxy**

For use in connection with the meeting of the holders of those of the
U.S.$600,000,000 7.875% Notes due 2010, CUSIP: 89989EAC1 (the "**Notes**")
of
**TuranAlem Finance B.V. (**the "**Issuer**"**)**
presently outstanding
convened for 9:00 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old
Broad
Street, London EC2N 1DW (the "**Meeting**")

*This form of sub-proxy should be completed in respect of a Noteholder who does not wish to attend and vote at the Meeting in person and who wishes to appoint a proxy to attend and vote on his behalf and signed by a DTC Participant and lodged with the Principal Paying Agent at The Bank of New York Mellon. 101 Barclay Street, New York NY 10286, United States of America, Attn: Corporate Trust Operations – Reorganisation Unit Attn:  William Buckley (Tel: (212)-815-5788, Fax: (212)-298-1915) by 5:00 p.m. (New York time) on 4 May 2010 to appoint the beneficial owner or another nominee or employee(s) of the Principal Paying Agent (to be nominated by it) as a sub-proxy to attend and vote at the Meeting or adjourned Meeting.*

We hereby certify that:

1.      Notes in the aggregate principal amount specified below were held by the DTC Participant on the Record Date for the purposes of the Meeting.

2.      We appoint [INSERT NAME OF BENEFICIAL OWNER/NOMINEE/EMPLOYEE(S) of the Principal Paying Agent nominated by it][21] of [ADDRESS] with [PASSPORT NUMBER/DRIVING LICENCE NUMBER] to act as our sub-proxy and to attend the Meeting on our behalf and to cast the votes in respect of the Notes described below in the manner set out below.

3.      No other person has been appointed as a sub-proxy in respect of the above Notes and no voting instruction has been given in relation to such Notes.

4.      The aggregate principal amount of Notes in respect of which votes should be cast [by such sub-proxy IN FAVOUR OF/AGAINST the Extraordinary Resolution] [as the sub-proxy wishes in respect of the Extraordinary Resolution] are:

The aggregate principal amount of Notes:  U.S.$_____

Terms defined in the Notice of Meeting in respect of the Notes dated 15 April 2010 and used in this sub-proxy shall have the meanings given to them in such Notice.

Signed by a duly authorised officer on behalf of the DTC Participant

Name of DTC Participant:………………

Account number of DTC Participant:…………………………..

Date: ……………………

---

[21]      Please insert the name of the beneficial owner or another nominee or retain the reference to "employee(s) of the Principal Paying Agent nominated by it" (as appropriate) to be appointed as a sub-proxy to attend and vote at the Meeting.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
E mail:_eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**TABULATION AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email:_eventsadmin@bnymellon.com
Attention:  Corporate Trust Events Administration

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

and

**JSC BTA Bank**
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

15 April 2010

### ANNEX 2 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

### TURANALEM FINANCE B.V.
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "Issuer")*

### NOTICE OF MEETING
#### of the holders of the
**U.S.$400,000,000 8% Notes due 2014 of the Issuer presently outstanding (the "Notes")**
and listed on the Luxembourg Stock Exchange
ISIN:  USN89065AF89 CUSIP:N89065AF8 U.S. ISIN:  US89989EAD94 CUSIP: 89989EAD9

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule 3 (*Provisions for Meetings of Noteholders*) to the trust deed dated 24 March 2004 (the "**Original Trust Deed**") as amended and restated by the amended and restated trust deed dated 6 April 2004 (the "**Amended and Restated Trust Deed**" and together with the Original Trust Deed, the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 9:10 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the U.S. $400,000,000 8% Notes due 2014 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 24 March 2004 as amended and restated by the amended and restated trust deed dated 6 April 2004 (together, the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as

votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)    instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)    instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)    in the event the Restructuring Plan is approved at the Claimants' Meeting:

    (i)    assents to the termination of the Guarantee; and

    (ii)    instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)    authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)    discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)    authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction. As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits. Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed. The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan. If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will,