subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum). If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum). Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*). This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan. Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors. In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding. This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)      the Trust Deed;

(b)      the Paying Agency Agreement;

(c)      the Prospectuses dated 19 March 2004 and 2 April 2004 relating to the Notes;

(d)      the PCTS; and

(e)      following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration.  The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring.  The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule 3 (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above.  The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**").  Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below.  On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution.  By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and

in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
| --- | --- |
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each U.S.$1,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**DTC Voting Procedures**

Record Date: 15 April 2010

Expiration Date: 5:00 p.m. (New York time) 4 May 2010

Notes represented by a Rule 144A Global Note are held by a custodian for The Depository Trust Company ("**DTC**"). Any Noteholder who, as at the Record Date holds Notes through DTC who wishes to attend and vote at the Noteholders' Meeting or appoint a Proxy to attend and vote at the Noteholders' Meeting on their behalf will be required to complete a form of sub-proxy (as set out in the Annex) and send it to the Principal Paying Agent so that it is received no later than the Expiration Date.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**ANNEX**

**Form of Sub-proxy**

For use in connection with the meeting of the holders of those of the
U.S.$400,000,000 8% Notes due 2014, CUSIP:  N89065AF8/89989EAD9 (the "**Notes**")
of
**TuranAlem Finance B.V. (**the "**Issuer**"**)**
presently outstanding
convened for 9:10 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad
Street, London EC2N 1DW (the "**Meeting**")

*This form of sub-proxy should be completed in respect of a Noteholder who does not wish to attend and vote at the Meeting in person and who wishes to appoint a proxy to attend and vote on his behalf and signed by a DTC Participant and lodged with the Principal Paying Agent at The Bank of New York Mellon. 101 Barclay Street, New York NY 10286, United States of America, Attn: Corporate Trust Operations — Reorganisation Unit, Attn:  William Buckley (Tel: (212)-815-5788, Fax: (212)-298-1915) by 5:00 p.m. (New York time) on 4 May 2010 to appoint the beneficial owner or another nominee or employee(s) of the Principal Paying Agent (to be nominated by it) as a sub-proxy to attend and vote at the Meeting or adjourned Meeting.*

We hereby certify that:

5.      Notes in the aggregate principal amount specified below were held by the DTC Participant on the Record Date for the purposes of the Meeting.

6.      We appoint [INSERT NAME OF BENEFICIAL OWNER/NOMINEE/EMPLOYEE(S) of the Principal Paying Agent nominated by it][22] of [ADDRESS] with [PASSPORT NUMBER/DRIVING LICENCE NUMBER] to act as our sub-proxy and to attend the Meeting on our behalf and to cast the votes in respect of the Notes described below in the manner set out below.

7.      No other person has been appointed as a sub-proxy in respect of the above Notes and no voting instruction has been given in relation to such Notes.

8.      The aggregate principal amount of Notes in respect of which votes should be cast [by such sub-proxy IN FAVOUR OF/AGAINST the Extraordinary Resolution] [as the sub-proxy wishes in respect of the Extraordinary Resolution] are:

The aggregate principal amount of Notes:  U.S.$_____

Terms defined in the Notice of Meeting in respect of the Notes dated 15 April 2010 and used in this sub-proxy shall have the meanings given to them in such Notice.

…………………………………
Signed by a duly authorised officer on behalf of the DTC Participant

Name of DTC Participant:………………………………

Account number of DTC Participant:………………………………
Date:………………….

---

[22]      Please insert the name of the beneficial owner or another nominee or retain the reference to "employee(s) of the Principal Paying Agent nominated by it" (as appropriate) to be appointed as a sub-proxy to attend and vote at the Meeting.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email:  eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

### ANNEX 3 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

### TURANALEM FINANCE B.V.
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "Issuer")*

### NOTICE OF MEETING
**of the holders of the**
**U.S.\$350,000,000 8.5% Notes due 2015 of the Issuer presently outstanding (the "Notes")**
and listed on the Luxembourg Stock Exchange
Common Code: 021187305 ISIN:  XS0211873053 U.S. ISIN:  US89989EAF43 CUSIP: 89989EAF4

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule 3 (*Provisions for Meetings of Noteholders*) to the trust deed dated 10 February 2005 the ("**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 9:20 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the U.S. \$350,000,000 8.5% Notes due 2015 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 10 February 2005 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or

supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)    instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)    instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)    in the event the Restructuring Plan is approved at the Claimants' Meeting:

    (i)    assents to the termination of the Guarantee; and

    (ii)    instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)    authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)    discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)    authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.  Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.  The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will, subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the

Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)     the Trust Deed;

(b)     the Paying Agency Agreement;

(c)     the Prospectus dated 9 February 2005 relating to the Notes;

(d)     the PCTS; and

(e)     following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below.  In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal,*

*financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration.   The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution.   Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring.  The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule 3 (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above.  The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**").  Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below.  On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution.  By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote

in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| **Noteholders' Meeting** | **Quorum Requirement** |
| --- | --- |
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each U.S.$1,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**DTC Voting Procedures**

Record Date: 15 April 2010

Expiration Date: 5:00 p.m. (New York time) 4 May 2010

Notes represented by a Rule 144A Global Note are held by a custodian for The Depository Trust Company ("**DTC**").  Any Noteholder who, as at the Record Date holds Notes through DTC who wishes to attend and vote at the Noteholders' Meeting or appoint a Proxy to attend and vote at the Noteholders' Meeting on their behalf will be required to complete a form of sub-proxy (as set out in the Annex) and send it to the Principal Paying Agent so that it is received no later than the Expiration Date.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**ANNEX**

**Form of Sub-proxy**

For use in connection with the meeting of the holders of those of the
U.S.$350,000,000 8.5 per cent. Notes due 2015, CUSIP: 89989EAF4 (the "**Notes**")

of

**TuranAlem Finance B.V.** (the "**Issuer**")
presently outstanding
convened for 9:20 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old
Broad
Street, London EC2N 1DW (the "**Meeting**")

*This form of sub-proxy should be completed in respect of a Noteholder who does not wish to attend and vote at the Meeting in person and who wishes to appoint a proxy to attend and vote on his behalf and signed by a DTC Participant and lodged with the Principal Paying Agent at The Bank of New York Mellon. 101 Barclay Street, New York NY 10286, United States of America, Attn: Corporate Trust Operations — Reorganisation Unit Attn: William Buckley (Tel: (212)-815-5788, Fax: (212)-298-1915) by 5:00 p.m. (New York time) on 4 May 2010 to appoint the beneficial owner or another nominee or employee(s) of the Principal Paying Agent (to be nominated by it) as a sub-proxy to attend and vote at the Meeting or adjourned Meeting.*

We hereby certify that:

1.      Notes in the aggregate principal amount specified below were held by the DTC Participant on
        the Record Date for the purposes of the Meeting.

2.      We appoint [INSERT NAME OF BENEFICIAL OWNER/NOMINEE/EMPLOYEE(S) of the
        Principal Paying Agent nominated by it][23] of [ADDRESS] with [PASSPORT
        NUMBER/DRIVING LICENCE NUMBER] to act as our sub-proxy and to attend the
        Meeting on our behalf and to cast the votes in respect of the Notes described below in the
        manner set out below.

3.      No other person has been appointed as a sub-proxy in respect of the above Notes and no
        voting instruction has been given in relation to such Notes.

4.      The aggregate principal amount of Notes in respect of which votes should be cast [by such
        sub-proxy IN FAVOUR OF/AGAINST the Extraordinary Resolution] [as the sub-proxy
        wishes in respect of the Extraordinary Resolution] are:

The aggregate principal amount of Notes:  U.S.$ _____

Terms defined in the Notice of Meeting in respect of the Notes dated 15 April 2010 and used in this
sub-proxy shall have the meanings given to them in such Notice.

Signed by a duly authorised officer on behalf of the DTC Participant Name of DTC Participant:

Account number of DTC Participant:………………………………….
Date:……………………

---

[23]     Please insert the name of the beneficial owner or another nominee or retain the reference to
"employee(s) of the Principal Paying Agent nominated by it" (as appropriate) to be appointed as a sub-proxy to
attend and vote at the Meeting.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email: eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

## ANNEX 4 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

### TURANALEM FINANCE B.V.
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "**Issuer**")*

### NOTICE OF MEETING
of the holders of the

**U.S.$250,000,000 7.75% Notes due 2013 of the Issuer presently outstanding (the "Notes") issued pursuant
to the U.S.$3,000,000,000 GMTN Programme of the Issuer (the "GMTN Programme")**

and listed on the London Stock Exchange
Common Code: 025188128 ISIN:  XS0251881289 U.S. ISIN:  US89989EAG26 CUSIP: 89989EAG2

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) to the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 9:40 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location.  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the U.S. $250,000,000 7.75% Notes due 2013 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as

votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)     instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)     instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)     in the event the Restructuring Plan is approved at the Claimants' Meeting:

    (i)     assents to the termination of the Guarantee; and

    (ii)     instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)     authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)     discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)     authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee.  The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.   Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.   The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will,

subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum). If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum). Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*). This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan. Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors. In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding. This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)     the Trust Deed;

(b)     the Paying Agency Agreement;

(c)     the Prospectuses dated 7 April 2006 relating to the GMTN Programme;

(d)     the Final Terms dated 21 April 2006 relating to the Notes;

(e)     the PCTS; and

(f)     following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders'

Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below. On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution. By submitting or

delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
| --- | --- |
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each U.S.$1,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**DTC Voting Procedures**

Record Date: 15 April 2010

Expiration Date: 5:00 p.m. (New York time) 4 May 2010

Notes represented by a Rule 144A Global Note are held by a custodian for The Depository Trust Company ("**DTC**").  Any Noteholder who, as at the Record Date holds Notes through DTC who wishes to attend and vote at the Noteholders' Meeting or appoint a Proxy to attend and vote at the Noteholders' Meeting on their behalf will be required to complete a form of sub-proxy (as set out in the Annex) and send it to the Principal Paying Agent so that it is received no later than the Expiration Date.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**ANNEX**

**Form of Sub-proxy**

For use in connection with the meeting of the holders of those of the
U.S.$250,000,000 7.75% Notes due 2013, CUSIP: 89989EAG2 (the "**Notes**")
of

**TuranAlem Finance B.V. (the "Issuer")**

presently outstanding

convened for 9:40 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad
Street, London EC2N 1DW (the "**Meeting**")

*This form of sub-proxy should be completed in respect of a Noteholder who does not wish to attend and vote at the Meeting in person and who wishes to appoint a proxy to attend and vote on his behalf and signed by a DTC Participant and lodged with the Principal Paying Agent at The Bank of New York Mellon. 101 Barclay Street, New York NY 10286, United States of America, Attn: Corporate Trust Operations — Reorganisation Unit Attn: William Buckley (Tel: (212)-815-5788, Fax: (212)-298-1915) by 5:00 p.m. (New York time) on 4 May 2010 to appoint the beneficial owner or another nominee or employee(s) of the Principal Paying Agent (to be nominated by it) as a sub-proxy to attend and vote at the Meeting or adjourned Meeting.*

We hereby certify that:

1.      Notes in the aggregate principal amount specified below were held by the DTC Participant on the Record Date for the purposes of the Meeting.

2.      We appoint [INSERT NAME OF BENEFICIAL OWNER/NOMINEE/EMPLOYEE(S) of the Principal Paying Agent nominated by it][24] of [ADDRESS] with [PASSPORT NUMBER/DRIVING LICENCE NUMBER] to act as our sub-proxy and to attend the Meeting on our behalf and to cast the votes in respect of the Notes described below in the manner set out below.

3.      No other person has been appointed as a sub-proxy in respect of the above Notes and no voting instruction has been given in relation to such Notes.

4.      The aggregate principal amount of Notes in respect of which votes should be cast [by such sub-proxy IN FAVOUR OF/AGAINST the Extraordinary Resolution] [as the sub-proxy wishes in respect of the Extraordinary Resolution] are:

The aggregate principal amount of Notes:  U.S.$ _____

Terms defined in the Notice of Meeting in respect of the Notes dated 15 April 2010 and used in this sub-proxy shall have the meanings given to them in such Notice.

…………………………………

Signed by a duly authorised officer on behalf of the DTC Participant

Name of DTC Participant:……………………………

Account number of DTC Participant:………………………………..

Date:…………………

---

[24]      Please insert the name of the beneficial owner or another nominee or retain the reference to "employee(s) of the Principal Paying Agent nominated by it" (as appropriate) to be appointed as a sub-proxy to attend and vote at the Meeting.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email: eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

ANNEX 5 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

**TURANALEM FINANCE B.V.**
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "**Issuer**")*

**NOTICE OF MEETING**
**of the holders of the**

**PLZ200,000,000 6.3% Notes due 2011 of the Issuer presently outstanding (the "Notes") issued pursuant to the U.S.$3,000,000,000 GMTN Programme of the Issuer (the "GMTN Programme")**

and listed on the London Stock Exchange
ISIN:  XS0249842732 Common Code: 024984273

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) to the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 9:30 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location.  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the PLZ200,000,000 6.3% Notes due 2011 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as

votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)   instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)   instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)   in the event the Restructuring Plan is approved at the Claimants' Meeting:

  (i)   assents to the termination of the Guarantee; and

  (ii)   instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)   authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)   discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)   authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.  Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.  The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will,

subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum). If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum). Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*). This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan. Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors. In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding. This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)     the Trust Deed;

(b)     the Paying Agency Agreement;

(c)     the Prospectuses dated 7 April 2006 relating to the GMTN Programme;

(d)     the Final Terms dated 4 August 2006 relating to the Notes;

(e)     the PCTS; and

(f)     following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders'

Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "Financial Advisers") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "Steering Committee Advisers") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below. On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution. By submitting or

delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
|---|---|
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each PLZ50,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email: eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

418

## ANNEX 6 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

### TURANALEM FINANCE B.V.
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "**Issuer**")*

### NOTICE OF MEETING
of the holders of the

**EUR500,000,000 6.25% Notes due 2011 of the Issuer presently outstanding (the "Notes") issued pursuant
to the U.S.$3,000,000,000 GMTN Programme of the Issuer (the "GMTN Programme")**

and listed on the London Stock Exchange
Common Code: 26926700 ISIN:  XS0269267000

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) to the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 9:50 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location.  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the EUR500,000,000 6.25% Notes due 2013 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") hereby:

(1)      approves the Restructuring Plan;

(2)      instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)      instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as

419

votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)     instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)     instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)     in the event the Restructuring Plan is approved at the Claimants' Meeting:

    (i)     assents to the termination of the Guarantee; and

    (ii)    instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)     authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)     discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)     authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.  Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.  The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will,

subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)       the Trust Deed;

(b)       the Paying Agency Agreement;

(c)       the Prospectuses dated 18 September 2006 relating to the GMTN Programme;

(d)       the Final Terms dated 22 September 2006 relating to the Notes;

(e)       the PCTS; and

(f)       following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders'

Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below. On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution. By submitting or

delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
| --- | --- |
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each EUR1,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the

Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email: eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

## ANNEX 7 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

### TURANALEM FINANCE B.V.
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "Issuer")*

### NOTICE OF MEETING
of the holders of the

**GBP 200,000,000 7.125% Notes due 2009 of the Issuer presently outstanding (the "Notes") issued pursuant to the U.S.$3,000,000,000 GMTN Programme of the Issuer (the "GMTN Programme")**

and listed on the London Stock Exchange
Common Code: 0279181662 ISIN:  XS0279181662

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) to the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly The Bank of New York (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 10:00 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the GBP 200,000,000 7.125% Notes due 2009 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour

427

and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)     instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)     instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)     in the event the Restructuring Plan is approved at the Claimants' Meeting:

   (i)     assents to the termination of the Guarantee; and

   (ii)    instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)     authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)     discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)     authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.  Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.  The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved

at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will, subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)     the Trust Deed;

(b)     the Paying Agency Agreement;

(c)     the Prospectuses dated 18 September 2006 and 8 December 2006 relating to the GMTN Programme;

(d)     The Supplemental Prospectus dated 8 December 2006 relating to the GMTN Programme;

(e)     the Final Terms dated 15 December 2006 relating to the notes;

(f)     the PCTS; and

(g)     following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "Financial Advisers") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "Steering Committee Advisers") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration.  The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution.  Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring.  The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above.  The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**").  Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do

so in accordance with the procedures set out below.  On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution.  By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule J (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
| --- | --- |
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each GBP £1,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email: eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

### ANNEX 8 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

### TURANALEM FINANCE B.V.

*(a private company with limited liability incorporated under the laws of The Netherlands)
(the "**Issuer**")*

### NOTICE OF MEETING
of the holders of the

**U.S.$1,000,000,000 8.25% Notes due 2037 of the Issuer presently outstanding (the "Notes") issued
pursuant to the U.S.$3,000,000,000 GMTN Programme of the Issuer (the "GMTN Programme")**

and listed on the London Stock Exchange
Common Code: 028315627 ISIN:  XS0283156270 U.S. ISIN:  US8998X0AB68 CUSIP:
8998XOAB6

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) to the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 10.20 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the U.S.$1,000,000,000 8.25% Notes due 2013 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)    instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)    instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)    instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)    in the event the Restructuring Plan is approved at the Claimants' Meeting:

    (i)    assents to the termination of the Guarantee; and

    (ii)    instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)    authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)    discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)    authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction. As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits. Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed. The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued

by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will, subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's Statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)      the Trust Deed;

(b)      the Paying Agency Agreement;

(c)      the Prospectuses dated 18 September 2006 relating to the GMTN Programme;

(d)      the Supplemental Prospectuses dated 8 December 2006 relating to the GMTN Programme;

(e)      the Supplemental Prospectuses dated 9 January 2007 relating to the GMTN Programme

(f)      the Final Terms dated 18 January 2007 relating to the Notes;

(g)      the PCTS; and

(h)      following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "Financial Advisers") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "Steering Committee Advisers") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do

so in accordance with the procedures set out below.  On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution.  By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| **Noteholders' Meeting** | **Quorum Requirement** |
|---|---|
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each U.S.$1,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**DTC Voting Procedures**

Record Date: 15 April 2010

Expiration Date: 5:00 p.m. (New York time) 4 May 2010

Notes represented by a Rule 144A Global Note are held by a custodian for The Depository Trust Company ("**DTC**").  Any Noteholder who, as at the Record Date holds Notes through DTC who wishes to attend and vote at the Noteholders' Meeting or appoint a Proxy to attend and vote at the Noteholders' Meeting on their behalf will be required to complete a form of sub-proxy (as set out in the Annex) and send it to the Principal Paying Agent so that it is received no later than the Expiration Date.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**ANNEX**

**Form of Sub-proxy**

For use in connection with the meeting of the holders of those of the
U.S.$1,000,000,000 8.25% Notes due 2037, CUSIP: 8998XOAB6 (the "**Notes**")
of
**TuranAlem Finance B.V. (**the "**Issuer**"**)**
presently outstanding
convened for 10:20 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old
Broad
Street, London EC2N 1DW (the "**Meeting**")

*This form of sub-proxy should be completed in respect of a Noteholder who does not wish to attend and vote at the Meeting in person and who wishes to appoint a proxy to attend and vote on his behalf and signed by a DTC Participant and lodged with the Principal Paying Agent at The Bank of New York Mellon. 101 Barclay Street, New York NY 10286, United States of America, Attn: Corporate Trust Operations — Reorganisation Unit Attn:  William Buckley (Tel: (212)-815-5788, Fax: (212)-298-1915) by 5:00 p.m. (New York time) on 4 May 2010 to appoint the beneficial owner or another nominee or employee(s) of the Principal Paying Agent (to be nominated by it) as a sub-proxy to attend and vote at the Meeting or adjourned Meeting.*

We hereby certify that:

1.      Notes in the aggregate principal amount specified below were held by the DTC Participant on the Record Date for the purposes of the Meeting.

2.      We appoint [INSERT NAME OF BENEFICIAL OWNER/NOMINEE/EMPLOYEE(S) of the Principal Paying Agent nominated by it][25] of [ADDRESS] with [PASSPORT NUMBER/DRIVING LICENCE NUMBER] to act as our sub-proxy and to attend the Meeting on our behalf and to cast the votes in respect of the Notes described below in the manner set out below.

3.      No other person has been appointed as a sub-proxy in respect of the above Notes and no voting instruction has been given in relation to such Notes.

