Account and moneys standing to the credit of the Collection Account. The principal amount of the Units as so adjusted, is referred to as the "**Adjusted Principal Amount**".

**10.    Redemption and Purchase**

(a)    *Scheduled Redemption*

The Adjusted Principal Amount of the Units will be redeemed in full on the Settlement Date.

(b)    *Purchase*

Subject to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in Share Capital and on the Repurchase of Securities*", the Bank may at any time purchase or procure others to purchase for its account the Units in the open market or otherwise and at any price. Units so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancelation at the option of the Bank, in compliance with Condition 10(c) (*Cancelation of Units*).  Any Units so purchased, while held by or on behalf of the Bank, shall not entitle the holder to vote at any meeting of Unitholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(c)    *Cancellation of Units*

Unless otherwise permitted pursuant to the covenant set out in the Trust Deed entitled "Restrictions on amendments to the Bank's Charter or change in Share Capital and on Repurchase of Securities", all Units which are redeemed or surrendered for cancellation pursuant to this Condition 10 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

**11.    Taxation**

(a)    *Taxation*

All Recovery Payments as well as payments of principal (including the Adjusted Principal Amount) in respect of the Units shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Unitholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Unit:

(i)    of a holder who is liable to such taxes, duties, assessments or governmental charges in respect of such Unit by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Unit; or

(ii)     presented for a payment of the Adjusted Principal Amount more than 30 days after the Relevant Date, except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Unit on the last day of such period of 30 days; or

(iii)    to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Unit; or

(iv)     where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 200348/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Unit (subject to the exclusions set out in (i), (ii) and (iii) above) that has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place.  Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Unit.

(b)   *Relevant Date*

As used in these Conditions, "**Relevant Date**" in respect of any Unit means the date on which payment in respect of such Unit first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Unitholders that such payment will be made, *provided that* payment is in fact made.

(c)   *Additional Amounts*

Any reference in these Conditions to Recovery Payments, principal or the Adjusted Principal Amount shall be deemed to include any additional amounts in respect of the Recovery Payments, principal or Adjusted Principal Amount (as the case may be) which may be payable under this Condition 11 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 11 (*Taxation*) pursuant to the Trust Deed.

(d)   *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 11 (*Taxation*) to the Republic of

Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

**12. Prescription**

Claims for Recovery Payments and for the Adjusted Principal Amount on redemption shall become void unless the relevant Unit Certificates are surrendered for payment within ten years of the appropriate Relevant Date.

**13. Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Units then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall:

(a) give notice to the Bank that the Units are and they shall become due and repayable in an aggregate amount equivalent to the higher of (1) the Reference Amount and (2) the aggregate of (A) amounts standing to the credit of the Collection Account and (B) amounts by reference to Recoveries realised in cash and required to be but not yet paid to the Collection Account; and/or

(b) exercise or direct the Trustee to exercise any or all of its rights, remedies, powers or discretions under the Trust Deed in respect of the Collection Account,

if any of the following events (each, an **"Event of Default"**) occurs and is continuing:

(i) *Non Payment*

the Bank fails to pay any amount due on the Units when the same becomes due and payable and such default continues for a period of ten Business Days; or

(ii) *Breach of Other Obligations*

the Bank is in default in the performance, or is otherwise in breach, of any provision of the Units or in relation to the Charged Property (other than a default or breach specifically dealt with elsewhere in this Condition 13 (*Events of Default*)) and, where such default or breach is, in the opinion of the Trustee, capable of remedy, such default or breach is not remedied within 30 calendar days after notice thereof has been given to the Bank, by a Unitholder or the Trustee, requiring the same to be remedied; or

(iii) *Cross Acceleration*

any Financial Indebtedness of the Group is declared to be or otherwise becomes due and payable prior to the due date for the payment thereof by reason of an event of default (howsoever described), *provided that* the aggregate amount of Financial Indebtedness referred to above exceeds U.S.$10 million (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(iv) *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and

prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement; or

(v) *Creditors' Process*

any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group having an aggregate value of not less than U.S.$10 million, and is not discharged or stayed within 45 days after commencement; or

(vi) *Invalidity or Unenforceability*

the validity of the Units is contested by the Bank or the Bank denies its obligations under the Units (whether by a general suspension of payments or a moratorium on the payment of debt or otherwise), or it is or becomes unlawful for the Bank to perform or comply with all or any of its obligations set out in the Units or all or any of the obligations of the Bank provided therein shall be or become unenforceable or invalid.

**14.    Replacement of Units**

If any Unit is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and Stock Exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Units must be surrendered before replacements will be issued.

**15.    Meetings of Unitholders; Modification and Waiver**

(a)    *Meetings of Unitholders*

The Trust Deed contains provisions for convening meetings of Unitholders to consider any matters relating to the Units, including the modification of any provision of these Conditions or the Trust Deed.  Any such modification may be made if sanctioned by an Extraordinary Resolution.  Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Unitholders holding not less than one-tenth of the aggregate principal amount of the outstanding Units.  The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Units for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Unitholders whatever the principal amount of the Units for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of any amount in respect of the Units, to reduce any amount payable on any date in respect of the Units, to alter the method of calculating the

amount of any payment in respect of the Units or the date for any such payment, to change the currency of payment under the Units or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) (a "**special quorum resolution**") may only be sanctioned by an Extraordinary Resolution passed at a meeting of Unitholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Units form a quorum. Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Unitholders, whether present or not.

The Trust Deed contains provisions for convening meetings of holders of the Units with holders of notes of other series issued under the Trust Deed if the Trustee so decides.

(b)   *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Unitholders who for the time being are entitled to receive notice of a meeting of Unitholders under the Trust Deed or (ii) if such Unitholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three-quarters of the aggregate principal amount of the outstanding Units. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Unitholders.

(c)   *Modification Without Unitholders' Consent*

The Trustee may, without the consent of the Unitholders, agree (i) to any modification of the Units (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Unitholders and (ii) to any modification of the Units (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error. In addition, the Trustee may, without the consent of the Unitholders, authorise or waive any proposed breach or breach of the Units or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Unitholders will not be materially prejudiced thereby. Any such modification, waiver or authorisation shall be binding on the Unitholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Unitholders in accordance with Condition 16 (*Notices*).

16.   **Notices**

(a)   *To the Unitholders*

Notices to Unitholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing. In addition, so long as the Units are listed on an Approved Stock Exchange or the Kazakhstan Stock Exchange and the relevant Stock Exchange so requires, notices to the Unitholders shall be published in a leading newspaper having general circulation in the country of such Exchange. Any such notice shall be deemed to have been given on the date of first publication.

(b)   *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank _____ and clearly marked on their exterior _____ (or at such other addresses and for such

other attentions as may have been notified to the Unitholders in accordance with Condition 16(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c) **To the Trustee and Agents**

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

## 17. Trustee

(a) **Indemnification**

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Unitholders. In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Unitholders on the terms of the Trust Deed. Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Units or for the performance by the Bank of its obligations under or in respect of the Units or the Trust Deed, as applicable.

(b) **Exercise of Power and Discretion**

In connection with the exercise of any of its powers, trusts, authorities or discretions (including, but not limited to, those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Unitholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Unitholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction. The Trustee shall not be entitled to require, and no Unitholder shall be entitled to claim, from the Bank (in the case of a Unitholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Unitholders.

(c) **Enforcement; Reliance**

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Units, but it shall not be bound to do so unless:

(i) it has been so requested in writing by the holders of a least one-fifth in principal amount of the outstanding Units or has been so directed by an Extraordinary Resolution; and

(ii) it has been indemnified or provided with security or pre-funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence. In particular, the Trust Deed provides that the

Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor. If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience that may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance that could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 13 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance that could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 13 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed. The Trustee shall be entitled to rely without liability on such certificates. The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)   *Failure to Act*

No Unitholder may proceed directly against the Bank or enforce the Security Interests unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)   *Retirement and Removal*

Any Trustee may retire at any time on giving at least three months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement, and the Unitholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. In the event of any change of the Trustee, notices thereof shall be published as provided in Condition 16(a) (*To the Unitholders*).

(f)   *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Unitholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Units and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligation assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice

thereof shall be given by the Bank to the Unitholders in accordance with Condition 16 (*Notices*).

**18.   Currency Indemnity**

If any sum due from the Bank in respect of the Units under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Units or in respect thereof under the Trust Deed, the Bank shall indemnify each Unitholder, on the written demand of such Unitholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Paying and Transfer Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Unitholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof. This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

**19.   Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Units under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

**20.   Governing Law; Arbitration and Jurisdiction**

(a)   *Governing Law*

The Trust Deed, the Units, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)   *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Units or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non-contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition. The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA. The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country. The seat of arbitration shall be London, England and the language of arbitration shall be English. Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c) **Trustee's Option**

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 20(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 20(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d) **Jurisdiction**

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 20(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Unitholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts. Subject to Condition 20(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e) **Appropriate Forum**

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f) **Agent for Service of Process**

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being. If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment. If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g) **Consent to Enforcement, etc.**

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 20(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)     ***Waiver of Immunity***

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

### ANNEX 5 – TERMS AND CONDITIONS OF THE DOLLAR SUBORDINATED NOTES

*The following is the text of the terms and conditions of the Dollar Subordinated Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Subordinated Dollar Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The U.S.$ _____ 7.2 per cent. notes due 2025 (the "**Dollar Subordinated Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of JSC BTA Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated _____ 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and _____ as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of a paying agency agreement dated _____ 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, _____ as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) and _____ as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee, _____. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.     **Status**

It is the intention of the Bank that the Notes be regarded as Tier 2 capital for the purposes of the FMSA Guidance.

Subject to exceptions provided by mandatory applicable law, the payment obligations under the Notes constitute direct, unconditional, unsecured and subordinated obligations of the Bank and shall, in case of (i) the bankruptcy in the Republic of Kazakhstan (*bankrotstvo*) of the Bank; (ii) the Bank being granted (provisional) suspension of payments in the Republic of Kazakhstan (*moratoriy na udovletvoreniye zadolzhennosti*) (such situation hereinafter being referred to as a "**Moratorium**"); or (iii) dissolution of the Bank in the Republic of Kazakhstan (*likvidatsiya*)) rank: (A) subordinate and junior only to present and future indebtedness of the Bank which by or under its terms ranks senior, or does not rank subordinate to, any indebtedness or other obligations of the Bank; (B) *pari passu* amongst themselves and with any other present and future indebtedness which ranks by or under its own terms or otherwise *pari passu* with subordinated indebtedness or other obligations of the Bank; and (C) senior to equity securities of the Bank and to any other present and future indebtedness which ranks by or under its own terms or otherwise, subordinate or junior to the Notes of the Bank.

By virtue of such subordination (i) payments to holders of Notes will, in the case of bankruptcy or dissolution of the Bank or in the event of a Moratorium with respect to the Bank, only be made after all payment obligations of the Bank ranking senior to such Notes have been satisfied; (ii) any right of set-off by a holder of Notes in respect of any amount

owed to such holder by the Bank under or in connection with such Notes shall be excluded; and (iii) each holder of Notes shall, by virtue of being the holder of such Notes, be deemed to have waived all such rights of set-off.

2. **Form, Denomination and Title**

    (a)     *Form and Denomination*

        The Notes are in registered form, without interest coupons attached, and shall be serially numbered. Notes shall be issued in denominations of U.S.$ _____ and integral multiples of U.S.$ _____ in excess thereof (each denomination an "**authorised denomination**").

    (b)     *Title*

        Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*). The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

        In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

3. **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement. A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding. Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

4. **Transfers**

    (a)     Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided, however, that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations. Transfer Forms are available from any Agent and the Bank upon the request of any holder.

    (b)     Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of a like principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder. In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in

foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)     The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)     Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)     All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions.  The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar.  A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

**5.     Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed.

**6.     Interest**

(a)     *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount from 1 July 2010 at the rate of 7.2 per cent. per annum (the "**Rate of Interest**"), payable in arrear on _____ and _____ in each year (each, an "**Interest Payment Date**"), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)     *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)     *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

(d)     *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of

30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7.     **Payments**

(a)     *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)     *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent. Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) (*Interest*) will be made as provided in these Conditions.

(c)     *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**").

(d)     *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a United States Dollar account maintained by the payee with a bank in New York City.

(e)     *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*). No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)     *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of Specified Officer of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place. A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day. In this Condition 7(f) (*Payment on a Business Day*), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in New York City, London and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)     *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders. The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided, however, that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar.  Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

8.     **Redemption and Purchase**

(a)     *Scheduled Redemption*

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be redeemed in ten equal semi-annual instalments on _____ and _____ of each year, with the first such instalment being payable on _____ 2020 and the last such instalment being payable on _____ 2025. The outstanding principal amount of each Note shall be reduced by any instalment amount, with effect from the related instalment payment date, unless payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount. Each Note shall be finally redeemed on due payment of final instalment amount.

(b)     *Purchase*

Subject to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*" and the Bank obtaining all necessary approvals and consents and compliance with all applicable laws and regulations, the Bank may purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price. Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 8(c) (Cancellation of Notes).  Any Notes so purchased, while held by or on behalf of the Bank or any other member of the Group, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(c)     *Cancellation of Notes*

Unless otherwise permitted pursuant to the covenant set out in the Trust Deed entitled "Restrictions on amendments to the Bank's Charter or Change in Share Capital and on the Repurchase of Securities", all Notes which are redeemed or surrendered for cancellation pursuant to this Condition 8 (Redemption and Purchase) shall be cancelled and may not be reissued or resold.[29]

---

[29] Cancellation to be discussed.

9.    **Taxation**

(a)    ***Taxation***

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)    presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note; or

(ii)    presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days; or

(iii)    to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)    where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place.  Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)     *Relevant Date*

As used in these Conditions, **"Relevant Date"** in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that such payment will be made, *provided that* payment is in fact made.

(c)     *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (Taxation) or any undertaking given in addition to or in substitution of this Condition 9 (Taxation) pursuant to the Trust Deed.

(d)     *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (Taxation) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

## 10.   Prescription

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

## 11.   Events of Default

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, file a petition for the winding up of the Bank if any of the following events (each, an **"Event of Default"**) occurs and is continuing and, in the case of (b) or (c) below the Notes have become due and payable as hereinafter provided:

(a)     *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b)     *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally

applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(c)  **Insolvency**

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement,

save that on the occurrence and continuation of an event specified in Condition 11(b) (*Cross Default*), *provided that* action has been taken (whether by the Trustee or the Senior Noteholders or the OID Noteholders) to accelerate the obligations of the Bank with respect to all outstanding Financial Indebtedness which is unsubordinated, the Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest.

## 12.  Replacement of Notes

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require. Mutilated or defaced Notes must be surrendered before replacements will be issued.

## 13.  Meetings of Noteholders; Modification and Waiver

(a)  **Meetings of Noteholders**

The Trust Deed provides that all meetings of holders of the Notes will include holders of the EUR–6.75 per cent. Notes due 2025 of the Bank (the "**EUR 2025 Notes**") and there shall be no provision for separate meetings of holders of the Notes and holders of the EUR 2025 Notes and that for purposes of determining a quorum and for voting purposes the EUR 2025 Notes shall be converted into U.S. Dollars at the Reference

Rate applicable as at the date of issuance of the Notes. Accordingly, all references in this Condition 13 to "Notes and "Noteholders" shall be deemed to include the EUR 2025 Notes and the holders of such notes, as the case may be.

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**"). Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)   *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)   *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error. In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby. Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

14.    **Notices**

(a)    *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing. In addition, so long as the Notes are listed on the an Approved Stock Exchange (as defined in the Trust Deed), and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of such Approved Stock Exchange. Any such notice shall be deemed to have been given on the date of first publication.

(b)    *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at _____ and clearly marked on their exterior _____ (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)    *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15.    **Trustee**

(a)    *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders. In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed. Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)    *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction. The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)   **Enforcement; Reliance**

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)   it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)   it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence. In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor. If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed. The Trustee shall be entitled to rely without liability on such certificates. The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions or the Trust Deed and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)   **Failure to Act**

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)   **Retirement and Removal**

Any Trustee may retire at any time on giving at least three months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any

Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)    ***Substitution***

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

**16.    Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

**17.    Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the **"first currency"**) in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the **"second currency"**) for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof. This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

**18.    Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

**19.    Governing Law; Arbitration and Jurisdiction**

(a)    ***Governing Law***

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)     *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non-contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition.  The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two-party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA.  The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country.  The seat of arbitration shall be London, England and the language of arbitration shall be English.  Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)     *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)     *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts.  Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)     *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)     *Agent for Service of Process*

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.  If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in

writing the Trustee of such appointment.  If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)   *Consent to Enforcement, etc.*

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)   *Waiver of Immunity*

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

## ANNEX 6 – TERMS AND CONDITIONS OF THE EURO SUBORDINATED NOTES

*The following is the text of the terms and conditions of the Subordinated Euro Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Subordinated Euro Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The EUR_____ 6.75 per cent. notes due 2025 (the **"Euro Subordinated Notes"** or the **"Notes"**, which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of JSC BTA Bank (the **"Bank"**) are (a) constituted by, and subject to, and have the benefit of a trust deed dated _____ 2010 (as amended or supplemented from time to time, the **"Trust Deed"**) between the Bank and _____ as trustee (the **"Trustee"**, which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("Noteholders") under the Trust Deed) and (b) the subject of a paying agency agreement dated _____ 2010 (as amended or supplemented from time to time, the **"Agency Agreement"**) between the Bank, the Trustee, _____ as principal paying and transfer agent (the **"Principal Paying and Transfer Agent"**; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) and _____ as registrar (the **"Registrar"**, which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee, _____. References herein to the **"Agents"** are to the Registrar and the Paying and Transfer Agents and any reference to an **"Agent"** is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.     **Status**

It is the intention of the Bank that the Notes shall be treated as Tier 2 capital for the purposes of the FMSA Guidance.

Subject to exceptions provided by mandatory applicable law, the payment obligations under the Notes constitute direct, unconditional, unsecured and subordinated obligations of the Bank and shall, in case of (i) the bankruptcy in the Republic of Kazakhstan (*bankrotstvo*) of the Bank; (ii) the Bank being granted (provisional) suspension of payments in the Republic of Kazakhstan (*moratoriy na udovletvoreniye zadolzhennosti*) (such situation hereinafter being referred to as a **"Moratorium"**); or (iii) dissolution of the Bank in the Republic of Kazakhstan (*likvidatsiya*)) rank: (A) subordinate and junior only to present and future indebtedness of the Bank which by or under its terms ranks senior, or does not rank subordinate to, any indebtedness or other obligations of the Bank; (B) *pari passu* amongst themselves and with any other present and future indebtedness which ranks by or under its own terms or otherwise *pari passu* with subordinated indebtedness or other obligations of the Bank; and (C) senior to equity securities of the Bank and to any other present and future indebtedness which ranks by or under its own terms or otherwise, subordinate or junior to the Notes of the Bank.

By virtue of such subordination (i) payments to holders of Notes will, in the case of bankruptcy or dissolution of the Bank or in the event of a Moratorium with respect to the Bank, only be made after all payment obligations of the Bank ranking senior to such Notes have been satisfied; (ii) any right of set-off by a holder of Notes in respect of any amount

owed to such holder by the Bank under or in connection with such Notes shall be excluded; and (iii) each holder of Notes shall, by virtue of being the holder of such Notes, be deemed to have waived all such rights of set-off.

2.   **Form, Denomination and Title**

   (a)   *Form and Denomination*

   The Notes are in registered form, without interest coupons attached, and shall be serially numbered. Notes shall be issued in denominations of EUR_____ and integral multiples of EUR_____ in excess thereof (each denomination an "**authorised denomination**").

   (b)   *Title*

   Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*). The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

   In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

3.   **Registration**

   The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement. A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding. Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

4.   **Transfers**

   (a)   Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided, however, that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations. Transfer Forms are available from any Agent and the Bank upon the request of any holder.

   (b)   Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of a like principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder. In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in

foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)     The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)     Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)     All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions. The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar. A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

**5.     Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed.

**6.     Interest**

(a)     *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount from 1 July 2010 at the rate of 6.75 per cent. per annum (the "**Rate of Interest**"), payable in arrear on _____ and _____ in each year (each, an "**Interest Payment Date**"), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)     *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)     *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

(d)     *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of

30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7.  **Payments**

(a)  *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)  *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent. Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) will be made as provided in these Conditions.

(c)  *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the **"Record Date"**).

(d)  *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a Euro account maintained by the payee with a bank in a city in which banks have access to the TARGET System.

(e)  *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*). No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)  *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of Specified Offices of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place. A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day. In this Condition 7(f), **"business day"** means any day on which banks are open for business (including dealings in foreign currencies) in the place of the Specified Offices of the Principal Paying Agent and which is a business day on which the TARGET System is operating and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note

Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g) *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders. The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided, however, that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar. Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

**8.    Redemption and Purchase**

(a) *Scheduled Redemption*

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be redeemed in ten equal semi-annual instalments on _____ and _____ of each year, with the first such instalment being payable on _____ 2020 and the last such instalment being payable on _____ 2025. The outstanding principal amount of each Note shall be reduced by any instalment amount, with effect from the related instalment payment date, unless payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount. Each Note shall be finally redeemed on due payment of final instalment amount.

