# EXHIBIT 9

CONFORMED COPY REFLECTING THE AMENDMENTS
MADE BY THE SUPPLEMENTAL TRUST DEED DATED
1 DECEMBER 2010

# WHITE & CASE

25 August 2010

## TRUST DEED

### relating to:

**U.S.$2,082,371,783 Senior Notes due 2018**

**KZT32,604,173,503 Senior Notes due 2018**

**U.S.$ 384,848,130 Fully Accreted Principal Amount of Original Issue Discount Notes due 2021**

**EUR437,110,856 Fully Accreted Principal Amount of Original Issue Discount Notes due 2021**

**U.S.$496,631,368 7.20 per cent. Subordinated Notes due 2025**

**EUR28,237,359 6.75 per cent. Subordinated Notes due 2025**

**KZT7,396,248,930 11.20 per cent. Subordinated Notes due 2025**

**KZT28,000,000,000 8.0 per cent. Subordinated Notes due 2030**

**U.S.$5,221,494,216 aggregate initial Reference Amount of Recovery Units**

**"BTA BANK" JSC**
as Bank

and

**BNY CORPORATE TRUSTEE SERVICES LIMITED**
as Trustee

White & Case LLP
5 Old Broad Street
London  EC2N 1DW

**TABLE OF CONTENTS**

Page

1.   INTERPRETATION..................................................................................................1

2.   AMOUNT OF THE NOTES AND COVENANT TO PAY .................................23

3.   FORM OF THE NOTES .......................................................................................26

4.   SECURITY INTERESTS......................................................................................28

5.   STAMP DUTIES...................................................................................................35

6.   APPLICATION OF MONEYS RECEIVED BY THE TRUSTEE.......................36

7.   ENFORCEMENT..................................................................................................37

8.   COVENANTS .......................................................................................................38

9.   REMUNERATION AND INDEMNIFICATION OF THE TRUSTEE.................60

10.  PROVISIONS SUPPLEMENTAL TO THE TRUSTEE ACT 1925 AND THE TRUSTEE
     ACT 2000 .............................................................................................................62

11.  TRUSTEE LIABLE FOR NEGLIGENCE...........................................................68

12.  TRUSTEE NOT PRECLUDED FROM ENTERING INTO CONTRACTS..........69

13.  WAIVER AND PROOF OF DEFAULT...............................................................69

14.  MODIFICATION AND SUBSTITUTION ...........................................................69

15.  APPOINTMENT, RETIREMENT AND REMOVAL OF THE TRUSTEE .........72

16.  CURRENCY INDEMNITY .................................................................................73

17.  COMMUNICATIONS ..........................................................................................74

18.  FURTHER ISSUES ..............................................................................................75

19.  NOTES HELD IN CLEARING SYSTEMS..........................................................75

20.  GOVERNING LAW; ARBITRATION AND JURISDICTION ...........................75

21.  SEVERABILITY ..................................................................................................76

22.  COUNTERPARTS ................................................................................................77

SCHEDULE 1 FORM OF DEFINITIVE NOTE CERTIFICATE .................................78

SCHEDULE 2 FORMS OF GLOBAL NOTE................................................................85
      Part 1 Form of Unrestricted Global Note.............................................................85
      Part 2 Form of Restricted Global Note ...............................................................92

SCHEDULE 3 PROVISIONS FOR MEETINGS OF NOTEHOLDERS .......................99

SCHEDULE 4 TERMS AND CONDITIONS OF THE NOTES..................................110
      Part 1 Terms and Conditions of the Senior Dollar Notes...................................110
      Part 2 Terms and Conditions of the Senior Tenge Notes...................................130
      Part 3 Terms and Conditions of the Dollar Original Issue Discount Notes.........150
      Part 4 Terms and Conditions of the Euro Original Issue Discount Notes ...........171
      Part 5 Terms and Conditions of the Dollar Subordinated Notes.........................192
      Part 6 Terms and Conditions of the Euro Subordinated Notes ...........................207
      Part 7 Terms and Conditions of the Subordinated Tenge A Notes......................222
      Part 8 Terms and Conditions of the Subordinated Tenge B Notes ......................237
      Part 9 Terms and Conditions of the Recovery Units ..........................................251

SCHEDULE 5 FORMS OF NOTICES AND ACKNOWLEDGEMENT ......................................... 275
    **Part 1** Form of Notice of Charge of the Collection Account ................................................ 275
    **Part 2** Form of Acknowledgment of Notice of Charge of the Collection Account .............. 277
    **Part 3** Form of Notice of Assignment of the Cash Management Agreement ....................... 279
    **Part 4** Form of Acknowledgment of Notice of Assignment of the Cash Management
          Agreement .......................................................................................................... 280

SCHEDULE 6 TRUSTEE'S POWERS IN RELATION TO THE CHARGED PROPERTY .......... 281

SCHEDULE 7 FORM OF CERTIFICATE OF RESIDENCY ......................................................... 282

SCHEDULE 8 RESTRUCTURING DOCUMENTS ...................................................................... 283

**THIS TRUST DEED** is made on 25 August 2010

**BETWEEN:**

(1)     **"BTA BANK" JSC** a joint stock company incorporated in accordance with the laws of the Republic of Kazakhstan, with registered number 39031900 AO, whose registered office is at 97, Dzholdasbekov str., Samal-2, Kazakhstan, 050051, Almaty, Kazakhstan (the "**Bank**"); and

(2)     **BNY CORPORATE TRUSTEE SERVICES LIMITED** of One Canada Square, London E14 5AL, United Kingdom (the "**Trustee**", which expression, where the context so admits, includes any other trustee for the time being of this Trust Deed).

**WHEREAS:**

(A)     The Bank has authorised the issue of U.S.$2,082,371,783 senior notes due 2018 (the "**Senior Dollar Notes**"), KZT32,604,173,503 senior notes due 2018 (the "**Senior Tenge Notes**" and, together with the Senior Dollar Notes, the "**Senior Notes**"), U.S.$384,848,130 Fully Accreted Principal Amount of original issue discount notes due 2021 (the "**Dollar Original Issue Discount Notes**"), EUR437,110,856 Fully Accreted Principal Amount of original issue discount notes due 2021 (the "**Euro Original Issue Discount Notes**" and, together with the Dollar Original Issue Discount Notes, the "**Original Issue Discount Notes**"), U.S.$496,631,368 7.20 per cent. subordinated notes due 2025 (the "**Dollar Subordinated Notes**"), EUR28,237,359 6.75 per cent. subordinated notes due 2025 (the "**Euro Subordinated Notes**"), the KZT7,396,248,930 11.20 per cent. subordinated notes due 2025 (the "**Subordinated Tenge A Notes**"), the KZT28,000,000,000 8.0 per cent. subordinated notes due 2030 (the "**Subordinated Tenge B Notes**" and, together with the Dollar Subordinated Notes, the Euro Subordinated Notes and the Subordinated Tenge A Notes, the "**Subordinated Notes**") and U.S.$5,221,494,216 aggregate initial Reference Amount of Recovery Units (the "**Recovery Units**" or the "**Units**"), all such notes or units (together, the "**Notes**" and each a "**Series**" of Notes) to be constituted by this Trust Deed.

(B)     The Bank's obligations under the Subordinated Notes are subordinated as provided therein.

(C)     The payment obligations of the Bank in respect of the Recovery Units are, in certain circumstances, limited in recourse on the terms set out in the Recovery Units Conditions.

(D)     By virtue of the Security Interests (as defined below) the terms of which are hereinafter set out, the Bank is granting security over the Collection Account and the Cash Management Agreement (each as hereinafter defined) to the Trustee as security for certain payment obligations of the Bank under the Recovery Units.

(E)     The Trustee has agreed to act as trustee of this Trust Deed on the following terms and conditions.

**THIS DEED WITNESSES AND IT IS DECLARED** as follows:

**1.      INTERPRETATION**

1.1     **Definitions**

In this Trust Deed the following expressions have the following meanings:

"**Acceptable Bank**" means a bank or financial institution which has a rating for its long term unsecured and non credit-enhanced debt obligations of BBB or higher by S&P or Fitch or B3

or higher by Moody's or a comparable rating from an internationally recognised credit rating agency;

"**Adjusted Deposits**" means the Bank's Total Deposits from Customers (which shall, for the avoidance of doubt, not include deposits which constitute Government Funding deposits) and Correspondent Accounts and deposits of banks;

"**Adjusted Liabilities**" means the Bank's (i) total liabilities (calculated by reference to the most recent financial statements of the Bank prepared in accordance with FMSA Methodology) excluding equity, minus (ii) Adjusted Deposits;

"**Affiliate**" of a person means a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, that person;

"**Agency Agreement**" means the agreement referred to as such in the Conditions, as amended from time to time, and includes any other agreements approved in writing by the Trustee appointing successor paying and transfer agents or amending any such agreements;

"**Agents**" means the Principal Paying and Transfer Agent, the Paying Agents, the Transfer Agents and the Registrar or any of them;

"**Aggregate Foreign Currency Open Position**" means the aggregate of the Bank's Foreign Currency Open Positions in each Foreign Currency;

"**Almaty Business Day**" means any day other than a Saturday or a Sunday on which banks are open for business (including dealings in foreign currencies) in Almaty;

"**Applicable Law**" means any law, regulation, ordinance, order or decree of or by any authority in effect from time to time having jurisdiction over the Bank, its assets and/or its operations;

"**Approved Stock Exchange**" means a recognised stock exchange established in any member state of the European Economic Area;

"**Appointee**" has the meaning given to it in Clause 10.11 (*Agents*);

"**Auditors**" means the auditors for the time being of the Bank or, if they are unable or unwilling to carry out any action requested of them under this Trust Deed, such other internationally recognised firm of accountants as may be nominated or approved in writing by the Bank and failing such nomination, as may be nominated by the Trustee;

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, permit, exemption, filing, notarisation or registration (including the Bank's licence and/or permits to carry out banking operations and other operations permitted by applicable legislation) required in connection with the business of the relevant person or in connection with the Restructuring and/or Restructuring Documents;

"**Authorised Signatory**" means, in respect of a person, an individual duly authorised by such person to sign specified documents on behalf of such person; in relation to any body corporate, a person who is duly empowered to bind such body corporate in relation to the relevant document(s) and, if necessary under the laws of the country of incorporation of such body corporate to ensure that such person is duly authorised, whose authority is evidenced by a resolution or an approval and authorisation of the Directors of such body corporate;

"**Bank Bonds**" means the 9 per cent. bonds issued by the Bank in an aggregate amount of KZT 645 billion in March 2009 to Samruk-Kazyna in exchange for all of the SK Bonds;

"**Base Case Model**" means the financial model titled "BTA Bank — BP — Revised PCTS@ 18 04 2010 — Sent Deloitte" sent to Deloitte at 8.00 p.m. on 18 April 2010;

"**Board**" means the board of directors of the Bank from time to time;

"**BTA/NBK Repo Transaction**" means any securities repurchase or resale agreement, securities borrowing agreement (or other agreement between the Bank and the NBK which is similar in legal and commercial effect to any of the foregoing) pursuant to which liquidity is made available by the NBK to the Bank against the SK Bonds;

"**BTA Undertaking**" means the deed poll to be executed by the Bank prior to the Restructuring Date covering (without limitation) compliance with the Charter;

"**Business Day**" means any day other than a Saturday or a Sunday on which banks are open for business (including dealings in foreign currencies) in London and New York City;

"**Business Plan**" means, at any time, the business plan then in effect as duly approved by a Qualified Majority of the Board;

"**Capital**" means the sum of the Bank's Tier 1 Capital and Tier 2 Capital, as such terms are defined in, calculated in accordance with, and subject to the limits, restrictions and deductions set forth in the FMSA Guidance;

"**Cash and Cash Equivalents**" means cash in hand and Cash Equivalent Investments which are unrestricted and available for immediate withdrawal (excluding any amounts held for mandatory reserve requirements);

"**Cash Equivalent Investments**" means at any time:

(a)    overnight bank deposits, time deposit accounts, certificates of deposit, banker's acceptances and money market deposits maturing within one year after the relevant date of calculation and issued by an Acceptable Bank or the NBK;

(b)    any investment in marketable debt obligations issued or guaranteed by the government of the United States of America, the United Kingdom, Canada, Switzerland, any member state of the European Economic Area or any Participating Member State or by an instrumentality or agency of any of them having an equivalent credit rating, maturing within one year after the relevant date of calculation and not convertible or exchangeable to any other security;

(c)    commercial paper not convertible or exchangeable to any other security:

      (i)    for which a recognised trading market exists;

      (ii)   issued by an issuer incorporated in the United States of America, the United Kingdom, Canada, Switzerland, any member state of the European Economic Area or any Participating Member State;

      (iii)  which matures within one year after the relevant date of calculation; and

      (iv)   which has a credit rating of either A-1 or higher by S&P or F1 or higher by Fitch or P-1 or higher by Moody's, or, if no rating is available in respect of

the commercial paper, the issuer of which has, in respect of its long-term unsecured and non-credit enhanced debt obligations, an equivalent rating;

(d) Tenge bills of exchange eligible for rediscount at the NBK and accepted by an Acceptable Bank (or their dematerialised equivalent);

(e) any investment in money market funds which (i) have a credit rating of either A-1 or higher by S&P or F1 or higher by Fitch or P-1 or by Moody's Investor Services Limited, (ii) which invest substantially all their assets in securities of the types described in paragraphs (a) to (d) above and (iii) can be turned into cash on not more than 30 days' notice; or

(f) re-purchase obligations with a term of not more than seven days for underlying securities of the types described in paragraphs (a) to (d) above entered into with any financial institution meeting the qualifications specified in sub-paragraphs (c)(ii) and (iv) above;

(g) money market funds at least 95 per cent. of the assets of which constitute Cash Equivalent Investments of the kinds described in paragraphs (a) through (f) of this definition;

(h) any other debt security approved by an Extraordinary Resolution and to which any member of the Group is alone (or together with other members of the Group) beneficially entitled at that time and which is not issued or guaranteed by any member of the Group or subject to any Security;

"**Cash Management Agreement**" means the cash management agreement entered into in relation to the Collection Account between the Trustee, the Bank and the Cash Manager dated on or about the date of this Trust Deed or any cash management agreement substantially on the same terms entered into with a replacement cash manager;

"**Cash Manager**" means the cash manager named in the Cash Management Agreement (or any of its successors or any replacement cash manager from time to time), initially being The Bank of New York Mellon, London Branch;

"**Charged Property**" means the property subject to the Security Interests;

"**Charter**" means the current charter of the Bank as approved by a meeting of the shareholders of the Bank on 22 June 2010;

"**Claimants' Meeting**" means the meeting of certain persons having claims against the Bank held on 28 May 2010 to approve the Restructuring Plan;

"**Clearstream**" means Clearstream Banking, *société anonyme*, Luxembourg;

"**Coercive Practice**" means impairing or harming or threatening to impair or harm, directly or indirectly, any party or its property or to influence improperly the actions of another party;

"**Collection Account**" has the meaning provided in the Cash Management Agreement;

"**Collusive Practice**" means an arrangement between two or more parties designed to achieve an improper purpose, including influencing improperly the actions of another party;

"**Condition Precedent**" means a condition precedent to the Restructuring becoming effective as described in Schedule 12 (*Conditions Precedent to the Restructuring Plan Becoming Effective*) of the Information Memorandum;

"**Conditions**" means in respect of each Series of Notes, the terms and conditions set out in Schedule 4 (*Terms and Conditions of the Notes*) as modified from time to time in accordance with this Trust Deed and, with respect to any Notes represented by a Global Note, as modified by the provisions of such Global Note, any reference to a particularly numbered Condition or the Conditions generally being construed accordingly;

"**Corporate Governance Code**" means the new corporate governance code of the Bank adopted on 22 June 2010 and reflecting the principles set out in the Detailed Term Sheet;

"**Correspondent Accounts and deposits of banks**" means accounts opened by the Bank in other banks, reflecting payments made by the Bank by order and at the expense of another bank under the correspondent agreement;

"**Corrupt Practice**" means with respect to any person the offering, giving, receiving or soliciting, directly or indirectly, anything of value to influence improperly its actions or the actions of another party including any of its directors, managers or employees;

"**Covenant Balance Sheet**" means a balance sheet prepared by the Bank on an unconsolidated basis in accordance with FMSA Methodology and containing such information as is required to disclose the level of compliance by the Bank with the covenants contained in Clause 8.1 (*Covenants in relation to the Senior Notes and the Original Issue Discount Notes*) and Clause 8.2 (*Covenants in relation to the Subordinated Notes*) together with an explanation of the accounting policies (which has been approved by the Board of Directors) used in the preparation of such balance sheet;

"**Creditor Directors**" means the two directors nominated by the Steering Committee (one appointed on behalf of the Senior Noteholders and one appointed on behalf of the Original Issue Discount Noteholders) and any replacement appointed in accordance with the provisions of the Samruk-Kazyna Undertaking;

"**Deed of Release**" means the deed to be entered into by the Bank following the Restructuring Date on behalf of certain persons having claims against the Bank and on behalf of Related Parties pursuant to the Restructuring Plan;

"**Deeds of Undertaking**" means the BTA Undertaking and the Samruk-Kazyna Undertaking;

"**Default**" has the meaning provided in the Information Memorandum;

"**Definitive Note Certificate**" means a Note in definitive form substantially in the form set out in Schedule 1 (*Form of Definitive Note Certificate*) and having the relevant Conditions endorsed thereon or attached thereto, and "**Restricted Note Certificate**" means a Definitive Note Certificate issued upon exchange of an interest in a Restricted Global Note for a Definitive Note Certificate or upon any transfer thereof and bearing the same ISIN and Common Code and "**Unrestricted Note Certificate**" means a Definitive Note Certificate issued upon exchange of an interest in an Unrestricted Global Note for a Definitive Note Certificate or upon any transfer thereof and bearing the same ISIN and Common Code;

"**Deposit Agreement**" means the deposit agreement to be entered into between the Bank and the Depositary in relation to the GDRs;

"**Depositary**" has the meaning set out in the Deposit Agreement;

"**Development Organisation**" means any of Asian Development Bank, European Bank for Reconstruction and Development, International Bank for Reconstruction and Development, International Finance Corporation, Nederlandse Financierings Maatschappij voor Ontwikkelingslanden N.V. or Deutsche Investitions und Entwicklungsgesellschaft GmbH or any other development finance institution established or controlled by one or more states and any other person which is a, or is controlled by any, Kazakhstan governmental body acting on behalf of or funded in relation to the relevant Financial Indebtedness by one or more of the foregoing development finance institutions;

"**Director**" means a director appointed to the Board;

"**Distribution Compliance Period**" means the period which expires on and includes the 40th day after the later of the commencement of the offering of the Notes and the Issue Date;

"**Dollar Notes**" means the Senior Dollar Notes, the Dollar Original Issue Discount Notes, the Dollar Subordinated, Notes and the Recovery Units;

"**Dollar Original Issue Discount Notes Conditions**" means the terms and conditions set out in Part 3 of Schedule 4 (*Terms and Conditions of the Dollar Original Issue Discount Notes*) as modified from time to time in accordance with this Trust Deed and, with respect to any Dollar Original Issue Discount Notes represented by the applicable Global Note, as modified by the provisions of such Global Note, any reference to a particularly numbered Dollar Original Discount Notes Condition being construed accordingly;

"**Dollar Subordinated Notes Conditions**" means the terms and conditions set out in Part 5 of Schedule 4 (*Terms and Conditions of the Dollar Subordinated Notes*) as modified from time to time in accordance with this Trust Deed and, with respect to any Dollar Subordinated Notes represented by the applicable Global Note, as modified by the provisions of such Global Note, any reference to a particularly numbered Dollar Subordinated Notes Condition being construed accordingly;

"**Euroclear**" means Euroclear Bank SA/NV;

"**Euro Original Issue Discount Notes Conditions**" means the terms and conditions set out in Part 4 of Schedule 4 (*Terms and Conditions of the Euro Original Issue Discount Notes*) as modified from time to time in accordance with this Trust Deed and, with respect to any Euro Original Issue Discount Notes represented by the applicable Global Note, as modified by the provisions of such Global Note, any reference to a particularly numbered Euro Original Issue Discount Notes Condition being construed accordingly;

"**Euro Subordinated Notes Conditions**" means the terms and conditions set out in Part 6 of Schedule 4 (*Terms and Conditions of the Euro Subordinated Notes*) as modified from time to time in accordance with this Trust Deed and, with respect to any Euro Subordinated Notes represented by the applicable Global Note, as modified by the provisions of such Global Note, any reference to a particularly numbered Euro Subordinated Notes Condition being construed accordingly;

"**Event of Default**" means an event of default as described in the Conditions;

"**Excluded Related Party**" means a person which is a Related Party solely by virtue of its relationship with or to Samruk-Kazyna;

"**Exposure**" means, at any relevant time of calculation, with respect to one or more counterparties:

(a)     the aggregate principal or nominal amount owed to the Bank, whether direct or contingent, by a Single Party in respect of money borrowed, equity or debt raised, guarantees, letters of credit or debt instruments issued or confirmed and other off-balance sheet engagements; less

(b)     any amount referred to in paragraph (a) above which is fully secured by rights of off-set against: (i) cash; and/or (ii) Adjusted Deposits; all of the foregoing forms of security being in equivalent amounts and comparable maturities placed with the Bank;

**"Extraordinary Resolution"** has the meaning given in Schedule 3 (*Provisions for Meetings of Noteholders*);

**"Financial Covenant Compliance Report"** means an auditor's report in respect of any annual Covenant Balance Sheet or a report from an accounting firm on its review of any semi-annual Covenant Balance Sheet, as the case may be, and provided by such auditor or accounting firm to the Bank;

**"Financial Indebtedness"** means any obligation (whether incurred as principal or surety), whether present or future, actual or contingent, for or in respect of:

(a)     moneys borrowed and debit balances at banks or other financial institutions;

(b)     any acceptance under any acceptance credit or bill discounting facility (or dematerialised equivalent);

(c)     any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d)     the amount of any liability in respect of Finance Leases;

(e)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis and meet any requirement for de-recognition under FMSA Methodology);

(f)     any Treasury Transaction (and, when calculating the value of that Treasury Transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close-out of that Treasury Transaction, that amount) shall be taken into account);

(g)     any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution in respect of (i) an underlying liability of an entity which is not a member of the Group which liability would fall within one of the other paragraphs of this definition or (ii) any liabilities of any member of the Group relating to any post-retirement benefit scheme;

(h)     any amount raised by the issue of redeemable shares which are redeemable (other than at the option of the issuer) before the final redemption or repayment date under the relevant Notes or are otherwise classified as borrowings under the FMSA Methodology);

(i)     any amount of any liability under an advance or deferred purchase agreement if (i) one of the primary reasons behind entering into the agreement is to raise finance or to finance the acquisition or construction of the asset or service in question or (ii) the agreement is in respect of the supply of assets or services and payment is due more

than 90 days after the date of supply;

(j)  any amount raised under any other transaction (including any forward sale or purchase, sale and sale back or sale and leaseback agreement) having the commercial effect of a borrowing or otherwise classified as borrowings under the FMSA Methodology; and

(k)  the amount of any liability in respect of any guarantee for any of the items referred to in paragraphs (a) to (j) above;

**"Finance Leases"** means any lease or hire purchase contracts which would, in accordance with FMSA Methodology, be treated as a finance or capital lease;

**"Financial Year"** means the annual accounting period of the Group ending on or about 31 December in each year;

**"Financing of Terrorism"** means the act of providing or collecting funds with the intention that they be used, or in the knowledge that they are to be used, in order to carry out terrorist acts;

**"FMSA"** means the Agency of the Republic of Kazakhstan on Regulation and Supervision of Financial Market and Financial Organisations;

**"FMSA Asset Classification Rules"** means the Rules of Classification of Assets, Conditional Liabilities and Creation of Provisions (Reserves) Against Them approved by the Resolution of the Management Board of the FMSA No. 296 dated 25 December 2006 (as amended at 18 April 2010);

**"FMSA Guidance"** means "Instruction about norm values and calculation methodology of prudential norms for second tier banks" approved by Resolution of the Management Board of the Agency of the Republic of Kazakhstan on Regulation and Supervision of Financial Market and Financial Organisations" dated 30 September 2005, No. 358, as amended, supplemented or updated from time to time;

**"FMSA Methodology"** means IFRS adjusted to reflect the FMSA's requirements for preparation of financial statements for regulatory purposes;

**"Foreign Currency"** means any currency other than Tenge;

**"Foreign Currency Assets"** means all assets of the Bank which are (i) denominated in Foreign Currency, (ii) payable by the terms of the agreement or other constitutive document providing for those assets or at the option of the payee in a Foreign Currency, or (iii) payable in Kazakhstan Tenge but in an amount determined by reference to any Foreign Currency index;

**"Foreign Currency Liabilities"** means all liabilities of the Bank which are (i) denominated in Foreign Currency, (ii) payable by the terms of the agreement or other constitutive document providing for those assets or at the option of the payee in a Foreign Currency, or (iii) payable in Tenge but in an amount determined by reference to a Foreign Currency index;

**"Foreign Currency Open Positions"** means, with respect to any Foreign Currency, the difference between Foreign Currency Assets and Foreign Currency Liabilities in that currency (whether that position is short or long), net of hedges through any foreign exchange cover, hedging facility or other similar arrangement;

"**Fraudulent Practice**" means an act or omission, including a misrepresentation, that knowingly or recklessly misleads, or attempts to mislead, a Person to obtain a financial or other benefit or to avoid an obligation;

"**Further Note**" means any note issued pursuant to Senior Notes or Subordinated Notes Condition 16 (*Further Issues*), or Original Issue Discount Notes Condition 17 (*Further Issues*);

"**GDRs**" means the global depositary receipts relating to Deposited Shares (as such term is defined in the Information Memorandum);

"**Global Note**" means, in respect of each Series of Notes, the Restricted Global Note or the Unrestricted Global Note, as the case may be, for such Series of Notes and "**Global Notes**" shall be construed accordingly;

"**Government**" means the government of the Republic of Kazakhstan;

"**Government Funding**" means (i) the Bank's Indebtedness to the Government or any of its agencies (including the NBK and municipalities in Kazakhstan) to fund or support state-sponsored lending programmes plus (ii) any customer accounts of the Government or any of its agencies (including the NBK and such municipalities) placed with the Bank to fund or support state-sponsored lending programmes;

"**Gross Loans**" means the total principal amount of all loan facilities extended by the Bank to its customers (other than banks) in the ordinary course of business, before the deduction of any Loan Loss Reserves.

