## SCHEDULE A

### SCHEDULE OF INCREASE OR REDUCTION IN [[PRINCIPAL AMOUNT/FULLY ACCRETED PRINCIPAL AMOUNT] OF THE NOTES/NUMBER OF RECOVERY UNITS] REPRESENTED BY THIS RESTRICTED GLOBAL NOTE

The following increases or reductions in the [[principal amount/Fully Accreted Principal Amount] of the Notes/number of Recovery Units] represented by this Restricted Global Note have been made as a result of (i) redemption or purchase and cancellation of Notes or (ii) transfer of Notes (including transfers of interests between the Global Notes):

| Date of Transfer/ Redemption/ Purchase and cancellation (stating which) | Amount of increase or decrease in [[principal amount/Fully Accreted Principal Amount] of Notes/number of Recovery Units] represented by this Restricted Global Note | [[Principal Amount of Notes/Fully Accreted Principal Amount]/number of Recovery Units] Represented by this Restricted Global Note following such increase or decrease | Notation made by or on behalf of the Principal Paying and Transfer Agent |
|---|---|---|---|

*[Attached to each Definitive Note Certificate:*

*[Terms and Conditions of the appropriate Notes as set out in Schedule 4 (Terms and Conditions of the Notes)]*

*[At the foot of the Terms and Conditions:*

| **PRINCIPAL PAYING AND TRANSFER AGENT** | **REGISTRAR** |
|---|---|
| The Bank of New York Mellon, London Branch | The Bank of New York Mellon (Luxembourg) S.A. |
| One Canada Square | Aerogolf Center, 1A, Hoehenhof |
| London E14 5AL | L-1736 Senningberg |
| United Kingdom | Luxembourg |

## SCHEDULE 3

### PROVISIONS FOR MEETINGS OF NOTEHOLDERS

**Interpretation**

1.  In this Schedule:

1.1  references to a meeting are:

  (i)  in the case of the Senior Notes, to a joint meeting of the holders of the Senior Dollar Notes and the Senior Tenge Notes;

  (ii)  in the case of the Original Issue Discount Notes, to a joint meeting of the holders of the Dollar Original Issue Discount Notes and the Euro Original Issue Discount Notes;

  (iii)  in the case of the Subordinated Notes, to a joint meeting of the holders of the Dollar Subordinated Notes, the Euro Subordinated Notes and the Subordinated Tenge A Notes; and

  (iv)  in all other cases, to a meeting of Noteholders of a single Series of Notes,

  and include, unless the context otherwise requires, any adjournment;

1.2  "**agent**" means a holder of a voting certificate or a proxy for a Noteholder;

1.3  "**block voting instruction**" means an instruction issued in accordance with paragraphs 10 to 15;

1.4  references to "Notes" and "Noteholders" are only to the Notes of the Series in respect of which a meeting has been, or is to be, called, and to the holders of these Notes, respectively;

1.5  "**Creditor Director matters**" means any of the matters referred to in paragraphs 3 and 4.

1.6  "**Extraordinary Resolution**" means a resolution passed at a meeting duly convened and held in accordance with this Trust Deed by a majority of at least 75 per cent of the votes cast;

1.7  "**voting certificate**" means a certificate issued in accordance with paragraphs 8, 9, 10 and 15;

1.8  references to Persons representing a proportion of the Notes are to Noteholders or agents holding or representing in the aggregate at least that proportion in principal amount of the Notes for the time being outstanding or (i) in the case of the Original Issue Discount Notes, at least that proportion in the Fully Accreted Principal Amount of the Notes for the time being outstanding and (ii) in the case of the Recovery Units, at least that proportion of units in the aggregate number of units issued; and

1.9  references to a Class are:

  (i)  in the case of the Senior Notes, to all the holders of the Senior Dollar Notes and the Senior Tenge Notes;

  (ii)  in the case of the Original Issue Discount Notes, to all the holders of the Dollar Original Issue Discount Notes and the Euro Original Issue Discount Notes;

  (iii)  in the case of the Subordinated Notes, all the holders of the Dollar Subordinated Notes, the Euro Subordinated Notes and the Subordinated Tenge A Notes; and

(iv)     in all other cases, all of the Noteholders of a single Series of Notes; and

1.10    **"OID Notes"** means the Original Issue Discount Notes and **"OID Noteholder"** means a holder of Original Issue Discount Notes.

**Powers of Meetings**

2.      A meeting shall, subject to the Conditions and subject as provided in paragraphs 3 and 4 and without prejudice to any powers conferred on other Persons by this Trust Deed, have power by Extraordinary Resolution:

2.1     to sanction any proposal by the Bank or the Trustee for any modification, abrogation, variation or compromise of, or arrangement in respect of, the rights of the Noteholders against the Bank whether or not those rights arise under this Trust Deed;

2.2     to sanction the exchange or substitution for the Notes of, or the conversion of the Notes into, shares, Notes or other obligations or securities of the Bank or any other entity;

2.3     to assent to any modification of this Trust Deed or the Notes proposed by the Bank or the Trustee;

2.4     to authorise anyone to concur in and do anything necessary to carry out and give effect to an Extraordinary Resolution;

2.5     to give any authority, direction or sanction required to be given by Extraordinary Resolution;

2.6     to appoint any Persons (whether Noteholders or not) as a committee or committees to represent the Noteholders' interests and to confer on them any powers or discretions which the Noteholders could themselves exercise by Extraordinary Resolution;

2.7     to approve a proposed new Trustee and to remove a Trustee; and

2.8     to discharge or exonerate the Trustee from any liability in respect of any act or omission for which it may become responsible under this Trust Deed or the Notes; provided that the special quorum provisions in paragraph 21 shall apply to any Extraordinary Resolution (a "**special quorum resolution**") for the purpose of sub paragraph 2.2 or for the purpose of making a modification to this Trust Deed or the Notes which would have the effect of:

        (i)      modifying the maturity of the Notes or the dates on which interest or principal is payable on them or the dates on which Recovery Payments are payable (subject as set out in the Recovery Units Conditions); or

        (ii)     reducing or cancelling the Reference Amount of the Recovery Units (other than as set out in the Conditions) or the principal amount of, any premium payable on redemption of, or interest on, or varying the method of calculating the rate of interest on, the Notes; or

        (iii)    changing the currency of payment of the Notes; or

        (iv)     changing the priority of payments in respect of the Notes or the subordination arrangements in respect of the Subordinated Notes; or

        (v)      releasing or discharging the Security Interests; or

        (vi)     converting, exchanging or substituting the Notes for any other securities of the Bank or any other Person; or

(vii)    modifying the provisions in this Schedule concerning the quorum required at a meeting or the majority required to pass an Extraordinary Resolution; or

(viii)   approving the substitution of any entity for the Bank (or any previous substitute) as principal debtor under this Trust Deed other than as set out in Clause 14.2 (*Substitution*) of the Trust Deed; or

(ix)     amending this proviso.

3.    A meeting of:

(i)     the Senior Noteholders shall, subject to the Conditions of the Senior Notes, have power by written direction of holders to require that the Trustee remove the Creditor Director appointed on behalf of the Senior Noteholders in accordance with paragraph 36; and

(ii)    the OID Noteholders shall, subject to the Conditions of the OID Notes, have power by written direction of holders to require that the Trustee remove the Creditor Director appointed on behalf of the OID Noteholders in accordance with paragraph 37.

4.    A meeting of:

(i)     the Senior Noteholders shall, subject to the Conditions, have power, by resolution of a majority of holders, to appoint a candidate nominated by a Senior Noteholder as replacement Creditor Director on behalf of the Senior Noteholders or, if a required majority of Senior Noteholders do not approve any candidate and the Bank has nominated a candidate, a meeting of the Senior Noteholders may disapprove the candidate nominated by the Bank as replacement Creditor Director upon 25% or more of the total number of votes attaching to Senior Notes voting to disapprove the candidate nominated by the Bank in accordance with paragraph 38; and

(ii)    the OID Noteholders shall, subject to the Conditions, have power, by resolution of a majority of holders, to appoint a candidate nominated by an OID Noteholder as replacement Creditor Director on behalf of the OID Noteholders or, if a required majority of OID Noteholders do not approve any candidate and the Bank has nominated a candidate, a meeting of the OID Noteholders may disapprove the candidate nominated by the Bank as replacement Creditor Director upon 25% or more of the total number of votes attaching to OID Notes voting to disapprove the candidate nominated by the Bank in accordance with paragraph 39.

**Convening a meeting**

5.    The Bank or the Trustee may at any time convene a meeting.

5.1    If the Trustee receives a written request for a meeting regarding any Creditor Director matter by the relevant Noteholders holding at least 5 per cent. of the aggregate principal amount (or, in the case of the Original Issue Discount Notes, the aggregate Fully Accreted Principal Amount) of the relevant Notes for the time being outstanding and is indemnified to its satisfaction against all costs and expenses, the Trustee shall convene a meeting of such Noteholders.

5.2    Subject to paragraph 5.1, if the Trustee receives a written request by Noteholders holding at least ten per cent. of the aggregate principal amount or Fully Accreted Principal Amount of the relevant Notes or of the aggregate number of Recovery Units (as the case may be) for the

time being outstanding and is indemnified to its satisfaction against all costs and expenses, the Trustee shall convene a meeting of such Noteholders.

5.3    Every meeting shall be held at a time and place approved by the Trustee.

6.    At least 21 days' notice (exclusive of the day on which the notice is given and of the day of the meeting) shall be given to the Noteholders.  A copy of the notice shall be given by the party convening the meeting to the other parties.  The notice shall specify the day, time and place of meeting and, unless the Trustee otherwise agrees, the nature of the resolutions to be proposed and shall explain how Noteholders may appoint proxies or representatives, obtain voting certificates and use block voting instructions and the details of the time limits applicable.

**Arrangements for voting**

7.    If a Noteholder wishes to obtain a voting certificate in respect of it for a meeting, it must deposit such Note for that purpose at least 48 hours before the time fixed for the meeting with an Agent or to the order of an Agent with a bank or other depositary nominated by the Paying and Transfer Agent for the purpose.  The Paying and Transfer Agent shall then issue a voting certificate in respect of it.

A Noteholder may, by an instrument in writing in the form available from the specified office of a Paying and Transfer Agent in the English language executed by or on behalf of the holder and delivered to such Paying and Transfer Agent at least 24 hours before the time fixed for a meeting, appoint any Person (a **"proxy"**) to act on his behalf in connection with that meeting.  A proxy need not be a Noteholder.

A corporation which holds a Note may, by delivering to a Transfer Agent at least 24 hours before the time fixed for a meeting a certified copy of a resolution of its directors or other governing body (with, if it is not in English, a certified translation into English), authorise any Person to act as its representative (a **"representative"**) in connection with that meeting.

**Voting Certificate**

8.    A voting certificate shall:

8.1    be a document in the English language;

8.2    be dated;

8.3    specify the meeting concerned and the serial numbers of the Notes deposited; and

8.4    entitle, and state that it entitles, its bearer to attend and vote at that meeting in respect of those Notes.

9.    Once a Paying Agent has issued a voting certificate for a meeting in respect of a Note, it shall not release the Note until either:

9.1    the meeting has been concluded; or

9.2    the voting certificate has been surrendered to the Paying and Transfer Agent.

10.    A Noteholder may require the Paying and Transfer Agent to issue a block voting instruction by (i) delivering electronic instructions through the clearing systems to the Paying and Transfer Agent indicating how the votes attributable to such Noteholder's Notes should be

cast at the forthcoming meeting and (ii) arranging (to the satisfaction of the Paying and Transfer Agent) for the relevant Notes to be blocked in an account with a clearing system, in each case not later than 48 hours before the time fixed for the relevant meeting. The Paying and Transfer Agent shall issue a block voting instruction in respect of the votes attributable to all such Notes.

11.     A block voting instruction shall:

11.1    be a document in the English language;

11.2    be dated;

11.3    specify the meeting concerned;

11.4    certify that certain specified Notes (each a **"Blocked Note"**) have been blocked in an account with a clearing system and will not be released until the conclusion of the meeting and that the holder of each Blocked Note or a duly authorised person on its behalf has instructed the Paying and Transfer Agent that the votes attributable to such Blocked Note are to be cast in a particular way on each resolution to be put to the meeting;

11.5    list the total number and serial numbers of the Blocked Notes, distinguishing with regard to each resolution between those voting for and those voting against it;

11.6    appoint a named Person (a **"proxy"**) to vote at that meeting in respect of the Blocked Notes and in accordance with instructions received in relation to the Blocked Notes.

        A proxy need not be a Noteholder.

12.     Once a Paying and Transfer Agent has issued a block voting instruction for a meeting in respect of the votes attributable to any Blocked Notes, the directions to which it gives effect may not be revoked or altered during the 48 hours before the time fixed for the meeting.

13.     If a Noteholder that has blocked its Notes and provided electronic instructions to the Paying and Transfer Agent in accordance with paragraph 10 provides further electronic instructions to the Paying and Transfer Agent revoking its previous electronic instructions and providing no further instructions at least 48 hours before the time fixed for the meeting, the Paying and Transfer Agent shall exclude the votes attributable to it from the block voting instruction. If a Noteholder that has blocked its Notes and provided electronic instructions to the Paying and Transfer Agent in accordance with paragraph 10 provides further electronic instructions to the Paying and Transfer Agent revoking its previous electronic instructions and providing further electronic instructions regarding how the votes attributable to its Notes should be cast at least 48 hours before the time fixed for the meeting, the Paying and Transfer Agent shall amend the block voting instruction accordingly.

14.     Each block voting instruction shall be deposited at least 24 hours before the time fixed for the meeting at such place as the Trustee shall designate or approve and in default it shall not be valid unless the chairman of the meeting decides otherwise before the meeting proceeds to business. If the Trustee requires, a notarially certified copy of each block voting instruction shall be produced by the proxy at the meeting but the Trustee need not investigate or be concerned with the validity of the proxy's appointment.

15.     A vote cast in accordance with a block voting instruction shall be valid even if it or any of the Noteholders' instructions pursuant to which it was executed has previously been revoked or amended, unless written intimation of such revocation or amendment is received from the

relevant Paying Agent by the Bank or the Trustee at its registered office or by the chairman of the meeting in each case at least 24 hours before the time fixed for the meeting.

No Note may be deposited with or to the order of a Paying and Transfer Agent at the same time for the purposes of both paragraph 7 and paragraph 10 for the same meeting.

**Chairman**

16.     The chairman of a meeting shall be such Person as the Trustee may nominate in writing, but if no such nomination is made or if the Person nominated is not present within 15 minutes after the time fixed for the meeting the Noteholders or their agents present shall choose one of their number to be chairman, failing which the Bank may appoint a chairman.

17.     The chairman may, but need not, be a Noteholder or an agent of one.  The chairman of an adjourned meeting need not be the same Person as the chairman of the original meeting.

