*of securities"* and the Bank obtaining all necessary approvals and consents and compliance with all applicable laws and regulations, the Bank may purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price. Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws). Any Notes so purchased, while held by or on behalf of the Bank or any other member of the Group, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

9.      **Taxation**

(a)     ***Taxation***

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a **"Taxing Jurisdiction"**), unless such withholding or deduction is required by law. In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)     presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note; or

(ii)    presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days; or

(iii)   to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)    where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place.  Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b) *Relevant Date*

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that such payment will be made, *provided that* payment is in fact made.

(c) *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 9 (*Taxation*) pursuant to the Trust Deed.

(d) *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

10.  **Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

11.  **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, file a petition for the winding up of the Bank if any of

the following events (each, an **"Event of Default"**) occurs and is continuing and, in the case of (b) or (c) below the Notes have become due and payable as hereinafter provided:

(a)   *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b)   *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(c)   *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement,

save that on the occurrence and continuation of an event specified in Condition 11(b) (*Cross Default*), *provided that* action has been taken (whether by the Trustee or the Senior Noteholders or the OID Noteholders) to accelerate the obligations of the Bank with respect to all outstanding Financial Indebtedness which is unsubordinated, the Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest.

12.     **Replacement of Notes**

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require. Mutilated or defaced Notes must be surrendered before replacements will be issued.

13.     **Meetings of Noteholders; Modification and Waiver**

(a)     *Meetings of Noteholders*

The Trust Deed provides that all meetings of holders of the Notes will include holders of the EUR28,237,359 6.75 per cent. Notes due 2025 of the Bank (the "**EUR 2025 Notes**") and the KZT7,396,248,930 11.20 per cent. Notes due 2025 of the Bank (the "**KZT 2025 Notes**") and there shall be no provision for separate meetings of holders of the Notes, holders of the EUR 2025 Notes and holders of the KZT 2025 Notes and that for purposes of determining a quorum and for voting purposes the EUR 2025 Notes and the KZT 2025 shall be converted into U.S. Dollars at the Reference Rate applicable as at the date of issuance of the Notes. Accordingly, all references in this Condition 13 to "Notes and "Noteholders" shall be deemed to include the EUR 2025 Notes and the KZT 2025 Notes and the holders of such notes, as the case may be.

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**"). Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)     *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the

outstanding Notes. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)   **Modification Without Noteholders' Consent**

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error. In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby. Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

14.   **Notices**

(a)   **To the Noteholders**

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing. In addition, so long as the Notes are listed on the an Approved Stock Exchange (as defined in the Trust Deed), and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of such Approved Stock Exchange. Any such notice shall be deemed to have been given on the date of first publication.

(b)   **To the Bank**

Notices to the Bank will be deemed to be validly given if delivered to the Bank at 97, Dzholdasbekov str., md Samal-2, Almaty, 050051, Kazakhstan and clearly marked on their exterior "Loan and Capital Markets Department" (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)   **To the Trustee and Agents**

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15.   **Trustee**

(a)   *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders. In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed. Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)   *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction. The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)   *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)   it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)   it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence. In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor. If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed.  The Trustee shall be entitled to rely without liability on such certificates.  The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions or the Trust Deed and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)     **Failure to Act**

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)     **Retirement and Removal**

Any Trustee may retire at any time on giving at least two months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any

Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee.  If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee.  In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)     **Substitution**

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute).  Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

16.    **Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

17.    **Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.  This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18.    **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19.    **Governing Law; Arbitration and Jurisdiction**

(a)    *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)    *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non-contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition.  The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two-party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA.  The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a

national of that country.  The seat of arbitration shall be London, England and the language of arbitration shall be English.  Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)   **Trustee's Option**

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)   **Jurisdiction**

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts.  Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)   **Appropriate Forum**

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)   **Agent for Service of Process**

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.  If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment.  If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)   **Consent to Enforcement, etc.**

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever

(irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)     ***Waiver of Immunity***

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

**Part 6**

**Terms and Conditions of the Euro Subordinated Notes**

*The following is the text of the terms and conditions of the Subordinated Euro Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Subordinated Euro Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The EUR28,237,359 6.75 per cent. notes due 2025 (the "**Euro Subordinated Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of "BTA BANK" JSC (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated 25 August 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of an agency agreement dated 25 August 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, The Bank of New York Mellon as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) Joint-Stock Company "Citibank Kazakhstan" (the "**Kazakhstan Paying and Transfer Agent**"; which expression includes any successor or additional Kazakhstan paying and transfer agents appointed from time to time in connection with the Notes) and The Bank of New York Mellon (Luxembourg S.A.) as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.    **Status**

It is the intention of the Bank that the Notes shall be treated as Tier 2 capital for the purposes of the FMSA Guidance.

Subject to exceptions provided by mandatory applicable law, the payment obligations under the Notes constitute direct, unconditional, unsecured and subordinated obligations of the Bank and shall, in case of (i) the bankruptcy in the Republic of Kazakhstan (*bankrotstvo*) of the Bank; (ii) the Bank being granted (provisional) suspension of payments in the Republic of Kazakhstan (*moratoriy na udovletvoreniye zadolzhennosti*) (such situation hereinafter being referred to as a "**Moratorium**"); or (iii) dissolution of the Bank in the Republic of Kazakhstan (*likvidatsiya*)) rank: (A) subordinate and junior only to present and future indebtedness of the Bank which by or under its terms ranks senior, or does not rank subordinate to, any indebtedness or other obligations of the Bank; (B) *pari passu* amongst themselves and with any other present and future indebtedness which ranks by or under its own terms or otherwise *pari passu* with subordinated indebtedness or other obligations of the Bank; and (C) senior to equity securities of the Bank and to any other present and future

indebtedness which ranks by or under its own terms or otherwise, subordinate or junior to the Notes of the Bank.

By virtue of such subordination (i) payments to holders of Notes will, in the case of bankruptcy or dissolution of the Bank or in the event of a Moratorium with respect to the Bank, only be made after all payment obligations of the Bank ranking senior to such Notes have been satisfied; (ii) any right of set-off by a holder of Notes in respect of any amount owed to such holder by the Bank under or in connection with such Notes shall be excluded; and (iii) each holder of Notes shall, by virtue of being the holder of such Notes, be deemed to have waived all such rights of set-off.

2.    **Form, Denomination and Title**

(a)    ***Form and Denomination***

The Notes are in registered form, without interest coupons attached, and shall be serially numbered.  Notes shall be issued in denominations of EUR 1 and integral multiples of EUR 1 in excess thereof (each denomination an "**authorised denomination**").

(b)    ***Title***

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*).  The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

3.    **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement.  A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding.  Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

4.    **Transfers**

(a)    Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided, however, that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations.  Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)   Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of alike principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder.  In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)   The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)   Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)   All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions.  The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar.  A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

## 5.   Covenants

The Noteholders will have the benefit of certain covenants contained in the Trust Deed.

## 6.   Interest

(a)   *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount from 1 July 2010 at the rate of 6.75 per cent. per annum (the "**Rate of Interest**"), payable in arrear on 1 January and 1 July in each year (each, an "**Interest Payment Date**" and with the first Interest Payment Date falling on 1 January 2011), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)   *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the

Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c) *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

(d) *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7. **Payments**

(a) *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b) *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent. Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) will be made as provided in these Conditions.

(c) *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the close of business (in the place of the Registrar's specified office) on the business day before the due date for such payment (the "**Record Date**").

(d) *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a Euro account maintained by the payee with a bank in a city in which banks have access to the TARGET System.

(e)     *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*). No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)     *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of Specified Offices of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place. A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day. In this Condition 7(f), **"business day"** means any day on which banks are open for business (including dealings in foreign currencies) in the place of the Specified Offices of the Principal Paying Agent and which is a business day on which the TARGET System is operating and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)     *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders. The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided, however, that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar. Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

## 8.    Redemption and Purchase

(a)     *Scheduled Redemption*

Unless previously redeemed as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be redeemed in ten equal semi-annual instalments on 1 January and 1 July of each year, with the first such instalment being payable on 1 January 2021 and the last such instalment being payable on 1 July 2025. The outstanding principal amount of each Note shall be reduced by any instalment amount, with effect from the related instalment payment date, unless payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount. Each Note shall be finally redeemed on due payment of the final instalment amount.

(b)   *Purchase*

Subject to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*" and the Bank obtaining all necessary approvals and consents and compliance with all applicable laws and regulations, the Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price. Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws). Any Notes so purchased, while held by or on behalf of the Bank or any other member of the Group, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

## 9.   Taxation

(a)   *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law. In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)    presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note;

(ii)   presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days;

(iii)  to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)   where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive

2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place. Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)     *Relevant Date*

As used in these Conditions, **"Relevant Date"** in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that, such payment will be made, *provided that* payment is in fact made.

(c)     *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 9 (*Taxation*) pursuant to the Trust Deed.

(d)     *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

10.   **Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

11. **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, file a petition for the winding up of the Bank if any of the following events (each, an "**Event of Default**") occurs and is continuing and, in the case of (ii) or (iii) below the Notes have become due and payable as hereinafter provided:

(a)     *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b)     *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(c)     *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement, save that on the occurrence and continuation of an event specified in Condition 11(b) (*Cross Default*), *provided that* action has been taken (whether by the Trustee or the Senior Noteholders or the OID Noteholders) to accelerate the obligations of the Bank with respect to all outstanding Financial Indebtedness which is unsubordinated, the Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give

notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest.

## 12.    Replacement of Notes

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Notes must be surrendered before replacements will be issued.

## 13.    Meetings of Noteholders; Modification and Waiver

(a)    *Meetings of Noteholders*

The Trust Deed provides that all meetings of holders of the Notes will include holders of the U.S.$496,631,368 7.20 per cent. Notes due 2025 of the Bank (the "**U.S. Dollar 2025 Notes**") and holders of the KZT7,396,248,930 11.2 per cent. Notes due 2025 of the Bank (the "**KZT 2025 Notes**") and there shall be no provision for separate meetings of holders of the Notes, holders of the U.S. Dollar 2025 Notes and holders of the KZT 2025 Notes and that for purposes of determining a quorum and for voting purposes the Notes and the KZT 2025 Notes shall be converted into U.S. Dollars at the Reference Rate applicable as at the date of issuance of the Notes.  Accordingly, all references in this Condition 13 to "Notes and "Noteholders" shall be deemed to include the U.S. Dollar 2025 Notes and the KZT 2025 Notes and the holders of such notes, as the case may be.

