Brett D. Jaffe
brett.jaffe@alston.com
Jennifer S. Kozar
jennifer.kozar@alston.com
James S. D'Ambra, Jr.
james.dambra@alston.com
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Phone:  (212) 210-9400
Fax:  (212) 210-9444

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATLANTICA HOLDINGS, INC., BALTICA INVESTMENT HOLDING, INC., BLU FUNDS, INC., Allan KIBLISKY, Anthony KIBLISKY, and Jacques GLIKSBERG, <br><br> Plaintiffs, <br><br> -v.- <br><br> BTA BANK JSC, <br><br> Defendant. | 13 CV 5790 (JMF), rel. 12 CV 8852 (JMF) <br><br><br> **ECF CASE** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BTA BANK JSC'S MOTION TO DISMISS OR STAY IN FAVOR OF ARBITRATION**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................iii

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF FACTS ....................................................................................3

    A.  The Parties ........................................................................................3

    B.  The Related Litigation .....................................................................4

    C.  The 2010 Restructuring....................................................................5

    D.  Plaintiffs' Purchases of the Subordinated Notes...............................7

    E.  Misstatements and Omissions in the Information Memorandum ...........................8

    F.  The Negative Carry Swap Comes to Light ................................10

    G.  BTA's Second Default in January 2012 ....................................11

    H.  S-K Fund and BTA Misrepresent Liability for the Recovery Units .........................11

ARGUMENT ......................................................................................................13

    I.       PLAINTIFFS HAVE STANDING TO BRING THE CLAIMS ASSERTED
            IN THE AMENDED COMPLAINT ..................................................13

    II.      SECTION 10(b) OF THE EXCHANGE ACT APPLIES TO THE
            TRANSACTIONS AT ISSUE.............................................................15

          A.  Plaintiffs Incurred Irrevocable Liability in the United States for their
              Secondary Market Purchases of the Subordinated Notes ..........................17

          B.  Plaintiffs Incurred Irrevocable Liability in the United States for
              Purchases of the Subordinated Notes in Connection with the 2010
              Restructuring............................................................................19

    III.    PLAINTIFFS' CLAIMS ARE NOT SUBJECT TO ARBITRATION ..............22

          A.  The Information Memorandum Is Not A Contract to Which Plaintiffs
              May Be Bound .......................................................................23

i

**Page**

B.   The Terms and Conditions of the Subordinated Notes Impose No
        Obligation on Noteholders to Arbitrate Disputes ......................................24

C.   The Trust Deed Does Not Impose on the Plaintiffs An Obligation to
        Arbitrate .......................................................................................................24

IV.      THE COURT HAS PERSONAL JURISDICTION OVER BTA.......................27

A.   BTA Has Minimum Contacts with the U.S. and Has Purposefully
        Availed Itself of this Forum ........................................................................28

1.   BTA Actively Participated in the Offering of Securities Intended
        for Sale in the United States............................................................30

2.   BTA Directed Communications Concerning the Subordinated
        Notes to the United States................................................................30

3.   BTA's Chapter 15 Filing in this District Provides Further
        Support for the Exercise of Personal Jurisdiction...........................31

B.   It is Reasonable for the Court to Assert Personal Jurisdiction Over
        BTA................................................................................................................33

V.      PLAINTIFFS ADEQUATELY PLED THEIR CLAIMS UNDER SECTION
          10(b)....................................................................................................................34

A.   Plaintiffs Adequately Allege Reliance .........................................................34

1.   Atlantica and Baltica Reasonably relied on the Information
        Memorandum In Connections with the 2010 Restructuring..........34

2.   Plaintiffs Reasonably Relied on BTA's Omissions and Material
        Misstatements About Recovery Units .............................................37

B.   Plaintiffs Adequately Allege Loss Causation .............................................38

C.   Plaintiffs Adequately Allege Scienter.........................................................39

1.   Plaintiffs Have Alleged Conscious Recklessness ...........................39

2.   Plaintiffs Have Alleged Motive and Opportunity...........................40

CONCLUSION...............................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                                                    <u>Page(s)</u>

*A.I. Trade Fin. v. Petra Bank*,
　989 F.2d 76 (2d Cir. 1993)....................................................................................27

*A T & T Technologies, Inc. v. Communications Workers of Am.*,
　475 U.S. 643 (1986)..............................................................................................22

*Absolute Activist Master Value Fund, Ltd. v. Ficeto*,
　No. 09 Civ. 8862 (GRD), 2013 WL 1286170 (S.D.N.Y. Mar. 28, 2013) ..............18

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
　677 F.3d 60 (2d Cir. 2012)...............................................................................16, 18

*Ackerberg v. Johnson*,
　892 F.2d 1328 (8th Cir. 1989) ..............................................................................14

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
　No. 05 Civ. 9050 (LMM), 2009 WL 2031855 (S.D.N.Y. July 8, 2009) ................25

*Affiliated Ute v. United States*,
　406 U.S. 128 (1972)..............................................................................................37

*Ameripay, LLC v. Ameripay Payroll, Ltd.*,
　334 F. Supp. 2d 629 (D.N.J. 2004) .......................................................................31

*Applied Energetics, Inc. v. NewOak Capital Markets, LLC*,
　645 F.3d 522 (2d Cir. 2011)..................................................................................22

*Arco Capital Corp. Ltd. v. Deutsche Bank AG*,
　949 F. Supp. 2d 532 (S.D.N.Y. 2012)...................................................................20

*Atlantica Holdings Inc. v. Sovereign Wealth Fund "Samruk-Kazyna" JSC*,
　No. 12 Civ. 8852 (JMF), --- F.3d ----, 2014 WL 917055 (S.D.N.Y. Mar. 10, 2014)...... *passim*

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
　305 F.3d 120 (2d Cir. 2002)..................................................................................33

*Bank of Am., N.A. v. Diamond State Ins. Co.*,
　38 Fed. App'x 687 (2d Cir. 2002) .........................................................................22

*Basquiat ex rel. Estate of Basquiat v. Sakura Intern.*,
　No. 04 Civ. 1369(GEL), 2005 WL 1639413 (S.D.N.Y. July 5, 2005) ...................36

*Blue Chip Stamps v. Manor Drug Stores*,
　421 U.S. 723 (1975)..............................................................................................15

**Cases**                                                                                                                 **Page(s)**

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985)............................................................................................28, 33

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,*
    750 F.3d 227 (2d Cir. 2014)...................................................................................38

*Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co.,*
    957 F. Supp. 2d 316 (S.D.N.Y. 2013)....................................................................25

*City of Pontiac Policemen's and Firemen's Retirement System v. UBS AG,*
    No. 12-cv-4355, --- F.3d ----, 2014 WL 1778041 (2d Cir. May 6, 2014) ...................... *passim*

*Colburn Family Foundation v. Chabad's Children of Chernobyl,*
    739 F. Supp. 2d 614 (S.D.N.Y. 2010)....................................................................14

*Delaney v. Bank of Am. Corp.,*
    908 F. Supp. 2d 498 (S.D.N.Y. 2012)....................................................................24

*Drexel Burnham Lambert Grp., Inc. v. Galadari,*
    No. 84 Civ. 2602(CBM), 1987 WL 6164 (S.D.N.Y. Jan. 29, 1987) ................................14, 15

*Erica P. John Fund, Inc. v. Halliburton Co.,*
    131 S. Ct. 2179 (2011)..........................................................................................35

*Gilligan, Will & Co. v. S.E.C.,*
    267 F.2d 461 (2d Cir. 1959)..................................................................................14

*Gildepath Holding B.V. v. Spherion Corp.,*
    590 F. Supp. 2d 435 (S.D.N.Y. 2007)....................................................................36

*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
    466 U.S. 408 (1984)..............................................................................................28

*Howsam v. Dean Witter Reynolds, Inc.,*
    537 U.S. 79 (2002)...........................................................................................22, 25

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.,*
    741 F. Supp. 2d 511 (S.D.N.Y. 2010)....................................................................39

*In re DaimlerChrysler AG SEC. Litig.,*
    247 F. Supp. 2d 579, 584 (D. Del. 2003)...............................................................30

*In re Gen. Elec. Co. Sec. Litig.,*
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)...............................................................38, 39

**Cases**                                                                  **Page(s)**

*In re Lyondell Chem. Co.*,
    491 B.R. 41 (Bankr. S.D.N.Y. 2013) *aff'd*, 505 B.R. 409 (S.D.N.Y. 2014) ....................23, 24

*In re Magnetic Audiotape Antitrust Litig.*,
    334 F.3d 204 (2d Cir. 2003)........................................................................................27

*In re NTL, Inc. Sec. Litig.*,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004)............................................................................38

*In re Optimal U.S. Litig.*,
    813 F. Supp. 2d 351 (S.D.N.Y. 2011)..........................................................................21

*In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*,
    586 F. Supp. 2d 172 (S.D.N.Y. 2008)..........................................................................15

*In re Smith Barney Transfer Agent Litig.*,
    290 F.R.D. 42 (S.D.N.Y. 2013) ..................................................................................38

*In re Vivendi Universal, S.A. Securities Litig.*,
    605 F. Supp. 2d 570 (S.D.N.Y. 2009)..........................................................................13

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 431 (S.D.N.Y. 2003)....................................................................14, 15

*JSC Surgutneftegaz v. President & Fellows of Harvard Coll.*,
    04 CIV. 6069 (RCC), 2005 WL 1863676 (S.D.N.Y. Aug. 3, 2005) *aff'd*, 167 Fed.
    App'x 266 (2d Cir. 2006) ..........................................................................................25

*Kernan v. Kurz–Hastings, Inc.*,
    175 F.3d 236 (2d Cir. 1999)........................................................................................28

*LaSalle Bank Nat'l Assoc. v. Nomura Asset Capital Corp.*,
    424 F.3d 195, 206 (S.D.N.Y. 2005)............................................................................26

*Law Debenture Trust Co. of New York v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010)........................................................................................26

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)........................................................................................39

*Les Telecommunications d'Haiti S.A.M. v. Cine*,
    13-CV-6462, 2014 WL 2655451 (E.D.N.Y. June 13, 2014)..................................................22

**<u>Cases</u>**                                                                                               **<u>Page(s)</u>**

*Liberty Media Corp. v. Vivendi Universal*,
  S.A., 861 F. Supp. 2d 262 (S.D.N.Y. 2012) ...............................................................16, 19, 20

*MBIA Ins. Corp. v. Spiegel Holdings, Inc.*
  No. 03 CV 10097 (GEL), 2004 WL 1944452 (S.D.N.Y. Aug. 31, 2004) ..............................15

*Mori v. Saito*,
  No. 10 Civ. 6465 (KBF), 2013 WL 1736527 (S.D.N.Y. April 19, 2013) ..............................16

*Morrison v. National Australia Bank Ltd.*,
  561 U.S. 247 (2010) ......................................................................................... *passim*

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ......................................................................................39, 40

*Pinker v. Roche Holdings, Ltd.*,
  292 F.3d 361 (3d Cir. 2002) ......................................................................................29, 31

*RJ Capital, S.A. v. Lexington Capital Funding III, Ltd.*,
  No. 10 CIV. 25 (PPG), 2011 WL 3251554 (S.D.N.Y. July 28, 2011) ...................................25

*Russell v. Mimeo, Inc.*,
  No. 08 Civ. 5354 (RJS), 2008 WL 6559743 (S.D.N.Y. Oct. 29, 2008) .................................22

*Sarhank Grp. v. Oracle Corp.*,
  404 F.3d 657 (2d Cir. 2005) ......................................................................................27

