UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                  :

ATLANTICA HOLDINGS, INC., BALTICA       :
INVESTMENT HOLDING, INC., BLU FUNDS, INC.,  :
Allan KIBLISKY, Anthony KIBLISKY, and Jacques  :         13 CV 5790 (JMF)
GLIKSBERG,                            :    [rel. No. 12 CV 8852 (JMF)]
                                  :
                Plaintiffs,        :
                                  :         **ECF CASE**
        - against -             :
                                  :
BTA BANK JSC,                      :
                                  :
                Defendant.      ::
                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**DEFENDANT "BTA BANK" JSC'S REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF ITS MOTION TO DISMISS OR STAY IN FAVOR OF ARBITRATION**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ..............................................................................................................................3

    I.      PLAINTIFFS LACK STANDING ...................................................................3

    II.     PLAINTIFFS CANNOT PLEAD THE REQUIRED DOMESTIC CONTENT
          UNDER MORRISON OR CITY OF PONTIAC ...............................................5

          A.     Plaintiffs' Secondary Market Purchases Were Not Domestic
                 Transactions ........................................................................................5

          B.     Atlantica and Baltica's Initial Acquisitions Were Not Domestic ..........7

    III.    PLAINTIFFS FAIL TO STATE A SECTION 10(b) CLAIM ........................10

          A.     Plaintiffs Have Not Adequately Alleged Reliance .............................10

                 1.     The Alleged Negative Carry Swap Was Disclosed ................10

                 2.     Other Alleged Misstatements Also Are Not Actionable..........11

                 3.     Plaintiffs Cannot Claim Reliance On Alleged Misstatements
                         Regarding the Recovery Units ...............................................11

          B.     Plaintiffs Have Not Adequately Alleged Loss Causation....................12

          C.     Plaintiffs Have Not Adequately Alleged Scienter ..............................13

    IV.    PLAINTIFFS CLAIMS ARE SUBJECT TO ARBITRATION.....................13

    V.     THE COURT LACKS PERSONAL JURISDICTION OVER BTA ..............15

CONCLUSION..........................................................................................................................18

# TABLE OF AUTHORITIES

## CASES

Absolute Activist Master Value Fund, Ltd. v. Ficeto, 677 F.3d 60 (2d Cir. 2012) ........................4, 9

Alexandra Global Master Fund, Ltd. v. Ikon Office Solutions, Inc., No. 06 CIV 5383 (JGK), 2007 WL 2077153 (S.D.N.Y. July 20, 2007) ...........................................................12

Am. Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349 (2d Cir. 1999).......................13

Ameripay, LLC v. Ameripay Payroll, Ltd., 334 F. Supp. 2d 629 (D.N.J. 2004) .............................17

Atlantica Holdings Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC, No. 12 CV 8852, 2014 WL 917055 (S.D.N.Y. Mar. 10, 2014) ...................................................................... passim

Barr v. McGraw-Hill, Inc., 710 F. Supp. 95 (S.D.N.Y. 1989)........................................................4

City of Pontiac Policemen's & Fireman's Ret. Sys. v. UBS AG 752 F.3d 173 (2d Cir. 2014)............................................................................... passim

Clarendon Nat'l Ins. Co. v. Lan, 152 F. Supp. 2d 506 (S.D.N.Y. 2001)........................................14

Cohen v. Stevanovich, 722 F. Supp. 2d 416 (S.D.N.Y. 2010) .........................................................4

Dujardin v. Liberty Media Corp., 359 F. Supp. 2d 337 (S.D.N.Y. 2005) ......................................12

Fid. & Guar. Ins. Co. v. W. Point Realty, Inc., No. 02 CIV.1951 LMM, 2002 WL 1933780 (S.D.N.Y. Aug. 21, 2002) ...............................................................................14, 15

Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002)........................................................14

Hynes v. Giambalvo, No. 09 CV 2599 ARR LB, 2011 WL 317979 (E.D.N.Y. Jan. 14, 2011) ........4

Hynes v. Giambalvo, No. 09 CV 2599 ARR LB, 2011 WL 346594 (E.D.N.Y. Jan. 31, 2011) ........4

In re Fairfield Sentry Ltd. Litig., 458 B.R. 665 (S.D.N.Y. 2011)...................................................17

In re JP Morgan Chase Secs. Litig., 363 F. Supp. 2d 595 (S.D.N.Y. 2005)...................................13

In re Merrill Lynch Auction Rate Sec. Litig., 704 F. Supp. 2d 378 (S.D.N.Y. 2010)....................10

In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig., 586 F. Supp. 2d 172 (S.D.N.Y. 2008) .................................................................................................................3

Kaess v. Deutsche Bank AG, No. 13-2364-cv, 2014 WL 3445468 (2d Cir. July 16, 2014)............11

Leema Enters., Inc. v. Willi, 575 F. Supp. 1533 (S.D.N.Y. 1983) .................................................17

Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161 (2d Cir. 2005)..................................12

Leucadia Nat'l Corp. v. FPL Grp. Capital, Inc., No. 93 CIV. 2908 (LAP), 1993 WL 464691
    (S.D.N.Y. Nov. 9, 1993) ........................................................................................4

Life Techs. Corp. v. AB Sciex Pte. Ltd., 803 F. Supp. 2d 270 (S.D.N.Y. 2011) ............13

Pelican Equity, LLC v. Brazell, No. 09 CIV. 5927 NRB, 2010 WL 3377452 (S.D.N.Y. Aug. 17,
    2010) ...................................................................................................................4

Pinker v. Roche Holdings, Ltd., 292 F.3d 361 (3d Cir. 2002)........................................16

S.E.C. v. Amerindo Inv. Advisors, Inc., No. 05 Civ. 5231(RJS), 2013 WL 1385013 (S.D.N.Y.
    Mar. 11, 2013).....................................................................................................9

S.E.C. v. Straub, 921 F. Supp. 2d 244 (S.D.N.Y. 2013)................................................16

Scottevest, Inc. v. AyeGear Glasgow Ltd., No. 12 Civ. 851 (PKC), 2012 WL 1372166 (S.D.N.Y.
    Apr. 17, 2012)......................................................................................................17

Shaw Grp. Inc. v. Triplefine Int'l Corp., 322 F.3d 115 (2d Cir. 2003) ...........................15

Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991).......................3

Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662 (2010) .............................14

