UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
ATLANTICA HOLDINGS, INC. et al.,                                        :
                                                                        :
                                        Plaintiffs,                     :       13-CV-5790 (JMF)
                                                                        :
                -v-                                                     :       OPINION AND ORDER
                                                                        :
BTA BANK JSC,                                                           :
                                                                        :
                                        Defendant.                      :
                                                                        :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       This is the second of two related securities fraud cases pending before this Court arising out of the restructuring of Defendant BTA Bank JSC ("BTA Bank" or the "Bank"), one of the largest banks in the Republic of Kazakhstan. Plaintiffs are Atlantica Holdings, Inc. ("Atlantica"), Baltica Investment Holding, Inc. ("Baltica"), and Blu Funds, Inc. ("Blu Funds"), all Panamanian corporations, and Allan Kiblisky, Anthony Kiblisky, and Jacques Gliksberg, all United States Citizens. They purchased subordinated debt securities in BTA Bank, and allege that the Bank violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j, and Rule 10-b. (Am. Compl. (Docket No. 32)).

       Pursuant to Rules 12(b)(1), 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, the Bank seeks to dismiss the Amended Complaint (the "Complaint") in its entirety for lack of subject-matter jurisdiction, lack of personal jurisdiction, and failure to state claim upon which relief can be granted. (Docket No. 42). In the alternative, the Bank seeks to compel arbitration pursuant to the Federal Arbitration Act ("FAA"). (*Id.*). For the reasons explained below, the motion is GRANTED in part and DENIED in part.

**BACKGROUND**

The facts relevant to this motion, taken from the Complaint and assumed to be true, *see, e.g.*, *Kalnit v. Eichler*, 264 F.3d 131, 135 (2d Cir. 2001), can be summarized briefly.[1] As noted, Plaintiffs purchased subordinated debt securities in BTA Bank between 2010 and 2012 in connection with two debt and capital restructurings that the Bank underwent during that period. (Am. Compl. ¶¶ 8-14). The Bank's first restructuring was completed in 2010 (the "2010 Restructuring" or "Restructuring"), and followed the Bank's announcement in April of the previous year that it had ceased payment of principal on all of its outstanding financial obligations. (*Id.* ¶¶ 28-29). As part of that restructuring, the Bank issued Subordinated Notes to its existing debt-holders, including Plaintiffs Atlantica and Baltica, in exchange for their prior interests in the bank. (*Id.* ¶¶ 34, 36). Although Plaintiffs do not allege that the Notes were ever listed on a United States exchange, they do allege that the Notes were issued in the United States in an exempt offering, and that the Notes could be re-sold to certain qualified purchasers in the United States in private, off-exchange transfers. (*Id.* ¶¶ 34, 37-38). Further, 80% of the Notes were denominated in United States dollars, and 17% of those were purchased by United States investors. (*Id.* ¶ 35).

In connection with the 2010 Restructuring, the Bank distributed an Information Memorandum to its existing creditors and potential new investors, and posted it online. (Am. Compl. ¶¶ 30-31). Plaintiffs contend that the Information Memorandum was materially misleading it two ways. First, it allegedly failed to disclose a scheme that Plaintiffs call the "Negative Carry Swap," in which the Sovereign Wealth Fund Samruk-Kazyna (the "S-K Fund"),

---

[1] The Court's opinion in *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC* ("*Atlantica I*"), familiarity with which is assumed, contains a longer description of the background of this case. 2 F. Supp. 3d 550 (S.D.N.Y. 2014).

2

a fund owned and operated by the Republic of Kazakhstan and the Bank's majority shareholder at all times relevant to this action (not to mention, the defendant in the related action), "siphon[ed] hundreds of millions of dollars from BTA Bank" by concealing improper dividends as interest payments. ( *Id.* ¶¶ 27, 33, 40-47, 47). When the truth about the Negative Carry Swap came to light, Plaintiffs allege, the value of the Subordinated Notes plummeted. (*Id.* ¶ 52). Second, the Information Memorandum stated that the Bank believed the Restructuring (1) would allow the Bank to achieve "the necessary levels of capital ratios" because of the "liquidity support" that would be provided by S-K Fund, (2) would enable the Bank to "continue as a going concern," and (3) was undertaken by S-K fund "with a goal of maximizing long term value." (*Id.* ¶¶ 54-55).