4.      The aggregate principal amount of Notes in respect of which votes should be cast [by such sub-proxy IN FAVOUR OF/AGAINST the Extraordinary Resolution] [as the sub-proxy wishes in respect of the Extraordinary Resolution] are:

The aggregate principal amount of Notes:  U.S.$ _____

Terms defined in the Notice of Meeting in respect of the Notes dated 15 April 2010 and used in this sub-proxy shall have the meanings given to them in such Notice.

…………………………………
Signed by a duly authorised officer on behalf of the DTC Participant

Name of DTC Participant:……………………………

Account number of DTC Participant:………………………..

Date:……………………

---

[25]      Please insert the name of the beneficial owner or another nominee or retain the reference to "employee(s) of the Principal Paying Agent nominated by it" (as appropriate) to be appointed as a sub-proxy to attend and vote at the Meeting.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email: eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

ANNEX 9 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

**TURANALEM FINANCE B.V.**
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "Issuer")*

**NOTICE OF MEETING**
**of the holders of the**

**JPY20,000,000,000 4.25% Notes due 2016 of the Issuer presently outstanding (the "Notes") issued**
**pursuant to the U.S.$3,000,000,000 GMTN Programme of the Issuer (the "GMTN Programme")**

Common Code: 028053177 ISIN:  XS0280531772

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) to the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 10.10 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location.  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the JPY20,000,000,000 4.25% Notes due 2016 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") hereby:

(1)      approves the Restructuring Plan;

(2)      instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)      instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as

445

votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)   instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)   instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)   in the event the Restructuring Plan is approved at the Claimants' Meeting:

(i)   assents to the termination of the Guarantee; and

(ii)   instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)   authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)   discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)   authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee.  The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.   Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.   The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will,

subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)      the Trust Deed;

(b)      the Paying Agency Agreement;

(c)      the Prospectuses dated 18 September 2006 relating to the GMTN Programme;

(d)      Supplemental Prospectuses dated 8 December 2006 relating to the GMTN Programme

(e)      the Final Terms dated 22 December 2006 relating to the Notes;

(f)      the PCTS; and

(g)      following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below.

In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement)*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below. On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation

to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution.  By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
| --- | --- |
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes. Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it. If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs. The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken. A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded. A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote. On a poll every such person has one vote in respect of each JPY1,000,000 principal amount of Notes so produced or for which he is a proxy or representative. Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way. In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar. Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form. Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email:  eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

## ANNEX 10 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD**
**TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

### TURANALEM FINANCE B.V.

*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "**Issuer**")*

### NOTICE OF MEETING

of the holders of the
**JPY 30,000,000,000 Floating Rate Puttable Notes due 2017 of the Issuer presently outstanding (the**
**"Notes") issued pursuant to the U.S.$8,000,000,000 GMTN Programme of the Issuer (the "GMTN Programme")**

Common Code: 030336160 ISIN:  XS0303361603

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) to an amended and restated trust deed dated 2 May 2007 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 10:30 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the JPY 30,000,000,000 Floating Rate Puttable Notes due 2017 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the amended and restated trust deed dated 2 May 2007 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour

and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)     instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)     instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)     in the event the Restructuring Plan is approved at the Claimants' Meeting:

   (i)     assents to the termination of the Guarantee; and

   (ii)    instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)     authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)     discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)     authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee.  The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.  Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.  The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved

at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will, subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)     the Trust Deed;

(b)     the Paying Agency Agreement;

(c)     the Prospectuses dated 2 May 2007 and 22 May 2007 relating to the GMTN Programme;

(d)     the Final Terms dated 29 May 2007 relating to the Notes;

(e)     the PCTS; and

(f)     following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders'

Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration.  The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution.  Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring.  The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above.  The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**").  Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below.  On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution.  By submitting or

delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule J (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
| --- | --- |
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each JPY 1,000,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email:  eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

460

## ANNEX 11 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

### TURANALEM FINANCE B.V.

*(a private company with limited liability incorporated under the laws of The Netherlands)
(the "**Issuer**")*

### NOTICE OF MEETING
#### of the holders of the

### JPY 15,000,000,000 Floating Rate Puttable Notes due 2017 of the Issuer presently outstanding (the
"**Notes**") issued pursuant to the U.S.$8,000,000,000 GMTN Programme of the Issuer (the
"**GMTN Programme**")

ISIN:  XS0323864313

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) to an amended and restated trust deed dated 2 May 2007 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem (the "**Bank**") and BNY Corporate Trustee Services Limited (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 10:40 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the JPY 15,000,000,000 Floating Rate Puttable Notes due 2017 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the amended and restated trust deed dated 2 May 2007 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (the "**Trustee**") hereby:

(1)      approves the Restructuring Plan;

(2)      instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)      instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour

and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)     instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)     instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)     in the event the Restructuring Plan is approved at the Claimants' Meeting:

    (i)     assents to the termination of the Guarantee; and

    (ii)     instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)     authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)     discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)     authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.  Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.  The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved

at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will, subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)      the Trust Deed;

(b)      the Paying Agency Agreement;

(c)      the Prospectuses dated 2 May 2007 and 22 May 2007 relating to the GMTN Programme;

(d)      the Final Terms dated 19 September 2007 relating to the Notes;

(e)      the PCTS; and

(f)      following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders'

Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration.   The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution.   Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring.   The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above.  The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**").  Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below.  On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution.  By submitting or

delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule J (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
| --- | --- |
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each JPY 1,000,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email:  eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

## ANNEX 12 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

### TURANALEM FINANCE B.V.
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "**Issuer**")*

### NOTICE OF MEETING
of the holders of the

**USD 200,000,000 11.5% Notes due 2013 of the Issuer presently outstanding (the "Notes") issued pursuant
to the U.S.$8,000,000,000 GMTN Programme of the Issuer (the "GMTN Programme")**

Common Code: 035803548 ISIN:  XS0358035482

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) of an amended and restated trust deed dated 2 May 2007 (the "Trust Deed") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 10:50 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the USD 200,000,000 11.5% Notes due 10 April 2013 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the an amended and restated trust deed dated 2 May 2007 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (the "**Trustee**") hereby:

(1)      approves the Restructuring Plan;

(2)      instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)      instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction

Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)     instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)     instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)     in the event the Restructuring Plan is approved at the Claimants' Meeting:

    (i)     assents to the termination of the Guarantee; and

    (ii)    instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)     authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)     discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)     authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.  Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.  The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will, subject to paragraph 6(2) of the Extraordinary Resolution, be extinguished in consideration of the

provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, of the Bank then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)      the Trust Deed;

(b)      the Paying Agency Agreement;

(c)      the Prospectuses dated 25 June 2007 and 8 October 2007 relating to the GMTN Programme (U.S.$8,000,000,000);

(d)      the Final Terms dated 22 April 2008 relating to the Notes;

(e)      the PCTS; and

(f)      following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below.  In light of such requirements, Noteholders are strongly urged either to attend the Noteholders'

Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration.   The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution.   Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring.   The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above.  The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**").  Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below.  On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution.  By submitting or

delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule J (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| **Noteholders' Meeting** | **Quorum Requirement** |
| --- | --- |
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each U.S.$1,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email:_eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

ANNEX 13 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

**TURANALEM FINANCE B.V.**
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "**Issuer**")*

**NOTICE OF MEETING**
**of the holders of the**

**U.S.$100,000,000 11.25% Notes due 2014 of the Issuer presently outstanding (the "Notes")
issued
pursuant to the U.S.$8,000,000,000 GMTN Programme of the Issuer (the "GMTN Programme")**

Common Code: 036669705 ISIN:  XS0366697059

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J(*Provisions for Meetings of Noteholders*) of an amended and restated trust deed dated 2 May 2007 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 11:00 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location). Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the U.S.$100,000,000 11.25% Notes due 27 May 2014 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the amended and restated trust deed dated 2 May 2007 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as

votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)    instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)    instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)    in the event the Restructuring Plan is approved at the Claimants' Meeting:

    (i)    assents to the termination of the Guarantee; and

    (ii)    instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)    authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)    discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)    authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.  Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.  The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will,

subject to paragraph 6(2) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)     the Trust Deed;

(b)     the Paying Agency Agreement;

(c)     the Prospectuses dated 25 June 2007 and 8 October 2007 relating to the GMTN Programme;

(d)     the Final Terms dated 26 May 2008 relating to the Notes;

(e)     the PCTS; and

(f)     following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders'

Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "Financial Advisers") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "Steering Committee Advisers") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below. On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution. By submitting or

delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule J (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
| --- | --- |
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each U.S.$1,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email: eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

**SCHEDULE 6 – BTA FINANCE LUXEMBOURG S.A. NOTICES**

[TEXT TO BE INSERTED]

**ANNEX 1 – NOTICE OF SHAREHOLDERS' MEETING**
**BTA FINANCE LUXEMBOURG S.A. Affiliated Company of JSC BTA Bank**
*société anonyme*

Registered Office: 46A, avenue John F. Kennedy, L-1855 Luxembourg
Grand Duchy of Luxembourg
R.C.S. Luxembourg B 112.100
(the "**Issuer**")

**CONVENING NOTICE OF EXTRAORDINARY GENERAL MEETING OF**
**SHAREHOLDERS ON**
**22 APRIL 2010**

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF**
**SHAREHOLDERS.  IF SHAREHOLDERS ARE IN ANY DOUBT AS TO THE ACTION**
**THEY**
**SHOULD TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS**
**IMMEDIATELY**

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Chapter IV (General Meeting of Shareholders) of the articles of association of the Issuer (the "**Articles**"), the Board of Directors of the Issuer resolved to convene a meeting (the "**Extraordinary General Meeting**") of the shareholders of the Issuer (the "**Shareholders**"), including the holders of the U.S.$400,000,000 Perpetual Preferred Securities (the "**Securities**") of the Issuer listed on the London Stock Exchange plc (the "**Holders**").

The Extraordinary General Meeting will be held at 12:00 noon (Central European Time) on 22 April 2010 at the offices of the Issuer at 46A, avenue John F. Kennedy, L-1855 Luxembourg, Grand Duchy of Luxembourg, for the purpose of considering and, if thought fit, passing the following resolutions, which will be proposed as Extraordinary Resolutions in accordance with the provisions of the Articles.  If within 15 minutes after such time the quorum prescribed by the Articles is not present, the Extraordinary General Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Extraordinary General Meeting (including the Extraordinary Resolutions) shall bear the meanings given to them in the Offering Memorandum or the principal commercial Term Sheet amendment letter dated 17 March 2010 (the "**PCTS Amendment Letter**") between JSC BTA Bank and the Steering Committee of its financial creditors.

The Extraordinary General Meeting has the agenda to approve the terms of **EXTRAORDINARY RESOLUTIONS** as follows:

"THAT this Meeting of Shareholders of BTA Finance Luxembourg S.A. (the "**Issuer**"), including the holders of the U.S.$400,000,000 Perpetual Preferred Securities having the benefit of a support agreement from JSC BTA Bank (formerly JSC Bank TuranAlem) ("**BTA**") dated 25 January 2006 (the "**Support Agreement**"), hereby:

First Resolutions
(*not subject to the quorum and majority requirements of an amendment to the Issuer's Articles*)

(1)      resolves to approve the Restructuring Plan;

(2)      resolves to authorise the board of directors of the Issuer (the "**Board of Directors**") to amend, waive all of the Issuer's rights concerning and terminate the Subsidiary Subordinated Loan in consideration of a transfer to the Issuer of TuranAlem Finance B.V.'s corresponding legal relationship with BTA concerning the Bank Subordinated Loan;

(3)      resolves to authorise the Board of Directors to submit to BTA a Claim Form on behalf of the Issuer;

486

(4) resolves to authorise the Board of Directors to vote the entire principal amount of the Bank Subordinated Loan or any other claims the Issuer may have on BTA in connection with the Securities in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as the Shareholders vote in favour of and/or against this Extraordinary Resolution;

(5) resolves to authorise the Board of Directors to (i) do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution, including any amendment and/or restatement of the Support Agreement, the Bank Subordinated Loan and/or the Subsidiary Subordinated Loan, and (ii) terminate the Support Agreement if a restructuring plan has become binding on the financial creditors of BTA under the Restructuring Law; and

(6) resolves, to the extent legally possible, to discharge and exonerate the Board of Directors from all liability in respect of the performance of its duties in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation,

<u>Second Resolution</u>
(*subject to the quorum and majority requirements of an amendment to the Issuer's Articles*)

(1) resolves to approve to amend the Issuer's Articles as follows:

(i) to insert a paragraph in Article 37 (*Definitions*), immediately after the definition of "**Replacement Instruments**", which reads:

""**Restructuring Law**" means the Law of the Republic of Kazakhstan No. 18S-IV ZRK dated 11 July 2009 on Amendments and Additions to Certain Legislative Acts on Money Payments and Transfers, Accounting and Financial Reporting, Banking Activities, the National Bank of Kazakhstan and Other Legislation;"

(ii) to add a sentence at the end of Article 7.2.4., which reads:

"For the avoidance of doubt, no Distributions shall be declared and paid on the Securities after a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law;"

(iii) to add a paragraph at the end of paragraph (I) of Article 35, which reads:

"Notwithstanding the availability of sufficient assets of the Company to pay any Liquidation Distribution to the Holders, if, at the time such Liquidation Distribution is to be paid, a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law, the Liquidation Distribution per Security paid to Holders thereof shall be equal to a proportionate share of the cash and/or securities and/or other entitlement which the Issuer receives under or as a result of such restructuring plan, which cash and/or securities and/or other entitlement shall, if the Board of Directors so elects, be distributed directly by the Bank to the Holders;" and

(iv) to insert a sentence, immediately after the first sentence of paragraph (V) of Article 35, which reads:

"For the avoidance of doubt, if a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law, under which plan the Bank Subordinated Loan has been restructured or cancelled, the Company may permit or take any action that would or might cause the liquidation or dissolution of the Company, subject only to the approval or non-objection by the FMSA (if then required)."

Finally, by voting on the above First Resolutions and notwithstanding whether such First Resolutions will be passed, each Holder authorises the Board of Directors to vote the entire principal amount of the Bank Subordinated Loan or any other claims it may have on BTA in connection with the Securities in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as the Shareholders vote in favour of and/or against such First Resolutions.

Terms used in these resolutions and defined in the Notice convening this Meeting or in the PCTS Amendment Letter are used herein as so defined."

**Documents Available for Inspection**

Holders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Extraordinary General Meeting, inspect at the offices of the Issuer copies of the following documents:

(a)     the Support Agreement dated 25 January 2006;

(b)     the Offering Memorandum dated 20 January 2006 relating to the Securities;

(c)     the SA/BV Subordinated Loan Agreement dated 20 January 2006 between TuranAlem Finance BV and the Issuer (the "**Subsidiary Subordinated Loan**");

(d)     the BV/BTA Subordinated Loan Agreement dated 20 January 2006 between BTA and TuranAlem Finance BV (the "**Bank Subordinated Loan**");

(e)     the PCTS Amendment Letter;

(f)     following publication, the information memorandum intended to be published by BTA (as defined below) no later than 23 April 2010 (such information memorandum, as supplemented from time to time, the "**Information Memorandum**"); and

(g)     the form of Claim Form.

Copies of the Information Memorandum will be, and the PCTS Amendment Letter and forms of proxy (referred to below) are, available for collection at the specified offices of the Principal Paying and Transfer Agent and the Registrar and also on BTA's website at www.bta.kz/en/investor.

**General**

Holders should pay particular attention to the requirements in respect of a quorum for the Extraordinary General Meeting and any adjourned Extraordinary General Meeting (if applicable) which are set out below.  In light of such requirements, Holders are strongly urged either to attend the Extraordinary General Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Extraordinary General Meeting.

*Neither Lazard Frères and UBS AG as BTA's financial advisers (the "**Financial Advisers**") nor the Steering Committee express any view or make any recommendations as to the merits of the Extraordinary Resolutions or any view on whether the Holders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolutions.  The Financial Advisers have not verified any of the statements made in the PCTS, Information Memorandum or in this Notice.*

*Nothing in the PCTS Amendment Letter or this Notice should be construed as a recommendation to the Holders from the Issuer or the Financial Advisers to vote for or against the Extraordinary Resolutions.  Accordingly, each of the Issuer, BTA and the Financial Advisers recommend that Holders who are unsure of the impact of the Extraordinary Resolutions should seek their own financial and legal advice.*

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Extraordinary General Meeting are set out in Chapter IV (General Meeting of Shareholders) of the Articles. The Securities are currently represented by a global certificate (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Securities, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Holder for the purposes of the Extraordinary General Meeting. On this basis, the only Holder for the purposes of the Extraordinary General Meeting will be the Registered Holder.

A holder of a Security wishing to attend and vote at the Extraordinary General Meeting in person must produce at the Extraordinary General Meeting a valid voting certificate or valid voting certificates issued by the Registrar relative to the Security(ies), in respect of which he wishes to vote. Voting certificates will be available with and can be received from the Registrar.

The Registered Holder may by instrument in writing in the English language (a "**Form of Proxy**") in the form available from the office of the Registrar signed by the Registered Holder or, in the case of a corporation, executed under its seal or signed on its behalf by its duly appointed attorney or a duly authorised officer of the corporation and delivered to the specified office of the Registrar not less than 24 hours before the time fixed for the Extraordinary General Meeting (or any adjourned such meeting), appoint any person (a "**proxy**") to act on his or its behalf in connection with the Extraordinary General Meeting (or any adjourned such meeting).

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Extraordinary General Meeting (or any adjourned or reconvened such meeting) to be the holder of the Securities to which such appointment relates and the Registered Holder of the Securities shall be deemed for such purposes not to be the holder.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Extraordinary General Meeting save that at least 8 days' notice shall be given. Such notice shall also state the quorum required at such adjourned meeting.

In accordance with the Articles, to validly deliberate on the Extraordinary Resolutions at the Extraordinary General Meeting the Extraordinary General Meeting must be quorate. The Extraordinary General Meeting will be quorate if at least 50 per cent. of the outstanding Class A Shares and at least 50 per cent. of the outstanding Securities are represented at the Extraordinary General Meeting.

Votes in favour of the First Resolutions of the Extraordinary Resolutions must represent a simple majority, votes in favour of the Second Resolution of the Extraordinary Resolutions must represent a majority of not less than $66\frac{2}{3}$ per cent. of the Class A Shareholders present or represented and $66\frac{2}{3}$ per cent. of the Holders present or represented, for these respective resolutions to be duly passed.

If, within fifteen minutes after the time appointed for the Extraordinary General Meeting, a quorum is not present, the Extraordinary General Meeting shall stand adjourned until 24 May 2010. The adjourned Extraordinary General Meeting will not be subject to a quorum requirement but the $66\frac{2}{3}$ per cent. majority vote will still be required.

Each question submitted to a meeting shall be decided by a show of hands or a roll call.

Every person who is present in person or represented at the Extraordinary General Meeting shall have one vote in respect of the Class A Share or the Security for which it is entitled to vote.

**Notice of Results**

The Issuer will give notice of the passing of an Extraordinary Resolutions to Class A Shareholders and to Holders within 14 days thereof, but failure to do so will not invalidate the resolutions.

**Governing Law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, Luxembourg law.

**THE ISSUER**

BTA Finance Luxembourg S.A.

46A, avenue John F. Kennedy

L-1855 Luxembourg

Grand Duchy Luxembourg

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.

Aerogolf Center

lA Hoehenhof

L-1736 Senningerberg

Grand Duchy Luxembourg

This notice is given by:

BTA Finance Luxembourg S.A.
46A, avenue John F. Kennedy
L-1855 Luxembourg
Grand Duchy Luxembourg


12 April 2010

### ANNEX 2 — NOTICE FROM REGISTERED HOLDER TO BENEFICIAL OWNERS OF PERPETUAL SECURITIES

### FOR THE ATTENTION OF THE HOLDERS OF THE OUTSTANDING U.S. $400,000,000 PERPETUAL PREFERRED SECURITIES OF BTA FINANCE LUXEMBOURG S.A.

**Common Code: 02401279**
**ISIN:  XS0242012796**

**THIS INFORMATION IS IMPORTANT AND REQUIRES IMMEDIATE ATTENTION OF THE HOLDERS.  IT SHOULD BE READ TOGETHER WITH THE ATTACHED NOTICE OF BTA FINANCE LUXEMBOURG S.A. CONVENING AN EXTRAORDINARY GENERAL MEETING.**

On 12 April 2010 BTA Finance Luxembourg S.A. issued a notice convening an extraordinary general meeting of its shareholders and holders of the U.S. $400,000,000 perpetual preferred securities (the "**Securities**").