(b) *Purchase*

Subject to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*" and the Bank obtaining all necessary approvals and consents and compliance with all applicable laws and regulations, the Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price. Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 8(c) (Cancellation of Notes). Any Notes so purchased, while held by or on behalf of the Bank or any other member of the Group, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(c) *Cancellation of Notes*

Unless otherwise permitted pursuant to the covenant set out in the Trust Deed entitled "Restrictions on amendments to the Bank's Charter or Change in Share Capital and on the Repurchase of Securities", all Notes which are redeemed or surrendered for

cancellation pursuant to this Condition 8 (Redemption and Purchase) shall be cancelled and may not be reissued or resold.[30]

9.     **Taxation**

(a)     *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)     presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note;

(ii)     presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days;

(iii)     to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)     where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or

---

[30] Cancellation to be discussed.

deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place. Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b) **_Relevant Date_**

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that, such payment will be made, _provided that_ payment is in fact made.

(c) **_Additional Amounts_**

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (Taxation) or any undertaking given in addition to or in substitution of this Condition 9 (Taxation) pursuant to the Trust Deed.

(d) **_Taxing Jurisdiction_**

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (Taxation) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

**10. Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

**11. Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, file a petition for the winding up of the Bank if any of the following events (each, an "**Event of Default**") occurs and is continuing and, in the case of (ii) or (iii) below the Notes have become due and payable as hereinafter provided:

(a) **_Non Payment_**

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

608

(b)   **Cross Default**

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.\$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(c)   **Insolvency**

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement, save that on the occurrence and continuation of an event specified in Condition 11(b) (*Cross Default*), *provided that* action has been taken (whether by the Trustee or the Senior Noteholders or the OID Noteholders) to accelerate the obligations of the Bank with respect to all outstanding Financial Indebtedness which is unsubordinated, the Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest.

**12.   Replacement of Notes**

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Notes must be surrendered before replacements will be issued.

13.    **Meetings of Noteholders; Modification and Waiver**

(a)    *Meetings of Noteholders*

The Trust Deed provides that all meetings of holders of the Notes will include holders of the U.S.$ 7.2 per cent. Notes due 2025 of the Bank (the "**U.S. Dollar 2025 Notes**") and there shall be no provision for separate meetings of holders of the Notes and holders of the U.S. Dollar 2025 Notes and that for purposes of determining a quorum and for voting purposes the Notes shall be converted into U.S. Dollars at the Reference Rate applicable as at the date of issuance of the Notes. Accordingly, all references in this Condition 13 (*Meetings of Noteholders; Modification and Waiver*) to "Notes and "Noteholders" shall be deemed to include the U.S. Dollar 2025 Notes and the holders of such notes, as the case may be.

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**"). Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)    *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)    *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error. In

addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby.  Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

14.    **Notices**

    (a)    ***To the Noteholders***

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing.  In addition, so long as the Notes are listed on an Approved Stock Exchange (as defined in the Trust Deed), and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of such Approved Stock Exchange.  Any such notice shall be deemed to have been given on the date of first publication.

    (b)    ***To the Bank***

Notices to the Bank will be deemed to be validly given if delivered to the Bank at _____ and clearly marked on their exterior _____ (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

    (c)    ***To the Trustee and Agents***

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15.    **Trustee**

    (a)    ***Indemnification***

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders.  In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed.  Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

    (b)    ***Exercise of Power and Discretion***

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust

Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction.  The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)   ***Enforcement; Reliance***

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)     it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)    it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence.  In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor.  If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed.  The Trustee shall be entitled to rely without liability on such certificates.  The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)     *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)     *Retirement and Removal*

Any Trustee may retire at any time on giving at least three months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee.  If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee.  In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)     *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

**16.     Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

**17.     Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.  This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18. **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19. **Governing Law; Arbitration and Jurisdiction**

    (a)    *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

    (b)    *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non-contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition. The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two-party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA. The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country. The seat of arbitration shall be London, England and the language of arbitration shall be English. Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

    (c)    *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

    (d)    *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts. Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)   **Appropriate Forum**

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)   **Agent for Service of Process**

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.  If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment.  If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)   **Consent to Enforcement, etc.**

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)   **Waiver of Immunity**

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

## ANNEX 7 – SUMMARY OF TENGE NEW NOTES

Tenge New Notes held by or on behalf of persons who are not resident, domiciled or organised in the Republic of Kazakhstan may be held in one of the following ways:

1.   by opening an account with the Kazakhstan Central Securities Depositary;

2.   by opening an account with a broker within or outside the Republic of Kazakhstan who has an account with the Kazakhstan Central Securities Depositary; or

3.   by opening an account with a bank or depositary outside the Republic of Kazakhstan who has an account (whether directly or through another bank or broker) with the Kazakhstan Central Securities Depositary.

### Senior Tenge Notes

The terms and conditions of the Senior Tenge Notes will be substantially the same as the terms and conditions of the Senior Dollar Notes, except that they will have a different principal amount and will bear interest at the rate of 14.75 per cent. per annum till _____ 2012 and 16.50 per cent. thereafter.

No holder of Senior Tenge Notes may take any acceleration action unless and until the holders of the Senior Dollar Notes have resolved to take any acceleration action under the Conditions of those Notes.

### Subordinated Tenge A Notes

The terms and conditions of the Subordinated Tenge A Notes will be substantially the same as the terms and conditions of the Dollar Subordinated Notes, except that they will have a different principal amount and will bear interest at the rate of 11.20 per cent. per annum.

### Subordinated Tenge B Notes

The terms and conditions of the Subordinated Tenge B Notes will be substantially the same as the terms and conditions of the Dollar Subordinated Notes, except that they will have a different principal amount and will bear interest at the rate of 8 per cent. per annum.

Payments of principal in respect of the Subordinated Tenge B Notes will commence on the fifteenth anniversary of the Restructuring Date and will be carried out in equal semi-annual instalments over five years.

No holder of Subordinated Tenge A Notes or Subordinated Tenge B Notes may take any acceleration action unless and until the holders of the Subordinated Non-Tenge Notes have resolved to take any acceleration action under the Conditions of those Notes.

### Covenants

Holders of the Tenge New Notes will have the benefit of the same covenants as holders of the corresponding Non-Tenge New Notes.

The Terms and Conditions of the Tenge New Notes will need to comply with domestic Kazakhstan legislation and be approved by the FMSA. As at the date of this Information Memorandum the Bank has not received such approval from the FMSA. The main issue that needs clearance is amortisation of principal according to domestic legislation. The Bank will publish a supplement to this Information Memorandum setting out the terms and conditions of the Tenge New Notes as approved by the FMSA.

**Governing Law and Jurisdiction[31]**

Tenge New Notes will be governed by Kazakhstan Law, with the courts of Kazakhstan having jurisdiction in relation to disputes arising out of or in connection with such Tenge New Notes.

---

[31]     The choice of Kazakhstan law as the governing law of the Notes remains subject to the approval of the FMSA. Absent this approval the Notes will be governed by English law and accordingly a number of consequential amendments will need to be made throughout the provisions of the Information Memorandum, including, amongst other things, (i) inserting cross references to the terms and conditions of the Notes alongside existing references to the equivalent Dollar and/or Euro denominated notes, where appropriate, to allow for them to be treated in the same way, and (ii) amending the terms and conditions of the equivalent Dollar and/or Euro denominated notes to provide for the Notes to be included in any meetings of the holders of such Dollar or Euro denominated notes.

## ANNEX 8 – TERMS AND CONDITIONS OF THE RCTFF

*The following is a summary of the terms and conditions on the basis of which the RCTFF Agreement will be prepared and entered into prior to the Restructuring Date.*

1.  **DEFINITIONS**

Terms used but not defined in this Annex have the meaning given to them elsewhere in this Information Memorandum and, in addition, the following terms shall have the meaning set out opposite them below:

| | |
|---|---|
| **"Approved Buyer"** | means such person as the Agent may from time to time approve, being a purchaser of exports from an Eligible Customer. |
| **"Approved Supplier"** | means such person as the Agent may from time to time approve, being a supplier of imports to an Eligible Customer. |
| **"BTA Correspondent Bank"** | means designated financial institutions located in CIS countries and/or Mongolia, subject in each case to the Agent: |

    (a)   having received:

        (i)   an approval in respect of such financial institution from the Borrower's internal risk compliance department; and

        (ii)  such financial information in respect of such financial institution as the Agent may reasonably request and in a form satisfactory to it; and

    (b)   being satisfied with such financial institution's long term foreign currency debt rating.

| | |
|---|---|
| **"BTA Group Bank"** | means: |

    (a)   each of the following financial institutions (for so long as they are under the Control of the Borrower): BTA Belarus; BTA Kazan; BTA Armenia; BTA Georgia; Sekerbank (Turkey); BTA Orix Leasing; Temir Leasing; BTA Ipoteka; and

    (b)   any other financial institution that is from time to time under the Control of the Borrower.

For the purposes of this definition, **"Control"** shall mean the possession by the Borrower, either directly or indirectly, of (i) more than 50 per cent. of the voting capital or a similar right of ownership with respect to the relevant financial institution or (ii) the power, whether by contract or otherwise, to appoint the members of the management board of the relevant financial institution.

| | |
|---|---|
| **"BTA Related Party"** | means: |

    (a)   any Holding Company of the Borrower;

(b)   any Subsidiary of the Borrower other than any BTA Group Bank;

(c)   any (i) officer, director or manager of the Borrower or any of the persons specified in paragraphs (a) and (b) above or (ii) any member of the management board or supervisory board of the Borrower as at 31 December 2008;

(d)   any spouse, parent, sibling and children of any of the persons specified in paragraph (c) above and which is a natural person; and

(e)   any other person who is "connected" to any of the natural persons identified in paragraphs (c) or (d) above within the meaning of the Insolvency Act 1986,

other than any Excluded Related Party.

**"Eligible Bank"**   means a BTA Group Bank or a BTA Correspondent Bank.

**"Eligible Beneficiary"**   means, as the context may require, an Approved Buyer or an Approved Supplier for whom the Agent will process an Eligible Trade Transaction and with respect to whom the Agent, acting reasonably, is satisfied that all necessary KYC evidence has been provided[32].

**"Eligible Customer"**   Means either:

(a)   an importer or exporter that is a customer of the Borrower and that is:

(i)   domiciled in a country that is not a prohibited jurisdiction for the purposes of Kazakhstani Banking Law (2009) and is not subject to sanctions by the United Nations or the United States; and

(ii)   not a BTA Related Party; or

(b)   an Eligible Bank in respect of whom the Agent or BTA may consider advising, confirming and/or financing a letter of credit issued by such Eligible Bank.

**"Eligible Trade Transaction"**   has the meaning given to it in paragraph (6) (*New Origination Criteria*) below.

**"Eligible Trade Transaction Agreement"**   means any export or import contract entered into by an Eligible Customer with an Approved Buyer or Approved Supplier (as the case may be) in relation to an Eligible Trade Transaction.

**"Eligible Trade Transaction Financing"**   means any loan, credit or other financial accommodation provided by the Borrower to an Eligible Customer and which is financed under the RCTFF Agreement and any

---

[32]   Substance of KYC requirements to be set out in full in the RCTFF Agreement.

|  | Security granted to the Borrower to secure such loan, credit or other financial accommodation. |
|---|---|
| **"Legacy Loan"** | has the meaning given to it in paragraph (3) (*RCTFF Outline*) below. |
| **"Maximum Exposure"** | means, in relation to any Eligible Customer and its Affiliates, the maximum principal amount of any New Origination(s) they may apply for, being: |

(a) in the case of any Eligible Customer which is controlled by SK or the Republic of Kazakhstan, up to U.S.$140,000,000 (or its equivalent) in aggregate; and

(b) in the case of any other Eligible Customer, up to U.S.$70,000,000 (or its equivalent) in aggregate,

and "control" for the purposes of paragraph (b) above shall mean the ownership, either directly or indirectly, of more than 50 per cent. of the voting capital or similar right of ownership in respect of the relevant Eligible Customer and/or its Affiliate.

| **"New Origination"** | has the meaning given to it in paragraph (3) (*RCTFF Outline*) below. |
|---|---|
| **"RCTFF Agreement"** | means the agreement setting out the terms of the RCTFF on the basis of this Annex 8. |
| **"RCTFF Collection Account"** | means the account held by the Borrower into which all amounts owing to it by each Eligible Customer or Approved Buyer (or its bank) with respect to any Eligible Trade Transaction are to be credited. |
| **"Settlement Date"** | has the meaning given to it in paragraph (6) (*New Origination Criteria*) below. |
| **"Transaction Due Diligence Report"** | means a due diligence report issued by the Borrower in relation to each Eligible Customer in the form previously agreed with the Agent and which will be attached as a schedule to the RCTFF Agreement. |
| **"Utilisation"** | has the meaning given to it in paragraph (3) (*RCTFF Outline*) below. |

In addition, a reference to the Legacy Loan or a New Origination being **"repaid"** or **"prepaid"** (in full or in part) shall mean:

(a) the Borrower providing cash cover for the Legacy Loan or New Origination (as the case may be);

(b) the maximum amount payable under the Legacy Loan or New Origination being reduced or cancelled in accordance with its terms; or

        (c)    the Lender being satisfied that it has no further liability under the Legacy Loan or New Origination,

and the amount by which the Legacy Loan is, or New Originations are, repaid or prepaid under paragraphs (a) and (b) above is the amount of the relevant cash cover or reduction.

## 2. PARTIES

| | |
|---|---|
| **Borrower:** | The Bank. |
| **Lenders:** | Restructuring Creditors whose Claims are agreed as Non-OGSC Eligible Trade Finance Debt and whose Claims are allocated to Senior Package 3 as contemplated in *"Allocation Mechanism"*. |
| **Agent:** | As agreed by the Borrower on or prior to the date of the RCTFF Agreement. |
| **Security Agent:** | As agreed by the Borrower on or prior to the date of the RCTFF Agreement. |

## 3. RCTFF OUTLINE

| | |
|---|---|
| **Total Commitments:** | U.S.$700,000,000 (as repaid or prepaid from time to time). |
| **Purpose:** | The RCTFF is provided to: |

        (a)    refinance the Borrower's existing indebtedness with respect to U.S.$700,000,000 Claims agreed as Non-OGSC Eligible Trade Finance Debt and which are allocated to Senior Package 3 as contemplated in *"Allocation Mechanism"* such that, as from the Restructuring Date:

                (i)    the terms applicable to such Non-OGSC Eligible Trade Finance Debt Claims shall be amended, restated in full and refinanced pursuant to the terms of the RCTFF Agreement, and thereafter such Claims shall remain outstanding on the terms set out in the RCTFF Agreement; and

                (ii)    such Claims shall be re-constituted and comprise a single loan obligation to be referred to as the **"Legacy Loan"**; and

        (b)    provide new credit to finance Eligible Trade Transactions through Utilisations to be provided by the Lenders for the benefit of the Borrower (each a **"New Origination"**).

| | |
|---|---|
| **Currencies:** | Legacy Loan: USD; and |
| | New Originations: USD, EUR, CHF, RUB, JPY or Tenge. |
| **Termination Date:** | 30 September 2013 unless previously cancelled or otherwise terminated in accordance with the RCTFF Agreement. |

| | |
|---|---|
| **Availability Period:** | For New Originations:  Up to and including 30 September 2012. |
| **Utilisation:** | The RCTFF will be capable of being utilised as follows: |

(a)   by way of the Legacy Loan; and

(b)   by way of New Originations in an aggregate principal amount (the "**Available Commitment**") not exceeding:

$$a - (b + c)$$

where:

(i)   "a" is the amount of Total Commitments;

(ii)   "b" is the principal amount of the Legacy Loan outstanding; and

(iii)   "c" is the aggregate principal amount of New Originations outstanding.

Utilisations by way of New Originations may be made available by way of cash advances, guarantees, standby letters of credit, letter of credit confirmations, deferred payment letters of credit and/or post import financing of letters of credit, to the extent that the New Origination criteria (as set out in paragraph 6 (*New Origination Criteria*) below) are satisfied in the opinion of the Agent.

The aggregate amount of all outstanding Utilisations shall at no time exceed the Total Commitments.

| | |
|---|---|
| **Utilisation Amounts:** | The original amount of the Legacy Loan as at the Restructuring Date will be equal to the amount of the Total Commitments. |

The maximum amount of any New Origination Utilisation will be:  U.S.$70,000,000 (or its equivalent).

The minimum amount of any New Origination Utilisation will be:  U.S.$10,000 (or its equivalent).

| | |
|---|---|
| **Tenor and Repayment:** | The Legacy Loan shall be repaid[33] in accordance with the Amortisation Schedule set out below. |

A New Origination must be repaid within 24 months of the relevant Utilisation date and, in any case, by not later than the Termination Date.

---

[33]   Amounts repaid or prepaid on the Legacy Loan or by reference to funded Utilisations shall be held by the Agent subject to arrangements with the Lenders to facilitate with the making, and day-to-day management of, New Origination Utilisations under the RCTFF.

| | |
|---|---|
| **Cash Margin for FX Risk:** | Any Utilisation denominated in a currency other than USD shall be referenced in USD for the purposes of this section at the Agent's spot rate of exchange on or about the dates identified below. |

With respect to any Utilisation denominated in a currency other than USD and with a tenor of more than 12 months then, to the extent that, on the date falling 12 months after the date of such Utilisation, the USD equivalent amount of such Utilisation then outstanding is below 2 per cent. or more of the original USD equivalent amount of such Utilisation, the Borrower will provide cash cover in USD for the shortfall (to be credited to the RCTFF Collection Account or such other account as shall be agreed between the Borrower and the Agent).

On the repayment date for any Utilisation denominated in a currency other than USD, the Borrower shall indemnify the Agent for the amount that is equal to the difference between (i) the original USD equivalent amount of such Utilisation and (ii) the USD equivalent amount that is actually due to be repaid in respect of such Utilisation, in each case to compensate the Lenders for any adverse FX movements during the tenor of any such Utilisation.

| | |
|---|---|
| **Scheduled Repayments of the Legacy Loan:** | The Borrower shall repay the Legacy Loan in instalments in the amounts and by no later than the dates (each a "**Repayment Date**") as set out below: |

| **Repayment Date** | **Repayment Instalment** |
|---|---|
| by 31 March 2011 | U.S.$175,000,000 |
| by 30 September 2011 | U.S.$175,000,000 |
| by 31 March 2012 | U.S.$175,000,000 |
| by 30 September 2012 | U.S.$175,000,000 |
| **Total:** | U.S.$700,000,000 |

The Borrower may, on the last Business Day of each month, elect to repay an instalment in full or in part *before* the Repayment Date for that instalment as set out above, *provided that* it provides the Agent with not less than ten (10) Business Days' notice of such repayment and the amount of any such repayment is not less than U.S.$5,000,000.

4. **PRICING**

| | |
|---|---|
| **Agent Fee:** | As agreed between the Agent and the Borrower. |
| **Security Agent Fee:** | As agreed between the Security Agent and the Borrower. |

623

| | |
|---|---|
| **Commitment Fee:** | Payable from 30 September 2010 to the end of the Availability Period, the Borrower will pay quarterly, on the Settlement Date next occurring after the end of each of its financial quarters, a commitment fee equal to 0.25 per cent. per annum on the Available Commitments. |
| **Interest Periods for funded Utilisations:** | 1, 2, 3 or 6 months or any other period agreed between the Borrower and the Lenders. |
| **Interest on funded Utilisations for New Originations:** | The aggregate of: |

(i)     the Margin;

(ii)    LIBOR, EURIBOR or the appropriate reference rate for New Originations funded in CHF, RUB, JPY or Tenge; and

(iii)   mandatory costs, if any,

payable on the last day of each Interest Period on the principal amount of each funded New Origination Utilisation.