"**Group**" means the Bank and each of its Subsidiaries from time to time;

"**IFRS**" means International Financial Reporting Standards in effect from time to time;

"**Indebtedness**" means any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

"**Indebtedness Guarantee**" means, in relation to any Financial Indebtedness of any Person, any obligation of another Person to pay such Financial Indebtedness, including (without limitation) (i) any obligation to purchase such Financial Indebtedness, (ii) any obligation to lend money, to purchase or subscribe to shares or other securities or to purchase assets or services in order to provide funds for the payment of such Financial Indebtedness, (iii) any indemnity against the consequences of a default in the payment of such Financial Indebtedness, (iv) any other agreement to be responsible for repayment of such Financial Indebtedness, including bonds, standby letters of credit or bank guarantees or other similar instruments issued in connection with the performance of contracts and (v) any Financial Indebtedness of another Person secured by a security interest over any of the first-mentioned Person's assets, the amount of such Financial Indebtedness being the lesser of the value of such assets and the amount of Financial Indebtedness so secured;

"**Independent Auditor**" means any of Deloitte, PricewaterhouseCoopers, KPMG or Ernst & Young LLP appointed to carry out the annual corporate governance review of the Bank;

"**Independent Directors**" means the three independent directors nominated by the Corporate Management and Appointments Committee of the Bank and appointed by a meeting of shareholders of the Bank;

"**Information Memorandum**" means the information memorandum published by the Bank and dated 1 May 2010 (and as supplemented from time to time);

"**Joint Venture**" means any joint venture entity, whether a company, unincorporated firm, undertaking, association, joint venture or partnership or any other similar entity;

"**KASE**" means the Kazakhstan Stock Exchange;

"**KCD**" means JSC Central Securities Depositary;

"**Legal Reservations**" means:

(a)    the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors;

(b)    the time barring of claims under the Limitation Acts 1980 and the Foreign Limitation Periods Act 1984, the possibility that an undertaking to assume liability for or indemnify a person against non-payment of UK stamp duty may be void and defences of set-off or counterclaim;

(c)    similar principles, rights and defences under the laws of any Relevant Jurisdiction as those referred to in paragraphs (a) and (b) above (to the extent applicable in that Relevant Jurisdiction); and

(d)    any other matters which are set out as qualifications or reservations as to matters of law of general application in any of the legal opinions to be delivered pursuant to the Conditions Precedent;

"**Legend**" means the transfer restriction legend set out in each of the Global Notes and any Definitive Note Certificate issued in respect thereof;

"**Loan Loss Reserves**" means accumulated reserves required to be made under FMSA Asset Classification Rules against the Gross Loans;

"**Management Board**" means the management board of the Bank from time to time;

"**Management Contract**" means a contract by which an independent third person agrees to manage any matters relating to the affairs of any member of the Group;

"**Material Adverse Effect**" means a material adverse effect on:

(a)    the business, operations, property, condition (financial or otherwise) or prospects of the Group taken as a whole; or

(b)    the ability of the Bank or the Group (taken as a whole) to perform its obligations under the relevant Restructuring Documents; or

(c)    the total equity or long-term debt of the Bank; or

(d)    validity or enforceability of, or the effectiveness or ranking of any Security granted or purporting to be granted pursuant to, any of the Restructuring Documents or the rights or remedies of any Noteholder, any Shareholder, any holder of GDRs or any lender under the RCTFF Agreement or under any of the Restructuring Documents;

"**Material Subsidiary**" means at any relevant time a Subsidiary of the Bank:

(a)   whose total assets, pre-tax profits or gross revenues (or, where the Subsidiary in question prepares consolidated accounts, whose total consolidated assets or gross consolidated revenues, as the case may be) attributable to the Bank represent not less than five per cent. of the total consolidated assets or pre-tax profits or the gross consolidated revenues of the Bank, all as calculated by reference to the then latest audited accounts (or, if none, its then most recent management accounts or consolidated accounts, as the case may be) of such Subsidiary and the then latest audited consolidated accounts of the Group; or

(b)   to which is transferred all or substantially all of the assets and undertaking of a Subsidiary which immediately prior to such transfer is a Material Subsidiary;

"**Money Laundering**" means:

(a)   the conversion or transfer of property, knowing it is derived from a criminal offence, for the purpose of concealing or disguising its illegal origin or of assisting any Person who is involved in the commission of the crime to evade the legal consequences of its actions which assistance has led or would be likely to, in the opinion of the Trustee, lead to a sanction, fine or reprimand from a competent authority or finding of guilt or liability by a competent court;

(b)   the concealment or disguise of the true nature, source, location, disposition, movement, rights with respect to or ownership of property knowing that it is derived from a criminal offence; or

(c)   the acquisition, possession or use of property knowing at the time of its receipt that it is derived from a criminal offence;

"**NBK**" means the National Bank of Kazakhstan, the central bank of Kazakhstan;

"**Net Assets**" means Total Assets less Total Liabilities;

"**Net Loans**" means the aggregate amount of all Gross Loans less Loan Loss Reserves;

"**Net Non-Performing Loans**" means the aggregate amount of all Non-Performing Loans less the amount of aggregate Loan Loss Reserves;

"**New Net Loans**" means Net Loans originated after the Restructuring Date (which, for the avoidance of doubt, shall not include any rescheduling of, or capitalisation of interest on, loans originally made prior to the Restructuring Date);

"**New Net Non-Performing Loans**" means Non-Performing Loans originated after the Restructuring Date;

"**Non-Performing Loans**" or "**NPLs**" means:

(a)   Gross Loans in respect of which any amounts have been outstanding for a period of more than 90 days after the relevant due dates provided for under the agreements providing for such Gross Loans;

(b)   Gross Loans restructured more than three times due to the applicable borrowers' inability to meet their payment obligations to the Bank provided for under the agreements providing for such Gross Loans; and

(c)    Gross Loans which in the reasonable opinion of the Bank's management, with the passage of time or otherwise, may qualify as Non-Performing Loans under paragraph (a) or (b) above.

"**Non-Tenge Notes**" means the Original Issue Discount Notes, the Senior Dollar Notes, the Recovery Units, the Euro Subordinated Notes and the Dollar Subordinated Notes;

"**Noteholder**" means a Person in whose name a Note, Further Note or Unit is registered in the Register (or in the case of joint holders, the first named holder thereof); and the words "**holder**" and "**holders**" and related expressions shall (where appropriate) be construed accordingly;

"**Note Certificate**" means the Global Note and the Definitive Note Certificate;

"**Obstructive Practice**" means:

(a)    deliberately destroying, falsifying, altering or concealing evidence material to an investigation, or making false statements to investigators, in order to materially impede an investigation by such investigators into allegations of a Coercive Practice, Collusive Practice, Corrupt Practice or Fraudulent Practice, and threatening, harassing or intimidating any party to prevent it from disclosing its knowledge of matters relevant to an investigation or from pursuing an investigation into such matters; or

(b)    acts intended to materially impede the exercise of the Trustee's contractual rights or access to information under the relevant Restructuring Documents;

"**outstanding**" means, in relation to the Notes, all Notes issued except (i) those which have been redeemed in accordance with the Conditions and this Trust Deed, (ii) those in respect of which the date for redemption has occurred and the redemption moneys (including all interest accrued on such Notes to the date for such redemption and any interest payable under the Conditions and this Trust Deed after such date) have been duly paid to the Trustee or to the Principal Paying and Transfer Agent as provided in Clause 2 (*Amount of the Notes and Covenant to Pay*) and remain available for payment in accordance with the Conditions, (iii) those which have become void, (iv) those which have been purchased and cancelled as provided in the Conditions, (v) those mutilated or defaced Notes which have been surrendered in exchange for replacement Notes, (vi) (for the purpose only of determining how many Notes are outstanding and without prejudice to their status for any other purpose) those Notes alleged to have been lost, stolen or destroyed and in respect of which replacement Notes have been issued and (vii) any Global Note to the extent that it shall have been exchanged for another Global Note pursuant to its provisions and any Global Note to the extent that it shall have been exchanged for Definitive Note Certificates pursuant to its provisions; provided that for the purposes of (a) ascertaining the right to attend and vote at any meeting of the Noteholders, (b) the determination of how many and which Notes are outstanding for the purposes of Senior Notes and Subordinated Notes Conditions 11 (*Events of Default*) and 13 (*Meetings of Noteholders; Modification and Waiver*), Original Issue Discount Notes Conditions 12 (*Events of Default*) and 14 (*Meetings of Noteholders; Modification and Waiver*) and Recovery Units Conditions 13 (*Events of Default*) and 15 (*Meetings of Noteholders; Modification and Waiver*), Clauses 4 (*Security Interests*), 7 (*Enforcement*) and 13 (*Waiver and Proof of Default*) and Schedule 3 (*Provisions for Meetings of Noteholders*) and (c) the exercise of any discretion, power or authority which the Trustee is required, expressly or impliedly, to exercise in or by reference to the interests of the Noteholders and (d) the certification (where relevant) by the Trustee as to whether a Potential Event of Default is in its opinion materially prejudicial to the interests of the Noteholders, those Notes which

are beneficially held by or on behalf of the Bank or any of its Subsidiaries and not cancelled shall (unless no longer so held) be deemed not to remain outstanding;

"**Participating Member State**" means any member state of the European Communities that adopts or has adopted the Euro as its lawful currency in accordance with legislation of the European Community relating to Economic and Monetary Union;

"**Permitted Acquisition**" means:

(a)     an acquisition by a member of the Group of an asset sold, leased, transferred or otherwise disposed of by another member of the Group in circumstances permitted by Clause 8.1(c)(ix) (*Disposals*);

(b)     the incorporation of a company with limited liability which on incorporation becomes a member of the Group, but only if that company is incorporated in the European Union, the United States of America or Kazakhstan and is engaged in a business substantially the same as that carried on by the Group with limited liability;

(c)     an acquisition for cash (including deferred cash) consideration, of (A) the issued share capital of a limited liability company or (B) (if the acquisition is made by a limited liability company whose sole purpose is to make the acquisition) a business or undertaking carried on as a going concern, but only if:

    (i)     no Default is continuing on the closing date for the acquisition or would occur as a result of the acquisition;

    (ii)     the acquired company, business or undertaking is engaged in a business substantially the same as that carried out by the Group;

(d)     any acquisition the aggregate consideration payable in respect of which (when aggregated with all other such acquisitions and Permitted Joint Ventures in the same Financial Year of the Bank) does not exceed 10 per cent. of the Net Assets of the Bank (by reference to, in the first Financial Year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent and, thereafter, its most recent annual Covenant Balance Sheet delivered in accordance with Clause 8.1(a) (*Financial and Other Information Covenants*) and Clause 8.2(a) (*Financial and Other Information Covenants*);

(e)     any acquisition by any member of the Group of any asset(s) secured in its favour pursuant to any enforcement of, or foreclosure under, any security interest granted in its favour by or in relation to any of its customers or their Subsidiaries in connection with the acceleration of any Financial Indebtedness owing by any such customer to such member of the Group; or

(f)     any other acquisition to which the Trustee has given its prior written consent;

"**Permitted Dividend**" means a dividend or distribution by the Bank to its Shareholders:

(a)     at any time after the Notes have been irrevocably repaid in full; or

(b)     at any time after the date falling four years after the Restructuring Date up to and including the date falling seven years after the Restructuring Date provided that:

    (i)     the Bank has positive operating cashflow post debt service for the year;

(ii)    the Bank's Tier 2 Capital (as shown in its most recently delivered financial statements) is above 15 per cent.;

(iii)    the aggregate distribution does not exceed 25 per cent. of cumulative net income or 25 per cent. of net operating cash flow after debt service;

(iv)    at the same time as the Bank pays such distribution, it prepays the Senior Notes and the Original Issue Discount Notes in the same amount in aggregate as such distribution (such payment to be applied between the Senior Notes and the Original Issue Discount Notes pro rata to their face value on the Restructuring Date (and in the case of the Senior Notes at their applicable redemption price (being par plus the Make Whole Amount (if any) plus accrued (but unpaid) interest) and in the case of the OID Notes at their Fully Accreted Principal Amount (plus accrued (but unpaid) interest) as at the date of its last repayment instalment)); and

(v)    no Default has occurred and is continuing on both the date the dividend is declared and when it is paid; or

(c)    at any time after the date falling seven years after the Restructuring Date provided that:

(i)    the Bank has positive operating cashflow post debt service for the year;

(ii)    the Bank's Tier 2 Capital (as shown in its most recently delivered financial statements) is above 15 per cent.;

(iii)    the aggregate distribution does not exceed 50 per cent. of cumulative net income or 50 per cent. of net operating cash flow after debt service; and

(iv)    no Default has occurred and is continuing on both the date the dividend is declared and when it is paid;

"**Permitted Joint Venture**" means any investment in any Joint Venture where:

(a)    the Joint Venture is incorporated, or established, and carries on its principal business, in the European Union, the United States of America or Kazakhstan;

(b)    the Joint Venture is engaged in a business substantially the same as that carried on by the Group with limited liability; and

(c)    in any financial year of the Bank, the aggregate of: (i) all amounts subscribed for shares in, lent to, or invested in all such Joint Ventures by any member of the Group; (ii) the contingent liabilities of any member of the Group under any guarantee given in respect of the liabilities of any such Joint Venture; and (iii) the market value of any assets transferred by any member of the Group to any such Joint Venture, when aggregated with all other such acquisitions and Permitted Joint Ventures in the same financial year, does not exceed 10 per cent. of the Net Assets of the Bank (by reference to, in the first financial year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent and, thereafter, its most recent audited annual financial statements);

"**Permitted Security**" means:

(a)     any lien arising by operation of law and in the ordinary course of trading and not as a result of any default or omission by any member of the Group;

(b)     any netting or set-off arrangement entered into by any member of the Group in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances;

(c)     any Security arising under any retention of title, hire purchase or conditional sale arrangement or arrangements having similar effect in respect of goods supplied to a member of the Group in the ordinary course of trading and on the supplier's standard or usual terms and not arising as a result of any default or omission by any member of the Group;

(d)     any Security entered into pursuant to any Restructuring Documents (including the Security Interests and any Security granted in respect of the RCTFF Collection Account);

(e)     any Security arising pursuant to any agreement (or other applicable terms and conditions) which is standard or customary in the relevant market (and not for the purpose of raising credit or funds for the operation of any member of the Group other than on a short-term basis as part of its liquidity management activities), in connection with (i) contracts entered into simultaneously for sales and purchases at market prices of precious metals or securities, (ii) the establishment of margin deposits and similar securities in connection with interest rate and foreign currency hedging operations and trading in securities or (iii) the foreign exchange dealings or other proprietary trading activities including, without limitation, Repos, of any member of the Group;

(f)     any Security provided that at the same time or prior to the creation of such Security, the Bank provides prior-ranking Security or the benefit of such other Security in favour of the Senior Noteholders and the Original Issue Discount Noteholders, in each case in form and substance satisfactory to the Trustee (acting on the instructions of the an Extraordinary Resolution of  Senior Noteholders and an Extraordinary Resolution of Original Issue Discount Noteholders);

(g)     granted in favour of the Bank by any Material Subsidiary to secure Financial Indebtedness or other obligations owed by such Material Subsidiary to the Bank;

(h)     arising in the ordinary course of the Bank's or a Material Subsidiary's trading activities and which is necessary in order to enable the Bank or such Material Subsidiary to comply with any mandatory or customary requirement imposed on it by a banking or other regulatory authority in connection with the Bank's or such Material Subsidiary's business;

(i)     on property acquired (or deemed to be acquired) under a Finance Lease, or claims arising from the use or loss of or damage to such property, provided that any such encumbrance secures only rentals and other amounts payable under such lease;

(j)     granted by the Bank in favour of a Development Organisation to secure Financial Indebtedness owed by the Bank to such Development Organisation pursuant to any loan agreement or other credit facility entered into between the Bank and such Development Organisation, provided that the amount of Financial Indebtedness so secured pursuant to this paragraph (j) shall not exceed in aggregate an amount in any

currency or currencies equivalent to six per cent. of the Bank's Net Assets calculated by reference to the most recent financial statements of the Bank prepared in accordance with FMSA Methodology;

(k)    arising out of the refinancing, extension, renewal or refunding of any Financial Indebtedness secured by Security permitted by any of the above exceptions, provided that the Financial Indebtedness thereafter secured by such Security does not exceed the amount of the original Financial Indebtedness and such Security is not extended to cover any property not previously subject to such Security;

(l)    not included in any of the above exceptions, in aggregate securing Financial Indebtedness with an aggregate principal amount at any time not exceeding U.S.$25 million (or its equivalent in other currencies) at that time; or any other Security to which the Trustee (acting on the instructions of an Extraordinary Resolution) has given its prior written consent;

**"Permitted Transaction"** means:

(a)    any Financial Indebtedness or Indebtedness Guarantee or Security incurred, or given, or other transaction arising, under the Restructuring Documents;

(b)    any transaction (other than (i) any acquisition, sale, lease, license, transfer or other disposal and (ii) the granting or creation of Security or the incurring or permitting to subsist of any Financial Indebtedness or Indebtedness Guarantee) conducted in the ordinary course of trading on arm's length terms and not in contravention of any of the provisions set out in Clause 8.1 (*Covenants in relation to the Senior Notes and the Original Issue Discount Notes*); and

(c)    the solvent liquidation or reorganisation of a Subsidiary of the Bank so long as (i) any payments or assets distributed as a result of such liquidation or reorganisation are distributed (to the extent of that member of the Group's interest therein) to another member of the Group, (ii) the value or percentage of any minority interest in any member of the Group held by any person which is not a member of the Group is not increased and (iii) such liquidation or reorganisation does not and could not reasonably be expected to have a Material Adverse Effect.;

**"Person"** means any individual, company (including a business trust), corporation, firm, partnership, joint venture, association, organisation, trust (including any beneficiary thereof), state or agency of a state or other entity, whether or not having a separate legal personality;

**"Potential Event of Default"** means an event or circumstance which could with any one or more of the giving of notice, lapse of time, issue of a certificate or fulfilment of any other requirement provided for in the Conditions become an Event of Default;

**"Principal Paying and Transfer Agent"** means The Bank of New York Mellon, London Branch or any Successor Principal Paying and Transfer Agent;

**"Qualified Majority"** means in relation to a decision of the Board, a majority of the Board including both of the Creditor Directors and at least one of the Independent Directors;

**"Rating Agency"** means Standard & Poors Rating Services, a division of The McGraw Hill Companies, Inc. ("S&P"), Moody's Investors Service Limited ("Moody's") or Fitch Ratings Limited ("Fitch") or any of their successors or any rating agency substituted for any of them with the written approval of the Trustee;

"**RCTFF Agreement**" means the agreement dated on or about the date of this Trust Deed setting out the terms of a US$ 700 million revolving committed trade finance facility to be extended to the Bank by certain lenders and to be used by the Bank for funding new trade finance transactions;

"**RCTFF Collection Account**" has the meaning provided to "Collection Account" in the RCTFF Agreement;

"**RCTFF Collection Account Charge**" has the meaning provided to "Collection Account Charge" in the RCTFF Agreement;

"**Receiver**" has the meaning ascribed thereto in Clause 4.16 (*Appointment of Receiver*);

"**Recovery Sub-Committee**" means the sub-committee of the Management Board entitled the "Strategy Committee" on which shall sit a Creditor Director;

"**Recovery Unit holder**" means a Person in whose name a Recovery Unit is registered in the Register of Recovery Unit holders (or in the case of joint holders, the first named holder thereof); and the words "**holder**" and "**holders**" and related expressions shall (where appropriate) be construed accordingly;

"**Recovery Units Conditions**" means the terms and conditions set out in Part 9 of Schedule 4 (*Terms and Conditions of the Recovery Units*) as modified from time to time in accordance with this Trust Deed and, with respect to any Notes represented by the applicable Global Note, as modified by the provisions of such Global Note, any reference to a particularly numbered Recovery Units Condition being construed accordingly;

"**Reference Rate**" means the average rate over the twenty-two trading days immediately preceding the Claimants' Meeting shown on the applicable Bloomberg pages for conversion of the relevant currency into U.S. Dollars;

"**Registrar**" means The Bank of New York Mellon (Luxembourg) S.A. or any successor Registrar appointed under the Agency Agreement;

"**Related Party**" means any Affiliate of the Bank, any officer, director or manager of the Bank or its Affiliates, any member of the Management Board or Supervisory Board as at 31 December 2008 and the spouse, parents, siblings and children or any such person which is a natural person (and for these purposes Samruk-Kazyna and any entity owned by Samruk-Kazyna shall be treated as a Related Party) and any other person who is "connected" to any such person within the meaning of the Insolvency Act 1986;

"**Related Party Exposure**" means the aggregate consolidated Exposure to all Related Parties (other than Excluded Related Parties);

"**Relevant Information**" means:

(a)     in the case of each set of annual consolidated financial statements, an auditor's report and, in the case of each annual Covenant Balance Sheet, the Financial Covenant Compliance Report;

(b)     in the case of each set of semi-annual consolidated financial statements, an auditor's review opinion and, in the case of each semi-annual Covenant Balance Sheet, the Financial Covenant Compliance Report;

(c)     in the case of each set of annual consolidated financial statements and quarterly consolidated financial statements, a balance sheet, profit and loss account and cashflow statement;

(d)     in the case of each set of quarterly consolidated financial statements, a cashflow forecast in respect of the Group relating to the three-month period commencing at the end of the relevant financial quarter;

(e)     in the case of each set of annual and semi-annual consolidated financial statements, the following:

         (i)     a statement by the directors of the Bank comparing actual performance for the period to which the financial statements relate to (x) the projected performance for that period set out in the Budget and (y) the actual performance for the corresponding period in the preceding Financial Year of the Group;

         (ii)     a management discussion and analysis, including a discussion of results of operations, financial condition, liquidity and capital resources, segment analysis (detailing SME, corporate and retail business), asset recovery efforts and developments, and an overview of the Kazakhstan banking industry;

         (iii)     appropriate footnotes and asset/liability analysis (including loans and advances to customers, economic sector and customer concentrations, investment securities, geographical risk, currency risk, liquidity risk, interest rate risk, derivatives positions, Related Party transactions, as well as segment analysis (detailing SME, corporate and retail business)); and

         (iv)     a description of all material recent developments, Related Party transactions and material non-ordinary course transactions as well as any changes in senior management.

"**Relevant Jurisdiction**" means, in relation to a member of the Group:

(a)     its jurisdiction of incorporation;

(b)     any jurisdiction where any asset subject to or intended to be subject to the transaction Security to be created by it is situated;

(c)     any jurisdiction where it conducts its business;

"**Repo**" means a securities repurchase or resale agreement or reverse repurchase or resale agreement, a securities borrowing agreement or any agreement relating to securities which is similar in effect to any of the foregoing and, for purposes of this definition, the term "**securities**" means any capital stock, share, debenture or other debt or equity instrument, or other derivative, whether issued by any private or public company, any government or agency or instrumentality thereof or any supranational, international or multilateral organisation;

"**Restricted Global Note**" means in relation to a Series of Notes the registered permanent global note representing beneficial interests in such Series of Notes initially issued to Eligible Investors (as defined in the Agency Agreement) pursuant to the Restructuring, each in the form or substantially in the form set out in Part 2 of Schedule 2 (*Form of Restricted Global Note*);

"**Restructuring**" means the proposed overall restructuring and/or cancellation of certain of the debts and other financial obligations of the Bank pursuant to, inter alia, the Restructuring Plan;

"**Restructuring Date**" means 26 August 2010 or as otherwise provided in the Information Memorandum;

"**Restructuring Documents**" has the meaning provided in Schedule 8 (*Restructuring Documents*) hereto;

"**Restructuring Plan**" means the plan to restructure certain Financial Indebtedness of the Bank in the form set out in the Information Memorandum as approved by the Specialised Financial Court in the City of Almaty on 1 July 2010;

"**Risk Weighted Assets**" means the aggregate of the Bank's balance sheet assets and off-balance sheet engagements, weighted for credit risk in accordance with the FMSA Guidance;

"**Samruk-Kazyna**" means joint-stock company 'Sovereign Welfare Fund "Samruk-Kazyna"';

"**Samruk-Kazyna Undertaking**" means the deed poll to be executed by Samruk-Kazyna prior to the Restructuring Date;

"**Securities Act**" means the U.S. Securities Act of 1933, as amended;

"**Security**" means any mortgage, charge, pledge, lien, security interest or other encumbrance securing any obligation of any Person or any other agreement or arrangement having a similar effect;

"**Security Interests**" means the security interests created pursuant to Clause 4 (*Security Interests*);

"**Senior Dollar Notes Conditions**" means the terms and conditions set out in Part 1 of Schedule 4 (*Terms and Conditions of the Senior Dollar Notes*) as modified from time to time in accordance with this Trust Deed and, with respect to any Senior Dollar Notes represented by the applicable Global Note, as modified by the provisions of such Global Note, any reference to a particularly numbered Senior Dollar Notes Condition being construed accordingly;

"**Senior Tenge Notes Conditions**" means the terms and conditions set out in Part 2 of Schedule 4 (*Terms and Conditions of the Senior Tenge Notes*) as modified from time to time in accordance with this Trust Deed and, with respect to any Senior Tenge Notes represented by the applicable Global Note, as modified by the provisions of such Global Notes, any reference to a particularly numbered Senior Tenge Notes Condition being construed accordingly;

"**Shareholder**" means a registered holder of Shares;

"**Shares**" means the common shares of the Bank;

"**Simple Majority**" means, with respect to decisions taken or to be taken at a Board meeting, a simple majority of the Directors;

"**Single Party**" means any counterparty and all connected parties of such counterparty, if any;

"**Single Party Exposure**" means the aggregate, consolidated Exposure to any Single Party (including any interbank exposure);

"**SK Bonds**" means the 4 per cent. bonds issued by Samruk-Kazyna in a total principal amount of KZT 645 billion, each with a denomination of KZT 1,000, and which Samruk-Kazyna issued in March 2009 and sold to the Bank in consideration for the issue by the Bank and sale to Samruk-Kazyna of the Bank Bonds with identification numbers KZP01Y06D392, KZP02Y07D398, KZP03Y08D394, KZP04Y09D390, KZP05Y10D395, KZP06Y11D391, KZP07Y12D397, KZP08Y13D393, KZP09Y14D399, KZP10Y15D394, KZP11Y06D391, KZP12Y07D397, KZP13Y08D393, KZP14Y09D399, KZP15Y10D394, KZP16Y11D390, KZP17Y12D396, KZP18Y13D392, KZP19Y14D398 and KZP20Y15D393;

"**SK Guarantee**" means the guarantee which Samruk-Kazyna shall issue to the NBK for a duration of no less than ten years beginning from the first BTA/NBK Repo Transaction in respect of the obligations of the Bank to the NBK under any BTA/NBK Repo Transaction, in consideration of which the Bank will pay the SK Guarantee Fee when due;

"**SK Guarantee Fee**" means the semi-annual fee to be paid by the Bank to Samruk-Kazyna equal to fifty per cent. (50 per cent.) of the interest paid from time to time by Samruk-Kazyna to the Bank in relation to any outstanding SK Bonds (i) held by BTA or (ii) which are the subject of a BTA/NBK Repo Transaction, if any, provided that this guarantee fee, will not exceed KZT 6.45 billion in 2010 and thereafter KZT 12.9 billion annually, such fee to cease to become payable on the fourteenth anniversary of the date of the completion of the Restructuring;

"**Specified Currency**" means, in relation to any payment obligation arising under any Note, the currency in which that payment obligation is expressed as specified in the relevant Conditions and, in relation to amounts payable by the Bank to the Trustee for its own account, dollars or such other currency as may be agreed between the Bank and the Trustee from time to time;

"**Stock Exchange**" means the Luxembourg Stock Exchange or the Kazakhstan Stock Exchange;

"**Subordinated Tenge A Notes Conditions**" means the Terms and Conditions set out in Part 7 of Schedule 4 (*Terms and Conditions of Subordinated Tenge A Notes*) as modified from time to time in accordance with this Trust Deed and, with respect to any Subordinated Tenge A Notes represented by the applicable Global Note. As modified by the provisions of such Global Note, any reference to a particularly numbered Subordinated Tenge A Notes condition being construed accordingly;

"**Subordinated Tenge B Notes Conditions**" means the Terms and Conditions set out in Part 8 of Schedule 4 (*Terms and Conditions of Subordinated Tenge B Notes*) as modified from time to time in accordance with this Trust Deed and, with respect to any Subordinated Tenge B Notes represented by the applicable Global Note. As modified by the provisions of such Global Note, any reference to a particularly numbered Subordinated Tenge B Notes condition being construed accordingly;

"**Subsidiary**" means:

(a)     an entity of which a person has direct or indirect control or owns directly or indirectly more than 50 per cent. of the voting capital or similar right of ownership (and "control" for this purpose means the power to direct the management and policies of the entity whether through the ownership of voting capital, by contract or otherwise); or

(b)     an entity whose financial statements are, in accordance with applicable law and IFRS, consolidated with those of another person,

and for these purposes, when determining whether an entity is a "Subsidiary" of another, the registration of any shares in such "Subsidiary" in the name of any nominee or any other person holding security over such shares shall be ignored so that such entity is deemed to be the Subsidiary of the person who created that security or on whose behalf the nominee holds the relevant shares (as the case may be) and, in respect of the Bank, includes those entities listed in the Information Memorandum;

"Successor" means, in relation to the Agents, such other or further person as may from time to time be appointed by the Bank as an Agent with the written approval of, and on terms approved in writing by, the Trustee and notice of whose appointment is given to Noteholders pursuant to Clause 8.1(a)(vii) (*Changes in Agents*) and Clause 8.2(a)(vii) (*Changes in Agents*);

"Super Majority" means in respect of a relevant matter, that matter requires:

(a)     the approval of 75 per cent. or more of the total number of Shares; and

(b)     provided that the GDRs then in issue represent 5 per cent. or more of the total Shares of the Bank then in issue and provided the Depositary casts at least one vote on the relevant resolution, the approval of at least 2/3 of the votes cast by the Depositary on behalf of GDR Holders eligible to vote;

"Tax" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same);

"Tax Deduction" means a deduction or withholding for or on account of Tax from a payment under any of the Notes;

"Tenge Notes" means the Senior Tenge Notes, the Subordinated Tenge A Notes and the Subordinated Tenge B Notes;

"Tier 1 Capital" means the Bank's Tier 1 Capital as such term is defined in the FMSA Guidance;

"Tier 2 Capital" means the Bank's Tier 2 Capital as such term is defined in the FMSA Guidance;

"Total Assets" means, at any time, the total book value of the Bank's assets determined in accordance with FMSA Methodology;

"Total Deposits from Customers" means Cash and Cash Equivalents transferred from customers to the Bank on terms of further repayment of nominal value (irrespective of whether such repayment is made on first demand or delayed, made in whole or in parts (whether with or without payment of a prior agreed premium) or made to the depositor directly or by order to third parties), excluding deposits by special purpose Subsidiaries of BTA and deposits comprised in Government Funding;

"Total Liabilities" means, at any time, the total liabilities of the Bank determined in accordance with FMSA Methodology;

"**Treasury Transactions**" means any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price;

"**trust corporation**" means a trust corporation (as defined in the Law of Property Act 1925) or a corporation entitled to act as a trustee pursuant to applicable foreign legislation relating to trustees;

"**Trust Deed**" means this Trust Deed (as amended from time to time in accordance with this Trust Deed) and any other document executed in accordance with this Trust Deed (as from time to time so amended) and expressed to be supplemental to this Trust Deed;

"**Unaudited Interim Financial Statements**" means the reviewed interim consolidated financial statements of the Bank for the nine-month period ended 30 September 2009 contained in the Information Memorandum;

"**United States**" has the meaning ascribed to it in Regulation S under the Securities Act; and

"**Unrestricted Global Note**" means in relation to a Series of Notes the registered permanent global note representing beneficial interests in such Series of Notes initially issued to Persons who are not US persons pursuant to the Restructuring, each in the form or substantially in the form set out in Part 1 of Schedule 2 (*Form of Unrestricted Global Note*).