**Attendance**

18.     The following may attend and speak at a meeting:

19.1    Noteholders, their proxies and any person holding a voting certificate;

19.2    the chairman; and

19.3    the Bank and the Trustee (through their respective representatives) and their respective financial and legal advisers.

        No one else may attend or speak.

**Quorum and Adjournment**

20.     No business (except choosing a chairman) shall be transacted at a meeting unless a quorum is present at the commencement of business.  If a quorum is not present within 15 minutes from the time initially fixed for the meeting, it shall, if convened on the requisition of Noteholders or if the Bank and the Trustee agree, be dissolved.  In any other case it shall be adjourned until such date, not less than 14 nor more than 42 days later, and time and place as the chairman may decide.  If a quorum is not present within 15 minutes from the time fixed for a meeting so adjourned, the meeting shall be dissolved.

21.     Two or more Noteholders or their agents present in Person shall be a quorum:

21.1    in the cases marked "No minimum proportion" in the table below, whatever the proportion of the Notes which they represent; and

21.2    in any other case, only if they represent the proportion of the Notes shown by the table below.

| Column 1 | Column 2 | Column 3 |
|---|---|---|
| Purpose of meeting | Any meeting except one referred to in column 3<br>Required proportion | Meeting previously adjourned through want of a quorum<br>Required proportion |
| To pass a special quorum resolution | 75 per cent. of the aggregate principal amount of the Notes or Fully Accreted Principal Amount of the Notes or the number of Recovery Units (as the case may be) | 25 per cent. of the aggregate principal amount of the Notes or Fully Accreted Principal Amount of the Notes or the number of Recovery Units (as the case may be) |
| To pass a resolution regarding a Creditor Director matter | 5 per cent. of the aggregate principal amount or Fully Accreted Principal Amount (as the case may be) of the Notes (but note that a resolution to remove a Creditor Director requires a written direction from 25 per cent. of the aggregate principal amount or Fully Accreted Principal Amount (as the case may be) of the relevant Class of Notes) | No minimum proportion (but note that a resolution to remove a Creditor Director requires a written direction from 25 per cent. of the aggregate principal amount or Fully Accreted Principal Amount (as the case may be) of the relevant Class of Notes) |
| To pass any other Extraordinary Resolution | A clear majority | No minimum proportion |

22.    The chairman may with the consent of (and shall if directed by) a meeting adjourn the meeting from time to time and from place to place. Only business which could have been transacted at the original meeting may be transacted at a meeting adjourned in accordance with this paragraph or paragraph 20.

23.    At least ten days' notice of a meeting adjourned through want of a quorum shall be given in the same manner as for an original meeting and that notice shall state the quorum required at the adjourned meeting. No notice need, however, otherwise be given of an adjourned meeting.

**Voting**

24.    Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Bank, the Trustee or one or more Persons representing two per cent. of the aggregate principal amount or Fully Accreted Principal Amount of the Notes or the aggregate number of Recovery Units (as the case may be).

25.    Unless a poll is demanded a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact without proof of the number or proportion of the votes cast in favour of or against it.

26.   If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.

27.   A poll demanded on the election of a chairman or on a question of adjournment shall be taken at once.

28.   On a show of hands every Person who is present in Person and who produces a Note or a voting certificate or is a proxy has one vote.  On a poll every such Person has one vote for each U.S.$1 of principal amount (in the case of the Senior Notes and the Subordinated Notes (other than the Subordinated Tenge B Notes)), each U.S.$1 of Fully Accreted Principal Amount (in the case of the Dollar Original Issue Discount Notes and the Euro Original Issue Discount Notes), each Unit (in the case the Recovery Units) or each KZT1 of principal amount (in the case of the Subordinated Tenge B Notes) of Notes so produced or represented by the voting certificate so produced or for which he is a proxy or representative, converted into U.S. Dollars, where applicable, at the Reference Rate.  Without prejudice to the obligations of proxies, a Person entitled to more than one vote need not use them all or cast them all in the same way.

29.   In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

**Effect and Publication of a resolution**

30.   Once passed, a resolution shall be binding on all the Noteholders, whether or not present at the meeting and each of them shall be bound to give effect to it accordingly.  The passing of such a resolution shall be conclusive evidence that the circumstances justify its being passed.  The Bank shall give notice of the passing of a resolution to Noteholders within 14 days but failure to do so shall not invalidate the resolution.

**Minutes**

31.   Minutes shall be made of all resolutions and proceedings at every meeting and, if purporting to be signed by the chairman of that meeting or of the next succeeding meeting, shall be conclusive evidence of the matters in them.  Until the contrary is proved every meeting for which minutes have been so made and signed shall be deemed to have been duly convened and held and all resolutions passed or proceedings transacted at it to have been duly passed and transacted.

**Trustee's Power to Prescribe Regulations**

32.   Subject to all other provisions in this Trust Deed and the Samruk-Kazyna Undertaking the Trustee may without the consent of the Noteholders prescribe such further regulations regarding the holding of meetings and attendance and voting at them as it in its sole discretion determines including (without limitation) such requirements as the Trustee thinks reasonable to satisfy itself that the Persons who purport to make any requisition in accordance with this Trust Deed are entitled to do so and as to the form of voting certificates or block voting instructions so as to satisfy itself that Persons who purport to attend or vote at a meeting are entitled to do so.

33.   The holder of a Global Note shall (unless such Global Note represents only one Note) be treated as two persons for the purposes of any quorum requirements of a meeting of Noteholders.

34.    The foregoing provisions of this Schedule shall have effect subject to the following provisions:

34.1    subject to paragraph 1.1, separate meetings of Noteholders of each Series will normally be held; however, the Trustee may from time to time determine that meetings of Noteholders of different Series shall be held together;

34.2    subject to paragraph 1.1, a resolution that in the opinion of the Trustee affects one Series alone shall be deemed to have been duly passed if passed at a meeting of the Noteholders of the Series concerned;

34.3    subject to paragraph 1.1, a resolution that in the opinion of the Trustee affects the Noteholders of more than one Series but does not give rise to a conflict of interest between the Noteholders of the different Series concerned shall be deemed to have been duly passed if passed at a single meeting of the Noteholders of all of the said different Series provided that for the purposes of determining the votes a Noteholder is entitled to cast pursuant to paragraph 27, each Noteholder shall have one vote in respect of each U.S.$1 nominal amount or, in the case of the Original Issue Discount Notes, each U.S.$1 of Fully Accreted Principal Amount and, in the case of Recovery Units, each U.S.$1 of Reference Amount of Notes held, converted, in the case of Notes that are not denominated in U.S. Dollars, at the Reference Rate;

34.4    a resolution that in the opinion of the Trustee affects the Noteholders of more than one Series and gives or may give rise to a conflict of interest between the Noteholders of the different Series concerned shall be deemed to have been duly passed only if it shall be duly passed at separate meetings of the Noteholders of the relevant Series; and

34.5    to all such meetings as aforesaid all the preceding provisions of this Schedule shall *mutatis mutandis* apply as though references therein to Notes and to Noteholders were references to the Notes and Noteholders of the Series concerned.

**Written Resolutions**

35.    A resolution in writing signed (a) by or on behalf of the holders of all of the Notes of a Class who for the time being are entitled to receive notice of a meeting or (b) if such holders have been given at least 21 clear days' notice of such resolution, by or on behalf of Persons holding three quarters of the aggregate principal amount or Fully Accreted Principal Amount of the outstanding Notes or of the aggregate number of outstanding Recovery Units (as the case may be), shall for all purposes be as valid and effective as an Extraordinary Resolution passed at a meeting of the Noteholders of that Class duly convened and held.  Such resolution in writing may be contained in one document or in several documents in like form each signed by or on behalf of one or more of the relevant Noteholders and the date of such resolution shall be the date of the latest such document.

**Creditor Directors - Removal**

36.    In the case of the Creditor Director appointed on behalf of the Senior Noteholders, if Senior Noteholders who hold in aggregate more than 25% in principal amount of the outstanding Senior Notes direct the Trustee in writing to remove that Creditor Director, the Trustee shall remove the Creditor Director appointed on behalf of the Senior Noteholders;

37.    In the case of the Creditor Director appointed on behalf of the OID Noteholders, if OID Noteholders who hold in aggregate more than 25% in Fully Accreted Principal Amount of the

outstanding OID Notes direct the Trustee in writing to remove that Creditor Director, the Trustee shall remove the Creditor Director appointed on behalf of the OID Noteholders;

**Replacement of Creditor Directors**

38.   Where the current Creditor Director appointed on behalf of holders of the Senior Notes has resigned or has been removed, the Trustee shall, upon notice from the Bank, call a meeting of Senior Noteholders.  The quorum for such meeting shall be Senior Noteholders holding in aggregate not less than 5 per cent. of the aggregate principal amount of the Senior Notes then outstanding.  Such meeting shall consider and vote on the appointment of any candidate nominated by any Senior Noteholder and, any candidate nominated by the Bank to fill the position of Creditor Director.  Provided the meeting of Senior Noteholders is quorate:

   38.1   if the candidate nominated by any Senior Noteholder is approved by a majority by value of Senior Noteholders present in person or by proxy at the Senior Noteholders' meeting (and provided such majority holds at least 25% of the total number of Senior Notes held by all Senior Noteholders present in person or by proxy at the meeting), then the Trustee shall inform both Samruk Kazyna and the Bank of this in writing and require that the Samruk Kazyna and the Bank procure that such person is elected to the Board of Directors of the Bank; or

   38.2   if such majority of Senior Noteholders do not approve any candidate nominated by the Senior Noteholders then, unless Senior Noteholders, holding 25% or more of the total number of Senior Notes held by all Senior Noteholders present in person or by proxy at the meeting, vote to reject the candidate nominated by the Bank, then the Trustee shall inform both Samruk Kazyna and the Bank of this in writing and require that the Samruk Kazyna and the Bank procure that the Bank's nominee for the position of Creditor Director is elected to the Board of Directors of the Bank

39.   Where the current Creditor Director appointed on behalf of holders of the OID Notes has resigned or has been removed, the Trustee shall, upon notice from the Bank, call a meeting of OID Noteholders.  The quorum for such meeting shall be OID Noteholders holding in aggregate not less than 5 per cent. of the aggregate Fully Accreted Principal Amount of the OID Notes then outstanding.  Such meeting shall consider and vote on the appointment of any candidate nominated by any OID Noteholder and, any candidate nominated by the Bank to fill the position of Creditor Director.  Provided the meeting of OID Noteholders is quorate:

   39.1   if the candidate nominated by any OID Noteholder is approved by a majority by value of OID Noteholders present in person or by proxy at the OID Noteholders' meeting (and provided such majority holds at least 25% of the total number of OID Notes held by all OID Noteholders present in person or by proxy at the meeting), then the Trustee shall inform both Samruk Kazyna and the Bank of this in writing and require that the Samruk Kazyna and the Bank procure that such person is elected to the Board of Directors of the Bank; or

   39.2   if such majority of OID Noteholders do not approve any candidate nominated by the OID Noteholders then, unless OID Noteholders, holding 25% or more of the total number of OID Notes held by all OID Noteholders present in person or by proxy at the meeting, vote to reject the candidate nominated by the Bank, then the Trustee shall inform both Samruk Kazyna and the Bank of this in writing and require that the Samruk Kazyna and the Bank procure that s the Bank's nominee for the position of Creditor Director is elected to the Board of Directors of the Bank.

40.   In the event any Noteholder meeting described in paragraphs 38 or 39 above does not produce a candidate to be elected as the replacement Creditor Director, the procedure set out in

paragraphs 38 or 39 (as the case may be) shall be repeated until an acceptable replacement Creditor Director is found and appointed.

**SCHEDULE 4**

**TERMS AND CONDITIONS OF THE NOTES**

**Part 1**

**Terms and Conditions of the Senior Dollar Notes**

*The following is the text of the terms and conditions of the Senior Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Senior Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The U.S.$2,082,371,783 step up notes due 2018 (the "**Senior Dollar Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of BTA Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated 25 August 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of an agency agreement dated 25 August 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, The Bank of New York Mellon as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes), Joint-Stock Company "Citibank Kazakhstan" as Kazakhstan paying and transfer agent (the "**Kazakhstan Paying and Transfer Agent**"; which expression includes any successor or additional Kazakhstan paying and transfer agents appointed from time to time in connection with the Notes) and The Bank of New York Mellon (Luxembourg) S.A. as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1. **Status**

    The obligations under the Notes are unconditional, direct, unsubordinated and, subject as provided in Clause 8.1(c)(xxiv) (*Negative Pledge*) of the Trust Deed, unsecured obligations of the Bank, and will at all times rank at least *pari passu* amongst themselves and *pari passu* in right of payment with all other present and future (except as provided therein) unsubordinated, unsecured obligations of the Bank, save only for such obligations as may be preferred by mandatory provisions of applicable law.

2.    **Form, Denomination and Title**

(a)    ***Form and Denomination***

The Notes are in registered form, without interest coupons attached, and shall be serially numbered.  Notes shall be issued in denominations of U.S.$1 and integral multiples of U.S.$1 in excess thereof (each denomination an "**authorised denomination**").

(b)    ***Title***

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*).  The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

3.    **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement.  A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding.  Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

4.    **Transfers**

(a)    Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided, however, that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations.  Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)    Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of alike principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder.  In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)     The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)     Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)     All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions. The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar. A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

## 5.     Covenants

The Noteholders will have the benefit of certain covenants contained in the Trust Deed relating to, amongst other things, restrictions on the creation of security interests, incurrence of indebtedness, conduct of business with related parties, acquisition and incorporation of subsidiaries, ability to enter into mergers and joint ventures, disposal of assets and payment of dividends.

## 6.     Interest

(a)     *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount from 1 July 2010 to 1 January 2013 at the rate of 10.75 per cent. per annum, and 12.5 per cent. per annum thereafter (the "**Rate of Interest**"), payable in arrear on 1 January and 1 July in each year (each, an "**Interest Payment Date**", and with the first Interest Payment Date falling on 1 January 2011), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)     *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)     *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note,

dividing the product by two and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

(d)   **Calculation of Interest for any Other Period**

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7.   **Payments**

(a)   **Principal**

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)   **Interest**

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent.  Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) will be made as provided in these Conditions.

(c)   **Record Date**

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the close of business (in the place of the Registrar's specified office) on the business day before the due date for such payment (the "**Record Date**").

(d)   **Payments**

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a United States Dollar account maintained by the payee with a bank in New York City.

(e)   **Payments Subject to Fiscal Laws**

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*).  No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)   *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of the Specified Offices of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place. A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day. In this Condition 7(f), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in New York City, London and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)   *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders. The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided, however, that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar. Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

**8.   Redemption and Purchase**

(a)   *Scheduled Redemption*

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be redeemed in eight equal semi-annual instalments on 1 January and 1 July of each year, with the first such instalment being payable on 1 January 2015 and the last such instalment being payable on 1 July 2018. The outstanding principal amount of each Note shall be reduced by any repayment of principal in accordance with these Conditions, including any instalment amount with effect from the related instalment payment date, unless the payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount. Each Note shall be finally redeemed on due payment of the final instalment amount.