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed.  Any such modification may be made if sanctioned by an Extraordinary Resolution.  Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes.  The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**").  Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)     *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)     *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error.  In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby.  Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

14.   **Notices**

(a)     *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing.  In addition, so long as the Notes are listed on an Approved Stock Exchange (as defined in the Trust Deed), and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of such Approved Stock Exchange.  Any such notice shall be deemed to have been given on the date of first publication.

(b)     *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at 97, Dzholdasbekov str., md Samal-2, Almaty, 050051, Kazakhstan and clearly marked on their exterior "Loan and Capital Markets Department" (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)     *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified

Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

**15.   Trustee**

(a)   *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders. In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed. Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)   *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction. The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)   *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)   it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)   it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence. In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor. If such evidence is relied upon, the Trustee's

determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed. The Trustee shall be entitled to rely without liability on such certificates. The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)     *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)     *Retirement and Removal*

Any Trustee may retire at any time on giving at least two months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)     *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

16.    **Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

17.    **Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.  This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18.    **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19.    **Governing Law; Arbitration and Jurisdiction**

(a)    *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)    *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non-contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition.  The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two-party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA.  The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a

national of that country.  The seat of arbitration shall be London, England and the language of arbitration shall be English.  Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)     *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)     *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts.  Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)     *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)     *Agent for Service of Process*

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.  If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment.  If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)     *Consent to Enforcement, etc.*

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever

(irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)     ***Waiver of Immunity***

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

**Part 7**

**Terms and Conditions of the Subordinated Tenge A Notes**

*The following is the text of the terms and conditions of the Subordinated Tenge A Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Subordinated Tenge A Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The KZT7,396,248,930 11.20 per cent. notes due 2025 (the "**Tenge Subordinated Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of "BTA BANK" JSC (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated 25 August 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of an agency agreement dated 25 August 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, The Bank of New York Mellon as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes), Joint-Stock Company "Citibank Kazakhstan" as Kazakhstan paying and transfer agent (the "**Kazakhstan Paying and Transfer Agent**"; which expression includes any successor or additional Kazakhstan paying and transfer agents appointed from time to time in connection with the Notes) and The Bank of New York Mellon (Luxembourg) S.A. as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Although the Notes in global form will be held by Clearstream, Luxembourg ("**Clearstream**"), payments of principal and interest on the Notes will be made outside of Clearstream. Noteholders must therefore have an account with a broker or custodian that holds an account with the Central Securities Depositary of Kazakhstan in order to receive payments of principal and interest on the Notes and, by its acceptance of a Note, each Noteholder undertakes to inform any transferee of such Note of this requirement prior to transfer. Clearstream will not incur any liability to any Noteholder for any damage or loss any Noteholder may suffer or incur in the event that this undertaking is not complied with.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.      **Status**

        It is the intention of the Bank that the Notes be regarded as Tier 2 capital for the purposes of the FMSA Guidance.

Subject to exceptions provided by mandatory applicable law, the payment obligations under the Notes constitute direct, unconditional, unsecured and subordinated obligations of the Bank and shall, in case of (i) the bankruptcy in the Republic of Kazakhstan (*bankrotstvo*) of the Bank; (ii) the Bank being granted (provisional) suspension of payments in the Republic of Kazakhstan (*moratoriy na udovletvoreniye zadolzhennosti*) (such situation hereinafter being referred to as a "**Moratorium**"); or (iii) dissolution of the Bank in the Republic of Kazakhstan (*likvidatsiya*) rank: (A) subordinate and junior only to present and future indebtedness of the Bank which by or under its terms ranks senior, or does not rank subordinate to, any indebtedness or other obligations of the Bank; (B) *pari passu* amongst themselves and with any other present and future indebtedness which ranks by or under its own terms or otherwise *pari passu* with subordinated indebtedness or other obligations of the Bank; and (C) senior to equity securities of the Bank and to any other present and future indebtedness which ranks by or under its own terms or otherwise, subordinate or junior to the Notes of the Bank.

By virtue of such subordination (i) payments to holders of Notes will, in the case of bankruptcy or dissolution of the Bank or in the event of a Moratorium with respect to the Bank, only be made after all payment obligations of the Bank ranking senior to such Notes have been satisfied; (ii) any right of set-off by a holder of Notes in respect of any amount owed to such holder by the Bank under or in connection with such Notes shall be excluded; and (iii) each holder of Notes shall, by virtue of being the holder of such Notes, be deemed to have waived all such rights of set-off.

2.      **Form, Denomination and Title**

(a)      *Form and Denomination*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered. Notes shall be issued in denominations of KZT 1,000 and integral multiples of KZT 1 in excess thereof (each denomination an "**authorised denomination**").

(b)      *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*). The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

3.      **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement. A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding. Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

4.    **Transfers**

(a)    Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; provided, however, that a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations. Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)    Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of a like principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder. In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)    The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)    Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)    All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions. The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar. A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

5.    **Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed.

6.    **Interest**

(a)    *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount from 1 July 2010 at the rate of 11.2 per cent. per annum (the "**Rate of Interest**"), payable in arrear on 1 January and 1 July in each year (each, an "**Interest Payment Date**" and with the first Interest Payment Date falling on 1 January 2011), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)     *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)     *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest tiyn (half a tiyn being rounded upwards).

(d)     *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7.     **Payments**

(a)     *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)     *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent. Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) (*Interest*) will be made as provided in these Conditions.

(c)     *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the close of business (in the place of the Registrar's specified office) on the business day before the due date for such payment (the "**Record Date**").

(d)     **Payments**

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a Kazakhstan Tenge account maintained by the payee with a bank in Kazakhstan.

(e)     **Payments Subject to Fiscal Laws**

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*). No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)     **Payment on a Business Day**

If the due date for payment of any amount in respect of any Note is not a business day in the place of Specified Officer of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place. A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day. In this Condition 7(f) (*Payment on a Business Day*), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in London, Almaty and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)     **Agents**

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders. The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; provided, however, that the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar. Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

**8.     Redemption and Purchase**

(a)     **Scheduled Redemption**

Unless previously redeemed as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be redeemed in ten equal semi-annual instalments on 1 January and 1 July of each year, with the first such instalment being payable on 1 January 2021 and the last such instalment being payable on 1 July 2025. The outstanding principal amount of each Note shall be reduced by any instalment amount, with effect from the related instalment payment date, unless payment of the instalment is improperly withheld or refused, in which case such amount shall remain

outstanding until the date of payment of such instalment amount. Each Note shall be finally redeemed on due payment of the final instalment amount.

(b) **Purchase**

Subject to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*" and the Bank obtaining all necessary approvals and consents and compliance with all applicable laws and regulations, the Bank may purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price. Notes so purchased may be held or resold (provided that such resale is in compliance with all applicable laws). Any Notes so purchased, while held by or on behalf of the Bank or any other member of the Group, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

## 9. Taxation

(a) **Taxation**

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law. In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)     presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note; or

(ii)    presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days; or

(iii)   to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)     where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and provided that reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place. Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)     **_Relevant Date_**

As used in these Conditions, "Relevant Date" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that such payment will be made, provided that payment is in fact made.

(c)     **_Additional Amounts_**

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (Taxation) or any undertaking given in addition to or in substitution of this Condition 9 (Taxation) pursuant to the Trust Deed.

(d)     **_Taxing Jurisdiction_**

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (Taxation) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

## 10.     Prescription

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

11.    **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre funded to its satisfaction) shall, file a petition for the winding up of the Bank if any of the following events (each, an "**Event of Default**") occurs and is continuing and, in the case of (b) or (c) below the Notes have become due and payable as hereinafter provided:

(a)     *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b)     *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, provided that the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(c)     *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, provided that sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement,

save that on the occurrence and continuation of an event specified in Condition 11(b) (*Cross Default*), provided that action has been taken (whether by the Trustee or the Senior Noteholders or the OID Noteholders) to accelerate the obligations of the Bank with respect to all outstanding Financial Indebtedness which is unsubordinated, the Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by

an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest.

**12.    Replacement of Notes**

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require. Mutilated or defaced Notes must be surrendered before replacements will be issued.

**13.    Meetings of Noteholders; Modification and Waiver**

(a)    *Meetings of Noteholders*

The Trust Deed provides that all meetings of holders of the Notes will include holders of the EUR28,237,359 6.75 per cent. notes due 2025 (the "**EUR 2025 Notes**") and the U.S.$496,631,368 7.20 per cent. notes due 2025 (the "**USD 2025 Notes**") of the Bank and there shall be no provision for separate meetings of holders of the Notes, the holders of the EUR 2025 Notes and the holders of the USD 2025 Notes and that for purposes of determining a quorum and for voting purposes the Notes and the EUR 2025 Notes shall be converted into U.S. Dollars at the Reference Rate applicable as at the date of issuance of the Notes. Accordingly, all references in this Condition 13 (*Meetings of Noteholders; Modification and Waiver*) to "Notes" and "Noteholders" shall be deemed to include the EUR 2025 Notes and the USD 2025 Notes and the holders of such notes, as the case may be.

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; provided, however, that certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or, at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**"). Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b) *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c) *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error. In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby. Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

14.    **Notices**

(a) *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing. In addition, so long as the Notes are listed on the an Approved Stock Exchange (as defined in the Trust Deed), and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of such Approved Stock Exchange. Any such notice shall be deemed to have been given on the date of first publication.