*Scottevest, Inc. v. AyeGear Glasgow Ltd.*,
  No. 12 Civ. 851 (PKC), 2012 WL 1372166 (S.D.N.Y. Apr. 17, 2012) .................................31

*S.E.C. v. Amerindo Inv. Advs. Inc.*,
  No. 05 Civ. 5231(RJS), 2013 WL 1385013 (S.D.N.Y. Mar. 11, 2013) ..........................20, 21

*S.E.C. v. Chicago Convention Center, LLC*,
  961 F. Supp. 2d 905 (N.D. Ill. 2013) ...................................................................................21

*S.E.C. v. Morton*,
  No. 10 Civ. 1720(LAK)(MHD), 2011 WL 1344259 (S.D.N.Y. Mar. 31, 2011)....................28

*S.E.C. v. Softpoint, Inc.*,
  No. 95 Civ. 2951(GEL), 2001 WL 43611 (S.D.N.Y. Jan. 18, 2001) ....................................28

*S.E.C. v. Straub*,
  921 F. Supp. 2d 244 (S.D.N.Y. 2013)...................................................................28, 30, 31, 33

*S.E.C. v. Syndicated Food Servs. Int'l*,
  No. 04-CV-1303(NGG)(ALC), 2010 WL 3528406 (E.D.N.Y. Sept. 3, 2010) ......................34

**Cases**                                                                    **Page(s)**

*S.E.C. v. Unifund SAL*,
    910 F.2d 1028 (2d Cir. 1990)..................................................................27

*Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
    559 U.S. 662 (2010)......................................................................22, 25

*The Republic of Iraq v. BNP Paribas USA*,
    472 Fed. App'x 11 (2d Cir. 2012) ............................................................22

*Thomson-CSF, S.A. v. Am. Arbitration Ass'n*,
    64 F.3d 773 (2d Cir. 1995)......................................................................25

*Valentini v. Citigroup, Inc.*,
    837 F. Supp. 2d 304 (S.D.N.Y. 2011)..............................................35, 36

*Wiva v. Shell Petroleum Dev. Co. of Nigeria Ltd.*,
    335 F. App'x 81 (2d Cir. 2009) ..............................................................27

**Statutes and Other Authorities**

11 U.S.C. § 1510...............................................................................................32

15 U.S.C. § 78aa ..............................................................................................27

Fed. R. Civ. P. 10b-5.................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6)....................................................................................14

Plaintiffs Atlantica Holdings, Inc., Baltica Investment Holding, Inc., Blue Funds, Inc., Allan Kiblisky, Anthony Kiblisky and Jacques Gliksberg submit this memorandum of law in opposition to Defendant BTA Bank JSC's ("BTA" or "Defendant") motion to dismiss the Amended Complaint or to stay this action in favor of arbitration (the "Motion").

## PRELIMINARY STATEMENT

This Court is intimately familiar with this case, having already denied nearly in its entirety a motion to dismiss brought by Defendant's 97% shareholder ("S-K Fund") in a related action arising out of the precise transactions and virtually the same fraudulent conduct as that alleged in the Amended Complaint. *See Atlantica Holdings Inc. v. Sovereign Wealth Fund "Samruk-Kazyna" JSC*, No. 12-cv-8852 (JMF), --- F. Supp. 2d ----, 2014 WL 917055 (S.D.N.Y. Mar. 10, 2014) (the "S-K Decision"). The bulk of the arguments offered by BTA in support of its Motion are nothing more than a rehash of those already rejected by this Court in the S-K Decision. To the limited extent BTA has identified new bases on which to seek the dismissal of the Amended Complaint, those too find no support in the law. The Motion should be denied in its entirety.

*First*, Plaintiffs have standing to bring the securities fraud claims asserted in the Amended Complaint. BTA argues that the securities at issue (the "Subordinated Notes") were subject to certain transfer restrictions, thus voiding Plaintiffs' acquisition of their securities and divesting them of standing. In doing so, BTA ignores the well-settled criteria for Article III standing, and seeks to impose an entirely new and legally unsupported pleading standard in this case. Plaintiffs have alleged that they are the purchasers and current holders of the Subordinated Notes, and suffered an injury-in-fact when, as a result of BTA's misstatements and omissions,

1

those securities suffered a near-total loss of value.  Nothing more is required.  *See* Section I, *infra*.

**Second**, this Court confirmed in the S-K Decision that, on allegations *virtually identical* to those in the instant Amended Complaint, Plaintiffs pled the existence of a domestic transaction as required by *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  In an effort to undo this Court's holding on that issue, BTA points to the Second Circuit's recent decision in *City of Pontiac Policemen's and Firemen's Retirement System v. UBS AG*, No. 12-cv-4355, --- F.3d ----, 2014 WL 1778041 (2d Cir. May 6, 2014).  But that case involved issues which have no bearing on this case or the Motion.  Specifically, *City of Pontiac* stood for the proposition that securities purchased on a foreign securities exchange cannot form the basis for a claim under the U.S. securities laws even if (i) the securities are cross-listed on a U.S. exchange or (ii) the buy order which lead to the foreign exchange purchase was placed domestically.  Unlike *City of Pontiac,* the Amended Complaint *expressly alleges* that all purchases at issue were made domestically in off-exchange transactions.  Those allegations – which must be accepted as true on this Motion – are, as held in the S-K Decision, sufficient to satisfy the requirement to plead the existence of a domestic securities transaction.  *See* Section II, *infra*.

**Third**, BTA has failed to carry its burden of identifying any agreement by which Plaintiffs "clearly and unequivocally" agreed to arbitrate the claims asserted in the Amended Complaint.  BTA cites to various documents – including the Information Memorandum, the Terms and Conditions of the Subordinated Notes, and the Trust Deed – by deceptively excerpting only limited portions of the relevant text.  When read in their entirety and in context, it is clear that *none* of these documents constitute an agreement by Plaintiffs – or any other holder of the Subordinated Notes – to submit claims to arbitration.  S*ee* Section III, *infra.*

*Fourth*, this Court has personal jurisdiction over BTA.  As alleged in the Amended Complaint, in connection with the transactions giving rise to Plaintiffs' claims, BTA had extensive contacts with the United States.  Among other things, BTA (i) availed itself of the U.S. capital markets by issuing the Subordinated Notes with the express intent that they would be purchased and traded by investors in the United States, (ii) made payment on the Subordinated Notes in the United States, (iii) disseminated the Information Memorandum to investors in the United States, (iv) published notice of the transaction contemplated by the Information Memorandum in the United States, including in the *Wall Street Journal*, and (v) made statements it reasonably understood would be disseminated to investors in the United States.  Finally, BTA has *twice* voluntarily availed itself of this Court, by filing Chapter 15 bankruptcy petitions in this District.  The first of those two filings was made in the context of the restructuring transaction which resulted in the issuance of the Subordinated Notes; the second arose from BTA's default on those securities.  These extensive contacts are more than sufficient to establish personal jurisdiction in this action.  *See* Section IV, *infra*.

*Finally*, for the reasons articulated by this Court in the S-K Decision, Plaintiffs have adequately pled reliance, loss causation and scienter in support of their fraud claims under Section 10(b) and Rule 10b-5.  *See* Section V, *infra*.

For all of these reasons, and those described below, the Motion should be denied.

## STATEMENT OF FACTS

### A.  The Parties

Plaintiffs are three investment companies, Atlantica Holdings, Inc. ("Atlantica"), Baltica Investment Holding, Inc. ("Baltica"), and Blu Funds, Inc. ("Blu Funds"), and three United States residents, Allan Kiblisky, Anthony Kiblisky, and Jacques Gliksberg (collectively "Plaintiffs").

Each of the Plaintiffs purchased, in various transactions between 2010 and 2012, Subordinated Notes issued by BTA.  *See* Am. Compl. ¶¶ 8-14.

Defendant BTA is a joint-stock company organized under the laws of the Republic of Kazakhstan.  *Id*. at ¶ 17.  On February 3, 2009, in response to a liquidity crisis at BTA, S-K Fund acquired a supermajority (75.1%) of the Bank's stock.  *Id*. at ¶ 27; Declaration of Francis Fitzherbert-Brockholes in Support of Motion to Dismiss or Stay in Favor of Arbitration dated June 10, 2014 [Dkt. No. 44] (the "FFB Decl."), Ex. 1 at 282.

Non-party Sovereign Wealth Fund Samruk-Kazyna ("S-K Fund") is a sovereign wealth fund owned entirely by the Republic of Kazakhstan. Am. Compl. at ¶ 17. S-K Fund's sole purpose is to engage in commercial activities.  *Id*.  S-K Fund controls more than 500 companies "in the key areas of the national economy," including banking, oil and gas, mining, chemicals, transport, communication, and electricity.  *Id*.

### B.  <u>The Related Litigation</u>

This action is related to a case previously commenced in this Court on December 5, 2012 against S-K Fund arising out of the exact same transactions described in the Amended Complaint, *Atlantica Holdings Inc. v. Sovereign Wealth Fund "Samruk-Kazyna" JSC*, No. 12 CV 8852 (JMF) (the "S-K Action").  BTA was not named as a defendant in the S-K Action because, at the time that action was commenced, BTA was the debtor in a Chapter 15 bankruptcy case pending in the United States Bankruptcy Court for the Southern District of New York.  *See In re "BTA" JSC,* Case No. 12-13081 (JMP) (Bankr. S.D.N.Y. terminated July 17, 2013).  S-K Fund moved to dismiss the S-K Action, arguing that (i) S-K Fund is a foreign sovereign entity and thus immune from suit; (ii) the transactions at issue were not domestic transaction as required by *Morrison*; and (iii) Plaintiffs failed to adequately plead reliance, loss causation and

scienter.  On March 10, 2014, this Court denied S-K Fund's motion virtually in its entirety.  *See* S-K Decision at *11.

BTA's bankruptcy was discharged on July 17, 2013, permitting Plaintiffs to bring the instant action against BTA.  Am. Compl. ¶¶ 7, 19.

### C.  The 2010 Restructuring

Just two months after S-K Fund acquired its dominant stake in BTA, BTA announced that it had ceased payment of principal on all outstanding BTA financial obligations.  *Id*. at ¶ 28. Thereafter, BTA and S-K Fund proposed the 2010 Restructuring to BTA's creditors, a group that included Plaintiffs Atlantica and Baltica.  *Id*.  at ¶¶ 29-30.

The 2010 Restructuring was carried out pursuant to the Information Memorandum, which was distributed to existing creditors of BTA.  The Information Memorandum was provided for the purpose of deciding whether to participate in the 2010 Restructuring, and was intended to provide disclosures as to the details of the proposed 2010 Restructuring and BTA's financial condition.  *Id*. at ¶¶ 2, 30-31.  The Information Memorandum was mailed directly to Plaintiffs' broker at the UBS Miami Office.  *Id.* at ¶ 30.  It was, at all relevant times, also publically available to creditors and potential investors on BTA's website.  *Id.*[1]

As part of the 2010 Restructuring, BTA issued equity and debt securities to pre-restructuring holders of its debt, including Plaintiffs Atlantica and Baltica.  Am. Compl. ¶¶ 34-36.  It was expressly contemplated by BTA, and plainly reflected in the Information Memorandum, that debt securities issued in connection with the 2010 Restructuring (including the Subordinated Notes) would be acquired by certain investors within the United States:

---

[1] Despite Defendant's contention that "only [] individuals who certified either that they (i) were outside the U.S. and non-U.S. Persons (as defined in Regulation S); or (ii) were either 'Accredited Investors' as defined in the Regulation D or 'Qualified Institutional Buyers' ... as defined in Rule 144A" had access to the Information Memorandum (*See* Def. Mem. at 4), it is in fact publicly available without limitation.  *See* http://bta.kz/files/IM_2010.pdf  (last accessed July 11, 2014).