Tamam v. Fransabank Sal, 677 F. Supp. 2d 720 (S.D.N.Y. 2010)...........................16, 17

Upstate Shredding, LLC v. Carloss Well Supply Co., 84 F. Supp. 2d 357 (N.D.N.Y. 2000)..........13

Vardanyan v. Close-Up Int'l, Inc., No. CV-0602243(DGT), 2007 WL 4276670 (E.D.N.Y. Nov.
    30, 2007) ..............................................................................................................4

Walden v. Fiore, 134 S. Ct. 1115 (2014) .......................................................................7

Wang v. Bear Stearns Companies LLC, No. 11 CIV. 5643, 2014 WL 1512032 (S.D.N.Y. Apr.
    16, 2014) ............................................................................................................10

Defendant "BTA Bank" JSC ("BTA") submits this reply memorandum of law in further support of its motion to dismiss the Amended Complaint filed by Plaintiffs Atlantica Holdings, Inc. ("Atlantica"), Baltica Investment Holding, Inc. ("Baltica"), Blu Funds Inc. ("Blu Funds"), Allan Kiblisky, Anthony Kiblisky, and Jacques Gliksberg (collectively, "Plaintiffs") or to stay this action in favor of arbitration.[1]

## PRELIMINARY STATEMENT

Having failed to take advantage of the Court's offer to amend, Plaintiffs now attempt to rely on artful pleading and insinuation to address the pleading defects in their Amended Complaint. As set forth below, Plaintiffs' claims remain legally deficient and should be dismissed.

First, Plaintiffs still have not sufficiently alleged facts showing that they were qualified purchasers of the Subordinated Notes and therefore lack standing. After failing to remedy this deficiency in the Amended Complaint, Plaintiffs seek to defer the issue and suggest that BTA is holding them to a heightened pleading standard. However, standing is a threshold issue, especially where Plaintiffs need only allege facts showing that they have satisfied straightforward contractual conditions that govern their standing as qualified purchasers. Plaintiffs' refusal to engage on this issue is telling and mandates dismissal.

Second, Plaintiffs remain unable to address their failure to plead a domestic transaction under the standards recently articulated by the Second Circuit. As City of Pontiac made clear,

---

[1] BTA's memorandum in support of its motion to dismiss [Dkt. No. 43] is the "Opening Brief" or "Def. Br." and Plaintiffs' Memorandum of Law in opposition thereto is referenced as "Pl. Br." The Information Memorandum and Trust Deed are attached as Exhibit 1 and 9 respectively to the Declaration of Francis Fitzherbert-Brockholes dated June 10, 2014 (the "FFB Decl.") [Dkt. No. 44]. "Subordinated Notes" and "Noteholders" have the meanings provided in the Information Memorandum. The "Transfer Restrictions" refer to the restrictions on transfer provided in the Information Memorandum and the Notes. (Def. Br. 8-9) (citing FFB Decl. Ex. 1 at 310-11). The "S-K Action" refers to the action styled Atlantica Holdings Inc., et al. v. Sovereign Wealth Fund Samruk-Kazyna JSC, No. 12 CV 8852 (S.D.N.Y.). The "S-K Decision" refers to the opinion issued by the Court denying S-K Fund's motion to dismiss. 2014 WL 917055 (S.D.N.Y. Mar. 10, 2014).

simply placing an order with a U.S. broker to purchase an interest in a foreign security listed outside the U.S. cannot domesticate a Section 10(b) claim, whether that purchase was on a foreign exchange or part of an "off-exchange" transaction.  Furthermore, the allegations regarding Atlantica and Baltica's initial acquisitions cannot establish that irrevocable liability occurred here as there is no allegation that these Plaintiffs were located anywhere other than Panama when they submitted their offers (the EIFs), and those offers were, in any event, subject to conditions precedent also occurring outside the U.S.

Third, the Section 10(b) allegations fail to state a claim.  Faced with BTA's motion, Plaintiffs do not dispute that certain alleged misstatements were only expressions of corporate optimism which are not actionable, and also cannot adequately allege reasonable reliance, loss causation or scienter based on the other allegedly false and misleading statements where the allegedly concealed facts were in fact disclosed.

Fourth, Plaintiffs are bound by the broad arbitration clause in the Trust Deed which is not limited only to disputes between BTA and the Trustee for the Notes.  Noteholders such as Plaintiffs were on notice of the arbitration requirement via the Information Memorandum -- which Plaintiffs claim to have relied to their detriment – which makes clear that any dispute arising from the Subordinated Notes would be subject to arbitration.

Finally, Plaintiffs' conclusory allegations do not establish personal jurisdiction over BTA.  BTA did not "avail" itself of the U.S. capital markets by issuing foreign securities that only could be purchased abroad and whose performance depended on BTA's operations abroad.  Nor did it domesticate those securities by simply operating a website.  Indeed, no Plaintiff can even claim to have relied on any U.S. act by BTA.  Finally, with respect to specific jurisdiction

over a securities claim, BTA's prior Chapter 15 filing cannot be a basis for jurisdiction because it was not premised on extensive U.S. contacts or contacts having anything to do with this case.

<u>ARGUMENT</u>

## I.     PLAINTIFFS LACK STANDING

As explained in the Opening Brief, the Amended Complaint fails to allege that Plaintiffs were qualified purchasers of the Subordinated Notes and therefore Plaintiffs lack standing under Section 10(b).  (Def. Br. 8-10)  After BTA raised this problem in its original motion to dismiss, the Court gave Plaintiffs the opportunity to amend their pleadings.  However, Plaintiffs chose to allege no facts to show that they were qualified purchasers.  Having done so, Plaintiffs now argue that BTA is attempting to impose a heightened pleading standard and seek to defer the question of their standing until after discovery.  (Pl. Br. 13-14)  There is no basis for deferring the issue, nor is it at all unusual to require a party whose rights emanate from contract to properly allege their standing through properly pled facts.

It is well established that "[a] plaintiff's standing to sue is necessarily the first inquiry, as 'standing is at heart a jurisdictional prerequisite to a federal court's deliberations.'"  <u>In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.</u>, 586 F. Supp. 2d 172, 178 (S.D.N.Y. 2008); <u>see also</u> <u>Shearson Lehman Hutton, Inc.</u> v. <u>Wagoner</u>, 944 F.2d 114, 117 (2d Cir. 1991) ("Because standing is jurisdictional . . . it is a threshold issue in all cases since putative plaintiffs lacking standing are not entitled to have their claims litigated in federal court.").