Contrary to the Information Memorandum's predictions, however, the 2010 Restructuring did not end the Bank's financial woes. In January 2012, less than two years after the 2010 Restructuring was completed, the Bank defaulted on its debt obligations, requiring it to undergo a second restructuring (the "2012 Restructuring"). ( *Id.* ¶ 57). Plaintiffs allege that the Bank made additional material misrepresentations in the period leading up to the second restructuring. Specifically, Plaintiffs assert that the Bank improperly concealed its liability for "Recovery Units" that had been issued to some of the Bank's creditors in connection with the 2010 Restructuring. (*Id.* ¶ 59). The Recovery Units entitled those creditors to 50% of the assets that the Bank was seeking to recover from its previous management team. (*Id.* ¶ 61). If, however, the Bank defaulted on its senior debt — according to Plaintiffs, a virtual certainty — the units became an unconditional $5 billion obligation. (*Id.*¶¶ 61-62). Plaintiffs allege that when this information was disclosed, the value of the Subordinated Notes fell even further, to less than 10% of their face value. (*Id.* ¶¶ 52, 65).

Based on these alleged misrepresentations, Plaintiffs sued the S-K Fund for securities fraud in December 2012.  (Case No. 12-CV-8852 (JMF), Docket No. 1).  Plaintiffs did not name BTA Bank as a defendant at that time because it was a debtor in a then-pending bankruptcy case.  (Am. Compl. ¶ 7).  In May 2013, the S-K Fund moved to dismiss the other case, arguing that S-K Fund was entitled to sovereign immunity, that the Complaint failed to state a claim under federal securities law because it did not allege any domestic transactions, and that the Complaint failed to adequately allege reliance, loss causation or *scienter*.  (Case No. 12-CV-8852 (JMF), Docket No. 15).  By Opinion and Order entered March 10, 2014, the Court rejected most of the S-K Fund's claims, including its claim of foreign sovereign immunity.  (*Id.*, Docket No. 28).  The S-K Fund appealed the Court's decision on sovereign immunity, and the case is currently stayed pending resolution of that appeal.  (*Id.*, Docket No. 35).  In August 2013, about a month after the Bank was discharged from Bankruptcy, Plaintiffs filed this lawsuit.  (Docket No. 1; Am. Compl. ¶ 7).

## LEGAL STANDARDS

A plaintiff bears the burden of establishing a court's personal jurisdiction over a particular defendant.  *See, e.g.*, *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).  In the absence of discovery or an evidentiary hearing, a plaintiff seeking to defeat a motion to dismiss pursuant to Rule 12(b)(2) for absence of personal jurisdiction need only make a prima facie showing that jurisdiction exists.  *See, e.g.*, *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005).  Such a showing "entails making 'legally sufficient allegations . . . ,' including 'an averment of facts that, if credited, would suffice'" to establish that jurisdiction exists.  *Penguin Grp.*, 609 F.3d at 35 (quoting *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)).  A court must therefore "view[] all facts in the light

4

most favorable to the non-moving party." *TradeComet.com LLC v. Google, Inc.*, 647 F.3d 472, 475 (2d Cir. 2011).

A Rule 12(b)(6) motion, by contrast, tests the legal sufficiency of the allegations in a complaint. *See ATSI Commnc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). A claim will survive a 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant acted unlawfully," *id.*, and cannot rely on mere "labels or conclusions" to support a claim. *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

Finally, because they allege securities fraud, Plaintiffs must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the PSLRA, which requires that *scienter* — that is, a defendant's "intention to deceive, manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted). To satisfy Rule 9(b), a plaintiff "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). To satisfy the PSLRA, a complaint must, "'with respect to each act or

5

omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(2)).

## DISCUSSION

In its motion to dismiss, the Bank argues that: (1) Plaintiffs lack standing; (2) the Court lacks personal jurisdiction over the Bank; (3) Plaintiffs' claims are subject to arbitration; (4) Plaintiffs fail to state a claim for securities fraud because they do not allege a domestic transaction; and (5) Plaintiffs have not adequately pleaded reliance, loss causation, or *scienter*. (Docket Nos. 42, 43). The Court will address each of those arguments — some of which do little more than rehash claims previously made unsuccessfully by the S-K Fund — in turn.