**Each owner ("Beneficial Owner") of a particular principal amount of the Securities as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("Direct Participants") will not be a Holder for the purposes of the Extraordinary General Meeting.  The only Holder for the purposes of the Extraordinary General Meeting will be the Registered Holder.  However, Beneficial Owners are hereby requested to ensure that Direct Participants submit Electronic Voting Instructions by 12:00 CET on 21 April 2010.**

The Extraordinary General Meeting will be held at 12:00 noon (Central European Time) on 22 April 2010 at the offices of the Issuer at 46A, avenue John F. Kennedy, L-1855 Luxembourg, Grand Duchy of Luxembourg, for the purpose of considering and, if thought fit, passing the following resolutions, which will be proposed as Extraordinary Resolutions in accordance with the provisions of the Articles.  If within 15 minutes after such time the quorum prescribed by the Articles is not present, the Extraordinary General Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Extraordinary General Meeting (including the Extraordinary Resolutions) shall bear the meanings given to them in the Offering Memorandum or the principal commercial Term Sheet amendment letter dated 17 March 2010 (the "**PCTS Amendment Letter**") between JSC BTA Bank and the Steering Committee of its financial creditors.

The Extraordinary General Meeting has the agenda to approve the terms of **EXTRAORDINARY RESOLUTIONS** as follows:

"THAT this Meeting of Shareholders of BTA Finance Luxembourg S.A. (the "**Issuer**"), including the holders of the U.S.$400,000,000 Perpetual Preferred Securities having the benefit of a support agreement from JSC BTA Bank (formerly JSC Bank TuranAlem) ("**BTA**") dated 25 January 2006 (the "**Support Agreement**"), hereby:

First Resolution
(*not subject to the quorum and majority requirements of an amendment to the Issuer's Articles*)

(1)   resolves to approve the Restructuring Plan;

(2)   resolves to authorise the board of directors of the Issuer (the "**Board of Directors**") to amend, waive all of the Issuer's rights concerning and terminate the Subsidiary Subordinated Loan in consideration of a transfer to the Issuer of TuranAlem Finance B.V.'s corresponding legal relationship with BTA concerning the Bank Subordinated Loan;

(3)   resolves to authorise the Board of Directors to submit to BTA a Claim Form on behalf of the Issuer;

(4)     resolves to authorise the Board of Directors to vote the entire principal amount of the Bank Subordinated Loan or any other claims the Issuer may have on BTA in connection with the Securities in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as the Shareholders vote in favour of and/or against this Extraordinary Resolution;

(5)     resolves to authorise the Board of Directors to (i) do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution, including any amendment and/or restatement of the Support Agreement, the Bank Subordinated Loan and/or the Subsidiary Subordinated Loan, and (ii) terminate the Support Agreement if a restructuring plan has become binding on the financial creditors of BTA under the Restructuring Law; and

(6)     resolves, to the extent legally possible, to discharge and exonerate the Board of Directors from all liability in respect of the performance of its duties in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation,

Second Resolution

(*subject to the quorum and majority requirements of an amendment to the Issuer's Articles*)

(1)     resolves to approve to amend the Issuer's Articles as follows:

(i)     to insert a paragraph in Article 37 (*Definitions*), immediately after the definition of "**Replacement Instruments**", which reads:

""**Restructuring Law**" means the Law of the Republic of Kazakhstan No. 18S-IV ZRK dated 11 July 2009 on Amendments and Additions to Certain Legislative Acts on Money Payments and Transfers, Accounting and Financial Reporting, Banking Activities, the National Bank of Kazakhstan and Other Legislation;"

(ii)    to add a sentence at the end of Article 7.2.4., which reads:

"For the avoidance of doubt, no Distributions shall be declared and paid on the Securities after a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law;"

(iii)   to add a paragraph at the end of paragraph (I) of Article 35, which reads:

"Notwithstanding the availability of sufficient assets of the Company to pay any Liquidation Distribution to the Holders, if, at the time such Liquidation Distribution is to be paid, a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law, the Liquidation Distribution per Security paid to Holders thereof shall be equal to a proportionate share of the cash and/or securities and/or other entitlement which the Issuer receives under or as a result of such restructuring plan, which cash and/or securities and/or other entitlement shall, if the Board of Directors so elects, be distributed directly by the Bank to the Holders;" and

(iv)    to insert a sentence, immediately after the first sentence of paragraph (V) of Article 35, which reads:

"For the avoidance of doubt, if a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law, under which plan the Bank Subordinated Loan has been restructured or cancelled, the Company may permit or take any action that would or might cause the liquidation or dissolution of the Company, subject only to the approval or non-objection by the FMSA (if then required)."

Finally, by voting on the above First Resolutions and notwithstanding whether such First Resolutions will be passed, each Holder authorises the Board of Directors to vote the entire principal amount of the Bank Subordinated Loan or any other claims it may have on BTA in connection with the Securities in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as the Shareholders vote in favour of and/or against such First Resolutions.

Terms used in these resolutions and defined in the Notice convening this Meeting or in the PCTS Amendment Letter are used herein as so defined."

**Documents Available for Inspection**

Beneficial Owners or Direct Participants may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Extraordinary General Meeting, inspect at the offices of the Issuer copies of the following documents:

(a)     the Support Agreement dated 25 January 2006;

(b)     the Offering Memorandum dated 20 January 2006 relating to the Securities;

(c)     the SA/BV Subordinated Loan Agreement dated 20 January 2006 between TuranAlem Finance BV and the Issuer (the "**Subsidiary Subordinated Loan**");

(d)     the BV/BTA Subordinated Loan Agreement dated 20 January 2006 between BTA and TuranAlem Finance BV (the "**Bank Subordinated Loan**");

(e)     the PCTS Amendment Letter;

(f)     following publication, the information memorandum intended to be published by BTA (as defined below) no later than 23 April 2010 (such information memorandum, as supplemented from time to time, the "**Information Memorandum**"); and

(g)     the form of Claim Form.

Copies of the Information Memorandum will be, and the PCTS Amendment Letter and forms of proxy (referred to below) are, available for collection at the specified offices of the Principal Paying and Transfer Agent and the Registrar and also on BTA's website at www.bta.kz.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Holder need take no further action in relation to the Extraordinary General Meeting in respect of the Extraordinary Resolutions.  By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant of the Securities instructs the Registered Holder of such Securities to complete and sign a Form of Proxy to authorise and instruct The Bank of New York Mellon to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolutions at the Extraordinary General Meeting (and any adjournment thereof).

Beneficial Owners must make arrangements with the relevant Clearing System so that Electronic Voting Instructions are received by not later than 12:00 CET on 21 April 2010 (or 12:00 the day before any adjourned meeting) and request or make arrangements for the Clearing System to block the Securities in the relevant Direct Participant's account and to hold the same to the order or under the control of The Bank of New York Mellon.

Any security(ies) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Extraordinary General Meeting (or, if later, the adjourned Extraordinary General Meeting) and (ii) upon such security(ies) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of The Bank of New York Mellon to be held to its order or under its control.

**Voting Arrangements and Quorum for the Extraordinary General Meeting**

The provisions governing the convening and holding of the Extraordinary General Meeting are set out in Chapter IV (General Meeting of Shareholders) of the Articles.  The Securities are currently represented by a global certificate (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**").  Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Securities, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Holder for the purposes of the Extraordinary General Meeting.  On this basis, the only Holder for the purposes of the Extraordinary General Meeting will be the Registered Holder.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Extraordinary General Meeting save that at least 8 days' notice shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

In accordance with the Articles, to validly deliberate on the Extraordinary Resolutions at the Extraordinary General Meeting the Extraordinary General Meeting must be quorate.  The Extraordinary General Meeting will be quorate if at least 50 per cent. of the outstanding Class A Shares and at least 50 per cent. of the outstanding Securities are represented at the Extraordinary General Meeting.

Votes in favour of the First Resolution of the Extraordinary Resolutions must represent a simple majority, votes in favour of the Second Resolution of the Extraordinary Resolutions must represent a majority of not less than $66\frac{2}{3}$ per cent. of the Class A Shareholders present or represented and $66\frac{2}{3}$ per cent. of the Holders present or represented, for these respective resolutions to be duly passed.

If, within fifteen minutes after the time appointed for the Extraordinary General Meeting, a quorum is not present, the Extraordinary General Meeting shall stand adjourned until 24 May 2010.  The adjourned Extraordinary General Meeting will not be subject to a quorum requirement but the $66\frac{2}{3}$ per cent. majority vote will still be required.

Each question submitted to a meeting shall be decided by a show of hands or a roll call.

Every person who is present in person or represented at the Extraordinary General Meeting shall have one vote in respect of the Class A Share or the Security for which it is entitled to vote.

None of the Issuer, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

By submitting or delivering an Electronic Instruction Form, each Beneficial Owner:

(a)     represents, warrants and undertakes to the Issuer, BTA and The Bank of New York Mellon that the Securities which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Extraordinary General Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, BTA and The Bank of New York Mellon that the Securities which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of The Bank of New York Mellon in the securities account to which such Securities are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     acknowledges that none of the Issuer, BTA, The Bank of New York Mellon or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolutions, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(e)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon its successors, assigns, heirs, executors, New Notes Trustees in bankruptcy and legal representatives and shall not be affected by, and shall survive, its death or incapacity; and

(f)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, BTA, The Bank of New York Mellon or any of their respective affiliates, directors or employees with regard to the tax consequences to Holders or beneficial owners of the Securities arising from voting in favour of the Extraordinary Resolution.

Beneficial Owners may register their holding of Securities with the Issuer's financial advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

Yours sincerely,


The Bank of New York Depository (Nominees) Limited

**ANNEX 3 – CORRECTION TO NOTICE OF SHAREHOLDERS' MEETING**

**BTA FINANCE LUXEMBOURG S.A. affiliated company of JSC BTA Bank**
*société anonyme*

Registered Office: 46A, avenue John F. Kennedy, L-1855 Luxembourg
Grand Duchy of Luxembourg
R.C.S. Luxembourg B 112.100
(the "**Issuer**")

**FOR THE ATTENTION OF THE SHAREHOLDERS OF BTA
FINANCE LUXEMBOURG S.A.
AFFILIATED COMPANY OF JSC BTA BANK**

**THIS INFORMATION IS IMPORTANT AND REQUIRES IMMEDIATE ATTENTION OF THE SHAREHOLDERS.  IF SHAREHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY.**

On 23 April 2010 notice (the "**Adjournment Notice**") was given to hold an adjourned extraordinary general meeting of shareholders (the "**Meeting**") of BTA Finance Luxembourg S.A. affiliated company of JSC BTA Bank (the "**Issuer**").  Under the articles of association of the Issuer The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as registered holder of the U.S. $400,000,000 perpetual preferred securities (the "**Perpetual Securities**") and JSC BTA Bank each categorise as shareholder.  In the Adjournment Notice reference was made to 24 May 2010 as the date of the Meeting.  Due to the public holiday on 24 May 2010 in the Grand Duchy of Luxembourg, notice is hereby given that the Meeting will be held at 12.00 noon (Central European Time) on 25 May 2010 at the offices of the Issuer at 46A, avenue John F. Kennedy, L-1855 Luxembourg, Grand Duchy of Luxembourg.

The terms of, and majority requirements for, the First Resolutions and Second Resolutions remain as set out in the Original Notice (as referred to in the Adjournment Notice), without any quorum requirement for the Meeting.

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, Luxembourg law.

This notice is given by:

BTA Finance Luxembourg S.A.
46A, avenue John F. Kennedy
L-1855 Luxembourg
Grand Duchy Luxembourg

30 April 2010

**SCHEDULE 7 – TURANALEM FINANCE B.V. DRAFT PLAN OF COMPOSITION**

Rotterdam, _____ 2010

**PLAN OF COMPOSITION**

Plan of composition regarding the private company with limited liability **TURANALEM FINANCE B.V.**, having its corporate seat in Rotterdam, the Netherlands (hereafter:  the "**Company**").

**Considering:**

1.    On _____ the district court of Rotterdam (the "**Court**") has declared the Company bankrupt on its own motion.  The Company offers its creditors which are affected by the bankruptcy a plan of composition in the form of this draft plan of composition (the "**Plan of Composition**").

2.    The Company's creditors may be divided into four or, if BTA Finance Luxembourg II S.A. ("**BTA Lux**") was still a creditor of the Company on the date at which the Company was declared bankrupt, five groups:

   (i)     the holders (the "**Noteholders**") of the notes (the "**Notes**") of the following series: (1) the  U.S.$600 million  7,875 per cent. notes, (2) the  U.S.$400 million  8 per cent. notes,   (3) the   U.S.$350 million   8,5 per cent.  notes,   (4) the  PLZ  200 million  6,3 per cent.  notes,   (5) the  U.S.$250 million   7,75 per cent.  notes,   (6) the  EUR 500 million  6,25 per cent.  notes,  (7) the  GBP  200 million  7,125 per cent., (8) the  JPY  20 billion  4,25 per cent.  notes,  (9) the  U.S.$750 million  8,25 per cent. notes, (10) the JPY 30 billion floating rate puttable notes, (11) the U.S.$250 million 8,25 per cent. notes, (12) the  JPY 15 billion floating rate puttable notes, (13) the U.S.$100 million  fixed  to  floating  rate  notes  on  10 April  2008,  (14) the U.S.$100 million  fixed  to  floating  rate  notes  on  23 April  2008  and  (15) the U.S.$100 million fixed to floating rate notes on 27 May 2008;

   (ii)    the syndicated lenders (the "**Syndicated Lenders**") of the following syndicated loans (the "**Syndicated Loans**"): (1) the term loan facility in the aggregate amount of U.S.$1,111 million and (2) the yen term loan facility in the aggregate amount of JPY 58,937,500,000;

   (iii)   if BTA Lux was still a creditor of the Company on the date at which the Company was declared bankrupt, BTA Lux as subordinated lender (the "**Subordinated Lender**") of the subordinated loan agreement (the "**Subsidiary Subordinated Loan**") with respect to the proceeds of the U.S.$400 million perpetual preferred securities issued by it ( the "**Securities**");

   (iv)    the other unsecured creditors (the "**Other Unsecured Creditors**"); and

   (v)     JSC BTA Bank (the "**Bank**") – which owns all the Company's shares and which guarantees the execution of the Plan of Composition – which has a conditional reimbursement claim against the Company in respect of the payment guarantees issued by it in favour of the Noteholders and the Syndicated Lenders.

3.    The Bank's conditional reimbursement claim is secured by a pledge on the claims the Company has against the Bank under the various deposit agreements under which the proceeds of the Notes and the Syndicated Loans were on-lent to the Bank.  Therefore, the Bank is not an unsecured creditor and is not affected by the bankruptcy.  After the execution of the Plan of Composition, the (then unconditional) claim of the Bank will be settled by means of a set-off against the Bank's debt to the Company under the various deposit agreements, whereby that claim and that debt shall be extinguished in their entirety.

4.   If BTA Lux was still a creditor of the Company under the Subsidiary Subordinated Loan on the date at which the Company was declared bankrupt, the following facts are relevant:  the Company has an intermediary role in the structure used by the Bank to raise Tier 1 capital. Under that structure, BTA Lux issued the Securities.  The proceeds of the issuance of the Securities were on-lent by BTA Lux to the Company under the Subsidiary Subordinated Loan, and the proceeds of that loan were on-lent by the Company to the Bank by way of another subordinated loan (the "**Bank Subordinated Loan**").  BTA Lux's claims against the Company under the Subsidiary Subordinated Loan are subordinated in the event of a bankruptcy of the Company.

5.   The guiding principle of the Plan of Composition is that the Bank executes the restructuring plan (the "**Restructuring Plan**"), which has been approved at a creditor's meeting of the Bank, that the Noteholders and the Syndicated Lenders receive what they are entitled to receive under the Restructuring Plan and will thereby be deemed to have received the same entitlements under the Plan of Composition as well, that BTA Lux (if it was still a creditor of the Company under the Subsidiary Subordinated Loan on the date at which the Company was declared bankrupt) receives the Restructuring Consideration, if any, which the Company may receive under the Restructuring Plan in respect of the Bank Subordinated Loan (except for any part of such Restructuring Consideration which relates to accrued interest under the Bank Subordinated Loan in excess of accrued interest under the Subsidiary Subordinated Loan (the "**Company's Margin**"), while the claims of the Other Unsecured Creditors are paid in full. The Restructuring Plan is attached to the Plan of Composition as Schedule 1.

6.   The Restructuring Plan is laid down in Schedule 1 of an information memorandum (the "**Information Memorandum**") which the Bank has published on 1 May 2010 (and as supplemented from time to time).  The Information Memorandum, including all schedules, is attached to the Plan of Composition as Schedule 2.  Capitalised terms in this Plan of Composition, which are not defined in this Plan of Composition, have the meanings given thereto in the Information Memorandum.

7.   The Restructuring Plan offers the Claimants (including the Noteholders and the Syndicated Lenders) payment of their claims in the form of a cash payment by the Bank, new notes to be issued by the Bank and/or new shares of the Bank.  Upon execution of the Restructuring Plan, Claimants receive a cash payment or nominal value which in most cases is significantly lower than the nominal value of their current claims on the Company (for which the Bank acts as guarantor), the maturity of those claims will be extended substantially or those claims will be swapped for shares of the Bank.  The options offered by the Bank, the Allocation and Reallocation of Claims Mechanism in case of oversubscription of the limitedly available options and the terms and conditions of the new notes the Bank offers, are set out in more detail in the Information Memorandum.

8.   The Company will pay the Other Unsecured Creditors in full under this Plan of Composition.

9.   All claims that are not affected by the bankruptcy, being the Bank's reimbursement claims mentioned in item 2 (v), will be settled in full (in the manner described in item 3).

10.   Upon execution of this Plan of Composition and the Restructuring Plan, the Noteholders' claims in respect of the Notes and the Syndicated Lenders' claims in respect of the Syndicated Loans against both the Bank and the Company, and, if BTA Lux was still a creditor of the Company under the Subsidiary Subordinated Loan on the date at which the Company was declared bankrupt, BTA Lux's claim in respect of Subsidiary Subordinated Loan against the Company, will cease to exist.  The Company will have no more indebtedness and equity which is expected to be approximately U.S.$7.5 million.

11.   The Plan of Composition is conditional, in such a way that it comes into effect if the Restructuring Plan has been declared binding by the competent court in Kazakhstan and the

conditions mentioned in Schedule 12 (*Conditions Precedent to the Restructuring Plan Becoming Effective*) of the Information Memorandum have been met.

12.    The Bank guarantees the performance of the Plan of Composition and shall for that reason co-sign the Plan of Composition.

**OFFERS THE FOLLOWING PLAN OF COMPOSITION:**

A.    The Bank shall pay or transfer to the Noteholders and the Syndicated Lenders the Restructuring Consideration which they are entitled to be paid or transferred under the Restructuring Plan and by that payment or transfer the Noteholders and the Syndicated Lenders shall be deemed to have been paid or transferred that Restructuring Consideration under the Plan of Composition as well.

B.    If BTA Lux was still a creditor of the Company under the Subsidiary Subordinated Loan on the date at which the Company was declared bankrupt, the Company shall transfer to BTA Lux the Restructuring Consideration, if any, which the Company may be paid under the Restructuring Plan in respect of the Bank Subordinated Loan, less any part of such Restructuring Consideration which relates to the Company's Margin.

C.    Other Unsecured Creditors are paid in full.

D.    The Plan of Composition is conditional, in such a way that it comes into effect if the Restructuring Plan has been declared binding by the competent court in Kazakhstan and the conditions mentioned in [Schedule 12 (*Conditions Precedent to the Restructuring Plan Becoming Effective*)] of the Information Memorandum have been met.

E.    The Bank guarantees the performance of the Plan of Composition.

F.    In the event of a conflict or inconsistency between the English version of this Plan of Composition and any translation thereof, the English version prevails.