The "**Margin**" in respect of funded Utilisations for New Originations:

(a)     with a tenor of up to 12 months, shall be 3.50 per cent. per annum; and

(b)     with a tenor of more than 12 months but not more than 24 months, shall be 4.50 per cent. per annum,

but if the Borrower has obtained and maintains a long term foreign currency debt rating from Moody's, Standard & Poor's or Fitch at or above the minimum rating specified in the table below, then the Margin will be the percentage rate per annum set out below opposite the rating then obtained or maintained by the Borrower[34]:

| **Rating**[35] | **Margin in respect of funded Utilisations for New Originations with a tenor of up to 12 months (% *per annum*)** | **Margin in respect of funded Utilisations for New Originations with a tenor of more than 12 months but not more than 24 months (% *per annum*)** |
|---|---|---|
| BBB- or higher | 1.00 | 2.00 |
| BB-, BB, BB+ | 2.00 | 3.00 |
| B-, B, B+ | 3.00 | 4.00 |

---

[34]     This pricing is agreed individually for BTA Bank only as a part of the restructuring of BTA and includes some expected projections.
[35]     Ratings are based on Standard & Poor's rating scale. Equivalent ratings will apply in the case of Moody's and Fitch.

| Fees and commission on unfunded Utilisations for New Organizations: | The fee in respect of unfunded Utilisations for New Originations shall be the greater of: |

(a)   U.S.$500; and

(b)   either:

       (i)   in the case of an unfunded Utilisation for a New Origination with a tenor of 12 months, 3.25 per cent. per annum; or

       (ii)   in the case of an unfunded Utilisation for a New Origination with a tenor of more than 12 months but not more than 24 months, 4.25 per cent. per annum,

and shall be paid quarterly in advance on the principal amount of each unfunded New Origination Utilisation, *provided that* if the Borrower has obtained and maintains a long term foreign currency debt rating from Moody's, Standard & Poor's or Fitch, then the applicable fee for the purposes of paragraph (b) above will be the percentage rate per annum set out below opposite the rating then obtained or maintained by the Borrower[36]:

| Rating[37] | Fee in respect of unfunded Utilisations for New Originations with a tenor of up to 12 months (*% per annum*) | Fee in respect of funded Utiisations for New Originations with a tenor of more than 12 months but not more than 24 months (*% per annum*) |
|---|---|---|
| BBB- or higher | 0.75 | 1.75 |
| BB-, BB, BB+ | 1.75 | 2.75 |
| B-, B, B+ | 2.75 | 3.75 |

## 5.   OTHER TERMS

| Mandatory Prepayments: | Mandatory prepayments in relation to (i) illegality and (ii) Change of Control and (iii) following any disposals (excluding disposals made in the ordinary course of trading of the Borrower and its Subsidiaries) in any Financial Year of more than 6.5 per cent. of the Borrower's total unconsolidated gross assets (determined by reference to the Borrower's most recent financial statements) (each a "**Relevant Disposal**"), each at the option of individual Lenders. |

| Application of Mandatory | All amounts mandatorily prepaid as a result of a Change of |

---

[36]    This pricing is agreed individually for BTA Bank only as a part of the restructuring of BTA and includes some expected projections.

[37]    Ratings are based on Standard & Poor's rating scale. Equivalent ratings will apply in the case of Moody's and Fitch.

| | |
|---|---|
| **Prepayments:** | Control or Relevant Disposal shall be paid to those Lenders who opt to be paid such prepayment. |
| | If there is an illegality in relation to any Lender, the Borrower shall procure that such Lender is repaid in full. |
| **Prepayments:** | Amounts repaid or prepaid, other than as a result of Mandatory Prepayments, may be redrawn. |
| | Any prepayment shall be made with accrued interest, fees, commission on the amount prepaid and subject to breakage costs, if any (which shall exclude margin), without premium or penalty. |
| **Representations:** | As set out in Schedule 10 (*Representations and Warranties of the Bank*) on a repeating basis. |
| **Information Covenants, Financial Covenants, General Covenants and Events of Default:** | As set out in Schedule 11 (*Covenants of the Bank*) and other additional covenants such as those set out in paragraph 7 (*Trade Finance related Covenants*) below, and with respect to Events of Default as set out in Condition 11 of Annex 1 (*Terms and Conditions of the Senior Notes*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*). |
| **Miscellaneous Provisions:** | The RCTFF Agreement will contain provisions relating to, amongst other things, default interest (at 2 per cent. per annum), market disruption, breakage costs (if any), full tax gross up (in relation to any withholding tax and not limited to withholding taxes arising on any change of law or regulation or their application) and indemnities, increased costs and setoff. |
| **Majority Lenders:** | Lenders whose participations aggregate more than 66⅔ per cent. of the Total Commitments then outstanding. |
| **Agency, Security Trustee and administration:** | Per current recommended form of investment grade LMA facility agreement. |
| **Assignments and Transfers by Lenders:** | A Lender may assign (without the consent of or needing to consult the Borrower) any of its rights or transfer by novation any of its rights and obligations to another bank or financial institution or to a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets. |
| **Governing Law:** | English law. |
| **Dispute resolution:** | Arbitration in London under LCIA Rules or, at the option of the Agent, Borrower submission to the exclusive jurisdiction of the English courts for the benefit of the Lenders (without prejudice to the ability of a Lender to take proceedings in any other court with jurisdiction). |

6.     **NEW ORIGINATION CRITERIA**

| | |
|---|---|
| **Conditions Precedent specific to particular New Origination:** | On any, but only once every, Business Day until (and including) the end of the Availability Period (each such date, a "**Settlement Date**"), the Borrower may set out all the transactions intended to be financed under New Originations in a settlement sheet in form and substance satisfactory to the Agent.   The Lenders will only be required to provide financing for those transactions which are Eligible Trade Transactions.   An Eligible Trade Transaction means the sale and purchase of goods and/or services to be financed by the Borrower for the benefit of Eligible Customers only in one of the following ways (together, the "**Eligible Trade Transactions**"): |
| **Unfunded transactions:** | **Type of trade transaction:** |
| | Import or export of goods and/or services. |
| | **Applicable trade instruments used:** |

1.     Confirmation of sight, deferred payment import and export letters of credit issued under UCP 600;

2.     Issuance of trade guarantees against the counter guarantee of the Borrower in relation to bid bonds, performance bonds, advance payments, warranty bonds and guarantees in support of payment of a purchase price in respect of an Eligible Trade Transaction;

3.     Confirmation of standby letters of credit in relation to bid bonds, performance bonds, advance payments, warranty bonds and guarantees in support of payment of a purchase price in respect of an Eligible Trade Transaction; and

4.     IRUs/irrevocable reimbursement undertakings,

together, the "**Trade Instruments**".

| | |
|---|---|
| **Documents required:** | The following documents need to be presented to the Agent for approval prior to the issuance of a Trade Instrument: |

1.     a Utilisation request setting out all the details relating to the relevant Utilisation, including details of the relevant Trade Instrument, the relevant Eligible Trade Transaction, the Eligible Customer and the Eligible Beneficiary(ies);

2.     a copy of the relevant Eligible Trade Transaction Agreement;

3.     a draft copy of the relevant letter of credit/standby letter of credit/guarantee/irrevocable reimbursement undertaking; and

4.     a Transaction Due Diligence Report.

**Funded transactions:**          **Type of trade transaction and methods of funding used:**

1. Discounting of confirmed issuance/deferred payment letters of credit, where the discounting charges are paid by the Eligible Customer or Eligible Beneficiary;

2. Post-import financing under confirmed letters of credit, where the funded Utilisation is paid directly to the Approved Supplier against presentation of credit conforming documents as called for under the relevant letters of credit, save that up to 20 per cent. of such Utilisation may be directed, subject to presentation of appropriate documentation to the Agent, towards the payment of any local mandatory costs to be incurred by the Eligible Customer in connection with such post-import financing;

3. Pre-export financing under a facility agreement and/or standby letter of credit/banker's acceptance/trade advance;

4. Post-export financing under a facility agreement and/or standby letter of credit/banker's acceptance/trade advance; and

5. Discounting of avalised bills of exchange or promissory notes issued by the Borrower supporting the import of goods and/or services into Kazakhstan.

**Documents required:**          The following documents need to be presented to the Agent for approval prior to the making of the relevant funded Utilisation:

1. a Utilisation request setting out all the details relating to the relevant Utilisation, including the relevant method of funding to be used, the relevant Eligible Trade Transaction, the Eligible Customer and the Eligible Beneficiary(ies);

2. a copy of the relevant Eligible Trade Transaction Agreement;

3. a copy of the purchase order (only in relation to pre-export financings);

4. a draft copy of the relevant letter of credit/standby letter of credit/guarantee;

5. in relation to a post-import financing, a copy of the relevant contract or other document with evidence of the local costs to be borne in connection with such transaction (if any);

6. in relation to a post-export financing, a copy of the relevant export letter of credit (if one is to be utilised); and

7. a Transaction Due Diligence Report.

628

| All transactions: | Such further conditions or documentation as the Agent may reasonably request and as may be suitable for such transactions. |
|---|---|

Payment will only be made on presentation of a full set of original documents or a duplicate original copy thereof, particularly in relation to shipment documents, such as bills of lading and airway bills, and the claim under a performance bond.  Such requirement must also be contained in the draft copy of the relevant letter of credit/stand by letter of credit.

## 7.    TRADE FINANCE RELATED COVENANTS

| Additional RCTFF Agreement covenants: | In addition to those covenants set out in Schedule 11 (*Covenants of the Bank*), the RCTFF Agreement will include the further covenants as set out below. |
|---|---|

(i)    *RCTFF Collection Account.*

(A)   The Borrower shall procure that all amounts owing to it by an Eligible Customer, or by an Eligible Beneficiary to an Eligible Customer (including, in the case of an Approved Buyer, its bank), with respect to any Eligible Trade Transaction are credited directly to the RCTFF Collection Account.

(B)   The Borrower shall provide to the Agent copies of statements/a weekly reconciliation of amounts credited to the RCTFF Collection Account.

(ii)   *Eligible Trade Transaction Financings.*

(A)   The Borrower shall ensure that all funds received from an Eligible Customer under and in prepayment of any Eligible Trade Transaction Financing shall be treated as having satisfied that Eligible Customer's debt obligation under such Eligible Trade Transaction Financing.

(B)   Except for operational matters which do not adversely affect the interests of the Lenders, in respect of which the Borrower shall have complete discretion, the Borrower will not terminate, amend or vary, or acquiesce in any amendment or variation to any Eligible Trade Transaction Financing, release any party thereto from its obligations thereunder in any material respect or waive any material breach of any party's obligations thereto, or do or permit, or omit to do or permit the omission of, any act or thing as a result of which any Eligible Trade Transaction Financing is or may be frustrated or be lawfully terminated, or refuse to comply

629

with any of its obligations under any Eligible Trade Transaction Financing for any reason (other than due to the failure of any third party to comply with its obligations).

(C) At the request of the Agent, the Borrower will provide every reasonable administrative and operational support in respect of the enforcement of any judgment or award given in respect of any Eligible Trade Transaction Financing following a default thereunder.

(D) The Borrower will exercise any rights or discretions and/or give any notices which the Borrower may be entitled to exercise or give under any Eligible Trade Transaction Financing to ensure the due performance of the same and comply with all reasonable requests and reasonable instructions given by the Agent in respect of the exercise of such rights or discretions or the giving of such notices, and it will account to the Agent for any monies received or recovered by the Borrower as a result of it exercising any rights it may have under any Eligible Trade Transaction Financing.

(iii) *Performance of obligations.* The Borrower shall:

(A) perform all its obligations in respect of each Eligible Trade Transaction Financing; *provided that*, no event of default shall arise in respect of this paragraph if the failure to comply is administrative or technical in nature and is capable of remedy, and the Borrower does so remedy such failure to comply as soon as reasonably practicable after the Agent giving notice to the Borrower or the Borrower becoming aware of the failure to comply;

(B) take all practical measures to prevent or minimise loss arising in connection with each Eligible Trade Transaction Agreement;

(C) provide every reasonable administrative and operational support with a view to achieving the smooth functioning of each Eligible Trade Transaction Agreement; and

(D) promptly notify the Agent of (i) any material breach by it, or any Eligible Customer or any Eligible Beneficiary, of any Eligible Trade Transaction Agreement and (ii) any event affecting the performance of any Eligible Trade Transaction Agreement which might reasonably be expected to adversely affect the interests of the Lenders, and of which the Borrower has

630

been notified by such Eligible Customer or Eligible Beneficiary or of which the Borrower is otherwise aware.

(iv) *Indemnity for set-off.* The Borrower shall on demand by the Agent (acting on the instructions of the Majority Lenders), pay to the Agent any amount set-off by any Eligible Customer in respect of its obligations under an Eligible Trade Transaction Agreement.

(v) *No Variation.* The Borrower shall procure that no variation, waiver or forbearance is made to any of the terms of any Eligible Trade Transaction Agreement which might reduce the amounts due to it or extend the date of receipt of any amount due to it, or agree to any compromise or settlement with any Eligible Customer or Eligible Beneficiary which might adversely affect the interests of the Lenders.

## SCHEDULE 10 – REPRESENTATIONS AND WARRANTIES OF THE BANK

As a condition precedent to the Restructuring, the Bank will make the following representations and warranties, for the benefit of the Restructuring Creditors with respect to itself and its Material Subsidiaries only which shall be correct immediately before the Restructuring Date:

(a)   **Status**

    (i)   It is a joint stock company duly incorporated and validly existing under the laws of its jurisdiction of incorporation.

    (ii)   Each of its Material Subsidiaries is a limited liability corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation.

    (iii)   It and each of its Material Subsidiaries has the power to own its assets and carry on its business as it is being conducted.

(b)   **Binding Obligations**

Subject to the Legal Reservations the obligations expressed to be assumed by it in the Deeds of Covenant and each Restructuring Document to which it is a party are legal, valid, binding and enforceable obligations.

(c)   **Non-Conflict with other Obligations**

The entry into and performance by it of, and the transactions contemplated by, the Deeds of Covenant and the Restructuring Documents to which it is a party do not and will not conflict with:

    (i)   any law or regulation applicable to it;

    (ii)   the constitutional documents of any member of the Group; or

    (iii)   any agreement or instrument binding upon it or any member of the Group or any of its or any member of the Group's assets or constitute a default or termination event (however described) under any such agreement or instrument, where the conflict has or is reasonably likely to have a Material Adverse Effect (provided, for the avoidance of doubt, the revocation of the banking licence of JSC "Mortgage organisation "BTA Ipoteka" shall not constitute a breach of this representation).

(d)   **Power and Authority**

    (i)   It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Deeds of Covenant and the Restructuring Documents to which it is or will be a party and the transactions contemplated by the Deeds of Covenant and the Restructuring Documents.

    (ii)   No limit on its powers will be exceeded as a result of the borrowing, grant of security or giving of guarantees or indemnities contemplated by the Deeds of Covenant and the Restructuring Documents to which it is a party.

(e)   **Validity and Admissibility in Evidence**

    (i)   All Authorisations required or desirable:

        (A)   to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Deeds of Covenant and the Restructuring Documents to which it is a party;

632

(B)    to make the Deeds of Covenant and the Restructuring Documents to which it is a party admissible in evidence in Kazakhstan and, where the Deeds of Covenant and the relevant Restructuring Document is expressed to be governed by English law, also England, have been obtained or effected and are in full force and effect except for presentation of a certified Russian and/or Kazakh translation of the Deeds of Covenant and the Restructuring Documents and payment of any related state duty which will be promptly obtained or effected after the Restructuring Date.

(ii)    All Authorisations necessary for the conduct of the business, trade and ordinary activities of members of the Group have been obtained or effected and are in full force and effect if failure to obtain or effect those Authorisations has or is reasonably likely to have a Material Adverse Effect.

(f)    **Governing Law and Enforcement**

(i)    Subject to the Legal Reservations, the choice of governing law of the Deeds of Covenant and the Restructuring Documents will be recognised and enforced in Kazakhstan and, where the Deeds of Covenant or the relevant Restructuring Document is expressed to be governed by English law, also England and the consent to arbitration under the LCIA rules and to the jurisdiction of the courts of England by the Bank Group in the Deeds of Covenant and the relevant Restructuring Documents is valid and binding upon it and not subject to revocation in any proceedings taken in Kazakhstan.

(ii)    Subject to the Legal Reservations, any judgment obtained in relation to a Deed of Covenant or a Restructuring Document in the jurisdiction of the governing law of that Deed of Covenant or Restructuring Document will be recognised and enforced in Kazakhstan and, where the Deed of Covenant or the relevant Restructuring Document is expressed to be governed by English law, also England.

(g)    **No Default under Terms of Restructuring Documents and Restructuring Plan**

(i)    No Default is continuing or is reasonably likely to result from the entry into, the performance of, or any transaction contemplated by, any Restructuring Document.

(ii)    No other event or circumstance is outstanding which constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination or any combination of any of the foregoing, would constitute) a default or termination event (however described) under any other agreement or instrument which is binding on it or any of its Subsidiaries (including, without limitation, under the Restructuring Documents or the Restructuring Plan) or to which its (or any of its Subsidiaries') assets are subject which has or is reasonably likely to have a Material Adverse Effect.

(h)    **No Misleading Information**

Save as otherwise disclosed in the Information Memorandum:

(i)    the Information Memorandum contains all information with respect to the Group, the Restructuring, the Deeds of Covenant and the Restructuring Documents which is material in the context of the Restructuring (including, without limitation, all information required by applicable laws of Kazakhstan and details all material intra-group debt (if any));

(ii)    any factual information contained in the Information Memorandum was true and accurate in all material respects as at the date of the relevant report or document containing the information or (as the case may be) as at the date the information is expressed to be given;

(iii)   the Base Case Model has been prepared in accordance with the FMSA Methodology, and the financial projections contained in the Base Case Model have been prepared on the basis of recent historical information;

(iv)   both the Original Business Plan and the Base Case Model have been approved by the board of directors of the Bank; and

(v)   no event or circumstance has occurred or arisen and no information has been omitted from the Information Memorandum and no information has been given or withheld that results in the information, opinions, intentions, forecasts or projections contained in the Information Memorandum being untrue or misleading in any material respect.

(i)   **Accuracy of Financial Statements**

(i)   The Unaudited Interim Financial Statements were prepared in accordance with International Financial Reporting Standard IAS 34, Interim Financial Reporting.

(ii)   Save as disclosed in the Information Memorandum, there has been no material adverse change in its assets, business operations, property, prospects or condition (financial or otherwise) (or the assets, business, operations, property, prospects or consolidated condition (financial or otherwise) of the Group) since 30 September 2009.

(j)   *Pari Passu* **Ranking**

Its payment obligations under the Deeds of Covenant and the Restructuring Documents (save for those which are expressed to be subordinated or limited in recourse) rank at least *pari passu* with the claims of all its other unsubordinated and unsecured creditors, except for obligations mandatorily preferred by relevant law and which applies to companies generally.

(k)   **No Proceedings Pending or Threatened**

No litigation, arbitration, administrative proceedings or investigations of, or before, any court, arbitral body or agency which, if adversely determined, are reasonably likely to have a Material Adverse Effect have (to the best of its knowledge and belief (having made due and careful enquiry)) been started or threatened against it or any of its Subsidiaries save as expressly disclosed in the Information Memorandum and, save as so disclosed at the date of the Information Memorandum, any disputes between the Bank Group and a Restructuring Creditor in connection with the admission and adjudication of Claims in connection with the Restructuring.

(l)   **No Breach of Money Laundering, Corruption, Anti-Terrorist, Employment or other Laws**

Save as disclosed in the Information Memorandum:

(i)   It has not (and none of its Subsidiaries has) breached any law or regulation which breach has or is reasonably likely to have a Material Adverse Effect.

(ii)   No labour disputes are current or, to the best of its knowledge and belief (having made due and careful enquiry), threatened against any member of the Group which have or are reasonably likely to have a Material Adverse Effect.

(iii)   It has not (and none of its Subsidiaries has) engaged in, nor authorised any person acting on its behalf to engaged in:

(A)   Corrupt Practices, Fraudulent Practices, Collusive Practices or Coercive Practices in connection with their respective business and operations,

634

including the procurement or the execution of any contract for goods or works relating to their respective business;

(B)     Obstructive Practices;

(C)     Money Laundering, or breached any applicable law relating to Money Laundering; or

(D)     the Financing of Terrorism.

(m)     **No Sovereign Immunity**

(i)     The execution by it of the Deeds of Covenant and each Restructuring Document to which it is a party constitutes, and its exercise of its rights and performance of its obligations thereunder will constitute, private and commercial acts done and performed for private and commercial purposes.

(ii)    It is capable of being sued in its own right and does not, nor do its assets generally, enjoy immunity from suit, execution, attachment or other legal process in any jurisdiction.

(n)     **No Winding Up**

Save for the Restructuring, or as described in the Information Memorandum, no:

(i)     corporate action, legal proceeding or other procedure or step described in paragraph (e) (*Insolvency*) of condition 11 (*Events of Default*) of Annex 1 *(Terms and Conditions of the Senior Dollar Notes)* of Schedule 9 (*Terms and Conditions of the New Notes and RCTFF*); or

(ii)    creditors' process described in paragraph (f) (*Creditors' Process*) of condition 11 (*Events of Default*) of Annex 1 *(Terms and Conditions of the Senior Dollar Notes)* of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*),

has been taken or, to the knowledge of the Bank, threatened in relation to the Bank or any Material Subsidiary; and none of the circumstances described in sub-paragraphs (A), (B) or (C) of paragraph (v) (*Insolvency*) of condition 11 (*Events of Default*) of Annex 1 *(Terms and Conditions of the Senior Dollar Notes)* of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*) applies to the Bank or any Material Subsidiary.

(o)     **Share Capital and no Security**

(i)     There are no agreements in force which provide for the issue or allotment of, or grant to any person of the right to call for the issue or allotment of, any share or loan capital of any member of the Group (including any option or right of pre-emption or conversion) or which restrict or prohibit the issue of any securities save as contemplated by the Information Memorandum, the Restructuring Documents and/or Restructuring Plan.

(ii)    The Bank's share capital details as set out in the Information Memorandum are correct and up to date as at the date of the Information Memorandum.

(iii)   Save as disclosed in the Information Memorandum, or in any supplement thereto or in a public announcement by the Bank made after the date of the Information Memorandum, the Bank has no Subsidiaries other than TuranAlem Finance, Temir Capital B.V. (Netherlands), TuranAlem Finance Russia, BTA Ipoteka, BTA Insurance, BTA Zhizn, BTA Securities, JSC Subsidiary of JSC BTA Insurance Company London-Almaty, BTA Bank Belarus, BTA Zabota, BTA Finance Luxembourg, First Kazakhstan Securitisation Company (Netherlands), Second

Kazakhstan Securitisation Company (Netherlands) and BTA Pension Fund BTA Kazakhstan and JSC "Organisation realising investment management of pension assets "Zhetysu".