1.2    Terms defined in the Conditions are used in this Trust Deed as so defined.

1.3    **Construction of Certain References**

References to:

(a)    principal include, in the case of the Original Issue Discount Notes, the Fully Accreted Principal Amount, the Accreted Principal Amount of the Notes or the Net Accreted Principal Amount of such Notes, as may be required in the context of the Original Issue Discount Notes Conditions;

(b)    principal are, in the case of the Recovery Units, to the Reference Amount represented thereby or, as the case may be, the Adjusted Principal Amount thereof, unless expressly provided otherwise;

(c)    the aggregate principal amount or any percentage or proportion thereof are, in the case of the Recovery Units, to the aggregate Reference Amount represented thereby, unless expressly provided otherwise;

(d)    costs, charges, remuneration or expenses include any value added, turnover or similar tax charged in respect thereof;

(e)    "**dollars**" and "**U.S.$**" are to the lawful currency for the time being of the United States of America;

(f)    "**Euro**", "**EUR**" or "**€**" are to the lawful currency of the Member States of the European Union that have adopted the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on the European Union and as further amended by the Treaty of Amsterdam;

(g)    "**KZT**" and "**Tenge**" are to the lawful currency for the time being of the Republic of Kazakhstan;

(h)     an action, remedy or method of judicial or other procedure for the enforcement of creditors' rights include references to the action, remedy or method of judicial proceedings in jurisdictions other than England as shall most nearly approximate thereto; and

(i)     the masculine gender shall include the feminine gender and references to the singular shall include the plural, save where the context otherwise permits.

### 1.4     Headings

Headings shall be ignored in construing this Trust Deed.

### 1.5     Schedules

The Schedules are an integral part of this Trust Deed.

### 1.6     Statutes

Any reference in this Trust Deed to a statute or statutory provision shall, unless the contrary is indicated, be construed as a reference to such statute or statutory provision as the same shall have been or may be amended or re-enacted.

### 1.7     Contracts

References in this Trust Deed to this Trust Deed or any other document are to this Trust Deed or those documents as amended, supplemented or replaced from time to time.

### 1.8     Contracts (Rights of Third Parties) Act 1999

A person who is not a party to this Trust Deed has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Trust Deed.

### 1.9     Alternative Clearing System

References in this Trust Deed to Euroclear, Clearstream and/or KCD shall, wherever the context permits, be deemed to include reference to any additional or alternative clearing system approved by the Bank, the Trustee and the Principal Paying and Transfer Agent.

## 2.     AMOUNT OF THE NOTES AND COVENANT TO PAY

### 2.1     Amount of the Notes

The initial aggregate principal amount of each Series of the Notes on issue shall be as follows:

(a)     U.S.$2,082,371,783. in the case of the Senior Dollar Notes;

(b)     KZT32,604,173,503, in the case of the Senior Tenge Notes;

(c)     U.S.$384,848,130 Fully Accreted Principal Amount, in the case of the Dollar Original Discount Notes;

(d)     EUR437,110,856 Fully Accreted Principal Amount, in the case of the Euro Original Discount Notes;

(e)     U.S.$496,631,368, in the case of the Dollar Subordinated Notes;

(f)     EUR28,237,359, in the case of the Euro Subordinated Notes;

(g)     KZT7,396,248,930, in the case of the Subordinated Tenge A Notes;

(h)     KZT28,000,000,000, in the case of the Subordinated Tenge B Notes; and

(i)     U.S.$5,221,494,216 aggregate initial Reference Amount, in the case of the Recovery Units.

The Notes are constituted by this Trust Deed.

## 2.2     Separate Series

The provisions of Clauses 2.3 (*Covenant to Pay*), 2.4 (*Discharge and Cancellation*) and 2.5 (*Payment after a Default*) and of Clauses 3 (*Form of the Notes*), 5 (*Stamp Duties*) to 16 (*Currency Indemnity*) (all inclusive) and 19 (*Notes Held in Clearing Systems*) shall apply *mutatis mutandis* separately and independently to the Notes of each Series and in such Clauses the expressions "Noteholders", together with all other terms that relate to Notes (including the Units), or their Conditions, shall be construed as referring to those of the particular Series in question and not of all Series unless expressly so provided, so that each Series shall be constituted by a separate trust pursuant to Clause 2.3 (*Covenant to Pay*) and that, unless expressly provided, events affecting one Series shall not affect any other.

## 2.3     Covenant to pay

(a)     The Bank will:

(i)     on any date when any amounts in respect of principal of any Notes in the relevant Series become due to be redeemed unconditionally pay or procure to be paid to, or to the order of, the Trustee for the benefit of the Noteholders (not later than 10:00 a.m. local time in the principal financial centre for the settlement of transactions in the Specified Currency of such Notes) in such Specified Currency in same day immediately available, freely transferable and cleared funds such amounts in respect of principal of the Notes becoming due for redemption or repayment, together with any applicable premium or (in the case of the Senior Notes) Make Whole Amount on that date and without exercising any counterclaim, lien, right of set-off or similar claim in respect thereof;

(ii)    (subject to the Conditions) until such payment (both before and after judgment or other order of a competent court) unconditionally so pay or procure to be paid to or to the order of the Trustee (and unless otherwise instructed by the Trustee, will make such payment to the Principal Paying and Transfer Agent) interest on the principal amount (or, in the case of the Original Issue Discount Notes, on the Net Accreted Principal Amount) of the Notes outstanding as set out in the Conditions; and

(iii)   on each Recovery Payment Date (as defined in the Recovery Units Conditions), subject to the Recovery Units Conditions, unconditionally pay or procure to be paid to or to the order of the Trustee (and unless otherwise instructed by the Trustee, will make such payment to the Principal Paying and Transfer Agent) in accordance with the terms of this Trust Deed, the Cash Management Agreement and the Recovery Units Conditions, in same day immediately available, freely transferable and cleared funds the Recovery Payments due on such Recovery Payment Date, provided that

(A)     payment of any sum due in respect of the Notes made to the Principal Paying and Transfer Agent, as provided in the Agency Agreement, shall, to that extent, satisfy such obligation except to the extent that there is failure in its subsequent payment to the relevant Noteholders under the Conditions; and

(B)     a payment made after the due date or pursuant to Senior Notes or Subordinated Notes Condition 11 (*Events of Default*), Original Issue Discount Notes 12 (*Events of Default*) or Recovery Units Condition 13 (*Events of Default*) will be deemed to have been made when the full amount due has been received by the Principal Paying and Transfer Agent or the Trustee and notice to that effect has been given to the Noteholders in accordance with Clause 8.1(a)(vi) (*Notice of Late Payment*) except to the extent that there is failure in its subsequent payment to the relevant Noteholders under the Conditions.

The Trustee will hold the benefit of this covenant on trust for itself and the Noteholders of each Series. The covenant contained in this Clause 2.3(a) shall only have effect while the Notes are issued and outstanding under this Deed.

(b)     In any case where (other than with respect to the Recovery Units):

(i)     payment of principal is not made to the Trustee or the Principal Paying and Transfer Agent on or before the due date, interest shall continue to accrue on the principal amount or, in the case of the Original Issue Discount Notes, on the Net Accreted Principal Amount of the Notes (both before and after any judgment or other order of a court or arbitral tribunal of competent jurisdiction) at the interest rate up to and including the date which the Trustee determines to be the date on and after which payment is to be made to the Noteholders in respect thereof as stated in a notice given to the Noteholders in accordance with the Conditions;

(ii)    payment of the whole or any part of the principal amount of any Note is improperly withheld or refused upon due presentation thereof (other than in circumstances contemplated above) interest shall accrue on that principal amount of payment which has been so withheld or refused (both before and after any judgment or other order of a court or arbitral tribunal of competent jurisdiction) at the interest rate from and including the date of such withholding or refusal up to and including the date on which, upon further presentation of the relevant Note, payment of the full amount (including interest as aforesaid) in the Specified Currency payable in respect of such Note is made or (if earlier) the day after notice is given to the relevant Noteholder; and

(c)     In any case where a Recovery Payment or payment of Adjusted Principal Amount with respect to the Recovery Units is not made to the Trustee or the Principal Paying and Transfer Agent on or before the due date, or is otherwise improperly withheld or refused upon due presentation thereof, such amount shall remain outstanding until the date of payment of such Recovery Payment or Adjusted Principal Amount, as the case may be.

2.4     **Discharge and Cancellation**

Subject to Clause 2.5 (*Payment after a Default*), any payment to be made in respect of the Notes by the Bank or the Trustee may be made as provided in the Conditions and any payment so made shall (subject to Clause 2.5 (*Payment after an Event of Default*)) to that extent be a good discharge to the Bank or the Trustee, as the case may be.

2.5     **Payment after an Event of Default**

At any time after an Event of Default or a Potential Event of Default has occurred or the Notes of all or any Series shall otherwise have become due and payable or the Trustee shall have received any money which it proposes to pay under Clause 6 (*Application of Moneys Received by the Trustee*) to the relevant Noteholders, the Trustee may:

(a)     by notice in writing to the Bank, the Agents and the Cash Manager, require the Agents and/or the Cash Manager, until notified by the Trustee to the contrary, so far as permitted by applicable law:

(i)     to act as agents of the Trustee under this Trust Deed and the Notes on the terms of the Agency Agreement and/or the Cash Management Agreement (with consequential amendments as necessary and except that the Trustee's liability for the indemnification, remuneration and expenses of the Agents and the Cash Manager shall be limited to the amounts for the time being held by the Trustee in respect of the Notes on the terms of this Trust Deed which are available for that purpose) and thereafter to hold all Notes and all moneys, documents and records held by them in respect of Notes to the order of the Trustee; or

(ii)     to deliver all Notes and all moneys, documents and records held by them in respect of the Notes to the Trustee or as the Trustee directs in such notice; and

(b)     by notice in writing to the Bank, require it to make all subsequent payments in respect of the Notes to or to the order of the Trustee and not to the Principal Paying and Transfer Agent.

2.6     **Covenant to Comply with the Trust Deed and Schedules**

The Bank covenants with the Trustee to comply with the provisions of this Trust Deed and the Conditions which are expressed to be binding on it and to perform and observe the same. The Notes are subject to the provisions contained in this Trust Deed, all of which shall be binding on the Bank and the Noteholders.

3.     **FORM OF THE NOTES**

3.1     **Global Notes**

Each Series of Notes shall initially be represented by an Unrestricted Global Note and a Restricted Global Note. Interests in the Unrestricted Global Notes and the Restricted Global Notes shall be exchangeable, but only in accordance with their respective terms, for Definitive Note Certificates.

3.2     **Definitive Note Certificates**

Definitive Note Certificates shall be printed in accordance with the applicable legal and Stock Exchange requirements substantially in the form set forth in Schedule 1 (*Form of Definitive Note Certificate*). Definitive Note Certificates shall have attached thereto or endorsed thereon the Conditions and form of transfer. Unless otherwise determined by the Bank, Definitive Note Certificates issued in exchange for interests in a Restricted Global Note shall bear the Legend and Definitive Note Certificates issued for interests in an Unrestricted Global Note during the Distribution Compliance Period shall bear the Legend.

3.3     **Signatures**

Each Global Note and Definitive Note Certificate (if issued) shall be signed manually or in facsimile by an Authorised Signatory of the Bank and shall be authenticated by or on behalf of the Registrar. The Bank may use a facsimile signature of an Authorised Signatory of the Bank on a Global Note or Definitive Note Certificate notwithstanding the fact that when such Global Note or Definitive Note Certificate, if applicable, shall be delivered any such person shall have ceased to hold such office provided that such person held such office at the date on which such Global Note or Definitive Note Certificate, if applicable, is expressed to be issued. A Global Note or Definitive Note Certificate, if applicable, so executed shall be a binding and valid obligation of the Bank.

3.4     **Legends**

The Bank may require such legend or legends on the Global Notes and the Definitive Note Certificates (if any) as it shall from time to time deem appropriate.

3.5     **Title**

Title to the Global Notes and, if Definitive Note Certificates are issued, Definitive Note Certificates, passes by registration of transfer in the relevant Register. All Definitive Note Certificates and any relevant Global Note issued upon any registration of a transfer or exchange of Definitive Note Certificates or the relevant Global Note (as the case may be) shall be valid obligations of the Bank evidencing the same obligation, and entitled to the same benefits under this Trust Deed, as the Definitive Note Certificates or the relevant Global Note (as the case may be) surrendered upon such registration of the transfer or exchange.

3.6     **Transfer**

Every Definitive Note Certificate and the relevant Global Note presented or surrendered for registration of a transfer or for exchange shall (if so required by the Bank or the Trustee) be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Trustee and the Registrar duly executed, by the holder thereof or his attorney duly authorised in writing.

3.7     **Notice of Conditions**

Noteholders are deemed to have notice of and to have accepted the Conditions.

3.8     **Noteholders**

To the fullest extent permitted by applicable law, the Bank, the Trustee and each Agent may treat the person or persons in whose name or names any Note is registered in the relevant Register for the purpose of making payments and all other purposes as the absolute owner

thereof (whether or not such Note shall be overdue and notwithstanding any notice which any person may have of the right, title, interest or claim of any other person thereto).

3.9     **Status**

The Notes of each Series of Senior Notes, Original Issue Discount Notes and of the Recovery Units rank *pari passu* and rateably without any preference or priority among themselves but the payment obligations of the Bank in respect thereof are solely as defined in these presents and the relevant Conditions.

The Subordinated Notes rank *pari passu* and rateably without any preference or priority among themselves but the payment obligations of the Bank in respect thereof are solely as defined in these presents and the relevant Conditions.

4.      **SECURITY INTERESTS**

4.1     **Charge and Assignment**

The Bank with full title guarantee:

(a)     hereby charges by way of first fixed charge in favour of the Trustee, for itself and as trustee for the Recovery Unit holders, and the Agents to secure the payment to the Trustee of all amounts due (up to and including the earlier of the date when the Reference Amount is reduced to zero and the Settlement Date) in respect of the Recovery Units pursuant to the Recovery Units Conditions all its rights, title and interest in and to all sums of money now or in the future deposited in the Collection Account and the rights of the Bank in those sums or the Collection Account (including interest from time to time accrued thereon); and

(b)     hereby assigns absolutely to the Trustee, for the benefit of itself and as trustee for the Recovery Unit holders, and the Agents all the rights, interests and benefits, both present and future, which have accrued or may accrue to the Bank under or pursuant to the Cash Management Agreement other than any rights, interests and benefits charged in favour of the Trustee by way of first fixed charge under this Clause 4.1.

4.2     **Continuing Security**

Each of the Security Interests constituted by Clause 4.1 (*Charge and Assignment*) is a continuing security and (subject to the Recovery Units Conditions) will extend to the ultimate balance of sums payable by the Bank in respect of the Recovery Units and shall not be discharged, satisfied or prejudiced until released or discharged in writing by the Trustee, regardless of any intermediate payment or discharge in whole or in part of any amount(s) due in respect of the Recovery Units.

4.3     **Effectiveness of Security**

If any payment by the Bank or any discharge given by the Trustee (whether in respect of the obligations of the Bank or any security for those obligations or otherwise) is avoided or reduced as a result of insolvency, administration or any similar event:

(a)     the liability of the Bank and the Security Interests shall continue as if the payment, discharge, avoidance or reduction had not occurred; and

(b)     the Trustee shall be entitled to recover the value or amount of that payment or security from the Bank, as if the payment, discharge, avoidance or reduction had not occurred.

The Trustee may concede or compromise any claim that any payment or discharge is liable to be avoided or reduced.

### 4.4    Declaration of trust

All assets, rights, interests and benefits granted to the Trustee pursuant to Clause 4.1 (*Charge and Assignment*) and all other rights, powers and discretions granted to or conferred upon the Trustee under this Clause 4 shall be held by the Trustee on trust for the Recovery Unit holders from time to time. The trust constituted by this Clause 4.4 shall come into existence on the date of this Trust Deed and shall remain in full force and effect until all amounts due in respect of the Recovery Units (up to and including the earlier of the date when the Reference Amount is reduced to zero and the Settlement Date) have been irrevocably paid in full.

### 4.5    Additional Security

The Security Interests are in addition to and are not in any way prejudiced by any other rights exercisable by the Trustee against the Bank or by any other guarantees or security now or subsequently held by the Trustee.

### 4.6    Consents

The Bank shall obtain as soon as possible (in form and substance reasonably satisfactory to the Trustee) any consent necessary to enable the assets of the Bank to be the subject of an effective fixed charge and assignment, as applicable, pursuant to Clause 4.1 (*Charge and Assignment*) and, immediately upon obtaining any such consent, the assets concerned shall stand charged and assigned, as applicable, in favour of the Trustee under Clause 4.1 (*Charge and Assignment*) and the Bank shall promptly deliver a copy of any such consent to the Trustee.

### 4.7    Release and Discharge

No withdrawals may be made from the Collection Account except as set out in this Trust Deed, the Cash Management Agreement and the Recovery Units Conditions. On the irrevocable and unconditional payment or discharge by the Bank of all sums due and payable under the Recovery Units (up to and including the earlier of the date when the Reference Amount is reduced to zero and the Settlement Date), and once the Trustee is satisfied that all obligations of the Bank to be performed on the Settlement Date have been properly performed by the Bank, the Trustee, at the request and cost of the Bank, and without recourse to, or any representation or warranty by, the Trustee or any Appointee, shall release and discharge the Security Interests to, or to the order of, the Bank, and shall release to the Bank, or as the Bank shall direct, any sums received by it in respect thereof and still held by it after such payment and discharge, provided that no such release or discharge shall be effective unless and until any such costs are paid to or to the order of the Trustee.

### 4.8    Perfection of Security Interests

Forthwith upon the execution of this Trust Deed the Bank shall give written notice (i) to The Bank of New York Mellon, London Branch in the form set out in Part 1 of Schedule 5 (*Form of Notice of Charge of the Collection Account*) of the charge set out in Clause 4.1 (*Charge and Assignment*) and shall procure that The Bank of New York Mellon, London Branch gives to the Trustee the acknowledgements thereof in the form set out in Part 2 of Schedule 5 (*Form

*of Acknowledgment of Notice of Charge of the Collection Account*) and (ii) to the Cash Manager in the form set out in Part 3 of Schedule 5 (*Form of Notice of Assignment of the Cash Management Agreement*) of the assignment set out in Clause 4.1 (*Charge and Assignment*) and shall procure that the Cash Manager gives to the Trustee the acknowledgements thereof in the form set out in Part 4 of Schedule 5 (*Form of Notice of Assignment of the Cash Management Agreement*). On the appointment of a new cash manager under the Cash Management Agreement, the Bank shall give written notice of the Security Interests to such new cash manager and procure written acknowledgment of the Security Interests from the new cash manager pursuant to this Clause 4.8.

4.9     **Rights of the Bank**

The Bank (save as expressly provided in these presents or with the prior written consent of the Trustee) shall not create or permit to subsist any Security over all or any part of the Charged Property or otherwise transfer or deal with the Charged Property or any right or benefit either present or future arising under or in respect of the Cash Management Agreement or the Collection Account or any part thereof or any interest therein or purport to do so.

4.10    **No Prejudice to Security**

The Bank shall not do, or omit to be done, or cause or permit to be done, or omitted to be done, anything which may in any way depreciate, jeopardise or otherwise prejudice the value to the Trustee of or the rights of the Trustee with respect to the Security Interests. In particular, but without limitation, the Bank shall not release, grant time or indulgence or compound with any third party or suffer to arise any set-off or other adverse rights against the Collection Account nor do or omit to do anything which may delay or prejudice the right of the Trustee to receive payment from the Collection Account at any time after the Security Interests have become enforceable.

4.11    **Collection Account Undertakings**

The Bank shall not without the prior written consent of the Trustee or as otherwise set out under the Cash Management Agreement permit or agree to any variation of the rights attaching to the Collection Account or close the Collection Account.  The Bank shall promptly notify the Trustee of any claim or notice received from any third party in relation to the Collection Account and of all other matters relevant to such claim or notice.

4.12    **Liability in respect of Charged Property**

The Trustee shall not be responsible for, nor shall it have any liability with respect to, any loss or theft or reduction in value of the Charged Property and shall not be obliged to insure or to procure the insurance of any Charged Property and shall have no responsibility or liability arising from the fact that any Charged Property is held in safe custody by any bank or custodian selected by the Bank with the consent of the Trustee and nor does the Trustee have responsibility for monitoring the adequacy or otherwise of the insurance arrangements for the Charged Property. The Trustee shall accept, without further investigation, requisition or objection to, such right, benefit, title and interest as the Bank may have in and to any of the Charged Property and is not bound to make any investigation into the same or into the Charged Property in any respect.

4.13    **Enforcement of the Security Interests**

The Security Interests are enforceable while an Event of Default under Recovery Units Condition 13(i) (*Non Payment*) has occurred and is continuing. At any time while the Security

Interests are enforceable the Trustee may, at its discretion and without notice to the Bank or prior authorisation from any court, and shall, if requested to do so by holders of at least one-fifth in principal amount of the Recovery Units outstanding or if directed to do so by an Extraordinary Resolution of Recovery Unit holders and, in either case, subject to it being indemnified and/or prefunded and/or provided with security to its satisfaction against all liabilities, proceedings, claims and demands to which it may thereby become liable and all costs, charges and expenses which may be incurred by it in connection therewith, enforce all or any part of the security created by this Trust Deed in favour of the Recovery Unit holders, in each case at the times, in the manner and on the terms it may think fit.

Upon such enforcement, the Trustee may call in, collect, sell or otherwise deal with the Charged Property or other moneys due under the Charged Property in such manner as the Trustee thinks fit, may take such actions or proceedings in connection therewith as it considers appropriate (including, without limitation, the actions listed in Schedule 6 (*Trustee's Powers in Relation to the Charged Property*)) and shall apply the proceeds of such realisation:

(a)     *first,* in payment or satisfaction of all costs, fees, charges, expenses and liabilities properly incurred by the Trustee in or about the enforcement of the Security Interests (including remuneration of the Trustee and any Appointee appointed hereunder);

(b)     *secondly, pari passu* and *pro rata* in payment or satisfaction of all costs, fees, charges, expenses and liabilities properly incurred by (i) the Cash Manager in or about the performance of the Cash Management Agreement (including remuneration of the Cash Manager) and (ii) the Agents in or about the performance of the Agency Agreement but only to the extent that the same relate to such performance in respect of the Recovery Units (including remuneration of the Agents); and

(c)     *thirdly, pro rata* to the Recovery Unit holders.

### 4.14   Law of Property Act 1925

Sections 93 and 103 of the Law of Property Act 1925 shall not apply hereto but the powers of sale, calling in, collection and appointment of a receiver and other powers conferred upon a mortgagee by Sections 101 and 104 of the Law of Property Act 1925 shall apply hereto and have effect on the basis that this Trust Deed constitutes a mortgage within the meaning of the Law of Property Act 1925 and the Trustee is a mortgagee exercising the power of sale conferred upon mortgagees by the Law of Property Act 1925, provided always that the Trustee shall not be required to take any action unless indemnified and/or prefunded and/or secured to its satisfaction and subject as provided in Recovery Units Condition 17(c) (*Enforcement; Reliance*) and Clause 4.13 (*Enforcement of the Security Interests*).

### 4.15   Powers of the Trustee

(a)     At any time while the Security Interests are enforceable the Trustee shall be entitled, subject to it being indemnified and/or prefunded and/or secured to its satisfaction, to do any of the acts and things listed in Schedule 6 (*Trustee's Powers in relation to the Charged Property*) in relation to the Charged Property, the Collection Account or the rights in respect of the Cash Management Agreement assigned pursuant to Clause 4.1 (*Charge and Assignment*) and the Bank hereby irrevocably appoints and constitutes the Trustee as the Bank's true and lawful attorney with full power in the name and on behalf of the Bank to do any of the foregoing (including, without limitation, the acts and things listed in Schedule 6 (*Trustee's Powers in relation to the Charged Property*)) and with full power for any such attorney to sub-delegate any of such powers including the power to sub-delegate.

(b)  Without limiting paragraph (a) above, in order to facilitate the enforcement of the Security Interests by the Trustee and the Receiver (if any) at any time while the Security Interests are enforceable, the Bank hereby irrevocably appoints and constitutes the Trustee and the Receiver as the Bank's true and lawful attorney severally with full power in the name and on behalf of the Bank or otherwise:

(i)  to request, require, demand, receive, compound, give receipts and discharges for, settle and compromise any and all sums and claims for money due and to become due under the Recovery Units and all other rights and obligations arising in respect thereof;

(ii)  to endorse any cheques or other instruments or orders in connection with the above;

(iii)  to file any claim, to take any action or institute any proceeding which the Trustee may deem to be necessary or advisable in connection therewith either in its own name or in the name of the Bank or in both such names;

(iv)  to execute any documents and to do anything which the Trustee deems to be necessary or desirable hereunder or thereunder, and with full power to delegate any of the rights and powers hereby conferred upon it; and

(v)  without prejudice to the generality of the foregoing, to exercise all or any of the powers or rights which but for the creation of the Security Interests would have been powers or rights of the Bank in relation to the Charged Property in such manner as it may consider expedient.

The Bank hereby ratifies and confirms and agrees to ratify and confirm whatever any such attorney shall do or purport to do in the exercise or purported exercise of all or any of the powers, authorities and discretions referred to in this Clause 4.

4.16  **Appointment of Receiver**

At any time while the Security Interests are enforceable, the Trustee may by writing appoint any person or persons to be a receiver, a receiver and manager or an administrative receiver (which shall not be the Trustee or an affiliate of the Trustee) (each, a **"Receiver"**) and may remove any Receiver so appointed and appoint another in its place. Section 109(1) of the Law of Property Act 1925 shall not apply.

4.17  **Discharge**

Upon any sale, calling in, collection or enforcement as provided in Clause 4.14 (*Law of Property Act 1925*) and upon any other dealing or transaction under the provisions contained in these presents, the receipt of the Trustee for the purchase money of the Charged Property sold and for any other moneys paid to it shall effectually discharge the purchaser or other person paying the same and such purchaser or other person shall not be responsible for the application of such moneys.