(b)   *Redemption at the Option of the Noteholders*

Unless the Noteholders have previously by an Extraordinary Resolution (as defined in the Trust Deed) disapplied this Condition 8(b) in relation to the applicable Relevant Event, following the occurrence of a Relevant Event (as defined below), the Bank shall promptly, and in any event within five Business Days thereafter, give notice (the "**Relevant Event Notice**") of such Relevant Event to the Noteholders (with a copy to the Trustee) in accordance with Condition 14 (*Notices*), which notice shall specify the date (which shall not be less than 30 days nor more than 60 days after the Relevant Event Notice (the "**Put Settlement Date**")), on which the Bank shall, at the option of

the holder of any Note, redeem such Note at its principal amount, together with interest accrued and unpaid to the Put Settlement Date. In order to exercise the option contained in this Condition 8(b), the holder of a Note must, not less than 15 days before the Put Settlement Date, deposit with any Paying Agent the relevant Note Certificate and a duly completed put option notice (a "**Put Option Notice**") in the form obtainable from any Paying Agent. No Note Certificate, once deposited with a duly completed Put Option Notice in accordance with this Condition 8(b), may be withdrawn; *provided, however, that* if, prior to the Put Settlement Date, any such Note becomes immediately due and payable or payment of the redemption monies is improperly withheld or refused, such Note Certificate shall, without prejudice to the exercise of the Put Option, be returned to the holder by uninsured first class mail (airmail if overseas) at such address as may have been given by such Noteholder in the relevant Put Option Notice. The Trustee shall not be responsible for monitoring whether or not any Relevant Event has occurred and shall be entitled to assume unless it receives written notice to the contrary, that no Relevant Event has occurred. In the event that a Relevant Event occurs but no Relevant Event Notice is given by the Bank, the Bank shall be deemed to have given a Relevant Event Notice specifying a Put Settlement Date on the date which is 60 days after the occurrence of the Relevant Event, unless such day is not a Business Day, in which event the Put Settlement Date shall be the immediately following Business Day thereafter.

(c)     *Redemption at the Option of the Bank*

The Notes may be redeemed at the option of the Bank in whole, but not in part, at any time, on giving not less than 30 nor more than 60 days' notice to the Noteholders and the Trustee in accordance with Condition 14 (*Notices*) (which notice shall be irrevocable), at their principal amount, together with interest accrued but unpaid to the date fixed for redemption as well as, if positive, the Make-Whole Amount (if any). Upon the expiry of any such notice as is referred to in this Condition 8(c), the Bank shall be bound to redeem the Notes in accordance with this Condition 8(c).

(d)     *Purchase*

Subject to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*", the Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price. Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 8(e) (*Cancellation of Notes*). Any Notes so purchased, while held by or on behalf of the Bank or any member of the Group, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(e)     *Cancellation of Notes*

Unless otherwise permitted pursuant to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*", all Notes which are redeemed or surrendered for cancellation pursuant to this Condition 8 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

(f)     *Definitions*

As used in this Condition 8 (*Redemption and Purchase*):

"**acting in concert**" means a group of persons who, pursuant to an agreement or understanding (whether formal or informal), actively cooperate, through the direct or indirect acquisition by any member or members of such group of shares in the Bank or of any of the assets of any member or members of the group, to obtain or consolidate control of the Bank.

"**Affiliate**" of a person means a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, that person.

"**Business Day**" means a day other than a Saturday or Sunday on which commercial banks are open for business (including dealings in foreign currencies) in London and New York.

"**Called Principal**" means the principal amount of the Notes to be redeemed.

"**Change of Control**" means:

(A)     Samruk-Kazyna ceases to control the Bank (other than where it ceases to control the Bank (a) by transfer of control to a Permitted Transferee or (b) in connection with a Secondary Public Offering), where "**control**" of the Bank means:

(i)      the holding beneficially of more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital); or

(ii)     the power (whether by ownership of shares, proxy, contract, agency or otherwise) to cast, or control the casting of, more than 50 per cent. of the maximum number of votes that might be cast at a general meeting of the Bank, or

(B)     any person or group of persons acting in concert (other than where (a) such person or persons are Permitted Transferees or (b) in connection with a Secondary Public Offering) gains control of the Bank where "**control**" means the power (whether by ownership of shares, proxy, contract, agency or otherwise) to:

(i)      appoint or remove all, or the majority, of the directors or other equivalent officers of the Bank; or

(ii)     give directions with respect to the operating and/or financial policies of the Bank with which the directors or other equivalent officers of the Bank are obliged to comply,

*provided that* any agreement whereby management of the Bank is transferred to a third party (the "**manager**") that does not, in conjunction with any acquisition of shares in the Bank by such manager or its Affiliates (whether or not occurring at the same time), cause the government of the Republic of Kazakhstan to cease to own more than 50 per cent. of the issued share capital of the Bank (excluding any part of

that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), will not constitute a "**Change of Control**" if (a) the Trustee and the Creditor Directors have been provided with an opinion in form and substance satisfactory to them of independent legal advisers of recognised standing to the effect that the management agreement, in conjunction with any acquisition of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), does not cause the government of the Republic of Kazakhstan (directly or indirectly) to cease to "**control**" the Bank or to have majority economic risk and/or benefit in the Bank and continues to allow the government of the Republic of Kazakhstan (directly or indirectly) to retain the sole right to exercise its rights as majority shareholders (including in relation to the appointment of directors), (b) the terms of the management agreement have been approved by a Qualified Majority and (c) the "**manager**" is a Permitted Transferee.

"**Discounted Value**" means, with respect to the Called Principal of the Notes, the amount obtained by discounting the Remaining Scheduled Payments with respect to the Called Principal in accordance with accepted financial practice and at a discount factor (applied on the same periodic basis as that on which interest on the Notes is payable) equal to the Reinvestment Yield with respect to such Called Principal.

"**Make-Whole Amount**" means an amount equal to the excess (if any) of:

(a)     the Discounted Value of the Remaining Scheduled Payments with respect to the Called Principal of the Notes; over

(b)     the Called Principal of the Notes.  "**OECD**" means the Organisation

for Economic Co-operation and Development.

"**Permitted Transferee**" means a person which: (A)(i) is a bank or other financial institution subject to financial regulation in Russia, China, Hong Kong, Singapore or an OECD country; or (ii) is a sovereign wealth fund of Russia, China, Hong Kong, Singapore or an OECD country or any other Country which may otherwise be approved by a Qualified Majority of the Board; (B) has, in the case of a bank or other financial institution, a minimum credit rating from S&P of at least BBB or equivalent from Moody's or Fitch; (C) has, in the case of a bank or other financial institution, a minimum paid up share capital and reserves of at least U.S.$7 billion or, in the case of a sovereign wealth fund, assets of at least U.S.$7 billion; and (D) is not affiliated with any of the present or former shareholders or managers of the Bank.

"**Redemption Date**" means the date on which any Note is redeemed either in whole or part.

"**Reinvestment Yield**" means, with respect to the Called Principal:

(a)     250 basis points; plus

(b)     the yield to maturity implied by:

(i)     the yields reported as of 10:00 a.m. (New York City time) on the second Business Day preceding the Redemption Date with respect to such Called Principal, on the display designated as "**PX1**" on the Bloomberg Financial Markets Service (or such other display as may replace PX1 on Bloomberg Financial Markets Service) for actively

> traded U.S. Treasury securities having a maturity equal to the Remaining Average Life of such Called Principal as of such Redemption Date; or

(ii)  if such yields are not reported as of such time or the yields reported as of such time are not ascertainable, the Treasury Constant Maturity Series Yields reported, for the latest day for which such yields have been so reported as of the second Business Day preceding the Redemption Date with respect to such Called Principal, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S. Treasury securities having a constant maturity equal to the Remaining Average Life of such Called Principal as of such Redemption Date,

and such implied yield will be determined, if necessary, by (a) converting U.S. Treasury bill quotations to bond-equivalent yields in accordance with accepted financial practice and (b) interpolating linearly between (1) the actively traded U.S. Treasury security with the duration closest to and greater than the Remaining Average Life and (2) the actively traded U.S. Treasury security with the duration closest to and less than the Remaining Average Life.

**"Relevant Event"** means:

(a)  a Change of Control; and/or

(b)  any disposals (excluding those disposals made in the ordinary course of trading) in any financial year of more than 6.5 per cent. of the Group's total gross assets (determined by reference to the Bank's most recent consolidated financial statements produced using IFRS).

**"Remaining Average Life"** means, with respect to any Called Principal, the number of years (calculated to the nearest one-twelfth year) obtained by dividing:

(a)  such Called Principal; into

(b)  the sum of the products obtained by multiplying (i) the principal component of each of the Remaining Scheduled Payments with respect to such Called Principal by (ii) the number of years (calculated to the nearest one-twelfth of a year) that will elapse between the Redemption Date with respect to such Called Principal and the due date of each such scheduled redemption.

**"Remaining Scheduled Payments"** means, with respect to the Called Principal, all payments of such Called Principal and interest thereon of the Notes to be redeemed that would have been due after the Redemption Date with respect to such Called Principal from their respective scheduled due dates to the final Redemption Date with respect to such Called Principal, *provided that* if such Redemption Date is not a date on which an interest payment is due to be made on the relevant instrument, the amount of the next succeeding scheduled interest payment shall be reduced by the amount of interest accrued to and required to be paid on the Redemption Date.

**"Secondary Public Offering"** means any sale or public offering of any equity security (including any preference shares) in the Bank or receipts or similar securities representing such equity securities by way of flotation, public placing, listing or other public offering on any recognised international exchange.

9. **Taxation**

(a) *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a **"Taxing Jurisdiction"**), unless such withholding or deduction is required by law. In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i) presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note; or

(ii) presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days; or

(iii) to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv) where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place. Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)     *Relevant Date*

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that such payment will be made, *provided that* payment is in fact made.

(c)     *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 9 (*Taxation*) pursuant to the Trust Deed.

(d)     *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

**10.     Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

**11.     Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest if any of the following events (each, an "**Event of Default**") occurs and is continuing:

(a)     *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b) **Breach of Other Obligations**

the Bank is in default in the performance, or is otherwise in breach, of any covenant, obligation, undertaking or other agreement under the Senior Notes, the OID Notes, the Recovery Units or the Trust Deed (other than a default or breach specifically dealt with elsewhere in this Condition 11 (*Events of Default*)) and, where such default or breach is, in the opinion of the Trustee, capable of remedy, such default or breach is not remedied within 30 calendar days after notice thereof has been given to the Bank, by the Trustee, requiring the same to be remedied; or

(c) **Cross Default**

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(d) **Judgment Default**

any judgment, ruling, decree or surety bond for the payment of an aggregate amount of not less than U.S.$10,000,000 (or its equivalent in any other currency or currencies) is rendered or granted against and is binding on any member of the Group or any part of its assets and is neither paid when due nor within any originally applicable grace period provided; or

(e) **Insolvency**

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement or any step or procedure contemplated in paragraph (c) of the definition of Permitted Transaction; or

(f)     *Creditors' Process*

after the Restructuring Date, any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group having an aggregate value of not less than U.S.$10,000,000, and is not discharged or stayed within 45 days after commencement; or

(g)     *Cessation of Business*

the Bank or any of its Material Subsidiaries suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business or its Banking Licence is revoked; or

(h)     *Compulsory Acquisition*

the authority or ability of the Bank or any of its Material Subsidiaries to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction, vesting, divesting, compulsory acquisition or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any member of the Group or any of its assets; or

(i)     *Invalidity or Unenforceability*

(a) the validity of the Notes or any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter is contested by the Bank or the Bank denies its obligations under the Senior Notes, the OID Notes or the Subordinated Notes (whether by a general suspension of payments or a moratorium on the payment of debt or otherwise), the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter or it is or becomes unlawful for the Bank to perform or comply with all or any of its obligations set out in any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, or all or any of the obligations of the Bank provided therein shall be or become unenforceable or invalid; or (b) the validity of the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, is contested by the Bank or Samruk-Kazyna, or either of the Bank or Samruk-Kazyna denies or fails to perform its obligations within any applicable grace period as stated under the BTA Undertaking or the Samruk-Kazyna Undertaking (as the case may be) including, for the avoidance of doubt, in relation to the appointment or removal of any Creditor Director and, following the occurrence of any of those events specified in this Condition 11(i), the Trustee is of the opinion that such occurrence is materially prejudicial to the interests of the Noteholders.

**12.     Replacement of Notes**

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require. Mutilated or defaced Notes must be surrendered before replacements will be issued.

13.    **Meetings of Noteholders; Modification and Waiver**

(a)    *Meetings of Noteholders*

The Trust Deed provides that all meetings of holders of the Notes will include holders of the KZT32,604,173,503 step up notes due 2018 (the "**KZT 2018 Notes**") of the Bank and there shall be no provision for separate meetings of the holders of the Notes and of the holders of the KZT 2018 notes and that for purposes of determining a quorum and for voting purposes the KZT Notes shall be converted into U.S. Dollars at the Reference Rate applicable as at the date of issuance of the Notes. Accordingly, all references in this Condition 13 (*Meetings of Noteholders; Modification and Waiver*) to "Notes" and "Noteholders" shall be deemed to include the KZT 2018 Notes and the holders of such notes, as the case may be.

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**"). A meeting to consider proposals to approve or reject a candidate nominated by any Noteholder or by the Bank, as the case may be, for the position of Creditor Director or to require the resignation of any Creditor Director (each, a "**Creditor Director matter**") may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than 5 per cent. of the aggregate principal amount of the outstanding Notes and the quorum at any meeting convened to vote on a Creditor Director matter will be two or more persons being or representing not less than five per cent. of the aggregate principal amount of the Notes for the time being outstanding or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented. Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)    *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of the Noteholders under the Trust Deed, or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on

behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c) *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error. In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby. Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

14. **Notices**

(a) *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing. In addition, so long as the Notes are listed on an Approved Stock Exchange (as defined in the Trust Deed) and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of the Approved Stock Exchange. Any such notice shall be deemed to have been given on the date of first publication.