(b) *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at 97, Dzholdasbekov str., md Samal-2, Almaty, 050051, Kazakhstan and clearly marked on their exterior "Loan and Capital Markets Department" (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c) *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified

Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

**15.  Trustee**

(a)  *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders. In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed. Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)  *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction. The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)  *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)  it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)  it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence. In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor. If such evidence is relied upon, the Trustee's

determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed. The Trustee shall be entitled to rely without liability on such certificates. The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions or the Trust Deed and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)     *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)     *Retirement and Removal*

Any Trustee may retire at any time on giving at least two months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, provided that the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)     *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

16.    **Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

17.    **Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof. This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18.    **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19.    **Governing Law; Arbitration and Jurisdiction**

(a)    *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)    *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non-contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition. The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two-party nominated arbitrators, provided that if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA. The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a

national of that country. The seat of arbitration shall be London, England and the language of arbitration shall be English. Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)     *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)     *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts. Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)     *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)     *Agent for Service of Process*

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being. If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment. If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)     *Consent to Enforcement, etc.*

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property

whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)    ***Waiver of Immunity***

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

**Part 8**

**Terms and Conditions of the Subordinated Tenge B Notes**

*The following is the text of the terms and conditions of the Subordinated Tenge B Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Subordinated Tenge B Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The KZT 28,000,000,000 8.0 per cent. notes due 2030 (the "**Tenge Subordinated Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of "BTA BANK" JSC (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated 25 August 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of an agency agreement dated 25 August 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, The Bank of New York Mellon as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes), Joint-Stock Company "Citibank Kazakhstan" as Kazakhstan paying and transfer agent (the "**Kazakhstan Paying and Transfer Agent**"; which expression includes any successor or additional Kazakhstan paying and transfer agents appointed from time to time in connection with the Notes) and The Bank of New York Mellon (Luxembourg) S.A. as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Although the Notes in global form will be held by Clearstream, Luxembourg ("**Clearstream**"), payments of principal and interest on the Notes will be made outside of Clearstream. Noteholders must therefore have an account with a broker or custodian that holds an account with the Central Securities Depositary of Kazakhstan in order to receive payments of principal and interest on the Notes and, by its acceptance of a Note, each Noteholder undertakes to inform any transferee of such Note of this requirement prior to transfer. Clearstream will not incur any liability to any Noteholder for any damage or loss any Noteholder may suffer or incur in the event that this undertaking is not complied with.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.     **Status**

It is the intention of the Bank that the Notes be regarded as Tier 2 capital for the purposes of the FMSA Guidance.

Subject to exceptions provided by mandatory applicable law, the payment obligations under the Notes constitute direct, unconditional, unsecured and subordinated obligations of the Bank

and shall, in case of (i) the bankruptcy in the Republic of Kazakhstan (*bankrotstvo*) of the Bank; (ii) the Bank being granted (provisional) suspension of payments in the Republic of Kazakhstan (*moratoriy na udovletvoreniye zadolzhennosti*) (such situation hereinafter being referred to as a "**Moratorium**"); or (iii) dissolution of the Bank in the Republic of Kazakhstan (*likvidatsiya*)) rank: (A) subordinate and junior only to present and future indebtedness of the Bank which by or under its terms ranks senior, or does not rank subordinate to, any indebtedness or other obligations of the Bank; (B) *pari passu* amongst themselves and with any other present and future indebtedness which ranks by or under its own terms or otherwise *pari passu* with subordinated indebtedness or other obligations of the Bank; and (C) senior to equity securities of the Bank and to any other present and future indebtedness which ranks by or under its own terms or otherwise, subordinate or junior to the Notes of the Bank.

By virtue of such subordination (i) payments to holders of Notes will, in the case of bankruptcy or dissolution of the Bank or in the event of a Moratorium with respect to the Bank, only be made after all payment obligations of the Bank ranking senior to such Notes have been satisfied; (ii) any right of set-off by a holder of Notes in respect of any amount owed to such holder by the Bank under or in connection with such Notes shall be excluded; and (iii) each holder of Notes shall, by virtue of being the holder of such Notes, be deemed to have waived all such rights of set-off.

## 2. Form, Denomination and Title

### (a) *Form and Denomination*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered. Notes shall be issued in denominations of KZT 1,000 and integral multiples of KZT 1 in excess thereof (each denomination an "**authorised denomination**").

### (b) *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*). The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

## 3. Registration

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement. A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding. Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

4.      **Transfers**

(a)      Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; provided, however, that a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations. Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)      Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of alike principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder. In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)      The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)      Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)      All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions. The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar. A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

5.      **Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed.

6.      **Interest**

(a)      *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount from 1 July 2010 at the rate of 8.0 per cent. per annum (the "**Rate of Interest**"), payable in arrear on 1 January and 1 July in each year (each, an "**Interest Payment Date**" and with the first Interest Payment Date falling on 1 January 2011), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)     *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)     *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest tiyn (half a tiyn being rounded upwards).

(d)     *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7.     **Payments**

(a)     *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)     *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent. Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) (*Interest*) will be made as provided in these Conditions.

(c)     *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the close of business (in the place of the Registrar's specified office) on the business day before the due date for such payment (the **"Record Date"**).

(d)     ***Payments***

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a Kazakhstan account maintained by the payee with a bank in Kazakhstan.

(e)     ***Payments Subject to Fiscal Laws***

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*). No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)     ***Payment on a Business Day***

If the due date for payment of any amount in respect of any Note is not a business day in the place of Specified Officer of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place. A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day. In this Condition 7(f) (*Payment on a Business Day*), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in London, Almaty and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)     ***Agents***

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders. The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; provided, however, that the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar. Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

**8.     Redemption and Purchase**

(a)     ***Scheduled Redemption***

Unless previously redeemed, subject as provided in Condition 7 (*Payments*), the Notes will be redeemed in ten equal semi-annual instalments on 1 January and 1 July of each year, with the first such instalment being payable on 1 January 2026 and the last such instalment being payable on 1 July 2030. The outstanding principal amount of each Note shall be reduced by any instalment amount, with effect from the related instalment payment date, unless payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of

payment of such instalment amount. Each Note shall be finally redeemed on due payment of the final instalment amount.

(b)   *Purchase*

Subject to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*" and the Bank obtaining all necessary approvals and consents and compliance with all applicable laws and regulations, the Bank may purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price. Notes so purchased may be held or resold (provided that such resale is in compliance with all applicable laws). Any Notes so purchased, while held by or on behalf of the Bank or any other member of the Group, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

9.   **Taxation**

(a)   *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law. In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)   presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note; or

(ii)   presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days; or

(iii)   to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)    where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and provided that reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place. Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)    *Relevant Date*

As used in these Conditions, "Relevant Date" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that such payment will be made, provided that payment is in fact made.

(c)    *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (Taxation) or any undertaking given in addition to or in substitution of this Condition 9 (Taxation) pursuant to the Trust Deed.

(d)    *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (Taxation) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

**10.**    **Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

**11.    Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre funded to its satisfaction) shall, file a petition for the winding up of the Bank if any of the following events (each, an "**Event of Default**") occurs and is continuing and, in the case of (b) or (c) below the Notes have become due and payable as hereinafter provided:

(a)    *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b)    *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, provided that the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(c)    *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, provided that sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement,

save that on the occurrence and continuation of an event specified in Condition 11(b) (*Cross Default*), provided that action has been taken (whether by the Trustee or the Senior Noteholders or the OID Noteholders) to accelerate the obligations of the Bank with respect to all outstanding Financial Indebtedness which is unsubordinated, the Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by

an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest.

## 12. Replacement of Notes

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require. Mutilated or defaced Notes must be surrendered before replacements will be issued.

## 13. Meetings of Noteholders; Modification and Waiver

(a) *Meetings of Noteholders*

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; provided, however, that certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**"). Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b) *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c) *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error. In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby. Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

14.    **Notices**

(a)    *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing.

(b)    *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at 97, Dzholdasbekov str., md Samal-2, Almaty, 050051, Kazakhstan and clearly marked on their exterior "Loan and Capital Markets Department" (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)    *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15.    **Trustee**

(a)    *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders. In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed. Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)   *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction. The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)   *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)   it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)   it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence. In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor. If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed. The Trustee shall be entitled to rely without liability on such certificates. The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions or the Trust Deed

and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d) *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e) *Retirement and Removal*

Any Trustee may retire at any time on giving at least two months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, provided that the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in Kazakhstan.

(f) *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

**16. Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

**17. Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency

and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof. This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18. **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19. **Governing Law; Arbitration and Jurisdiction**

(a) *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b) *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non-contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition. The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two-party nominated arbitrators, provided that if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA. The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country. The seat of arbitration shall be London, England and the language of arbitration shall be English. Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c) *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d) *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes,

irrevocably submits to the jurisdiction of such courts. Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e) *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f) *Agent for Service of Process*

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being. If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment. If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g) *Consent to Enforcement, etc.*

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h) *Waiver of Immunity*

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

Part 9

## Terms and Conditions of the Recovery Units

*The following is the text of the terms and conditions of the Recovery Units which, subject to amendment and completion, will be endorsed on each Unit Certificate pertaining to the Recovery Units and will be attached and (subject to the provisions thereof) apply to the relevant Global Note.*

The $5,221,494,216 aggregate initial Reference Amount of Recovery Units (the "**Recovery Units**" or the "**Units**"), issued by JSC BTA Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of, a trust deed dated 25 August 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited, as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Units ("**Unitholders**") under the Trust Deed) and (b) the subject of (i) a paying agency agreement dated 25 August 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, The Bank of New York Mellon, as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**", which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Units), Joint-Stock Company "Citibank Kazakhstan" as Kazakhstan paying and transfer agent (the "**Kazakhstan Paying and Transfer Agent**", which expression includes any successor or additional Kazakhstan paying and transfer agents appointed from time to time in connection with the Notes) and The Bank of New York Mellon (Luxembourg) S.A., as registrar (the "**Registrar**" which expression shall include any successor registrar appointed from time to time in connection with the Units) and (ii) a cash management agreement dated 25 August 2010 (as amended or supplemented from time to time, the "**Cash Management Agreement**") between the Bank, the Trustee and The Bank of New York Mellon, as cash manager (the "**Cash Manager**" which expression shall include any successor cash manager appointed from time to time in connection with the Units).

Certain provisions of these Conditions are summaries of the Trust Deed, the Agency Agreement and the Cash Management Agreement and are subject to their detailed provisions. The Unitholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed, the Agency Agreement and the Cash Management Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

1.     **Definitions**

Terms not defined in these Conditions shall have the meaning set out in the Trust Deed and for the purposes of these Conditions:

"**Adjusted Principal Amount**" has the meaning given to it in Condition 9(c) (*Adjusted Principal Amount*);

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

"**Bank Group**" means the Bank, BTA Finance Luxembourg S.A., TuranAlem Finance B.V. and LLP "**TuranAlem Finance**".

"**Base Case Model**" means the financial model titled "BTA Bank-BP-Revised PCTS@18 04 2010 — Sent Deloitte" sent to Deloitte at about 8.00 p.m. London time on 18 April 2010.