> THE NEW NOTES . . . WILL BE ISSUED ONLY TO, CLAIMANTS (I) OUTSIDE THE UNITED STATES OR (II) ***WITHIN THE UNITED STATES (IN PRIVATE TRANSACTIONS PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT) THAT ARE EITHER ACCREDITED INVESTORS OR QIBs***...

FFB Decl., Ex. 1 at 282 at (i) (caps in original, emphasis added).   The Information Memorandum (in a disclosure entitled "NOTICE TO CLAIMANTS IN THE UNITED STATES") similarly provided that the Subordinated Notes, once issued, could trade in the United States:

> THE NEW NOTES . . . MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ***EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT*** AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS.

FFB Decl., Ex. 1 at 282 at (i) (caps in original, emphasis added).  To facilitate such transfers of the Subordinated Notes in the secondary market among qualified investors in the United States, the 2010 Restructuring provided that the Subordinated Notes could be transferred on the books of "Direct Participants" in the United States (including large financial institutions such as UBS), and that those transactions could be cleared through DTC in the United States.  *See* FFB Decl., Ex. 1 at 282 at (i); FFB Decl. ¶ 27 ("Of course, an interest in the [Subordinated Notes] could also be transferred on the books of a Direct Participant or on the books of a third party holding a beneficial interest in [Subordinated Notes] through a Direct Participant.").

BTA's efforts to structure the 2010 Restructuring in a manner that would attract U.S. investors to purchase BTA's debt are plain.  In addition to providing a mechanism for transfer of the Subordinated Notes in the U.S., the bulk of the Subordinated Notes were denominated in U.S. dollars, and all interest and principal payments on the Subordinated Notes were to be made

to a New York City bank.  Am. Compl. ¶¶ 33-35, 37.  At least 17% of the dollar-denominated Subordinated Notes issued in the 2010 Restructuring were purchased by U.S. investors.  *Id.*

### D.  **Plaintiffs' Purchases of the Subordinated Notes**

*Atlantica and Baltica Agree to the 2010 Restructuring*.   Pre-2010 Restructuring creditors of BTA, including Atlantica and Baltica, were required to deliver an "Electronic Instruction Form" providing their assent to (or dissent from) the 2010 Restructuring.  FFB Decl., Ex. 1 at 91.  Relying on the representations made in the Information Memorandum, both Atlantica and Baltica approved the 2010 Restructuring, and thus, agreed to receive the Subordinated Notes in exchange for their existing BTA debt. Am. Compl.  ¶¶ 8-9, 36.  Atlantica and Baltica communicated their commitment to participate in the 2010 Restructuring by sending their completed Electronic Instruction Forms to their broker in the UBS Miami Office.  *Id.*  The Electronic Instruction Form provided, in part:

> **Electronic Instruction Forms from Beneficial Owners . . . shall be irrevocable** *provided*, *however*, that in the event that the Bank, in its sole discretion, amends, terminates or withdraws the Restructuring Plan, . . . in a manner that is materially adverse to affected Euronoteholders in the opinion of the Trustee, Euronoteholders shall be permitted, subject to the conditions set out herein, to revoke any Electronic Instruction Forms delivered in relation thereto for a period of two business days. . .

FFB Decl., Ex. 1 at 91 (italics in original, bold added).  As made clear by the form itself, once UBS submitted the Electronic Instruction Forms on Atlantica's and Baltica's behalf, those parties were irrevocably bound to the transaction.  *Id.*; *see also* Am. Compl. ¶¶ 8-9, 36.

*Plaintiffs' Secondary Market Purchases*.  Plaintiffs' secondary market purchases of the Subordinated Notes were also made through UBS.  Am. Compl.  ¶¶ 8-13.  In connection with each such secondary market transaction, Plaintiffs first placed an order to purchase Subordinated Notes with their broker in the UBS Miami Office.  *Id.*  Next, UBS Financial Services transmitted

7

the order to UBS's U.S. broker-dealer. *Id*. Finally, to effectuate the trades, funds were transferred from Plaintiffs' accounts maintained at the UBS Miami Office to UBS's back office in the Stamford, Connecticut where the orders were ultimately filled and the transactions were completed. *Id.*

### E.   Misstatements and Omissions in the Information Memorandum

Much of BTA's and S-K Fund's success in attracting investors to participate in the 2010 Restructuring and maintaining an active secondary market for the Subordinated Notes can be attributed to material misstatements concerning BTA's post-restructuring prospects, and the role that S-K Fund would play in ensuring BTA's future viability. *Id*. at ¶ 2, 36, 54-55.  While S-K Fund represented that its "primary objective is to manage [BTA] with a goal of maximizing long term value and increasing competitiveness of such legal entit[y] in world markets," that was far from the truth. *Id* at ¶ 54.

***The S-K Undertaking***.    The Information Memorandum incorporated the S-K Undertaking, a deed of undertaking executed by S-K Fund "in favour of" BTA's creditors. *Id*. at ¶¶ 2, 40.  Pursuant to the S-K Undertaking, S-K Fund promised creditors (including "their direct and indirect transferees") that S-K Fund would not accept any dividend or distribution from BTA for seven years after the Restructuring, unless creditors (including holders of the Subordinated Notes) had been paid in full. *Id*. at ¶¶ 40-41.  By incorporating the S-K Undertaking in the Information Memorandum, BTA similarly represented that no dividend or distribution contemplated by the S-K Undertaking would be paid to S-K Fund.  Despite this express representation, the Information Memorandum concealed from creditors that BTA paid millions of dollars of net annual distributions to its joint shareholder, S-K Fund, in the form of payments from BTA through the undisclosed "Negative Carry Swap" arrangement. *Id*. at ¶ 46.

*The Negative Carry Swap*.   Under the terms of the 2010 Restructuring, BTA was directed to purchase KZT 645 billion ($4.3 billion) of bonds issued by S-K Fund paying a nominal return of 4% per year to BTA.  *Id*. at ¶ 43.  BTA also was required to pay 2% on this sum in exchange for a guarantee from S-K Fund, so that the effective interest rate on the S-K Bonds was only 2%.  *Id*.  This minimal return was more than offset by two extremely unfavorable related transactions.  Shortly before the 2010 Restructuring, S-K Fund deposited KZT 245 billion ($1.6 billion) with BTA (the "S-K Deposit").  *Id*.  The S-K Deposit earned variable but extremely high rates of interest, reaching 10.9%.  *Id*.  In addition, at S-K Fund's direction, BTA entered into a repo transaction with NBK on approximately KZT 400 billion ($2.7 billion) that required it to pay 7% interest to the national bank.  *Id*.  The net result of the Negative Carry Swap was that S-K Fund received interest from BTA on its deposits far above market rates in the period following the 2010 Restructuring, while BTA received minimal interest payments from S-K Fund.  *Id*.  This Negative Carry Swap resulted in material declines in BTA's cash flow.  *Id*.

Additional disclosures in the Information Memorandum further obscured the Negative Carry Swap and the deleterious effect of that transaction on BTA's cash flow and prospects.  *Id*. at ¶ 45.  In the Information Memorandum, BTA stated that as of September 30, 2009, BTA's interest income on the bonds it purchased from S-K Fund for the nine months prior was KZT 20,502,000,000 ($137 million), and that its interest expense on amounts due to customers (principally S-K Fund) for the nine months prior was KZT 4,214,000,000 ($28 million).  *Id*. This statement was false and misleading because, as discussed above with respect to the Negative Carry Swap, at the time that the 2010 Restructuring was approved, interest expenses due to S-K Fund far exceeded interest income received from S-K Fund.  *Id*.

Similarly, the Information Memorandum falsely and misleadingly disclosed that "current accounts generally bear no interest," when in fact S-K Fund had current account deposits in excess of KZT 245 billion with BTA, and was receiving interest payments as high as 10.9%. *Id*. at ¶ 44. On an annual basis, BTA paid approximately KZT 68 billion ($453 million) in interest on S-K deposits, the S-K guarantee, and the NBK repo transaction, while receiving only KZT 26 billion ($173 million) in bond interest payments from S-K Fund, resulting in an annual negative carry of KZT 42 billion ($280 million). *Id*.

### F.  <u>The Negative Carry Swap Comes to Light</u>

Information about the Negative Carry Swap began to be leaked to the marketplace in mid-May 2011. *Id*. at ¶ 50. BTA issued a set of PowerPoint slides entitled the "Investor Call Presentation" on May 17, 2011, in which it disclosed on page 24 of the 24-page presentation that one of the outstanding issues that needed to be addressed was "negative carry." *Id*. Even then, however, BTA disclosed only that its yield on all assets averaged 5.5% while its average cost for all liabilities was 8.6% – but it did not disclose that the driving force behind its overall negative carry was the Negative Carry Swap. *Id*.

The following day, May 18, 2011, J.P. Morgan published a research report providing limited additional details concerning the Negative Carry Swap. *Id*. at ¶ 49. Specifically, J.P. Morgan reported that on a conference call with investors on May 17, 2011, BTA disclosed that the average interest rate on deposits held by S-K Fund was 9.8%, which was significantly more than the interest rate BTA earned on its assets. *Id*.

In response to these disclosures, the price of BTA debt, including the Subordinated Notes, plummeted. *Id*. at ¶ 50. The Subordinated Notes, which had been trading for approximately 70% of face value prior to the May 17 and 18 disclosures, immediately fell to less

than 60% of face value and continued their downward slide to approximately 40% of face value by the end of June 2011. *Id.*

### G.  BTA's Second Default in January 2012

In January 2012 (less than 18 months after the 2010 Restructuring was finalized), BTA signaled for the first time that it might be unable to continue as a going concern and that it would not be able to satisfy its debt obligations. *Id*. at ¶ 57.  BTA had to complete its second restructuring in less than two years (the "2012 Restructuring").  As a key part of the 2012 Restructuring, S-K Fund's equity interest in BTA increased to 97%. *Id.*

### H.  S-K Fund and BTA Misrepresent Liability for the Recovery Units

Under S-K Fund's control, BTA continued to make misrepresentations regarding its financial condition in 2012. *Id*. at ¶¶ 59-64.  Most significantly, BTA misrepresented the impact that Recovery Units issued in connection with the 2010 Restructuring would have on its total liabilities. *Id.*

The purpose of the Recovery Units, issued to various creditors in connection with the 2010 Restructuring, was to provide those creditors an interest in BTA's efforts to recover approximately $10 billion in BTA assets stolen from BTA by its former management prior to the 2010 Restructuring. *Id*. at ¶ 60.  Under the terms of the Recovery Units, holders of the Recovery Units and BTA would each be entitled to 50% of all funds recovered (net of expenses) from BTA's previous management. *Id.*  Additionally, in the event of BTA's default on its senior debt issued in the 2010 Restructuring, the Recovery Units (which bore a notional $5 billion reference amount, representing approximately 50% of the assets sought to be recovered from BTA's prior management) could be accelerated by holders of the Recovery Units and become an unconditional $5 billion obligation of BTA. *Id*. at ¶ 61.