Plaintiffs do not dispute that the Transfer Restrictions are valid and enforceable, but contend they only need at this point to allege that they purchased the Subordinated Notes.[2]  (Pl.

---

[2] Remarkably, Plaintiffs have not even identified what specific securities they purchased.  As noted in the Opening Brief, Plaintiffs allege they purchased "subordinated debt of BTA Bank" (Am. Compl. ¶¶ 8-14), but never precisely identify *the specific securities* each Plaintiff purchased.  As set forth in the Information Memorandum, BTA issued different types of subordinated debt, including "Dollar Subordinated Notes," "Euro Subordinated Notes," "Subordinated Tenge A Notes" and "Subordinated Tenge B Notes."  (FFB Decl., Ex. 1 at 42) (definition of

Br. 14)  Plaintiffs' argument is without merit.  Plaintiffs cannot simply allege they purchased Notes when the Transfer Restrictions make clear that any transfer or "purchase" by a person that was not a qualified investor would be void *ab initio*.  Thus, Plaintiffs cannot be "actual purchasers" to the extent they were not contractually qualified investors and any purported "purchase" of an interest in the Subordinated Notes must be treated as if it never happened.[3]  Nor is there anything unusual or "heightened" about requiring Plaintiffs to sufficiently plead facts showing they could actually acquire any interest in the Notes under the Transfer Restrictions.[4] As such, courts regularly dismiss claims for lack of standing where, as here, plaintiffs do not plead facts showing that they satisfy the relevant contractual preconditions.[5]  Here, Plaintiffs nowhere allege facts showing that they purchased their alleged interest in the Subordinated Note in compliance with the Transfer Restrictions, and therefore Plaintiffs have failed to adequately allege the requisite standing to bring these claims.[6]

---

"Subordinated Notes").  Plaintiff's failure to allege specifically what subordinated debt they acquired alone warrants dismissal.  See e.g., Cohen v. Stevanovich, 722 F. Supp. 2d 416, 431 (S.D.N.Y. 2010) (dismissing for failure to plead basic details regarding stock purchase); Barr v. McGraw-Hill, Inc., 710 F. Supp. 95, 97 (S.D.N.Y. 1989) (dismissing for failure to plead adequate details regarding securities).

[3] A transfer which is void *ab initio* renders the transfer a legal nullity, depriving Plaintiffs of standing.  See Vardanyan v. Close-Up Int'l, Inc., No. CV-0602243(DGT), 2007 WL 4276670, at *1 (E.D.N.Y. Nov. 30, 2007) (transfer of shares to plaintiff was void under terms of shareholder agreement and "[b]ecause the transfer is void, plaintiff has no standing to bring this suit"); see also Hynes v. Giambalvo, No. 09 CV 2599 (ARR) (LB), 2011 WL 317979, at *5-6 (E.D.N.Y. Jan. 14, 2011) (concluding plaintiff lacks standing as he obtained his interest in the company by a transfer in violation of the company's operating agreement which rendered the transfer void), report and recommendation adopted, 2011 WL 346594 (E.D.N.Y. Jan. 31, 2011).

[4] Indeed, the "purchaser" and "seller" requirement is itself a contractual determination.  See Absolute Activist Master Value Fund, Ltd. v. Ficeto, 677 F.3d 60, 67 (2d Cir. 2012) (explaining that a "purchase" and "sale" of a security under the Exchange Act, means "entering into a binding contract to purchase or sell securities").  Thus, it is appropriate to look to cases applying basic contract principle to make the threshold determination as to Plaintiffs' standing.

[5] See, e.g., Pelican Equity, LLC v. Brazell, No. 09 CIV. 5927 NRB, 2010 WL 3377452, at *4 (S.D.N.Y. Aug. 17, 2010) (dismissing plaintiff's action against parties to the contract as "a void assignment cannot confer standing on the purported assignee") Leucadia Nat'l Corp. v. FPL Grp. Capital, Inc., No. 93 CIV. 2908 (LAP), 1993 WL 464691, at *3-4 (S.D.N.Y. Nov. 9, 1993) (dismissing claim brought by contracting party as invalid assignment meant plaintiff "does not own the contractual right upon which it attempts to sue").

[6] In a footnote, Plaintiffs suggest that other exemptions to the U.S. securities laws could permit the resale of the Subordinated Notes to the Individual Defendants.  (Pl. Br. 14 n.2)  However, no facts are alleged in the Amended Complaint that Individual Defendants purchased the Subordinated Notes under any such exemption.  Nor do Plaintiffs otherwise dispute that the Individual Defendants by definition cannot be QIBs and therefore could not

II.     **PLAINTIFFS CANNOT PLEAD THE REQUIRED DOMESTIC CONTENT UNDER <u>MORRISON</u> OR <u>CITY OF PONTIAC</u>**

Under the Second Circuit's recent holding in <u>City of Pontiac Policemen's & Fireman's Ret. Sys.</u> v. <u>UBS AG</u>, 752 F.3d 173 (2d Cir. 2014), Plaintiffs have failed to plead facts establishing that the relevant transactions were domestic for purposes of supporting a Section 10(b) claim under <u>Morrison</u>.  (Def. Br. 11-17)  Plaintiffs expend great efforts in trying to argue that <u>City of Pontiac</u> is not relevant and the Court should simply follow its prior pre-<u>City of Pontiac</u> ruling in the S-K Action.  (Pl. Br. 16-17)  Plaintiffs' labors are for naught.  This Court recognized that <u>City of Pontiac</u> "arguably affects this case" in granting S-K Fund's motion to certify its appeal of the <u>Morrison</u> question.[7]  If anything, <u>City of Pontiac</u> has only taken on added importance where Plaintiffs' amended their Complaint to allege that the relevant securities were purchased in "off-exchange" transactions.  <u>City of Pontiac</u> made clear that simply placing an order with a U.S. broker for a security created and listed outside the United States cannot domesticate a Section 10(b) claim, whether that purchase was on a foreign exchange or part of an "off-exchange" transaction.  <u>City of Pontiac</u> weighs heavily in favor of dismissing Plaintiffs' claims as to both the secondary market and initial purchases.