### A.     Standing

As a threshold matter, Defendant contends that Plaintiffs lack standing because the Subordinated Notes could be transferred only subject to certain conditions, which Plaintiffs allegedly fail to satisfy. (Def. "BTA Bank" JSC's Mem. Law Supp. Its Mot. To Dismiss Or Stay Favor Arbitration ("Def.'s Mem.") (Docket No. 43) 8-10). Specifically, the Information Memorandum stated that the Notes would bear a legend limiting the investors who could obtain an interest in BTA Bank through the initial exchange to non-US persons, Accredited Investors or Qualified Institutional Buyers ("QIBs"). Further, only non-US persons or QIBs could obtain Notes in the secondary market. (Def.'s Mem. 8; Decl. Francis Fitzherbert-Brockholes (Docket No. 18) ("FFB Decl."), Ex. 1 at 311). The Bank argues that, because Plaintiffs do not allege that they are non-US persons, Accredited Investors, or QIBs, Plaintiffs' purchases of the Subordinated Notes are void and they lack standing to pursue their claims. (Def.'s Mem. 8-10;

Def. "BTA Bank" JSC's Reply Mem. Law Further Supp. Its Mot. To Dismiss Or Stay Favor Arbitration ("Def.'s Reply") (Docket No. 58) 3-4).

In support of its argument, the Bank cites cases (1) upholding transfer restrictions imposed on securities, (2) recognizing that only purchasers or sellers of securities may bring a lawsuit for securities fraud, and (3) holding that a void contract cannot confer standing. (Def.'s Mem. Law 8-10 (citing, *e.g.*, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739 (1975) (only actual purchasers or sellers may sue); *Drexel Burnham Lambert Grp., Inc. v. Galadari*, No. 84-CV-2602 (CMB), 1987 WL 6164 (S.D.N.Y. Jan. 29, 1987) (validity of transfer restrictions)); Def.'s Reply 3-4 n.3 (citing, *e.g.*, *Vardanyan v. Close-Up Int'l, Inc.*, No. 06-CV-22243 (DG), 2007 WL 4276670, at *1 (E.D.N.Y. Nov. 30, 2007) (transfer that had been voided cannot confer standing))). Notably, however, it does not cite (and the Court is not aware of) a single case requiring the plaintiffs in a securities fraud case to allege in their complaint that they have satisfied any transfer restrictions on the instrument that they purchased. Plaintiffs allege that they purchased Subordinated Notes in BTA Bank (Am. Compl. ¶¶ 8-14) and that they were "qualified purchasers" pursuant to SEC Rule 144A. (*Id.* ¶ 37). That is sufficient at this stage of the litigation.

**B.     Personal Jurisdiction**

As noted, the Bank also challenges the Court's personal jurisdiction. The Exchange Act grants federal courts the authority to exercise personal jurisdiction over a particular defendant to the full extent permitted under the Fifth Amendment's Due Process Clause. *See, e.g.*, *SEC v. Unifund Sal*, 910 F.2d 1028, 1033 (2d Cir. 1990); *see also Corning, Inc. v. Shin Etsu Quartz Prods. Co., LTD.*, 242 F.3d 364 (2d Cir. 2000) (unpublished). The due process analysis "consists of two separate components: the 'minimum contacts' inquiry and the 'reasonableness'

inquiry." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012). The minimum contacts test asks whether a defendant has engaged in "purposeful availment" — *i.e.*, whether the contacts indicate the defendant's intent to invoke the benefits and privileges of United States law. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-75 (1985). Because the Exchange Act authorizes nationwide service of process, "the minimum-contacts test . . . looks to contacts with the entire United States rather than with the forum state." *SEC v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) (internal quotation marks omitted). The second part of the due process analysis asks "whether the assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice — that is, whether it is reasonable under the circumstances of the particular case." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (internal quotation marks omitted).