_____
TuranAlem Finance B.V.
Timur Sabyrbaev, managing director

Date: _____

Date: _____

_____
JSC BTA Bank
_____, chairman of the management board
managing director

Date: _____

_____
TuranAlem Finance B.V.
Equity Trust Co N.V.,

Date: _____

Rotterdam, _____ 2010

## SCHEDULE 8 – NOTICE TO BENEFICIAL OWNERS OF CHF NOTES

### FOR THE ATTENTION OF THE HOLDERS OF THE OUTSTANDING CHF200,000,000 FLOATING
### RATE SENIOR NOTES DUE 7 AUGUST 2017 OF JSC BTA BANK (THE "NOTES")

**Common Code: 031235260**
**ISIN:  XS0312352601**

**THIS INFORMATION IS IMPORTANT AND REQUIRES IMMEDIATE ATTENTION OF THE HOLDERS.**

**Each owner ("Beneficial Owner") of a particular principal amount of the Notes as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("Direct Participants") are hereby requested to submit Electronic Instructions in relation to the matters set our below by no later than 19 May 2010.**

JSC BTA Bank (the "**Bank**") hereby notifies each Beneficial Owner that it will be holding a meeting (the "**Claimants' Meeting**") of the Claimants (as defined in the Information Memorandum referred to below (and, generally, being a person having a claim in respect of the financial indebtedness of the Bank)) arising under or in connection with certain financial indebtedness of the Bank for the purpose of considering and, if thought fit, approving a restructuring plan proposed to be made between the Bank and the Claimants (the "**Restructuring Plan**").  The Claimants' Meeting will be held in Almaty on 28 May 2010 at or about 10:00 a.m. (Almaty time) at The Dostyk Hotel, 36, Kurmangazy str., Almaty, Republic of Kazakhstan, 050021 (Tel: +7 727 2582270).

Beneficial Owners or Direct Participants are requested to submit Electronic Instructions appointing The Bank of New York Mellon as proxy to vote as directed in such Electronic Instructions in relation to the Restructuring Plan.  Electronic Instructions authorising The Bank of New York Mellon to vote in favour of the Restructuring Plan at the Claimants' Meeting will also be deemed to include an authorisation for The Bank of New York Mellon to submit to the Bank a Claim Form on behalf of the holders of the Notes to which votes in favour of the Restructuring Plan have been submitted, all in accordance with the Information Memorandum, as defined below.

**Background**

The Bank is undertaking an overall restructuring of certain of its financial indebtedness, as more fully described in the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 and as further amended by the indicative non-binding term sheet signed by the Bank and the Steering Committee on 18 April 2010, outlining the terms of the Bank's proposed financial restructuring (together the "**Term Sheet**") and as further described in the information memorandum to be published by the Bank in due course (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

**Documents Available for Inspection**

Beneficial Owners or Direct Participants may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays), inspect at the offices of the Bank copies of the following documents:

(a)      the Note Purchase Agreement relating to the Notes dated 7 August 2007;

(b)      the Agency Agreement relating to the Notes dated 7 August 2007;

(c)      the Term Sheet;

(d)      following its publication, the Information Memorandum; and

(e)      the Claim Form.

Copies of the Information Memorandum will be, and the Term Sheet and the Claim Form are, available for inspection on the Bank's website at www.bta.kz.

By submitting or delivering Electronic Instructions to the relevant Clearing Systems, the Direct Participant of the Notes instructs the Registered Holder of such Notes to complete and sign a Form of Proxy to authorise and instruct The Bank of New York Mellon to act as proxy and to vote in favour of (or against, as the case may be) the Restructuring Plan at the Claimant's Meeting.

Beneficial Owners must make arrangements with the relevant Clearing System so that Electronic Instructions are received by not later than 10:00 CET on 19 May 2010 and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of The Bank of New York Mellon.

Any security(ies) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Claimant's Meeting and (ii) upon such security(ies) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of The Bank of New York Mellon to be held to its order or under its control (the "**Blocking Period**").

By submitting or delivering Electronic Instructions, each Beneficial Owner:

(a) represents, warrants and undertakes to the Bank and The Bank of New York Mellon that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Claimants' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b) represents, warrants and undertakes to the Bank and The Bank of New York Mellon that the Notes which are the subject of the Electronic Instructions have been blocked (and will remain blocked) to the order of The Bank of New York Mellon in the Notes account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c) acknowledges that it has received and reviewed the terms of the notice described herein;

(d) consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity of holdings of Beneficial Owners) and Clearing Systems account details to the Bank and The Bank of New York Mellon at the time such Holder submits or delivers the Electronic Instruction;

(e) acknowledges that none of the Bank and The Bank of New York Mellon or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Restructuring Plan, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f) acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon its successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives and shall not be affected by, and shall survive, its death or incapacity; and

(g) acknowledges that, other than as set out herein, no information has been provided to it by the Bank, The Bank of New York Mellon or any of their respective affiliates, directors or employees with regard to the tax consequences to Holders or beneficial owners of the Notes arising from voting in favour of the Restructuring Plan.

**Holders of Notes in Definitive Form**

Each registered holder of the Notes which are held in definitive form will be required to submit a Claim Form directly to the Bank in respect of such Notes and to make its own arrangements to vote in relation to the Restructuring Plan at the Claimants' Meeting.  Further details relating to the procedure for submitting Claim Forms and voting at the Claimants' Meeting will be set out in the Information Memorandum.

Yours sincerely,


JSC BTA Bank
29 April 2010

**FOR THE ATTENTION OF THE HOLDERS OF THE OUTSTANDING U.S.$400,000,000 PERPETUAL PREFERRED SECURITIES OF BTA FINANCE LUXEMBOURG S.A. AFFILIATED COMPANY OF JSC BTA BANK**

**Common Code: 02401279**
**ISIN: XS0242012796**

**THIS INFORMATION IS IMPORTANT AND REQUIRES IMMEDIATE ATTENTION OF THE HOLDERS.**

On 12 April 2010 notice (the "**Original Notice**") was given to convene an extraordinary general meeting of shareholders (the "**Meeting**") of BTA Finance Luxembourg S.A. affiliated company of JSC BTA Bank (the "**Issuer**").  Under the articles of association of the Issuer The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as registered holder of the U.S. $400,000,000 perpetual preferred securities (the "**Perpetual Securities**") and JSC BTA Bank (the "**Bank**") each categorise as shareholder.  The Meeting was convened to consider and if thought fit to pass an extraordinary resolution, *inter alia*, to approve the Restructuring Plan (see the "First Resolutions", as referred to below) and to amend the articles of association of the Issuer (see the "Second Resolutions", as referred to below).

During the Meeting the First Resolutions were adopted by simple majority thereby, *inter alia*, approving the Bank's Restructuring Plan and authorising the Issuer to vote in favour of the restructuring at the proposed creditors' meeting expected to be held on 28 May 2010.  The votes for the First Resolutions represented 98.9 per cent. of the votes cast and followed from instructions received and accepted by the Registered Holder from 23.10 per cent. of the Beneficial Holders.

The Meeting was inquorate in relation to the Second Resolutions and therefore the Meeting was adjourned to 24 May 2010.  At the adjourned Meeting, the shareholders of the Issuer (including the holders of the Perpetual Securities) are eligible to vote (again) on the First Resolutions by simple majority and on the Second Resolutions with a two-thirds majority required for an amendment to the articles of association of the Issuer, in both cases without a quorum requirement.  The First Resolutions are re-proposed because of, *inter alia*, the low percentage of instructions accepted by the Registered Holder for the meeting on 22 April 2010.  The terms of the First Resolutions and Second Resolutions remain as set out in the Original Notice and are included below for ease of reference. Notice of the re-proposed First Resolutions and the adjourned meeting has been given to the Registered Holder and the Bank on Friday 23 April 2010.

The adjourned Meeting will be held at 12.00 noon (Central European Time) on 24 May 2010 at the offices of the Issuer at 46A, avenue John F. Kennedy, L-1855 Luxembourg, Grand Duchy of Luxembourg.

**Each owner ("Beneficial Owner") of a particular principal amount of the Perpetual Securities as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("Direct Participants") will not be a shareholder for the purposes of the Extraordinary General Meeting.  The only shareholder for the purposes of the Extraordinary General Meeting with respect to the Perpetual Securities will be the Registered Holder.  However, Beneficial Owners are hereby requested to ensure that Direct Participants submit Electronic Voting Instructions by 12:00 CET on 21 May 2010.  Unless revoked, the Registered Holder will deem instructions which have been given and accepted by it for the meeting of 22 April 2010 to apply to the meeting of 24 May 2010 as well.**

The Extraordinary General Meeting will be held at 12.00 noon (Central European Time) on 24 May 2010 at the offices of the Issuer at 46A, avenue John F. Kennedy, L-1855 Luxembourg, Grand Duchy of Luxembourg, for the purpose of considering and, if thought fit, passing the following resolutions, which will be proposed as Extraordinary Resolutions in accordance with the provisions of the Articles.  Unless the context otherwise requires, terms used in this Notice of Extraordinary General Meeting (including the Extraordinary Resolutions) shall bear the meanings given to them in the

Offering Memorandum or the principal commercial term sheet amendment letter dated 17 March 2010 (the "**PCTS Amendment Letter**") between JSC BTA Bank and the Steering Committee of its financial creditors.

The Extraordinary General Meeting has the agenda to approve the terms of **EXTRAORDINARY RESOLUTIONS** as follows:

"THAT this Meeting of Shareholders of BTA Finance Luxembourg S.A. (the "**Issuer**"), including the holders of the U.S.$400,000,000 Perpetual Preferred Securities having the benefit of a support agreement from JSC BTA Bank (formerly JSC Bank TuranAlem) ("**BTA**") dated 25 January 2006 (the "**Support Agreement**"), hereby:

First Resolution
*(not subject to the quorum and majority requirements of an amendment to the Issuer's Articles)*

(1)      resolves to approve the Restructuring Plan;

(2)      resolves to authorise the board of directors of the Issuer (the "**Board of Directors**") to amend, waive all of the Issuer's rights concerning and terminate the Subsidiary Subordinated Loan in consideration of a transfer to the Issuer of TuranAlem Finance B.V.'s corresponding legal relationship with BTA concerning the Bank Subordinated Loan;

(3)      resolves to authorise the Board of Directors to submit to BTA a Claim Form on behalf of the Issuer;

(4)      resolves to authorise the Board of Directors to vote the entire principal amount of the Bank Subordinated Loan or any other claims the Issuer may have on BTA in connection with the Securities in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as the Shareholders vote in favour of and/or against this Extraordinary Resolution;

(5)      resolves to authorise the Board of Directors to (i) do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution, including any amendment and/or restatement of the Support Agreement, the Bank Subordinated Loan and/or the Subsidiary Subordinated Loan, and (ii) terminate the Support Agreement if a restructuring plan has become binding on the financial creditors of BTA under the Restructuring Law; and

(6)      resolves, to the extent legally possible, to discharge and exonerate the Board of Directors from all liability in respect of the performance of its duties in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation,

Second Resolution
*(subject to the quorum and majority requirements of an amendment to the Issuer's Articles)*

(1)      resolves to approve to amend the Issuer's Articles as follows:

(i)      to insert a paragraph in Article 37 (Definitions), immediately after the definition of "**Replacement Instruments**", which reads:

""**Restructuring Law**" means the Law of the Republic of Kazakhstan No. 18S-IV ZRK dated 11 July 2009 on Amendments and Additions to Certain Legislative Acts on Money Payments and Transfers, Accounting and Financial Reporting, Banking Activities, the National Bank of Kazakhstan and Other Legislation;"

(ii) to add a sentence at the end of Article 7.2.4., which reads:

"For the avoidance of doubt, no Distributions shall be declared and paid on the Securities after a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law;"

(iii) to add a paragraph at the end of paragraph (I) of Article 35, which reads:

"Notwithstanding the availability of sufficient assets of the Company to pay any Liquidation Distribution to the Holders, if, at the time such Liquidation Distribution is to be paid, a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law, the Liquidation Distribution per Security paid to Holders thereof shall be equal to a proportionate share of the cash and/or securities and/or other entitlement which the Issuer receives under or as a result of such restructuring plan, which cash and/or securities and/or other entitlement shall, if the Board of Directors so elects, be distributed directly by the Bank to the Holders;" and

(iv) to insert a sentence, immediately after the first sentence of paragraph (V) of Article 35, which reads:

"For the avoidance of doubt, if a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law, under which plan the Bank Subordinated Loan has been restructured or cancelled, the Company may permit or take any action that would or might cause the liquidation or dissolution of the Company, subject only to the approval or non-objection by the FMSA (if then required).".

Finally, by voting on the above First Resolutions and notwithstanding whether such First Resolutions will be passed, each Holder authorises the Board of Directors to vote the entire principal amount of the Bank Subordinated Loan or any other claims it may have on BTA in connection with the Securities in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as the Shareholders vote in favour of and/or against such First Resolutions.

Terms used in these resolutions and defined in the Notice convening this Meeting or in the PCTS Amendment Letter are used herein as so defined."

**Documents Available for Inspection**

Beneficial Owners or Direct Participants may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Extraordinary General Meeting, inspect at the offices of the Issuer copies of the following documents:

(a) the Support Agreement dated 25 January 2006;

(b) the Offering Memorandum dated 20 January 2006 relating to the Perpetual Securities;

(c) the SA/BV Subordinated Loan Agreement dated 20 January 2006 between TuranAlem Finance BV and the Issuer (the "**Subsidiary Subordinated Loan**");

(d) the BV/BTA Subordinated Loan Agreement dated 20 January 2006 between the Bank and TuranAlem Finance BV (the "**Bank Subordinated Loan**");

(e) the PCTS Amendment Letter;

(f) following publication, the information memorandum intended to be published by the Bank prior to the adjourned meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**"); and

(g) the form of Claim Form.

Copies of the Information Memorandum will be and the PCTS Amendment Letter are, available for collection at the specified offices of the Principal Paying and Transfer Agent and the Registrar and also on BTA's website at www.bta.kz.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Registered Holder need take no further action in relation to the Extraordinary General Meeting in respect of the Extraordinary Resolutions.  By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant of the Perpetual Securities instructs the Registered Holder of such Perpetual Securities to complete and sign a Form of Proxy to authorise and instruct a proxy to vote in favour of (or against, as the case may be) the Extraordinary Resolutions at the Extraordinary General Meeting.

Beneficial Owners must make arrangements with the relevant Clearing System so that Electronic Voting Instructions are received by not later than 12:00 CET on 21 May 2010 and request or make arrangements for the Clearing System to block the Perpetual Securities in the relevant Direct Participant's account and to hold the same to the order or under the control of The Bank of New York Mellon.

Any security(ies) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Extraordinary General Meeting (or, if later, the adjourned Extraordinary General Meeting) and (ii) upon such security(ies) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of The Bank of New York Mellon to be held to its order or under its control.

Unless revoked, the Registered Holder will deem instructions which have been given and accepted by it for the meeting of 22 April 2010 to apply to the meeting of 24 May 2010 as well.

**Voting Arrangements and Quorum for the Extraordinary General Meeting**

The provisions governing the convening and holding of the Extraordinary General Meeting are set out in Chapter IV (General Meeting of Shareholders) of the Articles.  The Perpetual Securities are currently represented by a global certificate (the "**Global Certificate**") held by and registered in the name of the Registered Holder as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**").  Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Perpetual Securities, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a shareholder for the purposes of the Extraordinary General Meeting.  On this basis and in respect of the Perpetual Securities, the only shareholder for the purposes of the Extraordinary General Meeting will be the Registered Holder.

There are no quorum requirements for the First Resolutions or the Second Resolutions at the meeting on 24 May 2010.

Votes in favour of the First Resolution of the Extraordinary Resolutions must represent a simple majority, votes in favour of the Second Resolution of the Extraordinary Resolutions must represent a majority of not less than 66 2/3 per cent. of the Class A Shareholders present or represented and 66 2/3 per cent. of the holders of the Perpetual Securities present or represented, for these respective resolutions to be duly passed.

Each question submitted to a meeting shall be decided by a show of hands or a roll call.

Every person who is present in person or represented at the Extraordinary General Meeting shall have one vote in respect of the Class A Share or the Perpetual Security for which it is entitled to vote.

None of the Issuer, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

By submitting or delivering an Electronic Instruction Form, each Beneficial Owner:

(a)    represents, warrants and undertakes to the Issuer, the Bank and The Bank of New York Mellon that the Perpetual Securities which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Extraordinary General Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)    represents, warrants and undertakes to the Issuer, the Bank and The Bank of New York Mellon that the Perpetual Securities which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of The Bank of New York Mellon in the securities account to which such Securities are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)    acknowledges that it has received and reviewed the terms of the notice described herein;

(d)    acknowledges that none of the Issuer, the Bank, The Bank of New York Mellon or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolutions, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(e)    acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon its successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives and shall not be affected by, and shall survive, its death or incapacity; and

(f)    acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Bank, The Bank of New York Mellon or any of their respective affiliates, directors or employees with regard to the tax consequences to legal or beneficial owners of the Perpetual Securities arising from voting in favour of the Extraordinary Resolution.

Beneficial Owners may register their holding of Securities with the Issuer's financial advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

Yours sincerely,

The Bank of New York Depository (Nominees) Limited

**SCHEDULE 9 – TERMS AND CONDITIONS OF THE NEW NOTES AND THE RCTFF**

**ANNEX 1 – TERMS AND CONDITIONS OF THE SENIOR DOLLAR NOTES**

*The following is the text of the terms and conditions of the Senior Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Senior Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The U.S.$ _____ step up notes due 2018 (the "**Senior Dollar Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of JSC BTA Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated _____ 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and _____ as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of a paying agency agreement dated _____ 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, _____ as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) and _____ as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee, _____. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.    **Status**

The obligations under the Notes are unconditional, direct, unsubordinated and, subject as provided in Clause _____ (*Negative Pledge*) of the Trust Deed, unsecured obligations of the Bank, and will at all times rank at least *pari passu* amongst themselves and *pari passu* in right of payment with all other present and future (except as provided therein) unsubordinated, unsecured obligations of the Bank, save only for such obligations as may be preferred by mandatory provisions of applicable law.

2.    **Form, Denomination and Title**

(a)    *Form and Denomination*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered. Notes shall be issued in denominations of U.S.$ _____ and integral multiples of U.S.$ _____ in excess thereof (each denomination an "**authorised denomination**").

(b)    *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*). The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein,

any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

3.    **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement.  A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding.  Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

4.    **Transfers**

(a)    Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided*, *however*, *that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations.  Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)    Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of a like principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder.  In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)    The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)    Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)    All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions.  The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar.  A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

5.    **Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed relating to, amongst other things, restrictions on the creation of security interests, incurrence of indebtedness, conduct of business with related parties, acquisition and incorporation of subsidiaries, ability to enter into mergers and joint ventures, disposal of assets and payment of dividends.

6.    **Interest**

(a)    *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount from 1 July 2010 to 1 January 2013 at the rate of 10.75 per cent. per annum, and 12.5 per cent. per annum thereafter (the "**Rate of Interest**"), payable in arrear on _____ and _____ in each year (each, an "**Interest Payment Date**"), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)    *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)    *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

(d)    *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7.    **Payments**

(a)    *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)  *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent.  Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) will be made as provided in these Conditions.

(c)  *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**").

(d)  *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a United States Dollar account maintained by the payee with a bank in New York City.

(e)  *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*).  No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)  *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of the Specified Offices of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place.  A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day.  In this Condition 7(f), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in New York City, London and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)  *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders.  The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided*, *however*, *that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar.  Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

**8.**     **Redemption and Purchase**

(a)     *Scheduled Redemption*

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be redeemed in eight equal semi-annual instalments on _____ and _____ of each year, with the first such instalment being payable on _____ 2014 and the last such instalment being payable on _____ 2018.  The outstanding principal amount of each Note shall be reduced by any repayment of principal in accordance with these Conditions, including any instalment amount with effect from the related instalment payment date, unless the payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount.  Each Note shall be finally redeemed on due payment of the final instalment amount.

(b)     *Redemption at the Option of the Noteholders*

Unless the Noteholders have previously by an Extraordinary Resolution (as defined in the Trust Deed) disapplied this Condition 8(b) in relation to the applicable Relevant Event, following the occurrence of a Relevant Event (as defined below), the Bank shall promptly, and in any event within five Business Days thereafter, give notice (the "**Relevant Event Notice**") of such Relevant Event to the Noteholders (with a copy to the Trustee) in accordance with Condition 14 (*Notices*), which notice shall specify the date (which shall not be less than 30 days nor more than 60 days after the Relevant Event Notice (the "**Put Settlement Date**")), on which the Bank shall, at the option of the holder of any Note, redeem such Note at its principal amount, together with interest accrued and unpaid to the Put Settlement Date.  In order to exercise the option contained in this Condition 8(b), the holder of a Note must, not less than 15 days before the Put Settlement Date, deposit with any Paying Agent the relevant Note Certificate and a duly completed put option notice (a "**Put Option Notice**") in the form obtainable from any Paying Agent.  No Note Certificate, once deposited with a duly completed Put Option Notice in accordance with this Condition 8(b), may be withdrawn; *provided*, *however*, *that* if, prior to the Put Settlement Date, any such Note becomes immediately due and payable or payment of the redemption monies is improperly withheld or refused, such Note Certificate shall, without prejudice to the exercise of the Put Option, be returned to the holder by uninsured first class mail (airmail if overseas) at such address as may have been given by such Noteholder in the relevant Put Option Notice.  The Trustee shall not be responsible for monitoring whether or not any Relevant Event has occurred and shall be entitled to assume unless it receives written notice to the contrary, that no Relevant Event has occurred.  In the event that a Relevant Event occurs but no Relevant Event Notice is given by the Bank, the Bank shall be deemed to have given a Relevant Event Notice specifying a Put Settlement Date on the date which is 60 days after the occurrence of the Relevant Event, unless such day is not a Business Day, in which event the Put Settlement Date shall be the immediately following Business Day thereafter.