(iv) The shares to be issued to, or for the benefit of, the Restructuring Creditors and to be placed in the GDR Programme are or will be, when issued, properly registered, fully paid up and not subject to any Security.

(v) No Security other than a Permitted Security exists over all or any of the present or future assets of any member of the Group to secure any Financial Indebtedness save as disclosed to the contrary in the Information Memorandum.

(p) **No Withholding Tax on Payments to be made to the Restructuring Creditors**

The Bank is not required to make any deduction for or on account of Tax from any payment it may make under any Deed of Covenant or Restructuring Document other than in respect of withholding tax on interest payments under the RCTFF and on dividends on the Shares.

(q) **No Filing or Stamp Taxes**

Under the laws of its Relevant Jurisdiction, it is not necessary that the Deeds of Covenant or the Restructuring Documents be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the Deeds of Covenant or the Restructuring Documents or the transactions contemplated by the Deeds of Covenant or the Restructuring Documents except for the approval of the Restructuring Plan by the Court and the decision of the Court on termination of the Restructuring.

(r) **Taxation and Arm's Length Basis of Restructuring Transactions**

(i) It is not (and none of its Subsidiaries is) overdue in the filing of any Tax returns and it is not (and none of its Subsidiaries is) overdue in the payment of any amount in respect of Tax of U.S.$1,000,000 (or its equivalent in any other currency) or more.

(ii) No claims or investigations are being, or are reasonably likely to be, made or conducted against it (or any of its Subsidiaries) with respect to Taxes which have or are reasonably likely to have a Material Adverse Effect.

(iii) It is a resident for Tax purposes only in the jurisdiction of its incorporation.

(iv) Accumulated and other losses of the Bank and its Subsidiaries that are tax residents of Kazakhstan immediately prior to the Restructuring Date will be retained thereafter and will be available for set-off against future trading gains for 10 years after such losses were incurred.

(v) Income from cancellation by the creditor of liabilities included in the list of restructured assets and liabilities in the Restructuring Plan approved by the court is excluded from the taxable income of the Group under the laws of Kazakhstan.

(vi) Each transaction entered into by each member of the Group pursuant to the Restructuring have been entered into on arm's length (or better) terms and for full market value.

(s) **Good Title to Assets**

(i) Save as disclosed in the Information Memorandum, it and each of its Subsidiaries has a good, valid and marketable title to, or valid leases or licences of, and all appropriate Authorisations to use, the assets necessary to carry on its business as presently

636

conducted save to the extent that failure so to do does not have and is not reasonably likely to have a Material Adverse Effect.

(ii)    The Bank (and no other member of the Group) is the beneficial owner of the Recovery Assets.

(t)    **No Adverse Consequences**

(i)    It is not necessary under the laws of its Relevant Jurisdictions:

(A)    in order to enable the New Notes Trustee or the Depositary to enforce its rights under any Restructuring Document; or

(B)    by reason of the execution of any Restructuring Document or the performance by it of its obligations under any Restructuring Document,

that the New Notes Trustee or Depositary should be licensed, qualified or otherwise entitled to carry on business in any of its Relevant Jurisdictions.

(ii)    None of the New Notes Trustees or the Depositary is or will be deemed to be resident, domiciled or carrying on business in its Relevant Jurisdictions by reason only of the execution, performance and/or enforcement of any Restructuring Document.

(u)    **Effectiveness/Validity of Acts**

(i)    The mandatory issuance of shares in the Bank to Samruk-Kazyna in February 2009 and the subsequent reallocation of the shares in the Bank to Samruk-Kazyna by the FMSA were legal, valid and binding acts under the law of Kazakhstan.

(ii)    The actions taken by the FMSA with respect to the Bank from and including the mandatory issuance of shares in the Bank to Samruk-Kazyna in February 2009 to and including the Restructuring Date and all subsequent actions to be taken by the FMSA as contemplated by this Information Memorandum are, or will be, legal, valid and binding acts under Kazkahstan's law.

(iii)    The Restructuring has been recognised in Kazakhstan, the United States, the United Kingdom and Ukraine.

(iv)    The New Charter as in effect on the Restructuring Date is legal, valid and binding under Kazakhstan's law.

Any certificate signed by two officers of the Bank and delivered to the New Notes Trustee in connection with the Restructuring Documents shall be deemed to be a representation and warranty by the Bank to the Restructuring Creditors as to the matters covered thereby.

## SCHEDULE 11 – COVENANTS OF THE BANK

1.    **Financial and other information covenants**

So long as any amount is outstanding under the Senior Notes and the OID Notes (together, in this Schedule 11, the "**Senior Bonds**"), the Bank shall:

(a)    *Financial Statements*: send to the New Notes Trustee and the Depositary at the time of their issue and, in any event:

      (i)    (in the case of its audited annual consolidated and unconsolidated financial statements and auditor's report) within 150 days of the end of each Financial Year;

      (ii)    (in the case of its half-yearly reviewed consolidated and unconsolidated financial statements and auditor's review opinion), within 120 days after the end of each half year; and

      (iii)    (in the case of its quarterly consolidated and unconsolidated financial statements), within 45 days after the end of each quarter,

such number of copies in English of such financial statements as the New Notes Trustee or the Depositary may request, in each case prepared in accordance with FMSA Methodology, accompanied by the Relevant Information and certified by the Chairman of the Management Board as giving a true and fair view of (in the case of annual financial statements for any Financial Year), or fairly representing (in other cases), its financial condition and operations as at the date at which those financial statements were drawn up;

For the purpose of this Schedule 11:

"**Relevant Information**" means:

(a)    in the case of each set of annual financial statements, an auditor's report;

(b)    in the case of each set of semi-annual financial statements, an auditor's review opinion;

(c)    in the case of each set of annual financial statements and quarterly financial statements, a balance sheet, profit and loss account and cashflow statement;

(d)    in the case of each set of quarterly financial statements, a cashflow forecast in respect of the Group relating to the three-month period commencing at the end of the relevant financial quarter;

(e)    in the case of each set of annual and half-yearly financial statements, the following:

      (i)    a statement by the directors of the Bank comparing actual performance for the period to which the financial statements relate to (x) the projected performance for that period set out in the Budget and (y) the actual performance for the corresponding period in the preceding Financial Year of the Group;

      (ii)    a management discussion and analysis, including a discussion of results of operations, financial condition, liquidity and capital resources, segment analysis (detailing SME, corporate and retail business), asset recovery efforts and developments, and an overview of the Kazakhstan banking industry;

(iii) appropriate footnotes and asset/liability analysis (including loans and advances to customers, economic sector and customer concentrations, investment securities, geographical risk, currency risk, liquidity risk, interest rate risk, derivatives positions, Related Party transactions, as well as segment analysis (detailing SME, corporate and retail business)); and

(iv) a description of all material recent developments, Related Party transactions and material non-ordinary course transactions as well as any changes in senior management.

(b) *Regulatory Accounts*: send to the New Notes Trustee and the Depositary:

(i) an "**Agreed Upon Procedures**" ("**AUP**") report addressing the accuracy of numbers found in the regulatory return "form 700H" and "Report on Prudential Norm Fulfilment" (including all appendices), performing procedures to agree values and calculations, where possible, back to audited financial statements; and

(ii) an AUP report, addressing covenant compliance, performing procedures on adherence to each of the financial covenants by reference, where possible, to audited financial statements,

to be provided together with each set of annual financial statements delivered under paragraph (a)(i) and (ii) above;

(c) *Compliance Certificate*: send to the New Notes Trustee with each set of its annual and semi-annual consolidated financial statements and quarterly consolidated and unconsolidated financial statements, and at any other time within 10 days (or such longer period as the New Notes Trustee shall determine) of any request by a New Notes Trustee, a Compliance Certificate signed by the Chairman of the Management Board including confirmations that (having made all reasonable enquiries and to the best of his knowledge, information and belief) as at a date not more than five days prior to the date of the Compliance Certificate:

(i) no Default or other breach of the New Notes Trust Deed has occurred, or is continuing, since the date of the last Compliance Certificate;

(ii) based on computations to be included in the Compliance Certificate calculated (where appropriate) in accordance with FMSA rules, it is in compliance with all its financial covenants under the Restructuring Documents;

(iii) no material litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency have been started or threatened against it which would involve a liability or a potential or alleged liability exceeding U.S.$10,000,000 (or its equivalent in other currencies); and

(iv) no other material formal regulatory disputes or other breaches of regulation are outstanding with respect to the Bank,

or giving details of any such instances of non-compliance (to the extent in the case of (iii) and (iv) that it does not breach any applicable confidentiality restrictions) or, in the Bank's reasonable determination, any such disclosure would be materially prejudicial to its position and (if any Default or other

breach of the New Notes Trust Deed has occurred, or is continuing) what action the Bank is taking or proposes to take with respect thereto;

(d) *Notification of Default*:  promptly on becoming aware thereof inform the New Notes Trustee of any Default (and the steps, if any, being taken to remedy it) and, upon receipt of a written request to that effect from the New Notes Trustee, confirm to the New Notes Trustee that, save as previously notified to the New Notes Trustee or as notified in such confirmation, no Default has occurred;

(e) *Notification of Non-Payment*:  use its reasonable endeavours to procure that the Principal Paying Agent notifies the New Notes Trustee forthwith in the event that it does not, on or before the due date for payment in respect of the Senior Bonds or any of them, receive unconditionally the full amount in the relevant currency of the monies payable on such due date on all such Senior Bonds;

(f) *Notice of Late Payment*:  forthwith upon request by the New Notes Trustee give notice to the "**Holders**" (as defined in the Terms and Conditions of the relevant New Notes) of the Senior Bonds of any unconditional payment to the Principal Paying Agent or the New Notes Trustee of any sum due in respect of the Senior Bonds made after the due date for such payment;

(g) *Change in Agents*:  give at least 14 days' prior notice to the Holders of the Senior Bonds of any future appointment, resignation or removal of any agent or of any change by any agent of its specified office and not make any such appointment or removal without the New Notes Trustee's written approval;

(h) *Notes Held by the Bank, etc.*:  send to the New Notes Trustee as soon as practicable after being so requested by the New Notes Trustee a certificate of the Bank signed by the Chairman of the Management Board of the Bank stating the principal amount of Senior Bonds held at the date of such certificate by or on behalf of the Bank or any of its Subsidiaries;

(i) *Further Information*:   promptly upon request, so far as permitted by applicable law, give the New Notes Trustee such other information as it reasonably requires:

   (i) regarding the financial condition, business and operations of any member of the Group; and

   (ii) to perform any of its functions and discharge the duties, trusts, powers, authorities and discretions vested in it under any of the Senior Note Restructuring Documents or by operation of law;

(j) *Miscellaneous Information*:  promptly upon request of the New Notes Trustee send to the New Notes Trustee (in sufficient copies for all the relevant Holders of Senior Bonds, if the New Notes Trustee so requests):

   (i) so far as permitted by applicable law, a report with details of any Related Party Transaction described in paragraph (o)(ii)(A) of Clause 3 of this Schedule 11 (*Covenants of the Bank*);

   (ii) a report with details of any Default under any Senior Bond Restructuring Document (other than any cross-default which comprises an Event of Default as contemplated by paragraph (iii) (*Cross Default*) of condition 11 of each of the Terms and Conditions

of the Senior Bonds as set out at Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*));

(iii)    so far as permitted by applicable law and to the extent it does not breach any applicable confidentiality restrictions, details of any change in senior management and/or the auditors of the Bank and the reasons for such change;

(iv)    a copy of any report produced by the Independent Auditor; and

(v)    a report with details of any material corporate restructuring undertaken by any member(s) of the Group that is not in the ordinary course of business of the Group;

(k)    *Change in Accounting Principles or Practices*:  notify the New Notes Trustee if there has been a change in the FMSA Methodology or the accounting practices or any change to the last day of its Financial Year, and procure that its Auditors deliver to the New Notes Trustee:

(i)    a description of any change necessary for a comparison of the financial statements delivered by the Bank pursuant to paragraph (a) above against FMSA Methodology or accounting practices upon which the Base Case Model and Financial Statements were prepared; and

(ii)    sufficient information, in form and substance as may be reasonably required by the New Notes Trustee, to enable the Holders of the Senior Bonds to determine whether the financial covenants have been complied with and to make an accurate comparison between the financial position indicated in those financial statements and the Base Case Model and Financial Statements;

(l)    *Notices to be circulated to Holders*:  send to the New Notes Trustee for approval in English and at least seven days (or such longer period as the New Notes Trustee may determine) prior to publication the form of each notice to be given to Holders of New Notes in general and, once given, two copies of each such notice, such notice to be in a form approved by the New Notes Trustee.  For the avoidance of doubt, this clause shall not apply to any Relevant Information;

(m)    *Bank Website*:  make available on its website all non-confidential information delivered by it pursuant to this Clause 1 of Schedule 11 as soon as possible and, in any event, within five Business Days of sending such information to the New Notes Trustee; and

(n)    *Language*:  ensure that all information provided by it or on its behalf in connection with this Clause 1 of Schedule 11 is provided in the English language or, if that is not possible, provided together with a certified English translation.

**2.** **Financial Covenants**

**2.1.** **Financial Covenant Definitions**

For the purpose of the financial covenants in Clause 2.2 below, the following terms have the following meanings:

| Definition | Meaning |
|---|---|
| **"Adjusted Deposits"** | means the Bank's "Total Deposits from Customers" (which shall, for the avoidance of doubt, not include deposits which constitute Government Funding deposits) and "Correspondent Accounts and deposits of banks". |
| **"Adjusted Liabilities"** | means the Bank's (i) total liabilities (calculated by reference to the most recent financial statements of the Bank prepared in accordance with FMSA Methodology) excluding equity, minus (ii) Adjusted Deposits. |
| **"Aggregate Foreign Currency Open Position"** | means the aggregate of the Bank's Foreign Currency Open Positions in each Foreign Currency. |
| **"Capital"** | means the sum of the Bank's Tier 1 Capital and Tier 2 Capital, as such terms are defined in, calculated in accordance with, and subject to the limits, restrictions and deductions set forth in the FMSA Guidance. |
| **"Cash and Cash Equivalents"** | means cash in hand and Cash Equivalent Investments which are unrestricted and available for immediate withdrawal (excluding any amounts held for mandatory reserve requirements). |
| **"Excluded Related Party"** | means a person which is a Related Party solely by virtue of its relationship with or to Samruk-Kazyna. |
| **"Exposure"** | means, at any relevant time of calculation, with respect to one or more counterparties: |
| | (a)  the aggregate principal or nominal amount owed to the Bank, whether direct or contingent, by a Single Party in respect of money borrowed, equity or debt raised, guarantees, letters of credit or debt instruments issued or confirmed and other off-balance sheet engagements; less |
| | (b)  any amount referred to in paragraph (a) above which is fully secured by rights of off-set against: (i) cash; and/or (ii) Adjusted Deposits; all of the foregoing forms of security being in equivalent amounts and comparable maturities placed with the Bank. |
| **"FMSA Guidance"** | means "Instruction about norm values and calculation methodology of prudential norms for second tier banks" approved by Resolution of the Board of the Agency of the Republic of Kazakhstan for Regulation and Supervision of Financial Market and Financial Organisations" dated 30 September 2005, #358, as amended, supplemented or updated from time to time. |

| Definition | Meaning |
|---|---|
| "Foreign Currency" | means any currency other than Tenge. |
| "Foreign Currency Assets" | means all assets of the Bank which are (i) denominated in Foreign Currency, (ii) payable by the terms of the agreement or other constitutive document providing for those assets or at the option of the payee in a Foreign Currency, or (iii) payable in Kazakhstan Tenge but in an amount determined by reference to any Foreign Currency index. |
| "Foreign Currency Liabilities" | means all liabilities of the Bank which are (i) denominated in Foreign Currency, (ii) payable by the terms of the agreement or other constitutive document providing for those assets or at the option of the payee in a Foreign Currency, or (iii) payable in Tenge but in an amount determined by reference to a Foreign Currency index. |
| "Foreign Currency Open Positions" | means, with respect to any Foreign Currency, the difference between Foreign Currency Assets and Foreign Currency Liabilities in that currency (whether that position is short or long), net of hedges through any foreign exchange cover, hedging facility or other similar arrangement. |
| "Gross Loans" | means the total principal amount of all loan facilities extended by the Bank to its customers (other than banks) in the ordinary course of business, before the deduction of any Loan Loss Reserves. |
| "Loan Loss Reserves" | means accumulated reserves required to be made under IFRS against the Gross Loans. |
| "Net Loans" | means the aggregate amount of all Gross Loans less Loan Loss Reserves. |
| "Net Non-Performing Loans" | means the aggregate amount of all Non-Performing Loans less the amount of aggregate Loan Loss Reserves. |
| "New Net Loans" | means Net Loans originated after the Restructuring Date (which, for the avoidance of doubt, shall not include any rescheduling of, or capitalisation of interest on, loans originally made prior to the Restructuring Date). |
| "New Net Non-Performing Loans" | means Non-Performing Loans originated after the Restructuring Date. |
| "Non-Performing Loans or NPLs" | means: (a) Gross Loans in respect of which any amounts have been outstanding for a period of more than 90 days after the relevant due dates provided for under the agreements providing for such Gross Loans; (b) Gross Loans restructured more than three times due to the applicable borrowers' inability to meet their payment obligations to the Bank provided for under the agreements providing for such Gross Loans; and |

| Definition | Meaning |
|---|---|

|  | (c) Gross Loans which in the reasonable opinion of the Bank's management, with the passage of time or otherwise, may qualify as Non-Performing Loans under paragraph (a) or (b) above. |

**"Operating Expenses"** means the aggregate of:

(a) staff costs (including salaries, bonuses, benefits in-kind and other staff payments and emoluments as well as related pension, insurance and other social contributions incurred by the Bank during the relevant period);

(b) fees for professional services paid and/or incurred by the Bank during the relevant period (including any legal, audit, registrar, security and consultancy services);

(c) depreciation and amortisation of fixed tangible and intangible assets and fixed asset maintenance costs (other than capitalised expenses) incurred by the Bank during the relevant period;

(d) taxes on operating activities, income or property (other than corporate profit taxes) paid and/or incurred by the Bank during the relevant period;

(e) travel, advertisement, representation, stationary, mail and telecommunication costs and expenses as well as cost of, and expenses on, the supplies of other goods and services (other than fixed assets, the cost of which has been capitalised) incurred by the Bank during the relevant period; and

(f) any other costs and expenses incurred by the Bank during the relevant period which are attributable to the Group's operational activity and not related to the performance of any specific asset or asset class.

**"Operating Income"** means:

(a) gross interest income, gross fees and commissions income, dividend income, gross trading income and gains (including unrealised gains on holdings of securities and foreign exchange) and any other gross income from ordinary banking and financial activities of the Bank, less

(b) interest expenses, fees and commissions expenses, trading losses (including unrealised losses through the diminution in value of holdings of securities).