4.18  **The Receiver**

If the Trustee appoints a Receiver in relation to the Charged Property, the following provisions shall have effect in relation thereto:

(a)  such appointment may be made either before or after the Trustee has taken possession of any of the Charged Property;

(b)    such Receiver may be vested by the Trustee with such powers and discretions (not exceeding the powers and discretions of the Trustee) as the Trustee has and may think expedient, including, without limitation, those listed in Schedule 6 (*Trustee's Powers in relation to the Charged Property*), the power to sell or concur in selling all or any of the Charged Property, or the power to charge or release all or any of the Charged Property, in each case without restriction and on such terms and for such consideration (if any) as such Receiver may think fit and may carry any such transaction into effect by conveying, transferring and delivering in the name or on behalf of the Bank or otherwise;

(c)    the Trustee may from time to time fix the remuneration of such Receiver and direct payment thereof out of moneys accruing to him pursuant to these presents in the exercise of his powers as such;

(d)    the Trustee may from time to time and at any time require any such Receiver to give security for the due performance of his duties as Receiver and may fix the nature and amount of the security to be so given, but the Trustee shall not be bound in any case to require any such security;

(e)    the Trustee shall not be under any obligation to monitor or supervise such Receiver;

(f)    save insofar as otherwise directed by the Trustee, all moneys from time to time received by such Receiver shall be paid over forthwith to the Trustee to be held by it in accordance with the provisions of Clause 4.13 (*Enforcement of the Security Interests*); and

(g)    such Receiver shall be the agent of the Bank for all purposes and the Bank alone shall be responsible for his acts, default and misconduct and the Trustee and the Noteholders shall not be responsible for any misconduct or negligence on the part of any such Receiver and shall not incur any liability therefor or by reason of its or their making or consenting to the appointment of a Receiver under these presents.

4.19   **Further Assurance**

The Bank shall, at its own cost and expense, promptly and in any event within any time limits imposed by law, execute and do all such assurances, acts and things as the Trustee may require (including, without limitation, the giving of notices of charge, pledge, assignment or transfer and the effecting of filings or registrations in any jurisdiction) for perfecting the Security Interests (including the priority thereof) or protecting the Charged Property and from time to time and at any time after the charge (created pursuant to Clause 4.1 (*Charge and Assignment*)) or any part thereof has become enforceable, or from time to time and at any time in respect of the rights under the Cash Management Agreement assigned pursuant to Clause 4.1 (*Charge and Assignment*)), and shall execute and do all such assurances, acts and things as the Trustee may require for facilitating the realisation of, or enforcement of rights in respect of, all or any of the Charged Property.  For the purposes of this Clause 4.19, a certificate in writing signed by the Trustee to the effect that any particular assurance or thing required by it is required shall be *prima facie* evidence of the fact.

4.20   **Liability of the Trustee**

The Trustee shall not nor shall any Appointee or any of their respective officers, employees, agents or attorneys by reason of taking possession of all or any of the Charged Property or any other reason whatsoever and whether as mortgagee in possession or on any other basis whatsoever be liable to account for anything except actual receipts or be liable for any loss or damage arising from realisation of, or enforcement of rights in respect of such Charged

Property or any other property, assets, rights or undertakings of whatsoever nature whether or not owned by the Bank or any other person or in which the Bank or such other person has an interest, from any act, default or omission in relation to such Charged Property or any other property, assets, rights or undertakings of whatsoever nature whether or not owned by the Bank or any other person or in which the Bank or such other person has an interest, or from any exercise or non-exercise by it of any power, authority or discretion conferred upon it in relation to all or any of the Charged Property or any other property, assets, rights or undertakings of whatsoever nature whether or not owned by the Bank or any other person or in which the Bank or such other person has an interest, by or pursuant to these presents, unless such loss or damage shall be caused by its own fraud, negligence or wilful default.

4.21   **Powers Additional to LPA 1925**

The powers conferred by these presents in relation to all or any of the Charged Property on the Trustee or on any Appointee shall be in addition to and not in substitution for the powers conferred on mortgagees or receivers (in the case of an appointment of a Receiver) under the Law of Property Act 1925 and the Insolvency Act 1986 and where there is any ambiguity or conflict between the powers contained in such Acts and those conferred by these presents the terms of these presents shall prevail.

4.22   **Dealings with the Trustee**

No person dealing with the Trustee or with any Appointee of all or any of the Charged Property appointed by the Trustee shall be concerned to enquire whether any event has happened upon which any of the powers, authorities and discretions conferred by or pursuant to these presents in relation to such Charged Property or any other property, assets or undertaking are or may be exercisable by the Trustee or by any such Receiver or otherwise as to the propriety or regularity of acts purporting or intended to be in exercise of any such powers, authorities or discretions and all the protections of purchasers contained in Sections 104 and 107 of the Law of Property Act 1925 shall apply to any person purchasing from or dealing with the Trustee or any such Appointee in like manner as if the statutory powers of sale and of appointing an Appointee in relation to such Charged Property or any other property, assets or undertaking had not been varied or extended by these presents.

4.23   **Retention of Security**

The Trustee may retain all documents deposited with the Trustee under this Trust Deed for a period of seven months after any discharge in full of the Recovery Units; provided that, if at any time during that seven month period, a petition is presented for an order for the winding-up of the Bank or any corporate action, legal proceedings or other procedure or step is taken for the administration of, or the appointment of an administrator in respect of, the Bank or the Bank commences to be wound up voluntarily or any analogous proceedings are commenced in respect of the Bank in any jurisdiction, the Trustee may continue to retain such security and such documents for such further period as the Trustee may determine and this Trust Deed, the Security Interests and all such documents shall be deemed to have continued to have been held as security for the obligations of the Bank under the Recovery Units.

4.24   **Representations and Warranties of the Bank in Respect of the Security Interests**

The Bank hereby represents and warrants that, as at the date of this Trust Deed:

(a)     this Trust Deed creates the security which it purports to create over the Charged Property and such security has the ranking and priority it is expressed to have and is not liable to be avoided or otherwise set aside on its liquidation, administration or otherwise;

(b)     the Bank is the sole beneficial owner of the moneys deposited in the Collection Account and sole legal owner of the Collection Account;

(c)     the Bank is not prohibited or restricted by any agreement between it and The Bank of New York Mellon, London Branch or the Cash Manager from charging or otherwise granting the Security Interests;

(d)     there is no Security in existence over the Charged Property other than the Security Interests;

(e)     the Bank has not agreed to create any Security over any of the Charged Property other than the Security Interests;

(f)     none of the Charged Property is the subject of any claim, assertion, infringement, attack, right, action or other restriction or arrangement of whatever nature which does or may impinge upon the validity of the Charged Property or upon the ownership, enforceability or enjoyment of the Charged Property by the Bank; and

(g)     the Bank is not in breach of any of its obligations under the Cash Management Agreement.

The representations and warranties set out in this Clause 4.24 are deemed to be made by the Bank by reference to the facts and circumstances then existing on each Recovery Payment Date.

4.25     **Remedies and waivers**

No failure to exercise, nor any delay in exercising, on the part of the Trustee or any Appointee, any of the rights and powers conferred upon it under or pursuant to this Trust Deed shall operate as a waiver, nor shall any single or partial exercise of any such rights or powers prevent any further or other exercise or the exercise of any other rights or powers under or pursuant to this Trust Deed, all of which rights and powers are cumulative and not exclusive of any rights or remedies provided by law.

5.     **STAMP DUTIES**

The Bank shall pay any stamp, issue, documentary, registration or other taxes and duties, including interest and penalties, payable in Kazakhstan, the United Kingdom, Belgium, Germany, Luxembourg or the United States in respect of the creation, issue and offering of the Notes, any action taken by the Trustee (or any Noteholder where permitted or required under this Trust Deed to do so) to enforce the provisions of the Notes or this Trust Deed, the creation of the Security Interests constituted by this Trust Deed and the execution or delivery of this Trust Deed.  The Bank shall also indemnify the Trustee and the Noteholders from and against (i) all stamp, issue, documentary or other taxes, including interest and penalties, paid or payable by any of them in any jurisdiction in connection with any action taken by or on behalf of the Trustee or, as the case may be, the Noteholders to enforce the Bank's obligations under this Trust Deed or the Notes and (ii) any claim, demand, action, liability, damages, cost, loss or expense (including, without limitation, legal fees of the Trustee and any applicable value added tax) which they may incur as a result of, arising out of or in relation to any failure of the Bank to pay or delay by the Bank in paying any of the same.

5.1     **Change of Taxing Jurisdiction**

If the Bank becomes subject generally to the taxing jurisdiction of a territory or a taxing authority of or in that territory with power to tax other than or in addition to Kazakhstan or

any such authority of or in such territory then the Bank shall (unless the Trustee otherwise agrees) give the Trustee an undertaking satisfactory to the Trustee in terms corresponding to the terms of Senior Notes and Subordinated Notes Condition 9 (*Taxation*), Original Issue Discount Notes Condition 10 (*Taxation*) and Recovery Units Condition 11 (*Taxation*) with the substitution for, or (as the case may require) the addition to, the references in that Condition to Kazakhstan of references to that other or additional territory or authority to whose taxing jurisdiction the Bank has become so subject. In such event this Trust Deed and the Notes shall be read accordingly.

## 6. APPLICATION OF MONEYS RECEIVED BY THE TRUSTEE

### 6.1 Order of Payment

Other than as specifically provided in the Conditions and, in relation to the Recovery Units, Clause 4.13 (*Enforcement of the Security Interests*), the Trustee shall apply all moneys (which moneys shall be held by the Trustee on trust) received by it under Clause 2.5 (*Payment after an Event of Default*) or Clause 7 (*Enforcement*) of this Trust Deed in respect of any Series (subject to Clause 6.2 (*Accumulation*)):

(a) *first*, in payment or satisfaction of all costs, fees, charges, expenses and liabilities properly incurred by the Trustee in or about the preparation, execution, performance and/or enforcement of the trusts of this Trust Deed (including remuneration of the Trustee and any Appointee appointed hereunder), the Agency Agreement and the Cash Management Agreement;

(b) *secondly, pari passu* and pro rata in payment or satisfaction of all costs, fees, charges, expenses and liabilities properly incurred by (i) (if and to the extent that such moneys have been received by the Trustee in respect of the Recovery Units) the Cash Manager in or about the performance of the Cash Management Agreement (including remuneration of the Cash Manager) and (ii) the Agents in or about the performance of the Agency Agreement (including remuneration of the Agents);

(c) *thirdly*, in or towards payment *pari passu* and rateably of all arrears of amounts corresponding to principal (including prepayment, reduction, Recovery Payments and payment of instalments of principal) and interest remaining unpaid in respect of the Notes of such Series; and

(d) *fourthly*, in payment of any balance to the Bank for itself,

*provided that* no amount due under the Subordinated Notes of any Series shall be paid before all obligations due under each Series of the Senior Notes, the Original Issue Discount Notes and the Recovery Units have been discharged in full.

If the Trustee holds any moneys in respect of Notes which have become void, or` in respect of which claims have become prescribed, the Trustee shall apply them in accordance with the order of payment set out above.

### 6.2 Accumulation

If the amount of the moneys at any time available for payment in respect of the Notes (other than the Recovery Units) under Clause 6.1 (*Order of Payment*) is less than a sum sufficient to pay at least one-tenth of the principal amount or Fully Accreted Principal Amount (as the case may be) of the Notes then outstanding, the Trustee may, at its discretion, invest such moneys on the basis set out in Clause 6.3 (*Authorised Investments*) below. The Trustee may retain such investments and accumulate the resulting income until the accumulations, together with

any other funds for the time being under the control of the Trustee and applicable for this purpose, shall amount to a sum sufficient to pay at least one-tenth of the principal amount (or, in the case of the Original Issue Discount Notes, the Fully Accreted Principal Amount) of the Notes then outstanding. Such investments, accumulations and funds (after deduction of, or provision for, any taxes and any other reductions applicable thereto) shall be applied as specified in Clause 6.1 (*Order of Payment*).

6.3     **Authorised Investments**

Moneys held by the Trustee which may be invested by the Trustee pursuant to Clause 6.2 (*Accumulation*) may be invested in its name or under its control in any investments or other assets (though the Trustee shall be under no obligation to do so) anywhere, whether or not they produce income, or deposited in its name or under its control at such bank (including itself) or other financial institution in such currency as the Trustee may, in its absolute discretion, think fit. If that bank or institution is the Trustee or a subsidiary, holding or associated company of the Trustee, it need only account for an amount of interest at such rate as stated in the terms and conditions of the various Series of Notes.

Any such moneys may be invested in such currency as the Trustee in its absolute discretion may determine and the Trustee may at any time vary or transfer any of such investments for or into other such investments or convert any moneys so deposited into any other currency and shall not be responsible for any loss occasioned by reason of any such investments or such deposit, whether by depreciation in value, change in exchange rates or otherwise.

7.     **ENFORCEMENT**

7.1     **Proceedings brought by the Trustee**

At any time after an Event of Default under the Notes of any Series occurs and is continuing, the Trustee may at its discretion and without further notice take such proceedings as it may think fit against the Bank (including, in the case of an Event of Default under the Recovery Notes, the enforcement of the Security Interests as set out in Clause 4.13 (*Enforcement of the Security Interests*)) to enforce repayment thereof together with premium (if any) and accrued interest and any other moneys payable pursuant to this Trust Deed and may, in order to enforce the obligations of the Bank under this Trust Deed at its discretion and without further notice take such proceedings as it may think fit against the Bank for the purposes of enforcing or preserving any rights or remedies available to it under this Trust Deed in respect of any or all Series of Notes (including, in respect of the Recovery Units, the Security Interests), but the Trustee shall not be bound to take any action under this Clause 7.1 unless:

(a)     it has been so requested in writing by the holders of not less than one fifth in principal amount (or, in the case of the Original Issue Discount Notes, in Fully Accreted Principal Amount) of such Series of outstanding Notes (or, in the case of the Recovery Units, in aggregate number of outstanding Recovery Units) or has been so directed by an Extraordinary Resolution of Noteholders of such Series of outstanding Notes; and

(b)     it has been indemnified, prefunded or provided with security to its satisfaction,

and provided that the Trustee shall not be held liable for the consequences of taking any such action and may take such action without having regard to the effect of such action on individual Noteholders.

Only the Trustee may enforce the provisions of the Notes or this Trust Deed and no Noteholder shall be entitled to proceed directly against the Bank to enforce the provisions of

the Notes or this Trust Deed unless the Trustee, having become bound so to proceed on behalf of the Noteholders, fails to do so within a reasonable time and such failure is continuing.

The Trustee shall not be deemed to be responsible for the consequences of having acted in good faith upon any such instruction as set out in paragraph (a) herein.

**8.     COVENANTS**

8.1   **Covenants in relation to the Senior Notes and the Original Issue Discount Notes**

So long as any of the Senior Notes or the Original Issue Discount Notes are outstanding, the Bank will comply with each of the following covenants:

(a)      **Financial and other information Covenants**

(i)      **Financial Statements**: send to the Trustee at the time of their issue and, in any event:

(A)      (in the case of its audited annual consolidated financial statements and auditor's report and the annual Covenant Balance Sheet and (provided that the Trustee has complied with any procedure required from time to time by the relevant auditor for the Trustee to obtain the Financial Covenant Compliance Report) Financial Covenant Compliance Report) within 150 days of the end of each Financial Year;

(B)      (in the case of its semi-annual reviewed consolidated financial statements and auditor's review opinion and the semi-annual Covenant Balance Sheet and (provided that the Trustee has complied with any procedure required from time to time by the relevant accounting firm for the Trustee to obtain the Financial Covenant Compliance Report) Financial Covenant Compliance Report), within 120 days after the end of each half year; and

(C)      (in the case of its quarterly consolidated financial statements and the quarterly Covenant Balance Sheet), within 45 days after the end of each quarter,

such number of copies in English of such financial statements as the Trustee may request, in the case of any consolidated financial statements prepared in accordance with IFRS and (for the avoidance of doubt) in the case of any Covenant Balance Sheet prepared in accordance with FMSA Methodology, accompanied by the Relevant Information (subject, in the case of any Financial Covenant Compliance Report provided as part of the Relevant Information, as provided in paragraphs (A) and (B) above) and certified by the chairman of the Management Board (in the case of any consolidated financial statements) as presenting fairly in all material respects its financial position as at the date and its financial performance and cash flows for the period for which those financial statements were drawn up, and certified by the chairman of the Board (in the case of the Covenant Balance Sheets) as being prepared by the Bank on an unconsolidated basis in accordance with FMSA Methodology and containing such information as is required to disclose the level of compliance by the Bank with the covenants contained in this Clause 8.1;

(ii)     **Agreed Upon Procedures Report**: send to the Trustee together with each compliance certificate delivered under paragraph (iii)(B) in respect of any

annual and semi-annual Covenant Balance Sheets an Agreed Upon Procedures ("**AUP**") report (provided that the Trustee has complied with any procedure required from time to time by the relevant auditor for the Trustee to obtain the AUP report), addressing covenant compliance and performing procedures as to the Bank's compliance with each of the financial covenants by reference, where possible, to audited financial statements;

(iii)   **Compliance Certificates**: send to the Trustee with each set of its consolidated financial statements and each Covenant Balance Sheet and, in the case of the certifications set out in paragraphs (A), (C) and (D) below, at any other time within 10 Almaty Business Days or, in the case of the certification set out in paragraph (B) below, at any other time within 30 Almaty Business Days (or in each case such longer period as the Trustee shall determine) of any request by the Trustee, compliance certificates signed by the chairman of the Management Board in the case of the certifications set out in paragraphs (A), (C) and (D) below and by the chairman of the Board in the case of the certification set out in paragraph (B) below, including in each case confirmations that (having made all reasonable enquiries and to the best of his knowledge, information and belief or, in the case of paragraph (B) below, to the best of the knowledge, information and belief of the Board (including the Creditor Directors and Independent Directors)) as at a date not more than five Almaty Business Days prior to the date of the relevant compliance certificate:

(A)   no Event of Default or Potential Event of Default or other breach of this Trust Deed has occurred, or is continuing, since the date of the last compliance certificate;

(B)   based on computations to be included in the compliance certificate calculated (where appropriate) in accordance with FMSA rules, it is in compliance with all its financial covenants under the Restructuring Documents;

(C)   no material litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency have been started or threatened against it which would involve a liability or a potential or alleged liability exceeding U.S.$10,000,000 (or its equivalent in other currencies); and

(D)   no other material formal regulatory disputes or other breaches of regulation are outstanding with respect to the Bank,

or giving details of any such instances of non-compliance (to the extent in the case of (C) and (D) that it does not breach any applicable confidentiality restrictions) or, in the Bank's reasonable determination, any such disclosure would be materially prejudicial to its position and (if any Event of Default or Potential Event of Default or other breach of this Trust Deed has occurred, or is continuing) what action the Bank is taking or proposes to take with respect thereto;

(iv)   **Notification of Default** : promptly on becoming aware thereof inform the Trustee of any Event of Default or Potential Event of Default (and the steps, if any, being taken to remedy it) and, upon receipt of a written request to that effect from the Trustee, confirm to the Trustee that, save as previously

notified to the Trustee or as notified in such confirmation, no Event of Default or Potential Event of Default has occurred;

(v)     **Notification of Non-Payment**: use its reasonable endeavours to procure that the Principal Paying Agent notifies the Trustee forthwith in the event that it does not, on or before the due date for payment in respect of the Senior Notes and Original Issue Discount Notes or any of them, receive unconditionally the full amount in the relevant currency of the monies payable on such due date on all such Senior Notes and Original Issue Discount Notes;

(vi)    **Notice of Late Payment**: forthwith upon request by the Trustee give notice to the Senior Noteholders and Original Issue Discount Noteholders of any unconditional payment to the Principal Paying Agent or the Trustee of any sum due in respect of the Senior Notes and Original Issue Discount Notes made after the due date for such payment;

(vii)   **Change in Agents**: give at least 14 days' prior notice to the Holders of the Senior Notes and Original Issue Discount Notes of any future appointment, resignation or removal of any agent or of any change by any agent of its specified office and not make any such appointment or removal without the Trustee's written approval;

(viii)  **Notes Held by the Bank, etc.**: send to the Trustee within 10 Almaty Business Days of being so requested by the Trustee a certificate of the Bank signed by the Chairman of the Management Board of the Bank stating the principal amount of Senior Notes and Original Issue Discount Notes held at the date of such certificate by or on behalf of the Bank or any of its Subsidiaries;

(ix)    **Further Information**: promptly upon request, so far as permitted by applicable law, give the Trustee such other information as it reasonably requires:

        (A)     regarding the financial condition, business and operations of any member of the Group; and

        (B)     to perform any of its functions and discharge the duties, trusts, powers, authorities and discretions vested in it under this Trust Deed or by operation of law;

(x)     **Miscellaneous Information**: promptly upon request of the Trustee send to the Trustee (if the Trustee so requests, in sufficient copies for all the relevant Holders of Senior Notes and Original Issue Discount Notes, other than with respect to any report produced by the Independent Auditor or any copy thereof):

        (A)     so far as permitted by applicable law, a report with details of any Related Party Transaction described in 8.1(c)(xv) (*Arm's length basis and related party transactions*);

        (B)     a report with details of any Potential Event of Default or Event of Default;

        (C)     so far as permitted by applicable law, and to the extent it does not breach any applicable confidentiality restrictions, details of any

change in senior management and/or the auditors of the Bank and, to the extent within the Bank's knowledge, the reasons for such change;

(D)    a copy of any report produced by the Independent Auditor (provided that the Trustee has complied with any procedure required from time to time by the Independent Auditor for the Trustee to obtain such report); and

(E)    a report with details of any material corporate restructuring undertaken by any member(s) of the Group that is not in the ordinary course of business of the Group;

(xi)    **Change in Accounting Principles or Practices**: notify the Trustee if there has been a change in the FMSA Methodology or the accounting practices or any change to the last day of its Financial Year, and procure that its Auditors deliver to the Trustee:

(A)    a description of any change necessary for a comparison of the financial statements delivered by the Bank pursuant to Clause 8.1(a)(i) (*Financial Statements*) against FMSA Methodology or accounting practices upon which the Base Case Model and Unaudited Interim Financial Statements were prepared; and

(B)    sufficient information, in form and substance as may be reasonably required by the Trustee, to enable the holders of the Senior Notes and Original Issue Discount Notes to determine whether the financial covenants have been complied with and to make an accurate comparison between the financial position indicated in those financial statements and the Base Case Model and Unaudited Interim Financial Statements;

(xii)    **Notices to be circulated to Holders**: send to the Trustee for approval in English and at least seven days (or such longer period as the Trustee may determine) prior to publication the form of each notice to be given to Holders of the Senior Notes and the Original Issue Discount Notes in general and, once given, two copies of each such notice, such notice to be in a form approved by the Trustee. For the avoidance of doubt, this clause shall not apply to any Relevant Information;

(xiii)    **Bank Website**:

(A)    make available on its website all non-confidential information delivered by it pursuant to this Clause 8.1(a) (other than any Financial Covenant Compliance Report, AUP Report or Independent Auditor's report or any copy thereof) as soon as possible and, in any event, within five Business Days of sending such information to the Trustee; and

(B)    within seven Almaty Business Days of receipt of any Financial Covenant Compliance Report, AUP report or Independent Auditor's report by the Bank, publish notice thereof on its website and describe on its website any procedure that may be required from time to time for individual Noteholders to obtain copies of such report; and

(xiv)   **Language**: ensure that all information provided by it or on its behalf in connection with this Clause 8.1(a) is provided in the English language or, if that is not possible, provided together with a certified English translation.

(b)   **Financial Covenants**

The Bank shall:

(i)   at all times:

    (A)   maintain a ratio of Capital to Risk Weighted Assets expressed as a percentage that is in compliance with the FMSA Guidance prevailing at the date of the Term Sheet, that is, not less than 10 per cent; and

    (B)   comply with all prudential supervision and capital adequacy ratios as may from time to time be required under legislation, regulations, norms and guidelines in Kazakhstan, including, but not limited to, those regulations, norms and guidelines of the NBK and/or the FMSA;

(ii)   at all times from (and including) the date falling 180 days after the Restructuring Date, comply with the liquidity ratios required by the FMSA Guidance prevailing at 18 April 2010, being no less than:

    (A)   in the case of the "Coefficient of Term Liquidity k4-1"1.0;

    (B)   in the case of the "Coefficient of Term Liquidity k4-2" 0.9; and

    (C)   in the case of the "Coefficient of Term Liquidity k4-3" 0.8;

(iii)   not incur or allow to remain outstanding any Financial Indebtedness if (after taking into account such Financial Indebtedness) the ratio (expressed as a percentage) of Adjusted Liabilities to Total Assets is more than:

    (A)   70 per cent. (for year 2010);

    (B)   67 per cent. (for year 2011);

    (C)   64 per cent. (for year 2012);

    (D)   56 per cent. (for year 2013); and

    (E)   45 per cent. (for the year 2014 and at all times thereafter);

(iv)   ensure that the ratio (expressed as a percentage) of New Net Non-Performing Loans to New Net Loans shall not exceed 20 per cent. as of 31 December 2013 and at all times thereafter;

(v)   at all times, ensure that any new lending (which, for the avoidance of doubt, shall not include any rescheduling of, or capitalisation of interest on, loans originally made prior to the Restructuring Date) is in compliance with the FMSA Guidance prevailing at 18 April 2010 and specifically, that the ratio of Single Party Exposure to Capital should not exceed:

    (A)   25 per cent. in relation to any Single Party; and

(B)    200 per cent. in relation to the total of all Single Parties in relation to which the Bank's Single Party Exposure exceeds 10 per cent. of Capital (provided that for each amount of Single Party Exposure which was outstanding as of the Restructuring Date which is repaid or otherwise discharged a new amount of Single Party Exposure in the same amount may be incurred but provided always that at no time may the ratio of Single Party Exposure to Capital exceed 300 per cent. in relation to the total of all Single Parties in relation to which the Bank's Single Party Exposure exceeds 10 per cent. of Capital);

(vi)    at all times, ensure that any new lending (which, for the avoidance of doubt, shall not include any rescheduling of, or capitalisation of interest on, loans originally made prior to the Restructuring Date) does not result in a Related Party Exposure, save that:

(A)    personal loans made on arm's length terms under existing product lines may be made to employees of the Group;

(B)    personal loans not on arm's length terms may be made to employees of the Bank and Subsidiaries of the Bank incorporated in Kazakhstan up to an individual limit of U.S.$1,000,000 per employee and an aggregate limit at any time of U.S.$20,000,000; and

(C)    the Bank may incur Related Party Exposures of no greater than 15 per cent. of Capital in aggregate to the following entities: BTA Belarus, BTA Armenia, BTA Georgia, BTA Kazan, BTA Russia, BTA Ukraine and Subsidiary and Associate Companies, BTA Securities, BTA Pension Fund, BTA Ipoteka, BTA Zhizn, BTA Zabota, BTA Insurance, JSC Subsidiary of JSC BTA Insurance Company London-Almaty and JSC BTA Orix Leasing (provided that for each amount of Related Party Exposure which was outstanding as of the Restructuring Date which is repaid or otherwise discharged (other than by way of write-off) a new amount of Related Party Exposure in the same amount may be incurred but provided always that at no time may the ratio of Related Party Exposure to Capital exceed 50 per cent. in aggregate);

(vii)    at all times ensure that Exposure to Samruk-Kazyna is limited to KZT 677 billion, excluding accrued interest;

(viii)    at all times from (and including) the date falling 180 days after the Restructuring Date, ensure that the ratio (expressed as a percentage) of the Aggregate Foreign Currency Open Position to Capital is compliant with the FMSA Guidance prevailing at 18 April 2010;

(ix)    ensure that the ratio (expressed as a percentage) of Adjusted Deposits to Adjusted Liabilities shall be greater than the following:

| Relevant Period | Ratio |
| --- | --- |
| From the Restructuring Date to (and including) 31 December 2010 | 43% |
| From 1 January 2011 to (and including) 31 December 2011 | 57% |
| From 1 January 2012 to (and including) 31 December 2012 | 78% |
| From 1 January 2013 to (and including) 31 December 2013 | 106% |
| From 1 December 2014 and at all times thereafter | 150% |

(c)     **Other Covenants of the Bank**

The Bank shall:

(i)     **Authorisations**: promptly (and shall procure that each member of the Group shall promptly) obtain, comply with and do all that is necessary to maintain in full force and effect and supply certified copies to the Trustee of, any Authorisation required under any law or regulation of a Relevant Jurisdiction to enable it to (i) perform its obligations under the Senior Notes and Original Issue Discount Notes; (ii) ensure the legality, validity, enforceability or admissibility in evidence of any Restructuring Document; and (iii) carry on its business except in any such case where failure to do so is not reasonably likely to have a Material Adverse Effect;

(ii)    **Compliance with laws and other regulatory requirements**:

(A)     comply, and shall ensure that each member of the Group will comply, in all respects with all laws and regulations to which it may be subject if failure so to comply has or is reasonably likely to have a Material Adverse Effect;