(b) *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at 97, Dzholdasbekov str., md Samal-2, Almaty, 050051, Kazakhstan and clearly marked on their exterior "Loan and Capital Markets Department" (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c) *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15.   **Trustee**

(a)   ***Indemnification***

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders. In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed. Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)   ***Exercise of Power and Discretion***

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction. The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)   ***Enforcement; Reliance***

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)   it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)   it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence. In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor. If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed. The Trustee shall be entitled to rely without liability on such certificates. The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions or the Trust Deed and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)     *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)     *Retirement and Removal*

Any Trustee may retire at any time on giving at least two months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)     *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

16.   **Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

17.   **Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.  This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18.   **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19.   **Governing Law; Arbitration and Jurisdiction**

(a)   *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)   *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition.  The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA.  The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a

national of that country.  The seat of arbitration shall be London, England and the language of arbitration shall be English.  Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)    *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)    *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts.  Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)    *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)    *Agent for Service of Process*

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.  If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment.  If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)    *Consent to Enforcement, etc.*

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever

(irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)     *Waiver of Immunity*

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

Part 2

## Terms and Conditions of the Senior Tenge Notes

*The following is the text of the terms and conditions of the Senior Tenge Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Senior Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The KZT32,604,173,503 step up notes due 2018 (the "**Senior Tenge Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of "BTA BANK" JSC (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated 25 August 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of an agency agreement dated 25 August 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, The Bank of New York Mellon as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) Joint-Stock Company "Citibank Kazakhstan" as Kazakhstan paying and transfer agent (the "**Kazakhstan Paying and Transfer Agent**"; which expression includes any successor or additional Kazakhstan paying and transfer agents appointed from time to time in connection with the Notes) and The Bank of New York Mellon (Luxembourg) S.A. as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Although the Notes in global form will be held by Clearstream, Luxembourg ("**Clearstream**"), payments of principal and interest on the Notes will be made outside of Clearstream. Noteholders must therefore have an account with a broker or custodian that holds an account with the Central Securities Depositary of Kazakhstan in order to receive payments of principal and interest on the Notes and, by its acceptance of a Note, each Noteholder undertakes to inform any transferee of such Note of this requirement prior to transfer. Clearstream will not incur any liability to any Noteholder for any damage or loss any Noteholder may suffer or incur in the event that this undertaking is not complied with.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.  **Status**

    The obligations under the Notes are unconditional, direct, unsubordinated and, subject as provided in Clause 8.1(c)(xxiv) (*Negative Pledge*) of the Trust Deed, unsecured obligations of the Bank, and will at all times rank at least *pari passu* amongst themselves and *pari passu* in right of payment with all other present and future (except as provided therein) unsubordinated, unsecured obligations of the Bank, save only for such obligations as may be preferred by mandatory provisions of applicable law.

2.     **Form, Denomination and Title**

(a)    ***Form and Denomination***

The Notes are in registered form, without interest coupons attached, and shall be serially numbered. Notes shall be issued in denominations of KZT 1,000 and integral multiples of KZT 1 in excess thereof (each denomination an "**authorised denomination**").

(b)    ***Title***

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*). The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

3.     **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement. A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding. Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

4.     **Transfers**

(a)    Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; provided, however, that a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations. Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)    Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of a like principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder. In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)     The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)     Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)     All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions. The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar. A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

## 5.     Covenants

The Noteholders will have the benefit of certain covenants contained in the Trust Deed relating to, amongst other things, restrictions on the creation of security interests, incurrence of indebtedness, conduct of business with related parties, acquisition and incorporation of subsidiaries, ability to enter into mergers and joint ventures, disposal of assets and payment of dividends.

## 6.     Interest

(a)     *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount from 1 July 2010 to 1 January 2013 at the rate of 14.75 per cent. per annum, and 16.5 per cent. per annum thereafter (the "**Rate of Interest**"), payable in arrear on 1 January  and 1 July in each year (each, an "**Interest Payment Date**", and with the first Interest Payment Date falling on 1 January 2011), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)     *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)     *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note,

dividing the product by two and rounding the resulting figure to the nearest tiyn (half a tiyn being rounded upwards).

(d) *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

## 7. Payments

(a) *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b) *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent. Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) will be made as provided in these Conditions.

(c) *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the close of business (in the place of the Registrar's specified office) on the business day before the due date for such payment (the **"Record Date"**).

(d) *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a Kazakhstan Tenge account maintained by the payee with a bank in Kazakhstan.

(e) *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*). No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f) *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of the Specified Offices of the Principal Paying Agent, the holder thereof

shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place. A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day. In this Condition 7(f), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in London, Almaty and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)     *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders. The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; provided, however, that the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar. Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

8.     **Redemption and Purchase**

(a)     *Scheduled Redemption*

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be redeemed in eight equal semi-annual instalments on 1 January and 1 July of each year, with the first such instalment being payable on 1 January 2015 and the last such instalment being payable on 1 July 2018. The outstanding principal amount of each Note shall be reduced by any repayment of principal in accordance with these Conditions, including any instalment amount with effect from the related instalment payment date, unless the payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount. Each Note shall be finally redeemed on due payment of the final instalment amount.

(b)     *Redemption at the Option of the Noteholders*

Unless the Noteholders have previously by an Extraordinary Resolution (as defined in the Trust Deed) disapplied this Condition 8(b) in relation to the applicable Relevant Event, following the occurrence of a Relevant Event (as defined below), the Bank shall promptly, and in any event within five Business Days thereafter, give notice (the "**Relevant Event Notice**") of such Relevant Event to the Noteholders (with a copy to the Trustee) in accordance with Condition 14 (*Notices*), which notice shall specify the date (which shall not be less than 30 days nor more than 60 days after the Relevant Event Notice (the "**Put Settlement Date**")), on which the Bank shall, at the option of the holder of any Note, redeem such Note at its principal amount, together with interest accrued and unpaid to the Put Settlement Date. In order to exercise the option contained in this Condition 8(b), the holder of a Note must, not less than 15 days before the Put Settlement Date, deposit with any Paying Agent the relevant Note Certificate and a duly completed put option notice (a "**Put Option**

Notice") in the form obtainable from any Paying Agent. No Note Certificate, once deposited with a duly completed Put Option Notice in accordance with this Condition 8(b), may be withdrawn; provided, however, that if, prior to the Put Settlement Date, any such Note becomes immediately due and payable or payment of the redemption monies is improperly withheld or refused, such Note Certificate shall, without prejudice to the exercise of the Put Option, be returned to the holder by uninsured first class mail (airmail if overseas) at such address as may have been given by such Noteholder in the relevant Put Option Notice. The Trustee shall not be responsible for monitoring whether or not any Relevant Event has occurred and shall be entitled to assume unless it receives written notice to the contrary, that no Relevant Event has occurred. In the event that a Relevant Event occurs but no Relevant Event Notice is given by the Bank, the Bank shall be deemed to have given a Relevant Event Notice specifying a Put Settlement Date on the date which is 60 days after the occurrence of the Relevant Event, unless such day is not a Business Day, in which event the Put Settlement Date shall be the immediately following Business Day thereafter.

(c)  *Redemption at the Option of the Bank*

The Notes may be redeemed at the option of the Bank in whole, but not in part, at any time, on giving not less than 30 nor more than 60 days' notice to the Noteholders and the Trustee in accordance with Condition 14 (*Notices*) (which notice shall be irrevocable), at their principal amount, together with interest accrued but unpaid to the date fixed for redemption as well as, if positive, the Make-Whole Amount (if any). Upon the expiry of any such notice as is referred to in this Condition 8(c), the Bank shall be bound to redeem the Notes in accordance with this Condition 8(c).

(d)  *Purchase*

Subject to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*", the Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price. Notes so purchased may be held or resold (provided that such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 8(e) (*Cancellation of Notes*). Any Notes so purchased, while held by or on behalf of the Bank or any member of the Group, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(e)  *Cancellation of Notes*

Unless otherwise permitted pursuant to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*", all Notes which are redeemed or surrendered for cancellation pursuant to this Condition 8 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

(f)  *Definitions*

As used in this Condition 8 (*Redemption and Purchase*):

"**acting in concert**" means a group of persons who, pursuant to an agreement or understanding (whether formal or informal), actively cooperate, through the direct or indirect acquisition by any member or members of such group of shares in the Bank

or of any of the assets of any member or members of the group, to obtain or consolidate control of the Bank.

"**Affiliate**" of a person means a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, that person.

"**Business Day**" means a day other than a Saturday or Sunday on which commercial banks are open for business (including dealings in foreign currencies) in London and Almaty.

"**Called Principal**" means the principal amount of the Notes to be redeemed.

"**Change of Control**" means:

(A)   Samruk-Kazyna ceases to control the Bank (other than where it ceases to control the Bank (a) by transfer of control to a permitted transferee or (b) in connection with a secondary public offering), where "**control**" of the bank means:

(i)    the holding beneficially of more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital); or

(ii)   the power (whether by ownership of shares, proxy, contract, agency or otherwise) to cast, or control the casting of, more than 50 per cent. of the maximum number of votes that might be cast at a general meeting of the Bank, or

(B)   any person or group of persons acting in concert (other than where (a) such person or persons are Permitted Transferees or (b) in connection with a Secondary Public Offering) gains control of the Bank where "**control**" means the power (whether by ownership of shares, proxy, contract, agency or otherwise) to:

(i)    appoint or remove all, or the majority, of the directors or other equivalent officers of the Bank; or

(ii)   give directions with respect to the operating and/or financial policies of the Bank with which the directors or other equivalent officers of the Bank are obliged to comply,

*provided that* any agreement whereby management of the Bank is transferred to a third party (the "**manager**") that does not, in conjunction with any acquisition of shares in the Bank by such manager or its Affiliates (whether or not occurring at the same time), cause the government of the Republic of Kazakhstan to cease to own more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), will not constitute a "**Change of Control**" if (a) the Trustee and the Creditor Directors have been provided with an opinion in form and substance satisfactory to them of independent legal advisers of recognised standing to the effect that the management agreement, in conjunction with any acquisition of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a

distribution of either profits or capital), does not cause the government of the Republic of Kazakhstan (directly or indirectly) to cease to "control" the Bank or to have majority economic risk and/or benefit in the Bank and continues to allow the government of the Republic of Kazakhstan (directly or indirectly) to retain the sole right to exercise its rights as majority shareholders (including in relation to the appointment of directors), (b) the terms of the management agreement have been approved by a Qualified Majority and (c) the "manager" is a Permitted Transferee.

"**Comparable Tenge Bond Issue**" means the Tenge denominated Kazakhstan government securities selected by any Reference Tenge Bond Dealer as having a maturity equal (or most nearly equivalent) to the Remaining Average Life of such Called Principal as of such Redemption Date.

"**Comparable Tenge Bond Price**" means, with respect to any Redemption Date, the average of the Reference Tenge Bond Dealer Quotations for such Redemption Date, after excluding the highest and lowest such Reference Tenge Bond Dealer Quotations, or if the Bank obtains fewer than four such Reference Tenge Bond Dealer Quotations, the average of all such quotations.

"**Discounted Value**" means, with respect to the Called Principal of the Notes, the amount obtained by discounting the Remaining Scheduled Payments with respect to the Called Principal in accordance with accepted financial practice and at a discount factor (applied on the same periodic basis as that on which interest on the Notes is payable) equal to the Reinvestment Yield with respect to such Called Principal.

"**Make-Whole Amount**" means an amount equal to the excess (if any) of:

(A)     the Discounted Value of the Remaining Scheduled Payments with respect to the Called Principal of the Notes; over

(B)     the Called Principal of the Notes.

 "**OECD**" means the Organisation for Economic Co-operation and Development.

"**Permitted Transferee**" means a person which: (A)(i) is a bank or other financial institution subject to financial regulation in Russia, China, Hong Kong, Singapore or an OECD country; or (ii) is a sovereign wealth fund of Russia, China, Hong Kong, Singapore or an OECD country or any other Country which may otherwise be approved by a Qualified Majority of the Board; (B) has, in the case of a bank or other financial institution, a minimum credit rating from S&P of at least BBB or equivalent from Moody's or Fitch; (C) has, in the case of a bank or other financial institution, a minimum paid up share capital and reserves of at least U.S.$7 billion or, in the case of a sovereign wealth fund, assets of at least U.S.$7 billion; and (D) is not affiliated with any of the present or former shareholders or managers of the Bank.

"**Redemption Date**" means the date on which any Note is redeemed either in whole or in part.

"**Reference Tenge Bond Dealer**" means any dealer of Kazakhstan government securities appointed by the Bank in consultation with the Trustee.

"**Reference Tenge Bond Dealer Quotations**" means, with respect to each Reference Tenge Bond Dealer and any Redemption Date, the average as determined by the Bank of the bid and offered prices for the Comparable Tenge Bond Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Bank by

such Reference Tenge Bond Dealer at 3.30p.m. Almaty time on the third Business Day preceding such Redemption Date.

"**Reinvestment Yield**" means, with respect to the Called Principal:

(A)     250 basis points; plus

(B)     the yield to maturity implied by the rate per annum equal to the equivalent yield to maturity as of such Redemption Date of the Comparable Tenge Bond Issue, assuming a price for the Comparable Tenge Bond Issue (expressed as a percentage of its principal amount) equal to the Comparable Tenge Bond Price for such Redemption Date.

"**Relevant Event**" means:

(A)     a Change of Control; and/or

(B)     any disposals (excluding those disposals made in the ordinary course of trading) in any financial year of more than 6.5 per cent. of the Group's total gross assets (determined by reference to the Bank's most recent consolidated financial statements produced using IFRS).

"**Remaining Average Life**" means, with respect to any Called Principal, the number of years (calculated to the nearest one-twelfth year) obtained by dividing:

(A)     such Called Principal; into

(B)     the sum of the products obtained by multiplying (i) the principal component of each of the Remaining Scheduled Payments with respect to such Called Principal by (ii) the number of years (calculated to the nearest one-twelfth of a year) that will elapse between the Redemption Date with respect to such Called Principal and the due date of each such scheduled redemption.

"**Remaining Scheduled Payments**" means, with respect to the Called Principal, all payments of such Called Principal and interest thereon of the Notes to be redeemed that would have been due after the Redemption Date with respect to such Called Principal from their respective scheduled due dates to the final Redemption Date with respect to such Called Principal, *provided that* if such Redemption Date is not a date on which an interest payment is due to be made on the relevant instrument, the amount of the next succeeding scheduled interest payment shall be reduced by the amount of interest accrued to and required to be paid on the Redemption Date.

"**Secondary Public Offering**" means any sale or public offering of any equity security (including any preference shares) in the Bank or receipts or similar securities representing such equity securities by way of flotation, public placing, listing or other public offering on any recognised international exchange.

9.     **Taxation**

(a)     *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or

through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law. In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)     presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note; or

(ii)    presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days; or

(iii)   to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)    where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and provided that reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place. Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)   *Relevant Date*

As used in these Conditions, **"Relevant Date"** in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that such payment will be made, provided that payment is in fact made.

(c)   *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 9 (*Taxation*) pursuant to the Trust Deed.