"**Charged Property**" means all the property and rights of the Bank which are subject to the Charge and Assignment (as defined in Condition 2(c) (*Security*));

"**Collection Account**" means the account controlled by the Trustee and with a bank in London, opened in the name of the Bank in accordance with the Trust Deed and into which the Bank shall pay the Specified Percentage of any and all Recoveries pursuant to Condition 6(a) (*Collection Account and Conversion*);

"**Deferred Settlement Date**" means, after a Valuation Rejection Notice has been delivered pursuant to Condition 9 (*Valuation*) 30 June 2022;

"**FMSA**" means the Agency of the Republic of Kazakhstan on the Regulation and Supervision of the Financial Market and Financial Organisations;

"**FMSA Methodology**" means IFRS adjusted to reflect the FMSA's requirements for preparation of financial statements for regulatory purposes;

"**Group**" means the Bank and its consolidated Subsidiaries from time to time;

"**Impaired Recovery Assets**" has the meaning given to it in the definition of Write-backs;

"**IFRS**" means international financial reporting standards within the meaning of IAS Regulation 1606/2002 to the extent applicable to the relevant statements;

"**Information Memorandum**" means the Information Memorandum dated 1 May 2010 published by the Bank in connection with the Restructuring (and as supplemented from time to time);

"**Initial Settlement Date**" means 30 June 2020;

"**KPMG Provisions Report**" means the report prepared by KPMG in relation to the Impaired Recovery Assets, dated 12 November 2009;

"**Litigation Recoveries**" means any cash recoveries from, and the net proceeds of any sale of, any asset recovered through the Recovery Programme (to the extent that such cash recoveries are not also Impaired Recovery Assets or Tax Assets);

"**Quarterly Recovery Assets Management Report**" means the quarterly management information report on the ongoing performance of the Recoveries Assets to be prepared by the Bank;

"**Recoveries**" means Write-backs, Litigation Recoveries, the recoveries on Tax Assets and interest on the Collection Account;

"**Recoveries Assets**" means the Impaired Recovery Assets, the Litigation Recoveries and the Tax Assets;

"**Recovery Assets Auditor**" means an auditor appointed by the Bank (whose identity and terms of appointment shall have received Qualified Majority Approval and retained amongst other things to review the Recoveries Assets Opening Report and the Quarterly Recovery Assets Management Reports;

"**Recovery Assets Opening Report**" means the initial due diligence report prepared by the Bank, based on the KPMG Provisions Report and other sources of information as necessary particularly in relation to the small and medium enterprises and retail loans portfolios and subject to review by the Recovery Assets Auditor for the purpose of, amongst other things, quantifying the Recoveries;

"**Recovery Assets Replacement Loans**" has the meaning given in the definition of Write-backs;

"**Recovery Payment Date**" has the meaning given to it in Condition 7 (Recovery Payments);

"**Recovery Payments**" means, in relation to the outstanding Units and in respect of all Recoveries arising during a Recovery Units Payment Period, the Specified Percentage of such Recoveries payable pursuant to Condition 7 (*Recovery Payments*);

"**Recovery Programme**" has the meaning provided in Condition 6(e) (*Pursuit of Recoveries*);

"**Recovery Units Payment Period**" means each period beginning on (and including) the Reference Date or any Recovery Payment Date and ending on (but excluding) the next Recovery Payment Date;

"**Reference Amount**" means the aggregate principal amount of the Units, namely an amount equal to (i) the aggregate principal amount of Designated Financial Indebtedness subject to the Restructuring and in respect of which Recovery Units are issued minus (ii) the aggregate principal amount (converted into Dollars at the Spot Rate of Exchange two Business Days (as defined in Condition 6(a)(*Collection Account and Conversion*)) before the Reference Date) of the Senior Notes and Subordinated Notes issued under Senior Packages 1 and 2 (as defined and described in the Information Memorandum), the cash paid under those Packages and the Initial Principal Amount (converted into Dollars as aforesaid) of the OID Notes (for the avoidance of doubt, (i) minus (ii) being $5,221,494,216) minus (iii) the aggregate amount from time to time of all Recovery Payments made;

"**Residual Amount**" means (i) the value of any residual potential recoveries that may be made from the Impaired Recovery Assets and the Recovery Programme and (ii) any residual potential value in the Tax Assets, as at the Valuation Date and determined as such in accordance with Condition 9 (*Valuation*);

"**Reference Date**" means 1 July 2010;

"**Restructuring**" means the restructuring of the indebtedness of the Bank Group as described in the Information Memorandum;

"**Security Interests**" means the security interests created in favour of the Trustee in relation to the Collection Account and the Cash Management Agreement pursuant to the Trust Deed;

"**Settlement Date**" means the Initial Settlement Date or, if a Valuation Rejection Notice has been delivered pursuant to Condition 9 (*Valuation*), the Deferred Settlement Date;

"**Specified Percentage**" means the following percentages in relation to the following Recoveries:

(i)     Cash and Accounting Recoveries, Litigation Recoveries and Tax Assets: 50 per cent.

(ii)    Interest on the Collection Account:                                        100 per cent.

"**Spot Rate of Exchange**" means the spot rate of exchange quoted by SB HSBC Bank Kazakhstan JSC (or any other internationally recognised financial institution providing such quotations) for the purchase of United States Dollars with the relevant currency at or about 11:00 a.m. Almaty time on the relevant day;

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same);

"**Tax Assets**" means the benefit of any Reliefs obtained or deemed to have been obtained by the Bank where the Relief arises from a transaction or other event (including, without limitation, the recognition for accounting purposes of a loss or impairment in respect of any asset in the Recovery Units Opening Report or in relation to the Litigation Recoveries)

occurring in relation to or affecting the Bank on or prior to the Restructuring but not including, for the avoidance of doubt, the exclusion from taxation (by virtue of Article 3.1 of the Law of the Republic of Kazakhstan On Enactment of the Code of the Republic of Kazakhstan on Taxes and Other Mandatory Payments to the Budget (Tax Code) dated 10 December 2008) of the gains resulting from writing off and/or cancellation of indebtedness of the Bank effected pursuant to the Restructuring on the Restructuring Effective Date and for these purposes:

(i)     "**Relief**" shall include (without limitation) any relief, loss, allowance, credit, set off, deduction or exemption for any Tax purpose, any right to repayment of Tax (including any repayment supplement) and any reference to the "use" or "set off" of a Relief shall be construed accordingly and shall include use or set-off in part;

(ii)    the benefit of a Relief shall be deemed to have been obtained by the Bank in any case where (a) a member of the Group receives a repayment of Tax as a result of the use or set-off of a Tax Asset or would have received such a repayment had amounts paid pursuant to Condition 6(a) (*Collection Account and Conversion*) been deductible in computing the taxable profits of the Bank for purposes of Tax in Kazakhstan or (b) an amount of Tax payable by a member of the Group is reduced as a result of the use or set off of a Tax Asset or would have been so reduced had amounts so paid been deductible in computing the taxable profits of the Bank for purposes of Tax in Kazakhstan;

(iii)   the amount of any benefit of a Relief shall be deemed to be the amount of the repayment of Tax (in a case falling within paragraph (ii)(a) above) or the amount of Tax saved (in a case falling within paragraph (ii)(b) above) and in both cases in making this calculation it shall be assumed that (a) any amount to be paid in respect of Recoveries (other than in respect of Tax Assets) pursuant to Condition 6(a) (*Collection Account and Conversion*) is deductible in computing the taxable profits of the Bank for purposes of Tax in Kazakhstan, (b) any amount to be paid in respect of the receipt of the benefit of a Relief pursuant to Condition 6(a) *(Collection Account and Conversion)* is not deductible in computing the taxable profits of the Bank for the purposes of Tax in Kazakhstan and (c) the rate of corporate Tax in Kazakhstan is 15%;

(iv)    the benefit of a Relief shall be deemed to have been obtained on (a) the date that the repayment is actually received or (in the case of a repayment that would have been received   if amounts paid pursuant to Condition 6(a) (*Collection Account and Conversion*) had been deductible in computing the taxable profits of the Bank for purposes of Tax in Kazakhstan) 30 days after the date on which the tax return in which repayment would have been claimed is agreed with the relevant Tax authorities or is otherwise settled or (b) the date on which that Tax would have been payable but for the use of the Relief (in a case falling within paragraph (ii)(b) above); and

(v)     any amount paid pursuant to Condition 6(a) (*Collection Account and Conversion*) in respect of Recoveries (other than Tax Assets) shall be treated as deductible in the calendar year of payment to the Collection Account in computing the taxable profits of the Bank for purposes of Tax in Kazakhstan

and, for the purposes hereof, all benefits of a Relief shall be deemed to have been realised in cash:

"**Valuation Date**" means the date (the "**Initial Valuation Date**") falling three months prior to the Initial Settlement Date or, where a Valuation Rejection Notice has been delivered pursuant to Condition 9 (*Valuation*), the date (the "**Deferred Valuation Date**") falling three months prior to the Deferred Settlement Date;

"**Valuation Rejection Notice**" has the meaning given to it in Condition 9(b) (*Valuation Rejection Notice*); and

"**Write-backs**" means cash and accounting recoveries in relation to any provision or write-off of any asset (including any provision or write-off in respect of the principal amount of or interest on any asset written off or any provisioned asset) (each an "**Impaired Recovery Asset**") over and above net book value as at (or any such recovery where the asset has been written off as at or prior to) 30 June 2009 and by reference to all the Bank's assets (including collection agency receivables and Related Party Debt) and the release or forgiveness of any liability of the Bank in settlement of the Bank's claim in respect of any such asset, where:

(i)     such cash and accounting recoveries may be determined:

    (A)     on a pooled basis in relation to assets described in paragraph (iii)(C) below provided that the assets so pooled do not exceed six per cent. of the aggregate amount of provisions or amounts written off in relation to the original Impaired Recovery Assets calculated by reference to the KPMG Provisions Report; and

    (B)     in all other cases on an asset-by-asset basis;

(ii)    the Impaired Recovery Assets shall be identified as at 30 June 2009 by reference to the KPMG Provisions Report;

(iii)   the amounts of Recoveries shall be calculated in relation to Impaired Recovery Assets by reference to cash or accounting recoveries over and above the net book value of such assets following provision or write-off calculated in accordance with FMSA Methodology and, in particular:

    (A)     in relation to corporate loans by reference to the provisions (or amounts written off) as calculated and noted in the KPMG Provisions Report (which provided that such provisions (and amounts written off) amounted in aggregate to KZT1,846 billion);

    (B)     in relation to corporate off balance sheet exposures including by reference to the provisions (or amounts written off) as calculated and noted in the KPMG Provisions Report (which provided that such provisions (and amounts written off) amounted in aggregate to KZT119 billion); and

    (C)     in relation to loans to small and medium enterprises and retail loans, by reference to the provisions (or amounts written off) as calculated and noted by KPMG in Appendix 6 to the KPMG Provisions Report (which provided that such provisions (and amounts written off) amounted in aggregate to KZT119 billion);

(iv)    Recoveries will include:

    (A)     cash and accounting recoveries in respect of Impaired Recovery Assets (including, but not limited to, provisioned or written off amounts, interest, default and penalty interest, premiums, late payment amounts and principal payments, settlements and cash proceeds from assets (including amounts realised on collateral or security) and whether acquired by the Bank through litigation, settlement, auction or compromise, or write-backs of any amounts in accordance with or permitted by applicable accounting standards or applicable regulatory capital requirements and any amounts received by reference to Impaired Recovery Assets consisting of loans written off prior to 30 June 2009); and

      (B)    amounts received with respect to new loans ("**Recovery Assets Replacement Loans**") entered into by way of amendment, restatement, novation of, or otherwise replacing, loans from time to time constituting Recoveries Assets and in determining whether a loan is a Recovery Assets Replacement Loan, all loans or arrangements entered into by the Bank after 30 June 2009 with borrowers or obligors with respect to Recoveries Assets (and/or with any of their Affiliates) shall constitute Recovery Assets Replacement Loans but only to the extent that such arrangements do not represent any amounts in addition to the amounts of existing loans; and

    (v)    all such cash and accounting recoveries by reference to Impaired Recovery Assets shall, on a pooled or asset-by-asset basis (as appropriate in accordance with (i) above) only be treated as a "Recovery" to the extent that the aggregate amount of such recoveries by reference to such pool or asset exceeds the net book value of such pool or asset following provision or write-down as referred to in (ii) and (iii) above.