BTA defaulted on its senior debt in January 2012. *Id*. at ¶ 57. As a result, acceleration of the Recovery Units became a virtual certainty. *Id*. at ¶ 62. Nonetheless, in two PowerPoint presentations made in connection with the 2012 Restructuring, BTA continued to mislead investors about its liability for the Recovery Units. *Id*. at ¶¶ 62-64. First, in a January 2012 PowerPoint presentation made in connection with the 2012 Restructuring, BTA identified its *total* external liabilities – which included approximately $2 billion in senior debt and $850 million in Subordinated Notes – as approximately $4.8 billion. *Id*. at ¶ 63. Despite knowing of BTA's default on its senior debt, BTA and S-K Fund made no mention at all of increased liability for the Recovery Units or that upon acceleration, the full $5 billion notional value of the Recovery Units would become *pari passu* to BTA's senior debt. *Id*. at ¶¶ 61, 63.

Similarly, as late as March 19, 2012, BTA represented in a PowerPoint presentation to the Steering Committee for the 2012 Restructuring that its total liability for debt securities issued – including the senior debt and Subordinated Notes, as well as the Recovery Units – declined by 6.5% in its preliminary audited financial statements from previously issued estimates, from KZT 702 billion ($4.68 billion) to KZT 656 billion ($4.37 billion). *Id*. at ¶ 64. BTA further misrepresented that this purported decrease in its liabilities was the result of a KZT 46 billion ($310 million) decrease in its liability on the Recovery Units. *Id*. While that same presentation disclosed that acceleration of the Recovery Units was possible, BTA continued to omit a fundamental fact: in light of BTA's default, it was almost certain to be liable for the full $5 billion reference amount of the Recovery Units. *Id*. at ¶ 64.

Once the true facts concerning BTA's liability for the Recovery Units were disclosed, the price of the Subordinated Notes declined even further, to less than 10% of face value. *Id*. at ¶ 65. Plaintiffs – who purchased more than $76 million face amount of Subordinated Notes in reliance

on BTA and S-K Fund's many false and misleading statements and material omissions – were severely injured.  *Id.* at ¶ 73.

## ARGUMENT

### I.     PLAINTIFFS HAVE STANDING TO BRING THE CLAIMS ASSERTED IN THE AMENDED COMPLAINT

To establish Article III standing, Plaintiffs need only allege (i) injury-in-fact to Plaintiffs; (ii) causation, consisting of a "fairly traceable" connection between the injury-in-fact and BTA's alleged misconduct; and (iii) redressability, or a "non-speculative likelihood" that Plaintiffs' injury can be remedied by the relief they seek.  *See, e.g., In re Vivendi Universal, S.A. Securities Litig.*, 605 F. Supp. 2d 570, 574 (S.D.N.Y. 2009).  It is undisputed that Plaintiffs have pled each of these required elements.  Among other things, Plaintiffs plainly allege (i) an injury-in-fact stemming from their acquisition of the Subordinated Notes (Am. Compl. ¶¶ 67-73), (ii) reliance on false and misleading statements and/or material omissions knowingly made by BTA (Am. Compl. ¶¶ 8-14; 39), and they (iii) seek compensatory damages after the Subordinated Notes lost substantially all of their value (Am. Compl. ¶73 and Relief Requested).  Accordingly, Plaintiffs' allegations in the Amended Complaint are sufficient to establish their standing to bring the claims asserted against BTA; nothing more is required.

BTA ignores the black-letter requirements for pleading standards and instead seeks to impose on Plaintiffs a heightened pleading standard that simply does not exist.  BTA argues that Plaintiffs – the undisputed purchasers and current holders of the Subordinated Notes – nonetheless lack standing because they do not allege details of their status as Accredited Investors or Qualified Institutional Buyers ("QIBs").  BTA's argument finds no support in law or fact and should be rejected.

As a threshold matter, it is undisputed that, as alleged in the Amended Complaint, Plaintiffs *did actually purchase the Subordinated Notes and continue to hold those securities today. See* Am. Compl. ¶¶ 8-14.  To the extent that BTA wishes to assert as a defense that those purchases are *void ab initio,* BTA will – following discovery – bear the burden of proof with regard to that defense.  *See, e.g.*, *Colburn Family Foundation v. Chabad's Children of Chernobyl*, 739 F. Supp. 2d 614, 619 (S.D.N.Y. 2010) ("A party seeking to void a contract bears the burden of proving that the contract is invalid.").  On this Motion, however, the allegations asserted in the Amended Complaint must be presumed to be true; the Court should not adopt as "fact" BTA's unfounded speculation as to Plaintiffs' qualifications to purchase the securities at issue.  *See* S-K Decision at *3 ("In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.") (quotation and citation omitted).

Moreover, BTA does not cite a single case – and Plaintiffs have not located one – in which a Court imposed on a plaintiff a requirement to plead the facts delineating their status as an Accredited Investor or QIB.[2]  Instead, BTA attempts to bootstrap its argument to authority standing for two wholly unremarkable (and on this motion, irrelevant) propositions.  First, Defendant cites to *In re WorldCom, Inc. Sec. Litig*., 294 F. Supp. 2d 431 (S.D.N.Y. 2003) and *Drexel Burnham Lambert Grp., Inc. v. Galadari*, No. 84 Civ. 2602(CBM), 1987 WL 6164 (S.D.N.Y. Jan. 29, 1987) for the proposition that "transfer restrictions are enforceable."

---

[2] BTA argues that regardless of the allegations pled in the Amended Complaint, the Individual Defendants could not be QIBs and were thus necessarily unable to purchase the Subordinated Notes in the secondary markets.  *See* Def Mem. at 10.  However, Defendant ignores that Rule 144A is not an exclusive safe harbor and that other exemptions may permit the resale of the Subordinated Notes to non-QIBS.  To name one example, the well-recognized Section 4(a)(1 1/2) exemption permits resale of restricted securities to non-QIB accredited investors.  *See, e.g.*, *Ackerberg v. Johnson*, 892 F.2d 1328, 1337-38 (8th Cir. 1989) (citing *Gilligan, Will & Co. v. S.E.C.*, 267 F.2d 461, 466 (2d Cir. 1959)).  Most critically, there is no requirement that Plaintiffs – the *purchasers* of the securities at issue – plead the details of the legal exemption that the secondary market *seller* of those securities relied on in connection with that sale.

However, neither of those cases stand for or even considered the notion that a plaintiff's standing to bring an action is dependent upon pleading the factual basis for the satisfaction of legal transfer restrictions. *See WorldCom*, 294 F. Supp. 2d at 453-55 (considering transfer restrictions as evidence that securities offering was a private placement as to which Section 12(a)(2) of the Securities Act did not apply); *Drexel Burnham*, 1987 WL 6164 at **7-8 (recognizing general enforceability of share transfer restrictions).

Equally misplaced is Defendant's reliance on *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) and its progeny. BTA misleadingly argues that those cases stand for the proposition that "only *qualified* purchasers and sellers have standing to bring claims under section 10(b) and Rule 10b-5." *See* Def. Mem. at 10 (emphasis added). But those cases nowhere suggest a requirement that a plaintiff plead facts underlying its qualification to purchase the security at issue. Rather, that authority stands for the proposition that only the *actual* purchaser, and not some other party alleging to be harmed by the purchase, has standing to bring a securities fraud claim. *Blue Chip Stamps,* 421 U.S. at 754-55.[3]

Plaintiffs have pled they purchased the Subordinated Notes, and that as a result of BTA's misstatements and omissions made in connection with those purchases, Plaintiffs have been injured. Nothing more is required. Plaintiffs have standing to bring the Amended Complaint.

## II.    SECTION 10(b) OF THE EXCHANGE ACT APPLIES TO THE TRANSACTIONS AT ISSUE

Section 10(b) of the Securities Exchange Act and Rule 10b-5 apply to "transactions in securities listed on domestic exchanges[ ] and *domestic transactions in other securities*."

---

[3] Plaintiffs remaining authority in the *Blue Chip Stamps* line of authority is similarly inapposite. *See MBIA Ins. Corp. v. Spiegel Holdings, Inc.* No. 03 CV 10097 (GEL), 2004 WL 1944452, at * 2-4 (S.D.N.Y. Aug. 31, 2004) (non-purchasing insurer lacked standing); *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, 586 F. Supp. 2d 172, 179-80 (S.D.N.Y. 2008) (sale of securities by plaintiff-brokerage firm's client for its own benefit did not confer standing on plaintiff). Here, by sharp contrast, Plaintiffs *did* allege that they purchased the Subordinated Notes for their own benefit. *See* Am. Compl. at ¶ 14 and Exhibit A.

*Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 266 (2010) (emphasis added).  A transaction will be deemed domestic where either (i) irrevocable liability was incurred in the United States, or (ii) title passed within the United States.  *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012).  These requirements are disjunctive; either the passing of title or the incurring of irrevocable liability in the United States satisfies *Morrison*.  *See*, *e.g.*, *Mori v. Saito*, No. 10 Civ. 6465 (KBF), 2013 WL 1736527 at *5 (S.D.N.Y. April 19, 2013); *Liberty Media Corp. v. Vivendi Universal*, S.A., 861 F. Supp. 2d 262, 269 (S.D.N.Y. 2012) (because irrevocable liability was incurred in the United States, the court "need not reach the question of where title was transferred").  As the Second Circuit explained in *Absolute Activist*, a plaintiff may satisfy the irrevocable liability prong by alleging facts that show "the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security."  677 F.3d at 68.  Allegations in the Amended Complaint as to the incurring of irrevocable liability must be presumed to be true, and all reasonable inferences must be drawn in Plaintiffs' favor. *Mori*, 2013 WL 1736527 at *2.

Significantly, this Court has already held that Plaintiffs' allegations in the related S-K Action – which arose from the same set of facts and are virtually identical to the allegations in the Amended Complaint – sufficiently alleged that Plaintiffs incurred irrevocable liability in the U.S., thereby satisfying the test for a domestic transaction under *Morrison* and *Absolute Activist*. S-K Decision at **7-9.  BTA tries two different gambits to avoid this Court's well-reasoned and ultimately determinative holding on this issue.  As to Plaintiffs' secondary market purchases (which comprise the bulk of their holdings, *see* Am. Compl., Ex. A), Defendant argues that the Second Circuit's decision in *City of Pontiac* somehow changes the analysis that underpins the

Court's decision in the S-K Case.  As to Plaintiffs' purchases in connection with the 2010 Restructuring, BTA simply ignores this Court's S-K Decision altogether, rehashing the very same arguments which were made by S-K Fund in that action and roundly rejected by this Court. Each of these arguments should similarly be rejected here.

**A.  Plaintiffs Incurred Irrevocable Liability in the United States for their Secondary Market Purchases of the Subordinated Notes**

In a transparent attempt to circumvent the Court's holding in the S-K Action, BTA argues that the subsequently rendered decision in *City of Pontiac* warrants a different determination in this action.  *See* Def. Mem. at ¶¶ 16-17.  But *City of Pontiac* plainly addressed issues that are not before the Court on this motion, namely whether (i) the cross-listing of foreign-issued securities on a U.S. exchange is sufficient to meet the test for a domestic transaction under *Morrison* and (ii) the mere allegation that a "buy order" for foreign-issued shares that was placed in the U.S. and subsequently executed on a Swiss exchange, standing alone, is sufficient to establish that irrevocable liability was incurred in the U.S.  No. 12-cv-4355, --- F.2d ----, 2014 WL 1778041, at *4 (2d Cir. May 6, 2014).