A.     **Plaintiffs' Secondary Market Purchases Were Not Domestic Transactions**

As set forth in the Opening Brief, Plaintiff's allegations that they placed buy orders with U.S. brokers to make secondary market purchases of foreign securities fail to satisfy <u>City of Pontiac</u>.  (Def. Br. 15-16)  Plaintiffs do not dispute that simply placing a U.S. purchase order for a foreign security is not a domestic transaction, but attempt to distinguish <u>City of Pontiac</u> by

---

legitimately purchase the Subordinated Notes on the secondary market pursuant to the Transfer Restrictions.  (Def. Br. 10)  In any case, Plaintiffs miss the point.  The issue is not whether securities were properly sold under an exemption to the U.S. securities laws, but rather whether Plaintiffs have adequately alleged facts that establish *their standing* as purported "purchasers" of Subordinated Notes.

[7] The Second Circuits' ultimate decision not to certify S-K Fund's appeal on the <u>Morrison</u> issue only indicates that the court believes its decision in <u>City of Pontiac</u> provides sufficient guidance.

alleging that they purchased the Subordinated Notes "off-exchange" rather than on a foreign exchange, and that this somehow creates a domestic transaction.  (Pl. Br. 17-18)  However, the Second Circuit did not qualify or cabin its holding in City of Pontiac to only apply to buy orders for foreign securities that are executed on a foreign exchange.  To the contrary, the Second Circuit made clear that it had "never held that the placement of a purchase order, without more, is sufficient to incur irrevocable liability…."  752 F.3d at 181 n.33.  To be sure, the buy orders at issue in City of Pontiac related to foreign securities traded on a foreign exchange, but the court's holding and reasoning are not limited to foreign exchanges.  The relevant question is not where the buy order is submitted or whether the transaction was executed on a foreign exchange, but whether the interests in the securities at issue were obtained through a foreign transaction – which could involve a foreign exchange or other alternative means.  Here, it is undisputed that the securities at issue only were ever listed on the Luxembourg and Kazakhstan exchanges (Def. Br. 5; S-K Decision at *7), and that interests in the securities only could be acquired through Direct Participants working through non-U.S. clearing systems to acquire interests in a global note held outside the U.S.[8]  (Def. Br. 15-16)  As such, the Subordinated Notes are no more "domestic" than the shares of UBS listed on the Swiss exchange in City of Pontiac.  (Id.)[9]

Plaintiffs' argument also leads to absurd results.   By Plaintiffs' logic, any party who acquires an interest in a foreign security on a foreign exchange could not state a domestic claim, but another party that subsequently acquires an interest in the very same foreign security on the

---

[8] The Subordinated Notes were represented by interests in a global note (FFB Decl., Ex. 1 at 314-15) held by and registered in the name of the Bank of New York Depository (Nominees) Limited (id., Ex. 10 at ¶ 3), functioning as the "Registered Holder" (id.) and "Common Depositary" (id., Ex. 1 at 19), "acting through its London branch" (id., Ex. 1 at 314).

[9] Plaintiffs rely upon UBS's role as a Direct Participant in processing their orders (Am. Compl. at ¶¶ 8-13), but as a Direct Participant, UBS could only obtain interests in the Subordinated Notes through the Designated Clearing Systems located outside the U.S.  (See Def. Br. 5)  The process by which Direct Participants could obtain the Subordinated Notes was set forth in the various documents which Plaintiffs possessed or had notice of and which are properly considered on a motion to dismiss.  (Id. at 16. n.16)  At a minimum Plaintiffs' failure to allege how their broker UBS acquired interests in the Subordinated Notes leaves their claims deficient.

secondary market by placing a buy order in the U.S. in a so-called "off-exchange transaction" could thereby domesticate a claim under the Exchange Act.   This ignores the reasoning of Morrison and City of Pontiac, which focused on the geographic nature of the securities at issue in limiting the extraterritorial reach of section 10(b).[10]

B.      **Atlantica and Baltica's Initial Acquisitions Were Not Domestic**

Atlantica and Baltica's initial acquisitions of Subordinated Notes are also not domestic transactions because Atlantica and Baltica are foreign plaintiffs, who purchased foreign securities that were listed on foreign exchanges, and their election to route their purchase orders (the "Electronic Instruction Forms" or "EIFs") through a U.S. broker cannot create a domestic transaction.   (Def. Br. 12-14)   Additionally, the pleadings do not establish that irrevocable liability occurred here as there is no allegation that Atlantica and Baltica were located anywhere other than Panama when they transmitted the EIFs, and those offers were, in any event, subject to conditions precedent occurring outside the U.S.   (Id.)

Plaintiffs' attempt to distinguish these foreign transactions from the reach of City of Pontiac again falls flat.   Buried in a footnote, Plaintiffs suggest that these transactions are not subject to City of Pontiac because the securities were allegedly acquired "directly from BTA and not on an exchange at all."   (Pl. Br. 19 n.4)   As an initial matter, that contradicts the documents upon which Plaintiffs' claims are founded. As even Plaintiffs concede, the documents require that any interest in the Subordinated Notes only could be acquired through a Direct Participant,

_____

[10] This outcome would also run counter to the Supreme Court's recent holding that a plaintiff's unilateral actions cannot be the basis for personal jurisdiction, which must be read with Morrison to preclude Plaintiffs from domesticating claims under the Exchange Act by simply routing buy orders through a U.S. broker to purchase foreign securities that are listed on a foreign exchange.   See Walden v. Fiore, 134 S. Ct. 1115, 1122 (2014) (to establish specific jurisdiction "the relationship must arise out of contacts that the 'defendant himself' creates with the forum State" and not those of plaintiff).   Plaintiffs make no attempt to harmonize their "off-exchange" theory with Walden.

who in turn could only acquire interests in a global note held outside the U.S.[11]  In any case, BTA was located outside the U.S. and any acquisition of an interest in these securities "directly from BTA" could not occur here.[12]  More importantly, as discussed supra at 6, simply transmitting the EIFs through U.S. brokers could not make this a domestic transaction.