BTA Bank challenges the Court's exercise of jurisdiction under both the minimum contacts and the reasonableness prongs of the due process analysis. (Def.'s Mem. 24-27). With regard to the minimum contacts question, the Complaint states that the Bank "directed misstatements and omissions . . . at Plaintiffs and their agents in [the Southern District of New York]" and "knew that its public representations in the Information Memorandum regarding its financial condition would be disseminated throughout the United States." (Am. Compl. ¶ 21). Defendant seeks to undercut the significance of these allegations by claiming that the Complaint contains "*no* particularized allegations as to *how* BTA directed any statements at investors." (Def.'s Mem. 24-25 (emphasis added)). That contention, however, ignores the Complaint's assertions not only that the Bank made the Information Memorandum available to all creditors and potential investors (including those within the United States) on its website, but also that the

8

memorandum was mailed directly to Plaintiffs' brokers in Miami.  (Am. Compl. ¶ 30).[2]  Defendant asks the Court to disregard those allegations, citing cases that have held that the "mere maintenance" of an informational website or sending of a letter alone is insufficient to establish personal jurisdiction.  (Def.'s Mem. 25 & n. 25 (citing, among others, *In re DaimlerChrysler AG Sec. Litig.*, 247 F. Supp. 2d 579, 584 (D. Del. 2003); *Phat Fashions, LLC v. Phat Game Athletic Apparel, Inc.*, No. 00-CV-0201 (JSM), 2001 WL 1041990, at *4 (S.D.N.Y. Sept. 7, 2001)).  But even if those cases apply, Plaintiff alleges additional contacts.[3]

    Plaintiffs emphasize, for example, that 80% of the securities issued in connection with the 2010 Restructuring were denominated in United States dollars.  (Am. Compl. ¶ 35).  That allegation alone may be insufficient to establish personal jurisdiction, *see, e.g.*, *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 733 (S.D.N.Y. 2010), but Plaintiffs also claim that BTA Bank "offered securities for sale in [the Southern District of New York], and payments on those securities were made and were to be made in th[at] District."  (Am. Compl. ¶ 22).  Defendant contends that "the mere fact that certain qualified purchasers in the U.S. could acquire interests in the Subordinated Notes in transactions outside the U.S." does not grant the Court personal jurisdiction.  (Def.'s Reply 15).  The Court agrees, but the Complaint alleges that BTA Bank allowed the Subordinated Notes to be transferred in private, off-exchange transactions in order

---

[2]     Defendants' contention that the Complaint does not state who mailed the Information Memorandum to the broker in Miami borders on frivolous.  (Def.'s Mem. 25 n. 25).  It is clear from context that Plaintiffs assert that BTA Bank or its agents mailed it.

[3]     Further, some of the cases that Defendant cites analyze the New York long-arm statute, which is not co-extensive with the Due Process Clause.  *See Licci*, 673 F.3d at 60-61 ("The New York long-arm statute does not extend in all respects to the constitutional limits established by *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.").  (Def.'s Mem. 25 n.25 (citing *Phat Fasions*, 2012 WL 1041990, at *4 (explaining in the context of the New York long-arm statute that "[m]ere telephone, mail, or email contacts will normally not suffice)).

"*to facilitate* such transfers . . . in the secondary market *in the United States*." (Am. Compl. ¶ 38 (emphasis added)).  It may well be that the evidence will show that BTA Bank did not intentionally target the U.S. market.  The only question at this stage of the litigation, however, is whether Plaintiffs have made a *prima facie* showing that BTA Bank has sufficient contacts with the United States to justify the Court's exercise of personal jurisdiction over it.  Considering Plaintiffs' allegations as a whole, the Court finds that they have.[4]

The Bank also contends that exercising personal jurisdiction over it would be unreasonable because "BTA is a Kazakh Bank with no U.S. offices or business operations" and "there is not a strong U.S. interest in adjudicating claims related to a transaction involving foreign securities issued by a foreign bank and not listed on any U.S. exchange." (Def.'s Mem. 27).  But "[t]he reasonableness inquiry is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process because of the strong federal interests involved." *SEC v. Syndicated Food Servs. Int'l, Inc.*, No. 04-CV-1303 (NGG) (ALC), 2010 WL 3528406, at *3 (E.D.N.Y. Sept. 3, 2010) (internal quotation marks omitted).  Further, "the burden is on the defendant to show that jurisdiction in this forum will 'make litigation so gravely difficult and inconvenient that [it] unfairly is at a severe disadvantage in comparison to [its] opponent.'" *Donoghue v. Dicut, Inc.*, No. 01-CV-10194 (NRB), 2002 WL 1728539, at *2 (S.D.N.Y. July 24, 2002) (quoting *Burger King Corp. v. Rudzewick*, 471 U.S. 462, 478 (1985)).  The Bank has not met that burden here.  *See, e.g.*, *Porina v. Marward Shipping Co., Ltd.*, No. 05-CV-5621 (RPP), 2006 WL 2465819, at *8 (Aug. 24, 2006) (noting that requiring a foreign