(c)     *Redemption at the Option of the Bank*

The Notes may be redeemed at the option of the Bank in whole, but not in part, at any time, on giving not less than 30 nor more than 60 days' notice to the Noteholders and the Trustee in accordance with Condition 14 (*Notices*) (which notice shall be irrevocable), at their principal amount, together with interest accrued but unpaid to the date fixed for redemption as well as, if positive, the Make-Whole Amount (if any).  Upon the expiry of any such notice as is referred to in this Condition 8(c), the Bank shall be bound to redeem the Notes in accordance with this Condition 8(c).

(d)     *Purchase*

Subject to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*", the Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price.  Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 8(e) (*Cancellation of Notes*).  Any Notes so purchased, while held by or on behalf of the Bank or any member of the Group, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(e)     *Cancellation of Notes*

Unless otherwise permitted pursuant to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*", all Notes which are redeemed or surrendered for cancellation pursuant to this Condition 8 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

(f)     *Definitions*

As used in this Condition 8 (*Redemption and Purchase*):

"**acting in concert**" means a group of persons who, pursuant to an agreement or understanding (whether formal or informal), actively cooperate, through the direct or indirect acquisition by any member or members of such group of shares in the Bank or of any of the assets of any member or members of the group, to obtain or consolidate control of the Bank.

"**Affiliate**" of a person means a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, that person.

"**Business Day**" means a day other than a Saturday or Sunday on which commercial banks are open for business (including dealings in foreign currencies) in London and New York.

"**Called Principal**" means the principal amount of the Notes to be redeemed.

"**Change of Control**" means:

(A)     Samruk-Kazyna ceases to control the Bank (other than where it ceases to control the Bank (a) by transfer of control to a Permitted Transferee or (b) in connection with a Secondary Public Offering), where "**control**" of the Bank means:

(i)     the holding beneficially of more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital); or

(ii)    the power (whether by ownership of shares, proxy, contract, agency or otherwise) to cast, or control the casting of, more than 50 per cent. of the maximum number of votes that might be cast at a general meeting of the Bank, or

(B) any person or group of persons acting in concert (other than where (a) such person or persons are Permitted Transferees or (b) in connection with a Secondary Public Offering) gains control of the Bank where "**control**" means the power (whether by ownership of shares, proxy, contract, agency or otherwise) to:

(i) appoint or remove all, or the majority, of the directors or other equivalent officers of the Bank; or

(ii) give directions with respect to the operating and/or financial policies of the Bank with which the directors or other equivalent officers of the Bank are obliged to comply,

*provided that* any agreement whereby management of the Bank is transferred to a third party (the "**manager**") that does not, in conjunction with any acquisition of shares in the Bank by such manager or its Affiliates (whether or not occurring at the same time), cause the government of the Republic of Kazakhstan to cease to own more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), will not constitute a "**Change of Control**" if (a) the Trustee and the Creditor Directors have been provided with an opinion in form and substance satisfactory to them of independent legal advisers of recognised standing to the effect that the management agreement, in conjunction with any acquisition of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), does not cause the government of the Republic of Kazakhstan (directly or indirectly) to cease to "**control**" the Bank or to have majority economic risk and/or benefit in the Bank and continues to allow the government of the Republic of Kazakhstan (directly or indirectly) to retain the sole right to exercise its rights as majority shareholders (including in relation to the appointment of directors), (b) the terms of the management agreement have been approved by a Qualified Majority and (c) the "**manager**" is a Permitted Transferee.

"**Discounted Value**" means, with respect to the Called Principal of the Notes, the amount obtained by discounting the Remaining Scheduled Payments with respect to the Called Principal in accordance with accepted financial practice and at a discount factor (applied on the same periodic basis as that on which interest on the Notes is payable) equal to the Reinvestment Yield with respect to such Called Principal.

"**FSMA Methodology**" means International Financial Reporting Standards adjusted to reflect the FMSA's requirements for preparation of financial statements for regulatory purposes.

"**Make-Whole Amount**" means an amount equal to the excess (if any) of:

(a) the Discounted Value of the Remaining Scheduled Payments with respect to the Called Principal of the Notes; over

(b) the Called Principal of the Notes. "**OECD**" means the Organisation

for Economic Co-operation and Development.

"**Permitted Transferee**" means a person which: (A)(i) is a bank or other financial institution subject to financial regulation in Russia, China, Hong Kong, Singapore or an OECD country; or (ii) is a sovereign wealth fund of Russia, China, Hong Kong, Singapore or an OECD country or any other Country which may otherwise be approved by a Qualified Majority of the Board; (B) has, in the case of a bank or other financial institution, a minimum credit rating from S&P of at least BBB or equivalent

from Moody's or Fitch; (C) has, in the case of a bank or other financial institution, a minimum paid up share capital and reserves of at least U.S.$7 billion or, in the case of a sovereign wealth fund, assets of at least U.S.$7 billion; and (D) is not affiliated with any of the present or former shareholders or managers of the Bank.

"**Rating Agency**" means Standard & Poors ("**S&P**") and its successors, Moody's Investors Service Inc. ("**Moody's**") and its successors or Fitch Ratings Ltd. ("**Fitch**") and its successors.

"**Redemption Date**" means the date on which any Note is redeemed either in whole or part.

"**Reinvestment Yield**" means, with respect to the Called Principal:

(a)     250 basis points; plus

(b)     the yield to maturity implied by:

> (i)     the yields reported as of 10:00 a.m. (New York City time) on the second Business Day preceding the Redemption Date with respect to such Called Principal, on the display designated as "**PX1**" on the Bloomberg Financial Markets Service (or such other display as may replace PX1 on Bloomberg Financial Markets Service) for actively traded U.S. Treasury securities having a maturity equal to the Remaining Average Life of such Called Principal as of such Redemption Date; or

> (ii)    if such yields are not reported as of such time or the yields reported as of such time are not ascertainable, the Treasury Constant Maturity Series Yields reported, for the latest day for which such yields have been so reported as of the second Business Day preceding the Redemption Date with respect to such Called Principal, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S. Treasury securities having a constant maturity equal to the Remaining Average Life of such Called Principal as of such Redemption Date,

and such implied yield will be determined, if necessary, by (a) converting U.S. Treasury bill quotations to bond-equivalent yields in accordance with accepted financial practice and (b) interpolating linearly between (1) the actively traded U.S. Treasury security with the duration closest to and greater than the Remaining Average Life and (2) the actively traded U.S. Treasury security with the duration closest to and less than the Remaining Average Life.

"**Relevant Event**" means:

(a)     a Change of Control; and/or

(b)     any disposals (excluding those disposals made in the ordinary course of trading) in any financial year of more than 6.5 per cent. of the Group's total gross assets (determined by reference to the Bank's most recent consolidated financial statements produced using FSMA Methodology).

"**Remaining Average Life**" means, with respect to any Called Principal, the number of years (calculated to the nearest one-twelfth year) obtained by dividing:

(a)     such Called Principal; into

(b)   the sum of the products obtained by multiplying (i) the principal component of each of the Remaining Scheduled Payments with respect to such Called Principal by (ii) the number of years (calculated to the nearest one-twelfth of a year) that will elapse between the Redemption Date with respect to such Called Principal and the due date of each such scheduled redemption.

"**Remaining Scheduled Payments**" means, with respect to the Called Principal, all payments of such Called Principal and interest thereon of the Notes to be redeemed that would have been due after the Redemption Date with respect to such Called Principal from their respective scheduled due dates to the final Redemption Date with respect to such Called Principal, *provided that* if such Redemption Date is not a date on which an interest payment is due to be made on the relevant instrument, the amount of the next succeeding scheduled interest payment shall be reduced by the amount of interest accrued to and required to be paid on the Redemption Date.

"**Secondary Public Offering**" means any sale or public offering of any equity security (including any preference shares) in the Bank or receipts or similar securities representing such equity securities by way of flotation, public placing, listing or other public offering on any recognised international exchange.

9.   **Taxation**

(a)   *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)   presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note; or

(ii)   presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days; or

(iii)   to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such

beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)     where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place.  Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)     *Relevant Date*

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that such payment will be made, *provided that* payment is in fact made.

(c)     *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 9 (*Taxation*) pursuant to the Trust Deed.

(d)     *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

**10.     Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

11.   **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest if any of the following events (each, an "**Event of Default**") occurs and is continuing:

(a)   *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b)   *Breach of Other Obligations*

the Bank is in default in the performance, or is otherwise in breach, of any covenant, obligation, undertaking or other agreement under the Senior Notes, the OID Notes, the Recovery Units or the Trust Deed (other than a default or breach specifically dealt with elsewhere in this Condition 11 (*Events of Default*)) and, where such default or breach is, in the opinion of the Trustee, capable of remedy, such default or breach is not remedied within 30 calendar days after notice thereof has been given to the Bank, by the Trustee, requiring the same to be remedied; or

(c)   *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(d)   *Judgment Default*

any judgment, ruling, decree or surety bond for the payment of an aggregate amount of not less than U.S.$10,000,000 (or its equivalent in any other currency or currencies) is rendered or granted against and is binding on any member of the Group or any part of its assets and is neither paid when due nor within any originally applicable grace period provided; or

(e)   *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its

Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement or any step or procedure contemplated in paragraph (c) of the definition of Permitted Transaction; or

(f)  ***Creditors' Process***

after the Restructuring Date, any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group having an aggregate value of not less than U.S.\$10,000,000, and is not discharged or stayed within 45 days after commencement; or

(g)  ***Cessation of Business***

the Bank or any of its Material Subsidiaries suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business or its Banking Licence is revoked; or

(h)  ***Compulsory Acquisition***

the authority or ability of the Bank or any of its Material Subsidiaries to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction, vesting, divesting, compulsory acquisition or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any member of the Group or any of its assets; or

(i)  ***Invalidity or Unenforceability***

(a) the validity of the Notes or any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter is contested by the Bank or the Bank denies its obligations under the Senior Notes, the OID Notes or the Subordinated Notes (whether by a general suspension of payments or a moratorium on the payment of debt or otherwise), the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter or it is or becomes unlawful for the Bank to perform or comply with all or any of its obligations set out in any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, or all or any of the obligations of the Bank provided therein shall be or become unenforceable or invalid; or (b) the validity of the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, is contested by the Bank or Samruk-Kazyna, or either of the Bank or Samruk-Kazyna denies or fails to perform its obligations within any applicable grace period as stated under the BTA Undertaking or the Samruk-Kazyna Undertaking (as the case may be) including, for the avoidance of doubt, in relation to the appointment or removal of any Creditor Director and, following the occurrence of any of those events specified in this Condition 11(i), the Trustee is of the opinion that such occurrence is materially prejudicial to the interests of the Noteholders.

**12.    Replacement of Notes**

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses

incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require. Mutilated or defaced Notes must be surrendered before replacements will be issued.

**13.     Meetings of Noteholders; Modification and Waiver**

(a)     *Meetings of Noteholders*

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**"). A meeting to consider proposals to approve or reject a candidate nominated by any Noteholder or by the Bank, as the case may be, for the position of Creditor Director or to require the resignation of any Creditor Director (each, a "**Creditor Director matter**") may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than 5 per cent. of the aggregate principal amount of the outstanding Notes and the quorum at any meeting convened to vote on a Creditor Director matter will be two or more persons being or representing not less than five per cent. of the aggregate principal amount of the Notes for the time being outstanding or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented. Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)     *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of the Noteholders under the Trust Deed, or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)     *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error.  In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby.  Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

14.   **Notices**

(a)     *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register.  Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing.  In addition, so long as the Notes are listed on an Approved Stock Exchange (as defined in the Trust Deed) and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of the Approved Stock Exchange.  Any such notice shall be deemed to have been given on the date of first publication.

(b)     *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at _____ and clearly marked on their exterior _____ (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)     *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15.   **Trustee**

(a)     *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders.  In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed.  Accordingly, the Trustee makes no representations and

assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)  **Exercise of Power and Discretion**

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction.  The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)  **Enforcement; Reliance**

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)     it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)    it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence.  In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor.  If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed.  The Trustee shall be entitled to rely without liability on

such certificates.  The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions or the Trust Deed and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)     *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)     *Retirement and Removal*

Any Trustee may retire at any time on giving at least three months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee.  If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee.  In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)     *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

**16.    Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

**17.    Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of

business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.  This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18.    **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19.    **Governing Law; Arbitration and Jurisdiction**

(a)    *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)    *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition.  The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA.  The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country.  The seat of arbitration shall be London, England and the language of arbitration shall be English.  Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)    *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*).  Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)    *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts.  Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of

such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)     ***Appropriate Forum***

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)     ***Agent for Service of Process***

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.  If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment.   If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)     ***Consent to Enforcement, etc.***

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)     ***Waiver of Immunity***

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

**ANNEX 2 – TERMS AND CONDITIONS OF THE DOLLAR ORIGINAL ISSUE DISCOUNT NOTES**

*The following is the text of the terms and conditions of the Original Issue Discount Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Original Issue Discount Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The U.S.$ _____ Original Discount Notes due 2021 (the "**Dollar OID Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of JSC BTA Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated _____ 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and _____ as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of a paying agency agreement dated _____ 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, _____ as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**", which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) and _____ as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions.  The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them.  Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent.  Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee, _____.  References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.     **Status**

The obligations under the Notes are unconditional, direct, unsubordinated and, subject as provided in Clause _____ *(Negative Pledge)* of the Trust Deed, unsecured obligations of the Bank, and will at all times rank at least *pari passu* amongst themselves and *pari passu* in right of payment with all other present and future (except as provided therein) unsubordinated, unsecured obligations of the Bank, save only for such obligations as may be preferred by mandatory provisions of applicable law.

2.     **Form, Denomination and Title**

(a)     *Form and Denomination*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered.  Notes shall be issued in denominations of U.S.$ _____ and integral multiples of U.S.$ _____ in excess thereof (each denomination an "**authorised denomination**").

(b)     *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*).  The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein,

any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

### 3.    Registration

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement.  A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding.  Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

### 4.    Transfers

(a)    Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of any Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided, however, that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations.  Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)    Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of a like principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder.  In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)    Transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)    Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)    All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions.  The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar.  A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

5.      **Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed relating to, amongst other things, restrictions on the creation of security interests, incurrence of indebtedness, conduct of business with related parties, acquisition and incorporation of subsidiaries, ability to enter into mergers and joint ventures, disposal of assets and payment of dividends.

6.      **Interest and Principal**

(a)      *Accretion of Principal*

The principal amount in respect of the Notes shall accrete from _____ 2010 and every six months thereafter until _____ 2021 by U.S.$ _____.  Such accretion shall be taken into account for all purposes with respect to the outstanding principal amount under these Conditions, including but not limited to calculating the interest payable on the outstanding principal amount in accordance with Conditions 6(d) (*Calculation of Interest for an Interest Period*) and 6(e) (*Calculation of Interest for any Other Period*), and calculating the instalments of principal to be paid in accordance with Condition 8(a) (*Scheduled Redemption*) *provided that* in the event of a redemption for tax reasons in accordance with Condition 8(b) (*Redemption for Tax Reasons*), the Notes will be redeemed at their Fully Accreted Principal Amount.

(b)      *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount (as accreted in accordance with Condition 6(a) (*Accretion of Principal*)) from 1 July 2010 up to but excluding _____ 2017 (the "**Amortisation Date**") at the rate of 3.70 per cent. per annum (the "**Initial Rate of Interest**") and thereafter until _____ 2021 at the rate of 3.30 per cent. per annum (the "**Subsequent Rate of Interest**").  Interest is payable in arrear on _____ and _____ in each year (each, an "**Interest Payment Date**"), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(c)      *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(d)      *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Initial or the Subsequent Rate of Interest (as the case may be) to the principal amount of such Note (as accreted in accordance with Condition 6(a) (*Accretion of Principal*)), dividing the product by two and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

(e)     *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(d) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

**7.     Payments**

(a)     *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)     *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of partial payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent.  Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) will be made as provided in these Conditions.

(c)     *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**").

(d)     *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a United States Dollar account maintained by the payee with a bank in New York City.

(e)     *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*).   No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)     *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of the Specified Offices of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place.  A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day.  In this Condition 7(f), "**business day**" means any day on which banks are open for business (including dealings in foreign

currencies) in New York City, London and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)     *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders.  The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided, however, that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar.  Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

**8.      Redemption and Purchase**

(a)     *Scheduled Redemption*

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be redeemed in eight semi-annual instalments on _____ and _____ of each year, with the first such instalment being payable on _____ 2017 and the last such instalment being payable on _____ 2021. The outstanding principal amount of each instalment of principal shall be equal to a fraction of the accreted principal amount as at the date of payment of the instalment, for which the numerator is one and the denominator is the number of instalments (including the one in question) remaining until (and including) the last instalment.

The outstanding principal amount of each Note (as accreted in accordance with Condition 6(a) (*Accretion of Principal*)) shall be reduced by any repayment of principal in accordance with these Conditions with effect from the related instalment payment date, unless the payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount.  Each Note shall be finally redeemed on due payment of the final instalment amount.

(b)     *Redemption for Tax Reasons*

The Notes may be redeemed at the option of the Bank in whole, but not in part, at any time, on giving not less than 30 nor more than 60 days' notice to the Noteholders (which notice shall be irrevocable) at their Fully Accreted Principal Amount, together with interest accrued but unpaid to the date fixed for redemption, if, immediately before giving such notice, the Bank satisfies the Trustee that (i) the Bank will become obliged to pay, on the next date on which any amount would be payable with respect to the Notes, additional amounts, as provided or referred to in Condition 9 (*Taxation*), to any greater extent than would have been required had such a payment been required to be made on the [*date of the Claimants' Meeting*], as a result of any change in, or amendment to, the laws or regulations of the Republic of Kazakhstan or any political subdivision or any authority thereof having power to tax therein, or any change in the application or official interpretation of such laws or regulations (including a ruling by a court of competent jurisdiction, but excluding any such change or amendment which obliges the Bank to pay additional amounts in respect of

Notes held by or on behalf of a person resident, domiciled or organised in the Republic of Kazakhstan), which change or amendment becomes effective on or after the [*date of the Claimant's Meeting*] and (ii) such obligation cannot be avoided by the Bank taking reasonable measures available to it; *provided, however, that* no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Bank would be obliged to pay such additional amounts if a payment in respect of the Notes were then due. Prior to the publication of any notice of redemption pursuant to this Condition 8(b), the Bank shall deliver or procure that there is delivered to the Trustee a certificate signed by two directors of the Bank stating that the Bank is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Bank so to redeem have occurred and an opinion in form and substance satisfactory to the Trustee of independent legal advisers of recognised standing to the effect that the Bank has or will become obliged to pay such additional amounts as a result of such change or amendment. The Trustee shall be entitled to accept, without further enquiry, such certificate and opinion as sufficient evidence of the satisfaction of the circumstances set out in (i) and (ii) above, in which event these shall be conclusive and binding on the Noteholders. Upon the expiry of any such notice as is referred to in this Condition 8(b), the Bank shall be bound to redeem the Notes in accordance with this Condition 8(b).