**"Overhead Ratio"** means the ratio of Operating Expenses to Operating Income.

**"Related Party Exposure"** means the aggregate consolidated Exposure to all Related Parties excluding Excluded Related Parties (other than Excluded Related Parties).

| Definition | Meaning |
|---|---|
| "Risk Weighted Assets" | means the aggregate of the Group's balance sheet assets and off-balance sheet engagements, weighted for credit risk in accordance with the FMSA Guidance. |
| "Single Party" | means any counterparty and all connected parties of such counterparty, if any. |
| "Single Party Exposure" | means the aggregate, consolidated Exposure to any Single Party (including any interbank exposure). |
| "Tier 1 Capital" | means the Bank's Tier 1 Capital as such term is defined in the FMSA Guidance. |
| "Tier 2 Capital" | means the Bank's Tier 2 Capital as such term is defined in the FMSA Guidance. |
| "Total Assets" | means, at any time, the total book value of the Bank's assets determined in accordance with the Accounting Principles. |
| "Total Liabilities" | means, at any time, the total liabilities of the Bank determined in accordance with FMSA Methodology. |

2.2.   **Financial Covenants**

The Bank shall:

(a)   at all times:

    (i)   maintain a ratio of Capital to Risk Weighted Assets expressed as a percentage that is in compliance with the FMSA Guidance prevailing at the date of the Term Sheet, that is, not less than 10 per cent.; and

    (ii)   comply with all prudential supervision and capital adequacy ratios as may from time to time be required under legislation, regulations, norms and guidelines in Kazakhstan, including, but not limited to, those regulations, norms and guidelines of the National Bank of Kazakhstan and/or the FMSA;

(b)   at all times from (and including) the date falling 180 days after the Restructuring Date, comply with the liquidity ratios required by the FMSA Guidance prevailing at the date of the Term Sheet being:

    (i)   *"Coefficient of Term Liquidity k4-1"* shall be no less than 1.0;

    (ii)   *"Coefficient of Term Liquidity k4-2"* shall be no less than 0.9; and

    (iii)   *"Coefficient of Term Liquidity k4-3"* shall be no less than 0.8;

(c)   not incur or allow to remain outstanding any Financial Indebtedness if (after taking into account such Financial Indebtedness) the ratio (expressed as a percentage) of Adjusted Liabilities to Total Assets is more than:

    (i)   70 per cent. (for year 2010);

    (ii)   67 per cent. (for year 2011);

    (iii)   64 per cent. (for year 2012);

    (iv)   56 per cent. (for year 2013); and

(v)    45 per cent. (for the year 2014 and at all times thereafter);

(d)    ensure that the ratio (expressed as a percentage) of New Net Non-Performing Loans to New Net Loans shall not exceed 20 per cent. as of 31 December 2013 and at all times thereafter;

(e)    at all times, ensure that any new lending (which, for the avoidance of doubt, shall not include any rescheduling of, or capitalisation of interest on, loans originally made prior to the Restructuring Date) is in compliance with the FMSA Guidance prevailing at the date of the Term Sheet and specifically, that the ratio of Single Party Exposure to Capital should not exceed:

    (i)    25 per cent. in relation to any Single Party; and

    (ii)    200 per cent. in relation to the total of all Single Parties in relation to which the Bank's Single Party Exposure exceeds 10 per cent. of Capital (*provided that* for each amount of Single Party Exposure which was outstanding as of the Restructuring Date which is repaid or otherwise discharged a new amount of Single Party Exposure in the same amount may be incurred but *provided always that* at no time may the ratio of Single Party Exposure to Capital exceed 300 per cent. in relation to the total of all Single Parties in relation to which the Bank's Single Party Exposure exceeds 10 per cent. of Capital);

(f)    at all times, ensure that any new lending (which, for the avoidance of doubt, shall not include any rescheduling of, or capitalisation of interest on, loans originally made prior to the Restructuring Date) does not result in a Related Party Exposure, save that:

    (i)    personal loans made on arm's length terms under existing product lines may be made to employees of the Group;

    (ii)    personal loans not on arm's length terms may be made to employees of the Bank and Subsidiaries of the Bank incorporated in Kazakhstan up to an individual limit of U.S.$1,000,000 per employee and an aggregate limit at any time of U.S.$20,000,000; and

    (iii)    the Bank may incur Related Party Exposures of no greater than 15 per cent. of Capital in aggregate to the following entities:  BTA Belarus, BTA Armenia, BTA Georgia, BTA Kazan, Russia, BTA Ukraine and Subsidiary and Associate Companies, BTA Securities, BTA Pension Fund, BTA Ipoteka, BTA Zhizn, BTA Zabota, BTA Insurance, JSC Subsidiary of JSC BTA Insurance Company London-Almaty and JSC BTA Orix Leasing (*provided that* for each amount of Related Party Exposure which was outstanding as of the Restructuring Date which is repaid or otherwise discharged (other than by way of write-off) a new amount of Related Party Exposure in the same amount may be incurred but *provided always that* at no time may the ratio of Related Party Exposure to Capital exceed 50 per cent. in aggregate);

(g)    at all times ensure that Exposure to Samruk-Kazyna is limited to KZT677 billion, excluding accrued interest;

(h)    at all times from (and including) the date falling 180 days after the Restructuring Date, ensure that the ratio (expressed as a percentage) of the Aggregate Foreign Currency Open Position to Capital is compliant with the FMSA Guidance prevailing at the date of the Term Sheet;

(i)    ensure that the ratio (expressed as a percentage) of Adjusted Deposits to Adjusted Liabilities shall be greater than the following:

| Relevant Period | Ratio |
|---|---|
| From the Restructuring Date to (and including) 31 December 2010 | 43% |
| From 1 January 2011 to (and including) 31 December 2011 | 57% |
| From 1 January 2012 to (and including) 31 December 2012 | 78% |
| From 1 January 2013 to (and including) 31 December 2013 | 106% |
| From 1 December 2014 and at all times thereafter | 150% |

3.    **Other covenants**

The Bank shall:

(a)    *Authorisations; maintenance of any necessary regulatory and other approvals*: promptly (and shall procure that each member of the Group shall promptly) obtain, comply with and do all that is necessary to maintain in full force and effect and supply certified copies to the New Notes Trustee of, any Authorisation required under any law or regulation of a Relevant Jurisdiction to enable it to (i) perform its obligations under the Senior Bonds; (ii) ensure the legality, validity, enforceability or admissibility in evidence of any Restructuring Document; and (iii) carry on its business except in any such case where failure to do so is not reasonably likely to have a Material Adverse Effect;

(b)    *Compliance with laws and other regulatory requirements*:

(i)    comply, and shall ensure that each member of the Group will comply, in all respects with all laws and regulations to which it may be subject if failure so to comply has or is reasonably likely to have a Material Adverse Effect;

(ii)    not (and ensure that no member of the Group will), and shall not authorise any person acting on its behalf to, engage in any: (A) Corrupt Practices, Fraudulent Practices, Collusive Practices or Coercive Practices in connection with the Group's business and operations, including the procurement or the execution of any contract for goods or works relating to the Group's business; (B) Obstructive Practices; (C) Money Laundering, or act in breach of any law in any Relevant Jurisdiction relating to Money Laundering; or (D) the Financing of Terrorism, and the Bank shall institute, maintain and comply with internal procedures and controls following international best practice standards for the purpose of preventing any action in breach of the provisions of this paragraph (ii);

(iii)    inform the New Notes Trustee promptly if it should at any time obtain information in relation to any violation or potential violation of the provisions of paragraph (ii) above; and

(iv)    if the New Notes Trustee notifies the Bank of its concern that there has been a violation of any of the provisions of paragraph (ii) above, (A) co-operate in good faith with the New Notes Trustee and its representatives in determining whether such a violation has occurred; (B) respond promptly and in reasonable detail to any notice from the New Notes Trustee; and (C) furnish documentary support for such response upon request from the New Notes Trustee, and notwithstanding any other provision of the Senior Bonds, the Bank acknowledges that the New Notes Trustee may disclose to any competent national or international authority any information obtained by the New Notes Trustee in relation to any violation of any of the provisions of paragraph (ii) above;

(c)    *Taxation*: (i) pay and discharge (and ensure that each member of the Group will pay and discharge) all Taxes imposed upon it or its assets within the time period allowed

without incurring penalties unless and only to the extent that: (A) such payment is being contested in good faith and it will pay and discharge any such Taxes that are properly due and payable after having been finally determined or settled; and (B) adequate reserves are being maintained for those Taxes and the costs required to contest them pursuant to FMSA Methodology; and (ii) not permit any member of the Group to change its residence for Tax purposes, except that Subsidiaries of the Bank may change their residence for Tax purposes where to do so does not and could not reasonably be expected to have a Material Adverse Effect;

(d)     *Compliance with the Restructuring Plan and Bank's Charter*:

    (i)     comply (and shall procure that each member of the Group will comply) in all respects with all provisions of the Restructuring Plan and its Business Plan, save where otherwise approved by a Qualified Majority, and with all provisions set out in the Bank's Charter (as amended in accordance with the Deeds of Undertaking);

    (ii)     subject to paragraph (q) *(listings)* below, not take any decision on the de-listing of the New Instruments without obtaining the approval of a Qualified Majority of the Board; and

    (iii)     not take any decision to approve any public offering of equity securities of the Bank,

save where required otherwise pursuant to the Bank's Charter (as amended in accordance with the Deeds of Undertaking with Supermajority Approval, or the mandatory provisions of applicable law including, but not limited to, a governmental order, final and non-appealable court order or arbitral decision);

(e)     *Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*:

    (i)     not amend, or take any action with a view to amending, any provision of its Charter (as amended in accordance with the Deeds of Undertaking), except in the case of any amendment which (A) does not contravene or result in contravention of any provision of the Senior Notes and (B) has been approved by the requisite constituency of shareholders as set out under *"Share Distribution and Rights of Minority Shareholders – Shareholder/Board Approvals"*;

    (ii)     not amend, or take any action with a view to amending, its authorised share capital, or repurchase (or permit any member of the Group to purchase) any of its issued shares in circumstances which would result in any reduction of its share capital up until the third anniversary of the Restructuring Date and, thereafter by more than 1 per cent. in aggregate in any year; and

    (iii)     not repurchase (or permit any member of the Group to purchase) any New Instrument *except*:

        (A)     in the open market or by a private agreement by BTA Pension Fund, BTA Zhizn, BTA Zabota, BTA Insurance and/or JSC Subsidiary of JSC BTA Insurance Company LondonAlmaty;

        (B)     in the ordinary course of business of the Bank in connection with any BTA/NBK Repo Transaction or other transaction between the Bank and one of its customers where such Bonds are to be used as collateral;

(C)     for cancellation immediately following purchase; or

(D)     as part of its treasury operations in the ordinary course of business by the Bank and/or JSC "BTA Securities" (and not cancelled) *provided that* the outstanding principal amount of Senior Bonds so purchased does not exceed U.S.$50 million at any time pursuant to this paragraph (D),

*provided further that* any Senior Bonds held by the Bank or any member of the Group shall cease to carry the right to attend and vote at a meeting of the bondholders in respect of any such Senior Bonds and will not be taken into account, *inter alia*, for purposes of determining the quorum for such meetings and modification and waiver of the terms and conditions thereof as set out in the New Notes Trust Deed;

(f)     *Tax treatment*: (i) use its reasonable endeavours to ensure that all payments can be made under the Senior Bonds without any Tax Deduction; and (ii) use its reasonable endeavours to ensure that no Tax liability shall be incurred by itself, its Subsidiaries or any Holder of the Senior Bonds with respect to any cancellation pursuant to the Restructuring of any Financial Indebtedness owing by it to holders of the Senior Bonds;

(g)     *Establishment of GDR programme*: establish a GDR programme in respect of the Bank's shares and procure the listing of such GDRs on an Approved Stock Exchange within six months of the date of issue of the Senior Bonds;

(h)     *Use of proceeds*: not (and the Bank shall ensure that no member of the Group will) use the proceeds of any Financial Indebtedness raised after the date of issue of the Senior Bonds for any purpose other than in accordance with the Business Plan or to repay any amount under the New Notes and the RCTFF outstanding after the date of issue of the Senior Bonds;

(i)     *Disposals*: not (and the Bank shall ensure that no member of the Group will) enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose of any asset other than a sale, lease, transfer or other disposal (i) on arm's length in its ordinary course of trade, (ii) made on normal commercial terms and at fair market value, (iii) for cash on arm's length terms of any surplus or obsolete or worn out assets not required for the efficient operation of the business, (iv) for the purpose of securitisation of those assets, (v) to which the New Notes Trustee has given its consent or (vi) for another asset which, in the reasonable opinion of the Bank, is comparable or superior as to type, value and quality, and *provided further that* in the case of sub-paragraphs (i), (ii) and (iv) where either (A) the total consideration for such disposal is greater than U.S.$15,000,000, at least 50 per cent. of the consideration consists of Cash or Cash Equivalent Investments or (B) the total consideration for such disposal is greater than U.S.$75,000,000, at least 75 per cent. of the consideration for such disposal consists of Cash or Cash Equivalent Investments;

(j)     *Joint ventures*: not (and the Bank shall ensure that no member of the Group will): (i) enter into, invest in or acquire (or agree to acquire) any shares, stocks, securities or other interest in any Joint Venture; or (ii) transfer any assets or lend to or guarantee or give an indemnity for or give Security for the obligations of a Joint Venture or maintain the solvency of or provide working capital to any Joint Venture (or agree to do any of the foregoing), other than an acquisition of (or agreement to acquire) any interest in a Joint Venture or transfer of assets (or agreement to transfer assets) to a Joint Venture or loan made to or guarantee given in respect of the obligations of a

Joint Venture if such transaction is a Permitted Acquisition or a Permitted Joint Venture;

(k)     *Acquisitions and incorporation of subsidiaries*:  not (and the Bank shall ensure that no member of the Group will): (i) acquire a company or any shares or securities or a business or undertaking (or, in each case, any interest in any of them); or (ii) incorporate a company, other than an acquisition of a company, of shares, securities or a business or undertaking (or, in each case, any interest in any of them) or the incorporation of a company which is a Permitted Acquisition or a Permitted Transaction;

(l)     *Merger*:  not (and the Bank shall ensure that no member of the Group will) enter into any amalgamation, demerger, merger, consolidation or corporate reconstruction, unless:

   (i)     (in the case of any amalgamation, demerger, merger, consolidation or corporate reconstruction in respect of the Bank and subject always to the provisions in the New Notes Trust Deed relating to Change of Control):

      (A)     the entity (if other than the Bank) formed by or resulting from any such consolidation or merger shall be duly incorporated, organised and existing under the laws of the Republic of Kazakhstan and shall assume the performance and observance of all of the obligations and conditions under the Senior Bonds to be performed or observed by the Bank;

      (B)     the Bank or such successor, as the case may be, shall not immediately thereafter be in default (or would, with the giving of notice or lapse of time, or both, be in default) in relation to any of its obligations under the Senior Bonds;

      (C)     there has been delivered to the New Notes Trustee one or more opinion(s) of counsel acceptable to the New Notes Trustee (x) to the effect that holders of the Senior Bonds will not recognise income gain or loss for U.S. federal income tax purposes as a result of such amalgamation, demerger, merger, consolidation or corporate reconstruction and will be subject to U.S. federal income tax in the same amount and in the same manner and at the same times as would have been the case if such amalgamation, demerger, merger, consolidation or corporate reconstruction had not occurred, and (y) addressing such other matters as the New Notes Trustee may deem necessary; and

      (D)     the Financial Indebtedness of the Bank or such successor shall at the time of the relevant event be rated by at least one internationally recognised rating organisation and the New Notes Trustee has been advised by such organisation which shall then be rating such senior debt (or if more than two, by a majority of them) that the relevant event will not result in a downgrade of such rating organisation's or organisations' rating of the Senior Bonds or the senior debt of the Bank or such successor; or

   (ii)     in the case of any amalgamation, merger, consolidation or corporate reconstruction in respect of the Bank, if the entity or entities with which the Bank has amalgamated, merged, consolidated or entered into a corporate reconstruction had been acquired, such acquisition would have constituted a Permitted Acquisition;

650

(iii)    in the case of any demerger or corporate reconstruction in respect of the Bank which entails the disposal of any shares or assets, such disposal would have been permitted in accordance with Clause (i) (*Disposals*); and

(iv)    (in the case of any amalgamation, demerger, merger, consolidation or corporate reconstruction in respect of any of the Bank's Subsidiaries), the relevant transaction constitutes a Permitted Transaction within the meaning of paragraph (c) of that definition;

(m)    *Change of business*: procure that no substantial change is made to the general nature of the business of the Bank or the Group taken as a whole from that carried on by them at the date of issue of the Senior Bonds or as otherwise contemplated by the Business Plan;

(n)    *Pari passu ranking*: ensure that its payment obligations under the Senior Bonds rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application, and that its payment obligations under the Subordinated Notes rank as provided in the applicable terms and conditions of such Subordinated Notes;

(o)    *Arm's length basis and related party transactions*:

(i)    not (and the Bank shall ensure that no member of the Group will), directly or indirectly, conduct any business, enter into or permit to exist any transaction or series of related transactions (including, without limitation, the sale, transfer, purchase, assignment, lease, conveyance or exchange of any property or the rendering of any service) with any person (including, without limitation, any Related Party) except on arm's length terms and for fair market value, other than a Permitted Transaction, and *provided that*, where such transaction is with a Related Party, the Bank has complied with the provisions of paragraph (ii) below;

(ii)    a transaction or series of related transactions between a member of the Group and a Related Party (other than an Excluded Related Party or lending by the Bank to Subsidiary and Associate Banks (BTA Bank Belarus, BTA Armenia, BTA Georgia, BTA Kazan, BTA Russia, BTA Ukraine and Subsidiary and Associate Companies BTA Securities, BTA Pension Fund, BTA Ipoteka, BTA Zhizn, BTA Zabota, BTA Insurance, JSC Subsidiary of JSC BTA Insurance Company LondonAlmaty and JSC BTA Orix Leasing within the limits set out in Clause 2 (*Financial Covenants*) of this Schedule 11 (*Covenants of the Bank*) or transactions in relation to the Recovery Assets in accordance with the terms and conditions of the Recovery Units):

(A)    which involves aggregate payments or value of U.S.$5,000,000 (or its equivalent) or less shall only be permitted if the terms of such transaction or series of related transactions have been notified in writing to the New Notes Trustee and a simple majority (comprised of disinterested directors with respect to such transaction or series of related transactions) of the Board shall have determined in good faith that the transaction or series of related transactions will be on arm's length terms (or better) and for full market value and have approved the relevant transaction or series of transactions, as evidenced by a resolution of the Board; or

(B)    which involves aggregate payments or value in excess of U.S.$5,000,000 (or its equivalent) shall only be permitted if the terms of such transaction or series of related transactions have been notified

in writing to the New Notes Trustee and a Qualified Majority shall have determined in good faith that the transaction or series of related transactions will be on arm's length terms (or better) and for full market value and have approved the relevant transaction or series of transactions, as evidenced by a resolution of the Board, and, where the aggregate payments or value exceed U.S.$75 million, shall have obtained a confirmation from an independent investment bank, accountancy firm or other consultant of recognised standing selected by the Bank and approved by the New Notes Trustee that such transaction or series of related transactions will be on arm's length terms (or better) and for full market value;

(p) *Maintenance of proper books and records*: keep, and procure that each of member of the Group keeps, (i) proper books of account and accounting records (including, for the avoidance of doubt, the annual and semi-annual financial statements and quarterly management accounts required pursuant to Clause 1 (*Financial and Other Covenants*) of this Schedule 11 (*Covenants of the Bank*) in accordance with applicable law; and (ii) so far as permitted by applicable law, allow the New Notes Trustee and anyone appointed by it to whom the Bank has no reasonable objection, access to its books of account at all reasonable times during normal business hours;

(q) *Listing*: use its reasonable endeavours to procure the admission of the Tenge New Notes on the KASE and the Non-Tenge New Notes to trading on an Approved Stock Exchange and to maintain the listing of such notes on such exchanges (including by making all disclosures required by such exchanges), but if it is unable to do so having used such endeavours or if the maintenance of such listings is agreed by the New Notes Trustee to be unduly onerous and the New Notes Trustee is satisfied that the interests of the Holders of the Non-Tenge New Notes would not be materially prejudiced thereby, the Bank shall use its reasonable endeavours to procure and maintain the listing on another stock exchange or market agreed with the New Notes Trustee;

(r) *Insurance*: maintain (and ensure that each member of the Group will maintain) at its own expense with reputable independent insurance companies or underwriters of good standing insurances on and in relation to its business and assets against those risks and to the extent as is usual for businesses carrying on the same or substantially similar business;

(s) *Remuneration of senior management and service and management contracts*: (i) ensure that the remuneration of members of the Board and of the management board of the Bank, and of the board of directors and management board of each of its Subsidiaries, are in accordance with commercially reasonable standards; (ii) ensure that there is in place in respect of each member of the Group qualified management with appropriate skills; and (iii) not enter into a Management Contract with any person unless such contact has been specifically authorised by a Qualified Majority;

(t) *Treasury transactions*:

    (i) not (and will procure that no members of the Group will) enter into any Treasury Transaction, other than:

        (A) spot and forward delivery foreign exchange contracts entered into in the ordinary course of business and not for speculative purposes; or

        (B) any Treasury Transaction entered into for the hedging of actual or projected real exposures arising in the ordinary course of trading

activities of a member of the Group and not for speculative purposes; and

(C)     any Treasury Transaction entered into in the ordinary course of the Bank's trading activities for speculative purposes, *provided that* the aggregate notional amount of contingent or actual liabilities of the Bank under any such Treasury Transactions does not exceed the greater of 10 per cent. of the Capital of the Bank or U.S.$350,000,000 at any time (by reference to, in the first Financial Year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent and, thereafter, its most recent audited annual financial statements delivered in accordance with paragraph (a) of Clause 1 (*Financial and Other Information Covenants*) of this Schedule 11 (*Covenants of the Bank*); and

(ii)     ensure that all exchange rate and interest rate hedging arrangements required to protect its open currency positions in compliance with paragraph (h) of clause 2.2 (*Financial Covenants*) of this Schedule 11 (*Covenants of the Bank*) are implemented, documented under appropriate market standard documents with the NBK or with other counterparties with a credit rating of at least BBB-or the Development Bank of Kazakhstan provided it has a credit rating of at least BB+ (or to the extent there is no such counterparty, such other counterparty with a lower credit rating with Qualified Majority approval) by Standard & Poor's or an equivalent rating by Fitch or Moody's, and that such arrangements are legal, valid, binding and enforceable obligations of such counterparty;

(u)    *Limitations on payment of dividends and share redemption*: not: (i) declare, make or pay any dividend, charge, fee or other distribution (or interest on any unpaid dividend, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its share capital (or any class of its share capital) other than a Permitted Dividend; (ii) repay or distribute any dividend or share premium reserve; (iii) pay or allow any member of the Group to pay any management, advisory or other fee other than the SK Guarantee Fee) to or to the order of any of the Shareholders of the Bank; or (iv) other than in accordance with paragraph (e) (*Restrictions or amendments to the Bank's Charter or change in share capital on the repurchase of securities*), redeem, repurchase, retire or repay any of its share capital or resolve to do so;

(v)    *Corporate governance*: comply with (and will procure that each member of the Group complies with) each of the corporate governance requirements set out in "*Description of the Share Capital of the Bank and Minority Shareholder Rights Corporate Governance Code*";

(w)    *Compliance Audit*: procure that the Independent Auditor investigates annually (with the first such investigation occurring on or about the date falling six-months after the Restructuring Date), and promptly reports on to the audit committee chaired by a Creditor Director, the Bank's compliance with the New Corporate Governance Code and internal procedures and controls, all at the Bank's cost. Any non-compliance identified in that report shall be remedied by the Bank within six months of the date of the report and shall be noted in the Bank's annual financial statements;

(x)    *Negative Pledge*: not, and not permit any Material Subsidiary to, create or permit to subsist any Security (other than Permitted Security) upon the whole or upon the whole or any part of its present or future undertaking, assets or revenues (including uncalled capital) to secure any Financial Indebtedness or guarantee of Financial Indebtedness without (i) at the same time or prior thereto securing the Senior Notes

equally and rateably therewith or (ii) providing such other security for the Senior Notes as may be approved by an Extraordinary Resolution of Holders of the Senior Bonds or as the New Notes Trustee in its absolute discretion shall deem to be not materially less beneficial to Holders of the Senior Bonds;

(y)     *Auditors*:  at all time maintain as its auditor, a "Big Four" accounting firm;

(z)     *Government Funding*:  for so long as any of the New Notes (save for the Recovery Units) remain outstanding it shall use its reasonable efforts to remain eligible for participation in programmes sponsored by the government of Kazakhstan or its agencies for funding the commercial banking sector and to participate in such programmes to the extent such funding is available on reasonable commercial terms; and

(aa)    *Further Acts*:  so far as permitted by applicable law, do such further things, including but not limited to the execution of any further documents, as may be necessary in the opinion of the New Notes Trustee to give effect to the New Notes Trust Deed in respect of the Senior Bonds.