(B)     not (and ensure that no member of the Group will), and shall not authorise any person acting on its behalf to, engage in any: (A) Corrupt Practices, Fraudulent Practices, Collusive Practices or Coercive Practices in connection with the Group's business and operations, including the procurement or the execution of any contract for goods or works relating to the Group's business; (B) Obstructive Practices; (C) Money Laundering, or act in breach of any law in any Relevant Jurisdiction relating to Money Laundering; or (D) the Financing of Terrorism, and the Bank shall institute, maintain and comply with internal procedures and controls following international best practice standards for the purpose of preventing any action in breach of the provisions of this paragraph (B);

(C)     inform the Trustee promptly if it should at any time obtain information in relation to any violation or potential violation of the provisions of paragraph (B) above; and

(D)     if the Trustee notifies the Bank of its concern that there has been a violation of any of the provisions of paragraph (B) above, (1) co-operate in good faith with the Trustee and its representatives in determining whether such a violation has occurred; (2) respond promptly and in reasonable detail to any notice from the Trustee; and (3) furnish documentary support for such response upon request from the Trustee, and notwithstanding any other provision of the Senior Notes and Original Issue Discount Notes, the Bank acknowledges that the Trustee may disclose to any competent national or international authority any information obtained by the Trustee in relation to any violation of any of the provisions of paragraph (B) above;

(iii)   **Taxation**: (i) pay and discharge (and ensure that each member of the Group will pay and discharge) all Taxes imposed upon it or its assets within the time period allowed without incurring penalties unless and only to the extent that: (A) such payment is being contested in good faith and it will pay and

discharge any such Taxes that are properly due and payable after having been finally determined or settled; and (B) adequate reserves are being maintained for those Taxes and the costs required to contest them pursuant to FMSA Methodology; and (ii) not permit any member of the Group to change its residence for Tax purposes, except that Subsidiaries of the Bank may change their residence for Tax purposes where to do so does not and could not reasonably be expected to have a Material Adverse Effect;

(iv)     **Compliance with the Restructuring Plan and Bank's Charter:**

    (A)     comply (and shall procure that each member of the Group will comply) in all respects with all provisions of the Restructuring Plan and its Business Plan, save where otherwise approved by a Qualified Majority, and with all provisions set out in the Bank's Charter;

    (B)     subject to Clause 8.1(c)(xvii) (*Listing*), not take any decision on the de-listing of the Notes, GDRs or Shares without obtaining the approval of a Qualified Majority of the Board; and

    (C)     not take any decision to approve any public offering of equity securities of the Bank,

save where permitted pursuant to the Bank's Charter with Supermajority Approval, or where required in accordance with the mandatory provisions of applicable law including, but not limited to, a governmental order, final and non-appealable court order or arbitral decision);

(v)     **Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities:**

    (A)     not amend, or take any action with a view to amending, any provision of the Bank's Charter (as amended in accordance with the Deeds of Undertaking), except in the case of any amendment which (1) does not contravene or result in contravention of any provision of the Senior Notes and (2) if made prior to the Minority Protection Expiry Date (as defined in the Information Memorandum), has been approved by the requisite constituency of Shareholders as set out in the Bank's Charter, the Deeds of Undertaking and the Deposit Agreement;

    (B)     not amend, or take any action with a view to amending, its authorised share capital, or repurchase (or permit any member of the Group to purchase) any of its issued shares in circumstances which would result in any reduction of its share capital up until the third anniversary of the Restructuring Date and, thereafter by more than 1 per cent. in aggregate in any year; and

    (C)     not repurchase (or permit any member of the Group to purchase) any Subordinated Notes while any of the Senior Notes or Original Issue Discount Notes are outstanding and not repurchase (or permit any member of the Group to purchase) any Senior Notes or Original Issue Discount Notes except:

        (1)     in the open market or by a private agreement by BTA Pension Fund, BTA Zhizn, BTA Zabota, BTA Insurance

and/or JSC Subsidiary of JSC BTA Insurance Company London Almaty;

(2) in the ordinary course of business of the Bank in connection with any BTA/NBK Repo Transaction or other transaction between the Bank and one of its customers where such Senior Notes or Original Issue Discount Notes are to be used as collateral;

(3) for cancellation immediately following purchase; or

(4) as part of its treasury operations in the ordinary course of business by the Bank and/or JSC "BTA Securities" (and not cancelled) provided that the outstanding principal amount of Senior Notes and Original Issue Discount Notes so purchased does not exceed U.S.$50 million at any time pursuant to this paragraph (4),

provided further that any Notes held by the Bank or any member of the Group shall cease to carry the right to attend and vote at a meeting of the relevant Noteholders and will not be taken into account, inter alia, for purposes of determining the quorum for such meetings and modification and waiver of the terms and conditions thereof as set out in Schedule 3 (*Provisions of Meetings of Noteholders*) of this Trust Deed;

(vi) **Tax treatment**: (i) use its reasonable endeavours to ensure that all payments can be made under the Senior Notes and Original Issue Discount Notes without any Tax Deduction; and (ii) use its reasonable endeavours to ensure that no Tax liability shall be incurred by itself, its Subsidiaries or any Holder of the Senior Notes and Original Issue Discount Notes with respect to any cancellation pursuant to the Restructuring of any Financial Indebtedness owing by it to holders of the Senior Notes and Original Issue Discount Notes;

(vii) **Establishment of GDR programme**: establish a GDR programme in respect of the Bank's shares and procure the listing of such GDRs on an Approved Stock Exchange within six months of the date of issue of the Senior Notes and Original Issue Discount Notes;

(viii) **Use of proceeds**: not (and the Bank shall ensure that no member of the Group will) use the proceeds of any Financial Indebtedness raised after the date of issue of the Senior Notes and Original Issue Discount Notes for any purpose other than in accordance with the Business Plan or to repay any amount under the Notes and the RCTFF Agreement which is outstanding after the date of issue of the Senior Notes and Original Issue Discount Notes;

(ix) **Disposals**: not (and the Bank shall ensure that no member of the Group will) enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose of any asset other than a sale, lease, transfer or other disposal (A) on arm's length in its ordinary course of trade, (B) made on normal commercial terms and at fair market value, (C) for cash on arm's length terms of any surplus or obsolete or worn out assets not required for the efficient operation of the business, (D) for the purpose of securitisation of those assets, (E) to which the Trustee has given its consent or (F) for another asset which, in the

reasonable opinion of the Bank, is comparable or superior as to type, value and quality, and provided further that in the case of sub-paragraphs (A), (B) and (D) where either (1) the total consideration for such disposal is greater than U.S.$15,000,000, at least 50 per cent. of the consideration consists of Cash or Cash Equivalent Investments or (2) the total consideration for such disposal is greater than U.S.$75,000,000, at least 75 per cent. of the consideration for such disposal consists of Cash or Cash Equivalent Investments;

(x) **Joint ventures**: not (and the Bank shall ensure that no member of the Group will): (A) enter into, invest in or acquire (or agree to acquire) any shares, stocks, securities or other interest in any Joint Venture; or (B) transfer any assets or lend to or guarantee or give an indemnity for or give Security for the obligations of a Joint Venture or maintain the solvency of or provide working capital to any Joint Venture (or agree to do any of the foregoing), other than an acquisition of (or agreement to acquire) any interest in a Joint Venture or transfer of assets (or agreement to transfer assets) to a Joint Venture or loan made to or guarantee given in respect of the obligations of a Joint Venture if such transaction is a Permitted Acquisition or a Permitted Joint Venture;

(xi) **Acquisitions and incorporation of subsidiaries**: not (and the Bank shall ensure that no member of the Group will): (A) acquire a company or any shares or securities or a business or undertaking (or, in each case, any interest in any of them); or (B) incorporate a company, other than an acquisition of a company, of shares, securities or a business or undertaking (or, in each case, any interest in any of them) or the incorporation of a company which is a Permitted Acquisition or a Permitted Transaction;

(xii) **Merger**: not (and the Bank shall ensure that no member of the Group will) enter into any amalgamation, demerger, merger, consolidation or corporate reconstruction, unless:

(A) (in the case of any amalgamation, demerger, merger, consolidation or corporate reconstruction in respect of the Bank and subject always to the provisions in the Conditions relating to Change of Control):

(1) the entity (if other than the Bank) formed by or resulting from any such consolidation or merger shall be duly incorporated, organised and existing under the laws of the Republic of Kazakhstan and shall assume the performance and observance of all of the obligations and conditions under the Senior Notes and Original Issue Discount Notes to be performed or observed by the Bank;

(2) the Bank or such successor, as the case may be, shall not immediately thereafter be in default (or would, with the giving of notice or lapse of time, or both, be in default) in relation to any of its obligations under the Senior Notes and Original Issue Discount Notes;

(3) there has been delivered to the Trustee one or more opinion(s) of counsel acceptable to the Trustee (x) to the effect that holders of the Senior Notes and Original Issue Discount Notes will not recognise income gain or loss for U.S. federal income tax purposes as a result of such

amalgamation, demerger, merger, consolidation or corporate reconstruction and will be subject to U.S. federal income tax in the same amount and in the same manner and at the same times as would have been the case if such amalgamation, demerger, merger, consolidation or corporate reconstruction had not occurred, and (y) addressing such other matters as the Trustee may deem necessary; and

(4)   the Financial Indebtedness of the Bank or such successor shall at the time of the relevant event be rated by at least one Rating Agency and the Trustee has been advised by such Rating Agency which shall then be rating such senior debt (or if more than two, by a majority of them) that the relevant event will not result in a downgrade of such Rating Agency or Rating Agencies' rating of the Senior Notes and Original Issue Discount Notes or the senior debt of the Bank or such successor; or

(B)   in the case of any amalgamation, merger, consolidation or corporate reconstruction in respect of the Bank, if the entity or entities with which the Bank has amalgamated, merged, consolidated or entered into a corporate reconstruction had been acquired, such acquisition would have constituted a Permitted Acquisition;

(C)   in the case of any demerger or corporate reconstruction in respect of the Bank which entails the disposal of any shares or assets, such disposal would have been permitted in accordance with Clause 8.1(c)(ix) (*Disposals*); and

(D)   (in the case of any amalgamation, demerger, merger, consolidation or corporate reconstruction in respect of any of the Bank's Subsidiaries), the relevant transaction constitutes a Permitted Transaction within the meaning of paragraph (c) of that definition;

(xiii)   **Change of business**: procure that no substantial change is made to the general nature of the business of the Bank or the Group taken as a whole from that carried on by them at the date of issue of the Senior Notes and Original Issue Discount Notes or as otherwise contemplated by the Business Plan;

(xiv)   **Pari passu ranking**: ensure that its payment obligations under the Senior Notes and Original Issue Discount Notes rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application, and that its payment obligations under the Subordinated Notes rank as provided in the applicable terms and conditions of such Subordinated Notes;

(xv)   **Arm's length basis and related party transactions:**

(A)   not (and the Bank shall ensure that no member of the Group will), directly or indirectly, conduct any business, enter into or permit to exist any transaction or series of related transactions (including, without limitation, the sale, transfer, purchase, assignment, lease, conveyance or exchange of any property or the rendering of any

service) with any person (including, without limitation, any Related Party) except on arm's length terms and for fair market value, other than a Permitted Transaction, and provided that, where such transaction is with a Related Party, the Bank has complied with the provisions of paragraph (B) below;

(B)   a transaction or series of related transactions between a member of the Group and a Related Party (other than an Excluded Related Party or lending by the Bank to Subsidiary and Associate Banks (BTA Bank Belarus, BTA Armenia, BTA Georgia, BTA Kazan, BTA Russia, BTA Ukraine) and Subsidiary and Associate Companies (BTA Securities, BTA Pension Fund, BTA Ipoteka, BTA Zhizn, BTA Zabota, BTA Insurance, JSC Subsidiary of JSC BTA Insurance Company London Almaty and JSC BTA Orix Leasing) within the limits set out in Clause 8.1(a) (*Financial and other Information Covenants*) and 8.1(b) (*Financial Covenants*) or transactions in relation to the Recovery Assets in accordance with the Recovery Units Conditions):

(1)   which involves aggregate payments or value of U.S.$5,000,000 (or its equivalent) or less shall only be permitted if the terms of such transaction or series of related transactions have been notified in writing to the Trustee and a simple majority (comprised of disinterested directors with respect to such transaction or series of related transactions) of the Board shall have determined in good faith that the transaction or series of related transactions will be on arm's length terms (or better) and for full market value and have approved the relevant transaction or series of transactions, as evidenced by a resolution of the Board; or

(2)   which involves aggregate payments or value in excess of U.S.$5,000,000 (or its equivalent) shall only be permitted if the terms of such transaction or series of related transactions have been notified in writing to the Trustee and a Qualified Majority shall have determined in good faith that the transaction or series of related transactions will be on arm's length terms (or better) and for full market value and have approved the relevant transaction or series of transactions, as evidenced by a resolution of the Board, and, where the aggregate payments or value exceed U.S.$75 million, shall have obtained a confirmation from an independent investment bank, accountancy firm or other consultant of recognised standing selected by the Bank and approved by the Trustee that such transaction or series of related transactions will be on arm's length terms (or better) and for full market value;

(xvi)   **Maintenance of proper books and records**: keep, and procure that each of member of the Group keeps, (A) proper books of account and accounting records (including, for the avoidance of doubt, the annual and semi-annual financial statements and quarterly management accounts required pursuant to Clause 8.1(a) (*Financial and other information covenants*) in accordance with applicable law; and (B) so far as permitted by applicable law, allow the Trustee and anyone appointed by it to whom the Bank has no reasonable

objection, access to its books of account at all reasonable times during normal business hours;

(xvii) **Listing**: use its reasonable endeavours to procure the admission of the Tenge Notes on the KASE and the Non-Tenge Notes to trading on KASE and on an Approved Stock Exchange and to maintain the listing of such notes on such exchanges (including by making all disclosures required by such exchanges), but if it is unable to do so having used such endeavours or if the maintenance of such listings is agreed by the Trustee to be unduly onerous and the Trustee is satisfied that the interests of the Holders of the Non-Tenge Notes would not be materially prejudiced thereby, the Bank shall use its reasonable endeavours to procure and maintain the listing on another stock exchange or market agreed with the Trustee;

(xviii) **Insurance**: maintain (and ensure that each member of the Group will maintain) at its own expense with reputable independent insurance companies or underwriters of good standing insurances on and in relation to its business and assets against those risks and to the extent as is usual for businesses carrying on the same or substantially similar business;

(xix) **Remuneration of senior management and service and management contracts**: (A) ensure that the remuneration of members of the Board and of the management board of the Bank, and of the board of directors and management board of each of its Subsidiaries, are in accordance with commercially reasonable standards; (B) ensure that there is in place in respect of each member of the Group qualified management with appropriate skills; and (C) not enter into a Management Contract with any person unless such contact has been specifically authorised by a Qualified Majority;

(xx) **Treasury transactions:**

(A) not (and will procure that no members of the Group will) enter into any Treasury Transaction, other than:

(1) spot and forward delivery foreign exchange contracts entered into in the ordinary course of business and not for speculative purposes; or

(2) any Treasury Transaction entered into for the hedging of actual or projected real exposures arising in the ordinary course of trading activities of a member of the Group and not for speculative purposes; and

(3) any Treasury Transaction entered into in the ordinary course of the Bank's trading activities for speculative purposes, provided that the aggregate notional amount of contingent or actual liabilities of the Bank under any such Treasury Transactions does not exceed the greater of 10 per cent. of the Capital of the Bank or U.S.$350,000,000 at any time (by reference to, in the first Financial Year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent and, thereafter, its most recent annual Covenant Balance Sheet delivered in accordance with Clause 8.1(a)(i) (*Financial Statements*)); and

(B)     ensure that all exchange rate and interest rate hedging arrangements required to protect its open currency positions in compliance with Clause 8.1(b) (*Financial Covenants*) are implemented, documented under appropriate market standard documents with the NBK or with other counterparties with a credit rating of at least BBB-or the Development Bank of Kazakhstan provided it has a credit rating of at least BB+ (or its equivalent) (or to the extent there is no such counterparty, such other counterparty with a lower credit rating with Qualified Majority approval) by a Rating Agency and that such arrangements are legal, valid, binding and enforceable obligations of such counterparty;

(xxi)    **Limitations on payment of dividends and share redemption**: not: (A) declare, make or pay any dividend, charge, fee or other distribution (or interest on any unpaid dividend, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its share capital (or any class of its share capital) other than a Permitted Dividend; (B) repay or distribute any dividend or share premium reserve; (C) pay or allow any member of the Group to pay any management, advisory or other fee (other than the SK Guarantee Fee) to or to the order of any of the Shareholders of the Bank; or (D) other than in accordance with Clause 8.1(c)(v) (*Restrictions or amendments to the Bank's Charter or change in share capital and on the repurchase of securities*), redeem, repurchase, retire or repay any of its share capital or resolve to do so;

(xxii)   **Corporate governance**: comply with (and will procure that each member of the Group complies with) each of the corporate governance requirements set out in the Corporate Governance Code;

(xxiii)  **Compliance Audit**: procure that the Independent Auditor investigates annually (with the first such investigation occurring on or about the date falling six-months after the Restructuring Date), and promptly reports on to the audit committee chaired by a Creditor Director, the Bank's compliance with the Corporate Governance Code and internal procedures and controls, all at the Bank's cost. Any non-compliance identified in that report shall be remedied by the Bank within six months of the date of the report and shall be noted in the Bank's annual financial statements;

(xxiv)   **Negative Pledge**: not, and not permit any Material Subsidiary to, create or permit to subsist any Security (other than Permitted Security) upon the whole or any part of its present or future undertaking, assets or revenues (including uncalled capital) to secure any Financial Indebtedness or guarantee of Financial Indebtedness without (A) at the same time or prior thereto securing the Senior Notes and the Original Issue Discount Notes equally and rateably therewith or (B) providing such other security for the Senior Notes and Original Issue Discount Notes as may be approved by Extraordinary Resolutions of Holders of the Senior Notes and Original Issue Discount Notes or as the Trustee in its absolute discretion shall deem to be not materially less beneficial to Holders of the Senior Notes and Original Issue Discount Notes;

(xxv)    **Auditors**: at all times maintain as its auditor, a "Big Four" accounting firm;

(xxvi)   **Government Funding**: for so long as any of the Senior Notes and the Original Issue Discount Notes remain outstanding it shall use its reasonable efforts to remain eligible for participation in programmes sponsored by the

government of Kazakhstan or its agencies for funding the commercial banking sector and to participate in such programmes to the extent such funding is available on reasonable commercial terms; and

(xxvii) **Further Acts**: so far as permitted by applicable law, do such further things, including but not limited to the execution of any further documents, as may be necessary in the opinion of the Trustee to give effect to this Trust Deed in respect of the Senior Notes and Original Issue Discount Notes.

For the purposes of the covenants contained in this Clause 8.1, the completion of the acquisition of and/or merger with Ular Umit SPF JSC, Zhetysu OOIUPA JSC, Atlanta Police IC JSC and Titan Inkassatsia LLP by any member of the Group shall be permitted and such acquisitions and/or mergers shall under no circumstances constitute or trigger a breach of any of the covenants contained herein.

8.2    **Covenants in relation to the Subordinated Notes**

So long as any amount is outstanding under the Subordinated Notes the Bank shall:

(a)     **Financial and other information Covenants**

(i)     **Financial Statements**: send to the Trustee at the time of their issue and, in any event:

(A)     (in the case of its audited annual consolidated financial statements and auditor's report and the annual Covenant Balance Sheet and (provided that the Trustee has complied with any procedure required from time to time by the relevant auditor for the Trustee to obtain the Financial Covenant Compliance Report) Financial Covenant Compliance Report) within 150 days of the end of each Financial Year;

(B)     (in the case of its semi-annual reviewed consolidated financial statements and auditor's review opinion and the semi-annual Covenant Balance Sheet and (provided that the Trustee has complied with any procedure required from time to time by the relevant accounting firm for the Trustee to obtain the Financial Covenant Compliance Report) Financial Covenant Compliance Report), within 120 days after the end of each half year; and

(C)     (in the case of its quarterly consolidated financial statements and the quarterly Covenant Balance Sheet), within 45 days after the end of each quarter,

such number of copies in English of such financial statements as the Trustee may request, in the case of any consolidated financial statements prepared in accordance with IFRS and (for the avoidance of doubt) in the case of any Covenant Balance Sheet prepared in accordance with FMSA Methodology, accompanied by the Relevant Information (subject, in the case of any Financial Covenant Compliance Report provided as part of the Relevant Information, as provided in paragraphs (A) and (B) above) and certified by the chairman of the Management Board (in the case of any consolidated financial statements) as presenting fairly in all material respects its financial position as at the date and its financial performance and cash flows for the period for which those financial statements were drawn up, and certified by the chairman of the Board (in the case of the Covenant Balance Sheets) as being prepared

by the Bank on an unconsolidated basis in accordance with FMSA Methodology and containing such information as is required to disclose the level of compliance by the Bank with the covenants contained in this Clause 8.2;

(ii)     **Agreed Upon Procedures Report**: send to the Trustee together with each compliance certificate delivered under paragraph 8.1(a)(iii)(B) in respect of any annual and semi-annual Covenant Balance Sheets an Agreed Upon Procedures ("**AUP**") report (provided that the Trustee has complied with any procedure required from time to time by the relevant auditor for the Trustee to obtain the AUP report), addressing covenant compliance and performing procedures as to the Bank's compliance with each of the financial covenants by reference, where possible, to audited financial statements;

(iii)    **Compliance Certificates**: send to the Trustee with each set of its consolidated financial statements and each Covenant Balance Sheet and, in the case of the certifications set out in paragraphs (A), (C) and (D) below, at any other time within 10 Almaty Business Days or, in the case of the certification set out in paragraph (B) below, at any other time within 30 Almaty Business Days (or in each case such longer period as the Trustee shall determine) of any request by the Trustee, compliance certificates signed by the chairman of the Management Board in the case of the certifications set out in paragraphs (A), (C) and (D) below and by the chairman of the Board in the case of the certification set out in paragraph (B) below, including in each case confirmations that (having made all reasonable enquiries and to the best of his knowledge, information and belief or, in the case of paragraph (B) below, to the best of the knowledge, information and belief of the Board (including the Creditor Directors and Independent Directors)) as at a date not more than five Almaty Business Days prior to the date of the relevant compliance certificate:

(A)     no Event of Default or Potential Event of Default or other breach of this Trust Deed has occurred, or is continuing, since the date of the last compliance certificate;

(B)     based on computations to be included in the compliance certificate calculated (where appropriate) in accordance with FMSA rules, it is in compliance with all its financial covenants under the Restructuring Documents;

(C)     no material litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency have been started or threatened against it which would involve a liability or a potential or alleged liability exceeding U.S.$10,000,000 (or its equivalent in other currencies); and

(D)     no other material formal regulatory disputes or other breaches of regulation are outstanding with respect to the Bank,

or giving details of any such instances of non-compliance (to the extent in the case of (C) and (D) that it does not breach any applicable confidentiality restrictions) or, in the Bank's reasonable determination, any such disclosure would be materially prejudicial to its position and (if any Event of Default or Potential Event of Default or other breach of this Trust Deed has occurred, or is continuing) what action the Bank is taking or proposes to take with respect thereto;

(iv)     **Notification of Default** : promptly on becoming aware thereof inform the Trustee of any Event of Default or Potential Event of Default (and the steps, if any, being taken to remedy it) and, upon receipt of a written request to that effect from the Trustee, confirm to the Trustee that, save as previously notified to the Trustee or as notified in such confirmation, no Event of Default or Potential Event of Default has occurred;

(v)      **Notification of Non-Payment:** use its reasonable endeavours to procure that the Principal Paying Agent notifies the Trustee forthwith in the event that it does not, on or before the due date for payment in respect of the Subordinated Notes or any of them, receive unconditionally the full amount in the relevant currency of the monies payable on such due date on all such Subordinated Notes;

(vi)     **Notice of Late Payment:** forthwith upon request by the Trustee give notice to the Subordinated Noteholders of any unconditional payment to the Principal Paying Agent or the Trustee of any sum due in respect of the Subordinated Notes made after the due date for such payment;

(vii)    **Change in Agents**: give at least 14 days' prior notice to the Subordinated Noteholders of any future appointment, resignation or removal of any agent or of any change by any agent of its specified office and not make any such appointment or removal without the Trustee's written approval;

(viii)   **Notes Held by the Bank, etc.**: send to the Trustee within 10 Almaty Business Days of being so requested by the Trustee a certificate of the Bank signed by the Chairman of the Management Board of the Bank stating the principal amount of Subordinated Notes held at the date of such certificate by or on behalf of the Bank or any of its Subsidiaries;

(ix)     **Further Information**: promptly upon request, so far as permitted by applicable law, give the Trustee such other information as it reasonably requires:

(A)     regarding the financial condition, business and operations of any member of the Group; and

(B)     to perform any of its functions and discharge the duties, trusts, powers, authorities and discretions vested in it under this Trust Deed or by operation of law;

(x)      **Miscellaneous Information**: promptly upon request of the Trustee send to the Trustee (if the Trustee so requests, in sufficient copies for all the relevant Holders of the Subordinated Notes, other than with respect to any report produced by the Independent Auditor (set out in paragraph (D) below) or any copy thereof):

(A)     so far as permitted by applicable law, a report with details of any Related Party Transaction described in 8.1(c)(xv) (*Arm's length basis and related party transactions*);

(B)     a report with details of any Potential Event of Default or Event of Default;

(C)     so far as permitted by applicable law, and to the extent it does not breach any applicable confidentiality restrictions, details of any change in senior management and/or the auditors of the Bank and, to the extent within the Bank's knowledge the reasons for such change;

(D)     a copy of any report produced by the Independent Auditor pursuant to Clause 8.1(c)(xxiii) (*Compliance Audit*) (provided that the Trustee has complied with any procedure required from time to time by the Independent Auditor for the Trustee to obtain such report)s; and

(E)     a report with details of any material corporate restructuring undertaken by any member(s) of the Group that is not in the ordinary course of business of the Group;

(xi)    **Change in Accounting Principles or Practices**: notify the Trustee if there has been a change in the FMSA Methodology or the accounting practices or any change to the last day of its Financial Year, and procure that its Auditors deliver to the Trustee:

(A)     a description of any change necessary for a comparison of the financial statements delivered by the Bank pursuant to Clause 8.2(a)(i) (*Financial Statements*) against FMSA Methodology or accounting practices upon which the Base Case Model and Unaudited Interim Financial Statements were prepared; and

(B)     sufficient information, in form and substance as may be reasonably required by the Trustee, to enable the Subordinated Noteholders to determine whether the financial covenants have been complied with and to make an accurate comparison between the financial position indicated in those financial statements and the Base Case Model and Unaudited Interim Financial Statements;

(xii)   **Notices to be circulated to Holders**: send to the Trustee for approval in English and at least seven days (or such longer period as the Trustee may determine) prior to publication the form of each notice to be given to Subordinated Noteholders in general and, once given, two copies of each such notice, such notice to be in a form approved by the Trustee. For the avoidance of doubt, this clause shall not apply to any Relevant Information;

(xiii)  **Bank Website**:

(A)     make available on its website all non-confidential information delivered by it pursuant to this Clause 8.2(a) (other than any Financial Covenant Compliance Report, AUP report or Independent Auditor's report or any copy thereof) as soon as possible and, in any event, within five Business Days of sending such information to the Trustee; and

(B)     within seven Almaty Business Days of receipt of any Financial Covenant Compliance Report, AUP report or Independent Auditor's report by the Bank, publish notice thereof on its website and describe on its website any procedure that may be required from time to time for individual Noteholders to obtain copies of such report; and

55

(xiv) **Language**: ensure that all information provided by it or on its behalf in connection with this Clause 8.2(a) is provided in the English language or, if that is not possible, provided together with a certified English translation.

(b) **Government Funding**: for so long as any of the Subordinated Notes remain outstanding it shall use its reasonable efforts to remain eligible for participation in programmes sponsored by the government of Kazakhstan or its agencies for funding the commercial banking sector and to participate in such programmes to the extent such funding is available on reasonable commercial terms.

8.3 **Covenants in relation to the Recovery Units**

(a) **Collection Account and Conversion**

(i) Save as provided in Recovery Units Condition 7 (*Recovery Payments*), promptly following receipt of any Recoveries in U.S. Dollars the Bank shall deposit the Specified Percentage of such amount into the Collection Account.

(ii) Save as provided in Recovery Units Condition 7 (*Recovery Payments*), promptly following receipt of the benefit of any Relief, the Bank shall pay an amount in U.S. Dollars (effecting any necessary currency exchange at the Spot Rate of Exchange) equal to the Specified Percentage of such benefit of Relief into the Collection Account.