(d)   *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

## 10.   Prescription

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

## 11.   Events of Default

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest if any of the following events (each, an **"Event of Default"**) occurs and is continuing:

(a)   *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b)     *Breach of Other Obligations*

the Bank is in default in the performance, or is otherwise in breach, of any covenant, obligation, undertaking or other agreement under the Senior Notes, the OID Notes, the Recovery Units or the Trust Deed (other than a default or breach specifically dealt with elsewhere in this Condition 11 (*Events of Default*)) and, where such default or breach is, in the opinion of the Trustee, capable of remedy, such default or breach is not remedied within 30 calendar days after notice thereof has been given to the Bank, by the Trustee, requiring the same to be remedied; or

(c)     *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(d)     *Judgment Default*

any judgment, ruling, decree or surety bond for the payment of an aggregate amount of not less than U.S.$10,000,000 (or its equivalent in any other currency or currencies) is rendered or granted against and is binding on any member of the Group or any part of its assets and is neither paid when due nor within any originally applicable grace period provided; or

(e)     *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement or any step or procedure contemplated in paragraph (c) of the definition of Permitted Transaction; or

(f) *Creditors' Process*

after the Restructuring Date, any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group having an aggregate value of not less than U.S.$10,000,000, and is not discharged or stayed within 45 days after commencement; or

(g) *Cessation of Business*

the Bank or any of its Material Subsidiaries suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business or its Banking Licence is revoked; or

(h) *Compulsory Acquisition*

the authority or ability of the Bank or any of its Material Subsidiaries to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction, vesting, divesting, compulsory acquisition or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any member of the Group or any of its assets; or

(i) *Invalidity or Unenforceability*

(a) the validity of the Notes or any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter is contested by the Bank or the Bank denies its obligations under the Senior Notes, the OID Notes or the Subordinated Notes (whether by a general suspension of payments or a moratorium on the payment of debt or otherwise), the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter or it is or becomes unlawful for the Bank to perform or comply with all or any of its obligations set out in any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, or all or any of the obligations of the Bank provided therein shall be or become unenforceable or invalid; or (b) the validity of the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, is contested by the Bank or Samruk-Kazyna, or either of the Bank or Samruk-Kazyna denies or fails to perform its obligations within any applicable grace period as stated under the BTA Undertaking or the Samruk-Kazyna Undertaking (as the case may be) including, for the avoidance of doubt, in relation to the appointment or removal of any Creditor Director and, following the occurrence of any of those events specified in this Condition 11(i), the Trustee is of the opinion that such occurrence is materially prejudicial to the interests of the Noteholders.

## 12. Replacement of Notes

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require. Mutilated or defaced Notes must be surrendered before replacements will be issued.

13.    **Meetings of Noteholders; Modification and Waiver**

(a)    *Meetings of Noteholders*

The Trust Deed provides that all meetings of holders of the Notes will include holders of the U.S.$2,082,371,783 step up notes due 2018 (the "**USD 2018 Notes**") of the Bank and there shall be no provision for separate meetings of the holders of the Notes and of the holders of the USD 2018 notes and that for purposes of determining a quorum and for voting purposes the Notes shall be converted into U.S. Dollars at the Reference Rate applicable as at the date of issuance of the Notes. Accordingly, all references in this Condition 13 (*Meetings of Noteholders; Modification and Waiver*) to "Notes" and "Noteholders" shall be deemed to include the USD 2018 Notes and the holders of such notes, as the case may be.

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; provided, however, that certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**"). A meeting to consider proposals to approve or reject a candidate nominated by any Noteholder or by the Bank, as the case may be, for the position of Creditor Director or to require the resignation of any Creditor Director (each, a "**Creditor Director matter**") may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than 5 per cent. of the aggregate principal amount of the outstanding Notes and the quorum at any meeting convened to vote on a Creditor Director matter will be two or more persons being or representing not less than five per cent. of the aggregate principal amount of the Notes for the time being outstanding or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented. Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)    *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of the Noteholders under the Trust Deed, or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or

on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)   *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error. In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby. Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

## 14.   Notices

(a)   *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing. In addition, so long as the Notes are listed on an Approved Stock Exchange (as defined in the Trust Deed) and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of the Approved Stock Exchange. Any such notice shall be deemed to have been given on the date of first publication.

(b)   *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at 97, Dzholdasbekov str., md Samal-2, Almaty, 050051, Kazakhstan and clearly marked on their exterior "Loan and Capital Markets Department" (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)   *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15.     **Trustee**

(a)     ***Indemnification***

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders. In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed. Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)     ***Exercise of Power and Discretion***

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction. The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)     ***Enforcement; Reliance***

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)      it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)     it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence. In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor. If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed. The Trustee shall be entitled to rely without liability on such certificates. The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions or the Trust Deed and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)     *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)     *Retirement and Removal*

Any Trustee may retire at any time on giving at least two months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, provided that the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)     *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

16.    **Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

17.    **Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof. This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18.    **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19.    **Governing Law; Arbitration and Jurisdiction**

(a)    *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)    *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition. The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, provided that if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA. The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a

national of that country. The seat of arbitration shall be London, England and the language of arbitration shall be English. Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c) *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d) *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts. Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e) *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f) *Agent for Service of Process*

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being. If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment. If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g) *Consent to Enforcement, etc.*

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property

whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)     ***Waiver of Immunity***

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

Part 3

## Terms and Conditions of the Dollar Original Issue Discount Notes

*The following is the text of the terms and conditions of the Dollar Original Issue Discount Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Dollar Original Issue Discount Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The U.S.$384,848,130 Fully Accreted Principal Amount of Original Discount Notes due 2021 (the "**Dollar OID Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 17 (*Further Issues*) and forming a single series therewith) of "BTA BANK" JSC (the "**Bank**"), are (a) constituted by, and subject to, and have the benefit of a trust deed dated 25 August 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of an agency agreement dated 25 August 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, The Bank of New York Mellon as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**", which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes), Joint-Stock Company "Citibank Kazakhstan" as Kazakhstan paying and transfer agent (the "**Kazakhstan Paying and Transfer Agent**", which expression includes any successor or additional Kazakhstan paying and transfer agents appointed from time to time in connection with the Notes) and The Bank of New York Mellon (Luxembourg) S.A. as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.      **Definitions**

        In these Conditions:

        "**Accreted Principal Amount**" has the meaning provided in Condition 7(a) (*Accretion of Principal*) and in respect of any Note means the relevant Noteholder's *pro rata* shares of the aggregate Accreted Principal Amount of the Notes;

"**Fully Accreted Principal Amount**" means U.S.$384,848,130, being an amount equal to the principal amount of Designated Financial Indebtedness (as defined in the Information Memorandum) in respect of which the Notes are initially allocated, and "**Fully Accreted Principal Amount**" in respect of any Note shall mean the relevant Noteholder's *pro rata* share thereof;

"**Initial Principal Amount**" means U.S.$175,760,143, being an amount equal to 45.67% of the principal of and agreed interest on the Designated Financial Indebtedness in respect of which the Notes are initially allocated; and

"**Net Accreted Principal Amount**" has the meaning provided in Condition 9(a) (*Scheduled Redemption*) and in respect of any Note means the holder's *pro rata* share of the aggregate Net Accreted Principal Amount of the Notes.

2.   **Status**

The obligations under the Notes are unconditional, direct, unsubordinated and, subject as provided in Clause 8.1(c)(xxiv) (*Negative Pledge*) of the Trust Deed, unsecured obligations of the Bank, and will at all times rank at least *pari passu* amongst themselves and *pari passu* in right of payment with all other present and future (except as provided therein) unsubordinated, obligations of the Bank, save only for such obligations as may be preferred by mandatory provisions of applicable law.

3.   **Form and Title**

(a)   *Form*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered. Each Note shall be issued in respect of a specified Fully Accreted Principal Amount, with a minimum Fully Accreted Principal Amount of $100.

(b)   *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 4 (*Registration*) and 5 (*Transfers*). The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

4.   **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement. A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding. Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

5.      **Transfers**

    (a)    Notes shall be transferable in integral multiples of U.S.$1 of Fully Accreted Principal Amount. Subject to Conditions 5(d) and 5(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of any Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided that* a Note may not be transferred in part unless both the Fully Accreted Principal Amount being transferred and that being retained is not less than U.S.$100. Transfer Forms are available from any Agent and the Bank upon the request of any holder.

    (b)    Within five business days of the surrender of a Note Certificate in accordance with Condition 5(a), the Registrar will register the transfer in question and deliver a new Note Certificate of alike principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder. In this Condition 5(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

    (c)    Transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

    (d)    Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

    (e)    All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions. The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar. A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

6.      **Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed relating to, amongst other things, restrictions on the creation of security interests, incurrence of indebtedness, conduct of business with related parties, acquisition and incorporation of subsidiaries, ability to enter into mergers and joint ventures, disposal of assets and payment of dividends.

7.      **Interest and Principal**

    (a)    *Accretion of Principal*

        The Initial Principal Amount in respect of the Notes shall accrete by an amount of U.S.$9,503,999 on each Interest Payment Date. Accordingly, the "**Accreted**

Principal Amount" of the Notes at any time means the Initial Principal Amount together with the sum of all such accretions up to (and including) that time so that as from (and including) the last scheduled Interest Payment Date, the Accreted Principal Amount of the Notes shall equal their Fully Accreted Principal Amount.

The aggregate amounts of principal and interest payable on any Interest Payment Date and the aggregate Accreted Principal Amount and the aggregate Net Accreted Principal Amount on any Interest Payment date in relation to the Notes and in respect of the Interest Period following the relevant Interest Payment Date shall be as set out in the following table:

| Relevant Interest Payment Date | Aggregate Accreted Principal Amount | Aggregate Principal Repayments | Aggregate Net Accreted Principal Amount | Interest paid on the relevant Interest Payment Date |
|---|---|---|---|---|
| 1 July 2010 | 175,760,143 | - | 175,760,143 | - |
| 1 January 2011 | 185,264,142 | - | 185,264,142 | 3,251,562 |
| 1 July 2011 | 194,768,142 | - | 194,768,142 | 3,427,386 |
| 1 January 2012 | 204,272,141 | - | 204,272,141 | 3,603,210 |
| 1 July 2012 | 213,776,141 | - | 213,776,141 | 3,779,034 |
| 1 January 2013 | 223,280,140 | - | 223,280,140 | 3,954,858 |
| 1 July 2013 | 232,784,139 | - | 232,784,139 | 4,130,682 |
| 1 January 2014 | 242,288,139 | - | 242,288,139 | 4,306,506 |
| 1 July 2014 | 251,792,138 | - | 251,792,138 | 4,482,330 |
| 1 January 2015 | 261,296,138 | - | 261,296,138 | 4,658,154 |
| 1 July 2015 | 270,800,137 | - | 270,800,137 | 4,833,978 |
| 1 January 2016 | 280,304,137 | - | 280,304,137 | 5,009,802 |
| 1 July 2016 | 289,808,136 | - | 289,808,136 | 5,185,626 |
| 1 January 2017 | 299,312,135 | - | 299,312,135 | 5,361,450 |
| 1 July 2017 | 308,816,135 | - | 308,816,135 | 5,537,274 |
| 1 January 2018 | 318,320,134 | 38,602,017 | 279,718,117 | 5,095,466 |
| 1 July 2018 | 327,824,134 | 39,959,731 | 249,262,386 | 4,615,348 |
| 1 January 2019 | 337,328,133 | 41,543,731 | 217,222,654 | 4,112,829 |
| 1 July 2019 | 346,832,132 | 43,444,531 | 183,282,123 | 3,584,173 |
| 1 January 2020 | 356,336,132 | 45,820,531 | 146,965,591 | 3,024,155 |

| Relevant Interest Payment Date | Aggregate Accreted Principal Amount | Aggregate Principal Repayments | Aggregate Net Accreted Principal Amount | Interest paid on the relevant Interest Payment Date |
|---|---|---|---|---|
| 1 July 2020 | 365,840,131 | 48,988,530 | 107,481,060 | 2,424,932 |
| 1 January 2021 | 375,344,131 | 53,740,530 | 63,244,530 | 1,773,437 |
| 1 July 2021 | 384,848,130 | 72,748,529 | - | 1,043,534 |

(b)     *Interest Accrual*

The Notes shall bear interest on their Net Accreted Principal Amount from 1 July 2010 up to but excluding 1 July 2017 (the "**Amortisation Date**") at the rate of 3.70 per cent. per annum (the "**Initial Rate of Interest**") and thereafter until 1 July 2021 at the rate of 3.30 per cent. per annum (the "**Subsequent Rate of Interest**"). Interest is payable in arrear on 1 January and 1 July in each year commencing on 1 January 2011 (each, an "**Interest Payment Date**" and with the first Interest Payment Date falling on 1 January 2011), subject as provided in Condition 8 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(c)     *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(d)     *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Initial or the Subsequent Rate of Interest (as the case may be) to the Net Accreted Principal Amount of such Note applicable to the relevant Interest Period, dividing the product by two and rounding the resulting figure to down to the nearest cent.

(e)     *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 7(d) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

8.    **Payments**

   (a)    *Entitlements of Noteholders*

   Each holder of Notes shall be entitled to its *pro rata* share of principal or interest paid on the Notes based upon the ratio which the Fully Accreted Principal Amount of Notes held by such holder bears to the Fully Accreted Principal Amount of all the Notes.

   (b)    *Principal*

   Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

   (c)    *Interest*

   Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of partial payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent. Payments of all amounts other than as provided in Condition 8(b) (*Principal*) and this Condition 8(c) will be made as provided in these Conditions.

   (d)    *Record Date*

   Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the close of business (in the place of the Registrar's specified office) on the business day before the due date for such payment (the "**Record Date**").

   (e)    *Payments*

   Each payment in respect of the Notes pursuant to Conditions 8(b) (*Principal*) and 8(c) (*Interest*) will be made by transfer to a United States Dollar account maintained by the payee with a bank in New York City. Amounts payable shall be rounded down to the nearest cent.

   (f)    *Payments Subject to Fiscal Laws*

   All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 10 (*Taxation*). No commissions or expenses shall be charged to the Noteholders in respect of such payments.

   (g)    *Payment on a Business Day*

   If the due date for payment of any amount in respect of any Note is not a business day in the place of the Specified Offices of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place. A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day. In this Condition 8(g), "**business day**" means any day on which banks are open for business (including dealings in foreign

currencies) in New York City, London and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(h)   *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders. The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided, however, that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar. Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 15 (*Notices*).

9.   **Redemption and Purchase**

(a)   *Scheduled Redemption*

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 8 (*Payments*), the Notes will be redeemed in eight semi-annual instalments, with the first such instalment being payable on the Interest Payment Date that falls in January 2018 and the remaining instalments being payable on each Interest Payment Date thereafter. As provided in Condition 7(a) (*Accretion of Principal*), the outstanding principal amount of each instalment of principal shall be equal to the applicable Net Accreted Principal Amount as at the day prior to the relevant Interest Payment Date divided by the number of instalments (including the one in question) remaining until (and including) the last instalment.