## 2. Status

    (a)    *Status Prior to and Including the Settlement Date*

This Condition 2(a) applies to all amounts payable pursuant to the Units other than amounts specified in Condition 2(b) from and including the Reference Date up to and including the earlier of the date when the Reference Amount is reduced to zero and the Settlement Date. The Units constitute direct, general, unconditional and, subject to and in accordance with the Trust Deed, Condition 2(c) (*Security*) and Condition 6(b) (*Preservation of Security Interests*) and Condition 2(b) (*Status of Adjusted Principal Amount*) secured obligations of the Bank. The Units rank at all times without preference or priority *pari passu* among themselves.

    (b)    *Status of Adjusted Principal Amount*

Provided that the Reference Amount has previously not been reduced to zero, payment of the Adjusted Principal Amount shall constitute an unconditional, unsubordinated and secured obligation of the Bank which will at all times rank at least *pari passu* among themselves and *pari passu* in right of payment with all other present and future unsubordinated obligations of the Bank, save only for such obligations as may be preferred by mandatory provisions of applicable law.

    (c)    *Security*

This Condition 2(c) applies to the Units from and including the Reference Date up to and including the earlier of the date when the Reference Amount is reduced to zero and the Settlement Date.

As continuing security for the payment of all sums due under the Units, and subject always to Condition 2(a) (*Status Prior to and Including the Settlement Date*), the Bank will, in favour of the Trustee, for itself and on trust for the Unitholders, in accordance with the terms of the Trust Deed, charge with full title guarantee and by way of a first fixed charge all monies held from time to time in the Collection Account and assign with full title guarantee all its right, title and interest in, to and under the Cash Management Agreement and the Collection Account and all sums derived therefrom (the "**Charge and Assignment**").

In certain circumstances, the Trustee may (subject to it being indemnified, prefunded or secured to its satisfaction) be required by Unitholders holding at least 20 per cent. of the principal amount of the Units outstanding or by an Extraordinary Resolution of the Unitholders to exercise its powers under the Trust Deed arising under the Charge and Assignment.

If at any time, any Recovery Payment is due and payable but has not been paid, the Trustee may apply any balance standing to the credit of the Collection Account in and towards payment of such Recovery Payment.

3.   **Form, Denomination and Title**

(a)   *Form and Denomination*

The Units are in registered form, without interest coupons attached, and shall be serially numbered.  Units shall be issued in integral multiples of one Unit, each of which shall represent an initial Reference Amount of $1.

(b)   *Title*

Title to the Units will pass by transfer and registration as described in Conditions 4 (*Registration*) and 5 (*Transfers*).  The holder (as defined below) of any Units shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof), and no person shall be liable for so treating such holder.

In these Conditions, **"holder"** means the person in whose name a Unit is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and **"holding"**, **"holders"** and **"Unitholders"** shall be construed accordingly.

4.   **Registration**

The Bank shall procure that the Registrar will maintain a register (the **"Register"**) at the Specified Office of the Registrar in respect of the Units in accordance with the provisions of the Agency Agreement.  A certificate (each, a **"Unit Certificate"**) will be issued to each Unitholder in respect of its registered holding.  The Unit Certificates will be numbered serially, each with an identifying number, which will be recorded in the Register.

5.   **Transfers**

(a)   Subject to Conditions 5(d) and 5(e), a holding of Units may be transferred in whole or in part upon surrender of the relevant Unit Certificate, with the endorsed form of transfer (the **"Transfer Form"**) duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided that* only whole numbers of Units may be transferred and (where not all of the Units held by a holder are being transferred), both the number of Units not transferred and the number of Units being transferred is not less than one Unit.  Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)   Within five business days of the surrender of a Unit Certificate in accordance with Condition 5(a), the Registrar will register the transfer in question and deliver a new Unit Certificate in respect of a like number of the Units transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder.  In this Condition 5(b), **"business day"** means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in

foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)     The transfer of a Unit will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature, which may be levied or imposed in connection with such transfer.

(d)     Unitholders may not require transfers to be registered during the period of 15 days ending on the due date for any payment of principal or Recovery Payments in respect of the Units.

(e)     All transfers of Units and entries on the Register are subject to the detailed regulations concerning the transfer of the Units scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions. The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar. A copy of the current regulations will be mailed (free of charge) by the Registrar to any Unitholder who requests in writing a copy of such regulations.

6.     **Covenants**

The Unitholders will have the benefit of certain covenants in the Trust Deed relating to, amongst other things, restrictions on the creation of security interests, incurrence of indebtedness, disposal of assets and payment of dividends. In addition, the Bank covenants as follows:

(a)     *Collection Account and Conversion*

Promptly following receipt of any Recoveries in US Dollars the Bank shall deposit the Specified Percentage of such amount into the Collection Account.

Promptly following receipt of the benefit of any Relief, the Bank shall pay an amount in US Dollars (effecting any necessary currency exchange at the Spot Rate of Exchange) equal to the Specified Percentage of such benefit of Relief into the Collection Account.

The Bank shall, within 10 Business Days of receipt of any Recoveries that are not in U.S. Dollars, convert the Specified Percentage of such Recoveries into U.S. Dollars at the Spot Rate of Exchange and deposit the net proceeds of conversion into the Collection Account, provided that the Bank shall be under no obligation to convert any such Recoveries into U.S. Dollars or deposit any amounts into the Collection Account until such net proceeds exceed U.S.$5 million (determined by reference to the Spot Rate of Exchange for the relevant currencies).

In this Condition 6(a) "**Business Day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in Almaty, London and New York City.

The amount payable in respect of Recoveries shall (subject as provided in the definition of Tax Assets) be determined on a pre-tax basis and on an asset-by asset or pooled basis (as provided in the definition of Write-backs) by reference to the KPMG Provisions Report, the Recovery Assets Opening Report and the most recently delivered Quarterly Recovery Assets Management Report and a Recovery in relation to a Write Back comprising an accounting recovery shall be treated as received for the purposes of this paragraph (a) only when the Bank obtains the cash or cash equivalent benefit thereof.

(b)     *Preservation of Security Interests*

The Bank shall ensure that the Security Interests created in the Trust Deed shall at all times be in full force and effect.  In addition, the Bank shall not take or omit to take any action that would have the result of materially impairing the Security Interests created in the Trust Deed, and the Bank shall not grant any person other than the Trustee for the benefit of the Unitholders any interests whatsoever with respect to the Charged Property.

(c)     *No Netting Off*

Other than in respect of assets to be pooled in accordance with paragraph (i)(A) of the definition of Write-backs, Recoveries will not be netted off against any asset of the Bank which has been written off or in respect of which a provision has been created or increased.

(d)     *Information and Review Covenants*

(i)     Production of Quarterly Management Information:  The Bank shall, within 30 days of the end of each financial quarter, provide to the Trustee and the Recovery Assets Auditor a quarterly management information report (the "Quarterly Recovery Assets Management Report") on the ongoing performance of Recoveries Assets such report to include details of:

(A)     amounts paid out to Unitholders in the previous financial quarter;

(B)     the nature of the Recoveries made (including a loan-by-loan breakdown showing the loans by reference to which Recoveries were made) and the amount thereof (calculated in accordance with FMSA Methodology), including whether they constituted a payment of principal or interest;

(C)     reports from each of:

(1)     the Legal Department;

(2)     the Non-Performing Loan Department; and

(3)     the Department of Restructuring of Assets,

of the Bank as to Recoveries Assets and Recoveries and related activities by reference to the immediately preceding financial quarter and planned during the subsequent two financial quarters;

(D)     updating reports from international legal and financial advisers with respect to their continuing engagement in the Recovery Programme;

(E)     any Recovery Assets Replacement Loans made during the previous financial quarter or currently under negotiation or proposed; and

(F)     any other loans made or contracted to borrowers or other debtors with respect to Recoveries Assets (or parties connected with them) during the previous financial quarter or currently under negotiation or proposed.

(ii)     Quarterly independent review of ongoing operation and monitoring of the Recoveries Assets:  The Bank shall procure that the Recovery Assets Auditor will carry out an ongoing quarterly review covering:

(A)     independent sample testing of:

(1)     loans constituting Recoveries Assets and Recovery Assets Replacement Loans to confirm existence, completeness and accuracy of records; and

(2)     Recoveries made by reference to them including in the case of sales of portfolios of Recovery Assets, an audit of the attribution of consideration proceeds to particular assets and in particular whether values have been correctly ascertained or otherwise fixed by reference to individual assets in the context of portfolio sales;

(B)     loans to Related Parties;

(C)     quarterly Recoveries Assets' and Recoveries' valuations and appropriate accounting treatment of Recoveries Assets in accordance with FMSA Methodology, to include controls over the use of calculation models and spreadsheets, and regarding the use of third parties for any valuation services provided;

(D)     key controls over the Recoveries Assets and Recoveries, such as bank reconciliations, calculation of interest, provisions for losses and intercompany reconciliations;

(E)     controls (in particular in relation to compliance by the Bank with Section 6(a) (*Collection Account and Conversion*)) over the translation of foreign exchange assets and payments made in foreign exchange and controls over any foreign exchange hedging being performed including authorisation in each case in relation to the Recoveries Assets and Recoveries;

(F)     key systems controls in relation to the pursuit of Recoveries and Recoveries Assets including the set-up of new users and segregation of duties;

(G)     disaster recovery and business continuity plans;

(H)     review of management information reporting to Recovery Unit Trustee;

(I)     physical security of loan documentation relating to Recoveries Assets, including the controls in relation to access to documentation such as the use of logs for receipt and return of documentation;

(J)     dual control over payments relating to Recoveries Assets and Recoveries;

(K)     access controls over key payment systems relating to Recoveries Assets and Recoveries;

(L)     controls regarding, and review of, the calculation of payments due to each Unitholder and the Bank;

(M)   the clear and formal documentation of all material aspects of the activities noted above; and

(N)   review of any management letter from the Bank's Auditor to the Bank relating to any of the above.