The first aspect of the holding in *City of Pontiac* is undisputedly inapplicable to this case; Plaintiffs do not allege or rely upon any cross-listing of the Subordinated Notes on a U.S. exchange in their pleadings.  The second holding is equally inapplicable.  In *City of Pontiac*, it was uncontested (and, in fact admitted by the plaintiff in that case) that, while a buy order was submitted in the United States, the securities at issue were actually purchased on a Swiss exchange.  In sharp contrast, the Amended Complaint *expressly alleges* that in connection with Plaintiffs' secondary market purchases, the Subordinated Notes were purchased through domestic *off-exchange transactions* that occurred after Plaintiffs placed orders with their broker in the UBS Miami Office.  *See* Am. Compl. ¶¶ 8-13.

BTA has expressly admitted that the Subordinated Notes could be purchased by way of the very process that Plaintiffs allege to have followed:  *i.e.*, in a private transaction not conducted on any foreign securities exchange.  *See* Am. Compl. at ¶ 38; FFB Decl. at ¶ 27 ("[o]f course, an interest in the New Notes could also be transferred on the books of a Direct Participant or on the books of a third party holding a beneficial interest in the New Notes through a Direct Participant.").  In the S-K Decision, this Court recognized that those very allegations are sufficient to survive a motion to dismiss:

> Plaintiffs also allege that they placed orders with their agent, UBS, within the United States; that UBS transmitted their orders to its broker-dealer in New York; and that, in New York, Plaintiffs' funds at UBS were transferred to UBS's back office, where the order was filled and the transaction was completed. It may well be that discovery will reveal that Plaintiffs did not incur irrevocable liability at any of those stages in the transaction . . . .  ***But the question at this stage of the litigation is whether Plaintiffs have alleged facts "suggesting that irrevocable liability was incurred" in the United States.…The answer is that Plaintiffs have done enough to survive another day.***

S-K Decision at *9 (emphasis added); *see also Absolute Activist*, 677 F.3d at 65; *Absolute Activist Master Value Fund, Ltd. v. Ficeto*, No. 09 Civ. 8862 (GRD), 2013 WL 1286170 at *1 n.1 (S.D.N.Y. Mar. 28, 2013) (factual allegations concerning domestic transactions "are deemed to be true for the purposes of a motion to dismiss.").

Defendants' remaining argument is similarly unavailing and can be addressed in short order.  BTA speculates that the secondary market transactions at issue must have settled through Euroclear Bank and Clearstream Banking, both of which are non-U.S. entities, thus rendering the purchases to be foreign transactions.  Def. Mem. at 15-16.  But this Court has already rejected BTA's argument as improper on a motion to dismiss.  *See* S-K Decision at *9 n.6 ("That argument … is premised on facts that are neither found in the Amended Complaint nor detailed explicitly in the Information Memorandum, and thus is improper on a motion to dismiss.").  Moreover, BTA's speculations regarding the clearing of the trades at issue go to the ultimate

18

passage of title, and not the acts – far earlier in the relevant chain of events – by which Plaintiffs incurred irrevocable liability.  *See Liberty Media*, 861 F. Supp. 2d at 269 (finding a domestic transaction based on the incurring of irrevocable liability and declining to consider transfer of title).

**B. <u>Plaintiffs Incurred Irrevocable Liability in the United States for Purchases of the Subordinated Notes in Connection with the 2010 Restructuring</u>**

As alleged in the Amended Complaint, in connection with the 2010 Restructuring, Plaintiffs Atlantica and Baltica collectively acquired BTA Subordinated Notes with a face value of $946,000.  Am. Compl. ¶¶ 8-9 and Ex. A.  Irrevocable liability for these purchases was incurred when each of Atlantica and Baltica unconditionally committed to the 2010 Restructuring by a communication to their broker in the UBS Miami Office, who subsequently communicated Atlantica's and Baltica's acceptance to BTA.  Atlantica and Baltica thereby incurred irrevocable liability to accept subordinated debt in the 2010 Restructuring in the United States.  *Id*. at ¶¶ 8-9. [4]

BTA's arguments in opposition are unavailing.  BTA asserts that no acquisition of the Subordinated Notes in connection with the 2010 Restructuring could have been effective until creditors of the bank had voted in London and Kazakhstan to approve the plan of the Restructuring and a court in Kazakhstan had approved it.  Def. Mem. at 14.  This Court has already properly rejected BTA's argument in the S-K Decision, and the Court's reasoning applies equally here.  *See* S-K Decision at *9.

---

[4] BTA argues that the process by which Atlantica and Baltica acquired the Subordinated Notes is insufficient to establish a domestic connection under *City of Pontiac* because it  was "simply [a choice by Atlantica and Baltica] to route their [Electronic Instruction Forms] through a U.S. broker." Def. Mem. at 13.  Defendant again misconstrues *City of Pontiac*.  As noted above, that case held that a purchase on a foreign exchange is not rendered domestic by the use of a U.S. broker.   No. 12-cv-4355, --- F.2d ----, 2014 WL 1778041, at *4.  Here, it is expressly alleged that none of the securities at issue were acquired on a foreign exchange.  Am. Compl. ¶ 39.  Moreover, in connection with Atlantica's and Baltica's purchases in the 2010 Restructuring, it is undisputed that the Subordinated Notes were acquired directly from BTA and not on an exchange at all.  *See id*. *City of Pontiac* is thus plainly inapplicable.

First, the existence of conditions precedent to the closing of a deal do not render a transaction non-domestic.  *Id.* (citing *Arco Capital Corp. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 542-43 (S.D.N.Y. 2012) (liability irrevocable when party "no longer had the discretion to remove acceptance," notwithstanding that the transaction was not completed until other conditions were met); *Liberty Media Corp.*, 861 F. Supp. 2d at 269 ("Although there were conditions to be satisfied before closing and the eventual performance of the Merger Agreement was effectuated by the transfer of a different security than originally intended, this is insufficient to establish that irrevocable liability occurred later.").

Second, Atlantica and Baltica were committed to the transaction "for all practical purposes" when they submitted the Electronic Instruction Form."  S-K Decision at *9.   Atlantica and Baltica were required to deliver an "Electronic Instruction Form" providing their assent to (or dissent from) the restructuring transaction and receipt of the Subordinated Notes.  FFB Decl., Ex. 1 at 91.  That form made plain on its face that from the purchaser's perspective, commitment to the transaction was irrevocable:

> **Electronic Instruction Forms from Beneficial Owners . . . shall be irrevocable** *provided*, *however*, *that* in the event that the Bank, in its sole discretion, amends, terminates or withdraws the Restructuring Plan, . . . in a manner that is materially adverse to affected Euronoteholders in the opinion of the Trustee, Euronoteholders shall be permitted, subject to the conditions set out herein, to revoke any Electronic Instruction Forms delivered in relation thereto for a period of two business days. . .

*Id*. (italics in original, bold added).  Thus, once UBS – located in the United States (Am. Compl. ¶¶ 8-13) – communicated Atlantica's and Baltica's willingness to receive the Subordinated Notes to UBS by submission of the Electronic Instruction Form, Atlantica and Baltica were irrevocably bound to the transaction.[5]  *See  S.E.C. v. Amerindo Inv. Advs. Inc.*, No. 05 Civ. 5231(RJS), 2013

---

[5] Per the terms of the 2010 Restructuring, Atlantica's and Baltica's Electronic Instruction Form could only be submitted by a "Direct Participant" acting on their behalf. Defendant describes Direct Participants to be "generally

WL 1385013 at *6 (S.D.N.Y. Mar. 11, 2013) (purchaser could incur "irrevocable liability" to take and pay for a stock when he mailed notice of election even though payment and delivery were to be delayed) (citation omitted).  As this Court explained:

> Whether the circumstances allowing them to revoke their purchases would come to pass was an outcome out of [Atlantica's and Baltica's] control – it turned solely on actions taken by BTA, in its sole discretion."  (Information Mem. 91).  In light of that, it could be argued that BTA (and S-K Fund) were not irrevocably bound upon submission of the Electronic Instruction Form.  But, as a practical matter, Atlantica's and Baltica's liability was irrevocable *by them*, which is sufficient to satisfy the *Absolute Activist* test.

*Id.* (emphasis in original).

Finally, BTA argues that the issue of "irrevocable liability" turns on whether Plaintiffs were physically located in the U.S. at the time they transmitted the Electronic Instruction Form.  BTA misses the point.  Atlantica and Baltica incurred irrevocable liability when UBS, at Plaintiffs' direction, submitted the Electronic Instruction Form to BTA.  Only UBS – a "Direct Participant" – could transmit the Electronic Instruction Form on Plaintiffs' behalf.  As alleged in the Amended Complaint, that transmission occurred in the United States.[6]  *See* Am. Compl. ¶¶ 8-13.  As to the purchases in connection with the 2010 Restructuring, the *Morrison* requirements have been satisfied.  In any event, factual disputes between the parties as to where irrevocable liability attached may not be decided at the motion to dismiss stage.  *See S.E.C. v. Chicago Convention Center, LLC*, 961 F. Supp. 2d 905, 918 (N.D. Ill. 2013) (citing *In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 373 (S.D.N.Y. 2011)).

---

large financial institutions which held interests in the New Notes for their own accounts *or for the accounts of their customers*."  Def. Mem. at 5 (emphasis added).  Nowhere does Defendant suggest that UBS's broker-dealer was not such a Direct Participant.

[6] While BTA refers to the "mailbox rule" in arguing that Plaintiffs' physical location is central to the inquiry of where irrevocable liability was incurred, none of the authorities upon which it relies dealt with the issue of irrevocable liability under *Morrison*.  *See* Def. Mem. at 13 n.13.  Tellingly, BTA fails to cite to a single post-*Morrison* decision regarding the "mailbox rule" in support of this argument.  *Id.*

### III. PLAINTIFFS' CLAIMS ARE NOT SUBJECT TO ARBITRATION

As the party seeking to compel arbitration, BTA has the burden of affirmatively establishing that Plaintiffs in fact agreed to submit their claims to arbitration. *See Russell v. Mimeo, Inc.*, 08 Civ. 5354 (RJS), 2008 WL 6559743, at *1 (S.D.N.Y. Oct. 29, 2008).   In the absence of such an express agreement, Plaintiffs cannot be compelled to arbitrate. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83 (2002) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.") (quotation omitted); *see also Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,* 559 U.S. 662, 681 (2010) ("[T]he [Federal Arbitration Act] imposes certain rules of fundamental importance, including the basic precept that arbitration is a matter of consent, not coercion.").[7]   It is for the Court to determine whether Plaintiffs affirmatively entered into an agreement to arbitrate the claims asserted in the Amended Complaint. *See AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."); *Les Telecommunications d'Haiti S.A.M. v. Cine*, 13-CV-6462, 2014 WL 2655451, at *4 (E.D.N.Y. June 13, 2014) ("Arbitration cannot be compelled until a resolution of the issue concerning 'the very existence of the contract embodying the arbitration clause.'") (*quoting Bank of Am., N.A. v. Diamond State Ins. Co.*, 38 Fed. App'x 687, 689 (2d Cir. 2002)).

---

[7] While BTA cites to the FAA and case law for the proposition that there is a presumption in favor of arbitration, there is no such presumption where, as here, the Court is considering whether the parties agreed to arbitrate in the first place. *See Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, 526 (2d Cir. 2011) ("[W]hile doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made."); *see also The Republic of Iraq v. BNP Paribas USA*, 472 Fed. App'x 11, 14 n.1 (2d Cir. 2012) (same).