Plaintiffs also unsuccessfully try to dance around their failure to allege where they were located when they transmitted the EIFs.  To the extent the EIFs created any binding agreement, that agreement and any attendant liability would have been incurred at the time and place Atlantica and Baltica transmitted the EIFs to their broker.  (Def. Br. 13-14)  Plaintiffs chose not to amend their complaint to allege where they were located when they submitted the EIFs, leaving only the allegations that they are Panamanian entities.  Plaintiffs try to side-step this issue by asserting it is the location of their broker, UBS, which is relevant because it was UBS that ultimately transmitted the EIF on Plaintiffs behalf.  (Pl. Br. 21)  But this is wholly inconsistent with the Amended Complaint where both Atlantica and Baltica allege they "unconditionally communicated [their] commitment to participate in the 2012 Restructuring by sending [their] completed Electronic Instruction Form to [their] broker in the Miami, Florida, Office of UBS Financial Services, and thereby incurred irrevocable liability…."  (Am. Compl. ¶¶ 8, 9)

In another footnote, Plaintiffs suggest that the Court should disregard the mail box rule because no court has yet had the opportunity to consider its application under <u>Morrison</u>.  (Pl. Br. 21 n.6)  But that would defy logic.  Plaintiffs do not dispute that this is a well-established precept of contract law and offer no rationale why the Court should not use that rule to guide its analysis

---

[11] <u>See</u> supra at 6.

[12] Plaintiffs cite to paragraph 39 of the Amended Complaint, which simply alleges that "Plaintiffs purchased Subordinated Notes (i) as part of the Restructuring, in exchange for their previous interest as creditors of BTA Bank…."  There is no allegation that BTA was located in the U.S. when Atlantica and Baltica initially acquired these Subordinated Notes.

under <u>Morrison</u>.  Moreover, Plaintiffs themselves rely upon a case which looked to the loci of the plaintiffs' purchase orders to establish where they incurred irrevocable liability.  (Pl. Br. 20-21) (citing <u>S.E.C.</u> v. <u>Amerindo Inv. Advisors, Inc.</u>, No. 05 Civ. 5231(RJS), 2013 WL 1385013 (S.D.N.Y. Mar. 11, 2013))  In <u>Amerindo</u>, the court recognized that the mailing of a purchase order can be the point at which irrevocable liability occurs.  <u>Id.</u> at *6-7.[13]  Finally, given the well-settled mailbox rule and the facts Plaintiffs chose to allege, this cannot now be characterized as a factual dispute beyond the reach of a motion to dismiss.  The allegations in the Amended Complaint place Plaintiffs' actions squarely off-shore and Plaintiffs cannot as a matter of law domesticate their claims based on those off-shore actions.

Furthermore, the EIF by itself could not create "irrevocable liability" because when the EIFs were submitted the 2010 Restructuring had yet to be approved and there was no binding agreement or transaction for the exchange of any Subordinated Notes.  (Def. Br. 14)  Plaintiffs contend that the Court should not even consider this argument because it was previously raised in the S-K Action, but offer no legal logic why these facts, which are clear on the face of the documents relied upon in the Amended Complaint, cannot be given effect.  The Second Circuit held in <u>Absolute Activist</u> that irrevocable liability is incurred where "the parties to the transaction are committed to one another" (677 F.3d at 68) and <u>City of Pontiac</u> makes clear that a broker is incapable of binding both parties.  Thus, it was only upon the occurrence of other conditions outside the U.S., including BTA's acceptance of the EIFs, that both parties became irrevocably bound here.

---

[13] The Second Circuit also relied on basic contract principles in <u>Absolute Activist</u> in assessing whether the plaintiffs there had adequately pled where they incurred irrevocable liability.  677 F.3d at 67 (explaining that a "purchase" and "sale" of a security under the Exchange Act, means "entering into a binding contract to purchase or sell securities[,] [which] take[s] place when the parties become bound to effectuate the transaction.").

## III.     PLAINTIFFS FAIL TO STATE A SECTION 10(b) CLAIM

As explained in the Opening Brief, Plaintiffs failed to state a claim under Section 10(b) because they did not adequately allege reliance, loss causation or scienter.  (Def. Br. 28-37)  In response, Plaintiffs' principle argument is that the Court previously found their allegations sufficient to state a claim under Section 10(b) in the S-K Action.  (Pl. Br. 34)  However, Plaintiffs do not address several arguments that were not raised or addressed by the Court in the S-K Action which demonstrate the deficiencies in the allegations here.

### A.     Plaintiffs Have Not Adequately Alleged Reliance

#### 1.     The Alleged Negative Carry Swap Was Disclosed

BTA has shown that all of the relevant facts concerning the Negative Carry Swap were detailed in the Information Memorandum.  (Def. Br. 29-30)  Plaintiffs do not dispute this, but argue that they could not possibly understand the disclosures because the Information Memorandum was too long.  (Pl. Br. 35)[14]  As the cases BTA cited establish, "the prospectuses must be read 'as a whole.'"  (Def. Br. 30)  Furthermore, Plaintiffs – especially as alleged sophisticated QIBs – cannot simply ignore the relevant disclosures regarding the very facts allegedly concealed.[15]

---

[14] Plaintiffs also attempt to rely on the Court's prior ruling in the S-K Action, but the Court's decision in that case did not consider all the specific disclosures identified in BTA's Opening Brief.  (Def. Br. 29-30)

[15] Plaintiffs also do not adequately allege reliance after they acknowledge information regarding the Negative Carry Swap was made public.  (Def. Br. 31)  Plaintiffs do not dispute that the disclosures made by J.P. Morgan were public and relevant, but argue that their failure to discover the truth is not relevant in a motion to dismiss.  (Pl. Br. 36 n.12).  However, Plaintiffs cannot rely on public "corrective" disclosures to demonstrate a correlating drop in value of the Subordinated Notes and still claim to have subsequently relied on those same misrepresentations *after* such public disclosures.  See Wang v. Bear Stearns Companies LLC, No. 11 CIV. 5643, 2014 WL 1512032, at *10 (S.D.N.Y. Apr. 16, 2014) ("sophisticated investor" could not allege reliance where purchases were made following disclosures of liquidity problems which were widely reported in the press); see also In re Merrill Lynch Auction Rate Sec. Litig., 704 F. Supp. 2d 378, 402 (S.D.N.Y. 2010) (Plaintiffs could not show reasonable reliance where relevant facts were "disclosed in several sources that were widely available and easily accessible to the Plaintiffs").