---

[4]      Because the Court finds that the alleged contacts suffice, it need not reach Plaintiffs' argument that the Court may also consider BTA Bank's filing of a bankruptcy petition as a relevant contact with the United States.  (Pl.'s Mem. Law Opp'n Def. BTA Bank JSC's Mot. To Dismiss Or Stay Favor Arbitration (Docket No. 56) 31-33).

company which did not have significant business contacts with the United States to litigate in New York would pose a "substantial" burden, but that, given "the conveniences of modern communication and transportation," the burden would not be "overwhelming" (internal quotation marks omitted)).

**C.     Arbitration**

Next, Defendant argues that Plaintiffs' claims are subject to arbitration pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, 330 U.N.T.S. 38 (Dec. 29, 1970), *reprinted at* 9 U.S.C. § 201 (the "New York Convention"), and the FAA.  (Def.'s Mem. 17-24).[5]  The FAA provides that, where a petition to compel arbitration is filed, "[t]he court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4; *see also id.* § 206 (stating that under the New York Convention, "[a] court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement").[6]  The FAA thus "leaves no place for the exercise of discretion by a district

---

[5]     The Notes provided that "[T]he Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law."  (Decl. Francis Fitzherbert-Brockholes (Docket No. 44) ("FFB Decl."), Ex. 1 at 599).  Although that provision could indicate that the question of whether the dispute is arbitrable should be governed by English law, both parties rely exclusively on American law.  Accordingly, any argument that English law applies has been waived, at least for purposes of this motion.  *See Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) ("[E]ven when the parties include a choice-of-law clause in their contract, their conduct during litigation may indicate assent to the application of another state's law."); *Buffalo Sports Enterprises LLC v. Dalrada Fin. Corp.*, No. 04-CV-1029S (WMS), 2011 WL 4345688, at *2 (W.D.N.Y. Sept. 15, 2011) ("Defendants have neither disputed Plaintiff's argument that New York law should govern, nor brought the [California choice-of-law] clause to the Court's attention.  In the context of choice-of-law clauses, this constitutes a waiver.").

[6]     The codification of the New York Convention in Chapter 2 of the FAA includes a provision applying Chapter 1 of the FAA to actions arising under the Convention "to the extent

11

court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Severstal U.S. Holdings, LLC v. RG Steel, LLC*, 865 F. Supp. 2d 430, 438-39 (S.D.N.Y. 2012) (internal quotation marks and emphasis omitted). Accordingly, when one party brings a petition to compel arbitration, "the role of courts is limited to determining two issues: (i) whether a valid agreement or obligation to arbitrate exists, and (ii) whether one party to the agreement has failed, neglected or refused to arbitrate." *Jacobs v. USA Track & Field*, 374 F.3d 85, 88 (2d Cir. 2004) (internal quotation marks omitted).

The threshold "question of arbitrability" — that is, whether the matter is subject to arbitration at all — "is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (internal quotation marks omitted). Pointing to the broad arbitration clause in the Trust Deed (the "Trust Deed Arbitration Clause") — which provides that "[a]ny claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed . . . shall be referred to and finally settled by arbitration," (Def.'s Mem. 18; FFB Decl., Ex. 9 at 75) — Defendant argues that the arbitrator should decide whether the dispute is arbitrable. (Def.'s Mem. 21-22 (citing, *e.g.*, *Shaw Grp., Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120-21 (2d Cir. 2003); *Bell v. Cendant Corp.*, 293 F.3d 563, 569 (2d Cir. 2002))). As Plaintiffs note, however (*see* Pls.' Mem. 24-27), they did not sign the Trust Deed, which is a contract between the Bank and BNY Corporate Trustee Services Limited (the "Trustee"). (FFB Decl., Ex. 9 at 1,

---

that [Chapter 1] is not in conflict with this chapter or the Convention as ratified by the United States." 9 U.S.C. § 208. Accordingly, the language of Title 9, United States Code, Section 4 and cases analyzing that section are applicable to this action.