(c)     ***Redemption at the Option of the Noteholders***

Unless the Noteholders have previously by an Extraordinary Resolution (as defined in the Trust Deed) disapplied this Condition 8(c) (*Redemption at the Option of the Noteholders*) in relation to the applicable Relevant Event, following the occurrence of a Relevant Event (as defined below), the Bank shall promptly, and in any event within five Business Days thereafter, give notice (the "**Relevant Event Notice**") of such Relevant Event to the Noteholders (with a copy to the Trustee) in accordance with Condition 14 (*Notices*), which notice shall specify the date (which shall not be less than 30 days nor more than 60 days after the Relevant Event Notice (the "**Put Settlement Date**")), on which the Bank shall, at the option of the holder of any Note, redeem such Note at its then current accreted value together with interest accrued and unpaid to the Put Settlement Date. In order to exercise the option contained in this Condition 8(c), the holder of a Note must, not less than 15 days before the Put Settlement Date, deposit with any Paying Agent the relevant Note Certificate and a duly completed put option notice (a "**Put Option Notice**") in the form obtainable from any Paying Agent. No Note Certificate, once deposited with a duly completed Put Option Notice in accordance with this Condition 8(c), may be withdrawn; *provided, however, that* if, prior to the Put Settlement Date, any such Note becomes immediately due and payable or, upon due presentation of any such Note Certificate on the Put Settlement Date, payment of the redemption monies is improperly withheld or refused, such Note Certificate shall, without prejudice to the exercise of the Put Option, be returned to the holder by uninsured first class mail (airmail if overseas) at such address as may have been given by such Noteholder in the relevant Put Option Notice. The Trustee shall not be responsible for monitoring whether or not any Relevant Event has occurred and shall be entitled to assume, unless it receives written notice to the contrary, that no Relevant Event has occurred. In the event that a Relevant Event occurs but no Relevant Event Notice is given by the Bank, the Bank shall be deemed to have given a Relevant Event Notice specifying a Put Settlement Date on the date which is 60 days after the occurrence of the Relevant Event, unless such day is not a Business Day, in which event the Put Settlement Date shall be the immediately following Business Day thereafter.

(d) *Purchase*

Subject to the covenant set out in the Trust Deed, entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*", the Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price.  Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 8(e) (*Cancellation of Notes*).  Any Notes so purchased, while held by or on behalf of the Bank or any member of the Group shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(e) *Cancellation of Notes*

Unless otherwise permitted pursuant to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*", all Notes which are redeemed or surrendered for cancellation pursuant to this Condition 8 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

(f) *Definitions*

As used in this Condition 8 (*Redemption and Purchase*):

"**acting in concert**" means a group of persons who, pursuant to an agreement or understanding (whether formal or informal), actively cooperate, through the direct or indirect acquisition by any member or members of such group of shares in the Bank or of any of the assets of any member or members of the group, to obtain or consolidate Control of the Bank.

"**Affiliate**" of a person means a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, that person.

"**Business Day**" means a day other than a Saturday or Sunday on which commercial banks are open for business (including dealings in foreign currencies) in London and New York.

"**Change of Control**" means:

(a) Samruk-Kazyna ceases to control the Bank (other than where it ceases to control the Bank (a) by transfer of control to a Permitted Transferee or (b) in connection with a Secondary Public Offering), where "**control**" of the Bank means:

(i) the holding beneficially of more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital); or

(ii) the power (whether by ownership of shares, proxy, contract, agency or otherwise) to cast, or control the casting of, more than 50 per cent. of the maximum number of votes that might be cast at a general meeting of the Bank; or

(b) Any person or group of persons acting in concert (other than where (a) such person or persons are Permitted Transferees or (b) in connection with a

Secondary Public Offering) gains control of the Bank where "**control**" means the power (whether by ownership of shares, proxy, contract, agency or otherwise) to:

(i)      appoint or remove all, or the majority, of the directors or other equivalent officers of the Bank; or

(ii)     give directions with respect to the operating and/or financial policies of the Bank with which the directors or other equivalent officers of the Bank are obliged to comply,

*provided that* any agreement whereby management of the Bank is transferred to a third party (the "**manager**") that does not, in conjunction with any acquisition of shares in the Bank by such manager or its Affiliates (whether or not occurring at the same time), cause the government of the Republic of Kazakhstan to cease to own more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), will not constitute a "**Change of Control**" if (a) the Trustee and the Creditor Directors have been provided with an opinion in form and substance satisfactory to them of independent legal advisers of recognised standing to the effect that the management agreement, in conjunction with any acquisition of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), does not cause the government of the Republic of Kazakhstan (directly or indirectly) to cease to "**control**" the Bank or to have majority economic risk and/or benefit in the Bank and continues to allow the government of the Republic of Kazakhstan (directly or indirectly) to retain the sole right to exercise its rights as majority shareholders (including in relation to the appointment of directors), (b) the terms of the management agreement have been approved by a qualified majority of the Board of Directors of the Bank and (c) the "**manager**" is a Permitted Transferee.

"**FSMA Methodology**" means International Financial Reporting Standards adjusted to reflect the FMSA's requirements for preparation of financial statements for regulatory purposes.

"**OECD**" means the Organisation for Economic Co-operation and Development.

"**Permitted Transferee**" means a person which: (A)(i) is a bank or other financial institution subject to financial regulation in Russia, China, Hong Kong, Singapore or an OECD country; or (ii) is a sovereign wealth fund from Russia, China, Hong Kong, Singapore or an OECD country or any other country which may otherwise be approved by a Qualified Majority of the Board; (B) has, in the case of a bank or other financial institution, a minimum credit rating from S&P of at least BBB or equivalent from Moody's or Fitch; (C) has, in the case of a bank or other financial institution, a minimum paid up share capital and reserves of at least U.S.$7 billion or, in the case of a sovereign wealth fund, assets of at least U.S.$7 billion; and (D) is not affiliated with any of the present or former shareholders or managers of the Bank.

"**Rating Agency**" means Standard & Poors ("**S&P**") and its successors, Moody's Investors Service Inc. ("**Moody's**") and it successors or Fitch Ratings Ltd. ("**Fitch**") and its successors.

"**Relevant Event**" means:

(a)    a Change of Control; and/or

(b)    any disposals (excluding those disposals made in the ordinary course of trading) in any financial year of more than 6.5 per cent. of the Group's total gross assets (determined by reference to the Bank's most recent consolidated financial statements calculated in accordance with FSMA Methodology).

"**Secondary Public Offering**" means any sale or public offering of any equity security (including any preference shares) of the Bank or receipts or similar securities representing such equity securities by way of flotation, public placement, listing or other public offering on any recognised international Exchange.

## 9.    Taxation

(a)    *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)    presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note;

(ii)    presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days;

(iii)    to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)    where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place.  Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)   ***Relevant Date***

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that such payment will be made, *provided that* payment is in fact made.

(c)   ***Additional Amounts***

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 9 (*Taxation*) pursuant to the Trust Deed.

(d)   ***Taxing Jurisdiction***

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

## 10.   Prescription

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

**11.**   **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and shall become due and repayable at their then accreted principal amount together with accrued interest if any of the following events (each, an "**Event of Default**") occurs and is continuing:

(a)   *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b)   *Breach of Other Obligations*

the Bank is in default in the performance, or is otherwise in breach, of any covenant, obligation, undertaking or other agreement under the Senior Notes, the OID Notes, the Recovery Units or the Trust Deed (other than a default or breach specifically dealt with elsewhere in this Condition 11 (*Events of Default*)) and, where such default or breach is, in the opinion of the Trustee, capable of remedy, such default or breach is not remedied within 30 calendar days after notice thereof has been given to the Bank by the Trustee, requiring the same to be remedied; or

(c)   *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(d)   *Judgment Default*

any judgment, ruling, decree or surety bond for the payment of an aggregate amount of not less than U.S.$10,000,000 (or its equivalent in any other currency or currencies) is rendered or granted against and is binding on any member of the Group or any part of its assets and is neither paid when due nor within any originally applicable grace period provided; or

(e)   *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its

538

Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement or any step or procedure contemplated in paragraph (c) of the definition of Permitted Transaction; or

(f)  ***Creditors' Process***

after the Restructuring Date, any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group having an aggregate value of not less than U.S.$10,000,000, and is neither discharged nor stayed within 45 days after commencement; or

(g)  ***Cessation of Business***

the Bank or any of its Material Subsidiaries suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business or its Banking Licence is revoked; or

(h)  ***Compulsory Acquisition***

the authority or ability of the Bank or any of its Material Subsidiaries to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction, vesting, divesting, compulsory acquisition or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any member of the Group or any of its assets; or

(i)  ***Invalidity or Unenforceability***

(a) the validity of the Notes or any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter is contested by the Bank or the Bank denies its obligations under the Senior Notes, the OID Notes or the Subordinated Notes (whether by a general suspension of payments or a moratorium on the payment of debt or otherwise), the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter or it is or becomes unlawful for the Bank to perform or comply with all or any of its obligations set out in any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, or all or any of the obligations of the Bank provided therein shall be or become unenforceable or invalid; or (b) the validity of the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, is contested by the Bank or Samruk-Kazyna, or either of the Bank or Samruk-Kazyna denies or fails to perform its obligations within any applicable grace period as stated under the BTA Undertaking or the Samruk-Kazyna Undertaking (as the case may be) including, for the avoidance of doubt, in relation to the appointment or removal of any Creditor Director and, following the occurrence of any of those events specified in this Condition 11(i), the Trustee is of the opinion that such occurrence is materially prejudicial to the interests of the Noteholders.

**12.  Replacement of Notes**

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses

incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Notes must be surrendered before replacements will be issued.

**13.**     **Meetings of Noteholders; Modification and Waiver**

(a)     *Meetings of Noteholders*

The Trust Deed provides that all meetings of holders of the Notes will include holders of the EUR _____ Original Discount Notes due 2021 of the Bank (the "**EUR 2021 Notes**") and there shall be no provision for separate meetings of the holders of the Notes and of holders of the EUR 2021 Notes and that for purposes of determining a quorum and for voting purposes the EUR 2021 Notes shall be converted into U.S. Dollars at the applicable Reference Rate applicable as at the date of issuance of the Notes. Accordingly, all references in this Condition 13 (*Meetings of Noteholders; Modification and Waiver*) to "Notes" and "Noteholders" shall be deemed to include the EUR 2021 Notes and the holders of such notes as the case may be.

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed.  Any such modification may be made if sanctioned by an Extraordinary Resolution.  Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes.  The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**").   A meeting to consider proposals to approve or reject a candidate nominated by any Noteholder or by the Bank, as the case may be, for the position of Creditor Director or to require the resignation of any Creditor Director (each, a "**Creditor Director matter**") may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than 5 per cent. of the aggregate principal amount of the outstanding Notes and the quorum at any meeting convened to vote on a Creditor Director matter will be two or more persons being or representing not less than five per cent. of the aggregate principal amount of the Notes for the time being outstanding or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented. Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)     *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of the Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed, or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes.   Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)     *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error.   In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby.   Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

**14.     Notices**

(a)     *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing.   In addition, so long as the Notes are listed on an Approved Stock Exchange (as defined in the Trust Deed) and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of the Approved Stock Exchange.   Any such notice shall be deemed to have been given on the date of first publication.

(b)     *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at _____ and clearly marked on their exterior _____ (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)     *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15.    **Trustee**

(a)    *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders.  In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed.  Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)    *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction.  The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)    *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)    it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)    it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence.  In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor.  If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving

of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed.  The Trustee shall be entitled to rely without liability on such certificates.  The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions or the Trust Deed and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)     **Failure to Act**

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)     **Retirement and Removal**

Any Trustee may retire at any time on giving at least three months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee.  If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee.  In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)     **Substitution**

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute).  Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

**16.**     **Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

17.   **Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.   This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18.   **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19.   **Governing Law; Arbitration and Jurisdiction**

(a)   *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)   *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition.   The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA.   The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country.   The seat of arbitration shall be London, England and the language of arbitration shall be English.   Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)   *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts

of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)  **Jurisdiction**

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts.  Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)  **Appropriate Forum**

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)  **Agent for Service of Process**

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.  If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment.  If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)  **Consent to Enforcement, etc.**

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)  **Waiver of Immunity**

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

**ANNEX 3 – TERMS AND CONDITIONS OF THE EURO ORIGINAL ISSUE DISCOUNT NOTES**

*The following is the text of the terms and conditions of the Original Issue Discount Euro Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Original Issue Discount Euro Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The EUR_____ Original Discount Notes due 2021 (the "**Euro OID Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of JSC BTA Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated _____ 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and _____ as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of a paying agency agreement dated _____ 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, _____ as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**", which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) and _____ as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee, _____. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.      **Status**

The obligations under the Notes are unconditional, direct, unsubordinated and, subject as provided in Clause _____ *(Negative Pledge)* of the Trust Deed, unsecured obligations of the Bank, and will at all times rank at least *pari passu* amongst themselves and *pari passu* in right of payment with all other present and future (except as provided therein) unsubordinated, unsecured obligations of the Bank, save only for such obligations as may be preferred by mandatory provisions of applicable law.

2.      **Form, Denomination and Title**

(a)     *Form and Denomination*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered. Notes shall be issued in denominations of EUR_____ and integral multiples of EUR_____ in excess thereof (each denomination an "**authorised denomination**").

(b)     *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*). The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein,

any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

**3.     Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement.  A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding.  Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

**4.     Transfers**

(a)     Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of any Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided, however, that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations.  Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)     Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of a like principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder.  In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)     Transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)     Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)     All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions.  The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar.  A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

5.    **Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed relating to, amongst other things, restrictions on the creation of security interests, incurrence of indebtedness, conduct of business with related parties, acquisition and incorporation of subsidiaries, ability to enter into mergers and joint ventures, disposal of assets and payment of dividends.

6.    **Interest and Principal**

(a)    *Accretion of Principal*

The principal amount in respect of the Notes shall accrete from _____ 2010 and every six months thereafter until _____ 2021 by EUR_____.  Such accretion shall be taken into account for all purposes with respect to the outstanding principal amount under these Conditions, including but not limited to calculating the interest payable on the outstanding principal amount in accordance with Conditions 6(d) (*Calculation of Interest for an Interest Period*) and 6(e) (*Calculation of Interest for any Other Period*), and calculating the instalments of principal to be paid in accordance with Condition 8(a) (*Scheduled Redemption*) *provided that* in the event of a redemption for tax reasons in accordance with Condition 8(b) (*Redemption for Tax Reasons*), the Notes will be redeemed at their Fully Accreted Principal Amount.

(b)    *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount (as accreted in accordance with Condition 6(a) (*Accretion of Principal*)) from 1 July 2010 up to but excluding _____ 2017 (the "**Amortisation Date**") at the rate of 3.14 per cent. per annum (the "**Initial Rate of Interest**") and thereafter until _____ 2021 at the rate of 2.74 per cent. per annum (the "**Subsequent Rate of Interest**") payable in arrear on _____ and _____ in each year (each, an "**Interest Payment Date**"), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(c)    *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(d)    *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Initial or the Subsequent Rate of Interest (as the case may be) to the principal amount of such Note (as accreted in accordance with Condition 6(a) (*Accretion of Principal*)), dividing the product by two and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

(e)      *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(d) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

**7.      Payments**

(a)      *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)      *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of partial payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent.  Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) will be made as provided in these Conditions.

(c)      *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**").

(d)      *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a Euro account maintained by the payee with a bank in a city in which banks have access to the TARGET System.

(e)      *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*).  No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)      *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of the Specified Offices of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place.  A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day.  In this Condition 7(f), "**business day**" means any day on which banks are open for business (including dealings in foreign

currencies) in the place of the Specified Offices of the Principal Paying Agent and which is a business day on which the TARGET System is operating and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g) *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders.  The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided, however, that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar.  Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

**8.   Redemption and Purchase**

(a) *Scheduled Redemption*

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be redeemed in eight semi-annual instalments on _____ and _____ of each year, with the first such instalment being payable on _____ 2017 and the last such instalment being payable on _____ 2021.  The outstanding principal amount of each instalment of principal shall be equal to a fraction of the accreted principal amount as at the date of payment of the instalment, for which the numerator is one and the denominator is the number of instalments (including the one in question) remaining until (and including) the last instalment.

The outstanding principal amount of each Note (as accreted in accordance with Condition 6(a) (*Accretion of Principal*)) shall be reduced by any repayment of principal in accordance with these Conditions with effect from the related instalment payment date, unless the payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount.  Each Note shall be finally redeemed on due payment of the final instalment amount.

(b) *Redemption for Tax Reasons*

The Notes may be redeemed at the option of the Bank in whole, but not in part, at any time, on giving not less than 30 nor more than 60 days' notice to the Noteholders (which notice shall be irrevocable) at their Fully Accreted Principal Amount, together with interest accrued but unpaid to the date fixed for redemption,

if, immediately before giving such notice, the Bank satisfies the Trustee that (i) the Bank will become obliged to pay, on the next date on which any amount would be payable with respect to the Notes, additional amounts, as provided or referred to in Condition 9 (*Taxation*), to any greater extent than would have been required had such a payment been required to be made on the [*date of the Claimants' Meeting*], as a result of any change in, or amendment to, the laws or regulations of the Republic of Kazakhstan or any political subdivision or any authority thereof having power to tax

therein, or any change in the application or official interpretation of such laws or regulations (including a ruling by a court of competent jurisdiction, but excluding any such change or amendment which obliges the Bank to pay additional amounts in respect of Notes held by or on behalf of a person resident, domiciled or organised in the Republic of Kazakhstan), which change or amendment becomes effective on or after the [*date of the Claimant's Meeting*] and (ii) such obligation cannot be avoided by the Bank taking reasonable measures available to it; *provided, however, that* no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Bank would be obliged to pay such additional amounts if a payment in respect of the Notes were then due.  Prior to the publication of any notice of redemption pursuant to this Condition 8(b), the Bank shall deliver or procure that there is delivered to the Trustee a certificate signed by two directors of the Bank stating that the Bank is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Bank so to redeem have occurred and an opinion in form and substance satisfactory to the Trustee of independent legal advisers of recognised standing to the effect that the Bank has or will become obliged to pay such additional amounts as a result of such change or amendment.  The Trustee shall be entitled to accept, without further enquiry, such certificate and opinion as sufficient evidence of the satisfaction of the circumstances set out in (i) and (ii) above, in which event these shall be conclusive and binding on the Noteholders.  Upon the expiry of any such notice as is referred to in this Condition 8(b), the Bank shall be bound to redeem the Notes in accordance with this Condition 8(b).

(c)     ***Redemption at the Option of the Noteholders***

Unless the Noteholders have previously by an Extraordinary Resolution (as defined in the Trust Deed) disapplied this Condition 8(c) in relation to the applicable Relevant Event, following the occurrence of a Relevant Event (as defined below), the Bank shall promptly, and in any event within five Business Days thereafter, give notice (the "**Relevant Event Notice**") of such Relevant Event to the Noteholders (with a copy to the Trustee) in accordance with Condition 14 (*Notices*), which notice shall specify the date (which shall not be less than 30 days nor more than 60 days after the Relevant Event Notice (the "**Put Settlement Date**")), on which the Bank shall, at the option of the holder of any Note, redeem such Note at its then current accreted value together with interest accrued and unpaid to the Put Settlement Date.  In order to exercise the option contained in this Condition 8(c), the holder of a Note must, not less than 15 days before the Put Settlement Date, deposit with any Paying Agent the relevant Note Certificate and a duly completed put option notice (a "**Put Option Notice**") in the form obtainable from any Paying Agent.  No Note Certificate, once deposited with a duly completed Put Option Notice in accordance with this Condition 8(c), may be withdrawn; *provided, however, that* if, prior to the Put Settlement Date, any such Note becomes immediately due and payable or, upon due presentation of any such Note Certificate on the Put Settlement Date, payment of the redemption monies is improperly withheld or refused, such Note Certificate shall, without prejudice to the exercise of the Put Option, be returned to the holder by uninsured first class mail (airmail if overseas) at such address as may have been given by such Noteholder in the relevant Put Option Notice.  The Trustee shall not be responsible for monitoring whether or not any Relevant Event has occurred and shall be entitled to assume, unless it receives written notice to the contrary, that no Relevant Event has occurred.  In the event that a Relevant Event occurs but no Relevant Event Notice is given by the Bank, the Bank shall be deemed to have given a Relevant Event Notice specifying a Put Settlement Date on the date which is 60 days after the occurrence of the Relevant Event, unless such day is not a Business Day, in which event the Put Settlement Date shall be the immediately following Business Day thereafter.

(d)     *Purchase*

Subject to the covenant set out in the Trust Deed, entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*", the Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price.  Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 8(e) (*Cancellation of Notes*).  Any Notes so purchased, while held by or on behalf of the Bank or any member of the Group, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(e)     *Cancellation of Notes*

Unless otherwise permitted pursuant to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in Share Capital and on the Repurchase of Securities*", all Notes which are redeemed or surrendered for cancellation pursuant to this Condition 8 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

(f)     *Definitions*

As used in this Condition 8 (*Redemption and Purchase*):

"**acting in concert**" means a group of persons who, pursuant to an agreement or understanding (whether formal or informal), actively cooperate, through the direct or indirect acquisition by any member or members of such group of shares in the Bank or of any of the assets of any member or members of the group, to obtain or consolidate Control of the Bank.