[For the purposes of the covenants contained in this Schedule 11, the completion of the acquisition of and/or merger with Ular Umit SPF JSC, Zhetysu OOIUPA JSC, Atlanta Police IC JSC and Titan Inkassatsia LLP by any member of the Group shall be permitted and such acquisitions and/or mergers shall under no circumstances constitute or trigger a breach of any of the covenants contained herein.][38]

---

[38]     Subject to further discussion with the Steering Committee.

## SCHEDULE 12 – CONDITIONS PRECEDENT TO THE RESTRUCTURING PLAN BECOMING EFFECTIVE

1.  **Pre-Euronoteholders' meeting conditions precedent**

    Certain conditions precedent listed below need to be satisfied (in form and substance satisfactory to at least two-thirds in number of the Steering Committee) or waived by at least two-thirds in number of the Steering Committee before the first Euronoteholder meeting is held and made available for inspection by the Relevant Creditors:

    (a)   The Original Business Plan;

    (b)   The Base Case Model;

    (c)   The KPMG Provisions Report released to Restructuring Creditors who request it subject to the receipt of executed non-reliance letters in the form agreed with the Steering Committee from the recipients of its report;

    (d)   Report from Deloitte MCS Limited ("**Deloitte**") in relation to joint assessment with KPMG on loan loss provisioning relating to corporate loans released to Restructuring Creditors who request it subject to the receipt of executed reliance letters in the form agreed with the Steering Committee from the recipients of its report;

    (e)   Report from White & Case Kazakhstan LLP as previously released to the Restructuring Creditors who request it subject to the receipt of executed reliance letters from the recipients of its report;

    (f)   Report(s) from PricewaterhouseCoopers ("**PwC**") and Lovells LLP ("**Lovells**") in relation to potential claims and recoveries as previously released to the Restructuring Creditors who request it subject to the receipt of executed hold harmless letters in the form agreed with the Steering Committee from the recipients of such reports;

    (g)   Memorandum from White & Case setting out the position regarding recognition of the Restructuring Plan in the Material Jurisdictions being, Russia, Cyprus, United States, United Kingdom, Luxembourg, Netherlands, Seychelles, U.S. Virgin Islands and Kazakhstan;

    (h)   Documentation in relation to the appointment of (i) the Supervisor and (ii) the Adjudicator;

    (i)   Indemnities (from the Bank) to the New Notes Trustees, Supervisor and Adjudicator;

    (j)   Execution to the extent necessary by all parties (other than Restructuring Creditors) of the Major Restructuring Documents;

    (k)   Certified copies of the NBK Agreement and the SK Guarantee;

    (l)   At least two-thirds in number of the Steering Committee being satisfied that all relevant listings of the New Notes, Shares and GDRs including on KASE and the Luxembourg Stock Exchange can be effected and, where appropriate, ratings be obtained and such relevant instruments are clearable through Euroclear/Clearstream/DTC (assuming for these purposes that the Restructuring Date had occurred);

    (m)   Confirmation, payment instructions or other evidence of payment of all fees, costs and expenses then due from the Bank to the Steering Committee including the fees and expenses of the Steering Committee's advisers then due under the relevant appointment letters and any fees and expenses of independent third parties appointed to assist in connection with the Restructuring which are then due;

(n)    Corporate      documentation      (constitutional      documents/relevant      board resolutions/shareholder resolutions/specimen signatures/certificates) of the Bank Group has been provided to Baker & McKenzie (in relation to its legal opinion);

(o)    Confirmation from the FMSA (acceptable to the Steering Committee) that it supports the Restructuring and that it will treat the Bank no less favourably than other second-tier banks in Kazakhstan;

(p)    Confirmation from the NBK acceptable to the Steering Committee that it shall treat the Bank no less favourably than other second-tier banks in Kazakhstan and will waive any outstanding breaches under the Cooperation Agreement;

(q)    Irrevocable undertakings from BTA Finance Luxembourg that it will cast its vote at the Claimants' Meeting in favour of the Restructuring Plan;

(r)    Comfort letter from the Bank's auditors addressed to the Bank in relation to certain financial information in the Information Memorandum;

(s)    Evidence of any necessary regulatory and other approvals; and

(t)    No material adverse change in the business operations, property, condition (financial or otherwise), indebtedness or prospects of the Bank or in the international financial or capital markets compared to that envisaged by the Base Case Model or any relevant domestic financial or capital market (including devaluation of the Kazakhstan Tenge) or in the regulatory treatment as applied to the Bank.

2.    **Conditions precedent to the Restructuring becoming effective**

Conditions precedent to the Restructuring becoming effective will include the receipt by the Steering Committee of the documents and other evidence set out below, which are to be in form and substance satisfactory to at least two-thirds in number of the Steering Committee:

(a)    Following the date of the Term Sheet, no settlement of debts by any member of the Bank Group directly with the Relevant Creditors (whether by way of payment, voluntary set-off by a member of the Bank Group or otherwise), other than by means of the Restructuring and payments passed through by a member of the Bank Group to Restructuring Creditors in respect of Self-Liquidating Trade Finance Transactions.

(b)    All approvals required under the laws of Kazakhstan (including from the Claimants' Meeting, the Court, the FMSA and Samruk Kazyna) for the Deeds of Covenant and the Restructuring Documents to come into effect and be binding on the Bank Group and all Relevant Creditors and for the members of the Bank Group to be able to perform their obligations in the Restructuring Plan, the Deeds of Covenant and the Restructuring Documents.

(c)    Documentation in relation to the appointment of (i) the Independent Auditor, (ii) the Creditor Directors and (iii) the Recovery Assets Auditor.

(d)    Indemnities (from the Bank) to the Independent Auditor, Creditor Directors and the Recovery Assets Auditor.

(e)    Legal opinions from:

    (i)    White & Case, Almaty and London (as appropriate) addressed, as applicable, to the New Notes Trustee, the Depositary and the RCTFF Agent and each RCTFF Lender in relation to:

        (A)    the legal, valid and binding effect of the Bank's Charter under Kazakhstani law and the Deeds of Undertaking under Kazakhstani and English law; and

        (B)    the legality, validity and binding effect of the New Notes Trust Deed, the RCTFF Agreement, the RCTFF Collection Account Pledge, the Deposit Agreement and the Deeds of Undertaking under Kazakhstani and English laws; and

    (ii)    Baker & McKenzie addressed to the Steering Committee in relation to the Bank Creditor Loan Agreements (provided they have been executed), the RCTFF Agreement, the RCTFF Collection Account Pledge and the Deeds of Undertaking.

(f)    A ruling from Kazakhstani's tax authorities (including a certified English translation) confirming that:

    (i)    tax accumulated and other losses are retained to be set off against future trading gains for 10 years after such losses were incurred;

    (ii)    interest payments and other finance costs incurred by the Bank in respect of the New Notes and the Recovery Units will be deductible by the Bank in computing its taxable profits for Kazakhstani tax purposes, subject to any exceptions that would generally apply to the deductibility of interest payments and finance costs under the tax law of Kazakhstan; and

    (iii)    write-offs of Agreed Claims will not be treated as a taxable profit and will not negatively impact the retention of the losses described at (i) above.

(g)    Confirmation, payment instructions or other evidence that Samruk Kazyna has confirmed the appointment of the Creditor Directors and Independent Directors on the Board of Directors and other management bodies such appointments to take effect no later than the Restructuring Date.

(h)    Confirmation, payment instructions or other evidence that the Distribution Agent has received U.S.$1 billion to fund the cash payments to be made by the Bank to the Restructuring Creditors under Senior Package 1 on the Restructuring Date.

(i)    The Recoveries Assets Opening Report.

(j)    Amendments to the Bank's Charter (in accordance with *Undertakings by the Bank and Samruk Kazyna and Description of the Bank's Share Capital and Minority Shareholder Rights*") duly registered with/approved by all appropriate authorities in Kazakhstan (including, following approval by the Shareholders, approved and accepted for registration by the FMSA).

(k)    If applicable, establishment of the Bank Creditor SPVs, and the appointment of directors and managers with respect thereto and pre-funding of their anticipated costs and expenses as contemplated by this Information Memorandum.

(l)    Entry into of the remaining Deeds of Covenant and Restructuring Documents by all parties thereto.

(m)     Court orders or other equivalent rulings have been obtained in Kazakhstan, Ukraine, the United States and the United Kingdom confirming recognition of the Restructuring Plan and the Restructuring under the laws of those jurisdictions.

(n)     A copy (with a certified English translation) of all applications and other papers filed with the Court, and all orders issued by the Court, in connection with the Restructuring (to and including the order approving the Restructuring Plan, the Deeds of Covenant and Restructuring Documents following the Claimants' Meeting), a copy of the official record of the outcome of the Claimants' Meeting.

(o)     Confirmation, payment instructions or other evidence of payment of all fees, costs and expenses then due from the Bank to the Steering Committee and its advisers under the relevant appointment letters and any other independent advisers appointed by the Steering Committee in connection with the administration of the Restructuring process.

(p)     No material adverse change in the business operations, property, condition (financial or otherwise), indebtedness or prospects of the Bank or in the international financial or capital markets compared to that envisaged by the Base Case Model or any relevant domestic financial or capital market (including devaluation of the Kazakhstan Tenge) or in the regulatory treatment as applied to the Bank.

(q)     Evidence of appointment (or confirmation of appointment) of one of the "Big Four" firms as auditor of the Bank.

(r)     Publication on the Bank's website, no earlier than three Business Days prior to the Restructuring Date, of a copy of an officer's certificate confirming that the representations to be given by the Bank immediately before the occurrence of the Restructuring Date (specified in Schedule 10 (*Representations and Warranties of the Bank*)) are true and correct.[39]

(s)     Evidence that any process agent(s) required under the Deeds of Covenant and the Restructuring Documents have been appointed and have accepted such appointments.

(t)     Adoption of the New Corporate Governance Code (to cover, without limitation, the matters set out in "*Description of Bank's Share Capital and Minority Shareholder Rights – Corporate Governance Code*").

(u)     The agreed form of the periodical report to be provided by the Independent Auditor with respect to the Bank's compliance with the Governance Code (as contemplated in "*Description of Bank's Share Capital and Minority Shareholder Rights – Corporate Governance Code*").

(v)     Evidence that the Bank has opened the Recovery Units Collection Account and the RCTFF Collection Account.

For the purposes of serving (or not serving) any notice on the Bank that the conditions precedent set out in this Schedule 12 are satisfied, the Steering Committee shall:

(a)     be entitled to rely on officers' certificates and any confirmation, statement or assurance provided by any other third party or other supporting evidence without further investigation;

(b)     have the right but not the obligation to request further detail or other documents and evidence reasonably required by the Steering Committee; and

---

[39]     Contents of certificate subject to further discussion with the Steering Committee.

(c)     have the right but not the obligation to determine that a condition precedent is not satisfied if it is not in form and substance satisfactory to two-thirds of the Steering Committee.

The Steering Committee shall be entitled to waive satisfaction of any condition precedent with the approval of at least two-thirds in number of its members.

## INDEX OF FINANCIAL STATEMENTS

**Consolidated Financial Statements for the year ended 31 December 2008** . . . . . . . . . . . . . . . . . . . . . .   F-2

Independent Auditors' Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   F-3

Consolidated Balance Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   F-5

Consolidated Statement of Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   F-6

Consolidated Statement of Changes in Equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   F-7

Consolidated Statement of Cash Flows . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   F-9

Notes to the Consolidated Financial Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   F-10

**Condensed Interim Consolidated Financial Information for the Nine-Month Period Ended
30 September 2009** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   F-71

Report on Review of Interim Condensed Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . .   F-72

Interim Condensed Consolidated Statement on Financial Position . . . . . . . . . . . . . . . . . . . . . . . . . . . .   F-74

Interim Condensed Consolidated Income Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   F-75

Interim Condensed Consolidated Statement of Comprehensive Income . . . . . . . . . . . . . . . . . . . . . . . .   F-76

Interim Condensed Consolidated Statement of Changes in Equity . . . . . . . . . . . . . . . . . . . . . . . . . . . .   F-77

Interim Condensed Consolidated Statement of Cash Flows . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   F-79

Notes to Interim Condensed Consolidated Financial Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   F-81

# JSC BTA Bank and subsidiaries

## Consolidated Financial Statements

*Year ended 31 December 2008 together
with Independent Auditors' Report*



Ernst & Young LLP
Esentai Tower
Al-Farabi Ave., 77/7
Almaty, Kazakhstan

Tel:   +7 (727) 258 5960
Fax:   +7 (727) 258 5961
www.ey.com/kazakhstan

ТОО «Эрнст энд Янг»
Казахстан, Алматы
пр. Аль-Фараби, 77/7
Здание «Есентай Тауэр»

Тел.:  +7 (727) 258 5960
Факс:  +7 (727) 258 5961

**INDEPENDENT AUDITORS' REPORT**

To the shareholders and Board of Directors of JSC BTA Bank

We have audited the accompanying consolidated financial statements of JSC BTA Bank (the "Bank") and its subsidiaries (the "Group"), which comprise the consolidated balance sheet as at 31 December 2008, and the consolidated income statement, consolidated statement of changes in equity and consolidated cash flow statement for the year then ended, and a summary of significant accounting policies and other explanatory notes.

*Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with International Financial Reporting Standards. This responsibility includes: designing, implementing and maintaining internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error; selecting and applying appropriate accounting policies; and making accounting estimates that are reasonable in the circumstances.

*Auditors' Responsibility*

Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We conducted our audit in accordance with International Standards on Auditing. Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

A member firm of Ernst & Young Global Limited

 **ERNST & YOUNG**

*Opinion*

In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Group as at 31 December 2008, and its financial performance and its cash flows for the year then ended in accordance with International Financial Reporting Standards.

*Emphasis of Matter*

Without qualifying our opinion, we draw attention to Note 2 in the financial statements which indicates that the Group incurred a net loss amounting to KZT 1,188,050 million during the year ended 31 December 2008 and, as of that date, the Group's total liabilities exceeded its total assets by KZT 742,779 million. These conditions, along with other matters described in Note 2, including current defaults under debt agreements, indicate the existence of a material uncertainty which may cast significant doubt about the Group's ability to continue as a going concern.

*Ernst & Young LLP*

Evgeny Zhemaletdinov
Auditor/General Director, Ernst & Young
Ernst & Young LLC

State Audit License for audit activities on
the territory of the Republic of Kazakhstan
series МФЮ-2 No. 0000003 issued by the
Ministry of Finance of the Republic of
Kazakhstan on 15 July 2005

Auditor Qualification Certificate No. 0000553
dated 24 December 2003

8 May 2009

A member firm of Ernst & Young Global Limited

F-4

JSC BTA Bank

2008 Consolidated Financial Statements

## CONSOLIDATED BALANCE SHEET
## AS AT 31 DECEMBER

*(Millions of Kazakhstani tenge)*

| | Notes | 2008 | 2007 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | 7 | 87,893 | 99,723 |
| Obligatory reserves | 8 | 64,054 | 168,242 |
| Financial assets at fair value through profit or loss | 9 | 128,150 | 112,175 |
| Amounts due from credit institutions | 10 | 85,174 | 107,589 |
| Derivative financial assets | 11 | 21,650 | 31,397 |
| Available-for-sale investment securities | 12 | 20,482 | 26,422 |
| Loans to customers | 13 | 1,617,063 | 2,379,810 |
| Investments in associates | 14 | 72,371 | 67,767 |
| Property and equipment | | 23,704 | 13,433 |
| Goodwill | 15 | 37,421 | 37,557 |
| Current income tax assets | | 5,505 | 110 |
| Deferred income tax assets | 17 | 5,046 | 683 |
| Other assets | | 35,688 | 19,709 |
| **Total assets** | | **2,194,201** | **3,064,617** |
| | | | |
| **Liabilities** | | | |
| Amounts due to the Government and central banks | 18 | 1,718 | 913 |
| Amounts due to credit institutions | 19 | 803,366 | 835,304 |
| Amounts due to customers | 20 | 886,052 | 652,508 |
| Derivative financial liabilities | 11 | 18,789 | 5,528 |
| Debt securities issued | 21 | 1,087,726 | 1,084,445 |
| Provisions | 16 | 104,893 | 10,577 |
| Other liabilities | | 34,436 | 23,311 |
| **Total liabilities** | | **2,936,980** | **2,612,586** |
| | | | |
| **Equity** | 22 | | |
| Issued capital: common shares | | 303,456 | 303,427 |
| Treasury shares | | (1,568) | (555) |
| Available-for-sale investment securities revaluation reserve | | (1,112) | (195) |
| Foreign currency translation reserve | | (948) | 104 |
| (Accumulated deficit) / retained earnings | | (1,057,646) | 129,938 |
| Equity attributable to shareholders of the parent | | (757,818) | 432,719 |
| Minority interest | | 15,039 | 19,312 |
| **Total equity** | | **(742,779)** | **452,031** |
| **Total liabilities and equity** | | **2,194,201** | **3,064,617** |

Signed and authorized for release on behalf of the Management Board of the Bank

Anvar Saidenov        Chairman of the Board

Alma Maxutova        Chief Accountant

8 May 2009

*The accompanying notes on pages 6 to 66 are an integral part of these consolidated financial statements*

JSC BTA Bank                                    2008 Consolidated Financial Statements

# CONSOLIDATED STATEMENT OF INCOME
# FOR THE YEAR ENDED 31 DECEMBER

*(Millions of Kazakhstani Tenge)*

| | Notes | 2008 | 2007 |
|---|---|---|---|
| **Interest income** | | | |
| Loans | | 366,037 | 291,724 |
| Securities | | 12,597 | 14,587 |
| Deposits with other banks | | 17,833 | 17,137 |
| | | 396,467 | 323,448 |
| **Interest expense** | | | |
| Debt securities issued | | (95,888) | (85,683) |
| Deposits from customers | | (55,748) | (39,935) |
| Deposits and loans from credit institutions | | (56,745) | (53,661) |
| | | (208,381) | (179,279) |
| **Net interest income before impairment** | | 188,086 | 144,169 |
| Impairment charge | 10,13 | (1,094,300) | (67,810) |
| **Net interest income** | | (906,214) | 76,359 |
| | | | |
| Fee and commission income | 24 | 30,334 | 28,489 |
| Fee and commission expense | 24 | (1,179) | (1,057) |
| **Fees and commissions** | 24 | 29,155 | 27,432 |
| | | | |
| Net trading (loss)/ income | 25 | (29,769) | 2,503 |
| Gains less losses from foreign currencies: | | | |
| - dealing | | 1,665 | 2,512 |
| - translation differences | | (10,870) | 19,884 |
| Income from insurance operations | | 13,585 | 12,539 |
| Expenses from insurance operations | | (11,485) | (9,222) |
| Share of (loss)/ income of associates | 3 | (15,448) | 4,234 |
| Loss on disposal of subsidiaries | 3 | (11,252) | (249) |
| Impairment charge for available-for-sale investment securities | 12 | (42,610) | – |
| Impairment charge for goodwill | 15 | (8,107) | – |
| Impairment charge for investments in associates | | (19,138) | – |
| Other income / (loss) | | 212 | (62) |
| **Non interest (loss) / income** | | (133,217) | 32,139 |
| | | | |
| Salaries and other employee benefits | 26 | (26,597) | (25,744) |
| Other administrative and operating expenses | 26 | (27,414) | (23,400) |
| Depreciation and amortisation | | (4,435) | (2,314) |
| Taxes other than income tax | | (4,163) | (3,469) |
| Other provisions | 16 | (113,130) | (4,705) |
| Obligatory insurance of individuals' deposits | | (2,102) | (1,761) |
| **Non interest expense** | | (177,841) | (61,393) |
| | | | |
| **(Loss) / income before income tax expense** | | (1,188,117) | 74,537 |
| | | | |
| Income tax benefit/(expense) | 17 | 67 | (9,832) |
| | | | |
| **Net (loss) / income** | | (1,188,050) | 64,705 |
| Attributable to: | | | |
| Equity holders of the parent | | (1,187,584) | 61,354 |
| Minority interest | | (466) | 3,351 |
| **Net (loss) / income** | | (1,188,050) | 64,705 |
| | | | |
| Basic and diluted (loss)/ earnings per share (in Kazakhstani Tenge) | 27 | (141,878) | 8,143 |