(iii) Save as provided in Recovery Units Condition 7 (*Recovery Payments*), the Bank shall, within 10 Business Days of receipt of any Recoveries that are not in U.S. Dollars, convert the Specified Percentage of such Recoveries into U.S. Dollars at the Spot Rate of Exchange and deposit the net proceeds of conversion into the Collection Account, provided that the Bank shall be under no obligation to convert any such Recoveries into U.S. Dollars or deposit any amounts into the Collection Account until such net proceeds exceed U.S.$5 million (determined by reference to the Spot Rate of Exchange for the relevant currencies).

(iv) The amount payable in respect of Recoveries shall (subject as provided in the definition of Tax Assets) be determined on a pre tax basis and on an asset by asset or pooled basis (as provided in the definition of Write backs) by reference to the KPMG Provisions Report, the Recovery Assets Opening Report and the most recently delivered Quarterly Recovery Assets Management Report and a Recovery in relation to a Write Back comprising an accounting recovery shall be treated as received for the purposes of this paragraph (iv) only when the Bank obtains the cash or cash equivalent benefit thereof.

(v) In this Clause 8.3(a) "**Business Day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in Almaty, London and New York City.

(b) **Preservation of Security Interests**: The Bank shall ensure that the Security Interests created in Clause 4 (*Security Interests*) shall at all times be in full force and effect. In addition, the Bank shall not take or omit to take any action that would have the result of materially impairing the Security Interests created by this Trust Deed, and the Bank shall not grant any person other than the Trustee for the benefit of the Recovery Unit holders any interests whatsoever with respect to the Charged Property.

(c)    **No Netting Off**

Other than in respect of assets to be pooled in accordance with paragraph (i)(A) of the definition of Write backs in the Recovery Units Conditions, Recoveries will not be netted off against any asset of the Bank which has been written off or in respect of which a provision has been created or increased.

(d)    **Information and Review Covenants.**

    (i)    **Production of Quarterly Management Information**: The Bank shall, within 30 days of the end of each financial quarter, provide to the Trustee and the Recovery Assets Auditor a quarterly management information report (the "**Quarterly Recovery Assets Management Report**") on the ongoing performance of Recoveries Assets such report to include (details of):

        (A)    amounts paid out to Recovery Unit holders in the previous financial quarter;

        (B)    the nature of the Recoveries made (including a loan-by-loan breakdown showing the loans by reference to which Recoveries were made) and the amount thereof (calculated in accordance with FMSA Methodology), including whether they constituted a payment of principal or interest;

        (C)    reports from each of:

            (1)    the Legal Department;

            (2)    the Non-Performing Loan Department; and

            (3)    the Department of Restructuring of Assets,

        of the Bank as to Recoveries Assets and Recoveries and related activities by reference to the immediately preceding quarter, and planned during the subsequent two, financial quarters;

        (D)    updating reports from international legal and financial advisers with respect to their continuing engagement in the Recovery Programme;

        (E)    any Recovery Assets Replacement Loans made during the previous financial quarter or currently under negotiation or proposed; and

        (F)    any other loans made or contracted to borrowers or other debtors with respect to Recoveries Assets (or parties connected with them) during the previous financial quarter or currently under negotiation or proposed.

    (ii)    **Quarterly independent review of ongoing operation and monitoring of the Recoveries Assets**: The Bank shall procure that the Recovery Assets Auditor will carry out an ongoing quarterly review covering:

        (A)    independent sample testing of:

        (1)     loans constituting Recoveries Assets and Recovery Assets Replacement Loans to confirm existence, completeness and accuracy of records; and

        (2)     Recoveries made by reference to them including in the case of sales of portfolios of Recovery Assets, an audit of the attribution of consideration proceeds to particular assets and in particular whether values have been correctly ascertained or otherwise fixed by reference to individual assets in the context of portfolio sales;

(B)     loans to Related Parties;

(C)     quarterly Recoveries Assets' and Recoveries' valuation and appropriate accounting treatment of Recoveries Assets in accordance with FMSA Methodology, to include controls over the use of calculation models and spreadsheets, and regarding the use of third parties for any valuation services provided;

(D)     key controls over the Recoveries Assets and Recoveries, such as bank reconciliations, calculation of interest, provisions for losses and intercompany reconciliations;

(E)     controls (in particular in relation to compliance by the Bank with Clause 8.3(a) (*Collection Account and Conversion*) of this Trust Deed) over the translation of foreign exchange assets and payments made in foreign exchange and controls over any foreign exchange hedging being performed including authorisation in each case in relation to the Recoveries Assets and Recoveries;

(F)     key systems controls in relation to the pursuit of Recoveries and Recoveries Assets including the set-up of new users and segregation of duties;

(G)     disaster recovery and business continuity plans;

(H)     review of management information reporting to Recovery Unit Trustee;

(I)     physical security of loan documentation relating to Recoveries Assets, including the controls in relation to access to documentation such as the use of logs for receipt and return of documentation;

(J)     dual control over payments relating to Recoveries Assets and Recoveries;

(K)     access controls over key payment systems relating to Recoveries Assets and Recoveries;

(L)     controls regarding, and review of, the calculation of payments due to each Recovery Unit holder and the Bank;

(M)     the clear and formal documentation of all material aspects of the activities noted above; and

(N)   review of any management letter from the Bank's Auditor to the Bank relating to any of the above.

The Bank shall comply with the recommendations of the Recovery Assets Auditor with respect to any of the above, including, in particular, any recommendations to the effect that Recoveries (accounting or cash) by reference to any Recoveries Assets (on an asset-by-asset basis) were, or should have been accounted for as having been, higher.

(e)   **Pursuit of Recoveries:**

(i)   The Bank shall with the full support of Samruk-Kazyna, use its reasonable endeavours to maximise the recovery of any valuable asset of the Bank (including any claims available to it) whether in respect of debtors, former management or any other party whatsoever (and in any event act in compliance with its duties under Kazakhstan law and regulation and with international best practice, it being understood and agreed that a vigorous and transparent asset recovery programme (the "**Recovery Programme**") aimed at maximising recovery is of fundamental importance to the Bank, its shareholders and creditors and shall be pursued in their interests alone and, to the fullest extent possible, in a manner consistent with the Base Case Model.

(ii)   The Bank shall ensure that unless otherwise agreed by the Trustee it shall continue to engage appropriate professional advisers in respect of the Recovery Programme and that it will engage or continue to engage such other experts as are appropriate having regard to its duties as set out above. It shall also ensure, without limitation, that it maintains a sufficient team of in-house experts and other staff to support the Recovery Programme;

(iii)   The Bank shall:

(A)   take all reasonable steps, including (without limitation) the making of any claims, elections, surrenders, notices or consorts necessary to ensure that Tax Assets are realised on the earliest date possible;

(B)   keep proper records and accounts in relation to Recoveries and Recoveries Assets, and actions taken to recover them;

(C)   make such records and accounts freely available to the Recovery Assets Auditor and provide to the Recovery Assets Auditor equivalent access to such records and accounts and to personnel of the Bank regarding Recoveries Assets as it would to its auditors;

(D)   not further provide against or write off any Recoveries Asset without providing full justification thereof to the Recovery Assets Auditor;

(E)   before entering into any Recovery Assets Replacement Loan, provide complete copies of all documentation relating thereto (and the Recovery Asset(s) it is to replace) to the Recovery Assets Auditor (together with supporting credit information, including a business plan and historic financial information relating to the debtor(s) and details of any security to be provided in connection therewith, for review by the Recovery Assets Auditor and the reporting of the results of such review to the Trustee;

(F)    not reschedule any Recovery Asset by way of amendment or replacement (by way of a Recovery Assets Replacement Loan or otherwise) or otherwise without review by the Recovery Assets Auditor and the reporting of the results of such review to the Trustee; and

(G)    pay all costs and expenses of the Recovery Assets Auditor.

(f)    **Recovery Sub-Committee.**

(i)    Subject to the provision of confidentiality agreements in a form satisfactory to the Bank, members of the Recovery Sub-Committee of the Bank shall be provided with quarterly reports by the Bank in relation to the progress of the Recovery Programme and upon receipt of such reports the Recovery Sub-Committee shall have the opportunity to comment and/or make recommendations in respect of the Recovery Programme. It is intended that the reporting process shall provide full transparency to the Recovery Sub-Committee.

(ii)    The Recovery Sub-Committee shall act solely as an advisory and consultative body in respect of the Recovery Programme and the Bank, acting through the Board, shall be obliged to consider the Recovery Sub-Committee's recommendations in good faith and shall not take any material decision regarding Recoveries without first having sought recommendations in that regard from the Recovery Sub-Committee.

(g)    **Segregation**

The Impaired Recovery Assets will be segregated for accounting purposes in the Bank's financial statements and for servicing and monitoring purposes in the accounting books and records of the Bank.

## 9.    REMUNERATION AND INDEMNIFICATION OF THE TRUSTEE

### 9.1    Normal Remuneration

So long as any Note is outstanding, the Bank shall pay the Trustee as remuneration for its services as Trustee such sum on such dates in each case as set out in the Combined Proposal for Services of Trustee and Agency Services dated 13 July 2010. Such remuneration shall accrue from day to day from the date of this Trust Deed. However, if any payment to a Noteholder of moneys due in respect of any Note is improperly withheld or refused, such remuneration shall again accrue as from the date of such withholding or refusal until payment to such Noteholder is duly made.

### 9.2    Extra Remuneration

If an Event of Default or Potential Event of Default shall have occurred or if the Trustee considers it expedient or necessary or is requested by the Bank to undertake duties which they both consider to be of an exceptional nature or otherwise outside the scope of the Trustee's normal duties under this Trust Deed, the Bank shall pay such additional remuneration as they may agree or, failing agreement as to any of the matters in this Clause 9.2 or as to such sums referred to in Clause 9.1 (*Normal Remuneration*) as determined by an investment bank (acting as an expert) selected by the Trustee and approved by the Bank or, failing such approval, nominated by the President for the time being of The Law Society of England and Wales. The expenses involved in such nomination and such investment bank's fee shall be payable

by the Bank. The determination of such investment bank shall be conclusive and binding on the Bank, the Trustee and the Noteholders.

9.3   **Expenses**

The Bank shall within 15 business days of any receipt of a demand by the Trustee, pay or discharge all costs, charges, liabilities and expenses properly incurred by the Trustee in the preparation and execution of this Trust Deed and the performance of its functions under this Trust Deed including, but not limited to, legal and travelling expenses and any stamp, documentary or other taxes or duties paid by the Trustee in connection with any legal proceedings brought or contemplated by the Trustee against the Bank to enforce any provision of this Trust Deed or the Notes.  Such costs, charges, liabilities and expenses shall be payable or reimbursable by the Bank against presentation by the Trustee of invoices and such additional documents as the Bank may reasonably request (taking into account the availability of such invoices or documents) in order to comply with the Bank's internal procedures and shall:

(a)   in the case of payments made by the Trustee before such demand carry interest from 15 business days after the date of the demand at the rate of 2 per cent. per annum over the base rate of Barclays Bank Plc on the date on which the Trustee made such payments; and

(b)   in other cases carry interest at such rate from 30 days after the date of the demand or where the demand specifies that payment is to be made on an earlier date from such earlier date.

9.4   **Indemnity**

Without prejudice to the right of indemnity given by law to trustees, the Bank shall on demand by the Trustee indemnify it in respect of Amounts or Claims paid or incurred by it in acting as trustee under this Trust Deed including (i) any Agent/Delegate Liabilities and (ii) in respect of disputing or defending any Amounts or Claims made against the Trustee or any Agent/Delegate Liabilities.  The Bank shall on demand by such agent or delegate indemnify it against such Agent/Delegate Liabilities.  "**Amounts or Claims**" means losses, liabilities, costs, claims, actions, demands or expenses and "**Agent/Delegate Liabilities**" means Amounts or Claims which the Trustee is or would be obliged to pay or reimburse to any of its agents or delegates appointed pursuant to this Trust Deed.

9.5   **Continuing Effect**

Clauses 9.3 (*Expenses*) and 9.4 (*Indemnity*) shall continue in full force and effect as regards the Trustee even if it is no longer the Trustee and notwithstanding any discharge of this Trust Deed.

9.6   **Payments**

All payments to be made by the Bank to the Trustee for its own account under this Trust Deed shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed under any applicable law by or within any relevant jurisdiction or any authority therein or thereof having power to tax, unless such withholding or deduction is required by law. In that event, the Bank shall increase the amount payable to an amount which will result in the receipt by the Trustee of such amount as would have been received by it had no such withholding or deduction been required and, for Kazakhstan tax purposes, such increased amount shall be deemed to be a part of the payments due to the Trustee, *provided that* the

Bank shall not be required to increase any such amount unless the Trustee has delivered to the Bank prior to the payment of the amount the certificate of residency required by Clause 9.7 (*Certificate of Residency*).

## 9.7 Certificate of Residency

The Trustee shall deliver to the Bank prior to any payment to be made by the Bank to the Trustee, a residency certificate confirming its residency in that country issued by the relevant tax authority of that country. The form of such certificate shall be substantially in the form set out in Schedule 7 (*Form of Certificate of Residency*) hereto, or such other form as may be agreed upon from time to time by the Bank and the Trustee. If the Trustee has not delivered the certificate to the Bank prior to any payment to be made by the Bank to the Trustee, the Bank shall apply to such payment any withholding or deduction on account of any taxes imposed under the laws of Kazakhstan and shall not be liable for the payment of any additional amounts.

## 9.8 Value Added Tax

The Bank shall pay to the Trustee an amount equal to the amount of the value added tax or similar tax chargeable in respect of its remuneration of its costs, charges, liabilities or expenses under or in respect of this Trust Deed or in respect of any amount payable under the indemnity in Clause 9.4 (*Indemnity*) or any interest payable under Clause 9.3 (*Expenses*).

## 10. PROVISIONS SUPPLEMENTAL TO THE TRUSTEE ACT 1925 AND THE TRUSTEE ACT 2000

By way of supplement to the Trustee Act 1925 and the Trustee Act 2000, it is expressly declared as follows.

### 10.1 Advice

The Trustee may in relation to this Trust Deed act on (or not act on) the opinion or advice of, or a certificate or information obtained from, any expert, auditor, lawyer, banker, valuer, surveyor, broker, auctioneer or professional entity and shall not be responsible to anyone for any loss occasioned by so acting (or not acting). Any such opinion, advice or information may be sent or obtained by letter, email or fax and the Trustee shall not be liable to anyone for acting (or not acting) on any opinion, advice or information purporting to be conveyed by such means even if it contains some error or is not authentic. The Trustee may rely without liability to Noteholders on any certificate or report prepared by any of the above experts, including specifically the Auditors, or any auditor, pursuant to the Conditions or this Trust Deed, whether or not the expert or auditor's liability in respect thereof is limited by a monetary cap or otherwise or all such liability is disclaimed.

### 10.2 Trustee to Assume Performance

The Trustee need not notify anyone of the execution of this Trust Deed or do anything to find out if an Event of Default or Potential Event of Default has occurred. Until it has actual knowledge or express notice to the contrary, the Trustee may assume that no such event has occurred and that the Bank is performing and observing all its obligations, covenants and provisions under this Trust Deed and the Notes and that no event has occurred as a consequence of which any of the Notes may have become repayable.

### 10.3 Resolutions of Noteholders

The Trustee shall not be responsible for acting upon any resolution purporting to have been passed at a meeting of Noteholders in respect of which minutes have been made and signed or a written resolution made in accordance with paragraph 35 (*Written Resolutions*) of Schedule 3 (*Provisions for Meetings of Noteholders*) even if it is later found that there was a defect in the constitution of the meeting or the passing of the resolution or that the resolution was not valid or binding on the Noteholders.

### 10.4 Certificate signed by Authorised Signatories

If the Trustee, in the exercise of its functions, requires to be satisfied or to have information as to any fact or the expediency of any act, it may call for, rely on and accept as sufficient evidence of that fact or the expediency of that act a certificate signed by any two Authorised Signatories of the Bank or any other person duly authorised on their behalf as to that fact or to the effect that, in their opinion, that act is expedient and the Trustee need not call for further evidence and shall not be responsible for failing to do so or for any loss occasioned by acting on such a certificate.

### 10.5 Reliance on Certification of Clearing System

The Trustee may call for any certificate or other document issued by Euroclear, Clearstream or any other relevant clearing system in relation to any matter. Any such certificate or other document shall, in the absence of manifest error, be conclusive and binding for all purposes. Any such certificate or other document may comprise any form of statement or print out of electronic records provided by the relevant clearing system (including Euroclear's EUCLID or Clearstream's Cedcom system) in accordance with its usual procedures and in which the holder of a particular principal or nominal amount of the Notes is clearly identified together with the amount of such holding. The Trustee shall not be liable to any person by reason of having accepted as valid or not having rejected any certificate or other document to such effect purporting to be issued by Euroclear or Clearstream or any other relevant clearing system and subsequently found to be forged or not authentic.

### 10.6 Noteholders as a Class

Whenever in this Trust Deed the Trustee is required to have regard to the interests of the Noteholders in respect of a Series or in respect of the Noteholders generally in connection with any exercise of its powers, trusts, authorities or discretions, it shall have regard to the interests of the relevant Noteholders as a class and in particular, but without prejudice to the generality of the foregoing, shall not be obliged to have regard to the consequences of such exercise for any individual Noteholder resulting from his or its being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or any political sub-division thereof and the Trustee shall not be entitled to demand from the Bank, nor shall any Noteholder be entitled to claim, from the Bank, the Trustee or any other person any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders except to the extent already provided for in Senior and Subordinated Notes Condition 9 (*Taxation*), Original Issue Discount Notes Condition 10 (*Taxation*) or Recovery Units Condition 11 (*Taxation*) (as the case may be) and/or any undertaking given in addition thereto or in substitution thereof under this Trust Deed, and without prejudice to the right of the Trustee to be indemnified by the Bank pursuant to Clause 9.4 (*Indemnity*) of this Trust Deed.

10.7     **Trustee not Responsible for Investigations**

The Trustee shall not be responsible for investigating any matter which is the subject of any recital, statement, representation, warranty or covenant of any person contained in this Trust Deed, the Notes, or any other agreement or document relating to the transactions herein or therein contemplated or for the execution, legality, effectiveness, adequacy, genuineness, validity, enforceability or admissibility in evidence thereof. Without limitation to the generality of the foregoing, each Noteholder shall be responsible for making its own independent appraisal of and investigation into the financial condition, creditworthiness, condition, affairs, status and nature of the Bank and the Trustee shall not at any time have any responsibility for the same and no Noteholder shall rely on the Trustee in respect thereof.

10.8     **No Obligation to Monitor**

The Trustee shall be under no obligation to monitor or supervise the functions of any other person under this Trust Deed, the Notes or any other agreement or document relating to the transactions herein or therein contemplated and shall be entitled, in the absence of actual knowledge of a breach of obligation, to assume that each such person is properly performing and complying with its obligations.

10.9     **Deposit of Documents**

The Trustee may appoint as custodian, on any terms, any bank or entity whose business includes the safe custody of documents or any lawyer or firm of lawyers believed by it to be of good repute and may deposit this Trust Deed and any other documents with such custodian and pay all sums due in respect thereof.  The Trustee is not obliged to appoint a custodian of securities payable to bearer. The Trustee shall not be responsible for or required to insure against any loss incurred in connection with any such deposit.

10.10    **Discretion**

The Trustee shall have absolute and uncontrolled discretion as to the performance of its functions and all the trusts, powers, authorities and discretions vested in it by this Trust Deed or by operation of law and shall not be responsible for any loss, liability, cost, claim, action, damage, demand, expense or inconvenience which may result from their performance or non-performance but when the Trustee is under the provisions of this Trust Deed bound to act at the request or direction of Noteholders, the Trustee shall not be bound to act at the request or direction of the Noteholders or otherwise under any provision of this Trust Deed unless it shall first be indemnified, secured or prefunded to its satisfaction against all liabilities to which it may render itself liable or which it may incur by doing so.

10.11    **Agents**

(a)      Whenever it considers it expedient in the interests of the Noteholders, the Trustee may, in the conduct of its trust business, instead of acting personally, employ and pay an agent selected by it (and, if reasonably practicable, notify the Bank of the identity of the agent employed), whether or not a lawyer or other professional person, to transact or conduct, or concur in transacting or conducting, any business and to do or concur in doing all acts required to be done by the Trustee (including the receipt and payment of money).

(b)      Provided the Trustee exercises reasonable care in selecting any Receiver, attorney, manager, custodian, agent, delegate, co-trustee or nominee under this Clause 10.11 (an "**Appointee**"), the Trustee shall not have any obligation to supervise the Appointee or be responsible for any loss, liability, cost, claim, action, demand or

expense incurred by reason of the Appointee's misconduct or default or the misconduct or default of any substitute appointed by the Appointee.

**10.12   Delegation**

Whenever it considers it expedient in the interests of the Noteholders, the Trustee may delegate to any person on any terms (including power to sub-delegate) all or any of its functions, powers, trusts, authorities and discretions vested in the Trustee hereby and any such delegation may be by power of attorney or in such other manner as the Trustee may think fit and subject to such regulation as the Trustee may think fit.  The Trustee shall exercise reasonable care in its appointment of any delegate on the terms of this Clause 10.12. Any exercise by the Trustee of its rights under this Clause 10.12 shall not preclude the subsequent exercise of those powers or discretions by the Trustee, any revocation of the delegation, or any subsequent delegation of any such powers and discretions. The Trustee shall not have any obligation to notify anyone of such appointment or to supervise such delegate or be responsible for any loss, liability, cost, claim, action, demand or expense incurred by reason of any misconduct or default by any such delegate or sub-delegate. Subject to exercising reasonable care in its appointment, the Trustee shall not be responsible for any misconduct or default on the part of any person appointed by it hereunder or be bound to supervise the proceedings or acts of any such person and, without prejudice to the generality of the foregoing, the Trustee shall be entitled at any time following an Event of Default to appoint an agent (subject to the provisions of applicable law) in the name and on behalf of the Bank.

**10.13   Nominees**

In relation to any asset held by it under this Trust Deed, the Trustee may appoint any person to act as its nominee on any terms.

**10.14   Forged Notes**

The Trustee shall not be liable to the Bank or any Noteholder by reason of having accepted as valid or not having rejected any Note purporting to be such and later found to be forged or not authentic.

**10.15   Confidentiality**

Unless ordered to do so by a court of competent jurisdiction or duly authorised governmental authority the Trustee shall not be required to disclose to any Noteholder any confidential financial or other information made available to the Trustee by the Bank in connection with this Trust Deed and no Noteholder shall be entitled to take any action to obtain from the Trustee any such information.

**10.16   Determinations Conclusive**

As between itself and the Noteholders, the Trustee may determine all questions and doubts arising in relation to any of the provisions of this Trust Deed.  Such determinations, whether made upon such a question actually raised or implied in the acts or proceedings of the Trustee, shall be conclusive and shall bind the Trustee and the Noteholders.

**10.17   Currency Conversion**

Where it is necessary or desirable to convert any sum from one currency to another, it shall (unless otherwise provided hereby or required by law) be converted at such rate or rates, in accordance with such method and as at such date as may reasonably be specified by the

Trustee in its sole discretion but having regard to current rates of exchange, if available. Any rate, method and date so specified shall be binding on the Bank and the Noteholders.

### 10.18   Events of Default

The Trustee may determine whether or not an Event of Default or Potential Event of Default is, in its opinion, capable of remedy and/or materially prejudicial to the interests of the Noteholders. Any such determination shall be conclusive and binding on the Bank and the Noteholders.

### 10.19   Payment for and Delivery of Notes

The Trustee shall not be responsible for the receipt or application by the Bank of the proceeds of the issue of the Notes, any exchange of Notes or the delivery of definitive registered Notes to the persons entitled to them.

### 10.20   Notes held by the Bank, etc.

In the absence of knowledge or express notice to the contrary, the Trustee may assume without enquiry (other than requesting a certificate from the Bank to that effect) that no Notes are for the time being held by or on behalf of the Bank or its respective Subsidiaries.

### 10.21   Reliance

The Trustee may rely on any notice, certificate or other communication reasonably believed by it to be genuine and to have been sent or signed by the proper parties and shall not be liable for so doing.

### 10.22   Entry on the Register

The Trustee shall not be liable to the Bank or any Noteholder by reason of having accepted as valid or not having rejected any entry on the Register later found to be forged or not authentic and may assume for all purposes that any entry on the Register is correct.

### 10.23   Indemnity

Notwithstanding anything else herein contained, the Trustee may refrain from taking any action or exercising any right, power, authority or discretion vested in it under this Trust Deed or any other agreement relating to the transactions herein or therein contemplated (whether at the request or direction of the Bank or the Noteholders) unless and until it has been indemnified, secured or prefunded to its satisfaction against any and all costs, expenses, charges and other liabilities which might be brought, made or conferred against or suffered, incurred or sustained by it as a result of it taking any action or exercising any right, power, authority or discretion.

### 10.24   Action contrary to any law

Notwithstanding anything else herein contained, the Trustee may refrain from doing anything (a) that would or might in its opinion be contrary to any law of any jurisdiction or any directive or regulation of any agency of any state or which would or might otherwise render it liable to any person or cause it to act in a manner which might prejudice its interests and may do anything which is, in its reasonable opinion, necessary to comply with any such law, directive or regulation or (b) which, in its opinion, it would not have the power to do in any jurisdiction by virtue of any applicable law in that jurisdiction or if it is determined by any court or other competent authority in any jurisdiction that it does not have such power.

10.25   **Determination of "material"**

If the Trustee is for whatever reason required to make any determination of "material adverse effect" or like matter pursuant to the terms of the Notes or this Trust Deed, it may, in its absolute discretion, seek directions from the Noteholders by means of an Extraordinary Resolution or seek advice (at the expense of the Bank) from an expert, both in accordance with this Trust Deed, and the Trustee shall not be liable for any unavoidable delay involved in so doing.

10.26   **Professional charges**

Any trustee being a banker, lawyer, broker or other person engaged in any profession or business shall be entitled to charge and be paid all usual professional and other charges for business transacted and acts done by him or his partner or firm on matters arising in connection with the trusts of this Trust Deed and also his properly incurred charges in addition to disbursements for all other work and business done and all time spent by him or his partner or firm on matters arising in connection with this Trust Deed, including matters which might or should have been attended to in person by a trustee not being a banker, lawyer, broker or other professional person.

10.27   **Expenditure by the Trustee**

Nothing contained in this Trust Deed shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties or the exercise of any right, power, authority or discretion hereunder, including in relation to any deduction from any enforcement proceeds in connection with any insolvency proceedings following an Event of Default, if it has grounds to believe that the repayment of such funds or adequate indemnity against, or security for or prefunding for, such risk or liability is not reasonably assured to it.

10.28   **Consent of the Trustee**

Any consent given by the Trustee for the purposes of this Trust Deed may be given on such terms and subject to such conditions (if any) as the Trustee may require and may be given retrospectively.

10.29   **Actions of Trustee**

The permissive rights of the Trustee to take actions permitted by this Trust Deed shall not be construed as an obligation or duty to do so.

10.30   **Consequential Loss**

In no circumstances will the Trustee be liable to the Bank, any Subsidiary of the Bank or any other person for any special, indirect, cumulative, punitive or consequential damage or loss of any kind whatsoever (including loss of business, goodwill, opportunity or profit of any kind) whether or not foreseeable, even if advised of the possibility of such loss or damage and regardless of whether the claim for loss or damage is made in negligence or otherwise.

10.31   **Information and Other Reports**

Delivery of reports, information and documents to the Trustee under Clauses 8.1(a)(i) (*Financial Statements*), 8.1(a)(ii) (*Agreed Upon Procedures Report*), 8.1(a)(ix) (*Further Information*), 8.2(a)(i) (*Financial Statements*), 8.2(a)(ii) (*Agreed Upon Procedures Report*) and 8.2(a)(ix) (*Further Information*) is for informational purposes only and shall not impose any obligation on the Trustee to take any action in respect of them and the Trustee's receipt of

the foregoing shall not constitute actual or constructive notice of any information contained therein or determinable from information contained therein, including the Bank's or any Subsidiary's compliance with any of their covenants hereunder (as to which the Trustee is entitled to rely on certificates signed by two Authorised Signatories of the Bank).

10.32   **Trustee Act 2000**

Any exercise by the Trustee of any rights or powers under this Trust Deed that are the same as or similar to any rights or powers conferred on a trustee by the Trustee Act 2000 shall be construed solely as the exercise of the relevant rights or powers under this Trust Deed and not as the exercise of the same or any similar rights or powers under the Trustee Act 2000. The disapplication of certain parts or Sections of the Trustee Act 2000 as provided herein shall constitute an exclusion of the relevant parts of the Trustee Act 2000 for the purposes of that Act.