The outstanding Accreted Principal Amount of each Note (as accreted in accordance with Condition 7(a) (*Accretion of Principal*)) shall be reduced by any repayment of principal in accordance with these Conditions with effect from the related instalment payment date, such reduced Accreted Principal Amount being referred to herein as the "**Net Accreted Principal Amount**", unless the payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount. Each Note shall be finally redeemed on due payment of the final instalment amount.

(b)   *Redemption for Tax Reasons*

The Notes may be redeemed at the option of the Bank in whole, but not in part, at any time, on giving not less than 30 nor more than 60 days' notice to the Noteholders (which notice shall be irrevocable) at their Fully Accreted Principal Amount, together with interest accrued but unpaid to the date fixed for redemption, if, immediately before giving such notice, the Bank satisfies the Trustee that (i) the Bank will become obliged to pay, on the next date on which any amount would be payable with respect to the Notes, additional amounts, as provided or referred to in Condition 10 (*Taxation*), to any greater extent than would have been required had such a payment been required to be made on the date of the Claimants' Meeting, as a result of any change in, or amendment to, the laws or regulations of the Republic of Kazakhstan or

any political subdivision or any authority thereof having power to tax therein, or any change in the application or official interpretation of such laws or regulations (including a ruling by a court of competent jurisdiction, but excluding any such change or amendment which obliges the Bank to pay additional amounts in respect of Notes held by or on behalf of a person resident, domiciled or organised in the Republic of Kazakhstan), which change or amendment becomes effective on or after the date of the Claimant's Meeting and (ii) such obligation cannot be avoided by the Bank taking reasonable measures available to it; *provided, however, that* no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Bank would be obliged to pay such additional amounts if a payment in respect of the Notes were then due.  Prior to the publication of any notice of redemption pursuant to this Condition 9(b), the Bank shall deliver or procure that there is delivered to the Trustee a certificate signed by two directors of the Bank stating that the Bank is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Bank so to redeem have occurred and an opinion in form and substance satisfactory to the Trustee of independent legal advisers of recognised standing to the effect that the Bank has or will become obliged to pay such additional amounts as a result of such change or amendment.  The Trustee shall be entitled to accept, without further enquiry, such certificate and opinion as sufficient evidence of the satisfaction of the circumstances set out in (i) and (ii) above, in which event these shall be conclusive and binding on the Noteholders.  Upon the expiry of any such notice as is referred to in this Condition 9(b), the Bank shall be bound to redeem the Notes in accordance with this Condition 9(b).

(c)     ***Redemption at the Option of the Noteholders***

Unless the Noteholders have previously by an Extraordinary Resolution (as defined in the Trust Deed) disapplied this Condition 9(c) (*Redemption at the Option of the Noteholders*) in relation to the applicable Relevant Event, following the occurrence of a Relevant Event (as defined below), the Bank shall promptly, and in any event within five Business Days thereafter, give notice (the "**Relevant Event Notice**") of such Relevant Event to the Noteholders (with a copy to the Trustee) in accordance with Condition 15 (*Notices*), which notice shall specify the date (which shall not be less than 30 days nor more than 60 days after the Relevant Event Notice (the "**Put Settlement Date**")), on which the Bank shall, at the option of the holder of any Note, redeem such Note at its Net Accreted Principal Amount together with interest accrued and unpaid to the Put Settlement Date.  In order to exercise the option contained in this Condition 9(c), the holder of a Note must, not less than 15 days before the Put Settlement Date, deposit with any Paying Agent the relevant Note Certificate and a duly completed put option notice (a "**Put Option Notice**") in the form obtainable from any Paying Agent.  No Note Certificate, once deposited with a duly completed Put Option Notice in accordance with this Condition 9(c), may be withdrawn; *provided, however, that* if, prior to the Put Settlement Date, any such Note becomes immediately due and payable or, upon due presentation of any such Note Certificate on the Put Settlement Date, payment of the redemption monies is improperly withheld or refused, such Note Certificate shall, without prejudice to the exercise of the Put Option, be returned to the holder by uninsured first class mail (airmail if overseas) at such address as may have been given by such Noteholder in the relevant Put Option Notice.  The Trustee shall not be responsible for monitoring whether or not any Relevant Event has occurred and shall be entitled to assume, unless it receives written notice to the contrary, that no Relevant Event has occurred.  In the event that a Relevant Event occurs but no Relevant Event Notice is given by the Bank, the Bank shall be deemed to have given a Relevant Event Notice specifying a Put Settlement Date on the date which is 60 days after the occurrence of the Relevant

Event, unless such day is not a Business Day, in which event the Put Settlement Date shall be the immediately following Business Day thereafter.

(d)   *Purchase*

Subject to the covenant set out in the Trust Deed, entitled *"Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities"*, the Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price. Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 9(e) (*Cancellation of Notes*). Any Notes so purchased, while held by or on behalf of the Bank or any member of the Group shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(e)   *Cancellation of Notes*

Unless otherwise permitted pursuant to the covenant set out in the Trust Deed entitled *"Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities"*, all Notes which are redeemed or surrendered for cancellation pursuant to this Condition 9 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

(f)   *Definitions*

As used in this Condition 9 (*Redemption and Purchase*):

**"acting in concert"** means a group of persons who, pursuant to an agreement or understanding (whether formal or informal), actively cooperate, through the direct or indirect acquisition by any member or members of such group of shares in the Bank or of any of the assets of any member or members of the group, to obtain or consolidate Control of the Bank.

**"Affiliate"** of a person means a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, that person.

**"Business Day"** means a day other than a Saturday or Sunday on which commercial banks are open for business (including dealings in foreign currencies) in London and New York.

**"Change of Control"** means:

(a)   Samruk-Kazyna ceases to control the Bank (other than where it ceases to control the Bank (a) by transfer of control to a Permitted Transferee or (b) in connection with a Secondary Public Offering), where **"control"** of the Bank means:

(i)   the holding beneficially of more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital); or

      (ii)     the power (whether by ownership of shares, proxy, contract, agency or otherwise) to cast, or control the casting of, more than 50 per cent. of the maximum number of votes that might be cast at a general meeting of the Bank; or

(b)     Any person or group of persons acting in concert (other than where (a) such person or persons are Permitted Transferees or (b) in connection with a Secondary Public Offering) gains control of the Bank where "**control**" means the power (whether by ownership of shares, proxy, contract, agency or otherwise) to:

      (i)     appoint or remove all, or the majority, of the directors or other equivalent officers of the Bank; or

      (ii)     give directions with respect to the operating and/or financial policies of the Bank with which the directors or other equivalent officers of the Bank are obliged to comply,

*provided that* any agreement whereby management of the Bank is transferred to a third party (the "**manager**") that does not, in conjunction with any acquisition of shares in the Bank by such manager or its Affiliates (whether or not occurring at the same time), cause the government of the Republic of Kazakhstan to cease to own more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), will not constitute a "**Change of Control**" if (a) the Trustee and the Creditor Directors have been provided with an opinion in form and substance satisfactory to them of independent legal advisers of recognised standing to the effect that the management agreement, in conjunction with any acquisition of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), does not cause the government of the Republic of Kazakhstan (directly or indirectly) to cease to "**control**" the Bank or to have majority economic risk and/or benefit in the Bank and continues to allow the government of the Republic of Kazakhstan (directly or indirectly) to retain the sole right to exercise its rights as majority shareholders (including in relation to the appointment of directors), (b) the terms of the management agreement have been approved by a Qualified Majority and (c) the "**manager**" is a Permitted Transferee.

"**OECD**" means the Organisation for Economic Co-operation and Development.

"**Permitted Transferee**" means a person which: (A)(i) is a bank or other financial institution subject to financial regulation in Russia, China, Hong Kong, Singapore or an OECD country; or (ii) is a sovereign wealth fund from Russia, China, Hong Kong, Singapore or an OECD country or any other country which may otherwise be approved by a Qualified Majority of the Board; (B) has, in the case of a bank or other financial institution, a minimum credit rating from S&P of at least BBB or equivalent from Moody's or Fitch; (C) has, in the case of a bank or other financial institution, a minimum paid up share capital and reserves of at least U.S.$7 billion or, in the case of a sovereign wealth fund, assets of at least U.S.$7 billion; and (D) is not affiliated with any of the present or former shareholders or managers of the Bank.

"**Relevant Event**" means:

(a)     a Change of Control; and/or

(b)     any disposals (excluding those disposals made in the ordinary course of trading) in any financial year of more than 6.5 per cent. of the Group's total gross assets (determined by reference to the Bank's most recent consolidated financial statements calculated in accordance with IFRS).

"**Secondary Public Offering**" means any sale or public offering of any equity security (including any preference shares) of the Bank or receipts or similar securities representing such equity securities by way of flotation, public placement, listing or other public offering on any recognised international exchange.

10.     **Taxation**

(a)     *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)     presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note;

(ii)    presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days;

(iii)   to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)    where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place.  Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)    *Relevant Date*

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that such payment will be made, *provided that* payment is in fact made.

(c)    *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 10 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 10 (*Taxation*) pursuant to the Trust Deed.

(d)    *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 10 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

11.    **Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

**12.**    **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and shall become due and repayable at their Net Accreted Principal Amount together with accrued interest if any of the following events (each, an "**Event of Default**") occurs and is continuing:

(a)     *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b)     *Breach of Other Obligations*

the Bank is in default in the performance, or is otherwise in breach, of any covenant, obligation, undertaking or other agreement under the Senior Notes, the OID Notes, the Recovery Units or the Trust Deed (other than a default or breach specifically dealt with elsewhere in this Condition 12 (*Events of Default*)) and, where such default or breach is, in the opinion of the Trustee, capable of remedy, such default or breach is not remedied within 30 calendar days after notice thereof has been given to the Bank by the Trustee, requiring the same to be remedied; or

(c)     *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(d)     *Judgment Default*

any judgment, ruling, decree or surety bond for the payment of an aggregate amount of not less than U.S.$10,000,000 (or its equivalent in any other currency or currencies) is rendered or granted against and is binding on any member of the Group or any part of its assets and is neither paid when due nor within any originally applicable grace period provided; or

(e)     *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of

payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement or any step or procedure contemplated in paragraph (c) of the definition of Permitted Transaction; or

(f)     *Creditors' Process*

after the Restructuring Date, any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group having an aggregate value of not less than U.S.$10,000,000, and is neither discharged nor stayed within 45 days after commencement; or

(g)     *Cessation of Business*

the Bank or any of its Material Subsidiaries suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business or its Banking Licence is revoked; or

(h)     *Compulsory Acquisition*

the authority or ability of the Bank or any of its Material Subsidiaries to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction, vesting, divesting, compulsory acquisition or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any member of the Group or any of its assets; or

(i)     *Invalidity or Unenforceability*

(a) the validity of the Notes or any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter is contested by the Bank or the Bank denies its obligations under the Senior Notes, the OID Notes or the Subordinated Notes (whether by a general suspension of payments or a moratorium on the payment of debt or otherwise), the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter or it is or becomes unlawful for the Bank to perform or comply with all or any of its obligations set out in any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, or all or any of the obligations of the Bank provided therein shall be or become unenforceable or invalid; or (b) the validity of the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, is contested by the Bank or Samruk-Kazyna, or either of the Bank or Samruk-Kazyna denies or fails to perform its obligations within any applicable grace period as stated under the BTA Undertaking or the Samruk-Kazyna Undertaking (as the case may be) including, for the avoidance of doubt, in relation to the appointment or removal of any Creditor Director and, following the occurrence of any of those events specified in this Condition 12(i), the Trustee is of the opinion that such occurrence is materially prejudicial to the interests of the Noteholders.

13.     **Replacement of Notes**

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Notes must be surrendered before replacements will be issued.

14.     **Meetings of Noteholders; Modification and Waiver**

(a)     ***Meetings of Noteholders***

The Trust Deed provides that all meetings of holders of the Notes will include holders of the EUR437,110,856 Fully Accreted Principal Amount of Original Discount Notes due 2021 of the Bank (the "**EUR 2021 Notes**") and there shall be no provision for separate meetings of holders of the Notes and of holders of the EUR 2021 Notes and that for purposes of determining a quorum and for voting purposes the EUR 2021 Notes shall be converted into U.S. Dollars at the applicable Reference Rate applicable as at the date of issuance of the Notes.  Accordingly, all references in this Condition 14 (*Meetings of Noteholders; Modification and Waiver*) to "*Notes*" and "*Noteholders*" shall be deemed to include the EUR 2021 Notes and the holders of such notes as the case may be.

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed.  Any such modification may be made if sanctioned by an Extraordinary Resolution.  Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the Fully Accreted Principal Amount of the outstanding Notes.  The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the Fully Accreted Principal Amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the Fully Accreted Principal Amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate Fully Accreted Principal Amount of the outstanding Notes form a quorum (a "**special quorum resolution**").  A meeting to consider proposals to approve or reject a candidate nominated by any Noteholder or by the Bank, as the case may be, for the position of Creditor Director or to require the resignation of any Creditor Director (each, a "**Creditor Director matter**") may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than five per cent. of the aggregate Fully Accreted Principal Amount of the outstanding Notes and the quorum at any meeting convened to vote on a Creditor Director matter will be two or more persons being or representing not less than five per cent. of the aggregate Fully Accreted Principal Amount of the Notes for the time being outstanding or, at any adjourned meeting, two

or more persons being or representing Noteholders whatever the Fully Accreted Principal Amount of the Notes for the time being outstanding so held or represented. Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)     *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of the Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed, or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate Fully Accreted Principal Amount of the outstanding Notes.  Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)     *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error.  In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby.  Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 15 (*Notices*).

15.     **Notices**

(a)     *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing.  In addition, so long as the Notes are listed on an Approved Stock Exchange (as defined in the Trust Deed) and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of the Approved Stock Exchange.  Any such notice shall be deemed to have been given on the date of first publication.

(b)     *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at 97, Dzholdasbekov str., md Samal-2, Almaty, 050051, Kazakhstan and clearly marked on their exterior "Loan and Capital Markets Department" (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 15(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)     **To the Trustee and Agents**

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

16.    **Trustee**

(a)     *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders.  In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed.  Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)     *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction.  The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)     *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)      it has been so requested in writing by the holders of a least one fifth in Fully Accreted Principal Amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)     it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence.  In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the

Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor. If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 12 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 12 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed. The Trustee shall be entitled to rely without liability on such certificates. The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions or the Trust Deed and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)   *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)   *Retirement and Removal*

Any Trustee may retire at any time on giving at least two months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)   *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute).

Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 15 (*Notices*).