The Bank shall comply with the recommendations of the Recovery Assets Auditor with respect to any of the above, including, in particular, any recommendations to the effect that Recoveries (accounting or cash) by reference to any Recoveries Assets (on an asset-by-asset basis) were, or should have been accounted for as having been, higher.

(e)   *Pursuit of Recoveries*

(i)   The Bank shall with the full support of Samruk-Kazyna, use its reasonable endeavours to maximise the recovery of any valuable asset of the Bank (including any claims available to it) whether in respect of debtors, former management or any other party whatsoever (and in any event act in compliance with its duties under Kazakhstan law and regulation and with international best practice), it being understood and agreed that a vigorous and transparent asset recovery programme (the "**Recovery Programme**") aimed at maximising recovery is of fundamental importance to the Bank, its shareholders and creditors and shall be pursued in their interests alone and, to the fullest extent possible, in a manner consistent with the Base Case Model.

(ii)   The Bank shall ensure that unless otherwise agreed by the Trustee it shall continue to engage appropriate professional advisers in respect of the Recovery Programme and that it will engage or continue to engage such other experts as are appropriate having regard to its duties as set out above. It shall also ensure, without limitation, that it maintains a sufficient team of in-house experts and other staff to support the Recovery Programme;

(iii)   The Bank shall:

(A)   take all reasonable steps, including (without limitation) the making of any claims, elections, surrenders, notices or consorts necessary to ensure that Tax Assets are realised on the earliest date possible;

(B)   keep proper records and accounts in relation to Recoveries and Recoveries Assets, and actions taken to recover them;

(C)   make such records and accounts freely available to the Recovery Assets Auditor and provide to the Recovery Assets Auditor equivalent access to such records and accounts and to personnel of the Bank regarding Recoveries Assets as it would to its auditors;

(D)   not further provide against or write off any Recoveries Asset without providing full justification thereof to the Recovery Assets Auditor;

(E)   before entering into any Recovery Assets Replacement Loan, provide complete copies of all documentation relating thereto (and the Recovery Asset(s) it is to replace) to the Recovery Assets Auditor (together with supporting credit information, including a business plan and historic financial information relating to the debtor(s) and details of any security to be provided in connection therewith, for review by the Recovery Assets Auditor and the reporting of the results of such review to the Trustee;

(F)     not reschedule any Recovery Asset by way of amendment or replacement (by way of a Recovery Assets Replacement Loan or otherwise) or otherwise without review by the Recovery Assets Auditor and the reporting of the results of such review to the Trustee; and

(G)     pay all costs and expenses of the Recovery Assets Auditor.

(f)     *Recovery Sub-Committee*

(i)     Subject to the provision of confidentiality agreements in a form satisfactory to the Bank, members of the Recovery Sub-Committee of the Bank shall be provided with quarterly reports by the Bank in relation to the progress of the Recovery Programme and upon receipt of such reports the Recovery Sub-Committee shall have the opportunity to comment and/or make recommendations in respect of the Recovery Programme. It is intended that the reporting process shall provide full transparency to the Recovery Sub-Committee.

(ii)    The Recovery Sub-Committee shall act solely as an advisory and consultative body in respect of the Recovery Programme and the Bank, acting through the Board, shall be obliged to consider the Recovery Sub-Committee's recommendations in good faith and shall not take any material decision regarding Recoveries without first having sought recommendations in that regard from the Recovery Sub-Committee.

(g)     *Segregation*

The Impaired Recovery Assets will be segregated for accounting purposes in the Bank's financial statements and for servicing and monitoring purposes in the accounting books and records of the Bank.

7.      **Recovery Payments**

In the period commencing on the Reference Date and ending on the Settlement Date, the Bank shall make Recovery Payments *pro rata* to Unitholders on 30 September, 31 December, 31 March and 30 June of each year, commencing 31 December 2010 (each, a "**Recovery Payment Date**") *provided that*:

(i)     Recovery Payments will only be made if and to the extent that the balance standing to the credit of the Collection Account exceeds U.S.$30 million in which case, the whole such balance shall be paid to Unitholders;

(ii)    the aggregate of the Recovery Payments made by the Bank shall not exceed the Reference Amount; and

(iii)   notwithstanding any other provisions herein, in the period beginning on 1 July 2009 up to and including 31 December 2009, in 2010 and in 2011 no payment will be made by the Bank into the Collection Account in respect of any Recoveries unless they are realised or deemed obtained in cash (or, in the case of a Recovery in relation to a Write Back comprising an accounting recovery, the Bank obtains the cash or cash equivalent benefit thereof) and in the relevant period such Recoveries exceed the following amounts:

(A)     for the period beginning on 1 July 2009 up to and including 31 December 2009, KZT36 billion;

(B)     for 2010, KZT134 billion; and

(C)     for 2011, KZT103 billion.

On the making of any Recovery Payment, the balance of the Reference Amount with respect to the Units shall be reduced by the amount of such Recovery Payment with effect from the relevant Recovery Units Payment Date, unless the Recovery Payment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such Recovery Payment.

The Bank shall calculate the Reference Amount and shall inform the Noteholders of the balance of the Reference Amount on each Recovery Units Payment Date.  The calculation by the Bank of the Reference Amount shall, absent manifest error, be final and binding on the Trustee and the Noteholders.

For the avoidance of doubt if the balance of the Reference Amount is reduced to zero:

(A)     no further Recovery Payments shall be made by the Bank after such date;

(B)     the Security Interest shall be released and discharged in accordance with the Trust Deed; and

(C)     the Bank shall have no further obligations in respect of the Recovery Units.

8.    **Payments**

(a)     **_Recovery Payments_**

Recovery Payments will be made from the Collection Account to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) at the Specified Office of the Registrar or of any Agent *pro rata* by reference to Units held respectively by the Unitholders.

(b)     **_Adjusted Principal Amount_**

Payments of the Adjusted Principal Amount in respect of the Units will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender of the relevant Unit Certificates at the Specified Office of the Registrar or of any Agent.

(c)     **_Record Date_**

Each payment in respect of a Unit will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**") in accordance with Condition 8(a) (*Recovery Payments*) or 8(b) (*Adjusted Principal Amount*) above, as the case may be.

(d)     **_Payments_**

Each payment in respect of the Units pursuant to Conditions 8(a) (*Recovery Payments*) and 8(b) (*Adjusted Principal Amount*) will be made by wire transfer to a United States Dollar account maintained by the payee with a bank in New York City. The amount of any payment to a Unitholder will be its proportionate share of the aggregate Recovery Payments or, as the case may be, the aggregate Adjusted Principal Amount payable on the relevant payment date, with fractions of a cent being rounded down to the nearest cent.

(e)     **_Payments Subject to Fiscal Laws_**

All payments in respect of the Units are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions

of Condition 11 (*Taxation*).  No commissions or expenses shall be charged to the Unitholders in respect of such payments.

(f)     ***Payment on a Business Day***

If the due date for payment of any amount in respect of any Unit is not a business day in the place of the Specified Office of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place.  A holder of a Unit shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day.  In this Condition 8(g), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in New York City, London and, in the case of surrender of a Unit Certificate, in the place in which the Unit Certificate is surrendered (or, as the case may be, endorsed).

(g)     ***Agents***

In acting under the Agency Agreement and in connection with the Units, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Unitholders.  The Bank reserves the right (with the prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; provided, however, that the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar.  Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Unitholders in accordance with Condition 16 (*Notices*).

9.     **Valuation**

(a)     ***Valuation***

To the extent that on the Valuation Date there are any Units outstanding and the Reference Amount has not been reduced to zero in accordance with Condition 7 (*Recovery Payments*), the Bank shall during January or February 2020 appoint up to three independent valuers of recognised standing (and satisfactory to the Trustee) to value the Recoveries Assets and the Residual Amount (after taking into account any Recovery Payments actually made including on or after the Initial Valuation Date) as at the Initial Valuation Date.

The Bank shall notify the Trustee in writing of the identity of any person it approaches in connection with the performance of any such valuation and the identity and terms of appointment of each valuer prior to such appointment.  When more than one valuer has been appointed, the Residual Amount notified to the Trustee shall be the average value provided by such valuers.

The valuation shall be carried out on a discounted cash flow basis and the Residual Amount shall be communicated by the Bank to the Trustee in writing no later than 45 days prior to the Initial Settlement Date.

(b)     ***Valuation Rejection Notice***

Either of the Bank or the Trustee may, by no later than the date which falls 30 days prior to the Initial Settlement Date, serve to the other a notice (a "**Valuation**

Rejection Notice") stating that it is dissatisfied with the outcome of the valuation of the Residual Amount.  If a Valuation Rejection Notice is served, the Bank shall during January or February 2022 appoint up to three independent valuers of recognised standing (and satisfactory to the Trustee) to value the Recoveries Assets and determine the Residual Amount (after taking into account any Recovery Payments actually made including on or after the Valuation Date) as at the Deferred Valuation Date.

The Bank shall notify the Trustee in writing of the identity of any person it approaches in connection with the performance of any such valuation and the identity and terms of appointment of each valuer prior to such appointment.  When more than one valuer has been appointed, the Residual Amount notified to the Trustee shall be the average value provided by such valuers.

The valuation shall be carried out on a discounted cash flow basis and the Valuation Date and the Residual Amount shall be communicated by the Bank to the Trustee in writing no later than 45 days prior to the Deferred Settlement Date.