BTA points to three documents – the Information Memorandum, the Subordinated Notes, and the Trust Deed – as supposedly evidencing Plaintiffs' agreement to arbitrate the claims asserted in the Amended Complaint.   In fact, none of those documents (read separately or collectively) suggest Plaintiffs' affirmative agreement to arbitrate, or waiver of its rights to bring claims in this Court.

### A.   The Information Memorandum Is Not A Contract to Which Plaintiffs May Be Bound

Defendants cite to the language of the Information Memorandum as evidence of Plaintiffs' purported agreement to submit their claims to arbitration.   But the Information Memorandum, by its own terms, is not a contract and therefore cannot bind Plaintiffs to arbitration (or anything else).   *See* FFB Decl., Ex. 1 at 4 ("Nothing in this Information Memorandum or any other document issued with or appended to it should be relied on for any purpose other than to make a decision on the Restructuring Plan."); *accord In re Lyondell Chem. Co.*, 491 B.R. 41, 55 (Bankr. S.D.N.Y. 2013) *aff'd*, 505 B.R. 409 (S.D.N.Y. 2014) ("[T]he Information Memorandum did not constitute an offer which, upon acceptance, would lead to a binding agreement. An offer must be definite and certain, rather than simply informational or exploratory.").   As such, BTA cannot use any part of the Information Memorandum to meet its burden in establishing that Plaintiffs agreed to arbitrate any of their claims.   *See* Def. Mem. at 17-18.[8]

Moreover, the discussion of arbitration in the Information Memorandum is not final, and contemplates future action – the issuance of the Subordinated Notes – before any obligation

---

[8] Defendant suggests that the Information Memorandum is a binding contract because "Plaintiffs claim to have relied" on it.  *See* Def. Mem. at 18.  In so suggesting, Defendant conflates a contractual obligation – which the Information Memorandum plainly is not – with a statement made in connection with the purchase or sale of securities actionable under Section 10(b) of the Exchange Act and Rule 10b-5.  Indeed, this Court has already held that the Information Memorandum can form the basis of a 10b-5 claim.  *See* S-K Decision at *10.

described in the Information Memorandum will be imposed on anybody. *See* FFB Decl., Ex. 1 at 118 ("The Notes *will be* governed ….") (emphasis added). Such informational statements, describing events to occur in the future, cannot constitute a binding contractual obligation. *See In re Lyondell Chem. Co.*, 491 B.R. at 55; *Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 514 (S.D.N.Y. 2012) ("The doctrine of definiteness or certainty is well established in contract law ...") (quotations and citations omitted).

## B. The Terms and Conditions of the Subordinated Notes Impose No Obligation on Noteholders to Arbitrate Disputes

Defendant similarly references the "Terms and Conditions" of the Subordinated Notes and suggests that those Terms and Conditions constitute an agreement by Plaintiffs to arbitrate disputes arising out of the Subordinated Notes. *See* Def. Mem. at 18 n.20. However, Defendant's citation to the Terms and Conditions is grossly misleading, as it omits language making plain that *only BTA* agreed to arbitration:

> ***The Bank agrees that*** any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or Trust Deed (including any claim dispute or difference regarding its existence, termination or validity or any non-contractual obligations arising out of or in connection with the Trust Deed), shall be referred to . . . arbitration.

FFB Decl., Ex. 1 at 600 (emphasis added, highlighting text misleadingly omitted from Defendant's brief). The Terms and Conditions of the Subordinated Notes contain no language whatsoever purporting to bind Plaintiffs – or any other Noteholder – to arbitration.

## C. The Trust Deed Does Not Impose on the Plaintiffs An Obligation to Arbitrate

It is undisputed that Plaintiffs are not parties or signatories to the Trust Deed. *See* FFB Decl., Ex. 9 at 5. In relevant part, the Trust Deed states: "THIS TRUST DEED is made on 25 August 2010 BETWEEN: (1) "BTA" … and … (2) "BNY CORPORATE TRUSTEE SERVICES LIMITED" (the "Trustee"). *See id.* at 5; *see also id.* at 82 (signature block reflecting

only BTA and the Trustee as signatories).  As a threshold matter, Plaintiffs cannot be bound to a contract to which they are not a party.  *See Adelphia Recovery Trust v. Bank of Am., N.A.*, No. 05 Civ. 9050 (LMM), 2009 WL 2031855, at *9 (S.D.N.Y. July 8, 2009) ("A nonsignatory to a contract will not be bound by an arbitration clause even if the claims are intertwined with that of a signatory to the arbitration clause and the parties are closely aligned.") (citing *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995)).

In light of that fundamental problem, BTA relies on an incorporation provision contained in the Terms and Conditions of the Notes, which Defendant suggests binds the Noteholders to all of the provisions of the Trust Deed.  Def. Mem. at 17-18.  But again, Defendant's careful editing of the actual language of the document renders its citation misleading.  In fact, the Terms and Conditions of the Notes provide that the Noteholders will only be bound by provisions of the Trust Deed *expressly applicable to them*:

> The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement ***applicable to them***.

FFB Decl., Ex. 1 at 588 (emphasis added, highlighting text misleadingly omitted from Defendant's brief).  Such a provision makes good sense:  the incorporation provision cannot impose on the Noteholders obligations other than those to which they agreed to be bound.  *See Howsam*, 537 U.S. at 83; *Stolt-Nielsen S.A.*, 559 U.S. at 681.[9]

The text of the arbitration provision contained in the Trust Deed makes plain that it is not applicable to the Noteholders at all.  Rather, read in context, it is clear that provision only

---

[9] Tellingly, none of the cases upon which BTA relies addresses the issue of whether and when an arbitration agreement may be construed to compel a non-signatory to arbitrate its claims.  *See Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co.*, 957 F. Supp. 2d 316, 335 (S.D.N.Y. 2013) (timing of the redemption of securities under the terms of an indenture); *RJ Capital, S.A. v. Lexington Capital Funding III, Ltd.*, No. 10 CIV. 25 (PPG), 2011 WL 3251554, at **5-7 (S.D.N.Y. July 28, 2011) (enforceability of a no-action clause); *JSC Surgutneftegaz v. President & Fellows of Harvard Coll.*, 04 CIV. 6069 (RCC), 2005 WL 1863676, at *1 (S.D.N.Y. Aug. 3, 2005) *aff'd*, 167 F. App'x 266 (2d Cir. 2006) (seeking to compel *signatory* to the arbitration agreement to arbitrate).

contemplates arbitration of disputes between *BTA and the Trustee*, not BTA and the Noteholders.
*See* FFB Decl., Ex. 9 at 75.   Defendant quotes from the first portion of the clause, which
provides that certain disputes are to be submitted to arbitration.   *See* Def. Mem. at 18.  But again
Defendant stops short of telling the whole story.   The remainder of the provision details the
manner in which *the Bank and the Trustee* – the parties to the contract containing the arbitration
clause – will conduct that arbitration.   *See* FFB Decl., Ex. 9 at 75 ("The number of arbitrators
shall be three, *one of whom shall be nominated by the Bank, one by the Trustee* and the third of
whom, who shall act as Chairman, shall be nominated by the two party nominated
arbitrators….") (emphasis added).[10]  The Trust Deed goes on to describe the right of the *Trustee*
to elect court proceedings in lieu of arbitration (*id*. at § 20.3); the *Trustee's* agreement to
jurisdiction (*id*. at § 20.4); and the manner by which the *Trustee* can effectuate service of process
(*id*. at § 20.6).  Nowhere does the relevant portion of the Trust Deed mention the Noteholders at
all or describe any process by which anyone other than the Trustee and BTA will engage in
arbitration with regard to the Subordinated Notes.

Thus, a full reading of the Trust Deed makes plain that the arbitration provision in that
document – again, a contract solely between BTA and the Trustee – is only applicable to
disputes between those parties.  *See Law Debenture Trust Co. of New York v. Maverick Tube
Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) ("Where the parties dispute the meaning of particular
contract clauses, the task of the court is to determine whether such clauses are ambiguous when
read in the context of the entire agreement.") (quotation omitted); *LaSalle Bank Nat'l Assoc. v.
Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (S.D.N.Y. 2005) ("[W]ords and phrases [in a

---

[10]  This language is consistent with the arbitration process described by the Terms and Conditions of the
Subordinated Notes to which, as described above, only BTA expressly agreed to be bound.  *See* FFB Decl., Ex. 1 at
600, 614 (The number of arbitrators shall be three, *one of whom shall be nominated by the Bank, one by the
Trustee* and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated
arbitrators ….) (emphasis added)).

contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.") (quotation omitted).  As such, the Trust Deed is far from the clear evidence of intent to arbitrate that is required to compel arbitration.  *See Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 661 (2d Cir. 2005).  As BTA has failed to identify any agreement obligating Plaintiffs to arbitrate the claims asserted in the Amended Complaint, Defendant's motion to dismiss or stay this action in favor of arbitration should be denied.

## IV. THE COURT HAS PERSONAL JURISDICTION OVER BTA

On a motion to dismiss for lack of personal jurisdiction made prior to discovery, a plaintiff "can defeat a … motion to dismiss by pleading good faith, legally sufficient allegations of jurisdiction, i.e., by making a *prima facie* showing of jurisdiction." *Wiwa v. Shell Petroleum Dev. Co. of Nigeria Ltd.*, 335 F. App'x 81, 84 (2d Cir. 2009) (citations and internal quotation marks omitted).  A court "credit[s] a plaintiff's averments of jurisdictional facts as true," *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (citations omitted), and all jurisdictional allegations are to be construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor.  *A.I. Trade Fin. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993).

Section 27 of the Exchange Act, 15 U.S.C. § 78aa "permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment."  *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (citations omitted).  Therefore, to establish personal jurisdiction, Plaintiffs need only establish that the Court's exercise of jurisdiction over BTA would not offend due process.  *See id*.  "The due process test for personal jurisdiction has two related components: the 'minimum contacts inquiry' and the 'reasonableness' inquiry.  The [C]ourt must first determine whether the defendant has sufficient contacts with the forum state to

justify the court's exercise of personal jurisdiction." *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 252 (S.D.N.Y. 2013) (citations and internal quotation marks omitted).  In the event that such contacts are found, "the [C]ourt may assert personal jurisdiction so long as 'it is reasonable [to do so] under the circumstances of the particular case.'"  *S.E.C. v. Softpoint, Inc.*, No. 95 Civ. 2951(GEL), 2001 WL 43611, at *2 (S.D.N.Y. Jan. 18, 2001) .

Notably, this Court has already found that, as a result of its conduct in connection with the transactions described in the Amended Complaint, S-K Fund – BTA's 97% controlling shareholder – is subject to personal jurisdiction in this Court. *See* S-K Decision at *7 n.5.  As to BTA, the same result is warranted.

### A.  BTA Has Minimum Contacts with the U.S. and Has Purposefully Availed Itself of this Forum

The court may exercise specific jurisdiction over a defendant where the suit "aris[es] out of or relate[s] to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8 (1984).  In such cases, a plaintiff can demonstrate minimum contacts where it can establish that the defendant "purposefully availed himself of the privilege of doing business in the forum state and that the defendant could foresee being haled into court there."  *Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 242–43 (2d Cir. 1999) (alterations and internal quotation marks omitted).  A defendant's physical absence from a forum is insufficient to defeat personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).  In cases arising under the federal securities laws, the relevant forum for purposes of analyzing minimum contacts is the entire United States rather than the forum state." *S.E.C. v. Morton*, No. 10 Civ. 1720(LAK)(MHD), 2011 WL 1344259, at *12 (S.D.N.Y. Mar. 31, 2011) (citations omitted); *see also Softpoint, Inc.*, 2001 WL 43611, at *5.  Here, BTA's contacts with

the United States in connection with the facts alleged in the Amended Complaint are more than sufficient to establish personal jurisdiction.