### 2.    Other Alleged Misstatements Also Are Not Actionable

The alleged misstatements referenced in paragraph 54 of the Amended Complaint are also not actionable because they were merely statements of corporate optimism.  (Def. Br. 32) Plaintiffs do not dispute this, and instead reference entirely different alleged misstatements.[16] Plaintiffs cannot rely upon one set of alleged misstatements and omissions to establish the sufficiency of a different set of alleged misstatement or omissions.  (Def. Br. 32-33)  At bottom, Plaintiffs do not and cannot dispute the statements referenced in paragraph 54 of the Amended Complaint were anything other than expression of corporate optimism or they were "*objectively* false and disbelieved by the defendant" at the time they were made.  <u>Kaess</u> v. <u>Deutsche Bank AG</u>, No. 13-2364-cv, 2014 WL 3445468, at *1 (2d Cir. July 16, 2014) (emphasis added).

### 3.    Plaintiffs Cannot Claim Reliance On Alleged Misstatements Regarding the Recovery Units

As to the Recovery Units, Plaintiffs do not dispute that the bulk of Plaintiffs' purchases occurred before the alleged misstatements regarding the Recovery Units were made and any claims related to those purchases cannot be premised on those alleged misstatements.  (Def. Br. 33-34)[17]  With respect to those purchases made after the alleged misstatements regarding the Recovery Units, Plaintiffs do not allege they relied on any of those alleged misstatements and therefore these claims also fail.[18]  (Def. Br. 34)[19]

---

[16] Instead of addressing the deficient allegations in paragraph 54 of the Amended Complaint, Plaintiffs refer to "false statements and omission in the Information Memorandum regarding, *inter alia*, the Negative Carry Swap, the distributions paid to S-K Fund by BTA Bank, and the interest rate that BTA was paying S-K Fund on current accounts."  (Pl. Br. 36-37)  However, those are not the alleged misstatements and omissions referenced in paragraph 54 of the Amended Complaint, which as general statements of corporate optimism are not actionable.

[17] The Court has already determined that to be the case in the S-K Decision and Plaintiffs concede this point.  (S-K Decision at *11; Pl. Br. 37 n.13)

[18] Plaintiffs baldly assert that any suggestion that they failed to allege they reviewed and relied on the relevant presentations is "wrong" (Pl. Br. 37), but the Amended Complaint simply does not make any such allegation.  While Plaintiffs allude to certain alleged misrepresentations in BTA's public statements in 2012, they only specifically reference the January 2012 and March 2012 presentations (Am. Compl. ¶¶ 63-64) without actually alleging they reviewed or relied upon such presentations to purchase Subordinated Notes in 2012.  Plaintiffs allege they relied on "BTA Bank's reported balance sheet and other financial information" (Am. Compl. ¶ 58) but do not specifically

Plaintiffs alternatively suggest that reliance should be presumed because BTA allegedly failed to disclose material facts.  (Pl. Br. 37-38)   However, Plaintiffs have not alleged BTA had any duty to make any particular disclosures.[20]   In any event, the relevant facts concerning potential liability on the Recovery Units were in fact disclosed in the Information Memorandum and in the referenced presentation (Starner Decl. Ex. A at 42, 45) [Dkt. No. 45].  (Def. Br. 34, 37)[21]

###   B.   Plaintiffs Have Not Adequately Alleged Loss Causation

In the Opening Brief, BTA established that Plaintiffs failed to adequately allege loss causation as their losses could have been caused by a number of other intervening factors.  (Def. Br. 34)  Plaintiffs, relying primarily on the S-K Decision suggest otherwise (Pl. Br. 38-39), but Plaintiffs' artful pleading as to loss causation has failed to distinguish what factors caused the drop in value of the Subordinated Notes.[22]  Moreover, Plaintiffs fail to address the fact that the bulk of the purchases made by Atlantica and Blu Funds occurred after the alleged "disclosures"

---

identify the referenced financial information (or any alleged misstatement therein) and thus these allegations are also insufficient.

[19] Plaintiffs also suggest the Court already addressed the issue of reliance as to the Recovery Units (Pl. Br. 37), but the pleadings in the S-K Action differ significantly from the pleadings here.  Among other things, in the S-K Action, Plaintiffs alleged they relied on a number of public statements made *by S-K Fund* in 2011.  See S-K Amended Complaint ¶¶ 51-53 [Dkt. No. 14].  Thus, the Court relied on allegations in the S-K Action which are not made here.  See S-K Decision at *11 (citing S-K Amended Complaint ¶¶ 52, 76).

[20] It is well established that "a failure to disclose material information is actionable only when the defendant had an affirmative duty to disclose these facts."  Dujardin v. Liberty Media Corp., 359 F. Supp. 2d 337, 351 (S.D.N.Y. 2005) (dismissing for failure to plead a duty to disclose alleged scheme to conceal the true and fair value of company's stock).  Plaintiffs allege no such duty here.  See Alexandra Global Master Fund, Ltd. v. Ikon Office Solutions, Inc., No. 06 CIV. 5383 (JGK), 2007 WL 2077153, at *5 (S.D.N.Y. July 20, 2007) (dismissing claims where plaintiff failed to allege a duty of disclosure to noteholders).

[21] Plaintiffs suggest that the Information Memorandum and Trust Deed failed to disclose the events related to the acceleration of the Recovery Units, which Plaintiffs assert was triggered by BTA's default in January 2012.  (Pl. Br. 38 n. 14).  Obviously, at the time the Information Memorandum and Trust Deed were issued in 2010 they could not disclose future events that only "came to pass" in 2012.

[22] Plaintiffs suggest that the existence of other factors which likely contributed to the drop in the value of the Subordinated Debt cannot defeat loss causation at the pleading stage.  (Pl. Br. 39 n.15)  However, where the other risks discussed in the Information Memorandum also "materialized," Plaintiffs must adequately "distinguish" or "apportion" the loss between the alleged misrepresentations and other "salient factors."  Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 177 (2d Cir. 2005).

12

related to the "Negative Carry Swap" caused a drop in the price of BTA's debt, and thus no loss

causation has been stated as to these purchases.  (Def. Br. 35)

### C.    Plaintiffs Have Not Adequately Alleged Scienter

As above, Plaintiffs rely on the S-K Decision to support their pleading of scienter.  (Pl.