82).  *Cf. Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 733, 780 (2d Cir. 1995) ("A nonsignatory may not be bound to arbitrate except as dictated by some accepted theory under agency or contract law."); *Adelphia Recovery Trust v. Bank of Am., N.A.*, No. 05-CV-9050 (LMM), 2009 WL 2031855, at *9 (S.D.N.Y. July 8, 2009) (holding that non-signatories are not bound by an arbitration clause).  Defendant points to the Subordinated Notes' incorporation clause, which provides that: "The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them."  *See Clarendon Nat. Ins. Co. v. Lan*, 152 F. Supp. 2d 506, 520-21 (S.D.N.Y. 2001).  (FFB Decl., Ex. 1 at 588).  But the Notes themselves contain their own arbitration clause ("Notes Arbitration Clause").  That clause is nearly identical to the Trust Deed Arbitration Clause, with one important caveat: It makes the obligation to arbitrate unilateral by specifying that "[*t*]*he Bank* agrees that any claim . . . shall be referred to . . . arbitration" and making no mention of a reciprocal commitment on the part of the Notesholders.  (*Id.* at 600 (emphasis added)).  Given the differences between the two arbitration clauses, the Court cannot find that the parties "clearly and unmistakably" agreed that the arbitrator should decide the question of arbitrability.[7]

Whether Plaintiffs' claims are arbitrable is a closer question.  Defendant believes the dispute is arbitrable because the Trust Deed Arbitration Clause is broad and because the Information Memorandum explained that claims "arising out of or in connection with" the Subordinated Notes would be referred to arbitration.  (Def.'s Mem. 22-23; FFB Decl., Ex. 1 at 118).  Plaintiffs correctly point out, however, that the Information Memorandum was not a contract binding on them.  (Pls.' Mem. 23-24).  Further, as discussed above, while the Trust

---

[7]   Notably, Defendant does not repeat its argument that the arbitrator should decide the question of arbitrability in its reply.  (*See* Def.'s Reply 13-15).

Deed Arbitration Clause, in isolation, would seem to encompass all disputes, the Notes Arbitration Clause binds only the Bank. Interpreting the two clauses together, the Court concludes that the narrower clause indicates that the parties did not intend to obligate the Notesholders to arbitrate. *Cf. Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir. 2002) ("[U]nder normal circumstances, when an agreement includes two dispute resolution provisions, one specific . . . and one general . . . the specific provision will govern those claims that fall within it."); *State of N.Y. v. Oneida Indian Nation of N.Y.*, 90 F.3d 58, 62 (2d Cir. 1996) ("[T]he arbitration clause, read as a whole, evinces the parties' intent to exclude the type of claim at issue here from mandatory arbitration"). That conclusion is reinforced by the fact that (1) the Notes' incorporation provision applies only to those portions of the Trust Deed "applicable to the [Notesholders]"; and (2) both the Terms and Conditions of the Notes and the Trust Deed provide that *the Trustee* may, at his sole option, elect that the dispute should be heard in the English courts, and that *the Trustee* shall select one of the arbitrators. (FFB Decl., Ex. 1 at 588, 600; *id.*, Ex. 9 at 75).

**D.     Extraterritoriality**

In *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), the Supreme Court held that Section 10(b) of the Exchange Act applies only to "transactions in securities listed on domestic exchanges" and "domestic transactions in other securities." *Id.* at 267. Plaintiffs do not argue that this case falls within the first category. (*See* Pls.' Mem. 15-21). Defendant contends that it does not fall within the second either. (Def.'s Mem. 11-17).