"**Affiliate**" of a person means a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, that person.

"**Business Day**" means a day other than a Saturday or Sunday on which commercial banks are open for business (including dealings in foreign currencies) in London and New York and if on that day a payment in or a purchase of Euro is made which is also a TARGET Day.

"**Change of Control**" means:

(A)     Samruk-Kazyna ceases to control the Bank (other than where it ceases to control the Bank (a) by transfer of control to a Permitted Transferee or (b) in connection with a Secondary Public Offering), where "**control**" of the Bank means:

(i)      the holding beneficially of more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital); or

(ii)     the power (whether by ownership of shares, proxy, contract, agency or otherwise) to cast, or control the casting of, more than 50 per cent. of the maximum number of votes that might be cast at a general meeting of the Bank, or

(B)    Any person or group of persons acting in concert (other than where (a) such person or persons are Permitted Transferees or (b) in connection with a Secondary Public Offering) gains control of the Bank where "**control**" means the power (whether by ownership of shares, proxy, contract, agency or otherwise) to:

(i)    appoint or remove all, or the majority, of the directors or other equivalent officers of the Bank; or

(ii)    give directions with respect to the operating and/or financial policies of the Bank with which the directors or other equivalent officers of the Bank are obliged to comply,

*provided that* any agreement whereby management of the Bank is transferred to a third party (the "**manager**") that does not, in conjunction with any acquisition of shares in the Bank by such manager or its Affiliates (whether or not occurring at the same time), cause the government of the Republic of Kazakhstan to cease to own more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), will not constitute a "**Change of Control**" if (a) the Trustee has been provided with an opinion in form and substance satisfactory to them of independent legal advisers of recognised standing to the effect that the management agreement, in conjunction with any acquisition of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), does not cause the government of the Republic of Kazakhstan (directly or indirectly) to cease to "**control**" the Bank or to have majority economic risk and/or benefit in the Bank and continues to allow the government of the Republic of Kazakhstan (directly or indirectly) to retain the sole right to exercise its rights as majority shareholders (including in relation to the appointment of directors), (b) the terms of the management agreement have been approved by a Qualified Majority and (c) the "**manager**" is a Permitted Transferee.

"**FSMA Methodology**" means International Financial Reporting Standards adjusted to reflect the FMSA's requirements for preparation of financial statements for regulatory purposes.

"**OECD**" means the Organisation for Economic Co-operation and Development.

"**Permitted Transferee**" means a person which: (A)(i) is a bank or other financial institution subject to financial regulation in Russia, China, Hong Kong, Singapore or an OECD country; or (ii) is a sovereign wealth fund from Russia, China, Hong Kong, Singapore or an OECD country or any other country which may otherwise be approved by a Qualified Majority of the Board; (B) has, in the case of a bank or other financial institution, a minimum credit rating from S&P of at least BBB or equivalent from Moody's or Fitch; (C) has, in the case of a bank or other financial institution, a minimum paid up share capital and reserves of at least U.S.$7 billion or, in the case of a sovereign wealth fund, assets of at least U.S.$7 billion; and (D) is not affiliated with any of the present or former shareholders or managers of the Bank.

"**Rating Agency**" means Standard & Poors ("**S&P**") and its successors, Moody's Investors Service Inc. ("**Moody's**") and it successors or Fitch Ratings Ltd. ("**Fitch**") and its successors.

"**Relevant Event**" means:

(A)    a Change of Control; and/or

(B)     any disposals (excluding those disposals made in the ordinary course of trading) in any financial year of more than 6.5 per cent. of the Group's total gross assets (determined by reference to the Bank's most recent consolidated financial statements calculated in accordance with FSMA Methodology).

"**Secondary Public Offering**" means any sale or public offering of any equity security (including any preference shares) of the Bank or receipts or similar securities representing such equity securities by way of flotation, public placement, listing or other public offering on any recognised international Stock Exchange.

9.     **Taxation**

(a)     *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)     presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note;

(ii)     presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days;

(iii)     to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)     where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to

the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place.  Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)    ***Relevant Date***

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that such payment will be made, *provided that* payment is in fact made.

(c)    ***Additional Amounts***

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 9 (*Taxation*) pursuant to the Trust Deed.

(d)    ***Taxing Jurisdiction***

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

**10.    Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

11. **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and shall become due and repayable at their then accreted principal amount together with accrued interest if any of the following events (each, an "**Event of Default**") occurs and is continuing:

(a)     *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b)     *Breach of Other Obligations*

the Bank is in default in the performance, or is otherwise in breach, of any covenant, obligation, undertaking or other agreement under the Senior Notes, the OID Notes, the Recovery Units or the Trust Deed (other than a default or breach specifically dealt with elsewhere in this Condition 11 (*Events of Default*)) and, where such default or breach is, in the opinion of the Trustee, capable of remedy, such default or breach is not remedied within 30 calendar days after notice thereof has been given to the Bank by the Trustee, requiring the same to be remedied; or

(c)     *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(d)     *Judgment Default*

any judgment, ruling, decree or surety bond for the payment of an aggregate amount of not less than U.S.$10,000,000 (or its equivalent in any other currency or currencies) is rendered or granted against and is binding on any member of the Group or any part of its assets and is neither paid when due nor within any originally applicable grace period provided; or

(e)     *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its

Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement or any step or procedure contemplated in paragraph (c) of the definition of Permitted Transaction; or

(f)   ***Creditors' Process***

after the Restructuring Date, any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group having an aggregate value of not less than U.S.$10,000,000, and is not discharged or stayed within 45 days after commencement; or

(g)   ***Cessation of Business***

the Bank or any of its Material Subsidiaries suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business or its Banking Licence is revoked; or

(h)   ***Compulsory Acquisition***

the authority or ability of the Bank or any of its Material Subsidiaries to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction, vesting, divesting, compulsory acquisition or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any member of the Group or any of its assets; or

(i)   ***Invalidity or Unenforceability***

(a) the validity of the Notes or any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter is contested by the Bank or the Bank denies its obligations under the Senior Notes, the OID Notes or the Subordinated Notes (whether by a general suspension of payments or a moratorium on the payment of debt or otherwise), the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter or it is or becomes unlawful for the Bank to perform or comply with all or any of its obligations set out in any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, or all or any of the obligations of the Bank provided therein shall be or become unenforceable or invalid; or (b) the validity of the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, is contested by the Bank or Samruk-Kazyna, or either of the Bank or Samruk-Kazyna denies or fails to perform its obligations within any applicable grace period as stated under the BTA Undertaking or the Samruk-Kazyna Undertaking (as the case may be) including, for the avoidance of doubt, in relation to the appointment or removal of any Creditor Director and, following the occurrence of any of those events specified in this Condition 11(i), the Trustee is of the opinion that such occurrence is materially prejudicial to the interests of the Noteholders.

**12.   Replacement of Notes**

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses

incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require. Mutilated or defaced Notes must be surrendered before replacements will be issued.

**13.**    **Meetings of Noteholders; Modification and Waiver**

(a)    *Meetings of Noteholders*

The Trust Deed provides that all meetings of holders of the Notes will include holders of the U.S.$ _____ Original Discount Notes due 2021 of the Bank (the "**U.S Dollar 2021 Notes**") and there shall be no provision for separate meetings of holders of the Notes and of holders of the U.S. Dollar 2021 Notes and that for purposes of determining a quorum and for voting purposes the Notes shall be converted into U.S. Dollars at the applicable Reference Rate applicable as at the date of issuance of the Notes. Accordingly, all references in this Condition 13 (*Meetings of Noteholders; Modification and Waiver*) to "*Notes*" and "*Noteholders*" shall be deemed to include the U.S. Dollar 2021 Notes and the holders of such notes, as the case may be.

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**"). A meeting to consider proposals to approve or reject a candidate nominated by any Noteholder or by the Bank, as the case may be, for the position of Creditor Director or to require the resignation of any Creditor Director (each, a "**Creditor Director matter**") may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than 5 per cent. of the aggregate principal amount of the outstanding Notes and the quorum at any meeting convened to vote on a Creditor Director matter will be two or more persons being or representing not less than five per cent. of the aggregate principal amount of the Notes for the time being outstanding or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented. Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)     *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of the Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed, or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes.   Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)     *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error.   In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby.   Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

14.   **Notices**

(a)     *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing.   In addition, so long as the Notes are listed on an Approved Stock Exchange (as defined in the Trust Deed) and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of the Approved Stock Exchange.   Any such notice shall be deemed to have been given on the date of first publication.

(b)     *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at _____ and clearly marked on their exterior _____ (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)     *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15.   **Trustee**

(a)   *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders.  In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed.  Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)   *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction.  The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)   *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)   it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)   it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence.  In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor.  If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving

of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed.  The Trustee shall be entitled to rely without liability on such certificates.  The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions or the Trust Deed and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)    **Failure to Act**

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)    **Retirement and Removal**

Any Trustee may retire at any time on giving at least three months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee.  If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee.  In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)    **Substitution**

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute).  Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

**16.    Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

17. **Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.   This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18. **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19. **Governing Law; Arbitration and Jurisdiction**

    (a)     *Governing Law*

        The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

    (b)     *Arbitration*

        The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition.   The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA.   The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country.   The seat of arbitration shall be London, England and the language of arbitration shall be English.   Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

    (c)     *Trustee's Option*

        At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts

of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)   **Jurisdiction**

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts.  Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)   **Appropriate Forum**

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)   **Agent for Service of Process**

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.  If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment.  If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)   **Consent to Enforcement, etc.**

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)   **Waiver of Immunity**

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

## ANNEX 4 – TERMS AND CONDITIONS OF THE RECOVERY UNITS[26]

*The following is the text of the terms and conditions of the Recovery Units which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Recovery Units and will be attached and (subject to the provisions thereof) apply to the relevant Global Note. As noted, certain provisions are still under discussion with the Steering Committee:*

The _____ Recovery Units (the "**Recovery Units**" or the "**Units**"), each of which has a nominal value [equal to the Reference Amount divided by such number of Units], issued by JSC BTA Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of, a trust deed dated _____ 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and _____, as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Units ("**Unitholders**") under the Trust Deed) and (b) the subject of (i) a paying agency agreement dated _____ 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, _____, as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**", which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Units) and _____, as registrar (the "**Registrar**" which expression shall include any successor registrar appointed from time to time in connection with the Units) and (ii) a cash management agreement dated _____ 2010 (as amended or supplemented from time to time, the "**Cash Management Agreement**") between the Bank, the Trustee and _____, as cash manager (the "**Cash Manager**" which expression shall include any successor cash manager appointed from time to time in connection with the Units). The Recovery Units shall be listed on the KASE.

Certain provisions of these Conditions are summaries of the Trust Deed, the Agency Agreement and the Cash Management Agreement and are subject to their detailed provisions. The Unitholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed, the Agency Agreement and the Cash Management Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

1.      **Definitions**

        Terms not defined in these Conditions shall have the meaning set out in the Trust Deed and for the purposes of these Conditions:

        "**Adjusted Principal Amount**" has the meaning given to it in Condition 9(c) (*Adjusted Principal Amount*);

        "**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

        "**Bank Group**" means the Bank, BTA Finance Luxembourg S.A., TuranAlem Finance B.V. and LLP "**TuranAlem Finance**".

        "**Base Case Model**" means the financial model titled "BTA BankBPRevised PCTS@18 04 2010 — Sent Deloitte" sent by Deloitte at 8.00 p.m. on 18 April 2010.

        "**Charged Property**" means all the property and rights of the Bank which are subject to the Charge and Assignment (as defined in Condition 2(c) (*Security*);

        "**Collection Account**" means the account controlled by the Trustee and with a bank in London, opened in the name of the Bank in accordance with the Trust Deed and into which

---

[26]      The Recovery Units are subject to further discussion with the Steering Committee.

the Bank shall pay the Specified Percentage of any and all Recoveries pursuant to Condition 6(a) (*Collection Account and Conversion*);

"**Deferred Settlement Date**" means, after a Valuation Rejection Notice has been delivered pursuant to Condition 9 (*Valuation*) 30 June 2022;

"**FMSA**" means the Agency of the Republic of Kazakhstan on the Regulation and Supervision of the Financial Market and Financial Organisations;

"**FMSA Methodology**" means IFRS adjusted to reflect the FMSA's requirements for preparation of financial statements for regulatory purposes;

"**Group**" means the Bank and its consolidated Subsidiaries from time to time;

"**Impaired Recovery Assets**" has the meaning given to it in the definition of Write-backs;

"**IFRS**" means international financial reporting standards within the meaning of IAS Regulation 1606/2002 to the extent applicable to the relevant statements;

"**Information Memorandum**" means the Information Memorandum dated 1 May 2010 published by the Bank in connection with the Restructuring (and as supplemented from time to time);

"**Initial Settlement Date**" means _____ 2020;

"**Issue Date**" means 1 July 2010;

"**KPMG Provisions Report**" means the report prepared by KPMG in relation to the Impaired Recovery Assets, dated 12 November 2009;

"**Litigation Recoveries**" means any cash recoveries from, and the net proceeds of any sale of, any asset recovered through the Recovery Programme (to the extent that such cash recoveries are not also Impaired Recovery Assets or Tax Assets);

"**Quarterly Recovery Assets Management Report**" means the quarterly management information report on the ongoing performance of the Recoveries Assets to be prepared by the Bank;

"**Recoveries**" means Write-backs, Litigation Recoveries, the recoveries on Tax Assets and interest on the Collection Account;

"**Recoveries Assets**" means the Impaired Recovery Assets, the Litigation Recoveries and the Tax Assets;

"**Recovery Assets Auditor**" means an auditor appointed by the Bank (whose identity and terms of appointment shall have received Qualified Majority Approval and retained amongst other things to review the Recoveries Assets Opening Report and the Quarterly Recovery Assets Management Reports;

"**Recovery Assets Opening Report**" means the initial due diligence report prepared by the Bank, based on the KPMG Provisions Report and other sources of information as necessary particularly in relation to the small and medium enterprises and retail loans portfolios and subject to review by the Recovery Assets Auditor for the purpose of, amongst other things, quantifying the Recoveries;

"**Recovery Assets Replacement Loans**" has the meaning given in the definition of Write-backs;

"**Recovery Payment Date**" has the meaning given to it in Condition 7 (Recovery Payments);

"**Recovery Payments**" means, in relation to the outstanding Units and in respect of all Recoveries arising during a Recovery Units Payment Period, the Specified Percentage of such Recoveries payable pursuant to Condition 7 (*Recovery Payments*);

"**Recovery Programme**" has the meaning provided in Condition 6(e) (*Pursuit of Recoveries*);

"**Recovery Units Payment Period**" means each period beginning on (and, including) 1 July 2010 or any Recovery Payment Date and ending on (but excluding) the next Recovery Payment Date;

"**Reference Amount**" means the aggregate principal amount of the Units, namely an amount equal to (i) the aggregate principal amount of Designated Financial Indebtedness subject to the Restructuring and in respect of which Recovery Units are issued minus the aggregate principal amount (converted into Dollars at the Spot Rate of Exchange two Business Days (as defined in Condition 6(a)(*Covenants – Collection Account and Conversion*)) before the Issue Date) of the Senior Notes and Subordinated Notes issued under Senior Packages 1 and 2 (as defined and described in the Information Memorandum) and the aggregate principal amount as at the Issue Date (converted into Dollars as aforesaid) of the OID Notes less (ii) the aggregate amount from time to time of all Recovery Payments made;

"**Residual Amount**" means (i) the value of any residual potential recoveries that may be made from the Impaired Recovery Assets and the Recovery Programme and (ii) any residual potential value in the Tax Assets, as at the Valuation Date and determined as such in accordance with Condition 9 (*Valuation*);

"**Restructuring**" means the restructuring of the indebtedness of the Bank Group as described in the Information Memorandum;

"**Security Interests**" means the security interests created in favour of the Trustee in relation to the Collection Account and the Cash Management Agreement pursuant to the Trust Deed;

"**Settlement Date**" means the Initial Settlement Date or, if a Valuation Rejection Notice has been delivered pursuant to Condition 9 (*Valuation*), the Deferred Settlement Date;

"**Specified Percentage**" means the following percentages in relation to the following Recoveries:

(i)      Cash and Accounting Recoveries, Litigation Recoveries and Tax Assets: 50 per cent.

(ii)     Interest on the Collection Account:                                          100 per cent.

"**Spot Rate of Exchange**" means the spot rate of exchange quoted by SB HSBC Bank Kazakhstan JSC (or any other internationally recognised financial institution providing such quotations) for the purchase of United States Dollars with the relevant currency at or about 11:00 a.m. Almaty time on the relevant day;

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same);

"**Tax Assets**" means the benefit of any Reliefs obtained or deemed to have been obtained by the Bank where the Relief arises from a transaction or other event (including, without limitation, the recognition for accounting purposes of a loss or impairment in respect of any asset in the Recovery Units Opening Report or in relation to the Litigation Recoveries) occurring on or prior to the Restructuring but not including, for the avoidance of doubt, the exclusion from taxation (by virtue of Article 3.1 of the Law of the Republic of Kazakhstan On Enactment of the Code of the Republic of Kazakhstan on Taxes and Other Mandatory Payments to the Budget (Tax Code) dated 10 December 2008) of the gains resulting from

writing off and/or cancellation of indebtedness of the Bank effected pursuant to the Restructuring on the Restructuring Effective Date and for these purposes:

(i)     "**Relief**" shall include (without limitation) any relief, loss, allowance, credit, set off, deduction or exemption for any Tax purpose, any right to repayment of Tax (including any repayment supplement) and any reference to the "use" or "set-off" of a Relief shall be construed accordingly and shall include use or set off in part;

(ii)    the benefit of a Relief shall be deemed to have been obtained by the Bank in any case where: (a) a member of the Group receives a repayment of Tax as a result of the use of a Relief, or (b) an amount of Tax payable by a member of the Group is reduced as a result of the use or set-off of a Relief;

(iii)   the amount of any benefit of a Relief shall be deemed to be the amount of the repayment of Tax (in a case falling within paragraph (ii)(a) above) or the amount of Tax saved (in a case falling within paragraph (ii)(b) above);

(iv)    the benefit of a Relief shall be deemed to have been obtained on: (a) the date that the repayment is received (in a case falling within paragraph (ii)(a) above) or (b) the date on which that Tax would have been payable but for the use of the Relief (in a case falling within paragraph (ii)(b) above); and

(v)     to the extent that a payment in respect of a Tax Asset is made to the Recovery Unitholders in any period, the amount of such payment shall, if deductible, be deducted in the following period in computing the taxable profits of the Bank for the purposes of computing the amount of any Tax Assets arising in that later period [and, if not deductible, the amount to be paid pursuant to Condition 8(a) (*Recovery Payments*) shall be reduced by a percentage equal to the rate of Tax payable by the Bank (disregarding any applicable Relief) in relation to the relevant Recovery];[27]

and, for the purposes hereof, all benefits of a Relief shall be deemed to have been realised in cash,

"**Valuation Date**" means the date (the "**Initial Valuation Date**") falling three months prior to the Initial Settlement Date or, where a Valuation Rejection Notice has been delivered pursuant to Condition 9 (*Valuation*), the date (the "**Deferred Valuation Date**") falling three months prior to the Deferred Settlement Date;

"**Valuation Rejection Notice**" has the meaning given to it in Condition 9(b) (*Valuation Rejection Notice*); and

"**Write-backs**" means cash and accounting recoveries in relation to any provision or write-off of any asset (including any provision or write-off in respect of the principal amount of or interest on any asset written off or any provisioned asset) (each an "**Impaired Recovery Asset**") over and above net book value as at (or any such recovery where the asset has been written off as at or prior to) 30 June 2009 and by reference to all the Bank's assets (including collection agency receivables and Related Party Debt) and the release of any provisions and/or liabilities for less than their book value, where:

(i)     such cash and accounting recoveries shall be determined:

(A)     on a pooled basis in relation to assets described in paragraph (iii)(C) below *provided that* the assets so pooled do not exceed six per cent. of the aggregate amount of provisions or amounts written off in relation to the original Impaired Recovery Assets calculated by reference to the KPMG Provisions Report; and

---

[27]     Under discussion.