*The accompanying notes on pages 6 to 66 are an integral part of these consolidated financial statements*

JSC BTA Bank

2008 Consolidated Financial Statements

## CONSOLIDATED STATEMENT OF CHANGES IN EQUITY
### FOR THE YEAR ENDED 31 DECEMBER 2008

*(Millions of Kazakhstani Tenge)*

| | Issued capital-common shares | Treasury stock | Available-for-sale securities revaluation reserve | Foreign currency translation reserve | Retained earnings | Total | Minority interest | Total equity |
|---|---|---|---|---|---|---|---|---|
| 1 January 2007 | 116,451 | (2,840) | 335 | (45) | 68,584 | 182,485 | 12,133 | 194,618 |
| Fair value change of available-for-sale securities, net of tax | – | – | 56 | – | – | 56 | 48 | 104 |
| Amortization of revaluation loss on available-for-sale securities reclassified to held-to-maturity securities | – | – | 106 | – | – | 106 | – | 106 |
| Release of available-for-sale securities revaluation reserve on disposal of previously revalued assets | – | – | (692) | – | – | (692) | – | (692) |
| Foreign currency translation | – | – | – | 149 | – | 149 | – | 149 |
| Total income / (loss) recognized directly in equity | – | – | (530) | 149 | – | (381) | 48 | (333) |
| Net income | – | – | – | – | 61,354 | 61,354 | 3,351 | 64,705 |
| Total income | – | – | (530) | 149 | 61,354 | 60,973 | 3,399 | 64,372 |
| Issue of common shares | 186,976 | – | – | – | – | 186,976 | – | 186,976 |
| Purchase of treasury shares | – | (3,645) | – | – | – | (3,645) | – | (3,645) |
| Sale of treasury shares | – | 5,930 | – | – | – | 5,930 | – | 5,930 |
| Contribution to subsidiaries | – | – | – | – | – | – | 8,515 | 8,515 |
| Minority interest arising on acquisition | – | – | – | – | – | – | 988 | 988 |
| Acquisition of minority interest | – | – | – | – | – | – | (5,723) | (5,723) |
| 31 December 2007 | 303,427 | (555) | (195) | 104 | 129,938 | 432,719 | 19,312 | 452,031 |

*The accompanying notes on pages 6 to 66 are an integral part of these consolidated financial statements*

JSC BTA Bank

2008 Consolidated Financial Statements

CONSOLIDATED STATEMENT OF CHANGES IN EQUITY (continued)
FOR THE YEAR ENDED 31 DECEMBER 2008

(Millions of Kazakhstani Tenge)

| | Issued capital-common shares | Treasury stock | Available-for-sale securities revaluation reserve | Foreign currency translation reserve | Accumulated deficit | Total | Minority interest | Total equity |
|---|---|---|---|---|---|---|---|---|
| 1 January 2008 | 303,427 | – | (195) | 104 | 129,938 | 432,719 | 19,312 | 452,031 |
| Fair value change of available-for-sale securities, net of tax | – | – | (261) | – | – | (261) | (58) | (319) |
| Release of available-for-sale securities revaluation reserve on disposal of previously revalued assets | – | – | (29) | – | – | (29) | 1 | (28) |
| Share of changes recognized directly in equity of an associate | – | – | (627) | – | – | (627) | – | (627) |
| Foreign currency translation | – | – | – | (1,052) | – | (1,052) | (138) | (1,190) |
| Total loss recognized directly in equity | – | – | (917) | (1,052) | – | (1,969) | (195) | (2,164) |
| Net loss | – | – | – | – | (1,187,584) | (1,187,584) | (466) | (1,188,050) |
| Total loss | – | – | (917) | (1,052) | (1,187,584) | (1,189,553) | (661) | (1,190,214) |
| Issue of common shares | 29 | – | – | – | – | 29 | – | 29 |
| Purchase of treasury shares | – | (5,508) | – | – | – | (5,508) | – | (5,508) |
| Sale of treasury shares | – | 4,495 | – | – | – | 4,495 | – | 4,495 |
| Minority interest arising on acquisition | – | – | – | – | – | – | 15 | 15 |
| Acquisition of minority interest | – | – | – | – | – | – | (3,627) | (3,627) |
| 31 December 2008 | 303,456 | (1,568) | (1,112) | (948) | (1,057,646) | (757,818) | 15,039 | (742,779) |

*The accompanying notes on pages 6 to 66 are an integral part of these consolidated financial statements*

| JSC BTA Bank | | 2008 Consolidated Financial Statements |
|---|---|---|

## CONSOLIDATED STATEMENT OF CASH FLOWS
### FOR THE YEAR ENDED 31 DECEMBER

*(Millions of Kazakhstani Tenge)*

| | Notes | 2008 | 2007 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Interest received | | 299,195 | 250,757 |
| Interest paid | | (213,316) | (164,573) |
| Income received from trading in foreign currencies | | 1,665 | 2,512 |
| Fee and commission received | | 29,257 | 28,074 |
| Fee and commission paid | | (1,174) | (538) |
| Cash paid for insurance operations | | (5,108) | (2,139) |
| Cash received from insurance operations | | 9,859 | 9,333 |
| Cash paid to employees | | (24,910) | (19,681) |
| Recovery of loans previously written-off | 10,13,16 | 4,786 | 5,822 |
| Cash paid for obligatory deposits insurance | | (2,102) | (1,761) |
| Operating expenses paid | | (30,045) | (28,849) |
| **Cash flows provided by operating activities before changes in operating assets and liabilities** | | 68,107 | 78,957 |
| **Net cash increase / decrease from operating assets and liabilities** | | | |
| Net decrease / (increase) in obligatory reserves | | 125,369 | (38,751) |
| Net (increase) / decrease in financial assets at fair value through profit or loss | | (38,390) | 109,168 |
| Net decrease / (increase) in due from credit institutions | | 9,705 | (19,471) |
| Net increase in loans to customers | | (330,564) | (1,083,061) |
| Net increase in other assets, including prepaid taxes | | (16,991) | (7,033) |
| Net increase in due to the Government and central banks | | 93,321 | 44 |
| Net increase in derivative financial instruments | | (2,961) | – |
| Net (decrease) / increase in due to credit institutions | | (62,494) | 226,124 |
| Net increase in due to customers | | 197,629 | 128,468 |
| Income tax paid | | (10,370) | (11,756) |
| Net increase in other liabilities | | 4,750 | 4,815 |
| **Net cash from / (used in) operating activities** | | 37,111 | (612,496) |
| **Cash flows from investing activities** | | | |
| Acquisition of available-for-sale investment securities | | (58,061) | (57,057) |
| Proceeds from sale of available-for-sale investment securities | | 26,905 | 77,513 |
| Acquisition of subsidiaries, net of cash paid | | 11,455 | (692) |
| Investment in associates | | (33,690) | (57,537) |
| Acquisition of minority interest | | (8,970) | (19,652) |
| Dividends received from associates | | 658 | – |
| Acquisition of property and equipment | | (5,251) | (14,774) |
| Proceeds from disposal of property and equipment | | 1,102 | 6,615 |
| **Net cash used in investing activities** | | (65,852) | (65,584) |
| **Cash flows from financing activities** | | | |
| Proceeds from debt securities issued | | 118,828 | 451,931 |
| Redemption of debt securities issued | | (96,657) | (66,997) |
| Proceeds from issue of common shares | | 29 | 186,976 |
| Contribution to subsidiaries by minority shareholders | | – | 8,515 |
| Purchase of treasury shares | | (5,508) | (3,645) |
| Proceeds from sale of treasury shares | | 4,495 | 5,930 |
| **Net cash from financing activities** | | 21,187 | 582,710 |
| Effect of exchange rate changes on cash and cash equivalents | | (4,276) | 1,453 |
| **Net increase in cash and cash equivalents** | | (11,830) | (93,917) |
| Cash and cash equivalents at beginning of the year | | 99,723 | 193,640 |
| **Cash and cash equivalents at the end of the year** | 7 | 87,893 | 99,723 |
| | | | |
| **Non-cash transactions:** | | | |
| Transfer to investments | | 6,785 | – |
| Deconsolidation of subsidiary | | (13,288) | 249 |

*The accompanying notes on pages 6 to 66 are an integral part of these consolidated financial statements*

*(Millions of Kazakhstani Tenge)*

## 1. Principal activities

JSC BTA Bank and its subsidiaries (together the "Group") provide retail and corporate banking services, insurance services, leasing and other financial services in Kazakhstan, Kyrgyzstan, Russian Federation and Belorussia. The parent company of the Group is BTA Bank (the "Bank"), a joint stock company. The Bank is incorporated and domiciled in the Republic of Kazakhstan. Note 3 lists the Bank's subsidiaries and associates.

The address of the Bank's registered office is: 97 Zholdasbekov Street, Samal-2, Almaty, 050051, Republic of Kazakhstan.

The Bank accepts deposits from the public and extends credit, transfers payments within Kazakhstan and abroad, exchanges currencies and provides other banking services to its commercial and retail customers. In addition, the Group is authorized to accept pension fund deposits. The Bank has a primary listing in the Kazakhstani Stock Exchange ("KASE"). Certain of the Group's debt securities are listed on the Luxemburg Stock Exchange and London Stock Exchange with a secondary listing on the KASE. Its head office is located in Almaty, Kazakhstan. At 31 December 2008, the Bank had 22 regional branches and 279 cash settlement units (2007 - 22 regional branches and 289 cash settlement units) located throughout Kazakhstan and representative offices in Shanghai, China; Moscow, Russia; Kiev, Ukraine; Dubai, United Arab Emirates; London, Great Britain.

As at 31 December the following shareholders held the outstanding shares:

| | 2008 | 2007 |
|---|---|---|
| Shareholders: | % | % |
| Common shares: | | |
| KT Asia Investment Group B.V. | 9.66 | 9.66 |
| Drey Associates Limited | 9.65 | 9.65 |
| Strident Energy Limited | 9.56 | 9.56 |
| InvestCapital Company LLP | 8.14 | 8.50 |
| SMKK LLP | 7.77 | 7.53 |
| Yassi Invest LLP | 7.19 | 7.19 |
| Agroinvest LLP | 7.15 | 7.15 |
| CP-CreditPriveSA | 6.74 | 6.74 |
| Makta Aral Company LLP | 6.67 | 6.96 |
| Other less than 5% | 27.47 | 27.06 |
| | 100.00 | 100.00 |

As described in more detail in Note 2, in accordance with Law of the Republic of Kazakhstan on Bank and banking activities in February 2009 Agency of the Republic of Kazakhstan on Regulation and Supervision of Financial Market and Financial Organizations (the "FMSA") made an offer to the Government of the Republic of Kazakhstan to purchase a majority interest in BTA Bank JSC. The purchase was carried out through an additional emission. As part of this emission, the Government represented by JSC "Sovereign Wealth Fund "Samruk-Kazyna""(the "controlling shareholder") purchased 25,246,343 shares at the price of KZT 8,401 per share that resulted in KZT 212,095 million invested to the Bank's equity and the share of the controlling shareholder in the Bank's equity amounted to 75.10%.

No dividends to common shareholders were paid during 2008 and 2007.

## 2. Going Concern

There has been a significant deterioration in the Group's financial position during 2008, which was identified by the current management of the Bank in 2009, principally resulting from the loss events related with the loan portfolio described in Note 5. This has lead to a breach, by the Bank and the Group, of certain prudential requirements including those related to capital adequacy set by the FMSA. As a result of these loss events the Group's total liabilities as at 31 December 2008 exceeded its total assets by KZT 742,779 million and the Group has reported a net loss amounting to KZT 1,188,050 million for the year then ended. This led the Bank to non-compliance of certain ratios, including capital adequacy ratio as calculated in accordance with Basel Capital Accord 1988 requirements.

As at 31 December 2008, the amount drawn by the Group under bond programs and loan facilities amounted to KZT 1,891,092 million. In accordance with the contractual terms of certain bond programs and loan facilities, the Bank is required to maintain certain financial ratios, particularly with regard to its liquidity, capital adequacy and lending exposures. Furthermore, the Bank is required to maintain a certain level of credit rating from major international rating agencies.

The Bank was in breach of these capital adequacy and lending exposure covenants on syndicated loans, bond programs and certain other facilities as at 31 December 2008. In addition, in April 2009, the credit ratings of the Bank from major international rating agencies have been decreased to default levels. Accordingly, certain credit facilities are in default and have become callable by the lenders. The Bank's default under these covenants resulted in accelerations and cross-defaults under the terms of the respective agreements.

*(Millions of Kazakhstani Tenge)*

## 2     Going Concern (continued)

Due to the Bank's inability to early repay all its debts as called by creditors, the Bank may not be able to meet all its obligations. Subsequent to 31 December 2008, certain lenders have requested repayment of debts amounting to USD 550 million or equivalent of KZT 83 billion, citing default and/or acceleration clauses. If those lenders continue to exercise and other lenders seek to exercise rights under acceleration and default clauses, the Bank may not be able to meet its obligations.

The Group, with the Government's support, is in the process of restructuring these debts and the Bank's controlling shareholder, Samruk Kazyna, and the management considers that the restructuring of the above facilities will be completed in 2009.

Prior to the debt restructuring, the controlling shareholder, has committed to provide funding to enable the Bank to make all interest payments on debt outstanding and to enable the Bank to continue all banking operations other than payment of principal on external debts amounting to approximately USD 13 billion or equivalent of KZT 1,570 billion. After the debt restructuring, the controlling shareholder has committed to provide to the Bank sufficient funds to enable the Bank to both repay interest and principal in accordance with restructured maturities and to continue the Bank's operations for at least a one year period from 8 May 2009.

Starting from February 2009, the controlling shareholder and the management of the Bank have been executing several initiatives aimed at improving liquidity and enabling the Group to continue its operations including, but not limited, to the following:

(a) In March 2009, the controlling shareholder purchased the Bank's bonds totaling KZT 645 billion;

(b) In 2009, significant funds were placed on current accounts  with the Group by entities owned by the controlling shareholder;

(c) the Bank is an active participant of governmental programs. Under Governmental anti-crisis programs the Group received KZT 40 billion to refinance mortgage loans, KZT 22 billion to finance medium and small size entities and KZT 20 billion to complete construction projects. Furthermore the Bank is a key financial institution for realization of stabilization and support of a real sector of economy.

(d) The controlling shareholder is looking for a strategic investor in the Bank's equity;

(e) The Group is negotiating with FMSA a grace period to give the Bank time to restructure its debt and get its banking ratios in line with the requirements of FMSA.

Because of the negative events described above there is a material uncertainty which may cast significant doubt about the Bank's ability to continue as a going concern. Therefore, the Bank may be unable to realize its assets and discharge its liabilities in the normal course of business. These consolidated financial statements of the Group have been prepared on a going concern basis that contemplates the realization of restructuring of its long-term debt and continued adequate support from the controlling shareholder of the Bank.

These consolidated financial statements do not include any adjustments relating to the recoverability and classification of recorded assets and classification of liabilities that might be necessary if the restructuring of debt is unsuccessful and adequate additional resources are not available, the Bank is unable to continue as a going concern.

## 3.    Basis of preparation

### Statement of compliance

These consolidated financial statements have been prepared in accordance with International Financial Reporting Standards ("IFRS") which comprise standards and interpretations approved by the International Accounting Standards Board, and International Accounting Standards ("IAS") and Standing Interpretations Committee interpretations ("SIC") approved by the International Accounting Standards Committee that remain in effect.

### General

These financial statements are presented in millions of Kazakh Tenge ("KZT"), except per share amounts and unless otherwise indicated. The KZT is utilized as the shareholders, the managers and the regulators measure the Group's performance in KZT. In addition, the KZT, being the national currency of the Republic of Kazakhstan, is the currency that reflects the economic substance of the underlying events and circumstances relevant to the Group. Significant foreign currency positions are maintained as they are necessary to meet customers' requirements, manage foreign currency risks and achieve a proper assets and liabilities structure for the Group's balance sheet. Transactions in other currencies are treated as transactions in foreign currencies.

JSC BTA Bank                              Notes to the 2008 Consolidated Financial Statements (continued)

*(Millions of Kazakhstani Tenge)*

## 3.   Basis of preparation (continued)

**General (continued)**

The consolidated financial statements are prepared under the historical cost convention modified for the measurement at fair value of available-for-sale investment securities, financial assets at fair value through profit or loss and derivative contracts as required by IAS 39 "Financial Instruments: Recognition and Measurement".

**Reclassifications**

The following reclassifications have been made to 2007 balances to conform to the 2008 presentation:

| December 31, 2007 | As previously reported | Reclassification | As reported herein | Comment |
|---|---|---|---|---|
| *Balance sheet:* | | | | |
| Provisions | – | 10,577 | 10,577 | Reclassification of provisions on commitments and contingencies to provisions from other liabilities. |
| Other liabilities | 33,888 | (10,577) | 23,311 | |

**Consolidated subsidiaries**

The consolidated financial statements include the following subsidiaries:

| Subsidiary | Holding, % December 31 2008 | 2007 | Country | Date of incorporation | Industry | Date of acquisition |
|---|---|---|---|---|---|---|
| JSC Subsidiary of JSC BTA Bank BTA Securities | 100.00% | 100.00% | Kazakhstan | 17.10.97 | Securities trading and asset management | 13.12.97 |
| JSC Subsidiary of JSC BTA Bank Accumulative Pension Fund BTA Kazakhstan | 95.20% | 76.83% | Kazakhstan | 11.12.97 | Pension fund | 16.09.98 |
| JSC BTA Ipoteka Subsidiary Mortgage company of JSC BTA Bank | 100.00% | 100.00% | Kazakhstan | 20.11.00 | Consumer mortgage lending | 20.11.00 |
| JSC Subsidiary Life Insurance company of BTA Bank JSC BTA Zhizn | 100.00% | 100.00% | Kazakhstan | 22.07.99 | Life and annuity insurance | 30.03.01 |
| JSC Subsidiary insurance company of BTA Bank JSC BTA Zabota | 98.17% | 98.17% | Kazakhstan | 10.09.96 | Health insurance | 04.04.01 |
| TuranAlem Finance B.V. | 100.00% | 100.00% | Netherlands | 22.05.01 | Capital markets | 22.05.01 |
| LLC Subsidiary of BTA Bank JSC TuranAlem Finance | 100.00% | 100.00% | Russia | 22.06.04 | Capital markets | 28.09.04 |
| JSC Subsidiary of JSC BTA Bank Insurance Company London-Almaty | 99.40% | 99.40% | Kazakhstan | 20.11.97 | Property and Liability insurance | 05.08.04 |
| BTA Finance Luxembourg S.A. | 86.11% | 86.11% | Luxembourg | 05.01.06 | Capital markets | 06.03.06 |
| BTA Insurance JSC Subsidiary company of JSC BTA Bank | 100.00% | 100.00% | Kazakhstan | 08.09.98 | Property and Liability insurance | 21.12.06 |
| JSC Subsidiary of JSC BTA Bank TemirBank | 69.85% | 64.32% | Kazakhstan | 26.03.92 | Bank activities | 29.12.06 |
| TemirCapital B.V. | 100.00% | 100.00% | Netherlands | 29.05.01 | Operations on capital markets | 29.12.06 |
| BTA Bank CJSC | 71.00% | 71.00% | Kyrgyzstan | 02.12.96 | Bank activities | 19.11.07 |
| BTA Bank CJSC | 99.29% | – | Belorussia | 25.04.02 | Bank activities | 30.10.08 |
| LLC BTA Finance (subsidiary of BTA Bank JSC) | – | 100.00% | Russia | 27.11.06 | Operations on capital markets | 27.11.06 |
| LLC BTA Capital (subsidiary of BTA Bank JSC) | – | 100.00% | Russia | 27.11.06 | Operations on capital markets | 27.11.06 |

JSC BTA Bank                                         Notes to the 2008 Consolidated Financial Statements (continued)

*(Millions of Kazakhstani Tenge)*

### 3.    Basis of preparation (continued)

**Consolidated subsidiaries (continued)**

| Subsidiary | Holding,% December 31 | | Country | Date of incorporation | Industry | Date of acquisition |
| --- | --- | --- | --- | --- | --- | --- |
| | **2008** | **2007** | | | | |
| First Kazakh Securitization Company | – | – | Netherlands | 08.12.05 | Securitization of financial assets | – |
| Second Kazakh Securitization Company | – | – | Netherlands | 25.09.07 | Securitization of financial assets | – |
| BTA DPR Finance Company | – | – | Cayman Islands | 02.09.07 | Financial services | 02.09.07 |

In October 2008, the Bank finalized the acquisition of additional 50.3% equity interest in BTA Bank CJSC (Belorussia) (former Astanaeximbank CJSC) for KZT 3,501 million. As a result of the acquisition the Bank's interest in BTA Bank CJSC (Belorussia) increased to 99.29%, which provided the Bank with effective control and enabled the Bank to treat BTA Bank CJSC (Belorussia) as a subsidiary starting from November 2008. BTA Bank CJSC (Belorussia) was incorporated as a closed joint stock company and operates in Belorussia. Refer to Note 6 for the fair value of the identifiable assets and liabilities acquired and goodwill arising at the date of acquisition. Before the Group took over the effective control over the operations of CJSC BTA Bank (Belorussia), it was accounted as an associate under equity method.