10.33   **Legal Opinions**

The Trustee shall not be responsible to any person for failing to request, require or receive any legal opinion relating to any Notes or for checking or commenting upon the content of any such legal opinion and shall not be responsible for any liability incurred thereby.

10.34   **Right to Deduct or Withhold**

Notwithstanding anything contained in this Trust Deed, to the extent required by any applicable law, if the Trustee is or will be required to make any deduction or withholding from any distribution or payment made by it hereunder or if the Trustee is or will be otherwise charged to, or is or may become liable to, tax as a consequence of performing its duties hereunder whether as principal, agent or otherwise, and whether by reason of any assessment, prospective assessment or other imposition of liability to taxation of whatsoever nature and whensoever made upon the Trustee, and whether in connection with or arising from any sums received or distributed by it or to which it may be entitled under this Trust Deed (other than in connection with its remuneration as provided for herein) or any investments or deposits from time to time representing the same, including any income or gains arising therefrom or any action of the Trustee in connection with the trusts of this Trust Deed (other than the remuneration herein specified) or otherwise, then the Trustee shall be entitled to make such deduction or withholding or, as the case may be, to retain out of sums received by it in an amount sufficient to discharge any liability to tax which relates to sums so received or distributed or to discharge any such other liability of the Trustee to tax from the funds held by the Trustee upon the trusts of this Trust Deed.

10.35   **Error of Judgment**

The Trustee shall not be liable for any error of judgment made in good faith by any officer or employee of the Trustee assigned by the Trustee to administer its corporate trust matters.

11.   **TRUSTEE LIABLE FOR NEGLIGENCE**

Section 1 of the Trustee Act 2000 shall not apply to any function of the Trustee, provided that if the Trustee fails to show the reasonable degree of care and diligence required of it as trustee, nothing in this Trust Deed shall relieve or indemnify it from or against any liability which would otherwise attach to it in respect of any negligence, wilful default or fraud of which it may be guilty.

12.   **TRUSTEE NOT PRECLUDED FROM ENTERING INTO CONTRACTS**

The Trustee and any other person, whether or not acting for itself, may acquire, hold or dispose of any Note or other security (or any interest therein) of the Bank or any other person, may enter into or be interested in any contract or transaction with any such person and may act on, or as depositary or agent for, any committee or body of holders of any securities of any such person in each case with the same rights as it would have had if the Trustee were not acting as Trustee and need not account for any profit.

13.   **WAIVER AND PROOF OF DEFAULT**

13.1   **Waiver**

The Trustee may, without the consent or sanction of the Noteholders and without prejudice to its rights in respect of any subsequent breach, condition, event or act, from time to time and at any time, but only if and in so far as in its opinion the interests of the Noteholders shall not be materially prejudiced thereby, waive or authorise, on such terms and conditions as shall seem expedient to it, but subject as provided in the Conditions, any breach or proposed breach by the Bank of any of the covenants or provisions contained in this Trust Deed, the Notes or the Agency Agreement or determine that any Event of Default or Potential Event of Default shall be disregarded. Any such authorisation, waiver or determination shall be binding on the Noteholders and, if, but only if, the Trustee shall so require, the Bank shall cause such authorisation, waiver or determination to be notified to the Noteholders as soon as practicable thereafter in accordance with the Conditions, provided that the Trustee shall not exercise any powers conferred upon it by this Clause 13.1 (*Waiver*) in contravention of any express direction by an Extraordinary Resolution of or a request in writing of holders holding not less than 20 per cent. in aggregate principal amount of Notes (or, in the case of the Original Issue Discount Notes, in aggregate Fully Accreted Principal Amount of Notes and, in the case of the Recovery Units, in aggregate number of Recovery Units) of the relevant Series outstanding made pursuant to Senior Notes or Subordinated Notes Conditions 11 (*Events of Default*) and 15(c) (*Enforcement; Reliance*), Original Issue Discount Notes Conditions 12 (*Events of Default*) and 16(c) (*Enforcement; Reliance*) and Recovery Units Conditions 13 (*Events of Default*) and 17(c) (*Enforcement; Reliance*), as the case may be. No such direction or request shall affect any authorisation, waiver or determination previously given or made. The Trustee may not authorise or waive any such breach or proposed breach relating to any of the matters the subject of the special quorum resolution as specified and defined in Schedule 3 (*Provisions for Meetings of Noteholders*).

13.2   **Proof of Default**

If the Trustee makes any claim in respect of, or lodges any proof in a winding-up in respect of, the Bank or institutes any proceedings to enforce any obligation under this Trust Deed or in respect of the Notes, proof therein that, as regards any specified Note, default has been made by the Bank in paying any amount in respect of principal, interest, Adjusted Principal Amount, Recovery Payments or any other amount due to the relevant Noteholder shall (unless the contrary is proved) be sufficient evidence that default has been made as regards all other Notes of the same Series in respect of which a corresponding payment is then due.

14.   **MODIFICATION AND SUBSTITUTION**

14.1   **Modification**

The Trustee may from time to time and at any time without any consent or sanction of the Noteholders concur with the Bank in making (a) any modification to this Trust Deed or the Notes (other than in respect of the matters the subject of the special quorum resolution as

specified and defined in Schedule 3 (*Provisions for Meetings of Noteholders*)) which, in the opinion of the Trustee it may be proper to make provided the Trustee is of the opinion that such modification will not be materially prejudicial to the interests of the Noteholders or (b) any modification to this Trust Deed or the Notes if in the opinion of the Trustee such modification is of a formal, minor or technical nature or made to correct a manifest error. Any such modification shall be binding on the Noteholders and, unless the Trustee otherwise agrees, the Bank shall cause such modification to be notified to the Noteholders as soon as practicable thereafter in accordance with the Conditions.

14.2    **Substitution**

(a)      The Trustee may, without the consent of the Noteholders, agree to the substitution of the Bank's successor in business or any Subsidiary of the Bank (the "**Substituted Obligor**") in place of the Bank (or of any previous substitute under this Clause 14.2) as the principal debtor under this Trust Deed, the Agency Agreement and the Notes if:

(i)      a trust deed is executed or some other written form of undertaking is given by the Substituted Obligor to the Trustee, in form and manner satisfactory to the Trustee, agreeing to be bound by the terms of this Trust Deed, the Agency Agreement and the Notes with any consequential or other amendments which the Trustee may deem appropriate as fully as if the Substituted Obligor had been named in this Trust Deed, the Agency Agreement and on the Notes as the principal debtor in place of the Bank or of any previous substitute under this Clause;

(ii)      the obligations of the Substituted Obligor as principal debtor in respect of the Notes are unconditionally and irrevocably guaranteed by the Bank and the Trustee is satisfied that the Bank has obtained all governmental and regulatory approvals and consents necessary for such guarantee and such approvals and consents are at the time of substitution in full force and effect;

(iii)      the Bank shall continue to be subject to the covenants contained in Clause 8 (*Covenants*);

(iv)      arrangements are made to the satisfaction of the Trustee for the Noteholders and the Trustee to have or be able to have the same or equivalent rights against the Substituted Obligor as they have against the Bank (or any such previous substitute);

(v)      the Trustee is satisfied that the Substituted Obligor has obtained all governmental and regulatory approvals and consents necessary for its assumption of the obligations and liabilities as principal debtor under this Trust Deed and the Agency Agreement and in respect of the Notes in place of the Bank (or such previous substitute as aforesaid) and such approvals and consents are at the time of substitution in full force and effect;

(vi)      without prejudice to the generality of the preceding paragraphs (i) to (v), where the Substituted Obligor is incorporated, domiciled or resident in a territory other than the Republic of Kazakhstan, undertakings or covenants are given in terms corresponding to the provisions of this Trust Deed and Senior Notes and Subordinated Notes Condition 9 (*Taxation*), Original Issue Discount Notes Condition 10 (*Taxation*) and Recovery Units Condition 11 (*Taxation*), as applicable, with the substitution or addition to the references to *Republic of Kazakhstan,* in respect of a substitution of the Bank;

(vii)   the Substituted Obligor and the Bank shall have delivered to the Trustee an opinion of independent counsel to the effect that any and all documents entered into by the Bank, the Substituted Obligor and the Trustee are valid, binding and enforceable against the Substituted Obligor and the Bank; and

(viii)   the Trustee is satisfied with respect to each Series of Notes that the said substitution is not materially prejudicial to the interests of the Noteholders as a class.

(b)   The Trustee shall be entitled to refuse to approve any Substituted Obligor if, pursuant to the law of the country of incorporation, domicile or residence of the Substituted Obligor, the assumption by the Substituted Obligor of its obligations hereunder imposes responsibilities on the Trustee over and above those which have been assumed under this Trust Deed and the Agency Agreement.

(c)   The Bank and the Substituted Obligor shall comply with such other requirements as the Trustee may reasonably direct in the interests of the Noteholders.

(d)   In connection with any proposed substitution, the Trustee shall not have regard to, or be in any way liable for, the consequences of such substitution for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory.

(e)   The Bank or the Substituted Obligor shall indemnify each Noteholder for any income, gain or loss for tax purposes recognised by such Noteholder as a result of the substitution.

(f)   Subject to Clauses 14.2(a)(ii) and 14.2(h), any such agreement by the Trustee pursuant to this Clause 14.2 (*Substitution*) shall, if so expressed, operate to release the Bank (or such previous substitute as aforesaid) from any or all of its obligations as principal debtor under this Trust Deed, the Agency Agreement and the Notes. Not later than 14 days after the execution of any such documents to effect the substitution as aforesaid and after compliance with the said requirements of the Trustee, the Substituted Obligor shall cause notice of the substitution to be given to the Noteholders.

(g)   Upon the execution of such documents and compliance with the said requirements, the Substituted Obligor shall be deemed to be named in this Trust Deed, the Agency Agreement and the Notes as the principal debtor in place of the Bank (or of any previous substitute under this Clause 14.2) and this Trust Deed, the Agency Agreement and the Notes shall thereupon be deemed to be amended in such manner as shall be necessary to give effect to the substitution and without prejudice to the generality of the foregoing any references in this Trust Deed, the Agency Agreement or in the Notes to the Bank shall be deemed to be references to the Substituted Obligor.

(h)   The Bank shall, notwithstanding the completion of the substitution:

(i)   maintain the Security Interests created pursuant to Clause 4 (*Security Interests*) of this Trust Deed in accordance with the terms thereof, or procure that the Security Interests are maintained until such time; and

(ii)   continue to seek the Recoveries until the earlier of the date when the Reference Amount is reduced to zero or the Settlement Date or procure that the Recoveries are sought until such time;

(i)     The Substituted Obligor and the Bank shall use all reasonable endeavours to ensure that the Notes continue to be listed on an Approved Stock Exchange and on KASE or, if the maintenance of such listings or any of them are agreed by the Trustee to be unduly onerous and the Trustee is satisfied that the interests of the Noteholders would not be thereby materially prejudiced, instead use its reasonable endeavours to obtain and maintain a listing of the Notes on another stock exchange or exchanges to be approved in writing by the Trustee and give notice of the identity of such other stock exchange or exchanges or securities market or markets to the Noteholders.

## 15.    APPOINTMENT, RETIREMENT AND REMOVAL OF THE TRUSTEE

### 15.1    Appointment

The Bank has the power of appointing new trustees but may not do so unless previously approved by an Extraordinary Resolution. A trust corporation shall at all times be a Trustee and may be the sole Trustee. Any appointment of a new Trustee shall be notified by the Bank to the Noteholders as soon as practicable.

### 15.2    Retirement and Removal

Any Trustee may retire at any time on giving at least two months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement. The retirement of any Trustee shall not become effective unless there remains a trustee hereof (being a trust corporation) in office after such retirement. The Noteholders may by Extraordinary Resolution and having given not less than two months' prior written notice remove any Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, the Bank shall use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. If the Bank fails to appoint a new Trustee within 30 days following the notice or Extraordinary Resolution referred to in this Clause 15.2, the Trustee may do so.

### 15.3    Co-Trustees

The Trustee may, despite Clause 15.1 (*Appointment*), by written notice to the Bank appoint anyone to act as an additional Trustee jointly with the Trustee:

(a)     if the Trustee considers the appointment to be in the interests of the Noteholders;

(b)     to conform with a legal requirement, restriction or condition in a jurisdiction in which a particular act is to be performed; or

(c)     to obtain a judgment or to enforce a judgment or any provision of this Trust Deed in any jurisdiction.

Subject to the provisions of this Trust Deed, the Trustee may confer on any person so appointed such functions as it thinks fit. The Trustee may by written notice to the Bank and that person remove that person. At the Trustee's request, the Bank shall forthwith do all things as may be required to perfect such appointment or removal and irrevocably appoints the Trustee as its attorney in its name and on its behalf to do so.

### 15.4    Competence of a Majority of Trustees

If there are more than two Trustees the majority of them shall be competent to perform the Trustee's functions provided the majority includes a trust corporation.

15.5  **Attorneys**

The Bank hereby irrevocably appoints the Trustee to be its attorney in its name and on its behalf to execute an instrument of appointment in accordance with Clause 15.3 (*Co-Trustees*). Such person appointed by the Trustee under such instrument of appointment shall (subject always to the provisions of this Trust Deed) have such trusts, powers, authorities and discretions (not exceeding those conferred on the Trustee by this Trust Deed) and such duties and obligations as shall be conferred on such person or imposed by the instrument of appointment. The Trustee shall have power in like manner to remove any such person. Such proper remuneration as the Trustee may pay to any such person, together with any attributable costs, charges and expenses incurred by it in performing its function as such separate trustee or co-trustee, shall for the purposes of this Trust Deed be treated as costs, charges and expenses incurred by the Trustee.

15.6  **Powers additional**

The powers conferred by this Trust Deed upon the Trustee shall be in addition to any powers which may from time to time be vested in it by general law or as the holder of any of the Notes.

15.7  **Merger**

Any corporation into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation succeeding to all or substantially all the corporate trust business of the Trustee, shall be the successor of the Trustee under this Trust Deed, provided such corporation shall be otherwise qualified and eligible under this Clause 15.7, without the execution or filing of any paper or any further act on the part of any of the parties to this Trust Deed.

15.8  **Bank to Appoint New Trustee**

Subject to the other sub-Clauses in this Clause 15, the Bank may appoint a new trustee if the United Kingdom ceases to be the jurisdiction in which the Trustee is resident and acting through for taxation purposes.

16.  **CURRENCY INDEMNITY**

16.1  **Currency of Account and Payment**

United States Dollars is the only currency of account and payment for all sums payable by the Bank under or in connection with this Trust Deed (save to the extent that such payments relate to the Euro Notes or the Tenge Notes) and the Dollar Notes, including damages. Euro is the only currency of account and payment for all sums payable by the Bank under or in connection with the Euro Notes, including damages. Kazakhstan Tenge is the only currency of account and payment for all sums payable by the Bank under or in connection with the Tenge Notes, including damages.

16.2  **Extent of discharge**

An amount received or recovered in a currency other than United States Dollars, Euro or Kazakhstan Tenge, as the case may be (whether as a result of, or on the enforcement of, a judgment or order of a court of any jurisdiction, in the winding-up or dissolution of the Bank or otherwise), by the Trustee or any Noteholder in respect of any sum expressed to be due to it from the Bank will only discharge the Bank to the extent of the United States Dollars, Euro

or Kazakhstan Tenge (as the case may be) amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).

16.3   **Indemnity**

If the United States Dollars, Euro or Kazakhstan Tenge (as the case may be) amount is less than the United States Dollars, Euro or Kazakhstan Tenge (as the case may be) amount expressed to be due to the recipient under this Trust Deed or the Notes, the Bank shall indemnify the recipient against any loss sustained by it as a result.  In any event, the Bank shall indemnify the recipient against the cost of making any such purchase.

16.4   **Indemnity separate**

The indemnities in this Clause 16 and in Clause 9.4 (*Indemnity*) constitute separate and independent obligations from the other obligations in this Trust Deed, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Trustee and/or any Noteholder and shall continue in full force and effect despite any judgment, order, claim or proof for a liquidated amount in respect of any sum due under this Trust Deed and the Notes or any other judgment or order.

17.   **COMMUNICATIONS**

Any communication shall be in writing and in English and shall be by letter, email or fax:

in the case of the Bank, to it at:

"BTA BANK" JSC
97, Dzholdasbekov str.,
md Samal-2, Almaty,
050051, Kazakhstan

Fax:           +7 727 250 0224
Attention:     Loan and Capital Markets Department

in the case of the Trustee, to it at:

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

Fax:           +44 20 7964 2536
Attention:     Trustee Administration Manager

Communications will take effect, in the case of delivery, when delivered (and, in the case of the Trustee, when received by a responsible officer) or, in the case of fax, upon acknowledgement of receipt by the recipient. Any communication to be delivered to any party under this Trust Deed which is to be sent by facsimile will be written legal evidence.

18.     **FURTHER ISSUES**

18.1    **Supplemental Trust Deed**

If the Bank issues Further Notes, the Bank shall, before their issue, execute and deliver to the Trustee a deed supplemental to this Trust Deed containing such provisions (corresponding to any of the provisions of this Trust Deed) as the Trustee may require.

18.2    **Meetings of Noteholders**

If the Trustee so directs, Schedule 3 (*Provisions for Meetings of Noteholders*) shall apply equally to Noteholders and to holders of any Further Notes as if references in it to "Notes" and "Noteholders" were also to such securities and their holders respectively.

19.     **NOTES HELD IN CLEARING SYSTEMS**

So long as any Notes represented by a Global Note are held on behalf of a clearing system, in considering the interests of Noteholders, the Trustee may have regard to any information provided to it by such clearing system or its operator as to the identity (either individually or by category) of its accountholders or participants with entitlements to any such Notes and may consider such interests on the basis that such accountholders or participants were the holder(s) thereof.

20.     **GOVERNING LAW; ARBITRATION AND JURISDICTION**

20.1    **Governing law**

This Trust Deed and any non-contractual obligations arising out of or in connection herewith are governed by, and shall be construed in accordance with, English law.

20.2    **Arbitration**

Any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non contractual obligations arising out of or in connection with this Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Clause, which Rules shall be deemed incorporated into this Clause.  The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, provided that if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA.  The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country.  The seat of arbitration shall be London, England and the language of arbitration shall be English.  Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

20.3    **Trustee's Option**

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Clause 20.2 (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Clause 20.4 (*Jurisdiction*).  Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

20.4 **Jurisdiction**

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Clause 20.3 (*Trustee's Option*), the Trustee agrees for the benefit of itself and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts. Subject to Clause 20.2 (*Arbitration*), nothing in this Clause shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

20.5 **Appropriate Forum**

The Bank irrevocably waives any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

20.6 **Service of Process**

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being. If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment. If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

20.7 **Consent to Enforcement**

The Bank consents generally in respect of any Disputes (or Proceedings in accordance with Clause 20.4 (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Proceedings or Disputes, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

20.8 **Waiver of Immunity**

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

21. **SEVERABILITY**

In case any provision in or obligation under this Trust Deed shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining

provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

## 22.    COUNTERPARTS

This Trust Deed may be executed in any number of counterparts, each of which shall be deemed to be an original.

**SCHEDULE 1**

**FORM OF DEFINITIVE NOTE CERTIFICATE**

Serial Number: ＿＿＿[1]
ISIN: ＿＿＿[1]
Common Code: ＿＿＿[1]

THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES. BY ACCEPTANCE OF THE SECURITY REPRESENTED HEREBY, EACH BENEFICIAL OWNER HEREOF REPRESENTS THAT (A) IT IS EITHER (I) NOT A U.S. PERSON AND IS LOCATED OUTSIDE THE UNITED STATES AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT OR (II) AN ACCREDITED INVESTOR AS DEFINED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT ("AN ACCREDITED INVESTOR") OR (III) A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("QIB") AND (B) THE SECURITY MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (I) OUTSIDE THE UNITED STATES TO PERSONS THAT ARE NOT U.S. PERSONS AS DEFINED IN, AND IN ACCORDANCE WITH, REGULATION S OR (II) WITHIN THE UNITED STATES IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QIB THAT IS PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER QIB; AND IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES. TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE OR EFFECT, WILL BE VOID AB INITIO, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION UNDER THE SECURITIES ACT FOR RESALES OF THIS SECURITY.

THIS SECURITY AND ALL RELATED DOCUMENTATION MAY BE AMENDED OR SUPPLEMENTED FROM TIME TO TIME TO MODIFY THE RESTRICTIONS ON AND PROCEDURES FOR RESALES AND OTHER TRANSFERS OF THIS SECURITY TO REFLECT ANY CHANGE IN APPLICABLE LAW OR REGULATION (OR THE INTERPRETATION THEREOF) OR IN PRACTICES RELATING TO THE RESALE OR TRANSFERS OF RESTRICTED SECURITIES GENERALLY. BY THE ACCEPTANCE OF THIS SECURITY THE HOLDER HEREOF SHALL BE DEEMED TO HAVE AGREED TO ANY SUCH AMENDMENT OR SUPPLEMENT.

---

[1] The ISIN and Common Code for any Notes represented by a Definitive Note Certificate will be the same as those applicable to the Global Note by which those Notes were originally represented.

**"BTA BANK" JSC**
*(incorporated with limited liability under*
*the laws of the Republic of Kazakhstan)*
(the "**Bank**")

**U.S.$2,082,371,783 Senior Notes due 2018**
**KZT32,604,173,503 Senior Notes due 2018**
**U.S.$384,848,130 Fully Accreted Principal Amount of Original Issue Discount Notes due 2021**
**EUR437,110,856 Fully Accreted Principal Amount of Original Issue Discount Notes due 2021**
**U.S.$496,631,368 7.20 per cent. Subordinated Notes due 2025**
**EUR28,237,359 6.75 per cent. Subordinated Notes due 2025**
**KZT7,396,248,930 11.20 per cent. Subordinated Notes due 2025**
**KZT28,000,000,000 8.0 per cent. Subordinated Notes due 2030**
**U.S.$5,221,494,216 aggregate initial Reference Amount of Recovery Units**

**DEFINITIVE NOTE CERTIFICATE**

**Introduction:** This Definitive Note Certificate is issued in respect of the [[U.S.$/EUR/KZT] _____ [Fully Accreted Principal Amount of] [ _____ per cent.] Notes due _____ 20_____ / U.S.$_____ aggregate initial Reference Amount of Recovery Units] (the "**Notes**") of the Bank. The Notes are constituted by, are subject to, and have the benefit of, a trust deed dated 25 August 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited as trustee (the "**Trustee**", which expression includes all persons for the time being appointed trustee or trustees under the Trust Deed) and are the subject of an agency agreement dated 25 August 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") made between the Bank and The Bank of New York Mellon (Luxembourg) S.A., as registrar (the "**Registrar**", which expression includes any successor registrar appointed from time to time in connection with the Notes), The Bank of New York Mellon, London Branch, as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"), the other paying and transfer agent[s] named therein and the Trustee.

1.    **References to Conditions:** Any reference herein to the "**Conditions**" is to the terms and conditions of the [[Senior Dollar/Senior Tenge/Dollar Original Issue Discount/Euro Original Issue Discount/ Dollar Subordinated/ Euro Subordinated/ Subordinated Tenge A/ Subordinated Tenge B] Notes/Recovery Units] endorsed hereon and any reference to a numbered "Condition" is to the correspondingly numbered provision thereof. If the Conditions endorsed on this Definitive Note Certificate are different from those appearing in the Schedule to the Trust Deed, the Conditions endorsed on this Definitive Note Certificate prevail.

2.    **Registered holder:** This is to certify that _____ of _____ is, at the date hereof, entered in the register maintained by the Registrar in relation to the Notes (the "Register") as the duly registered holder or, if more than one person is so registered, the first-named of such persons (the "Holder") of [[U.S.$/EUR/KZT] _____ (_____[UNITED STATES DOLLARS/EUR/KZT]) in aggregate [principal amount/Fully Accreted Principal Amount] of the Notes/_____ (_____) Recovery Units representing U.S.$_____ (_____UNITED STATES DOLLARS) of Reference Amount].

3.    **Promise to pay:** The Bank, for value received, hereby promises to pay such sum in respect of [principal/Adjusted Principal Amount] to the Holder on [1 July 20_____/the Settlement Date] (or on such earlier date or dates as the same may become payable in accordance with the Conditions), and to pay [interest on such sum in respect of [principal/Net Accreted Principal Amount] in arrear/Recovery Payments] on the dates and at the rates specified in the Conditions, together with any additional amounts payable in accordance with the Conditions, all subject to and in accordance with the Conditions.

4.   **Determination of entitlement:**  This Definitive Note Certificate is evidence of entitlement only and is not a document of title.  Entitlements are determined by the Register and only the Holder is entitled to payment in respect of this Definitive Note Certificate.

5.   **Authentication:**  This Definitive Note Certificate shall not be valid for any purpose until it has been authenticated for and on behalf of the Registrar.

6.   **Governing law:**  This Definitive Note Certificate and any non-contractual obligations arising out of or in connection herewith are governed by, and shall be construed in accordance with, English law.

7.   **Legends:**  The statements set forth in the legend above are an integral part of the Note or Notes in respect of which this certificate is issued and by acceptance thereof each Holder agrees to be subject to and bound by the terms and provisions set forth in such legend.

**AS WITNESS** the manual or facsimile signature of a duly authorised person on behalf of the Bank.

**"BTA BANK" JSC**

By:                                                              By:
[*manual or facsimile signature*]                [*manual or facsimile signature*]
(duly authorised)                                        (duly authorised)

**ISSUED on 25 August 2010**

**AUTHENTICATED for and on behalf of**
**The Bank of New York Mellon (Luxembourg) S.A.**
as registrar without recourse, warranty
or liability

By:
[*manual or facsimile signature*]
(duly authorised)

**FORM OF TRANSFER**

**"BTA BANK" JSC**
*(incorporated with limited liability under
the laws of the Republic of Kazakhstan)*
(the "**Bank**")

**U.S.$2,082,371,783 Senior Notes due 2018**
**KZT32,604,173,503 Senior Notes due 2018**
**U.S.$384,848,130 Fully Accreted Principal Amount of Original Issue Discount Notes due 2021**
**EUR437,110,856 Fully Accreted Principal Amount of Original Issue Discount Notes due 2021**
**U.S.$496,631,368 7.20 per cent. Subordinated Notes due 2025**
**EUR28,237,359 6.75 per cent. Subordinated Notes due 2025**
**KZT7,396,248,930 11.20 per cent. Subordinated Notes due 2025**
**KZT28,000,000,000 8.0 per cent. Subordinated Notes due 2030**
**U.S.$5,221,494,216 aggregate initial Reference Amount of Recovery Units**

**FOR VALUE RECEIVED** [*insert name of transferor*] (the "**Transferor**"), being the registered holder of this Definitive Note Certificate, hereby transfers to [*insert name of transferee*] of [*insert address (including postcode or equivalent) of transferee*] (the "**Transferee**"), [[U.S.$/EUR/KZT] _____ in [principal amount/Fully Accreted Principal Amount] of the [[U.S.$/EUR/KZT] _____ ] [_____ per cent.] Notes due _____ 20___ / ____ Recovery Units] (ISIN No. ____², Common Code: ____²) (the "**Notes**") of the Bank and irrevocably requests and authorises The Bank of New York Luxembourg S.A., in its capacity as Registrar, in relation to the Notes (or any successor to Bank of New York Luxembourg S.A., in its capacity as such) to effect the relevant transfer by means of appropriate entries in the register kept by it.

[[NOTE:   INSERT [A] FOR TRANSFERS OF NOTES BEARING THE SAME ISIN AND COMMON CODE AS THE RESTRICTED GLOBAL NOTE TO TRANSFEREES THAT TAKE DELIVERY OF NOTES NOT BEARING THE SAME ISIN AND COMMON CODE AS THE RESTRICTED GLOBAL NOTE.   INSERT [B] FOR TRANSFERS OF NOTES NOT BEARING THE SAME ISIN AND COMMON CODE AS THE RESTRICTED GLOBAL NOTE TO TRANSFEREES THAT TAKE DELIVERY OF NOTES BEARING THE SAME ISIN AND COMMON CODE AS THE RESTRICTED GLOBAL NOTE PRIOR TO THE EXPIRY OF THE DISTRIBUTION COMPLIANCE PERIOD.]