**17.   Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

**18.   Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.   This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

**19.   Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

**20.   Governing Law; Arbitration and Jurisdiction**

(a)   *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)   *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition.   The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators,

*provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA. The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country. The seat of arbitration shall be London, England and the language of arbitration shall be English. Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)     *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 20(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 20(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)     *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 20(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts. Subject to Condition 20(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)     *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)     *Agent for Service of Process*

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being. If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment. If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)     *Consent to Enforcement, etc.*

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 20(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)     *Waiver of Immunity*

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

Part 4

**Terms and Conditions of the Euro Original Issue Discount Notes**

*The following is the text of the terms and conditions of the Euro Original Issue Discount Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Euro Original Issue Discount Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The EUR437,110,856 Fully Accreted Principal Amount of Original Discount Notes due 2021 (the "**Euro OID Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 17 (*Further Issues*) and forming a single series therewith) of "BTA BANK" JSC (the "**Bank**"), are (a) constituted by, and subject to, and have the benefit of a trust deed dated 25 August 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of an agency agreement dated 25 August 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, The Bank of New York Mellon as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**", which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes), Joint-Stock Company "Citibank Kazakhstan" as Kazakhstan paying and transfer agent (the "**Kazakhstan Paying and Transfer Agent**", which expression includes any successor or additional Kazakhstan paying and transfer agents appointed from time to time in connection with the Notes)and The Bank of New York Mellon (Luxembourg) S.A. as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.    **Definitions**

In these Conditions:

"**Accreted Principal Amount**" has the meaning provided in Condition 7(a) (*Accretion of Principal*) and in respect of any Note means the relevant Noteholder's *pro rata* shares of the aggregate Accreted Principal Amount of the Notes;

"**Fully Accreted Principal Amount**" means EUR437,110,856, being an amount equal to the principal amount of Designated Financial Indebtedness (as defined in the Information Memorandum) in respect of which the Notes are initially allocated, and "**Fully Accreted Principal Amount**" in respect of any Note shall mean the relevant Noteholder's *pro rata* share thereof;

"**Initial Principal Amount**" means EUR199,628,531, being an amount equal to 45.67% of the principal of and agreed interest on the Designated Financial Indebtedness in respect of which the Notes are initially allocated; and

"**Net Accreted Principal Amount**" has the meaning provided in Condition 9(a) (*Scheduled Redemption*) and in respect of any Note means the holder's *pro rata* share of the aggregate Net Accreted Principal Amount of the Notes.

2.   **Status**

The obligations under the Notes are unconditional, direct, unsubordinated and, subject as provided in Clause 8.1(c)(xxiv) (*Negative Pledge*) of the Trust Deed, unsecured obligations of the Bank, and will at all times rank at least *pari passu* amongst themselves and *pari passu* in right of payment with all other present and future (except as provided therein) unsubordinated, obligations of the Bank, save only for such obligations as may be preferred by mandatory provisions of applicable law.

3.   **Form and Title**

(a)   *Form*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered. Each Note shall be issued in respect of a specified Fully Accreted Principal Amount, with a minimum Fully Accreted Principal Amount of EUR 100.

(b)   *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 4 (*Registration*) and 5 (*Transfers*). The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

3.   **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement. A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding. Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

5.   **Transfers**

(a)   Notes shall be transferable in integral multiples of EUR 1 of Fully Accreted Principal Amount. Subject to Conditions 5(d) and 5(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of any Agent, together with such evidence as the Registrar or (as the case may be) such Agent may

reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided that* a Note may not be transferred in part unless both the Fully Accreted Principal Amount being transferred and that being retained is not less than EUR 100. Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)     Within five business days of the surrender of a Note Certificate in accordance with Condition 5(a), the Registrar will register the transfer in question and deliver a new Note Certificate of alike principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder. In this Condition 5(b), **"business day"** means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)     Transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)     Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)     All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions. The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar. A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

6.     **Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed relating to, amongst other things, restrictions on the creation of security interests, incurrence of indebtedness, conduct of business with related parties, acquisition and incorporation of subsidiaries, ability to enter into mergers and joint ventures, disposal of assets and payment of dividends.

7.     **Interest and Principal**

(a)     *Accretion of Principal*

The Initial Principal Amount in respect of the Notes shall accrete by an amount of EUR10,794,651 on each Interest Payment Date. Accordingly, the **"Accreted Principal Amount"** of the Notes at any time means the Initial Principal Amount together with the sum of all such accretions up to (and including) that time so that as from (and including) the last scheduled Interest Payment Date, the Accreted Principal Amount of the Notes shall equal their Fully Accreted Principal Amount.

The aggregate amounts of principal and interest payable on any Interest Payment Date and the aggregate Accreted Principal Amount and the aggregate Net Accreted

Principal Amount on any Interest Payment Date in relation to the Notes and in respect of the Interest Period following the relevant Interest Payment Date shall be as set out in the following table:

| Relevant Interest Payment Date | Aggregate Accreted Principal Amount | Aggregate Principal Repayments | Aggregate Net Accreted Principal Amount | Interest paid on the relevant Interest Payment Date |
|---|---|---|---|---|
| 1 July 2010 | 199,628,531 | | 199,628,531 | |
| 1 January 2011 | 210,423,182 | - | 210,423,182 | 3,134,167 |
| 1 July 2011 | 221,217,833 | - | 221,217,833 | 3,303,644 |
| 1 January 2012 | 232,012,484 | - | 232,012,484 | 3,473,120 |
| 1 July 2012 | 242,807,136 | - | 242,807,136 | 3,642,596 |
| 1 January 2013 | 253,601,787 | - | 253,601,787 | 3,812,072 |
| 1 July 2013 | 264,396,438 | - | 264,396,438 | 3,981,548 |
| 1 January 2014 | 275,191,089 | - | 275,191,089 | 4,151,024 |
| 1 July 2014 | 285,985,740 | - | 285,985,740 | 4,320,500 |
| 1 January 2015 | 296,780,391 | - | 296,780,391 | 4,489,976 |
| 1 July 2015 | 307,575,042 | - | 307,575,042 | 4,659,452 |
| 1 January 2016 | 318,369,694 | - | 318,369,694 | 4,828,928 |
| 1 July 2016 | 329,164,345 | - | 329,164,345 | 4,998,404 |
| 1 January 2017 | 339,958,996 | - | 339,958,996 | 5,167,880 |
| 1 July 2017 | 350,753,647 | - | 350,753,647 | 5,337,356 |
| 1 January 2018 | 361,548,298 | 43,844,206 | 317,704,092 | 4,805,325 |
| 1 July 2018 | 372,342,949 | 45,386,299 | 283,112,444 | 4,352,546 |
| 1 January 2019 | 383,137,600 | 47,185,407 | 246,721,688 | 3,878,640 |
| 1 July 2019 | 393,932,251 | 49,344,338 | 208,172,002 | 3,380,087 |
| 1 January 2020 | 404,726,903 | 52,043,000 | 166,923,652 | 2,851,956 |
| 1 July 2020 | 415,521,554 | 55,641,217 | 122,077,086 | 2,286,854 |
| 1 January 2021 | 426,316,205 | 61,038,543 | 71,833,194 | 1,672,456 |
| 1 July 2021 | 437,110,856 | 82,627,845 | - | 984,114 |

(b)     *Interest Accrual*

The Notes shall bear interest on their Net Accreted Principal Amount from 1 July 2010 up to but excluding 1 July 2017 (the **"Amortisation Date"**) at the rate of 3.14 per cent. per annum (the **"Initial Rate of Interest"**) and thereafter until 1 July 2021 at the rate of 2.74 per cent. per annum (the **"Subsequent Rate of Interest"**). Interest is payable in arrear on 1 January and 1 July in each year commencing on 1 January 2011 (each, an **"Interest Payment Date"** and with the first Interest Payment Date falling on 1 January 2011), subject as provided in Condition 8 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an **"Interest Period"**.

(c)     *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(d)     *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Initial or the Subsequent Rate of Interest (as the case may be) to the Net Accreted Principal Amount of such Note applicable to the relevant Interest Period, dividing the product by two and rounding the resulting figure to down to the nearest cent.

(e)     *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 7(d) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

8.    **Payments**

(a)    ***Entitlements of Noteholders***

Each holder of Notes shall be entitled to its *pro rata* share of principal or interest paid on the Notes based upon the ratio which the Fully Accreted Principal Amount of Notes held by such holder bears to the Fully Accreted Principal Amount of all the Notes.

(b)    ***Principal***

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(c)    ***Interest***

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of partial payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent. Payments of all amounts other than as provided in Condition 8(b) (*Principal*) and this Condition 8(c) will be made as provided in these Conditions.

(d)    ***Record Date***

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the close of business (in the place of the Registrar's specified office) on the business day before the due date for such payment (the "**Record Date**").

(e)    ***Payments***

Each payment in respect of the Notes pursuant to Conditions 8(b) (*Principal*) and 8(c) (*Interest*) will be made by transfer to a Euro account maintained by the payee with a bank in a city in which banks have access to the TARGET System. Amounts payable shall be rounded down to the nearest cent.

(f)    ***Payments Subject to Fiscal Laws***

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 10 (*Taxation*). No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(g)    ***Payment on a Business Day***

If the due date for payment of any amount in respect of any Note is not a business day in the place of the Specified Offices of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place. A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day. In this Condition 8(g), "**business day**" means any day on which banks are open for business (including dealings in foreign

currencies) in the place of the Specified Offices of the Principal Paying Agent and which is a business day on which the TARGET System is operating and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(h)     *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders. The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided, however, that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar. Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 15 (*Notices*).

9.     **Redemption and Purchase**

(a)     *Scheduled Redemption*

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 8 (*Payments*), the Notes will be redeemed in eight semi-annual instalments, with the first such instalment being payable on the Interest Payment Date that falls in January 2018 and the remaining instalments being payable on each Interest Payment Date thereafter. As provided in Condition 7(a) (*Accretion of Principal*), the outstanding principal amount of each instalment of principal shall be equal to the applicable Net Accreted Principal Amount as at the day prior to the relevant Interest Payment Date divided by the number of instalments (including the one in question) remaining until (and including) the last instalment.

The outstanding Accreted Principal Amount of each Note (as accreted in accordance with Condition 7(a) (*Accretion of Principal*)) shall be reduced by any repayment of principal in accordance with these Conditions with effect from the related instalment payment date, such reduced Accreted Principal Amount being referred to herein as the "**Net Accreted Principal Amount**", unless the payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount. Each Note shall be finally redeemed on due payment of the final instalment amount.

(b)     *Redemption for Tax Reasons*

The Notes may be redeemed at the option of the Bank in whole, but not in part, at any time, on giving not less than 30 nor more than 60 days' notice to the Noteholders (which notice shall be irrevocable) at their Fully Accreted Principal Amount, together with interest accrued but unpaid to the date fixed for redemption, if, immediately before giving such notice, the Bank satisfies the Trustee that (i) the Bank will become obliged to pay, on the next date on which any amount would be payable with respect to the Notes, additional amounts, as provided or referred to in Condition 10 (*Taxation*), to any greater extent than would have been required had such a payment

been required to be made on the date of the Claimants' Meeting, as a result of any change in, or amendment to, the laws or regulations of the Republic of Kazakhstan or any political subdivision or any authority thereof having power to tax therein, or any change in the application or official interpretation of such laws or regulations (including a ruling by a court of competent jurisdiction, but excluding any such change or amendment which obliges the Bank to pay additional amounts in respect of Notes held by or on behalf of a person resident, domiciled or organised in the Republic of Kazakhstan), which change or amendment becomes effective on or after the date of the Claimant's Meeting and (ii) such obligation cannot be avoided by the Bank taking reasonable measures available to it; *provided, however, that* no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Bank would be obliged to pay such additional amounts if a payment in respect of the Notes were then due. Prior to the publication of any notice of redemption pursuant to this Condition 9(b), the Bank shall deliver or procure that there is delivered to the Trustee a certificate signed by two directors of the Bank stating that the Bank is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Bank so to redeem have occurred and an opinion in form and substance satisfactory to the Trustee of independent legal advisers of recognised standing to the effect that the Bank has or will become obliged to pay such additional amounts as a result of such change or amendment. The Trustee shall be entitled to accept, without further enquiry, such certificate and opinion as sufficient evidence of the satisfaction of the circumstances set out in (i) and (ii) above, in which event these shall be conclusive and binding on the Noteholders.  Upon the expiry of any such notice as is referred to in this Condition 9b), the Bank shall be bound to redeem the Notes in accordance with this Condition 9(b).

(c)     ***Redemption at the Option of the Noteholders***

Unless the Noteholders have previously by an Extraordinary Resolution (as defined in the Trust Deed) disapplied this Condition 9(c) (*Redemption at the Option of the Noteholders*) in relation to the applicable Relevant Event, following the occurrence of a Relevant Event (as defined below), the Bank shall promptly, and in any event within five Business Days thereafter, give notice (the "**Relevant Event Notice**") of such Relevant Event to the Noteholders (with a copy to the Trustee) in accordance with Condition 15 (*Notices*), which notice shall specify the date (which shall not be less than 30 days nor more than 60 days after the Relevant Event Notice (the "**Put Settlement Date**")), on which the Bank shall, at the option of the holder of any Note, redeem such Note at its Net Accreted Principal Amount together with interest accrued and unpaid to the Put Settlement Date.  In order to exercise the option contained in this Condition 9(c), the holder of a Note must, not less than 15 days before the Put Settlement Date, deposit with any Paying Agent the relevant Note Certificate and a duly completed put option notice (a "**Put Option Notice**") in the form obtainable from any Paying Agent.  No Note Certificate, once deposited with a duly completed Put Option Notice in accordance with this Condition 9(c), may be withdrawn; *provided, however, that* if, prior to the Put Settlement Date, any such Note becomes immediately due and payable or, upon due presentation of any such Note Certificate on the Put Settlement Date, payment of the redemption monies is improperly withheld or refused, such Note Certificate shall, without prejudice to the exercise of the Put Option, be returned to the holder by uninsured first class mail (airmail if overseas) at such address as may have been given by such Noteholder in the relevant Put Option Notice.  The Trustee shall not be responsible for monitoring whether or not any Relevant Event has occurred and shall be entitled to assume, unless it receives written notice to the contrary, that no Relevant Event has occurred.  In the event that a Relevant Event occurs but no Relevant Event Notice is given by the

Bank, the Bank shall be deemed to have given a Relevant Event Notice specifying a Put Settlement Date on the date which is 60 days after the occurrence of the Relevant Event, unless such day is not a Business Day, in which event the Put Settlement Date shall be the immediately following Business Day thereafter.

(d)   *Purchase*

Subject to the covenant set out in the Trust Deed, entitled *"Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities"*, the Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price. Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 9(e) (*Cancellation of Notes*). Any Notes so purchased, while held by or on behalf of the Bank or any member of the Group, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(e)   *Cancellation of Notes*

Unless otherwise permitted pursuant to the covenant set out in the Trust Deed entitled *"Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities"*, all Notes which are redeemed or surrendered for cancellation pursuant to this Condition 9 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

(f)   *Definitions*

As used in this Condition 9 (*Redemption and Purchase*):

**"acting in concert"** means a group of persons who, pursuant to an agreement or understanding (whether formal or informal), actively cooperate, through the direct or indirect acquisition by any member or members of such group of shares in the Bank or of any of the assets of any member or members of the group, to obtain or consolidate Control of the Bank.