(c)     **Adjusted Principal Amount**

After the valuation, the aggregate principal amount outstanding in respect of the Units shall be adjusted for all purposes (including for the purposes of Condition 10 (*Redemption and Purchase*)) to be an amount equal to the lesser of (i) the balance of the Reference Amount and (ii) the aggregate of the relevant Specified Percentages of the Residual Amount, any amounts required to be but not as yet paid to the Collection Account and moneys standing to the credit of the Collection Account.  The principal amount of the Units as so adjusted, is referred to as the **"Adjusted Principal Amount"**.

## 10.     Redemption and Purchase

(a)     **Scheduled Redemption**

The Adjusted Principal Amount of the Units will be redeemed in full on the Settlement Date.

(b)     **Purchase**

Subject as otherwise provided in the Trust Deed, the Bank may at any time purchase or procure others to purchase for its account the Units in the open market or otherwise and at any price.  Units so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 10(c) (*Cancellation of Units*).  Any Units so purchased, while held by or on behalf of the Bank, shall not entitle the holder to vote at any meeting of Unitholders and shall not be deemed to be outstanding for the purposes of calculating the quorum at any such meeting.

(c)     **Cancellation of Units**

Unless otherwise permitted by the Trust Deed, all Units which are redeemed or surrendered for cancellation pursuant to this Condition 10 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

## 11.     Taxation

(a)     **Taxation**

All Recovery Payments as well as payments of principal (including the Adjusted Principal Amount) in respect of the Units shall be made free and clear of, and without

withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Unitholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Unit:

(i)     of a holder who is liable to such taxes, duties, assessments or governmental charges in respect of such Unit by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Unit; or

(ii)    presented for a payment of the Adjusted Principal Amount more than 30 days after the Relevant Date, except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Unit on the last day of such period of 30 days; or

(iii)   to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Unit; or

(iv)    where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 200348/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Unit (subject to the exclusions set out in (i), (ii) and (iii) above) that has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place.  Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written

certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Unit.

(b) *Relevant Date*

As used in these Conditions, **"Relevant Date"** in respect of any Unit means the date on which payment in respect of such Unit first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Unitholders that such payment will be made, *provided that* payment is in fact made.

(c) *Additional Amounts*

Any reference in these Conditions to Recovery Payments, principal or the Adjusted Principal Amount shall be deemed to include any additional amounts in respect of the Recovery Payments, principal or Adjusted Principal Amount (as the case may be) which may be payable under this Condition 11 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 11 (*Taxation*) pursuant to the Trust Deed.

(d) *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 11 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

12. **Prescription**

Claims for Recovery Payments and for the Adjusted Principal Amount on redemption shall become void unless the relevant Unit Certificates are surrendered for payment within ten years of the appropriate Relevant Date.

13. **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Units then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall:

(a) give notice to the Bank that the Units are and they shall become due and repayable in an aggregate amount equivalent to the higher of (1) the Reference Amount and (2) the aggregate of (A) amounts standing to the credit of the Collection Account and (B) amounts by reference to Recoveries realised in cash and required to be but not yet paid to the Collection Account; and/or

(b) exercise or direct the Trustee to exercise any or all of its rights, remedies, powers or discretions under the Trust Deed in respect of the Collection Account,

if any of the following events (each, an **"Event of Default"**) occurs and is continuing:

(i) *Non Payment*

the Bank fails to pay any amount due on the Units when the same becomes due and payable and such default continues for a period of ten Business Days; or

(ii) *Breach of Other Obligations*

the Bank is in default in the performance, or is otherwise in breach, of any provision of the Units or in relation to the Charged Property (other than a default or breach

specifically dealt with elsewhere in this Condition 13 (*Events of Default*)) and, where such default or breach is, in the opinion of the Trustee, capable of remedy, such default or breach is not remedied within 30 calendar days after notice thereof has been given to the Bank, by a Unitholder or the Trustee, requiring the same to be remedied; or

(iii) *Cross Acceleration*

any Financial Indebtedness of the Group is declared to be or otherwise becomes due and payable prior to the due date for the payment thereof by reason of an event of default (howsoever described), *provided that* the aggregate amount of Financial Indebtedness referred to above exceeds U.S.$10 million (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(iv) *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement; or

(v) *Creditors' Process*

any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group having an aggregate value of not less than U.S.$10 million and is not discharged or stayed within 45 days after commencement; or

(vi) *Invalidity or Unenforceability*

the validity of the Units is contested by the Bank or the Bank denies its obligations under the Units (whether by a general suspension of payments or a moratorium on the payment of debt or otherwise), or it is or becomes unlawful for the Bank to perform or comply with all or any of its obligations set out in the Units or all or any of the obligations of the Bank provided therein shall be or become unenforceable or invalid.

**14.     Replacement of Unit Certificates**

If any Unit Certificate is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and Stock Exchange requirements, upon payment by the claimant of the

expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Unit Certificates must be surrendered before replacements will be issued.

15.  **Meetings of Unitholders; Modification and Waiver**

(a)  *Meetings of Unitholders*

The Trust Deed contains provisions for convening meetings of Unitholders to consider any matters relating to the Units, including the modification of any provision of these Conditions or the Trust Deed.  Any such modification may be made if sanctioned by an Extraordinary Resolution.  Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Unitholders holding not less than one-tenth the aggregate principal amount of the outstanding Units.  The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Units for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Unitholders whatever the principal amount of the Units for the time being outstanding so held or represented; provided, however, that certain proposals (including any proposal to change any date fixed for payment of any amount in respect of the Units, to reduce any amount payable on any date in respect of the Units, to alter the method of calculating the amount of any payment in respect of the Units or the date for any such payment, to change the currency of payment under the Units or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) (a "**special quorum resolution**") may only be sanctioned by an Extraordinary Resolution passed at a meeting of Unitholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Units form a quorum.  Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Unitholders, whether present or not.

The Trust Deed contains provisions for convening meetings of holders of the Units with holders of notes of other series issued under the Trust Deed if the Trustee so decides.

(b)  *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Unitholders who for the time being are entitled to receive notice of a meeting of Unitholders under the Trust Deed or (ii) if such Unitholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three-quarters of the aggregate principal amount of the outstanding Units.  Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Unitholders.

(c)  *Modification Without Unitholders' Consent*

The Trustee may, without the consent of the Unitholders, agree (i) to any modification of the Units (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Unitholders and (ii) to any modification of the Units (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error.  In addition, the Trustee may, without the consent of the Unitholders, authorise or waive any proposed breach or breach of the Units or the Trust Deed (other than a proposed

breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Unitholders will not be materially prejudiced thereby.  Any such modification, waiver or authorisation shall be binding on the Unitholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Unitholders in accordance with Condition 16 (*Notices*).

16.  **Notices**

(a)  ***To the Unitholders***

Notices to Unitholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing.  In addition, so long as the Units are listed on an Approved Stock Exchange or the Kazakhstan Stock Exchange and the relevant Stock Exchange so requires, notices to the Unitholders shall be published in a leading newspaper having general circulation in the country of such Exchange. Any such notice shall be deemed to have been given on the date of first publication.

(b)  ***To the Bank***

Notices to the Bank will be deemed to be validly given if delivered to the Bank  at 97 Dzholdasbekov str., rnd Samal-2, Almaty 050051, Kazakhstan and clearly marked on their exterior "Loan and Capital Markets Department"(or at such other addresses and for such other attentions as may have been notified to the Unitholders in accordance with Condition 16(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)  ***To the Trustee and Agents***

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

17.  **Trustee**

(a)  ***Indemnification***

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Unitholders.  In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Unitholders on the terms of the Trust Deed.  Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Units or for the performance by the Bank of its obligations under or in respect of the Units or the Trust Deed, as applicable.

(b)  ***Exercise of Power and Discretion***

In connection with the exercise of any of its powers, trusts, authorities or discretions (including, but not limited to, those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Unitholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual

Unitholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction. The Trustee shall not be entitled to require, and no Unitholder shall be entitled to claim, from the Bank (in the case of a Unitholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Unitholders.

(c)     *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Units, but it shall not be bound to do so unless:

(i)     it has been so requested in writing by the holders of a least one-fifth in principal amount of the outstanding Units or has been so directed by an Extraordinary Resolution; and

(ii)    it has been indemnified or provided with security or pre-funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence. In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor. If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience that may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance that could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 13 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance that could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 13 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed. The Trustee shall be entitled to rely without liability on such certificates. The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)     *Failure to Act*

No Unitholder may proceed directly against the Bank or enforce the Security Interests unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)     *Retirement and Removal*

Any Trustee may retire at any time on giving at least two months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement, and the Unitholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. In the event of any change of the Trustee, notices thereof shall be published as provided in Condition 16(a) (*To the Unitholders*).

(f)     *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Unitholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Units and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligation assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Unitholders in accordance with Condition 16 (*Notices*).

18.   **Currency Indemnity**

If any sum due from the Bank in respect of the Units under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Units or in respect thereof under the Trust Deed, the Bank shall indemnify each Unitholder, on the written demand of such Unitholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Paying and Transfer Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Unitholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof. This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

19.   **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Units under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

20.     **Governing Law; Arbitration and Jurisdiction**

(a)     *Governing Law*

The Trust Deed, the Units, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)     *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Units or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non-contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition.  The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA.  The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country.  The seat of arbitration shall be London, England and the language of arbitration shall be English.  Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)     *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 20(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 20(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)     *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 20(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Unitholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts.  Subject to Condition 20(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)     *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f) **_Agent for Service of Process_**

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being. If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment. If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g) **_Consent to Enforcement, etc._**

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 20(d) (_Jurisdiction_)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h) **_Waiver of Immunity_**

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

## SCHEDULE 5

### FORMS OF NOTICES AND ACKNOWLEDGEMENT

#### Part 1

#### Form of Notice of Charge of the Collection Account

To:     The Bank of New York Mellon, London Branch
        One Canada Square
        London E14 5AL
        United Kingdom

25 August 2010

Dear Sirs,

Trust Deed dated 25 August 2010 (the "**Trust Deed**") between "BTA BANK" JSC (the "**Bank**") and
BNY Corporate Trustee Services Limited. (the "**Trustee**")
relating to the U.S.$5,221,494,216 aggregate initial Reference Amount of Recovery Units (the
"**Units**")

We refer to the Trust Deed and hereby give you notice that we have on 25 August 2010 by virtue of
the provisions of Clause 4 (*Security Interests*) of the Trust Deed charged to the Trustee to secure the
payment to the Trustee of certain amounts due under the Units of the Trust Deed, all our rights, title
and interest in and to all sums of money now or in the future deposited in the Collection Account No:
2804788401 held in our name with you and the debts represented by such sums.

The Bank hereby unconditionally instructs and authorises you at any time:

(a)     to disclose to the Trustee without reference to or further authority from the Bank such
        information relating to the Collection Account and the sums therein as the Trustee may at any
        time and from time to time request you to disclose to it;

(b)     to hold all sums from time to time standing to the credit of the Collection Account to the
        order of the Trustee;

(c)     to pay or release all or any part of the sums standing to the credit of the Collection Account in
        accordance with the written instructions of the Trustee; and

(d)     to comply with the terms of any written notice or instructions in any way relating to or
        purporting to relate to the charge specified above, the sums standing to the credit of the
        Collection Account or the debts represented thereby which you receive at any time from the
        Trustee without any reference to or further authority from us and without any inquiry by you
        as to the justification or validity of such notices or instructions.

The instructions and authorisations which are contained in this letter shall remain in full force and
effect until the Bank and the Trustee together give you notice in writing revoking them. This letter
shall be governed and construed in accordance with English law.

Would you please acknowledge receipt of this letter and your acceptance of the instructions and
authorisations contained in it by signing the form of acknowledgement attached to the enclosed copy
of this letter and returning it forthwith to the Trustee at One Canada Square, London E14 5AL, United
Kingdom with a copy to us.

Yours faithfully,

By:  …………………………………
a duly authorised attorney for and on behalf of
"BTA BANK" JSC.

**cc: BNY Corporate Trustee Services Limited (in its capacity as Trustee)**

**Part 2**

**Form of Acknowledgment of Notice of Charge of the Collection Account**

To:   BNY Corporate Trustee Services Limited
      One Canada Square
      London E14 5AL
      United Kingdom

      (as Trustee for the Units
      (as defined below))

25 August 2010

Dear Sirs,

Trust Deed dated 25 August 2010 (the "**Trust Deed**") between "BTA BANK" JSC (the "**Bank**") and
BNY Corporate Trustee Services Limited (the "**Trustee**")
relating to the issue of the U.S.$5,221,494,216 aggregate initial Reference Amount of Recovery Units
(the "**Units**")

We hereby acknowledge receipt of a letter (a copy of which is attached hereto) of today's date addressed to us by the Bank regarding the Collection Account therein referred to, and we hereby accept the instructions and authorisations contained therein and undertake to act in accordance and comply with the terms thereof.

We hereby further acknowledge and confirm to you that:

(a)     we have notice of the charge created by the Trust Deed;

(b)     we do not have, and will not make or exercise, any claims or demands, any rights of counter-claim, rights of set-off or any other equities or security interest against the Bank in respect of the Collection Account, the sums therein or the debts represented thereby; and

(c)     we have not, as at the date hereof, received any notice that any third party has or will have any rights or interest whatsoever or has made or will be making any claim or demand or taking any action whatsoever in respect of the Collection Account, the sums therein or the debts represented thereby.

We undertake that, in the event of our becoming aware at any time that any person or entity other than you has or will have any rights or interests whatsoever in or has made or will be making any claim or demand or taking any action whatsoever in respect of the Collection Account, the sums therein or the debts represented thereby, we will forthwith give written notice thereof to you and to the Bank. We have made the acknowledgements and confirmations and have given the undertaking set out in this letter in the knowledge that they will be required by you in connection with the security which has been constituted by the Bank in your favour under the Trust Deed.

This letter is governed by, and shall be construed in accordance with English law.

Yours faithfully,

for and on behalf of
The Bank of New York Mellon, London Branch

cc: "BTA BANK" JSC

**Part 3**

**Form of Notice of Assignment of the Cash Management Agreement**

To:     The Bank of New York Mellon, London Branch

25 August 2010

Dear Sirs,

Trust Deed dated 25 August 2010 (the "**Trust Deed**") between "BTA BANK" JSC (the "**Bank**") and
BNY Corporate Trustee Services Limited (the "**Trustee**")
relating to the U.S.$5,221,494,216 aggregate initial Reference Amount of Recovery Units (the
"**Units**")

We refer to the Trust Deed and hereby give you notice that we have on 25 August 2010 by virtue of
the provisions of Clause 4 (*Security Interests*) of the Trust Deed assigned to the Trustee to secure the
payment to the Trustee of certain amounts due under the Units of the Trust Deed, all the rights,
interests and benefits, both present and future, which have accrued or may accrue to the Bank under or
pursuant to the Cash Management Agreement.

The Bank hereby unconditionally instructs and authorises you at any time:

(a)     to disclose to the Trustee without reference to or further authority from the Bank such
        information relating to the Cash Management Agreement as the Trustee may at any time and
        from time to time request you to disclose to it; and

(b)     to comply with the terms of any written notice or instructions in any way relating to or
        purporting to relate to the assignment specified above which you receive at any time from the
        Trustee without any reference to or further authority from us and without any inquiry by you
        as to the justification or validity of such notices or instructions.

The instructions and authorisations which are contained in this letter shall remain in full force and
effect until the Bank and the Trustee together give you notice in writing revoking them.  This letter
shall be governed and construed in accordance with English law.

Would you please acknowledge receipt of this letter and your acceptance of the instructions and
authorisations contained in it by signing the form of acknowledgement attached to the enclosed copy
of this letter and returning it forthwith to the Trustee at One Canada Square, London E14 5AL, United
Kingdom with a copy to us.

Yours faithfully,

By: ...........................................
a duly authorised attorney for and on behalf of
"BTA BANK" JSC.

     **cc: BNY Corporate Trustee Services Limited (in its capacity as Trustee)**

**Part 4**

**Form of Acknowledgment of Notice of Assignment of the Cash Management Agreement**

To:     BNY Corporate Trustee Services Limited
        One Canada Square
        London E14 5AL
        United Kingdom

        (as Trustee for the Units
        (as defined below))

25 August 2010

Dear Sirs,

Trust Deed dated 25 August 2010 (the "**Trust Deed**") between "BTA BANK" JSC (the "**Bank**") and
BNY Corporate Trustee Services Limited (the "**Trustee**")
relating to the issue of the U.S.$5,221,494,216 aggregate initial Reference Amount of Recovery Units
(the "**Units**")

We hereby acknowledge receipt of a letter (a copy of which is attached hereto) of today's date addressed to us by the Bank regarding the Cash Management Agreement therein referred to, and we hereby accept the instructions and authorisations contained therein and undertake to act in accordance and comply with the terms thereof.

We hereby further acknowledge and confirm to you that:

(a)     we have notice of the assignment created by the Trust Deed; and

(b)     we have not, as at the date hereof, received any notice that any third party has or will have any rights or interest whatsoever or has made or will be making any claim or demand or taking any action whatsoever in respect of the Collection Account, the sums therein or the debts represented thereby.

We undertake that, in the event of our becoming aware at any time that any person or entity other than you has or will have any rights or interests whatsoever in or has made or will be making any claim or demand or taking any action whatsoever in respect of the Cash Management Agreement, we will forthwith give written notice thereof to you and to the Bank. We have made the acknowledgements and confirmations and have given the undertaking set out in this letter in the knowledge that they will be required by you in connection with the security which has been constituted by the Bank in your favour under the Trust Deed.

This letter is governed by, and shall be construed in accordance with English law.

Yours faithfully,

for and on behalf of
The Bank of New York Mellon, London Branch

cc: "BTA BANK" JSC

## SCHEDULE 6

### TRUSTEE'S POWERS IN RELATION TO THE CHARGED PROPERTY

1.      Power to demand and collect or arrange for the collection of and receive all amounts which shall from time to time become due and payable in respect of the Charged Property;

2.      Power to compound, give receipts and discharges for, settle and compromise any and all sums and claims for money due and to become due in respect of the Charged Property;

3.      Power to exercise all or any of the powers or rights which but for the creation of the Security Interests would have been exercisable by the Bank in respect of the Charged Property;

4.      Power to file any claim, to take any action, and to institute and prosecute or defend any legal, arbitration or other proceedings;

5.      Power to lodge claims and prove in and to institute, any insolvency proceedings of whatsoever nature relating to the Bank;

6.      Power to execute, deliver, file and record any statement or other paper to create, preserve, perfect or validate the creation of the Security Interests or to enable the Trustee to exercise and enforce its rights under these presents;

7.      Power to apply for, obtain, make and renew any approvals, permissions, authorisations and other consents and all registrations and filings which may be desirable or required to create or perfect the Security Interests or to ensure the validity, enforceability or admissibility in evidence of these presents in any jurisdiction;

8.      Power to require payment to the Trustee of any credit balance on the Collection Account and power to operate the Collection Account;

9.      Power to appropriate or apply without notice all or any part of any monies standing to the credit of the Collection Account in or towards the payment or other satisfaction of all or any amount due in respect of the Recovery Units pursuant to the Recovery Units Conditions; and

10.     Power to execute all documents and do or refrain from doing all other acts that the Trustee considers necessary to fulfil any of the purposes listed in paragraphs (1) to (9) above.

**SCHEDULE 7**

**FORM OF CERTIFICATE OF RESIDENCY**

HM Revenue & Customs

TO WHOM IT MAY CONCERN

Date ........

Our ref......

CERTIFICATE OF RESIDENCE IN THE UNITED KINGDOM

Year 2010

The United Kingdom Tax Authorities certify that to the best of their knowledge

BNY CORPORATE TRUSTEE SERVICES LIMITED

Is resident in the United Kingdom and is subject to UK tax on its total income

## SCHEDULE 8

## RESTRUCTURING DOCUMENTS

1.  Restructuring Plan

2.  Information Memorandum

3.  This Trust Deed

4.  Agency Agreement

5.  Cash Management Agreement

6.  RCTFF Agreement

7.  Each RCTFF Collection Account Charge

8.  Deposit Agreement

9.  SK Guarantee

10.  Deeds of Undertaking

11.  The Deed of Release

12.  Charter

13.  Corporate Governance Code

14.  Appointment letters and indemnities (from the Bank) for the Supervisor (as such term is defined in the Information Memorandum), the Adjudicator (as such term is defined in the Information Memorandum), the Independent Auditor, the Recovery Assets Auditor and the Creditor Directors.

In witness whereof this Trust Deed has been executed as a deed on the date state at the beginning.

Executed as a Deed by
**"BTA BANK" JSC**


......................................

Print Name..........................
Authorised Signatory


**EXECUTED** as a Deed by

**BNY CORPORATE TRUSTEE SERVICES LIMITED**

Acting by its two lawful attorneys:

Attorney:

Attorney:

In the presence of:

Witness name:

Signature:

Address: One Canada Square, London E14 5AL