      1.   <u>BTA Actively Participated in the Offering of Securities Intended for Sale in the United States</u>

It is well-settled that foreign defendants who offer securities for sale in the U.S. have purposefully availed themselves of the U.S. capital markets and thus subject themselves to jurisdiction for claims arising out of the sale of those securities. *See, e.g.*, *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 371 (3d Cir. 2002) (issuer sponsored ADR facility to assist in trading of its shares over the counter).

Here, the allegations in the Amended Complaint are more than ample to show purposeful availment of the U.S. capital markets. As a threshold matter, it was expressly contemplated by BTA, and plainly reflected in the Information Memorandum, that debt securities issued in connection with the 2010 Restructuring (including the Subordinated Notes) would be acquired by investors within the United States. Am. Compl. ¶ 38. Consistent with that intention, Defendant denominated eighty percent of the securities issued in connection with the 2010 Restructuring in U.S. dollars. (Am. Compl. ¶ 35), and made payments on those securities in this District (Am. Compl. ¶ 22). BTA's efforts to avail itself of the U.S. capital markets was well received: at least 17% of the dollar-denominated Subordinated Notes issued in the 2010 Restructuring – with a face amount in the hundreds of millions of dollars – were purchased by investors in the U.S. Am. Compl. ¶ 35. These extensive contacts alone establish personal jurisdiction over BTA.

2.   <u>BTA Directed Communications Concerning the Subordinated Notes to the United States</u>

BTA's communications directed to investors in the United States provide yet another basis for personal jurisdiction.   BTA distributed the Information Memorandum containing misleading statements and omissions to BTA's existing creditors and potential investors in the United States – including Plaintiffs.   Am. Compl. ¶ 30.   BTA also made the Information Memorandum generally available to United States investors – including Plaintiffs – on its website.   *Id.*   Finally, both in connection with and subsequent to the 2010 Restructuring, BTA knowingly directed misstatements and omissions towards purchasers of securities in this District. Am. Compl. ¶¶ 22, 50, 62.

BTA argues that the Court should disregard these extensive contacts with the United States for purposes of evaluating this Court's jurisdiction.   But those arguments are without merit.   First, BTA argues that only its direct contacts with *Plaintiffs* are relevant to the jurisdictional inquiry.   Def. Mem. at 25.   That is not the law.   *See S.E.C. v. Straub*, 921 F. Supp. 2d 244, 254 (S.D.N.Y. 2013) (jurisdiction is proper where contacts proximately result from actions by the defendant that create a substantial connection with the forum).   BTA's reliance on *In re DaimlerChrysler AG S.E.C. Litig.* is misplaced.   In that case, the plaintiffs were attempting to establish personal jurisdiction over a member of Daimler's board of directors on the basis of certain meetings he had attended in the United States.   247 F. Supp. 2d 579, 584 (D. Del. 2003). The court found that there was no nexus between these meetings and plaintiff's causes of action. *Id.*   Here, by contrast, Plaintiffs' Section 10(b) claims flow directly from BTA's actions directed at the United States.

BTA also attempts to diminish the impact of its website, which hosted the Information Memorandum (and other documents related to the 2010 Restructuring).   *See* Def. Mem. at 25.

Again, BTA's authority is inapposite.  The defendant in *Scottevest, Inc. v. AyeGear Glasgow Ltd.*, No. 12 Civ. 851 (PKC), 2012 WL 1372166, at *3 (S.D.N.Y. Apr. 17, 2012), had no business in this state.  BTA, by contrast, structured a transaction that resulted in the sale of hundreds of millions in securities in the U.S.  Similarly, the defendant in *Ameripay, LLC v. Ameripay Payroll, Ltd.*, 334 F. Supp. 2d 629 (D.N.J. 2004) had a "software key" that defendant distributed only to certain clients.  Access to BTA's website, on the other hand, was unrestricted.

Finally, Defendant argues that its statements were not directed to the United States and BTA never intended to disseminate those statements in this forum.  But the law is clear:  where a foreign corporation issues securities it understands will be purchased and traded in the United States, subsequent misleading statements are deemed to be directed towards the United States even if not principally directed there.  *See Pinker*, 292 F.3d at 372 ("Although the plaintiff's complaint does not allege that the fraudulent media releases and annual reports were specifically directed to American investors, a foreign corporation that has created an American market for its securities can fairly expect that the market will rely on reports and media release issued by that corporation."); *see also Straub*, 921 F. Supp. 2d at 255 (defendants knew or had reason to know that any false or misleading reports would be given to prospective American purchasers).

### 3. BTA's Chapter 15 Filing in this District Provides Further Support for the Exercise of Personal Jurisdiction

BTA's initiation of two separate Chapter 15 proceedings in the Bankruptcy Court of the United States District Court for the Southern District of New York (the "Bankruptcy Court") is further evidence of its purposeful availment of this forum, including its courts.  *See In re JSC BTA*, Case No. 10-10638-jmp (S.D.N.Y. Bankr. Feb. 4, 2010); *In re JSC BTA*, Case No. 12-13081-jmp (S.D.N.Y. Bankr. July 16, 2012).

BTA argues that its multiple Chapter 15 proceedings are somehow irrelevant in considering its contacts with the United States and its courts, and are meaningless for purposes of assessing personal jurisdiction. S*ee* Def. Mem. at 24 n.24.  11 U.S.C. § 1510 provides that "[t]he sole fact" of a foreign entity's Chapter 15 filing does not establish personal jurisdiction.  *See* § 1510.  Section 1510 does not, however, preclude or restrict this Court from considering the Chapter 15 proceedings as relevant to its minimum contacts analysis.  *See id.*  BTA's 2010 Chapter 15 filing relates to the 2010 Restructuring, the same transaction described in the Information Memorandum and which resulted in the issuance of the Subordinated Notes.  *See* BTA Bank JSC's Foreign Representative's Motion for an Order Granting Permanent Injunctive Relief in Support of Restructuring Plan and Closing Case, *In re JSC BTA*, Case No. 10-10638-jmp, Dkt. No. 35, ¶ 9 ("[T]he Bank published an information memorandum in connection with the restructuring….") (Declaration of Brett D. Jaffe submitted herewith (the "Jaffe Decl.), Ex. 1) BTA acknowledged in that proceeding that (i) BTA made the Information Memorandum available online to "interested parties" on its website (*id.*); (ii) published notice of the 2010 Restructuring in the Wall Street Journal (*id.*); and (iii) made the filing in order to protect property of BTA "within the territorial jurisdiction of the United States" from creditors (*id.* at ¶¶ 29(f), 39).  Moreover, in seeking Bankruptcy Court protection, BTA enumerated its "connections to the United States," and that it had creditors in the United States consisting of "a diverse group of banks, mutual funds, hedge funds…"  (a group which includes Plaintiffs).  Verified Petition for Recognition of Foreign Main Proceeding and Request for Related Relief, *In re JSC BTA*, Case No. 10-10638-jmp, Dkt. No. 2, ¶ 33 (Jaffe Decl., Ex. 2).

Similarly, the 2012 Chapter 15 filing arose out of BTA's default on the Subordinated Notes – one of the very events which is alleged to have resulted in Plaintiffs' injuries.  Am.

Compl. ¶¶ 57-65; Verified Petition for Recognition of Foreign Main Proceeding and Request for Related Relief, *In re JSC BTA*, Case No. 12-13081-jmp, Dkt. No. 2, ¶¶ 28 n.6 (Jaffe Decl., Ex. 3).  BTA again detailed its "Connections to the United States," describes its principal assets as located in New York City, and identifies its major U.S. domestic creditors.  *See id.* at ¶¶ 39-41.  BTA's two Chapter 15 proceedings in this District both relate *directly* to the claims asserted in this case.  For that reason, BTA's purposeful availment of the U.S. Courts gives rise to personal jurisdiction over BTA in this action.

### B.  It is Reasonable for the Court to Assert Personal Jurisdiction Over BTA

In determining the reasonableness of exercising personal jurisdiction over a particular defendant, courts must evaluate "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (citations and internal quotation marks omitted).  The burden is on the defendant to demonstrate that assertion of personal jurisdiction would be unreasonable.  *See Burger King Corp.*, 471 U.S. at 478.  Critically, "[t]he reasonableness inquiry is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process because of the strong federal interests involved."  *Straub*, 921 F. Supp. 2d at 259.[11]  "To date, while most courts continue to apply the test as a constitutional floor to protect litigants from truly undue burdens, few (and none in this Circuit) have ever declined

---

[11] Tellingly, none of BTA's cases in which a court declined to exercise jurisdiction on reasonableness grounds concerned a federal law providing for nationwide service of process.  *See* Def. Mem. at 26-27.

jurisdiction, on fairness grounds, in such cases." *S.E.C. v. Syndicated Food Servs. Int'l*, No. 04-CV-1303, 2010 WL 3528406, at *3 (E.D.N.Y. Sept. 3, 2010) (internal quotation marks omitted).

Here, the burdens on BTA, a multi-billion dollar institution, would be minimal. BTA already has counsel here. It has also repeatedly sought relief in the courts of this District. Accordingly, the exercise of personal jurisdiction over BTA is reasonable here.

## V. PLAINTIFFS ADEQUATELY PLED THEIR CLAIMS UNDER SECTION 10(b)

For the same reasons this Court has already rejected substantially identical arguments relating to Plaintiffs' claims in the S-K Action, BTA cannot establish that Plaintiffs' claims under Section 10(b) were not adequately plead. *See* S-K Decision at **10-11.

### A. Plaintiffs Adequately Allege Reliance

As this Court previously held in the S-K Decision, Plaintiffs' allegations that (i) Atlantica and Baltica participated in the 2010 Restructuring, and acquired the Subordinated Notes, in reasonable reliance on material misstatements and omissions contained in the Information Memorandum (*see* Am. Compl. ¶¶ 30-31, 36) and (ii) that all Plaintiffs made secondary market purchases in reasonable reliance on subsequent misstatements and omissions by BTA (*see* Am. Compl. ¶¶ 8-14, 38-39) are sufficient to sustain their claims. *See* S-K Decision at **10-11.

#### 1. Atlantica and Baltica Reasonably Relied on the Information Memorandum In Connection with the 2010 Restructuring

The Amended Complaint alleges that (i) the Information Memorandum contained material misstatements and omissions by BTA (*id*. at ¶¶ 40, 43-46); (ii) in support of the 2010 Restructuring, the Information Memorandum was distributed to Plaintiffs (*id*. at ¶¶ 2, 5, 30); and (iii) in reliance on those material misstatements and omissions contained in the Information Memorandum, Plaintiffs (specifically those who participated in the 2010 Restructuring), approved the 2010 Restructuring and acquired the Subordinated Notes. *Id*. at ¶¶ 8-13, 30, 32,

36-39, 49.  In addition, the Amended Complaint contains allegations explaining why Plaintiffs'

reliance was reasonable, alleging that BTA's misstatements and omissions concerned

information that would have influenced the decision of a reasonable investor to acquire the

Subordinated Notes.  *Id*. at ¶¶ 42, 47, 49, 53, 72.  These allegations are more than adequate to

satisfy the requirements for pleading reliance under the Exchange Act.  *Erica P. John Fund, Inc.*

*v. Halliburton Co.*, 131 S. Ct. 2179, 2185 (2011); *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d

304, 318 (S.D.N.Y. 2011) (reasonableness of plaintiff's reliance turns on an analysis of "the

entire context of the transaction") (internal citations and quotations omitted).

BTA argues that Plaintiffs' reliance on the Information Memorandum was unreasonable

because the misstatements and omissions alleged in the Amended Complaint concerning the

Negative Carry Swap were not, in fact, misstated or omitted.  Def. Mem. at 29-33.  Critically,

BTA does not – and cannot – assert that the details and net effect of the Negative Carry Swap

were disclosed in a way that permits a potential investor to clearly and reasonably understand the

Negative Carry Swap and its deleterious effect on BTA.  Rather, BTA argues that the various

discrete components of the Negative Carry Swap were separately disclosed in scattered financial

tables throughout the 699-page Information Memorandum.  Def. Mem. at 29-31.  But this Court

has already rejected this precise argument, concluding that this type of "scattershot" disclosure

cannot serve to refute Plaintiffs' allegations of reasonable reliance.  *See* S-K Decision at *10 (

"Plaintiffs' failure to discover the exact nature of a complex financial transaction buried in a

scattershot fashion in a tome-length 'memorandum' does not render their reliance unreasonable

as a matter of law.").

BTA attempts to deflect attention from its own alleged misconduct by arguing that

Plaintiffs cannot adequately allege reliance because (i) Plaintiffs purportedly held themselves out

as sophisticated investors, and (ii) information regarding the Negative Carry Swap was leaked to the marketplace beginning in May 2011.  *See* Def. Mem. at 31-32.  Both of these arguments fail for reasons that are clearly set forth in the S-K Decision.  With respect to the first point, this Court already found that the Information Memorandum could not have been the "'product of negotiations between "sophisticated business entities" of roughly equal bargaining power.'"  S-K Decision at **10-11 (quoting *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 318 (S.D.N.Y. 2011)).  Accordingly, BTA cannot show that Plaintiffs' reliance was unreasonable, regardless of their investor status.  *See id.*  As to the second point, this Court has already determined that BTA cannot show that Plaintiffs should have relied on third party reports instead of the Information Memorandum.[12]  *See* S-K Decision at *10.

Finally, BTA argues that certain other misstatements it made are not actionable because they constitute "puffery or ordinary expressions of corporate optimism" (*see* Def. Mem. at 32-33).  But statements of future intent by the speaker, if false when made, do not constitute mere "puffery."  *See Gildepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 455 (S.D.N.Y. 2007); *see also Basquiat ex rel. Estate of Basquiat v. Sakura Intern.*, No. 04 Civ. 1369(GEL), 2005 WL 1639413, at *5 (S.D.N.Y. July 5, 2005)  ("[I]f, as plaintiff alleges, defendant made false statements knowing they were false, New York law indicates that those statements are actionable ….")  (quotations and citations omitted).  Here, Plaintiffs allege that BTA made knowingly false statements and omissions in the Information Memorandum regarding, *inter alia*, the Negative Carry Swap, the distributions paid to S-K Fund by BTA Bank, and the interest rate

---

[12] BTA argues that the Court's holding in the S-K Decision was incorrect because Plaintiffs' failure to act on the disclosures in the J.P. Morgan report was in fact "reckless."  Def. Mem. at 32 n.32.  As this Court properly held, however, Plaintiffs' allegations are sufficient at this stage of the litigation:  "taking Plaintiffs' version of the facts as true and drawing all reasonable inferences in their favor, their failure to discover the truth about the Negative Carry Swap was not reckless."  S-K Decision at *10.  The reasonableness of Plaintiffs' reliance is a fact-intensive question that cannot be decided on a motion to dismiss.  *See Gildepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 460 (S.D.N.Y. 2007) ("[T]he issue of whether an investor reasonably relied on a defendant's misrepresentations is a fact-intensive inquiry that cannot be decided on this motion to dismiss.") (citation omitted).

that BTA was paying S-K Fund on current accounts.  *See* Am. Compl. at ¶¶ 41, 43-48.  Plaintiffs

have sufficiently alleged reliance.

> ### 2. Plaintiffs Reasonably Relied on BTA's Omissions and Material Misstatements Concerning the Recovery Units

Plaintiffs reasonably relied on BTA's public statements in 2012 which failed to disclose

BTA's true liability for the Recovery Units following BTA's default on its senior debt

obligations in January 2012.[13]  As alleged in the Amended Complaint, upon default of BTA on

its senior debt, the Recovery Units could be accelerated such that the entire $5 billion reference

amount of the Recovery Units would become an unconditional obligation of BTA, *pari passu* to

its senior debt.  *See* Am. Compl. ¶¶ 60-62.  Yet, despite BTA's default on its senior debt in

January 2012, and the virtual certainty that the Recovery Units would be accelerated, BTA made

no meaningful disclosure at all of this enormous increased liability.  *Id.* at ¶¶ 62-64.

BTA does not refute that Atlantica and Blu Funds bought Subordinated Notes after

material misstatements and omissions were made following certain investor presentations in

2012.  *See* Def. Mem. at 33.  BTA's argument that Plaintiffs did not allege that they reviewed

any of the presentations and therefore did not rely on them is wrong.  *See* Am. Compl. ¶¶ 58-64;

*see also* S-K Decision at *11 (rejecting this argument as "contrary to the allegations in the

Amended Complaint, which the Court must credit for purposes of this motion.").

Moreover, to the extent that Plaintiffs relied on BTA's failure to disclose this dramatic

change in BTA's liability, reliance is presumed.  *See Affiliated Ute v. United States*, 406 U.S.

128, 153 (1972) (where material facts are omitted, "positive proof of reliance is not a

prerequisite to recovery.").  The *Affiliated Ute* presumption will apply where a plaintiff shows

that the omission was material and the party principally liable for the omission had a duty to

---

[13] Plaintiffs recognize that, in the S-K Decision, the Court dismissed Plaintiffs' claims solely as related to Baltica and the Individual Defendants in connection with statements or omissions made after 2011.

make a disclosure.  *See In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 48 (S.D.N.Y. 2013).  Here, there can be little doubt that an increase in BTA's indebtedness of more than $5 billion was material.  *See In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 25 (S.D.N.Y. 2004) (failure to disclose accumulation of excessive debt was material).  BTA was thus subject to a duty to disclose this information fully and accurately, which it failed to do.[14]

### B. <u>Plaintiffs Adequately Allege Loss Causation</u>

This Court previously determined that Plaintiffs have adequately pled loss causation.  *See S-K Decision at *11.  Here, BTA does little more than rehash the defendant's arguments in the S-K Action, which were rejected by this Court, and should again be rejected in this case.  *See id*.

To establish loss causation, "plaintiffs must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 n.4 (2d Cir. 2014).  A Plaintiff is only obligated to plead facts sufficient to "ascribe some rough proportion of the whole loss" to defendants' fraud.  *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 398 (S.D.N.Y. 2012) (citation omitted).

Here, Plaintiffs sufficiently alleged "particular" material misstatements and omissions (both in the Information Memorandum and thereafter), upon which they relied in purchasing the Subordinated Notes, and which were the cause of Plaintiff's injury.  As alleged in the Amended Complaint, when information about the Negative Carry Swap was disclosed in May 2011, the price of the Subordinated Notes dropped significantly. Am. Compl. ¶¶ 50-52.  BTA's argument that Plaintiffs have failed to allege any "particular disclosures" as to the Recovery Notes that

---

[14] Defendant claims that BTA's potential liability on the Recovery Units was "actually disclosed" in the Information Memorandum and Trust. Def. Mem. at 34.  However, nowhere does the Information Memorandum or Trust Deed disclose that the risk of acceleration of the Recovery Units and the resulting $5 billion liability senior to the Subordinated Notes had, in fact, come to pass and such acceleration was a virtual certainty.

resulted in injury is simply wrong:   Plaintiffs plainly allege that BTA failed to disclose its

liability with regard to the Recovery Units, and that the Subordinated Notes further declined in

value once BTA's true liability for the Recovery Unites was disclosed.  *Id.* at ¶ 64-65.  These

allegations are sufficient to plead a cause of action under Rule 10b-5.  *See* S-K Decision at *11.[15]

### C. **Plaintiffs Adequately Allege Scienter**

As held by this Court in the S-K Decision, Plaintiffs have adequately pled both BTA's (i)

"motive and opportunity to commit fraud," and (ii) conscious recklessness, as well as its motive

and opportunity.  *See* S-K Decision at *11.  Under the settled law of this Circuit, Plaintiffs have

adequately pled scienter.  *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).

#### 1.   Plaintiffs Have Alleged Conscious Recklessness

The Amended Complaint adequately pleads conscious recklessness by BTA.

Recklessness is adequately alleged where a plaintiff alleges defendants' knowledge of facts or

access to information contradicting their public statements.  *See Novak*, 216 F.3d at 308;  *In re

Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 532-33 (S.D.N.Y. 2010).  Here, BTA

is alleged to have known (i) the details of the undisclosed Negative Carry Swap (Am. Compl. ¶

40-49), (ii) S-K Fund's true intentions with regard to BTA (*id.* at ¶ 43), and (iii) BTA's true

liability for the Recovery Units.  *Id.* at ¶¶ 58-64.  BTA's failure to make accurate disclosure of

these facts constituted conscious recklessness.

On its motion, BTA does little more than parrot the arguments made in the S-K Action:

namely, that (i) facts concerning the Negative Carry Swap and Recovery Units were both fully

---

[15] As in the S-K Action, BTA references a number of factors unrelated to Defendant's alleged misconduct that purportedly caused the decline in the value of the Subordinated Notes.  Def. Mem. at 35.  The existence of other factors, however, is not sufficient to disprove loss causation at the pleading stage, and a determination as to whether plaintiffs' loss was actually caused by an intervening event "is a matter of proof to be decided at trial" – thus, BTA's motion must be denied.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (citation omitted); *see also Gen. Elec.*, 857 F. Supp. 2d at 398.

disclosed in the Information Memorandum and (ii) BTA's misstatements concerning the 2010 Restructuring and S-K Fund's intention to support BTA were merely "[s]tatements of corporate optimism" or "puffery" and hence cannot support a strong inference of scienter.  Def. Mem. at 36-37.  Those arguments were rejected by this Court in the S-K Action and thus should be rejected here as well.  *See* S-K Decision at *11.

### 2.  Plaintiffs Have Alleged Motive and Opportunity

Scienter may also be pled by alleging "motive and opportunity to commit fraud."  *Novak*, 216 F.3d at 311.  Defendant does not dispute – nor could it – that BTA had the opportunity to commit fraud.  Def. Mem. at 28-38.  BTA had complete control of BTA's financial information and the controlled disclosure of that information in connection with the 2010 Restructuring and thereafter.  *See* Am. Compl. ¶¶ 42-43; *see also* FFB Decl., Ex. 1 at 120.  As to motive, the Amended Complaint plainly articulates BTA's motive to commit fraud in connection with each of the Information Memorandum and BTA's post-restructuring misstatements:  to ensure that its 97% majority shareholder S-K Fund would obtain hundreds of millions of dollars.  *See* Am. Compl.  ¶¶ 1, 38, 46-48, 55.

### CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny BTA's motion to dismiss the Amended Complaint in its entirety.

Dated: New York, New York
       July 11, 2014

ALSTON & BIRD LLP

/s/        Brett D. Jaffe
Brett D. Jaffe
Jennifer S. Kozar
James S. D'Ambra, Jr.
90 Park Avenue
New York, New York 10016
*Attorneys for Plaintiffs*

40