Br. 39)  However, as noted, relevant facts concerning the Negative Carry Swap and the Recovery

Units were in fact adequately disclosed in the Information Memorandum and in the relevant

2012 presentations.  (Def. Br. 36-37)  Plaintiffs also do not dispute that the statements referenced

in paragraph 54 of the Amended Complaint are merely statements of corporate optimism and do

not establish a strong inference of scienter.  (Id.)  Plaintiffs' suggestion that BTA was motived

"to ensure that its 97% majority shareholder S-K Fund would obtain hundreds of millions of

dollars" is also illogical.  (Pl. Br. 40)  Plaintiffs do not dispute that it makes little sense for BTA

to "doom" itself to ensure short term gains for S-K Fund and Plaintiffs have accordingly failed to

adequately plead the requisite scienter.[23]

## IV.    PLAINTIFFS CLAIMS ARE SUBJECT TO ARBITRATION

To the extent Plaintiffs acquired any interest in the Subordinated Notes, they acquired

those interests subject to the broad arbitration clause in the Trust Deed which requires that these

claims be arbitrated in London.  (Def. Br. 17-18)  Plaintiffs concede they are bound by the Trust

Deed, but contend that the arbitration clause is not applicable to them.  (Pl. Br. 25-26)[24]

---

[23] See In re JP Morgan Chase Secs. Litig., 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005) (allegations that the defendant risked substantial sums of money by participating in an allegedly fraudulent scheme yielding nominal returns defy economic reason and do not give rise to a plausible inference of scienter).

[24] Plaintiffs halfheartedly assert that they are not "party or signatories to the Trust Deed" (Pl. Br. 24-25), but concede (as they must) that they are bound by the Trust Deed.  (Pl. Br. 25); see also (Def. Br. 20-21)  In any case, it is well established that non-signatories can be bound by contracts and arbitration clauses in those contracts under a number of different circumstances.  See, e.g., Life Techs. Corp. v. AB Sciex Pte. Ltd., 803 F. Supp. 2d 270, 273-74 (S.D.N.Y. 2011) ("A nonsignatory may be estopped from avoiding arbitration where it knowingly accepted the benefits of an agreement with an arbitration clause."); Am. Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (2d Cir. 1999) ("A party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause."); Upstate Shredding, LLC v. Carloss Well Supply Co., 84

Contrary to Plaintiffs' argument, the arbitration clause in the Trust Deed is not limited to disputes between BTA and the Trustee for the Notes.  It states: "Any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non-contractual obligations arising out of or in connection with this Trust Deed)" shall be referred to arbitration in London.  (FFB Decl. Ex. 9 at 75)  As Plaintiffs are admittedly bound by Trust Deed, the broadly worded arbitration clause contained in that agreement also applies to Plaintiffs.  See Clarendon Nat'l Ins. Co. v. Lan, 152 F. Supp. 2d 506, 521 (S.D.N.Y. 2001) (non-signatory bound by broad arbitration clause); see also Fid. & Guar. Ins. Co. v. W. Point Realty, Inc., No. 02 CIV.1951 LMM, 2002 WL 1933780, **4-5 (S.D.N.Y. Aug. 21, 2002) (concluding that broadly worded arbitration clause applied to non-signatory).[25]  Consistent with this, the Information Memorandum upon which Plaintiffs claim to have relied to their detriment echoes this broad agreement to arbitrate and placed all potential Noteholders on notice they would have to arbitrate any dispute they might have with BTA.  (FFB Decl., Ex. 1 at 118)  It would make little sense for BTA to put potential purchasers of Subordinated Notes on notice regarding an arbitration clause that did not apply to Noteholders.[26]

Finally, the arbitration clause in the Subordinated Notes cannot be read in isolation.  The terms of the Subordinated Notes must be read together with the Trust Deed and the Information Memorandum to determine what was intended here (and what the Noteholders could reasonably

---

F. Supp. 2d 357, 365 (N.D.N.Y. 2000) ("a nonsignatory party may be bound to an arbitration agreement 'if so dictated by the ordinary principles of contract and agency.'").

[25] The cases cited by Plaintiffs to suggest they should not be bound by the arbitration clause in the Trust Deed are inapposite. (Pl. Br. 25)  In Howsam v. Dean Witter Reynolds, Inc., the court merely recognized that courts generally determine questions of arbitrability but that an arbitrator should interpret an arbitration's procedural rules.  537 U.S. 79, 85 (2002).  Likewise, the court in Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp. assessed whether an arbitration clause provided for class arbitration, which is not at issue here.  559 U.S. 662, 684 (2010).

[26] There also is nothing controversial about the Trustee being given certain procedural rights upon commencement of arbitration.  Indeed, issuers regularly agree to provide Trustees for noteholders certain specific rights that are not extended to individual noteholders.

expect).  See Fid. & Guar. Ins. Co., 2002 WL 1933780, at *5 (reading two agreements together

to conclude that non-signatory was intended to be bound by arbitration clause); see also Shaw

Grp. Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 124 (2d Cir. 2003) (in interpreting arbitration

agreements court is "obliged to give 'full meaning and effect to all of [contract's] provisions.'").

As noted, the arbitration clause in the Trust Deed makes clear that any claims against BTA are

subject to arbitration, and Noteholders were also put on notice in the Information Memorandum

– the document that Plaintiffs rely on for purposes of their claims – that any dispute (including

"any non-contractual obligations arising out of or in connection with [the Notes or Trust Deed]")

would be subject to arbitration.  Thus, terms of the Subordinated Notes must be read broadly to

give effect to the arbitration clause and also remain consistent with the Trust Deed and the

Information Memorandum.

## V.        THE COURT LACKS PERSONAL JURISDICTION OVER BTA

As explained in the Opening Brief, Plaintiffs' conclusory allegations do not establish

personal jurisdiction over BTA.  (Def. Br. 24-28)  In response, Plaintiffs argue that they have

sufficiently alleged a basis for specific jurisdiction because BTA "purposefully availed itself" of

the U.S. capital markets, directly communicated with investors in the U.S. and previously filed a

Chapter 15 bankruptcy proceeding in the U.S.  Plaintiffs' arguments are without merit.[27]

First, BTA did not "avail" itself of the U.S. capital markets such that it is subject to

specific jurisdiction here.  The 2010 Restructuring occurred outside the U.S. and the mere fact

that certain qualified purchasers in the U.S. could acquire interests in the Subordinated Notes in

transactions outside the U.S. does not change this.  Plaintiffs have not identified a single case

where a court found jurisdiction over a foreign issuer who issued securities that were listed on a

---

[27] Plaintiffs suggest that, having found jurisdiction over S-K Fund, the Court is bound to find jurisdiction over BTA.
(Pl. Br. 28)  But, S-K Fund falls under the purview of the FSIA, and this Court did not assess personal jurisdiction
under the normal constitutional analysis.  See S-K Decision at *12 n.5.

foreign exchange simply because qualified U.S. investors could acquire an interest in such foreign securities.[28]   That BTA was aware that certain qualified U.S. investors could acquire interests in the Subordinated Notes is not the same as taking active steps to facilitate their trade.[29]   As even the cases cited by Plaintiffs recognize, mere "foreseeability" of potential effects in the U.S. is insufficient.  S.E.C. v. Straub, 921 F. Supp. 2d 244, 255 (S.D.N.Y. 2013).[30]

Second, Plaintiffs' attempt to rely upon BTA's alleged "direct communications" with investors in the U.S. is also flawed.  Yet again, Plaintiffs attempt to rely upon artful pleading and insinuation.  Plaintiffs assert that BTA distributed the Information Memorandum to its creditors and investors in the United States, including Plaintiffs.  (Pl. Br. 30)  But this is inconsistent with the actual allegations in the Amended Complaint.   Plaintiffs allege that the Information Memorandum was distributed by BTA to "existing creditors, including Atlantica and Baltica, as well as to potential investors" (Am Compl. ¶ 30), but do not allege the Information Memorandum was distributed by BTA in the United States.   Similarly, Plaintiffs allege the Information Memorandum "was mailed directly to Plaintiffs' brokers at the UBS Miami Office" (id.), but do not allege who mailed the Information Memorandum.   Thus, the only remaining allegation is that the Information Memorandum was made available on a website, which is not enough to subject BTA to personal jurisdiction here.[31]

---

[28] The only case Plaintiffs cite for this proposition is an out of circuit case where the Court concluded the defendant purposefully availed itself of the U.S. securities market when it set up an ADR facility in the U.S. to facilitate domestic trading of securities here.  Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 371 (3d Cir. 2002).  There is no allegation that BTA ever set up such U.S. based trading here.

[29] Furthermore, as noted supra at 6, U.S. investors could only acquire an interest in the Subordinated Notes through Designated Participants via transactions outside the U.S. subject to the Transfer Restrictions.

[30] Similarly, simply denominating a foreign security offering in U.S. dollars does not constitute "purposeful availment" of the U.S. capital markets or otherwise create a relevant contact with the U.S. for purposes of establishing personal jurisdiction.  See Tamam v. Fransabank Sal, 677 F. Supp. 2d 720, 729 (S.D.N.Y. 2010) (dismissing for lack of personal jurisdiction and noting that "given the worldwide availability of U.S. currency, it does not follow that New York (or even the United States) is essential to the provision of said currency.").

[31] Plaintiffs' attempt to distinguish the cases cited in the Opening Brief is unavailing.  (Pl. Br. 30-31)  These cases recognize that accessibility of a website in the forum is not a sufficient basis for jurisdiction where, as here, the

Third, Plaintiffs' attempt to rely on the prior Chapter 15 proceeding is also flawed. Plaintiffs do not dispute that as a statutory matter, a foreign entity's Chapter 15 proceeding cannot be used as a basis for personal jurisdiction in a separate proceeding such as this.  (Def. Br. 24 n. 24)  Plaintiffs nonetheless seek to circumvent this prohibition by suggesting BTA's Chapter 15 filing is still relevant to the Court's analysis.  Plaintiffs have not identified any legal authority to support this argument which runs directly contrary to the statute.  In any case, BTA's Chapter 15 filing only highlighted BTA's lack of relevant connections to the U.S.  See In re Fairfield Sentry Ltd. Litig., 458 B.R. 665, 679 (S.D.N.Y. 2011) (explaining the limited and ancillary nature of Chapter 15 proceedings).[32]

Finally, exercising personal jurisdiction over BTA would not be reasonable here.  As discussed in the Opening Brief, the U.S. does not have a compelling interest in adjudicating claims where the contacts are so tenuous and all the relevant acts by BTA took place abroad. Plaintiffs do not really dispute this, but suggest that the reasonableness inquiry is "largely academic" and contend that exercising jurisdiction over BTA would be reasonable because it's a large institution and already has counsel here.  (Pl. Br. 33-34)  That BTA may be a large bank does not change the fact that it's a Kazakh company without any offices or operations here, which weighs against the exercise of jurisdiction.  Similarly, retention of counsel in the U.S.

---

relevant commercial transactions were not conducted on the website.   See Scottevest, Inc. v. AyeGear Glasgow Ltd., No. 12 Civ. 851 (PKC), 2012 WL 1372166, at *3 (S.D.N.Y. Apr. 17, 2012) (website does not support jurisdiction because no relevant "business transactions" took place on website); Ameripay, LLC v. Ameripay Payroll, Ltd., 334 F. Supp. 2d 629, 634-35 (D.N.J. 2004) (website does not support jurisdiction because no contracts could be executed online and any interactive features were restricted or non-commercial in nature).  Moreover, during the relevant period, access to the website was restricted to those who certified they were eligible investors. (FFB Decl. ¶ 8)  Even to the extent Plaintiffs dispute the limited accessibility of the Information Memorandum on the website, there is no allegation that Plaintiffs actually accessed the website and it was also not foreseeable that non-eligible investors would access the website.

[32] The Chapter 15 filing shows that BTA's de minimis contacts with the U.S. consist of a correspondent bank account and some creditors, which falls far short of the necessary contacts to establish personal jurisdiction here. See Tamam, 677 F. Supp. 2d at 727 ("courts in this district have routinely held that merely maintaining a New York correspondent bank account is insufficient to subject a foreign bank to personal jurisdiction"); Leema Enters., Inc. v. Willi, 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983) (concluding that mere maintenance of correspondent bank accounts in the forum is not enough to establish personal jurisdiction).

cannot be a basis for personal jurisdiction.  Any foreign entity can retain counsel in the U.S. and that clearly says nothing about whether they should be haled into court here.

## CONCLUSION

For the foregoing reasons, BTA respectfully requests that an order be made dismissing the Amended Complaint in its entirety or staying this action and compelling Plaintiffs to arbitrate their claims.

Dated:  New York, New York
        August 1, 2014

WHITE & CASE LLP

By:     /s/ Gregory M. Starner
        Gregory M. Starner (GS1719)
        Owen C. Pell (OP0118)
        Joshua B. Elmore (JE2080)

        1155 Avenue of the Americas
        New York, New York 10036
        (212) 819-8200

        Attorneys for Defendant
        "BTA Bank" JSC