Relying on *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012), which held that "facts suggesting that irrevocable liability was incurred or title was transferred within the United States" were sufficient to allege "a domestic securities transaction,"

14

*id.* at 69, the Court rejected a nearly identical argument in *Atlantica I*. *See Atlantica I*, 2 F. Supp. 3d at 559-61. Here, as in *Atlantica I*, Plaintiffs allege that Atlantica and Baltica "unconditionally communicated [their] commitment to participate in the 2010 Restructuring by sending . . . completed 'Electronic Instruction Form[s]' [("EIFs")] to [their] broker[s] in the Miami, Florida, Office of UBS Financial Services, and thereby incurred irrevocable liability to accept the subordinated debt in the 2010 Restructuring in the United States." (Am. Compl. ¶¶ 8-9). UBS then "transmitted the order to its U.S. broker-dealer, where funds from a bank account [Plaintiff] maintained at the UBS Miami office were transferred to UBS's back office in Stamford, Connecticut, where the order was filled and the transaction was completed." (Am. Compl. ¶¶ 8-13).

BTA Bank makes two arguments for why the Court should revisit its prior conclusions, neither of which is convincing.[8] First and foremost, the Bank argues that intervening Second Circuit precedent — *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014), and *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198 (2d Cir. 2014) (per curiam) — dictates a different result in this case. (Def.'s Reply 5-8; Def.'s Sept. 2, 2014 Ltr. (Docket No. 59)). In *City of Pontiac*, the Second Circuit held that "the mere placement of a buy order in the United States for the purchase of foreign securities on a foreign exchange" is insufficient for the plaintiffs to have incurred irrevocable liability in the United States. 752 F.3d at 181. The Court's decision hinged on the fact that, although the order was placed in the United States, it was "then *executed* on a foreign exchange," and that the

---

[8]  Defendant also argues that the EIF could not create "irrevocable liability" because there were conditions precedent that had to be fulfilled before the transaction became binding. (Def.'s Mem. 14-15). The Court, however, rejected that argument in *Atlantica I*, 2 F. Supp. 3d at 559-61, and reaffirms that ruling here for the same reasons.

Supreme Court in *Morrison* had explained that the Exchange Act was not intended to regulate foreign exchanges. *Id.* (emphasis added).  In this case, however, the initial purchases were not executed on a foreign exchange.  Defendant itself concedes that an interest in the Subordinated Notes could be acquired only through a direct participant — here, Plaintiffs' broker in Miami.  (Def.'s Reply 7-8).  And the Complaint alleges that the secondary market transactions were completed in Connecticut.  (Am. Compl. ¶¶ 8-13).  Thus, as in *Atlantica I*, Plaintiffs allege that they incurred irrevocable liability in the United States.  *City of Pontiac* therefore does not apply.

*Parkcentral* is even less on point.  In that case, the plaintiffs had purchased "securities-based swap agreements" whose price was pegged to the price of shares of Volkswagon AG ("VW") stock (which was not traded on a U.S. exchange).  763 F.3d at 201.  The plaintiffs alleged that the foreign defendants had made misleading statements about their intentions with regard to VW (mostly, but not entirely, outside of the United States), upon which they relied in making their swap agreements.  *See id.* at 201.  Neither the defendants nor VW had any involvement with the swaps themselves.  Under those circumstances, the Court held, even if the purchase of the swaps was a domestic transaction, the claims were "so predominantly foreign" that the Exchange Act did not apply.  *Id.* at 216.  The Court was careful, however, to cabin its holding to the facts of the case presented.  It emphasized that its conclusion "depend[ed] in some part on the particular character of the unusual security at issue" and cautioned that the Court "express[ed] no view on whether [it] would have reached the same result if the suit were based on different transactions."  *Id.* at 201-02.  Given the differences in the nature of the securities involved in *Parkcentral* from the Subordinated Notes at issue here, that case does not alter the Court's conclusion that Plaintiffs have adequately pled that the Exchange Act applies.

Second, with respect to the initial purchases by Atlantica and Baltica, Defendant argues that irrevocable liability, if incurred at all, would have arisen at the time and place where the companies sent their EIFs to their brokers. (Def.'s Mem. 13). More specifically, because Atlantica and Baltica are Panamanian corporations and the Complaint does not allege that the EIFs were transmitted within the United States, BTA Bank argues that the Court cannot infer that the EIFs were sent from within the United States and must conclude, applying the so-called "mailbox rule," that irrevocable liability was incurred abroad. (Def.'s Mem. 13). But the main case that the Bank cites for the proposition that the "mailbox rule" applies here turned on the particular language of the agreements at issue. (Def.'s Mem. 13 (citing *S.E.C. v. Benger*, No. 09-CV-676 (JNC), 2013 WL 593952, at *9-10 (holding that irrevocable liability was incurred at the place where the investor sent its Stock Purchase Agreement to its broker because the Agreement explicitly provided that the liability was incurred when it was "*submit[ted]* to the Escrow Agent" (emphasis added)))). In this case, Defendant has not pointed to — and the Court is not aware of — any provision of the EIF stating that it became binding when sent. In fact, several provisions of the EIF appear to indicate otherwise — namely, that irrevocable liability was incurred when the direct participant (here, the Miami broker) sent the EIF. (*See, e.g.*, Information Mem. 81, *available at* http://bta.kz/files/IM_2010.pdf ("Only Direct Participants may submit Electronic Instruction Forms. If a Euronoteholder or Beneficial Owner is not a Direct Participant, it must arrange for the Direct Participant through which it holds Euronotes to submit an Electronic Instruction Form on its behalf to the relevant Clearing System prior to the deadline specified by the relevant Clearing System and the Voting Instructions Deadline.")). Accordingly, and in light of the Court's obligation to draw all inferences in Plaintiffs' favor, the Court declines to depart from its prior holding on the basis of the mailbox rule.

**E.     Pleading of 10(b) Claim**

Finally, as the S-K Fund did in *Atlantica I*, Defendant argues that Plaintiffs have not adequately pleaded reliance, loss causation, or *scienter*, as required to state a claim under Section 10(b).  *See Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005).  (Def.'s Mem. 28-37).  Substantially for the reasons stated in *Atlantica I*, the bulk of those arguments fail.  *See* 2 F. Supp. 3d at 561-63.  With regard to the alleged misrepresentations about the Recovery Units, however, the Court agrees with BTA Bank — as it did in *Atlantica I* — that there is no claim that any Plaintiffs other than Atlantica and Blu Funds bought Subordinated Notes after the misrepresentations about the Units occurred.  (Def.'s Mem. 33-34; Am. Compl. ¶¶ 58-59 & Ex. A).  Accordingly, to the extent the Complaint can be construed as stating claims based on those misrepresentations on behalf of the other plaintiffs, those claims are DISMISSED.

In light of *Atlantica I*, only one of Defendant's arguments requires discussion here.  Specifically, Defendant contends that some of the alleged misrepresentations in the Information Memorandum — namely, the statements that the Bank expected the 2010 Restructuring to allow it to continue as a "going concern" and to achieve the "necessary capital ratios," and that S-K fund aimed to "maximize[] [the Bank's] long term value" — are mere "expressions of corporate optimism" upon which Plaintiffs were not entitled to rely.  (Def.'s Mem. 32-33 (citing, *e.g.*, *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996)); Am. Compl. ¶ 59).  But statements regarding future performance *are* actionable if "they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them."  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004) (internal quotation marks omitted); *see, e.g.*, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 111-12 (2d Cir. 2011) (recognizing that

18

statements of opinion can be actionable "if they misstate the opinions or beliefs held, or, in the case of statements of reasons, the actual motivation for the speaker's actions, *and* are false or misleading with respect to the underlying subject matter they address"). Plaintiffs' Complaint claims that the Bank's projections of the effects of the 2010 Restructuring, as well as its statements about S-K's motivations, were false, and that, "at the time they were made, BTA Bank knew they were false." (Am. Compl. ¶ 55). While BTA Bank claimed the 2010 Restructuring was intended to benefit the Bank and its creditors, Plaintiffs allege that it was actually designed solely to benefit S-K Fund and that the Bank never expected the Restructuring to significantly improve its financial outlook. (*See, e.g.*, Am. Compl. ¶¶ 4, 43-44, 47-48). Although Plaintiffs may well far short of carrying their burdens at later stages of the litigation, those allegations are sufficient to survive a motion to dismiss.

## CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is DENIED in part and GRANTED in part. Specifically, the motion is DENIED except insofar as the Complaint states claims arising out of statements in 2011 or later on behalf of Baltica and the individual Plaintiffs.

The Clerk of Court is directed to terminate Docket No. 42.

SO ORDERED.

Date: January 12, 2015
New York, New York

JESSE M. FURMAN
United States District Judge

19