(B)     in all other cases on an asset-by-asset basis;

(ii)     the Impaired Recovery Assets shall be identified as at 30 June 2009 by reference to the KPMG Provisions Report;

(iii)     the amounts of Recoveries shall be calculated by reference to Impaired Recovery Assets by reference to cash or accounting recoveries over and above the net book value of such assets following provision or write-off calculated in accordance with FMSA Methodology and, in particular:

(A)     in relation to corporate loans by reference to the provisions (or amounts written off) as calculated and noted in the KPMG Provisions Report (which *provided that* such provisions (and amounts written off) amounted in aggregate to KZT 1,846 billion);

(B)     in relation to corporate off balance sheet exposures including by reference to the provisions (or amounts written off) as calculated and noted in the KPMG Provisions Report (which *provided that* such provisions (and amounts written off) amounted in aggregate to KZT 119 billion); and

(C)     in relation to loans to small and medium enterprises and retail loans, by reference to the provisions (or amounts written off) as calculated and noted by KPMG in Appendix 6 to the KPMG Provisions Report (which *provided that* such provisions (and amounts written off) amounted in aggregate to KZT 119 billion);

(iv)     Recoveries will include:

(A)     cash and accounting recoveries in respect of Impaired Recovery Assets (including, but not limited to, provisioned or written off amounts, interest, default and penalty interest, premiums, late payment amounts and principal payments, settlements and cash proceeds from assets (including amounts realised on collateral or security) and whether acquired by the Bank through litigation, settlement, auction or compromise, or write-backs of any amounts in accordance with or permitted by applicable accounting standards or applicable regulatory capital requirements and any amounts received by reference to Impaired Recovery Assets consisting of loans written off prior to 30 June 2009); and

(B)     amounts received with respect to new loans ("**Recovery Assets Replacement Loans**") entered into by way of amendment, restatement, novation of, or otherwise replacing, loans from time to time constituting Recoveries Assets and in determining whether a loan is a Recovery Assets Replacement Loan, all loans or arrangements entered into by the Bank after 30 June 2009 with borrowers or obligors with respect to Recoveries Assets (and/or with any of their Affiliates) shall constitute Recovery Assets Replacement Loans but only to the extent that such arrangements do not represent any amounts in addition to the amounts of existing loans; and

(v)     all such cash and accounting recoveries by reference to Impaired Recovery Assets shall, on a pooled or asset-by-asset basis (as appropriate in accordance with (i) above) only be treated as a "Recovery" to the extent that the aggregate amount of such recoveries by reference to such pool or asset exceeds the net book value of such pool or asset following provision or write-down as referred to in (ii) and (iii) above.

2.      **Status**

(a)      ***Status Prior to and Including the Settlement Date***

This Condition 2(a) applies to all amounts payable pursuant to the Units other than amounts specified in Condition 2(b) from and including the Issue Date up to and including the earlier of the date when the Reference Amount is reduced to zero and the Settlement Date.  The Units constitute direct, general, unconditional and, subject to and in accordance with the Trust Deed, Condition 2(c) (*Security*) and Condition 6(b) (*Preservation of Security Interests*) and Condition 2 (a) (ii)(*Status of Adjusted Principal Amount*) secured obligations of the Bank.  The Units rank at all times without preference or priority *pari passu* among themselves.

(b)      ***Status of Adjusted Principal Amount***

*Provided that* the Reference Amount has previously not been reduced to zero, payment of the Adjusted Principal Amount shall constitute an unconditional, unsubordinated and secured obligation of the Bank which will at all times rank at least *pari passu* among themselves *and pari passu* in right of payment with all other present and future unsecured obligations of the Bank, save only for such obligations as may be preferred by mandatory provisions of applicable law.

(c)      ***Security***

This Condition 2(c) applies to the Units from and including the Issue Date up to and including the earlier of the date when the Reference Amount is reduced to zero and the Settlement Date.

As continuing security for the payment of all sums due under the Units, and subject always to Condition 2(a) (*Status Prior to and Including the Settlement Date*), the Bank will, in favour of the Trustee, for itself and on trust for the Unitholders, in accordance with the terms of the Trust Deed, charge with full title guarantee and by way of a first fixed charge all monies held from time to time in the Collection Account and assign with full title guarantee all its right, title and interest in, to and under the Cash Management Agreement and the Collection Account and all sums derived therefrom (the "**Charge and Assignment**").

In certain circumstances, the Trustee may (subject to it being indemnified, prefunded or secured to its satisfaction) be required by Unitholders holding at least 20 per cent. of the principal amount of the Units outstanding or by an Extraordinary Resolution of the Unitholders to exercise its powers under the Trust Deed arising under the Charge and Assignment.

If at any time, any Recovery Payment is due and payable but has not been paid, the Trustee may apply any balance standing to the credit of the Collection Account in and towards payment of such Recovery Payment.

3.      **Form, Denomination and Title**

(a)      ***Form and Denomination***

The Units are in registered form, without interest coupons attached, and shall be serially numbered.  Units shall be issued in integral multiples of one unit (each an "**authorised denomination**").

(b)      ***Title***

Title to the Units will pass by transfer and registration as described in Conditions 4 (*Registration*) and 5 (*Transfers*).  The holder (as defined below) of any Units shall

(except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof), and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Unit is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Unitholders**" shall be construed accordingly.

4.    **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Units in accordance with the provisions of the Agency Agreement.  A certificate (each, a "**Note Certificate**") will be issued to each Unitholder in respect of its registered holding.  Each Note Certificate will be numbered serially with an identifying number, which will be recorded in the Register.

5.    **Transfers**

(a)    Subject to Conditions 5(d) and 5(e), a Unit may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided*, *however*, *that* a Unit may not be transferred unless the number of Units transferred and (where not all of the Units held by a holder are being transferred) the number of Units not transferred are authorised denominations.  Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)    Within five business days of the surrender of a Note Certificate in accordance with Condition 5(a), the Registrar will register the transfer in question and deliver a new Note Certificate in respect of a like number of the Units transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder.  In this Condition 5(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)    The transfer of a Unit will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature, which may be levied or imposed in connection with such transfer.

(d)    Unitholders may not require transfers to be registered during the period of 15 days ending on the due date for any payment of principal or Recovery Payments in respect of the Units.

(e)    All transfers of Units and entries on the Register are subject to the detailed regulations concerning the transfer of the Units scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions.  The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar.  A copy of the current regulations will be

mailed (free of charge) by the Registrar to any Unitholder who requests in writing a copy of such regulations.

6.      **Covenants**[28]

The Unitholders will have the benefit of certain covenants in the Trust Deed relating to, amongst other things, restrictions on the creation of security interests, incurrence of indebtedness, disposal of assets and payment of dividends.  In addition, the Bank covenants as follows:

(a)     *Collection Account and Conversion*

Promptly following receipt of any Recoveries in US Dollars the Bank shall deposit the Specified Percentage of such amount into the Collection Account.

Promptly following receipt of the benefit of any Relief, the Bank shall pay an amount in US Dollars (effecting any necessary currency exchange at the Spot Rate of Exchange) equal to the Specified Percentage of such benefit of Relief into the Collection Account.

The Bank shall, within 10 Business Days of receipt of any Recoveries that are not in U.S. Dollars, convert the Specified Percentage of such Recoveries into U.S. Dollars at the Spot Rate of Exchange and deposit the net proceeds of conversion into the Collection Account, *provided that* the Bank shall be under no obligation to convert any such Recoveries into U.S. Dollars or deposit any amounts into the Collection Account until such net proceeds exceed U.S.$ 5 million (determined by reference to the Spot Rate of Exchange for the relevant currencies).

In this Condition 6(a) "**Business Day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in Almaty, London and New York City.

The amount payable in respect of Recoveries shall (subject as provided in the definition of Tax Assets) be determined on a pre-tax basis and on an asset-by asset or pooled basis (as provided in the definition of Write-backs) by reference to the KPMG Provisions Report, the Recovery Assets Opening Report and the most recently delivered Quarterly Recovery Assets Management Report.

(b)     *Preservation of Security Interests*

The Bank shall ensure that the Security Interests created in the Trust Deed shall at all times be in full force and effect.  In addition, the Bank shall not take or omit to take any action that would have the result of materially impairing the Security Interests created in the Trust Deed, and the Bank will not grant any person other than the Trustee for the benefit of the Unitholders any interests whatsoever with respect to the Charged Property.

(c)     *No Netting Off*

Other than in respect of assets to be pooled in accordance with paragraph 2.1(a)(i) of the definition of Write-backs, Recoveries will not be netted off against any asset of the Bank which has been written off or in respect of which a provision has been created or increased.

---

[28]     Tax assets subject to further discussion with Steering Committee.

(d)     *Information and Review Covenants*

(i)     Production of Quarterly Management Information:  The Bank shall, within 30 days of the end of each financial quarter, provide to the Trustee and the Recovery Assets Auditor a quarterly management information report (the "Quarterly Recovery Assets Management Report") on the ongoing performance of Recoveries Assets such report to include (details of):

(A)     amounts paid out to Unitholders in the previous financial quarter;

(B)     the nature of the Recoveries made (including a loan-by-loan breakdown showing the loans by reference to which Recoveries were made) and the amount thereof (calculated in accordance with FMSA Methodology), including whether they constituted a payment of principal or interest;

(C)     reports from each of:

(1)     the Legal Department;

(2)     the Non-Performing Loan Department; and

(3)     the Department of Restructuring of Assets,

of the Bank as to Recoveries Assets and Recoveries and related activities by reference to the immediately preceding financial quarter, and planned during the subsequent two, financial quarters;

(D)     updating reports from international legal and financial advisers with respect to their continuing engagement by reference to in the Recovery Programme;

(E)     any Recovery Assets Replacement Loans made during the previous financial quarter or currently under negotiation or proposed; and

(F)     any other loans made or contracted to borrowers or other debtors with respect to Recoveries Assets (or parties connected with them) during the previous financial quarter or currently under negotiation or proposed.

(ii)    Quarterly independent review of ongoing operation and monitoring of the Recoveries Assets:  The Bank shall procure that the Recovery Assets Auditor will carry out an ongoing quarterly review covering:

(A)     independent sample testing of:

(1)     loans constituting Recoveries Assets and Recovery Assets Replacement Loans to confirm existence, completeness and accuracy of records; and

(2)     Recoveries made by reference to them including in the case of sales of portfolios of Recovery Assets, an audit of the attribution of consideration proceeds to particular assets and in particular whether values have been correctly ascertained or otherwise fixed by reference to individual assets in the context of portfolio sales;

(B)     loans to Related Parties;

(C)     quarterly Recoveries Assets' and Recoveries' valuations and appropriate accounting treatment of Recoveries Assets in accordance with FMSA Methodology, to include controls over the use of calculation models and spreadsheets, and regarding the use of third parties for any valuation services provided;

(D)     key controls over the Recoveries Assets and Recoveries, such as bank reconciliations, calculation of interest, provisions for losses and intercompany reconciliations;

(E)     controls (in particular in relation to compliance by the Bank with Section 6(a) (*Collection Account and Conversion*)) over the translation of foreign exchange assets and payments made in foreign exchange and controls over any foreign exchange hedging being performed including authorisation in each case in relation to the Recoveries Assets and Recoveries;

(F)     key systems controls in relation to the pursuit of Recoveries and Recoveries Assets including the set-up of new users and segregation of duties;

(G)     disaster recovery and business continuity plans;

(H)     review of management information reporting to Recovery Unit Trustee;

(I)     physical security of loan documentation relating to Recoveries Assets, including the controls in relation to access to documentation such as the use of logs for receipt and return of documentation;

(J)     dual control over payments relating to Recoveries Assets and Recoveries;

(K)     access controls over key payment systems relating to Recoveries Assets and Recoveries;

(L)     controls regarding, and review of, the calculation of payments due to each Unitholder and the Bank;

(M)     the clear and formal documentation of all material aspects of the activities noted above; and

(N)     review of any management letter from the Bank's Auditor to the Bank relating to any of the above.

The Bank shall comply with the recommendations of the Recovery Assets Auditor with respect to any of the above, including, in particular, any recommendations to the effect that Recoveries (accounting or cash) by reference to any Recoveries Assets (on an asset-by-asset basis) were, or should have been accounted for as having been, higher.

(e)     ***Pursuit of Recoveries***

(i)     The Bank shall with the full support of Samruk-Kazyna, use its reasonable endeavours to maximise the recovery of any valuable asset of the Bank (including any claims available to it) whether in respect of debtors, former management or any other party whatsoever (and in any event act in compliance with its duties under Kazakhstan law and regulation and with international best practice), it being understood and agreed that a vigorous

and transparent asset recovery programme (the "**Recovery Programme**") aimed at maximising recovery is of fundamental importance to the Bank, its shareholders and creditors and shall be pursued in their interests alone and, to the fullest extent possible, in a manner consistent with the Base Case Model.

(ii)    The Bank shall ensure that unless otherwise agreed by the Trustee it shall continue to engage appropriate professional advisers in respect of the Recovery Programme and that it will engage or continue to engage such other experts as are appropriate having regard to its duties as set out above.  It shall also ensure, without limitation, that it maintains a sufficient team of in-house experts and other staff to support the Recovery Programme;

(iii)    The Bank shall:

    (A)    take all reasonable steps, including (without limitation) the making of any claims, elections, surrenders, notices or consorts necessary to ensure that Tax Assets are realised on the earliest date possible;

    (B)    keep proper records and accounts in relation to Recoveries and Recoveries Assets, and actions taken to recover them;

    (C)    make such records and accounts freely available to the Recovery Assets Auditor and provide to the Recovery Assets Auditor equivalent access to such records and accounts and to personnel of the Group regarding Recoveries Assets as it would to its auditors;

    (D)    not further provide against or write off any Recoveries Asset without providing full justification thereof to the Recovery Assets Auditor (and the Recovery Assets Auditor approving such provision or write-off);

    (E)    before entering into any Recovery Assets Replacement Loan, provide complete copies of all documentation relating thereto (and the Recovery Asset(s) it is to replace) to the Recovery Assets Auditor (together with supporting credit information, including a business plan and historic financial information relating to the debtor(s) and details of any security to be provided in connection therewith, for approval by the Recovery Assets Auditor;

    (F)    not reschedule any Recovery Asset by way of amendment or replacement (by way of a Recovery Assets Replacement Loan or otherwise) or otherwise without the approval of the Recovery Assets Auditor; and

    (G)    pay all costs and expenses of the Recovery Assets Auditor.

(f)    ***Recovery Sub-Committee***

(i)    Subject to the provision of confidentiality agreements in a form satisfactory to the Bank, members of the Recovery Sub-Committee of the Bank shall be provided with quarterly reports by the Bank in relation to the progress of the Recovery Programme and upon receipt of such reports the Recovery Sub-Committee shall have the opportunity to comment and/or make recommendations in respect of the Recovery Programme.  It is intended that the reporting process shall provide full transparency to the Recovery Sub-Committee.

(ii)    The Recovery Sub-Committee shall act solely as an advisory and consultative body in respect of the Recovery Programme and the Bank, acting through the Board, shall be obliged to consider the Recovery Sub-Committee's recommendations in good faith and shall not take any material decision regarding Recoveries without first having sought recommendations in that regard from the Recovery Sub-Committee.

(g)    ***Segregation***

The Impaired Recovery Assets will be segregated for accounting purposes in the Bank's financial statements and for servicing and monitoring purposes in the accounting books and records of the Bank.

**7.    Recovery Payments**

In the period commencing on the Issue Date and ending on the Settlement Date, the Bank shall make Recovery Payments *pro rata* to Unitholders on _____,_____,_____ and _____ of each year (each, a "**Recovery Payment Date**") *provided that*:

(i)    Recovery Payments will only be made if and to the extent that the balance standing to the credit of the Collection Account exceeds U.S.$30 million in which case, the whole such balance shall be paid to Unitholders;

(ii)    the aggregate of the Recovery Payments made by the Bank shall not exceed the Reference Amount; and

(iii)    notwithstanding any other provisions herein, no Recovery Payments will be made by the Bank in relation to Recoveries (other than in relation to interest on the Collection Account) realised in cash by the Bank in the period beginning on 1 July 2009 up to and including 31 December 2009, in 2010 and in 2011 until such Recoveries exceed the following amounts:

(A)    for the period beginning on 1 July 2009 up to and including 31 December 2009, KZT 36 billion;

(B)    for 2010, KZT 134 billion; and

(C)    for 2011, KZT 103 billion.

On the making of any Recovery Payment, the balance of the Reference Amount with respect to the Units shall be reduced by the amount of such Recovery Payment with effect from the relevant Recovery Units Payment Date, unless the Recovery Payment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such Recovery Payment.

The Bank shall calculate the Reference Amount and shall inform the Noteholders of the balance of the Reference Amount on each Recovery Units Payment Date.  The calculation by the Bank of the Reference Amount shall, absent manifest error, be final and binding on the Trustee and the Noteholders.

For the avoidance of doubt if the balance of the Reference Amount is reduced to zero:

(A)    no further Recovery Payments shall be made by the Bank after such date;

(B)    the Security Interest shall be released and discharged in accordance with the Trust Deed; and

(C)    the Bank shall have no further obligations in respect of the Recovery Units.

8.    **Payments**

(a)    *Recovery Payments*

Recovery Payments will be made from the Collection Account to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) at the Specified Office of the Registrar or of any Agent *pro rata* by reference to Units held respectively by the Unitholders.

(b)    *Adjusted Principal Amount*

Payments of the Adjusted Principal Amount in respect of the Units will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender of the relevant Unit Certificates at the Specified Office of the Registrar or of any Agent.

(c)    *Record Date*

Each payment in respect of a Unit will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**") in accordance with Condition 8(a) (*Recovery Payments*) or 8(b) (*Adjusted Principal Amount*) above, as the case may be.

(d)    *Payments*

Each payment in respect of the Units pursuant to Conditions 8(a) (*Recovery Payments*) and 8(b) (*Adjusted Principal Amount*) will be made by wire transfer to a United States Dollar account maintained by the payee with a bank in New York City.

(e)    *Payments Subject to Fiscal Laws*

All payments in respect of the Units are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 11 (*Taxation*).  No commissions or expenses shall be charged to the Unitholders in respect of such payments.

(f)    *Payment on a Business Day*

If the due date for payment of any amount in respect of any Unit is not a business day in the place of the Specified Office of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place.  A holder of a Unit shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day.  In this Condition 8(g), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in New York City, London and, in the case of surrender of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)    *Agents*

In acting under the Agency Agreement and in connection with the Units, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Unitholders.  The Bank reserves the right (with the prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided, however, that* the Bank shall at all times

maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar.  Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Unitholders in accordance with Condition 16 (Notices).

9.    **Valuation**

(a)    *Valuation*

To the extent that on the Valuation Date there are any Units outstanding and the Reference Amount has not been reduced to zero in accordance with Condition 7 (*Recovery Payments*), the Bank shall during January or February 2020 appoint up to three independent valuers of recognised standing (and satisfactory to the Trustee) to value the Recoveries Assets and the Residual Amount (after taking into account any Recovery Payments actually made including on or after the Initial Valuation Date) as at the Initial Valuation Date.

The Bank shall notify the Trustee in writing of the identity of any person it approaches in connection with the performance of any such valuation and the identity and terms of appointment of each valuer prior to such appointment.  When more than one valuer has been appointed, the Residual Amount notified to the Trustee shall be the average value provided by such valuers.

The valuation shall be carried out on a discounted cash flow basis and the Residual Amount shall be communicated by the Bank to the Trustee in writing no later than 45 days prior to the Initial Settlement Date.

(b)    *Valuation Rejection Notice*

Either of the Bank or the Trustee may, by no later than the date which falls 30 days prior to the Initial Settlement Date, serve to the other a notice (a "**Valuation Rejection Notice**") stating that it is dissatisfied with the outcome of the valuation of the Residual Amount.  If a Valuation Rejection Notice is served, the Bank shall during January or February 2022 appoint up to three independent valuers of recognised standing (and satisfactory to the Trustee) to value the Recoveries Assets and determine the Residual Amount (after taking into account any Recovery Payments actually made including on or after the Valuation Date) as at the Deferred Valuation Date.

The Bank shall notify the Trustee in writing of the identity of any person it approaches in connection with the performance of any such valuation and the identity and terms of appointment of each valuer prior to such appointment.  When more than one valuer has been appointed, the Residual Amount notified to the Trustee shall be the average value provided by such valuers.

The valuation shall be carried out on a discounted cash flow basis and the Valuation Date and the Residual Amount shall be communicated by the Bank to the Trustee in writing no later than 45 days prior to the Deferred Settlement Date.

(c)    *Adjusted Principal Amount*

After the valuation, the aggregate principal amount outstanding in respect of the Units shall be adjusted for all purposes (including for the purposes of Condition 10 (*Redemption and Purchase*)) to be an amount equal to the lesser of (i) the balance of the Reference Amount and (ii) the aggregate of the relevant Specified Percentages of the Residual Amount, any amounts required to be but not as yet paid to the Collection