In December 2008, JSC Accumulative Pension Fund BTA Kazakhstan, the Bank's subsidiary, authorized to issue 5,000,000 common shares. As at 31 December 2008, 3,841,585 common shares were issued and paid by the Bank. As a result the Group's share in JSC Accumulative Pension Fund BTA Kazakhstan has increased to 95.20%. Gain from increase of Group's share amounted to KZT 843 million.

In 2007, the Group increased its ownership in its subsidiary JSC TemirBank from 50.80% to 64.32% for KZT 30,205 million. During 2008 the Bank increased its ownership in subsidiary of JSC BTA Bank JSC TemirBank from 64.32% to 69.85%.

In November 2007, the Group increased its ownership in CJSC BTA Bank Kyrgyzstan from 46.00% to 71.00% for KZT 925 million, which enabled the Group to take over the effective control over the operations of CJSC BTA Bank and to consider it as a subsidiary as at 31 December 2007. CJSC BTA Bank was incorporated as a closed joint stock company and operates in Kyrgyzstan. Before the Group took over the effective control over the operations of CJSC Ineximbank, it was accounted as an associate under equity method. The Group's share in income of CJSC Ineximbank for 2007 amounted to KZT 151 million.

In 2006, the Group established in Russian Federation two 100% owned subsidiaries, BTA Finance and BTA Capital, as limited liability companies (LLC). In October 2007, the Board of Directors made a decision to close LLC BTA Finance (subsidiary of BTA Bank JSC) and LLC BTA Capital (subsidiary of BTA Bank JSC). There were no operations in those subsidiaries starting from the date of incorporation. In 2008, these subsidiaries were liquidated.

Although the Group did not own any shares in First Kazakh Securitisation Company, Second Kazakh Securitisation Company and in BTA DPR Finance Company, as at and for the years ended 31 December 2008 and 2007 they were treated, in accordance with SIC-12 "Consolidation – Special Purpose Entities", as subsidiaries, because at those dates the Group controlled and benefited directly from operations of these entities.

JSC BTA Bank                                                Notes to the 2008 Consolidated Financial Statements (continued)

*(Millions of Kazakhstani Tenge)*

## 3.    Basis of preparation (continued)

Associates accounted for under equity method

The following associates are accounted for under the equity method and included into investments in associates:

| *2008* | | | | Share in net income / (loss) | Total assets | Total liabilities | Equity |
|---|---|---|---|---|---|---|---|
| *Associates* | *Holding, %* | *Country* | *Activities* | | | | |
| BTA Bank LLC | 22.26% | Russia | Bank | (18,827) | 196,389 | 236,125 | (39,736) |
| BTA Bank OJSC (Ukraine) | 49.99% | Ukraine | Bank | – | 35,418 | 11,607 | 23,811 |
| BTA Bank JSC (Georgia) | 49.00% | Georgia | Bank | 48 | 11,542 | 8,530 | 3,012 |
| BTA Bank CJSC (Armenia) | 48.93% | Armenia | Bank | (195) | 5,202 | 3,030 | 2,172 |
| JSCB BTA Kazan OJSC | 47.32% | Russia | Bank | 376 | 37,770 | 28,943 | 8,827 |
| BTA ORIX Leasing JSC | 45.00% | Kazakhstan | Leasing | 34 | 6,047 | 3,922 | 2,125 |
| Temir Leasing JSC | 45.63% | Kazakhstan | Leasing | 41 | 4,070 | 1,874 | 2,196 |
| Sekerbank | 33.98% | Turkey | Bank | 3,185 | 653,616 | 578,808 | 74,808 |

In December 2008, the Bank finalized the acquisition of additional equity interest in BTA Bank OJSC (Ukraine) in the amount of 40.038% for KZT 27,301 million. As a result the Bank's interest in BTA Bank OJSC (Ukraine) increased to 49.99%, which provided the Bank with significant influence on operations of BTA Bank OJSC (Ukraine) and enabled the Bank to treat BTA Bank OJSC (Ukraine) as an associated bank.

In July 2008, the Group acquired additional 38.64% of the statutory fund in BTA Bank LLC (Russia), which resulted in increase of the Group's interest to 52.84% and provided the Group with a controlling interest. In November 2008, BTA Bank LLC (Russia) issued additional shares in the amount of RUR 7,200 million (equivalent of KZT 31,968 million). The Bank did not use its preemptive right to purchase these shares. As a result the Bank's share in BTA Bank LLC (Russia) decreased to 22.26% resulting in a loss from deemed disposal in the amount of KZT 12,095 million.

In December 2007, the Bank acquired 25%+ 1 share ownership in Oranta NJSIC OJSC for KZT 11,943 million. In September 2005, shareholders of Oranta NJSIC OJSC made a decision to increase share capital by UAH 79.7 million. In February 2006, the shares were placed between shareholders existing at that date. However, in accordance with legislation of Ukraine the share capital can be increased only after the share issue is registered with regulatory bodies. The registration and consequent increase in share capital took place in March 2008. The Bank did not participate in this share issue since it was not a shareholder when the decision on increase in share capital was made in 2005. Therefore, the increase in share capital of Oranta NJSIC OJSC has been diluted and decreased from 25.00% as at 31 December 2007 to 14.01% as at 31 December 2008.

In November 2008, the Group acquired an additional equity interest in TemirLeasing JSC, as a result the Group's equity interest in TemirLeasing JSC increased to 45.63%.

In May 2008, BTA Silk Road Bank JSC was renamed as BTA Bank JSC (Georgia).

In December 2008, BTA InvestBank CJSC was renamed as BTA Bank CJSC (Armenia).

| *2007* | | | | Share in net income | Total assets | Total liabilities | Equity |
|---|---|---|---|---|---|---|---|
| *Associates* | *Holding, %* | *Country* | *Activities* | | | | |
| BTA Bank CJSC (Belorussia) | 49.00% | Belorussia | Bank | 50 | 10,707 | 9,263 | 1,444 |
| BTA Bank JSC (Georgia) | 49.00% | Georgia | Bank | 243 | 13,330 | 10,679 | 2,651 |
| BTA Bank CJSC (Armenia) | 48.87% | Armenia | Bank | 114 | 7,114 | 4,911 | 2,203 |
| JSCB BTA Kazan JSC | 47.32% | Russia | Bank | 308 | 43,028 | 36,831 | 6,197 |
| BTA ORIX Leasing JSC | 45.00% | Kazakhstan | Leasing | 141 | 7,390 | 5,323 | 2,067 |
| Temir Leasing JSC | 43.87% | Kazakhstan | Leasing | 64 | 7,643 | 3,032 | 4,611 |
| Sekerbank | 33.98% | Turkey | Bank | 3,163 | 626,637 | 537,603 | 89,034 |
| Oranta NJSIC OJSC | 25.00% | Ukraine | Insurance | – | 15,526 | 6,630 | 8,896 |

F-14

*(Millions of Kazakhstani Tenge)*

## 4.    Summary of significant accounting policies

### Changes in accounting policies

The Group has adopted the following amended IFRS and new IFRIC Interpretations during the year. The principal effects of these changes are as follows:

*IFRIC 11 "IFRS 2 – Group and Treasury Share Transactions"*

IFRIC 11 became effective for annual periods beginning on or after 1 March 2007. It requires arrangements whereby an employee is granted rights to an entity's equity instruments to be accounted for as an equity-settled scheme, even if the entity buys the instruments from another party, or the shareholders provide the equity instruments needed. This Interpretation had no impact on the Group.

*IFRIC 12 "Service Concession Arrangements"*

IFRIC 12 was issued in November 2006 and became effective for annual periods beginning on or after 1 January 2008. This Interpretation applies to service concession operators and explains how to account for the obligations undertaken and rights received in service concession arrangements. No member of the Group is an operator and hence this Interpretation had no impact on the Group.

*IFRIC 14 "IAS 19 – The Limit on a Defined Benefit Asset, Minimum Funding Requirements and their Interaction"*

IFRIC 14 was issued in July 2007 and became effective for annual periods beginning on or after 1 January 2008. This Interpretation provides guidance on how to assess the limit on the amount of surplus in a defined benefit scheme that can be recognized as an asset under IAS 19 Employee Benefits. This Interpretation had no impact on the financial position or performance of the Group.

*Reclassification of Financial Assets – Amendments to IAS 39 "Financial instruments: Recognition and measurement" and IFRS 7 "Financial instruments: Disclosures"*

Amendments to IAS 39 and IFRS 7 were issued on 13 October 2008 and allow reclassification of non-derivative financial assets out of the held for trading category in particular circumstances. The amendments also allow transfer of certain financial assets from the available for sale category to loans and receivables category. The effective date of those amendments is 1 July 2008. Any reclassification made in periods beginning on or after 1 November 2008 shall take effect only from the date when the reclassification is made. Reclassifications are disclosed in Note 12.

### New IFRSs and IFRIC interpretations not yet effective

*Standards and interpretations issued but not yet effective*

*Improvements to IFRS*

In May 2008, the IASB issued amendments to IFRS, which resulted from the IASB's annual improvements project. They comprise amendments that result in accounting changes for presentation, recognition or measurement purposes as well as terminology or editorial amendments related to a variety of individual IFRS standards. Most of the amendments are effective for annual periods beginning on or after 1 January 2009, with earlier application permitted. The Group is currently evaluating the potential impact that the adoption of the amendments will have on its consolidated financial statements.

*IAS 1 Presentation of Financial Statements (Revised)*

A revised IAS 1 was issued in September 2007, and becomes effective for annual periods beginning on or after 1 January 2009. This revised Standard separates owner and non-owner changes in equity. The statement of changes in equity will include only details of transactions with owners, with non-owner changes in equity presented as a single line. In addition, the Standard introduces the statement of comprehensive income: it presents all items of recognised income and expense, either in one single statement, or in two linked statements. The Group is still evaluating whether it will have one or two statements.

JSC BTA Bank            Notes to the 2008 Consolidated Financial Statements (continued)

*(Millions of Kazakhstani Tenge)*

## 4.   Summary of significant accounting policies (continued)

**New IFRSs and IFRIC interpretations not yet effective (continued)**

*Standards and interpretations issued but not yet effective (continued)*

*IAS 23 "Borrowing Costs" (Revised)*

A revised IAS 23 Borrowing costs was issued in March 2007, and becomes effective for financial years beginning on or after 1 January 2009. The standard has been revised to require capitalisation of borrowing costs when such costs relate to a qualifying asset. A qualifying asset is an asset that necessarily takes a substantial period of time to get ready for its intended use or sale. In accordance with the transitional requirements in the Standard, the Group will adopt this as a prospective change. Accordingly, borrowing costs will be capitalised on qualifying assets with a commencement date after 1 January 2009. No changes will be made for borrowing costs incurred to this date that have been expensed.

*Amendments to IAS 32 "Financial Instruments: Presentation" and IAS 1 "Presentation of Financial Statements" – Puttable Financial Instruments and Obligations Arising on Liquidation*

These amendments were issued in February 2008, and become effective for annual periods beginning on or after 1 January 2009. The amendments require puttable instruments that represent a residual interest in an entity to be classified as equity, provided they satisfy certain conditions. The Group does not expect that these amendments will have an impact on the Group's financial statements.

*Amendment to IAS 39 "Financial Instruments: recognition and measurement" - Eligible Hedged Items.*

The amendment to IAS 39 was issued in August 2008, and becomes effective for annual periods beginning on or after 1 July 2009. The amendment addresses the designation of a one-sided risk in a hedged item, and designation of inflation as a hedged risk or portion in particular situations. It clarifies that an entity is permitted to designate a portion of the fair value changes or cash flow variability of a financial instrument as hedged item. The Group does not expect the amendment to IAS 39 will affect the Group's financial statements as the Group has not entered into any such hedges.

*Amendments to IFRS 1 "First-time Adoption of IFRSs" and IAS 27 "Consolidated and Separate Financial Statements" - Cost of an Investment in a Subsidiary, Jointly Controlled Entity or Associate*

These amendments were issued in May 2008, and become effective for annual periods beginning on or after 1 January 2009. The revision to IAS 27 will have to be applied prospectively. The amendments to IFRS 1 allow an entity to determine the cost of investments in a subsidiary, jointly controlled entity or associate as at the date of transition to IFRS in accordance with IAS 27 or using a deemed cost. The amendment to IAS 27 requires all dividends from a subsidiary, jointly controlled entity or associate to be recognized in the income statement in the separate financial statements. The new requirements affect only the separate financial statements and do not have an impact on the consolidated financial statements.

*Amendments to IFRS 2 "Share-based Payment"- Vesting Conditions and Cancellations*

Amendment to IFRS 2 were issued in January 2008 and become effective for annual periods beginning on or after 1 January 2009. This amendment clarifies the definition of vesting conditions and prescribes the accounting treatment of an award that is effectively cancelled because a non-vesting condition is not satisfied. The Group did not enter into such type of transactions, accordingly, these amendments have no impact on the financial statements of the Group.

*IFRS 3 "Business Combinations" (revised) and IAS 27 "Consolidated and Separate Financial Statements" (revised).*

The revised standards were issued in January 2008 and become effective for financial years beginning on or after 1 July 2009. Revised IFRS 3 introduces a number of changes in the accounting for business combinations that will impact the amount of goodwill recognised, the reported results in the period that an acquisition occurs, and future reported results. Revised IAS 27 requires that a change in the ownership interest of a subsidiary is accounted for as an equity transaction. Therefore, such a change will have no impact on goodwill, nor will it give rise to a gain or loss. Furthermore, the revised standard changes the accounting for losses incurred by the subsidiary as well as the loss of control of a subsidiary. The changes introduced by the revised Standards must be applied prospectively and will affect only future acquisitions and transactions with minority interests.

*(Millions of Kazakhstani Tenge)*

## 4.    Summary of significant accounting policies (continued)

**New IFRSs and IFRIC interpretations not yet effective (continued)**

*Standards and interpretations issued but not yet effective (continued)*

*IFRS 8 "Operating Segments"*

IFRS 8 becomes effective for annual periods beginning on or after 1 January 2009. This Standard requires disclosure of information about the Group's operating segments and replaces the requirement to determine primary (business) and secondary (geographical) reporting segments of the Group. The Group is currently evaluating the potential impact that this standard will have on its consolidated financial statements.

*IFRIC 13 "Customer Loyalty Programmes"*

IFRIC Interpretation 13 was issued in June 2007 and becomes effective for annual periods beginning on or after 1 July 2008. This Interpretation requires customer loyalty award credits to be accounted for as a separate component of the sales transaction in which they are granted and therefore part of the fair value of the consideration received is allocated to the award credits and deferred over the period that the award credits are fulfilled. The Group expects that this interpretation will have no impact on the Group's financial statements as no such schemes currently exist.

*IFRIC 15 "Agreements for the Construction of Real Estate"*

IFRIC Interpretation 15 was issued in July 2008 and is applicable retrospectively for annual periods beginning on or after 1 January 2009. IFRIC 15 clarifies when and how revenue and related expenses from the sale of a real estate unit should be recognized if an agreement between a developer and a buyer is reached before the construction of the real estate is completed. The interpretation also provides guidance on how to determine whether an agreement is within the scope of IAS 11 "Construction Contracts" or IAS 18 "Revenue" and supersedes the current guidance for real estate in the Appendix to IAS 18. The Group expects that this interpretation will have no impact on the Group's financial statements.

*IFRIC 16 "Hedges of a Net Investment in a Foreign Operation"*

IFRIC Interpretation 16 was issued in July 2008 and is applicable for annual periods beginning on or after 1 October 2008. This Interpretation provides guidance on identifying the foreign currency risks that qualify for hedge accounting in the hedge of net investment, where within the group the hedging instrument can be held and how an entity should determine the amount of foreign currency gain or loss, relating to both the net investment and the hedging instrument, to be recycled on disposal of the net investment. The Group expects that this interpretation will have no impact on the Group's financial statements.

*IFRIC 17 "Distribution of Non-Cash Assets to Owners"*

IFRIC Interpretation 17 was issued on 27 November 2008 and is effective for annual periods beginning on or after 1 July 2009. This interpretation applies to pro rata distributions of non-cash assets to owners except for common control transactions and requires that a dividend payable should be recognised when the dividend is appropriately authorised; an entity should measure the dividend payable at the fair value of the net assets to be distributed; an entity should recognise the difference between the dividend paid and the carrying amount of the net assets distributed in profit or loss. The Interpretation also requires an entity to provide additional disclosures if the net assets being held for distribution to owners meet the definition of a discontinued operation. The Group expects that this interpretation will have no impact on the Group's financial statements.

*IFRIC 18 Transfers of Assets from Customers*

IFRIC 18 was issued in January 2009 and becomes effective for financial years beginning on or after 1 July 2009 with early application permitted, provided valuations were obtained at the date those transfers occurred. This interpretation should be applied prospectively. IFRIC 18 provides guidance on accounting for agreements in which an entity receives from a customer an item of property, plant and equipment that the entity must then use either to connect the customer to a network or to provide the customer with ongoing access to a supply of goods or services or to do both. The interpretation clarifies the circumstances in which the definition of an asset is met, the recognition of the asset and its measurement on initial recognition, the identification of the separately identifiable services, the recognition of revenue and the accounting for transfers of cash from customers. The Group expects that this interpretation will have no impact on the Group's consolidated financial statements.

*(Millions of Kazakhstani Tenge)*

## 4.    Summary of significant accounting policies (continued)

**New IFRSs and IFRIC interpretations not yet effective (continued)**

*Standards and interpretations issued but not yet effective (continued)*

*Amendments to IFRS 7 "Improving Disclosures about Financial Instruments"*

Amendments to IFRS 7 "Improving Disclosures about Financial Instruments" were issued in March 2009 and become effective for periods beginning on or after 1 January 2009 with early application permitted. These Amendments introduce a three-level fair value disclosure hierarchy that distinguishes fair value measurements by the significance of the inputs used. In addition, the amendments enhance disclosure requirements on the nature and extent of liquidity risk arising from financial instruments to which an entity is exposed. The Group is currently evaluating the potential impact that this standard will have on its consolidated financial statements.

**Basis of consolidation**

Subsidiaries, which are those entities in which the Group has an interest of more than one half of the voting rights, or otherwise has power to exercise control over their operations, are consolidated. Subsidiaries are consolidated from the date on which control is transferred to the Group and are no longer consolidated from the date that control ceases. All intragroup transactions, balances and unrealised gains on transactions between group companies are eliminated in full; unrealised losses are also eliminated unless the transaction provides evidence of an impairment of the asset transferred. Where necessary, accounting policies for subsidiaries have been changed to ensure consistency with the policies adopted by the Group.

*Acquisition of subsidiaries*

The purchase method of accounting is used to account for the acquisition of subsidiaries by the Group. Identifiable assets acquired and liabilities and contingent liabilities assumed in a business combination are measured initially at their fair values at the acquisition date, irrespective of the extent of any minority interest.

The excess of purchase consideration over the Group's share in the net fair value of the identifiable assets, liabilities and contingent liabilities is recorded as goodwill. If the cost of the acquisition is less than the Group's share in the net fair value of the identifiable assets, liabilities and contingent liabilities of the subsidiary acquired the difference is recognised directly in the consolidated statement of income.

Minority interest is the interest in subsidiaries not held by the Group. Minority interest at the balance sheet date represents the minority shareholders' share in the net fair value of the identifiable assets, liabilities and contingent liabilities of the subsidiary at the acquisition date and the minorities' share in movements in equity since the acquisition date. Minority interest is presented within equity.

Losses allocated to minority interest do not exceed the minority interest in the equity of the subsidiary unless there is a binding obligation of the minority to fund the losses. All such losses are allocated to the Group.

*Increases in ownership interests in subsidiaries*

The differences between the carrying values of net assets attributable to interests in subsidiaries acquired and the consideration given for such increases are charged or credited to goodwill.

**Investments in associates**

Associates are entities in which the Group generally has between 20% and 50% of the voting rights, or is otherwise able to exercise significant influence, but which it does not control or jointly control. Investments in associates are accounted for under the equity method and are initially recognised at cost, including goodwill. Subsequent changes in the carrying value reflect the post-acquisition changes in the Group's share of net assets of the associate. The Group's share of its associates' profits or losses is recognised in statement of income, and its share of movements in reserves is recognised in equity. However, when the Group's share of losses in an associate equals or exceeds its interest in the associate, the Group does not recognise further losses, unless the Group is obliged to make further payments to, or on behalf of, the associate.

Unrealised gains on transactions between the Group and its associates are eliminated to the extent of the Group's interest in the associates; unrealised losses are also eliminated unless the transaction provides evidence of an impairment of the asset transferred.

F-18