[A] In connection with such request and in respect of such Notes, the Transferor hereby certifies that (i) such transfer has been effected in accordance with the transfer restrictions set forth in the Notes and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction and (ii) either:

(A)     such transfer has been effected pursuant to and in accordance with Rule 903 or Rule 904 of Regulation S under the Securities Act, and accordingly the Transferor hereby certifies that:

    1.     the offer and sale of the Notes was not made to a person in the United States or to or for the account or benefit of a U.S. person and such offer and sale was not targeted to an identifiable group of US citizens abroad;

---

² The ISIN and Common Code for any Notes represented by a Definitive Note Certificate will be the same as those applicable to the Global Note by which those Notes were originally represented.

2.    either

    (a)    at the time the buy order was originated, the Transferee was outside the United States or the undersigned and any person acting on its behalf reasonably believed that the Transferee was outside the United States, or

    (b)    the transaction was executed in, on or through the facilities of a designated offshore securities market (as defined in Regulation S) and neither the Transferor nor any person acting on its behalf knows that the transaction was pre-arranged with a buyer in the United States;

3.    no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or 904(b) of Regulation S, as applicable;

4.    the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act; and

5.    if the Transferor is an officer or director of the Bank or a distributor, who is an affiliate of the Bank or distributor solely by holding such position, such sale is made in accordance with the applicable provisions of Rule 904(b)(2) of Regulation S; or

(B)    the transfer has been effected pursuant to an exemption from registration under the Securities Act provided by Rule 144 thereunder.

[B] In connection with such request and in respect of such Notes, the Transferor hereby certifies that such transfer has been effected pursuant to and in accordance with Rule 144A under the Securities Act ("**Rule 144A**") and, accordingly, the Transferor hereby further certifies that the beneficial interest in such Notes is being transferred to a person that the Transferor reasonably believes is purchasing the Notes for its own account, or for one or more accounts with respect to which such person exercises sole investment discretion, and such person, and each such account is a "**qualified institutional buyer**" within the meaning of Rule 144A, in each case in a transaction meeting the requirements of Rule 144A and in accordance with the transfer restrictions set forth in the Notes and any applicable securities laws of any state of the United States or any other jurisdiction.]

Dated:......................................................

By:...........................................................        By:...........................................................
    (duly authorised)                           (duly authorised)

Name: [*insert name of Transferor*]        Name: [*insert name of Transferor*]

**Notes**

(a)    The name of the person by or on whose behalf this form of transfer is signed must correspond with the name of the registered holder as it appears on the face of this Definitive Note Certificate.

(b)    A representative of such registered holder should state the capacity in which he signs, e.g., executor.

(c)    The signature of the person effecting a transfer shall conform to any list of duly authorised specimen signatures supplied by the registered holder or be certified by a recognised bank, notary public or in such other manner as the Registrar or the relevant Paying and Transfer Agent may require.

(d)     This form of transfer must be accompanied by such documents, evidence or information as the Registrar may require.

(e)     If the Transferor is a corporation, partnership or fiduciary, the title of the person signing on behalf of such Transferor must be stated.

(f)     Any transfer of Notes shall be in an amount equal to [U.S.$/EUR/KZT] ____ or integral multiples of [U.S.$/EUR/KZT] 1 in excess thereof, except in the case of the Recovery Units. Any transfer of Recovery Units shall be in integral multiples of one Unit.

*[Attached to each Definitive Note Certificate:*

*Terms and Conditions of the appropriate Notes as set out in Schedule 4 (Terms and Conditions of the Notes)*

*At the foot of the Terms and Conditions:]*

| PRINCIPAL PAYING AND TRANSFER AGENT | REGISTRAR |
|---|---|
| The Bank of New York Mellon, London Branch | The Bank of New York Mellon (Luxembourg) S.A. |
| One Canada Square | Aerogolf Center, 1A, Hoehenhof |
| London E14 5AL | L-1736 Senningberg |
| United Kingdom | Luxembourg |

## SCHEDULE 2

## FORMS OF GLOBAL NOTE

### Part 1

### Form of Unrestricted Global Note

ISIN:____                                                    Common Code:____

THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES. BY ACCEPTANCE OF THE SECURITY REPRESENTED HEREBY, EACH BENEFICIAL OWNER HEREOF REPRESENTS THAT (A) IT IS EITHER (I) NOT A U.S. PERSON AND IS LOCATED OUTSIDE THE UNITED STATES AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT OR (II) AN ACCREDITED INVESTOR AS DEFINED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT ("AN ACCREDITED INVESTOR") OR (III) A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("QIB") AND (B) THE SECURITY MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (I) OUTSIDE THE UNITED STATES TO PERSONS THAT ARE NOT U.S. PERSONS AS DEFINED IN, AND IN ACCORDANCE WITH, REGULATION S OR (II) WITHIN THE UNITED STATES IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QIB THAT IS PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER QIB; AND IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES. TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE OR EFFECT, WILL BE VOID AB INITIO, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION UNDER THE SECURITIES ACT FOR RESALES OF THIS SECURITY.

THIS SECURITY AND ALL RELATED DOCUMENTATION MAY BE AMENDED OR SUPPLEMENTED FROM TIME TO TIME TO MODIFY THE RESTRICTIONS ON AND PROCEDURES FOR RESALES AND OTHER TRANSFERS OF THIS SECURITY TO REFLECT ANY CHANGE IN APPLICABLE LAW OR REGULATION (OR THE INTERPRETATION THEREOF) OR IN PRACTICES RELATING TO THE RESALE OR TRANSFERS OF RESTRICTED SECURITIES GENERALLY. BY THE ACCEPTANCE OF THIS SECURITY THE HOLDER HEREOF SHALL BE DEEMED TO HAVE AGREED TO ANY SUCH AMENDMENT OR SUPPLEMENT.

**"BTA BANK" JSC**

*(incorporated with limited liability under
the laws of the Republic of Kazakhstan)*
(the "**Bank**")

**U.S.$2,082,371,783 Senior Notes due 2018**
**KZT32,604,173,503 Senior Notes due 2018**
**U.S.$384,848,130 Fully Accreted Principal Amount of Original Issue Discount Notes due 2021**
**EUR437,110,856 Fully Accreted Principal Amount of Original Issue Discount Notes due 2021**
**U.S.$496,631,368 7.20 per cent. Subordinated Notes due 2025**
**EUR28,237,359 6.75 per cent. Subordinated Notes due 2025**
**KZT7,396,248,930 11.20 per cent. Subordinated Notes due 2025**
**KZT28,000,000,000 8.0 per cent. Subordinated Notes due 2030**
**U.S.$5,221,494,216 aggregate initial Reference Amount of Recovery Units**

**UNRESTRICTED GLOBAL NOTE**

1.  **Introduction:** This Unrestricted Global Note is issued in respect of the [[U.S.$/EUR/KZT] _____ [Fully Accreted Principal Amount of] [____ per cent.] Notes due ____ 20____ / U.S.$5,221,494,216 aggregate initial Reference Amount of Recovery Units] (the "**Notes**") of the Bank. The Notes are constituted by, are subject to and have the benefit of, a trust deed dated 25 August 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited, as trustee (the "**Trustee**", which expression includes all persons for the time being appointed trustee or trustees under the Trust Deed) and are the subject of an agency agreement dated 25 August 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") and made between the Bank, The Bank of New York Mellon (Luxembourg) S.A., as registrar (the "**Registrar**", which expression includes any successor registrar appointed from time to time in connection with the Notes), The Bank of New York Mellon, London Branch, as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"), the other paying and transfer agents named therein and the Trustee.

2.  **References to Conditions:** Any reference herein to the "**Conditions**" is to the terms and conditions of the [[Senior Dollar/Senior Tenge/Dollar Original Issue Discount/Euro Original Issue Discount/ Dollar Subordinated/ Euro Subordinated/ Subordinated Tenge A/ Subordinated Tenge B] Notes/Recovery Units] attached hereto and any reference to a numbered "**Condition**" is to the correspondingly numbered provision thereof.  If the Conditions endorsed on this Unrestricted Global Note are different from those appearing in the Schedule to the Trust Deed, the Conditions endorsed on this Unrestricted Global Note shall prevail.

3.  **Registered holder:** This is to certify that The Bank of New York Depository (Nominees) Limited is, at the date hereof, entered in the register maintained by the Registrar in relation to the Notes (the "**Register**") as the duly registered holder (the "**Holder**") of **[U.S.$/EUR/KZT ____ ([*AMOUNT IN WORDS*] [UNITED STATES DOLLARS/EUR/KZT])** in aggregate [principal amount/Fully Accreted Principal Amount] of Notes/____ (____) Recovery Units representing **U.S.$____ ([*AMOUNT IN WORDS*] UNITED STATES DOLLARS)** of Reference Amount] or such other amount as is shown on the register of Noteholders as being represented by this Unrestricted Global Note and is duly endorsed (for information purposes only) in the third column of Schedule A to this Unrestricted Global Note.

4.  **Promise to pay:** The Bank, for value received, hereby promises to pay such sum in respect of [principal/Adjusted Principal Amount] to the Holder on [1 July 20____/the Settlement Date] (or on such earlier date or dates as the same may become payable in accordance with the Conditions), and to pay [interest on such sum of [principal/Net Accreted Principal

Amount] in arrear/Recovery Payments] on the dates and at the rates specified in the Conditions, together with any additional amounts payable in accordance with the Conditions, all subject to and in accordance with the Conditions.

5.   **Transfers:**  Transfers of interests in the Notes represented by this Unrestricted Global Note for interests in the Restricted Global Note shall be made in accordance with the Agency Agreement and in accordance with the operating procedures of the relevant clearing system and any such transfers may only be made upon presentation of a transfer certificate as provided in the Agency Agreement.

6.   **Exchange for Definitive Note Certificates:**   This Unrestricted Global Note shall be exchanged in whole (but not in part) free of charge to the Holder for duly authenticated and completed Definitive Note Certificates ("**Definitive Note Certificates**") in substantially the form (subject to completion) set out in Schedule 1 (*Form of Definitive Note Certificate*) to the Trust Deed if any of the following events occurs:

   (a)   Euroclear and/or Clearstream, Luxembourg is closed for business for a continuous period of 14 days (other than by reason of legal holidays) or announces an intention permanently to cease business or does in fact do so; or

   (b)   an Event of Default (as defined and set out in the Conditions on the Notes) occurs.

   Such exchange shall be effected in accordance with paragraph 7 (*Delivery of Definitive Note Certificates*).  The Bank shall notify the Holder of the occurrence of any of the events specified in (a) and (b) as soon as practicable thereafter.

7.   **Delivery of Definitive Note Certificates:**  Whenever this Unrestricted Global Note is to be exchanged for Definitive Note Certificates, such Definitive Note Certificates shall be issued in an aggregate [principal amount/Fully Accreted Principal Amount/number of Recovery Units] equal to the [principal amount of/Fully Accreted Principal Amount/number of Recovery Units represented by] this Unrestricted Global Note within five business days of the delivery, by or on behalf of the Holder, Euroclear and/or Clearstream, Luxembourg, to the Registrar of such information as is required to complete and deliver such Definitive Note Certificates (including, without limitation, the names and addresses of the persons in whose names the Definitive Note Certificates are to be registered and the [principal amount/Fully Accreted Principal Amount/number of Recovery Units] of each such person's holding) against the surrender of this Unrestricted Global Note at the Specified Office (as defined in the Agency Agreement) of the Registrar. Such exchange shall be effected in accordance with the provisions of the Agency Agreement and the regulations concerning the transfer and registration of Notes scheduled thereto and, in particular, shall be effected without charge to any Holder or the Trustee, but against such indemnity as the Registrar may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such exchange.  In this paragraph, "**business day**" means a day on which commercial banks are open for business (including dealings in foreign currencies) in the city in which the Registrar has its Specified Office.

8.   **Conditions apply:**  Save as otherwise provided herein, the Holder of this Unrestricted Global Note shall have the benefit of, and be subject to, the Conditions and, for the purposes of this Unrestricted Global Note, any reference in the Conditions to "**Note Certificate**" or "**Note Certificates**" shall, except where the context otherwise requires, be construed so as to include this Unrestricted Global Note.

9.   **Notices:**  Notwithstanding Condition ____ (*Notices*), so long as this Unrestricted Global Note is held on behalf of Euroclear and/or Clearstream, Luxembourg or any other clearing system (an "**Alternative Clearing System**"), notices to Holders of Notes represented by this

Unrestricted Global Note ("**Noteholders**") may be given by delivery of the relevant notice to Euroclear and/or Clearstream, Luxembourg or (as the case may be) such Alternative Clearing System; provided, however, that, so long as the Notes are admitted to trading on the Luxembourg Stock Exchange or the KASE and the rules of the Stock Exchange so require, notices will also be published in a leading newspaper having general circulation in Luxembourg and on the website of the Luxembourg Stock Exchange (www.bourse.lu) as well as in a leading newspaper having general circulation in Kazakhstan.

10. **Meetings:**  The Holder shall be treated at any meeting of Noteholders as having one vote in respect of each [[U.S.$/KZT] ____ [principal amount/Fully Accreted Principal Amount] of Notes [(converted from [Tenge/Euros] as set out in the Trust Deed)]/Recovery Unit] for which this Unrestricted Global Note may be exchanged.

11. **Contracts (Rights of Third Parties) Act 1999:**  No rights are conferred on any person under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Unrestricted Global Note but this does not affect any right or remedy of a third party which exists or is available apart from that Act.

12. **Payment:**  [Payments of [principal and interest/Adjusted Principal Amount] [and Recovery Payments] in respect of Notes represented by this Unrestricted Global Note shall be made against presentation for endorsement and if no further payment falls to be made in respect of the Notes, surrender of the Unrestricted Global Note to or to the order of The Bank of New York Mellon, London Branch.

13. **Determination of entitlement:**  This Unrestricted Global Note is evidence of entitlement only and is not a document of title.  Entitlements are determined by the Register and only the Holder is entitled to payment in respect of this Unrestricted Global Note.

14. **Trustee Powers:**  In considering the interests of Noteholders while this Unrestricted Global Note is held on behalf of a clearing system, the Trustee may have regard to any information provided to it by such clearing system or its operator as to the identity (either individually or by category) of its accountholders with entitlements to this Unrestricted Global Note and may consider such interests as if such accountholders were the holders of this Unrestricted Global Note.

15. **Prescription:**  This Unrestricted Global Note shall become void unless it is presented for payment within a period of 10 years [(in the case of principal)/in respect of Adjusted Principal Amount and Recovery Payments] [and five years (in the case of interest)] from the appropriate Relevant Date (as defined in Condition ____ (*Taxation*)).

16. **Purchase and Cancellation:**  Cancellation of any Note required by the Conditions to be cancelled following its purchase shall be effected by reduction in the principal amount of this Unrestricted Global Note.

17. **Authentication:**  This Unrestricted Global Note shall not be valid for any purpose until it has been authenticated for and on behalf of the Registrar.

18. **Governing law:**  This Unrestricted Global Note and any non-contractual obligations arising out of or in connection herewith are governed by, and shall be construed in accordance with, English law.

**AS WITNESS** the manual or facsimile signature of a duly authorised person on behalf of the Bank.

**"BTA BANK" JSC**


By:............................................................    By:............................................................
    [*manual or facsimile signature*]        [*manual or facsimile signature*]
    (duly authorised)        (duly authorised)

**ISSUED ON 25 August 2010**

**AUTHENTICATED for and on behalf of**
**The Bank of New York Mellon (Luxembourg) S.A.**

By:............................................................
    [*manual or facsimile signature*]
    (duly authorised)

**SCHEDULE A**

**SCHEDULE OF INCREASE OR REDUCTION IN [[PRINCIPAL AMOUNT/FULLY ACCRETED PRINCIPAL AMOUNT] OF THE NOTES/NUMBER OF RECOVERY UNITS] REPRESENTED BY THIS UNRESTRICTED GLOBAL NOTE**

The following increases or reductions in the [[principal amount/Fully Accreted Principal Amount] of the Notes/number of Recovery Units] represented by this Unrestricted Global Note have been made as a result of (i) redemption or purchase and cancellation of Notes or (ii) transfer of Notes (including transfers of interests between the Global Notes):

| Date of Redemption/ Purchase and cancellation (stating which) | Amount of increase or decrease in [[principal amount/Fully Accreted Principal Amount] of Notes/number of Recovery Units] represented by this Unrestricted Global Note | [[Principal Amount/Fully Accreted Principal Amount] of Notes/number of Recovery Units] Represented by this Unrestricted Global Note following such increase or decrease | Notation made by or on behalf of the Principal Paying and Transfer Agent |
| --- | --- | --- | --- |

[*Attached to each Definitive Note Certificate:*]

[*Terms and Conditions of the appropriate Notes as set out in Schedule 4 (Terms and Conditions of the Notes)*]

[*At the foot of the Terms and Conditions:*]

| PRINCIPAL PAYING AND TRANSFER AGENT | REGISTRAR |
|---|---|
| The Bank of New York Mellon, London Branch | The Bank of New York Mellon (Luxembourg) S.A. |
| One Canada Square | Aerogolf Center, 1A, Hoehenhof |
| London E14 5AL | L-1736 Senningberg |
| United Kingdom | Luxembourg |

**Part 2**

**Form of Restricted Global Note**

ISIN:____                                                          Common Code:____

THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES. BY ACCEPTANCE OF THE SECURITY REPRESENTED HEREBY, EACH BENEFICIAL OWNER HEREOF REPRESENTS THAT (A) IT IS EITHER (I) NOT A U.S. PERSON AND IS LOCATED OUTSIDE THE UNITED STATES AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT OR (II) AN ACCREDITED INVESTOR AS DEFINED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT ("AN ACCREDITED INVESTOR") OR (III) A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("QIB") AND (B) THE SECURITY MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (I) OUTSIDE THE UNITED STATES TO PERSONS THAT ARE NOT U.S. PERSONS AS DEFINED IN, AND IN ACCORDANCE WITH, REGULATION S OR (II) WITHIN THE UNITED STATES IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QIB THAT IS PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER QIB; AND IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES. TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE OR EFFECT, WILL BE VOID AB INITIO, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION UNDER THE SECURITIES ACT FOR RESALES OF THIS SECURITY.

THIS SECURITY AND ALL RELATED DOCUMENTATION MAY BE AMENDED OR SUPPLEMENTED FROM TIME TO TIME TO MODIFY THE RESTRICTIONS ON AND PROCEDURES FOR RESALES AND OTHER TRANSFERS OF THIS SECURITY TO REFLECT ANY CHANGE IN APPLICABLE LAW OR REGULATION (OR THE INTERPRETATION THEREOF) OR IN PRACTICES RELATING TO THE RESALE OR TRANSFERS OF RESTRICTED SECURITIES GENERALLY. BY THE ACCEPTANCE OF THIS SECURITY THE HOLDER HEREOF SHALL BE DEEMED TO HAVE AGREED TO ANY SUCH AMENDMENT OR SUPPLEMENT.

**"BTA BANK" JSC**

*(incorporated with limited liability under*
*the laws of the Republic of Kazakhstan)*
(the "**Bank**")

**U.S.$2,082,371,783 Senior Notes due 2018**
**KZT32,604,173,503 Senior Notes due 2018**
**U.S.$384,848,130 Fully Accreted Principal Amount of Original Issue Discount Notes due 2021**
**EUR437,110,856 Fully Accreted Principal Amount of Original Issue Discount Notes due 2021**
**U.S.$496,631,368 7.20 per cent. Subordinated Notes due 2025**
**EUR28,237,359 6.75 per cent. Subordinated Notes due 2025**
**KZT7,396,248,930 11.20 per cent. Subordinated Notes due 2025**
**KZT28,000,000,000 8.0 per cent. Subordinated Notes due 2030**
**U.S.$5,221,494,216 aggregate initial Reference Amount of Recovery Units**

**RESTRICTED GLOBAL NOTE**

1. **Introduction:** This Restricted Global Note is issued in respect of the [[U.S.$/EUR/KZT] ____ [Fully Accreted Principal Amount of] [____ per cent.] Notes due ____ 20____ / U.S.$5,221,494,216 aggregate initial Reference Amount of Recovery Units] (the "**Notes**") of the Bank. The Notes are constituted by, are subject to and have the benefit of, a trust deed dated 25 August 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited, as trustee (the "**Trustee**", which expression includes all persons for the time being appointed trustee or trustees under the Trust Deed) and are the subject of an agency agreement dated 25 August 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") and made between the Bank, The Bank of New York Mellon (Luxembourg) S.A., as registrar (the "**Registrar**", which expression includes any successor registrar appointed from time to time in connection with the Notes), The Bank of New York Mellon, London Branch, as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"), the other paying and transfer agents named therein and the Trustee.

2. **References to Conditions**: Any reference herein to the "**Conditions**" is to the terms and conditions of the [[Senior Dollar/Senior Tenge/Dollar Original Issue Discount/Euro Original Issue Discount/ Dollar Subordinated/ Euro Subordinated/ Subordinated Tenge A/ Subordinated Tenge B] Notes/Recovery Units] attached hereto and any reference to a numbered "**Condition**" is to the correspondingly numbered provision thereof. If the Conditions endorsed on this Restricted Global Note are different from those appearing in the Schedule to the Trust Deed, the Conditions endorsed on this Restricted Global Note shall prevail.

3. **Registered holder**: This is to certify that The Bank of New York Depository (Nominees) Limited is, at the date hereof, entered in the register maintained by the Registrar in relation to the Notes (the "**Register**") as the duly registered holder (the "**Holder**") of [[U.S.$/EUR/KZT] ____ (*AMOUNT IN WORDS*] [UNITED STATES DOLLARS/EUR/KZT]) in aggregate [principal amount/Fully Accreted Principal Amount] of Notes/____ (____) Recovery Units representing U.S.$____ (*AMOUNT IN WORDS*] UNITED STATES DOLLARS) of Reference Amount] or such other amount as is shown on the register of Noteholders as being represented by this Restricted Global Note and is duly endorsed (for information purposes only) in the third column of Schedule A to this Restricted Global Note.

4. **Promise to pay:** The Bank, for value received, hereby promises to pay such sum in respect of [principal/Adjusted Principal Amount] to the Holder on [1 July 20____/the Settlement Date] (or on such earlier date or dates as the same may become payable in accordance with

the Conditions), and to pay [interest on such sum of [principal/Net Accreted Principal Amount] in arrear/Recovery Payments] on the dates and at the rates specified in the Conditions, together with any additional amounts payable in accordance with the Conditions, all subject to and in accordance with the Conditions.

5.    **Transfers:**  Transfers of interests in the Notes represented by this Restricted Global Note for interests in the Unrestricted Global Note shall be made in accordance with the Agency Agreement and in accordance with the operating procedures of the relevant clearing system and any such transfers may only be made upon presentation of a transfer certificate as provided in the Agency Agreement.

6.    **Exchange for Definitive Note Certificates:**  This Restricted Global Note shall be exchanged in whole (but not in part) free of charge to the Holder for duly authenticated and completed Definitive Note Certificates (**"Definitive Note Certificates"**) in substantially the form (subject to completion) set out in Schedule 1 (*Form of Definitive Note Certificate*) to the Trust Deed if any of the following events occurs:

    (a)    Euroclear and/or Clearstream, Luxembourg is closed for business for a continuous period of 14 days (other than by reason of legal holidays) or announces an intention permanently to cease business or does in fact do so; or

    (b)    an Event of Default (as defined and set out in the Conditions on the Notes) occurs.

Such exchange shall be effected in accordance with paragraph 7 (*Delivery of Definitive Note Certificates*).  The Bank shall notify the Holder of the occurrence of any of the events specified in (a) and (b) as soon as practicable thereafter.

7.    **Delivery of Definitive Note Certificates:**  Whenever this Restricted Global Note is to be exchanged for Definitive Note Certificates, such Definitive Note Certificates shall be issued in an aggregate [principal amount/Fully Accreted Principal Amount/number of Recovery Units] equal to the [principal amount/Fully Accreted Principal Amount/number of Recovery Units represented by] of this Restricted Global Note within five business days of the delivery, by or on behalf of the Holder, Euroclear and/or Clearstream, Luxembourg, to the Registrar of such information as is required to complete and deliver such Definitive Note Certificates (including, without limitation, the names and addresses of the persons in whose names the Definitive Note Certificates are to be registered and the [principal amount/Fully Accreted Principal Amount/number of Recovery Units] of each such person's holding) against the surrender of this Restricted Global Note at the Specified Office (as defined in the Agency Agreement) of the Registrar.  Such exchange shall be effected in accordance with the provisions of the Agency Agreement and the regulations concerning the transfer and registration of Notes scheduled thereto and, in particular, shall be effected without charge to any Holder or the Trustee, but against such indemnity as the Registrar may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such exchange.  In this paragraph, **"business day"** means a day on which commercial banks are open for business (including dealings in foreign currencies) in the city in which the Registrar has its Specified Office.

8.    **Conditions apply:**  Save as otherwise provided herein, the Holder of this Restricted Global Note shall have the benefit of, and be subject to, the Conditions and, for the purposes of this Restricted Global Note, any reference in the Conditions to **"Note Certificate"** or **"Note Certificates"** shall, except where the context otherwise requires, be construed so as to include this Restricted Global Note.

9.    **Notices:**  Notwithstanding Condition ____ (*Notices*), so long as this Restricted Global Note is held on behalf of Euroclear or Clearstream, Luxembourg or any other clearing system (an

"**Alternative Clearing System**"), notices to Holders of Notes represented by this Restricted Global Note ("**Noteholders**") may be given by delivery of the relevant notice to Euroclear or Clearstream or (as the case may be) such Alternative Clearing System; provided, however, that, so long as the Notes are admitted to trading on the Luxembourg Stock Exchange or the KASE and the rules of such Stock Exchange so require, notices will also be published in a leading newspaper having general circulation in Luxembourg and on the website of the Luxembourg Stock Exchange (www.bourse.lu) as well as in a leading newspaper having general circulation in Kazakhstan.

10. **Meetings:**  The Holder shall be treated at any meeting of Noteholders as having one vote in respect of each [[U.S.$/EUR/KZT] ____ [[principal amount/Fully Accreted Principal Amount] of Notes [(converted from [Tenge/Euros] as set out in the Trust Deed)]/Recovery Unit] for which this Restricted Global Note may be exchanged.

11. **Contracts (Rights of Third Parties) Act 1999:**  No rights are conferred on any person under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Restricted Global Note but this does not affect any right or remedy of a third party which exists or is available apart from that Act.

12. **Payment:**  [Payments of [principal and interest/Adjusted Principal Amount] [and Recovery Payments] in respect of Notes represented by this Restricted Global Note shall be made against presentation for endorsement and if no further payment falls to be made in respect of the Notes, surrender of the Unrestricted Global Note to or to the order of The Bank of New York Mellon, London Branch.

13. **Determination of entitlement:**  This Restricted Global Note is evidence of entitlement only and is not a document of title.  Entitlements are determined by the Register and only the Holder is entitled to payment in respect of this Restricted Global Note.

14. **Trustee Powers:**  In considering the interests of Noteholders while this Restricted Global Note is held on behalf of a clearing system, the Trustee may have regard to any information provided to it by such clearing system or its operator as to the identity (either individually or by category) of its accountholders with entitlements to this Restricted Global Note and may consider such interests as if such accountholders were the holders of this Restricted Global Note.

15. **Prescription:**  This Restricted Global Note shall become void unless it is presented for payment within a period of 10 years [(in the case of principal)/in respect of Adjusted Principal Amount and Recovery Payments] [and five years (in the case of interest)] from the appropriate Relevant Date (as defined in Condition ____ (*Taxation*)).

16. **Purchase and Cancellation:**  Cancellation of any Note required by the Conditions to be cancelled following its purchase shall be effected by reduction in the principal amount of this Restricted Global Note.

17. **Authentication:**  This Restricted Global Note shall not be valid for any purpose until it has been authenticated for and on behalf of the Registrar.

18. **Governing law:**  This Restricted Global Note and any non-contractual obligations arising out of or in connection herewith are governed by, and shall be construed in accordance with, English law.

**AS WITNESS** the manual or facsimile signature of a duly authorised person on behalf of the Bank.

**"BTA BANK" JSC**

By:..................................................       By:..................................................
   [*manual or facsimile signature*]           [*manual or facsimile signature*]
   (duly authorised)                   (duly authorised)

**ISSUED ON 25 August 2010**

**AUTHENTICATED for and on behalf of**
**The Bank of New York Mellon (Luxembourg) S.A.**

By:..................................................
   [*manual or facsimile signature*]
   (duly authorised)