**"Affiliate"** of a person means a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, that person.

**"Business Day"** means a day other than a Saturday or Sunday on which commercial banks are open for business (including dealings in foreign currencies) in London and New York and if on that day a payment in or a purchase of Euro is made which is also a TARGET Day.

**"Change of Control"** means:

(A)   Samruk-Kazyna ceases to control the Bank (other than where it ceases to control the Bank (a) by transfer of control to a Permitted Transferee or (b) in connection with a Secondary Public Offering), where **"control"** of the Bank means:

   (i)   the holding beneficially of more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital

that carries no right to participate beyond a specified amount in a distribution of either profits or capital); or

(ii)    the power (whether by ownership of shares, proxy, contract, agency or otherwise) to cast, or control the casting of, more than 50 per cent. of the maximum number of votes that might be cast at a general meeting of the Bank, or

(B)    Any person or group of persons acting in concert (other than where (a) such person or persons are Permitted Transferees or (b) in connection with a Secondary Public Offering) gains control of the Bank where "**control**" means the power (whether by ownership of shares, proxy, contract, agency or otherwise) to:

(i)    appoint or remove all, or the majority, of the directors or other equivalent officers of the Bank; or

(ii)    give directions with respect to the operating and/or financial policies of the Bank with which the directors or other equivalent officers of the Bank are obliged to comply,

*provided that* any agreement whereby management of the Bank is transferred to a third party (the "**manager**") that does not, in conjunction with any acquisition of shares in the Bank by such manager or its Affiliates (whether or not occurring at the same time), cause the government of the Republic of Kazakhstan to cease to own more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), will not constitute a "**Change of Control**" if (a) the Trustee and the Creditor Directors have been provided with an opinion in form and substance satisfactory to them of independent legal advisers of recognised standing to the effect that the management agreement, in conjunction with any acquisition of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), does not cause the government of the Republic of Kazakhstan (directly or indirectly) to cease to "**control**" the Bank or to have majority economic risk and/or benefit in the Bank and continues to allow the government of the Republic of Kazakhstan (directly or indirectly) to retain the sole right to exercise its rights as majority shareholders (including in relation to the appointment of directors), (b) the terms of the management agreement have been approved by a Qualified Majority and (c) the "**manager**" is a Permitted Transferee.

"**OECD**" means the Organisation for Economic Co-operation and Development.

"**Permitted Transferee**" means a person which: (A)(i) is a bank or other financial institution subject to financial regulation in Russia, China, Hong Kong, Singapore or an OECD country; or (ii) is a sovereign wealth fund from Russia, China, Hong Kong, Singapore or an OECD country or any other country which may otherwise be approved by a Qualified Majority of the Board; (B) has, in the case of a bank or other financial institution, a minimum credit rating from S&P of at least BBB or equivalent from Moody's or Fitch; (C) has, in the case of a bank or other financial institution, a minimum paid up share capital and reserves of at least U.S.$7 billion or, in the case of a sovereign wealth fund, assets of at least U.S.$7 billion; and (D) is not affiliated with any of the present or former shareholders or managers of the Bank.

"**Relevant Event**" means:

(A)   a Change of Control; and/or

(B)   any disposals (excluding those disposals made in the ordinary course of trading) in any financial year of more than 6.5 per cent. of the Group's total gross assets (determined by reference to the Bank's most recent consolidated financial statements calculated in accordance with IFRS).

"**Secondary Public Offering**" means any sale or public offering of any equity security (including any preference shares) of the Bank or receipts or similar securities representing such equity securities by way of flotation, public placement, listing or other public offering on any recognised international exchange.

10.   **Taxation**

(a)   *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)   presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note;

(ii)   presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days;

(iii)   to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)    where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place. Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)    *Relevant Date*

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that such payment will be made, *provided that* payment is in fact made.

(c)    *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 10 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 10 (*Taxation*) pursuant to the Trust Deed.

(d)    *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 10 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

## 11.    Prescription

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

12.   **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and shall become due and repayable at their Net Accreted Principal Amount together with accrued interest if any of the following events (each, an "**Event of Default**") occurs and is continuing:

(a)   *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b)   *Breach of Other Obligations*

the Bank is in default in the performance, or is otherwise in breach, of any covenant, obligation, undertaking or other agreement under the Senior Notes, the OID Notes, the Recovery Units or the Trust Deed (other than a default or breach specifically dealt with elsewhere in this Condition 12 (*Events of Default*)) and, where such default or breach is, in the opinion of the Trustee, capable of remedy, such default or breach is not remedied within 30 calendar days after notice thereof has been given to the Bank by the Trustee, requiring the same to be remedied; or

(c)   *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(d)   *Judgment Default*

any judgment, ruling, decree or surety bond for the payment of an aggregate amount of not less than U.S.$10,000,000 (or its equivalent in any other currency or currencies) is rendered or granted against and is binding on any member of the Group or any part of its assets and is neither paid when due nor within any originally applicable grace period provided; or

(e)   *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of

payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement or any step or procedure contemplated in paragraph (c) of the definition of Permitted Transaction; or

(f)     *Creditors' Process*

after the Restructuring Date, any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group having an aggregate value of not less than U.S.$10,000,000, and is neither discharged nor stayed within 45 days after commencement; or

(g)     *Cessation of Business*

the Bank or any of its Material Subsidiaries suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business or its Banking Licence is revoked; or

(h)     *Compulsory Acquisition*

the authority or ability of the Bank or any of its Material Subsidiaries to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction, vesting, divesting, compulsory acquisition or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any member of the Group or any of its assets; or

(i)     *Invalidity or Unenforceability*

(a) the validity of the Notes or any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter is contested by the Bank or the Bank denies its obligations under the Senior Notes, the OID Notes or the Subordinated Notes (whether by a general suspension of payments or a moratorium on the payment of debt or otherwise), the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter or it is or becomes unlawful for the Bank to perform or comply with all or any of its obligations set out in any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, or all or any of the obligations of the Bank provided therein shall be or become unenforceable or invalid; or (b) the validity of the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, is contested by the Bank or Samruk-Kazyna, or either of the Bank or Samruk-Kazyna denies or fails to perform its obligations within any applicable grace period as stated under the BTA Undertaking or the Samruk-Kazyna Undertaking (as the case may be) including, for the avoidance of doubt, in relation to the appointment or removal of any Creditor Director and, following the occurrence of any of those events specified in this Condition 12(i), the Trustee is of the opinion that such occurrence is materially prejudicial to the interests of the Noteholders.

13.   **Replacement of Notes**

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Notes must be surrendered before replacements will be issued.

14.   **Meetings of Noteholders; Modification and Waiver**

(a)   *Meetings of Noteholders*

The Trust Deed provides that all meetings of holders of the Notes will include holders of the U.S.$384,848,130 Fully Accreted Principal Amount of Original Discount Notes due 2021 of the Bank (the "**U.S. Dollar 2021 Notes**") and there shall be no provision for separate meetings of holders of the Notes and of holders of the U.S. Dollar 2021 Notes and that for purposes of determining a quorum and for voting purposes the Notes shall be converted into U.S. Dollars at the applicable Reference Rate applicable as at the date of issuance of the Notes. Accordingly, all references in this Condition 14 (*Meetings of Noteholders; Modification and Waiver*) to "*Notes*" and "*Noteholders*" shall be deemed to include the U.S. Dollar 2021 Notes and the holders of such notes, as the case may be.

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed.  Any such modification may be made if sanctioned by an Extraordinary Resolution.  Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the Fully Accreted Principal Amount of the outstanding Notes.  The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the Fully Accreted Principal Amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the Fully Accreted Principal Amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate Fully Accreted Principal Amount of the outstanding Notes form a quorum (a "**special quorum resolution**").  A meeting to consider proposals to approve or reject a candidate nominated by any Noteholder or by the Bank, as the case may be, for the position of Creditor Director or to require the resignation of any Creditor Director (each, a "**Creditor Director matter**") may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than five per cent. of the aggregate Fully Accreted Principal Amount of the outstanding Notes and the quorum at any meeting convened to vote on a Creditor Director matter will be two or more persons being or representing not less than five per cent. of the aggregate Fully Accreted Principal Amount of the Notes for the time being outstanding or, at any adjourned meeting, two

or more persons being or representing Noteholders whatever the Fully Accreted Principal Amount of the Notes for the time being outstanding so held or represented. Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)   **Written Resolution**

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of the Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed, or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate Fully Accreted Principal Amount of the outstanding Notes. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)   **Modification Without Noteholders' Consent**

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error. In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby. Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 15 (*Notices*).

15.   **Notices**

(a)   **To the Noteholders**

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing. In addition, so long as the Notes are listed on an Approved Stock Exchange (as defined in the Trust Deed) and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of the Approved Stock Exchange. Any such notice shall be deemed to have been given on the date of first publication.

(b)   **To the Bank**

Notices to the Bank will be deemed to be validly given if delivered to the Bank at 97, Dzholdasbekov str., md Samal-2, Almaty, 050051, Kazakhstan and clearly marked on their exterior "Loan and Capital Markets Department" (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 15(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)     **To the Trustee and Agents**

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

## 16.     Trustee

(a)     **Indemnification**

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders.  In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed.  Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)     **Exercise of Power and Discretion**

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction.  The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)     **Enforcement; Reliance**

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)      it has been so requested in writing by the holders of a least one fifth in Fully Accreted Principal Amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)     it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence.  In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the

Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor.  If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 12 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 12 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed.  The Trustee shall be entitled to rely without liability on such certificates.  The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions or the Trust Deed and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)    *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)    *Retirement and Removal*

Any Trustee may retire at any time on giving at least two months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee.  If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee.  In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)    *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute).

Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 15 (*Notices*).

## 17.    Further Issues

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

## 18.    Currency Indemnity

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof. This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

## 19.    Contracts (Rights of Third Parties) Act 1999

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

## 20.    Governing Law; Arbitration and Jurisdiction

(a)      *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)      *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition.  The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators,

*provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA. The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country. The seat of arbitration shall be London, England and the language of arbitration shall be English. Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)    ***Trustee's Option***

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 20(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 20(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)    ***Jurisdiction***

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 20(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts. Subject to Condition 20(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)    ***Appropriate Forum***

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)    ***Agent for Service of Process***

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being. If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment. If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)     *Consent to Enforcement, etc.*

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 20(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)     *Waiver of Immunity*

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

**Part 5**

**Terms and Conditions of the Dollar Subordinated Notes**

*The following is the text of the terms and conditions of the Dollar Subordinated Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Subordinated Dollar Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The U.S.$496,631,368 7.2 per cent. notes due 2025 (the "**Dollar Subordinated Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of "BTA BANK" JSC (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated 25 August 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of an agency agreement dated 25 August 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, The Bank of New York Mellon as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes), Joint-Stock Company "Citibank Kazakhstan" (the "**Kazakhstan Paying and Transfer Agent**"; which expression includes any successor or additional Kazakhstan paying and transfer agents appointed from time to time in connection with the Notes) and The Bank of New York Mellon (Luxembourg) S.A. as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.    **Status**

It is the intention of the Bank that the Notes be regarded as Tier 2 capital for the purposes of the FMSA Guidance.

Subject to exceptions provided by mandatory applicable law, the payment obligations under the Notes constitute direct, unconditional, unsecured and subordinated obligations of the Bank and shall, in case of (i) the bankruptcy in the Republic of Kazakhstan (*bankrotstvo*) of the Bank; (ii) the Bank being granted (provisional) suspension of payments in the Republic of Kazakhstan (*moratoriy na udovletvoreniye zadolzhennosti*) (such situation hereinafter being referred to as a "**Moratorium**"); or (iii) dissolution of the Bank in the Republic of Kazakhstan (*likvidatsiya*)) rank: (A) subordinate and junior only to present and future indebtedness of the Bank which by or under its terms ranks senior, or does not rank subordinate to, any indebtedness or other obligations of the Bank; (B) *pari passu* amongst themselves and with any other present and future indebtedness which ranks by or under its own terms or otherwise *pari passu* with subordinated indebtedness or other obligations of the Bank; and (C) senior to equity securities of the Bank and to any other present and future

indebtedness which ranks by or under its own terms or otherwise, subordinate or junior to the Notes of the Bank.

By virtue of such subordination (i) payments to holders of Notes will, in the case of bankruptcy or dissolution of the Bank or in the event of a Moratorium with respect to the Bank, only be made after all payment obligations of the Bank ranking senior to such Notes have been satisfied; (ii) any right of set-off by a holder of Notes in respect of any amount owed to such holder by the Bank under or in connection with such Notes shall be excluded; and (iii) each holder of Notes shall, by virtue of being the holder of such Notes, be deemed to have waived all such rights of set-off.

2.     **Form, Denomination and Title**

(a)     *Form and Denomination*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered. Notes shall be issued in denominations of U.S.$1 and integral multiples of U.S.$1 in excess thereof (each denomination an "**authorised denomination**").

(b)     *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*). The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

3.     **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement. A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding. Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

4.     **Transfers**

(a)     Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided, however, that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations. Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b) Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of alike principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder. In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c) The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d) Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e) All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions. The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar. A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

## 5.   Covenants

The Noteholders will have the benefit of certain covenants contained in the Trust Deed.

## 6.   Interest

(a)   *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount from 1 July 2010 at the rate of 7.2 per cent. per annum (the "**Rate of Interest**"), payable in arrear on 1 January and 1 July in each year (each, an "**Interest Payment Date**" and with the first Interest Payment Date falling on 1 January 2011), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)   *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the

Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)   *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

(d)   *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7.   **Payments**

(a)   *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)   *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent. Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) (*Interest*) will be made as provided in these Conditions.

(c)   *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the close of business (in the place of the Registrar's specified office) on the business day before the due date for such payment (the "**Record Date**").

(d)   *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a United States Dollar account maintained by the payee with a bank in New York City.

(e)  **Payments Subject to Fiscal Laws**

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*).  No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)  **Payment on a Business Day**

If the due date for payment of any amount in respect of any Note is not a business day in the place of Specified Officer of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place.  A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day.  In this Condition 7(f) (*Payment on a Business Day*), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in New York City, London and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)  **Agents**

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders.  The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided, however, that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar.  Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 *(Notices)*.

## 8.   Redemption and Purchase

(a)  **Scheduled Redemption**

Unless previously redeemed as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be  redeemed in ten equal semi-annual instalments on 1 January and 1 July of each year, with the first such instalment being payable on 1 January 2021 and the last such instalment being payable on 1 July 2025.  The outstanding principal amount of each Note shall be reduced by any instalment amount, with effect from the related instalment payment date, unless payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount.  Each Note shall be finally redeemed on due payment of the final instalment amount.

(b)  **Purchase**

Subject to the covenant set out in the Trust Deed entitled *"Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase*